[ORAL ARGUMENT NOT YET SCHEDULED]

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NICOLAS TALBOTT, et al.,

      Plaintiffs-Appellees,

v.

      No. 25-5087

UNITED STATES OF AMERICA, et al.,

      Defendants-Appellants.

## EMERGENCY MOTION FOR IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL

YAAKOV M. ROTH
*Acting Assistant Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
*Attorneys, Appellate Staff*
*Civil Division, Room 7252*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Amanda.L.Mundell@usdoj.gov*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..........................................................................................ii

INTRODUCTION AND SUMMARY .......................................................1

BACKGROUND.....................................................................................2

ARGUMENT ......................................................................................11

I.     The Government Is Likely To Prevail On The Merits...................11

       A.     The 2025 Policy Complies With Equal Protection...............11

       B.     The District Court's Analysis Is Fundamentally Flawed ....18

II.    The Injunction Is Overbroad.........................................................26

III.   The Equitable Factors Favor A Stay ............................................26

CONCLUSION ...................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(a), the undersigned counsel certifies as follows:

### A.    Parties and *Amici*

This is an appeal from a preliminary injunction and a denial of a motion to dissolve a preliminary injunction of the U.S. District Court for the District of Columbia.

Appellants are the United States of America, Peter B. Hegseth, Daniel Driscoll[1], United States Department of the Army, John Phelan[2], United States Department of the Navy, Gary Ashworth, United States Department of the Air Force, David J. Smith[3], and the Defense Health Agency. These entities and individuals appeared as defendants before the district court.

---

[1] Daniel Driscoll (Secretary of the Army) was automatically substituted for Mark F. Averill, who has since left the position and who appeared as a defendant in district court.

[2] John Phelan (Secretary of the Navy) was automatically substituted for Terence Emmert, who has since left the position and who appeared as a defendant in district court.

[3] David J. Smith (Acting Director of the Defense Health Agency) was automatically substituted for Telita Crosland, who has since left the position and who appeared as a defendant in district court.

Appellees are Nicholas Talbott, Erica Vandal, Kate Cole, Gordon Herrero, Dany Danridge, Jamie Hash, Koda Nature, Cael Neary, Miriam Perelson, Clayton McCallister, Greyon Shishkina, Audrie Graham, Roan Pickett, Quinn Tyson, Amiah Sale, Minerva Bettis, Samuel Ahearn, Regan Morgan, Vera Wolf, Michelle Bloomrose, Hunter Marquez, Sean Kersch-Hamar, Kelsey Orth, Taylor Maiwald, Sabrina Bruce, C.J. Dulaney, Micah Jacqueline Gross, Austin Converse, Nathalie Richter, Beck Simpson, Clara Winchell, and Ashley Davis. These individuals also appeared as plaintiffs before the district court.

Constitutional Accountability Center, the State of Vermont, the State of Washington, Frank Kendall, and Christine Wormuth appeared as *amici* in district court.

## B.    Rulings Under Review

Appellants seek review of the March 18, 2025, opinion and order of the district court (Reyes, J.) granting plaintiffs a preliminary injunction that bars the government from implementing the U.S. Department of Defense's policy regarding gender dysphoria. *See* Dkt. Nos. 88, 89. The district court's unpublished opinion is also available at 2025 WL 842332.

Appellants also seek review of the March 26, 2025, opinion and order of the district court (Reyes, J.) denying the government's motion to dissolve the preliminary injunction. *See* Dkt. No. 100. The district court's unpublished opinion is also available at 2025 WL 914716.

## C.    Related Cases

There are no currently pending related cases in this Court that raise the same issue presented on appeal here.

The following out-of-circuit cases present the same or similar challenges as this appeal:

*Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.)

*Ireland v. Hegseth*, No. 25-cv-01918 (D.N.J.)

Respectfully submitted,

 */s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorney, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

March 2025

iv

## INTRODUCTION AND SUMMARY

For decades, the military generally barred individuals with gender dysphoria from serving. As recently as 2019, the Supreme Court and this Court allowed the military to do so. After then-Secretary of Defense Mattis issued a 2018 policy presumptively disqualifying individuals with gender dysphoria from service, the Supreme Court and this Court permitted the policy to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019) (staying preliminary injunction pending appeal); *Doe 2 v. Shanahan*, 755 F. App'x 19, 22, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why the Mattis Plan complies with … [ ]equal protection"). The policy challenged here mirrors the Mattis policy in all relevant respects. Yet the district court below enjoined it anyway, on a worldwide basis. This Court should stay the preliminary injunction.

Gender dysphoria is a medical condition associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning caused by incongruence between a person's sex and the gender with which he or she identifies. Gender dysphoria,

1

like other psychiatric conditions, limits deployability and imposes additional costs on the military.  At a minimum, there is a rational basis for the military to treat individuals with gender dysphoria differently.

The district court, however, substituted its judgment for that of the military, reasoning that the Constitution likely precludes the military from treating gender dysphoria as a disqualifying medical condition.  The court issued a worldwide preliminary injunction barring the Department of Defense from implementing its policy.

The government respectfully requests a stay pending appeal and an immediate administrative stay by March 28 at 7:00 P.M., when the district court stay expires.  Absent this relief, the military will be forced to continue implementing a policy that the Department has determined is not compatible with military readiness and lethality.[1]

## BACKGROUND

1.     Individuals seeking to join or continue serving in the military must meet medical requirements, which are designed to ensure that servicemembers are "capable of performing duties," free of conditions that "may reasonably be expected to require excessive time lost from duty for

---

[1] Plaintiffs oppose this motion.

necessary treatment or hospitalization," and "adaptable to the military environment without geographical area limitations." U.S. Dep't of Def. Instr. 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022). These requirements mean that the vast majority of Americans between ages 17 and 24—that is, 71%—are ineligible to join the military for mental, medical, or behavioral health reasons.

For decades, these standards presumptively barred individuals with gender dysphoria. Instruction 6130.03, vol. 1, at 27, 48; *Doe 2 v. Shanahan,* 917 F.3d 694, 709 (D.C. Cir. 2019) (Williams, J., concurring in the result). In 2016, the Department of Defense revised its policy, as directed by then-Secretary Carter. *See Doe 2,* 917 F.3d at 710-11. Under this revision, "individuals not suffering from gender dysphoria or undergoing gender transition were eligible for service—*only* in their biological sex." *Id.* at 710. Individuals diagnosed with gender dysphoria while serving could continue to serve if they met deployability standards but had to serve in their sex "until their transition was 'complete.'" *Id.* at 710-11.

3

For accessions into the military, a history of "gender dysphoria" and "gender transition" would be disqualifying unless the individual had "been stable without clinically significant distress or impairment" for 18 months. *Id.* (quotation marks omitted).

In 2017, the Department began an extensive review of military service by trans-identifying individuals, as directed by then-Secretary Mattis. *Doe 2,* 917 F.3d at 730 (Williams, J., concurring in the result). That months-long process, involving a "panel of experts" that conducted "a comprehensive study," culminated in a new policy in 2018. *Id.* at 714, 730. As with the Carter policy, the Mattis policy required all individuals "without a history or diagnosis of gender dysphoria to serve in their biological sex," with limited exceptions. *Id.* at 711. The Mattis policy "presumptively disqualified for accession purposes individuals with a 'history' of 'gender dysphoria' unless they were stable" for 36 months. *Id.* "For retention purposes, individuals 'diagnosed with gender dysphoria after entering into service [could] be retained if they [did] not require a change of gender and remain deployable within applicable retention standards.'" *Id.*

Although there were various legal challenges to the Mattis policy, the Supreme Court and this Court ultimately permitted the Mattis policy to take effect. *Karnoski*, 586 U.S. at 1124 (staying preliminary injunction pending appeal); *Doe 2*, 755 F. App'x at 22, 25 (vacating the preliminary injunction).

In 2021, then-President Biden issued Executive Order 14004 permitting trans-identifying individuals to serve openly and directing then-Secretary Austin to develop a process by which servicemembers "may transition genders" and to "prohibit involuntary separations … on the basis of gender identity." 86 Fed. Reg. 7471, 7471-7472 (Jan. 28, 2021). Under the Austin policy, a history of "gender dysphoria" was disqualifying unless the individual had been stable for 18 months, and a history of hormones or genital surgery was disqualifying unless certain conditions were met. Instruction 6130.03, vol. 1, at 28, 30, 46, 52. The Austin policy recognized that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness," but nonetheless permitted "in-service transitions." U.S. Dep't of

Def., Instr. 1300.28, *In-Service Transition for Transgender Service Members*, at 3, 7 (Apr. 30, 2021).

2.   In January 2025, President Trump revoked Executive Order 14004, 90 Fed. Reg. 8237, 8238 (Jan. 28, 2025), and issued Executive Order 14183 stating that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion," and "uniformity," among other traits, and that this "policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." 90 Fed. Reg. 8757 (Feb. 3, 2025). The Order directed the Department to update its medical standards. *Id.* at 8757-58.

3.   On February 26, the Department announced its new policy. Add.99-111. Recognizing the need for servicemembers who can "meet the high standards for military service and readiness without special accommodations," the policy explains that "[m]ilitary service" by those "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria … is not in the best interests of the Military Services." Add.101.

Under the policy, applicants and servicemembers "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender

dysphoria" or "who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery" are disqualified. Add.104-106. But these individuals "may be considered" for a "waiver on a case-by-case basis where there is a compelling Government interest," and they (1) "demonstrate[] 36 consecutive months of stability," (2) "demonstrate[] that [they have] never attempted to transition" to a different sex, and (3) are "willing and able to adhere to all applicable standards, including the standards associated with [their] sex." Add.104-106, 198-199.

Servicemembers who are no longer eligible for service "will be processed for administrative separation" and "provided full involuntary separation pay." Add.106-107. Characterization of their service "will be honorable except where [their] record otherwise warrants a lower characterization." Add.101.

The 2025 policy was "informed through consideration of" "prior [Department] studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria," among other things. Add.115. In particular, the Department considered

the report underlying the Mattis policy, "[a] 2021 review conducted by [the Department's] Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity," a "2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs," and a review of cost data.  Add.115-16.

4.    Plaintiffs are trans-identifying current and aspiring servicemembers.  *See* Dkt. No. 69, at 7-46.  They allege that the Executive Order and the 2025 policy violate equal protection.  *Id.* at 68-69.

5.    The district court entered a preliminary injunction on March 18, barring the government from implementing the Executive Order and the 2025 policy and directing the Department to "continue Plaintiffs' military statuses" "pending further order."  Add.1-2.

The court concluded that plaintiffs' equal-protection challenge was likely to succeed.  Add.42-77.  The court characterized the 2025 policy as a broad ban without meaningful exemption.  Add.4 n.2, 23-24.  The court then declined to apply military deference and concluded that intermediate scrutiny applied because the policy classifies based on "transgender status," which the court equated with sex discrimination, and because "transgender persons are a quasi-suspect class."  Add.54-60.

The court discounted the evidence on which the Department relied. Add.61. The court characterized the Mattis report's findings as "outdated" and faulted the Department for failing to consider the impact of service by "persons with gender dysphoria" who "have been deployed under the Austin Policy." Add.61-62, 65. The court also questioned the Department's reliance on the 2021 review and 2025 medical literature review. Add.28-31, 61-62.

The court also concluded that the policy was motivated by animus. That determination rested primarily on language in the Executive Order and the court's characterization of the policy as a blanket ban on trans-identifying people serving in the military. Add.67-77.

The court determined that, absent injunctive relief, plaintiffs would suffer irreparable harms in the form of lost employment, income, and medical care, and that the government would not be harmed by an injunction maintaining the status quo. Add.78-79.

The court temporarily stayed its injunction. Add.2; *see also* Minute Order (Mar. 21, 2025) (extending the stay).

6.  On March 21, the Department issued "guidance to assist the Military Departments in identifying" for separation those servicemembers with a history, diagnosis, or symptoms consistent with gender dysphoria. Add.200. The guidance makes clear that "[t]he phrase 'exhibit symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders," and that "[t]his language applies only to individuals who exhibit … symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." Add.200 n.2.

7.  Defendants moved to dissolve the preliminary injunction in light of this new guidance. On the evening of March 26, the district court denied the motion to dissolve and defendants' request for a stay pending appeal, but stayed the injunction until March 28 at 7:00 P.M. Add.83-98. The court repeated its characterization of the policy as "broad enough to cover people who do not have gender dysphoria" regardless of the meaning of the phrase "exhibit symptoms consistent with gender dysphoria." Add.96.

10

## ARGUMENT

In considering a stay pending appeal, this Court examines "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted).

## I.    The Government Is Likely To Prevail On The Merits

### A.    The 2025 Policy Complies With Equal Protection

1.    As this Court recognized in permitting the Mattis policy to take effect, the "Constitution vests [t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force exclusively in the legislative and executive branches." *Doe 2*, 755 F. App'x at 24 (quotation marks omitted). Accordingly, the 2025 policy merits highly deferential review.

Although the military is subject to constitutional constraints, "the tests and limitations to be applied may differ because of the military context." *Doe 2*, 755 F. App'x at 24 (quoting *Rostker v. Goldberg*, 453 U.S.

11

57, 67 (1981)). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). The same is true for decisions as to "the composition and internal administration of combat-ready military forces." *Doe 2*, 755 F. App'x at 24; *see also, e.g.*, *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) ("It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference.").

When "applying this standard in *Rostker*, the Supreme Court concluded that a facially discriminatory, sex-based draft-registration statute was 'not invidious, but rather realistically reflect[ed] the fact that the sexes [were] not similarly situated.'" *Doe 2*, 755 F. App'x at 25 (quoting *Rostker*, 453 U.S. at 79). The Supreme Court reaffirmed this standard in *Trump v. Hawaii*, 585 U.S. 667, 704 (2018), when it applied "rational basis review" and stressed that judicial "inquiry into matters of … national security is highly constrained," even when evaluating a "'categorical' …

classification that discriminate[s] on the basis of sex," *id.* at 703-04 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)).

2.    The 2025 policy easily satisfies this deferential standard. As Secretary Mattis explained, generally allowing individuals with a history of gender dysphoria or related medical interventions to serve poses "substantial risks" and would "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Add.120. The military's interest in avoiding those harms is compelling: Courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted), and the Department has concluded that minimizing these risks is "absolutely essential," Add.120. Therefore, the only issue is whether this Court should defer to the military's judgment that this presumptive disqualification is not just rationally related to, but actually "necessary" to, furthering that critical interest. Add.121. That is not a close question.

13

a.  Military Readiness.  As the Department explained, service by individuals with a history of gender dysphoria or related medical interventions poses at least two significant risks to military readiness.  First, the Department was concerned about subjecting these individuals to the unique stresses of miliary life.  Add.143, 164.  Gender dysphoria is characterized by clinically significant distress or impairment in functioning, and the military must consider the "risk of exacerbation if [a servicemember with gender dysphoria] were exposed to trauma or severe operational stress."  Add.156.  That judgment is also reflected in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria absent proof that they had "been stable without clinically significant distress or impairment" for 18 months.  *See Doe 2,* 917 F.3d at 710 (quotation marks omitted); Instruction 6130.03, vol. 1, at 52.

Additionally, the Department had reasonable concerns about the "considerable scientific uncertainty concerning whether [cross-sex hormones and sex-reassignment surgery] fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria."  Add.154; *see* Add.143-149.  A 2025 medical literature review conducted

by the Office of the Assistant Secretary of Defense for Health Affairs in-
dicated that "[t]he strength of the evidence" on gender dysphoria and re-
lated medical interventions "is low to moderate." Add.188. Although
Secretaries Carter and Austin were more willing to tolerate these risks,
there is no constitutional requirement that the current Secretary of De-
fense must hew to the risk tolerance of his predecessors. *See* Instruction
1300.28, at 3, 7 (Austin policy recognizing challenges associated with "in-
service transitions"); Add.149 (explaining that the RAND report under-
lying the Carter policy cautioned that "it is difficult to fully assess the
outcomes of treatment" for gender dysphoria).

Second, sex-reassignment-related interventions could render ser-
vicemembers "non-deployable for a potentially significant amount of
time." Add.157. As the Department noted, "[a] 2021 review conducted
by [the Department's] Psychological Health Center of Excellence and the
Accession Medical Standards Analysis and Research Activity" "found
that nearly 40% of Service members with gender dysphoria in an ob-
served cohort were non-deployable over a 24 month period." Add.115. In
addition to being inherently problematic, these limits on deployability

would have harmful effects on units as a whole: any increase in the number of non-deployable servicemembers requires those who can deploy to bear "undue risk and personal burden," which "negatively impacts mission readiness." Add.157 (quotation marks omitted); *see also* Add.115.

b. <u>Unit Cohesion and Good Order and Discipline.</u> Additionally, the Department determined that exempting individuals from sex-based standards would undermine the critical objectives served by those rules, namely, "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality." Add.150. "Given the unique nature of military service, Service members … [must] often … live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." Add.159. To protect privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women." Add.159; *see United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (recognizing that it is "necessary to afford members of each sex privacy from the other sex in living arrangements"). Permitting individuals to serve inconsistently with applicable sex-based standards imposes irreconcilable privacy demands on the military. Add.159.

The Department was also concerned that exempting servicemembers from sex-based standards in training and athletic competitions would be unfair. Add.148. In *Rostker*, the Supreme Court deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to … physical standards." 453 U.S. at 81 (quotation marks omitted). As this Court recognized, "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Doe 2*, 755 F. App'x at 25 (quoting *Rostker*, 453 U.S. at 81).

Similarly, the Department was concerned that exempting servicemembers from uniform and grooming standards would create friction in the ranks, as other servicemembers may wish to be exempted from sex-based "uniform and grooming standards as a means of expressing their own sense of identity." Add.153; *cf. Goldman v. Secretary of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that it cannot make exceptions … for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly"), *aff'd sub nom.* 475 U.S. 503 (1986).

17

c.  Disproportionate Costs.  The Department noted that medical interventions related to gender dysphoria were "disproportionately costly on a per capita basis."  Add.163; *see also* Add.116.  Even when alleged constitutional rights are involved, decisions by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" deserve significant deference.  *Middendorf v. Henry*, 425 U.S. 25, 45 (1976).

## B.    The District Court's Analysis Is Fundamentally Flawed

The district court erred in concluding that plaintiffs are likely to prevail on their claim that the Constitution precludes the military from treating gender dysphoria as a disqualifying medical condition.

1.    The court's order hinged on its mischaracterization of the 2025 policy.  *See* Add.23-25.  As this Court concluded, the Mattis policy was not a "blanket ban" despite excluding individuals with "gender dysphoria or who are unwilling to serve in their biological sex."  *Doe 2*, 755 F. App'x at 23-24.  The same is true here.  The 2025 policy, like the Mattis policy, excludes individuals based on a medical condition (gender dysphoria) or related medical interventions, and requires individuals to serve in

18

their sex.  The 2025 policy also permits individuals with a history of gender dysphoria to be considered for waivers, "provided there is a compelling Government interest in retaining the Service member," they "demonstrate 36 consecutive months of stability," have "never attempted to transition to any sex other than their sex," and are "willing and able to adhere to" "the standards associated with the Service member's sex."  Add.106, 198-199.

The district court mistakenly relied on language used in a brief social media post by Secretary Hegseth.  *See* Add.23.  But that post merely shared a link to a news article and repeated the headline.[2]   It did not "announce[]" anything, much less anything inconsistent with the terms of the policy itself.  Add.23.

The court also faulted the waiver process as applying to "[v]irtually no one."  Add.24.  But the waiver criteria mirror some of the requirements of service under the Mattis policy, which also required 36 months of stability for accessions and required servicemembers to serve in their sex, with limited exceptions.  *Doe 2,* 917 F.3d at 711 (Williams, J., concurring

---

[2]  Pete Hegseth (@PeteHegseth), X (Feb. 27, 2025, 11:52 AM), https://perma.cc/ESD3-TJ82.

in the result). And even if the district court were correct that nobody could satisfy the waiver criteria, *but see id.* (observing that not all trans-identifying individuals "seek to transition to their preferred gender or have gender dysphoria"), that would not alter the fact that this policy, like the Mattis policy before it, does not turn on one's identity but rather on objective facts and conduct: whether a person has gender dysphoria or has undergone related medical interventions, and whether a person is willing to abide by applicable sex-based standards.

The district court was equally mistaken to presume that the 2025 policy "capture[s] persons who have never had gender dysphoria" because it covers individuals who also "exhibit symptoms *consistent with*[] gender dysphoria." Add.63, 71 (quotation marks omitted). The Department explained that this language "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria, *i.e.*, "a marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." Add.200 n.2. The district court's decision (Add.96) to brush this explanation aside only underscores why the court's injunction was based on a misunderstanding of the 2025 policy.

20

2.    The district court erred in applying intermediate scrutiny, reasoning that the policy classifies based on sex and targets a quasi-suspect class. As explained above, the military's judgment about the composition of the military warrants great deference. *Goldman*, 475 U.S. at 507. In any event, the 2025 policy, like the Carter, Mattis, and Austin policies, draws lines based on a medical condition (gender dysphoria) and related medical interventions, and not identity or status. Such classifications receive only rational-basis review. *See, e.g.*, *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001).

3.    The court erred in undertaking its own review of the evidence and concluding that it does not support the policy. Add.26-33. The Supreme Court has explained that "in the area of military affairs," courts must be "particularly careful not to substitute" their "own evaluation of evidence for a reasonable evaluation" by the political branches. *Rostker*, 453 U.S. at 67-68. As the Supreme Court explained in *Hawaii*, judicial "inquiry into matters of … national security is highly constrained." 585 U.S. at 704.

In the military context, the Supreme Court has accepted concerns about "administrative problems" and post hoc justifications as sufficient

21

to uphold military policies—even when sex-based classifications are involved. *Rostker*, 453 U.S. at 81 (quotation marks omitted); *see id.* at 74-75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975) (upholding sex-based mandatory-discharge requirements for naval officers based on what "Congress may … quite rationally have believed").  It has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including testimony from current and former military officials.  *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63.  And it has granted the political branches wide latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510.

For instance, the Supreme Court in *Goldman* rejected an argument that the Air Force had "failed to prove that a specific exception for [the] practice of wearing an unobtrusive yarmulke would threaten discipline" and "that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from actual experience or a scientific study in the record, and is contradicted by expert testimony."  475 U.S. at 509.  The Court did not

question whether the Air Force's judgment rested on adequate evidence, deeming it sufficient that the issue had been "decided by the appropriate military officials" in their "considered professional judgment." *Id.*

In any event, the district court's evaluation ignored the ample evidence in the 44-page report underlying the Mattis policy, which the Department relied on in issuing the 2025 policy. Add.115. The court reasoned that the Mattis report does not support the 2025 policy because the Department did not assemble and analyze data from the past four years of the Austin policy. Add.27-28. But nothing required the Department to do so. In making determinations about composition of the force, the Department considers the long-term risks and consequences of service by individuals with medical conditions. *See* Instruction 6130.03, vol. 1, at 4-5. That judgment takes into account not only the current status and severity of a particular medical condition, or how controlled it has been over the past four years, but also how it may progress over time or lead to other complications in the future, such as side effects from treatment or potential comorbidities. The Mattis report and the conclusions of the panel of experts who conducted "a comprehensive study" are thus entitled to military deference and reasonably support the 2025 policy. *Doe 2,* 917

23

F.3d at 714, 730 (Williams, J., concurring in the result).  Indeed, this Court has already "acknowledge[d] that the military has substantial arguments [based on the Mattis report] for why the Mattis Plan complies with … [ ]equal protection principles." *Doe 2*, 755 F. App'x at 25.

The court further erred in faulting the Department's reliance on certain medical literature reviews because some of the data could cut different ways and because some data was not available.  Add.28-33.  These reviews also contain findings that support the Department's 2025 policy.  *See* Add.188 ("The strength of the evidence on transgender mental health and gender-affirming care is low to moderate." (emphasis omitted)); Add.115 (data underscoring readiness risks and deployability limitations associated with gender dysphoria).  That these studies contain data that could cut in different ways is no reason to discredit the military's judgment and its conclusions about the level of risk it is willing to tolerate.

4.    Finally, the court erred in concluding that the policy is based on animus.  Add.65-75.  The court relied primarily on the Executive Order in reaching this conclusion, Add.68, 70, but the operative policy is the Department's 2025 policy, so the Executive Order is irrelevant.

24

Regardless, plaintiffs have not demonstrated animus. The Executive Order, which focuses on "ensur[ing] the readiness and effectiveness of our Armed Forces," 90 Fed. Reg. at 8757, does not show that the Department's 2025 policy "lack[s] any purpose other than a 'bare ... desire to harm a politically unpopular group,'" *Hawaii*, 585 U.S. at 705 (second alteration in original). It is not "impossible to discern a relationship to legitimate [government] interests' or that the policy is 'inexplicable by anything but animus.'" *Id.* at 706. As explained, the 2025 policy furthers the government's important interests in military readiness, unit cohesion, good order and discipline, and avoiding disproportionate costs.

The court concluded that the military's concerns regarding gender dysphoria were pretextual because the 2025 policy does not turn on whether an individual has gender dysphoria. Add.70-71. But as explained, *supra* pp.18-21, this characterization of the policy is incorrect. The court also reasoned that the military could have addressed its concerns in other ways. Add.71. But the court's view that there were other possible ways to conduct military affairs does not demonstrate that the Department's stated concerns about a medical condition were pretextual.

25

## II.    The Injunction Is Overbroad

The district court also erred in ordering universal relief.  Universal injunctions are "legally and historically dubious," *Hawaii*, 585 U.S. at 721 (Thomas, J., concurring), and "patently unworkable," *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., joined by Thomas, J., concurring in the grant of stay).  They transgress constitutional limits on courts' powers, which extend only to "render[ing] a judgment or decree upon the rights of the litigants."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., joined by Thomas and Barrett, J.J., concurring in the judgment) (alteration and quotation marks omitted).  They are also incompatible with "'foundational' limits on equitable jurisdiction." *Department of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissenting from the denial of the application to vacate order).  And they compromise the Executive Branch's ability to carry out its functions before any court can fully examine the merits of its actions.

## III.   The Equitable Factors Favor A Stay

The court's injunction causes direct, irreparable injury to the interests of the government and the public, which merge here.  *See Nken*, 556

U.S. at 435. It compels the Department to maintain a policy it has determined undermines military readiness and lethality. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration and quotation marks omitted)).

In contrast, a stay pending appeal would not irreparably harm plaintiffs. As this Court has made clear, only those harms that are "beyond remediation" can support a request for injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). None of the plaintiffs who seek to enlist face any immediate harm from a stay pending appeal, because they have not yet been accepted into military service. As for the servicemember plaintiffs, none of the concrete harms that the court identified is incapable of being remedied later. *See, e.g.*, *Guerra v. Scruggs*, 942 F.2d 270, 274-75 (4th Cir. 1991) (concluding that the plaintiffs' discharge from the military under allegedly unequal procedures did not constitute irreparable injury and that employment-related decisions based on a discriminatory policy can be remedied by an order permitting or reinstating employment, as well as damages).

At a minimum, the Court should stay the injunction as it pertains to the Department's policy regarding accession and stay the universal scope of the injunction pending the resolution of the government's appeal. Such a stay would at least allow the military to implement in part the 2025 policy, which it has determined is in the Nation's best interests.

## CONCLUSION

This Court should issue an administrative by March 28 at 7:00 P.M., when the district court stay expires, and stay the district court's preliminary injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
    *General*
MICHAEL S. RAAB
ASHLEY C. HONOLD

 */s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5155 words, according to Microsoft Word.

*/s/ Amanda L. Mundell*
Amanda L. Mundell

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Amanda L. Mundell*
Amanda L. Mundell

# ADDENDUM

# TABLE OF CONTENTS

Order Granting Preliminary Injunction, Dkt. No. 88......................Add.1

Memorandum Opinion, Dkt. No. 89 ...................................................Add.4

Memorandum Opinion and Order Denying Motion to Dissolve,
Dkt. No. 100................................................................................Add.83

Additional Guidance on Prioritizing Military Excellence and Readiness,
Feb. 26, 2025, (2025 policy) Dkt. No. 63-1 ............................Add.99

Action Memo: Implementing Guidance for Prioritizing Military
Excellence and Readiness Executive Order (EO),
Feb. 26, 2025, Dkt. No. 73-23 ...............................................Add.112

Mattis Memorandum and Report, Feb. 22, 2018, Dkt. No. 73-8 .. Add.118

Accessions Medical Administrative Data on Transgender Service Mem-
bers (2021 Review), July 14, 2021, Dkt. No. 73-24 ..............Add.167

Literature Review: Level of Evidence for Gender-Affirming Treatments
(2025 Medical Literature Review), Dkt. No. 73-25..............Add.187

Clarifying Guidance on Prioritizing Military Excellence and Readiness:
Retention and Accession Waivers, Mar. 4, 2025,
Dkt. No. 70-1 (excerpt) .........................................................Add.198

Prioritizing Military Excellence and Readiness: Military Department
Identification, Mar. 21, 2025, Dkt. No. 91-2 ........................Add.200

DSM-5 Criteria for Gender Dysphoria, Dkt. No. 92-2 ..................Add.203

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NICOLAS TALBOTT, et al, <br>       *Plaintiffs*, <br><br>    v. <br><br> UNITED STATES, et al, <br>       *Defendants*. | Civil Action No. 25-cv-00240 (ACR) |

**<u>ORDER</u>**

For the reasons set forth in the accompanying Memorandum Opinion, the Court hereby:

**GRANTS** Plaintiffs' [72] Renewed Application for Preliminary Injunction; it further

**ORDERS** that Defendants Peter B. Hegseth, in his official capacity as Secretary of

Defense; the United States Department of the Army; Daniel P. Driscoll in his official capacity as

Secretary of the Army; the United States Department of the Navy; Terence G. Emmert in his

official capacity as Acting Secretary of the Navy; the United States Department of the Air Force;

Gary A. Ashworth in his official capacity as Acting Secretary of the Air Force; the Defense

Health Agency; Telita Crosland in her official capacity as Director of the Defense Health

Agency, are preliminarily enjoined, pending further order of this Court, from implementing

Executive Order No. 14183; as well as "Additional Guidance on Prioritizing Military Excellence

and Readiness," Dkt. 63-1; and any other memorandums, guidance, policies, or actions issued

pursuant to Executive Order 14183 or the Additional Guidance on Prioritizing Military

Excellence and Readiness.

The effect of the Court's Order is to maintain the *status quo* of military policy regarding

transgender service that existed immediately before President Donald J. Trump issued Executive

Add.1

Order 14183, *e.g.*, the policies described in Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," change 5, May 28, 2024; DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," change 1, June 6, 2022; and DoDI 1300.28, "In-Service Transition for Transgender Service Members," change 1, December 20, 2022.

The Court also **ORDERS** that, pending further order of this Court, Defendants shall maintain and continue Plaintiffs' military statuses; it further

**ORDERS** Defendants to take all steps necessary to effectuate this Order; it further

**ORDERS** Defendants to provide written notice of this Order by 5:00 pm eastern on March 21, 2025, to all branches of the Department of Defense and to any other entity responsible for implementing military policy; it further

**ORDERS** Defendants to file with the Court confirmation by 6:00 pm eastern on March 21, 2025, that it has provided the written notice of the Order as the Court has directed; it further

**ORDERS** the parties to file a joint status report by March 31, 2025, that informs the Court of Defendants' compliance with this Order.

Finally, on its own motion, the Court **STAYS** the effect of this Order until March 21, 2025, at 10:00 am eastern.  This Order will automatically go into effect, unless stayed by an appellate court, on March 21, 2025, at 10:01 am eastern.

If the parties, at any time, have questions about the scope of this injunction, they should

jointly reach out to Chambers.  The Court will move expeditiously to address any issues.

**SO ORDERED.**

Date: March 18, 2025

_____

ANA C. REYES
United States District Court Judge

Add.3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

NICOLAS TALBOTT, et al,

　　　　*Plaintiffs*,

　　v.

UNITED STATES, et al,

　　　　*Defendants*.

Civil Action No. 25-cv-00240 (ACR)

---

## MEMORANDUM OPINION

In Executive Order No. 14183, President Donald J. Trump focuses on "Prioritizing

Military Excellence and Readiness." 90 Fed. Reg. 8757 (Jan. 27, 2025). The military's "clear

mission" is to "protect the American people and our homeland as the world's most lethal and

effective fighting force." *Id.* § 1. Service by transgender persons[1] is "inconsistent" with this

mission because they lack the "requisite warrior ethos" to achieve "military excellence." *Id.*

§§ 1, 2. On February 26, 2025, Secretary of Defense Peter B. Hegseth issued a policy to

implement EO14183's directives. Dkt. 63-1 (Hegseth Policy). It disqualifies "[t]ransgender

troops . . . from service without an exemption."[2]

The President has the power—indeed the obligation—to ensure military readiness. At

times, however, leaders have used concern for military readiness to deny marginalized persons

---

[1] EO14183 does not employ the word "transgender." But Defendants concede the term it does use—those with a gender identity that diverges from their biological sex—refers to transgender persons. *See* Docket (Dkt.) 58, Transcript to Court Hearing (Tr.) (Feb. 18, 2025) at 44.

[2] The Hegseth Policy also studiously does not employ the word "transgender," but as issued it bans transgender persons. Both the Department of Defense and Secretary Hegseth announced this inescapable fact via social media. @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost).

Add.4

the privilege of serving.  "[Fill in the blank] is not fully capable and will hinder combat effectiveness; [fill in the blank] will disrupt unit cohesion and so diminish military effectiveness; allowing [fill in the blank] to serve will undermine training, make it impossible to recruit successfully, and disrupt military order."[3]  First minorities, then women in combat, then gays filled in that blank.  Today, however, our military is stronger and our Nation is safer for the millions of such blanks (and all other persons) who serve.[4]

Currently before the Court is Plaintiffs' Renewed Application for Preliminary Injunction. Dkt. 72 (App.).  Plaintiffs, who are transgender, claim that EO14183 and the Hegseth Policy (together, the Military Ban) treats them as today's "fill in the blank" group.  Seeking nothing more than to serve their country, they ask the Court to enjoin the Military Ban.  App. at 26.  They claim that the Hegseth Policy was rushed and reached a preordained result, contains no analysis, and has an exemption in name only.  *Id.* at 56.  The Ban at bottom invokes derogatory language to target a vulnerable group in violation of the Fifth Amendment.  *Id.* at 29, 35–37; *see* U.S. Const. amend. V.

Not at all, say Defendants.  They assert that the Military Ban is necessary because transgender persons undermine "military readiness" and disrupt "[u]nit cohesion, good order, and discipline."  Dkt. 81 (Opp.) at 40–54.  Being transgender is "inconsistent" with "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  Hegseth Policy at 3.  Gender ideology activists are "unconcerned with the requirements of military service like physical and mental health, selflessness, and unit cohesion."

---

[3] Beth Bailey, Introduction, *Integrating the U.S. Military* 3 (Beth Bailey ed., 2017) (brackets in original).  *See also* Dkt. 77-1 (Amicus Br. of Const. Accountability Ctr.) at 14–23.

[4] *See* Dkt. 47-1 (Amicus Br. of Former Military Dep't Heads) at 5–12; Dkt. 82 (Amicus Br. of Const. Accountability Ctr.) at 14–23.

2

Add.5

EO14183 § 1. Transgender persons cannot maintain "an honorable, truthful, and disciplined lifestyle." *Id.* Their expression of sexual identity "is not consistent with [] humility and selflessness." *Id.* They also cost too much. Opp. at 49.

Plaintiffs beg to differ. And differ they can. Together they have provided over 130 years of military service. They have served in roles ranging from Senior Military Science Instructor to Artillery Platoon Commander to Intelligence Analyst to Satellite Operator to Operations Research Analyst to Naval Flight Officer to Weapons Officer. They have deployed around the globe, from Afghanistan to Poland to Korea to Iraq to Kuwait to the USS Ronald Reagan and USS George W. Bush. One is presently deployed to an active combat zone. They have earned more than 80 commendations including: a Bronze Star; two Global War on Terrorism Service Medals; two Global War on Terrorism Expeditionary Medals; numerous Meritorious Service Medals; numerous Commendation Medals; Air and Space Outstanding Unit Awards; and the Military Outstanding Volunteer Service Medal, among many others.

Defendants rejoin that these service records are inapposite. The Court must ignore them and instead "defer to the military's judgment." Tr. (Mar. 12, 2025) at 180. Yes, the Court must defer. But not blindly. The President issued EO14183 within seven days of taking office, and Secretary Hegseth issued the Policy thirty days later. There is no evidence that they consulted with uniformed military leaders before doing so. Neither document contains any analysis nor cites any data. They pronounce that transgender persons are not honorable, truthful, or disciplined—but Defense counsel concedes that these assertions are pure conjecture.

> THE COURT: Is saying that transgender people or people with gender dysphoria, [that] their inherent identity is inconsistent with a commitment to an honorable, truthful, and disciplined lifestyle, is that demeaning to them?
>
> DEFENSE COUNSEL: I don't have a characterization for that, Your Honor.

Add.6

> THE COURT: Okay. And if I asked you about all the other words in [the Military Ban], with respect to the characterization of transgender people or people with gender dysphoria, you would have the same answer?
>
> DEFENSE COUNSEL: Yes, Your Honor.
>
> THE COURT: There's nothing [supporting these assertions] in the studies; right?
>
> DEFENSE COUNSEL: That says those same things, no, Your Honor, not that I know of.
>
> THE COURT: [No study] says anything close to those things; correct?
>
> DEFENSE COUNSEL: Not that I know of, Your Honor.

Tr. (Mar. 12, 2025) at 188–89. An "Action Memo" claims the Policy "was informed through consideration of" three studies and cost data. Dkt. 73-23 (Action Memo) at 4. *Who* considered the information, however, is anyone's guess; Defendants do not know. Maybe no one, because one study is eight years old and the other two support Plaintiffs' position.

Transgender persons have served openly since 2021, but Defendants have not analyzed their service. That is unfortunate. Plaintiffs' service records alone are Exhibit A for the proposition that transgender persons can have the warrior ethos, physical and mental health, selflessness, honor, integrity, and discipline to ensure military excellence. ***Defendants agree.*** They agree that Plaintiffs are mentally and physically fit to serve, have "served honorably," and "have satisfied the rigorous standards" demanded of them. Tr. (Feb. 18, 2025) at 9–14, 148; *see also* Tr. (Mar. 12, 2025) at 130. Plaintiffs, they acknowledge, have "made America safer." Tr. (Feb. 18, 2025) at 10. So why discharge them and other decorated soldiers? Crickets from Defendants on this key question.

Plaintiffs have also introduced declarations from the military leaders responsible for integrating transgender persons into open military service. Each declarant attests that our military has not fallen into an "existential" crisis since transgender persons began serving openly

Add.7

in 2021.  Nor have our "lethal and effective" soldiers come unglued when asked to use preferred pronouns, which the Hegseth Policy also bans.  To the contrary, they each testify that recruiting, unit cohesion, and military readiness have improved since 2021.

To obtain an injunction, Plaintiffs must establish a likelihood of success on the merits. They have done so.  The Court's factual findings, the vast majority conceded by Defendants and all supported by the Record, make it highly unlikely that the Military Ban will survive judicial review, whether it be rational basis or intermediate scrutiny.  Plaintiffs must also show irreparable harm and that the balance of the equities and the public interest favor an injunction. On the former, Plaintiffs face a violation of their constitutional rights, which constitutes irreparable harm.  Indeed, the cruel irony is that thousands of transgender servicemembers have sacrificed—some risking their lives—to ensure for others the very equal protection rights the Military Ban seeks to deny them.  On the latter, Defendants have not shown they will be burdened by continuing the status quo pending this litigation, and avoiding constitutional violations is always in the public interest.

The Court therefore **GRANTS** Plaintiffs' Renewed Application for Preliminary Injunction.  Dkt. 72.  The Court details the scope of the injunction in the Order that accompanies this Opinion.  The Court, on its own motion, stays its Order until March 21, 2025, at 10:00 am eastern, to provide Defendants time to consider filing an emergency stay with the D.C. Circuit.

* * * * *

The Court does not issue this preliminary injunction lightly.  Judicial overreach is no less pernicious than executive overreach.  But the coordinate branches must, "by their mutual relations, be the means of keeping each other in their proper places."  The Federalist No. 51 (James Madison).  The President and Defendants could have crafted a policy that balances the

Nation's need for a prepared military and Americans' right to equal protection. They still can. The Military Ban, however, is not that policy. The Court therefore must act to uphold the equal protection rights that the military defends every day.

The Court's opinion is long, but its premise is simple. In the self-evident truth that "all people are created equal,"[5] *all* means *all*. Nothing more. And certainly nothing less.

## BACKGROUND

### I.    OBAMA—TRANSGENDER PERSONS CAN SERVE[6]

Before 2014, the United States precluded transgender persons from military service. Dkt. 69 (Third Amend. Compl.) ¶ 225. This changed during President Barack Obama's second term. In 2014, the Department of Defense (DoD) eliminated its categorical ban on service by transgender persons and instructed each branch of the Armed Forces to reassess the ban's rationales. *See* Dkt. 72-86 (DoDI 1332.18).

In 2015, then-Secretary of Defense Ashton B. Carter established a working group to identify issues related to open military service by transgender persons. Dkt. 72-70 (RAND Report) at 4. To aid its work, the group commissioned the RAND Corporation's National Defense Research Institute to study the issue.[7] *Id.* After a year of research, RAND concluded that allowing transgender persons to serve openly would have "minimal impact on unit

---

[5] Women were "included in the sequel" when passage of the Nineteenth Amendment granted them the right to vote in 1920. *See* Lin-Manuel Miranda, *Hamilton: An American Musical* (2016); *compare* U.S. Declaration of Independence (1776) *with* U.S. Const. amend. XIX (1920). That right is one of the many that thousands of transgender persons serve to protect.

[6] For an in-depth history, see *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177–85 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).

[7] The National Defense Research Institute is not a fly-by-night operation. It is "a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community." RAND Report at 4–5.

cohesion" and estimated the "impact [of transgender persons serving openly] on readiness to be

negligible." *Id.* at 13, 91.  It further found that extending health care coverage for gender

transition-related treatments represented an "exceedingly small proportion" of health care

expenditures: between $2.4 million and $8.4 million out of $49.3 billion, or 0.017%—at most—

of the Unified Medical Program budget.  *Id.* at 12–13, 91.  Relying in part on that report, the

working group "unanimously concluded that transgender people should be allowed to serve

openly in the military."  *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 179 (D.D.C. 2017).  It found that

"*prohibiting* transgender people from serving undermines military effectiveness and readiness."

*Id.* (emphasis in original).  Such a policy "excludes qualified individuals on a basis that has no

relevance to one's fitness to serve[] and creates unexpected vacancies requiring expensive and

time-consuming recruitment and training of replacements."  *Id.*

To implement the working group's recommendation, in 2016, Secretary Carter issued

Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service

Members."  Dkt. 72-60 (Carter Policy).  The Carter Policy stated that "open service by

transgender Service members while being subject to the same standards and procedures as other

members with regard to their medical fitness for duty, physical fitness, uniform and grooming,

deployability, and retention, is consistent with military readiness and with strength through

diversity."  *Id.* at 3.

Both the Army and the Air Force issued guidance allowing transgender individuals to

serve openly starting in July and October 2016.  *Doe 1*, 275 F. Supp. 3d at 182.  The Carter

Policy for acceding transgender persons to the military was set to take effect on June 30, 2017.

*Id.* at 181.  However, President Trump took office in January 2017, and on June 30—the date

accessions were to start—then-Secretary of Defense James Mattis deferred acceding transgender individuals into the military until January 1, 2018. *Id.* at 182.

## II.    TRUMP I—TRANSGENDER PERSONS CANNOT SERVE

### A.    President Trump Orders a Ban on Transgender Service

On August 25, 2017, President Trump issued a memorandum entitled "Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security" (2017 Memorandum). *Doe 1*, 275 F. Supp. 3d at 183. The 2017 Memorandum called for a ban on members of the military from serving in a sex different from their birth sex, stopped the accession of transgender persons, and halted funding for gender-affirming care. *Id.* at 183–84. It instructed Secretary Mattis to gather a working group to review the 2017 Memorandum and advise if the group disagreed with the Memorandum's conclusions. *Id.* at 185.

### B.    Courts Enjoin the 2017 Memorandum

Litigation ensued. Several transgender persons then serving or hoping to enlist challenged President Trump's 2017 Memorandum. *Id.* at 175–76. On October 30, 2017, Judge Colleen Kollar-Kotelly of this Court entered a preliminary injunction, effectively barring any change from the status quo as it related to service and accession. *See id.* at 177. She dismissed the claims relating to gender affirming care based on a lack of standing. *Id.* The D.C. Circuit declined to stay the injunction pending appeal. *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017). Around the same time, three other federal courts also enjoined the 2017 Memorandum. *See Stone v. Trump*, 280 F. Supp. 3d 747 (D. Md. 2017); *Karnoski v. Trump*, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017); *Stockman v. Trump*, 2017 WL 9732572 (C.D. Cal Dec. 22, 2017).

Add.11

### C.    DoD Recommends Revisions to the 2017 Memorandum

DoD subsequently issued a report that addressed transgender military service.  Dkt. 73-8

(2018 Report) at 5–49.  The report concluded that transgender persons undermine military

preparedness.  *See id.* at 37–38.  It likened gender dysphoria to "bipolar disorder, personality

disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder."

*Id.* at 25.  It claimed that individuals with gender dysphoria were more likely to have substance

abuse issues and commit suicide and that they would inflict excessive costs on the military.  *Id.*

at 26, 46*.*  It emphasized that the "uncertainty" surrounding the view of medical professionals

meant that the military should "proceed with caution."  *Id.* at 11.

Based on this report, on February 22, 2018, Secretary Mattis presented a memorandum

(Mattis Policy) to President Trump that proposed an alternative to the enjoined 2017

Memorandum.  *See generally id*. at 2–4.  The Mattis Policy would not have banned service to all

transgender persons.  *Id.* at 3.  Instead, it recommended banning anyone who had undergone

gender transition and those with a history or current diagnosis of gender dysphoria, except in

some limited circumstances.  *Id.*  It allowed transgender persons already in the military—who

did not have gender dysphoria and were otherwise qualified for service—to serve, but only in

their biological sex.  *Id.* at 3–4.

President Trump issued a memorandum on March 23, 2018, revoking the 2017

Memorandum and delegating authority to DoD and Department of Homeland Security to

implement the Mattis Policy.  Third Amend. Compl. ¶ 256.

### D.    The Mattis Policy Takes Effect

Following publication of the Mattis Policy, the *Doe 1* plaintiffs amended their complaint.

Again, the government moved to dismiss and asked the court to dissolve the existing preliminary

injunction. *Doe 2 v. Trump*, 315 F. Supp. 3d 474, 479 (D.D.C. 2018). The district court declined to do so. *Id.* at 480. The government again appealed—this time successfully. *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019). In an unpublished opinion on January 4, 2019, the D.C. Circuit reversed the district court's denial of the government's motion to dissolve the preliminary injunction and vacated the preliminary injunction without prejudice.[8] *Id.* The D.C. Circuit held that "[i]t was clear error [for the district court] to say there was no significant change" in military policy—from the genesis of the 2017 Memorandum to the issuance of the Mattis Policy—and so vacatur of the preliminary injunction was warranted. *Id.* at 23.

The Mattis Policy went into effect after the dissolution of the preliminary injunction. It remained in place until the beginning of the Biden administration in 2021. App. at 14.

## III.    BIDEN—TRANSGENDER PERSONS CAN SERVE

On January 25, 2021, President Joseph R. Biden issued Executive Order 14004, "Enabling All Qualified Americans [t]o Serve Their Country in Uniform." 86 Fed. Reg. 7471 (Jan. 25, 2021) (EO14004). EO14004 directed the Secretaries of Defense and Homeland Security to take necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." *Id.* § 1.

EO14004 cited its reliance on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces." *Id.* This included "a meticulous, comprehensive study requested by [DoD]," testimony to Congress by the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the

---

[8] As acknowledged by both parties, *Doe 2* is not binding on this Court, but it is persuasive. *See* Fed. R. App. P. 32.1; *see also* Tr. (Feb. 19, 2025) at 5–7.

Marine Corps, and Chief of Staff of the Air Force that "they were not aware of any issues of unit

cohesion, disciplinary problems, or issues of morale resulting from open transgender service."

*Id.* (cleaned up).  It also included a statement by former United States Surgeons General, who

served under both Democratic and Republican Presidents, "that transgender troops are as

medically fit as their non-transgender peers and that there is no medically valid reason—

including a diagnosis of gender dysphoria—to exclude them from military service or to limit

their access to medically necessary care."  *Id.* (cleaned up).

The Office of the Undersecretary of Defense for Personnel and Readiness convened a

working group tasked with "formulat[ing] policy options for DoD regarding transgender service

members."  Dkt. 72-59 ¶ 9.  After the group "collect[ed] and consider[ed] evidence from a

variety of sources, including a careful review of all available scholarly evidence and

consultations with medical experts, personnel experts, readiness experts, health insurance

companies, civilian employers, and commanders whose units included transgender service

members," it concluded that "banning service by transgender persons would harm the military by

excluding qualified individuals based on a characteristic with no relevance to a person's fitness

to serve."  *Id.* ¶¶ 10, 12.

In March 2021, the Office of the Undersecretary of Defense for Personnel and Readiness

issued guidance on accession.  Dkt. 73-9 (DoDI 6130.03, Vol 1).  In addition to meeting standard

accession requirements, transgender persons with a history of gender dysphoria could enlist if

they had been stable in their gender identity for at least 18 months prior to enlistment.  *Id.*  On

April 30, 2021, the Office of the Undersecretary of Defense for Personnel and Readiness issued

"DoD Instruction 1300.28—In-Service Transition for Transgender Service Members."  Dkt. 72-

63 (DoDI 1300.28).  A servicemember could serve in their preferred sex by changing their

"DEERS Marker" (Defense Enrollment Eligibility Reporting System) to reflect their gender identity.[9] *Id.* at 7.

In short, the Austin Policy allowed transgender persons to enlist and serve openly.

## IV.    TRUMP II—TRANSGENDER PERSONS CANNOT SERVE

### A.    President Trump Again Orders a Ban on Transgender Service

On the first day of his second term, President Trump issued Executive Order 14168, "Defending Women [f]rom Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO14168). That Order provides that the federal government will recognize only two sexes: male and female. *Id.* § 2. EO14168 defines a "male" as a "a person belonging, at conception, to the sex that produces the small reproductive cell," and a "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.*

EO14168 requires federal agencies to ignore conflicting provisions of related executive orders from the previous administration, including Executive Orders: 13988, on preventing and combating discrimination based on gender identity or sexual orientation; 14004, on enabling transgender persons to serve openly in the military; 14020, which established the White House Gender Policy Council; 14021, addressing the need for a comprehensive approach to gender equity and equality; and 14075, on advancing equity for all individuals. *Id.* § 7(b). EO14183 also directed federal agencies to rescind guidance documents, such as "The White House Toolkit on Transgender Equality," "Supporting Transgender Youth in School," and "Back-to-School

---

[9] DoDI 1300.28 explains that "[g]ender transition in the military begins when a Service member receives a diagnosis from a military medical provider indicating the Service member's gender transition is medically necessary, and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender." Dkt. 72-63 at 20.

Add.15

Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS," among others relating to the LGBTQ+ community. *Id.* § 7(c).

On January 27, 2025, President Trump issued EO14183, which incorporates by reference the definitions in EO14168. EO14183 § 3. The Order revokes President Biden's Executive Order 14004, which allowed transgender persons to serve openly in the military. *Id.* § 5. It describes the U.S. military's mission as "protect[ing] the American people and our homeland as the world's most lethal and effective fighting force." *Id.* § 1. But it adds that "the Armed Forces have been afflicted with radical gender ideology to appease activists unconcerned with the requirements of military service." *Id.* It claims that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.*

EO14183 declares that it is U.S. Government policy "to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2. "This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." *Id.* EO14183 therefore requires: DoD to revise its medical standards (DoDI 6130.03 Volume 1 and Volume 2) within 60 days to reflect the purpose and policy of the Order, *id.* § 4(a); the Defense Secretary to end identification-based pronoun usage, *id.* § 4(b); and within 30 days to identify guidance to implement the Order, *id.* § 4(c); and the Armed Forces to prohibit servicemembers born male to use or share facilities for those born female and vice versa, *id.* § 4(d).

Add.16

The White House also provided an accompanying fact sheet that reiterated EO14183's

goal of "RESTORING SANITY IN OUR MILITARY: During the Biden Administration, the

Department of Defense allowed gender insanity to pervade our military organizations."  Fact

Sheet: President Donald J. Trump Ensures Military Excellence and Readiness, The White House

(Jan. 27, 2025).

On February 7, 2025, the Secretary of Defense issued a memorandum that "paused" all

activities under the Austin Policy pending his forthcoming policy implementing EO14183.  Dkt.

33-1 (Feb. 7 Memo).

### B.    Litigation Ensues

On January 28, 2025, one day after President Trump issued EO14183, eight transgender

persons filed a Complaint for Declaratory and Injunctive Relief.  Dkt. 1.  The current operative

complaint is the Third Amended Complaint.  Dkt. 69.  Plaintiffs Nicolas Talbott, Erica Vandal,

Kate Cole, Gordon Herrero, Dany Danridge, Jamie Hash, Minerva Bettis, Audrie Graham, Roan

Pickett, Amiah Sale, Quinn Tyson, Michelle Bloomrose, Vera Wolf, and Regan Morgan are

transgender active-duty servicemembers.  *Id.* ¶¶ 21–168.  Plaintiff Miriam Perelson is enlisted in

U.S. Army basic training.  *Id.* ¶ 87.  Plaintiffs Samuel Ahearn, Clayton McCallister, Greyson

Shishkina, Koda Nature, and Cael Neary are transgender persons in the process of enlisting.  *Id.*

¶¶ 169–206.

Collectively, the active-duty Plaintiffs have served in the U.S. military honorably and

with distinction for over 130 years.  Third Amend. Compl. ¶¶ 22, 33, 44, 53, 65, 77, 88, 106,

114, 122, 134, 146, 153, 160, 166.[10]  The Court cites some of their accolades above; there are

---

[10] All Plaintiffs submitted sworn declarations, which Defendants do not contest.  Dkts. 72-18–72-
58.  The Court accepts and incorporates them into the factual record.

many more. *Id.* ¶¶ 36, 46, 56, 69, 80, 108, 135, 147, 155, 162. The Government concedes that

each active-duty Plaintiff is honorable, truthful, and disciplined, and that each is currently

physically and mentally fit to serve. Tr. (Feb. 18, 2025) at 9. They have "served honorably" and

"have satisfied the rigorous standards" of military service. *Id.* at 9, 14, 148. The Government

also concedes that, together, Plaintiffs have made America safer. *Id.* at 10. The active-duty

Plaintiffs have adhered to all military standards and serve without accommodation. *See, e.g.*,

Dkt. 72-27 (Herrero Second Supp. Decl.) ("I meet all standards applicable to male service

members."); Dkt. 72-58 (Wolf Decl.) ¶ 18 ("I meet all standards applicable to female service

members."); Tr. (Mar. 12, 2025) at 130. Yet there is no dispute that the Military Ban's directives

would prohibit Plaintiffs from serving. Tr. (Mar. 12, 2025) at 167.

Defendants are the United States of America, Secretary of Defense Peter B. Hegseth,

Secretary of the Army Daniel P. Driscoll, the Department of the Army, Acting Secretary of the

Navy Terence G. Emmert, the Department of the Navy, Acting Secretary of the Air Force Gary

A. Ashworth, the Department of the Air Force, Director of the Defense Health Agency Telita

Crosland, and the Defense Health Agency.[11] *Id.* ¶¶ 207–16. Plaintiffs sue the individual

Defendants in their official capacities. *Id.* ¶ 217.

Plaintiffs allege that the Military Ban, "[r]ather than being based on any legitimate

governmental purpose, . . . reflects animosity toward transgender people because of their

transgender status." *Id.* ¶ 314. They claim that the Military Ban violates the equal protection

component of the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 317–31. They also allege

that the Military Ban violates the currently serving Plaintiffs' procedural due process rights

---

[11] Upon agreement of the parties, the Court dismissed President Trump as a defendant on
February 13, 2025. Dkt. Notice (February 13, 2025).

under the Fifth Amendment. *Id.* ¶¶ 332–39. And because some Plaintiffs "reasonably relied on the Austin Policy" when they transitioned, some also bring an estoppel claim.[12] *Id.* ¶¶ 340–45.

On February 3, 2025, Plaintiffs filed an Application for Preliminary Injunction followed by an Application for Temporary Restraining Order the next day. Dkts. 13, 14. At a status conference on February 4, the Court explained that it could not grant the TRO because it addressed harm to a non-plaintiff. Tr. (Feb. 4, 2025) at 42–43. After further discussion, the parties agreed to follow the briefing and hearing schedule the Court had originally set for the preliminary injunction application. Dkt. Notice (Feb. 4, 2025).

On February 13, 2025, the Court previewed for the parties, at length, the legal issues and cases it expected to address at the formal preliminary injunction hearing. Tr. (Feb. 13, 2025). On February 15, 2025, the Government confirmed that it would neither present any affirmative witnesses nor cross-examine any of Plaintiffs' declarants at the preliminary injunction hearing.[13] At that point, Plaintiffs notified all parties that it would not call on any of its declarants.[14] The Court held oral argument on February 18 and 19, 2025. At the February 18 hearing, the Court granted the Government's request that it refrain from ruling until after DoD released its implementing policies. Tr. (Feb. 18, 2025) at 113–14. On March 4, 2025, Plaintiffs filed their Third Amended Complaint. Dkt. 69. They filed a Renewed Application for Preliminary Injunction on March 7, 2025. Dkt. 72. Defendants filed their Opposition to Plaintiffs' Application on March 11, 2025. Dkt. 81. The Court heard oral argument on the renewed Application on March 12, 2025.

---

[12] Since Plaintiffs have established likelihood of success on their equal protection claim, the Court does not address the procedural due process or estoppel claims.

[13] Email from Defs.' Counsel to Court and Pls.' Counsel (Feb. 15, 2025).

[14] Email from Pls.' Counsel to Court and Defs.' Counsel (Feb. 15, 2025).

### C.    The Hegseth Policy Issues

DoD implemented EO14183 on February 26, 2025, in a memorandum entitled "Additional Guidance on Prioritizing Military Excellence and Readiness."  Dkt. 63-1 (Hegseth Policy).  Secretary Hegseth issued the Policy "pursuant to Executive Order 14183, 'Prioritizing Military Excellence and Readiness.'"  *Id.* at 1.  The Policy states that "[m]ilitary service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service." *Id.* at 3.  Consequently, "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service."  *Id*.

The Hegseth Policy directs the Secretaries of the Military Departments to "[e]stablish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum."  *Id.* at 5.  Next, "[w]ithin 30 days of identification," the Departments must "begin separation actions . . . for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver."  *Id.* Regarding retention policies, "[s]ervice members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service."  *Id.* at 8.  In addition, "[s]ervice members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service."  *Id.*

The Hegseth Policy purports to allow exemptions "on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities" and the servicemember meets the following three conditions: he or she

(1) "demonstrates 36 consecutive months of stability in [his or her] [birth] sex without clinically significant distress or impairment," (2) "demonstrates that he or she has never attempted to transition to any sex other than their [birth] sex," and (3) "is willing and able to adhere to all applicable standards, including the standards associated with the Service member's [birth] sex." *Id.* Any transgender person who cannot satisfy these conditions is disqualified from service.

With respect to separation policies, the Hegseth Policy provides that "[s]ervice members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance." *Id.* at 9. Those who do so "may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43 . . . at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29." *Id.* The Policy provides that those "choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l)." *Id.* On the other hand, "[t]he Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated." *Id.*

On the same day that DoD issued the Hegseth Policy, the Under Secretary of Defense for Personnel and Readiness also distributed "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order," also called the Action Memo. Dkt. 73-23 (Action Memo). The Action Memo repeats the purposes and policies President Trump outlined in EO14183 and reiterates the main points of the Hegseth Policy. *Id.* It lists four "consideration[s]" that "informed" the Hegseth Policy: (1) the Mattis Policy, (2) a 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical

Standards Analysis and Research Activity, (3) a 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs, and (4) a review of cost data. *Id.* at 4–5.

Based on these reviews, DoD concluded that "[w]hile Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force." *Id.* at 5.

## FINDINGS OF FACT

"A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Courts, for example, permit hearsay evidence in the form of sworn affidavits in considering an application for preliminary injunction. *See e.g.*, *Karem v. Trump*, 404 F. Supp. 3d 203 (D.D.C. 2019) (citing *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases from six other circuits)).

The Court makes its factual findings based on the entire record, including the Third Amended Complaint, documents cited in the Complaint, exhibits to the preliminary injunction application and opposition, the declarations the parties submitted, and concessions[15] or points of agreement made by the parties at oral argument (altogether, the Record). *See American Foreign Service Ass'n, et al. v. Trump et al.*, 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025). It is early

---

[15] Over three hearings on Plaintiffs' motion, Defendants made numerous concessions concerning the scope and application of EO14183 and the Hegseth Policy. When citing a concession, the Court cites "Defs. Concession" and then the transcript cite.

days for this litigation, however.  Things change.  If new developments cause Defendants to move to dissolve this injunction, the Court will hear that motion expeditiously.

## I.  THE HEGSETH POLICY BANS ALL TRANSGENDER TROOPS

Secretary Hegseth issued the Hegseth Policy on February 26, 2025.  Dkt. 63-1.  The next day, the Department of Defense and Secretary Hegseth publicly announced that under it: "Transgender troops are disqualified from service without an exemption."[16]  Defense counsel contends that the Court must ignore Secretary Hegseth's public description of the policy he wrote and that he is responsible for implementing.  Tr. (Mar. 12, 2025) at 19–22.  Secretary Hegseth used the word "transgender," defense counsel claims, only as "shorthand" for gender dysphoria.  *Id.* at 22.  Seriously?  These were not off-the-cuff remarks at a cocktail party.  DoD and Secretary Hegseth used official government accounts to announce a new policy affecting the entire U.S. Military.  The Court presumes that in doing so they did not use loose or misleading language.  Indeed, if the Hegseth Policy addressed only gender dysphoria, the post would have read, "Gender dysphoria is a disqualifying medical condition for service."  Both sentences contain nine words, belying counsel's "shorthand" excuse.

DoD and Secretary Hegseth announced that the Policy bans "transgender troops" because that is precisely what it does.  To be sure, the word transgender does not appear on its pages.  It is nonetheless aimed squarely at transgender persons, banning everyone:

- with a current diagnosis of gender dysphoria;
- with a history of gender dysphoria;
- who exhibits symptoms consistent with gender dysphoria;
- with a history of cross-sex hormone therapy (as treatment for gender dysphoria or in pursuit of sex transition);

---

[16] @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025).  The Court has taken judicial notice of their posts.  *See* Dkt. Notice (Mar. 7, 2025); Fed. R. Evid. 201(b)(2).

- with a history of sex reassignment or genital reconstruction surgery (same);
- who has transitioned or attempted to transition to a sex other than their birth sex; and,
- who is not willing to serve in their birth sex.

Hegseth Policy at 3–6.

There is an exemption, but it is one in name only. Individuals can obtain a waiver if there "is a compelling government interest in retaining them that directly supports warfighting capabilities." *Id.* at 6. That includes only those with "special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department, if such experience, training, and education is directly related to the operational needs of the Military Service concerned." Dkt. 70-1 (Clarifying Guidance on Hegseth Policy) at 1. Even if someone stumbled into this elite cadre, she could continue to serve only if: (1) she has been stable in her *birth* sex for 36 consecutive months; (2) she has never transitioned or attempted to transition to anything other than her birth sex; and (3) she is willing (against medical advice) to serve in her birth sex.[17] *Id.* at 1–2. Virtually no one can meet all these criteria. The Court finds that Plaintiffs, for their part, do not. *See* Third Amend. Compl. ¶¶ 27, 38, 48, 58, 71, 82, 88, 109, 115, 124, 136, 148, 157, 163, 167, 170, 185, 186, 198, 206.

---

[17] Medical experts, including the American Psychological Association, agree that "[f]orcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions." Dkt. 72-78 (Brown Decl.) ¶ 10.

## II.    THE MILITARY BAN IS BASED ON CONJECTURE

### A.    The Administration Rushed the Hegseth Policy

President Trump issued EO14183 seven days after taking office.  No one knows what he

relied on, if anything.  Tr. (Feb. 18, 2015) at 117.  EO14183 commanded DoD to craft the

implementing policy within 30 days of that Order.  EO14183 § 4.  This was rushed by any

measure.  By comparison, DoD spent 12 months to craft the Carter Policy, 7 months to craft the

Mattis Policy, and 8 months to craft implementing guidance on the Austin Policy.  *See* Third

Amend. Compl. ¶¶ 229, 237, 254–56, 262–66.

Alex Wagner, the former Assistant Secretary of the Air Force for Manpower and Reserve

Affairs, notes that the "rushed and haphazard manner" in which Defendants "issued and

implemented" the Military Ban is "highly unusual."  Dkt. 72-68 (Wagner Second Supp. Decl.)

¶ 10.  "Ordinarily, the reversal of an existing [military] policy—especially one [like the Austin

Policy] adopted after careful study and review—would take place only in response to significant,

documented problems with existing policy, after careful consideration and review including an

explanation of what led to the problematic outcomes, and would be rolled out in a careful,

orderly fashion that provided commanders and members clear guidance."  *Id.*  The "abrupt

reversal" of the Austin Policy, without comprehensive review, "is unprecedented" and "an

extreme departure from how military policy is typically made."  Dkt. 72-74 (Cisneros Decl.)

¶ 21.

Former Deputy Undersecretary of Defense for Personnel and Readiness Shawn Skelly

has "significant concerns about the immediate and long-term harms" of the Hegseth Policy and

"the ways in which it conflicts with established military policy and practices."  Dkt. 72-73 ¶ 1.

Based on his experience, he believes that this "categorical approach to administratively separate

an entire class of people who demonstrate their ability to serve and meet military standards

22

represents a significant departure from military practice." *Id.* ¶ 2. "There are no other circumstances where service members with a treatable condition that allows them to deploy and meet all readiness standards are nevertheless deemed categorically incapable of service." *Id.* ¶¶ 2.[18] In his view, this Policy—not transgender service—"will severely disrupt the chain of command and erode unit cohesion and trust," and "[t]he rollout of this policy is unprecedented in the chaos and confusion associated with it." *Id.* ¶¶ 5, 15.

### B.    Defendants' Evidence Supports Plaintiffs' Application

EO14183 and the Hegseth Policy provide nothing to support Defendants' view that transgender military service is inconsistent with military readiness. So instead, Defendants turn to the Action Memo. *See* Tr. (Mar. 12, 2025) at 136. The Action Memo, an internal document accompanying the Hegseth Policy, explains that the Military Ban "was informed through consideration of, among other things," EO14183, the Hegseth Policy, and the following: (1) the "SecDef Memorandum" from February 22, 2018 (*i.e.*, the Mattis Policy); (2) "a 2021 review conducted by . . . the Accession Medical Standards Analysis and Research Activity," (AMSARA Report), (3) "[a] 2025 medical literature review," (Medical Literature Review), and (4) "a review of cost data." Action Memo at 4–5.

After listing the sources the Military Ban relies on, the Action Memo concludes that

> [w]hile Service members with gender dysphoria volunteered to
> serve their country, the costs associated with their health care,
> coupled with the medical and readiness risks associated with their
> diagnosis and associated treatment that can limit their
> deployability, make continued service by such individuals
> incompatible with the Department's rigorous standards and
> national security imperative to deliver a ready, deployable force.

---

[18] Mr. Skelly claims that the Hegseth Policy is "both punitive and based on animus." Dkt. 72-73 ¶ 3. Because the parties have not briefed whether this is a legal conclusion, the Court does not accept his assertion as a finding of fact.

*Id.* at 5. This claim is belied by the evidence the Action Memo itself cites.

### 1.    *The Mattis Policy*

Defendants contend that "[m]any of the rationales justifying the 2018 [Mattis] policy—which was approved by President Trump as the Commander in Chief in 2018—would apply here." Dkt. 38 at 34. The Court, they contend on repeat, must defer to the Hegseth Policy's adoption of the Mattis Policy's findings. *See, e.g.*, Opp. at 12, 13, 14, 18, 28, 29, 30, 32–39, 40, 44, 47, 48, 50. The Mattis Policy's findings, they claim, support the Action Memo's conclusion. Action Memo at 5; *see also* Tr. (Mar. 12, 2025) at 135. It does not.

The Mattis Policy resulted from the work over many months of "a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders." Dkt. 73-8 at 2. It "included combat veterans to ensure that our military purpose remained the foremost consideration." *Id*. And it "met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of gender dysphoria." *Id.* at 2–3. No panel of experts—or any other kind—informed the Hegseth Policy. The Record reflects only that it "was informed through consideration." Action Memo at 4 (cleaned up). But, again, Defendants do not even know *who* undertook the "consideration." Tr. (Mar. 12, 2025) at 38–39.

By its own terms, moreover, the Mattis Policy's findings were limited by "uncertainty." Transgender persons had not served openly previously. *Id.* at 11. And the medical literature concerning "the study and treatment of gender dysphoria" was then also in a state of flux. *Id.* This mandated "caution." *Id.* That uncertainty no longer exists. Transgender persons have

served openly in the U.S. military since the Austin Policy issued in 2021, and medical studies

now overwhelmingly conclude that gender dysphoria is "highly treatable."  Dkt. 72-77 ¶ 17.

General Mattis explained that "[u]nlike past reviews, the [Mattis] Panel's analysis was

informed by the Department's own data and experience obtained since the Carter Policy took

effect."  *Id.* at 23; *see also* Tr. (Mar. 12, 2025) at 11.  Here, Defendants did not analyze the

"Department's own data and experience since the [Austin] Policy took effect."

### 2.    *2021 Psychological Health Center Review*

The Action Memo references and attaches a 2021 review conducted by DoD's

Psychological Health Center of Excellence and the Access Medical Standards Analysis and

Research Activity (the Center, AMSARA Report).  Dkt. 73-24.  The Center studied medical

issues relating to accession of persons with a history or diagnosis of gender dysphoria.  The

Center compared the available accessions records of transgender service persons to a cohort of

other servicemembers.  *Id.* at 5.

The Action Memo's entire discussion of the AMSARA Report is:

> A 2021 review conducted by DoD's [AMSARA team] found that "rates of
> disability *evaluation* were estimated to be higher [about 12%] among
> [transgender] service members [1%].  Additionally, this review found that
> nearly 40% of Service members with gender dysphoria in an observed
> cohort were non-deployable over a 24 month period.  This level of non-
> deployability creates significant readiness risk and places additional
> burdens on Service members without gender dysphoria to meet
> requirements.

Action Memo at 4 (emphasis added).

No one who has read the AMSARA Report could find that it supports this conclusion.

To start, the Action Memo fails to mention the Report's key finding: rates of transgender persons

experiencing the conditions of the cohort group (*psychiatric, musculoskeletal, and neurological*)

"were comparable to those of all service members evaluated for disability."  Dkt. 73-24 at 6

(emphasis added).  The other rates the Center studied were "similar" between the transgender cohort and the other servicemember cohort as to: (1) the proportion with history of any accession medical disqualification status; (2) the distribution of specific medical disqualifications; (3) the rates of adverse attrition; and (4) the rates of existing prior to service discharge.  *Id*. at 4.  The Action Memo quotes the *only* rate that was higher for transgender persons, and that was a rate of *evaluation*, not occurrence.  Action Memo at 4.

With respect to non-deployability, the Action Memo also ignores that "data w[as] not available from non-transgender service members that could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-deployability rate."  Dkt. 86-1 (AMSARA Parts I-III) at 11–12.  Without comparator data, the non-deployability rate for the transgender cohort is not informative, something the Report highlights.  Dkt. 73-24 at 6.

The Center also conducted a medical literature review as part of its work that the Action Memo ignores altogether.  One study stands out.  The AMSARA Report cited, without criticism, a 2014 study that summarized "and challenge[d] [] common notions to justify barring transgender individuals from Service which are actually not supported by research and not internally consistent with other DoD policies."  Dkt. 86-1 at 2.  "The most notable challenge to these assumptions is falsely equating transgender identify with mental health disorders, which has become a debunked connection broadly in the field."  *Id.*

The Court does not question military judgment broadly as to acceptable non-deployment rates.  The Court instead finds that the Action Memo's summary of the AMSARA Report is inexplicably misleading.  Further, the Report contradicts, rather than supports, the conclusions the Action Memo draws from it.  These findings support Plaintiffs' contention that Defendants

26

Add.29

did not exercise military judgment to which the Court can defer on the narrow question of

whether the Hegseth Policy comports with the Fifth Amendment.

### 3.    *2025 Medical Literature Review*

The Action Memo also references the 2025 Medical Literature Review conducted by the

Office of the Assistant Secretary of Defense for Health Affairs.  The Action Memo's entire

discussion of the Medical Literature Review is that it:

> Included findings that "55% of transgender individuals
> experienced suicidal ideation and 29% attempted suicide in their
> lifetime...[and] the suicide attempt rate is estimated to be 13 times
> higher among transgender individuals compared to their cisgender
> counterparts," "transgender individuals are approximately twice as
> likely to receive a psychiatric diagnosis compared to cisgender
> individuals," and that the strength of the evidence on transgender
> mental health and gender-affirming care is low to moderate.

Action Memo at 4–5 (quoting Dkt. 73-25 (Med. Lit. Rev.) at 2–3).

No one summarizing the Review in good faith could draw these conclusions.  To start,

the Medical Literature Review did not survey studies on transgender persons in military service:

*i.e.*, individuals already found to be physically and mentally fit.  Dkt. 73-25 at 2; *see also* Defs.

Concession, Tr. (Mar. 12, 2025) at 116–17.  So it can shed little light on how transgender

persons fare in the military.  *See also* Defs. Concession, Tr. (Mar. 12, 2025) at 117.  For that

analysis, the Court refers to the AMSARA Report, which, again, found similar rates of

psychotherapy for transgender and other servicemembers.

Second, the suicide conclusions of the Medical Literature Review undercut banning

transgender persons from the military.  To start, the military already restricts individuals with

suicidal tendencies from enlisting.  *See* DoDI 6130.03, Vol. 1, at 6.28(m).  Moreover, the studies

under review confirm that transgender persons are not inherently mentally unfit.  Instead, the

studies cited find that transgender suicide rates are influenced by external factors, such as

"gender identity-related disparities, discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence and victimization." Dkt. 73-25 at 3. The studies also show "that suicide risk among transgender . . . individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination." *Id.*; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 118–19.

Third, each meta-study cited found that Gender-Affirming Hormone Treatment and Gender-Affirming Surgery treatment improves psychological well-being, mental health, and quality of life. *See id.* at 4–6. Each treatment method reduces gender dysphoria, depression, anxiety, psychological distress, and depressive symptoms. *Id.* Further, "long-term studies show that regret rates are extremely low, with most individuals reporting improved quality of life, body image satisfaction, and overall well-being." *Id.* at 5.

The Court does not question military judgment as to what constitutes as disqualifying medical events. The Court instead finds that the Action Memo's summary of the 2025 Medical Literature Review is inexplicably misleading. Further, the Review contradicts, rather than supports, the conclusions the Action Memo draw from it. These findings support Plaintiffs' contention that Defendants did not exercise military judgment to which the Court can defer on the narrow question of whether the Hegseth Policy comports with the Fifth Amendment.

### 4.    *Military Costs*

The Action Memo concludes that "the costs associated with [gender-affirming] health care," which it estimates at $52 million over 10 years, make service by transgender members incompatible with military readiness. Action Memo at 5; Dkt. 66 at 5. It is impossible to see

how.  Assuming $5.2 million per year, estimated transgender care costs was fifty-seven hundred-thousandths of a percent (00.00057%) of total military spending for 2024.[19]  Perhaps understandably, then, Former Deputy Undersecretary Skelly testified, and Defendants do not rebut, that under the Austin Policy, the Assistant Secretary for Health Affairs or Defense Health Agency staff raised no concerns about the cost of treating transgender servicemembers.  *See* Dkt. 72-73 ¶ 14; *see also* Dkt. 72-68 ¶¶ 8–9.

Defendants could fairly respond that whether $5.2 million per year is a "rounding error" of the overall budget is not the right comparator.  Instead, they could argue, the number must be compared to similar costs the military incurs.  Had Defendants done that comparison—indeed, had they done *any* comparison—they might have a point.  But the Action Memo makes no comparison.  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 144–45.  It states that the amount to treat gender dysphoria is $52 million over ten years and that this amount is too high.  Action Memo at 5.  Comparisons are important, though.  For example, the Department spent approximately $41 million for Viagra in 2023, compared to an estimated $5.2 million for gender-affirming care.  *See* Dkt. 72-68 ¶ 9.[20]  Defendants do not explain why the former (and every other medical cost) is acceptable while the latter requires banning transgender persons from military service.  Tr. (Mar. 12, 2025) at 150–54.

Nor do Defendants analyze the costs of discharging and replacing thousands of trained servicemembers, many with decades of experience and specialized skills.  This is not an idle

---

[19] From January 1, 2016, to May 14, 2021, the military provided gender-affirming care to 1,892 active duty servicemembers.  Dkt. 66-1 at 2.  That number represents about two hundredths of one percent (0.02%) of the 9.5 million beneficiaries TRICARE covered in 2024.  *See id*.

[20] *See also Beyond the Budget: Addressing Financial Accountability in the Department of Defense: Joint Hearing Before the Subcomm. on Nat. Sec., the Border, & Foreign Affairs & the Subcomm. on Gov't Operations & the Fed. Workforce*, 118th Cong. 49 (2023).

question.  The military's practice of discharging gay and lesbian servicemembers under "Don't Ask, Don't Tell" "cost taxpayers more than $600 million." Dkt. 77-1 at 19 (cleaned up).  Even a sixth of that number would be twenty times the annual cost of care for gender dysphoria.  Nor do Defendants analyze whether the military could save the same costs, or more, in other areas and without excluding a class of people.

The Court does not question military judgment concerning how it should apportion its funds.  Nor does the Court find that the military must undertake an entire budget review before concluding some costs are unacceptably high.  But there must be *some* benchmark.  Citing a number—devoid of any context or analysis—and concluding that the number is too high does not support banning transgender persons from military service.  If it did, courts would have to accept *any* cost amount the military cites to justify any policy.

### 5.    *Missing Evidence*

If the Military Ban goes into effect, it will upend lives and ruin the careers of thousands of persons.  Given this potential impact, the evidence *not* in the record is striking.  Defendants claim transgender persons impact military readiness, but they acknowledge the DoD does not track individuals "by gender identity and has no means of searching for [the number of] 'transgender individuals.'"  Dkt. 66 at 5; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 173.  Not only that, but DoD's own Public Affairs Guidance on the Military Ban acknowledges that "[w]e [DoD] do not have an exact number of active-duty Service members diagnosed with gender dysphoria." Dkt. 79-1 at 6.  And it admits that "[w]e [DoD] do not have [a breakdown of individuals in the military by service, gender, race, and occupation] readily available." *Id.*

Without answers to these basic questions, Defendants cannot explain how transgender persons impact military readiness.  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 46–47.  How

have they done so?  Is that impact positive or negative?  Is it material?  How many have, like

Plaintiffs, served with distinction and are fit for continued service?  How many are stable after a

gender dysphoria diagnosis?  How many have had deployment issues?  How many will be

eligible for an exemption?  How many will be discharged?  What amount of irreplaceable

experience will the military then lose?  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 136–37.

Who knows?  Not Defendants.

The Hegseth Policy also does not contain: (1) evidence that transgender persons are

inherently unfit to serve; (2) evidence that being transgender is inconsistent with "honesty,"

"humility," and "integrity," EO14183 § 2; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 191;

(3) evidence that being transgender "conflicts with a soldier's commitment to an honorable,

truthful, and disciplined lifestyle," EO14183 § 1; *see also* Defs. Concession, Tr. (Mar. 12, 2025)

at 187; (4) analysis of whether the costs of discharging and replacing transgender

servicemembers outweigh the costs of retaining them; (5) analysis of the effect on military

readiness of losing thousands of servicemembers; or, among numerous other holes, (6) the

criteria of "exhibiting evidence of gender dysphoria," *see generally* Hegseth Policy, much less

how such behavior will be policed.  Defendants also concede that they have no *post hoc* evidence

(assuming the Court could even consider it) to justify the Military Ban.  Defs. Concession, Tr.

(Feb. 18, 2025) at 146–48.

To contextualize this absence, consider, by contrast, Executive Order 14208, "Ending

Procurement and Forced Use of Paper Straws."  90 Fed. Reg. 9585 (Feb. 10, 2025) (EO14208).

EO14208 makes it "the policy of the United States to end the use of paper straws."  *Id.* § 1.

EO14208 provides clear and articulable reasons to support its conclusions.  Paper straws: (1)

"are nonfunctional," (2) "use chemicals that may carry risks to human health," (3) "are more

expensive to produce than plastic straws," (4) "often force users to use multiple straws," and (5)

"sometimes come individually wrapped in plastic, undermining the environmental argument for

their use." *Id.* The White House also provided a fact sheet supporting EO14208, citing to

multiple studies supporting these claims. *See* Fact Sheet: President Donald J. Trump Ends the

Procurement and Forced Use of Paper Straws, The White House (Feb. 2025). No such rationale,

much less supporting data, is anywhere to be found in EO14183.

Presumably, a policy that bans transgender persons from military service—individuals

who have served honorably and "made American safer"—should result from study at least

comparable to one that bans paper straws.

### C.    Defendants' Failure to Consider the Military's Experience with Transgender Persons Serving Openly Undercuts the Military Ban

The Austin Policy—which the Hegseth Policy supersedes—"was based on years of

thoughtful policymaking supported by peer-reviewed scientific research" and "has resulted in a

stronger, not a weaker military." Dkt. 13-28 ¶ 34. High-ranking military leaders who

implemented the Austin Policy have submitted sworn declarations in which they testify, from

personal experience, that transgender persons serving openly has improved, not decreased,

military preparedness. Of the four declarations by high-ranking military leaders, Defendants

rebut only one aspect of one of them. The Court briefly reviews that testimony, including

Defendants' sole rebuttal, here.

#### 1.    *Plaintiffs' Declarants*

Declarant Carlos Del Toro was the 78th Secretary of the Navy. Dkt. 72-79 ¶ 1. Former

Secretary Del Toro had "oversite [sic] responsibilities over all personnel matters affecting the

Navy and Marine Corps, including implementation of . . . policies regarding service by

transgender personnel." *Id.* ¶ 6. Secretary Del Toro testifies that "[b]ased on [his] direct

32

Add.35

experience and observation, transgender service members who meet the standards required for their positions serve effectively and contribute positively to unit readiness." *Id.* ¶ 7.  Notably, during Secretary Del Toro's "three and a half years as Secretary," he "reviewed thousands of disciplinary cases and personnel matters," yet he cannot "recollect a single disciplinary case or performance issue related directly to a service member's transgender status." *Id.* ¶ 8.

Former Secretary Del Toro testifies that "being transgender does not inherently affect a service member's ability to meet [military] standards or to deploy worldwide," and that "[a]ny suggestion to the contrary contradicts the actual documented performance of transgender service members in our forces." *Id.* ¶ 10.  He further testifies that "[t]here is no evidence-based justification for excluding from service someone who meets all applicable standards merely because they are transgender," and that "[s]uch exclusion would harm military readiness by depriving our force of qualified personnel who have proven their ability to serve." *Id.* ¶ 13. "Contrary to speculative concerns, [he] has observed that allowing transgender individuals to serve strengthens unit cohesion by fostering honesty and mutual trust," and that "excluding transgender individuals from military service is destabilizing to good order and discipline." *Id.* ¶¶ 15, 17.

Declarant Alex Wagner is the former Assistant Secretary of the Air Force for Manpower and Reserve Affairs.  Dkt. 72-59 ¶ 1.  Mr. Wagner was a member of the working group convened by the Acting Undersecretary of Defense for Personnel and Readiness "to formulate policy options for DoD regarding transgender service members." *Id.* ¶ 9.  Mr. Wagner testifies that he is "not aware of any negative impact . . . on . . . our overall military readiness." *Id.* ¶ 27.  Rather, he testifies that the Austin Policy "foster[ed] openness and trust among team members . . . thereby engender[ing] stronger unit cohesion." *Id.* ¶ 28.  He is "not aware of any complaints

regarding unit cohesion" or "readiness." *Id.* ¶¶ 32, 33. It is "patently clear" to him that "the Austin Policy [did] not negatively impact[]" these objectives. *Id.* ¶ 32.

Declarant Yvette Bourcicot is the former Acting Assistant Secretary of the Army for Manpower and Reserve Affairs and former Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs. Dkt. 72-69 ¶ 1. Ms. Bourcicot also served on the working group convened to study the new policy allowing transgender persons to serve. *Id.* ¶ 12. Ms. Bourcicot testifies that she reviewed each request submitted by a transgender servicemember wishing to transition and that she "made a recommendation on whether to grant the service member's request." *Id.* ¶ 19. To her "best recollection," "every request [she] received met the requirements of the policy, and every requesting service member met the necessary standards for serving." *Id.* Ms. Bourcicot "observed no negative impact from permitting transgender service in the Army [] on our military capabilities" and is "unaware of any complaints regarding unit cohesion resulting from permitting transgender people to serve." *Id.* ¶¶ 23, 26.

Declarant Shawn G. Skelly is the former Deputy Under Secretary of Defense for Personnel and Readiness and Assistant Secretary of Defense for Readiness. Dkt. 72-72 ¶ 1. Mr. Skelly's responsibilities "included implementing the policy permitting service by transgender troops." *Id.* ¶ 8. Mr. Skelly testifies that the Austin Policy "enable[d] [the] military to retain highly trained and experienced service members by applying the same standards to transgender service members that are applied to others." *Id.* ¶ 10. He further testifies that "[t]he transgender service policy has not negatively impacted readiness," *id.* ¶ 11, and that he is "not aware of any complaints regarding unit cohesion resulting from the Austin [P]olicy," *id.* ¶ 13. "To the extent the Austin [P]olicy has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering increased trust among team members." *Id.* "Personnel

Add.37

policies that allow transgender service members to be evaluated based on skill and merit . . . do not jeopardize the military's mission of protecting the United States, but strengthen it." *Id.* ¶ 14.

### 2.    *Challenge to One Declarant's Testimony*

The Court informed Defendants that, if not challenged, it would accept the testimony contained in Plaintiffs' third-party declarations as findings of fact. Min. Order Feb. 10, 2025. It repeatedly informed Defendants that they had a right to cross-examine these witnesses, but Defendants declined to do so. Tr. (Feb. 18, 2025) at 121–22; Tr. (Mar. 12, 2025) at 128–29.

Defendants did file the sworn declaration of Timothy D. Dill, Assistant Secretary of Defense for Manpower and Reserve Affairs, Dkt. 52, to challenge the sworn declaration of Gilbert R. Cisneros, Jr., former Under Secretary of Defense for Personnel and Readiness, Dkt. 13-30, filed by Plaintiffs. Mr. Cisneros was responsible for overseeing implementation of the Austin Policy and testifies that, "[i]f there were complaints or problems about transgender service members, I would have known of them through my role as Under Secretary of Defense for Personnel and Readiness." Dkt. 13-30 ¶¶ 12, 17. He further testifies that "[i]n that role, I did hear complaints about some other issues, but I never received or heard about a single complaint relating to transgender service members." *Id.* To rebut this, Mr. Dill testifies that "it would be highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary [Mr. Cisneros]." Dkt. 52-1 ¶ 6. In response, Mr. Cisneros testifies that:

> [Mr. Dill's statement] does not accurately describe my degree of awareness of these matters as Under Secretary of Defense for Personnel and Readiness. As the Under Secretary in charge of readiness, it was my responsibility to be aware of unit cohesion, military readiness, medical readiness, deployability, and lethality. If a unit or service was dealing with readiness issues due to the service by transgender service members, that would have been brought to my attention.

Dkt. 53-1 ¶ 4. Mr. Cisneros provides an example concerning his oversight of Junior ROTC units to support this testimony. *Id.* ¶ 6. As between Mr. Cisneros, who testifies under oath as to his own experience, and Mr. Dill, who testifies under oath as to what he thinks Mr. Cisneros's personal experience would have been, the Court naturally credits Mr. Cisneros. That said, the Court would reach the same conclusions even if it did not credit this part of Mr. Cisneros's testimony.

Defendants argue generally that the declarants cannot have personal knowledge that "no complaint" was ever filed concerning a transgender servicemember. Tr. (Feb. 18, 2025) at 124–26. The Court accepts that contention and will not rely on these declarations for the proposition that *no* complaint anywhere in the Armed Forces ever arose. However, as former high-ranking officials at DoD directly involved in either drafting or implementing the Austin Policy, Plaintiffs' declarants have personal knowledge concerning the impact of transgender persons serving openly on military preparedness. And they unanimously conclude that they have had either no detrimental effect or have had a positive one. Defendants concede that they have proffered no evidence to contradict these assertions. Tr. (Feb. 18, 2025) at 120.

The Court, at this early stage of the litigation, accepts Plaintiffs' declarants' uncontested testimony as part of its findings of fact.

## STANDARD OF REVIEW

The "traditional goal of a preliminary injunction is to preserve [the] status quo," which is "the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). A party seeking preliminary injunctive relief must show that the following factors, taken together, weigh in favor of an injunction: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence

of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors "merge" into one "when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Circuits differ in their reading of *Winter*'s four factor test; some allow a strong showing of one factor to make up for a weaker showing on another, *see, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011) (employing this sliding-scale approach), while others require each element to be proven independently, *see, e.g.*, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Powell*, 915 F.3d 197, 215 n.7 (4th Cir. 2019).

Historically, this Circuit evaluated the factors on a sliding scale. *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). But it has read *Winter* "at least to suggest if not hold" that the moving party faces "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction." *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (cleaned up). Yet it has repeatedly "declined to take sides" on whether *Winter* so held. *Am Meat Inst. v. USDA*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

Because each of the four factors favors granting preliminary injunctive relief, Plaintiffs would prevail under either the sliding-scale or independent-factor approach. The Court therefore remains on the sidelines of this ongoing debate.

## PRELIMINARY INJUNCTION ANALYSIS

### I.    PLAINTIFFS' COMPLAINT IS RIPE

Defendants contend that this Court lacks jurisdiction because Plaintiffs did not exhaust their administrative remedies. Opp. at 26–28. Because some Plaintiffs are current military

personnel, they claim, those Plaintiffs must exhaust military tribunals before involving "civilian courts." *Id*. at 27 (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) (cleaned up)).  Not so.

Plaintiffs claim the Military Ban violates the Fifth Amendment.  Defendants cite no support for their contention that exhaustion is required for claims that raise a constitutional challenge to agency action.  Opp. at 15-18.  In *Axon Enter. Inc. v. FTC*, the Supreme Court held that petitioners could raise, without exhausting their remedies, a challenge "collateral to any decisions the [agencies] could make in individual enforcement proceedings."  598 U.S. 175, 195 (2023).  *Axon* involved a challenge to the constitutionality of the agency itself, but its reasoning is informative here.  Plaintiffs claim that subjecting them to discharge proceedings, verbal degradation, and reputational damage, though they are physically and mentally fit to serve, are "here-and-now" injuries of being subjected to an unconstitutional policy.  *Id*. at 192.  No relief ordered by a military tribunal can remedy such harm.  *Id.*

Exhaustion is also futile.  Defendants push back by stating: "[t]he [obviously futile] exception applies only when 'the agency will most certainly deny any relief … because it has a preconceived notion on … the matter.'"  Opp. at 17 (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986)).  They claim the relief here is not preordained.  It is.  The Hegseth Policy lays out in detail the military's "preconceived notion" on Plaintiffs' service.

Defendants finally claim that "development of a factual record" by the military will assist the Court in its analysis of the involuntary separation.  Opp. at 17.  What more facts does the Court need as to the individual Plaintiffs?  Each active-duty Plaintiff is subject to the Hegseth

Policy, no Plaintiff is eligible for a waiver, and the military will discharge each one.  Defs.

Concession, Tr. (March 12, 2025) at 160–63.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Deference to the Military

#### *1.    Defendants Seek Too Broad an Application of Deference*

The Court agrees that "courts [are] ill-equipped to determine the impact upon discipline

that any particular intrusion upon military authority might have" and that "the military

authorities [not courts] have been charged by the Executive and Legislative Branches with

carrying out our Nation's military policy."  *Goldman v. Weinberger*, 475 U.S. 503, 507–08

(1986) (cleaned up).  Often, courts accept "the reasoned, professional analysis of Congress and

the Executive on matters strictly within the realm of military expertise."  *Doe 2 v. Shanahan*, 917

F.3d 694, 702 (D.C. Cir. 2019) (Wilkins, J., concurring).

Defendants carry deference too far, however.  By "defer" they basically mean the Court

must side with the military's position, end-stop.  And they contend the Court must defer even if

the judgment, as here, does not make sense.

> THE COURT: [F]or every 1 thousand people we can expect less than 2 will require care for gender dysphoria.  Can you explain to me, please, how two out of 1 thousand people negatively impact unit cohesion?
>
> DEFENSE COUNSEL: I don't have an answer for that beyond what's in the record.
>
> THE COURT: Well, there's no answer in the record.  If there's an answer in the record, tell me what the answer in the record is, if there is no answer, [and] you can't answer, that is fine.
>
> DEFENSE COUNSEL: These are judgments the military has made.

Tr. (Mar. 12, 2025) at 175–76.

Must defer even if prior military judgment supported by extensive study and data will go, as here, by the wayside.

> THE COURT:  [Can] you point to me any case in American history that says to a [c]ourt you should defer on a military policy [that replaces] another military policy that was put in place after review by the President of the United States and careful review by military leaders[.  You] should ignore [the latter] and defer instead to a policy put in place by an individual who has been the Secretary of Defense for about 30 days and who cited in his reasoning, two studies that undercut what he is doing.
>
> . . .
>
> DEFENSE COUNSEL:  I don't have a case that has every specific fact that's at issue here.
>
> THE COURT:  …[A]nything remotely close to this?
>
> DEFENSE COUNSEL:  I mean, I think every single of the Supreme Court's and Courts of Appeals military deference doctrines are deference to the current military…I think by definition, these are Courts that are deferring to current military judgments about an issue.

Tr. (Mar. 12, 2025) at 132–33.

Must defer even if the military judgment, as here, is not supported by "actual data."

> THE COURT: How can someone decide that a group of people are hurting unit cohesion and discipline if we have no records of them doing so and we don't even know who they are?
>
> DEFENSE COUNSEL: The person and the people who are entrusted to decide that question are the military and the president. And if there's not actual data to back something up, the question is a professional military judgment.  Again, as I said, a prediction.

Tr. (Mar. 12, 2025) at 137–38.

### 2.    *Courts Do Not Owe the Military Blind Deference*

Defendants' position does not urge judicial deference to military judgment.  It urges judicial abdication.  No.  The law does not demand that the Court rubber-stamp illogical judgments based on conjecture.  In fact, it requires the opposite because the executive does not

enjoy a "wholesale license to discriminate in matters of military policy." *Doe 2*, 917 F.3d at 704 (Wilkins, J., concurring).

The D.C. Circuit's recent decision in *Singh v. Berger* is informative. 56 F.4th 88 (D.C. Cir. 2022). *Singh* reversed a district court's denial of a preliminary injunction against a Marine Corps' standard grooming and dress policy that plaintiffs claimed violated their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq*. *Id.* at 91. The D.C. Circuit acknowledged that "[t]o inculcate the importance to service members of sacrificing personal preferences and identifies in favor of the overall group mission, the military has long had an interest in the strict enforcement of its uniform dress requirements." *Id.* (cleaned up). And it "indulge[d] the widest latitude in considering the Marine Corps' interests in fostering cohesion and unity among its members, which surely qualifies as compelling." *Id.* at 99 (cleaned up). But it also highlighted that "the cost of military service has never entailed the complete surrender of all basic rights." *Id.* at 92 (citing cases) (cleaned up). The D.C. Circuit analyzed the military's justifications and found that "the Marine Corps [had] come up very short." *Id.* at 107.

Defendants relegate *Singh* to a footnote. They claim it is inapposite because it involved RFRA, which contains a strict scrutiny standard. Opp. at 38 n.8. It does. But even employing a lower scrutiny standard, Plaintiffs retain their constitutional rights. Notwithstanding the deference the Court owes it, the military still must show that burdening these Plaintiffs' equal protection rights is related to furthering a government interest. And as discussed throughout this opinion, the military's justifications "come up very short." *Singh*, 56 F.4th at 107.

*Singh* also instructed the district court to enter a preliminary injunction that altered the status quo. That itself is rare because "courts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the

non-movant ultimately wins on the merits." *Id.* at 95. Here, the Military Ban—not an injunction—would upend the status quo. Further, if Defendants later prevail on the merits, they will not be prejudiced as was the case in *Singh*.

Sidestepping *Singh*, Defendants point instead to *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981), in which the Supreme Court upheld a law that required only men to register for the draft. Without question, *Rostker* is an example of the Supreme Court showing deference to military judgment, even when it implicates sex-based distinctions. Defendants, overstep, however, in claiming that in *Rostker* "the Court's approach most closely resembles rational-basis review." Opp. at 38. Even in *Rostker*, the Supreme Court deferred because it found that Congress had acted with "deliberate consideration," rather than "unthinkingly" or "reflexively." *Id.* at 72, 83. The Military Ban's 30-day incubation period pales next to the "hearings, floor debate, and in committee" discussions that precipitated the law in *Rostker*. *Id.* at 72.

Further, the Supreme Court's later-decided *United States v. Virginia* (*VMI*) decision "drastically revise[d] [the Court's] established standards for reviewing sex-based classifications." 518 U.S. at 566 (Scalia, J., dissenting). When reviewing sex-based classifications, "the reviewing court must determine with the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. That is intermediate, not rational, review.

Defendants' reliance on *Goldman v. Weinberger* is similarly unpersuasive. 475 U.S. 503 (1986). Defendants argue that judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." Opp. at 37–38; *see also* 475 U.S. at 507. Sure. But this is not a First Amendment case. And the facts of *Goldman* bear no relation to those here.

*Goldman* asked whether an Orthodox Jewish servicemember "can wear a yarmulke while in uniform."  *Id.* at 504.  The question here is whether transgender persons can wear the uniform at all.  The Supreme Court would likely not have signed off on the military banning all Orthodox Jews who had ever worn a yarmulke from service.

### 3. Trump v. Hawaii *Confirms that the Military Is Not Owed Blind Deference*

To argue the Court must defer to the military's judgment here, Defendants rely heavily on *Trump v. Hawaii*.  *See* Opp. at 39, 50–52; 585 U.S. 667 (2018).  That reliance is misplaced.

A week after taking office in 2017, President Trump issued what he had previously called a "Muslim Ban."  By executive order, he limited entry into the United States by foreign nationals from Muslim-majority countries.  *Id.* at 676.  A month and a half later, after an injunction blocked the policy, President Trump replaced his first executive order with a second executive order.  *Id.*  The second order restricted entry of foreign nationals from six of the original seven countries, though it allowed waivers on a case-by-case basis.  *Id.*  After lower courts again enjoined the order, the Supreme Court stayed the injunctions.  *Id.* at 677.

In September 2017, after the Secretary of Homeland Security completed a review of the policy, President Trump issued yet another iteration, Proclamation No. 9645.  *Id.*  The Proclamation implemented entry restrictions for foreign nationals from eight countries "whose systems for managing and sharing information about their nationals the President deemed inadequate."  *Id.*  Plaintiffs in *Trump v. Hawaii* challenged it as a violation of the Establishment Clause, alleging that it was "motivated not by concerns pertaining to national security but by animus toward Islam."  *Id.* at 681.  They were unsuccessful.

The Supreme Court rejected Plaintiffs' contention that the new policy simply continued the animus they claimed permeated the first one.  *Id.* at 706.  First, Proclamation No. 9645

"sa[id] nothing about religion." *Id.* at 706. It was a "facially neutral policy denying certain foreign nationals the privilege of admission" to the United States. *Id.* at 710. It did not mention Islam or any other religion. Additionally, the first ban went into effect seven days after President Trump was inaugurated. *Id.* at 676. Proclamation No. 9645 came 8 months later and "reflect[ed] the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies." *Id.* at 707. Because of the "thoroughness" of the "multi-agency review," the Supreme Court ultimately deferred to the Executive's determination that the ban was important for national security. *Id.* at 707–08.

Second, Proclamation No. 9645 restricted entry for foreign nationals from some Muslim majority countries, but not all, and it applied to foreign nationals of all religions. *Id.* at 707. Because the policy did not encompass all Muslim majority countries, the Supreme Court reasoned that "the determinations were justified by the distinct conditions in each country." *Id.* Third, it found Proclamation No. 9645 to be "expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Id.* at 706. It found that the restrictions reflected in the Proclamation were designed to achieve those purposes. *Id.* at 708–09.

Comparing the facts of the policy upheld in *Hawaii* to the ones here is informative.

Add.47

| *Trump v. Hawaii* | Military Ban |
|---|---|
| Facially neutral | Not facially neutral |
| Months and numerous working groups removed from "Muslim ban" tweets | "Transgender ban" tweet posted the day after the Hegseth Policy issued |
| Multiple iterations of the ban | One iteration of the ban |
| No derogatory characterizations | Derogatory characterizations |
| Alleged animus statements were outside the proclamation's text | Animus in the ban's text |
| Legitimate waiver program | Waivers in name only |
| World-wide review process | No discernable review process |

This Court has the same obligation here as the Supreme Court did in *Hawaii* and the D.C. Circuit in *Singh* to test the military's assertion of its interests. It does so in the rest of this Opinion.

## B.    Intermediate Scrutiny

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. While "not as explicit a guarantee of equal treatment as the Fourteenth Amendment," the Supreme Court has held that "the Constitution imposes upon federal, state, and local government actors the *same* obligation to respect the personal right to equal protection of the laws." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 231–32 (1995) (emphasis added).

The parties dispute whether the Military Ban denies Plaintiffs equal protection as a quasi-suspect class. Laws that do not classify based on a suspect or quasi-suspect class "[are]

presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Laws that discriminate based on a quasi-suspect classification must survive intermediate scrutiny. The government "must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (quoting *VMI*, 518 U.S. at 533).

Plaintiffs are likely to succeed on their claim that the Military Ban is subject to intermediate scrutiny because it classifies based on sex and transgender status, two distinct quasi-suspect classes. Plaintiffs are also likely to succeed on their claim that the Military Ban fails intermediate scrutiny.

### 1.    *The Military Ban Classifies on the Basis of Sex*

The Supreme Court has recognized that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Plaintiffs claim that the logic of *Bostock* applies in the equal protection context; Defendants disagree. Plaintiffs have the better argument.

### a.    *The Logic of* **Bostock** *Applies to the Equal Protection Analysis*

In *Bostock*, the Supreme Court considered whether firing an employee for being transgender or homosexual constituted sex discrimination. *Bostock*, 590 U.S. at 650–52. The case arose under Title VII, which prohibits discrimination "because of . . . sex." *Id.* at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). In holding that firing an employee for being transgender did in fact constitute sex discrimination, Justice Neil M. Gorsuch asserted that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating

against that individual based on sex." *Id.* at 660. To illustrate this point, Justice Gorsuch offered

a hypothetical involving an employer and two employees. *See id.* The two hypothetical

employees were identical in every way except that one was a transgender woman and the other a

cisgender woman. *See id.* Justice Gorsuch explained that if the hypothetical employer fires only

the transgender woman because she is transgender, it has "intentionally penalize[d]" her "for

traits or actions that it tolerates in an employee identified as female at birth." *Id.* He concluded

that "if changing the employee's sex would have yielded a different choice by the employer,"

then the discrimination is based on sex. *Id.* at 659–60.

The Court agrees with Defendants that *Bostock*'s holding is cabined to Title VII. *Id.* at

660; Opp. at 34. But its reasoning is not. The Supreme Court deduced it *impossible*—end

stop—to discriminate against a transgender person without discriminating against that person

based on sex. *Bostock*, 590 U.S. at 660. Three circuit courts have applied that same logic in the

Fifth Amendment context. The Fourth Circuit *en banc* has held that: "discriminating on the basis

of [a gender dysphoria] diagnosis *is* discriminating on the basis of gender identity and sex."

*Kadel v. Folwell*, 100 F.4th 122, 141 (4th Cir. 2024) (en banc) (cleaned up). Ditto the Ninth

Circuit. *See Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024). Ditto the Tenth Circuit. *See*

*Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024).

On the other hand, the Sixth and Eleventh Circuits have declined to borrow *Bostock*'s

discrimination analysis because of "[d]ifferences between the language of [Title VII] and the

Constitution." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023); *see also*

*Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228–29 (11th Cir. 2023). First, "Title VII

covers disparate impact claims" while "the [Fifth] Amendment does not." *L.W.*, 83 F.4th at 485.

Second, Title VII is limited to certain classifications, and it does not incorporate tiers of scrutiny.

*Bostock*, 590 U.S. at 655.  In contrast, the Fifth Amendment "addresses all manner of distinctions between persons" and "implies different degrees of judicial scrutiny."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring).  Third, Title VII also contains many defenses—such as "bona fide occupational qualifications and bona fide seniority and merit systems"—that the Fifth Amendment does not. *L.W.*, 83 F.4th at 485.

All true.  But a distinction is not necessarily one with a difference.  "[N]othing about these differences [] prevent[s] *Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from [being] appl[ied] to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." *Fowler*, 104 F.4th at 790 (citing *Bostock*, 590 U.S. at 660).  "Adopting *Bostock*'s commonsense explanation for how to detect a sex-based classification does not require us to import Title VII's test for liability."  *Fowler*, 104 F.4th at 790–91 (cleaned up).  That Title VII's defenses are codified in separate provisions of Title VII, arguably "bel[ies] any notion that those defenses must apply in equal-protection cases."  *L.W.*, 83 F.4th at 503 n.7 (White, J., dissenting).

The differences between the provisions—material as they may be in some situations—have no bearing on the Supreme Court's careful step-by-step reasoning on the "inextricable relationship" that exists between transgender status and sex.  *See Fowler*, 104 F.4th at 790.  The Court therefore applies *Bostock*'s reasoning to analyze the Military Ban.  In doing so, it does not "import[] the Title VII test for liability," *L.W.*, 83 F.4th at 485, into the equal protection guarantee of the Fifth Amendment.  Rather, it borrows Justice Gorsuch's reasoning to conclude that transgender discrimination is a form of sex discrimination for purposes of the equal protection inquiry.

Add.51

### b. Application of the Military Ban to Both Males and Females Does Not Negate Plaintiffs' Individual Rights to Equal Protection

The Military Ban's *raison d'être* is to exclude transgender persons from military service on the basis of their sex. EO14183 posits that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." EO14183 § 1. The Hegseth Policy declares that the DoD "only recognizes two sexes: male and female," and that "[a]n individual's sex is immutable, unchanging during a person's life." Hegseth Policy at 3. It demands that "[a]ll Service members [] serve in accordance with their [biological] sex." *Id.*

The Military Ban excludes from service transgender women because they are biologically male but identify as women. Had those very same servicemembers been born female, the military would not ban them. Is this discrimination on the basis of sex? The test is simple: would changing that transgender soldier's sex lead to a different decision by the military? Yes, a biological female who identifies as a woman is not banned. Ergo, discrimination. To adopt Justice Gorsuch's analysis to this case:

> [T]ake … a transgender person [discharged from the military] who was identified as a male at birth but who now identifies as a female. If the [military] retains an otherwise identical [soldier] who was identified as female at birth, the [military] intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in [a soldier] identified as female at birth. Again, the individual [soldier's] sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 590 U.S. at 660.

To this, Defendants have no answer. They argue instead that because the Military Ban "applies equally to males and female servicemembers," it does not discriminate based on sex. Dkt. 38 at 14; *see also id.* at 33. They focus on Justice Gorsuch's assertion in *Bostock* that "[t]he

employers might be onto something if Title VII only ensured equal treatment between groups of men and women . . . Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups." *Bostock*, 590 U.S. at 671; Dkt. 38 at 33; Tr. (Feb. 19, 2025) at 35–39.

Defendants' argument "misreads the Equal Protection Clause to protect particular groups, a construction that [the Supreme Court has] tirelessly repudiated in a long line of cases understanding equal protection as a personal right." *Schuette v. Coalition to Def. Affirmative Action*, 572 U.S. 291, 324 (2014) (Scalia, J., concurring) (cleaned up). Instead, it is a "basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*." *Adarand Constructors*, 515 U.S. at 227 (considering race classification) (emphasis in original). Government actions based on sex "should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Id*. Thus, in *Loving v. Virginia*, the Supreme Court rejected "the notion that the mere equal application of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discrimination." 388 U.S. 1, 8 (1967) (cleaned up).[21] And in *J.E.B. v. Alabama ex rel. T.B.*, the Supreme Court held that the Equal Protection Clause prohibits discrimination in jury selection on the basis of sex even though the challenged practice applied equally to both sexes. 511 U.S. 127, 131, 146 (1994).

Defendants' final push to distinguish *Bostock* centers on the "premise" from which *Bostock* proceeds. Opp. at 23. "While in the Title VII context individuals are generally similarly

---

[21] Granted, race-based claims are subject to a higher level of scrutiny than sex-based claims in an equal protection inquiry. *See Cleburne*, 473 U.S. at 440–41. But neither the Supreme Court nor the D.C. Circuit have said that the initial question—whether there is a classification—differs depending on the classification at issue.

situated because an individual's homosexuality or transgender status is not relevant to employment decisions, . . . men and women are not similarly situated when it comes to certain military standards." *Id.* at 23–24 (cleaned up). True. But again, the Court here does not apply *Bostock* or "import[] the Title VII test for liability." *L.W.*, 83 F.4th at 485. It instead borrows Justice Gorsuch's logic to conclude that transgender discrimination is a form of sex discrimination. And because the Military Ban targets transgender persons for disparate treatment, it creates an explicit sex-based classification that requires application of intermediate scrutiny. *See VMI*, 518 U.S. at 531.

### 2.    *Transgender Persons are a Quasi-Suspect Group*

Plaintiffs argue that the Military Ban is also subject to intermediate scrutiny because transgender persons are a quasi-suspect class. Neither the Supreme Court[22] nor the D.C. Circuit has addressed this contention. But the relevant test is well established. *See Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987). Quasi-suspect classes have historically been subject to discrimination, *Cleburne*, 473 U.S. at 440–41; they have a defining characteristic that bears no relation to ability to contribute to society, *id.*; they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and they lack political power, *id.*

The Court addresses each factor in turn. But, first, it acknowledges that the bar for recognizing a new quasi-suspect class is high. As Defendants emphasize, Opp. at 35, the Supreme Court "has not recognized any new constitutionally protected classes in over four decades[] and instead has repeatedly declined to do so." *L.W.*, 83 F.4th at 486. But the bar—no

---

[22] A case pending before the Supreme Court might settle the question. *See United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024). But the Court cannot read tea leaves, so it will not speculate about the outcome there in reaching its decision.

Add.54

matter how high—is not insurmountable. *See Padula*, 822 F.2d at 102. Indeed, many Circuit Courts have held that the transgender community clears it. *See Hecox*, 104 F.4th at 1079; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) *as amended* (Aug. 28, 2020) [23]; *but see L.W.*, 83 F.4th at 486–87.

### a.    *Transgender Persons Face Discrimination*

Transgender persons, "[a]s a class[,] . . . have suffered, and continue to suffer, severe persecution and discrimination." *Doe 1*, 275 F. Supp. 3d at 208–09. Other executive orders issued by President Trump seek to deny them necessary medical care (and threaten those who help them with potential civil and criminal liability), erase them from all government websites, and refuse them access to homeless shelters. *See infra* Analysis II.C.3. Dozens of state laws also target transgender persons. *See* Dkt. 73-15. These bills span transgender rights to education, healthcare, birth certificates, employment, bathroom access, incarceration, marriage, civil rights, adoption, child abuse, pronouns, and the military. *See id.* Taken together, these actions show government hostility—and at times outright discrimination—against transgender persons.

This discrimination is not new. *See Grimm*, 972 F.3d at 612. The transgender community has historically "suffer[ed] from high rates of employment discrimination, economic instability, and homelessness." *Id.* at 611. According to a 2011 National Transgender

---

[23] Numerous district courts, including this one, have also held that transgender persons constitute a quasi-suspect class. *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017), *vacated on other grounds by Doe 2 v. Shanahan*, 755 Fed. Appx. 19 (D.C. Cir. 2019); *Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 872–74 (S.D. Ohio 2016); *Adkins v. City of New York.*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

Add.55

Discrimination Survey (NTDS), transgender persons are twice as likely as the general population to experience unemployment. *Id.* at 611–12.  When employed, 97% of NTDS respondents reported experiencing some mistreatment at work or having to conceal their transition to avoid mistreatment.  *Id.* at 612.  Transgender persons frequently experience harassment, and at times physical assault, in schools, medical settings, and retail stores.  *Id.*  They are also "more likely to be [victims] of violent crimes" than the general population.  *Id.*; *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).  For good reason, then, in 2009, the House Judiciary Committee "recognized the extreme bias against gender nonconformity" and the "particularly violent crimes perpetrated against transgender persons." *Grimm*, 972 F.3d at 612 (cleaned up).

This discrimination has not been without effect.  The medical literature review study the Action Memo cites concludes that transgender persons have a higher rate of mental health episodes because of the pervasive discrimination they face.  *See supra* Findings of Fact II.B.  For these reasons, the Court finds that transgender persons, as a class, satisfy this factor.

### b.    *Transgender Persons Contribute to Society*

Being transgender bears no relation to one's ability to perform or contribute to society. *Grimm*, 972 F.3d at 612.  Plaintiffs' service—exemplary service that Defendants recognize— proves as much.  Dr. Brown,[24] Plaintiffs' expert, confirms that "there is no medical or scientific basis for the assertion that being transgender conflicts with military standards of troop readiness, lethality, cohesion, honesty, humility, uniformity, or integrity."  Dkt. 72-77 at 4.  Seventeen of

---

[24] Dr. Brown earned his Doctor of Medicine from the University of Rochester School of Medicine in 1983.  Dkt. 72-77 ¶ 4.  He has three decades of experience researching, teaching, and consulting about transgender health issues, including gender dysphoria.  *Id.* ¶ 2.  He has authored well over a hundred publications on the subject and received dozens of awards for his work.  Dkt. 32-1 at 9–10, 14–22.

Add.56

the foremost medical, mental health, and public health organizations agree that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[25]  While some transgender persons experience gender dysphoria, and that could cause some level of impairment, not all transgender persons have gender dysphoria.  Those who do can obtain effective treatment.  Dkt. 32-2 at 6, 9, 15.  Defendants offer no rebuttal to this evidence.  For these reasons, the Court finds that transgender persons, as a class, satisfy this factor.

### c.    *Transgender Persons Have Immutable Characteristics*

The Court agrees with the holdings of other courts that transgender persons constitute a discrete group with immutable characteristics.  "Gender identity is formulated for most people at a very early age." *Grimm*, 972 F.3d at 612.  It is also "not a choice."  *Id.*  "Rather, it is as natural and immutable as being cisgender."  *Id.*; *see also Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1087 (9th Cir. 2000).

Plaintiffs cite numerous studies to support their immutability argument.  First, those studies show that "transgender women and non-transgender women have similar brain structures, specifically in the volume of the bed nucleus of the stria terminalis."  Dkt. 57 at 5.  Second, they show "that if one identical twin is transgender, the other is much more likely to be transgender compared to fraternal twins."  *Id*.  And third, they show that scientists are now investigating differences in specific genes associated with being transgender.  *Id.* at 5–6.  These studies highlight that biology likely plays a role shaping a person's transgender identity.

---

[25] Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender and Gender Non-Conforming Individuals 1 (2024), https://www.psychiatry.org/getattachment/ad686aa4-8ca9-4a92-b007-cf05a50f8e78/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

Add.57

Defendants disagree. Citing the Sixth Circuit's *L.W.* decision, they claim that transgender identity "is not necessarily immutable, as the stories of detransitioners indicate." Opp. at 36 (citing *L.W.*, 83 F.4th at 487) (cleaned up). If people can detransition, being transgender is not immutable. Case closed, Defendants say. Not so fast, Plaintiffs shoot back. A detransition is not always voluntary and does not dispel gender dysphoria. Indeed, "no available research indicates that change efforts are effective in altering gender identity." Dkt. 72-3 at 3 (cleaned up). To the contrary, individuals who detransition "have reported harm resulting from these experience[s] such as emotional distress, loss of relationships, and low self-worth." *Id.* at 4 (cleaned up). Gender identity change efforts "are associated with harmful social and emotional effects for many individuals, including but not limited to, the onset or increase of depression, anxiety, suicidality, loss of sexual feeling, impotence, deteriorated family relationships, a range of post-traumatic responses, and substance abuse." *Id.* (cleaned up). "Leading medical and mental health professional associations agree." *Id.* Defendants offer no rebuttal.

Defendants also cite *L.W.*'s statement that "[t]ransgender status [] is not characterized by a specific defining feature, but instead may be said to include 'a huge variety of gender identities and expressions.'" Opp. at 36 (citing *L.W.*, 83 F.4th at 487). But neither Defendants nor Plaintiffs assert such a broad definition of "transgender." *See* Third Amend. Compl. ¶¶ 218–23. The parties' definitions cover individuals that either *live or wish to live in* (according to Plaintiffs, Third Amend. Compl. ¶ 218) or *identify as* (according to Defendants, Tr. (Feb. 18, 2025) at 45) a sex different than their birth sex. These definitions are consistent with each other and with the American Psychological Association's definition of "transgender." *See* Dkt. 57-3 at 2. The Court finds that, as a class, transgender persons satisfy this factor.

        *d.*      ***Transgender Persons Constitute a Minority Lacking Political Power***

Defendants deem it "untenable" to claim that transgender persons cannot attract the attention of lawmakers, and they cite federal and state laws protecting transgender persons in the employment setting.  Opp. at 36–37.  They also claim that transgender persons "achieved at least some version of their desired military policy from the last two Democratic Administrations and can reasonably be expected to do so again from the next Democratic Administration."  *Id.* at 36. Likewise, the Sixth Circuit has stated that it is "difficult to maintain that the democratic process remains broken on this issue today" in part because "[t]he President of the United States [Biden] and the Department of Justice support the [transgender] plaintiffs."  *L.W.*, 83 F.4th at 487.  But that support was new, and the Trump Administration quickly withdrew that support when it re-assumed office.[26]

The question, however, is not whether the political process is broken on any given day on a given issue.  The question is whether transgender persons—who comprise approximately 0.6% of the adult population in the United States[27]—have been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  This Memorandum Opinion's sub-headings concerning military service alone answer it:

> Part I.A. Obama—Transgender Persons Can Serve
> Part I.B. Trump I—Transgender Persons Cannot Serve
> Part I.C. Biden—Transgender Persons Can Serve

---

[26] *United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024) (Feb. 7, 2025 Letter from Deputy Solicitor General).

[27] Grace Abels, *How many trans people are there in the U.S., and why do we overestimate it?*, PolitiFact (July 13, 2023), https://www.politifact.com/article/2023/jul/13/how-many-trans-people-are-there-in-the-us-and-why/.

Part I.D. Trump II—Transgender Persons Cannot Serve.

Being kicked around like a football by whatever team has possession is the opposite of

meaningful political power. The Court finds that transgender persons, as a class, satisfy this

factor.

### 3.    *Application of Intermediate Scrutiny*

Intermediate scrutiny is a "demanding" standard. *VMI*, 518 U.S. at 533. The burden

"rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its

differential treatment. *Id*. The Government must show "that the [challenged] classification

serves important governmental objectives and that the discriminatory means employed are

substantially related to the achievement of those objectives." *Id.* (cleaned up). The justification

for a law that discriminates against a quasi-suspect class "must be genuine, not hypothesized or

invented *post hoc* in response to litigation." *Id.* "And it must not rely on overbroad

generalizations about the different talents, capacities, or preferences of males and females." *Id.*

Defendants suggest that "ample evidence supports the military's judgment on this issue."

Opp. at 40. They divide their evidence into three categories: (1) military readiness, (2) unit

cohesion, good order, and discipline, and (3) disproportionate costs. Below, the Court addresses

the lack of any connection between Defendants' evidence and the Military Ban's directives. In a

separate section below, *see infra* Analysis II.C., the Court finds that the Military Ban is littered

with animus and pretext. That discussion is equally applicable in assessing why the Military Ban

does not survive intermediate scrutiny.

### a.    *Military Readiness*

Defendants first argue that DoD "is concerned about subjecting those with a history of

gender dysphoria to the unique stresses of military life." Opp. at 41. They explain that "any

mental-health condition characterized by clinically significant distress or impairment in

functioning raises readiness concerns." *Id.*  And because there is an "absence of evidence on the impact of deployment on individuals with gender dysphoria," DoD "concluded that this condition posed readiness risks." *Id.* (cleaned up).  Defendants also argue that "it remains the case that transition-related medical treatment . . . could render transitioning servicemembers non-deployable for a potentially significant amount of time," which could create "harmful effects on transitioning servicemembers' units as a whole." *Id.* at 42–43 (cleaned up).

To support these conclusions, Defendants "expressly relied" on the 2018 Mattis Policy, the 2021 AMSARA Report, and the 2025 Medical Literature Review.  Opp. at 41–44.  Not one of these supports a finding that the discriminatory means employed (banning transgender persons from serving) are substantially related to the achievement of the Ban's objectives (military readiness).  First, citing the Mattis Policy, Defendants claim that there is an "'absence [of experience] on the impact of deployment on individuals with gender dysphoria.'"  *Id*. at 41 (quoting Mattis Policy at 39).  Therefore, gender dysphoria "pose[s] readiness risks."  *Id.*  But there is no absence.  There *may* have been one *in 2018* when the Mattis Policy issued.  Since then, however, persons with gender dysphoria have been deployed under the Austin Policy.  *See supra* Background III.  That Defendants did not review the impact of their service does not mean it does not exist.

Second, the AMSARA Report supports *retaining* transgender persons in the military.  *See id.*  Of the eleven categories it studied, in ten transgender persons' statistics were similar to or better than those for other servicemembers.  *Id*.; *see also* Tr. (Mar. 12, 2025) at 78.  The Action Memo picked the one outlier: transgender persons are *evaluated* more.  Tr. (Mar. 12, 2025) at 47.  But their *occurrence* rates, including in psychotherapy and surgery, are similar.  *Id.* at 68.  Defendants' argument that the Report found that transgender persons' non-deployment rates

were unacceptable is incorrect.  The Report expressly found that more study was needed before anyone could reach such a conclusion because comparator data for other servicemembers had not been collected.  Dkt. 73-24 at 6.

Third, the 2025 Medical Literature Review does not include studies that address military servicemembers.  It therefore does not study the effect of service on active-duty transgender servicemembers, all of whom have met the military's mental fitness requirements to accede.  *See* Tr. (Mar. 12, 2025) at 130.  Indeed, Defendants cite no contemporaneous support for their purported concern that those with a history of gender dysphoria are more prone to the unique stresses of military life.  To the contrary, the Review confirms that—contrary to the presumption that those who have ever had gender dysphoria cannot serve—gender dysphoria is highly treatable.  *See id.*

Plaintiffs, for their part, have provided evidence that disproves any relation between the Military Ban's methods and goals.  Five military leaders in charge of implementing the Austin Policy each conclude that the Austin Policy was "based on years of thoughtful policymaking supported by peer-reviewed scientific research" and that it "has resulted in a stronger, not a weaker military."  Dkt. 72-69 ¶ 34.  Based on their first-hand knowledge, they each also testify that the Austin Policy "fosters openness and trust among team members, thereby enhancing unit cohesion."  Dkt. 72-74 ¶ 13; *see also* Dkt. 72-72 ¶ 9.  They testify that the Military Ban—not the Austin Policy—"is harmful to the military" and "undermines unit readiness."  Dkt. 72-59 ¶ 38; *see also* Dkt. 72-72 ¶ 21 ("[A] prohibition on service by transgender individuals would degrade military readiness and capabilities.").  Other than a limited foundation objection as to one declarant, Defendants do not rebut this testimony.

### b.    Unit Cohesion, Good Order, and Discipline

Defendants further contend that "DoD reasonably determined that exempting individuals with gender dysphoria who have undergone gender transition or seek to do so from the military's sex-based standards would undermine good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality." Opp. at 45 (cleaned up). They speculate that "a contrary approach would risk, among other things, eroding reasonable expectations of privacy by other servicemembers." *Id.* (cleaned up). Defendants also assert that "DoD has expressed concerns that exempting servicemembers from sex-based standards in training and athletic competitions on the basis of gender identity would generate perceptions of unfairness in the ranks." *Id.* at 47. And per Defendants, "DoD is also concerned that exempting servicemembers from uniform and grooming standards based on gender identity would create friction in the ranks." *Id.*

These justifications fail. To start, the Military Ban covers those who even "exhibit symptoms *consistent with*[] gender dysphoria." Hegseth Policy at 1 (emphasis added). Because it has no guard rails—*i.e.*, what these symptoms include, how often they can be exhibited, who decides whether they are being exhibited, Def. Concession Tr. (March 12, 2025) at 14–15—this exclusion is so broad as to capture persons who have never had gender dysphoria, and therefore do not even possibly present the same "concerns."

Defendants again rely almost exclusively on the Mattis Policy. *See id.* at 45–49. But, yet again, the Mattis Policy is woefully stale. *See supra* Findings of Fact II.B.1. Further, the Military Ban's justifications impermissibly rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 533. They also impermissibly rely on not only overbroad, but also derogatory generalizations about the different

talents, capacities, or preferences of transgender persons.  Such overbroad generalizations do not suffice to show that a sweeping discriminatory ban is substantially related to military readiness and unit cohesion.

Even if the Military Ban had focused solely on those diagnosed with gender dysphoria, Defendants do not identify any problem that needs a new solution.  Appropriate treatment for gender dysphoria is both "effective" and "no more specialized or difficult than other sophisticated medical care the military system routinely provides."  Dkt. 32-2 at 6, 9, 15.  The 2025 Medical Literature Review the Action Memo cites concludes that gender-affirming medical care is highly effective.  *See supra* Findings of Fact II.B.3.  And recall that already under DoD Instruction 6130.0 (Medical Standards for Appointment, Enlistment, or Induction into the Military Services), individuals with a history of gender dysphoria seeking to enlist must be "stable" in their gender identity for 18 months before enlistment.  Third Amend. Compl. ¶ 263.  Defendants do not explain why addressing a *treatable* condition requires excluding all persons who have ever had—or even exhibited symptoms of—it.  Nor do they explain why the constraint already in place, 18 months of stability, is insufficient.

These overbroad generalizations are also contradicted by the Record.  Plaintiff Talbott testifies: "In each military setting I have worked in so far—basic training, Officer Candidate School, and my Reserve unit—I have been open about my transgender status and have felt welcomed by my peers and supervisors."  Dkt. 72-18 ¶ 18.  Plaintiff Vandal testifies that after coming out she "received nothing but support and acceptance from my command and others who learned I was transgender.  Since then, I have been promoted to my current rank of Major."  Dkt. 72-20 ¶ 14–15.  Plaintiff Herrero testifies: "The support of my leaders, peers, and subordinates throughout my transition has not only made our units stronger but has also made me a more

Add.64

effective leader." Dkt. 72-25 ¶ 16.  Plaintiff Danridge testifies: "In my time as both a Reservist and on active duty, my transgender status has rarely come up and has never been an issue.  In fact, I received overwhelming support from my unit's Commanding Officer to apply for OCS."  Dkt. 72-28 ¶ 24.

This testimony—which Defendants do not rebut—is a credit to the military's ability to welcome all those capable of serving.  Indeed, had Defendants conferred with transgender servicemembers and those who serve with them, instead of making specious generalizations, they might have learned that the Military Ban is little more than a solution in search of a problem.

### c.    *Disproportionate Costs*

Defendants argue that "DoD reasonably concluded that its disproportionate expenditures on facilitating gender transition should be better devoted elsewhere."  Opp. at 50.  They explain that "between 2015 and 2024, DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria" and that "medical costs for servicemembers with gender dysphoria was nearly three times compared to servicemembers without this condition."  *Id.* at 49.

To support this "three times" conclusion, Defendants rely on the Mattis Policy's assessment of costs from the time before the Carter Policy was instituted through to the issuance of the Mattis Report (2014 to 2018).  Dkt. 73-8 at 46.  But the Mattis findings show that costs spiked after the military first began covering gender-affirming costs in September 2015, no doubt because of pent up demand.  Dkt. 38-4 at 32.  They began returning to baseline thereafter.  *Id.* That trend indicates two things.  First, the Mattis Policy findings are outdated.  Second, costs are likely no longer disproportionate.  This is confirmed by the AMSARA Report's findings that

occurrence rates for common medical events are similar between transgender and non-transgender service members.  Dkt. 73-24 at 4.

As discussed in the Findings of Fact, Defendants cannot explain how transgender care has resulted in "disproportionate" costs for the military.  *See supra* Findings of Fact II.B.4.  When asked to provide the overall medical, psychotherapy, and surgical costs for all servicemembers so that some comparison could be made, Defendants could not answer.  *See* Tr. (Mar. 12, 2025) at 144–50.  Without any source of comparison or benchmark, Defendants cannot claim that allowing transgender persons to serve results in "disproportionate" costs for the military.

### d.    The Hegseth Policy's Exemption Provision

Defendants contend that the Hegseth Policy's exemption provision addresses any potential issue.  Opp. at 22–23.  Hardly.  Transgender servicemembers can obtain an exemption if they show that they can safely perform all military tasks, and if retaining the servicemember would support warfighting capabilities.  Hegseth Policy at 8.  Even then, the transgender person can only continue to serve if: (1) they have been stable in their birth sex for 36 consecutive months, (2) they have never transitioned *or even attempted to transition* to any sex but their birth sex, and (3) they agree to serve in their birth sex.  *Id.*  Under this test, none of the Plaintiffs would be eligible for an exemption.  Indeed, it is hard to imagine anyone who could or, given the constraints, would want to do so.  Even with this non-exemption exemption, the Military Ban is not even remotely, much less rationally or substantially, related to the Government's goals.  *See supra* Findings of Fact II.

The Military Ban also prohibits the use of "invented" pronouns used to "identify" persons because they too are inconsistent with military readiness.  EO14183 § 4(b).  This assertion makes

no sense as written—all pronouns are invented and used to identify persons.  That aside,

Defendants could not even begin to identify how pronoun usage affects military readiness.  Tr.

(Mar. 12, 2025) at 198.  The Court gave defense counsel the opportunity to present a witness—

any witness—to state under oath that it does.  *Id.*  None materialized.

* * * * *

Defendants have articulated important government objectives in military readiness, unit

cohesion, and saving costs.  But the Fifth Amendment requires more than pointing to such

"broadly formulated interests."  *Singh*, 56 F.4th at 97.  Defendants must show that the

discriminatory Military Ban is in some way substantially related to the achievement of those

objectives.  And they must do so without relying on "overbroad generalizations about the

different talents, capacities, or preferences of males and females."  *VMI*, 518 U.S. at 538.  They

do not come close.  Plaintiffs are likely to succeed on their claim that the Military Ban fails

intermediate scrutiny review.

### C.    Animus

In our constitutional republic, citizens are free to hold and express divergent views.  But

when "sincere, personal opposition [to a group of people] becomes enacted law and public

policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that

soon demeans or stigmatizes those whose own liberty is then denied."  *Obergefell v. Hodges*, 576

U.S. 644, 672 (2015).  Such is the case here.  The Military Ban is soaked in animus and dripping

with pretext.  Its language is unabashedly demeaning, its policy stigmatizes transgender persons

as inherently unfit, and its conclusions bear no relation to fact.  Thus, even if the Court analyzed

the Military Ban under rational basis review, it would fail.

###### 1.    *The Military Ban Is Fueled by Animus*

Plaintiffs contend that because the Military Ban is fueled by animus, it fails any level of scrutiny.  They stand on solid legal ground.  *Romer v. Evans*: a law that "seems inexplicable by anything but animus toward the class it affects [] lacks a rational relationship to legitimate state interests."  517 U.S. 620, 632 (1996).  *Lawrence v. Texas*: "[m]oral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause."  539 U.S. 558, 583 (2003) (O'Connor, J., concurring).  *United States v. Windsor*:  legislation intended to "injure," "stigma[tize]," "demean," and "degrade" does not survive scrutiny.  570 U.S. 744, 769, 770, 772, 774 (2013).  *Cleburne*: a law that "rest[s] on irrational prejudice" cannot stand.  473 U.S. at 450.  And *U.S. Dep't of Agric. v. Moreno*: "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  413 U.S. 528, 534 (1973).

Defendants respond that the Court cannot probe "government officials' subjective intentions."  Dkt. 38 at 27.  True, the Court cannot read minds.  But it can read.  EO14183 and the Hegseth Policy tag transgender persons as weak, dishonorable, undisciplined, boastful, selfish liars who are mentally and physically unfit to serve.[28]  Its accompanying Fact Sheet piles on, further calling transgender persons insane, not resilient, unhealthy, and unfit.  Dkt. Notice (Mar. 7, 2025).  Hardly subtle.  Refusing to give up the ghost, however, Defendants refused to answer whether this language evinces animus.  Tr. (Feb. 18, 2025) at 155–56; *see also id.* at 154–59; Tr. (Mar. 12, 2025) at 192.  But the Court has no such problem.  It finds that the

---

[28] The Court reaches this conclusion by mirroring the Ban's language.  For example, in stating that transgender persons cannot maintain discipline, the Ban necessarily asserts that transgender persons are undisciplined.

Military Ban's language evinces the "bare...desire to harm a politically unpopular group."
*Moreno*, 413 U.S. at 534.

Faced with incontrovertible facts, Defendants do not contend that the Military Ban is an animus-free zone. They argue instead that the Military Ban must be impossible to justify based on anything but animus to be unconstitutional. Tr. (Feb. 19, 2025) at 63–64, 87. "If," Defendants claim, "there is a facially legitimate, bona fide reason, then perceived animus is not a ground on which the courts can second-guess the political branches in the national security space." *Id.* at 90. Defendants have not provided a legitimate reason for banning all transgender troops.

That aside, animus alone has never been the standard. The Colorado law at issue in *Romer*, for example, prohibited the state or any municipalities from enacting laws designed to protect members of the LBGTQ community. 517 U.S. at 624. The state offered a legitimate, bona-fide reason for the law: "respect for other citizens' freedom of association." *Id.* at 635. Nonetheless, because the "breadth of the amendment [wa]s so far removed from these particular justifications," the Supreme Court "f[ou]nd it impossible to credit them." *Id.* Thus, even though the state alleged a legitimate interest, the Court held that the law "classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else." *Id.* The Military Ban does the same.

The Military Ban is also unique in its unadulterated expression of animus—an expression of animus that no law the Supreme Court has struck down comes close to matching. Though the law at issue in *Romer* directly addressed "homosexuals," it did not include any demeaning or derogatory language. *Id.* at 624. In *Cleburne*, a Texas city required a special permit for "hospitals for the insane or feeble-minded," but the zoning ordinance said nothing about the

character of mentally ill persons. 473 U.S. at 436. The provision at issue in *Moreno*, which involved a challenge to a food stamp restriction aimed at hippies, required only that food stamp recipients living in the same household be related. 413 U.S. at 531. Even the Defense of Marriage Act was silent as to any negative stereotypes or generalizations about gay people. *Windsor*, 570 U.S. at 752. Yet the Supreme Court struck down each of these laws.

Defendants also argue that once the government identifies a legitimate interest, a court's inquiry stops. Tr. (Feb. 18, 2025) at 158–59; Tr. (Feb. 19, 2025) at 63–64. Not so. The city in *Cleburne* argued that the special permit requirement was related to its interest in "the safety and fears of residents in the adjoining neighborhood." 473 U.S. at 437. These safety concerns were not entirely unfounded—the city was worried about "negative attitudes" of local property owners, the location of the mental institution near a school, fire hazards, and traffic congestion. *Id.* at 448–50. But the Supreme Court did not simply take the city at its word. Instead, it found that these rationales "fail[ed] rationally to justify" the special permit restriction. *Id.* at 450.

The *Moreno* Court scrutinized the government's stated interest even further. The government maintained that the food stamps restriction was meant to minimize fraud. *Moreno*, 413 U.S. at 535. But the Supreme Court noted that there were already provisions in place to minimize fraud, and whatever fraud did occur was subject to criminal prosecution. *Id.* at 536. Thus the Court had "considerable doubt" that the restriction was "rationally . . . intended to prevent those very same abuses." *Id.* at 537.

Peeling back other stated rationales of the Military Ban reveals pretext for animus. To start, Defendants concede that DoD has never identified any "mental health constraint" other than gender dysphoria that is wholly inconsistent with characterizations such as "honesty, humility, and integrity" and therefore with military service. Dkt. 66 at 3. Moreover, current

military policies already address gender dysphoria. *See* Dkt. 72-67 (DoDI 6130.03, Vol. 2);

DoDI 6130.03, Vol. 1 at 6.28(t).  If gender dysphoria were a genuine concern, the Policy would

cover a narrow set of individuals with gender dysphoria.  Instead, the Policy reaches everyone

who has ever "exhibit[ed] symptoms consistent with[] gender dysphoria."  Hegseth Policy at 3.

Because this "breadth" is "so far removed" from military health concerns, it is "impossible to

credit" Defendants' justifications. *Romer*, 517 U.S. at 635.

Defendants claim more generally that the Ban is needed because every servicemember

must meet the military's rigorous physical and mental fitness requirements. *See* Dkt. 72-67; Dkt.

72-82 ¶ 20.  But such standards are already in place, and each active-duty Plaintiff already meets

them. *See, e.g.*, Dkt. 72-27 ¶ 4 ("I meet all standards applicable to male service members.");

Dkt. 72-58 ¶ 18 ("I meet all standards applicable to female service members.");  Defs.

Concession, Tr. (Mar. 12, 2025) at 130.  And if the concern were genuine, the Policy would

permit waivers for anyone who could demonstrate an "ability to safely complete common

military tasks at a general duty level."  DoDI 6130.03, Vol. 2, at 3.2(a).  Or, to use the Policy's

own language, it would allow for waivers "provided there is a compelling Government interest in

retaining the Service member that directly supports warfighting capabilities." *See* Hegseth

Policy at 4.  So, like in *Moreno*, the Court has "considerable doubt" that this rationale is driving

the Military Ban.

If the fitness concern were genuine, the Policy would also be limited to addressing health

concerns.  Yet the policy makes some assertions that can be explained only by pretext, *e.g.*, that

pronoun usage in some (still unfathomable) way impacts military readiness. *Id.* at 3.  Defendants

also make a passing reference that the military must address suicide ideation.  Fair, but again, the

military already bars individuals with suicidality from enlisting. *See* DoDI 6130.03, Vol. 1, at

6.28(m).  Additionally, if the health concern were genuine, the Policy would apply to all people

who have received any kind of hormone therapy or genital reconstruction surgery.  But it does

not.  It applies only to those who have received such care "as treatment for gender dysphoria or

in pursuit of a sex transition."  Hegseth Policy at 6; *see also* Defs. Concession, Tr. (Mar. 12,

2025) at 120.

      Defendants claim the Military Ban is necessary to ensure all servicemembers' privacy,

such as in sleeping and showering arrangements.  *See* Hegseth Policy at 4.  If this concern were

genuine, barrack assignments would be based on anatomical (phenotypic) sex, not reproductive

(gonadal) sex.  For intersex individuals, who can present in about forty different ways,[29] the two

are not necessarily aligned.  A person with ovotestes has both ovarian and testicular tissue and so

presumably could not be assigned to either male or female barracks, regardless of their

anatomical sex.[30]  A person with male genitalia but female reproductive anatomy would be put in

female barracks, undoing the very privacy concern the Military Ban purports to address.[31]  And

how will the military assure persons are tucked away in barracks without causing "privacy"

---

[29] The Cleveland Clinic's intersex internet page addresses some of these presentations. *Intersex*,
Cleveland Clinic (last visited Mar. 16, 2025),
https://my.clevelandclinic.org/health/articles/16324-intersex.

[30] *Id.*

[31] To be sure, being intersex is rare—about 1.7% of the U.S. adult population.  But then again,
being transgender is more so—about 0.6% of the U.S. adult population.  *See* Rebecca Boone &
Jeff McMillan, *How many transgender and intersex people live in the U.S.?*, US News (July 27,
2023, 10:31 AM), https://apnews.com/article/how-many-transgender-intersex-laws-
0218b75a197f07d8c51620bb73495d55.

Add.72

concerns?  Presumably, by looking at them.  So why not base barrack assignments on anatomical sex?  Because doing so would not exclude transgender persons from serving.[32]

Lastly, Defendants' cost concerns make clear that the Ban is purposely targeting transgender individuals.  As discussed, the cost of medical care for transgender troops is de minimis.  *See supra* Findings of Fact II.B.4.  And Defendants have not explained why *these* costs are of more concern than other costs.  "Many service members receive medical care for far more common medical conditions, at a far greater cost and with a significant impact on the military budget."  Dkt. 72-76 ¶ 13.  For example, Viagra cost the DoD $41,000,000 in 2023 alone—nearly eight times what the DoD spends on transgender medical care each year.  *See* Dkt. 72-68 ¶ 9.  Additionally, "the same medications (hormone therapies) and surgeries (mastectomies, hysterectomies, genital reconstruction)" that Defendants claim are too costly "are provided to non-transgender service members."  Dkt. 72-78 ¶ 65.  But the Hegseth Policy does not ban those treatments.  So why pay for hormone therapy for some servicemembers but not others?  Because the Policy clearly targets *transgender* medical care costs.  It "rest[s] on irrational prejudice."  *Cleburne*, 473 U.S. at 450.

### 2.    *Defendants Misread* Trump v. Hawaii *Again*

Defendants rely on *Trump v. Hawaii* to argue that the Court must defer to the military even if it finds the military ban is fueled by animus.  They assert that because the government has offered what—on their face—appear to be legitimate reasons for the ban (i.e., troop readiness and unit cohesion), the Court must uphold the Ban.  Opp. at 50–54.

---

[32] Courts have rejected privacy as a rationale for discrimination against transgender persons.  *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023); *Grimm*, 972 F.3d at 613–14; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018).

As discussed above, this has never been the Supreme Court's approach in animus cases. The *Hawaii* Court cited *Moreno*, *Cleburne*, and *Romer* as examples of laws that could *not* "reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705, 706. Yet the defendants in those cases did not fail to proffer independent justifications. Rather, the Supreme Court found those purported justifications to be lacking. *See supra* Analysis II.C.1. So, too, does this Court find Defendants' justifications empty.

Defendants further argue that, to find animus, the *Hawaii* Court required that a law be "inexplicable by anything but animus." Opp. at 51 (quoting *Hawaii*, 585 U.S. at 706). But this quote is inapposite for two reasons. First, this is not what the Supreme Court said. Rather, it concluded that the entry restriction proclamation "d[id] not fit the pattern" of previous animus cases because it was neither "impossible to discern a relationship to legitimate state interests" nor was it "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 706 (cleaned up). Thus, at the very least, the *Hawaii* Court offered two paths to a finding of animus: the lack of a relationship to a legitimate state interest or the inability to explain by anything but animus. *Id.* This Court, as discussed above, cannot conclude that the Military Ban is related to the government's interests in military readiness, unit cohesion, and cost reduction. So, applying the *Hawaii* Court's own language, Defendants' argument fails.

Second, even if a law *had to be* inexplicable by anything but animus, the Court here has no trouble finding that the Military Ban fits this description. To recap, the Military Ban: disqualifies all "[t]ransgender troops . . . without an exemption"; contains an exemption in name only; relies on derogatory generalizations Defendants concede are pure conjecture; reflects no study of the service of transgender persons since 2021 and instead relies on "predictions" made

in 2018; egregiously misquotes studies and ignores data supporting service by transgender persons; asserts "justifications" untethered to fact except insofar as Defendants' own evidence contradicts them; and bans certain medical treatments only when prescribed to transgender individuals.  The Court could go on.  Suffice it to say, at this early stage, Plaintiffs are likely to prevail on their claim that the Military Ban is driven exclusively by animus.

### 3.    *The Government Has Targeted Transgender Persons Writ Large*

The Court could stop here in its analysis and comfortably conclude that Plaintiffs are likely to succeed on their claim that the Military Ban is motivated by animus and is not tailored to meet its stated goals.  But, as they say, there is more, for the Military Ban does not stand alone.  President Trump has signed an executive order recognizing the existence of only two sexes;[33] blocked schools from using federal funds to promote the idea that gender can be fluid;[34] directed the State Department to stop issuing documents that allow a third "X" gender marker;[35] changed references to "LGBTQI+" on government websites to "LGB," erasing not just transgender persons, but intersex people as well;[36] revoked the ability of transgender federal employees to receive gender-affirming care;[37] and directed that all incarcerated transgender

---

[33] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[34] Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

[35] Shannon K. Kingston & Kiara Alfonseca, *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025, 11:27 AM), https://abcnews.go.com/US/state-department-halts-passport-gender-marker-applications/story?id=118062178.

[36] Dkt. 74-8 at 8.

[37] *See* Lauren Clason, *Trump EOs Cast Doubt on Benefits for Transgender Federal Workers*, Bloomberg Law (Jan. 31, 2025, 10:38 AM), https://news.bloomberglaw.com/daily-labor-report/trump-eos-cast-doubt-on-benefits-for-transgender-federal-workers (discussing President Trump's revocation of Biden-era executive orders that expanded federal employee health coverage for gender-affirming care).

Add.75

persons be denied medical treatments and be housed by birth sex,[38] where they are nine times more susceptible to violence.[39]

The Office of Personnel Management has issued a memo directing all agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology,"[40] resulting in vital Centers for Disease Control pages on contraception guidelines, vaccine information, and HIV data, among some 8,000, being taken down.[41]  The Office of Management and Budget—following the President's directives—issued a memo promising to stop the use of federal funds to promote "transgenderism."[42]

The federal government removed all references to LGBTQ+ youth from the website for the National Center for Missing and Exploited Children, including a page on the suicide rates of missing children and one on male victims of sex trafficking.[43]  It also removed references to LGBTQ+ youth from stopbullying.gov, including a 2016 study that showed the disproportionate rates at which LGBTQ+ students are bullied and a tipsheet on how to prevent such discrimination in schools.[44]  Apparently, bullying and exploiting children is okay if they are gay,

---

[38] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[39] Nora Neus, *Trans women are still incarcerated with men and it's putting their lives at risk*, CNN (June 23, 2021, 2:54 PM), https://www.cnn.com/2021/06/23/us/trans-women-incarceration/index.html.

[40] U.S. Off. of Pers. Mgmt., Initial Guidance Regarding President Trump's Executive Order *Defending Women* (Jan. 29, 2025).

[41] Dkts. 74-2, 74-7, 74-8.

[42] Matthew J. Vaeth, Off. of Mgmt. & Budget, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (Jan. 27, 2025).

[43] Dkt. 74-3 at 4.

[44] Dkt. 74-8 at 8.

Add.76

transgender, or intersex.  And the National Park Service removed references to "transgender" from its webpage about the Stonewall National Monument.[45]

    This Court does not opine on the constitutionality of these actions.  That said, the flurry of government actions directed at transgender persons—denying them everything from necessary medical care to access to homeless shelters—must give pause to any court asked to consider whether one such order under review furthers a legitimate government interest free of animus.

### III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

    Irreparable harm is "a high standard."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The harm "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Id.* (cleaned up).  But it must also be "beyond remediation," meaning "the possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm."  *Id.* at 297–98 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).

    Plaintiffs readily meet these criteria.  "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (cleaned up).  Suits

---

[45] *Id.* at 4.  Stonewall is an inn in New York City where LBGTQ+ rioters, including trans activists, sparked the gay rights movement.  Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025, 12:52 PM), https://www.npr.org/2025/02/14/g-s1-48923/stonewall-monument-transgender-park-service. The Stonewall Uprising "is regarded as a turning point in sparking a nationwide movement for the equal treatment of gay, lesbian, bisexual and transgender Americans."  *Id.*  To stress how ahistorical this change is, the Wikipedia page for Stonewall uses the word "transgender" (or its variations) fifty-three times.  *Stonewall riots*, Wikipedia, https://en.wikipedia.org/wiki/Stonewall_riots (last visited Mar. 13, 2025).

involving "the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). Separately, all transgender servicemembers suffer from the irreparable reputational stigma the Military Ban espouses and forced separation from their positions. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (reputational harm is irreparable); *McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (irreparable harm in military context); *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (same).

Plaintiffs also allege that their removal from military service would deprive them of steady income and medical care and that the order brands them as less capable solely because of their transgender status. Dkt. 72-1 at 75. Courts in this District have held such losses to be irreparable harms. *See McVeigh*, 983 F. Supp. at 221 (finding that the loss of "benefits attendant with being a Naval officer" constituted irreparable harm); *Elzie*, 841 F. Supp. at 443 (finding that a Marine suffered irreparable harm when he was "labeled as unfit for service solely on the basis of his sexual orientation").

## IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS

The final two factors—the balance of equities and the public interest—favor Plaintiffs. The balance of equities weighs the harm to plaintiffs absent a preliminary injunction against the harm to defendants if the court grants the motion. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). When the government is a party to the case, as it is here, this balancing test and the public interest merge into one factor. *Id.* ("the government's interest *is* the public interest").

Add.78

Defendants will not suffer any harm if this Court grants the preliminary injunction. In

*Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court emphasized the deference

afforded to the judgment of military officials "concerning the relative importance of a particular

military interest." *Winter*, 555 U.S. 7, 24 (2008) (cleaned up). In finding that the balance of

equities and consideration of the public interest "tip[ped] strongly in favor of the Navy," the

Court gave significant weight to officers' statements regarding the burden a preliminary

injunction would place on the Navy's ability to conduct training exercises and the resulting

adverse impact on national security. *Id.* at 24–26.

Defendants have provided no testimony. That is so most likely because no such burden

exists here. Granting the preliminary injunction would maintain the status quo of policies that

have governed the military for years. *See* Dkt. 72-1 at 12–15, 28. The accession policy has been

in place since 2021, *id.* at 14–15, and the retention policy has been in place for nearly a decade

(though it was interrupted by the first Trump Administration's Mattis Plan), *id.* at 2–6, 28. The

Military Ban does not cite, and Defendants have not provided, any studies or declarations that

explain why maintaining the status quo pending litigation would unfairly burden the military.

In contrast, Plaintiffs will be subject to the irreparable harm discussed above absent a

preliminary injunction. And absent one, Plaintiffs will also face significant hardship because the

Military Ban puts to them a Hobson's choice[46]: either immediately conform with the grooming

and appearance standards for their birth sex or choose separation, either voluntarily or by

removal proceedings. Dkt. 72-1 at 74. Since Plaintiffs cannot physically conform to those

---

[46] A "Hobson's choice" is a free choice in which there is only one real option. The term traces its origin to Thomas Hobson, a sixteenth-century English stable owner who notoriously offered his customers a "choice" of taking the horse closest to the door (so all would get equally used) or leaving without a horse—essentially, no choice for those who needed a horse. *See* H.W. Fowler, *Hobson's Choice, in The King's English* 203 (2d ed. 1908).

Add.79

standards and would have to do so against medical advice even if they could, they have no choice but to separate. *See, e.g.*, Dkts. 72-19 ¶ 8; 72-22 ¶ 6; 72-24 ¶ 6. This then puts to Plaintiffs a Sophie's choice.[47] If they separate voluntarily, they will leave a career that they have no desire to end. If they opt for removal proceedings, they may be discharged dishonorably and, per the Hegseth Policy, will be required to repay the military their bonuses and other amounts. Hegseth Policy at 7; Dkt. 79-1 at 7. Permitting the Hegseth Policy to remain in place during litigation, therefore, will work an obvious hardship to the Plaintiffs.

Public interest considerations also support granting the preliminary injunction. For one thing, "[e]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). As discussed above, Plaintiffs have shown they are likely to succeed on their Fifth Amendment claim. And Plaintiffs point to potential harm to military cohesion and capability should the ban go into effect. Dkt. 72-1 at 75.

Plaintiffs have carried their burden under all four preliminary injunction factors by showing their likely success on the merits, the threat of irreparable harm, and that the public interest and equities support an injunction.

---

[47] A "Sophie's choice" is a dilemma between two equally devastating options. In the novel *Sophie's Choice*, a camp doctor at Auschwitz makes Sophie choose which of her two children would be gassed and which would live. Sophie chooses to save her son, Jan, so that the family name can continue through him. She releases her daughter, Eva, and watches as she is taken away to be killed in a gas chamber. Sophie, unable to live with the guilt, later commits suicide. *See* William Styron, *Sophie's Choice* (Random House 1979). So, not a pick-me-up.

Add.80

## SCOPE OF THE INJUNCTION

Considering the full Record and for the reasons stated above, the Court hereby **GRANTS** Plaintiffs' Renewed Application for Preliminary Injunction. The Court details the scope of the injunction in the Order that accompanies this Opinion. On its own motion, the Court stays this injunction until March 21, 2025, at 10:00 am eastern, to provide Defendants time to consider filing a motion for an emergency stay in the D.C. Circuit.

Defendants claim that any injunction must be limited to the Plaintiffs. Opp. at 61. It cannot be, rationally or logistically. Other transgender servicemembers face the same irreparable harms as Plaintiffs. Any transgender person affected by the Ban would need only to file a "me too" complaint in this Court to obtain the same relief. The Court and Defendants then would have to deal with a never-ending conveyor belt of claims. A limited injunction would also cause havoc for the Armed Forces. Some transgender persons would be permitted to serve and accede, others would not. Depending on what happened at the permanent injunction phase, one group or the other would be affected. Superiors and colleagues would need to keep track of ongoing litigation docket updates to understand who was covered. Notably, the government has reiterated that "uniformity" is one of the key goals of the Military Ban multiple times throughout this litigation. *See* EO14183 § 2; Hegseth Policy at 3; Action Memo at 2.

Add.81

**CONCLUSION**

The Court knows that this opinion will lead to heated public debate and appeals. In a healthy democracy, both are positive outcomes. We should all agree, however, that every person who has answered the call to serve deserves our gratitude and respect. For, as Elmer Davis observed, "[t]his nation will remain the land of the free only so long as it is the home of the brave."

The Court extends its appreciation to every current servicemember and veteran. Thank you.

Date: March 18, 2025

ANA C. REYES
United States District Court Judge

Add.82

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, et al,

     *Plaintiffs*,

  v.

UNITED STATES, et al,

     *Defendants*.

Civil Action No. 25-cv-00240 (ACR)

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants ask the Court to dissolve, or stay pending appeal, the preliminary injunction it entered on March 18, 2025.[1]  Dkt. 91 (Motion to Dissolve (Mot.)).  They claim that a newly-issued guidance document—the Military Department Identification Guidance, Dkt. 91-2 (MDI Guidance)—presents a significant change in fact.  *Id.* at 3.  This change, they contend, shows that the Court's Preliminary Injunction Opinion (Op.) is incorrect.  *Id.*

The MDI Guidance is new, but Defendants' argument is not.  Defendants re-emphasize their "consistent position that the [Hegseth] Policy is concerned with the military readiness, deployability, and costs associated with *a medical condition*."  *Id.* (emphasis added).  Regulating gender dysphoria is no different than regulating bipolar disorder, eating disorders, or suicidality.  The Military Ban regulates a medical condition, they insist, not people.

And therein lies the problem.  Gender dysphoria is not like other medical conditions, something Defendants well know.  It affects only one group of people: all persons with gender

---

[1] The Court assumes the reader is familiar with its March 18, 2025 Opinion.  For those who are not, it is available on the public court docket at 25-cv-00240, Dkt. 89.  The Court recycles here the defined terms it used in the Opinion.

dysphoria are transgender and only transgender persons experience gender dysphoria. Defs. Concession Tr. (Mar. 21, 2025) at 23–24. Does this mean that all transgender persons have gender dysphoria? No, of course not. But it does mean that when Defendants regulate gender dysphoria, they knowingly and necessarily regulate only transgender persons.

Defendants try to obfuscate this key point at every turn. The Department of Defense (DoD) and Secretary of Defense publicly announced that the Military Ban disqualifies all "transgender troops"? No, they were using "shorthand" for gender dysphoria. Defendants accused transgender persons of inherently lacking honor, truthfulness, and discipline? No, they accused gender dysphoria of having those mission-endangering attributes. The military plans to discharge thousands of transgender troops who have made "America safer"? No, the military plans to discharge gender dysphoria. Total coincidence that gender dysphoria only afflicts transgender people.

This litigation is not about a medical condition. A medical condition has not given its country decades of military service. Or deployed into combat zones throughout the globe. Or earned countless commendations. People have. A medical condition has not fought terrorism. Or analyzed intelligence. Or commanded platoons. People have. A medical condition has not been accused of lacking warrior ethos. Or been branded dishonorable, dishonest, and undisciplined. Or been threatened with the loss of livelihood. People have. Transgender *people.*

Defendants' arguments did not sway the Court before; regurgitating them with the MDI Guidance is equally unpersuasive. The Court **DENIES** the Motion to Dissolve the Preliminary Injunction and Motion for a Stay Pending Appeal. The Court, on its own motion, stays its Order, Dkt. 88, until March 28, 2025, at 7:00 pm eastern to provide Defendants the opportunity to file an emergency stay with the D.C. Circuit.

## BACKGROUND

On March 18, 2025, the Court granted Plaintiffs' Renewed Application for Preliminary Injunction, Dkt. 72, and enjoined Defendants from implementing Executive Order No. 14183 and the Additional Guidance on Prioritizing Military Excellence and Readiness, Dkt. 63-1, as well as any other policies issued pursuant to the Military Ban.  Dkts. 88, 89.  Three days later, Defendants filed a Motion to Dissolve the Preliminary Injunction.  Dkt. 91.  They argue that the MDI Guidance issued by DoD's Office of the Under Secretary of Defense for Personnel and Readiness on March 21, 2025 constitutes a "significant change either in factual conditions or in law."  Mot. at 3 (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)).

Defendants claim that "the [Hegseth] Policy presumptively barring individuals from serving in the military turns on gender dysphoria—a medical condition—and does not discriminate against trans-identifying persons as a class."  *Id.* at 2.  In support, Defendants cite to the MDI Guidance.  *See id.* at 3.

In the MDI Guidance, Defendants define—for the first time—the criteria in the Hegseth Policy, "exhibit symptoms consistent with gender dysphoria."[2]  MDI Guidance at 1.  In a footnote, the MDI Guidance states that the phrase "refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental [(DSM-V)] Disorders" for gender dysphoria and "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis (i.e., a marked incongruence and clinically significant distress or impairment for at least 6 months)."  *Id.*  The MDI Guidance attaches the DSM-V criteria.  Dkt. 92-2.

---

[2] To avoid wordiness, the Court refers to this phrase as "the Symptoms Criteria."  Because Defendants' Motion concerns the definition of this phrase, the Court only includes the additional criteria "current diagnosis or history of gender dysphoria," as necessary.

Add.85

The MDI Guidance explains that the "primary means" military leaders will use to identify servicemembers who meet the Symptoms Criteria "will be through reviewing medical records." MDI Guidance at 1. To this effect, the MDI Guidance reminds the Secretaries of each Military Department of their "authority to direct unit commanders, in coordination with supporting medical assets, to require that all Service members comply with their obligations." *Id.* at 2. Service members must complete a Periodic Health Assessment (PHA) and report any "medical issues . . . that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service to their chain of command." *Id.*

Moreover, "[w]ithin 45 days" of March 21, 2025, each servicemember's reporting responsibilities will include attesting "whether they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria." *Id.* "This attestation will be a standard part of the self-assessment done in conjunction with the annual PHA." *Id.* If a servicemember self-reports, "the facility or location conducting the PHA will be responsible for conducting or coordinating any follow-up medical evaluation, if necessary, and for notifying the Service member's command." *Id.* Each identified service member "*must* be categorized as 'Not Medically Ready' and non-deployable." *Id.* (emphasis added). They will be, consistent with new policies enacted by the Military Ban, "recommended for administrative separation or, where appropriate, enrolled in the Disability Evaluation system (e.g., where a co-morbidity or other qualifying condition is present)." *Id.*

Defendants contend that this new guidance "confirms that the Court has misconstrued the scope of the DoD Policy," and they "move to dissolve the March 18, 2025, preliminary injunction." Mot. at 2–3. In the alternative, they ask the Court to stay its Order pending appellate review. *Id.* at 3–4.

**STANDARD OF REVIEW**

A party seeking to dissolve a preliminary injunction must show "'a significant change either in factual conditions or in law'" that makes continued enforcement of the injunction "'detrimental to the public interest.'"  *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (quoting *Horne*, 557 U.S. at 447).  The moving party "bears the burden of establishing that changed circumstances warrant relief."  *Am. Council of the Blind. v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (cleaned up).

**ANALYSIS**

**I.     THE MDI GUIDANCE SUPPORTS PLAINTIFFS' CLAIM**

Defendants' Motion ignores the MDI Guidance's objective.  The MDI Guidance's purpose is not to define the phrase "exhibit symptoms of gender dysphoria."  Indeed, the Guidance relegates that definition to a footnote.  *See* MDI Guidance at 1 n.2.  Its purpose, instead, is to guide military personnel on how to identify individuals to disqualify.

In civilian-speak, DoD plans to (1) assign people—they do not say who, but presumably some type of military gender police—to review medical files for signs of gender dysphoria, and (2) require each of the estimated 1.3 million active-duty servicemembers to attest—at least once a year—whether they exhibit symptoms of gender dysphoria and turn themselves in if they do.  Then DoD will discharge them.  *See supra* at 4.

Add.87

Pause for a moment on this approach. To target "a medical condition," Mot. at 3,

Defendants plan to:

1. address (unsubstantiated) military readiness, non-deployability, privacy, and cost concerns[3] by

2. diverting personnel away from performing "mission critical functions,"[4] and

3. having them instead rummage through *private* medical records,[5] and also by

4. requiring more than 1.3 million active-duty servicemembers to self-assess *every year* whether they have had, have, or exhibit symptoms of gender dysphoria,[6]

5. with the goal of identifying the less than two-thousand people who *might* have had, have, or exhibit symptoms of gender dysphoria,[7]

6. a mental condition that current military policies already address,[8]

7. and requiring that those servicemembers "*must* be categorized as 'Not Medically Ready' and non-deployable,"[9]

8. which will result in the mass discharge of thousands of servicemembers.[10]

Really. This is not hyperbole. This is the process the MDI Guidance requires.

So does the MDI Guidance support Plaintiffs or Defendants? Well, let's Occam's razor

this. What is the more straightforward explanation? That the new guidance reveals the Hegseth

Policy for what it is: animus directed at transgender persons? Or that experienced military

leaders acting in good faith have adjudged that ridding the military of the less than 2,000 persons

who *might* have gender dysphoria requires committing scarce, expensive resources to invading

---

[3] Op. at 57–63.

[4] Dkt. 66 at 2–3.

[5] MDI Guidance at 2.

[6] *Id.*

[7] Op. at 29 n.19.

[8] *Id.* at 61.

[9] MDI Guidance at 2.

[10] Op. at 30.

6

Add.88

the privacy of the more than 1.3 million active-duty members who certainly do not—year after year?

If the MDI Guidance confirms anything, it confirms that the Hegseth Policy is not based on reasoned judgment.

## II.    THE MDI GUIDANCE DOES NOT IMPACT THE COURT'S FACTUAL FINDINGS

### A.  The Court Correctly Construed the Scope of the Military Ban

Defendants mainly contend that the MDI Guidance's definition of Symptoms Criteria "confirms that the Court has misconstrued the scope of the [Hegseth] Policy." Mot. at 2–3. How?  They do not say.  They recite the Court's factual finding that "'the Hegseth Policy bans all transgender troops.'"  *Id.* at 2 (quoting Op. at 20).  And they state that the Court based this finding "on an interpretation of, among other things, the following language in the [Hegseth Policy]: 'Service members who have a current diagnosis or history of, *or exhibits symptoms consistent with*, gender dysphoria are disqualified from military service.'"  *Id.* at 2 (cleaned up) (emphasis in original).  That is it.

Hardly a silver bullet.  Indeed, not a bullet at all.  For reading the MDI Guidance in toto confirms the Court's findings that the Military Ban targets people, not a medical condition. Recall that EO14183 covered those "individuals with" gender dysphoria.  90 Fed. Reg. 8757 (Jan. 27, 2025).  The Hegseth Policy extended the ban by adding the phrase "exhibit symptoms consistent with" gender dysphoria.  Dkt. 63-1 at 1, 3, 5, 6–9.  The MDI Guidance in turn explains that this phrase covers persons whom no one has previously diagnosed with or treated for gender dysphoria.  It does so based on the "prediction"—unsupported by "actual data"—that these persons might cause issues in the future.  Op. at 40–41, 71–72; Tr. (Mar. 12, 2025) at 137–38.

Add.89

Recall also that the Symptoms Criteria is but one of seven independent criteria the Hegseth Policy employss to disqualify people. *See* Op. at 21–22 (citing Dkt. 63-1 at 3, 6). Three criteria disqualify transgender persons with a current diagnosis or history of, or who exhibit symptoms consistent with, gender dysphoria—however defined. Those include transgender persons:

- with a history of cross-sex hormone therapy (as treatment for gender dysphoria *or in pursuit of sex transition*);
- with a history of sex reassignment or genital reconstruction surgery (as treatment for gender dysphoria *or in pursuit of sex transition*);
- who [have] transitioned or attempted to transition to a sex other than their birth sex.

*Id.* (emphases added). Defendants do not define the phrase "in pursuit of sex transition," but it must include persons with no prior or current gender dysphoria diagnosis. Otherwise, it would be redundant because the phrase "as treatment for gender dysphoria" already covers all those who pursue sex transition as treatment after a gender dysphoria diagnosis.

Finally, at the March 21, 2025 hearing, Defendants continued to insist that the Court should ignore DoD's and Secretary Hegseth's public statements that the Hegseth Policy disqualifies all transgender troops. Tr. (Mar. 21, 2025) at 7. The Court then *again* gave Defendants the opportunity to file a declaration from Secretary Hegseth or any other military official to correct the public record. Defendants *again* declined to do so. *Id.* at 5–6; *see also* Tr. (Mar. 12, 2025) at 22–23. That is of course their right. But the Court cannot credit a lawyer's argument that a Department and Cabinet member publicly misconstrued the scope of their own policy and then could not be bothered to correct the evidentiary record in a high-profile litigation concerning the scope of that same policy. Occam's razor again. DoD and Secretary Hegseth meant what they said. That noted, the Court wants to be clear. Even if it considered only the

text within the four corners of the Hegseth Policy, the Court would easily find that the Military

Ban excludes all transgender troops.[11]

### B.  The MDI Guidance Supports the Court's Scrutiny Analysis

The MDI Guidance undercuts every rationale Defendants have given for implementing

the Military Ban.  To wit:

*Military Readiness*:  Earlier, Defendants claimed that answering certain cost questions

would divert the attention of "the relevant staff's primary responsibility to perform mission

critical functions."  Dkt. 66 at 2, 3.  Pulling staff away to review an untold number of medical

files will presumably do the same (only on a far larger scale) and thus undermine military

readiness.  MDI Guidance at 1.

*Privacy*:  To address "privacy concerns" purportedly caused by the less than 2,000

servicemembers treated for gender dysphoria, Defendants will invade the medical privacy of 1.3

million plus servicemembers.  *Id.*

*Deployability*:  To address the non-deployability concerns persons experiencing gender

dysphoria *might* create, Defendants will *automatically* tag as "Medically Not Ready" and non-

deployable servicemembers who possess no deployability concern, *e.g.*, transgender people who

have been successfully treated for gender dysphoria and no longer exhibit symptoms.  *Id.* at 2.

*Cost*:  And to save $5.2 million per year by cutting gender-affirming care, the military

will spend untold millions (if not tens of millions) to identify persons not yet diagnosed with any

medical condition.  *Id.*; *see also* Op. at 29.

The MDI Guidance also fails to explain why it treats gender dysphoria differently than

other disqualifying medical conditions.  It requires, for example, servicemembers who were

---

[11] To better understand how the Court comes to this conclusion, see its Opinion at 20–22.

previously diagnosed with gender dysphoria to self-report for discharge, even if they have successfully completed treatment. MDI Guidance at 2. By contrast, other conditions "must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating" to be disqualifying. Dkt. 72-67 at 13.

The MDI Guidance offers no explanation for how the Military Ban's derogatory language covers a medical condition. Characterizations such as lacking warrior ethos, discipline, honor, and integrity apply to people, not medical conditions. One does not say, for example, that those who suffer from bipolar disorder inherently lack warrior ethos, discipline, honor and integrity. Moreover, as an example, DoD's medical standards for retention list bipolar disorder as a disqualifying condition. *Id.* at 36. Still, the military treats bipolar disorder, like all other disqualifying conditions, "on a case-by-case basis" considering "[t]he affected Service member's ability to safely complete common military tasks at a general duty level" and any "[l]imitations or requirements due to medical condition(s) or objections to recommended medical interventions that" present an obvious risk to the health and safety of the individual or their fellow servicemembers, among other factors. *Id.* at 8–9.

### C. The MDI Guidance Does Not Cure the Hegseth Policy's Many Defects

Defendants claim that the MDI Guidance supports their position that the Military Ban is only about "a medical condition—one that every prior Administration has, *to some degree*, kept out of the military." Mot. at 3 (emphasis added). Put differently, the Hegseth Policy is different only in degree from the Mattis and Austin Policies.

It is different in kind.  A simple comparison of the Mattis and Hegseth Policies using the

factors the D.C. Circuit considered in *Doe 2* demonstrates this:

| **Mattis Policy (2018)** | **Hegseth Policy (2025)** |
|---|---|
| Facially neutral | Facially derogatory |
| Impact of transgender service was uncertain and hypothetical | Defendants did not review available evidence; Plaintiffs' evidence is that transgender service has a beneficial effect |
| Active servicemembers grandfathered | Active servicemembers not grandfathered. |
| Many servicemembers could serve in their biological sex | Virtually no servicemembers can serve in their biological sex |
| No evidence that serving in biological sex creates "hardship" | Record confirms serving in biological sex creates hardship, including "mental distress" |
| Months-long study by panel of experts | No review process |

*Compare* Mattis Policy at 2, 3, 11 *with* Op. at 18, 21, 45, 58.[12]

Moving onto the Austin Policy, Defendants contend that it deserves no more credence

than the Hegseth Policy.  Tr. (Feb. 18, 2025) at 125–27.  This is so, they claim, because it did not

result from any deliberative process.  *Id*. at 126, 128.  Wrong.  In issuing Executive Order 14004,

President Biden relied on "substantial evidence" including "a meticulous, comprehensive study

requested by [DoD]," testimony to Congress by military leaders, and statements by former

United States Surgeons General from both political parties.  Op. at 10 (citing 86 Fed. Reg. 7471

(Jan. 25, 2021)).  Next, the Office of the Under Secretary of Defense for Personnel and

Readiness convened a working group that "collect[ed] and consider[ed] evidence from a variety

---

[12] By making these comparisons, the Court does not opine on the constitutionality of the Mattis or Austin Policies.

Add.93

of sources, including a careful review of all available scholarly evidence and consultations with [experts]." *Id.* (citing Dkt. 72-59 ¶¶ 10, 12).  This deliberative process culminated with the release of the Austin Policy in March 2021.  Op. at 10–12.

Defendants' argument also ignores that high-level military officials responsible for integrating transgender persons into the military from 2021 to 2024 have testified based on their personal knowledge of how the Austin Policy worked in practice.  Based on that experience, they "unanimously conclude" that allowing transgender persons to serve openly had "no detrimental effect" on military preparedness.  Op. at 36.  Indeed, based on their experience, open service improved military readiness and unit cohesion.  *Id.* at 32, 35.  Defendants wish to change course. They are entitled to do so, and courts should defer to that determination.  But if the new course bans a class of people from military service, the Fifth Amendment requires that Defendants provide a plausible, evidence-based rationale for the policy shift.  *See id.* at 57.  Defendants offered none before the Court issued its Opinion, and the MDI Guidance adds nothing.  *See id.* at 57–63.

## III.    THE MDI GUIDANCE DOES NOT IMPACT THE COURT'S LEGAL CONCLUSIONS

### A.  Intermediate Scrutiny Applies

Defendants contend that if the Court construes the Military Ban as only addressing a medical condition, intermediate scrutiny cannot apply.  Tr. (Mar. 12, 2025) at 28.  Not so.  Even Defendants' too-narrow view of the Hegseth Policy implicates intermediate scrutiny.

Just as it is impossible to know a person is transgender without knowing their sex, Op. at 47, it is impossible to know whether a person has gender dysphoria without knowing their sex. The Fourth Circuit's *en banc* decision in *Kadel v. Folwell* illustrates this common-sense proposition.  *See* 100 F.4th 122 (4th Cir. 2024) (en banc).  *Kadel* found that "gender dysphoria is

12

Add.94

so intimately related to transgender status as to be virtually indistinguishable from it." *Id.* at 146. This is because "gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status." *Id.* And so the Fourth Circuit held that exclusion of coverage for gender dysphoria care discriminates based on sex because application of the exclusion "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Id.* at 147. That is why treatments for gender dysphoria "aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status." *Id.* at 146.

For this reason, Defendants "cannot immunize [themselves] from violating" the Fifth Amendment "by discriminating against only a subset of" transgender persons. *Id.* A ban on gender dysphoria, even if it does not reach every transgender person, can nonetheless discriminate against transgender persons as a class. Under Supreme Court precedent, "a law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Id.* at 144 (cleaned up); *see also Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000); *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977); *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976). Thus, Defendants cannot evade discriminating against transgender people simply by labeling the policy as addressing gender dysphoria.

### B.  The Court Did Not Rely on the Symptoms Criteria

Defendants concede that the MDI Guidance does not impact the Court's analysis in any material respect. It does not impact the Court's findings: (1) that the Hegseth Policy is based on outdated data, Tr. (Mar. 21, 2025) at 15, and studies that contradict, rather than support, a transgender ban, *id.* at 15, 28; (2) that the Hegseth Policy does not contain evidence supporting the Military Ban's stated objectives, *id.* at 18–22, 30; (3) that Plaintiffs' declarants have personal

knowledge concerning the impact of transgender persons serving openly, and that Defendants do not rebut those declarants, save one, *id.* at 23; (4) that administrative exhaustion is not required, *id.*; (5) that the Court has a duty to scrutinize the military's assertion of its interests, *id.* at 23; (6) that everyone with gender dysphoria is transgender, but that some transgender persons do not have gender dysphoria, *id.* at 23–24; and (7) that the Military Ban is animated by animus, *id.* at 31–32.

The Court discussed the Symptoms Criteria in only one paragraph of its analysis, noting that the phrase "was so broad as to capture persons who have never had gender dysphoria." Op. at 60. But even without that reasoning, the Court would still conclude that the Hegseth Policy targets more than just gender dysphoria. The Hegseth Policy's text is broad enough to cover people who do not have gender dysphoria without any reference to the Symptoms Criteria. *See supra* at 7–12.

### C. The MDI Guidance Makes It More Likely that the Hegseth Policy Will Not Survive Rational Basis Review

The MDI Guidance underscores that the Ban is "far removed from [its stated] justifications." *Romer v. Evans*, 517 U.S. 620, 624 (1996). To be sure, gender dysphoria is a valid health concern. But the MDI Guidance cites several DoD and military policies that already ensure medical readiness in transgender persons, whether they have had, have, or might later have gender dysphoria. For example, DoD conducts Periodic Health Assessments "at least yearly" for all servicemembers to ensure they meet the military's high medical standards. MDI Guidance at 2. If a servicemember becomes unable to meet the military's rigorous mental and physical standards, DoD would discover that during a Periodic Health Assessment. The redundancy of the Hegseth Policy gives the Court "considerable doubt" that it is based on anything other than animus. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973).

Additionally, the MDI Guidance states that DoDI 6025.19 requires servicemembers to report any medical issues "that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service." MDI Guidance at 2. Their commanders are responsible for ensuring that they do so. *Id.* So even if the Periodic Health Assessment fails to catch the issue, or if the medical condition develops between Health Assessments, the military will still be informed on medical issues. Thus, Defendants' argument that the Hegseth Policy—which bans anyone with a history of gender dysphoria—is necessary to ensure troop readiness raises the same doubt that the Supreme Court had in *Moreno*.

At the March 21, 2025, hearing, the Court asked Defense counsel to explain why the military needs to exclude people who meet the Symptoms Criteria when the MDI Guidance cites policies that already address deployability and retention concerns. Tr. (Mar. 21, 2025) at 33–35. Defense counsel gave no discernable answer, finally resorting to the argument that the Court must defer to the military's "predictive judgment," Tr. (Mar. 21, 2025) at 42, that people must be weeded out now—*Minority Report*-style[13]—to prevent hypothetical future problems. That response begs more questions than it answer.

## STAY PENDING APPEAL

For the reasons stated above and in the Court's earlier Opinion, the Court denies Defendants' Motion for a Stay Pending Appeal. Defendants provide no reason in support of their request. Plaintiffs still face irreparable harm. Indeed, in the few additional days that the Court extended its stay to consider this motion, Plaintiffs filed a Motion for Temporary Restraining Order, Dkt. 95, based on ongoing harms experienced by Plaintiffs.

---

[13] If you know, you know. If you don't, the Court commends to you *Minority Report* (20th Century Fox 2002).

Defendants, on the other hand, have yet to explain the burden on them of continuing the status quo. Much less do they explain how that purported burden is greater than the ongoing injury Plaintiffs experience and the additional harms that will result if the Court stays the injunction. Nor do Defendants explain how the public benefits from a stay of the injunction order, which will require DoD to enact a policy that likely violates Plaintiffs' Fifth Amendment rights.

The Court, on its own motion, stays its Order until March 28, 2025, at 7:00 pm eastern to provide Defendants the opportunity to file an emergency stay with the D.C. Circuit.

### CONCLUSION

As the Court predicted, its Opinion has generated heated public debate, and Defendants will appeal. This is all to the good. But let's recall that our servicemembers make the debate and appeals possible. Their sacrifices breathe life into the phrase, "one nation under God, indivisible, with liberty and justice for all." The Court, again, thanks them. All.

* * * * *

For the reasons stated above, the Court hereby:

**DENIES** Defendants' Motion to Dissolve the Preliminary Injunction and Motion for a Stay Pending Appeal, Dkt. 91; and

**STAYS** its Order, Dkt. 88, until March 28, 2025, at 7:00 pm eastern.

Date: March 26, 2025

_____
ANA C. REYES
United States District Court Judge

16

Add.98



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

**FEB 2 6 2025**

PERSONNEL AND
READINESS

### MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
### COMMANDERS OF THE COMBATANT COMMANDS
### DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Additional Guidance on Prioritizing Military Excellence and Readiness

As directed by the Secretary of Defense in his February 7, 2025, memorandum, "Prioritizing Military Excellence and Readiness," it is Department policy that, pursuant to Executive Order 14183, "Prioritizing Military Excellence and Readiness," the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service.

The attachment to this memorandum provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance. The policy guidance in the attachment: (1) supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda; and (2) is effective immediately and will be incorporated into respective Department issuances, as appropriate.

The following DoD issuances will be updated to reflect guidance in this attachment, as appropriate:

- Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended

- DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended

- DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

- DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

- DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

- DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

Effective immediately, the following issuances, policies, and memoranda are cancelled:

- DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended

- Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023

- Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016

- Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019

The Assistant Secretary of Defense for Manpower and Reserve Affairs will be responsible for all data collection and reporting. The first report is due March 26, 2025. All Department of Defense and Military Service policy recissions and updates must be completed no later than June 25, 2025.

Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

Darin S. Selnick
Performing the Duties of the Under Secretary of Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General, Public Health Service
Administrator, National Oceanic and Atmospheric Administration

**ATTACHMENT**
**Service Members and Applicants for Military Service**
**who Have a Current Diagnosis or History of, or**
**Exhibit Symptoms Consistent with, Gender Dysphoria**

1. **Policy.**  It is DoD policy that:

a.  Service in the Military Services is open to all persons who can meet the high standards for military service and readiness without special accommodations.

b.  It is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity.  This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

c.  Military service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service.  Service by these individuals is not in the best interests of the Military Services and is not clearly consistent with the interests of national security.

d.  Individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in sections 4.1.c. and 4.3.c. of this attachment.

e.  Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service in accordance with section 4.4. of this attachment.  Characterization of service under these procedures will be honorable except where the Service member's record otherwise warrants a lower characterization.

f.  The Department only recognizes two sexes: male and female.  An individual's sex is immutable, unchanging during a person's life.  All Service members will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

g.  Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

h.  Pronoun usage when referring to Service members must reflect a Service member's sex.  In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

i. Absent extraordinary operational necessity, the Military Services will not allow male Service members to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Service members to use or share sleeping, changing, or bathing facilities designated for males.

j. No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k. Consistent with existing law and Department policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information. Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties. Personnel shall also be accountable for safeguarding this health information consistent with existing law and Departmental policy.

**2. Applicability.** This policy guidance applies to the Office of the Secretary of Defense, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff, the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

**3. Responsibilities.**

3.1. Under Secretary of Defense for Personnel and Readiness (USD(P&R)).

The USD(P&R) will:

a. Update or rescind existing DoD issuances, or publish new issuances, as necessary pursuant to this guidance.

b. Ensure all Military Department and Military Service regulations, policies, and guidance are consistent with this attachment.

3.2. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA) will:

a. Coordinate with the Assistant Secretary of Defense for Health Affairs (ASD(HA)) in the management and implementation of this guidance, and issue clarifying guidance, as appropriate.

b. Serve as the primary point of contact, through the Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)), for those responsibilities assigned in sections 3.3. through 3.6. of this attachment and provide reports in accordance with section 7 of this attachment, until a determination is made and notification provided to the Secretaries of the Military Departments that the reports may be cancelled.

c. Oversee the recission and updates to applicable DoD issuances, policy memoranda, and other guidance documents in accordance with this guidance.

3.3. <u>ASD(HA)</u>.

Under the authority, direction, and control of the USD(P&R), the ASD(HA) will:

a. Coordinate with the ASD(M&RA) in the management and implementation of health care matters associated with this guidance, and issue clarifying guidance, as appropriate.

b. Oversee the recission of, and updates to, applicable DoD issuances, Defense Health Agency issuances, and other policy memoranda or guidance documents in accordance with this guidance.

c. Consider requests submitted by the Secretaries of the Military Departments, on a case-by-case basis, for an exception to section 1.j.. The ASD(HA) may authorize an exception to section 1.j. of this attachment for non-surgical care if required to protect the health of Service members. This authority may not be further delegated.

d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.4. <u>Secretaries of the Military Departments</u>.

The Secretaries of the Military Departments will:

a. Adhere to all provisions of this guidance.

b. Update or publish new regulations, policies, and guidance to implement the provisions of this attachment.

c. Ensure the protection of personally identifiable information, protected health information, and personal privacy considerations, consistent with existing law and DoD policy.

d. Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service regulations, policies, and guidance applicable to Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

e. Establish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum.

f. Within 30 days of identification pursuant to section 3.4.e. of this attachment, begin separation actions, in accordance with section 4.4. of this attachment, for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3.c. of this attachment.

g. Ensure all Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and other Joint assignments are reassigned to their respective Military Services for the purpose of initiating administrative separation processes.

h. Ensure all personnel systems accurately reflect each Service member's sex.

i. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.5. <u>Chairman of the Joint Chiefs of Staff</u>.

The Chairman of the Joint Chiefs of Staff will:

a. Adhere to all provisions of this guidance.

b. Ensure the Commanders of the Combatant Commands adhere to all provisions of this guidance.

c. Consolidate and submit to the DASD(MPP) a report on Combatant Command compliance with section 5 of this attachment, in accordance with section 7 of this attachment.

d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.6. <u>Defense Agency and DoD Field Activity Directors</u>.

The Defense Agency and DoD Field Activity Directors will:

a. Ensure compliance with section 5 of this attachment.

b. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

**4. Procedures.**

4.1. <u>Appointment, Enlistment, or Induction into the Military Services</u>.

a. Applicants for military service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified for military service.

b. A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

c. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities. The applicant

must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

d. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment and not granted a waiver pursuant to section 4.1.c. of this attachment shall not ship to Initial Entry Training.

e. Offers of admission to a Military Service Academy or the Senior Reserve Officers' Training Corps to individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment shall be rescinded except where the individual is granted a waiver pursuant to section 4.1.c. of this attachment. Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may still participate in classes taught or coordinated by the Senior Reserve Officer's Training Corps that are open to all students at the college or university concerned. All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with section 5 of this attachment.

f. Individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment are subject to separation from a Military Service Academy in accordance with DoDI 1322.22, or from the Senior Reserve Officers' Training Corps in accordance with DoDI 1215.08, unless the individual is granted a waiver consistent with section 4.1.c. of this attachment. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

4.2. Medical Care.

a. In accordance with DoDI 6025.19 and DoDI 1215.13, Service members have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report any medical and health (including mental health) issues that may affect their readiness to deploy or fitness to continue serving in an active status.

b. All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.

c. Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider (HCP) in order to prevent further complications, be continued until separation is complete.

d. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria. The retention or processing for separation of such Service members will follow procedures in section 4.3. or section 4.4. of this attachment, as appropriate.

4.3. <u>Retention</u>.

    a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

    b. Service members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service.

    c. Service members disqualified pursuant to sections 4.3.a. and 4.3.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

        1. The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

        2. The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and

        3. The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

4.4. <u>Separation</u>.

    a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3. of this attachment will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections in, DoDI 1332.14 and DoDI 1332.30. The Secretaries of the Military Departments will direct the administrative separation of (1) any enlisted Service member prior to the expiration of the member's term of service following a determination that doing so is in the best interest of the relevant Military Service; or (2) any officer whose retention is not clearly consistent with the interests of national security.

        1. Service members are ineligible for referral to the Disability Evaluation System (DES) when they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria, not constituting a physical disability pursuant to DoDI 1332.18.

        2. Service members may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with DoDI 1332.18, prior to processing for administrative separation.

        3. Service members who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

4.  Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance.  Such Service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43.  Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29.

5.  Service members separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174 and DoDI 1332.29.

6.  All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board.

7.  All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with 10 U.S.C. § 1182.

8.  Service members identified pursuant to section 3.4.e. of this attachment with over 18 but less than 20 years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

9.  Eligible Service members (including active duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

10.  Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(1).  The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

11.  The Secretaries of the Military Departments shall waive any remaining military service obligation for Service members who are separated pursuant to this policy.

b.  Separation proceedings for individuals identified pursuant to section 3.4.e. of this attachment will be initiated after the Secretaries of Military Departments complete the requirements in section 3.4.e. of this attachment.

c.  Nothing in this attachment precludes appropriate administrative or disciplinary action for Service members who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

**5. Sex.**

5.1. Military Records. All military records will reflect the Service member's sex.

5.2. Military Standards.

   a. Access to intimate spaces will be determined by Service members' or applicants for military service's sex. The Military Services will apply all standards that involve consideration of the Service members' sex, to include, but not limited to:

   1. Uniforms and grooming.

   2. Body composition assessment.

   3. Medical fitness for duty.

   4. Physical fitness and body fat standards.

   5. Berthing, bathroom, and shower facilities.

   6. Military personnel drug abuse testing program participation.

   b. All such shared intimate spaces will be clearly designated for either male, female, or family use.

   c. Exceptions to this requirement may be made only in cases of extraordinary operational necessity. During deployments, or in austere environments where space is limited, commanders will prioritize unit cohesion and readiness while adhering to this policy.

**6. Administrative Absence for Service Members with a Current History or Diagnosis of, or Symptoms Consistent with, Gender Dysphoria.**

6.1. Administrative Absence.

   a. In order to maintain good order and discipline in accordance with section 5 of this attachment, the Secretary of the Military Department concerned may place Service members being processed for separation under the criteria in section 4.4.a. of this attachment in an administrative absence status, with full pay and benefits, until their separation is complete.

   b. Service members in an administrative absence status in accordance with this section will be designated as non-deployable until their separation is complete.

   c. Service members in an administrative absence status in accordance with this section will complete the Transition Assistance Program in accordance with DoDI 1332.35.

**7. <u>Reporting</u>.**

7.1. <u>Report Requirements</u>.

   a.  No later than March 26, 2025, and every 30 days thereafter, submit via a Correspondence and Task Management System (CATMS) tasker a memorandum to the DASD(MPP) providing the following:

      1.  Identification of all DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance where the content of which relate to, or may be affected by, guidance provided in this attachment.

      2.  Status of updates to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

      3.  Draft revisions to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

      4.  Status of system of records updates.

      5.  Status of, and progress on, separations of Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria in accordance with section 4.4. of this attachment.

      6.  Status of, and progress on, compliance with section 5 of this attachment.

## GLOSSARY

### G.1. Acronyms

| Acronym | Meaning |
|---------|---------|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CATMS | Correspondence and Task Management System |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DoDI | DoD Instruction |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

### G.2. Definitions

Unless otherwise noted, these terms and their definitions are for the purposes of this attachment.

| Term | Definition |
|------|------------|
| **cross-sex hormone therapy** | The use of feminizing hormones by a male or the use of masculinizing hormones by a female. |
| **gender dysphoria** | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| **gender identity** | Defined in Executive Order 14168 as a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex. |
| **sex** | Defined in Executive Order 14168 as an individual's immutable biological classification as either male or female. |

# REFERENCES

Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025

Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025

DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoDI 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

DoDI 1332.14, "Enlisted Administrative Separations," August 1, 2024

DoDI 1332.18, "Disability Evaluation System," November 10, 2022

DoDI 1332.29, "Involuntary Separation Pay (Non-Disability)," March 3, 2017

DoDI 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoDI 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoDI 1332.43, "Voluntary Separation Pay (VSP) Program for Service Members," November 28, 2017

DoDI 1332.46, "Temporary Early Retirement Authority (TERA) for Service Members," December 21, 2018

DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoDI 6130.03, Volume 1, "Medical Standards for Military Service:  Appointment, Enlistment, or Induction," May 6, 2018, as amended

DoDI 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020, as amended

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Title 10, United States Code

Title 37, United States Code

# EXHIBIT V

**ACTION MEMO**

**FOR:** DARIN S. SELNICK, PERFORMING THE DUTIES OF THE UNDER SECRETARY
OF DEFENSE FOR PERSONNEL AND READINESS

**FROM:** Tim Dill, Performing the Duties of the Assistant Secretary of Defense for Manpower
and Reserve Affairs    DILL.TIMOTHY. Digitally signed by DILL.TIMOTHY.D.1289452547
                        D.1289452547    Date: 2025.02.26 20:15:13 -05'00'

**SUBJECT:** Implementing Guidance for Prioritizing Military Excellence and Readiness
Executive Order (EO)

- **Purpose.** Recommend you sign the memorandum at TAB A to implement EO 14183,
  "Prioritizing Military Excellence and Readiness," January 27, 2025, consistent with SecDef
  guidance provided on February 7, 2025 (TAB B).

- **Discussion**

  - On January 27, 2025, President Trump issued Executive Order 14183 (TAB C), stating
    that "military service must be reserved for those mentally and physically fit for duty,"
    and that "[t]he Armed Forces must adhere to high mental and physical health standards to
    ensure our military can deploy, fight, and win, including in austere conditions and
    without the benefit of routine medical treatment or special provisions.

  - The EO states that "[i]t is the policy of the United States Government to establish high
    standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and
    integrity. This policy is inconsistent with the medical, surgical, and mental health
    constraints on individuals with gender dysphoria." The EO then instructs SecDef to issue
    guidance and actions in light of the EO within 30-60 days.

  - The EO further adopts the definitions in EO 14168, "Defending Women from Gender
    Ideology Extremism and Resorting Biological Truth to the Federal Government," January
    20, 2025 (TAB D), including that "'sex' shall refer to an individual's immutable
    biological classification as either male or female." As directed by EO 14168, the
    Department of Health and Human Services has issued further guidance on the definitions
    of "male" and "female."

  - SecDef issued guidance to the Department on February 7, 2025, directing a pause for "all
    new accessions for individuals with a history of gender dysphoria" and a pause for "all
    unscheduled, scheduled, or planned medical procedures associated with affirming or
    facilitating a gender transition for Service members… ."

  - SecDef further authorized and directed you "to provide additional policy and
    implementation guidance… including guidance regarding service by Service members
    with a current diagnosis or history of gender dysphoria… ."

  - The memorandum at TAB A, among other actions:

- o Cancels the following DoD issuances, policies, and memoranda:
  - – DoD Instruction (DoDI) 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended (TAB 1)

  - – Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023 (TAB 2)

  - – Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016 (TAB 3)

  - – Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019 (TAB 4)

- o Directs updates to the following DoD issuances, consistent with the memorandum:
  - – DoDI 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended (TAB 5)

  - – DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended (TAB 6)

  - – DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended (TAB 7)

  - – DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended (TAB 8)

  - – DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended (TAB 9)

  - – DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022 (TAB 10)

- o Establishes as DoD policy that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" are inconsistent with the "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."

- o Determines that "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for

military service," directs that "Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service…," and prohibits their accession, all subject to certain exceptions.

o   Establishes that DoD only recognizes two sexes: male and female, and that these sexes are not changeable.  It further requires all Service members to serve in accordance with their sex as defined in EO 14168, "Defending Women from Gender Ideology Extremism and Resorting Biological Truth to the Federal Government."

o   Establishes clear requirements on pronoun usage when referring to Service members.

o   Prohibits the use of DoD funds to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy, subject to certain exceptions.

–   This policy was informed through consideration of, among other things, the President and Secretary's written direction, existing and prior DoD policy, and prior DoD studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria.  This consideration included:

o   SecDef Memorandum, "Military Service by Transgender Individuals," February 22, 2018, which "conclude[d] that there are substantial risks associated with allowing accession and retention of individuals with a history or diagnosis of gender dysphoria… ." This conclusion was informed by an extensive inquiry conducted by a panel of experts (TAB 11).

o   A 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity which found that "rates of disability evaluation were estimated to be higher among [transgender] service members… ." (TAB 12) Additionally, this review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period.  This level of non-deployability creates significant readiness risk and places additional burdens on Service members without gender dysphoria to meet requirements.

o   A 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs that included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime,…[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts,"

"transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of evidence on transgender mental health and gender-affirming care is low to moderate (TAB 13).

    o  A review of cost data by the Office of the Assistant Secretary of Defense for Health Affairs indicated that, between 2015 and 2024, DoD spent $52,084,407 providing care to active duty Service members to treat gender dysphoria, including $15,233,158 for psychotherapy; $3,135,593 for hormone therapy, and $14,324,739 for surgical care.

–  While Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

**RECOMMENDATION:** Sign the memorandum at TAB A.

**Attachments:**

File Folder:

| | |
|---|---|
| TAB A | Performing the Duties of the Under Secretary of Defense for Personnel and Readiness, "Additional Guidance on Prioritizing Military Excellence and Readiness," Memorandum for Signature |
| TAB B | Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," February 7, 2025 |
| TAB C | Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025 |
| TAB D | Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025 |
| TAB E | Coord |

Binder:

| | |
|---|---|
| TAB 1 | DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended |
| TAB 2 | Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023 |
| TAB 3 | Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016 |
| TAB 4 | Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019 |
| TAB 5 | DoD Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended |

TAB 6    DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended

TAB 7    DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

TAB 8    DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

TAB 9    DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

TAB 10    DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

TAB 11    Secretary of Defense Memorandum, "Military Service by Transgender Individuals," February 22, 2018

TAB 12    Accession Medical Standards Analysis and Research Activity (AMSARA) Report, "Analysis of Medical Administrative Data on Transgender Service Members," July 14, 2021

TAB 13    Office of the Assistant Secretary of Defense for Health Affairs Literature Review: Level of Evidence for Gender-Affirming Treatments

# EXHIBIT G



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

FEB 2 2 2018

MEMORANDUM FOR THE PRESIDENT

SUBJECT: Military Service by Transgender Individuals

"Transgender" is a term describing those persons whose gender identity differs from their biological sex. A subset of transgender persons diagnosed with gender dysphoria experience discomfort with their biological sex, resulting in significant distress or difficulty functioning. Persons diagnosed with gender dysphoria often seek to transition their gender through prescribed medical treatments intended to relieve the distress and impaired functioning associated with their diagnosis.

Prior to your election, the previous administration adopted a policy that allowed for the accession and retention in the Armed Forces of transgender persons who had a history or diagnosis of gender dysphoria. The policy also created a procedure by which such Service members could change their gender. This policy was a departure from decades-long military personnel policy. On June 30, 2017, before the new accession standards were set to take effect, I approved the recommendation of the Services to delay for an additional six months the implementation of these standards to evaluate more carefully their impact on readiness and lethality. To that end, I established a study group that included the representatives of the Service Secretaries and senior military officers, many with combat experience, to conduct the review.

While this review was ongoing, on August 25, 2017, you sent me and the Secretary of Homeland Security a memorandum expressing your concern that the previous administration's new policy "failed to identify a sufficient basis" for changing longstanding policy and that "further study is needed to ensure that continued implementation of last year's policy change would not have … negative effects." You then directed the Department of Defense and the Department of Homeland Security to reinstate the preexisting policy concerning accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." You made clear that we could advise you "at any time, in writing, that a change to this policy is warranted."

I created a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and directed them to consider this issue and develop policy proposals based on data, as well as their professional military judgment, that would enhance the readiness, lethality, and effectiveness of our military. This Panel included combat veterans to ensure that our military purpose remained the foremost consideration. I charged the Panel to provide its best military advice, based on increasing the lethality and readiness of America's armed forces, without regard to any external factors.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical

Add.119

professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed available information on gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike previous reviews on military service by transgender individuals, the Panel's analysis was informed by the Department's own data obtained since the new policy began to take effect last year.

Based on the work of the Panel and the Department's best military judgment, the Department of Defense concludes that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender. Furthermore, the Department also finds that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all Service members, including transgender Service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.

The prior administration largely based its policy on a study prepared by the RAND National Defense Research Institute; however, that study contained significant shortcomings. It referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own. In short, this policy issue has proven more complex than the prior administration or RAND assumed.

I firmly believe that compelling behavioral health reasons require the Department to proceed with caution before compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations. Preservation of unit cohesion, absolutely essential to military effectiveness and lethality, also reaffirms this conclusion.

Therefore, in light of the Panel's professional military judgment and my own professional judgment, the Department should adopt the following policies:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

I have consulted with the Secretary of Homeland Security, and she agrees with these proposed policies.

By its very nature, military service requires sacrifice. The men and women who serve voluntarily accept limitations on their personal liberties – freedom of speech, political activity, freedom of movement - in order to provide the military lethality and readiness necessary to ensure American citizens enjoy their personal freedoms to the fullest extent. Further, personal characteristics, including age, mental acuity, and physical fitness – among others – matter to field a lethal and ready force.

In my professional judgment, these policies will place the Department of Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the survival and success of our Service members around the world. The attached report provided by the Under Secretary of Defense for Personnel and Readiness includes a detailed analysis of the factors and considerations forming the basis of the Department's policy proposals.

I therefore respectfully recommend you revoke your memorandum of August 25, 2017, regarding Military Service by Transgender Individuals, thus allowing me and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to implement appropriate policies concerning military service by transgender persons.

Attachment:
As stated

cc:
Secretary of Homeland Security

3

Add.121

# DEPARTMENT OF DEFENSE REPORT AND RECOMMENDATIONS
## ON
## MILITARY SERVICE BY TRANSGENDER PERSONS



**FEBRUARY 2018**

## Table of Contents

Executive Summary ........................................................................................................ 2

History of Policies Concerning Transgender Persons ............................................... 7

    Transgender Policy Prior to the Carter Policy ....................................................... 8

        A. Accession Medical Standards ....................................................................... 8

        B. Retention Standards ..................................................................................... 11

    The Carter Policy ................................................................................................... 12

        A. Changes to the DSM ................................................................................... 12

        B. The Department Begins Review of Transgender Policy .................................. 13

        C. New Standards for Transgender Persons ...................................................... 14

            1. Retention Standards ............................................................................... 14

            2. Accession Standards ............................................................................... 15

Panel of Experts Recommendation .......................................................................... 17

Recommended Policy ................................................................................................ 19

    Discussion of Standards ........................................................................................ 19

        A. Mental Health Standards ............................................................................. 19

        B. Physical Health Standards ........................................................................... 27

        C. Sex-Based Standards ................................................................................... 28

    New Transgender Policy ........................................................................................ 32

        A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex ......................................................................................... 32

        B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified ............................................................................................... 32

            1. Undermines Readiness .......................................................................... 32

            2. Incompatible with Sex-Based Standards ................................................ 35

            3. Imposes Disproportionate Costs ............................................................ 41

        C. Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances ................................................ 41

            1. Accession of Individuals Diagnosed with Gender Dysphoria .................... 42

            2. Retention of Service Members Diagnosed with Gender Dysphoria ............ 42

            3. Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria. ........................................................................... 42

Conclusion .................................................................................................................. 44

## Executive Summary

It is a bedrock principle of the Department of Defense that any eligible individual[1] who can meet the high standards for military service without special accommodations should be permitted to serve.  This is no less true for transgender persons than for any other eligible individual.  This report, and the recommendations contained herein, proceed from this fundamental premise.

The starting point for determining a person's qualifications for military duty is whether the person can meet the standards that govern the Armed Forces.  Federal law requires that anyone entering into military service be "qualified, effective, and able-bodied."[2]  Military standards are designed not only to ensure that this statutory requirement is satisfied but to ensure the overall military effectiveness and lethality of the Armed Forces.

The purpose of the Armed Forces is to fight and win the Nation's wars.  No human endeavor is more physically, mentally, and emotionally demanding than the life and death struggle of battle.  Because the stakes in war can be so high—both for the success and survival of individual units in the field and for the success and survival of the Nation—it is imperative that all Service members are physically and mentally able to execute their duties and responsibilities without fail, even while exposed to extreme danger, emotional stress, and harsh environments.

Although not all Service members will experience direct combat, standards that are applied universally across the Armed Forces must nevertheless account for the possibility that any Service member could be thrust into the crucible of battle at any time.  As the Department has made clear to Congress, "[c]ore to maintaining a ready and capable military force is the understanding that each Service member is required to be available and qualified to perform assigned missions, including roles and functions outside of their occupation, in any setting."[3]  Indeed, there are no occupations in the military that are exempt from deployment.[4]  Moreover, while non-combat positions are vital to success in war, the physical and mental requirements for those positions should not be the barometer by which the physical and mental requirements for all positions, especially combat positions, are defined.  Fitness for combat must be the metric against which all standards and requirements are judged.  To give all Service members the best chance of success and survival in war, the Department must maintain the highest possible standards of physical and mental health and readiness across the force.

While individual health and readiness are critical to success in war, they are not the only measures of military effectiveness and lethality.  A fighting unit is not a mere collection of individuals; it is a unique social organism that, when forged properly, can be far more powerful than the sum of its parts.  Human experience over millennia—from the Spartans at Thermopylae to the band of brothers of the 101st Airborne Division in World War II, to Marine squads fighting building-to-building in Fallujah—teaches us this.  Military effectiveness requires

---

[1] 10 U.S.C. §§ 504, 505(a), 12102(b).
[2] 10 U.S.C. § 505(a).
[3] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," pp. 8-9 (Apr. 2016).
[4] Id.

transforming a collection of individuals into a single fighting organism—merging multiple individual identities into one. This transformation requires many ingredients, including strong leadership, training, good order and discipline, and that most intangible, but vital, of ingredients—unit cohesion or, put another way, human bonding.

Because unit cohesion cannot be easily quantified, it is too often dismissed, especially by those who do not know what Justice Oliver Wendell Holmes called the "incommunicable experience of war."[5] But the experience of those who, as Holmes described, have been "touched with fire" in battle and the experience of those who have spent their lives studying it attest to the enduring, if indescribable, importance of this intangible ingredient. As Dr. Jonathan Shay articulated it in his study of combat trauma in Vietnam, "[s]urvival and success in combat often require soldiers to virtually read one another's minds, reflexively covering each other with as much care as they cover themselves, and going to one another's aid with little thought for safety."[6] Not only is unit cohesion essential to the health of the unit, Dr. Shay found that it was essential to the health of the individual soldier as well. "Destruction of unit cohesion," Dr. Shay concluded, "cannot be overemphasized as a reason why so many psychological injuries that might have healed spontaneously instead became chronic."[7]

Properly understood, therefore, military effectiveness and lethality are achieved through a combination of inputs that include individual health and readiness, strong leadership, effective training, good order and discipline, and unit cohesion. To achieve military effectiveness and lethality, properly designed military standards must foster these inputs. And, for the sake of efficiency, they should do so at the least possible cost to the taxpayer.

To the greatest extent possible, military standards—especially those relating to mental and physical health—should be based on scientifically valid and reliable evidence. Given the life-and-death consequences of warfare, the Department has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members.

Not all standards, however, are capable of scientific validation or quantification. Instead, they are the product of professional military judgment acquired from hard-earned experience leading Service members in peace and war or otherwise arising from expertise in military affairs. Although necessarily subjective, this judgment is the best, if not only, way to assess the impact of any given military standard on the intangible ingredients of military effectiveness mentioned above—leadership, training, good order and discipline, and unit cohesion.

For decades, military standards relating to mental health, physical health, and the physiological differences between men and women operated to preclude from military service transgender persons who desired to live and work as the opposite gender.

---

[5] *The Essential Holmes: Selections from the Letters, Speeches, Judicial Opinions, and Other Writings of Oliver Wendell Holmes, Jr.*, p. 93 (Richard Posner, ed., University of Chicago Press 1992).
[6] Jonathan Shay, *Achilles in Vietnam*, p. 61 (Atheneum 1994).
[7] Id. at 198.

3

Add.125

Relying on a report by an outside consultant, the RAND National Defense Research Institute, the Department, at the direction of Secretary Ashton Carter, reversed that longstanding policy in 2016. Although the new policy—the "Carter policy"—did not permit all transgender Service members to change their gender to align with their preferred gender identity, it did establish a process to do so for transgender Service members who were diagnosed with gender dysphoria—that is, the distress or impairment of functioning that is associated with incongruity between one's biological sex and gender identity. It also set in motion a new accession policy that would allow applicants who had a history of gender dysphoria, including those who had already transitioned genders, to enter into military service, provided that certain conditions were met. Once a change of gender is authorized, the person must be treated in all respects in accordance with the person's preferred gender, whether or not the person undergoes any hormone therapy or surgery, so long as a treatment plan has been approved by a military physician.

The new accession policy had not taken effect when the current administration came into office. Secretary James Mattis exercised his discretion and approved the recommendation of the Services to delay the Carter accession policy for an additional six months so that the Department could assess its impact on military effectiveness and lethality. While that review was ongoing, President Trump issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security with respect to the U.S. Coast Guard expressing that further study was needed to examine the effects of the prior administration's policy change. The memorandum directed the Secretaries to reinstate the longstanding preexisting accession policy until such time that enough evidence existed to conclude that the Carter policy would not have negative effects on military effectiveness, lethality, unit cohesion, and military resources. The President also authorized the Secretary of Defense, in consultation with the Secretary of Homeland Security, to address the disposition of transgender individuals who were already serving in the military.

Secretary Mattis established a Panel of Experts that included senior uniformed and civilian leaders of the Department and U.S. Coast Guard, many with experience leading Service members in peace and war. The Panel made recommendations based on each Panel member's independent military judgment. Consistent with those recommendations, the Department, in consultation with the Department of Homeland Security, recommends the following policy to the President:

      A.    <u>Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex.</u> Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are qualified for service, provided that they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which transgender persons without a history or diagnosis of gender dysphoria must serve, like everyone else, in their biological sex.

B.  Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified. Except for those who are exempt under this policy, as described below, and except where waivers or exceptions to policy are otherwise authorized, transgender persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be ineligible for service. For reasons discussed at length in this report, the Department concludes that accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs. Underlying these conclusions is the considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments, such as cross-sex hormone therapy and sex reassignment surgery—interventions which are unique in psychiatry and medicine—remedy the multifaceted mental health problems associated with gender dysphoria.

C.  Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances. Transgender persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver or exception to policy as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

    1.  *Accession of Individuals Diagnosed with Gender Dysphoria.* Persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex.

    2.  *Retention of Service Members Diagnosed with Gender Dysphoria.* Consistent with the Department's general approach of applying less stringent standards to retention than to accession in order to preserve the Department's substantial investment in trained personnel, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[8]

    3.  *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.* Transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary care,

---

[8] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

Add.127

to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences. This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order. The Service member must, however, adhere to the Carter policy procedures and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months). While the Department believes that its solemn promise to these Service members, and the investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy.

Although the precise number is unknown, the Department recognizes that many transgender persons who desire to serve in the military experience gender dysphoria and, as a result, could be disqualified under the recommended policy set forth in this report. Many transgender persons may also be unwilling to adhere to the standards associated with their biological sex as required by longstanding military policy. But others have served, and are serving, with distinction under the standards for their biological sex, like all other Service members. Nothing in this policy precludes service by transgender persons who do not have a history or diagnosis of gender dysphoria and are willing and able to meet all standards that apply to their biological sex.

Moreover, nothing in this policy should be viewed as reflecting poorly on transgender persons who suffer from gender dysphoria, or have had a history of gender dysphoria, and are accordingly disqualified from service. The vast majority of Americans from ages 17 to 24—that is, 71%—are ineligible to join the military without a waiver for mental, medical, or behavioral reasons.[9] Transgender persons with gender dysphoria are no less valued members of our Nation than all other categories of persons who are disqualified from military service. The Department honors all citizens who wish to dedicate, and perhaps even lay down, their lives in defense of the Nation, even when the Department, in the best interests of the military, must decline to grant their wish.

Military standards are high for a reason—the trauma of war, which all Service members must be prepared to face, demands physical, mental, and moral standards that will give all Service members the greatest chance to survive the ordeal with their bodies, minds, and moral character intact. The Department would be negligent to sacrifice those standards for any cause. There are serious differences of opinion on this issue, even among military professionals, but in the final analysis, given the uncertainty associated with the study and treatment of gender dysphoria, the competing interests involved, and the vital interests at stake—our Nation's defense and the success and survival of our Service members in war—the Department must proceed with caution.

---

[9] The Lewin Group, Inc., "Qualified Military Available (QMA) and Interested Youth: Final Technical Report," p. 26 (Sept. 2016).

Add.128

## History of Policies Concerning Transgender Persons

For decades, military standards have precluded the accession and retention of certain transgender persons.[10] Accession standards—i.e., standards that govern induction into the Armed Forces—have historically disqualified persons with a history of "transsexualism." Also disqualified were persons who had undergone genital surgery or who had a history of major abnormalities or defects of the genitalia. These standards prevented transgender persons, especially those who had undergone a medical or surgical gender transition, from accessing into the military, unless a waiver was granted.

Although retention standards—i.e., standards that govern the retention and separation of persons already serving in the Armed Forces—did not require the mandatory processing for separation of transgender persons, it was a permissible basis for separation processing as a physical or mental condition not amounting to a disability. More typically, however, such Service members were processed for separation because they suffered from other associated medical conditions or comorbidities, such as depression, which were also a basis for separation processing.

At the direction of Secretary Carter, the Department made significant changes to these standards. These changes—i.e., the "Carter policy"—prohibit the separation of Service members on the basis of their gender identity and allow Service members who are diagnosed with gender dysphoria to transition to their preferred gender.

Transition-related treatment is highly individualized and could involve what is known as a "medical transition," which includes cross-sex hormone therapy, or a "surgical transition,"

---

[10] For purposes of this report, the Department uses the broad definition of "transgender" adopted by the RAND National Defense Institute in its study of transgender service: "an umbrella term used for individuals who have sexual identity or gender expression that differs from their assigned sex at birth." RAND National Defense Research Institute, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, p.75 (RAND Corporation 2016), available at https://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/RR1530/RAND_RR1530.pdf ("RAND Study"). According to the Human Rights Campaign, "[t]he transgender community is incredibly diverse. Some transgender people identify as male or female, and some identify as genderqueer, nonbinary, agender, or somewhere else on or outside of the spectrum of what we understand gender to be." Human Rights Campaign, "Understanding the Transgender Community," https://www.hrc.org/resources/understanding-the-transgender-community (last visited Feb. 14, 2018). A subset of transgender persons are those who have been diagnosed with gender dysphoria. According to the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association, "gender dysphoria" is a "marked incongruence between one's experienced/expressed gender and assigned gender" that "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 452-53 (5th ed. 2013). Based on these definitions, a person can be transgender without necessarily having gender dysphoria (i.e., the transgender person does not suffer "clinically significant distress or impairment" on account of gender incongruity). A 2016 survey of active duty Service members estimated that approximately 1% of the force—8,980 Service members— identify as transgender. Office of People Analytics, Department of Defense, "2016 Workplace and Gender Relations Survey of Active Duty Members, Transgender Service Members," pp. 1-2. Currently, there are 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016. In addition, when using the term "biological sex" or "sex," this report is referring to the definition of "sex" in the RAND study: "a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals (intersex is a rare exception)." RAND Study at 75.

which includes sex reassignment surgery. Service members could also forego medical transition treatment altogether, retain all of their biological anatomy, and live as the opposite gender—this is called a "social transition."

Once the Service member's transition is complete, as determined by the member's military physician and commander in accordance with his or her individualized treatment plan, and the Service member provides legal documentation of gender change, the Carter policy allows for the Service member's gender marker to be changed in the DEERS. Thereafter, the Service member must be treated in every respect—including with respect to physical fitness standards; berthing, bathroom, and shower facilities; and uniform and grooming standards—in accordance with the Service member's preferred gender. The Carter policy, however, still requires transgender Service members who have not changed their gender marker in DEERS, including persons who identify as other than male or female, to meet the standards associated with their biological sex.

The Carter policy also allows accession of persons with gender dysphoria who can demonstrate stability in their preferred gender for at least 18 months. The accession policy did not take effect until required by court order, effective January 1, 2018.

The following discussion describes in greater detail the evolution of accession and retention standards pertaining to transgender persons.

Transgender Policy Prior to the Carter Policy

A.    Accession Medical Standards

DoD Instruction (DoDI) 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, establishes baseline accession medical standards used to determine an applicant's medical qualifications to enter military service. This instruction is reviewed every three to four years by the Accession Medical Standards Working Group (AMSWG), which includes medical and personnel subject matter experts from across the Department, its Military Services, and the U.S. Coast Guard. The AMSWG thoroughly reviews over 30 bodily systems and medical focus areas while carefully considering evidence-based clinical information, peer-reviewed scientific studies, scientific expert consensus, and the performance of existing standards in light of empirical data on attrition, deployment readiness, waivers, and disability rates. The AMSWG also considers inputs from non-government sources and evaluates the applicability of those inputs against the military's mission and operational environment, so that the Department and the Military Services can formally coordinate updates to these standards.

Accession medical standards are based on the operational needs of the Department and are designed to ensure that individuals are physically and psychologically "qualified, effective, and able-bodied persons"[11] capable of performing military duties. Military effectiveness requires that the Armed Forces manage an integrated set of unique medical standards and qualifications because all military personnel must be available for worldwide duty 24 hours a day without

---

[11] 10 U.S.C. § 505(a).

8

Add.130

restriction or delay. Such duty may involve a wide range of demands, including exposure to danger or harsh environments, emotional stress, and the operation of dangerous, sensitive, or classified equipment. These duties are often in remote areas lacking immediate and comprehensive medical support. Such demands are not normally found in civilian occupations, and the military would be negligent in its responsibility if its military standards permitted admission of applicants with physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have.

In sum, these standards exist to ensure that persons who are under consideration for induction into military service are:

- free of contagious diseases that probably will endanger the health of other personnel;
- free of medical conditions or physical defects that may require excessive time lost from duty for necessary treatment or hospitalization, or probably will result in separation from service for medical unfitness;
- medically capable of satisfactorily completing required training;
- medically adaptable to the military environment without the necessity of geographical area limitations; and
- medically capable of performing duties without aggravation of existing physical defects or medical conditions.[12]

Establishing or modifying an accession standard is a risk management process by which a health condition is evaluated in terms of the probability and effect on the five listed outcomes above. These standards protect the applicant from harm that could result from the rigors of military duty and help ensure unit readiness by minimizing the risk that an applicant, once inducted into military service, will be unavailable for duty because of illness, injury, disease, or bad health.

Unless otherwise expressly provided, a current diagnosis or verified past medical history of a condition listed in DoDI 6130.03 is presumptively disqualifying.[13] Accession standards reflect the considered opinion of the Department's medical and personnel experts that an applicant with an identified condition should only be able to serve if they can qualify for a waiver. Waivers are generally only granted when the condition will not impact the individual's assigned specialty or when the skills of the individual are unique enough to warrant the additional risk. Waivers are not generally granted when the conditions of military service may aggravate the existing condition. For some conditions, applicants with a past medical history may nevertheless be eligible for accession if they meet the requirements for a certain period of "stability"—that is, they can demonstrate that the condition has been absent for a defined period

---

[12] Department of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* (Apr. 28, 2010), incorporating Change 1, p. 2 (Sept. 13, 2011) ("DoDI 6130.03").
[13] Id. at 10.

9

of time prior to accession.[14]  With one exception,[15] each accession standard may be waived in the discretion of the accessing Service based on that Service's policies and practices, which are driven by the unique requirements of different Service missions, different Service occupations, different Service cultures, and at times, different Service recruiting missions.

Historically, mental health conditions have been a great concern because of the unique mental and emotional stresses of military service.  Mental health conditions frequently result in attrition during initial entry training and the first term of service and are routinely considered by in-service medical boards as a basis for separation.  Department mental health accession standards have typically aligned with the conditions identified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), which is published by the American Psychiatric Association (APA).  The DSM sets forth the descriptions, symptoms, and other criteria for diagnosing mental disorders.  Health care professionals in the United States and much of the world use the DSM as the authoritative guide to the diagnosis of mental disorders.

Prior to implementation of the Carter policy, the Department's accession standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[16]  These standards were consistent with DSM-III, which in 1980, introduced the diagnosis of transsexualism.[17]  In 1987, DSM-III-R added gender identity disorder, non-transsexual type.[18]  DSM-IV, which was published in 1994, combined these two diagnoses and called the resulting condition "gender identity disorder."[19]  Due to challenges associated with updating and publishing a new iteration of DoDI 6130.03, the DoDI's terminology has not changed to reflect the changes in the DSM, including further changes that will be discussed later.

DoDI 6130.03 also contains other disqualifying conditions that are associated with, but not unique to, transgender persons, especially those who have undertaken a medical or surgical transition to the opposite gender.  These include:

- a history of chest surgery, including but not limited to the surgical removal of the breasts,[20] and genital surgery, including but not limited to the surgical removal of the testicles;[21]

---

[14] See, e.g., id. at 47.

[15] The accession standards for applicants with HIV are not waivable absent a waiver from both the accessing Service and the Under Secretary of Defense for Personnel and Readiness.  See Department of Defense Instruction 6485.01, *Human Immunodeficiency Virus (HIV) in Military Service Members* (Jun. 7, 2013).

[16] DoDI 6130.03 at 48.

[17] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, pp. 261-264 (3rd ed. 1980).

[18] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)*, pp. 76-77 (3rd ed. revised 1987).

[19] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, pp. 532-538 (4th ed. 1994).

[20] DoDI 6130.03 at 18.

[21] Id. at 25-27.

- a history of major abnormalities or defects of the genitalia, including but not limited to change of sex, hermaphroditism, penis amputation, and pseudohermaphroditism;[22]
- mental health conditions such as suicidal ideation, depression, and anxiety disorder;[23] and
- the use of certain medications, or conditions requiring the use of medications, such as hormone therapies and anti-depressants.[24]

Together with a diagnosis of transsexualism, these conditions, which were repeatedly validated by the AMSWG, provided multiple grounds for the disqualification of transgender persons.

B.    Retention Standards

The standards that govern the retention of Service members who are already serving in the military are generally less restrictive than the corresponding accession standards due to the investment the Department has made in the individual and their increased capability to contribute to mission accomplishment.

Also unlike the Department's accession standards, each Service develops and applies its own retention standards.  With respect to the retention of transgender Service members, these Service-specific standards may have led to inconsistent outcomes across the Services, but as a practical matter, before the Carter policy, the Services generally separated Service members who desired to transition to another gender.  During that time, there were no express policies allowing individuals to serve in their preferred gender rather than their biological sex.

Previous Department policy concerning the retention (administrative separation) of transgender persons was not clear or rigidly enforced.  DoDI 1332.38, *Physical Disability Evaluation*, now cancelled, characterized "sexual gender and identity disorders" as a basis for allowing administrative separation for a condition not constituting a disability; it did not require mandatory processing for separation.  A newer issuance, DoDI 1332.18, *Disability Evaluation System (DES)*, August 5, 2014, does not reference these disorders but instead reflects changes in how such medical conditions are characterized in contemporary medical practice.

Earlier versions of DoDI 1332.14, *Enlisted Administrative Separations*, contained a cross reference to the list of conditions not constituting a disability in former DoDI 1332.38.  This was how "transsexualism," the older terminology, was used as a basis for administrative separation. Separation on this basis required formal counseling and an opportunity to address the issue, as well as a finding that the condition was interfering with the performance of duty.  In practice, transgender persons were not usually processed for administrative separation on account of gender dysphoria or gender identity itself, but rather on account of medical comorbidities (e.g., depression or suicidal ideation) or misconduct due to cross dressing and related behavior.

---

[22] Id.
[23] Id. at 47-48.
[24] Id. at 48.

11

The Carter Policy

At the direction of Secretary Carter, the Department began formally reconsidering its accession and retention standards as they applied to transgender persons with gender dysphoria in 2015. This reevaluation, which culminated with the release of the Carter policy in 2016, was prompted in part by amendments to the DSM that appeared to change the diagnosis for gender identity disorder from a disorder to a treatable condition called gender dysphoria. Starting from the assumption that transgender persons are qualified for military service, the Department sought to identify and remove the obstacles to such service. This effort resulted in substantial changes to the Department's accession and retention standards to accommodate transgender persons with gender dysphoria who require treatment for transitioning to their preferred gender.

A.    Changes to the DSM

When the APA published the fifth edition of the DSM in May 2013, it changed "gender identity disorder" to "gender dysphoria" and designated it as a "condition"—a new diagnostic class applicable only to gender dysphoria—rather than a "disorder."[25] This change was intended to reflect the APA's conclusion that gender nonconformity alone—without accompanying distress or impairment of functioning—was not a mental disorder.[26] DSM-5 also decoupled the diagnosis for gender dysphoria from diagnoses for "sexual dysfunction and parphilic disorders, recognizing fundamental differences between these diagnoses."[27]

According to DSM-5, gender dysphoria in adolescents and adults is "[a] marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following":

- A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
- A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

---

[25] See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 451-459 (5th ed. 2013) ("DSM-5").

[26] RAND Study at 77; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (May 15, 2014), p. 1 ("This change was intended to reflect a consensus that gender nonconformity is not a psychiatric disorder, as it was previously categorized. However, since the condition may cause clinically significant distress and since a diagnosis is necessary for access to medical treatment, the new term was proposed."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, pp. 1182-83 (2016) ("In the DSM-5, [gender dysphoria] has replaced the diagnosis of 'gender identity disorder' in order to place the focus on the dysphoria and to diminish the pathology associated with identity incongruence.").

[27] Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (2016).

- A strong desire for the primary and/or secondary sex characteristics of the other gender.
- A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
- A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
- A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Importantly, DSM-5 observed that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[28]

B.     The Department Begins Review of Transgender Policy

On July 28, 2015, then Secretary Carter issued a memorandum announcing that no Service members would be involuntarily separated or denied reenlistment or continuation of service based on gender identity or a diagnosis of gender dysphoria without the personal approval of the Under Secretary of Defense for Personnel and Readiness.[29]  The memorandum also created the Transgender Service Review Working Group (TSRWG) "to study the policy and readiness implications of welcoming transgender persons to serve openly."[30]  The memorandum specifically directed the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[31]

As part of this review, the Department commissioned the RAND National Defense Research Institute to conduct a study to "(1) identify the health care needs of the transgender population, transgender Service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender Service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender Service members to serve openly."[32]  The resulting report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, reached several conclusions.  First, the report estimated that there are between 1,320 and 6,630 transgender Service members already serving in the active component of the Armed Forces and 830 to 4,160 in the Selected Reserve.[33]  Second, the report predicted "annual gender transition-related health care to be an extremely small part of the overall health care provided to the [active component] population."[34]  Third, the report estimated that active component "health care costs will increase by between $2.4 million and $8.4 million annually— an amount that will have little impact on and represents an exceedingly small proportion of

---

[28] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, p. 453 (5th ed. 2013).
[29] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).
[30] Id.
[31] Id.
[32] RAND Study at 1.
[33] Id. at x-xi.
[34] Id. at xi.

Add.135

[active component] health care expenditures (approximately $6 billion in FY 2014)."[35]  Fourth, the report "found that less than 0.0015 percent of the total available labor-years would be affected, based on estimated gender transition-related health care utilization rates."[36]  Finally, the report concluded that "[e]xisting data suggest a minimal impact on unit cohesion as a result of allowing transgender personnel to serve openly."[37]  "Overall," according to RAND, "our study found that the number of U.S. transgender Service members who are likely to seek transition-related care is so small that a change in policy will likely have a marginal impact on health care costs and the readiness of the force."[38]

The RAND report thus acknowledged that there will be an adverse impact on health care utilization and costs, readiness, and unit cohesion, but concluded nonetheless that the impact will be "negligible" and "marginal" because of the small estimated number of transgender Service members relative to the size of the active component of the Armed Forces.  Because of the RAND report's macro focus, however, it failed to analyze the impact at the micro level of allowing gender transition by individuals with gender dysphoria.  For example, as discussed in more detail later, the report did not examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy at the unit and sub-unit levels, all of which are critical to unit cohesion.  Nor did the report meaningfully address the significant mental health problems that accompany gender dysphoria—from high rates of comorbidities and psychiatric hospitalizations to high rates of suicide ideation and suicidality—and the scope of the scientific uncertainty regarding whether gender transition treatment fully remedies those problems.

C.     New Standards for Transgender Persons

Based on the RAND report, the work of the TSRWG, and the advice of the Service Secretaries, Secretary Carter approved the publication of DoDI 1300.28, *In-service Transition for Service Members Identifying as Transgender*, and Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," on June 30, 2016.  Although the new retention standards were effective immediately upon publication of the above memoranda, the accession standards were delayed until July 1, 2017, to allow time for training all Service members across the Armed Forces, including recruiters, Military Entrance Processing Station (MEPS) personnel, and basic training cadre, and to allow time for modifying facilities as necessary.

1.     *Retention Standards*.  DoDI 1300.28 establishes the procedures by which Service members who are diagnosed with gender dysphoria may administratively change their gender.  Once a Service member receives a gender dysphoria diagnosis from a military physician, the physician, in consultation with the Service member, must establish a treatment plan.  The treatment plan is highly individualized and may include cross-sex hormone therapy (i.e., medical transition), sex reassignment surgery (i.e., surgical transition), or simply living as the opposite gender but without any cross-sex hormone or surgical treatment (i.e., social

---

[35] Id. at xi-xii.
[36] Id. at xii.
[37] Id.
[38] Id. at 69.

transition). The nature of the treatment is left to the professional medical judgment of the treating physician and the individual situation of the transgender Service member. The Department does not require a Service member with gender dysphoria to undergo cross-sex hormone therapy, sex reassignment surgery, or any other physical changes to effectuate an administrative change of gender. During the course of treatment, commanders are authorized to grant exceptions from physical fitness, uniform and grooming, and other standards, as necessary and appropriate, to transitioning Service members. Once the treating physician determines that the treatment plan is complete, the Service member's commander approves, and the Service member produces legal documentation indicating change of gender (e.g., certified birth certificate, court order, or U.S. passport), the Service member may request a change of gender marker in DEERS. Once the DEERS gender marker is changed, the Service member is held to all standards associated with the member's transitioned gender, including uniform and grooming standards, body composition assessment, physical readiness testing, Military Personnel Drug Abuse Testing Program participation, and other military standards congruent to the member's gender. Indeed, the Service member must be treated in all respects in accordance with the member's transitioned gender, including with respect to berthing, bathroom, and shower facilities. Transgender Service members who do not meet the clinical criteria for gender dysphoria, by contrast, remain subject to the standards and requirements applicable to their biological sex.

      2.   *Accession Standards*. DTM 16-005 directed that the following medical standards for accession into the Military Services take effect on July 1, 2017:

(1)    A history of gender dysphoria is disqualifying, unless, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

(2)    A history of medical treatment associated with gender transition is disqualifying, unless, as certified by a licensed medical provider:

    (a)    the applicant has completed all medical treatment associated with the applicant's gender transition; and
    (b)    the applicant has been stable in the preferred gender for 18 months; and
    (c)    if the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

(3)    A history of sex reassignment or genital reconstruction surgery is disqualifying, unless, as certified by a licensed medical provider:

    (a)    a period of 18 months has elapsed since the date of the most recent of any such surgery; and

    (b)    no functional limitations or complications persist, nor is any additional surgery required.[39]

---

[39] Memorandum from Ashton Carter, Secretary of Defense, "Directive-type Memorandum (DTM) 16-005, 'Military Service of Transgender Service Members,'" Attachment, pp. 1-2 (June 30, 2016).

16

### Panel of Experts Recommendation

The Carter policy's accession standards for persons with a history of gender dysphoria were set to take effect on July 1, 2017, but on June 30, after consultation with the Secretaries and Chiefs of Staff of each Service, Secretary Mattis postponed the new standards for an additional six months "to evaluate more carefully the impact of such accessions on readiness and lethality."[40]  Secretary Mattis specifically directed that the review would "include all relevant considerations" and would last for five months, with a due date of December 1, 2017.[41]  The Secretary also expressed his desire to have "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department."[42]

While Secretary Mattis's review was ongoing, President Trump issued a memorandum, on August 25, 2017, directing the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to reinstate longstanding policy generally barring the accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."[43]  The President found that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."[44]  Accordingly, the President directed both Secretaries to maintain the prohibition on accession of transgender individuals "until such time as the Secretary of Defense, after consulting with the Secretary of Homeland Security, provides a recommendation to the contrary" that is convincing.[45]  The President made clear that the Secretaries may advise him "at any time, in writing, that a change to this policy is warranted."[46]  In addition, the President gave both Secretaries discretion to "determine how to address transgender individuals currently serving" in the military and made clear that no action be taken against them until a determination was made.[47]

On September 14, 2017, Secretary Mattis established a Panel of Experts to study, in a "comprehensive, holistic, and objective" manner, "military service by transgender individuals, focusing on military readiness, lethality, and unit cohesion, with due regard for budgetary constraints and consistent with applicable law."[48]  He directed the Panel to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."[49]

---

[40] Memorandum from James N. Mattis, Secretary of Defense, "Accession of Transgender Individuals into the Military Services" (June 30, 2017).

[41] Id.

[42] Id.

[43] Memorandum from Donald J. Trump, President of the United States, "Military Service by Transgender Individuals" (Aug. 25, 2017).

[44] Id. at 1.

[45] Id. at 2.

[46] Id.

[47] Id.

[48] Memorandum from James N. Mattis, Secretary of Defense, "Terms of Reference—Implementation of Presidential Memorandum on Military Service by Transgender Individuals," pp. 1-2 (Sept. 14, 2017).

[49] Id. at 2.

Add.139

The Panel consisted of the Under Secretaries of the Military Departments (or officials performing their duties), the Armed Services' Vice Chiefs (including the Vice Commandant of the U.S. Coast Guard), and the Senior Enlisted Advisors, and was chaired by the Under Secretary of Defense for Personnel and Readiness or an official performing those duties. The Secretary of Defense selected these senior leaders because of their experience leading warfighters in war and peace or their expertise in military operational effectiveness. These senior leaders also have the statutory responsibility to organize, train, and equip military forces and are uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force. The Panel met 13 times over a span of 90 days.

The Panel received support from medical and personnel experts from across the Departments of Defense and Homeland Security. The Transgender Service Policy Working Group, comprised of medical and personnel experts from across the Department, developed policy recommendations and a proposed implementation plan for the Panel's consideration. The Medical and Personnel Executive Steering Committee, a standing group of the Surgeons General and Service Personnel Chiefs, led by Personnel and Readiness, provided the Panel with an analysis of accession standards, a multi-disciplinary review of relevant data, and information about medical treatment for gender dysphoria and gender transition-related medical care. These groups reported regularly to the Panel and responded to numerous queries for additional information and analysis to support the Panel's review and deliberations. A separate working group tasked with enhancing the lethality of our Armed Forces also provided a briefing to the Panel on their work relating to retention standards.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed information and analyses about gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike past reviews, the Panel's analysis was informed by the Department's own data and experience obtained since the Carter policy took effect.

To fulfill its mandate, the Panel addressed three questions:

- Should the Department of Defense access transgender individuals?
- Should the Department allow transgender individuals to transition gender while serving, and if so, what treatment should be authorized?
- How should the Department address transgender individuals who are currently serving?

After extensive review and deliberation, which included evidence in support of and against the Panel's recommendations, the Panel exercised its professional military judgment and made recommendations. The Department considered those recommendations and the information underlying them, as well as additional information within the Department, and now proposes the following policy consistent with those recommendations.

## Recommended Policy

To maximize military effectiveness and lethality, the Department, after consultation with and the concurrence of the Department of Homeland Security, recommends cancelling the Carter policy and, as explained below, adopting a new policy with respect to the accession and retention of transgender persons.

The Carter policy assumed that transgender persons were generally qualified for service and that their accession and retention would not negatively impact military effectiveness. As noted earlier, Secretary Carter directed the TSRWG, the group charged with evaluating, and making recommendations on, transgender service, to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[50] Where necessary, standards were adjusted or relaxed to accommodate service by transgender persons. The following analysis makes no assumptions but instead applies the relevant standards applicable to everyone to determine the extent to which transgender persons are qualified for military duty.

For the following reasons, the Department concludes that transgender persons should not be disqualified from service solely on account of their transgender status, provided that they, like all other Service members, are willing and able to adhere to all standards, including the standards associated with their biological sex. With respect to the subset of transgender persons who have been diagnosed with gender dysphoria, however, those persons are generally disqualified unless, depending on whether they are accessing or seeking retention, they can demonstrate stability for the prescribed period of time; they do not require, and have not undergone, a change of gender; and they are otherwise willing and able to meet all military standards, including those associated with their biological sex. In order to honor its commitment to current Service members diagnosed with gender dysphoria, those Service members who were diagnosed after the effective date of the Carter policy and before any new policy takes effect will not be subject to the policy recommended here.

### Discussion of Standards

The standards most relevant to the issue of service by transgender persons fall into three categories: mental health standards, physical health standards, and sex-based standards. Based on these standards, the Department can assess the extent to which transgender persons are qualified for military service and, in light of that assessment, recommend appropriate policies.

A.    Mental Health Standards

Given the extreme rigors of military service and combat, maintaining high standards of mental health is essential to military effectiveness and lethality. The immense toll that the burden and experience of combat can have on the human psyche cannot be overstated. Therefore, putting individuals into battle, who might be at increased risk of psychological injury, would be reckless, not only for those individuals, but for the Service members who serve beside them as well.

---

[50] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).

The Department's experience with the mental health issues arising from our wars in Afghanistan and Iraq, including post-traumatic stress disorder (PTSD), only underscores the importance of maintaining high levels of mental health across the force. PTSD has reached as high as 2.8% of all active duty Service members, and in 2016, the number of active duty Service members with PTSD stood at 1.5%.[51] Of all Service members in the active component, 7.5% have been diagnosed with a mental health condition of some type.[52] The Department is mindful of these existing challenges and must exercise caution when considering changes to its mental health standards.

Most mental health conditions and disorders are automatically disqualifying for accession absent a waiver. For example, persons with a history of bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder (to name a few) are barred from entering into military service, unless a waiver is granted.[53] For a few conditions, however, persons may enter into service without a waiver if they can demonstrate stability for 24 to 36 continuous months preceding accession. Historically, a person is deemed stable if they are without treatment, symptoms, or behavior of a repeated nature that impaired social, school, or work efficiency for an extended period of several months. Such conditions include depressive disorder (stable for 36 continuous months) and anxiety disorder (stable for 24 continuous months).[54] Requiring a period of stability reduces, but does not eliminate, the likelihood that the individual's depression or anxiety will return.

Historically, conditions associated with transgender individuals have been automatically disqualifying absent a waiver. Before the changes directed by Secretary Carter, military mental health standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[55] These standards, however, did not evolve with changing understanding of transgender mental health. Today, transsexualism is no longer considered by most mental health practitioners as a mental health condition. According to the APA, it is not a medical condition for persons to identify with a gender that is different from their biological sex.[56] Put simply, transgender status alone is not a condition.

Gender dysphoria, by contrast, is a mental health condition that can require substantial medical treatment. Many individuals who identify as transgender are diagnosed with gender dysphoria, but "[n]ot all transgender people suffer from gender dysphoria and that distinction," according to the APA, "is important to keep in mind."[57] The DSM-5 defines gender dysphoria as

---

[51] Deployment Health Clinical Center, "Mental Health Disorder Prevalence among Active Duty Service Members in the Military Health System, Fiscal Years 2005-2016" (Jan. 2017).
[52] Id.
[53] DoDI 6130.03 at 47-48.
[54] Id.
[55] Id. at 48.
[56] DSM-5 at 452-53.
[57] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018). Conversely, not all persons with gender dysphoria are transgender. "For example, some men who are disabled in combat, especially if their injury includes genital wounds, may feel that they are no longer men because their bodies do not conform to their concept of manliness. Similarly, a woman who opposes plastic surgery, but who must undergo mastectomy because of breast

a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration," that is manifested in various specified ways.[58] According to the APA, the "condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[59]

Transgender persons with gender dysphoria suffer from high rates of mental health conditions such as anxiety, depression, and substance use disorders.[60] High rates of suicide ideation, attempts, and completion among people who are transgender are also well documented in the medical literature, with lifetime rates of suicide attempts reported to be as high as 41% (compared to 4.6% for the general population).[61] According to a 2015 survey, the rate skyrockets to 57% for transgender individuals without a supportive family.[62] The Department is concerned that the stresses of military life, including basic training, frequent moves, deployment to war zones and austere environments, and the relentless physical demands, will be additional contributors to suicide behavior in people with gender dysphoria. In fact, there is recent evidence that military service can be a contributor to suicidal thoughts.[63]

Preliminary data of Service members with gender dysphoria reflect similar trends. A review of the administrative data indicates that Service members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%).[64]

---

cancer, may find that she requires reconstructive breast surgery in order to resolve gender dysphoria arising from the incongruence between her body without breasts and her sense of herself as a woman." M. Jocelyn Elders, George R. Brown, Eli Coleman, Thomas Kolditz & Alan Steinman, "Medical Aspects of Transgender Military Service," *Armed Forces & Society*, p. 5 n.22 (Mar. 2014).

[58] DSM-5 at 452.

[59] DSM-5 at 453.

[60] Cecilia Dhejne, Roy Van Vlerken, Gunter Heylens & Jon Arcelus, "Mental health and gender dysphoria: A review of the literature," *International Review of Psychiatry*, Vol. 28, pp. 44-57 (2016); George R. Brown & Kenneth T. Jones, "Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study," *LGBT Health*, Vol. 3, p. 128 (Apr. 2016).

[61] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, p. 2 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf; H.G. Virupaksha, Daliboyina Muralidhar & Jayashree Ramakrishna, "Suicide and Suicide Behavior among Transgender Persons," *Indian Journal of Psychological Medicine*, Vol.38, pp. 505-09 (2016); Claire M. Peterson, Abigail Matthews, Emily Copps-Smith & Lee Ann Conard, "Suicidality, Self-Harm, and Body Dissatisfaction in Transgender Adolescents and Emerging Adults with Gender Dysphoria," *Suicide and Life Threatening Behavior*, Vol. 47, pp. 475-482 (Aug. 2017).

[62] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, pp. 2, 12 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

[63] Raymond P. Tucker, Rylan J. Testa, Mark A.Reger, Tracy L. Simpson, Jillian C. Shipherd, & Keren Lehavot, "Current and Military-Specific Gender Minority Stress Factors and Their Relationship with Suicide Ideation in Transgender Veterans," *Suicide and Life Threatening Behavior* DOI: 10.1111/sltb.12432 (epub ahead of print), pp. 1-10 (2018); Craig J. Bryan, AnnaBelle O. Bryan, Bobbie N. Ray-Sannerud, Neysa Etienne & Chad E. Morrow, "Suicide attempts before joining the military increase risk for suicide attempts and severity of suicidal ideation among military personnel and veterans," *Comprehensive Psychiatry*, Vol. 55, pp. 534-541 (2014).

[64] Data retrieved from Military Health System data repository (Oct. 2017).

Service members with gender dysphoria are also nine times more likely to have mental health encounters than the Service member population as a whole (28.1 average encounters per Service member versus 2.7 average encounters per Service member).[65]  From October 1, 2015 to October 3, 2017, the 994 active duty Service members diagnosed with gender dysphoria accounted for 30,000 mental health visits.[66]

It is widely believed by mental health practitioners that gender dysphoria can be treated. Under commonly accepted standards of care, treatment for gender dysphoria can include: psychotherapy; social transition—also known as "real life experience"—to allow patients to live and work in their preferred gender without any hormone treatment or surgery; medical transition to align secondary sex characteristics with patients' preferred gender using cross-sex hormone therapy and hair removal; and surgical transition—also known as sex reassignment surgery—to make the physical body—both primary and secondary sex characteristics—resemble as closely as possible patients' preferred gender.[67]  The purpose of these treatment options is to alleviate the distress and impairment of gender dysphoria by seeking to bring patients' physical characteristics into alignment with their gender identity—that is, one's inner sense of one's own gender.[68]

Cross-sex hormone therapy is a common medical treatment associated with gender transition that may be commenced following a diagnosis of gender dysphoria.[69]  Treatment for women transitioning to men involves the administration of testosterone, whereas treatment for men transitioning to women requires the blocking of testosterone and the administration of estrogens.[70]  The Endocrine Society's clinical guidelines recommend laboratory bloodwork every 90 days for the first year of treatment to monitor hormone levels.[71]

As a treatment for gender dysphoria, sex reassignment surgery is "a unique intervention not only in psychiatry but in all of medicine."[72]  Under existing Department guidelines

---

[65] Data retrieved from Military Health System data repository (Oct. 2017).  Study period was Oct. 1, 2015 to July 26, 2017.

[66] Data retrieved from Military Health System data repository (Oct. 2017).

[67] RAND Study at 5-7, Appendices A & C; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 1 (May 15, 2014) ("The full therapeutic approach to [gender dysphoria] consists of 3 elements or phases, typically in the following order:  (1) hormones of the desired gender; (2) real-life experience for 12 months in the desired role; and (3) surgery to change the genitalia and other sex characteristics (e.g., breast reconstruction or mastectomy).  However, not everyone with [gender dysphoria] needs or wants all elements of this triadic approach."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (Oct. 2016) ("The Endocrine Society proposes a sequential approach in transsexual care to optimize mental health and physical outcomes.  Generally, they recommend initiation of psychotherapy, followed by cross-sex hormone treatments, then [sex reassignment surgery].").

[68] RAND Study at 73.

[69] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons:  An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[70] Id. at 3885-3888.

[71] Id.

[72] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011); see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of

implementing the Carter policy, men transitioning to women may obtain an orchiectomy (surgical removal of the testicles), a penectomy (surgical removal of the penis), a vaginoplasty (surgical creation of a vagina), a clitoroplasty (surgical creation of a clitoris), and a labiaplasty (surgical creation of the labia). Women transitioning to men may obtain a hysterectomy (surgical removal of the uterus), a mastectomy (surgical removal of the breasts), a metoidioplasty (surgical enlargement of the clitoris), a phalloplasty (surgical creation of a penis), a scrotoplasty (surgical creation of a scrotum) and placement of testicular prostheses, a urethroplasty (surgical enlargement of the urethra), and a vaginectomy (surgical removal of the vagina). In addition, the following cosmetic procedures may be provided at military treatment facilities as well: abdominoplasty, breast augmentation, blepharoplasty (eyelid lift), hair removal, face lift, facial bone reduction, hair transplantation, liposuction, reduction thyroid chondroplasty, rhinoplasty, and voice modification surgery.[73]

The estimated recovery time for each of the surgical procedures, even assuming no complications, can be substantial. For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to eight weeks; an orchiectomy is up to six weeks; and a vaginoplasty is up to three months.[74] When combined with 12 continuous months of hormone therapy, which is required prior to genital surgery,[75] the total time necessary for surgical transition can exceed a year.

Although relatively few people who are transgender undergo genital reassignment surgeries (2% of transgender men and 10% of transgender women), we have to consider that the rate of complications for these surgeries is significant, which could increase a transitioning Service member's unavailability.[76] Even according to the RAND study, 6% to 20% of those receiving vaginoplasty surgery experience complications, meaning that "between three and 11 Service members per year would experience a long-term disability from gender reassignment

---

Gender Dysphoria," p. 2 (May 15, 2014) (noting that gender dysphoria "does not readily fit traditional concepts of medical necessity since research to date has not established anatomical or physiological anomalies associated with [gender dysphoria]"); Hayes Annual Review, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (Apr. 18, 2017).

[73] Memorandum from Defense Health Agency, "Information Memorandum: Interim Defense Health Agency Procedures for Reviewing Requests for Waivers to Allow Supplemental Health Care Program Coverage of Sex Reassignment Surgical Procedures" (Nov. 13, 2017); see also RAND Study at Appendix C.

[74] University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/ trans?page=guidelines-home (last visited Feb. 16, 2018); Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[75] RAND Study at 80; see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

[76] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

Add.145

surgery."[77]  The RAND study further notes that of those receiving phalloplasty surgery, as many as 25%—one in four—will have complications.[78]

The prevailing judgment of mental health practitioners is that gender dysphoria can be treated with the transition-related care described above.  While there are numerous studies of varying quality showing that this treatment can improve health outcomes for individuals with gender dysphoria, the available scientific evidence on the extent to which such treatments fully remedy all of the issues associated with gender dysphoria is unclear.  Nor do any of these studies account for the added stress of military life, deployments, and combat.

As recently as August 2016, the Centers for Medicare and Medicaid Services (CMS) conducted a comprehensive review of the relevant literature, over 500 articles, studies, and reports, to determine if there was "sufficient evidence to conclude that gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[79]  After reviewing the universe of literature regarding sex reassignment surgery, CMS identified 33 studies sufficiently rigorous to merit further review, and of those, "some were positive; others were negative."[80]  "Overall," according to CMS, "the quality and strength of evidence were low due to mostly observational study designs with no comparison groups, subjective endpoints, potential confounding . . . , small sample sizes, lack of validated assessment tools, and considerable [number of study subjects] lost to follow-up."[81]  With respect to whether sex reassignment surgery was "reasonable and necessary" for the treatment of gender dysphoria, CMS concluded that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."[82]

Importantly, CMS identified only six studies as potentially providing "useful information" on the effectiveness of sex reassignment surgery.  According to CRS, "the four best designed and conducted studies that assessed the quality of life before and after surgery using validated (albeit, non-specific) psychometric studies did not demonstrate clinically significant changes or differences in psychometric test results after [sex reassignment surgery]."[83]

---

[77] RAND Study at 40-41.

[78] Id. at 41.

[79] Tamara Jensen, Joseph Chin, James Rollins, Elizabeth Koller, Linda Gousis & Katherine Szarama, "Final Decision Memorandum on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria," Centers for Medicare & Medicaid Services, p. 9 (Aug. 30, 2016) ("CMS Report").

[80] Id. at 62.

[81] Id.

[82] Id. at 65.  CMS did not conclude that gender reassignment surgery can never be necessary and reasonable to treat gender dysphoria.  To the contrary, it made clear that Medicare insurers could make their own "determination of whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances."  Id. at 66.  Nevertheless, CMS did decline to require all Medicare insurers to cover sex reassignment surgeries because it found insufficient scientific evidence to conclude that such surgeries improve health outcomes for persons with gender dysphoria.

[83] Id. at 62.

Additional studies found that the "cumulative rates of requests for surgical reassignment reversal or change in legal status" were between 2.2% and 3.3%.[84]

A sixth study, which came out of Sweden, is one of the most robust because it is a "nationwide population-based, long-term follow-up of sex-reassigned transsexual persons."[85] The study found increased mortality and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a healthy control group.[86] As described by CMS: "The mortality was primarily due to completed suicides (19.1-fold greater than in [the control group]), but death due to neoplasm and cardiovascular disease was increased 2 to 2.5 times as well. We note, mortality from this patient population did not become apparent until after 10 years. The risk for psychiatric hospitalization was 2.8 times greater than in controls even after adjustment for prior psychiatric disease (18%). The risk for attempted suicide was greater in male-to-female patients regardless of the gender of the control."[87]

According to the Hayes Directory, which conducted a review of 19 peer-reviewed studies on sex reassignment surgery, the "evidence suggests positive benefits," including "decreased [gender dysphoria], depression and anxiety, and increased [quality of life]," but "because of serious limitations," these findings "permit only weak conclusions."[88] It rated the quality of evidence as "very low" due to the numerous limitations in the studies and concluded that there is

---

[84] Id.

[85] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 6 (Feb. 2011); see also id. ("Strengths of this study include nationwide representativity over more than 30 years, extensive follow-up time, and minimal loss to follow-up. . . . Finally, whereas previous studies either lack a control group or use standardised mortality rates or standarised incidence rates as comparisons, we selected random population controls matched by birth year, and either birth or final sex.").

[86] Id. at 7; see also at 6 ("Mortality from suicide was strikingly high among sex-reassigned persons, also after adjustment for prior psychiatric morbidity. In line with this, sex-reassigned persons were at increased risk for suicide attempts. Previous reports suggest that transsexualism is a strong risk factor for suicide, also after sex reassignment, and our long-term findings support the need for continued psychiatric follow-up for persons at risk to prevent this. Inpatient care for psychiatric disorders was significantly more common among sex-reassigned persons than among matched controls, both before and after sex reassignment. It is generally accepted that transsexuals have more psychiatric ill-health than the general population prior to the sex reassignment. It should therefore come as no surprise that studies have found high rates of depression, and low quality of life, also after sex reassignment. Notably, however, in this study the increased risk for psychiatric hospitalization persisted even after adjusting for psychiatric hospitalization prior to sex reassignment. This suggests that even though sex reassignment alleviates gender dysphoria, there is a need to identify and treat co-occurring psychiatric morbidity in transsexual persons not only before but also after sex reassignment.").

[87] CMS Report at 62. It bears noting that the outcomes for mortality and suicide attempts differed "depending on when sex reassignment was performed: during the period 1973-1988 or 1989-2003." Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 5 (Feb. 2011). Even though both mortality and suicide attempts were greater for transsexual persons than the healthy control group across both time periods, this did not reach statistical significance during the 1989-2003 period. One possible explanation is that mortality rates for transsexual persons did not begin to diverge from the healthy control group until after 10 years of follow-up, in which case the expected increase in mortality would not have been observed for most of the persons receiving sex reassignment surgeries from 1989-2003. Another possible explanation is that treatment was of a higher quality from 1989-2003 than from 1973-1988.

[88] Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 4 (May 15, 2014).

not sufficient "evidence to establish patient selection criteria for [sex reassignment surgery] to treat [gender dysphoria]."[89]

With respect to hormone therapy, the Hayes Directory examined 10 peer-reviewed studies and concluded that a "substantial number of studies of cross-sex hormone therapy each show some positive findings suggesting improvement in well-being after cross-sex hormone therapy."[90] Yet again, it rated the quality of evidence as "very low" and found that the "evidence is insufficient to support patient selection criteria for hormone therapy to treat [gender dysphoria]."[91] Importantly, the Hayes Directory also found: "Hormone therapy and subsequent [sex reassignment surgery] failed to bring overall mortality, suicide rates, or death from illicit drug use in [male-to-female] patients close to rates observed in the general male population. It is possible that mortality is nevertheless reduced by these treatments, but that cannot be determined from the available evidence."[92]

In 2010, Mayo Clinic researchers conducted a comprehensive review of 28 studies on the use of cross-sex hormone therapy in sex reassignment and concluded that there was "very low quality evidence" showing that such therapy "likely improves gender dysphoria, psychological functioning and comorbidities, sexual function and overall quality of life."[93] Not all of the studies showed positive results, but overall, after pooling the data from all of the studies, the researchers showed that 80% of patients reported improvement in gender dysphoria, 78% reported improvement in psychological symptoms, and 80% reported improvement in quality of life, after receiving hormone therapy.[94] Importantly, however, "[s]uicide attempt rates decreased after sex reassignment but stayed higher than the normal population rate."[95]

The authors of the Swedish study discussed above reached similar conclusions: "This study found substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and psychiatric hospitali[z]ations in sex-reassigned transsexual individuals compared to a healthy control population. This highlights that post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up. Even though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons."[96]

Even the RAND study, which the Carter policy is based upon, confirmed that "[t]here have been no randomized controlled trials of the effectiveness of various forms of treatment, and

---

[89] Id. at 3.
[90] Hayes Directory, "Hormone Therapy for the Treatment of Gender Dysphoria," pp. 2, 4 (May 19, 2014).
[91] Id. at 4.
[92] Id. at 3.
[93] Mohammad Hassan Murad, Mohamed B. Elamin, Magaly Zumaeta Garcia, Rebecca J. Mullan, Ayman Murad, Patricia J. Erwin & Victor M. Montori, "Hormonal therapy and sex reassignment: a systematic review and meta-analysis of qualify of life and psychosocial outcomes," *Clinical Endocrinology*, Vol. 72, p. 214 (2010).
[94] Id. at 216.
[95] Id.
[96] Cecilila Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011).

most evidence comes from retrospective studies."[97]  Although noting that "[m]ultiple observational studies have suggested significant and sometimes dramatic reductions in suicidality, suicide attempts, and suicides among transgender patients after receiving transition-related treatment," RAND made clear that "none of these studies were randomized controlled trials (the gold standard for determining treatment efficacy)."[98]  "In the absence of quality randomized trial evidence," RAND concluded, "it is difficult to fully assess the outcomes of treatment for [gender dysphoria]."[99]

Given the scientific uncertainty surrounding the efficacy of transition-related treatments for gender dysphoria, it is imperative that the Department proceed cautiously in setting accession and retention standards for persons with a diagnosis or history of gender dysphoria.

B.    Physical Health Standards

Not only is maintaining high standards of mental health critical to military effectiveness and lethality, maintaining high standards of physical health is as well.  Although technology has done much to ease the physical demands of combat in some military specialties, war very much remains a physically demanding endeavor.  Service members must therefore be physically prepared to endure the rigors and hardships of military service, including potentially combat. They must be able to carry heavy equipment sometimes over long distances; they must be able to handle heavy machinery; they must be able to traverse harsh terrain or survive in ocean waters; they must be able to withstand oppressive heat, bitter cold, rain, sleet, and snow; they must be able to endure in unsanitary conditions, coupled with lack of privacy for basic bodily functions, sometimes with little sleep and sustenance; they must be able to carry their wounded comrades to safety; and they must be able to defend themselves against those who wish to kill them.

Above all, whether they serve on the frontlines or in relative safety in non-combat positions, every Service member is important to mission accomplishment and must be available to perform their duties globally whenever called upon.  The loss of personnel due to illness, disease, injury, or bad health diminishes military effectiveness and lethality.  The Department's physical health standards are therefore designed to minimize the odds that any given Service member will be unable to perform his or her duties in the future because of illness, disease, or injury.  As noted earlier, those who seek to enter military service must be free of contagious diseases; free of medical conditions or physical defects that could require treatment, hospitalization, or eventual separation from service for medical unfitness; medically capable of satisfactorily completing required training; medically adaptable to the military environment; and medically capable of performing duties without aggravation of existing physical defects or medical conditions.[100]  To access recruits with higher rates of anticipated unavailability for deployment thrusts a heavier burden on those who would deploy more often.

---

[97] RAND Study at 7.
[98] Id. at 10 (citing only to a California Department of Insurance report).
[99] Id.
[100] DoDI 6130.03 at 2.

Historically, absent a waiver, the Department has barred from accessing into the military anyone who had undergone chest or genital surgery (e.g., removal of the testicles or uterus) and anyone with a history of major abnormalities or defects of the chest or genitalia, including hermaphroditism and pseudohermaphroditism.[101]  Persons with conditions requiring medications, such as anti-depressants and hormone treatment, were also disqualified from service, unless a waiver was granted.[102]

These standards have long applied uniformly to all persons, regardless of transgender status.  The Carter policy, however, deviates from these uniform standards by exempting, under certain conditions, treatments associated with gender transition, such as sex reassignment surgery and cross-sex hormone therapy.  For example, under the Carter policy, an applicant who has received genital reconstruction surgery may access without a waiver if a period of 18 months has elapsed since the date of the most recent surgery, no functional limitations or complications persist, and no additional surgery is required.  In contrast, an applicant who received similar surgery following a traumatic injury is disqualified from military service without a waiver.[103]  Similarly, under the Carter policy, an applicant who is presently receiving cross-sex hormone therapy post-gender transition may access without a waiver if the applicant has been stable on such hormones for 18 months.  In contrast, an applicant taking synthetic hormones for the treatment of hypothyroidism is disqualified from military service without a waiver.[104]

C.    Sex-Based Standards

Women have made invaluable contributions to the defense of the Nation throughout our history.  These contributions have only grown more significant as the number of women in the Armed Forces has increased and as their roles have expanded.  Today, women account for 17.6% of the force,[105] and now every position, including combat arms positions, is open to them.

The vast majority of military standards make no distinctions between men and women.  Where biological differences between males and females are relevant, however, military standards do differentiate between them.  The Supreme Court has acknowledged the lawfulness of sex-based standards that flow from legitimate biological differences between the sexes.[106]  These sex-based standards ensure fairness, equity, and safety; satisfy reasonable expectations of privacy; reflect common practice in society; and promote core military values of dignity and respect between men and women—all of which promote good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality.

---

[101] Id. at 25-27.
[102] Id. at 46-48.
[103] Id. at 26-27.
[104] Id. at 41.
[105] Defense Manpower Data Center, Active and Reserve Master Files (Dec. 2017).
[106] For example, in *United States v. Virginia*, the Court noted approvingly that "[a]dmitting women to [the Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." 518 U.S. 515, 550-51 n.19 (1996) (citing the statute that requires the same standards for women admitted to the service academies as for the men, "except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals").

For example, anatomical differences between males and females, and the reasonable expectations of privacy that flow from those differences, at least partly account for the laws and regulations that require separate berthing, bathroom, and shower facilities and different drug testing procedures for males and females.[107]  To maintain good order and discipline, Congress has even required by statute that the sleeping and latrine areas provided for "male" recruits be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training and that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits" to ensure "after-hours privacy for recruits during basic training."[108]

In addition, physiological differences between males and females account for the different physical fitness and body fat standards that apply to men and women.[109]  This ensures equity and fairness.  Likewise, those same physiological differences also account for the policies that regulate competition between men and women in military training and sports, such as boxing and combatives.[110]  This ensures protection from injury.

---

[107] See, e.g., Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017); Department of the Air Force, Air Force Instruction 32-6005, "Unaccompanied Housing Management," p. 35 (Jan 29., 2016); Department of the Army, Human Resources Command, AR 600-85, "Substance Abuse Program" (Dec. 28, 2012) ("Observers must . . . [b]e the same gender as the Soldier being observed.").

[108] See 10 U.S.C. § 4319 (Army), 10 U.S.C. § 6931 (Navy), and 10 U.S.C. § 9319 (Air Force) (requiring the sleeping and latrine areas provided for "male" recruits to be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training); 10 U.S.C. § 4320 (Army), 10 U.S.C. § 6932 (Navy), and 10 U.S.C. § 9320 (Air Force) (requiring that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits").

[109] See, e.g., Department of the Army, Army Regulation 600-9, "The Army Body Composition Program," pp. 21-31 (June 28, 2013); Department of the Navy, Office of the Chief of Naval Operations Instruction 6110.1J, "Physical Readiness Program," p. 7 (July 11, 2011); Department of the Air Force, Air Force Instruction 36-2905, "Fitness Program," pp. 86-95, 106-146 (Aug. 27, 2015); Department of the Navy, Marine Corps Order 6100.13, "Marine Corps Physical Fitness Program," (Aug. 1, 2008); Department of the Navy, Marine Corps Order 6110.3A, "Marine Corps Body Composition and Military Appearance Program," (Dec. 15, 2016); see also United States Military Academy, Office of the Commandant of Cadets, "Physical Program Whitebook AY 16-17," p. 13 (specifying that, to graduate, cadets must meet the minimum performance standard of 3:30 for men and 5:29 for women on the Indoor Obstacle Course Test); Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017) ("Performance requirement differences, such as [Army Physical Fitness Test] scoring are based on physiological differences, and apply to the entire Army.").

[110] See, e.g., Headquarters, Department of the Army, TC 3-25.150, "Combatives," p. A-15 (Feb. 2017) ("Due to the physiological difference between the sexes and in order to treat all Soldiers fairly and conduct gender-neutral competitions, female competitors will be given a 15 percent overage at weigh-in."); id. ("In championships at battalion-level and above, competitors are divided into eight weight class brackets. . . . These classes take into account weight and gender."); Major Alex Bedard, Major Robert Peterson & Ray Barone, "Punching Through Barriers:  Female Cadets Integrated into Mandatory Boxing at West Point," *Association of the United States Army* (Nov. 16, 2017), https://www.ausa.org/articles/punching-through-barriers-female-cadets-boxing-west-point (noting that "[m]atching men and women according to weight may not adequately account for gender differences regarding striking force" and that "[w]hile conducting free sparring, cadets must box someone of the same gender"); RAND Study at 57 (noting that, under British military policy, transgender persons "can be excluded from sports that organize around gender to ensure the safety of the individual or other participants"); see also International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_

Uniform and grooming standards, to a certain extent, are also based on anatomical differences between males and females. Even those uniform and grooming standards that are not, strictly speaking, based on physical biology nevertheless flow from longstanding societal expectations regarding differences in attire and grooming for men and women.[111]

Because these sex-based standards are based on legitimate biological differences between males and females, it follows that a person's physical biology should dictate which standards apply. Standards designed for biological males logically apply to biological males, not biological females, and vice versa. When relevant, military practice has long adhered to this straightforward and logical demarcation.

By contrast, the Carter policy deviates from this longstanding practice by making military sex-based standards contingent, not necessarily on the person's biological sex, but on the person's gender marker in DEERS, which can be changed to reflect the person's gender identity.[112] Thus, under the Carter policy, a biological male who identifies as a female (and changes his gender marker to reflect that gender) must be held to the standards and regulations for females, even though those standards and regulations are based on female physical biology, not female gender identity. The same goes for females who identify as males. Gender identity alone, however, is irrelevant to standards that are designed on the basis of biological differences.

Rather than apply only to those transgender individuals who have altered their external biological characteristics to fully match that of their preferred gender, under the Carter policy, persons need not undergo sex reassignment surgery, or even cross-sex hormone therapy, in order to be recognized as, and thus subject to the standards associated with, their preferred gender. A male who identifies as female could remain a biological male in every respect and still must be treated in all respects as a female, including with respect to physical fitness, facilities, and uniform and grooming. This scenario is not farfetched. According to the APA, not "all individuals with gender dysphoria desire a complete gender reassignment. . . . Some are satisfied with no medical or surgical treatment but prefer to dress as the felt gender in public."[113] Currently, of the 424 approved Service member treatment plans, at least 36 do not include cross-

---

consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion; NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.

[111] "The difference between men's and women's grooming policies recognizes the difference between the sexes; sideburns for men, different hairstyles and cosmetics for women. Establishing identical grooming and personal appearance standards for men and women would not be in the Navy's best interest and is not a factor in the assurance of equal opportunity." Department of the Navy, Navy Personnel Command, Navy Personnel Instruction 156651, "Uniform Regulations," Art. 2101.1 (July 7, 2017); see also Department of the Army, Army Regulation 670-1, "Wear and Appearance of Army Uniforms and Insignia," pp. 4-16 (Mar. 31, 2014); Department of the Air Force, Air Force Instruction 26-2903, "Dress and Personal Appearance of Air Force Personnel," pp. 17-27 (Feb. 9, 2017); Department of the Navy, Marine Corps Order P1020.34G, "Marine Corps Uniform Regulations," pp. 1-9 (Mar. 31, 2003).

[112] Department of Defense Instruction 1300.28, *In-service Transition for Service Members Identifying as Transgender*, pp. 3-4 (June 30, 2016).

[113] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018).

sex hormone therapy or sex reassignment surgery.[114]  And it is questionable how many Service members will obtain any type of sex reassignment surgery.  According to a survey of transgender persons, only 25% reported having had some form of transition-related surgery.[115]

The variability and fluidity of gender transition undermine the legitimate purposes that justify different biologically-based, male-female standards.  For example, by allowing a biological male who retains male anatomy to use female berthing, bathroom, and shower facilities, it undermines the reasonable expectations of privacy and dignity of female Service members.  By allowing a biological male to meet the female physical fitness and body fat standards and to compete against females in gender-specific physical training and athletic competition, it undermines fairness (or perceptions of fairness) because males competing as females will likely score higher on the female test than on the male test and possibly compromise safety.  By allowing a biological male to adhere to female uniform and grooming standards, it creates unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity.

These problems could perhaps be alleviated if a person's preferred gender were recognized only after the person underwent a biological transition.  The concept of gender transition is so nebulous, however, that drawing any line—except perhaps at a full sex reassignment surgery—would be arbitrary, not to mention at odds with current medical practice, which allows for a wide range of individualized treatment.  In any event, rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender women.[116]  Only up to 25% of surveyed transgender persons report having had some form of transition-related surgery.[117]  The RAND study estimated that such rates "are typically only around 20 percent, with the exception of chest surgery among female-to-male transgender individuals."[118]  Moreover, of the 424 approved Service member treatment plans available for study, 388 included cross-sex hormone treatment, but only 34 non-genital sex reassignment surgeries and one genital surgery have been completed thus far.  Only 22 Service members have requested a waiver for a genital sex reassignment surgery.[119]

Low rates of full sex reassignment surgery and the otherwise wide variation of transition-related treatment, with all the challenges that entails for privacy, fairness, and safety, weigh in favor of maintaining a bright line based on biological sex—not gender identity or some variation thereof—in determining which sex-based standards apply to a given Service member.  After all, a person's biological sex is generally ascertainable through objective means.  Moreover, this approach will ensure that biologically-based standards will be applied uniformly to all Service members of the same biological sex.  Standards that are clear, coherent, objective, consistent, predictable, and uniformly applied enhance good order, discipline, steady leadership, and unit cohesion, which in turn, ensure military effectiveness and lethality.

---

[114] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).
[115] Id.
[116] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.
[117] Id. at 100.
[118] RAND Study at 21.
[119] Defense Health Agency, Supplemental Health Care Program Data (Feb. 2018).

New Transgender Policy

In light of the forgoing standards, all of which are necessary for military effectiveness and lethality, as well as the recommendations of the Panel of Experts, the Department, in consultation with the Department of Homeland Security, recommends the following policy:

A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex.

Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are eligible for service, provided that they, like all other persons, satisfy all mental and physical health standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which a transgender person's gender identity is recognized only if the person has a diagnosis or history of gender dysphoria.

Although the precise number is unknown, the Department recognizes that many transgender persons could be disqualified under this policy. And many transgender persons who would not be disqualified may nevertheless be unwilling to adhere to the standards associated with their biological sex. But many have served, and are serving, with great dedication under the standards for their biological sex. As noted earlier, 8,980 Service members reportedly identify as transgender, and yet there are currently only 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016.

B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified.

Except for those who are exempt under this policy, as described below in C.3, and except where waivers or exceptions to policy are otherwise authorized, persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be disqualified from service. In the Department's military judgment, this is a necessary departure from the Carter policy for the following reasons:

1. *Undermines Readiness.* While transition-related treatments, including real life experience, cross-sex hormone therapy, and sex reassignment surgery, are widely accepted forms of treatment, there is considerable scientific uncertainty concerning whether these treatments fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria. Despite whatever improvements in condition may result from these treatments, there is evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment, as compared to persons without gender dysphoria.[120] The persistence of these problems is a risk for readiness.

---

[120] See *supra* at pp. 24-26.

Another readiness risk is the time required for transition-related treatment and the impact on deployability. Although limited and incomplete because many transitioning Service members either began treatment before the Carter policy took effect or did not require sex reassignment surgery, currently available in-service data already show that, cumulatively, transitioning Service members in the Army and Air Force have averaged 167 and 159 days of limited duty, respectively, over a one-year period.[121]

Transition-related treatment that involves cross-sex hormone therapy or sex reassignment surgery could render Service members with gender dysphoria non-deployable for a significant period of time—perhaps even a year—if the theater of operations cannot support the treatment. For example, Endocrine Society guidelines for cross-sex hormone therapy recommend quarterly bloodwork and laboratory monitoring of hormone levels during the first year of treatment.[122] Of the 424 approved Service member treatment plans available for study, almost all of them—91.5%—include the prescription of cross-sex hormones.[123] The period of potential non-deployability increases for those who undergo sex reassignment surgery. As described earlier, the recovery time for the various sex reassignment procedures is substantial. For non-genital surgeries (assuming no complications), the range of recovery is between two and eight weeks depending on the type of surgery, and for genital surgeries (again assuming no complications), the range is between three and six months before the individual is able to return to full duty.[124] When combined with 12 continuous months of hormone therapy, which is recommended prior to genital surgery,[125] the total time necessary for sex reassignment surgery could exceed a year. If the operational environment does not permit access to a lab for monitoring hormones (and there is considerable debate over how common this would be), then the Service member must be prepared to forego treatment, monitoring, or the deployment. Either outcome carries risks for readiness.

Given the limited data, however, it is difficult to predict with any precision the impact on readiness of allowing gender transition. Moreover, the input received by the Panel of Experts varied considerably. On one hand, some commanders with transgender Service members

---

[121] Data reported by the Departments of the Army and Air Force (Oct. 2017).

[122] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[123] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017). Although the RAND study observed that British troops who are undergoing hormone therapy are generally able to deploy if the "hormone dose is steady and there are no major side effects," it nevertheless acknowledged that "deployment to all areas may not be possible, depending on the needs associated with any medication (e.g., refrigeration)." RAND Study at 59.

[124] For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to 8 weeks; an orchiectomy is up to 6 weeks; and a vaginoplasty is up to three months. See University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/trans?page=guidelines-home (last visited Feb. 16, 2018); see also Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[125] RAND Study at 80; see also id. at 7; Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

reported that, from the time of diagnosis to the completion of a transition plan, the transitioning Service members would be non-deployable for two to two-and-a-half years.[126]  On the other hand, some commanders, as well as transgender Service members themselves, reported that transition-related treatment is not a burden on unit readiness and could be managed to avoid interfering with deployments, with one commander even reporting that a transgender Service member with gender dysphoria under his command elected to postpone surgery in order to deploy.[127]  This conclusion was echoed by some experts in endocrinology who found no harm in stopping or adjusting hormone therapy treatment to accommodate deployment during the first year of hormone use.[128]  Of course, postponing treatment, especially during a combat deployment, has risks of its own insofar as the treatment is necessary to mitigate the clinically significant distress and impairment of functioning caused by gender dysphoria.  After all, "when Service members deploy and then do not meet medical deployment fitness standards, there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower."[129]  In short, the periods of transition-related non-availability and the risks of deploying untreated Service members with gender dysphoria are uncertain, and that alone merits caution.

Moreover, most mental health conditions, as well as the medication used to treat them, limit Service members' ability to deploy.  Any DSM-5 psychiatric disorder with residual symptoms, or medication side effects, which impair social or occupational performance, require a waiver for the Service member to deploy.[130]  The same is true for mental health conditions that pose a substantial risk for deterioration or recurrence in the deployed environment.[131]  In managing mental health conditions while deployed, providers must consider the risk of exacerbation if the individual were exposed to trauma or severe operational stress.  These determinations are difficult to make in the absence of evidence on the impact of deployment on individuals with gender dysphoria.[132]

The RAND study acknowledges that the inclusion of individuals with gender dysphoria in the force will have a negative impact on readiness.  According to RAND, foreign militaries that allow service by personnel with gender dysphoria have found that it is sometimes necessary to restrict the deployment of transitioning individuals, including those receiving hormone therapy and surgery, to austere environments where their healthcare needs cannot be met.[133]  Nevertheless, RAND concluded that the impact on readiness would be minimal—e.g., 0.0015% of available deployable labor-years across the active and reserve components—because of the

---

[126] Minutes, Transgender Review Panel (Oct. 13, 2017).
[127] Id.
[128] Minutes, Transgender Review Panel (Nov. 9, 2017).
[129] Institute for Defense Analyses, "Force Impact of Expanding the Recruitment of Individuals with Auditory Impairment," pp. 60-61 (Apr. 2016).
[130] Modification Thirteen to U.S. Central Command Individual Protection and Individual, Unit Deployment Policy, Tab A, p. 8 (Mar. 2017).
[131] Id.
[132] See generally Memorandum from the Assistant Secretary of Defense for Health Affairs, "Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications," pp. 2-4 (Oct. 7, 2013).
[133] RAND Study at 40.

exceedingly small number of transgender Service members who would seek transition-related treatment.[134]  Even then, RAND admitted that the information it cited "must be interpreted with caution" because "much of the current research on transgender prevalence and medical treatment rates relies on self-reported, nonrepresentative samples."[135]  Nevertheless, by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers.[136]  And yet that is no reason to allow persons with those conditions to serve.

The issue is not whether the military can absorb periods of non-deployability in a small population; rather, it is whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible.  As the Department has noted before:  "[W]here the operational requirements are growing faster than available resources," it is imperative that the force "be manned with Service members capable of meeting all mission demands.  The Services require that every Service member contribute to full mission readiness, regardless of occupation.  In other words, the Services require all Service members to be able to engage in core military tasks, including the ability to deploy rapidly, without impediment or encumbrance."[137]  Moreover, the Department must be mindful that "an increase in the number of non-deployable military personnel places undue risk and personal burden on Service members qualified and eligible to deploy, and negatively impacts mission readiness."[138]  Further, the Department must be attuned to the impact that high numbers of non-deployable military personnel places on families whose Service members deploy more often to backfill or compensate for non-deployable persons.

In sum, the available information indicates that there is inconclusive scientific evidence that the serious problems associated with gender dysphoria can be fully remedied through transition-related treatment and that, even if it could, most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time.  By this metric, Service members with gender dysphoria who need transition-related care present a significant challenge for unit readiness.

2.  *Incompatible with Sex-Based Standards.*  As discussed in detail earlier, military personnel policy and practice has long maintained a clear line between men and women where their biological differences are relevant with respect to physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards.  This line promotes good order and discipline, steady leadership, unit cohesion, and ultimately military

---

[134] Id. at 42.

[135] Id. at 39.

[136] According to the National Institute of Mental Health, 2.8% of U.S. adults experienced bipolar disorder in the past year, and 4.4% have experienced the condition at some time in their lives.  National Institute of Mental Health, "Bipolar Disorder" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/bipolar-disorder.shtml.  The prevalence of schizophrenia is less than 1%.  National Institute of Mental Health, "Schizophrenia" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/schizophrenia.shtml.

[137] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces." p. 9 (Apr. 2016).

[138] Id. at 10.

effectiveness and lethality because it ensures fairness, equity, and safety; satisfies reasonable expectations of privacy; reflects common practice in the society from which we recruit; and promotes core military values of dignity and respect between men and women. To exempt Service members from the uniform, biologically-based standards applicable to their biological sex on account of their gender identity would be incompatible with this line and undermine the objectives such standards are designed to serve.

First, a policy that permits a change of gender without requiring any biological changes risks creating unfairness, or perceptions thereof, that could adversely affect unit cohesion and good order and discipline. It could be perceived as discriminatory to apply different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology. For example, it unfairly discriminates against biological males who identify as male and are held to male standards to allow biological males who identify as female to be held to female standards, especially where the transgender female retains many of the biological characteristics and capabilities of a male. It is important to note here that the Carter policy does not require a transgender person to undergo any biological transition in order to be treated in all respects in accordance with the person's preferred gender. Therefore, a biological male who identifies as female could remain a biological male in every respect and still be governed by female standards. Not only would this result in perceived unfairness by biological males who identify as male, it would also result in perceived unfairness by biological females who identify as female. Biological females who may be required to compete against such transgender females in training and athletic competition would potentially be disadvantaged.[139] Even more importantly, in physically violent training and competition, such as boxing and combatives, pitting biological females against biological males who identify as female, and vice versa, could present a serious safety risk as well.[140]

This concern may seem trivial to those unfamiliar with military culture. But vigorous competition, especially physical competition, is central to the military life and is indispensable to the training and preparation of warriors. Nothing encapsulates this more poignantly than the words of General Douglas MacArthur when he was superintendent of the U.S. Military Academy and which are now engraved above the gymnasium at West Point: "Upon the fields of friendly

---

[139] See *supra* note 109. Both the International Olympic Committee (IOC) and the National Collegiate Athletic Association (NCAA) have attempted to mitigate this problem in their policies regarding transgender athletes. For example, the IOC requires athletes who transition from male to female to demonstrate certain suppressed levels of testosterone to minimize any advantage in women's competition. Similarly, the NCAA prohibits an athlete who has transitioned from male to female from competing on a women's team without changing the team status to a mixed gender team. While similar policies could be employed by the Department, it is unrealistic to expect the Department to subject transgender Service members to routine hormone testing prior to biannual fitness testing, athletic competition, or training simply to mitigate real and perceived unfairness or potential safety concerns. See, e.g., International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion, NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.

[140] See *supra* note 109.

strife are sown the seeds that, upon other fields, on other days will bear the fruits of victory."[141] Especially in combat units and in training, including the Service academies, ROTC, and other commissioning sources, Service members are graded and judged in significant measure based upon their physical aptitude, which is only fitting given that combat remains a physical endeavor.

Second, a policy that accommodates gender transition without requiring full sex reassignment surgery could also erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline. Given the unique nature of military service, Service members of the same biological sex are often required to live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom. Because of reasonable expectations of privacy, the military has long maintained separate berthing, bathroom, and shower facilities for men and women while in garrison. In the context of recruit training, this separation is even mandated by Congress.[142]

Allowing transgender persons who have not undergone a full sex reassignment, and thus retain at least some of the anatomy of their biological sex, to use the facilities of their identified gender would invade the expectations of privacy that the strict male-female demarcation in berthing, bathroom, and shower facilities is meant to serve. At the same time, requiring transgender persons who have developed, even if only partially, the anatomy of their identified gender to use the facilities of their biological sex could invade the privacy of the transgender person. Without separate facilities for transgender persons or other mitigating accommodations, which may be unpalatable to transgender individuals and logistically impracticable for the Department, the privacy interests of biological males and females and transgender persons could be anticipated to result in irreconcilable situations. Lieutenants, Sergeants, and Petty Officers charged with carrying out their units' assigned combat missions should not be burdened by a change in eligibility requirements disconnected from military life under austere conditions.

The best illustration of this irreconcilability is the report of one commander who was confronted with dueling equal opportunity complaints—one from a transgender female (i.e., a biological male with male genitalia who identified as female) and the other from biological females. The transgender female Service member was granted an exception to policy that allowed the Service member to live as a female, which included giving the Service member access to female shower facilities. This led to an equal opportunity complaint from biological females in the unit who believed that granting a biological male, even one who identified as a female, access to their showers violated their privacy. The transgender Service member responded with an equal opportunity complaint claiming that the command was not sufficiently supportive of the rights of transgender persons.[143]

The collision of interests discussed above are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions. Leaders at all levels

---

[141] Douglas MacArthur, *Respectfully Quoted: A Dictionary of Quotations* (1989), available at http://www.bartleby.com/73/1874.html.

[142] See *supra* note 108.

[143] Minutes, Transgender Review Panel (Oct. 13, 2017). Limited data exists regarding the performance of transgender Service members due to policy restrictions in Department of Defense 1300.28, *In-Service Transition for Transgender Service Members* (Oct. 1, 2016), that prevent the Department from tracking individuals who may identify as transgender as a potentially unwarranted invasion of personal privacy.

already face immense challenges in building cohesive military units. Blurring the line that differentiates the standards and policies applicable to men and women will only exacerbate those challenges and divert valuable time and energy from military tasks.

The unique leadership challenges arising from gender transition are evident in the Department's handbook implementing the Carter policy. The handbook provides guidance on various scenarios that commanders may face. One such scenario concerns the use of shower facilities: "A transgender Service member has expressed privacy concerns regarding the open bay shower configuration. Similarly, several other non-transgender Service members have expressed discomfort when showering in these facilities with individuals who have different genitalia." As possible solutions, the handbook offers that the commander could modify the shower facility to provide privacy or, if that is not feasible, adjust the timing of showers. Another scenario involves proper attire during a swim test: "It is the semi-annual swim test and a female to male transgender Service member who has fully transitioned, but did not undergo surgical change, would like to wear a male swimsuit for the test with no shirt or other top coverage." The extent of the handbook's guidance is to advise commanders that "[i]t is within [their] discretion to take measures ensuring good order and discipline," that they should "counsel the individual and address the unit, if additional options (e.g., requiring all personnel to wear shirts) are being considered," and that they should consult the Service Central Coordination Cell, a help line for commanders in need of advice.

These vignettes illustrate the significant effort required of commanders to solve challenging problems posed by the implementation of the current transgender service policies. The potential for discord in the unit during the routine execution of daily activities is substantial and highlights the fundamental incompatibility of the Department's legitimate military interest in uniformity, the privacy interests of all Service members, and the interest of transgender individuals in an appropriate accommodation. Faced with these conflicting interests, commanders are often forced to devote time and resources to resolve issues not present outside of military service. A failure to act quickly can degrade an otherwise highly functioning team, as will failing to seek appropriate counsel and implementing a faulty solution. The appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline.

The RAND study does not meaningfully address how accommodations for gender transition would impact perceptions of fairness and equity, expectations of privacy, and safety during training and athletic competition and how these factors in turn affect unit cohesion. Instead, the RAND study largely dismisses concerns about the impact on unit cohesion by pointing to the experience of four countries that allow transgender service—Australia, Canada, Israel, and the United Kingdom.[144] Although the vast majority of armed forces around the world do not permit or have policies on transgender service, RAND noted that 18 militaries do, but only four have well-developed and publicly available policies.[145] RAND concluded that "the available research revealed no significant effect on cohesion, operational effectiveness, or

---

[144] RAND Study at 45.
[145] Id. at 50.

readiness."[146]  It reached this conclusion, however, despite noting reports of resistance in the ranks, which is a strong indication of an adverse effect on unit cohesion.[147]  Nevertheless, RAND acknowledged that the available data was "limited" and that the small number of transgender personnel may account for "the limited effect on operational readiness and cohesion."[148]

Perhaps more importantly, however, the RAND study mischaracterizes or overstates the reports upon which it rests its conclusions.  For example, the RAND study cites *Gays in Foreign Militaries 2010: A Global Primer* by Nathaniel Frank as support for the conclusions that there is no evidence that transgender service has had an adverse effect on cohesion, operational effectiveness, or readiness in the militaries of Australia and the United Kingdom and that diversity has actually led to increases in readiness and performance.[149]  But that particular study has nothing to do with examining the service of transgender persons; rather, it is about the integration of homosexual persons into the military.[150]

With respect to transgender service in the Israeli military, the RAND study points to an unpublished paper by Anne Speckhard and Reuven Paz entitled *Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service*.  The RAND study cites this paper for the proposition that "there has been no reported effect on cohesion or readiness" in the Israeli military and "there is no evidence of any impact on operational effectiveness."[151]  These sweeping and categorical claims, however, are based only on "six in-depth interviews of experts on the subject both inside and outside the [Israeli Defense Forces (IDF)]: two in the IDF leadership—including the spokesman's office; two transgender individuals who served in the IDF, and two professionals who serve transgender clientele—before, during and after their IDF service."[152]  As the RAND report observed, however:  "There do appear to be some limitations on the assignment of transgender personnel, particularly in combat units.  Because of the austere living conditions in these types of units, necessary accommodations may not be available for Service members in the midst of a gender transition.  As a result, transitioning individuals are typically not assigned to combat units."[153]  In addition, as the RAND study notes, under the Israeli policy at the time, "assignment of housing, restrooms, and showers is typically linked to the birth gender, which does not change in the military system until after gender reassignment surgery."[154]  Therefore, insofar as a Service member's change of gender is not recognized until after sex reassignment

---

[146] Id. at 45.
[147] Id.
[148] Id.
[149] Id.
[150] Nathaniel Frank, "Gays in Foreign Militaries 2010: A Global Primer," p. 6 *The Palm Center* (Feb. 2010), https://www.palmcenter.org/wpcontent/uploads/2017/12/FOREIGNMILITARIESPRIMER2010FINAL.pdf ("This study seeks to answer some of the questions that have been, and will continue to be, raised surrounding the instructive lessons from other nations that have lifted their bans on openly gay service.").
[151] Rand Study at 45.
[152] Anne Speckhard & Reuven Paz, "Transgender Service in the Israeli Defense Forces:  A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service," p. 3 (2014), http://www.researchgate.net/publication/280093066.
[153] RAND Study at 56.
[154] Id. at 55.

surgery, the Israeli policy—and whatever claims about its impact on cohesion, readiness, and operational effectiveness—are distinguishable from the Carter policy.

Finally, the RAND study cites to a journal article on the Canadian military experience entitled *Gender Identity in the Canadian Forces: A Review of Possible Impacts on Operational Effectiveness* by Alan Okros and Denise Scott. According to RAND, the authors of this article "found no evidence of any effect on unit or overall cohesion."[155]  But the article not only fails to support the RAND study's conclusions (not to mention the article's own conclusions), it confirms the concerns that animate the Department's recommendations.  The article acknowledges, for example, the difficulty commanders face in managing the competing interests at play:

> Commanders told us that the new policy fails to provide sufficient guidance as to how to weigh priorities among competing objectives during their subordinates' transition processes.  Although they endorsed the need to consult transitioning Service members, they recognized that as commanding officers, they would be called on to balance competing requirements.  They saw the primary challenge to involve meeting trans individual's expectations for reasonable accommodation and individual privacy while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness.  To do so, they said that they require additional guidance on a range of issues including clothing, communal showers, and shipboard bunking and messing arrangements.[156]

Notwithstanding its optimistic conclusions, the article also documents serious problems with unit cohesion.  The authors observe, for instance, that the chain of command "has not fully earned the trust of the transgender personnel," and that even though some transgender Service members do trust the chain of command, others "expressed little confidence in the system," including one who said, "I just don't think it works that well."[157]

In sum, although the foregoing considerations are not susceptible to quantification, undermining the clear sex-differentiated lines with respect to physical fitness; berthing, bathroom, and shower facilities; and uniform and grooming standards, which have served all branches of Service well to date, risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline.  The Department acknowledges that there are serious differences of opinion on this subject, even among military professionals, including among some who provided input to the Panel of Experts,[158] but given the vital interests at stake—the survivability of Service members, including

---

[155] Id. at 45.

[156] Alan Okros & Denise Scott, "Gender Identity in the Canadian Forces," *Armed Forces and Society* Vol. 41, p. 8 (2014).

[157] Id. at 9.

[158] While differences of opinion do exist, it bears noting that, according to a Military Times/Syracuse University's Institute for Veterans and Military Families poll, 41% of active duty Service members polled thought that allowing gender transition would hurt their unit's readiness, and only 12% thought it would be beneficial.  Overall, 57% had a negative opinion of the Carter policy.  Leo Shane III, "Poll:  Active-duty troops worry about military's transgender

transgender persons, in combat and the military effectiveness and lethality of our forces—it is prudent to proceed with caution, especially in light of the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health.

   3.   *Imposes Disproportionate Costs.*  Transition-related treatment is also proving to be disproportionately costly on a per capita basis, especially in light of the absence of solid scientific support for the efficacy of such treatment.  Since implementation of the Carter policy, the medical costs for Service members with gender dysphoria have increased nearly three times—or 300%—compared to Service members without gender dysphoria.[159]  And this increase is despite the low number of costly sex reassignment surgeries that have been performed so far.[160]  As noted earlier, only 34 non-genital sex reassignment surgeries and one genital surgery have been completed,[161] with an additional 22 Service members requesting a waiver for genital surgery.[162]  We can expect the cost disparity to grow as more Service members diagnosed with gender dysphoria avail themselves of surgical treatment.  As many as 77% of the 424 Service member treatment plans available for review include requests for transition-related surgery, although it remains to be seen how many will ultimately obtain surgeries.[163]  In addition, several commanders reported to the Panel of Experts that transition-related treatment for Service members with gender dysphoria in their units had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care.[164]

   Taken together, the foregoing concerns demonstrate why recognizing and making accommodations for gender transition are not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality.  Therefore, it is the Department's professional military judgment that persons who have been diagnosed with, or have a history of, gender dysphoria and require, or have already undergone, a gender transition generally should not be eligible for accession or retention in the Armed Forces absent a waiver.

   C.   Transgender Persons With a History or Diagnosis of Gender Dysphoria Are
        Disqualified, Except Under Certain Limited Circumstances.

---

policies," *Military Times* (July 27, 2017) available at https://www.militarytimes.com/news/pentagon-congress/2017/07/27/poll-active-duty-troops-worry-about-militarys-transgender-policies/.

[159] Minutes, Transgender Review Panel (Nov. 2, 2017).

[160] Minutes, Transgender Review Panel (Nov. 2, 2017).

[161] Data retrieved from Military Health System Data Repository (Nov. 2017).

[162] Defense Health Agency Data (as of Feb. 2018).

[163] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).

[164] Minutes, Transgender Review Panel (Oct. 13, 2017); see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1185 (Oct. 2016) ("As previously discussed, a new diagnosis of gender dysphoria and the decision to proceed with gender transition requires frequent evaluations by the [mental health professional] and endocrinologist.  However, most [military treatment facilities] lack one or both of these specialty services.  Members who are not in proximity to [military treatment facilities] may have significant commutes to reach their required specialty care.  Members stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations.").

As explained earlier in greater detail, persons with gender dysphoria experience significant distress and impairment in social, occupational, or other important areas of functioning. Gender dysphoria is also accompanied by extremely high rates of suicidal ideation and other comorbidities. Therefore, to ensure unit safety and mission readiness, which is essential to military effectiveness and lethality, persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1. *Accession of Individuals Diagnosed with Gender Dysphoria.* Given the documented fluctuations in gender identity among children, a history of gender dysphoria should not alone disqualify an applicant seeking to access into the Armed Forces. According to the DSM-5, the persistence of gender dysphoria in biological male children "has ranged from 2.2% to 30%," and the persistence of gender dysphoria in biological female children "has ranged from 12% to 50%."[165] Accordingly, persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability—i.e., absence of gender dysphoria—immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex. The 36-month stability period is the same standard the Department currently applies to persons with a history of depressive disorder. The Carter policy's 18-month stability period for gender dysphoria, by contrast, has no analog with respect to any other mental condition listed in DoDI 6130.03.

2. *Retention of Service Members Diagnosed with Gender Dysphoria.* Retention standards are typically less stringent than accession standards due to training provided and on-the-job performance data. While accession standards endeavor to predict whether a given applicant will require treatment, hospitalization, or eventual separation from service for medical unfitness, and thus tend to be more cautious, retention standards focus squarely on whether the Service member, despite his or her condition, can continue to do the job. This reflects the Department's desire to retain, as far as possible, the Service members in which it has made substantial investments and to avoid the cost of finding and training a replacement. To use an example outside of the mental health context, high blood pressure does not meet accession standards, even if it can be managed with medication, but it can meet retention standards so long as it can be managed with medication. Regardless, however, once they have completed treatment, Service members must continue to meet the standards that apply to them in order to be retained. Therefore, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[166]

---

[165] DSM-5 at 455.
[166] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

3.    *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.*  The Department is mindful of the transgender Service members who were diagnosed with gender dysphoria and either entered or remained in service following the announcement of the Carter policy and the court orders requiring transgender accession and retention.  The reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed. Therefore, transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary treatment, to change their gender marker in DEERS, and to serve in their preferred gender, even after the new policy commences.  This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order.  The Service member must, however, adhere to the procedures set forth in DoDI 1300.28, and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).  While the Department believes that its commitment to these Service members, including the substantial investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption instead is and should be deemed severable from the rest of the policy.

43

Add.165

## Conclusion

In making these recommendations, the Department is well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues. But as the forgoing analysis demonstrates, the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed. In fact, the RAND study itself repeatedly emphasized the lack of quality data on these issues and qualified its conclusions accordingly. In addition, that study concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs. In its view, however, such harms were negligible in light of the small size of the transgender population. But especially in light of the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect, the Department is not convinced that these risks could be responsibly dismissed or that even negligible harms should be incurred given the Department's grave responsibility to fight and win the Nation's wars in a manner that maximizes the effectiveness, lethality, and survivability of our most precious assets—our Soldiers, Sailors, Airmen, Marines, and Coast Guardsmen.

Accordingly, the Department weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring in developing these recommendations. It is the Department's view that the various balances struck by the recommendations above provide the best solution currently available, especially in light of the significant uncertainty in this area. Although military leadership from the prior administration reached a different conclusion, the Department's professional military judgment is that the risks associated with maintaining the Carter policy—risks that are continuing to be better understood as new data become available—counsel in favor of the recommended approach.

# EXHIBIT W

# Accession Medical Standards Analysis and Research Activity

## (AMSARA)



## Analysis of Medical Administrative Data on Transgender Service Members

*Phase 4*

7/14/2021

<u>Requested by:</u>
Dr. Paul Ciminera, MD MPH
Program Director, Medical Accessions and Retention Policy, OASD(HA)

<u>Prepared by:</u>
Accession Medical Standards Analysis and Research Activity (AMSARA)
Statistics and Epidemiology Branch (S&E)
Center for Enabling Capabilities (CEC)
Walter Reed Army Institute of Research (WRAIR)

<u>Prepared in response to:</u>
Accession Medical Standards Working Group (AMSWG) task

Distribution Restrictions: not cleared for public release

FCMR-UWE-S

## 1. Purpose

In their ongoing efforts to address concerns regarding medical standards for transgender individuals accessing into the U.S. Military, the Accession Medical Standards Working Group (AMSWG) tasked the Psychological Health Center of Excellence (PHCoE) and the Accession Medical Standards Analysis and Research Activity (AMSARA) to investigate any relevant data sources that may suggest appropriate periods of psychological stability prior to enlistment or commissioning. Specifically, four questions were posed by Dr. Ciminera and CAPT Bradford on behalf of the AMSWG:

*1. What are the appropriate periods of stability prior to accession into the military for medical (e.g. surgeries, cross-sex hormone use) and psychological conditions associated with gender dysphoria or a gender transition?*
*2. Do our current accession stability period standards for mental health conditions such as depression or anxiety (typically 36 months of stability following treatment) appropriately inform what we should consider appropriate for gender dysphoria or gender transition?*
*3. Does the evidence show that issues such as cross-sex hormone therapy, not a medical condition, should have an equal period of stability as gender dysphoria?*
*4. What would be the next logical steps for further research into this space to inform DoD medical standards?*

To address these core questions, the PHCoE and AMSARA teams crafted a joint approach that includes four phases:

Phase 1: Initial environmental scan of relevant treatment standards, key literature, and international military standards for military accession by transgender individuals.
  ✓ Completed and presented at the AMSWG meeting, 1 April 2021

Phase 2: Analysis of health care data from an identified cohort of individuals diagnosed with gender dysphoria or undergoing gender transition medical procedures in the military health system.
  ✓ Completed and presented at the AMSWG meeting, 13 May 2021

Phase 3: Comprehensive literature review of psychological stability associated with gender dysphoria, gender transition, and hormone replacement therapy.
  ✓ Submitted as a separate RAH for AMSWG meeting, 22 July 2021

Phase 4: Analysis of administrative and health care data from a cohort of accessions and separations from transgender disqualifications and waivers.
  ✓ Completed in this document and to be presented at the AMSWG meeting, 22 July 2021

## 2. Key Findings

- Transgender service members appear similar to the full military applicant pool in terms of the proportion with history of any pre-accession medical disqualification status as well as the distribution of specific medical disqualifications.
- Rates of adverse attrition and existing prior to service (EPTS) discharge among transgender service members were similar to the total force. However, the rates of disability evaluation were estimated to be higher among TG service members.

## 3. Background

The Accession Medical Standards Analysis and Research Activity (AMSARA) conducted a small complementary analysis with similar cohort identification process to Psychological Health Center of Excellence (PHCoE) to increase the available evidence surrounding transgender service members. These analyses aimed to examine the usability of pre-accession factors and end of service outcomes among transgender service members' as evidence to inform discussions on related to DoD accession policies pertaining to transgender applicants.

## 4. Methods

Following the PHCoE's cohort identification criteria, eligible for inclusion were service members (Army, Navy, Marine Corps, or Air Force) who had a medical encounter for a qualifying transgender (TG) diagnosis between calendar year 2015-2020.[i] Qualifying diagnoses were identified by the presence of an ICD-9/ICD-10 diagnostic code[ii] in the first or second diagnostic position recorded within a medical encounter either in a military treatment facility (MTF) or outside of the MTF system (purchased care). Only service members with a beneficiary category of active duty or guard/reserve on active duty were included, however due to data limitations, this category was derived from the medical record rather than from the Defense Enrollment Eligibility Reporting System (DEERS), which was utilized by the PHCoE.

To supplement in-service outcomes described in the PHCoE study, AMSARA evaluated pre-accession profiles and end of service outcomes among the identified TG cohort. Military Entrance Processing Station (MEPS) medical screening, accession medical waiver, and accession records were utilized to identify pre-accession medical disqualifications, with an emphasis on transgender or psychiatric-related disqualifications. In addition, AMSARA assessed time in service and end of service outcomes, including non-adverse separations (e.g., expiration of term of service, retirement), adverse attrition (e.g., unqualified for active duty, insufficient retainability), disability discharge, and existing prior to service (EPTS) discharge to: 1) supplement the understanding of the end of service among this cohort gained from the PHCoE analyses; and, 2) provide insight on potential stability periods.

U.S. Military Entrance Processing Command (USMEPCOM) provided data on all enlisted applicants for the Army, Navy, Marine Corps, or Air Force in any component, and data on EPTS discharges.

---

[i] Transsexualism, Dual Role Transvestism, Gender Identity Disorder Of Childhood, Other Gender Identity Disorders, Gender Identity Disorder, Unspecified, Transvestic Fetishism, Personal History Of Sex Reassignment
[ii] 302.3, 302.6, 302.50, 302.51, 302.52, 302.53, 302.85, F64.0, F64.1, F64.2, F64.8, F64.9, F65.1, Z87.890

Accession and separation records were obtained from the Defense Manpower Data Center (DMDC), medical waiver records for enlisted medical waiver requests were received from the various Service Medical Waiver Authorities, and all disability evaluation records were provided by U.S. Army Physical Disability Agency (USPDA), Secretary of the Navy Council of Review Boards (CORB) and Air Force Personnel Center (AFPC). Medical encounter records were queried from the Military Health Systems Data Repository (MDR).

## 5.    Findings

Of the 2,063 service members in the identified cohort, the majority had an accession record in the AMSARA database (94%) and the majority had an application record (94%). Those with a missing accession record could be related to the transactional nature of the data while missing application records is likely due to the service member not applying for enlisted service and therefore not being seen at a Military Entrance Processing Station (MEPS).

A wide range of initial accession years were seen among the cohort (1995-2020), however, 80% initially accessed between fiscal years 2011 and 2020. Among those with an accession record, most initially entered as enlisted (92%) and/or active duty (87%) (Table 1).  In contrast, the DMDC reported that, as of May 2021, 82% of the military were enlisted and 62% were active duty.[4] Among the TG cohort, roughly 35% initially accessed into the Army, while 29% joined the Navy, 24% the Air Force, and 7% accessed into the Marine Corps.  For comparison, according to the DMDC, the distribution of all fiscal year 2019 accessions was approximately 36% for Army, 24% for Navy, and approximately 20% for both the Air Force and Marine Corps.[4]

Approximately 11% of the cohort were medically disqualified at application (Table 1), which is lower than the proportion of medically disqualified applicants among all applicants (17%).[1] The most common disqualifications fell under the Eyes (23%), Learning, Psychiatric, and Behavioral Disorders (19%), Vision (18%), or Miscellaneous Conditions of the Extremities (10%) subsections of the Department of Defense Instruction (DoDI) 6130.03: Medical standards for appointment, enlistment, or induction into the military services[2] (Table 2). This distribution of disqualifications is consistent with the most common disqualifications among all enlisted applicants.[1] The most common disqualifications among the 42 TG service members with history of a Learning, Psychiatric, and Behavioral Disorder pre-accession medical disqualification were attention-deficit hyperactivity disorders (n=24, 57%), unspecified mental disorder (n=9, 21%), and major depressive disorder (n=7, 17%)  (Table 3).

The average time in service to first cohort-qualifying medical encounter was approximately 53 months (± 49 months), although this metric may be skewed due to the large variation of time in service (range of 3 months to 23 years).  The median time to their first cohort-qualifying encounter was 38 months, which is typically nearing the end of a service member's first contract obligation (Table 4).

Nearly half of the cohort were still serving at the end of the study period, however, approximately a quarter were adversely separated either via adverse attrition (12%) or EPTS discharge (0.2%) (Table 1). The most common reason for adverse separation, based on inter-service separation codes (ISC), was unqualified for active duty (34%) (Table 5), which is comparable to the proportion of all adverse

separations among all active duty DoD service members who were separated in FY 2020 (roughly 29%).[4] On average, cohort members were adversely discharged about three years after their first qualifying medical encounter. Only three cohort members were discharged due to EPTS in the first 180 days of service, although EPTS data is known to be incomplete and should be considered an underestimate.  Reasons for these EPTS discharges were psychiatric-related, including other specified depressive episodes, adjustment disorder with depressed mood, and unspecified gender identity disorder (Table 6). All three service members were discharged between fiscal year 2017 and 2019 (results not shown) approximately six weeks after their first cohort qualifying encounter.

Nearly 12% of the cohort population was evaluated for disability discharge (Table 1), which is larger than the rate of disability evaluation among all service members (roughly 1-2%).  On average, cohort members were evaluated for disability about 20 months after their first qualifying medical encounter (Table 7). Approximately 72% of disability evaluated cohort members were subsequently disability retired with 30% or more DoD benefits.  Similarly, the most common disability disposition among disability evaluated Soldiers, Sailors and Airmen is disability retirement with a 30% or higher rating.[3] The most commonly evaluated conditions among cohort members (psychiatric 54%, musculoskeletal 28%, neurological 18%) (Table 8) were comparable to those of all service members evaluated for disability[3]. Major depressive disorder and post-traumatic stress disorder accounted for three quarters of the psychiatric conditions (Table 9); however, PTSD and mood disorders (including major depressive disorder) are often among the most common conditions in the full disability population.[3]

**6.    Conclusion**

The identified TG cohort present similarly to full applicant pool in terms of pre-accession medical disqualifications. These service members also appear similar to the total force in terms of rates of both adverse attrition and EPTS discharge; however, the proportion of disability discharge is higher. When compared to previous research, TG service members appear to stay in service longer than those who are diagnosed with a psychiatric disorder;[5,6,7]  nevertheless, having longer in service time does not equate to deployability. Future research is needed to more thoroughly evaluate in service characteristics including deployment and limited duty.

**References**

1. Washington W, Weber N, Kelley A, et. al (2020). Accession Medical Standards Analysis and Research Activity (AMSARA) 2019 Annual Report. Silver Spring, MD: Walter Reed Army Institute of Research.
2. Department of Defense (DoD). (2018). Department of Defense Instruction (DoDI) 6130.03: Medical standards for appointment, enlistment, or induction into the military services.
3. Washington W, Weber N, Kelley A, et. al (2020). Disability Evaluation System Analysis and Research (DESAR) 2020 Annual Report. Silver Spring, MD: Walter Reed Army Institute of Research.
4. DMDC Reporting System. (n.d.). https://dmdcrs.dmdc.osd.mil/dmdcrs/public/.
5. Garvey Wilson AL, Messer SC, Hoge CW. U.S. military mental health care utilization and attrition prior to the wars in Iraq and Afghanistan. Social Psychiatry and Psychiatric Epidemiology. 2009 Jun;44(6):473-81. doi: 10.1007/s00127-008-0461-7. Epub 2008 Dec 4. PMID: 19057830.
6. Hoge CW, Auchterlonie JL, Milliken CS. Mental Health Problems, Use of Mental Health Services, and Attrition From Military Service After Returning From Deployment to Iraq or Afghanistan. JAMA. 2006;295(9):1023–1032. doi:10.1001/jama.295.9.1023
7. Shawn M.S. Garcia, MC USN, Brian V. Ortman, USAF BSC, Daniel G. Burnett, FS, USAF MC, Mental Health Diagnoses and Attrition in Air Force Recruits, Military Medicine, Volume 180, Issue 4, April 2015, Pages 436–444, https://doi.org/10.7205/MILMED-D-14-00311

**Table 1**: Military Characteristics of the Transgender Cohort at Accession

| | Cohort (N=2,063) | |
|---|---|---|
| **Cohort Entry Calendar Year** | **N** | **%** |
| 2015 | 128 | 6.20% |
| 2016 | 517 | 25.06% |
| 2017 | 523 | 25.35% |
| 2018 | 367 | 17.79% |
| 2019 | 328 | 15.90% |
| 2020 | 200 | 9.69% |
| **First Accession Fiscal Year** | | |
| 1995 | 2 | 0.10% |
| 1996 | 4 | 0.19% |
| 1997 | 3 | 0.15% |
| 1998 | 5 | 0.24% |
| 1999 | 12 | 0.58% |
| 2000 | 12 | 0.58% |
| 2001 | 8 | 0.39% |
| 2002 | 14 | 0.68% |
| 2003 | 22 | 1.07% |
| 2004 | 25 | 1.21% |
| 2005 | 21 | 1.02% |
| 2006 | 29 | 1.41% |
| 2007 | 44 | 2.13% |
| 2008 | 50 | 2.42% |
| 2009 | 61 | 2.96% |
| 2010 | 97 | 4.70% |
| 2011 | 108 | 5.24% |
| 2012 | 135 | 6.54% |
| 2013 | 176 | 8.53% |
| 2014 | 192 | 9.31% |
| 2015 | 245 | 11.88% |
| 2016 | 259 | 12.55% |
| 2017 | 208 | 10.08% |
| 2018 | 138 | 6.69% |
| 2019 | 60 | 2.91% |
| 2020 | 18 | 0.87% |
| No Accession Record | 115 | 5.57% |
| **First Accession Service** | | |
| Army | 714 | 34.61% |
| Navy | 592 | 28.70% |
| Marine Corps | 150 | 7.27% |

| | | |
|---|---|---|
| Air Force | 490 | 23.75% |
| No Accession Record | 115 | 5.57% |
| **First Accession Component** | | |
| Active Duty | 1,789 | 86.72% |
| Reserves | 72 | 3.49% |
| National Guard | 87 | 4.22% |
| No Accession Record | 115 | 5.57% |
| **Rank at First Accession** | | |
| Officer | 58 | 2.81% |
| Enlisted | 1,890 | 91.61% |
| No Accession Record | 115 | 5.57% |
| **Medical Status at Application** | | |
| Qualified | 1,723 | 83.52% |
| Disqualified | 220 | 10.66% |
| No Application Record | 120 | 5.82% |
| **Service Outcome\*** | | |
| Still in Service\*\* | 1,003 | 48.62% |
| Adverse Attrition | 247 | 11.97% |
| EPTS Discharge | 3 | 0.15% |
| Disability Evaluation | 243 | 11.78% |
| Non-Adverse Separation | 540 | 26.18% |

\* Excludes individuals for whom AMSARA found no accession and no separation record

\*\* As of 30 September 2020

**Table 2**: DoDI Subsections among those Transgender Cohort Medically Disqualified at Application

| DoDI Subsection* | Medically Disqualified (N=220) | |
|---|---|---|
| | N | % |
| Head | 0 | 0.00% |
| Eyes | 51 | 23.18% |
| Vision | 39 | 17.73% |
| Ears | 1 | 0.45% |
| Hearing | 0 | 0.00% |
| Nose, Sinuses, Mouth, and Larynx | 1 | 0.45% |
| Dental | 1 | 0.45% |
| Neck | 1 | 0.45% |
| Lungs, Chest Wall, Pleura, and Mediastinum | 14 | 6.36% |
| Heart | 2 | 0.91% |
| Abdominal Organs and Gastrointestinal System | 0 | 0.00% |
| Female Genital System | 12 | 5.45% |
| Male Genital System | 6 | 2.73% |
| Urinary System | 4 | 1.82% |
| Spine and Sacroiliac Joint Conditions | 6 | 2.73% |
| Upper Extremities | 7 | 3.18% |
| Lower Extremities | 16 | 7.27% |
| Miscellaneous Conditions of the Extremities | 22 | 10.00% |
| Vascular System | 1 | 0.45% |
| Skin and Cellular Tissue Conditions | 12 | 5.45% |
| Blood and Blood Forming Conditions | 3 | 1.36% |
| Systemic Conditions | 12 | 5.45% |
| Endocrine and Metabolic Conditions | 5 | 2.27% |
| Rheumatologic Conditions | 3 | 1.36% |
| Neurologic Conditions | 3 | 1.36% |
| Sleep Disorders | 0 | 0.00% |
| Learning, Psychiatric, and Behavioral Disorders | 42 | 19.09% |
| Tumors and Malignancies | 1 | 0.45% |
| Miscellaneous Conditions | 19 | 8.64% |
| Transgender | 1 | 0.45% |

* Includes waiver data, subsections are not mutually exclusive so individuals can be count more than once in the table but only once per subsection. Also, excludes those with a disqualification code that cannot be mapped to the DoDI Subsections.

**Table 3**: Most Common Disqualifications among those Transgender Cohort Medically Disqualified at Application under Learning, Psychiatric, and Behavioral Disorders DoDI Subsection

| Learning, Psychiatric, and Behavioral Disorders Disqualifications* | Medically Disqualified (DoDI Subsection 28) (N=42) | |
| --- | --- | --- |
| | **N** | **%** |
| Attention-deficit hyperactivity disorders (F90) | 24 | 57.14% |
| Mental disorder, not otherwise specified (F99) | 9 | 21.43% |
| Major depressive disorder (F32) | 7 | 16.67% |
| Dysthymic disorder (F34.1) | 3 | 7.14% |
| Cannabis abuse (F12.1) | 2 | 4.76% |
| Unspecified mood [affective] disorder (F39) | 2 | 4.76% |
| Other anxiety disorders (F41) | 2 | 4.76% |
| Impulse disorders (F63) | 2 | 4.76% |
| Underweight (R63.6) | 2 | 4.76% |
| Personal history of self-harm (Z91.5) | 2 | 4.76% |
| Specific developmental disorders of speech and language (F80) | 1 | 2.38% |
| Asperger's syndrome (F84.5) | 1 | 2.38% |
| Problems related to lifestyle (Z72) | 1 | 2.38% |

* Disqualifications are not mutually exclusive so individuals can be count more than once in the table but only once per disqualification.

**Table 4**: Months from Accession to Cohort Entry

| Quantile | Cohort with Accession Record (N=1,948) |
| --- | --- |
| | **Months** |
| 100% Max | 274 |
| 99% | 228 |
| 95% | 160 |
| 90% | 119 |
| 75% Q3 | 71 |
| 50% Median | 38 |
| 25% Q1 | 17 |
| 10% | 9 |
| 5% | 7 |
| 1% | 3 |
| 0% Min | 0 |
| **Months from Accession to Cohort Entry (mean±SD)*** | 52.96±48.68 |

* Calculated only among those in the TG cohort with an accession record in AMSARA's data.

**Table 5**: End of Service Characteristics among the Transgender Cohort who have Adversely Separated

| | Cohort Adversely Separated (N=247) | |
|---|---|---|
| **ISC Code** | **N** | **%** |
| Unqualified for Active Duty - Other (1016, 2016) | 83 | 33.60% |
| Drugs (1067) | 31 | 12.55% |
| Commission of a Serious Offense (1084) | 20 | 8.10% |
| Expeditious Discharge/Unsatisfactory Performance (1086) | 17 | 6.88% |
| Discreditable Incidents - Civilian or Military (1065) | 15 | 6.07% |
| Pattern of Minor Disciplinary Infractions (1083) | 13 | 5.26% |
| Other (1099) | 13 | 5.26% |
| Character or Behavior Disorder (1060) | 12 | 4.86% |
| Failure to Meet Minimum Qualifications for Retention (1085) | 11 | 4.45% |
| Alcoholism (1064) | 7 | 2.83% |
| Trainee Discharge/Entry Level Performance and Conduct (1087) | 5 | 2.02% |
| Erroneous Enlistment or Induction (1091) | 4 | 1.62% |
| Good of the Service (in lieu of Court Martial) (1078) | 4 | 1.62% |
| Court Martial (1073) | 3 | 1.21% |
| Unfitness or Unacceptable Conduct (Other) (2081) | 2 | 0.81% |
| Failure of Selection for Promotion (2079) | 2 | 0.81% |
| Fraudulent Entry (1074) | 2 | 0.81% |
| Failure of Course of Instruction (2063) | 1 | 0.40% |
| Secretarial Authority (1090) | 1 | 0.40% |
| Sexual Perversion (1077) | 1 | 0.40% |
| **Months from Cohort Entry to Separation (mean±SD)\*** | 33.33±36.41 | |

\* Calculated only among those in the TG cohort identified as adversely separated.

**Table 6**: Characteristics of Existed Prior to Service Discharge among the Transgender Cohort

| | Cohort with an EPTS Record (N=3) | |
|---|---|---|
| **ICD Code** | **N** | **%** |
| Other specified depressive episodes (F32.89) | 1 | 33.33% |
| Adjustment disorder with depressed mood (F43.21) | 1 | 33.33% |
| Gender identity disorder, unspecified (F64.9) | 1 | 33.33% |
| **Days from Cohort Entry to Discharge (mean±SD)\*** | 41.67±41.02 | |

\* Calculated only among those in the TG cohort identified as having and EPTS discharge.

**Table 7**: Characteristics of Disability Evaluation among the Transgender Cohort

| | Cohort with a Disability Record (N=243) | |
|---|---|---|
| **Disability Disposition** | **N** | **%** |
| Retired* | 175 | 72.02% |
| Separated with severance | 46 | 18.93% |
| Separated w/out benefits | 8 | 3.29% |
| Fit | 13 | 5.35% |
| Other | 1 | 0.41% |
| **Percent Rating Categories**** | | |
| <30% | 48 | 21.62% |
| ≥30% (disability retirement) | 174 | 78.38% |
| **# of Conditions Evaluated (mean±SD)**** | 1.45±0.93 | |
| **Months from Cohort Entry to Disability Evaluation (mean±SD)**** | 20.43±13.30 | |

\* Retired category is made up of PDRL, TDRL, retained on TDRL

\*\* Excludes unrated and missing

\*\*\* Calculated only among those in the TG cohort with a disability evaluation record.

**Table 8**: VASRD Categories among the Transgender Cohort with a Disability Evaluation

| | Cohort with a Disability Record (N=243) | |
|---|---|---|
| **VASRD Categories*** | **N** | **%** |
| Psychiatric | 131 | 53.91% |
| Musculoskeletal | 68 | 27.98% |
| Neurological | 43 | 17.70% |
| Digestive | 6 | 2.47% |
| Genitourinary | 4 | 1.65% |
| Dermatologic | 3 | 1.23% |
| Cardiovascular | 3 | 1.23% |
| Respiratory | 3 | 1.23% |
| Endocrine | 2 | 0.82% |
| Infectious Disease | 2 | 0.82% |
| Eyes and Vision | 1 | 0.41% |
| Hemic/Lymphatic | 1 | 0.41% |

\* VASRD categories are not mutually exclusive so individuals can be count more than once in the table but only once per category.

**Table 9**: VASRD Codes among the Transgender Cohort with a Disability Evaluation within the Psychiatric Category

| VASRD Codes* | Cohort with a Psychiatric VASRD Code (N=131) | |
| --- | --- | --- |
| | N | % |
| Major depressive disorder (9434) | 52 | 39.69% |
| Post-traumatic stress disorder (9411) | 47 | 35.88% |
| Chronic adjustment disorder (9440) | 18 | 13.74% |
| Bipolar disorder (9432) | 12 | 9.16% |
| Generalized anxiety disorder (9400) | 5 | 3.82% |
| Dissociative amnesia; dissociative fugue, dissociative identity disorder (9416) | 1 | 0.76% |
| Panic disorder and/or agoraphobia (9412) | 1 | 0.76% |
| Somatization disorder (9421) | 1 | 0.76% |
| Specific (simple) phobia (9403) | 1 | 0.76% |

\* VASRD codes are not mutually exclusive so individuals can be count more than once in the table but only once per code.

USCA Case #25-5087    Document #2108033    Filed: 03/27/2025    Page 213 of 240

# Analysis of Medical Administrative Data on Transgender Service Members

Accession Medical Standards Analysis and Research Activity (AMSARA)

Medical Standards Analytics and Research (MSAR)

Statistics and Epidemiology Branch

Walter Reed Army Institute of Research





# AMSARA TG Studies

- Study #1
  - January 2018 accession policy change enabled to identify TG population:
    - TG Disqualification: N=24
    - TG Accession: N=1
  - No follow up studies were possible
  - Report presented at the AMSWG meeting, May 2021
- Study #2
  - Complementary administrative data analysis:
    - PHCoE TG cohort N=2,063
      - AD SMs with TG diagnosis from 2015 to 2020
    - Accession characteristics:
      - Data sources: MEPS medical screening, medical waivers and accession records
      - Data points: all medical, TG and psychiatric DQs
    - End of service outcomes:
      - Data sources: loss, disability and EPTS records
      - Data points: non-adverse separations, adverse attrition, disability and EPTS discharges
  - Examined pre-accession factors and end of service outcomes among TG SMs
  - Report presented at the AMSWG meeting, July 2021

**WRAIR** | UNCLASSIFIED    2

# **Results**

|  |  | TG % | All Accessions ~ % |
|---|---|---|---|
| Accession Characteristics | Medical DQ | 11 | 17 |
|  | Enlisted | 92 | 82 |
|  | Active Duty | 87 | 62 |
| In Service Characteristics | Army | 35 | 36 |
|  | Navy | 29 | 24 |
|  | Air Force | 24 | 20 |
|  | Marine Corps | 7 | 20 |
| End of Service Outcomes | Adverse Attrition | 12 | 12* |
|  | Disability Evaluation | 12 | 1.5 |
|  | EPTS Discharge | 0.2 | 0.9 |

\* Within 3 years of accession

Add.183

# **Findings: Characteristics**

- 80% of TG cohort initially accessed: FY11 - FY20
  - Comparing cohort to all AD
    - Higher % of enlisted (92 vs 82) and AD (87 vs 62)
    - Slightly higher % of Navy and AF, but much lower % of Marines
- Approximately 11% DQ'd at application
  - Slightly lower % of medically DQ'd at application than all AD (11 vs 17)
- Most common DQ's among TG cohort were: Eyes, Psych, Vision
  - Similar when compared to all AD
- Among the TG cohort DQ'd for psych
  - Most common DQ's were ADHD (60%), unspecified mental disorder (20%), and major depressive disorder (17%)
- Median time in service to the first TG encounter: 38 months

**WRAIR** | UNCLASSIFIED 4

USCA Case #25-5087   Document #2108033   Filed: 03/27/2025   Page 222 of 240

# **Findings: Outcomes**

- TG: evaluated for disability ~20 months after their first TG encounter
- TG vs. All SM:
  - Similar adverse attrition and EPTS discharge
  - Higher disability evaluation (12 vs 1-2)
    - Similar % of retired with ≥30% disability (~72)
    - Similar most common evaluated conditions
      - Psychiatric, MSK, neurological
        - TG evaluated for psych disability: MDD and PTSD
        - All SM evaluated for psych disability: PTSD and mood disorders
- TG vs. SMs diagnosed with a psychiatric disorder:
  - Stay in service longer
  - NB: Longer in service time does not equate to deployability

**WRAIR** | UNCLASSIFIED 5

# **Key Findings**

- Comparison of TG vs. all SMs:
  - <u>Similar</u>
    - Proportion with history of any pre-accession medical DQ status
    - The distribution of specific medical DQs
    - Rates of adverse attrition
    - EPTS discharge
  - <u>Higher in TG SMs</u>
    - Disability evaluation

# EXHIBIT X

## LITERATURE REVIEW
## LEVEL OF EVIDENCE FOR GENDER-AFFIRMING TREATMENTS

**ISSUE:**

Health Affairs requested a review of existing research literature on the level of evidence for gender-affirming treatments for gender dysphoria (i.e., behavioral health, hormone therapy, and surgical procedures).

**BACKGROUND:**

Systematic reviews are a rigorous way to compile scientific evidence on health care issues like treatment, diagnosis, or prevention, aiming to minimize bias by assessing the methodological quality and overall strength of the studies. In emerging areas of research like transgender health, systematic reviews face limitations (e.g., lack of available research, methodological differences, evolving treatments, lack of research funding) making it difficult to draw clear conclusions on the strength of the evidence.

The levels of evidence hierarchy range from low (expert opinion, case reports, case series), moderate (cohort studies, case-control studies), and high (meta-analyses, systematic reviews, randomized control trials). Higher levels of hierarchy represent strong research evidence due to rigorous study design. Notably, there are little to no randomized controls trials for transgender health due to ethical concerns and methodological challenges.

A total of 34 studies on transgender health and gender-affirming treatments were included, with 30 peer-reviewed systematic reviews, two independent systematic reviews, one electronic health record review, and one follow-up study.

**DISCUSSION:**

### Behavioral Health

Six systematic reviews were included to review the level of evidence on transgender health and treatment. ***The strength of the evidence on transgender mental health and gender-affirming care is low to moderate.***

Research findings consistently show high rates of mental health disparities and the benefits of gender-affirming care, but are limited by cross-sectional study designs, reliance on self-reported data, lack of standardized assessments, and small sample sizes. Even with low to moderate research evidence, a ***consistent recommendation in the literature is that mental health care should be available before, during, and after transitioning***. The main themes of the systematic reviews on behavioral health include:

Mental Health Disparities are Driven by Discrimination and Minority Stress.
- A meta-synthesis of 42 studies found that 55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime, with higher ideation rates among transfeminine individuals and higher attempt rates among transmasculine individuals.[i]

1

- A systematic review of 165 peer-reviewed articles found that transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals, with mood disorders (1.5x higher), anxiety disorders (3.9x higher), and psychotic disorders (3.8x higher) being the most prevalent. Additionally, the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts. The higher prevalence of mental health disorders was largely driven by minority stress, discrimination, social rejection, lack of access to gender-affirming care, and increased exposure to violence and victimization.[ii]
- The risk of suicide ideation and attempts among transgender individuals increases due to gender identity-related disparities, discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization.[iii]
- A systematic review of 15 quantitative studies found that transgender individuals experience high levels of discrimination, prejudice, and bias, leading to negative mental health outcomes (e.g., psychological distress, substance abuse, eating disorders, reduced relationship quality, ineffective coping, lower self-esteem, and a higher risk of attempted suicide).[iv]
- A systematic review of 47 studies found a strong correlation between minority stress and suicidality in transgender and gender non-conforming (TGNC) adults, but the evidence quality is low, as most studies were cross-sectional, relied on self-reported measures, and lacked standardized assessments, making causality difficult to determine.[v]
- A systematic review and meta-analysis of 85 cross-sectional quantitative studies found that transgender and gender-diverse (TGD) individuals experience significantly higher rates of depression, suicidal ideation, and suicide attempts, largely driven by minority stress factors such as discrimination, social rejection, lack of gender-affirming care, and victimization.[vi]

<u>Effectiveness and Limitations of Affirmative Psychological Interventions.</u>

- A systematic review of 22 studies found that affirmative psychological interventions for transgender and non-binary (TGNB) adults and adolescents show promising improvements in depression, anxiety, suicidality, self-acceptance, coping skills, and minority stress, but evidence quality remains limited due to methodological inconsistencies, small sample sizes, and high risk of bias across studies.[vii]
- Research demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination.[viii]

## **Gender-Affirming Hormone Therapy (GAHT):**

Twelve systematic reviews were included to review the level of evidence on GAHT. ***The strength of the evidence on the effectiveness of GAHT, for physical and mental health, is generally low to moderate.***

Research findings on GAHT are typically observational, lack randomized controlled trials (RCTs), and have small sample sizes. While literature on GAHT consistently demonstrates improvements in mental health, gender dysphoria, and body composition, its long-term effects on cardiovascular

health and metabolism remain uncertain due to methodological limitations.  ***Clinical practice guidelines strongly recommend confirming the diagnosis of gender dysphoria, pre-hormone therapy medical evaluations, monitoring bone health, and an individualized approach to GAHT.***[ix]   The main themes of the systematic reviews on GAHT include:

Cardiovascular, Metabolic, and Bone Density Risks.
- A systematic review of 2 studies – 8 cross-sectional and 4 cohort studies – found that gender-affirming hormone therapy may influence the risk of subclinical atherosclerosis (i.e., plaque builds up inside the arteries) among transgender men, with the evidence being moderate.  However, the effects on cardiovascular health for transgender women may be neutral or even beneficial.[x]
- The systematic review by Connelly et al. (2021) included 14 studies encompassing a total of 1,309 transgender individuals (approximately equal numbers of transgender men and women) treated with GAHT between 1989 and 2019.  Due to methodological limitations, the authors concluded that there is insufficient data to advise the impact of GAHT on blood pressure.[xi]
- The systematic review by Kotamarti et al. (2021) analyzed 27 studies, encompassing 10,428 transgender patients undergoing GAHT.  The findings revealed that transgender women had a higher incidence of venous thromboembolism compared to transgender men, but the strength of the evidence was moderate.[xii]
- While the quality of evidence is low, it is strongly recommended that monitoring of bone mineral density occur during GAHT, especially for transgender individuals at risk of osteoporosis or who have discontinued GAHT after gonadectomy.[xiii]

Psychological Benefits.
- The Endocrine Society's clinical practice guidelines are based on evidence from two systematic reviews, as well as the best available evidence from other published systematic reviews and individual studies.  The guidelines strongly support GAHT for improving psychological well-being and reducing gender dysphoria; however, it acknowledges gaps in long-term safety data, the need for more standardized research, and the lack of high-quality evidence on optimal hormone regimens and monitoring strategies.[xiv]
- One systematic review of seven observational studies, with a total of 552 transgender participants, found that GAHT was associated with improvements in quality of life, depression, and anxiety; but the evidence quality was very low to low.[xv]
- A systematic review by Baker et al. (2021) included 20 studies reported in 22 publications.  Findings demonstrated that gender-affirming hormone therapy (GAHT) is associated with improved mental health and quality of life, but the strength of evidence was low due to small sample sizes, high risk of bias in study designs, and confounding factors such as concurrent gender-affirming surgeries.[xvi]
- A systematic review of 46 studies found that GAHT reduces psychological distress and depressive symptoms, but the evidence quality among studies was highly variable.[xvii]
- A systematic review of 38 studies found that GAHT reduces gender dysphoria and improves psychological well-being and quality of life, but the overall evidence quality is low to moderate.[xviii]
- The systematic review by Hughto and Reisner (2016) included three uncontrolled prospective cohort studies with a total of 247 transgender adults. Results found that GAHT

3

was associated with improved psychological functioning and quality of life, but the evidence is low.[xix]

Effectiveness and Limitations of GAHT.
- Endocrine Society's clinical practice guidelines are based on evidence from two systematic reviews, as well as the best available evidence from other published systematic reviews and individual studies. Most evidence levels were low or very low, except for hormone monitoring and cardiovascular risk assessment, which had moderate-quality evidence. The guidelines strongly support GAHT for improving psychological well-being and reducing gender dysphoria; however, it acknowledges gaps in long-term safety data, the need for more standardized research, and the lack of high-quality evidence on optimal hormone regimens and monitoring strategies.[xx]
- One narrative systematic review on four retrospective studies found that antiandrogens (e.g., cyproterone acetate, leuprolide, and spironolactone) effectively suppress testosterone levels in transgender women, but there is insufficient evidence comparing their impact on feminization outcomes like breast development, body fat redistribution, and facial/body hair reduction.[xxi]
- A systematic review found that gender-affirming hormone therapy (GAHT) has mixed effects on sexual function, with testosterone in transgender men generally increasing libido but sometimes reducing genital sensitivity, while estrogen in transgender women often decreases spontaneous erections and libido, though satisfaction improves with gender congruence.[xxii]
- The systematic review by Spanos et al. (2020) included 26 studies and found that GAHT is effective in altering body composition. Testosterone therapy in transgender men increased lean mass, decreased fat mass, and had no significant impact on insulin resistance, while estrogen therapy in transgender women led to decreased lean mass, increased fat mass, and may worsen insulin resistance. However, the overall strength of evidence was moderate to low largely due to a lack of long-term data.[xxiii]

## Gender-Affirming Surgery (GAS)

Fifteen systematic reviews, one follow-up study, and one database study were included to review the level of evidence on GAS. ***The strength of the evidence on the effectiveness of GAS are generally low to moderate.***

The literature review highlights that GAS is associated with high patient satisfaction, reduced gender dysphoria, and improvements in mental health, including decreased anxiety, depression, and suicidality. While complication rates for top surgeries and facial feminization are relatively low, genital surgeries such as phalloplasty and vaginoplasty present higher risks. Despite these challenges, long-term studies show that regret rates are extremely low, with most individuals reporting improved quality of life, body image satisfaction, and overall well-being. ***The research recommends standardized assessment tools, long-term follow-up, and higher-quality research to determine the long-term safety and effectiveness of GAS procedures.*** The main themes of the systematic reviews on GAS include:

4

Patient Satisfaction and Quality of Life.

- A narrative review of current research concluded that GAS decrease rates of gender dysphoria, depression, and suicidality, and significantly improve quality-of-life measures. However, the strength of the evidence is moderate due to inconsistent approaches in measuring post-operative behavioral health impacts.[xxiv]
- The Hayes 2018 and 2020 independent reports[1] on GAS found that while transgender individuals typically experienced high satisfaction, reduced gender dysphoria symptoms and improved body image satisfaction, the overall quality of evidence is low. Across the two reports, findings showed persistent limitations such as small sample sizes, lack of control groups, and short follow-up periods.[xxv, xxvi]
- A systematic review of 79 studies found GAS to be associated with high levels of surgical satisfaction and improved quality of life for transgender individuals at least one-year post-surgery. Additionally, the majority of patients reported reduced gender dysphoria, increased body satisfaction, and overall psychological well-being. However, due to methodological limitations, the evidence strength was low to moderate.[xxvii]
- The systematic reviews by Oles et al. (2022) found that GAS, including chest masculinization, breast augmentation, facial feminization, voice surgery and genitoplasty (vaginoplasty, phalloplasty, metoidioplasty, and oophorectomy/colpectomy), generally had high patient satisfaction rates but the strength of the evidence is moderate.[xxviii, xxix]
- A 40-year follow-up study with 15 participants found that patient satisfaction with GAS remained high, with improved body congruency, reduced gender dysphoria, and persistent mental health benefits, including lower rates of suicidal ideation and depression. Despite high complication rates for some procedures (i.e., phalloplasty and vaginoplasty), none of the participants expressed regret.[xxx]
- A systematic review of 54 studies found reduced suicide attempts, anxiety, depression, and gender dysphoria, as well as higher levels of life satisfaction and happiness. However, the strength of the evidence was moderate due to methodological differences.[xxxi]
- The systematic review by Wernick et al. (2019) included 33 studies and found that GAS (i.e., facial feminization or masculinization, vocal feminization, breast augmentation, mastectomy, chest reconstruction, metoidioplasty, orchiectomy, salpingo-oophorectomy, vaginoplasty, or phalloplasty) often led to significant improvements in quality of life, body image/satisfaction, and overall psychiatric functioning." However, predictive conclusions cannot be drawn due to methodological variability.[xxxii]

Risks and Complications.

- A narrative review of current research concluded that complication rates for gender-affirming mastectomy and breast augmentation are very low, while those for genital surgeries are also reasonably low.[xxxiii]
- The systematic review and meta-analysis by Ding et al. (2023) included 27 studies comprising a total of 3,388 transgender women who underwent penile inversion vaginoplasty. Results found that the risks were low, but notable, for urinary complications (e.g., incontinence, urethral strictures) and emphasized the importance of postoperative follow-up.[xxxiv]

---

[1] The Hayes reports are independently produced and were not located in peer-reviewed journals.

Add.192

- A systematic review of 21 studies highlighted the increased risk for surgical complications among transgender men undergoing phalloplasty and metoidioplasty, but the strength of the evidence was low to moderate due to the literature consisting of mostly observational or retrospective studies.[xxxv]
- The evidence on the impact of GAS on sexual function is low to moderate quality. Research revealed mixed effects on sexual function, with many transgender individuals reporting improved body image and satisfaction, but also a notable prevalence of sexual dysfunction, including reduced genital sensitivity and orgasmic difficulties, particularly after vaginoplasty and phalloplasty.[xxxvi]
- One study reviewed a database of 4,114 patients who underwent GAS and found that in four years (2015-2019), GAS increased by 400%, with masculinizing procedures being the most common. An overall GAS complication rate was 6%, with bottom surgeries having the highest complication rate at 8%, which was influenced by factors like age and body mass index.[xxxvii]

Surgical Regret.

- A systematic review and meta-analysis of 7,928 transgender individuals found an extremely low prevalence of regret (1%) after GAS, with minor regret being more common. Notably, transfeminine surgeries (e.g., vaginoplasty) had a slightly higher regret rate (1%) compared to transmasculine surgeries (e.g., phalloplasty and mastectomy, <1%), though overall regret rates remained extremely low.[xxxviii]
- Another systematic review of 29 studies found that regret rates for GAS were extremely low (1.94%), but the evidence was limited by retrospective study designs. Vaginoplasty had the highest regret rate (4.0%) among transfeminine individuals, while phalloplasty had a notable regret rate among transmasculine individuals, though lower overall (0.8%).[xxxix]
- A systematic review found regret rates for GAS are significantly lower (<1%) compared to elective surgeries among cisgender individuals (0%-47.1% for breast reconstruction, 5.1%-9.1% for breast augmentation, and 10.82%-33.3% for body contouring).[xl]

**Summary**

While systematic reviews and meta-analyses provide valuable insights, methodological inconsistencies, high risk of bias, and a scarcity of longitudinal, randomized controlled trials weaken the ability to draw definitive causal conclusions. The strength of the evidence reviewed was:

- Low to moderate for mental health treatment among six systematic reviews.
- Low to moderate on GAHT among twelve systematic reviews.
- Low to moderate for GAS among fifteen systematic reviews.

Notably, there is sufficient research evidence that indicates barriers to accessing gender-affirming care and discrimination are key contributors to healthcare disparities and worsened mental health outcomes for transgender individuals. More high-quality, long-term research is needed to strengthen the evidence base and guide best practices in transgender healthcare.

[i] Adams N, Hitomi M, Moody C. Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. *Transgender Health.* 2017;2(1):60-75. doi:10.1089/trgh.2016.0036.

[ii] Pinna F, Paribello P, Somaini G, et al. Mental health in transgender individuals: A systematic review. *International Review of Psychiatry.* 2022;34(3-4):292-359. doi:10.1080/09540261.2022.2093629

[iii] Adams N, Hitomi M, Moody C. Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. *Transgender Health.* 2017;2(1):60-75. doi:10.1089/trgh.2016.0036.

[iv] Drabish K, Theeke LA. Health impact of stigma, discrimination, prejudice, and bias experienced by transgender people: a systematic review of quantitative studies. *Issues Ment Health Nurs.* 2022;43(2):111-118. doi:10.1080/01612840.2021.1961330.

[v] Gosling H, Pratt D, Montgomery H, Lea J. The relationship between minority stress factors and suicidal ideation and behaviors amongst transgender and gender non-conforming adults: A systematic review. *Journal of Affective Disorders.* 2022;303:31-51. doi:10.1016/j.jad.2021.12.091

[vi] Pellicane MJ, Ciesla JA. Associations between minority stress, depression, and suicidal ideation and attempts in transgender and gender diverse (TGD) individuals: Systematic review and meta-analysis. *Clinical Psychology Review.* 2022;91:102113. doi:10.1016/j.cpr.2021.102113.

[vii] Expósito-Campos P, Pérez-Fernández JI, Salaberria K. Empirically supported affirmative psychological interventions for transgender and non-binary youth and adults: A systematic review. *Clinical Psychology Review.* 2023;100:102229. doi:10.1016/j.cpr.2022.102229.

[viii] Pellicane MJ, Ciesla JA. Associations between minority stress, depression, and suicidal ideation and attempts in transgender and gender diverse (TGD) individuals: Systematic review and meta-analysis. *Clinical Psychology Review.* 2022;91:102113. doi:10.1016/j.cpr.2021.102113.

[ix] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[x] Allgayer RM, da Silva Borba G, Moraes RS, Ramos RB, Spritzer PM. The effect of gender-affirming hormone therapy on the risk of subclinical atherosclerosis in the transgender population: a systematic review. *Endocr Pract.* 2023;29(6):498-507. doi:10.1016/j.endpr.2023.02.005.

[xi] Connelly PJ, Clark A, Touyz RM, Delles C. Transgender adults, gender-affirming hormone therapy, and blood pressure: A systematic review. *Journal of Hypertension.* 2021;39(2):223-230. doi:10.1097/HJH.0000000000002632

xii Kotamarti VS, Greige N, Heiman AJ, Patel A, Ricci JA. Risk for venous thromboembolism in transgender patients undergoing cross-sex hormone treatment: a systematic review. *J Sex Med.* 2021;18(7):1280-1291. doi:10.1016/j.jsxm.2021.06.009.

xiii Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

xiv Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

xv Rowniak S, Bolt L, Sharifi C. Effect of cross-sex hormones on the quality of life, depression, and anxiety of transgender individuals: A quantitative systematic review. *JBI Database of Systematic Reviews and Implementation Reports.* 2019;17(9):1826–1854. doi:10.11124/JBISRIR-2017-003869

xvi Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society.* 2021;5(4):bvab011. doi:10.1210/jendso/bvab011

xvii Doyle DM, Lewis TOG, Barreto M. A systematic review of psychosocial functioning changes after gender-affirming hormone therapy among transgender people. *Nature Human Behavior.* 2023;7(8):1320-1331. doi:10.1038/s41562-023-01605-w

xviii van Leerdam TR, Zajac JD, Cheung AS. The effect of gender-affirming hormones on gender dysphoria, quality of life, and psychological functioning in transgender individuals: A systematic review. *Transgender Health.* 2023;8(1):6-21. doi:10.1089/trgh.2020.0094

xix White Hughto JM, Reisner SL. A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health.* 2016;1(1):21-31. doi:10.1089/trgh.2015.0008

xx Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

xxi Angus LM, Nolan BJ, Zajac JD, Cheung AS. A systematic review of antiandrogens and feminization in transgender women. *Clinical Endocrinology (Oxf).* 2021;94(5):743-752. doi:10.1111/cen.14329.

xxii Mattawanon N, Charoenkwan K, Tangpricha V. Sexual dysfunction in transgender people: A systematic review. *Urologic Clinics North America.* 2021;48(4):437-460. doi:10.1016/j.ucl.2021.06.004

xxiii Spanos C, Bretherton I, Zajac JD, Cheung AS. Effects of gender-affirming hormone therapy on insulin resistance and body composition in transgender individuals: A systematic review. *World Journal of Diabetes.* 2020;11(3):66-77. doi:10.4239/wjd.v11.i3.66

xxiv Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: what we know, and what we need to know. *Surgery.* 2021;170(1):336-340. doi:10.1016/j.surg.2021.03.032.

8

[xxv] Hayes, Inc. Sex reassignment surgery for the treatment of gender dysphoria. *Winifred S. Hayes, Inc.* August 1, 2018.

[xxvi] Hayes, Inc. Sex reassignment surgery for the treatment of gender dysphoria: Annual update. *Winifred S. Hayes, Inc.* September 1, 2020.

[xxvii] Javier C, Crimston CR, Barlow FK. Surgical satisfaction and quality of life outcomes reported by transgender men and women at least one year post gender-affirming surgery: A systematic literature review. *International Journal of Transgender Health.* 2022;23(3):255-273. doi:10.1080/26895269.2022.2046110.

[xxviii] Oles N, Darrach H, Landford W, Garza M, Twose C, Park CS, Tran P, Schechter LS, Lau B, Coon D. Gender affirming surgery: a comprehensive, systematic review of all peer-reviewed literature and methods of assessing patient-centered outcomes (part 1: breast/chest, face, and voice). *Ann Surg.* 2022;275(1):e52-e66. doi:10.1097/SLA.0000000000004870.

[xxix] Oles N, Darrach H, Landford W, et al. Gender-affirming surgery: A comprehensive, systematic review of all peer-reviewed literature and methods of assessing patient-centered outcomes (Part 2: Genital Reconstruction). *Annals of Surgery.* 2022;275(1):e67-e74. doi:10.1097/SLA.0000000000004717.

[xxx] Park RH, Liu Y-T, Samuel A, et al. Long-term outcomes after gender-affirming surgery: 40-year follow-up study. *Ann Plast Surg.* 2022;89(4):431-436. doi:10.1097/SAP.0000000000003233.

[xxxi] Swan J, Phillips TM, Sanders T, Mullens AB, Debattista J, Brömdal A. Mental health and quality of life outcomes of gender-affirming surgery: A systematic literature review. *Journal of Gay & Lesbian Mental Health.* 2023;0(0):1-19. doi:10.1080/19359705.2021.2016537

[xxxii] Wernick JA, Busa S, Matouk K, Nicholson J, Janssen A. A systematic review of the psychological benefits of gender-affirming surgery. *Urologic Clinics North America.* 2019;46(4):475-486. doi:10.1016/j.ucl.2019.07.011.

[xxxiii] Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: what we know, and what we need to know. *Surgery.* 2021;170(1):336-340. doi:10.1016/j.surg.2021.03.032.

[xxxiv] Ding C, Khondker A, Goldenberg MG, et al. Urinary complications after penile inversion vaginoplasty in transgender women: Systematic review and meta-analysis. *Canadian Urological Association Journal.* 2023;17(4):121-128. doi:10.5489/cuaj.8108.

[xxxv] Hu C-H, Chang C-J, Wang S-W, Chang K-V. A systematic review and meta-analysis of urethral complications and outcomes in transgender men. *Journal of Plastic, Reconstructive & Aesthetic Surgery.* 2022;75(1):10-24. doi:10.1016/j.bjps.2021.08.006.

[xxxvi] Mattawanon N, Charoenkwan K, Tangpricha V. Sexual dysfunction in transgender people: A systematic review. *Urologic Clinics North America.* 2021;48(4):437-460. doi:10.1016/j.ucl.2021.06.004

[xxxvii] Scott KB, Thuman J, Jain A, Gregoski M, Herrera F. Gender-affirming surgeries: A national surgical quality improvement project database analyzing demographics, trends, and

outcomes. *Annals of Plastic Surgery.* 2022;88(Suppl 5):S501-S507. doi:10.1097/SAP.0000000000003157.

[xxxviii] Bustos VP, Bustos SS, Escandón JM, et al. Regret after gender affirmation surgery: A systematic review and meta-analysis of prevalence. *Plastic and Reconstructive Surgery–Global Open.* 2021;9(12):e3510. doi:10.1097/GOX.0000000000003510.

[xxxix] Ren T, Galenchik-Chan A, Erlichman Z, Krajewski A. Prevalence of regret in gender-affirming surgery: A systematic review. *Annals of Plastic Surgery.* 2024;92(5):597-602. doi:10.1097/SAP.0000000000003895

[xl] Thornton SM, Edalatpour A, Gast KM. A systematic review of patient regret after surgery: A common phenomenon in many specialties but rare within gender-affirmation surgery. *The American Journal of Surgery.* 2024;234:68-73. doi:10.1016/j.amjsurg.2024.04.021

10



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
1500 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1500

MAR 0 4 2025

**MANPOWER AND
RESERVE AFFAIRS**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                COMMANDERS OF THE COMBATANT COMMANDS
                DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers

      Pursuant to the attached Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025, it is Department policy that the medical, surgical, and mental health constraints on individuals who meet the following criteria are incompatible with military service:

1. Individuals with a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

2. Individuals with a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition.

      Service members and applicants for military service disqualified pursuant to the attached memorandum may be considered for a retention or accession waiver on a case-by-case basis where there is a compelling Government interest in either retaining or accessing such individuals that directly supports the Department's warfighting capabilities.

      A compelling Government interest that directly supports warfighting capabilities includes special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department, if such experience, training, and education is directly related to the operational needs of the Military Service concerned. The authority to grant a waiver pursuant to this memorandum shall not be further delegated.

      To be eligible for such a waiver, the Service member or applicant for military service must meet the following criteria:

1. The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

2. The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

3.  The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

In accordance with the reporting requirement in section 7 of the attachment, the Military Services shall track and report on approved retention waivers for Service members retained and approved accession waivers for all applicants who access into a branch or component of the Military Services.

Tim Dill
Performing the Duties of the Assistant
    Secretary of Defense for Manpower and
    Reserve Affairs

Attachment:
As stated

cc:
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy & Oversight (HSP&O)
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

PERSONNEL AND
READINESS

MAR 2 1 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                   COMMANDERS OF THE COMBATANT COMMANDS
                   DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Prioritizing Military Excellence and Readiness: Military Department Identification

    This memorandum is not to be implemented at this time due to the preliminary injunction issued in *Talbott v. United States*, No. 1:25-cv-240-ACR (D.D.C. Mar. 18, 2025). When the court order is modified or lifted, this memorandum will be updated accordingly.

    As directed in Office of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025 (Attachment 1), it is Department policy that Service members[1] who have a current diagnosis or history of, or exhibit symptoms consistent with,[2] gender dysphoria are no longer eligible for military service and will be processed for separation. This memorandum provides guidance to assist the Military Departments in identifying such Service members.

    Department policy also requires that Service members abide by the standards of their biological sex. As reiterated in the February 26, 2025 memorandum, "[w]here a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex," and a person's sex refers to their immutable biological classification as either male or female. The Secretaries of the Military Departments are directed to require adherence to these requirements associated with an individual's sex, and address non-compliance with these requirements by Service members appropriately.

Records Review

    The primary means of identifying Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria who are no longer eligible for military service will be through reviewing medical records. All reviews of medical records or other protected health information will be conducted in accordance with DoD Manual 6025.18,

---

[1] For the purposes of this guidance, the term "Service member" includes cadets and midshipmen admitted to a Military Service Academy and cadets and midshipmen enrolled as members of a Reserve Officers' Training Corps (ROTC) program.
[2] The phrase "exhibit symptoms consistent with gender dysphoria" refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders (Attachment 2). This language applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis (i.e., a marked incongruence and clinically significant distress or impairment for at least 6 months).

"Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs," March 13, 2019.

<u>Medical Readiness</u>

The Secretaries of the Military Departments have the authority to direct unit commanders, in coordination with supporting medical assets, to require that all Service members comply with their obligations pursuant to the Individual Medical Readiness (IMR) program and any Military Service-specific IMR guidance. The primary means of assessing medical readiness is the DoD Periodic Health Assessment (PHA), conducted at least annually for all Service members.

Per DoD Instruction 6025.19, "Individual Medical Readiness Program," July 13, 2022, IMR is a Military Service, command, and individual Service member responsibility. As a condition of continued participation in military service, Service members have a responsibility to report medical issues (including physical, dental, and mental/behavioral health) that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service to their chain of command.

Within 45 days of this guidance, the PHA self-assessment questionnaire will be modified to require Service members to attest whether they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria. This attestation will be a standard part of the self-assessment done in conjunction with the annual PHA.

If, during a PHA, a Service Member is identified as having a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria, the facility or location conducting the PHA will be responsible for conducting or coordinating any follow-up medical evaluation, if necessary, and for notifying the Service member's command. Further, such a Service Member must be categorized as "Not Medically Ready" and non-deployable, in accordance with DoD Instruction 6025.19. Service members who do not meet the minimum standards for military service retention, in accordance with Attachment 1, will be recommended for administrative separation or, where appropriate, enrolled in the Disability Evaluation System (e.g., where a co-morbidity or other qualifying condition is present).

<u>Involuntary Separation</u>

Service members identified under the processes detailed in this memorandum and not granted a waiver pursuant to the February 26, 2025 memorandum and the Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance of Prioritizing Military Excellence and Readiness: Retention and Accession Waivers," March 4, 2025 (Attachment 3), will be processed for involuntary separation. Service members pending involuntary separation may elect to self-identify for separation.

The policy guidance in this memorandum supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda.

Jules W. Hurst III
Performing the Duties of the Under Secretary of
Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force

*DSM-5 Criteria for Gender Dysphoria*[1]

A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 months in duration, as manifested by at least two of the following:

A.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)

B.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)

C.  A strong desire for the primary and/or secondary sex characteristics of the other gender

D.  A strong desire to be of the other gender (or some alternative gender different from one's designated gender)

E.  A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)

F.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Specify if:
A.  The condition exists with a disorder of sex development.

B.  The condition is post-transitional, in that the individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one sex-related medical procedure or treatment regimen—namely, regular sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in natal males; mastectomy or phalloplasty in natal females).

---

[1] Diagnostic and statistical manual of mental disorders (DSM-5). American Psychiatric Pub.