**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5087

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**NICOLAS TALBOTT *et al.*,**

Plaintiffs-Appellees,

v.

**UNITED STATES OF AMERICA *et al.*,**

Defendants-Appellants.

ON APPEAL FROM THE DISTRICT COURT
OF THE DISTRICT OF COLUMBIA
No. 25-cv-240 (ACR)
(The Honorable Ana C. Reyes)

**PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO
DEFENDANTS-APPELLANTS' REQUEST FOR
ADMINISTRATIVE STAY**

_____

Jennifer Levi
GLBTQ Legal Advocates &
Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter
Christopher Stoll
National Center for Lesbian Rights
870 Market Street, Suite 370 San
Francisco, CA 94102
Telephone: (415) 392-6257

(continued on next page)

| | |
|---|---|
| Joseph J. Wardenski* | Sara E. Kropf |
| WARDENSKI P.C. | KROPF MOSELEY PLLC |
| 134 West 29th Street, Suite 709 | 1100 H Street, NW Ste 1220 |
| New York, NY 10001 | Washington, DC 20003 |
| Telephone: (347) 913-3311 | Telephone: (202) 627-6900 |

* *Application for admission forthcoming*

*Counsel for Plaintiffs-Appellees*

March 27, 2025

The unique circumstances of this case weigh against granting an administrative stay because doing so would alter the status quo and increase—not limit—harm. *United States v. Texas*, 144 S. Ct. 797, 798 (Barrett, J., concurring in denial of application for stay). The purpose of an administrative stay is to preserve the status quo while giving the Court a sufficient opportunity to consider the merits of a motion for stay. *See D.C. Circuit Handbook of Practice and Internal Procedures* 33 (2024). In this case, however, due to Defendants' March 28 deadline for initiating administrative separation proceedings against transgender service members, granting an administrative stay would alter a status quo that has existed for years in a way that would greatly multiply the harms to Plaintiffs. **The effect of an administrative stay would be to allow those separations to start immediately, disrupting a status quo that has been in place for many years.** Add. 79 (entry of the preliminary injunction "maintain[s] the status quo of policies that have governed the military for years.").

The Hegseth Policy reverses years of demonstrated successful service by transgender personnel dating from as early as 2015 and stretching across multiple administrations. *See* Cisneros Decl., ECF No. 72-74, ¶ 22. Since 2021, thousands of transgender individuals have been serving openly in the U.S. military pursuant to the policy adopted by then-Secretary of Defense Austin, which allowed transgender individuals to serve openly provided they met the same standards as others. Add.

3

13–15. Importantly, however, some transgender service members have been serving openly since 2015, when then Secretary of Defense Carter ordered that no transgender service member be discharged without his permission, pending the results of a comprehensive study of the issue by the Rand Institute and a military working group. Wagner Decl., ECF No. 72-59, ¶¶ 9, 13. Based on the results of that study, Secretary Carter adopted a policy permitting open service by transgender troops. *Id.* ¶¶ 14–17. When President Trump sought to reverse that policy and ban transgender service in 2017, the District Court issued a preliminary injunction halting the policy from going into effect. *Doe 1 v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017). Following that decision, this Court denied an administrative stay and a stay pending appeal. *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389 (D.C. Circuit Dec. 22, 2017). Several months later, Secretary of Defense James Mattis implemented a modified policy that permitted transgender individuals who had been serving in reliance on the Carter Policy to continue doing so. Mattis Policy, ECF No. 73-08 at 42. As a result, some transgender service members have been serving openly for as long as ten years, and thousands have been doing so since 2021.

In contrast to the Mattis Policy, which retained transgender service members who were already serving and meeting military standards, the Hegseth Policy seeks to immediately discharge *all* transgender troops, including the Plaintiffs-Appellees in this case, simply because they are transgender and regardless of their service

4

records, accomplishments, training, skills, expertise, or ability to meet standards. Under the terms of the Hegseth Policy, and as Defendants-Appellants state, **involuntary separation proceedings for transgender service members will start tomorrow, March 28, 2025**. Memorandum from Jules W. Hurst III, Performing the Duties of the Under Sec. of Def. for Personnel and Readiness to Senior Pentagon Leadership, Commanders of the Combatant Commands, and Def. Agency and DOD Field Activity Dirs. (Mar. 21, 2025), ECF No. 93-1.

The District Court found that the Hegseth Policy applies to all active-duty Plaintiffs-Appellees, each of whom is a transgender person who has transitioned or taken steps to transition to a sex different than their birth sex and all of whom will be discharged. Add. 41-42 ("Each active-duty Plaintiff is subject to the Hegseth Policy, no Plaintiff is eligible for a waiver, and the military will discharge each one."). As the District Court explained, while "the word transgender does not appear on its pages," the Hegseth Policy "is nonetheless aimed squarely at transgender persons, banning everyone:

- with a current diagnosis of gender dysphoria;

- with a history of gender dysphoria;

- who exhibits symptoms consistent with gender dysphoria;

- with a history of cross-sex hormone therapy (as treatment for gender dysphoria or in pursuit of sex transition)

5

• with a history of sex reassignment or genital reconstruction surgery (same);

• who has transitioned or attempted to transition to a sex other than their birth sex; and,

• who is not willing to serve in their birth sex."

Add. 23-24 (citing Hegseth Policy at 3–6).

The Hegseth Policy is also unique in its use of administrative separation, a particularly severe form of discharge. Soper Decl., ECF No. 72-82, ¶ 11; 2d Supp. Cisneros Decl., ECF No. 72-76, ¶ 4.  Even the restrictive Mattis policy, which excluded transgender people other than those grandfathered in, did not subject transgender personnel to administrative separation. Mattis Policy, ECF No. 73-08 at 42.  The Hegseth policy takes the extraordinary step of subjecting transgender service members to an involuntary separation procedure typically reserved for serious misconduct or failure to meet standards. Soper Decl., ¶¶ 11–12; 2d Supp. Cisneros Decl., ¶¶ 3-4. These proceedings leave a unique and serious stain on a service member's record—despite these individuals continuing to meet all military requirements and often demonstrating exemplary leadership and performance. Soper Decl., ¶¶ 14, 16.

These unique circumstances—the Hegseth policy's stark reversal of the status quo and its use of a particularly harsh and stigmatizing procedure—underscore why **granting an administrative stay is not appropriate given the March 28 timeline**

6

**for initiating separation proceedings**. Whereas an administrative stay normally preserves the status quo for a short period to provide time for this Court to consider the merits of a stay, here the opposite is true. Granting an administrative stay would trigger an explosive and harmful trip wire, causing reputational, professional, and constitutional harm that can never be fully undone. Once initiated, an involuntary separation proceeding is not easily undone, and the shame and opprobrium of being forced into that process (even if later reversed) causes irreparable harm. Soper Decl., ¶¶ 8–12; 2d Supp. Cisneros Decl., ¶¶ 3-4. "If the Military Ban goes into effect, it will upend lives and ruin the careers of thousands of persons." Add. 33.

In contrast, preserving a status quo that has been in place for years while this Court considers the merits of Defendants' motion will cause no harm to Defendants or anyone else. Add. 79. During the proceedings below, Defendants conceded that the Plaintiffs are fit . Feb. 18 Hr'g Tr., ECF No. 58, 11:22–12:1 (Q: "The active-duty Plaintiffs are right now, as we sit here, mentally and physically fit to serve. Correct?" A: "As far as I know, your Honor. Yes."). Defendants offered no evidence that transgender service members are not performing well or failing to meet standards. Add. 79. ("The Military Ban does not cite, and Defendants have not provided, any studies or declarations that explain why maintaining the status quo pending litigation would unfairly burden the military."). Instead, they argued that no such evidence is required because courts must simply defer to military judgment, including, in this

7

case, the judgment that transgender service is "inconsistent" with "military excellence" and the "warrior ethos." Add. 4.

Regardless of whether Defendants' expansive view of military deference, even as to service members constitutional rights, is *legally* correct, it is significant that Defendants assert no *evidence* of any concrete harms that would be caused by permitting transgender service to continue (as it has for years) while this Court resolves their motion. In addition, the military already has comprehensive regulations in place to address any service member—transgender or not—who fails to meet standards, engages in conduct that violates military requirements, or fails to meet readiness concerns for any reasons. *See, e.g.,* DoDI 1332.14, ECF No. 72-84, § 5 (detailing procedures for separation of enlisted members for cause); DoDI 1332.30, ECF No. 72-85, §§ 4-5 (detailing procedures for separation of commissioned officers); Soper Decl. ¶ 13; DoDI 1332.18, ECF No. 72-86 (detailing procedures for evaluating impacts of medical conditions on readiness). These existing mechanisms provide ample authority to maintain discipline and readiness while this Court considers Defendants' motion; in contrast, allowing the ban to go into effect will wreak havoc in the lives of faithful, dedicated service members who have done nothing wrong and seek only to serve their country. Given these unique circumstances, Plaintiffs respectfully submit that no administrative stay should be granted.

Finally, to expedite this Court's review and further minimize any need for an administrative stay, Plaintiffs respectfully propose to file their opposition to Defendants' motion for a stay pending appeal by 6 p.m. ET on Friday, March 28, 2025.

DATED: March 27, 2025

Jennifer Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Joseph J. Wardenski*
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Respectfully submitted,

Shannon P. Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370 San
Francisco, CA 94102
Telephone: (415) 392-6257

Sara E. Kropf
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

*Application for admission forthcoming*

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation because it contains 1,452 words, according to Microsoft Word.

*/s/ Jennifer Levi*
Jennifer Levi

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jennifer Levi*
Jennifer Levi
