No. 25-5087

In the United States Court of Appeals
for the District of Columbia Circuit

_____

NICHOLAS TALBOTT, *et al.*,
*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA, *et al.*,
*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the District of Columbia

_____

Brief *Amicus Curiae* of
Lt. Gen. Michael T. Flynn (USA-Ret.),
America's Future,
Citizens United,
Public Advocate of the United States, Public Advocate Foundation,
U.S. Constitutional Rights Legal Defense Fund, and
Conservative Legal Defense and Education Fund
in Support of Defendants-Appellants and Reversal

_____

MICHAEL BOOS
  Washington, DC  20003
JOSEPH W. MILLER
  Fairbanks, AK  99708
J. MARK BREWER
  Johnson City, TX  78636
PATRICK M. MCSWEENEY
  Powhatan, VA  23139
RICK BOYER
  Lynchburg, VA  24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com
  Counsel for *Amici Curiae*
  *Attorney of Record
  September 30, 2025

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

### Parties and *Amici*

Except for the following, all parties, intervenors, and *amici curiae* appearing before the district court below and this Court are listed in the briefs for the parties:

*Amici curiae* are Lt. Gen. Michael T. Flynn (USA-ret.), America's Future, Citizens United, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund.

### Ruling under Review

References to the ruling at issue appear in the Appellants' Brief filed September 23, 2025.

### Related Cases

Counsel adopt and incorporate by reference parties' statements with respect to related cases.

### CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Lt. Gen. Michael T. Flynn (USA-ret.), America's Future, Citizens United, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this

ii

Corporate Disclosure Statement pursuant to Rules 26.1(b) and 29(c) of the Federal Rules of Appellate Procedure, and Rule 26.1 of the Rules of the United States Court of Appeals for the District of Columbia Circuit.

*Amici curiae* are an individual person and several non-stock, nonprofit corporations, which have no parent company, and no person or entity owns them or any part of them.

*Amici curiae* are represented herein by William J. Olson, counsel of record, and Jeremiah L. Morgan of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, VA 22180-5615; Michael Boos of Citizens United, 1006 Pennsylvania Ave. SE, Washington, DC 20003; Joseph W. Miller of Law Offices of Joseph Miller, LLC, P.O. Box 83440, Fairbanks, AK 99708; J. Mark Brewer, 209 N. Nugent Ave., Johnson City, TX 78636; Patrick M. McSweeney, 3358 John Tree Hill Road, Powhatan, VA 23139; and Rick Boyer of Integrity Law Firm, P.O. Box 10953, Lynchburg, VA 24506.

　　　　　　　　　　　　　　　　　　*/s/ William J. Olson*
　　　　　　　　　　　　　　　　　　William J. Olson

iii

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . . . . . .  i

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT

I.     THE DISTRICT COURT IMPROPERLY DISREGARDED ALL THE REASONS
       OFFERED IN SUPPORT OF THE CHANGE IN POLICY . . . . . . . . . . . . . . . . . . . . . 5

II.    THE DISTRICT COURT INJUNCTION VIOLATED THE SEPARATION OF
       POWERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.     The Constitution Does Not Empower the Judiciary to Second
              Guess the Military Personnel Readiness Policies of the
              President and Secretary of Defense. . . . . . . . . . . . . . . . . . . . . . . 9

       B.     Congress Has Delegated Its Power to the Secretary of Defense
              to Impose the Hegseth Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       C.     Congress Has Not Acted Despite Shifting Policies Concerning
              Transgender Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.   THE DISTRICT COURT'S RULING IS NOT SUPPORTED BY SUPREME
       COURT PRECEDENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

iv

IV.   THE DISTRICT COURT DISREGARDED THE PROBLEMS OF THOSE
      SUFFERING FROM GENDER DYSPHORIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

v

# TABLE OF AUTHORITIES

<u>Page</u>

**CONSTITUTION**

Article I, section 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14

Article II, section 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Amendment V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATUTES**

10 U.S.C. § 113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17

1st Congress, Chapter VII, Sess. 1, 1 Stat. 49-50 (1789) . . . . . . . . . . . . . . . 15, 16

**CASES**

*Bostock v. Clayton Cnty*, 590 U.S. 644 (2020) . . . . . . . . . . . . . . . . . . . 3, 5, 21, 23

*Chappell v. Wallace*, 462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Dep't of the Navy v. Egan*, 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gilligan v. Morgan*, 413 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Goldman v. Weinberger*, 475 U.S. 503 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kansas v. United States Dep't of Educ.,* 739 F. Supp. 3d 902 (D. Kan. 2024) . . . 22

*\*Orloff v. Willoughby*, 345 U.S. 83 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Parker v. Levy*, 417 U.S. 733 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rostker v. Goldberg*, 453 U.S. 57 (1981). . . . . . . . . . . . . . . . . . . . . . . 8, 9, 15-17

*Smith v. Whitney*, 116 U.S. 167 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Solorio v. United States*, 483 U.S. 435 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tennessee v. Cardona*, 2024 U.S. App. LEXIS 17600 (6th Cir. 2024). . . . . . . . 22

*\*Trump v. Karnoski*, 586 U.S. 1124 (2019). . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

*\*Trump v. Stockman*, 586 U.S. 1124 (2019) . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

*United States v. Eliason*, 41 U.S. 291 (1842) . . . . . . . . . . . . . . . . . . . . . . 14, 15

*\*United States v. Shilling*, 145 S. Ct. 2695 (2025) . . . . . . . . . . . . . . . . . . . . 4, 20

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025) . . . . . . . . . . . . . . . . . . . . . . 21

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). . . . . . . . . . . . . 7, 8

\* Authorities upon which we chiefly rely are marked with asterisks.

vi

**MISCELLANEOUS**

S. Dasarathan and S. Kalaivani, "Study of prevalence of sexually transmitted infections/human immunodeficiency virus and condom usage among male-to-female transgender: A retrospective analysis from a tertiary care hospital in Cehnnai," 38 INDIAN J. SEX. TRANSM. DIS. AIDS 43 (Jan.-June, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

H. Eccles, *et al.*, "Mental Disorders and Suicidality in Transgender and Gender-Diverse People," *JAMA Network Open* (Oct. 2, 2024) . . . . . . . . . 23

S. Grammel, "Old Soldiers Never Die: Prior Military Service and the Doctrine of Military Deference on the Supreme Court," 223 MIL. L. REV. 998 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. Hamilton, Federalist 78 (1788) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

J. Lewis, *et al.*, "Examining gender-specific mental health risks after gender-affirming surgery: a national database study," 22 J. SEX. MED. 645 (Apr. 15, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

J. Madison, Federalist 47 (1788) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

E. Meese, "The Solemn Duty of Government and the Military," *Heritage Foundation* (Mar. 28, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

S. Nunn, "The Fundamental Principles of the Supreme Court's Jurisprudence in Military Cases," 29 WAKE FOREST L. REV. 557 (1994) . . . . . . . . . . . . . 13

S. Rep. No. 112, 103d Cong., 1st Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J. Story, Commentaries on the Constitution of the United States, 3d ed (Little, Brown & Co. 1858) . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 18

E. Warren, "The Bill of Rights and the Military," 37 N.Y.U. L. REV. 181 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

\* Authorities upon which we chiefly rely are marked with asterisks.

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Lt. Gen. Michael T. Flynn (USA-ret.) is a 33-year veteran of the U.S. Army, the former Director of the Defense Intelligence Agency, and served as National Security Advisor to President Donald Trump in his first term. *Amici curiae* America's Future, Citizens United, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal income taxation under Section 501(c)(3) or Section 501(c)(4) of the Internal Revenue Code, which have filed hundreds of *amicus curiae* briefs in federal and state courts. Some of these *amici* filed an *amicus* brief in *Doe I v. Trump,* No. 17-5276, when the Supreme Court was considering a challenge to a similar policy during the first Trump Administration. *See* Brief *Amicus Curiae* of Public Advocate of the United States, *et al.* (Dec. 15, 2017). These *amici* also iled an *amicus* brief in the Supreme Court in support of a stay of an injunction in *United States of America v. Shilling*, No. 24A1030. *See* Brief *Amicus Curiae* of Lt. Gen. Michael T. Flynn (USA-ret.), *et al.* (May 1, 2025).

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than the *amici curiae*, its members or its counsel contributed money that was intended to fund preparing or submitting this brief.

2

## STATEMENT OF THE CASE

On January 28, 2025, President Trump revoked former President Biden's Executive Order 14004, which, for the first time in the history of the U.S. military, had eliminated most restrictions on persons identifying as "transgender" from serving in the military. *See* Brief for Appellants ("Aplt. Br.") at 11. The same day, President Trump issued Executive Order 14183, which stated, "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion," and "uniformity," among other factors, and that this "policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." 90 *Fed. Reg.* 8757 (Feb. 3, 2025).

Pursuant to EO 14183, Defense Secretary Pete Hegseth promulgated a policy that "disqualifies individuals with a history of gender dysphoria from military service, unless they obtain waivers." Aplt. Br. at 1. "The 2025 policy, like the [2018 policy under former Defense Secretary James] Mattis ... excludes individuals based on a medical condition (gender dysphoria) or related medical interventions, and requires individuals to serve in their [biological] sex." *Id.* at 40.

The plaintiffs are "trans-identifying current and aspiring servicemembers" who "allege that Executive Order 14183 and the 2025 policy violate equal protection." *Id.* at 14.

3

On March 18, 2025, the U.S. District Court for the District of Columbia ruled that "Plaintiffs are likely to succeed on their claim that the Military Ban is subject to intermediate scrutiny because it classifies based on sex and transgender status, two distinct quasi-suspect classes. Plaintiffs are also likely to succeed on their claim that the Military Ban fails intermediate scrutiny." *Talbott v. United States*, 775 F. Supp. 3d 283, 316 (D.D.C. 2025) ("*Talbott I*"). The district court applied *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), a statutory interpretation of Title VII, to a constitutional provision. *Talbott I* at 316-17. Finding that the plaintiffs face irreparable harm and that the balance of equities and the public interest favor the plaintiffs, the district court issued a preliminary injunction against the Hegseth policy, applying it nationwide in favor of the plaintiffs and any other current or aspiring servicemember similarly situated. *Id.* at 332-34. On March 26, the district court rejected a government motion to stay its decision pending appeal. *Talbott v. United States*, 775 F. Supp. 3d 445 (D.D.C. 2025). The following day, this Court granted the government's motion for an administrative stay. *Talbott v. United States*, 2025 U.S. App. LEXIS 7225 (D.C. Cir. 2025).

## SUMMARY OF ARGUMENT

The challenge brought below is not the first such challenge. During President Trump's first term, the Supreme Court was asked to resolve, and did

4

resolve, the same issue raised here — restricting who may serve in the nation's armed forces — after multiple district courts had issued injunctions against the Mattis Policy of 2018. See *Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019). On May 6, 2025, the Supreme Court did so again with respect to the Department's 2025 policy when the Court stayed a district court's preliminary injunction against the policy pending disposition of the Ninth Circuit appeal and any timely petition for a writ of certiorari, *United States v. Shilling*, 145 S. Ct. 2695 (2025).

Those decisions should have ended the case, but the district court disagreed. First, the district court basically treated this case as if it arose in a civilian, not military, context. Then it disregarded all of the compelling reasons for the rule change offered by the government. There was no deference given, and even no self-awareness of how profoundly unsupported the district court decision was. Thus far, the case has been litigated in terms of judicial deference, which is addressed in Section I, *infra*. However, there is reason to believe that the Framers of our Constitution intended that the courts would have no authority — no jurisdiction — to second-guess decisions by the Executive Branch, authorized by Congress, on matters of force readiness. Although not stated in absolute jurisdictional terms, numerous authorities advance the view that such decisions

5

belong only to the President and Congress, not the Courts.  *See* Section II, *infra*.

The district court improperly relied on the Supreme Court's *Bostock* decision, as

demonstrated in Section III, *infra*.  Lastly, these *amici* present in Section IV, *infra*,

some additional reasons that force readiness and cohesion is being damaged each

and every day that the injunction is allowed to remain in effect.

**ARGUMENT**

**I.     THE DISTRICT COURT IMPROPERLY DISREGARDED ALL THE REASONS OFFERED IN SUPPORT OF THE CHANGE IN POLICY.**

The district court treated this case as a garden-variety civil rights case

addressing discrimination outside of the military context, giving no attention to the

reasons and interests asserted by the President and the Secretary of Defense in this

case.  Until the district court's decision, it had been unquestioned that one

President's Executive Order may be overridden by a succeeding President's

Executive Order without judicial review.  However, the district court apparently

believed, to paraphrase George Orwell in <u>Animal Farm</u>, that "all executive orders

are equal, but some executive orders are more equal than others."  The district

court believed it had the authority to prefer the Biden EO over the Trump EO

because "[n]o one knows what [President Trump] relied on, if anything....  This

was rushed by any measure."  *Talbott I* at 302.

6

The court claimed that "the Hegseth Policy provide[s] nothing to support Defendants' view that transgender military service is inconsistent with military readiness," and that the prior policy "'was based on years of thoughtful policymaking supported by peer-reviewed scientific research.'" *Id.* at 303, 308.

At the same time, the district court acknowledged that the government relied on "(1) the 'SecDef Memorandum' from February 22, 2018 (i.e., the Mattis Policy); (2) 'a 2021 review conducted by . . . the Accession Medical Standards Analysis and Research Activity,' (AMSARA Report), (3) '[a] 2025 medical literature review,' (Medical Literature Review), and (4) 'a review of cost data.'" *Id.* at 303.  It appeared to concede that a presumption of deference is owed, conceding that "[t]he Mattis Policy resulted from the work over many months of 'a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders.' ...  It 'included combat veterans to ensure that our military purpose remained the foremost consideration.' *Id*.  And it 'met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of gender dysphoria.'" *Id.* But in the end, the court discounted all of the government evidence, in favor, apparently, of more "persuasive data," consisting only of four declarations

7

attached to the plaintiffs' complaint.  *Id.* at 308-09.  Translated, the district court believed the Biden policy is preferable to the Trump policy.

The Supreme Court has repeatedly counseled that "judges are not given the task of running the Army....  The military constitutes a specialized community governed by a separate discipline from that of the civilian.  Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953).

Even when considering constitutional challenges, the judiciary historically has been far more deferential to the government's judgment in military matters than in civilian matters.  As the government notes, the Supreme Court has made clear that "judicial 'review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society.'"  Aplt. Br. at 23 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).

Until now, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988).  It has been understood that courts should "indulge the widest latitude of interpretation to sustain [the President's] exclusive

8

function to command the instruments of national force, at least when turned

against the outside world for the security of our society." *Youngstown Sheet &*

*Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring).

The Supreme Court has even deferred to Congress in military matters in

cases of differential treatment between the sexes.  In 1981, the Court upheld the

male-only draft as within the elected branches' power to prescribe:

> The Senate Report, evaluating the testimony before the Committee,
> recognized that "[the] argument for registration and induction of
> women ... is not based on military necessity, but on considerations of
> equity."  S. Rep. No. 96-826, p. 158 (1980).  **Congress was certainly
> entitled, in the exercise of its constitutional powers to raise and
> regulate armies and navies, to focus on the question of military
> need rather than "equity."**  [*Rostker v. Goldberg*, 453 U.S. 57, 79-
> 80 (1981) (emphasis added).]

The district court claimed that it need not "rubber-stamp illogical judgments

based on conjecture."  *Talbott I* at 312.  However, given the "medical literature

review" cited by the government here of increased suicide risks and other mental

health issues among the "transgender" population, the Defense Department's

determinations of injury to military readiness are entitled to deference.  The case is

all the stronger given that the Hegseth Policy is essentially identical to the policy

for the history of the U.S. military until 2015.

9

As Congress was allowed in *Rostker*, the President in this case is "certainly entitled, in the exercise of [his] constitutional powers ... to focus on the question of military need rather than 'equity.'" *Rostker* at 80. It is not the job of the courts to substitute their preferred policy judgments for the considered military decisions of the President and the Defense Department. The government notes in its Brief that the role of courts is rather to "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Aplt. Br. at 28-29 (quoting *Winter v. NRDC, Inc*., 555 U.S. 7, 24 (2008). This is because "complex, subtle, and professional decisions as to the composition ... of a military force" are "essentially professional military judgments." *Winter* at 24 (citation omitted).

## II. THE DISTRICT COURT INJUNCTION VIOLATED THE SEPARATION OF POWERS.

### A. The Constitution Does Not Empower the Judiciary to Second-Guess the Military Personnel Readiness Policies of the President and Secretary of Defense.

Although this case has generally been argued in terms of judicial deference, the problem with the district court's ruling is that it had no jurisdiction whatsoever to entertain the challenge. The district court never considered whether the issue of

10

military readiness was within the constitutional authority of the courts. In truth, the district court judge had no authority to overrule the President's decision.

Under Article II, section 2 of the U.S. Constitution, the President is the nation's only Commander-in-Chief. Congress was given the power "[t]o raise and support Armies" (Art. I, sec. 8, cl. 12), "[t]o provide and maintain a Navy" (*id*. at cl. 13), and, importantly here, "[t]o make Rules for the Government and Regulation of the land and naval Forces" (*id*. at cl. 14). Article III certainly makes no mention of a role for the judiciary over military readiness decisions.[2]

The judiciary's recognition of limitations on its jurisdiction is not a matter to be taken lightly, as James Madison warned that our liberty depends upon it: "the preservation of liberty requires that the three great departments of power should be separate and distinct." *Federalist 47*. As Alexander Hamilton clearly stated, "[t]he judiciary ... has **no influence over ... the sword**...." *Federalist 78* (emphasis added). Joseph Story explained why the Framers vested command of the military in a single hand:

> The command and application of the public force … are powers so
> obviously of an executive nature, and require the exercise of qualities
> so peculiarly adapted to this [executive] department, that a well-

---

[2] *See* S. Grammel, "Old Soldiers Never Die: Prior Military Service and the Doctrine of Military Deference on the Supreme Court," 223 MIL. L. REV. 988, 992 (2015).

11

organized government can scarcely exist when they are taken away from it.  Of all the cases and concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand.  Unity of plan, promptitude, activity, and decision, are indispensable to success; and these can scarcely exist, except when a single magistrate is entrusted exclusively with the power.[3]

When the Constitution vests in Congress authority to "make Rules for the

Government and Regulation of the land and naval Forces" (Article I, sec. 8, cl.

14), Congress's plenary power to establish a complete military justice system for

service members in "service-connected" capacities has been recognized by the

Supreme Court:  "[t]his Court has long recognized that the military is, by

necessity, a specialized society separate from civilian society.  We have also

recognized that the military has, again by necessity, developed laws and traditions

of its own during its long history."  *Parker v. Levy*, 417 U.S. 733, 743 (1974).

*Parker* relied on an 1886 decision of the Supreme Court, in turn relying on

English cases, which explained the limitation of judges to decide certain matters:

> [M]ilitary or naval officers, from their training and experience in the service, are **more competent judges than the courts of common law**....  Now this procedure is founded upon the usages and customs of war, upon the regulations issued by the Sovereign, and upon old practice in the army, as to all which points common law judges have no opportunity, either from their law books or from the course of their

---

[3] J. Story, II <u>Commentaries on the Constitution of the United States</u>, 3d ed. at 360 (Little, Brown & Co.: 1858).

12

experience, to inform themselves.  [*Smith v. Whitney*, 116 U.S. 167, 178-79 (1886) (emphasis added).]

This principle has carried through the history of our country, and the Supreme Court has agreed that "[o]rderly government requires that the judiciary be ... scrupulous not to interfere with legitimate Army matters...." *Orloff* at 94.  In 1983, the High Court recognized "the special relationships that define military life" *Chappell v. Wallace*, 462 U.S. 296, 305 (1983).  Thus, "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the Military Establishment." *Id.* at 300.

Even activist, jurist, and civil libertarian Chief Justice Earl Warren acknowledged the need for the judiciary to adopt essentially a "'hands-off' attitude" to the military.  "Many of the problems of the military society are, in a sense, alien to the problems with which the judiciary is trained to deal."[4]  *See also Solorio v. United States*, 483 U.S. 435, 448 (1987) ("[t]he notion that civil courts are 'ill equipped' to establish policies regarding matters of military concern is substantiated by experience....").

---

[4]  E. Warren, "The Bill of Rights and the Military," 37 N.Y.U. L. REV. 181, 187 (1962).

13

Senator Sam Nunn (D-GA), the longtime chairman of the Senate Armed Services Committee, spoke to the unique operational reality of military service: "Military personnel policy cannot be based upon what might work in the white collar setting of a stateside garrison."[5]  He continued:

> The armed forces routinely restrict the opportunities for service on the basis of circumstances such as physical condition, age, sex, parental status, educational background, medical history, and mental aptitude. These restrictions primarily reflect professional military judgment as to **what categories of personnel contribute to overall combat effectiveness**.... [*Id*. at 559 (emphasis added).]

Then-Chairman of the Joint Chiefs of Staff General Colin Powell testified before the Senate Armed Services Committee that any threat to military cohesion, such as that being prevented by the Hegseth policy, threatens the lives of those in the military:

> To win wars, we create **cohesive teams** of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the **cohesion of the group** and for their individual buddies.  We cannot allow anything to happen which would disrupt that **feeling of cohesion** within the force.[6]

---

[5]  S. Nunn, "The Fundamental Principles of the Supreme Court's Jurisprudence in Military Cases," 29 WAKE FOREST L. REV. 557, 563 (1994).

[6]  S. Rep. No. 112, 103d Cong., 1st Sess. at 275, testimony of General Colin L. Powell, U.S. Army, Chairman of the Joint Chiefs of Staff, before the Senate Armed Services Committee (July 20, 1993) (emphasis added).

14

The principle involved has often been described as deference because courts are reluctant to accept any limitation on their own power. However, the better view is that the judiciary has no authority, no jurisdiction, to second-guess matters such as the Hegseth Doctrine affecting military readiness under equal protection rules designed and developed for the private sector. This view is strengthened by a review of Congress's constitutional powers in this area.

## B. Congress Has Delegated Its Power to the Secretary of Defense to Impose the Hegseth Policy.

Congress has broadly delegated its constitutional authority "[t]o make Rules for the Government and Regulation of the land and naval Forces" (Article I, sec. 8, cl. 14) to Secretary Hegseth:

> The Secretary is the principal assistant to the President in all matters relating to the Department of Defense. Subject to the direction of the President and to this title and section 2 of the National Security Act of 1947 (50 U.S.C. 3002) he has authority, direction, and control over the Department of Defense. [10 U.S.C. § 113(b).]

Under previous legislation, the Supreme Court asserted: "**The power of the executive to establish rules and regulations for the government of the army, is undoubted**." *United States v. Eliason*, 41 U.S. 291, 301 (1842) (emphasis added). The Court addressed the Secretary's powers:

> **The Secretary of War** is the regular constitutional organ of the President for the administration of the military establishment of the

15

nation; and rules and orders publicly promulgated through him must
be received as the acts of the executive, and as such, be binding upon
all within the sphere of his legal and constitutional authority. **Such
regulations cannot be questioned or defied, because they may be
thought unwise or mistaken**. [*Eliason* at 302 (emphasis added).]

Secretary Hegseth, operating at the direction of the President, has authority
to make the challenged determination unless expressly foreclosed by Congress.
As the Supreme Court noted in *Rostker*, an "imposing number of cases from this
Court" make clear that "judicial deference to such congressional exercise of
authority is at its apogee when legislative action under the congressional authority
to raise and support armies and make rules and regulations for their governance is
challenged." *Rostker* at 70. And it has properly recognized, "the military
authorities have been charged by the Executive and Legislative Branches with
carrying out our Nation's military policy." *Goldman* at 508.

The principle involved is not new, as Congress delegated broad authority to
the Secretary of Defense since the first Congress. On March 4, 1789, Congress
passed "An Act to establish an Executive Department, to be denominated the
Department of War." The Act provided that:

there shall be a principal officer therein, to be called the Secretary for
the Department of War, who shall perform and execute such duties as
shall from time to time be enjoined on, or entrusted to him by the
President of the United States, agreeably to the Constitution, relative
to military commissions, or to the land or naval forces, ships, or

16

warlike stores of the United States, or to such other matters respecting military or naval affairs, as the President of the United States shall assign to the said department....[7]

## C. Congress Has Not Acted Despite Shifting Policies Concerning Transgender Persons.

Today, under its authority "to raise and support armies and make rules and regulations for their governance" (*Rostker* at 70), Congress has expressly delegated to the Secretary of Defense under 10 U.S.C. § 113 the "authority, direction, and control over the Department of Defense." This includes the authority to determine which persons or classes of persons are eligible for enlistment and the terms of such enlistment.

As presidential administrations have changed over the past decade, the status of "transgender" troops has been back-and-forth. Until 2015, they could not participate in the military. In 2016, President Obama's Defense Secretary Ashton Carter changed Defense Department policy to allow "transgender" troops, with some exceptions. During President Trump's first term, Secretary Mattis again prohibited "transgender" troops, with some exceptions. President Biden's Defense Secretary, Lloyd Austin, pursuant to executive order, modified the exceptions.

---

[7] 1st Congress, Chapter VII, Sess. 1, 1 Stat. 49-50 (1789).

17

Now Secretary Hegseth has reinstated the prohibition, with limited exceptions. Aplt. Br. at 6-13.

At no point during a decade with five different policies did Congress ever step in to change the policy. At no point has Congress suggested that any of the five policies were outside the delegated discretion of the Secretary. Congress's inaction suggests strongly that none of the policies were outside the delegated authority of 10 U.S.C. § 113(b).

The Supreme Court has recognized that "'it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.'... The responsibility for determining how best our Armed Forces shall attend to that business rests with Congress ... and with the President." *Rostker* at 70-71 (citations omitted). Here, both elected branches are in accord. Secretary Hegseth has exercised his delegated authority, as did his four immediate predecessors, to determine under what conditions "transgender" troops could serve or not. The Supreme Court quite properly never has asserted authority to reverse any of those policies, and in fact has stayed two injunctions against President Trump's prior Mattis Policy. The decision here should be the same. This Court should reverse the injunction below.

18

The district court's error would have devastating consequences if allowed to continue unchecked.  Should this Court fail to reverse this unconstitutional injunction, it will have obliterated the constitutional entrustment of military decisions to the elected branches, leaving some 400 unelected judges poised to each impose their personal preferences as national military policy.  It would usher in the "very definition" of the threat Justice Story warned of:  "enfeebl[ing] the system, divid[ing] the responsibility, and not unfrequently defeat[ing] every energetic measure" the military might undertake.  Story at 360.  All "unity of plan, promptitude, activity, and decision" would be paralyzed by 400 decision-makers.  *Id.*  One President and one Secretary of Defense would be replaced by 400-plus Presidents/Secretaries in black robes.  The destruction wreaked on military readiness and capabilities would be incalculable.

Both elected branches — the only two with constitutional roles to play in military decision-making — have rendered their verdict.  The district court, with no constitutional role, disagrees.  This Court's responsibility is to overrule the district court's usurpation of authority to make decisions constitutionally reserved to the other branches.

19

Indeed, as the Supreme Court has recognized, "it is difficult to conceive of an area of governmental activity in which the courts have less competence."

*Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Accordingly, it held:

> The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The **ultimate responsibility** for these decisions is appropriately **vested in branches** of the government which are periodically **subject to electoral accountability**. **It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system.** [*Id*. at 10-11 (bold added).]

As is often true, former Attorney General Edwin Meese best explained the principle at stake:

> Regardless of the merits or substance of the policy in question, when judges refuse to respect the legitimate constitutional authority of the Executive and Legislative branches, and through preliminary injunctions order the military to replace long-established qualification standards with untested practices imposed by an outgoing administration, the rule of law has given way to the edict of unelected judges.[8]

---

[8] E. Meese, "The Solemn Duty of Government and the Military," *Heritage Foundation* (Mar. 28, 2018).

20

### III.   THE DISTRICT COURT'S RULING IS NOT SUPPORTED BY SUPREME COURT PRECEDENT.

Even if the judiciary has authority to address the issue, and even if it felt it owed no deference to the President and Secretary, the district court's decision is still unsupported.  The district court cherry-picked from the Supreme Court's decisions to support its position.  It completely ignored the Supreme Court's grants of stays of injunctions with respect to the Mattis Policy in 2019 — both in *Trump v. Karnoski*, 586 U.S. 1124 (2019), and in *Trump v. Stockman*, 586 U.S. 1124 (2019).  The district court argued that the new policy was "rushed and haphazard" and "without comprehensive review" — despite the Hegseth Policy being expressly based on its predecessor Mattis Policy, which the district court conceded "resulted from the work over many months of 'a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders.'" *Talbott I* at 303.  The district court also ignored the Supreme Court's decision this year in the nearly identical case of *United States v. Shilling*, 145 S. Ct. 2695 (2025).  *Shilling*, like *Karnoski* and *Stockman,* stayed a district court injunction against the Hegseth Policy.

The district court grounded its opinion in the "equal protection component" of the Fifth Amendment.   The district court states that the Hegseth Policy

21

"classifies based on sex and transgender status," which it declared to be "two distinct quasi-suspect classes." *Talbott I* at 316. The district court then superimposed this Court's statutory interpretation decision in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) upon its constitutional analysis, ignoring *Bostock's* caution against applying it in other circumstances.[9] The court likewise ignored the Supreme Court's recent decision in *United States v. Skrmetti*, which expressly declined to apply equal protection review to laws that classify on the basis of medical conditions: "[c]lassifications that turn on age or medical use are subject to only rational basis review." *United States v. Skrmetti*, 145 S. Ct. 1816, 1829 (2025). The Hegseth Policy classifies expressly based on individuals with "gender dysphoria," which the Supreme Court has recognized as "**a medical condition** characterized by persistent, clinically significant distress." *Skrmetti* at 1824 (emphasis added).

The district court states that "not all transgender persons have gender dysphoria" (*Talbott I* at 320), thereby inadvertently conceding that the Hegseth Policy classifies on the basis of medical conditions, just like the state law that the Supreme Court upheld in *Skrmetti*. Thus, the court's attempt to create a new

---

[9] *See Bostock* at 681 ("none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today").

22

suspect classification for "transgender" behavior — which the Supreme Court has never done — gives the wrong answer to a question not even properly before the court.  As one court noted, "the reasoning from *Bostock* does not automatically transfer to the Title IX context, nor does *Bostock* compel the changes to the Title IX regulations encompassed by the Final Rule." *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 921 (D. Kan. 2024).  The Sixth Circuit has noted that "Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination....  Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Tennessee v. Cardona*, 2024 U.S. App. LEXIS 17600 at *8 (6th Cir. 2024).[10]

---

[10]  *Cardona* collected numerous supportive cases, including "*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 290, 308 ... (2023) (Gorsuch, J., concurring) (distinguishing the Equal Protection Clause from Titles VI and VII); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *Brandt ex rel. Brandt v. Rutledge*, No. 21-2875, 2022 U.S. App. LEXIS 31855 ... at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., dissenting from denial of rehearing en banc)." *Id.*

23

These *amici* believe that *Bostock* was wrongly decided, as the text and history of Title VII did not compel or permit its conclusion, but even under *Bostock*, it does not require a similar result here.

## IV.   THE DISTRICT COURT DISREGARDED THE PROBLEMS OF THOSE SUFFERING FROM GENDER DYSPHORIA.

The government's policy applies to persons with "Gender Dysphoria," a mental health disorder.  EO 14183, Section 2.  The district court sought to minimize the problems suffered by such persons shown by many studies.

A 2024 Canadian study found that 64 percent of "transgender" persons reported dealing with depression, compared to 14 percent of the population in general.[11]  Also, 18 percent of "transgender" persons reported bipolar diagnoses, compared with 3 percent of the general population.  *Id.*  And 26 percent of "transgender" persons reported a substance use disorder, compared with 8 percent of the general population.  *Id.*  Tragically, 32 percent reported attempting suicide, compared to 3 percent of the general population.  *Id.*

Interestingly, another 2025 study reported that co-occurring disorders actually increased, rather than decreasing, after surgeries aimed at making the recipients' bodies appear as the opposite sex.  It found that "both male and female

---

[11]  H. Eccles, *et al.*, "Mental Disorders and Suicidality in Transgender and Gender-Diverse People," *JAMA Network Open* (Oct. 2, 2024).

24

patients with gender dysphoria who undergo gender-affirming surgery are at significantly higher risk for adverse mental health outcomes, including depression, anxiety, suicidal ideation, and substance use disorder...."[12]  Those who identify as "transgender" also experience rates of infection with sexually transmitted diseases such as AIDS (nine times the rate of the general population[13]), homelessness, and unemployment.

It does not require speculation to see the risk inherent in allowing those who suffer from serious mental health and other problems to serve in the military. Coupling a high attempted suicide rate with ready access to fully automatic firearms and other powerful weapons might not be the best of ideas.  And placing a person with a serious mental illness in the cockpit of a fighter aircraft or in a missile silo in North Dakota may jeopardize not just the military, but also the nation.

---

[12]  J. Lewis, *et al*., "Examining gender-specific mental health risks after gender-affirming surgery: a national database study," 22 J. SEX. MED. 645 (Apr. 15, 2025).

[13]  *See* S. Dasarathan and S. Kalaivani, "Study of prevalence of sexually transmitted infections/human immunodeficiency virus and condom usage among male-to-female transgender: A retrospective analysis from a tertiary care hospital in Cehnnai," 38 INDIAN J. SEX. TRANSM. DIS. AIDS 43 (Jan.-June, 2017).

25

The fact that the district court disregarded these factors confirms why the

Constitution did not vest the authority to set military readiness policies in judges.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the

district court.

Respectfully submitted,

*/s/ William J. Olson*

<table>
<tr><td>MICHAEL BOOS<br>  CITIZENS UNITED<br>  1006 Pennsylvania Ave., SE<br>  Washington, DC  20003</td><td>_____<br>WILLIAM J. OLSON*<br>JEREMIAH L. MORGAN<br>  WILLIAM J. OLSON, P.C.<br>  370 Maple Avenue West, Suite 4<br>  Vienna, VA  22180-5615</td></tr>
<tr><td>JOSEPH W. MILLER<br>  LAW OFFICES OF JOSEPH MILLER, LLC<br>  P.O. Box 83440<br>  Fairbanks, AK  99708</td><td>  (703) 356-5070<br>  wjo@mindspring.com<br>*Counsel of Record</td></tr>
<tr><td>PATRICK M. MCSWEENEY<br>  3358 John Tree Hill Road<br>  Powhatan, VA  23139</td><td>J. MARK BREWER<br>  209 N. Nugent Ave.<br>  Johnson City, TX  78636</td></tr>
<tr><td>RICK BOYER<br>  INTEGRITY LAW FIRM<br>  P.O. Box 10953<br>  Lynchburg, VA  24506</td><td>Counsel for *Amici Curiae*<br>September 30, 2025</td></tr>
</table>

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of Lt. Gen. Michael T. Flynn (USA-ret.), *et al.*, in Support of Defendants-Appellants and Reversal complies with the type-volume limitation of Rule 29(a)(5), Federal Rules of Appellate Procedure, because this brief contains 5,433 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

*/s/ William J. Olson*
_____
William J. Olson
Attorney for *Amicus Curiae*

Dated: September 30, 2025

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Lt. Gen. Michael T. Flynn (USA-ret.), *et al.*, in Support of Defendants-Appellants and Reversal, was made, this 30th day of September 2025, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*

_____

William J. Olson
Attorney for *Amicus Curiae*