**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 25-5087**

———————————————

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

**NICHOLAS TALBOTT *et al.*,**
Plaintiffs-Appellees,

v.

**UNITED STATES OF AMERICA *et al.*,**
Defendants-Appellants.

———————————————

On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-240 (ACR)
The Honorable Ana C. Reyes

———————————————

**BRIEF FOR PLAINTIFFS-APPELLEES**

———————————————

Jennifer Levi
Michael Haley
GLBTQ Legal Advocates &
Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter
Christopher F. Stoll
National Center for LGBTQ
Rights
1401 21st Street #11548
Sacramento, CA 95811
Telephone: (415) 392-6257

(continued on next page)

Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Sara E. Kropf
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

*Counsel for Plaintiffs-Appellees*

November 6, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Except for the following, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants. The states of California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Rhode Island, and Wisconsin appeared as *amici curiae* in the district court.

Lt. Gen. Michael T. Flynn (USA-Ret.), America's Future, Citizens United, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund appeared as *amici curiae* supporting Appellants in this Court.

### B. Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

i

## C. Related Cases

The case on review was not previously before this Court or any other court. There are no related cases currently pending in this Court. *Shilling v. Trump*, No. 25-2039 (9th Cir.), involves similar parties and issues.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY ..........................................................................................xii

INTRODUCTION................................................................................1

STATEMENT REGARDING JURISDICTION .......................................1

STATEMENT OF THE ISSUE ...............................................................1

STATEMENT OF THE CASE ................................................................2

    A. Nature of the Case ...................................................................2

    B. Course of Proceedings and Disposition Below ............................2

STATEMENT OF FACTS ......................................................................4

    A. Plaintiffs' Distinguished Military Service....................................4

    B. The Hegseth Policy's Group-Based Exclusion and Demeaning Characterizations .....................................................................5

    C. The Government's Reliance on Outdated and Mischaracterized Evidence ................................................................................7

    D. The Government Acknowledged Its Lack of Evidence.................9

    E. The Scant Evidence Cited by the Government Contradicted Rather than Supported its Proffered Justifications ....................9

    F. Evidence of Successful Transgender Military Service...............11

    G. The Broader Campaign Against Transgender Persons ............13

SUMMARY OF ARGUMENT .................................................................14

STANDARD OF REVIEW.....................................................................19

ARGUMENT .......................................................................................20

  I. APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM.......................................20

    A. The Hegseth Policy Violates the Equal Protection Component of the Fifth Amendment Because It Is Based on Animus Toward Transgender Persons. .............................................................20

1.  Government Actions Based on Animus Violate Equal Protection Under Any Level of Scrutiny ................................20

2.  The Hegseth Policy's Text Reveals Unmistakable Animus…22

3.  The Government's Proffered Justifications Cannot Survive Any Scrutiny....................................................24

    a.  Medical Readiness.................................................24

    b.  Unit Cohesion.....................................................27

    c.  Cost...............................................................29

4.  The Broader Context Confirms Animus...........................30

5.  The Hegseth Policy Is Fundamentally Different from the Mattis Policy For Which This Court Reversed Preliminary Relief.............................................................31

6.  The Policy Targets Transgender Status, Not Medical Conditions.....................................................37

7.  The Military Deference Doctrine Does Not Insulate the Hegseth Policy from Meaningful Review..........................42

B.  The Hegseth Policy Also Discriminates Based on Sex and Transgender Status, Independently Violating Equal Protection. .................................................................49

1.  The Hegseth Policy Discriminates Based on Sex.................49

2.  Transgender Persons Are a Quasi-Suspect Class .................53

3.  The Hegseth Policy Cannot Survive Heightened Scrutiny....54

II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT ENTRY OF A PRELIMINARY INJUNCTION ........................................................59

A.  Plaintiffs Demonstrated the Likelihood of Irreparable Harm Without an Injunction, and Defendants Showed None.........59

B.  Defendants Offered No Evidence That They or the Public Would be Harmed by an Injunction of the Hegseth Policy....62

III. THE INJUNCTION ENTERED BY THE DISTRICT COURT IS NECESSARY TO PROVIDE COMPLETE RELIEF TO THE NAMED PLAINTIFFS. ...............................................63

iv

CONCLUSION……………………………………………………....67

CERTIFICATE OF COMPLIANCE………………………………….68

CERTIFICATE OF SERVICE……………………………………….69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683
  (2024)................................................................................57

*Austin v. U.S. Navy Seals 1–26*,
  142 S. Ct. 1301 (2022) (Mem.) ....................................... 45, 46

*Bostock v. Clayton County*,
  590 U.S. 644 (2020).............................................. 16, 49, 51

*Bowen v. Gilliard*,
  483 U.S. 587 (1987)...........................................................53

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ........................................... 60

*Chappell v. Wallace*,
  462 U.S. 296 (1983)...........................................................45

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)............................................... 21, 30, 53

*Clendening v. United States*,
  143 S. Ct. 11 (2022)...........................................................45

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ...........................................................66

*Craig v. Boren*,
  429 U.S. 190 (1976)...........................................................44

*Diaz v. Brewer*,
  656 F.3d 1008 (9th Cir. 2011)............................................58

*Doe 1 v. Trump*,
  275 F. Supp. 3d 167 (D.D.C. 2017) ............................... 32, 36

*Doe 1 v. Trump*,
No. 17-5267, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) ..... 32, 35, 64

*Doe 2 v. Shanahan*,
755 F. App'x 19 (D.C. Cir. 2019) ................................................. 33, 34

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019) ............................................. 36, 37, 46

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636
(2019)........................................................................................... 57

*Doe v. Ladapo*,
737 F. Supp. 3d 1240 (N.D. Fla. 2024) ............................................. 21

*Elzie v. Aspin*,
841 F. Supp. 439 (D.D.C. 1993) .................................................. 60, 61

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
955 F.3d 106 (D.C. Cir. 2020) ............................................................ 20

*Fiallo v. Bell*,
430 U.S. 787 (1977).......................................................................... 43

*Flack v. Wis. Dep't of Health Servs.*,
395 F. Supp. 3d 1001 (W.D. Wis. 2019) ............................................ 58

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ........................................................ 50

*Frontiero v. Richardson*,
411 U.S. 677 (1973).......................................................................... 44

*Goldman v. Weinberger*,
475 U.S. 503 (1986)............................................................. 17, 44, 47

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........................................................ 62

*Graham v. Richardson*,
403 U.S. 365 (1971).......................................................................... 58

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ............................................ 16, 29, 54, 57

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024), *cert. granted,* 145 S.Ct.
   2871 (2025) ......................................................................... 16, 50, 54

*Jones v. District of Columbia*,
   177 F. Supp. 3d 542 (D.D.C. 2016) ...................................... 60

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) ............................................. 50

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) ............................................. 59

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ............................................................. 42

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ............................................................... 43

*McVeigh v. Cohen*,
   983 F. Supp. 215 (D.D.C. 1998) .......................................... 60, 61

*Mem'l Hosp. v. Maricopa Cnty.*,
   415 U.S. 250 (1974) ............................................................. 58

*Middendorf v. Henry*,
   425 U.S. 25 (1976) ............................................................... 30

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) .......................................... 60

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................. 59

*Padula v. Webster*,
   822 F.2d 97 (D.C. Cir. 1987) ............................................... 53

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894
    (2020) ........................................................................................ 57

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................. 58

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................ 59

*Roe v. Critchfield*,
    131 F.4th 975 (9th Cir. 2025) ................................................. 29

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) .................................................. 45

*Romer v. Evans*,
    517 U.S. 620 (1996) ......................................... 16, 21, 30, 48

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) ....................................................... 44, 47

*Schlessinger v. Ballard*,
    419 U.S. 498 (1975) ..................................................... 46, 47

*Serono Lab'ys, Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ............................................. 20

*Shilling v. United States*,
    773 F. Supp. 3d 1069 (W.D. Wash. 2025) ......................... 48, 59

*Singh v. Berger*,
    56 F.4th 88 (2022) ............................................. 17, 18, 45, 61

*Steffan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) (en banc) ................................. 46

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ......................................... 18, 63, 65, 66

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .......................................................... *passim*

*U.S. Navy SEALs 1–26 v. Biden,* 578 F. Supp. 3d 822 (N.D. Tex. 2022) ........................................................................... 46

*United States Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973) ................................................... 3, 20, 37

*United States v. Shilling,*
145 S. Ct. 2695 (2025) ...................................................... 48

*United States v. Skrmetti,*
145 S. Ct. 1816 (2025) ...................................... 20, 40, 41

*United States v. Virginia,*
518 U.S. 515 (1996) ........................................... 17, 55, 56

*United States v. Windsor,*
570 U.S. 744 (2013) ............................................................ 20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) .................................................. 21, 37

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
858 F.3d 1034 (7th Cir. 2017) ................................ 29, 57

*Winter v. NRDC,*
555 U.S. 7 (2008) ..................................................... 19, 59

## Statutes

28 U.S.C. § 1292(a)(1) ......................................................... 1

28 U.S.C. §§ 1331, 1343 ..................................................... 1

Tenn. Code Ann. § 68–33–102(5) ...................................... 40

## Other Authorities

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ........ 14, 30, 31

Exec. Order No. 14183, 90. Fed. Reg. 8757 (Jan. 27, 2025) ........... *passim*

Fact Sheet: President Donald J. Trump Ensures Military
    Excellence and Readiness, The White House (Jan. 27,
    2025)..................................................................................................23

U.S. Const. art. III, § 2 ............................................................................66

## GLOSSARY

**AMSARA:** Accession Medical Standards Analysis and Research Activity

## INTRODUCTION

Transgender service members with over 120 military commendations collectively— including Bronze Stars and Global War on Terrorism medals—face immediate discharge under Executive Order 14183 and its implementing policy (the "Hegseth Policy"). The district court granted a preliminary injunction blocking this categorical ban, finding it is based on unconstitutional animus toward transgender people. The evidence strongly supports the district court's order, including the Government's concession that no evidence supports its derogatory claims about transgender service members.

## STATEMENT REGARDING JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in issuing a preliminary injunction preventing enforcement of a policy barring transgender service members based on the district court's finding that the policy is unsupported by evidence and reflects animus toward transgender people?

## STATEMENT OF THE CASE

### A.    Nature of the Case

This case challenges the disqualification of transgender service members from the military under Executive Order 14183 and the Hegseth Policy. Plaintiffs are a group of current and prospective transgender service members who collectively have provided over 260 years of honorable military service, earning more than 120 commendations.[1] Despite the Government's concession that each active-duty Plaintiff meets all physical and mental standards for service,  the Hegseth Policy—which the district court found to be "soaked in animus and dripping with pretext" and containing language that is "unabashedly demeaning"—mandates their discharge because they are transgender. JA1224, 1273.

### B.    Course of Proceedings and Disposition Below

Plaintiffs filed their initial complaint on January 28, 2025, one day after President Trump issued Executive Order 14183. JA21. The Government issued implementing guidance on February 26, 2025, JA48.

---

[1] These numbers reflect the addition of 12 plaintiffs following plaintiffs' motion for a preliminary injunction but before the District Court issued its opinion. Dkt. No. 94.

Plaintiffs filed their Third Amended Complaint on March 4, 2025, and Renewed Application for Preliminary Injunction on March 7, 2025. JA37.

Following briefing and three days of oral argument spanning February 18 and 19 and March 12, 2025, the district court granted Plaintiffs' preliminary injunction motion on March 18, 2025. JA1207. The court found that Plaintiffs demonstrated: (1) a likelihood of success on their Fifth Amendment equal protection claim; (2) irreparable harm absent an injunction; and (3) that the balance of equities and public interest favored preliminary relief. JA1286.

The district court's preliminary injunction order was accompanied by a 79-page memorandum opinion. JA1210. The court concluded that under any standard of review, the Hegseth Policy would fail constitutional scrutiny because it rests on a "bare . . . desire to harm a politically unpopular group." JA1275 (quoting *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

The Government appealed on March 27, 2025, simultaneously seeking both an administrative stay and a stay of the preliminary injunction. That day, this Court granted the government's motion for an

administrative stay.[2] JA1311. On April 22, 2025, this Court held oral argument on the Government's stay motion. No order on the stay motion has yet issued, and the March 27, 2025, administrative stay remains in effect.

## STATEMENT OF FACTS

### A.    Plaintiffs' Distinguished Military Service

Plaintiffs are transgender individuals who either currently serve in or seek to enlist in the United States Armed Forces. JA1223. Transgender people live as a sex different than their birth sex or would do so if able. JA712, 736–37, 1264. The active-duty Plaintiffs have collectively served for over 260 years, deployed globally to Afghanistan, Poland, South Korea, Iraq, Kuwait, and aboard the USS Ronald Reagan and USS George W. Bush. *See, e.g.*, JA222–24, 227, 235, 242–43, 255, 334, 391, 1212, 1223; n.1, *supra*.

---

[2] The order also invited Plaintiffs to inform the Court if any action occurs that negatively impacts service members under the Hegseth Policy and request a lift of the administrative stay. JA1311. Plaintiffs did so on August 18, 2025, after the Air Force issued guidance denying transgender service members the opportunity to appear at their separation proceedings because it requires them to appear in their birth sex, which—because they have transitioned—they cannot do. Dkt. No. 2130709.

Together, Plaintiffs have earned more than 120 commendations, including a Bronze Star, two Global War on Terrorism Service Medals, two Global War on Terrorism Expeditionary Medals, numerous Meritorious Service Medals and Commendation Medals, Air and Space Outstanding Unit Awards, and the Military Outstanding Volunteer Service Medal. *See, e.g.*, JA223, 255, 377, 392, 1212; n.1, *supra*. The Government concedes that each active-duty Plaintiff has "served honorably," "satisfied the rigorous standards" of military service, is currently physically and mentally fit to serve, and that collectively they have "made America safer." Tr. (Feb. 18, 2025) at 9–14, 148; Tr. (Mar. 12, 2025) at 130; JA1213, JA1224.

## B. The Hegseth Policy's Group-Based Exclusion and Demeaning Characterizations

On January 27, 2025, seven days after taking office, President Trump issued Executive Order 14183. JA1222. The Executive Order declares that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle." Exec. Order No. 14183, 90. Fed. Reg. 8757 (Jan. 27, 2025) § 1; JA1222. It asserts that being transgender is "not

consistent with the humility and selflessness required of a service member." *Id*.; JA1211–12, 1222.

The Executive Order mandates that the Department of Defense establish standards that reflect the purpose and policy of the order and directs the Secretary of Defense to implement guidance within 30 days. *Id*. § 4; JA1222. The accompanying White House Fact Sheet accused the Biden Administration of allowing "gender insanity to pervade our military organizations" and framed the Executive Order as "RESTORING SANITY IN OUR MILITARY." JA1223.

On February 26, 2025, Secretary of Defense Hegseth issued the Hegseth Policy, declaring the next day that transgender service members are "disqualified from service without an exemption." JA48, 1229. The Hegseth Policy characterizes service by transgender individuals as "incompatible with military service" and "inconsistent" with "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." JA50, 1211, 1226. The Policy bans all service members who have transitioned or taken any steps to do so, or who cannot serve in their birth sex. JA50, 55, 1226–27, 1229–30.

The Policy claims to allow exemptions but imposes requirements that are impossible for a transgender person to meet: (1) the service member has never transitioned; (2) they have been "stable" in their birth sex for 36 consecutive months; and (3) they must serve in their birth sex. JA55, JA1226–27. These requirements are incompatible with being transgender. By definition, a transgender person does not—and cannot indefinitely—live in their birth sex. JA712. As the district court correctly found, it is an exemption "in name only." JA1230. No Plaintiffs qualify for the exemption because they have transitioned and cannot serve in their birth sex. JA1230, 1272.

Both the Department of Defense and Secretary Hegseth publicly announced via official social media accounts that under the Policy, "transgender troops are disqualified from service." JA1229 (citing @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025)).

## C.    The Government's Reliance on Outdated and Mischaracterized Evidence

The Government claims the Hegseth Policy rests on "a comprehensive study" conducted by Secretary Mattis in 2018. Br. at 20. But that study was conducted when transgender service members had served openly for only a brief period and before the military opened

7

enlistment for transgender recruits. The study relied exclusively on speculative harms, not on evidence of actual harms. JA77, JA1233. Despite eight years of actual transgender service, the Government has conducted no analysis of that service record, even though it had the capability to do so. Tr. (Mar. 12, 2025) at 146–48, 150–54, 173, 187, 191; JA1213, 1234.

The Government concedes it does not track transgender service members, has no data on how many transgender service members are currently serving, and made no effort to obtain such data before issuing the Hegseth Policy. Tr. (Mar. 12, 2025) at 136–37; JA1239. The Government concedes that the Department of Defense has conducted no analysis of how transgender persons have impacted military readiness since they began serving openly. Tr. (Mar. 12, 2025) at 146–48; JA1212, 1239–40, 1242, 1245. When asked how the military could determine that transgender persons hurt unit cohesion without any records of them doing so, defense counsel responded: "if there's not actual data to back something up, the question is a professional military judgment. Again, as I said, a prediction." Tr. (Mar. 12, 2025) at 137–38; JA1249.

### D.    The Government Acknowledged Its Lack of Evidence

Throughout three days of oral argument, the Government repeatedly acknowledged  the Hegseth Policy's lack of evidentiary foundation, conceding that it could not back up the policy's characterization of being transgender as "inconsistent with a commitment to an honorable, truthful, and disciplined lifestyle," Tr. (Mar. 12, 2025) at 188–89; JA1212; that it had no data on which service members were transgender, *id.* at 173; Dkt. No. 66 at 5; JA203, 1239; that it had conducted no analysis on transgender service members' impact on military readiness, Tr. (Mar. 12, 2025) at 46–47; JA1212, 1239–40, 1242, 1245; and that the Plaintiffs in this case are physically and mentally fit to serve. Tr. (Feb. 18, 2025) at 9–14, 148; Tr. (Mar. 12, 2025) at 130; JA1213, 1224. Rather than offering facts or data in support of the policy, the Government asked the court to defer to the military's "predictive judgment." Tr. (Mar. 12, 2025) at 42, 89; JA1248–49.

### E.    The Scant Evidence Cited by the Government Contradicted Rather than Supported its Proffered Justifications

The district court found that the Government's own evidence directly contradicted the Hegseth Policy's conclusions and instead affirmatively supported allowing plaintiffs to continue serving. The

district court characterized the Government's misrepresentations of its own sources as "inexplicably misleading." JA1235, 1237.

First, the Government misrepresented its own study on deployability. The Government cited a 2021 Accession Medical Standards Analysis and Research Activity ("AMSARA") report to claim that transgender service members have higher non-deployability rates. JA1232, 1234. In fact, the report reached the opposite conclusion: its "key finding" was that transgender service members' rates of disability conditions "were comparable to those of all service members evaluated for disability." JA139, 1234. The report explicitly stated that its non-deployability data was meaningless without comparator data for non-transgender service members—which the Government failed to provide. JA126–27, 1235.

Second, the Government relied on a 2025 medical literature review for statistics on suicide rates among transgender persons in the general population—not the rigorously screened, mentally and physically fit transgender service members already serving in the military. JA157, 189, 1236–37. Moreover, the review itself contradicted the Government's position, concluding that transgender suicide rates are driven by external

discrimination and lack of support—precisely what the Hegseth Policy imposes—and that "suicide risk among transgender . . . individuals is mitigated by access to [medical] care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination." JA189, 1237.

Finally, the Government's cost argument is pretextual. The Government claimed that $52 million over ten years in treatment costs justified the Hegseth Policy. JA1237. This amounts to 0.00057% of total military spending. JA1238. The Government provided no comparison to other routine medical costs, failed to analyze the enormous costs of discharging and replacing thousands of trained service members, and could not explain why the military spent $41 million on Viagra in 2023 alone—eight times the annual cost of all treatment for gender dysphoria—without raising similar concerns. *Id.*

## F. Evidence of Successful Transgender Military Service

The Government's speculative concerns are contradicted by actual evidence. Plaintiffs presented sworn declarations from the high-ranking military officials responsible for implementing policies allowing transgender service. JA1241–45.

Former Secretary of the Navy Carlos Del Toro testified that "transgender service members who meet the standards required for their positions serve effectively and contribute positively to unit readiness." JA729, 1242. During his three and a half years as Secretary, he reviewed thousands of disciplinary cases and could not "recollect a single disciplinary case or performance issue related directly to a service member's transgender status." JA729, 1242. He concluded that "being transgender does not inherently affect a service member's ability to meet [military] standards or to deploy worldwide" and that "any suggestion to the contrary contradicts the actual documented performance of transgender service members." JA730, 1242.

Former Assistant Secretary of the Air Force Alex Wagner testified that he was "not aware of any negative impact" on military readiness and that the policy allowing transgender service "foster[ed] openness and trust among team members, . . . thereby engender[ing] stronger unit cohesion." JA403, 1242.

Former Acting Assistant Secretary of the Army Yvette Bourcicot testified that she personally reviewed each request by a transgender service member wishing to transition and that to her "best recollection,"

"every request [she] received met the requirements of the policy, and every requesting service member met the necessary standards for serving." JA553, 1243. She "observed no negative impact from permitting transgender service in the Army or on our military capabilities." JA554, 1243.

Former Deputy Under Secretary of Defense Shawn Skelly testified that the policy allowing transgender service "enable[d] [the] military to retain highly trained and experienced service members" and that "[t]he transgender service policy has not negatively impacted readiness." JA679, 1243.

The Government challenged none of this testimony, declined to cross-examine any witnesses, and presented no contrary evidence, despite the court offering it numerous opportunities to do so. Min. Ord. Feb. 10, 2025; Tr. (Feb. 18, 2025) at 120–22, Tr. (Mar. 12, 2025) at 128–29; JA1241, JA1244–45.

## G.    The Broader Campaign Against Transgender Persons

The Hegseth Policy is part of a coordinated campaign targeting transgender individuals across federal policy.  On his first day in office President Trump signed Executive Order 14168 defining sex to preclude

13

any recognition of transgender people and revoking all prior protections. Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); JA1221, 1281. That order and related actions mandated, among other things, transferring incarcerated transgender women to men's prisons, denying medical treatment, stopping issuance of passports reflecting transgender persons' current sex, and scrubbing references to transgender people from federal websites. *Id.*; JA1145–53, 1281–83.

As the district court concluded: "[T]he flurry of government actions directed at transgender persons—denying them everything from necessary medical care to access to homeless shelters—must give pause to any court asked to consider whether one such order under review furthers a legitimate government interest free of animus." JA1283.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in granting Plaintiffs' motion for a preliminary injunction. Plaintiffs demonstrated a likelihood of success on their Fifth Amendment equal protection claim, irreparable harm absent an injunction, and that the balance of equities and public interest favor preliminary relief.

14

**1. Appellees Are Likely to Succeed on the Merits.** The Hegseth Policy violates equal protection because it is based on animus toward transgender persons. The Policy's text brands transgender service members as inherently dishonest, undisciplined, and unfit—declaring that their service is inconsistent with "honesty, humility, uniformity, and integrity." JA50. These stigmatizing characterizations lack any evidentiary support. The Government concedes it conducted no analysis of transgender service members' actual performance, has no data on their impact on military readiness, and admits that Plaintiffs themselves meet standards and have served honorably. JA1224.

The Government's justifications fail under scrutiny. Its own evidence—the 2021 AMSARA report—contradicts rather than supports the Policy, finding that transgender service members' disability rates "were comparable to those of all service members." JA139, 1234. The Government so badly misrepresented its sources that the district court found its characterizations "inexplicably misleading." JA1235, 1237. The Policy rests on 2018 data the Government admits is "woefully stale" and ignores eight years of successful transgender service. JA1269. This disconnect between the Policy's claims and the evidence demonstrates

15

that the Policy is "inexplicable by anything but animus." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The Hegseth Policy independently violates equal protection because it discriminates based on sex and transgender status, triggering heightened scrutiny. Under *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), it is "impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." The Policy requires transgender service members to serve only in their birth sex—precisely the requirement *Bostock* held constitutes unlawful sex discrimination. The district court also correctly concluded that transgender persons constitute a quasi-suspect class, as multiple circuits have held. *See Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024), *cert. granted,* 145 S.Ct. 2871 (2025); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020).

The Government cannot satisfy heightened scrutiny. It offers no substantial evidence connecting its proffered justifications to the categorical exclusion of all transgender persons. The Government points to no actual problems during eight years of open transgender service. Its reliance on hypothetical concerns and outdated data cannot justify

16

discrimination against service members whom the Government concedes meet all standards.

Military deference does not immunize policies motivated by animus or lacking evidentiary support. Even under deferential review, the Policy fails because it rests on "overbroad generalizations," *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"), rather than "considered professional judgment" based on evidence. *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986). The Government's rush to issue the Policy thirty days after the Executive Order, without any new study or analysis, and reliance on concededly unsupported negative claims about the character of transgender people, does not warrant deference.

**2. The Balance of Equities and Public Interest Favor an Injunction.** Plaintiffs suffer irreparable harm in multiple forms: the loss of constitutional freedoms; reputational injury from being branded unfit and incapable; deprivation of the equal opportunity to serve in the military—a hallmark of citizenship; denial of their ability to provide financially for themselves and their families; and the withholding of necessary medical care. This Court has recognized these harms as irreparable in *Singh v. Berger*, 56 F.4th 88 (2022), where Sikh plaintiffs

were denied the ability to serve for reasons bearing "no relationship to their ability to perform." *Id.* at 110 (citation omitted). Plaintiffs here, whom the Government concedes are fit and have served honorably, face the same serious, irreparable injuries.

In contrast, Defendants offered no evidence that the military or public would be harmed by an injunction maintaining the status quo. The district court found that the unrebutted evidence of transgender service members' successful service undermined any assertion that their continued service would harm military interests. Enforcement of an unconstitutional law is always contrary to the public interest.

**3. The Injunction's Scope Is Necessary to Provide Complete Relief.** Under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), an injunction must provide "complete relief" to plaintiffs, even if it has the "practical effect of benefiting nonparties." *Id.* at 852, 861. A narrower injunction limited to named Plaintiffs would fail to provide complete relief. First, it would require the Government to specially identify Plaintiffs to commanders as exceptions to the ban, marking them as individuals permitted to serve only by court order rather than as qualified service

members constitutionally protected from discriminatory standards. This would stain their professional reputations and limit career opportunities.

Second, throughout their careers, Plaintiffs will serve under different commanders across various units and deployments. If the ban remains in effect for all other transgender service members, each new commander Plaintiffs encounter would need to be informed that these particular individuals are exempt. This creates ongoing uncertainty about whether Plaintiffs can serve, compromises operational effectiveness, and threatens individual safety. Because the harm stems from the discriminatory rule itself, facial relief is necessary to protect Plaintiffs.

The district court did not abuse its discretion in granting the preliminary injunction. This Court should affirm.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). On appeal, this Court reviews the district

court's "findings of fact under the 'clearly erroneous' standard," *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998), its "legal conclusions *de novo*," and "its weighing of the four relevant factors for abuse of discretion." *In re Fed. Bureau of Prisons' Execution Protocol Cases,* 955 F.3d 106, 111–12 (D.C. Cir. 2020).

## ARGUMENT

## I.   APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM

### A.   The Hegseth Policy Violates the Equal Protection Component of the Fifth Amendment Because It Is Based on Animus Toward Transgender Persons.

#### 1.   Government Actions Based on Animus Violate Equal Protection Under Any Level of Scrutiny.

The Government invokes military deference, but that doctrine does not immunize policies based on animus. As the Supreme Court affirmed in *Skrmetti*, a law motivated by animus "is unconstitutional." *United States v. Skrmetti*, 145 S. Ct. 1816, 1853 (2025) (Barrett, J., concurring) (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)); *see also id.* at 1836 (opinion of the Court). Equal protection forbids government action driven by "a bare desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534. The Supreme Court has repeatedly struck down laws whose purpose was to disparage and injure disfavored groups. *United States v.*

20

*Windsor*, 570 U.S. 744, 772, 775 (2013) (invalidating Defense of Marriage Act); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (striking down zoning ordinance that "rest[ed] on an irrational prejudice against" people with intellectual disabilities); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (finding the "sheer breadth [of a challenged law] . . . so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects"). When the stated justifications for a classification are unsupported by the evidence, the classification demonstrates impermissible animus. *Id.*

Plaintiffs need not prove that animus was the sole or even primary factor. Proof that animus was "a motivating factor" requires heightened judicial scrutiny, not deference. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified.").

Once animus is shown as a motivating factor, the government must prove it would have enacted the same policy absent the discriminatory purpose. *Id.* at 270–71 n.21; *see also Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1273 (N.D. Fla. 2024) (animus "undermines the presumption of good faith

ordinarily afforded legislation"). The Government cannot meet this burden. It offers no legitimate rationale that withstands scrutiny.

### 2. The Hegseth Policy's Text Reveals Unmistakable Animus.

Unlike the laws in *Romer*, *Windsor*, and *Cleburne*—which contained no explicitly demeaning language—the Hegseth Policy is facially derogatory. It brands transgender persons as inherently deficient, dishonest, and dishonorable.

Executive Order 14183 declares that transgender persons lack "the requisite warrior ethos" to achieve "military excellence," 90 Fed. Reg. 8757, § 1 (Jan. 27, 2025); have adopted a "false 'gender identity,'" *id.*; lack "commitment to an honorable, truthful, and disciplined lifestyle," *id.*; and lack the "humility and selflessness required of a service member," *id.* It characterizes them as inconsistent with "honesty, humility, uniformity, and integrity." *Id.* § 2.

The Executive Order provides no evidence for these claims, and the Government concedes that none exists. It ignores the successful service of thousands of transgender personnel, including Plaintiffs' exemplary records. JA222–24, 227, 235. It reverses a carefully developed policy

based on extensive study without explaining what changed or conducting any new analysis.

The Hegseth Policy implementing Executive Order 14183 makes the same unsupported claims—that transgender persons cannot maintain "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." JA50. The Policy cites no evidence. The Government disclaimed any basis for these statements at the preliminary injunction hearing. Despite this lack of factual support, the Policy mandated identification and separation of transgender service members. JA50–51.

The White House Fact Sheet accompanying the Hegseth Policy proclaimed that the prior administration's policy "allowed gender insanity to pervade our military organizations" and that the Hegseth Policy is necessary for "RESTORING SANITY IN OUR MILITARY." JA1223 (quoting Fact Sheet: President Donald J. Trump Ensures Military Excellence and Readiness, The White House (Jan. 27, 2025)). The Government conceded repeatedly that it had no evidence to support these characterizations of transgender service members. Tr. (Mar. 12, 2025) at 188–89.

23

These are not neutral, fact-based policy determinations about medical readiness. They are stigmatizing pronouncements that brand an entire class of people as dishonest, dishonorable, undisciplined, boastful, selfish, insane, weak, and mentally and physically unfit. These characterizations go well beyond any statutory or policy language the Supreme Court previously has found to reveal animus. *Romer*, *Windsor*, and *Cleburne* required courts to infer discriminatory intent from more neutrally framed laws that contained none of the explicit status-based aspersions littered throughout the Executive Order and the Hegseth Policy. Here, the animus is explicit, repeated, and, by the Government's own admission, lacks evidentiary support.

### 3. The Government's Proffered Justifications Cannot Survive Any Scrutiny.

The disconnect between the Government's stated justifications and the evidence demonstrates animus. Every proffered rationale fails under scrutiny, revealing that the true purpose is to exclude transgender people.

### a. Medical Readiness

No data supports the Government's medical readiness rationale. The Government concedes it does not track transgender service members

or know how many are currently serving. It made no effort to obtain such data before issuing the Hegseth Policy. Tr. (Mar. 12, 2025) at 136–37. The Department of Defense has conducted no analysis of how transgender persons have impacted military readiness since they began serving under the Carter Policy in 2016. Tr. (Mar. 12, 2025) at 146–48, 158.

The Government conceded that the Appellees themselves meet all physical and mental standards for service. Tr. (Feb. 18, 2025) at 9–14, 148; Tr. (Mar. 12, 2025) at 130. The 2021 AMSARA report's "key finding" was that transgender service members' rates of disability conditions "were comparable to those of all service members evaluated for disability." JA139.

The Hegseth Policy's treatment of gender dysphoria exposes its false medical rationale. For every other medical condition, service members receive individualized review through the Disability Evaluation Service to determine how their condition impacts service and deployability. JA544. The Hegseth Policy eliminates this individualized assessment only for transgender service members. Instead, it subjects them to involuntary administrative separation procedures typically

reserved for serious misconduct—without any consideration of their actual fitness for service. JA55, 543-44. This departure from standard medical protocols shows that the Policy's purpose is exclusionary, not medical.

The implementation of the Hegseth Policy demonstrates that its motivation is not medical concerns but transgender status itself. The Hegseth Policy changes transgender service members' military records sex markers to their birth sex, places Plaintiffs on administrative leave for not serving in their birth sex, and bars them from their own separation proceedings unless they appear consistent with their birth sex. JA1312–22. Continued service in their military assignments and even presence at their separation proceedings rests on a requirement— being physically present in their birth sex—that Plaintiffs cannot meet. If the Policy's true concern were readiness or medical fitness, a service member's appearance would be irrelevant—changing how someone appears does not change their medical condition or their ability to serve. The fact that the Policy imposes this requirement proves it targets transgender status, not fitness.

26

The Government conducted no analysis of transgender service members' deployability. The 2021 AMSARA report—which the Government cited to claim transgender service members have higher non-deployability rates—explicitly stated that its statistic was not informative without comparator data for non-transgender service members. JA126–27, 139.

Former military leaders with direct responsibility for implementing transgender service policies testified that they observed no deployability problems. Former Secretary of the Navy Carlos Del Toro testified that "being transgender does not inherently affect a service member's ability to meet [military] standards or to deploy worldwide" and that "any suggestion to the contrary contradicts the actual documented performance of transgender service members." JA730. Former Acting Assistant Secretary of the Army Yvette Bourcicot similarly testified that she "observed no negative impact from permitting transgender service in the Army on our military capabilities." JA554.

### b.    Unit Cohesion

When asked how the military could determine that transgender persons hurt unit cohesion without any records of them doing so, defense

counsel responded: "if there's not actual data to back something up, the question is a professional military judgment. Again, as I said, a prediction." Tr. (Mar. 12, 2025) at 137–38. The Government's cohesion rationale rests on pure speculation.

The evidence contradicts this speculation. Former Assistant Secretary of the Air Force Alex Wagner testified that he was "not aware of any negative impact" on military readiness and that the policy allowing transgender service "foster[ed] openness and trust among team members, . . . thereby engender[ing] stronger unit cohesion." JA403. Former Deputy Under Secretary of Defense Shawn Skelly testified that the policy allowing transgender service "enable[d] [the] military to retain highly trained and experienced service members" and that "[t]he transgender service policy has not negatively impacted readiness." JA679.

Contrary to the Government's argument, Plaintiffs are not seeking exemptions from any requirements. *See* Br. at 37. They seek to continue meeting the same sex-specific requirements they have met for years: transgender men meeting men's requirements and transgender women

28

meeting women's requirements, consistent with military rules in place before the Hegseth Policy.

With respect to privacy, transgender service members have served openly for eight years, and the Government has identified no privacy problems during that period. Its reliance on hypothetical concerns demonstrates pretext. Courts have consistently rejected such rationales for excluding transgender individuals. *See Grimm*, 972 F.3d at 614; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017).[3]

### c.    Cost

The Government claimed that $52 million over ten years in treatment costs justified the Hegseth Policy. But this amounts to 0.00057% of total military spending. JA1238. The Government provided no comparison to other medical costs and failed to analyze the costs of discharging and replacing thousands of trained service members. *Id.* The

---

[3] The Government's citation to *Roe v. Critchfield*, 131 F.4th 975 (9th Cir. 2025) misses the mark. *Roe* addressed what it characterized as important privacy interests of school-aged children who are "still developing mentally, physically, emotionally, and socially," *see* 131 F.4th at 986–87, an entirely different context from trained military service members who are governed by strict protocols that have operated for eight years without any identified issues.

29

Government's citation to *Middendorf v. Henry,* 425 U.S. 25, 28 (1976), is unavailing. Unlike in that case, the Government produced no data supporting its assertion that the costs associated with transgender service members were disproportionate and admitted as much. Tr. (Mar. 12, 2025) at 144–45; JA1238–39.

When a classification lacks empirical support, courts infer that it rests on "irrational prejudice" rather than fact. *Cleburne*, 473 U.S. at 450. Here, the Government admits it has no data supporting its claimed concerns about medical readiness, deployability, or unit cohesion. Yet it has adopted a policy that categorically excludes all transgender persons based on those rationales. This is "inexplicable by anything but animus." *Romer*, 517 U.S. at 632.

### 4.    The Broader Context Confirms Animus.

The Hegseth Policy is part of a coordinated campaign targeting transgender individuals across federal policy. On his first day in office, President Trump signed Executive Order 14168 defining sex to preclude any recognition of transgender people and revoking all prior orders providing protections for or recognizing transgender people. 90 Fed. Reg. 8615 (Jan. 20, 2025). That order also mandated transferring all

30

incarcerated transgender women to men's prisons—despite known safety risks—and denying them medical treatment. *Id*. § 4. The State Department stopped issuing passports with sex markers reflecting transgender persons' current sex. JA1151. Federal websites were scrubbed of references to "transgender." JA1145–53, JA1282. The National Center for Missing and Exploited Children removed references to transgender youth from its website, including pages on suicide rates and sex trafficking. JA1107.

As the district court concluded: "[T]he flurry of government actions directed at transgender persons—denying them everything from necessary medical care to access to homeless shelters—must give pause to any court asked to consider whether one such order under review furthers a legitimate government interest free of animus." JA1283.

### 5. The Hegseth Policy Is Fundamentally Different from the Mattis Policy For Which This Court Reversed Preliminary Relief.

The Government's comparison of the Hegseth Policy to the earlier Mattis Policy fails. The Hegseth Policy differs fundamentally from the Mattis Policy in ways that undermine each ground on which this Court relied in preliminarily allowing the Mattis Policy to take effect.

31

The Mattis Policy was issued in 2018 following President Trump's 2017 Presidential Memorandum ordering the Secretary of Defense to bar all transgender people from service. Dkt. No. 13-9 at 3. District courts preliminarily enjoined the 2017 Presidential Memorandum, including in the District of Columbia. See *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 217 (D.D.C. 2017). This Court denied the Government's motion to stay that injunction pending appeal. *See Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *3 (D.C. Cir. Dec. 22, 2017).

While the appeal was pending, Secretary Mattis released the Mattis Policy on February 22, 2018. JA68. That policy recognized that current transgender service members had a strong reliance interest and permitted those who had already transitioned under prior policy to remain in service and to continue serving in their post-transition sex. JA69–70. The policy barred only prospective accessions and future transitions—it did not separate transgender individuals already serving. *Id*. Because the Mattis Policy did not mandate the discharge of existing transgender troops, it did not force transgender service members into administrative separation, as the Hegseth Policy does, or otherwise call their continued fitness to serve into question.

32

After the district court denied the Government's motion to dissolve the preliminary injunction based on the issuance of the Mattis Policy, this Court vacated the preliminary injunction "without prejudice," holding that dissolution was warranted because the Mattis Policy was not the same as the 2017 Presidential Memorandum that the district court had enjoined and therefore required independent review before being halted. *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019). The Court emphasized that its decision was "not a final determination on the merits" but was based on its conclusion that "[i]t was clear error to say there was no significant change with respect to at least two aspects of" the Mattis Policy compared to the 2017 Presidential Memorandum. *Id.* at 23, 25.

First, the Mattis Policy "took substantial steps to cure the procedural deficiencies" in the rushed, irregular process that produced the 2017 Presidential Memorandum. *Id.* at 23. Second, unlike the 2017 categorical ban, the Mattis Policy permitted existing transgender service members "to continue to serve and receive gender transition-related medical care." *Id.* at 24.

The Hegseth Policy has neither feature. It mandates automatic separation of all currently serving transgender service members—not through medical evaluation, but through the harsh and punitive process of administrative separation typically reserved for misconduct. There is no reliance exception, and unlike the Mattis Policy, the Hegseth Policy details a harsh process for swift separation. *Compare Doe 2*, 755 F. App'x at 24.

Moreover, unlike the Mattis Policy, which contained no disparaging language, the Hegseth Policy expressly characterizes transgender people as inherently "false" and incompatible with military values. 90 Fed. Reg. 8757 § 1.

The Hegseth Policy's waiver provision—which is unavailable to any Plaintiff or to any other transgender person—confirms this departure. The Mattis Policy permitted transgender people already serving to continue serving in their post-transition sex; it did not require or result in the discharge of even a single transgender servicemember. In stark contrast, as the district court correctly noted, the Hegseth Policy's waiver provision "is one in name only." JA1230. Current service members disqualified under this policy are eligible for a waiver only if there is a

"compelling Government interest in retaining [them]," they have been clinically stable in their birth sex for 36 months, never attempted to transition to any other sex, and are able to serve in their birth sex. *Id.* These conditions effectively exclude transgender people—barring anyone who has ever transitioned or taken any steps to transition, or who is unable to serve in their birth sex.

In these ways, the Hegseth Policy diverges sharply from the Mattis Policy and instead closely resembles the 2017 Presidential Memorandum that district courts enjoined. This Court denied a stay of that injunction, noting that "'the sheer breadth of the exclusion ordered by the [Memorandum], the unusual' and abrupt 'circumstances surrounding the President's announcement of [the exclusion], the fact that the reasons given for [it] do not appear to be supported by any facts, and the recent rejection of those reasons by the military itself,' taken together, 'strongly suggest that Plaintiffs' Fifth Amendment claim is meritorious.'" *Doe 1*, 2017 WL 6553389, at *1 (citation omitted).

The Government's reliance on *Doe 2* ignores this critical history. The 2017 Presidential Memorandum followed President Trump's statement that "the United States Government will not accept or allow

35

transgender individuals to serve in any capacity in the U.S. Military." *Doe 1,* 275 F. Supp. 3d at 183. In denying a stay of the injunction, this Court declined to disturb the district court's findings that the Memorandum created a "blanket proscription" under which transgender persons "will be indefinitely prevented from acceding to the military" and "the military shall authorize the discharge of current service members who are transgender." *Id.* at 196, 201; *see also Doe 2 v. Shanahan*, 917 F.3d 694, 698 (D.C. Cir. 2019) (Wilkins, J., concurring) ("By ordering a return to pre-Carter policies, President Trump effectively reinstated the prior blanket ban on accession and retention in military service by all transgender persons."). The Hegseth Policy does the same.

Like the 2017 Presidential Memorandum, the Hegseth Policy was announced in an "unusual and abrupt" manner, "fail[ed] to provide any supporting facts," and dramatically departed from professional military judgment. *See Doe 2*, 917 F.3d at 699 (Wilkins, J., concurring). As Judge Wilkins explained, "intemperate contemporaneous statements by policymakers, departures from normal procedures, and adoption of policies unsupported or contrary to data can be considered evidence that invidious discrimination was 'a motivating factor' in the decision." *Id.*

(quoting *Arlington Heights,* 429 U.S. at 466–68). The course of events leading to the 2017 Presidential Memorandum bore "a 'bare . . . desire to harm a politically unpopular group.'" *Id*. (quoting *Moreno,* 413 U.S. at 534). The Hegseth Policy goes further: its express denigration of transgender persons and their service demonstrates animus that is no longer merely inferable but undeniable. The Government cannot rely on *Doe 2* for more than it held: that the Mattis Policy differed from the categorical bar announced by President Trump in August 2017.

### 6.    The Policy Targets Transgender Status, Not Medical Conditions.

The Government cannot avoid the Hegseth Policy's animus by arguing that it classifies based on a medical condition rather than transgender status. Both the express terms and the Government's implementation of the Policy make clear that its purpose and effect are to exclude transgender people from military service because they are transgender.

On its face, the Hegseth Policy excludes anyone from service who serves or wishes to serve in a sex different than their birth sex—*i.e.*, anyone who is transgender—based on the view that being transgender is inherently "false" and incompatible with military service. 90 Fed. Reg. at

37

8757. It bars from military service all individuals who, regardless of any medical diagnosis or treatment, have "transitioned or attempted to transition to a sex other than their birth sex" or are "not willing to serve in their birth sex." JA1229–30. This central prohibition is directed squarely at a person being transgender, not at a medical condition, and contains no exceptions that would permit any transgender individual to serve. This is a transgender ban, not a medical classification.

The Government's implementation of the Hegseth Policy confirms that the policy is directed at transgender status. For example, a Public Affairs Guidance document prepared by the Department of Defense confirms that the policy targets transgender status and asserts that *being transgender* is incompatible with honorable military service:

> Q: The Secretary of Defense has said that the focus needs to be on "lethality, meritocracy, accountability, standards, and readiness." **Specifically focusing on 'meritocracy,' will consideration be given to high performing transgender Service members?**
>
> A: While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.
>
> Q: Transgender Service members have been serving without exception since 2021 and were previously 'grandfathered'

under the previous Trump administration policies. **Why are all transgender Service members being targeted for separation now?**

A: While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service . . . .

JA206 (emphasis added).

Further underscoring that the Hegseth Policy is directed at transgender status, an August 14, 2025, Department of the Air Force memorandum details procedures for involuntary separation proceedings. It states that during board proceedings, transgender service members—including those such as Plaintiffs who have been serving for years in their post-transition sex—must "adhere to standards associated with their biological sex unless the member waives their personal appearance and elects for the board to proceed in absentia." JA1321. This requirement forces transgender members into an impossible choice that deprives them of fundamental due process: they must either appear at their separation hearing in their birth sex or waive their right to personal appearance. These conditions have nothing to do with a medical diagnosis or fitness

to serve. Instead, they are measures that penalize service members and deprive them of due process simply because they are transgender.

The Hegseth Policy's targeting of transgender status itself distinguishes this case from *Skrmetti*. In *Skrmetti,* the Supreme Court reviewed a Tennessee statute that banned specific medical procedures— "prescribing, administering, or dispensing any puberty blocker or hormone"—for treating transgender minors. 145 S. Ct. at 1826 (quoting Tenn. Code Ann. § 68–33–102(5)) (brackets omitted). The statute did nothing more than restrict these medical treatments. Unlike the Hegseth Policy, it did not require youth to conform to their birth sex or regulate how they lived their lives. Because Tennessee's prohibitions applied solely to a list of medical procedures, the Court found the statute classified based on age and "medical use"—not sex or transgender status—and therefore did not warrant heightened scrutiny. It was a restriction on the prescribing of medical treatments. *Id.* at 1829. The Hegseth Policy operates entirely differently: unlike the statute in *Skrmetti*, the Hegseth Policy targets transgender service members expressly.

Consistent with that express targeting, the documents that implement the Hegseth Policy refer directly to transgender service members, independent of any medical condition. *See, e.g.*, JA206, 992, 995; Dkt. No. 37-1 ("Implementation of Executive Orders Related to Transgender Military Service"); Dkt. No. 49-1 (same). And Secretary Hegseth has repeatedly publicly denigrated transgender service members simply because they are transgender. JA1210, 1229, 1254, 1301.

Even if the Hegseth Policy was based on a medical condition, it would still violate equal protection if motivated by animus toward the affected class. *Skrmetti*, 145 S. Ct. at 1836 (citing *Romer*, 517 U.S. at 632); *see also id.* at 1853 (Barrett, J., concurring). In *Skrmetti*, the Court found sufficient evidence of medical uncertainty and ongoing debate regarding treatment for minors with gender dysphoria to negate any inference of animus. *See id.* at 1836. The Hegseth Policy presents the opposite situation: its animus toward transgender people is apparent on its face.

**7.    The Military Deference Doctrine Does Not Insulate the Hegseth Policy from Meaningful Review.**

The Government relies heavily on *Trump v. Hawaii*, 585 U.S. 667 (2018), to argue for judicial deference in national security contexts. *Hawaii* is inapplicable. It applied the *Mandel* "facially legitimate and bona fide reason" test—a deferential standard limited to immigration cases. *Hawaii*, 585 US. at 703. No court has ever applied *Mandel* to military personnel policies affecting service members' constitutional rights.

In *Hawaii*, the Court reviewed a travel ban excluding certain foreign nationals from entering the United States. *Id.* at 679. The Court applied the standard from *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972), under which courts ask only whether the Executive provides a "facially legitimate and bona fide" reason for its action. *Hawaii*, 585 U.S. at 706. This standard requires virtually no inquiry into the persuasiveness of the government's justifications or the evidence supporting them. *Id.* at 707–08 (noting policy will be upheld despite "extrinsic evidence" of animus so long as it "can reasonably be understood

to result from a justification independent of unconstitutional grounds"). It is less demanding than even rational basis review.

The *Mandel* standard derives from the unique immigration context, where the "admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Aliens seeking admission have "no constitutional right to entry," and exclusion decisions are "frequently of a character more appropriate to either the Legislature or the Executive." *Id.* at 702–03 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Courts have, therefore, historically applied minimal review in this context. The *Mandel* test represents the absolute minimal floor of review in this otherwise largely unreviewable domain.

The Supreme Court has never applied the *Mandel* standard to military personnel decisions. When military policies affect service members' constitutional rights, courts apply actual scrutiny—either rational basis review or heightened scrutiny, depending on the classification involved.

In *Rostker v. Goldberg*, 453 U.S. 57 (1981), the Supreme Court applied intermediate scrutiny to a sex-based military policy, citing *Craig v. Boren*, 429 U.S. 190 (1976), and explaining that "deference does not mean abdication" when the courts evaluate whether the Government's actions violates the Equal Protection Clause. *Rostker*, 453 U.S. at 70. While the Court deferred to military judgments about tactical and operational matters, it genuinely reviewed whether the sex-based classification substantially related to important governmental objectives. *Id.* at 70–71. That is real scrutiny, not *Mandel*'s minimal review. And in *Frontiero v. Richardson*, 411 U.S. 677 (1973), the Court applied heightened scrutiny to sex-based military benefits rules. *Frontiero*, 411 U.S. at 682.

In *Goldman v. Weinberger*, 475 U.S. 503 (1986), the Court deferred to the military's interest in uniformity but still evaluated whether the headgear restriction actually advanced that interest. *Goldman,* 475 U.S. at 507–10. Had the rule contained exceptions or applied only to religious headgear, the outcome would likely have been different.

This distinction in review levels reflects constitutional structure: aliens abroad seeking admission lack the constitutional rights that

44

service members possess. As Justice Thomas has explained, the Supreme Court "has never held . . . that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Clendening v. United States*, 143 S. Ct. 11, 13 (2022) (mem.) (Thomas, J., dissenting from denial of certiorari) (quoting *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)). When a Navy policy disqualified service members for refusing vaccines for religious reasons but not for other reasons, the Supreme Court "left in place an injunction that dictated personnel decisions to the Navy." *Id.* (citing *Austin v. U.S. Navy Seals 1–26*, 142 S. Ct. 1301 (2022) (Mem.)).

Multiple post-*Hawaii* decisions confirm Justice Thomas's point. In *Singh*, this Court directed the district court to enter an injunction against military policy prohibiting beards at Marine boot camp. *Singh*, 56 F.4th at 110. In *Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020), the Fourth Circuit enjoined the military's policy restricting service members with HIV, finding that the military's own research contradicted its asserted concerns and that its explanations were "at odds with modern science." *Roe*, 947 F.3d at 228.

45

Courts across the country enjoined the military from enforcing COVID-19 vaccine mandates against service members with religious objections. *See, e.g., U.S. Navy SEALs 1–26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022) (issuing preliminary injunction); *Austin v. U.S. Navy Seals 1–26*, 142 S. Ct. 1301 (2022) (Mem.) (partially staying injunction but leaving in place bar on adverse personnel actions).

Nor does deference lower the standard of scrutiny for suspect or quasi-suspect classifications. Even in the military context, "[c]lassifications based on race or religion, of course, would trigger strict scrutiny." *Steffan v. Perry*, 41 F.3d 677, 689 n.9 (D.C. Cir. 1994) (en banc). In *Rostker*, the Supreme Court declined "to declare that rational basis scrutiny, rather than heightened scrutiny, necessarily applies to all military policies, even when the policy includes a facially discriminatory classification." *Doe 2*, 917 F.3d at 704. As this Court explained, "we presumably would give more scrutiny to a military policy that permits the wearing of any religious headgear except yarmulkes than we would give to a neutral policy that restricts all religious headgear." *Id.* at 703. *Schlessinger v. Ballard*, 419 U.S. 498 (1975) does not assist the government. Decided before *Craig v. Boren*, it upheld a Congressionally

enacted promotion-timing rule because women, at that time, faced legally restricted combat and command opportunities and were thus not similarly situated to men. 419 U.S. at 505–08. It does not authorize deference to asserted "administrative problems" or post-hoc rationales. *Schlessinger* turned on then-existing substantive differences in opportunity, not administrative say-so.

In addition, military deference applies only when military judgments rest on "considered professional judgment" of "appropriate military officials" after "evenhandedly regulat[ing]" the matter. *Goldman*, 475 U.S. at 509–10. The Hegseth Policy fails this test. It was issued 30 days after Executive Order 14183—a timeline that "pales next to the 'hearings, floor debate, and in committee' discussions that precipitated the law in *Rostker*." JA1251 (quoting *Rostker*, 453 U.S. at 72). The Government conducted no new study, consulted no transgender service members, and analyzed no data about performance since 2016. "[T]he rush to issue the Military Ban and Hegseth Policy with no new military study, evaluation, or evidence does not warrant the same baseline level of deference as the Supreme Court gave in *Rostker* or

*Goldman*." *Shilling v. United States*, 773 F. Supp. 3d 1069, 1094 (W.D. Wash. 2025).

Even *Hawaii* preserved review for policies "inexplicable by anything but animus." 585 U.S. at 706 (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)). Unlike *Hawaii*'s facially neutral travel ban following a multi-agency worldwide review, the Hegseth Policy is "soaked in animus and dripping with pretext" and contains "unabashedly demeaning" language. JA1273. It categorically excludes service members the Government concedes are fit, honorable, and have made America safer. *Id*.

The Supreme Court's May 2025 stay in *United States v. Shilling*, 145 S. Ct. 2695 (2025), does not compel a different result. That procedural ruling on a stay pending appeal, which was issued without any written opinion, did not constitute merits review and did not analyze the animus showing developed here. The government may have legitimate interests in uniformity, readiness, and cohesion that would not apply in a civilian context. But military deference does not rubber-stamp a policy rooted in animus for which no justifications hold up.

48

**B.    The Hegseth Policy Also Discriminates Based on Sex and Transgender Status, Independently Violating Equal Protection.**

Even if the Court were to find the Government's proffered justifications to be rationally related to a legitimate governmental interest—despite the overwhelming evidence to the contrary detailed in Section I.A., *supra*, and as found by the District Court—the Hegseth Policy independently violates the requirement of equal protection because it discriminates based on sex and transgender status. Such discrimination triggers heightened scrutiny, which the Government cannot satisfy.

### 1.    The Hegseth Policy Discriminates Based on Sex.

The Hegseth Policy is subject to heightened scrutiny because it discriminates based on sex. As the Supreme Court held in *Bostock v. Clayton County*, 590 U.S. 644 (2020), it is "impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. at 660. The reason is straightforward: transgender discrimination necessarily compares individuals based on their birth sex. A person who was born male is treated differently than a person who was born female—even though

49

both identify and live as female. The differential treatment turns entirely on birth sex. This is sex discrimination.

The district court recognized that "the logic of *Bostock* applies in the equal protection context." JA1255. Multiple circuits have agreed. *See Kadel v. Folwell*, 100 F.4th 122, 153–54 (4th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1079–80 (9th Cir. 2024), *cert granted*, 145 S. Ct. 2871 (2025); *Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024).

The Government offers no reason why *Bostock*'s analysis of whether a policy facially discriminates based on sex would not apply here. Instead, the Government contends that the Hegseth Policy does not discriminate based on sex for two reasons.

First, it argues that references to "sex" in the Policy describe medical interventions, not discrimination. This repeats the flawed argument that the Policy classifies based on a medical condition rather than transgender status. *See* Section I.A.6 *supra*. But, as explained above, this argument fails because the Policy targets transgender status directly. *See id.*

Second, the Government argues that requiring transgender persons to serve only in their birth sex does not discriminate based on sex but

instead declines "to provide a special exemption from . . . sex-based standards for servicemembers who . . . seek to . . . serve in their asserted gender identity." Appellants' Br. at 45 (emphasis omitted). This argument contradicts *Bostock*. Preventing transgender individuals from living and working consistent with their post-transition sex is precisely what the Supreme Court held constitutes unlawful sex discrimination. *Bostock*, 590 U.S. at 660. Framing equal treatment as a "special exemption" does not make it any less discriminatory.

Aimee Stephens, the transgender employee in *Bostock*, was fired because she could not comply with her employer's requirement that she present as male and adhere to male workplace standards. The employer fired Stephens after learning she planned to "live and work full time as a woman." *Bostock*, 590 U.S. at 654. The Supreme Court held this was sex discrimination because requiring a transgender woman to present only as male "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660.

The Hegseth Policy discriminates based on sex for the same reason. It requires all transgender service members to serve only in their birth

sex—including Plaintiffs who have completed their transition and have served in their post-transition sex for years. The Policy, therefore, penalizes transgender service members living in a sex different than their birth sex (transgender men and women) for traits or actions it permits for service members who live in their birth sex (non-transgender men and women).

The Executive Order's language demonstrates its sex-based focus. It declares as binding government policy that "expressing a false 'gender identity' divergent from an individual's [birth] sex cannot satisfy the rigorous standards necessary for military service" and that "adoption of a gender identity inconsistent with an individual's [birth] sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." 90 Fed. Reg. 8757. It further states that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.*

These statements penalize individuals based on their birth sex. A person identified as male at birth who lives as a woman is branded as dishonest and unfit; a person identified as female at birth who lives as a

52

woman is not. This is sex discrimination under *Bostock*. The district court correctly concluded that the Hegseth Policy facially discriminates based on sex.

### 2. Transgender Persons Are a Quasi-Suspect Class.

The district court also correctly concluded that, independently, the Hegseth Policy is subject to intermediate scrutiny because being transgender has all the defining features of a quasi-suspect class. As the district court noted, "the relevant test is well established." JA1260 (citing *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987)). The record before the district court strongly supported its conclusion that transgender persons satisfy that test: [1] they "have historically been subject to discrimination; [2] they have a defining characteristic that bears no relation to ability to contribute to society; [3] they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and [4] they lack political power." JA1260 (citing *Cleburne*, 473 U.S. at 440–41 and *Bowen*, 483 U.S. at 602) (internal citations omitted). The Government offered no evidence to the contrary. The district court was therefore correct to conclude, consistent with the decisions of multiple other circuits, that transgender

53

persons are a quasi-suspect class. *See, e.g., Hecox*, 104 F.4th at 1079; *Grimm*, 972 F.3d at 610.

The Government contests the district court's conclusion that heightened scrutiny applies to classifications based on transgender status only by citing two concurring opinions from *Skrmetti*. See Appellants' Br. at 46–47. The district court, however, offered robust legal and evidentiary support for its conclusions, including an extensive record of federal and state *de jure* discrimination against transgender persons, see JA1261–62; record evidence that being transgender does not impair individuals' ability to serve in the military, JA1262–63; evidence that being transgender "is as natural and immutable as being cisgender," JA1263 (quoting *Grimm*, 972 F.3d at 612); and evidence that transgender people possess "the opposite of meaningful political power," JA1266. The Government offered nothing to rebut these conclusions in the district court, nor does it in this Court.

### 3.    The Hegseth Policy Cannot Survive Heightened Scrutiny.

Under heightened scrutiny applicable to policies that discriminate based on sex and transgender status, the government must prove the policy is substantially related to an exceedingly persuasive justification.

*United States v. Virginia*, 518 U.S. 515, 533 (1996). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation," and cannot rely on "overbroad generalizations" about transgender people. *Id.*

As demonstrated in Section I.A.3., *supra*, the Government's proffered justifications fail. The Government concedes it has no data on transgender service members' impact on military readiness, deployability, or unit cohesion. *See* Section I.A.3.a.–c, *supra*. Its own evidence—the AMSARA report and 2025 medical literature review—contradicts rather than supports the Hegseth Policy. *See* Section I.A.3.a, *supra*. The district court found the Government's characterizations of its sources "inexplicably misleading." JA1236–37. And the Government admits that Appellees themselves meet all standards for service. *See* Section I.A.3.a, *supra*.

This absence of supporting evidence is fatal under heightened scrutiny. The Government cannot meet its burden to show the Hegseth Policy is substantially related to important governmental interests when it conducted no analysis of transgender service, relied on "woefully stale" data from 2018 and offers justifications contradicted by its own evidence.

JA1233, JA1269. As the district court correctly found, there is a "lack of any connection between [the Government's] evidence and the Military Ban's directives." JA1266.

The Government's cohesion arguments fare no better. Transgender service members have served openly for nearly eight years. The Government points to no privacy problems during that period. Its reliance on hypothetical concerns—despite this track record—confirms that its arguments rest on the very stereotypes that heightened scrutiny forbids.

Privacy-based justifications for excluding transgender individuals fail for multiple reasons. First, they "impermissibly rely on 'overbroad generalizations about the different talents, capabilities, or preferences of males and females.'" JA1268 (quoting *Virginia*, 518 U.S. at 533). The premise that the mere presence of transgender people inherently violates privacy is unsupported by evidence or experience. Military facilities already accommodate privacy through individual stalls, changing areas, and other existing measures that protect all service members without categorical exclusions. JA1031.

Second, courts across multiple circuits have consistently rejected privacy-based justifications for discrimination against transgender individuals in analogous contexts. The Supreme Court has repeatedly declined to reverse those decisions, denying certiorari in every case. *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 614 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018) ("[W]e decline to recognize . . . a right that would be violated by the presence of students [in restrooms or locker rooms] who do not share the same birth sex."), *cert. denied*, 139 S. Ct. 2636 (2019); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017) ("A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of . . . any other student who used the bathroom at the same time."), *cert. dismissed*, 138 S. Ct. 1260 (2018). This consistent pattern of appellate decisions—and the Supreme Court's

repeated refusal to disturb them—demonstrates that privacy rationales do not justify categorical exclusion of transgender individuals.

Moreover, under heightened review, cost savings alone cannot justify discrimination. Defendants "must do more than show that denying . . . medical care . . . saves money." *Mem'l Hosp. v. Maricopa Cnty.,* 415 U.S. 250, 263 (1974). "The conservation of the taxpayers' purse is simply not a sufficient state interest" to justify an Equal Protection violation under heightened scrutiny. *Id.*; *see also Graham v. Richardson*, 403 U.S. 365, 375 (1971). The Government must justify why it chose a particular group to bear the cost-saving burden. *Plyler v. Doe*, 457 U.S. 202, 229 (1982); *see also Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011); *Flack v. Wis. Dep't of Health Servs*., 395 F. Supp. 3d 1001, 1021–22 (W.D. Wis. 2019).

As detailed in Section I.A.3.d, the claimed $52 million over ten years represents 0.00057% of total military spending. JA1238. And the Government provided no analysis of the costs of discharging and replacing thousands of trained service members. JA1238–39. A cost rationale this decontextualized and unsupported cannot justify categorical exclusion under heightened scrutiny.

For these reasons, the district court properly concluded that the Hegseth Policy excludes otherwise qualified and capable service members based on sex and transgender status and cannot survive intermediate scrutiny. JA1273, 1280–81. *See also Shilling*, 773 F. Supp. at 1095.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT ENTRY OF A PRELIMINARY INJUNCTION

The district court did not abuse its discretion in concluding that the equities tip strongly in favor of Plaintiffs. JA1284–86. "The balance of the equities weighs the harm to [Plaintiffs] if there is no injunction against the harm to the [Defendants] if there is." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Winter*, 555 U.S. at 25–26). The balance of equities and public interest "'merge when,' as here, 'the Government is the opposing party.'" *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### A. Plaintiffs Demonstrated the Likelihood of Irreparable Harm Without an Injunction, and Defendants Showed None.

The district court correctly found that Plaintiffs established they would be irreparably harmed by Defendants' enforcement of the Hegseth

Policy to exclude them from military service because they are transgender. JA1283–84. The Hegseth Policy has already subjected them to serious harms, including pulling them from their positions, branding them as unfit and incapable, depriving them of the chance to serve in the military on equal terms with others, harming them reputationally, denying them housing, steady income, and essential medical care. *Id.* This Court should affirm.

Harm is irreparable where it is "certain and great," "actual and not theoretical," and "beyond remediation" by compensatory or other relief at the conclusion of the litigation. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The district court cited unrebutted evidence showing that Plaintiffs were facing multiple forms of imminent (and now ongoing) irreparable harm: "the loss of constitutional freedoms," JA1283 (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)); "irreparable reputational stigma," JA1285 (citing *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016), *McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998), *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993)); and being "depriv[ed] . . . of steady income and medical care and that the

order brands them less capable solely because of their transgender status," JA1284 (citing *McVeigh*, 983 F. Supp. at 221; *Elzie*, 841 F. Supp. at 443).

This Court has found precisely these types of harms to be irreparable when enjoining discriminatory military policies. *See Singh*, 56 F.4th at 109–10. In *Singh*, the Sikh plaintiffs were barred from enlisting in the Marine Corps because the Corps refused to waive hair and grooming requirements that conflicted with plaintiffs' religious practices. *Id.* at 91. The Court found that being "subjected to the 'indignity' of being unable to serve for reasons that, on this record, 'bear[] no relationship to their ability to perform," subjected them to "irreversible and irreparable harm." *Id.* at 110. As in *Singh*, Plaintiffs here are being denied the ability to serve openly for reasons unrelated to their ability to perform. *See Singh*, 56 F.4th at 109–10.

The district court did not abuse its discretion in assessing the evidence before it to conclude that Plaintiffs would be irreparably harmed without an injunction, with no resulting harm to Defendants.

61

**B.      Defendants Offered No Evidence That They or the Public Would be Harmed by an Injunction of the Hegseth Policy.**

The district court rightly found that its injunction would simply maintain the status quo—allowing transgender service members to continue to serve as they had, without issue, for years—and that Defendants offered no testimony, no studies, declarations, or any other evidence to show that the status quo would burden the military in any way. JA1285. Instead, unrebutted evidence of transgender service members' honorable service undermines any assertion that their continued service would interfere with military readiness, unit cohesion, good order, or discipline, or otherwise harm the military's interests. JA1284–86. In fact, the court found, implementation of the Hegseth Policy would potentially harm military cohesion and capability. JA1286. In making these findings, the district court did not abuse its discretion.

For these reasons, the district court correctly found that the public interest would be frustrated, not advanced, without an injunction. JA1286. Separately, the district court noted that "[e]nforcement of an unconstitutional law is always contrary to the public interest," *id.* (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

The district court, weighing the evidence before it, did not abuse its discretion in concluding that the balance of the equities favored Plaintiffs.

## III.   THE INJUNCTION ENTERED BY THE DISTRICT COURT IS NECESSARY TO PROVIDE COMPLETE RELIEF TO THE NAMED PLAINTIFFS.

The Government erroneously contends that the scope of the district court's injunction exceeded its equitable authority. The injunction is proper because it imposes no greater burden on the Government than necessary to provide complete interim relief to the named Plaintiffs.

In *CASA,* the Supreme Court partially stayed nationwide injunctions barring enforcement of an Executive Order on birthright citizenship, but only "to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861. The district court's injunction satisfies this standard. It does no more than necessary to protect Plaintiffs from the full range of harms they would suffer under the Hegseth Policy.

The district court carefully considered both the legal issues and the equities. It determined that only an injunction barring the Government from enforcing or implementing Executive Order 14183 and the Hegseth

Policy would fully preserve the status quo for Plaintiffs as this litigation proceeds. JA1207, JA1287. That determination was not an abuse of discretion.

The district court's injunction is no broader than necessary to provide complete relief to Plaintiffs. This Court recognized this principle when it denied the Government's motion to partially stay a nationwide injunction against the 2017 Presidential Memorandum. *Doe 1*, 2017 WL 6553389, at *3 (D.C. Cir. Dec. 22, 2017). A narrower injunction—one permitting Plaintiffs to continue serving but barring new accessions— would fail to provide complete relief. It would "disqualif[y] them from educational [and professional] opportunities now," *id.*, by marking them as individuals serving only under a limited exception that could be revoked at any time, resulting in immediate separation.

An injunction limited to the named Plaintiffs suffers from the same flaws this Court recognized in *Doe 1*. Such an injunction would require the Government to specially identify Plaintiffs to commanders as subject to an exception to a ban that otherwise applies to all transgender service members. This would stain their professional reputations and limit their career opportunities.

*CASA* involved none of these ongoing injuries to careers and professional relationships. In that case, complete relief required only ensuring that the children of named plaintiffs were not denied citizenship; extending the injunction to others "would not render [their] relief any more complete." 606 U.S. at 853.

Importantly, limiting relief to the individual plaintiffs would also not resolve the practical and operational harms arising from the policy. Military service is dynamic; personnel transfer between units, rotate through commands, and deploy to environments where clarity and uniform rules are essential. Plaintiffs will serve under different commanders across various units and deployments who may not be aware that these particular individuals are exempt from the ban. That uncertainty creates real risks in settings where rapid identification, communication, and adherence to protocol matter. A service member who is protected only by an individual injunction may still encounter misclassification in personnel systems, conflicting orders, or breakdowns in recognition and address that can compromise communication in time-sensitive or stressful circumstances. In the military, confusion is not theoretical. It has immediate operational and personal consequences.

65

Because the harm stems not only from the application of the rule but from the existence of the rule itself, facial relief is necessary to fully protect the individual plaintiffs; any broader effect follows from ensuring that the plaintiffs receive complete, reliable relief.

The Government's argument that the injunction exceeds the constitutional power of federal courts lacks merit. Article III grants the judiciary power to adjudicate "all Cases, in Law and Equity," arising under the Constitution and laws of the United States. U.S. Const. art. III, § 2. Interpreting the Judiciary Act of 1789's parallel language granting federal courts jurisdiction over suits arising "in equity," the Supreme Court has held that the Act empowers courts to issue injunctions providing "complete relief" to the parties, even if those injunctions "advantage nonparties . . . incidentally." *CASA*, 606 U.S. at 851 (quoting *Trump v. Hawaii*, 585 U.S. at 717 (Thomas, J., concurring)). If the Government contends that Article III imposes narrower limits, its argument would preclude injunctive relief in class actions under Fed. R. Civ. P. 23(b)(1) and (2) and universal vacatur of administrative rules under the APA—remedies the Supreme Court has "affirmed countless" times. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S.

66

799, 831 (2024) (Kavanaugh, J., concurring). The district court issued precisely this type of injunction.

## CONCLUSION

For the foregoing reasons, this Court should affirm in full the district court's opinion and order granting Plaintiffs-Appellees a preliminary injunction.

DATED: November 6, 2025                Respectfully submitted,


Jennifer Levi                          Shannon P. Minter
Michael Haley                          Christopher F. Stoll
GLBTQ LEGAL ADVOCATES &                NATIONAL CENTER FOR LGBTQ
DEFENDERS                              RIGHTS
18 Tremont Street, Suite 950           1401 21st Street #11548
Boston, MA 02108                       Sacramento, CA 95811
Telephone: (617) 426-1350              Telephone: (415) 392-6257


Joseph J. Wardenski                    Sara E. Kropf
WARDENSKI P.C.                         KROPF MOSELEY PLLC
134 West 29th Street, Suite 709        1100 H Street, NW Ste 1220
New York, NY 10001                     Washington, DC 20003
Telephone: (347) 913-3311              Telephone: (202) 627-6900


*Counsel for Plaintiffs-Appellees*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation because it contains 12,115 words, according to Microsoft Word.

*/s/ Jennifer Levi*
Jennifer Levi

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jennifer Levi*
Jennifer Levi