**ORAL ARGUMENT SCHEDULED JANUARY 22, 2026**

**No. 25-5087**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NICHOLAS TALBOTT, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

REPLY BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney
  General*

YAAKOV M. ROTH
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...................................................................ii

GLOSSARY....................................................................................... vi

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................... 3

I.    The Department's 2025 Policy Withstands Constitutional
      Scrutiny................................................................................... 3

      A.    The Department's 2025 Policy Complies With Equal
            Protection................................................................... 3

            1.    The 2025 Policy Merits The Most Deferential
                  Review............................................................... 3

            2.    Plaintiffs' Equal Protection Challenge Cannot
                  Succeed........................................................... 16

II.   The Other Injunction Factors Weigh In The Government's
      Favor ..................................................................................... 27

III.  The Universal Injunction Is Improper......................................... 32

CONCLUSION.................................................................................. 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                    <u>**Page(s)**</u>

*Austin v. U.S. Navy Seals 1-26*,
  142 S. Ct. 1301 (2022) ........................................................ 16

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ................................................... 10, 12

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ............................................................ 6

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .......................................................... 34

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
  473 U.S. 432 (1985) ............................................................ 7

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ............................................................ 6

*Doe 2 v. Shanahan*:
  755 F. App'x 19 (D.C. Cir. 2019) ........................... 1, 5, 24, 26
  917 F.3d 694 (D.C. Cir. 2019) .............................. 10, 14, 23

*Eknes-Tucker v. Governor of Alabama*,
  80 F.4th 1205 (11th Cir. 2023) ........................................ 11

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) .......................................................... 17

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) .......................................................... 34

*Folwell v. Kadel*,
  145 S. Ct. 2838 (2025) ...................................................... 12

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024) ........................................ 12

*Frontiero v. Richardson*
  411 U.S. 677 (1973) .......................................................... 15

*Geduldig v. Aiello*,
 417 U.S. 484 (1974) ................................................................... 5

*Goldman v. Secretary of Def.*,
 734 F.2d 1531 (D.C. Cir. 1984) ................................................... 15-16

*Goldman v. Weinberger*,
 475 U.S. 503 (1986) ........................................................ 12, 13, 14, 28

*Grimm v. Gloucester Cnty. Sch. Bd.*,
 972 F.3d 586 (4th Cir. 2020) .............................................................. 5

*Hecox v. Little*,
 104 F.4th 1061 (9th Cir. 2024) ...................................................... 12

*Heller v. Doe ex rel. Doe*,
 509 U.S. 312 (1993) ....................................................................... 18

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
 121 F.4th 604 (7th Cir. 2024) .......................................................... 11

*Kadel v. Folwell*,
 100 F.4th 122 (4th Cir. 2024) ..................................................... 11-12

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019) ...................................................... 16, 26

*L.W. ex rel. Williams v. Skrmetti*,
 83 F.4th 460 (6th Cir. 2023), *aff'd sub nom.*
 *United States v. Skrmetti*, 605 U.S. 495 (2025) ............................... 11

*Little v. Hecox*,
 145 S. Ct. 2871 (2025) ........................................................... 12

*McHenry v. Texas Top Cop Shop, Inc.*,
 145 S. Ct. 1 (2025) ........................................................... 34

*Roe v. Department of Def.*,
 947 F.3d 207 (4th Cir. 2020) ........................................................ 16

*Rostker v. Goldberg*,
 453 U.S. 57 (1981) ...................................................... 12, 13

iii

*Schlesinger v. Ballard,*
    419 U.S. 498 (1975) ............................................................ 17

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) ...................................... 16, 30

*Stitt v. Fowler,*
    145 S. Ct. 2840 (2025) ......................................................... 12

*Trump v. Boyle,*
    145 S. Ct. 2653 (2025) ......................................................... 27

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ....................................................... 32, 33

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ........................................ 9, 21, 22, 27

*Trump v. Karnoski,*
    586 U.S. 1124 (2019) ..................................................... 2, 23

*Trump v. Orr,*
    No. 25A319, 2025 WL 3097824 (U.S. Nov. 6, 2025) .......................... 21

*Trump v. Stockman,*
    586 U.S. 1124 (2019)......................................................2, 23

*U.S. R.R. Ret. Bd. v. Fritz,*
    449 U.S. 166 (1980) ............................................................ 25

*United States v. Carolene Prods. Co.,*
    304 U.S. 144 (1938) .............................................................7

*United States v. Shilling,*
    145 S. Ct. 2695 (2025) ................................................... 2, 23

*United States v. Skrmetti,*
    605 U.S. 495 (2025) ............................. 2, 4, 5, 6-7, 7, 11, 20

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................. 28, 30, 32

iv

**Regulatory Material:**

Exec. Order No. 14,004, § 2,
  86 Fed. Reg. 7471 (Jan. 28, 2021) ..................................................... 15

**Other Authorities:**

American Psychiatric Association, *Expert Q&A: Gender Dysphoria*,
  https://perma.cc/9JSC-AGSZ.................................................................5

U.S. Dep't of Def., Instruction 1300.28, *In-Service Transition
  for Transgender Service Members* (Apr. 30, 2021) .............................10

U.S. Dep't of Def., Instruction 6130.03, *Medical Standards
  for Military Service: Appointment, Enlistment, or
  Induction*, vol. 1 (May 28, 2024) .......................................6, 18, 19, 29

U.S. Dep't of Def., Instruction 6130.03, *Medical Standards
  for Military Service: Retention*, vol. 2 (June 6, 2022).....................6, 29

# GLOSSARY

Administrative Procedure Act                                        APA

Diagnostic and Statistical Manual of Mental Disorders        DSM

## INTRODUCTION

The fundamental dispute in this case stems from plaintiffs' misunderstanding of the Department of War's 2025 policy. Plaintiffs, like the district court, repeatedly characterize the policy as a broad, class-wide ban on service by trans-identifying individuals. It is not. The 2025 policy, like the Mattis policy, focuses on individuals who have a history of a particular medical condition—gender dysphoria—that causes significant mental distress. Although plaintiffs contend that any policy concerning gender dysphoria necessarily applies to all trans-identifying individuals, courts—including this one—say otherwise, as do medical experts. *See, e.g.*, *Doe 2 v. Shanahan*, 755 F. App'x 19, 24 (D.C. Cir. 2019) (per curiam) (holding that the Mattis policy was not a "blanket transgender ban" because "not all transgender persons … have gender dysphoria"). Accordingly, the question this Court must resolve is whether the district court erred in enjoining the Department from implementing a policy that classifies based on a medical condition. The answer, as the government has explained, is yes. Additionally, at least two developments since the filing of this appeal underscore why vacatur of the district court's injunction is warranted.

First, on May 6, 2025, the Supreme Court permitted the Department to effectuate its 2025 policy, which disqualifies individuals with a history of gender dysphoria, or who have received related medical interventions, from military service: The Court stayed another district court's preliminary injunction against the 2025 policy pending disposition of the appeal and any petition for a writ of certiorari, *United States v. Shilling*, 145 S. Ct. 2695 (2025), just as it had done six years ago with respect to preliminary injunctions against the Mattis policy—a policy that also generally disqualified individuals with gender dysphoria, or who have received medical interventions for gender dysphoria, from serving in the military, *see Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019). That decision should be all but dispositive here, particularly as to the equities.

Second, in June 2025, the Supreme Court decided *United States v. Skrmetti*, 605 U.S. 495 (2025). There, the Court rejected the plaintiffs' claim that a state ban on medical interventions for gender dysphoria discriminated based on sex or transgender status and upheld the state law on rational-basis review. *Id.* at 510-14. There is no reason to resolve this case any differently: The 2025 policy likewise turns on a medical

condition and related interventions—not sex or transgender status—and it withstands rational-basis review, particularly in light of the military context. This Court should vacate the universal injunction.

## ARGUMENT

### I. The Department's 2025 Policy Withstands Constitutional Scrutiny

#### A. The Department's 2025 Policy Complies With Equal Protection

##### 1. The 2025 Policy Merits The Most Deferential Review

As the government's opening brief explained (at 26-27), the 2025 policy draws classifications based on a medical condition (gender dysphoria) and related medical interventions. Rational-basis review therefore applies, especially given the military context.

a. Plaintiffs argue that heightened scrutiny is warranted on the ground that the 2025 policy discriminates based on "transgender status" and because "transgender persons are a quasi-suspect class." Response Br. 49-54 (capitalization altered); *see also id.* 37-40. But the policy does not classify based on transgender status. Rather, the 2025 policy, like the Carter and Austin policies, focuses on gender dysphoria and the "clinically significant *distress* or impairment in … functioning" that may

3

accompany the incongruence between one's experienced or expressed gender and one's sex. JA1292 (emphasis added); *see* JA1289 n.2 (adopting the Diagnostic and Statistical Manual of Mental Disorders' (DSM) "diagnostic criteria" for gender dysphoria). Such classifications based on a medical condition receive rational-basis review, as the Supreme Court recently reaffirmed in *Skrmetti*, 605 U.S. 495, where the Court applied rational-basis review to a state law prohibiting medical interventions for gender dysphoria in minors. Gov't Br. 27.

Plaintiffs identify no operative provision of the 2025 policy to the contrary. Plaintiffs argue that the 2025 policy "excludes anyone from service who serves or wishes to serve in a sex different than their birth sex—*i.e.*, anyone who is transgender." Response Br. 37. But that is incorrect and conflates gender dysphoria with "transgender status." *Id.* The 2025 policy, like the Mattis policy, excludes individuals based on a medical condition (gender dysphoria) or related medical interventions, and requires individuals to serve in their sex. The 2025 policy uses the same definition of gender dysphoria as the American Psychiatric Association does in the DSM. JA1289 n.2, 1292. And "gender dysphoria" and "transgender" are distinct terms. Gov't Br. 40-41; JA1292. As this

Court recognized in permitting the Mattis policy to take effect, not all trans-identifying individuals have gender dysphoria. *Doe 2 v. Shanahan*, 755 F. App'x 19, 24 (D.C. Cir. 2019) (per curiam); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020) ("[N]ot all transgender persons have gender dysphoria."); *Skrmetti*, 605 U.S. at 502 (observing that *"[s]ome* transgender individuals suffer from gender dysphoria") (emphasis added); American Psychiatric Association, *Expert Q&A: Gender Dysphoria*[1] ("Not all transgender people suffer from gender dysphoria and that distinction is important to keep in mind."). Plaintiffs' attempt to equate gender dysphoria with "transgender status" therefore contradicts the DSM and the weight of precedent. Response Br. 37. It also contradicts the Supreme Court's precedents that instruct that classifications based on a specific condition are just that, even if that condition correlates with a different classification. *See Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification."); *see also Dobbs v.*

---

[1] https://perma.cc/9JSC-AGSZ.

*Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) (reaffirming the same).

Nor is regulating gender dysphoria so "irrational" that "an intent to disfavor [trans-identifying individuals] can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). To the contrary, the clinically significant distress or impairment characterizing gender dysphoria, as well as the effects of related medical interventions, are obviously rational causes for concern with respect to military service, especially given the military's similar standards for a wide range of other medical conditions. *See* U.S. Dep't of Def., Instruction 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); *see* U.S. Dep't of Def., Instruction 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022).

Even if the 2025 policy discriminated based on trans-identifying status, heightened scrutiny would still be inappropriate because trans-identifying people are not a suspect or quasi-suspect class. First, trans-identifying people are not marked by the "obvious, immutable, or distinguishing characteristics" of a "discrete group." *Skrmetti*, 605 U.S.

6

at 550 (Barrett, J., concurring) (citations omitted); *see id.* at 1866 (Alito, J., concurring in part and concurring in the judgment). Nor have plaintiffs shown that trans-identifying people have "suffered a history of de jure discrimination." *Id.* at 554 (Barrett, J., concurring) (citations omitted); *see id.* at 575-76 (Alito, J., concurring in part and concurring in the judgment). Moreover, trans-identifying individuals are not politically powerless. *Id.* at 576 (Alito, J., concurring in part and concurring in the judgment); *see id.* at 555 (Barrett, J., concurring) (noting that *United States v. Carolene Products Co.*, 304 U.S. 144, 152-153 n.4 (1938), "equates political powerlessness with laws burdening those who lacked a vote"). And finally, treating trans-identifying people as a quasi-suspect class "would require courts to oversee all manner of policy choices normally committed to legislative discretion." *Id.* at 551 (Barrett, J., concurring); *see City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 445 (1985) (holding that individuals with mental disabilities should not be treated as a quasi-suspect class because governments must have "flexibility and freedom from judicial oversight in shaping and limiting their remedial efforts").

Plaintiffs note that the 2025 policy draws classifications based on whether someone has "transitioned or attempted to transition" to another sex. Response Br. 38. But that is a classification based on medical interventions (*i.e.*, cross-sex hormones and sex-reassignment surgery), not on identity per se. The Carter and Austin policies likewise drew classifications based on medical interventions for gender dysphoria. *See* Gov't Br. 7, 10-11. Plaintiffs also note that those who are not disqualified under the 2025 policy—*i.e.*, those who have never had gender dysphoria and who have never received related interventions—must serve in accordance with their sex. Response Br. 38. But those same individuals likewise had to serve in accordance with their sex under the Carter, Mattis, and Austin policies, regardless of their asserted gender identity. *See* Gov't Br. 7, 9, 10-11. Just as it was not discrimination against trans-identifying people then, it is not discrimination against trans-identifying people now. Plaintiffs contend (at 38) that the 2025 policy "contains no exceptions that would permit any transgender individual to serve." That is incorrect. Even if an individual identifies as the opposite sex, the 2025 policy allows that individual to serve under the same rules as all other servicemembers—so long as that individual

8

has never suffered from gender dysphoria (or has demonstrated "36 consecutive months of stability" and received a waiver, JA55), has never received related interventions, and is willing to serve in his or her sex.

In insisting that the 2025 policy discriminates based on "transgender status," plaintiffs cite various public statements. Response Br. 5-7, 38-39. But it is irrelevant that, when discussing the 2025 policy in the court of public opinion, officials used common terms like "transgender" rather than medical terms like "gender dysphoria." In a court of law, what matters is the actual text of the policy, which, in this case, is a "directive, neutral on its face, addressing a matter within the core of executive responsibility." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). Again, the policy's operative provisions classify based on gender dysphoria and related interventions. JA48-60. Plaintiffs invoke an Air Force memorandum enforcing sex-specific uniform and grooming standards, but these standards, which apply to all servicemembers, do not show that the 2025 policy is "directed at transgender status." Response Br. 39. Plaintiffs assert that documents related to the 2025 policy "refer directly to transgender service members." Response Br. 41. But so did the Carter and Austin policies that preceded the 2025 policy.

9

*See*, *e.g.*, *Doe 2 v. Shanahan*, 917 F.3d 694, 712-13 (D.C. Cir. 2019) (Williams, J., concurring in the result); U.S. Dep't of Def., Instruction 1300.28, *In-Service Transition for Transgender Service Members* (Apr. 30, 2021). In fact, the 2025 policy refers to "Transgender" servicemembers only in quoting the titles of policies issued by Secretary Austin. JA49.

b. Plaintiffs also attempt (at 49-52) to justify heightened scrutiny on the ground that the 2025 policy discriminates based on "sex." But the 2025 policy references "sex" in only two contexts—in describing certain medical interventions and in declining to provide a preferential exemption from valid sex-based standards for individuals who have gender dysphoria and who seek related interventions. As the government explained, neither context constitutes sex discrimination. Gov't Br. 44-46.

Plaintiffs have no persuasive response. They contend that language in the Executive Order "demonstrates its sex-based focus." Response Br. 52. Even if that were true, the operative policy is the Department's 2025 policy, so this Court's analysis must be based on that policy. Gov't Br. 51. Plaintiffs also cite *Bostock v. Clayton County*, 590 U.S. 644 (2020), to assert that the 2025 policy discriminates based on sex

because it discriminates based on "transgender" status.  Response Br. 49.

51.  That assertion is incorrect because the policy does not discriminate

based on "transgender" status, for the reasons stated above.  Indeed,

nothing in *Bostock* suggests that if the government regulates a medical

condition in a way that merely requires knowing an individual's sex—

*e.g.*, requiring additional warning related to treatments for uterine

cancer—it is engaged in sex discrimination per se.  The Supreme Court

in *Skrmetti* held that classification based on gender dysphoria is not

discrimination based on sex and explained that *Bostock* "does not alter

[the] analysis."  605 U.S. 519-20.

Plaintiffs' reliance on *Bostock* is misplaced for two additional

reasons.  First, *Bostock* was a Title VII case, not an equal-protection case,

so its reasoning does not apply here.  *See L.W. ex rel. Williams v.*

*Skrmetti*, 83 F.4th 460, 484-85 (6th Cir. 2023), *aff'd sub nom. Skrmetti*,

605 U.S. at 495; *id.* at 526-29 (Thomas, J., concurring); *id.* at 563-64

(Alito, J., concurring in part and concurring in the judgment); *Eknes-*

*Tucker v. Governor of Alabama*, 80 F.4th 1205, 1229 (11th Cir. 2023);

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604,

619 (7th Cir. 2024).  Plaintiffs rely on *Kadel v. Folwell*, 100 F.4th 122,

153-54 (4th Cir. 2024), *Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024), and *Hecox v. Little*, 104 F.4th 1061, 1079-80 (9th Cir. 2024), to argue otherwise.  Response Br. 50.  But *Kadel* and *Fowler* were vacated and remanded for further consideration in light of *Skrmetti*.  *See Folwell v. Kadel*, 145 S. Ct. 2838 (2025); *Stitt v. Fowler*, 145 S. Ct. 2840 (2025).  And the Supreme Court granted certiorari in *Hecox*.  *See Little v. Hecox*, 145 S. Ct. 2871 (2025).

Second, even if *Bostock* were relevant, it would not alter the analysis.  *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must compare the plaintiff to "others who are similarly situated" in order to determine whether he has been treated "worse."  590 U.S. at 657.  When it comes to military service, individuals with a medical condition, like plaintiffs here, are not similarly situated to those without such a condition.

c.  Plaintiffs argue (at 42) that the 2025 policy is not entitled to deference.  But the Supreme Court has repeatedly recognized that the "judgments" of the political branches are owed "a healthy deference" in "the area of military affairs."  *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981); *accord Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986).  And

plaintiffs do not seriously suggest that the policies in cases like *Rostker* (excluding women from a registration requirement) and *Goldman* (banning a Jewish psychologist from wearing a yarmulke) would have been upheld if adopted by the government in a civilian context. Plaintiffs assert (at 44) that the Supreme Court in *Rostker* "applied intermediate scrutiny to a sex-based military policy," but that is incorrect. As the government explained (Gov't Br. 24-25), although the Supreme Court declined to attach a "label" to the type of review applicable to military policies, *Rostker*, 453 U.S. at 70, the Court's approach most closely resembles rational-basis review. The Supreme Court explained that "the tests and limitations to be applied may differ because of the military context," and although the court does not "abdicate [its] ultimate responsibility to decide the constitutional question," it must "recognize that the Constitution itself requires such deference" in this context. *Id.* at 67.

Plaintiffs contend (at 44) that the outcome in *Goldman* "likely would have been different" if the headgear restriction in that case "contained exceptions or applied only to religious headgear." But the restriction *did* contain exceptions. 475 U.S. at 509. And as Judge

13

Williams explained, "the effect of [the Mattis policy] on transgender persons is no different from that of a regulation barring headgear (and thus yarmulkes) on Orthodox Jews." *Doe 2*, 917 F.3d at 733 (Williams, J. concurring in the result) (citation omitted). "Even if both policies require 'suppressi[on] [of] the characteristic that defines [a person's] identity … the magnitude of the impact does nothing to transform a facially neutral policy into a facially discriminatory one." *Id.* (alterations in original).

Plaintiffs try to distinguish this case from the Mattis policy on the ground that the military issued the 2025 policy "30 days after [the] Executive Order" and "'with no new military study, evaluation, or evidence.'" Response Br. 47. But deference does not turn on any of those considerations. Instead, deference turns on the separation of powers and the fact that "courts [are] 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.'" *Goldman*, 475 U.S. at 507-08.

In any event, issuance of the 2025 policy was no more "'rush[ed]'" than President Biden's decision to revoke the Mattis policy just five days after taking office, without conducting any new military study or

evaluation.  Response Br. 47; *see* Exec. Order No. 14,004, § 2, 86 Fed. Reg. 7471, 7472 (Jan. 28, 2021).   And in issuing the 2025 policy, the Department was not starting from scratch.  The Department issued the 2025 policy only after considering Secretary Mattis's determination in 2018, based on the work of a panel of experts, that "there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria."  JA69.  Contrary to plaintiffs' contention, the Department also considered more recent data and studies.  JA64-65, JA116-197; Gov't Br. 21.  Thus, even if "deference applies only when military judgments rest on 'considered professional judgment' of 'appropriate military officials,'" Response Br. 47, deference is warranted here.

Plaintiffs' authorities (at 44-46) do not support their narrow conception of military deference or their arguments for heightened scrutiny.  As this Court has explained, the Supreme Court in *Frontiero v. Richardson*, 411 U.S. 677 (1973) (plurality opinion), "extend[ed] no special deference to statutes providing benefits to members of the uniformed services" because those laws "never purported to be a congressional judgment on a uniquely military matter."  *Goldman v.*

15

*Secretary of Def.*, 734 F.2d 1531, 1537 (D.C. Cir. 1984). Additionally, *Singh v. Berger*, 56 F.4th 88, 92-93 (D.C. Cir. 2022), and *Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301 (2022) (Mem), involved challenges under the Religious Freedom Restoration Act, which has a statutorily mandated "demanding compelling-interest and least-restrictive-means test" and thus "subjects governmental action to strict scrutiny." *Singh*, 56 F.4th at 92-93. No such requirement applies here. In *Roe v. Department of Defense*, 947 F.3d 207, 225 n.3 (4th Cir. 2020), the Court only addressed plaintiff's Administrative Procedure Act (APA) challenge and did not reach their equal protection claims.

### 2. Plaintiffs' Equal Protection Challenge Cannot Succeed

As the government's opening brief explained (at 28-40), the 2025 policy easily satisfies rational-basis review. Even if this Court were to conclude that intermediate scrutiny applies, military deference would "inform[its] application," and the 2025 policy would survive this level of scrutiny. *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019). The district court itself acknowledged that the government has important interests in military readiness, cohesion, good order, discipline, and costs.

JA1273. The 2025 policy, like the Mattis policy, is substantially related to achieving those ends.

Plaintiffs have little to say in response—and nothing that squares with rational-basis review. Plaintiffs fault the government (at 16, 56) for "hypothetical concerns and outdated data." But under rational-basis review, the government may rely "on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *see also Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975) (upholding different mandatory-discharge requirements for male and female naval officers based on what "Congress may … quite rationally have believed"). Even if intermediate scrutiny applied, the Department relied on the evidence and considerations underlying the Mattis policy as well as more recent evidence. JA64-65; Gov't Br. 28-40. Plaintiffs dismiss the Department's data as "'stale'" and fault the Department for not analyzing data from the past four years of the Austin policy. Response Br. 55-56. But as explained, the Department's analysis focused not on how well controlled a particular medical condition has been over a four-year snapshot, but rather on the long-term risks of service by individuals with that medical condition. Gov't Br. 49-50. Plaintiffs

likewise err in contending (at 16, 55) that the government "offers no substantial evidence" that the 2025 policy enhances military readiness, unit cohesion, or lethality. But even if that were true, under rational-basis review, the government had "no obligation to produce evidence." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). Instead, the burden lies with plaintiffs "'to negative every conceivable basis which might support'" the policy, "whether or not the basis has a foundation in the record." *Id.* at 320-21.

Plaintiffs have failed to meet that burden. Plaintiffs do not address the 2025 accession standards at all—let alone explain why it would be rational for the military to treat other medical conditions (such as asthma, diabetes, and eating disorders) as presumptively disqualifying but not gender dysphoria. Instruction 6130.03, *supra*, vol. 1, at 4-5 (May 28, 2024). Indeed, plaintiffs do not dispute that the Department has historically relied on the DSM in deeming mental disorders presumptively disqualifying; that the DSM identifies gender dysphoria as a condition associated with clinically significant distress or impairment; or that the Carter, Mattis, and Austin policies included gender dysphoria and related medical interventions on their lists of

18

presumptively disqualifying conditions. Gov't Br. 5-11. Plaintiffs thus fail to explain why the 2025 accession standards are not at least rationally related to ensuring that those entering service are "[f]ree of medical conditions or physical defects that may … require excessive time lost from duty." Instruction 6130.03, *supra*, vol. 1, at 4-5 (May 28, 2024).

Plaintiffs likewise fail to explain why the 2025 retention standards—which generally disqualify servicemembers who are diagnosed with or exhibit symptoms consistent with gender dysphoria instead of allowing them to undergo "gender transition"—are not at least rationally related to maintaining military readiness, unit cohesion, good order, and discipline, and managing costs. Gov't Br. 28-40. There can be no dispute that there is "considerable scientific uncertainty" concerning whether "transition-related" interventions, such as "cross-sex hormone therapy" and "sex reassignment surgery," "fully remedy … the mental health problems associated with gender dysphoria." JA103; *see* JA92-98. Plaintiffs question what one particular study showed about the effect of gender dysphoria on non-deployability and accuse the government of "misrepresent[ing]" the study (at 10), Response Br. 10, 15, 25, 27, but they do not dispute that servicemembers receiving medical interventions

19

for gender dysphoria could be rendered "non-deployable for a potentially significant amount of time," JA106. As explained, Gov't Br. 50-51, that data could cut in different ways is no reason to discredit the military's judgment and its conclusions about the level of risk it is willing to tolerate. *See Skrmetti*, 605 U.S. at 523 (upholding the challenged law that "respond[ed] directly to [the] uncertainty" given the "ongoing debate among medical experts regarding the risks and benefits associated with [medical interventions] to treat gender dysphoria"). To the contrary, it is a reason to defer to the military's reasoned judgment.

Plaintiffs discount the military's interest in unit cohesion, arguing that courts have "rejected privacy-based justifications … in analogous contexts." Response Br. 57. But none of the cases plaintiffs cite involve the military context, and indeed, there *is* no context analogous to the military context. As the Mattis report explained, "[g]iven the unique nature of military service, Service members … [must] often … live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." JA108. To protect privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women." JA108. Nor do plaintiffs

contest the Department's valid concern that exempting some servicemembers from uniform and grooming standards would create friction in the ranks, as other servicemembers may wish to be exempted from sex-specific "uniform and grooming standards as a means of expressing their own sense of identity."  JA102.

While plaintiffs contend that medical interventions related to gender dysphoria make up only a small fraction of "total military spending," Response Br. 29, 58, and that the government ignored the "costs of discharging and replacing" discharged servicemembers, *id.*, they do not dispute that, all else being equal, servicemembers with gender dysphoria cost the Department "disproportionately" more "on a per capita basis" than other servicemembers, such that excluding individuals with gender dysphoria will save costs in the long-term, JA112; *see also* JA65.

Plaintiffs argue (at 20-31) that the 2025 policy is unconstitutional because it is motivated by animus.  But plaintiffs have not met the high bar of showing that the policy "lack[s] any purpose other than a 'bare … desire to harm a politically unpopular group.'"  *Hawaii*, 585 U.S. at 705 (second alteration in original); *see also Trump v. Orr*, No. 25A319, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025) (applying the same bare-desire

21

standard). As explained, the 2025 policy allows trans-identifying individuals to serve, unless they have suffered from the medical condition of gender dysphoria or have received medical interventions related to that condition. And the 2025 policy is "expressly premised on legitimate purposes," *Hawaii*, 585 U.S. at 706, including maintaining "high mental and physical standards necessary for military service," reducing "the medical and readiness risks associated with" "gender dysphoria," addressing "the costs associated with" related medical interventions, and "deliver[ing] a ready, deployable force," JA65, 48. The 2025 policy thus belies any suggestion that it is motivated by a bare desire to harm, as opposed to those legitimate purposes.

In any event, the 2025 policy should be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705. And "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" *Id.* at 706. Because the 2025 policy has "a legitimate grounding" in the purposes discussed above, this Court "must accept that independent justification." *Id.* Plaintiffs dismiss *Hawaii*, noting that the

22

proclamation at issue was "facially neutral" and "follow[e]d a multi-agency worldwide review." Response Br. 48. But here, the policy is similarly facially neutral, as the text says nothing about status or identity, JA50-58, and the policy is based on the Mattis Report, which is the product of a "'comprehensive'" review by a "panel of experts," *Doe 2,* 917 F.3d at 714 (Williams, J., concurring in the result), who were senior military leaders "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force," JA89. Plaintiffs focus on the Executive Order, Response Br. 22-23, but the operative policy is the Department's 2025 policy.

Finally, plaintiffs' argument (at 31) that the 2025 policy "differs fundamentally from" the Mattis policy cannot be reconciled with the Supreme Court's treatment of both policies. The Supreme Court not only stayed preliminary injunctions against the Mattis policy, *see Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019); it also stayed a district court's preliminary injunction against the 2025 policy pending disposition of the government's appeal and any petition for a writ of certiorari, *United States v. Shilling*, 145 S. Ct. 2695 (2025). At a minimum, the *Shilling* stay underscores why the

government is likely to succeed on its argument that the 2025 policy is consistent with equal protection.

Plaintiffs do not identify any material differences between the Mattis policy and the 2025 policy. First, plaintiffs contend (at 31-36) that, unlike the Mattis policy, the 2025 policy bars all trans-identifying people from military service. That is incorrect. Under the 2025 policy, as under the Mattis policy, "persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces." JA113; *see* JA53. But not all trans-identifying individuals have gender dysphoria. *E.g.*, *Doe 2*, 755 F. App'x at 24. Thus, under both policies (and the Carter and Austin policies), servicemembers who have never had gender dysphoria or received related interventions may serve "in accordance with their sex," regardless of their asserted gender identity. JA50-51. Similarly, under both policies, individuals with gender dysphoria who are able to meet the waiver requirements may also serve "in accordance with their sex," regardless of their asserted gender identity. JA55.

As compared to the Mattis policy, the 2025 policy narrows the circumstances in which an otherwise disqualified person may serve. For

example, the 2025 policy, unlike the Mattis policy, requires a showing of "a compelling Government interest" to obtain a waiver. JA210. And the 2025 policy, unlike the Mattis policy, provides no exemption for servicemembers who have undergone medical interventions for gender dysphoria. *See* JA76-77. But these differences—like any differences between the 2025 policy and the Carter and Austin policies—simply reflect a more cautious approach to the "risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria." JA69. Nothing in the Constitution forbids such an approach. Indeed, under rational-basis review, "the fact [that a] line might have been drawn differently at some points" does not cast doubt on the policy's validity. *See U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

Second, plaintiffs contend (at 34) that the Mattis policy "contained no disparaging language," unlike Executive Order 14,183. But as explained above, the operative policy is the Department's 2025 policy, Gov't Br. 51, and plaintiffs' assertion that the 2025 policy was motivated by animus lacks merit. *See supra* pp. 21-23. And quite apart from any asserted animus, the 2025 policy, like the Mattis policy, is independently

25

grounded in legitimate interests in maintaining military readiness, cohesion, good order, and discipline, and managing costs.

Third, plaintiffs argue (at 36) that the 2025 policy is more like the 2017 Presidential Memorandum than the Mattis policy and that it "was announced in an unusual and abrupt manner [and] failed to provide any supporting facts." Response Br. 36 (alteration and quotation marks omitted). But as explained above, *supra* pp. 14-15, in issuing the 2025 policy, the Department was not starting from scratch. Plaintiffs acknowledged that the Mattis policy "'took substantial steps to cure the procedural deficiencies'" associated with "the 2017 Presidential Memorandum." Response Br. 33 (quoting *Doe* 2, 755 F. App'x at 23). As explained, *supra* p. 23, Gov't Br. 8-9, the Mattis policy was based on the Mattis Report, which was issued after "extensive review and deliberation" by the panel of military experts. JA89; *Karnoski*, 926 F.3d at 1191. And the 2025 policy relied on the same underlying report as the Mattis policy, among other things. *See* JA64-65; Gov't Br. 12-14. Plaintiffs assert that the "predictions" of that report have since been undermined by experience under the Austin policy. Response Br. 7-8. But that is for the Executive, not the district court, to evaluate. The

26

district court "cannot substitute [its] own assessment for the Executive's predictive judgments" on matters of "national security," which "are delicate, complex, and involve large elements of prophecy." *Hawaii*, 585 U.S. at 707-08.

## II. The Other Injunction Factors Weigh In The Government's Favor

The Supreme Court's stay in *Shilling* should be all but dispositive on the balance of equities, because to obtain a stay of the district court's injunction during the pendency of the appeal, the government had to show that it would suffer irreparable harm if the injunction remained in place, and that its harms—or the harm to the public interest— outweighed any alleged harms to the plaintiffs. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (granting government's stay application and explaining that the "application is squarely controlled" by the Court's stay in a similar case because "[a]lthough our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases"). A similar calculus applies here. Enjoining the 2025 policy irreparably harms the Executive Branch by forcing the Department to maintain a policy that it has determined conflicts with "the best interests of the Military Services" and with "the

interests of national security." JA50. These harms outweigh those asserted by plaintiffs here.

1.    Plaintiffs give short shrift to the harms that tip the balance in the government's favor. *See* Response Br. 62-63. They argue (at 62) that the government could not be harmed by an injunction that merely "maintain[s] the status quo" when the government has provided no "evidence to show that the status quo would burden the military in any way." Plaintiffs are mistaken: The Department relied on the "extensive inquiry conducted by a panel of experts" in connection with the Mattis policy, which led it to conclude, as it did in 2018, that "there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria." JA64, 69. Such professional military judgments about the composition of the armed forces should be given "'great deference,'" rather than second-guessed. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Deference to this assessment is owed notwithstanding plaintiffs' claim (at 62) that they have served honorably under different military policies. *See Goldman*, 475 U.S. at 509 (rejecting the plaintiff's argument that the Air Force should have accommodated his wearing of a yarmulke

in the absence of any evidence that it "would threaten discipline" and deferring to the military's "professional judgment" regarding uniformity). As explained, the Department was focused in part on the *long-term* consequences of service by individuals with a history of gender dysphoria or related medical interventions; it was not required to give greater weight to individual service records under less cautious policies.

Moreover, plaintiffs brought a facial challenge to the 2025 policy, not an as-applied challenge, so it is irrelevant if plaintiffs have been able to serve honorably. The military presumptively disqualifies many other medical conditions, ranging from cataracts and asthma to severe headaches and other common medical conditions, Instruction 6130.03, *supra*, vol. 1 (May 28, 2024); Instruction 6130.03, *supra*, vol. 2 (June 6, 2022), but that does not mean that there are not individuals with these conditions who hypothetically could otherwise serve honorably at some point in their lives. In enacting the 2025 policy, the military was free to make a judgment that takes into account not only the current status and severity of a particular medical condition, or how controlled it has been in the past, but also how it may progress over time or lead to other

complications in the future, such as side effects from treatment or potential comorbidities.

Plaintiffs contend (at 62) that permitting the Department's policy to take effect will undermine unit cohesion, although they do not explain how. In any event, after considering "existing and prior [Department] policy" and "prior [Department] studies and reviews of service by individuals with gender dysphoria," the Department reached a different conclusion. JA64. This is precisely the kind of exercise of professional military judgment that the Constitution does not authorize courts to second-guess. *See, e.g.*, *Winter*, 555 U.S. at 24 ("[This Court] 'give[s] great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'"); *Singh*, 56 F.4th at 99 (recognizing that the military's "interest in fostering cohesion and unity among its members" is "compelling" and affording it "'the widest latitude'").

2.   On the other side of the balance, plaintiffs fail to distinguish their alleged harms from those raised by the plaintiffs who unsuccessfully challenged the Mattis policy. Even if the Mattis policy had affected fewer individuals who sought to join or remain in military

service, it imposed precisely the same alleged harms that plaintiffs assert here. In particular, the Mattis policy required the discharge of current servicemembers who, for example, were diagnosed with gender dysphoria after the effective date of that policy and sought to undergo "gender transition." JA76.

Moreover, plaintiffs' attempts to establish irreparable harm fail even on their own terms. Plaintiffs contend, for example, that absent an injunction, they will lose "constitutional freedoms." Response Br. 17, 60. Presumably, plaintiffs are referring to a loss of equal protection, which is a merits argument. But as explained above, they are unlikely to succeed on their equal protection challenge to the 2025 policy. Relying on *Singh*, plaintiffs also contend that the 2025 policy will irreparably harm them by disqualifying them from military service "for reasons unrelated to their ability to perform." Response Br. 61. But *Singh* is of no help to plaintiffs because the Court reviewed the plaintiffs' asserted harms against the backdrop of a heightened statutory standard that does not apply here. *See supra* pp. 15-16.

In any event, disqualification based on a medical condition *is* related to servicemember performance. As the Department explained,

"[m]ilitary effectiveness requires that … all military personnel must be available for worldwide duty 24 hours a day without restriction or delay," "often in remote areas lacking immediate and comprehensive medical support," JA79-80—conditions that are incompatible with service by individuals, like those diagnosed with gender dysphoria, who have ongoing needs for "essential medical care," Response Br. 60.

Plaintiffs' other asserted harms—being "pull[ed] … from their positions" and denied "housing" and "steady income"—are employment-related harms that are not irreparable. Response Br. 60. And their assertion (*id.*) that they face reputational harm cannot be squared with the Department's commitment to reflect that their service was honorable upon discharge.

3.    Even if plaintiffs could show irreparable harm, any such harm would be "outweighed by the public interest" and the "national security imperative" of "deliver[ing] a ready, deployable force." JA65; *Winter*, 555 U.S. at 23.

## III. The Universal Injunction Is Improper

Federal courts have no equitable authority to grant universal injunctions. *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). Instead,

they may only "administer complete relief *between the parties*."  *Id.* at 851.  Plaintiffs urge that only a universal injunction could grant them complete relief.  Response Br. 63-67.  But the Supreme Court has cautioned that "'[c]omplete relief' is not synonymous with 'universal relief,'" *CASA*, 606 U.S. at 851, and "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be," *id.* at 855 (quotation marks omitted).  Plaintiffs fail to make the requisite showing.

Plaintiffs claim (at 64-66) that they will suffer a range of harms if the injunction were stayed as to everyone except them.  But these assertions are made without any basis.  For example, plaintiffs do not explain how an injunction permitting them to serve would nonetheless deprive them of educational and professional opportunities or stain their reputations unless the injunction applied to nonparties too.  Nor do plaintiffs explain why their other hypothetical harms—like the possibility that their fellow servicemembers will mistakenly address them by pronouns that correspond to their sex—would persist with a narrow preliminary injunction but not a broader one.  Response Br. 64.

Finally, Article III confines courts to adjudicating the rights of "the litigants brought before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973); *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); *McHenry v. Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025). Plaintiffs argue (at 66) that such limitation would "preclude injunctive relief in class actions" and "universal vacatur of administrative rules under the APA." But plaintiffs have not brought a class action and do not seek relief under the APA, so the propriety of relief to non-parties in those circumstances is not before this Court.

# CONCLUSION

The preliminary injunction should be vacated in whole or at least as to everyone except for the servicemember plaintiffs.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney*
  *General*
YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*
MICHAEL S. RAAB
ASHLEY C. HONOLD

  *s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

December 2025

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of D.C. Circuit Rule 32-1(a) because it contains 6494 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Amanda L. Mundell*
Amanda L. Mundell

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM-ECF system.

*s/ Amanda L. Mundell*
Amanda L. Mundell