**[ORAL ARGUMENT HELD JANUARY 22, 2026]**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NICOLAS TALBOTT, *et al.*,

 Plaintiffs-Appellees,

 v.                                                                        No. 25-5087

UNITED STATES OF AMERICA, *et al.*,

 Defendants-Appellants.

**PLAINTIFFS-APPELLEES' OPPOSITION TO MOTION TO STAY THE
MANDATE PENDING PETITION FOR A WRIT OF CERTIORARI**

Plaintiffs-Appellees ("Plaintiffs") respectfully oppose the government's motion to stay the mandate (the "Motion").

A stay of the mandate is not granted as a matter of course. The movant "must show that the [certiorari] petition would present a substantial question and that there is good cause for a stay," Fed. R. App. P. 41(d)(1), and a stay remains "an intrusion into the ordinary processes of administration and judicial review" that is "not a matter of right," *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted). "Rule 41's 'good cause' language calls for looking to the normal principles that guide equitable relief like irreparable harm," such that "the test for stays under Rule 41 mirrors the Supreme Court's own test for granting stays pending the filing of a petition for certiorari." *White v. Plappert*, 137 F.4th 579, 581 (6th Cir. 2025). To

obtain a stay, then, the government must establish a reasonable probability that the Court will grant certiorari, a fair prospect of reversal, and a likelihood of irreparable harm absent a stay, weighed against the harm to the opposing parties and the public interest. *Nken*, 556 U.S. at 434; *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). The government satisfies none of these requirements.

The government's own conduct refutes the urgency on which its motion depends. Since May 6, 2025, when the Supreme Court stayed the nationwide injunction in *United States v. Shilling*, 145 S. Ct. 2695 (2025), the government has been free to apply the challenged policy to the named Plaintiffs without restraint. It has not done so. As the accompanying declaration establishes, none Plaintiffs has been involuntarily separated from service; the government has not even initiated separation proceedings against most of the currently serving Plaintiffs; and the only two whose administrative separation boards have recommended separation remain in the service, their cases pending on administrative appeal. *See* Decl. of Michael Haley ¶¶ 1-29 (July 20, 2026) ("Haley Decl."). A movant that has allowed more than a year to pass without acting on the interest it now calls urgent has not shown—and cannot show—the diligence, urgency, and irreparable harm on which a stay of the mandate depends. The government's conduct has shown the opposite: the government cannot show that separation of transgender service members is urgent or that doing so would cause irreparable harm to the military.

Yet the government now seeks, through a stay, to preserve the very ability it has been in no hurry to exercise: to expel from the armed forces the small number of named, currently serving Plaintiffs to which the preliminary injunction applies. These servicemembers have collectively given the Nation more than 130 years of honorable service and earned more than 80 commendations, and whose fitness for service the government has never contested. *Talbott v. United States*, 176 F.4th 720, 742, 748–49 (D.C. Cir. 2026).

This Court vacated the injunction as to accession and narrowed the injunction to the named Plaintiffs currently serving. *Id.* at 750. With or without a stay, the government remains free to implement the challenged policy as to everyone else. The government asks this Court to suspend the only relief this Court affirmed— protection for a small number of decorated servicemembers who are named Plaintiffs in this case—so that it may separate them from service before any court finally adjudicates their claims, though it has shown no urgency to do so in the many months since the injunction was stayed. Nothing in Rule 41(d) requires, and nothing in equity permits, that result.

**ARGUMENT**

## I.    THERE IS NO GOOD CAUSE FOR A STAY.

### A.    The government's delay of more than a year refutes any claim of urgency, irreparable harm, or good cause.

A stay of the mandate is "not a matter of right" but "an exercise of judicial discretion" that depends on "the circumstances of the particular case." *Nken*, 556 U.S. at 433 (citation omitted). Foremost among those circumstances is whether the movant has acted with the diligence its asserted emergency implies. The government has not.

The preliminary injunction has been stayed since March 27, 2025, when this Court entered an administrative stay, and it has remained stayed ever since—through this Court's stay pending appeal in December 2025 and through the present day. And since May 6, 2025, when the Supreme Court stayed the nationwide preliminary injunction in the *Shilling* case that had also restrained it from enforcing the ban on military service by transgender individuals, the government has been free to apply the policy to the named Plaintiffs without restraint. That was over fourteen months ago. If retaining these servicemembers truly posed the "substantial risks to an effective national defense" the government now invokes, Mot. 9, one would expect it to have moved promptly to separate them once it was free to do so.

It did not. As the accompanying Haley Declaration establishes, none of the Plaintiffs has been involuntarily separated from service. Haley Decl. ¶ 1. Of the

Plaintiffs who continue to serve, most have never received a notice of separation proceedings at all. *Id.* ¶¶ 2, 6, 10, 15, 19, 21, 22, 29. A few have received notices but have had no separation board. *Id.* ¶ 5, 7, 17, 27. The only two whose boards recommended separation remain in service pending administrative appeal. *Id.* ¶¶ 12, 29. In the more than a year during which it was free to act, the government has involuntarily separarated none of the Plaintiffs it now says it is urgent to remove.

That want of diligence is dispositive here, because the government bears the burden on this motion and because delay independently defeats the two showings the government must make. Irreparable harm must be "certain and great," "actual and not theoretical," and imminent. *Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party's own extended delay in acting on an interest is powerful evidence that no such imminent injury exists: alleged harm the government tolerated for more than a year is not the sudden, irreparable injury that issuance of the mandate would inflict. *Cf. Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (a movant's delay in seeking relief "bolster[s]" the conclusion that "an injunction should not issue"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (unexcused delay in seeking extraordinary relief may warrant denial because it "implies a lack of urgency and irreparable harm"). And as to the equities, a movant seeking the extraordinary intervention of a stay must have

pursued its asserted interest diligently; equity aids the vigilant, not those who sleep on their rights. The government's conduct shows that its purported interest in removing Plaintiffs from service is not urgent. Its protracted delay in effectuating that purported interest has been the opposite of diligence. This alone is reason to deny the motion.

**B.      A stay would inflict serious, irreparable harm on the Plaintiffs.**

A stay of the mandate would leave the currently serving Plaintiffs exposed to expulsion from their careers under a policy this Court has held likely unconstitutional as applied to them—for the months or years it may take the Supreme Court to act on a petition the government does not intend to file until August 30, 2026. Mot. 2. The "loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citation modified). And, as this Court has explained, the "indignity of being unable to serve for reasons that . . . bear no relationship to their ability to perform" is, itself, irreparable harm. *Singh v. Berger*, 56 F.4th 88, 110 (D.C. Cir. 2022) (citation modified); *see Talbott*, 176 F.4th at 748–49.

The government's invocation of *Sampson v. Murray*, 415 U.S. 61 (1974), misconceives the injury. Plaintiffs do not claim mere "loss of income" or reputational harm. Mot. 10. They face the termination of military careers spanning,

6

collectively, more than a century of honorable service—with the attendant loss of "job, income, pension, health and life insurance, and all the other benefits attendant" with military service, *McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998). These terminations will be processed through a separation mechanism ordinarily reserved for misconduct, on the basis of a constitutional violation this Court has already found likely. This Court itself recognized that "it appears to us to be a much greater hardship to end a military career than to delay the start of one," and it calibrated relief accordingly, affirming the injunction only for those Plaintiffs already serving. *Talbott*, 176 F.4th at 749. The government's motion asks the Court to nullify precisely the relief its own equitable calculus preserved.

**C.**    **The government has identified no cognizable countervailing harm.**

Against these concrete injuries, the government offers the assertion that the enjoined policy reflects "specific, predictive judgments" of military officials entitled to deference. Mot. 9–10 (citing *Winter*, 555 U.S. at 27). But deference must attach to something. As the district court found, and this Court recounted, the government provided "no testimony" from any military officer as to the burden an injunction would impose, and "put forward no evidence" that the predecessor policy—under which transgender servicemembers served openly for four years—posed any risk to national security. *Talbott*, 176 F.4th at 748. "[N]ational-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a

multitude of sins.'" *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)).

More pointedly, the government "has not contested that all of the currently serving Plaintiff-Appellees . . . have served honorably and met all military standards during their service," and it has therefore "forfeited any argument that, for purposes of the balance of equities analysis, retaining these servicemembers will harm national security." *Talbott*, 176 F.4th at 748–49. Because the injunction now protects only those named individuals, the mandate's issuance would simply require the government to continue to retain a small number of concededly capable, decorated service members pending trial. The suggestion that this narrow relief "pose[s] substantial risks to an effective national defense," Mot. 9, is not merely unsupported by the record—it is refuted by the government's own concessions.

**D.    The "status quo" argument inverts the ordinary operation of appellate judgments, and the government has an adequate alternative remedy.**

The government contends that issuance of the mandate would "upend the existing status quo." Mot. 9. That argument misidentifies the status quo that equity protects. The relevant status quo is "the last uncontested status which preceded the pending controversy," *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969), here, the state of affairs before the challenged policy was applied to these Plaintiffs, when they served

openly and honorably under the preceding policy. Preserving that status quo counsels in favor of issuing the mandate, not staying it. The "status quo" the government invokes—a regime in which the challenged policy operates against these Plaintiffs—is instead an artifact of interim stay orders, not of any merits adjudication. The only merits decisions in this case, by the district court and now by this Court, have held the policy likely unconstitutional as applied to the currently serving Plaintiffs. Moreover, "[e]nforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Once a court of appeals decides an appeal, issuance of the mandate is the ordinary consequence of the judgment; interim orders entered to preserve the court's ability to decide do not acquire independent force entitling the losing party to their indefinite continuation after it has lost.

## II.    THE GOVERNMENT'S FORTHCOMING PETITION WILL NOT PRESENT A SUBSTANTIAL QUESTION.

### A.    The decision below is interlocutory, fact-bound, and splitless.

The government must show that its petition "would present a substantial question" warranting certiorari. Fed. R. App. P. 41(d)(1). Three features of this case make a grant of certiorari unlikely.

First, the decision below is interlocutory. This Court reviewed a preliminary injunction and remanded for further proceedings, including a trial on the merits. *Talbott*, 176 F.4th at 750. The Supreme Court has long explained that the

9

interlocutory posture of a case "of itself alone furnishe[s] sufficient ground for the denial" of certiorari. *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 258 (1916); *see Virginia Mil. Inst. v. United States*, 113 S. Ct. 2431, 2432 (1993) (Scalia, J., concurring) (the Court "generally await[s] final judgment in the lower courts"). The government identifies no reason the Supreme Court would depart from that settled practice to review a preliminary, partially vacated, as-applied injunction while the case proceeds to final judgment below—particularly when the same policy remains under review in the Ninth Circuit. *See Shilling v. United States*, 773 F. Supp. 3d 1069 (W.D. Wash 2025), *appeal argued*, No. 25-2039 (9th Cir. Oct. 30, 2025).

Second, the decision below is fact-bound. The judgment rests on this record and, in large measure, on the government's own litigation choices. The government conceded below that it had "presented no evidence" that persons with gender dysphoria lack honesty, humility, or integrity—the justification expressly given for the policy's disqualifications—and it "never contended, in the District Court or in this Court, that this part of the justification . . . has any sufficient relation to a legitimate government interest." *Talbott*, 176 F.4th at 741–42. It offered no explanation, in the policy or in litigation, for disqualifying persons whose only history of gender dysphoria is remote or childhood-era; no explanation for a waiver provision that categorically excludes anyone who has ever socially transitioned; and no explanation for routing servicemembers through administrative separation—the

10

process ordinarily reserved for misconduct—rather than the individualized Disability Evaluation System used for every other medical condition. *Id.* at 743–45. It did not contest that every currently serving plaintiff has served honorably and met every standard demanded of them. *Id.* at 742. And it "d[id] not meaningfully contest the animus finding" below, choosing instead to "ignore the Administration's repeated statements in their briefing." *Id.* at 745. A decision that turns on concessions, forfeitures, and evidentiary gaps particular to one preliminary-injunction record is a poor vehicle for resolving any question of general importance, and the Supreme Court is unlikely to select it as one.

Third, there is no circuit split or conflict of authority. No court of appeals has issued a contrary merits ruling on this policy; the Ninth Circuit has not yet decided *Shilling*. Nor did the panel here resolve any contested doctrinal question in Plaintiffs' favor. This Court assumed that no form of heightened scrutiny applies and evaluated the policy under the deferential framework the Supreme Court has itself applied to military classifications. *Talbott*, 176 F.4th at 736–39 (discussing *Goldman v. Weinberger*, 475 U.S. 503 (1986), *Schlesinger v. Ballard*, 419 U.S. 498 (1975), and *Rostker v. Goldberg*, 453 U.S. 57 (1981)); *id.* 752–55 (Rogers, J., concurring in part) (applying even the "highly deferential form of rational basis review espoused by the government" and concluding that features of the policy are "inexplicable by anything other than animus") (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)).

A judgment that the government loses under its own preferred standard, on this record, presents no substantial question of law—only a disagreement with the application of settled principles to conceded facts.

### B.    The *Shilling* stay order does not control.

The government's lead argument is that the Supreme Court's unexplained stay of the preliminary injunction in *United States v. Shilling*, 145 S. Ct. 2695 (2025), is "dispositive." Mot. 9. It is not, for at least four reasons.

First, an unreasoned stay order is not a decision on the merits and establishes no precedent that the policy is constitutional. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("the Court's stay order is not a decision on the merits"). The government invokes *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), for the proposition that an interim stay order carries weight in later proceedings. But *Boyle* accords an interim order that weight only where the case returns in materially the same posture in which the order issued. Here the posture has changed in every respect that matters: as explained below, the record, the scope of relief, and the procedural posture all differ materially from the circumstances before the Supreme Court when it entered the *Shilling* stay. The *Shilling* stay therefore supplies no reason to stay the mandate now.

Second, the record is different. The *Shilling* district court expressly declined to reach the question of animus. *See Shilling v. United States*, 773 F. Supp. 3d at

1098–99; *Talbott*, 176 F.4th at 753 (Rogers, J., concurring in part). Here, by contrast, the district court found—and this Court affirmed on a full merits record, after briefing and argument—that the policy's classifications rest on expressly stated, never-defended invidious justifications. Whatever the Supreme Court necessarily found on the abbreviated stay papers before it in April 2025, *see Hollingsworth v. Perry*, 558 U.S. at 190, it did not and could not have assessed this record, these concessions, or this Court's reasoned merits decision, none of which existed at the time.

Third, the relief is different. The injunction stayed in *Shilling* was universal and entered before *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). The relief this Court affirmed is narrow, as-applied protection for the named, currently serving plaintiffs alone. *Talbott*, 176 F.4th at 750. The government protests that the *Shilling* stay extended even to the named plaintiffs there. Mot. 6 n.1. But that only underscores the point: the Supreme Court gave no reasons. The equities of retaining the named plaintiffs in *Shilling*—on a record with no animus finding, no merits decision, and a universal injunction—differ here from the equities of retaining these decorated Plaintiffs, whose honorable service the government has conceded, after a court of appeals has held the policy likely unconstitutional as applied to them.

Fourth, the posture is different. *Shilling* stayed a district court injunction pending appellate review that had not yet occurred. Here, appellate review has

occurred. After full briefing and oral argument, this Court held that the policy is likely unconstitutional as applied to the currently serving Plaintiffs. The premise of the *Shilling* stay—that the policy should remain in effect until an appellate court could evaluate it—has been fulfilled. An appellate court has evaluated it, and the government lost.

### C.    *B.P.J.*, *Skrmetti*, and *Mullin* do not cast doubt on the judgment.

The government contends that *West Virginia v. B.P.J.*, 609 U.S. ___ (2026), "casts doubt" on the panel's analysis. Mot. 8. It does not. The government mislabels the decision: *B.P.J.* reviewed the challenged athletic-eligibility laws as sex-based classifications under intermediate scrutiny, not rational-basis review, and the principles the government invokes—that a classification may rest on generalizations addressed "to the general problem" rather than to each individual, and need not allow "individualized exemptions," Mot. 8–9—are that decision's application of intermediate scrutiny, not a relaxed standard of review. In any event, the judgment below is consistent with *B.P.J.*: the policy here does not fail for want of individualized exemptions, but because the courts below found its classifications rest on expressly stated, never-defended animus, unrelated to any legitimate interest—a defect fatal under any standard of review. *Talbott*, 176 F.4th at 752, 755 (Rogers, J., concurring in part).

The panel's findings show as much. It identified central classifications with no articulated—or conceivable—relation to any legitimate interest: the disqualification of persons whose only history of gender dysphoria is remote and asymptomatic; the categorical waiver bar for anyone who has ever socially transitioned, which the government "never explained" anywhere, *Talbott*, 176 F.4th at 740–41; and the routing of one medical condition, alone among all others, through the separation process used for misconduct, a departure from uniform military practice that the government likewise never explained, *id.* at 744. *B.P.J.*'s "general problem" framing presupposes some rational relationship between the classification and a legitimate end. It does not permit classifications that rest, as this Court found these do, on the expressly stated premises that persons expressing a "false 'gender identity'" are unfit to serve and that persons with a history of gender dysphoria lack "honesty, humility, . . . and integrity"—premises for which the government conceded it has no evidence and offered no defense. *Id.* at 733–34, 743–44. "[A] bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* government interest," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and the Supreme Court reaffirmed that very principle in *Trump v. Hawaii*, 585 U.S. at 705–06, the government's own touchstone. Nothing in *B.P.J.* suggests otherwise.

The government's reliance on *Mullin v. Doe*, 225 L. Ed. 2d 594 (U.S. June 25, 2026), and on Justice Thomas's separate concurrence in *B.P.J.*, Mot. 9, fares no

15

better. A single Justice's concurrence is not the holding of the Court. And in any event, the panel's animus analysis did not rest on "extrinsic" evidence of the sort at issue in *Trump v. Hawaii*. It rested on the four corners of the governing documents themselves: the Executive Order and the February 7 Memorandum, both cited in and incorporated into the policy, and the Department's own approved FAQs about the policy. *Talbott*, 176 F.4th at 745 & n.14. Even under the most restrictive facial legitimacy inquiry, a policy that announces its invidious premises on its face cannot be saved by hypothesized alternative justifications. *See id.* at 746–47 (citing *Nordlinger v. Hahn*, 505 U.S. 1, 15–16 (1992)).

At most, the government has identified recent decisions that it believes bear on one strand of the panel's reasoning. If the Supreme Court agrees that those decisions matter here, the ordinary course is to allow this litigation to proceed to final judgment, where any intervening authority can be applied on a complete record—not to grant plenary review of an interlocutory order. A speculative prospect of certiorari is not a substantial question, and the government's confidence that the Supreme Court has "keen interest" in the general subject matter, Mot. 8, says nothing about whether it will grant review of this order in this posture.

## CONCLUSION

The motion to stay the mandate should be denied.

DATED: July 20, 2026                    Respectfully submitted,

*/s/ Jennifer Levi*
Jennifer Levi
Michael R. Haley
GLBTQ LEGAL ADVOCATES
& DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jlevi@glad.org
mhaley@glad.org

Shannon P. Minter
Christopher F. Stoll
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
Telephone: (415) 392-6257
sminter@nclrights.org

Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311
joe@wardenskilaw.com

*Counsel for Plaintiffs-Appellees*

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that this response satisfies the type-volume limitation in Rule 27(d)(2)(A) because it contains 3,754 words. This response complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

*/s/ Joseph J. Wardenski*
Joseph J. Wardenski

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. I further certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Joseph J. Wardenski*
Joseph J. Wardenski