ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5087

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NICOLAS TALBOTT *et al.*,
Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA *et al.*,
Defendants-Appellants.

ON APPEAL FROM THE DISTRICT COURT
OF THE DISTRICT OF COLUMBIA
No. 25-cv-240 (ACR)
(The Honorable Ana C. Reyes)
_____

**PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO
DEFENDANTS-APPELLANTS' REQUEST FOR
STAY PENDING APPEAL**

Jennifer Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257

Joseph J. Wardenski*
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Sara E. Kropf
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

*\* Application for admission forthcoming*

*Counsel for Plaintiffs-Appellees*

April 1, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.    Parties and Amici**

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants. The states of California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Rhode Island, and Wisconsin appeared as *amici curiae* in the district court.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C.    Related Cases**

The case on review was not previously before this court or any other court. There are no related cases currently pending in this court. *Shilling v. Trump*, No. 25-2039 (9th Cir.), involves similar parties and issues.

/s/ Jennifer Levi
Jennifer Levi

April 1, 2025

i

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............... i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 3

   I.   APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS. ................................ 3

      A.   The Hegseth Policy Bans Transgender Troops. ..................................... 3

      B.   Appellants Disregard the Hegseth Policy's Exceptional Content and Irregular Mode of Adoption. ........................................... 7

      C.   The Military Deference Doctrine Does Not Insulate the Hegseth Policy from Meaningful Review............................................ 9

      D.   The Hegseth Policy Is Subject to Heightened Scrutiny. ...................... 12

      E.   The Hegseth Policy Cannot Survive Any Level of Review................. 14

   II.   THE EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY AGAINST A STAY. ... 18

CONCLUSION ................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

(Page 3 of Total)

# TABLE OF AUTHORITIES

## Cases

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ........................................................ 12

*Bowen v. Gilliard*,
  483 U.S. 587 (1987) ........................................................ 13

*Cleburne v. Cleburne Living Center*,
  473 U.S. 432 (1985) ........................................................ 13

*Craig v. Boren*,
  429 U.S. 190 (1976) ........................................................ 10

*Doe 1 v. Trump*,
  No. 17-5267, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) ........................ 22-23

*Doe 2 v. Shanahan*,
  917 F.3d 694 (D.C. Cir. 2019) .................................................9, 10, 11

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024) .............................................. 12

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) (plurality) ........................................... 10

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ...........................................................9, 11

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .............................................. 14

*Guerra v. Scruggs*,
  942 F.2d 270 (4th Cir. 1991) .............................................. 20

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) ....................................... 12, 14

iii

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) ........................................................................ 13

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) (en banc) ........................................ 6, 12

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) .......................................................... 10

*Loving v. Virginia*,
  388 U.S. 1 (1967) ............................................................................ 13

*McVeigh v. Cohen*,
  983 F. Supp. 215 (D.D.C. 1998) ...................................................... 21

*Nken v. Holder*,
  556 U.S. 418, 428 (2009) ................................................................ 18

*Padula v. Webster*,
  822 F.2d 97 (D.C. Cir. 1987) ........................................................... 13

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ............................................................ 11

*Roe v. Shanahan*,
  359 F. Supp. 3d 382 (E.D. Va. 2019) ............................................... 21

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) ...................................................................... 10, 11

*Shilling v. United States*,
  No. 25-cv-241, 2025 WL 926866 (W.D. Wash. Mar. 27, 2025), *appeal docketed*, No. 25-2039 (9th Cir. Mar. 28, 2025)
  ............................................... 3, 6, 8, 9, 11, 14, 15, 16, 17, 18, 20

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ................................................ 9, 10, 11, 21

*Steffan v. Perry*,
  41 F.3d 677 (D.C. Cir. 1994) (*en banc*) ........................................ 10

iv

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ...................................................................11

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ................................................................... 8

*U.S. Navy SEALs 1-26 v. Biden*,
   578 F. Supp. 3d 822 (N.D. Tex. 2022)....................................11

*United States v. Virginia*,
   518 U.S. 515 (1996) ................................................................ 10

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ............................................... 12

**Other Authorities**

Exec. Order No. 14183, 90 FR 8757 (Jan. 27, 2025) ......................................... 1, 8

## INTRODUCTION

Appellants seek extraordinary relief from this Court: an emergency stay that would greenlight a purge of transgender service members while this Court considers the appeal. The government's policy targets a class of individuals, many of whom have served honorably for years. It is not, as Appellants suggest, about regulating medical care. The directives carrying out this purge do not exclusively focus on a medical condition, nor do they function as medical regulations would.

Appellees include distinguished transgender service members in critical roles who have deployed globally and earned numerous commendations. Appellants have conceded that each active-duty Appellee is honorable, disciplined, and fit to serve.

President Trump's executive order targeted transgender individuals, characterizing being transgender as a "falsehood" and labeling transgender service members as undisciplined and selfish. Exec. Order No. 14183, 90 FR 8757, 8757 (Jan. 27, 2025). The directives implementing that order explicitly target transgender people through multiple overlapping requirements that ensure their exclusion: prohibiting service by anyone whose gender identity differs from their birth sex,[1] who has transitioned, or who has gender dysphoria; and requiring all personnel to

---

[1] As the District Court noted, "Defendants concede the term . . . —those with a gender identity that diverges from their biological sex—refers to transgender persons." Add.4 n.1; *see also* App. 427-28 (describing the defining characteristics of a transgender person).

1

serve according to their birth sex. *See* Office of the Under Sec'y of Defense, Additional Guidance on Prioritizing Military Excellence and Readiness (Feb. 26, 2025), App. 393-405[2] ("Hegseth Policy"). These interlocking requirements create a comprehensive system specifically engineered to purge transgender individuals from military service ("the Military Ban").

The military can point to no precedent for systematically removing service members with a treatable medical condition who are meeting all performance standards. Instead of using normal medical evaluation procedures, the Hegseth Policy proposes to identify transgender service members and then immediately initiate administrative separation proceedings. Such proceedings are normally reserved for serious misconduct or repeated failure to meet standards, not for service members who are successfully performing their duties. Their use here is unprecedented and will inflict serious harm.

Appellants bear a heavy burden of demonstrating irreparable harm—a burden they cannot shoulder given that transgender service members meet military standards, and existing regulations address any who do not. In contrast, if this Court grants the stay, thousands of transgender service members will face immediate

---

[2] Documents reproduced in the Appendix to Plaintiffs-Appellees' Response in Opposition to Defendants-Appellants' Motion for Stay are abbreviated as "App. X."

separation, permanently damaging their careers and eroding essential trust within their units.

Appellees respectfully ask this Court to deny the requested stay.

## ARGUMENT

### I.    APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS.

The District Court correctly held that the Hegseth Policy likely violates the requirement of equal protection. Far from being a mere medical policy, as Appellants assert, the Hegseth Policy explicitly targets and excludes transgender individuals from military service. As such, it is subject to heightened scrutiny as both sex-based discrimination and discrimination against a quasi-suspect class. As the District Court and two other courts have now found, it fails this scrutiny by relying on unfounded generalizations rather than actual data about transgender troops. Add.60; *Shilling v. United States*, No. 25-cv-241, 2025 WL 926866, at *16-20 (W.D. Wash. Mar. 27, 2025), *appeal docketed*, No. 25-2039 (9th Cir. Mar. 28, 2025); Order on Mot. for TRO, *Ireland v. Hegseth et al.*, No. 25-cv-1918 (D.N.J. Mar. 24, 2025), App. 669.

### A.    The Hegseth Policy Bans Transgender Troops.

Substantial evidence supports the district court's finding that the Hegseth Policy "bans all transgender troops." Add.23. As the Court found, the Hegseth Policy is "aimed squarely at transgender persons," banning anyone who (1) has a diagnosis, history, or symptoms consistent with gender dysphoria; (2) has a history of cross-

3

sex hormone therapy "in pursuit of sex transition"; (3) has a history of sex reassignment or genital reconstruction surgery; (4) "has transitioned or attempted to transition to a sex other than their birth sex"; or (5) "is not willing to serve in their birth sex." Add.23-24.

Appellants' own documents corroborate the District Court's finding that the policy targets transgender people, as the attached Chart of Classification based on Transgender Status demonstrates. *See* App. 730. For example, the Navy's January 28 Decision Guidance Memorandum states: "Future Sailors . . . who are identified as **transgender** will have their ship dates postponed," and new applicants who "self-identify as **transgender** are not eligible to process for enlistment at this time." App. 247 (emphasis added). The Secretary of Defense's February 7 Memorandum for Senior Pentagon Leadership affirms that **"[e]xpressing a false 'gender identity' divergent from an individual's sex** cannot satisfy the rigorous standards necessary for Military Service." App. 325 (emphasis added). A March 7 Army memorandum states that "**an individual's sex is immutable, unchanging during a person's life, all soldiers will only serve in accordance with their sex**." App. 624 (emphasis added). These policies target transgender people as such; they are not based on gender dysphoria.

4

A Public Affairs Guidance document prepared by the Department of Defense confirms that the policy targets all transgender troops and that no exceptions or waivers apply. The document includes the following Q & A:

> Q: The Secretary of Defense has said that the focus needs to be on 'lethality, meritocracy, accountability, standards, and readiness.' **Specifically focusing on 'meritocracy,' will consideration be given to high performing transgender Service members?**

> A: While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

> Q: Transgender Service members have been serving without exception since 2021 and were previously 'grandfathered' under the previous Trump administration policies. **Why are all transgender Service members being targeted for separation now?**

> A: While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service….

App. 639 (emphasis added).

A supposed exemption to the exclusion of transgender people from service by securing a waiver "is one in name only." Add.24; *see also* App. 330, 413-15, 432-33. For a transgender person to obtain a waiver, she would need to establish that "(1) she has been stable in her birth sex for 36 consecutive months; (2) she has never transitioned or attempted to transition to anything other than her birth sex; and (3) she is willing (against medical advice) to serve in her birth sex." Add.24. None

5

of the Appellants here, all of whom have transitioned, can meet these requirements. For some hypothetical transgender person who has never transitioned, or attempted to transition, or manifested any instability in their birth sex for 3 years, these requirements would require them to suppress their gender identity and live in their birth sex. Such requirements are "not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions." Add.24 n.17; *see also Shilling* 2025 WL 926866, at *1 (no transgender service member can meet these conditions).

In sum, the Hegseth Policy excludes anyone who expresses a gender identity different from one's birth sex—*i.e.*, anyone who is transgender—based on the view that such an identity is inherently "false" and incompatible with military service. This central prohibition—repeated in every official document—is directed squarely at transgender identity. It is not based on a medical condition.[3]

Other aspects of the Hegseth Policy confirm that its goal is to ban transgender service rather than to address medical concerns: first, it treats gender dysphoria differently than any other medical condition by mandating automatic discharge, bypassing the individualized assessment required for all other medical conditions;

---

[3] Moreover, as the District Court correctly found, even if the Hegseth Policy were based on gender dysphoria, it would still facially discriminate against transgender service members. Add.50 (quoting *Kadel v. Folwell*, 100 F.4th 122, 141 (4th Cir. 2024) (en banc)).

6

and second, it uses administrative separation procedures rather than medical evaluation processes. For all other medical conditions, service members are evaluated by a Medical Evaluation Board, "which allows the military to consider how a person's medical condition impacts their service and potential deployability." App. 446.[4] In contrast, the Hegseth Policy subjects transgender service members to an involuntary separation procedure typically reserved for serious misconduct or failure to meet standards. App. 330, 423, 445-46. This stark departure from established military protocols for handling medical conditions reinforces the policy's purpose: not to address legitimate readiness or lethality concerns, but to exclude transgender individuals from military service, despite them meeting rigorous standards.

### B.    Appellants Disregard the Hegseth Policy's Exceptional Content and Irregular Mode of Adoption.

Appellants' characterization of the Hegseth Policy as a routine policy based on military judgment ignores the policy's exceptional content and its irregular mode of adoption. First, it is highly unusual for a government policy to disparage an entire class of people, and yet the Military Ban does so throughout its multiple iterations,

---

[4] In prior briefings, Appellants misleadingly assert that DoD treats some medical conditions as presumptively disqualifying without individualized assessment. This is false. While they selectively cite language from Section 5 of DoD Instruction 6130.03-V2 regarding serious conditions like cardiomyopathy or heart failure, they consistently ignore that Section 3.2 of the same document explicitly states "[t]he standards in Section 5 will be applied on a case-by-case basis," without exception.

7

including Executive Order 14183, the February 26 Guidance, the Action Memorandum, and other official documents. The Executive Order and the Hegseth Policy describe transgender people as inherently lacking honesty, humility, integrity, and discipline. *See* Add.68; *Shilling,* 2025 WL 926866, at *2.

The government admitted it lacked evidence for its sweeping negative assertions about this group. Add.34; *see also Shilling*, 2025 WL 926866, at *2 n.4 (same). At the very least, when a government policy explicitly endorses and bases its reasoning on such broad negative generalizations about any group of people, careful scrutiny is required. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Second, the genesis of the Hegseth Policy—and its disconnection from evidence of any problems relating to transgender service—are also unusual. As the District Court noted, "[t]he President issued EO14183 within seven days of taking office, and Secretary Hegseth issued the Policy thirty days later. There is no evidence that they consulted with uniformed military leaders before doing so. Neither document contains any analysis nor cites any data." Add.6. The Court further observed that "EO14183 and the Hegseth Policy provide nothing to support [Appellants]' view that transgender military service is inconsistent with military readiness." Add. at 26. In particular, the policy is not based on any evidence or data regarding the service of transgender troops. Add.33-34 (noting absence of any

8

information or evidence to support claim that "transgender persons impact military readiness"); *see also Shilling*, 2025 WL 926866, at *17.

### C. The Military Deference Doctrine Does Not Insulate the Hegseth Policy from Meaningful Review.

The government asserts an expansive interpretation of the military deference doctrine, essentially contending that any decisions related to personnel are insulated from meaningful judicial review. Mot. at 11. But neither this Court nor the Supreme Court has adopted that position. While military context matters, courts routinely apply heightened scrutiny and enjoin military policies that violate equal protection or personal liberties—including policies about personnel. There is no "license to discriminate in matters of military policy." *Doe 2 v. Shanahan*, 917 F.3d 694, 702 (D.C. Cir. 2019) (Wilkins, J., concurring).

Courts respect the military's unique interests, such as uniformity in *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), but that does not dictate blind deference to that interest, nor does it mean the Court abdicates its role in evaluating the fit between the policy and the interest. As this Court affirmed in *Singh v. Berger*, "the cost of military service has never entailed the complete surrender of all basic rights." 56 F.4th 88, 92 (D.C. Cir. 2022) (internal quotation marks and brackets omitted). Even giving "widest berth" to military interests, *Singh* found the government failed to demonstrate a sufficient connection between grooming standards that excluded Sikhs and its policy interest in uniformity. *Id.* at 99.

9

Nor does deference mean that courts fail to scrutinize suspect or quasi-suspect classifications. Even in the military context, "[c]lassifications based on race or religion, of course, would trigger strict scrutiny." *Steffan v. Perry*, 41 F.3d 677, 689 n.9 (D.C. Cir. 1994) (*en banc*). In *Rostker v. Goldberg*, 453 U.S. 57 (1981), the Supreme Court declined "to declare that rational basis scrutiny, rather than heightened scrutiny, necessarily applies to all military policies, even when the policy includes a facially discriminatory classification. *Doe 2*, 917 F.3d at 704; *see also id*. at 703 (noting that "we presumably would give more scrutiny to a military policy that permits the wearing of any religious headgear except yarmulkes than we would give to a neutral policy that restricts all religious headgear"); *Rostker*, 453 U.S. at 63 (citing *Craig v. Boren*, 429 U.S. 190 (1976) and applying heightened scrutiny test). The Supreme Court has applied heightened scrutiny to sex-based military policies in prior cases. *See Frontiero v. Richardson*, 411 U.S. 677, 688-91 (1973) (plurality); *United States v. Virginia*, 518 U.S. 515, 555 (1996) (applying heightened scrutiny to sex-based military college policy); *see also Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (applying heightened scrutiny to previous transgender military service ban).

"Even when dealing with facially neutral policies, Congress and the Executive receive deference only where military policies are based upon the "considered professional judgment" of "appropriate military officials" and only after

10

finding that the policies "reasonably and evenhandedly regulate" the matter at issue[.]" *Doe 2*, 917 F.3d at 703-74 (quoting *Goldman*, 475 U.S. at 509-10). As the District Court correctly found: "The Military Ban's 30-day incubation period pales next to the 'hearings, floor debate, and in committee' discussions that precipitated the law in *Rostker*." Add.45 (quoting *Rostker*, 453 U.S. at 72). *See also Shilling,* 2025 WL 926866, at *16 ("[T]he rush to issue the Military Ban and Hegseth Policy with no new military study, evaluation, or evidence does not warrant the same baseline level of deference as the Supreme Court gave in *Rostker* or *Goldman*.").

*Trump v. Hawaii*, 585 U.S. 667 (2018), does not mandate deference to the Military Ban. Unlike the facially neutral policy in *Hawaii* that followed an extensive and lengthy professional review, the Military Ban explicitly targets transgender service members, was enacted very quickly, without meaningful investigation, and contains language openly disparaging transgender individuals. Since *Hawaii*, courts have continued to enjoin policies infringing on constitutional liberties in military contexts. *See Singh*, 56 F.4th at 110; *see also Roe v. Dep't of Def.*, 947 F.3d 207, 234 (4th Cir. 2020); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022), *partial stay granted as to individual "deployment" and "assignment," decisions,* 142 S. Ct. 1301 (2022) (Mem.). This Court should likewise decline Appellants' invitation to replace appropriate deference with unwarranted abdication.

**D.      The Hegseth Policy Is Subject to Heightened Scrutiny.**

The Hegseth Policy is subject to heightened scrutiny because it treats service members differently based on their transgender status and sex. As the Supreme Court has held, it is "impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). The District Court recognized that "the logic of *Bostock* applies in the equal protection context." Add.49. Multiple circuits have agreed. *See Kadel*, 100 F.4th at 153-54; *Hecox v. Little*, 104 F.4th 1061, 1079-80 (9th Cir. 2024); *Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050-54 (7th Cir. 2017).

Appellants contend that differences in the language of Title VII and the Equal Protection Clause mean that *Bostock*'s reasoning cannot be applied in the equal protection context. But as the District Court correctly determined, "[n]othing about these differences [] prevent[s] *Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from [being] appl[ied] to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." Add.51 (quoting *Fowler*, 104 F.4th at 790).

Nor can the Military Ban escape intermediate scrutiny because it applies equally to males and females. The Supreme Court has rejected the argument that

12

policies discriminating on suspect classifications are acceptable if they apply equally to all groups within that classification. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 10 (1967). A policy that explicitly applies sex-based criteria must face intermediate scrutiny regardless of whether it applies equally to men and women. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994). Just as sex-based peremptory challenges in jury selection could not avoid heightened scrutiny despite being applicable to both men and women, the requirement that all service members must serve according to their birth sex—a facially sex-based restriction—remains subject to intermediate scrutiny under the Fifth Amendment's equal protection guarantee.

The District Court also correctly concluded that, independently, the Military Ban is subject to intermediate scrutiny because being transgender has all the defining features of a quasi-suspect class. As the District Court noted, "the relevant test is well established." Add.54 (citing *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987)). The record before the District Court strongly supported its conclusion that transgender persons satisfy that test: [1] they "have historically been subject to discrimination, *Cleburne* [*v. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985)]; [2] they have a defining characteristic that bears no relation to ability to contribute to society, *id.*; [3] they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and [4] they lack political power, *id.*" *Id*. Appellants offered no evidence

13

to the contrary. The District Court was therefore correct to conclude, consistent with the decisions of multiple other circuits, that transgender persons are a quasi-suspect class. *See, e.g.*, *Hecox*, 104 F.4th at 1079; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020).

### E.    The Hegseth Policy Cannot Survive Any Level of Review.

The District Court correctly found that the Military Ban fails heightened scrutiny and even rational basis review because it relies on conjecture and sweeping generalizations, not evidence. In fact, the available evidence—including Appellants' own submissions—contradicts rather than supports a ban. Appellants offered no testimony or other proof that the ban stemmed from considered military judgment or evidence about transgender troops' service.

As the District Court noted, neither Executive Order 14183 or the Hegseth Policy "contains any analysis nor cites any data," Add.6, and they "provide nothing to support [Appellants]' view that transgender military service is inconsistent with military readiness," Add.26. *See also Shilling*, 2025 WL 926866, at *1 (same). Both documents "pronounce that transgender persons are not honorable, truthful, or disciplined—but Defense counsel concedes that these assertions are pure conjecture." Add.6; *see also Shilling,* 2025 WL 926866, at *2 & n.4 (same).

Apart from unsubstantiated claims about transgender people, Appellants provided almost no explanation for the ban. Among all documents issued by

14

Appellants, only the February 26 Action Memo mentioned any substantive reasons for the ban, citing "costs associated with [transgender] health care" and "medical and readiness risks" that could "limit deployability." Add.116. The Action Memo's only evidence for these claims was a 2018 report from former Secretary Mattis, two studies including a medical literature review concerning the strength of the evidence for "transgender mental health and gender affirming care," and a cost data review. Add.115-16. However, "[n]ot one of these supports a finding that the discriminatory means employed (banning transgender persons from serving) are substantially related to the achievement of the Ban's objectives (military readiness)." Add.61.

The District Court found the Mattis report to be "woefully stale," based on "outdated" and "limited" data, rendering it largely irrelevant given the service of transgender troops over the past four years. Add.27, 63, 65. While the Mattis report recommended caution due to "uncertainty" regarding transgender service, the Court noted this uncertainty no longer exists, as transgender persons have served openly since the Austin Policy of 2021. Add.27-28. *See also Shilling,* 2025 WL 926866, at *17.

Regarding the AMSARA Report, the District Court found that the report contradicts the government's claims. Rather than showing decreased deployability among transgender troops, the report demonstrated remarkable *similarity* between transgender service members and their non-transgender counterparts. Add.28-29.

15

*See also Shilling,* 2025 WL 926866, at *8 ("The Action Memo does not accurately summarize the AMSARA report's findings and limitations.").

Similarly, the Court rejected Appellants' "inexplicably misleading" characterization of the 2025 medical literature review, declaring that "no one summarizing the Review in good faith" could draw the conclusions Appellants suggested. Add.30-31. Far from supporting claims of increased mental health problems, the review found similar rates of psychotherapy between transgender and other service members, affirmed that "transgender persons are not inherently mentally unfit," and confirmed the effectiveness of medical treatment for gender dysphoria. Add.30-31. In each instance, the Court determined that the evidence contradicts rather than supports the conclusions drawn in the Action Memo. Add.29, 31. *See also Shilling,* 2025 WL 926866, at *12 (finding that "the court need not defer to unreasonable uses or *omissions in evidence*") (emphasis in original).

Appellants seek to minimize these findings by suggesting that these studies merely contain "data that could cut in different ways." Mot. at 29. In fact, the District Court found: "No one who has read the AMSARA Report could find that it supports [the government's] conclusion," Add.28; "No one summarizing the Review in good faith could draw these conclusions," Add.30; and "The Court . . . finds that the Action Memo's summary of the 2025 Medical Literature Review is inexplicably

misleading,"Add.31. *See also Shilling,* 2025 WL 926866, at *16 (rejecting the government's "irrational use of the evidence it relies on").

Finally, based on the record before it, the District Court rejected Appellants' cost-based justification. While the Action Memo claimed that transgender healthcare cost $52 million over 10 years, Appellants conceded that this represents an infinitesimal fraction of total military healthcare spending and failed to provide any comparative analysis. Add.31-32. For perspective, the Department of Defense spent approximately $41 million on Viagra in 2023 alone—nearly eight times the annual cost of providing health care for transgender troops. Add.32. The government also ignored the substantial costs of discharging and replacing thousands of trained service members. Add.31. *See also Shilling,* 2025 WL 926866, at *19 (finding that cost of replacing transgender service members would be exponentially higher than cost of their healthcare). While acknowledging military discretion in budget matters, the District Court properly concluded that a decontextualized figure without benchmarking cannot justify excluding an entire class of individuals from service, as such reasoning would allow the military to cite any cost to justify any discriminatory policy. Add.33.

In sum, the District Court found that Appellants failed to present any evidence: (1) that "transgender persons are inherently unfit to serve," (2) that "being transgender is inconsistent with 'honesty,' 'humility,' and 'integrity,'" (3) that "being

17

transgender 'conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle,'" (4) about "whether the costs of discharging and replacing transgender servicemembers outweigh the costs of retaining them," (5) about "the effect on military readiness of losing thousands of servicemembers," or (6) about "the criteria of 'exhibiting evidence of gender dysphoria,' much less how such behavior will be policed." Add.34 (internal citations omitted). Conversely, Appellants failed to rebut the testimony submitted by multiple "[h]igh-ranking military leaders who implemented the Austin Policy" testifying, "from personal experience, that transgender persons serving openly has improved, not decreased, military preparedness." Add.35. *See also Shilling,* 2025 WL 926866, at *18.

For these reasons, the District Court found that the Hegseth Policy fails not only intermediate scrutiny, but even rational basis review. Add.67, 74-75. *See also Shilling,* 2025 WL 926866, at *20 (same).

## II.    THE EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY AGAINST A STAY.

To obtain the "extraordinary remedy" of a stay pending appeal, Appellants bear the heavy burden of demonstrating that they will suffer irreparable harm absent a stay. *Nken v. Holder*, 556 U.S. 418, 428, 434 (2009). Appellants do not come close to meeting their burden. Appellants' claim of irreparable harm consists of a single, conclusory assertion that, without a stay, "the military will be forced to continue implementing a policy that [it] has determined is not compatible with military

18

readiness and lethality." Mot. at 2. This bare statement falls far short of demonstrating the concrete, imminent, and irreparable harm required for the extraordinary relief they seek.

Appellants have provided no evidence, despite multiple opportunities to do so, that transgender service has compromised military readiness or lethality during the nearly decade-long period in which transgender individuals have served openly. Add.35-39. Rather, the record contains substantial uncontroverted evidence from military leaders that the Military Ban itself, not the current policy allowing transgender service, "is harmful to the military" and "undermines unit readiness." Add.62.

To the extent that any transgender service members present readiness or lethality risks, the military already has procedures in place to ensure that all service members, transgender or not, meet applicable standards and to address them individually when they do not. App. 446-47. Nothing precludes their use to address any issues of readiness or lethality associated with any transgender service members should the need arise while this appeal proceeds. These existing mechanisms provide ample guarantees of readiness and lethality without triggering a class-based ban that immediately subjects service members to harsh and damaging separation proceedings.

19

Appellants' reliance on *Guerra v. Scruggs*, 942 F.2d 270 (4th Cir. 1991), is misplaced. *Guerra* concerned an individual service member challenging discharge proceedings for admitted drug use under established disciplinary procedures. The court found no irreparable harm because the discharge was based on undisputed misconduct directly relevant to military readiness. *Id*. at 274-75. The present case is materially and legally distinct, involving a categorical policy targeting a class of service members based on a characteristic unrelated to individual conduct or performance. Add.36. *See Singh*, 56 F.4th at 110 (finding irreparable harm where service members are excluded for reasons bearing "no relationship to their ability to perform").

In stark contrast to Appellants' speculative assertions, Appellees face severe, imminent, and irreparable harm well-recognized under Circuit precedent. The District Court correctly found that Plaintiffs face the irreparable loss of their constitutional rights, the undermining of trust their troops and commanders have placed in them, and most immediately and concretely, forced separation from military service under a harsh and inappropriate process. Add.77-78. *See also Shilling,* 2025 WL 926866, at *18; App. 663.

This Circuit has recognized that military separation constitutes irreparable harm. In *Singh v. Berger*, the Court found irreparable harm where military policy deprived plaintiffs of the opportunity to serve, holding that they "are subjected to the

20

'indignity' of being unable to serve for reasons that, on this record, 'bear[] no relationship to their ability to perform.'" 56 F.4th at 110 (quoting *Roe v. Shanahan*, 359 F. Supp. 3d 382, 419-20 (E.D. Va. 2019)).

The irreparable harm of military separation is particularly acute because it entails the loss of an entire way of life, including housing, healthcare, community, and a life's calling of military service. *See McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (finding irreparable injury where plaintiff would "lose his job, income, pension, health and life insurance, and all the other benefits attendant with being a Naval officer").

The harm is further magnified by the Military Ban's use of administrative separation proceedings to exclude transgender service members, procedures normally reserved for misconduct or failure to meet performance standards, distinct from medical evaluation processes, which would be the appropriate channel if the military's actual concern were physical or mental fitness for duty. App. 330-31, 417-18, 423-24, 446. Administrative separation, even if it results in a discharge characterized as "honorable," carries a stigma that denotes the service member failed to meet standards or engaged in misconduct, causing lasting professional and personal harm. App. 446.

None of these harms can be remedied later if the preliminary injunction is upheld on appeal. Plaintiffs will already have suffered the devastating harm of

21

separation proceedings, damage to their reputation and relationships within the military, and the injury of being separated based on a discriminatory policy that undermines the character of their service.

When weighing the relative harms, the balance tips decisively against granting a stay. Appellants have failed to identify any concrete harm they would suffer from maintaining the status quo under which the military has successfully operated for years. The District Court's finding that "[t]he Military Ban does not cite, and Appellants have not provided, any studies or declarations that explain why maintaining the status quo pending litigation would unfairly burden the military," Add.79, remains unrebutted. This Court should decline Appellants' invitation to disrupt the status quo based on nothing more than their bare assertion of harm, especially when doing so would inflict substantial and irreparable injury on Plaintiffs.

This Court's prior observation remains true: "in the balancing of equities, it must be remembered that all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them." *Doe 1 v.*

22

*Trump*, No. 17-5267, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) (denying motion to stay preliminary injunction of prior ban).

This Court should also reject Appellants' request for a more limited stay. Their alternative proposal—allowing current transgender service members to remain while halting new accessions—is fundamentally flawed. First, it implicitly acknowledges that transgender status does not impair military service, as Appellants have presented no evidence that being transgender interferes with meeting service standards.

Second, this "compromise" would still inflict severe harm on current transgender service members. They would serve only as exceptions to a policy that officially declares them categorically unfit, undermining the essential trust between these service members, their command, and their troops. Serving as marked "exceptions" to a policy that labels them unfit would place a target on their backs and significantly compromise their leadership effectiveness and unit cohesion.

## CONCLUSION

For the foregoing reasons, this Court should deny Appellants' request for an emergency stay.

23

DATED: April 1, 2025

Respectfully submitted,

Jennifer Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257

Joseph J. Wardenski*
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Sara E. Kropf
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

* *Application for admission forthcoming*

*Counsel for Plaintiffs-Appellees*

24

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation because it contains 5,113 words, according to Microsoft Word.

*/s/ Jennifer Levi*
Jennifer Levi


**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jennifer Levi*
Jennifer Levi