**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5087**

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

**NICOLAS TALBOTT** *et al.*,
Plaintiffs-Appellees,

v.

**UNITED STATES OF AMERICA** *et al.*,
Defendants-Appellants.

———————————

ON APPEAL FROM THE DISTRICT COURT
OF THE DISTRICT OF COLUMBIA
No. 25-cv-240 (ACR)
(The Honorable Ana C. Reyes)

———————————

**APPENDIX TO PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION
TO DEFENDANTS-APPELLANTS' MOTION FOR STAY
Volume I of II (App. 001 - App. 389)**

———————————

Jennifer Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257

(continued on next page)

Joseph J. Wardenski*
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Sara E. Kropf
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

*Application for admission
forthcoming

*Counsel for Plaintiffs-Appellees*

April 01, 2025

## TABLE OF CONTENTS

**Page**

**VOLUME 1**

Declaration of Alex Wagner (ECF 13-20) .....................................................App. 001

   Ex. A: DTM 16-005 (ECF 13-22).........................................................App. 016

   Ex. B: Army Directive 2016-30 (ECF 13-23) .........................................App. 023

   Ex. C: Army Directive 2016-35 (ECF 13-24) .........................................App. 028

   Ex. D: DoD Instruction 1300.28 (ECF 13-25) .......................................App. 048

   Ex. E: Air Force Policy Memorandum 2021-36-01 (ECF 13-26)..........App. 071

   Ex. F: PRRI Survey (ECF 13-27) .........................................................App. 097

Declaration of Yvette Bourcicot (ECF 13-28) .............................................App. 103

   Ex. A: RAND Report (ECF 13-29)........................................................App. 115

Declaration of Gilbert Cisneros (ECF 13-30)...............................................App. 228

Declaration of Shawn Skelly (ECF 13-31) ...................................................App. 238

Navy Decision Guidance Memo #N00-30 (ECF 14-2) ................................App. 246

Secretary of Defense Memorandum to Senior Pentagon Leadership,
   Commanders of the Combatant Commands, and Def. Agency and DOD
   Field Activity Dirs. (Jan. 31, 2025) (ECF 14-3)......................................App. 248

MEPS Email re: Pause on Transgender Accessions (ECF 14-4).................App. 251

Declaration of George Brown (ECF 32)........................................................App. 253

i

Secretary of Defense Memorandum to Senior Pentagon Leadership,
    Commanders of the Combatant Commands, and Def. Agency and DOD
    Field Activity Dirs. (Feb. 7, 2025) (ECF 33-1) ........................App. 325

Dep't of the Army, Implementation of Executive Orders related to
    Transgender Military Service (EXORD 150-25) (Feb. 7, 2025), (ECF No.
    37-1) ..................................................................................App. 326

Supplemental Declaration of Alex Wagner (ECF 48-27) ............................App. 329

    Ex. A: DoD Instruction 6130.03 Vol. 2 (ECF 48-28) .............................App. 334

Secretary of the Navy Instruction 1000.11A (ECF 48-32) ...........................App. 375

Dep't of the Army, Fragmentary Order ("FRAGORD") 1 amending EXORD
    150-25 (Feb. 14, 2025), (ECF No. 49-1) ..................................................App. 386

**VOLUME 2**

Supplemental Declaration of Gilbert Cisneros (ECF 53-1)..........................App. 390

Office of the Under Sec'y of Defense, Additional Guidance on Prioritizing
    Military Excellence and Readiness (Feb. 26, 2025),
    (ECF No. 63-1) ........................................................................App. 393

Additional Guidance for Executive Order 14183, "Prioritizing Military
    Excellence and Readiness" (Mar. 1, 2025) (ECF 67-1) .........................App. 406

Second Supplemental Declaration of Alex Wagner (ECF 72-68) ...............App. 409

Supplemental Declaration of Yvette Bourcicot (ECF 72-71) .......................App. 413

Supplemental Declaration of Shawn Skelly (ECF 72-73)............................App. 417

Second Supplemental Declaration of Gilbert Cisneros (ECF 72-76)...........App. 423

Supplemental Declaration of George Brown (ECF 72-78) .........................App. 427

Declaration of Martha Soper (ECF 72-82) ....................................................App. 443

ii

Ex. A: DoD Instruction 1332.14 (ECF 72-84)..........................................App. 449

Ex. B: DoD Instruction 1332.30 (ECF 72-85)..........................................App. 513

Ex. C: DoD Instruction 1332.18 (ECF 72-86)..........................................App. 541

Sec'y of the Army, Prioritizing Military Excellence and Readiness
Implementation Guidance (Mar. 6, 2025), (ECF No. 75-1) ...................App. 613

Dep't of the Army, Implementing Guidance for Executive Order
(EXORD175-25) (superseding EXORD 150-25) (Mar. 7, 2025),
(ECF No. 75-2) .........................................................................................App. 620

DoD Public Affairs Guidance (ECF 79-1).....................................................App. 631

Sec'y of the Navy, Initial Direction on Prioritizing Military Excellence and
Readiness (ALNAV 023/25) (Mar. 13, 2025), (ECF No. 84-1) .............App. 641

Chief of Naval Operations, Initial Execution Related to Prioritizing Military
Excellence and Readiness (NAVADMIN 055/25) (Mar. 13, 2025), (ECF
No. 87-1) ...................................................................................................App. 649

Memorandum from Jules W. Hurst III, Performing the Duties of the Under
Sec. of Def. for Personnel and Readiness to Senior Pentagon Leadership,
Commanders of the Combatant Commands, and Def. Agency and DOD
Field Activity Dirs. (Mar. 21, 2025) (ECF 93-1)....................................App. 656

Temporary Restraining Order in *Ireland v. Hegseth et al.*, No. 25-01918-
CPO (D.N.J.)..............................................................................................App. 657

Memorandum Opinion in *Shilling v. United States*, No. 25-cv-241-BHS,
2025 U.S. Dist. LEXIS 57869 (W.D. Wash. Mar. 27, 2025)...................App. 665

Chart of Classification Based on Transgender Status...................................App. 730

D.C. Circuit Handbook of Practice and Internal Procedures (2024)............App.732

iii

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br><br> Civil Action No. 25-cv-240-ACR |

---

## DECLARATION OF ALEX WAGNER

I, Alex Wagner, declare as follows:

1. From June 10, 2022, through January 20, 2025, I served as Assistant Secretary of the Air Force for Manpower and Reserve Affairs. In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness

**App. 001**

support for all service members within both the United States Air Force and United States Space Force.

## PROFESSIONAL BACKGROUND

2.   I attended Brown University and obtained undergraduate degrees in Political Science and History in 1999.  After college, I worked as a research analyst and reporter in Washington, D.C. for three years prior to enrolling at Georgetown University Law Center, graduating with a law degree in 2005.

3.   After I graduated law school, I practiced as an attorney at the law firm Preston Gates & Ellis, now K&L Gates.  I have since worked in multiple positions within the Department of Defense ("DoD").  From 2009 to 2011, I was the Special Assistant to the Assistant Secretary of Defense (Global Strategic Affairs).  I then served as the Senior Advisor to the Deputy Assistant Secretary of Defense (Rule of Law and Detainee Policy) from 2011 to 2014.

4.   From 2015 to 2017, I served as Chief of Staff to the Secretary of the Army.  In that capacity, I was deeply involved in shaping the development and implementation of policies that, among other things, enabled transgender Americans to serve in the military.

5.   On June 7th, 2022, I was confirmed by the U.S. Senate and sworn in as Assistant Secretary of the Air Force for Manpower and Reserve Affairs on June 10, 2022.      In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness support for all service members within both the United States Air Force and United States Space Force.

6.   For my work in the DoD, I was awarded the Office of the Secretary of Defense Exceptional Public Service Medal in 2015, the Army's Distinguished Public Service Medal in 2017, and the

**App. 002**

Department of the Air Force's Decoration for Exceptional Public Service in 2025 (the latter two are the highest awards a civilian can earn).

## THE DEPARTMENT OF THE AIR FORCE

7.   The Department of the Air Force ("DAF") is responsible for organizing, training, and equipping two military services: the United States Air Force and the United States Space Force ("USSF"), the forces, respectively, that defend America's air and space domains.  It is one of three military departments within the DoD.  The DAF, with an annual budget of more than $217.5 billion, employs nearly 700,000 Airmen, Guardians, and civilian employees.  The Air Force, including the Air Force Reserve and Air National Guard, operates over 300 flying squadrons, consisting of eight to 24 aircraft each, worldwide. Air and Space Force bases are located across the United States and span the globe.

8.   The DAF is one of the world's most technologically sophisticated organizations, in many respects dwarfing the technological capabilities of individual companies in the private sector.  Air Force and Space Force personnel train for years to function effectively and develop the leadership skills necessary to advance the critical missions our Nation requires.  Recruitment and retention of capable and qualified Airmen and Guardians is of critical importance to the readiness of the DAF.

## PRIOR DEVELOPMENT OF DOD POLICY

9.   On July 28, 2015, then-Secretary of Defense Ashton B. Carter ordered Brad Carson, in his capacity as Under Secretary of Defense for Personnel and Readiness ("USD P&R"), to convene a working group to formulate policy options for DoD regarding transgender service members (the "Working Group").  Secretary Carter ordered the Working Group to present its recommendations within 180 days.  In the interim, transgender service members were not to be discharged or denied reenlistment or continuation of service for being transgender.

**App. 003**

10. The Working Group formulated its recommendations by collecting and considering evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members.

11. The Working Group concluded that banning service by transgender persons would require the discharge of highly trained and experienced service members, leaving unexpected vacancies in operational units and requiring the expensive and time-consuming recruitment and training of replacement personnel.

12. The Working Group also concluded that banning service by transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve.

13. In 2016, the RAND Corporation, a federally funded, independent research organization, presented the results of an exhaustive study requested by Mr. Carson. That report was entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report"). The RAND Report found no evidence that allowing transgender people to serve would negatively impact unit cohesion, operational effectiveness, or readiness. RAND Report at 69–70.

14. On June 30, 2016, Secretary of Defense Ashton Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), a true and correct copy of which is attached as Exhibit A.

15. The purpose of DTM 16-005 was to "[e]stablish[ ] policy, assign[ ] responsibilities, and prescribe [ ] procedures for the standards for retention, accession, separation, in-service transition,

4

**App. 004**

and medical coverage for transgender personnel serving in the Military Services." Notably, DTM 16-005 set forth the policy that allowed transgender individuals to serve in the military.

16. Through DTM 16-005, the Secretary of Defense ordered the Secretaries of the Military Departments, including the Army, to identify all DoD, Military Department, and Service issuances in need of revision in light of the DoD change in policy, and to submit proposed revisions to USD P&R. USD P&R was tasked with drafting revisions to all necessary issuances consistent with DTM 16-005.

17. To begin implementing DTM 16-005 as applied to the Army, on July 1, 2016, I assisted then-Secretary of the Army Eric K. Fanning in the development and issuance of Army Directive 2016-30, entitled *Army Policy on Military Service of Transgender Soldiers*, a true and correct copy of which is attached as Exhibit B.

18. Army Directive 2016-30 was effective immediately and applied to all personnel in the Active Army, U.S. Army Reserve, and Army National Guard. It stated that "it is Army policy to allow open service by transgender soldiers. The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender. An otherwise qualified Soldier will not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity." The Directive required the Assistant Secretary of the Army for Manpower and Reserve Affairs (the "ASA (M&RA)") to establish, no later than July 5, 2016, a Transgender Service Implementation Group to develop policies and procedures for transgender service, as well as a Service Central Coordination Cell ("SCCC"), composed of medical, legal, and military personnel experts, to serve as a resource for commanders' inquiries and requests. By October 1,

**App. 005**

2016, the ASA (M&RA) was directed to recommend a policy addressing service of transgender soldiers, including "a process by which transgender soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in [the Defense Enrollment Eligibility Reporting System ("DEERS")]."   In the meantime, the Directive established a process whereby gender marker changes would be handled via Exceptions to Policy ("ETPs") processed by the SCCC and ASA (MR&A), with weekly reports summarizing the ETPs to be provided to the Secretary of the Army, as well as  the Chief of Staff of the Army, then General Mark Milley.

19. On October 7, 2016, I also assisted in Secretary Fanning's issuance of a further directive, Army Directive 2016-35, which "establishe[d] policies and procedures for gender transition in the Army."  A true and correct copy of Army Directive 2016-35 is attached as Exhibit C.

20. Army Directive 2016-35 provided that "a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition."  The Directive provided that gender transition in the Army begins with a diagnosis that gender transition is medically necessary and ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender.  The Directive further stated that for policies and standards that differ according to gender, the Army will recognize a Soldier's gender based on the gender marker that appears in DEERS.  It stated that "the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards" according to the gender marker in DEERS.

**App. 006**

**THE AUSTIN POLICY**

21. On January 25, 2021, President Joseph R. Biden rescinded the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

22. On April 30, 2021, the DoD implemented the EO through the issuance of DoD Instruction ("DoDI") 1300.28, entitled *In-Service Transition for Transgender Service Members* (the "Austin Policy"). The Austin Policy applies to all military departments and sets forth guidance to allow service by qualifying transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and

7

**App. 007**

retention is consistent with military service and readiness."  A true and correct copy of DoDI 1300.28 is attached as Exhibit D.

23. To implement the Austin Policy, the then-Acting Secretary of the Air Force issued Department of the Air Force Policy Memorandum 2021-36-01 (the "DAF Policy Memorandum"). As Assistant Secretary of the Air Force for Manpower and Reserve Affairs, my responsibilities included overseeing implementation of the DAF's policy permitting service by qualified transgender Airmen and Guardians.  A true and correct copy of the DAF Policy Memorandum is attached as Exhibit E.

24. The DAF Policy Memorandum states that "[s]ervice in the Air Force and Space Force should be open to all persons who can meet the high standards for military service and readiness" and that "transgender Service members or applicants for accession must be subject to the same standards as all other persons."  For any standard, requirement, or policy that "depends on whether an individual is male or female . . .  all persons will be subject to the standard, requirement, or policy associated with their gender marker in [DEERS]."

25. The DAF Policy Memorandum specifies that personnel will either be accessed or commissioned in accordance with medical standards issued by the DAF and the DoD.

26. The DAF Policy Memorandum also confirms that "[n]o person, sole[ly] based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force."  Additionally, for service members "whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition," the DAF Policy Memorandum states that they "should be treated, for purposes of separation and

**App. 008**

retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition."

27. In overseeing the implementation of the Austin Policy and the DAF Policy Memorandum, I was not aware of any negative impact that service by transgender Airmen or Guardians had on the Air Force, the Space Force, or our overall military readiness.

28. The Austin Policy fosters openness and trust among team members, enabling all members of our total force to bring their full selves to their high stakes mission, and thereby engenders stronger unit cohesion. This unit cohesion forms the basis of our military's ethos and is vital to successfully advancing America's national security interests around the world. To ensure America's Air and Space Forces are effective in deterring, denying, and — if necessary—defeating our adversaries, the DAF needs to recruit and retain the best talent the American people have available. As a result, we must be seen as an employer of choice in a highly competitive talent marketplace.

29. Any organization that is perceived by America's youth as discriminatory will be at a competitive disadvantage in this race for talent. In 2024, PRRI found that an overwhelming majority of Gen Z adults, ranging in age from 18 to 26, support nondiscrimination protections for LGBT people. (https://www.prri.org/spotlight/young-americans-views-on-lgbtq-rights/). In addition, the great majority of young adults know LGBT people as classmates, as teammates, as brothers and sisters, and as cousins. The Austin Policy not only sends a message to LGBT youth and their families that the military is open to everyone who can meet its high standards; it also sends a message to all other youth that it is not an organization that discriminates. A true and correct copy of the PRRI analysis is attached as Exhibit F.

**App. 009**

30. Further, the Austin Policy enables our military to retain highly trained and specialized service members that the American taxpayers have invested in financially by providing an opportunity to advance professionally and develop their leadership skills to support our readiness.

31. The military also has an obligation to provide health care to all service members. Gender transition-related health care is medically necessary health care. The Austin Policy fulfills the duty owed to service members to provide necessary care in a non-discriminatory manner to promote a ready force. An individual who seeks transgender health care does not abruptly disappear from the ranks, but rather works with a military medical practitioner to ensure readiness, both personal and unit readiness. This is consistent with the military's general medical policies for any other medically necessary treatment. It is also consistent with new parental leave policies enacted in 2022 which enable the military to retain key talent despite brief interruptions in service.

32. What is patently clear to me is that the Austin Policy has not negatively impacted readiness. During my time as Assistant Secretary, I did not attend a single meeting where concerns about the service of transgender Airmen or Guardians were raised.

33. It is also clear to me that allowing transgender service has had little or no effect on unit cohesion. I am not aware of any complaints regarding unit cohesion resulting from the non-discriminatory policy. To the contrary, in my experience, inclusion of transgender service members into units has been a non-issue. In a 2022 visit to Air Force Basic Military Training (BMT) at Lackland Air Force Base, I discussed the inclusion of transgender trainees with the command team of the 37th Training Wing, responsible for, among other things, providing foundational training for those entering the Air Force, Space Force, Air Force Reserve and Air National Guard—generating 93% of the enlisted corps. The command team reported to me that during their time in command, there had been four transgender trainees and there had been no

**App. 010**

issues for other trainees or for leadership.  To the extent the Austin Policy has had any appreciable impact on unit cohesion, I would assess its impact was either negligible or positive, in that not worrying about hiding one's authentic self improves focus on mission and as a result enables greater trust among team members.

34. Personnel policies that allow transgender service members to be evaluated based on merit rather than transgender status strengthen the military's mission of protecting the United States; they do not jeopardize it.  The true power of an All-Volunteer Force that reflects the diversity of the American people is in that it enables those that don't serve to understand it as an extension of their interests.  Anyone with a propensity to serve who meets our high entry and retention standards and is courageous enough to pledge that they will support and defend the Constitution, should be able to do so.

## IMPACT OF REVERSING THE AUSTIN POLICY

35. On January 27, 2025, President Trump issued an executive order reversing the Biden Administration's EO and mandating that all transgender people be barred from military service, including those already serving.

36. Such an abrupt reversal of established military personnel policy is both highly unusual and incredibly disruptive.

37. Absent any evidence, the Trump EO claims that the Austin Policy that has been in place since 2021 has had a negative impact on military effectiveness, lethality, and unit cohesion.  The Trump EO also claims, without evidence, that transgender people are inherently dishonorable, deceitful, and unfit for military service.  These claims are wholly unfounded and refuted by the reality that transgender people are serving honorably, effectively, and often with distinction in our Nation's military while meeting the same performance and medical standards as others.  The

11

**App. 011**

notion that being transgender reflects negatively on a person's honesty, character, or fitness has no basis in reality, is contradicted every day by the actual contributions of transgender service members, is cruel, and frankly beneath the dignity of the Commander-in-Chief of the United States Armed Forces.

38. Prohibiting transgender individuals from serving in the military is harmful to the military, degrades our recruiting enterprise, undermines unit readiness, and thus is inimical to our national security and the public interest for several reasons.

39. **Loss of Qualified Personnel.**  Prohibiting current transgender service members from accessing or serving in the military will result in the loss of opportunity for otherwise qualified Americans to consider military service, not only for transgender Americans, but for the rest of American youth (and their influencers) who would view the military as an institution that discriminates on bases unrelated to those qualifications to serve.  Indeed, perhaps the greatest value of the law rescinding "Don't Ask, Don't Tell" in 2010, was in realigning in the eyes of the American people the military's practice with its essential ethos: that ability and merit—rather than unjust discrimination—best enable good order and discipline, unit cohesion, and mission accomplishment.

40. For those currently serving, excising transgender service members from their units would undermine readiness and operational effectiveness.  Transgender service members, both officers and enlisted, hold key positions throughout units and well as leadership positions.

41. The loss of qualified personnel as a result of separating transgender service members could be particularly acute at a time of decreased familiarity with military service.  Although the DAF has achieved its 2024 enlisted recruiting goals and is well on its way to meet its increased 2025 goals, the DAF like the other services, is currently facing a reduced pool of American who meet

12

**App. 012**

military physical and heath standards.  This reality is further compounded by decreased familiarity with military service and especially strong private-sector economic conditions.  Unlike many private-sector companies, which can fill vacancies by simply tapping an experienced and flexible labor pool, the DAF builds and grows its own skilled specialists and leaders organically, and this typically requires years or decades.

42. **Worldwide Deployability.**  Allowing transgender service members to serve does not create any unique issues relating to deployability.  The DAF relies on force management models, reserve component mobilization, and, in some cases, civilian support to meet mission requirements.  Civilians are particularly well integrated into USSF operations, as approximately half the manpower of the USSF is civilian.  Responding to any deployability issues to the extent that they may arise for some individual transgender service member creates no greater challenges than those recently addressed by, for example, recent expansion of parental leave policies to 12 weeks for both female and male service members, or for the myriad other medical issues that result in short-term periods of non-deployability.  There is nothing about the healthcare needs of transgender individuals that in any way presents any unique issues relating to deployment.

43. **Erosion of Trust in Command.**  The abrupt reversal of policy is also harmful to military readiness because it erodes service members' trust in their command structure and its professionalism.  The military's effectiveness depends on a relationship of mutual trust between leaders and followers.  That trust, and the prompt following of commands, is essential to good order and discipline, unit cohesion, and the ensuing rapid response required to address unexpected crises or challenges.  Following the adoption of the Austin Policy permitting service by transgender persons in 2021, military leaders instructed service members that they should not discriminate

**App. 013**

against their transgender colleagues. For that policy to be abruptly reversed will inevitably erode trust in the reliability and integrity of military decision making.

44. This sudden reversal is harmful both to transgender service members and to other formerly disfavored groups that have been recently integrated into the military and into combat roles. In 2011, the policy prohibiting gay, lesbian, and bisexual people from openly serving in the military was formally repealed. More recently, DoD also removed remaining barriers for women serving in certain combat specialties. The sudden reversal of the DoD's recently adopted policy of inclusion sends a message that politics is driving the changes and other policies promoting readiness and equal opportunity may similarly be arbitrarily reversed.

45. **Readiness and Morale.** The sudden reversal of a policy adopted after substantial deliberation and rigorous data assessment will also have a deleterious effect on morale, as it undermines the confidence of service members that important military policy decisions will be based on rational, deliberate, and merit-based assessments. Airmen, Guardians, and other service members must believe that the orders and policies they are required to follow are based on the best interests of the force and the Nation, not impulse or a partisan political agenda to punish disfavored groups. This trust in the rationality and professionalism of our military leadership is also a key factor in recruiting and retaining talented personnel. The sudden reversal of the Austin Policy is not supported by data nor by lived experience, and as a result, it undermines confidence in the chain of command.

46. The impact to readiness, morale, good order and discipline, unit cohesion, and mission effectiveness engendered by the abrupt reversal of the Austin Policy permitting service by transgender people will have a negative impact not only on transgender service members, but on the joint force as a whole. Any suggestion that those serving to protect and defend our country

**App. 014**

will not have the full support of their entire chain of command will also undermine the DAF's ability to attract and retain highly qualified candidates who can perform at the highest levels necessary to complete the incredibly complex and critical national security missions asked of them, particularly in this new era of great power competition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 3, 2025
_____
Alex Wagner

# EXHIBIT A



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN 3 0 2016

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
            CHAIRMAN OF THE JOINT CHIEFS OF STAFF
            UNDER SECRETARIES OF DEFENSE
            DEPUTY CHIEF MANAGEMENT OFFICER
            CHIEF OF THE NATIONAL GUARD BUREAU
            GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
            DIRECTOR, COST ASSESSMENT AND PROGRAM
                EVALUATION
            INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
            DIRECTOR, OPERATIONAL TEST AND EVALUATION
            DEPARTMENT OF DEFENSE CHIEF INFORMATION OFFICER
            ASSISTANT SECRETARY OF DEFENSE FOR LEGISLATIVE
                AFFAIRS
            ASSISTANT TO THE SECRETARY OF DEFENSE FOR PUBLIC
                AFFAIRS
            DIRECTOR, NET ASSESSMENT
            DIRECTORS OF THE DEFENSE AGENCIES
            DIRECTORS OF THE DOD FIELD ACTIVITIES

SUBJECT:     Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender
             Service Members"

References:  DoD Directive 1020.02E, "Diversity Management and Equal Opportunity in the
                DoD," June 8, 2015
             DoD Directive 1350.2, "Department of Defense Military Equal Opportunity
                (MEO) Program," August 18, 1995
             DoD Instruction 6130.03, "Medical Standards for Appointment, Enlistment, or
                Induction in the Military Services," April 28, 2010, as amended

    Purpose. This DTM:

        • Establishes policy, assigns responsibilities, and prescribes procedures for the
          standards for retention, accession, separation, in-service transition, and
          medical coverage for transgender personnel serving in the Military Services.

        • Except as otherwise noted, this DTM will take effect immediately.  It will be
          converted to a new DoDI.  This DTM will expire effective June 30, 2017.

    Applicability. This DTM applies to OSD, the Military Departments (including the Coast
Guard at all times, including when it is a Service in the Department of Homeland Security by
agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the

*DTM-16-005*

Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

Policy.

- The defense of the Nation requires a well-trained, all-volunteer force comprised of Active and Reserve Component Service members ready to deploy worldwide on combat and operational missions.

- The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.

- These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity.

Responsibilities

- The Secretaries of the Military Departments will:

    o Take immediate action to identify all DoD, Military Department, and Service issuances, the content of which relate to, or may be affected by, the open service of transgender Service members.

    o Draft revisions to the issuances identified, and, as necessary and appropriate, draft new issuances, consistent with the policies and procedures in this memorandum.

    o Submit to the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) the text of any proposed revisions to existing Military Department and Service regulations, policies, and guidance, and of any proposed new issuance, no later than 30 days in advance of the proposed publication date of each.

- The USD(P&R) will:

    o Take immediate action to identify all DoD, Military Department, and Service issuances, the content of which relate to, or may be affected by, the open service of transgender Service members.

2

**App. 018**

*DTM-16-005*

o  Draft revisions to the issuances identified in this memorandum and, as necessary and appropriate, draft new issuances consistent with the policies and procedures in this memorandum.

Procedures.  See Attachment.

Releasability.  **Cleared for public release.**  This DTM is available on the DoD Issuances Website at http://www.dtic.mil/whs/directives.

Attachment:
As stated

cc:
Secretary of Homeland Security
Commandant, United States Coast Guard

3

*DTM-16-005*

<u>ATTACHMENT</u>

<u>PROCEDURES</u>

1.  <u>SEPARATION AND RETENTION</u>

a.  Effective immediately, no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity.

b.  Transgender Service members will be subject to the same standards as any other Service member of the same gender; they may be separated, discharged, or denied reenlistment or continuation of service under existing processes and basis, but not due solely to their gender identity or an expressed intent to transition genders.

c.  A Service member whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition.

2.  <u>ACCESSIONS</u>

a.  Medical standards for accession into the Military Services help to ensure that those entering service are free of medical conditions or physical defects that may require excessive time lost from duty.  Not later than July 1, 2017, the USD(P&R) will update DoD Instruction 6130.03 to reflect the following policies and procedures:

(1)  A history of gender dysphoria is disqualifying, **unless**, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

(2)  A history of medical treatment associated with gender transition is disqualifying, **unless**, as certified by a licensed medical provider:

(a)  the applicant has completed all medical treatment associated with the applicant's gender transition; and

(b)  the applicant has been stable in the preferred gender for 18 months; and

(c)  If the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

USCA Case #25-5087      Document #2108715      Filed: 04/01/2025      Page 26 of 394
Case 1:25-cv-00240-ACR      Document 13-22      Filed 02/03/25      Page 6 of 7

DTM-16-005

(3)  A history of sex reassignment or genital reconstruction surgery is disqualifying, **unless**, as certified by a licensed medical provider:

(a)  a period of 18 months has elapsed since the date of the most recent of any such surgery; and

(b)  no functional limitations or complications persist, nor is any additional surgery required.

b.  The Secretaries of the Military Departments and the Commandant, United States Coast Guard, may waive or reduce the 18-month periods, in whole or in part, in individual cases for applicable reasons.

c.  The standards for accession described in this memorandum will be reviewed no later than 24 months from the effective date of this memorandum and may be maintained or changed, as appropriate, to reflect applicable medical standards and clinical practice guidelines, ensure consistency with military readiness, and promote effectiveness in the recruiting and retention policies and procedures of the Armed Forces.

3.  <u>IN-SERVICE TRANSITION</u>

a.  Effective October 1, 2016, DoD will implement a construct by which transgender Service members may transition gender while serving, in accordance with DoDI 1300.28, which I signed today.

b.  Gender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs.

4.  <u>MEDICAL POLICY</u>.  Not later than October 1, 2016, the USD(P&R) will issue further guidance on the provision of necessary medical care and treatment to transgender Service members.  Until the issuance of such guidance, the Military Departments and Services will handle requests from transgender Service members for particular medical care or to transition on a case-by-case basis, following the spirit and intent of this memorandum and DoDI 1300.28.

5.  <u>EQUAL OPPORTUNITY</u>

a.  All Service members are entitled to equal opportunity in an environment free from sexual harassment and unlawful discrimination on the basis of race, color, national origin, religion, sex, or sexual orientation.  It is the Department's position, consistent with the U.S. Attorney General's opinion, that discrimination based on gender identity is a form of sex discrimination.

*DTM-16-005*

    b.  The USD(P&R) will revise DoD Directives (DoDDs) 1020.02E," Diversity Management and Equal Opportunity in the DoD," and 1350.2,"Department of Defense Military Equal Opportunity (MEO) Program," to prohibit discrimination on the basis of gender identity and to incorporate such prohibitions in all aspects of the DoD MEO program.  The USD(P&R) will prescribe the period of time within which Military Department and Service issuances implementing the MEO program must be conformed accordingly.


6.  <u>EDUCATION AND TRAINING</u>

    a.  The USD(P&R) will expeditiously develop and promulgate education and training materials to provide relevant, useful information for transgender Service members, commanders, the force, and medical professionals regarding DoD policies and procedures on transgender service.  The USD(P&R) will disseminate these training materials to all Military Departments and the Coast Guard not later than October 1, 2016.

    b.  Not later than November 1, 2016, each Military Department will issue implementing guidance and a written force training and education plan.  Such plan will detail the Military Department's plan and program for training and educating its assigned force (to include medical professionals), including the standards to which such education and training will be conducted, and the period of time within which it will be completed.


7.  <u>IMPLEMENTATION AND TIMELINE</u>

    a.  Not later than October 1, 2016, the USD(P&R) will issue a Commander's Training Handbook, medical guidance, and guidance establishing procedures for changing a Service member's gender marker in DEERS.

    b.  In the period between the date of this memorandum and October 1, 2016, the Military Departments and Services will address requests for gender transition from serving transgender Service members on a case-by-case basis, following the spirit and intent of this memorandum and DoDI 1300.28.

3                Attachment

**App. 022**

# EXHIBIT B



**SECRETARY OF THE ARMY**
**WASHINGTON**

0 1 JUL 2016

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

1. References:

   a.  Department of Defense (DoD) Directive-type Memorandum (DTM) 16-005, Military Service of Transgender Service Members, June 30, 2016.

   b.  DoD Instruction 1300.28 (In-Service Transition for Transgender Service Members), June 30, 2016.

2.  Pursuant to references a and b, it is Army policy to allow open service by transgender Soldiers. The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender.  An otherwise qualified Soldier shall not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity.

3.  No later than July 5, 2016, the Assistant Secretary of the Army for Manpower and Reserve Affairs (ASA (M&RA)) will do the following.

   a.  Establish a Transgender Service Implementation Group (TSIG) to develop policies and procedures for transgender service.  ASA (M&RA) will Chair the TSIG.  Members of the TSIG will be in the rank/grade of General Officer, Civilian Senior Executive Service, or Command Sergeant Major/Sergeant Major and include representatives from the ASA (M&RA), Deputy Chief of Staff G-1, Deputy Chief of Staff G-3/5/7, Office of General Counsel, Office of the Judge Advocate General, Office of the Chief of Chaplains, the Assistant Chief of Staff for Installation Management, U.S. Army Forces Command, U.S. Army Training and Doctrine Command, Office of the Inspector General, and Office of the Surgeon General.

   b.  Establish and embed a Service Central Coordination Cell (SCCC) as a sub-committee within the TSIG.  The SCCC will be comprised of medical, legal, and military personnel experts.  The SCCC will serve as a resource for commanders, address commanders' inquires, and process requests for exceptions to policy.

**App. 024**

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

4.  All commands, organizations, activities, and personnel of the Department of the Army will fully support the ASA (M&RA), as chair of the TSIG, in the execution of the assigned tasks.

5.  Exceptions to Policy (ETP).  At present, the Army does not have codified procedures and policy for gender transition to include completing a gender marker change in the Defense Enrollment Eligibility Reporting System (DEERS).  Until the Army establishes such procedures and policy, the following guidance concerning ETPs will apply:

   a.  For Soldiers whose gender transition is otherwise complete but are awaiting a change to their gender marker, their ETPs shall be processed within ten days after receipt of the ETP by the SCCC and shall be given a presumption in favor of approval. For the purposes of this provision, a Soldier's gender transition is complete when the Soldier has received a diagnosis indicating gender transition is medically necessary from a military medical provider, has completed medically necessary treatment, and has obtained the required documentation supporting a gender change.  The Soldier's chain of command shall provide the SCCC with a recommendation for action on the ETP, and an assessment of an approved ETP on readiness and good order and discipline.

   b.  All other requests for ETPs from Soldiers will include the medical diagnosis from a military medical provider and an approved treatment plan with the expected date of completion.  The chain of command will provide recommendations for action and an assessment of an approved ETP on readiness and good order and discipline.

   c.  All requests will be submitted through the first General Officer in the chain of command.  Commanders shall forward all requests for ETPs related to gender transition (to include application of standards for uniform and grooming, body composition assessment, and physical readiness testing) through the chain of command to the SCCC for a recommendation to the ASA (M&RA), who will make the decision.

   d.  The ASA (M&RA) shall provide a report on a weekly basis to the Chief of Staff and me summarizing the requests for ETPs and the ASA (M&RA)'s decisions.

6. The ASA (M&RA), through the TSIG, is responsible for ensuring completion of the following tasks no later than the prescribed dates:

   a.  Training and educating the force is necessary to sustain readiness.  The Army shall create a force-wide training and education plan no later than November 1, 2016. This training shall be completed across the Army no later than July 1, 2017.

   b.  The Army will continue to provide medically necessary care and treatment to all Soldiers, consistent with applicable laws, policies, and procedures.  No later than 45 days following DoD Under Secretary of Defense for Personnel and Readiness published

2

**App. 025**

SUBJECT: Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

guidance on the provision of medical care to transgender Service members, the Army shall issue guidance to its medical providers to ensure they are prepared to offer or arrange for all medically necessary care for our transgender Soldiers.

   c.  No later than October 1, 2016, the ASA (M&RA) will recommend a policy addressing the military service of transgender Soldiers, to include establishing a process by which transgender Soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in DEERS.  In addition, the ASA (M&RA) will identify applicable Army issuances to be updated accordingly.

7.  All Soldiers should be able to perform their duties free from unlawful discrimination. It is Army policy that discrimination based on gender identity is a form of sex discrimination. Army commanders shall promote an environment that is free from gender identity discrimination. No later than October 1, 2016, the Army's issuances implementing the DoD Military Equal Opportunity Program shall be updated to prohibit discrimination on the basis of gender identity and incorporate such prohibitions in all aspects of the Army MEO program.

8.  The provisions of this directive are effective immediately and apply to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States.  This directive shall be rescinded upon publication of revised issuances and updates to governing regulations.

Eric K. Fanning

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
U.S. Army Forces Command
U.S. Army Training and Doctrine Command
U.S. Army Materiel Command
U.S. Army Pacific
U.S. Army Europe
U.S. Army Central
U.S. Army North
U.S. Army South
U.S. Army Africa/Southern European Task Force
U.S. Army Special Operations Command
(CONT)

3

**App. 026**

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)


DISTRIBUTION:  (CONT)

Military Surface Deployment and Distribution Command
U.S. Army Space and Missile Defense Command/Army Strategic Command
U.S. Army Medical Command
U.S. Army Intelligence and Security Command
U.S. Army Criminal Investigative Command
U.S. Army Corps of Engineers
U.S. Army Military District of Washington
U.S. Army Test and Evaluation Command
U.S. Army Installation Management Command
Superintendent, United States Military Academy
Director, U.S. Army Acquisition Support Center
Executive Director, Arlington National Cemetery
Commander, U.S. Army Accessions Support Brigade
Commandant, U.S. Army War College
Commander, Second Army

CF:
Director, Army National Guard
Director of Business Transformation
Commander, Eighth Army
Commander, U.S. Army Cyber Command

4

**App. 027**

# EXHIBIT C



**SECRETARY OF THE ARMY**
**WASHINGTON**

0 7 OCT 2016

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

1.  References. A complete list of references is at enclosure 1.

2.  The Army is open to all who can meet the standards for military service and readiness and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. The Army allows transgender Soldiers to serve openly. Consistent with this policy, the following principles shall apply:

  a.  No otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of the Soldier's gender identity.

  b.  Army medical providers will diagnose and provide medically necessary care and treatment for transgender Soldiers eligible for military medical care in accordance with the guidance for transgender care issued by the Assistant Secretary of Defense (Health Affairs) and the Army Surgeon General. Consistent with that guidance, a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition.

  c.  For policies and standards that apply differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS). Coincident with that gender marker, the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards applied with consideration of the member's gender. For facilities subject to regulation by the Army, a Soldier uses those billeting, bathroom, and shower facilities associated with the Soldier's gender marker in DEERS.

3.  This directive establishes policies and procedures for gender transition in the Army. Gender transition in the Army begins when a Soldier receives a diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care) indicating that gender transition is medically necessary. Gender transition ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender.

SUBJECT: Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

a. Any Soldier with a diagnosis indicating that gender transition is medically necessary must ensure that his or her chain of command is informed of the diagnosis and projected schedule for medical treatment that is part of the Soldier's medical treatment plan, including an estimated date for a change in the Soldier's gender marker, and must request that the chain of command approve the timing of the medical treatment. The Soldier must notify his or her chain of command of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

b. The exact procedures Soldiers, military medical providers, and commanders are to follow in relation to a Soldier's gender transition depend on the Soldier's duty status and eligibility for military medical care. Procedures for Soldiers on active duty and eligible for military medical care are in enclosure 2. Procedures for Soldiers serving in the Selected Reserve in the U.S. Army Reserve or Army National Guard, including Individual Mobilization Augmentees, are in enclosure 3. Procedures for Soldiers serving in the Standby Reserve or Individual Ready Reserve are in enclosure 4. Procedures for Soldiers serving in the Inactive National Guard are in enclosure 5.

c. When the Soldier is stable in his or her preferred gender, as determined or confirmed by a military medical provider, the Soldier may request approval of a change to their gender marker in DEERS through the procedures identified in enclosures 2 through 5. The request for a change in gender marker must be supported by a medical diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care) indicating that gender transition is medically necessary; confirmation from a military medical provider that the Soldier is stable in the preferred gender; and legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

d. Within 30 days after receiving a request for a change to a Soldier's gender marker and all required documentation (within 60 days for reserve component Soldiers), the applicable approval authority identified in enclosures 2 through 5 will approve a change to the Soldier's gender marker in DEERS to show the Soldier's preferred gender. The approval will be in writing and state the effective date of the change to the Soldier's gender marker.

e. The Soldier's gender marker will be changed upon submission of the written approval to the Commander, U.S. Army Human Resources Command. Human Resources Command will make the change in the Army personnel information systems, which in turn will update the gender marker in DEERS.

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

f.  After the gender marker in DEERS is changed to show a Soldier's preferred gender, the Soldier will be expected to adhere to Army standards applicable to the preferred gender, as described in paragraph 2c.

g.  The change to the gender marker in DEERS does not preclude additional medically necessary care.

4.  Commanders are responsible and accountable for the overall readiness of their command.  Commanders are also responsible for the collective morale, welfare, good order, and discipline of their unit; for the command climate; and for ensuring that all members of the command are treated with dignity and respect.

a.  Commanders should approach a Soldier undergoing gender transition in the same way they would approach a Soldier undergoing any medically necessary treatment.  Commanders will continue to minimize effects to the mission and ensure continued unit readiness.  Commanders will balance the needs of the individual transitioning Soldier and the needs of the command in a manner that is comparable to the actions available to the commander in addressing comparable medical circumstances unrelated to gender transition.  Commanders may consider the following actions:

(1)  Adjusting the date on which the Soldier's gender transition, or any component of the gender transition process, will begin.

(2)  Advising a Soldier of the availability of options for extended leave status or participation in other voluntary absence programs during the gender transition process, in accordance with Army Regulation (AR) 600-8-10 (Leaves and Passes).

(3)  Processing requests for exceptions to policy (ETPs) associated with gender transition in accordance with paragraph 5.

(4)  Establishing or adjusting local policies on the use of billeting, bathroom, and shower facilities subject to regulation by the military during the gender transition process, consistent with paragraphs 4b and 4c.

(5)  Referring the Soldier for a determination of fitness in the disability evaluation system in accordance with DoD Instruction 1332.18 (Disability Evaluation System (DES)) and AR 40-501 (Standards of Medical Fitness).

(6)  Taking other actions, including the initiation of administrative or other proceedings, comparable to actions that could be initiated for other Soldiers whose ability to serve is similarly affected for reasons unrelated to gender transition.

**App. 031**

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

b.  Soldiers must accept living and working conditions that are often austere, primitive, and characterized by little or no privacy.  All Soldiers will use the billeting, bathroom, and shower facilities associated with their gender marker in DEERS.  However, commanders have discretion to employ reasonable accommodations to respect the modesty or privacy interests of Soldiers, including discretion to alter billeting assignments or adjust local policies on the use of bathroom and shower facilities, in accordance with Army policy, in the interest of maintaining morale, good order, and discipline and consistent with performance of the mission.  Nevertheless, no commander may order a Soldier on the basis of his or her gender identity or transitioning status to use a billeting, bathroom, or shower facility not required of other Soldiers with the same gender marker.

c.  Facilities will not be designated, modified, or constructed to make transgender-only areas.  If modifications are made to accommodate the modesty or privacy concerns of a Soldier, they must be made available for all Soldiers to use.  Commanders will accommodate privacy concerns using existing facilities and furnishings where possible and will modify facilities only when other options are ineffective.

d.  Commanders should remain mindful of the privacy of personal or health-related information concerning the Soldiers in their command.  Personal information regarding transgender Soldiers should be safeguarded to the same extent as comparable information regarding any other Soldier.

e.  The Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA (M&RA)) has established a Service Central Coordination Cell composed of medical, legal, and military personnel experts to provide advice and assistance to commanders, address their inquiries, and process requests for ETPs in connection with gender transition for decision by the ASA (M&RA).

5.  In general, Soldiers are expected to comport with the standards of their gender marker in DEERS.  In the event that a Soldier undergoing gender transition is unable to meet a particular Army standard as a result of medical treatment or other aspects of the Soldier's gender transition, the Soldier's chain of command, together with the Soldier and/or the military medical provider, should consider options (for example, adjusting the date of a physical fitness test or extended leave options) other than requesting an ETP to depart from Army standards.  If submitted, a request for an ETP to depart from the standards of a Soldier's gender marker in DEERS must be processed according to the procedures outlined in this paragraph and will be evaluated on a case-by-case basis.

a.  An active duty or Selected Reserve Soldier should submit the ETP request through the Soldier's chain of command.  An Individual Ready Reserve or Standby Reserve Soldier should submit the ETP request to the Commander, Human Resources

**App. 032**

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)


Command.  An Inactive National Guard Soldier should submit the ETP request to the Director, Army National Guard.

b.  When submitting an ETP request, the Soldier must identify the specific policy for which the Soldier is seeking an exception and explain the reason for the request.  The request must be accompanied by a medical diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care), an approved medical treatment plan identifying medically necessary treatment and a projected schedule for such treatment, and an estimated date for completion of the treatment pursuant to the medical treatment plan.

c.  As soon as practicable, but no later than 60 days after receipt of an ETP request, the recipient of the request (as identified in paragraph 5a) must forward the request through the first general officer in the chain of command to the Service Central Coordination Cell or, if disestablished, to the relevant policy proponent in Headquarters, Department of the Army.  Informed, as appropriate, by advice from a military medical provider, the recipient must provide a recommendation for action on the ETP request and an assessment of the expected effects, if any, the ETP will have on mission readiness and the good order and discipline of the unit.  Commanders should include in their assessment a discussion of what other actions not requiring deviation from Army policies they considered or used and why the actions were ineffective or inadequate.

d.  The ASA (M&RA) has withheld the authority to decide requests for ETPs in relation to a Soldier's gender transition.

6.  Effective immediately, the following regulations will be revised in accordance with the language in enclosure 6:  AR 40-501, AR 135-178, AR 600-20, AR 600-85, AR 635-200, and AR 638-2.  The Deputy Chief of Staff (DCS), G-1, the proponent of AR 601-270 and AR 670-1, will review those regulations for consistency with this directive and references a and b and update those regulations as necessary.  In addition, the Army will take the following actions:

a.  Training and educating the force is necessary to sustain readiness.  No later than 1 November 2016, the Army will develop the necessary training and education to ensure that all members of the force understand the core principles of Army policy on the military service of transgender Soldiers.  Training and education via chain teaching across the Army will be completed no later than 1 July 2017.  In addition, by 1 July 2017, the Army will adjust existing blocks of instruction throughout the Army to sustain the training and education of the Army policy concerning transgender military service.

b.  This directive does not alter Army accessions policy.  No later than 1 July 2017, the Under Secretary of Defense (Personnel and Readiness) will update the policies and procedures governing accessions for transgender applicants in DoD Instruction 6130.03

**App. 033**

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

(Medical Standards for Appointment, Enlistment, or Induction in the Military Services). No later than 60 days after those policies and procedures are published, the Army will update its accessions policy.

    c.  No later than 1 October 2017, the ASA (M&RA) will provide the Secretary of the Army with an assessment of whether the Service Central Coordination Cell should be continued, disestablished, or become a permanent body.  At that time, the ASA (M&RA) will also reassess whether the ASA (M&RA) should continue to retain approval authority for ETPs associated with gender transition or should delegate the authority to the proponents of the underlying policy.

    d.  No later than 1 October 2018, The Inspector General will provide the Secretary of the Army with a report of inspection on the Army's compliance with reference b and this directive.  This report will be used for assessing and overseeing compliance; identifying compliance deficiencies, if any; initiating timely corrective action, as appropriate; and identifying best practices and lessons learned.

    e.  All Army activities will review local regulations and policies for consistency with this directive and references a and b and update those regulations and policies as necessary.

7.  The provisions of this directive are effective immediately and apply to all personnel in the Active Army, Army National Guard/Army National Guard of the United States, and Army Reserve.  The directive will be rescinded upon publication of revised issuances and updated to governing regulations.  The ASA (M&RA) is the proponent for this policy.  The point of contact is Chief, Accessions Division, DCS, G-1, 703-695-7693, DSN 312-225-7693.

Encls                                     Eric K. Fanning

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
    U.S. Army Forces Command
    U.S. Army Training and Doctrine Command
    U.S. Army Materiel Command
    U.S. Army Europe
    U.S. Army Central
    U.S. Army North
    (CONT)

**App. 034**

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)


DISTRIBUTION:  (CONT)
U.S. Army South
U.S. Army Pacific
U.S. Army Africa/Southern European Task Force
U.S. Army Special Operations Command
Military Surface Deployment and Distribution Command
U.S. Army Space and Missile Defense Command/Army Strategic Command
U.S. Army Cyber Command
U.S. Army Medical Command
U.S. Army Intelligence and Security Command
U.S. Army Criminal Investigation Command
U.S. Army Corps of Engineers
U.S. Army Military District of Washington
U.S. Army Test and Evaluation Command
U.S. Army Installation Management Command
Superintendent, United States Military Academy
Director, U.S. Army Acquisition Support Center
Executive Director, Arlington National Cemetery
Commander, U.S. Army Accessions Command
Commander, U.S. Army War College
Commander, Second Army

CF:
Director, Army National Guard
Director of Business Transformation
Commander, Eighth U.S. Army

7

**App. 035**

### REFERENCES

a.  Department of Defense (DoD) Directive-type Memorandum (DTM) 16-005 (Military Service of Transgender Service Members), June 30, 2016.

b.  DoD Instruction 1300.28 (In-Service Transition for Transgender Service Members), July 1, 2016.

c.  DoD Instruction 1332.18 (Disability Evaluation System (DES)), August 5, 2014.

d.  DoD Instruction 6130.03 (Medical Standards for Appointment, Enlistment, or Induction in the Military Services), April 28, 2010, Incorporating Change 1, September 13, 2011.

e.  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers), 1 July 2016.

f.  Army Regulation (AR) 40-501 (Standards of Medical Fitness), 14 December 2007, Including Rapid Action Revision Issued 4 August 2011.

g.  AR 135-178 (Enlisted Administrative Separations), 18 March 2014.

h.  AR 600-8-10 (Leaves and Passes), 15 February 2006, Including Rapid Action Revision Issued 4 August 2011.

i.  AR 600-20 (Army Command Policy), 6 November 2014.

j.  AR 600-85 (The Army Substance Abuse Program), 28 December 2012.

k.  AR 601-270 (Army Retention Program), 1 April 2016.

l.  AR 635-200 (Active Duty Enlisted Administrative Separations), 6 June 2005, Including Rapid Action Revision Issued 6 September 2011.

m. AR 638-2 (Army Mortuary Affairs Program), 23 June 2015.

n.  AR 670-1 (Wear and Appearance of Army Uniforms and Insignia), 10 April 2015.

**GENDER TRANSITION FOR ACTIVE DUTY SOLDIERS**

1.  The gender transition process for a Soldier serving on active duty and eligible for military medical care begins when the Soldier receives a diagnosis from a military medical provider indicating that gender transition is medically necessary.  The Soldier must ensure that his or her brigade-level commander is informed, through command channels, of the diagnosis and projected schedule for medical treatment that is part of the Soldier's medical treatment plan, including an estimated date for a change in the Soldier's gender marker.  The Soldier must request that the brigade-level commander approve the timing of the medical treatment.  The Soldier must also notify his or her brigade-level commander of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

2.  Upon establishing a diagnosis indicating that gender transition is necessary, the military medical provider is responsible for developing a medical treatment plan and presenting the plan through command channels to the Soldier's brigade-level commander.  The provider must advise the brigade-level commander on the medical diagnosis applicable to the Soldier, including the provider's assessment of medically necessary care and treatment, the urgency of the proposed care and treatment, the likely effect of the care and treatment on the individual's readiness and deployability, and the extent of the human and functional support network needed to support the individual.

3.  The Soldier's brigade-level commander is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition and must:

- consider the Soldier's individual facts and circumstances, including the Soldier's medical treatment plan;

- ensure military readiness by minimizing effects to the mission (including deployment, operational, training, and exercise schedules, and critical skills availability); and

- maintain the morale, welfare, good order, and discipline of the unit.

Upon receipt of the Soldier's request, the brigade-level commander will notify the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  The brigade-level commander will approve the timing of the medical treatment in writing.  The timing of the treatment may be adjusted, after consulting with the medical provider, based on unscheduled requirements.

4.  The medical provider, in consultation with the Soldier, must advise the brigade-level commander when the Soldier has completed the medical treatment necessary to achieve stability in the preferred gender and recommend to the brigade-level commander when the Soldier's gender marker should be changed in the Defense

Army Directive 2016-35                                                        Enclosure 2

Enrollment Eligibility Reporting System (DEERS). At that point, the Soldier may request that the brigade-level commander approve a change to the Soldier's gender marker.

a. In support of the request, the Soldier must ensure that the brigade-level commander receives:

- a medical diagnosis from a military medical provider indicating that gender transition is medically necessary;

- confirmation from the military medical provider that the Soldier is stable in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

b. Upon receipt of the Soldier's request for a change to his or her gender marker, the brigade-level commander will notify the SCCC and consult the SCCC in responding to the request. The brigade-level commander will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt. Within 30 days after receiving all required information from the Soldier, the brigade-level commander will approve the request, including the date when the Soldier's gender marker should be changed in Army personnel information systems, which will initiate the gender marker change in DEERS.

c. A Soldier's gender marker will be changed when his or her brigade-level commander submits written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky 40122. Human Resources Command will make the change in Army personnel information systems, which will update the gender marker in DEERS.

## GENDER TRANSITION FOR U.S ARMY RESERVE AND ARMY NATIONAL GUARD SELECTED RESERVE SOLDIERS

1.  The gender transition process for a Soldier serving in the Selected Reserve in the Army Reserve or Army National Guard (ARNG), including Individual Mobilization Augmentees, who is not eligible for military medical care begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis through command channels to his or her brigade-level commander, accompanied by a projected schedule for medical treatment and an estimated date for a change in the Soldier's gender marker, and request that the commander approve the timing of the medical treatment.  The Soldier must also notify the brigade-level commander in the event of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

2.  The Soldier's brigade-level commander is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition and must:

- consider the Soldier's individual facts and circumstances, including the Soldier's expected medical treatment schedule;

- ensure military readiness by minimizing effects to the mission (including deployment, operational, training, and exercise schedules, and critical skills availability); and

- maintain the morale, welfare, good order, and discipline of the unit.

Upon receipt of the Soldier's request, the brigade-level commander will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving the request, the brigade-level commander will submit the Soldier's request and diagnosis to, as appropriate, U.S. Army Reserve Command's Command Surgeon or the Chief Surgeon, ARNG, who will confirm any civilian medical diagnosis that gender transition is medically necessary.  The brigade-level commander's approval of the timing of medical treatment will be in writing.  The timing of the treatment may be adjusted, after consulting with the medical provider, based on unscheduled requirements.

3.  After the brigade-level commander approves the timing of medical treatment and once the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may request, through command channels, that the brigade-level commander approve a change to the Soldier's gender marker.

   a.  In support of the request, the Soldier must include:

   - the medical diagnosis indicating that gender transition is medically necessary;

Army Directive 2016-35                                              Enclosure 3

**App. 039**

- confirmation from a medical provider that the Soldier's medical treatment plan is complete and that the Soldier has achieved stability in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the brigade-level commander will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the brigade-level commander will submit the Soldier's request to, as appropriate, Reserve Command's Command Surgeon or the Chief Surgeon, ARNG for confirmation of the medical determination that the Soldier has achieved stability in the preferred gender.

c.  The brigade-level commander will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from the Soldier, the brigade-level commander will approve the request, including the date when the Soldier's gender marker should be changed, and will submit the written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  Human Resources Command will make the change in Army personnel information systems, which will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

**App. 040**

**GENDER TRANSITION FOR SOLDIERS SERVING IN THE STANDBY RESERVE OR INDIVIDUAL READY RESERVE**

1.  The gender transition process for a Soldier serving in the Standby Reserve or Individual Ready Reserve begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis to the Commander, Human Resources Command (HRC), accompanied by a projected schedule for medical treatment with an estimated date for a change in the Soldier's gender marker, and request that the Commander, HRC approve the timing of the medical treatment.  The Soldier must also notify the Commander, HRC in the event of any change to the projected schedule for such treatment or the estimated date for the change in the Soldier's gender marker.

2.  Upon receipt of a request, the Commander, HRC is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition.  Factors the Commander, HRC should consider when reviewing the request include the likelihood of the Soldier's return to active service as well as any military necessity that may warrant the mobilization or activation of the Soldier.  Upon receipt of the Soldier's request, the Commander, HRC will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving the timing of any medical treatment, the Commander, HRC will also ensure that the HRC Command Surgeon confirms any civilian medical diagnosis that gender transition is medically necessary.  The timing of the approval will be noted in a memorandum HRC provides to the Soldier.  The Commander, HRC may adjust the timing, after consulting with the medical provider, based on unscheduled requirements.

3.  After the Commander, HRC approves the timing of medical treatment and the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may ask the commander to approve a change to the Soldier's gender marker.

    a.  In support of the request, the Soldier must include:

- the medical diagnosis indicating that gender transition is medically necessary;

- confirmation from a medical provider that the Soldier's medical treatment plan is complete and the Soldier has achieved stability in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

    b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the Commander, HRC will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the Commander, HRC will ensure that the HRC

Army Directive 2016-35                                        Enclosure 4

Command Surgeon confirms the medical diagnosis that the Soldier has achieved stability in the preferred gender.

    c.  The Commander, HRC will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from a Soldier, the Commander, HRC will approve the request, including the effective date of the gender marker change, and change the Soldier's gender marker in Army personnel information systems.  This will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

## GENDER TRANSITION FOR SOLDIERS SERVING IN THE
## INACTIVE NATIONAL GUARD

1.  The gender transition process for a Soldier serving in the Inactive National Guard begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis to the Director, Army National Guard (ARNG), accompanied by a projected schedule for medical treatment and an estimated date for a change in the Soldier's gender marker, and request that the Director, ARNG approve the timing of the medical treatment.  The Soldier must also notify the Director in the event of any change to the projected schedule for the treatment or the estimated date for the change in the Soldier's gender marker.

2.  Upon receipt of a request, the Director, ARNG is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition.  Factors the Director, ARNG should consider when reviewing the request include the likelihood of the Soldier's return to active status or active duty, as well as any military necessity that may warrant the mobilization or activation of the Soldier.  Upon receipt of the Soldier's request, the Director, ARNG will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving any treatment plan, the Director, ARNG will also ensure that the Chief Surgeon, ARNG confirms any civilian medical diagnosis that gender transition is medically necessary.  The Director may adjust the timing of the treatment, after consulting with the medical provider, based on unscheduled requirements.

3.  After the Director, ARNG approves the timing of the medical treatment and after the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may ask the Director, ARNG to approve a change in the Soldier's gender marker.

   a.  In support of the request, the Soldier must provide:

   - the medical diagnosis indicating that gender transition is medically necessary;

   - confirmation from a medical provider that the Soldier's medical treatment plan is complete and the Soldier has achieved stability in the preferred gender; and

   - legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

   b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the Director, ARNG will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the Director will ensure that the Chief Surgeon, ARNG confirms the medical diagnosis that the Soldier has achieved stability in the preferred gender.

Army Directive 2016-35                                               Enclosure 5

**App. 043**

    c.  The Director, ARNG will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from a Soldier, the Director, ARNG will approve the request, including the effective date of the gender marker change, and submit the written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  HRC will make the change in Army personnel information systems, which will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

## PROPOSED REVISIONS TO ARMY REGULATIONS

**AR 40-501 (Standards of Medical Fitness), 14 December 2007:**

*Contents, page iii, line 15 should be revised to read:*

Personality, psychosexual conditions, ~~transsexual, gender identity,~~ exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified • 3–35, page 33

*Paragraph 2-14a(5) should be revised to read:*

(5)  History of major abnormalities or defects of the genitalia such as ~~change of sex (P64.5),~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis (752.7), or dysfunctional residuals from surgical correction of these conditions does not meet the standard.

*Paragraph 2-14d should be revised to read:*

d.  History of major abnormalities or defects of the genitalia, such as ~~a change of sex (P64.5),~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis (752.7), or dysfunctional residuals from surgical correction of these conditions does not meet the standard.

*Paragraph 2-27n should be revised to read:*

n.  Current or history of psychosexual conditions (302), including, but not limited to ~~transsexualism,~~ exhibitionism, transvestism, voyeurism, and other paraphilias, do not meet the standard.

*Paragraph 3-35 should be revised to read:*

**3-35. Personality, psychosexual conditions, ~~transsexual, gender identity,~~ exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified**
a.  A history of, or current manifestations of, personality disorders, disorders of impulse control not elsewhere classified, transvestism, voyeurism, other paraphilias, or factitious disorders, psychosexual conditions ~~transsexual, gender identity disorder to include major abnormalities or defects of the genitalia such as change of sex or a current attempt to change sex,~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis or dysfunctional residuals from surgical correction of these conditions render an individual administratively unfit.

**AR 135-178 (Enlisted Administrative Separations), 18 March 2014:**

Lines 25-26 on the Summary of Change should be revised to read:

o Adds transsexualism/gender transformation in accordance with AR 40-501 as a basis for separation. (para 6-7a).

Paragraph 6-7a should be revised to read:

a. *Criteria.*  The separation authority (para 1–10, of this regulation) may approve discharge under this paragraph on the basis of other physical or mental conditions not amounting to disability (AR 635–40) that potentially interfere with assignment to or performance of military duty.  Such conditions may include, but are not limited to, chronic airsickness or seasickness, enuresis, sleepwalking, dyslexia, severe nightmares, claustrophobia, personality disorder, transvestism, gender identity disorder or gender dysphoria, and other related conditions in accordance with AR 40–501, paragraph 3–35. Transsexualism/gender transformation in accordance with AR 40–501, and other disorders manifesting disturbances of perception, thinking, emotional control or behavior sufficiently severe that the Soldier's ability to perform military duties effectively is significantly impaired.

**AR 600-20 (Army Command Policy), 6 November 2014**

Replace all references to discrimination based on sex or gender with "sex (including gender identity)."

**AR 600–85 (The Army Substance Abuse Program), 28 December 2012**

Appendix E, paragraph E-4b(2) should be revised to read:

(2)  Optional wide mouth collection cup (for females).

Appendix E, paragraph E-5h should be revised to read:

h.  If the Soldier is female requires use of the optional wide mouth collection cup, the optional wide mouth collection cup will be issued to the Soldier at this time.

Appendix E, paragraph E-5m should be revised to read:

m.  The following procedure applies to female Soldiers who usetilize the wide mouth collection cups:

**AR 635-200 (Active Duty Enlisted Administrative Separations), 6 June 2005**

Paragraph 5-17a should be revised to read:

a.  Commanders specified in paragraph 1–19 may approve separation under this paragraph on the basis of other physical or mental conditions not amounting to disability (AR 635–40) and excluding conditions appropriate for separation processing under paragraph 5–11 or 5–13 that potentially interfere with assignment to or performance of duty.  Such conditions may include, but are not limited to—
(1)  Chronic airsickness.
(2)  Chronic seasickness.
(3)  Enuresis.
(4)  Sleepwalking.
(5)  Dyslexia.
(6)  Severe nightmares.
(7)  Claustrophobia.
(8)  ~~Transsexualism/gender transformation in accordance with AR 40-501 paragraph 3-35.~~

~~(9)~~ Other disorders manifesting disturbances of perception, thinking, emotional control, or behavior sufficiently severe that the Soldier's ability to effectively perform military duties is significantly impaired.  Soldiers with 24 months or more of active duty service may be separated under this paragraph based on a diagnosis of personality disorder.  For Soldiers who have been deployed to an area designated as an imminent danger pay area, the diagnosis of personality disorder must be corroborated by the MTF Chief of Behavioral Health (or an equivalent official).  The corroborated diagnosis will be forwarded for final review and confirmation by the Director, Proponency of Behavioral Health, Office of the Surgeon General (DASG-HSZ).  Medical review of the personality disorder diagnosis will consider whether PTSD, Traumatic Brain Injury (TBI), and/or other comorbid mental illness may be significant contributing factors to the diagnosis.  If PTSD, TBI, and/or other comorbid mental illness are significant contributing factors to a mental health diagnosis, the Soldier will not be processed for separation under this paragraph, but will be evaluated under the physical disability system in accordance with AR 635–40.


**AR 638–2 (Army Mortuary Affairs Program), 23 June 2015**

Paragraph 2-9b(1) should be revised to read:

(1)  No uniform is authorized; dark suit only or equivalent for females ~~and transgenders~~.

**App. 047**

# EXHIBIT D



# DoD Instruction 1300.28

# In-Service Transition for Transgender Service Members

---

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | April 30, 2021 (This issuance supersedes any previously published contradictory guidance). |
| **Change 1 Effective:** | December 20, 2022 |
| **Releasability:** | Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 1300.28, "Military Service by Transgender Persons and Persons with Gender Dysphoria," September 4, 2020 |
| **Approved by:** | Virginia S. Penrod, Acting Under Secretary of Defense for Personnel and Readiness |
| **Change 1 Approved by:** | Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness |

---

**Purpose:**  In accordance with the authority in DoD Directive 5124.02, this issuance establishes policy, assigns responsibilities, and prescribes procedures:

- Regarding the process by which Service members may transition gender while serving.

- For changing a Service member's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).

- For medical care for Active Component (AC) and Reserve Component (RC) transgender Service members.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ............................................................. 3
    1.1. Applicability. .................................................................................................. 3
    1.2. Policy. ............................................................................................................. 3
    1.3. Summary of Change 1. .................................................................................. 3
SECTION 2: RESPONSIBILITIES .............................................................................. 4
    2.1. Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ........................ 4
    2.2. Assistant Secretary of Defense for Manpower and Reserve Affairs. ............................ 4
    2.3. Assistant Secretary of Defense for Health Affairs............................................... 4
    2.4. Director, Defense Health Agency (DHA)............................................................... 4
    2.5. Secretaries of the Military Departments and Commandant, USCG. ........................... 5
SECTION 3: GENDER TRANSITION ........................................................................ 6
    3.1. General. ........................................................................................................ 6
    3.2. Special Military Considerations. ........................................................................ 7
        a. Medical................................................................................................... 7
        b. In-Service Transition. ............................................................................... 8
        c. Continuity of Medical Care. ....................................................................... 8
        d. Living in Self-Identified Gender. ................................................................. 8
        e. DEERS. .................................................................................................. 8
        f. Military Readiness................................................................................... 8
    3.3. Roles and Responsibilities. ............................................................................... 9
        a. Service Member's Role. ............................................................................. 9
        b. Military Medical Provider's Role. ............................................................... 9
        c. Commander's Role. ................................................................................ 10
        d. Role of the Military Department and the USCG. ............................................ 10
    3.4. Gender Transition Approval Process. ................................................................. 12
    3.5. Considerations Associated with RC personnel. .................................................... 13
        a. Gender Transition Approach........................................................................ 13
        b. Diagnosis and Medical Treatment Plans. ..................................................... 13
        c. Selected Reserve Drilling Member Participation. ........................................... 13
        d. Delayed Training Program (DTP). .............................................................. 14
        e. Split Option Training. .............................................................................. 14
    3.6. Considerations Associated with the First Term of Service........................................ 14
SECTION 4: ADDITIONAL POLICY GUIDANCE .......................................................... 16
    4.1. Equal Opportunity.......................................................................................... 16
    4.2. Protection of PII and PHI................................................................................. 16
    4.3. Personal Privacy Considerations........................................................................ 16
    4.4. Assessment and Oversight of Compliance. .......................................................... 16
GLOSSARY .......................................................................................................... 18
    G.1. Acronyms. ................................................................................................... 18
    G.2. Definitions.................................................................................................... 19
REFERENCES ...................................................................................................... 22

**App. 050**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

a.  This issuance applies to OSD, the Military Departments (including the United States Coast Guard (USCG) at all times, including when it is a Service in the Department of Homeland Security, by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

b.  The requirement in Paragraph 2.5.e. of this issuance does not apply to the USCG.

c.  For the purpose of this issuance, the term "Service member" includes cadets and midshipmen in a contracted Reserve Officer Training Corps (ROTC) status and those at the Military Service Academies.  This issuance does not apply to individuals participating in ROTC programs in a non-contracted volunteer status.  Contracted ROTC midshipmen and cadets have limited eligibility for medical benefits and care through a military medical treatment facility (MTF), delineated in DoD Instruction (DoDI) 1215.08.

## 1.2. POLICY.

a.  DoD and the Military Departments will institute policies to provide Service members a process by which they may transition gender while serving.  These policies are based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness.

b.  All Service members must be treated with dignity and respect.  No person, solely on the basis of his or her gender identity, will be:

(1)  Involuntarily separated or discharged from the Military Services;

(2)  Denied reenlistment or continuation of service in the Military Services; or

(3)  Subjected to adverse action or mistreatment.

## 1.3. SUMMARY OF CHANGE 1.

The change to this issuance:

a.  Adds transgender data related guidance pursuant to DoDI 6400.11.

b.  Updates references for accuracy.

**App. 051**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 2: RESPONSIBILITIES

## 2.1. UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R):

a. Evaluates any proposed new Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with this issuance.

b. Issues guidance to the Military Departments, establishing the prerequisites and procedures for changing a Service member's gender marker in DEERS.

## 2.2. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Manpower and Reserve Affairs coordinates with the Assistant Secretary of Defense for Health Affairs in the management and implementation of this policy, and issues clarifying guidance, as appropriate.

## 2.3. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Health Affairs coordinates with the Assistant Secretary of Defense for Manpower and Reserve Affairs in the management and implementation of health care matters associated with this policy, and issues clarifying guidance, as appropriate.

## 2.4. DIRECTOR, DEFENSE HEALTH AGENCY (DHA).

Under the authority, direction, and control of the USD(P&R), through the Assistant Secretary of Defense for Health Affairs, the Director, DHA:

a. Provides or coordinates guidance and oversight, as appropriate, to standardize the provision of medically necessary health care for transgender Service members diagnosed with gender dysphoria, including members for whom gender transition is determined to be medically necessary by a medical provider.

b. Oversees the development and use of clinical practice guidelines to support the medical treatment plan and projected schedule for treatment of Service members diagnosed with gender dysphoria.

**App. 052**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

c.  Oversees the development and use of clinical practice guidelines to support the continuity of care for Service members diagnosed with gender dysphoria.

d.  Establishes procedures to require that education and training on transgender health care are conducted in MTFs.

e.  Ensures appropriate standards and procedures under the Supplemental Health Care Program for transgender health care services.

## 2.5.  SECRETARIES OF THE MILITARY DEPARTMENTS AND COMMANDANT, USCG.

The Secretaries of the Military Departments and the Commandant, USCG:

a.  Adhere to all provisions of this issuance.

b.  Administer their respective programs, and update existing Military Department regulations, policies, and guidance, or issue new issuances, as appropriate, in accordance with the provisions of this issuance.

c.  Maintain a Service central coordination cell (SCCC) to provide multi-disciplinary (e.g., medical, mental health, legal, military personnel management) expert advice and assistance to commanders with regard to service by transgender Service members and gender transition in the military, and to assist commanders in the execution of DoD, Military Department, and Service policies and procedures.

d.  Educate their respective AC and RC forces to ensure an adequate understanding within those forces of policies and procedures pertaining to gender transition in the military.

e.  Submit to the USD(P&R) the text of any proposed revision to existing Military Department and Service regulations, policies, and guidance, and of any proposed new issuance, at least 15 business days in advance of the proposed publication date.  In accordance with Paragraph 1.1.b. of this issuance, this requirement does not apply to the USCG.

f.  Provide oversight regarding the implementation of this issuance and any Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, the protection of personally identifiable information (PII), protected health information (PHI), and personal privacy considerations, consistent with current DoD guidance and in accordance with Paragraphs 4.2. and 4.3. of this issuance.

g.  Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Service policies and procedures applicable to service by transgender persons, and persons with gender dysphoria, in accordance with Paragraph 4.4. of this issuance.

**App. 053**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 3:  GENDER TRANSITION

## 3.1.  GENERAL.

a.  Except where an exception to policy (ETP) has been granted transgender Service members will be subject to the same standards as all other Service members.  When a standard, requirement, or policy depends on whether the individual is male or female (e.g., medical fitness for duty; physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all Service members will be subject to the standard, requirement, or policy associated with their gender marker in DEERS.

b.  The Military Departments and Services recognize a Service member's gender by the Service member's gender marker in DEERS.  Consistent with that gender marker, the Services apply, and the Service member must meet, all standards for uniforms and grooming; body composition assessment (BCA); physical readiness testing (PRT); Military Personnel Drug Abuse Testing Program (MPDATP) participation; and other military standards applied with consideration of the Service member's gender.  For facilities subject to regulation by the military, Service members will use those berthing, bathroom, and shower facilities associated with their gender marker in DEERS.

c.  Service members with a diagnosis that gender transition is medically necessary will receive associated medical care and treatment from a medical provider.  The recommendations from a military medical provider will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment.  Medical providers will provide advice to commanders in a manner consistent with processes used for other medical conditions that may limit the Service member's performance of official duties.

d.  Any medical care and treatment provided to an individual Service member in the process of gender transition will be provided in the same manner as other medical care and treatment. Nothing in this issuance will be construed to authorize a commander to deny medically necessary treatment to a Service member.

e.  Any determination that a transgender Service member is non-deployable at any time will be consistent with established Military Department and Service standards, as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

f.  Commanders will assess expected impacts on mission and readiness after consideration of the advice of military medical providers and will address such impacts in accordance with this issuance.  In applying the tools described in this issuance, a commander will not accommodate biases against transgender individuals.  If a Service member is unable to meet standards or requires an ETP during a period of gender transition, all applicable tools, including the tools described in this issuance, will be available to commanders to minimize impacts to the mission and unit readiness.

**App. 054**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

g.  When a cognizant military medical provider determines that a Service member's gender transition is complete, and at a time approved by the commander in consultation with the Service member concerned, the Service member's gender marker will be changed in DEERS and the Service member will be recognized in the self-identified gender.

## 3.2.  SPECIAL MILITARY CONSIDERATIONS.

Gender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness.  Where possible, gender transition should be conducted such that a Service member would meet all applicable standards and be available for duty in the birth gender before a change in the Service member's gender marker in DEERS and would meet all applicable standards and be available for duty in the self-identified gender after the change in gender marker.  However, since every transition is unique, the policies and procedures set forth herein provide flexibility to the Military Departments, Services, and commanders, in addressing transitions that may or may not follow this construct.  These policies and procedures are applicable, in whole or in relevant part, to Service members who intend to begin transition, are beginning transition, who already may have started transition, and who have completed gender transition and are stable in their self-identified gender.

   a.  **Medical.**

   (1)  In accordance with DoDIs 6025.19 and 1215.13, all Service members must maintain their health and fitness, meet individual medical readiness requirements, and report to their chains of command any medical (including mental health) and health issue that may affect their readiness to deploy or fitness to continue serving.

   (2)  Each Service member in the AC or in the Selected Reserve will, as a condition of continued participation in military service, report significant health information to their chain of command.  Service members who have or have had a medical condition that may limit their performance of official duties must consult with a military medical provider concerning their diagnosis and proposed treatment, and must notify their commanders.

   (3)  When a Service member receives a diagnosis of gender dysphoria from a military medical provider and obtains a medical treatment plan for gender transition, the Service member's notification to the commander must identify all medically necessary care and treatment that is part of the Service member's medical treatment plan.

      (a)  If applicable, the Service member's notification to the commander must identify a projected schedule for such treatment and an estimated date for a change in the Service member's gender marker in DEERS.

      (b)  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, the Service member must provide notification to the commander identifying the additional care, treatment, and projected schedule for such treatment.

**App. 055**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

    (c)  Recommendations of a military health care provider will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment.

**b.  In-Service Transition.**

    Gender transition begins when a Service member receives a diagnosis from a military medical provider indicating that gender transition is medically necessary, and then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan as necessary to achieve stability in the self-identified gender.  It concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in his or her self-identified gender.  Care and treatment may still be received after the gender marker is changed in DEERS as described in Paragraph 3.2.c. of this issuance, but at that point, the Service member must meet all applicable military standards in the self-identified gender.  With regard to facilities subject to regulation by the military, a Service member whose gender marker has been changed in DEERS will use those berthing, bathroom, and shower facilities associated with his or her gender marker in DEERS.

**c.  Continuity of Medical Care.**

    A military medical provider may determine certain medical care and treatment (e.g., cross-sex hormone therapy) to be medically necessary even after a Service member's gender marker is changed in DEERS.  A gender marker change does not preclude such care and treatment.  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, and that change may impact the Service member's fitness for duty the Service member must provide, medical documentation to the commander identifying the additional care, treatment, and projected schedule for such treatment.

**d.  Living in Self-Identified Gender.**

    Each Military Department and Service may issue policy regarding the application of real life experience (RLE), including RLE in an on-duty status before gender marker change in DEERS.

**e.  DEERS.**

    Except when an exception has been granted in accordance with Paragraph 3.2.d. or 3.2.f. of this issuance, a Service member's gender is recognized by the Service member's gender marker in DEERS.  Coincident with that gender marker, the Services apply, and the Service member must meet, all standards for uniforms and grooming; BCA; PRT; MPDATP participation; and other military standards applied with consideration of the Service member's gender.

**f.  Military Readiness.**

    Unique to military service, the commander is responsible and accountable for the overall readiness of his or her command.  The commander is also responsible for the collective morale, welfare, good order, and discipline of the unit, and establishing a command climate that creates an environment where all members of the command are treated with dignity and respect.  When a commander receives any request from a Service member that entails a period of non-availability for duty (e.g., necessary medical treatment, ordinary leave, emergency leave,

**App. 056**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

temporary duty, other approved absence), the commander must consider the individual need associated with the request and the needs of the command in making a decision on that request.

### 3.3. ROLES AND RESPONSIBILITIES.

#### a. Service Member's Role.

The Service member will:

(1)  Secure a medical diagnosis from a military medical provider.

(2)  Notify the commander of a diagnosis indicating gender transition is medically necessary.  This notification will identify all medically necessary treatment in their medical treatment plan and a projected schedule for such treatment, including an estimated date for a change in the Service member's gender marker in DEERS, pursuant to Paragraph 3.2.a. of this issuance.

(3)  Notify the commander of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date on which the Service member's gender marker will be changed in DEERS.

(4)  Notify the commander of any new care determined to be medically necessary after a gender marker change in DEERS that was not previously approved in the medical treatment plan, in accordance with Paragraph 3.2.a.(3) of this issuance, as such care or treatment may affect readiness to deploy or fitness to continue serving.

#### b. Military Medical Provider's Role.

The military medical provider will:

(1)  Establish the Service member's medical diagnosis, recommend medically necessary care and treatment, and, in consultation with the Service member, develop a medical treatment plan associated with the Service member's gender transition, pursuant to Paragraph 3.1.a. of this issuance, for submission to the commander.

(2)  In accordance with established military medical practices, advise the commander on the medical diagnosis applicable to the Service member, including the provider's assessment of the medically necessary care and treatment, the urgency of the proposed care and treatment, the likely impact of the care and treatment on the individual's readiness and deployability, and the scope of the human and functional support network needed to support the individual.

(3)  In consultation with the Service member, formally advise the commander when the Service member's gender transition is complete and recommend to the commander a time at which the Service member's gender marker may be changed in DEERS.

(4)  Provide the Service member with medically necessary care and treatment after the Service member's gender marker has been changed in DEERS.

**App. 057**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

### c. Commander's Role.

The Service member's commander will:

(1)  Review the Service member's request to transition gender.  Approves the timing and oversees, as appropriate, a transition process that:

(a)  Complies with DoD, Military Department, and Service regulations, policies, and guidance.

(b)  Considers the individual facts and circumstances presented by the Service member.

(c)  Maintains military readiness by minimizing impacts to the mission (including deployment, operational, training and exercise schedules, and critical skills availability), as well as to the morale, welfare, good order, and discipline of the unit.

(d)  Is consistent with the medical treatment plan.

(e)  Incorporates consideration of other factors, as appropriate.

(2)  Coordinate with the military medical provider regarding any medical care or treatment provided to the Service member and any medical issues that arise in the course of a Service member's gender transition.

(3)  Consult, as necessary, with the SCCC about service by transgender Service members and gender transition in the military; the execution of DoD, Military Department, and Military Service policies and procedures; and assessment of the means and timing of any proposed medical care or treatment.

### d. Role of the Military Department and the USCG.

The Military Departments and USCG will:

(1)  Establish policies and procedures in accordance with this issuance, outlining the actions a commander may take to minimize impacts to the mission and ensure continued unit readiness in the event a transitioning individual is unable to meet standards or requires an ETP during a period of gender transition.  Such policies and procedures may address the means and timing of transition, procedures for responding to a request for an ETP before the change of a Service member's gender marker in DEERS, appropriate duty statuses, and tools for addressing any inability to serve throughout the gender transition process.  Any such actions available to the commander will consider and balance the needs of the individual and the needs of the command in a manner comparable to the actions available to the commander in addressing comparable Service members' circumstances unrelated to gender transition.  Such actions may include:

(a)  Adjustments to the date the Service member's gender transition, or any component of the transition process, will begin.

**App. 058**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

(b)  Advising the Service member of the availability of options for extended leave status or participation in other voluntary absence programs during the transition process.

(c)  Arrangements for the transfer of the Service member to another organization, command, location, or duty status (e.g., Individual Ready Reserve), as appropriate, during the transition process.

(d)  ETPs associated with changes in the Service member's physical appearance and body composition during gender transition, such as accommodations in the application of standards for uniforms and grooming, BCA, PRT, and MPDATP participation.

(e)  Establishment of, or adjustment to, local policies on the use of berthing, bathroom, and shower facilities subject to regulation by the military during the transition process.

(f)  Referral, as appropriate, for a determination of fitness in the Integrated Disability Evaluation System in accordance with DoDI 1332.18 or the USCG Physical Disability Evaluation System, pursuant to Commandant Instruction M1850.2 (series).

(2)  Establish policies and procedures, consistent with this issuance, whereby a Service member's gender marker will be changed in DEERS based on a determination by the military medical provider that the Service member's gender transition is complete; receipt of written approval from the commander, issued in consultation with the Service member; and documentation indicating gender change provided by the Service member.  Such documentation is limited to:

(a)  A certified true copy of a State birth certificate reflecting the Service member's self-identified gender;

(b)  A certified true copy of a court order reflecting the Service member's self-identified gender; or

(c)  A United States passport reflecting the Service member's self-identified gender.

(3)  When the Service member's gender marker in DEERS is changed:

(a)  Apply uniform standards, grooming standards, BCA standards, PRT standards, MPDATP standards, and other standards applied with consideration of the Service member's gender, applicable to the Service member's gender as reflected in DEERS.

(b)  As to facilities subject to regulation by the military, direct the use of berthing, bathroom, and shower facilities according to the Service member's gender marker as reflected in DEERS.

**App. 059**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

### 3.4. GENDER TRANSITION APPROVAL PROCESS.

a. A Service member on active duty who receives a diagnosis from a military medical provider for which gender transition is medically necessary may, in consultation with the military medical provider, request that the commander approve:

(1) The timing of medical treatment associated with gender transition;

(2) An ETP associated with gender transition, pursuant to Paragraphs 3.2.d., 3.2.f., or 3.3.d. of this issuance; or

(3) A change to the Service member's gender marker in DEERS.

b. The commander, informed by the recommendations of the military medical provider, the SCCC, and others, as appropriate, will respond to the request within a framework that ensures readiness by minimizing impacts to the mission (including deployment, operational, training, exercise schedules, and critical skills availability), as well as to the morale, welfare, good order, and discipline of the command.

c. Consistent with applicable law, regulation, and policy, the commander will:

(1) Comply with the provisions of this issuance and with Military Department and Service regulations, policies, and guidance, and consult with the SCCC.

(2) Promptly respond to any request for medical care, as identified by the military medical provider, and require such care is provided consistent with applicable regulations.

(3) Respond to any request for medical treatment or an ETP associated with gender transition as soon as practicable, but not later than 90 calendar days after receiving a request determined to be complete in accordance with the provisions of this issuance and applicable Military Department and Service regulations, policies, and guidance. The response will be in writing; will include notice of any actions taken by the commander in accordance with applicable regulations, policies, and guidance and the provisions of this issuance; and will be provided to both the Service member and their military medical provider. The commander will return any request that is determined to be incomplete to the Service member with written notice of the deficiencies identified as soon as practicable, but not later than 30 calendar days after receipt.

(4) At any time before the change of the Service member's gender marker in DEERS, the commander, in consultation with the Service member and a military health care provider, may modify a previously approved approach to, or an ETP associated with, gender transition. A determination that modification is necessary and appropriate will be made in accordance with and upon review and consideration of the procedures and factors set forth in Paragraph 3.3.c. of this issuance. Written notice of such modification will be provided to the Service member pursuant to procedures established by the Military Department or Military Service, and may include options as set forth in Paragraph 3.3.d. of this issuance.

(5) The commander will approve, in writing, the change of a Service member's gender marker in DEERS, after receipt of the recommendation of the military medical provider that the

**App. 060**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

Service member's gender marker be changed and receipt of the requisite documentation from the Service member. Upon submission of the commander's written approval to the appropriate personnel servicing activity, the change in the Service member's gender marker will be entered in the appropriate Service database, transmitted to the Defense Manpower Data Center, and updated in DEERS.

d. As authorized by applicable Military Department and Service regulations, policies, and guidance implementing this issuance, a Service member may request review by a senior officer in the chain of command of a subordinate commander's decision with regard to any request pursuant to this issuance and any later modifications to that decision.

e. A Service member who has completed a gender transition but has not resolved the gender dysphoria should consult with their military medical provider and commander. If a return to their previous gender is medically required, the Service member is to use the procedures outlined in Paragraph 3.4. of this issuance.

## 3.5. CONSIDERATIONS ASSOCIATED WITH RC PERSONNEL.

Excepting only those special considerations set forth in Paragraph 3.5. of this issuance, RC personnel are subject to all policies and procedures applicable to AC Service members as set forth in this issuance and in applicable Military Department and Military Service regulations, policies, and guidance implementing this issuance.

### a. Gender Transition Approach.

All RC Service members (except Selected Reserve full-time support personnel) identifying as transgender individuals will submit to and coordinate with their chain of command evidence of a medical evaluation that includes a medical treatment plan. Selected Reserve full-time support personnel will follow the gender transition approval process set forth in Paragraph 3.4. of this issuance.

### b. Diagnosis and Medical Treatment Plans.

A diagnosis established by a civilian medical provider will be subject to review and validation by a military medical provider pursuant to applicable Military Department and Military Service regulations, policies, and guidance. A treatment plan established by a civilian medical provider will be subject to review by a military medical provider and the military medical provider will validate any associated duty limitations pursuant to applicable Military Department and Military Service regulations, policies, and guidance.

### c. Selected Reserve Drilling Member Participation.

To the greatest extent possible, commanders and Service members will address periods of non-availability for any period of military duty, paid or unpaid, during the Service member's gender transition with a view to mitigating unsatisfactory participation. In accordance with DoDI 1215.13, such mitigation strategies may include:

SECTION 3: GENDER TRANSITION                                             13

**App. 061**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

(1)  Rescheduled training;

(2)  Authorized absences; or

(3)  Alternate training.

**d.  Delayed Training Program (DTP).**

Recruiters and commanders must advise DTP personnel of limitations resulting from being non-duty qualified.  As appropriate, Service members in the DTP may be subject to the provisions of Paragraph 3.6. of this issuance.

**e.  Split Option Training.**

When authorized by the Military Department or Military Service concerned, Service members who elect to complete basic and specialty training over two non-consecutive periods may be subject to the provisions of Paragraph 3.6. of this issuance.

**3.6.  CONSIDERATIONS ASSOCIATED WITH THE FIRST TERM OF SERVICE.**

a.  A blanket prohibition on gender transition during a Service member's first term of service is not permissible.  However, the All-Volunteer Force readiness model may be taken into consideration by a commander in evaluating a request for medical care or treatment or an ETP associated with gender transition during a Service member's first term of service.  Any other facts and circumstances related to an individual Service member that impact that model will be considered by the commander as set forth in this issuance and implementing Military Department and Service regulations, policies, and guidance.

b.  The following policies and procedures apply to Service members during the first term of service and will be applied to Service members with a diagnosis indicating that gender transition is medically necessary in the same manner, and to the same extent, as to Service members with other medical conditions that have a comparable impact on the Service member's ability to serve:

(1)  A Service member is subject to separation in an entry-level status during the period of initial training in accordance with DoDI 1332.14, based on a medical condition that impairs the Service member's ability to complete such training.

(2)  An individual participant is subject to placement on medical leave of absence or medical disenrollment from the Reserve Officers' Training Corps in accordance with DoDI 1215.08 or from a Military Service Academy in accordance with DoDI 1322.22, based on a medical condition that impairs the individual's ability to complete such training or to access into the Military Services.

(3)  A Service member is subject to administrative separation for a fraudulent or erroneous enlistment or induction when warranted and in accordance with DoDI 1332.14, based on any deliberate material misrepresentation, omission, or concealment of a fact, including a

**App. 062**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

medical condition, that if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

(4)  If a Service member requests non-urgent medical treatment or an ETP associated with gender transition during the first term of service, including during periods of initial entry training in excess of 180 calendar days, the commander may give the factors set forth in Paragraph 3.6.a. of this issuance significant weight in considering and balancing the individual need associated with the request and the needs of the command, in determining when such treatment, or whether such ETP may commence in accordance with Paragraphs 3.2.d, 3.2.f., and 3.3.d. of this issuance.

**App. 063**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 4:  ADDITIONAL POLICY GUIDANCE

## 4.1.  EQUAL OPPORTUNITY.

The DoD and the USCG provide equal opportunity to all Service members in an environment free from harassment and discrimination on the basis of race, color, national origin, religion, sex, gender identity, or sexual orientation, pursuant to DoDI 1350.02.

## 4.2.  PROTECTION OF PII AND PHI.

a.  The Military Departments and the USCG will:

(1)  In cases in which there is a need to collect, use, maintain, or disseminate PII in furtherance of this issuance or Military Department and Military Service regulations, policies, or guidance, protect against unwarranted invasions of personal privacy and the unauthorized disclosure of such PII in accordance with Section 552a of Title 5, United States Code, also known as the Privacy Act of 1974, as amended; DoDI 5400.11; and DoD 5400.11-R.

(2)  Maintain such PII so as to protect individuals' rights, consistent with Federal law, regulation, and policy.

b.  Disclosure of PHI will be consistent with DoDI 6025.18 and DoDI 6490.08.

## 4.3.  PERSONAL PRIVACY CONSIDERATIONS.

A commander may employ reasonable measures to respect the privacy interests of Service members.  Commanders are encouraged to consult with the Service member and SCCC when employing such measures.

## 4.4.  ASSESSMENT AND OVERSIGHT OF COMPLIANCE.

a.  The Secretaries of the Military Departments and the Commandant, USCG will implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service policies and procedures applicable to service by transgender persons.

b.  Beginning in fiscal year 2022 and at least every 3 years thereafter, the Secretaries of the Military Departments and the Commandant, USCG will direct a special inspection by the Service Inspector General or another appropriate auditing agency to ensure compliance with this issuance and implementing Military Department, Military Service or USCG regulations, policies, and guidance.  Such reports will be endorsed and provided by the Secretary concerned to the USD(P&R) within 3 months of completion.  The directing official will review the report of inspection for purposes of assessing and overseeing compliance; identifying compliance deficiencies, if any; timely initiating corrective action, as appropriate; and deriving best practices and lessons learned.

**App. 064**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

c.  Any questions on gender identity in DoD cross-component assessment of Service members (e.g., surveys, focus groups interviews) must be approved by the USD(P&R) via the Department of Defense Human Resources Activity.  The Secretaries of the Military Departments and the Commandant, USCG will implement processes for the approval of these questions for assessments containing these items administrated solely within their components.  USD(P&R) approval is not required when transgender-related data:

   (1)  Is being collected for the limited purpose of survey-based prevention research to inform primary prevention as defined in DoDI 6400.09.

   (2)  Collection conforms with DoDI 6400.11, Paragraph 5.3(c)(1)-(5).

   (3) Uses DoD-approved item language in accordance with Paragraph 5.3.d. of DoDI 6400.11.

   (4)  Follows policies outlined in DoDIs 8910.01, 1100.13, and 3216.02.

d.  Gender identity is a personal and private matter.  DoD Components, including the Military Departments and Services, require written approval from the USD(P&R) to collect transgender and transgender related data or publicly release such data.  USD(P&R) approval is not required when transgender-related data meets the conditions in Paragraph 4.4.c.  Applicable privacy and human subject procedures should be followed to ensure appropriate safeguards are in place when conducting prevention research.

**App. 065**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| AC | Active Component |
| BCA | body composition assessment |
| DEERS | Defense Enrollment Eligibility Reporting System |
| DHA | Defense Health Agency |
| DoDI | DoD instruction |
| DSM-5 | American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition |
| DTP | Delayed Training Program |
| ETP | exception to policy |
| HIPAA | Health Insurance Portability and Accountability Act |
| MPDATP | Military Personnel Drug Abuse Testing Program |
| MTF | military medical treatment facility |
| PHI | protected health information |
| PII | personally identifiable information |
| PRT | physical readiness testing |
| RC | Reserve Component |
| RLE | real life experience |
| ROTC | Reserve Officer Training Corps |
| SCCC | Service Central Coordination Cell |
| TRICARE | Military Health Care |
| USCG | United States Coast Guard |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

**App. 066**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

## G.2.  DEFINITIONS.

These terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
|---|---|
| **cross-sex hormone therapy** | The use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth. A common medical treatment associated with gender transition. |
| **DTP** | A program established by the Secretary of the Army to provide a personnel accounting category for members of the Army Selected Reserve to be used for categorizing members of the Selected Reserve who have not completed the minimum training required for deployment or who are otherwise not available for deployment. |
| **gender dysphoria** | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM-5), page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| **gender identity** | An individual's internal or personal sense of gender, which may or may not match the individual's biological sex. |
| **gender marker** | Data element in DEERS that identifies a Service member's gender.  Service members are expected to adhere to all military standards associated with their gender marker in DEERS and use military berthing, bathroom, and shower facilities in accordance with the DEERS gender marker. |
| **gender transition is complete** | A Service member has completed the medical care identified or approved by a military medical provider in a documented medical treatment plan as necessary to achieve stability in the self-identified gender. |
| **gender transition process** | Gender transition in the military begins when a Service member receives a diagnosis from a military medical provider indicating the Service member's gender transition is medically necessary, and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender. |

**App. 067**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

| TERM | DEFINITION |
|------|------------|
| **human and functional support network** | Support network for a Service member that may be informal (e.g., friends, family, co-workers, social media.) or formal (e.g., medical professionals, counselors, clergy). |
| **medically necessary** | Health-care services or supplies necessary to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine. |
| **mental health provider** | A medical provider who is licensed, credentialed, and experienced in the diagnosis and treatment of mental health conditions and is privileged at a Military MTF (in the direct care system). Private care sector civilian TRICARE authorized mental health providers may be involved in a specific Active Duty Service member's care.  These providers are credentialed through the managed care support contractors. |
| **military medical provider** | Any military, government service, or contract civilian health care professional who, in accordance with regulations of a Military Department or DHA, is credentialed and granted clinical practice privileges to provide health care services within the provider's scope of practice in a Military MTF. |
| **non-urgent medical treatment** | The care required to diagnose and treat problems that are not life or limb threatening or that do not require immediate attention. |
| **PHI** | Individually identifiable health information (as defined in the HIPAA Privacy Rule) that, except as provided in this issuance, is transmitted or maintained by electronic or any other form or medium. PHI excludes individually identifiable health information in employment records held by a DoD covered entity in its role as employer. Information that has been de-identified in accordance with the HIPAA Privacy Rule is not PHI. |
| **PII** | Information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual. Defined in OMB Circular No. A-130. |

**App. 068**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

| TERM | DEFINITION |
|---|---|
| **RLE** | The phase in the gender transition process during which the individual begins living socially in the gender role consistent with their self-identified gender.  RLE may or may not be preceded by the commencement of cross-sex hormone therapy, depending on the medical treatment associated with the individual Service member, cadet, or midshipman's gender transition.  The RLE phase is also a necessary precursor to certain medical procedures, including gender transition surgery.  RLE generally encompasses dressing in the new gender, as well as using self-identified gender berthing, bathroom, and shower facilities. |
| **SCCC** | Service-level cell of experts created to provide multi-disciplinary (e.g., medical, legal) advice and assistance to commanders regarding service by transgender Service members, cadets, or midshipmen and gender transition in the military. |
| **self-identified gender** | The gender with which an individual identifies. |
| **stable in the self-identified gender** | The absence of clinically significant distress or impairment in social, occupational, or other important areas of functioning associated with a marked incongruence between an individual's experienced or expressed gender and the individual's biological sex.  Continuing medical care including, but not limited to, cross-sex hormone therapy may be required to maintain a state of stability. |
| **transgender Service member** | Service member who has received a medical diagnosis indicating that gender transition is medically necessary, including any Service member who intends to begin transition, is undergoing transition, or has completed transition and is stable in the self-identified gender. |
| **transition** | Period of time when individuals change from the gender role associated with their sex assigned at birth to a different gender role.  For many people, this involves learning how to live socially in another gender role.  For others, this means finding a gender role and expression that are most comfortable for them.  Transition may or may not include feminization or masculinization of the body through cross-sex hormone therapy or other medical procedures.  The nature and duration of transition are variable and individualized. |

GLOSSARY                                                                 21

**App. 069**

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# REFERENCES

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Commandant Instruction M1850.2D, "Physical Disability Evaluation System," May 19, 2006

DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1100.13, "DoD Surveys," January 15, 2015, as amended

DoD Instruction 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoD Instruction 1322.22, "Service Academies," September 24, 2015

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System," November 10, 2022

DoD Instruction 1350.02, "DoD Military Equal Opportunity Program," September 4, 2020, as amended

DoD Instruction 3216.02, "Protection of Human Subjects and Adherence to Ethical Standards in DoD-Conducted and -Supported Research," April 15, 2020, as amended

DoD Instruction 5400.11, "DoD Privacy and Civil Liberties Programs," January 29, 2019, as amended

DoD Instruction 6025.18, "Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule Compliance in DoD Health Care Programs," March 13, 2019

DoD Instruction 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoD Instruction 6400.11, "DoD Integrated Primary Prevention Policy for Prevention Workforce and Military Leaders," December 20, 2022

DoD Instruction 6400.09, "DoD Policy on Integrated Primary Prevention of Self-Directed Harm and Prohibited Abuse or Harm," September 11, 2020

DoD Instruction 6490.08, "Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members", August 17, 2011

DoD Instruction 8910.01, "DoD Implementation of the Paperwork Reduction Act," December 5, 2022

Office of Management and Budget Circular No. A-130, "Managing Information as a Strategic Resource," July 28, 2016

United States Code, Title 5, Section 552a (also known as the "Privacy Act of 1974,"), as amended

**App. 070**

# EXHIBIT E

Administrative Change to DAFPM 2021-36-01, *Accessions and In-service Transition for Persons Identifying as Transgender*

DAFPM 2021-36-01, is extended and will remain posted on e-publishing and in effect until it is superseded with another PM or PD. It will not otherwise automatically expire on 6 June 2023, but remain in effect until a new or updated PM or PD is accomplished and published to replace it. 6 Dec 2022

DAFPM 2021-36-01 is extended and will remain posted on e-publishing and in effect until it is superseded with another PM or PD. It will not otherwise automatically expire on 30 April 2023, but remain in effect until a new or updated PM or PD is accomplished and published to replace it. 28 April 2022

OPR: SAF/MRR

References to "usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil" are hereby changed to "DAF.Service_Central.Coordination_Cell@us.af.mil." 7 May 2021.



**DEPARTMENT OF THE AIR FORCE**
**WASHINGTON, DC**

**OFFICE OF THE SECRETARY**

DAFPM2021-36-01
30 April 2021
Extended Date: 28 April 2022

MEMORANDUM FOR DISTRIBUTION C
                         MAJCOMs/FLDCOMs/FOAs/DRUs

SUBJECT:  Department of the Air Force Policy Memorandum *Accessions and In-Service Transition for Persons Identifying as Transgender*

This Department of the Air Force (DAFPM) Policy Memorandum immediately establishes specific Air Force and Space Force policy and provides guidance associated with the accession and in-service transition of Service members identifying as transgender.  Compliance with this memorandum is mandatory.  To the extent the memorandum's directions are inconsistent with other DAF publications, the information herein prevails, in accordance with Department of the Air Force Instruction 33-360, *Publications and Forms Management.*

The policy guidance outlined in this memorandum is effective immediately and will be incorporated into Air Force Manual (AFMAN) 36-2905, *Air Force Physical Fitness Program;* Air Force Instruction (AFI) 36-2903, *Dress and Personal Appearance of Air Force Personnel;* AFI 36-3206, *Administrative Discharge Procedures for Commissioned Officers;* AFI 36-3208, *Administrative Separation of Airmen;* AFI 36-3209, *Separation and Retirement Procedures for Air National Guard and Air Force Reserve Members;* AFI 36-3501, *United States Air Force Academy Operations;* AFROTCI 36-2011, *Cadet Operations;* Department of the Air Force Manual 48-123, *Medical Examinations and Standards;* AFI 36-2710, *Equal Opportunity Program* and AFI 32-6000, *Housing Management.*

There are no releasability restrictions on this publication.  It applies to the Regular Air Force, United States Space Force, Air Force Reserve, and Air National Guard.  Ensure all records generated as a result of processes prescribed in this publication adhere to Air Force Instruction 33-322, *Records Management and Information Governance Program,* and are disposed in accordance with the Air Force Records Disposition Schedule, which is located in the Air Force Records Information Management System.  This Memorandum becomes void after one year has elapsed from the date of this Memorandum, or upon publishing of a new Policy Directive permanently establishing this policy, whichever is earlier.

JOHN P. ROTH
Acting Secretary of the Air Force

Attachments:
1. Policy Guidance for Transgender Service Members and Members with Gender Dysphoria
2. In-Service Transition
3. References
4. SAMPLE:  Exception to Policy (ETP) Request Memorandum

1

**App. 073**

**Attachment 1**
**Policy Guidance for Transgender Service Members and Members with Gender Dysphoria**

**1.  SECTION I: Applicability.**

This memorandum provides policy and guidance for all Service members serving in the Regular Air Force, the Air Force Reserve, the Air National Guard, and the United States Space Force. This guidance implements the policy in Department of Defense Instruction (DoDI) 1300.28, *In Service Transition for Transgender Service Members* effective April 30, 2021.  This guidance also assigns responsibilities, and prescribes procedures regarding the standards for accession, retention, separation, in-service transition, and medical coverage for members and applicants with gender dysphoria, as applicable.  Questions regarding this policy may be addressed to the Service Central Coordination Cell (SCCC) at usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil.

For the purpose of this issuance, the term "Service member" includes cadets and midshipmen in a contracted Air Force Reserve Officer Training Corps (AFROTC) status and those at the United States Air Force Academy. This issuance does not apply to individuals participating in AFROTC in a non-contracted volunteer status. Contracted AFROTC cadets have limited eligibility for medical benefits and care through a military medical treatment facility (MTF), delineated in DoD Instruction (DoDI) 1215.08, *Senior Reserve Officers' Training Corps (ROTC) Programs*.

**2.  SECTION II:  Policy.**

It is DAF policy that:

a.  Service in the Air Force and Space Force should be open to all persons who can meet the high standards for military service and readiness.

b.  All Service members and applicants for accession must be treated with dignity and respect and afforded equal opportunity in an environment free from prohibited discrimination. No person, sole based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force.  In today's Air Force and Space Force, people of different backgrounds and views work, live, and fight together on a daily basis. This is possible because they treat each other with dignity and respect.  We will continue to respect and serve with others who may have different backgrounds or hold different views.

c.  Except where a provision of policy has granted an exemption, transgender Service members or applicants for accession must be subject to the same standards as all other persons. When a standard, requirement, or policy depends on whether the individual is male or a female (e.g. medical fitness for duty; physical fitness and body fat standards; lodging, bathroom and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).

2

**App. 074**

d.  Personnel will be accessed or commissioned in accordance with DAFMAN 48-123 and Volume 1 of DODI 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*.

e.  Separation and Retention:

(1)  Service members may not be separated, discharged, or denied reenlistment or continuation of service solely based on gender identity.

(2)  A service member, whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition.

(3)  Service members are subject to separation in an entry-level status during the period of initial training defined as 180 days per DoDI 1332.14, *Enlisted Administrative Separations,* based on a medical condition that impairs the member's ability to complete such training.

(4)  A Service member is subject to administrative separation for a fraudulent or erroneous enlistment or induction when warranted and in accordance with AFI 36-3208, based on any deliberate material misrepresentation, omission, or concealment of a fact, including a medical condition, that if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

(5)  Service members who are not wartime mission capable or who are non-deployable for more than 12 consecutive months will be evaluated for referral into the Disability Evaluation System, administrative separation, or retention determination as appropriate, pursuant to DoDI 1332.45, *Retention Determinations for Non-Deployable Service Members* and DAF implementing issuances.

**3.  SECTION III:  Considerations for Air Force Reserve Officer Training Corps (AFROTC) and United States Air Force Academy (USAFA) Cadets.**

a.  In seeking approval for gender transition, contracted AFROTC cadets must coordinate with their detachment commander on how to submit all required civilian medical and mental health documents to Accession Medical Waiver Division (AMWD) for clinical and administrative review for appropriate case disposition. AMWD forwards cases to the Transgender Health Medical Evaluation Unit (THMEU) to validate civilian diagnosis, treatment plan, and to determine the estimated date transition is complete in accordance with associated timeline.  In seeking approval for gender transition, USAFA cadets will follow the procedures for regular Active Duty members in Attachment 2.  Except as indicated in this Section, contracted AFROTC cadets will follow the procedures in Attachment 2.

b.  An individual participant is subject to placement on medical leave of absence or medical disenrollment from the AFROTC in accordance with DoDI 1215.08 or from USAFA in accordance with DoDI 1322.22, *Service Academies* based on a medical condition that impairs the individual's ability to complete such training or to access into the Military Services.

c.  In a manner consistent with this issuance and with applicable DoD regulations, commanders will address a contracted AFROTC cadet or USAFA cadet's gender transition with a view of mitigating the impact on the cadet's training, scholarships, and eligibility for retention and commissioning. Such mitigation strategies may include:

(1)  AFROTC Cadet:

(a)  Deferring Field Training.

(b)  Placing the cadet in Pursuing Status.

(c)  Requesting waivers to policy or medical standards (including medical qualification for Field Training if appropriate).

(d)  Medical Leave of Absence.

(e)  Changing the Date of Commission, within the same or to a later fiscal year.

(2)  USAFA cadet:

(a)  Requesting waivers to policy or medical standards.

(b)  Medical or excess leave.

d.  Retention:

(1)  Contracted AFROTC or USAFA cadets undergoing commander-approved gender transition.  As with all cadets who experience a medical condition while in the AFROTC Program or USAFA, each situation is unique and will be evaluated based on the individual circumstances.  Individuals are required, however, to meet medical accession standards as a prerequisite to appointment in the Armed Forces."

(a)  Time elapsed since the most recent sex reassignment or genital reconstruction surgery, with no functional limitations or complications and no additional surgery, under DoDI 6130.03 V1, sections 5.13(f)(2) or 5.14(m)(2), or

(b)  Stability on cross-sex hormones or no longer requiring such hormones, under DoDI 6130.03 V1, section 5.24(t), or

(c)  Stability following gender dysphoria diagnosis, under DoDI 6130.03 V1, section 5.28(t).

(2)  A cadet may still be disenrolled for medical disqualification within 180 days after becoming a contracted AFROTC or USAFA cadet.

(3)  A cadet may still be disenrolled as otherwise permitted under applicable regulations.

(4)  Contracted AFROTC and USAFA cadets must meet accession standards at graduation and prior to commissioning.

**4.  SECTION IV:  Medical Waivers.**

a.  Any accessions applicant who does not meet the medical criteria in DoDI 1300.28 and/or Volume 1 of DoDI 6130.03 may be considered for a medical waiver(s).  Medical waiver requests are routed to the appropriate component's Air Force Medical Waiver Review Authority. (i.e. AD/SG, ANG/SG, AFRC/SG).

**5.  SECTION V:  Miscellanea.**

a.  Medical Policy.

(1)  For Service members who have been diagnosed with gender dysphoria, the DAF will handle requests for medical care and treatment in accordance with DoDI 1300.28*, Individual Medical Readiness (IMR)* and **Attachment 2** to this issuance.

(2)  In accordance with DoDI 1300.28, and DoDI 1215.13, *Ready Reserve Member Participation Policy*, all members in the Active and Reserve Components have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report to their chain of command any medical and health issue (including mental health) that may affect their readiness to deploy or fitness to continue serving.

(3)  As a reminder, all Service members, regardless of status and as a condition of continued participation in military service, will report any health information to their chain of command which may limit their performance of official duties, per DoDI 1300.28, para 3.2,a.(2): Each Service member in the AC or in the Selected Reserve will, as a condition of continued participation in military service, report significant health information to their chain of command.  Service members who have or have had a medical condition that may limit their performance of official duties must consult with a military medical provider (or a civilian medical provider validated by a military medical provider) concerning their diagnosis and proposed treatment, and must notify their commanders.

b.  Equal Opportunity. The DAF provides equal opportunity to all Service members in an environment free from harassment and unlawful discrimination on the basis of race, color, national origin, religion, sex, gender identity, or sexual orientation.

c.  Protection of Personally Identifiable Information (PII) and Protected Health Information (PHI).  The DAF will:

(1)  In accordance with DoDD 5400.11, *DoD Privacy Program*, in cases where there is a need to collect, use, maintain, or disseminate PII in accordance with this memorandum or DAF regulations, policies or guidance, DAF will protect against unwarranted invasions of personal privacy and the unauthorized disclosure of such PII.

(2)  Maintain such PII and protect individual's rights, consistent with federal law, regulation, and policy.

(3)  Disclosure of PHI will be consistent with DoD Manual 6025.18, *Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs* and DoDI 6490.08, *Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members.*

d.  Standards. The DAF recognizes a Service member's status as male or female by the member's gender marker in DEERS.

(1)  The DAF applies all standards that involve consideration of the Service member's status as male or female solely based on the member's gender marker in DEERS such as:

(a)  Uniforms and grooming.

(b)  Body composition assessment.

(c)  Physical readiness testing.

(d)  Military Drug Demand Reduction Program (DDRP).

(2)  As to facilities subject to regulation by the DAF, the Service member will use lodging, bathroom, and shower facilities associated with the member's gender marker in DEERS.

e.  Assessment and Oversight of Compliance.

(1)  Beginning in fiscal year 2022 and at least every 3 years thereafter, the Air Force Inspector General or another appropriate auditing agency designated by the Secretary of the Air Force (SecAF) will conduct a special inspection to ensure compliance with this issuance and related regulations, policies, and guidance. Such reports will be endorsed and provided by SecAF to the USD(P&R) within three

6

**App. 078**

months of completion, in accordance with DoDI 1300.28. SecAF will review the report of inspection for purposes of assessing and overseeing compliance; identifying compliance deficiencies, if any; timely initiating corrective action, as appropriate; and deriving best practices and lessons learned.

**App. 079**

**ATTACHMENT 2**

**IN-SERVICE TRANSITION**

This guidance provides unit personnel, supervisors, commanders, and Service members with a diagnosis of gender dysphoria and the medical community a construct by which Service members may transition gender while serving.

**1.  SECTION I:  General considerations for In-Service Transition.**

a.  The DAF recognizes a Service member's gender by the member's gender marker in DEERS. Coincident with that gender marker, the DAF applies, and the member is responsible to meet, all standards for uniforms and grooming, fitness, Military DDRP participation, and other military standards applied with consideration of the member's gender.  Service members will use lodging, bathroom and shower facilities that are subject to regulation by the military in accordance with their gender marker in DEERS unless provided an approved exception to policy (ETP).

b.  Gender transition begins when a Service member receives a diagnosis from a military medical provider (or a civilian medical provider validated by a military medical provider) indicating that gender transition is medically necessary.  The service member then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan validated by the THMEU as necessary to achieve stability in the self-identified gender.  Transition concludes when the Service member's gender marker is changed in DEERS and the Service member is recognized in the member's self-identified gender.  Care and treatment may still be received after the gender marker is changed in DEERS, but at that point, the Service member must meet all applicable military standards in the self-identified gender.

c.  Any determination that a transgender Service member or Service member with gender dysphoria is non-deployable at any time will be consistent with established DAF standards, as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

**2. Section II:  Medical Diagnosis and Treatment.**

a.  Any medical care and treatment provided to a transgender Service member or Service member with gender dysphoria will be provided in the same manner as other medical care and treatment. Nothing in this memorandum will be construed to authorize a commander to deny medically necessary treatment to a transgender Service member or Service member with gender dysphoria or authorize elective care not consistent with medical protocols and standards of practice.

b.  When a Service member receives a diagnosis of gender dysphoria from a medical provider, indicating that gender transition is medically necessary for the Service member, it will be confirmed by the Transgender Health Medical Evaluation Unit (THMEU) at Joint Base San Antonio, Lackland. Once the diagnosis is confirmed, the member and military medical provider

8

**App. 080**

(or a civilian medical provider validated by a military medical provider) must notify the unit commander of the diagnosis.

    c. The THMEU will provide the service member with a medical treatment plan (MTP). Recommendations will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment. Medical advice to commanders will be provided in a manner consistent with processes used for other medical conditions that may limit a Service member's performance of official duties. The THMEU will liaise with base Physical Evaluation Board Liaison Officers (PEBLOs) or ARC/SG to make recommendations regarding profile status for any transitioning members, and update the member's profile in the Aeromedical Services Information Management System (ASIMS) as appropriate.

    d. An MTP must be developed with input by the patient and the patient's military medical provider (or a civilian medical provider validated by a military medical provider), or by the patient and the THMEU.  All MTPs will be validated by the THMEU prior to start of transition and whenever an update is required. Patients may participate in a medical TDY to the THMEU at Joint Base San Antonio-Lackland for MTP development and validation or updates as needed. When possible, patients should attend a medical TDY to THMEU at least once during the medical transition process, preferably at start of transition.

    e. When a Service member receives a diagnosis of gender dysphoria from a military medical provider (or a civilian medical provider validated by a military medical provider) and obtains an MTP for gender transition from a military medical provider (or a civilian medical provider validated by a military medical provider), the Service member must notify their commander. The Service member's notification to the commander must identify all medically necessary care and treatment that is part of the Service member's MTP.

        (1)  If applicable, the Service member's notification to the commander must identify a projected schedule for such treatment and an estimated date for a change in the Service member's gender marker in DEERS.

        (2)  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, the Service member must provide notification to the commander identifying the additional care, treatment, and projected schedule for such treatment.

        (3)  Recommendations of a military medical provider (or a civilian medical provider validated by a military medical provider) will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment.

    f.  Medically necessary care may include real life experiences (RLE). Full-time RLE may be achieved when, as a component of the MTP, a Service member receives an approved ETP for dress and appearance and use of facilities. Full-time RLE is also achieved when a gender marker change is made.

    g.  Continued Medical Care. A military medical provider (or a civilian medical provider validated by a military medical provider) in coordination with the THMEU, may determine certain medical care and treatment to be medically necessary even after a Service member's gender marker is changed in DEERS (e.g., cross-sex hormone therapy and/or gender reaffirming surgery). A gender marker change does not preclude such care and treatment. Updates in the treatment plan will be followed by notification to the Service member's unit commander and include treatment timing.  The commander in consultation with the Service member and military medical personnel may approve and/or negotiate impact to the unit mission to reconcile any concerns prior to approval.

    h. The THMEU will serve as the POC and consultant to all Military Treatment Facilities (MTFs), RMUs, GMUs, and commanders with any questions relating to medical concerns which may arise as part of a member's gender transition. The THMEU may be contacted at usaf.jbsa.59-mdw.mbx.59-mdw-thmeu-mmdt@mail.mil.

**3. SECTION III:  Transition Approval Process.**

    a.  A service member seeking gender transition must follow the procedures in this section.

    b.  After the THMEU provides or validates an MTP, the Service member may request that the commander or superior commander concur within 30 calendar days for Active DAF Service members and no later than 90 calendar days for Guard and Reserve:

        (1)  The timing of medical treatment associated with gender transition, to include gender-affirming hormones and/or surgeries

        (2)  Any ETP associated with gender transition, consistent with guidance in this memorandum; and/or

        (3) A change to the Service member's gender marker in MilPDS to flow to DEERS.

    c.  If the commander has concerns with mission impact, the commander will resolve the concerns with the Service member and treating provider within 30 calendar days for Regular DAF Service members and no later than 90 calendar days for Guard and Reserve.

    d.  Consistent with applicable law, regulation, and policy, the commander will:

        (1)  Comply with the provisions of this issuance, and with DAF regulations, policies and guidance, and consult with the treating provider(s) and the SCCC.

        (2)  Promptly respond to any request for medical care, as identified by the medical provider, and ensure that such care is provided consistent with applicable regulations.

(3)  Respond to the request for MTP approval within a framework that ensures readiness by minimizing impacts to the mission (including deployment, operational, training, exercise schedules, and critical skills availability), as well as to the morale and welfare and good order and discipline of the command, as informed by the recommendations of the military medical provider, the THMEU, the SCCC, and others as appropriate.

(4)  Consider the All-Volunteer Force readiness model in evaluating a request for medical care or treatment or an ETP associated with gender transition during a Service member's first term of service. Any other facts and circumstances related to an individual Service member that impact that model will be considered by the commander as set forth in this issuance and DoDI 1300.28. If a Service member requests non-urgent medical treatment or an ETP associated with gender transition during the first term of service, including  during periods of initial entry training in excess of 180 calendar days, the commander may give the factors set forth in this paragraph significant weight in considering and balancing the individual need associated with the request and the needs of the command, in determining when such treatment, or whether such ETP may commence.

(5)  30 Calendar days after receipt for Active Duty DAF members and no later than 90 calendar days for Guard and Reserve in writing; include notice of any actions taken by the commander in accordance with applicable regulations, policies and guidance, and the provisions of this issuance; and will be provided to both the Service member and their military medical provider" to "military medical provider (or a civilian medical provider validated by a military medical provider). A request that the commander determines to be incomplete will be returned to the service member, with written notice of the deficiencies identified, as soon as practicable, but not later than 30 calendar days after receipt. However, commanders of part-time AFRC or ANG members must return incomplete requests to the Service member NLT 90 calendar days after receipt.

(6)  At any time prior to the change of the Service member's gender marker in MilPDS to flow to DEERS, and after consultation with the Service member and the THMEU, the commander may request the treating provider(s) and THMEU modify a previously approved approach to, or an ETP associated with gender transition to address mission impact. A determination that modification is necessary and appropriate will be made in accordance with the procedures in this memorandum and upon review and consideration of all other factors prescribed in this memorandum.  Any modification in the treatment plan must not negatively affect the Service member's health nor violate current medical practice standards. Notice of such modification will be provided to the Service member. A Service member may dispute any ETP modification or decision up to the next higher

authority, following the same routing process as for new ETP requests. Once an ETP is approved by a Service member's Wing Commander or equivalent superior authority, that approval will be honored following PCS to a new duty station, subject to modification by the gaining Wing/Installation Commander or equivalent in accordance with this paragraph.

(7) Approve, in writing, the request to change a service member's gender marker in MilPDS to flow to DEERS, subsequent to receiving a recommendation from the military medical provider (or upon the recommendation of a civilian provider validated by a military medical provider) and the THMEU indicating that the Service member's gender marker be changed and upon receipt of appropriate legal documentation supporting a gender change. Such documentation consists of either a certified true copy of a state birth certificate reflecting the member's preferred gender, a certified true copy of a court order reflecting the member's preferred gender, or a United States passport reflecting the member's preferred gender. Upon submission of the commander's written approval and required legal documentation to the appropriate personnel servicing activity, the change in the Service member's gender marker will be entered and updated in MilPDS and transmitted to and updated in DEERS, under the authority, direction, and control of the Defense Manpower Data Center (DMDC).

## 4. SECTION IV: Accommodations for Transitioning Service Member.

a. In cases where transitioning Service members may require accommodation in regard to military dress and appearance standards, fitness standards, or to use the designated facilities of their preferred gender, the Service member should submit requests through their unit commander. This may include requests for dress and appearance, fitness or facility exceptions to policy. Upon receiving any request, recommendation, or dispute on a Service member's ETP under this issuance, a commander or director must approve the member's request or forward the disapproval recommendation to the next higher authority within 30 calendar days for Regular DAF Active Duty and no later than 90 calendar days for Guard and Reserve.

b. Fitness.

(1) Service members must adhere to applicable Fitness standards of the gender reflected in DEERS as outlined in AFMAN 36-2905. However, Service members undergoing cross-sex hormone treatment as a component of an MTP, validated and approved by the THMEU, may request an exemption from taking the Fitness Assessment (FA) during their period of transition, prior to a gender marker change in MilPDS to flow to DEERS. Military medical providers may enter profiles for components of the fitness assessment as appropriate.

12

**App. 084**

(3)  For cases in which members have failed the fitness assessment due to treatment for gender dysphoria, a fitness exemption may be requested by the member in accordance with AFI 36-2905. The following are required for fitness assessment exemption consideration:

(a)  A memorandum from the service member requesting the AF exemption, and

(b)  A signed DD Form 2870, *Authorization for Disclosure of Medical or Dental Information*, and

(c)  An MTP signed by the THMEU that shows evidence of:

(i)  A medical diagnosis of gender dysphoria from a military medical provider confirmed by the THMEU (or the diagnosis of a civilian provider validated by a military medical provider and the THMEU), and

(ii)  Confirmation of ongoing cross-sex hormone treatment as part of a gender transition plan, and

(iii)  An estimated gender marker change date that has not yet expired.

(d)  Unit commander, or equivalent, certification that the service member made a full and clear effort to meet the FA standards of their current gender.

(4)  DAF/A1 is the approval authority for exemption requests as outlined in AFI 36-2905. For service members who are transitioning and have an approved MTP, authority to approve fitness exemptions is delegated to the wing commander or equivalent.

(a)  The service member's immediate commander, or equivalent, will recommend approval or disapproval and forward the request through their chain of command to the wing commander for approval. Any disapproval will follow the process below:

(i)  DAF/A1 retains the disapproval authority for such fitness exemptions. Any commander recommending disapproval, after Staff Judge Advocate review, will forward the request to the appropriate MAJCOM, FLDCOM, FOA or DRU A1. The MAJCOM, FLDCOM, FOA, DRU A1 recommends approval or disapproval and forwards the request, to the commander or director

13

**App. 085**

for approval or to recommend disapproval. Any MAJCOM, FLDCOM, FOA, DRU commander or director recommending disapproval, after Staff Judge Advocate review, forwards the request to the SCCC to route for DAF/A1 decision

(5)  If the fitness exemption is approved, the unit commander, or equivalent, will sign a memo authorizing the exemption. Unit Fitness Program Managers (UFPM) will document the exemption in AFFMS II using the commander's composite exemption. Initial FA exemptions will be for a period of 6 months. To receive a new exemption, the Service member will provide the previously approved FA exemption memo and updated medical documentation showing proof of continued cross-sex hormone treatment to their current unit commander, who may approve or deny any additional 6-month period exemptions.

(a)  Upon approval of a fitness exemption, the Installation Commander, or delegate for fitness appeals under AFMAN 36-2905, may approve the removal of failing fitness assessment scores due to gender transition.

(b)  Wing Commanders or DAF, MAJCOM, FLDCOM, NAF, FOA and DRU Directors or USSF equivalents receiving a request for fitness exemption will provide a completed, approved request package to the SCCC at usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil.

(6)  A service member who receives a fitness exemption will be expected to maintain a healthy lifestyle, participate in unit physical fitness, and work with their unit commander to ensure they are maintaining an active fitness regimen. Members are ultimately responsible for maintaining a healthy lifestyle which incorporates fitness. Unit commanders may use current United States Air Force Fitness Improvement Program options, such as BE WELL online, a Healthy Weight program, or Military OneSource Health Coaching to assist in formally monitoring members' fitness levels. Service members diagnosed with gender dysphoria should provide their unit commander a Fitness Maintenance Plan to ensure they have a verifiable plan to remain physically fit during their gender transition.

(7)  The fitness assessment exemption will apply at current and future duty locations but will need to be re-evaluated by the unit commander when the exemption expires.

c. Dress and Appearance

(1)  Service members must adhere to applicable dress and appearance standards of the gender reflected in DEERS as outlined in AFI 36-2903. However, altered physical characteristics during gender transition may make dress and appearance standard changes appropriate prior to gender marker changes in MilPDS to flow to DEERS.

14
**App. 086**

Therefore, Service members may submit an ETP request for RLE to their commander to adhere to their preferred gender identity dress and appearance standards prior to their official gender marker change in MilPDS, and in turn, DEERS.

(2) The ETP request package will require the following supporting justification:

    (a) A memorandum from the service member requesting to adhere to the preferred gender's dress and appearance standards, and

    (b) A signed DD Form 2870, and

    (c) An MTP signed by the THMEU that shows:

        (i) Evidence of a medical diagnosis of gender dysphoria from a military medical provider confirmed by the THMEU (or the diagnosis of a civilian provider validated by a military medical provider and the THMEU), and

        (ii) Confirmation that the ETP request is a component of the service member's gender transition plan, and

        (iii) An estimated gender marker change date that has not yet expired, and

        (iv) Unit commander, or equivalent, assessment of dress and appearance that includes information about the service member's professional military image in current and preferred gender's dress and appearance standards, fit and/or function of the uniforms, and potential impact on unit cohesion, good order and discipline (if any).

(3) DAF/A1 is the approval authority for ETP requests for dress and appearance as outlined in AFI 36-2903, paragraph 12.5. For service members who are transitioning and have an approved MTP, authority to approve dress and appearance ETPs is delegated to the wing commander or equivalent.

(4) The Service member's immediate commander or equivalent will recommend approval or disapproval and forward the request through their chain of command to the wing commander for approval. Any disapproval will follow the process below:

    (a) DAF/A1 retains the disapproval authority for such ETPs. Any commander recommending disapproval, after Staff Judge Advocate review, will forward the request to the appropriate MAJCOM, FLDCOM, FOA or DRU A1. The MAJCOM, FLDCOM, FOA, DRU A1 recommends approval or disapproval and forwards the request, to the commander or director for approval or to recommend disapproval. After

Staff Judge Advocate review, the MAJCOM/FLDCOM/CC recommending disapproval forwards the request to the SCCC to route for DAF/A1 decision.

(5)  Wing Commanders or HAF, MAJCOM, FLDCOM, NAF, FOA and DRU Directors or USSF equivalents receiving a request for a dress and appearance ETP will provide a completed, approved request package to SCCC at usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil.

(6)  If approved, the ETP will apply to both the wear of the preferred gender's dress and appearance standards at current and subsequent duty stations, unless modified by the service member's commander. Service members approved for an ETP prior to gender marker change must ensure they carry a copy of their approved ETP on their person until gender marker is changed in MilPDS.  Once the ETP is approved, the member will provide the ETP to the member's medical provider.

(7)  This guidance applies to Air Reserve Technicians (ARTs) who are required to wear the military uniform while performing civilian duties as an ART in accordance with AFI 36-128, *Pay Setting and Allowances*. ARTs must adhere to applicable dress and appearance standards in accordance with AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, of the gender reflected in their military personnel record until the ETP request has been approved.

(8)  Service members attached to a unit belonging to another Military Department or a joint or combined environment, will coordinate with their Service Senior Representative (SSR) regarding the dress and appearance requirements applicable to personnel attached to that unit.

d.  Facilities

(1)  A service member undergoing gender transition may request an ETP to use facilities subject to regulation by the military in accordance with their preferred gender prior to a gender marker change in DEERS. The ETP request from the member will require evidence that a military medical provider in coordination with the THMEU (or a civilian medial provider validated by a military medical provider in coordination with the THMEU) has confirmed a diagnosis of gender dysphoria; use of facilities and an ETP for dress and appearance standards are components of the MTP; and after verification the member has received an approved ETP.

(2)  For members who are transitioning and have an approved MTP, authority to approve ETP requests for use of facilities has been delegated by AF/A4 to the installation commander (or relevant approval authority) for approval or disapproval.

(3)  Service members may request an ETP for the following facilities:

(a)  Domicile - AFI 32-6000, discusses quarters assignment. Currently, members are assigned to quarters based on the gender reflected in the DEERS, consistent with policy in DoDI 1300.28. Any exceptions should be made consistent with paragraphs (1) and (2) of this section. Until an ETP is approved or gender is updated in DEERS, the member will use the facilities associated with their gender marker in DEERS.

(b)  Bathroom and showers (public) - A service member undergoing gender transition may request a facilities ETP to use facilities subject to regulation by the military in accordance with their preferred gender prior to a gender marker change in DEERS.

(4)  Once the ETP is approved, the member will provide the ETP to the member's medical provider. The member's medical provider will review the document and may include this in the treatment plan to utilize the facilities of the preferred gender. The medical provider will also send a copy of the approved ETP to the THMEU.

(5)  A service member with a locally approved ETP request for use of facilities must also have an approved ETP for dress and appearance prior to using the facilities of their preferred gender.

(6)  Any Air Force installation commander recommending disapproval, after Staff Judge Advocate review, will forward the request to the appropriate MAJCOM, FLDCOM, FOA or DRU A4. The MAJCOM, FLDCOM, FOA, DRU A4 recommends approval or disapproval and forwards the request, to the commander or director for approval or to recommend disapproval. Any MAJCOM, FLDCOM, FOA, DRU commander or director recommending disapproval, after Staff Judge Advocate review, forwards the request to the SCCC to route for AF/A4 decision.

(7)  A Service member whose facilities-use ETP request was disapproved by a non-Air Force/Space Force installation commander (or relevant approval authority) shall follow the policies and procedures related to the facilities of the Service or agency, which is the lead for the installation.

(8)  In executing any accommodation, the unit commander will take into account the physical construction of the facilities as well as the privacy of other members using the facilities in question. The unit commander should consider and balance the needs of the individual and the needs of the command. The installation should explore no-cost facility options. No-cost options may include, but are not limited to, allowing the member to use any family style restroom/shower area, providing additional time for the member to use the privacy of their domicile, or mandating wear of minimal articles of clothing for all.

17

**App. 089**

(9)  If a service member has an approved facilities ETP, they should work with their command chain on coordinating appropriate facility usage at any temporary duty, deployed, or permanent change of station (PCS) locations prior to departure. This includes billeting that may require shared living quarters or restrooms. Although many installations have accommodations in place, facilities ETPs, especially in a joint environment, may not have reciprocity.

e.  Deployment and Outside Continental United States (OCONUS) Assignments

(1)  Transgender service members or service members with gender dysphoria selected for deployment, or short-tour overseas assignments, will not be prevented from deploying or reassigned if they are medically qualified and such deployment or reassignment is compatible with the host nation law for the gaining installation. Coordinate any approved exceptions to policy regarding accommodation during transition with the deployed commander to ensure knowledge of transition and any potential accommodations required for the deployed environment. Coordinate any approved exceptions to policy with gaining commander prior to PCS or short-tour assignment.  For OCONUS assignments, coordinate with respective Geographic Combatant Command's International Law Division to ensure that the assignment will be compatible with host- nation laws issues, agreements, and/or responsibilities.

f.  Considerations for ARC Members

(1)  Air Force Reserve Command (AFRC) and Air National Guard (ANG) members on orders for Title 10 Active Duty Operational Support for one year or more or on AGR Title 10 tours will follow the same policies and procedures as Regular DAF Service members. All other AFRC and ANG members will follow the procedures in this section in addition to the provisions in 1.1 through 1.3 above.

(2)  Air Force Reserve Command (AFRC) and Air National Guard (ANG) members (AGRs, ARTs, TRs, traditional Guardsmen, and IMAs) must provide their supporting medical unit (Reserve Medical Unit (RMU), Guard Medical Unit (GMU) or Active Duty Medical Treatment Facility) all civilian medical and mental health documentation for review. The RMU, GMU, or Active Duty Medical Treatment Facility will forward all cases to ARC/SG for review. ARC/SG will forward all cases to the THMEU to validate civilian diagnosis, treatment plan, and to determine the estimated date transition is complete. ARC medical providers do not validate diagnoses or provide treatment plans.

(3)  To the greatest extent possible, commanders and service members will address periods of non-availability for any period of military duty, paid or unpaid, during the member's gender transition with a view of mitigating unsatisfactory

participation in accordance with AFMAN 36-2136, DoDI 1215.13 and DoDI 1300.28. In accordance with DoDI 1215.13, such mitigation strategies may include:

     (a)  Rescheduled training;

     (b)  Authorized absences; or

     (c)  Alternate training.

## 5.  SECTION V: Completion of Transition and Post-Transition:

a.  In consultation with the service member, military medical provider" to "military medical provider (or a civilian medical provider validated by a military medical provider), in coordination with the THMEU will formally advise the commander when the service member's gender transition is complete, and recommend to the commander a time at which the member's gender marker may be changed in MilPDS to flow to DEERS.

b.  THMEU will validate all requests for GMC and make recommendations based on *Diagnostic and Statistical Manual of Mental Disorders, 5TH Edition* (DSM-V) gender dysphoria post-transition criteria to ensure stability in the affirmed gender or completion of the member's MTP. THMEU will provide written documentation to member's commander recommending gender marker change when appropriate

c.  When a Service member has completed transition, they must bring official documentation to their Military Personnel Flight (MPF) to update their gender in MilPDS to flow to DEERS. Official documentation includes authorization from the member's unit commander and a military medical provider's recommendation, validated by the THMEU, to change the member's gender marker. In addition, the member must provide appropriate legal documentation supporting gender change to the MPF. Legal documentation must be either a certified true copy of a state birth certificate reflecting the transgender member's preferred gender, a certified true copy of a court order reflecting the Service member's preferred gender, or a United States passport reflecting the Service member's preferred gender.

d.  An electronic copy of the legal document and a completed AF Form 281, *Notification of Change in Service Member's Official Records*, will be submitted into the member's ARMS record. There will be no direct update in DEERS; the gender marker in MilPDS is what will update DEERS. A new Common Access Card (CAC) will be issued to reflect the updated gender data. ANG Dual Status Technician/ARTs are required to update their gender marker in MilPDS and Defense Civilian Personnel Data System (DCPDS), as there is no integration between the systems (with the exception of data reporting to DEERS from MilPDS and DCPDS).

e.  Post-transition, coincident with the gender marker change, except as noted below, the Air Force and Space Force will apply, and the transgender Service member is responsible to meet, all standards for uniforms and grooming, fitness, DDRP participation, and other military standards

applied with consideration of their gender marker in DEERS. Transgender service members will use military lodging, bathrooms and shower facilities associated with their gender marker in DEERS.

f.  Any determination that a transgender service member is non-deployable at any time will be consistent with established DAF standards, as applied to other service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

g.  A military medical provider (or a civilian medical provider validated by a military medical provider) may determine certain treatment to be medically necessary, even after a Service member's gender marker is changed in MilPDS to flow to DEERS (e.g. cross-sex hormone therapy or surgical and cosmetic procedures). Surgical interventions after gender marker change will be addressed through an updated MTP, requiring endorsement by the member's commander.

h.  Members who have completed a gender transition and subsequently require a return to previous gender marker will be evaluated by the THMEU and follow procedures for gender transition consistent with this attachment and DODI 1300.28, paragraph 3.4.

## ATTACHMENT 3

### REFERENCES

#### PART I. GLOSSARY OF REFERENCES AND SUPPORTING INFORMATION

DoDI 1300.28, *In-service transition for transgender service members,* 30 April 2021

DoD Manual 6025.18, *Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs,* 13 March 2019

DoDI 5400.11, *DoD Privacy and Civil Liberties Programs,* 29 January 2019

DoDI 1332.14, *Enlisted Administrative Separations,* 27 January 2014

DoDI 1332.45, *Retention Determinations for Non-Deployable Service Members,* 30 July 2018

DoDI 1322.22, *Service Academies,* 24 September 2015

DoDI 1215.08, *Senior Reserve Officers' Training Corps (ROTC) Programs,* 19 January 2017

DoDI 1215.13, *Ready Reserve Member Participation Policy,* 5 May 2015

DoDI 6025.19, *Individual Medical Readiness (IMR),* 9 June 2014

DoDI 6130.03, Volume 1, *Medical Standards for Military Service: Appointment, Enlistment, or Induction,* 6 May 2018

DoDI 6490.08, *Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members*

DAFI 33-360, *Publications and Forms Management,* 1 December 2015

AFI 36-128, *Pay Setting and Allowances,* 17 May 2019

AFI 32-6000, *Housing Management*, 18 March 2020

AFI 36-2710, *Equal Opportunity Program,* 18 June 2020

AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, 7 February 2020

AFMAN 36-2905, *Fitness Program*, 11 December 2020

AFI 36-3206, *Administrative Discharge Procedures for Commissioned Officers,* 9 June 2004

AFI 36-3208, *Administrative Separation of Airmen,* 9 July 2004

AFI 36-3209, *Separation and Retirement Procedures for Air National Guard and Air Force Reserve Members,* 14 April 2005

AF Form 281, *Notification of Change in Service Member's Official Records*

AFI 33-322, *Records Management and Information Governance Program,* 23 March 2020

AFI 36-3212, *Physical Evaluation for Retention Retirement and Separation,* 15 July 2019

AFI 36-3501, *United States Air Force Academy Operations,* 28 December 2018

DAFMAN 48-123, *Medical Examinations and Standards,* 8 December 2020

Health Affairs Memo, *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members,* 29 July 16

DD Form 2870, *Authorization for Disclosure of Medical or Dental Information*

DSM-V, *Diagnostic and Statistical Manual of Mental Disorders, 5TH Edition*

#### PART II. ABBREVIATIONS AND ACRONYMS

**AFFMS II**—Air Force Fitness Management System II

**AFI**—Air Force Instruction

**AFMAN-**Air Force Manual

**AFRC**—Air Force Reserve Command

**AFROTC**-Air Force Reserve Officer Training Corp

**AGR**—Active Guard Reserve

**ANG**—Air National Guard

**App. 093**

**ARC/SG**-Air Reserve Component/Surgeon General
**ART**—Air Reserve Technician
**CAC**—Common Access Card
**DAF**—Department of the Air Force
**DAFMAN**—Department of the Air Force Manual
**DCPDS**— Defense Civilian Personnel Data System
**DDRP**—Drug Demand Reduction Program
**DEERS**—Defense Enrollment Eligibility Reporting System
**DoDI**—Department of Defense Instruction
**DMDC**—Defense Manpower Data Center
**ETP**—Exception to Policy
**FA**—Fitness Assessment
**FLDCOM**---Field Command
**GMC**—Gender Marker Change
**GMU**—Guard Medical Unit
**MAJCOM**—Major Command
**MilPDS**—Military Personnel Data System
**MPF**—Military Personnel Flight
**MTF**—Military Treatment Facility
**NAF**-Numbered Air Force
**OCONUS**—Outside the Continental United States
**PII**—Personally Identifiable Information
**RLE**—Real Life Experience
**RMU**—Reserve Medical Unit
**SCCC**—Service Central Coordination Cell
**THMEU**—Transgender Health Medical Evaluation Unit
**UFPM**—Unit Fitness Program Manager
**USAFA**—United States Air Force Academy
**USD P&R** – Under Secretary of Defense Personnel & Readiness

## PART III. TERMS

These terms and their definitions are for purpose of this memorandum.

**Biological Sex**—A person's biological status as male or female based on chromosomes, gonads, hormones, and genitals.
**Cross-Sex Hormone Therapy**—The use of feminizing hormones in an individual with a biological sex of male or the use of masculinizing hormones in an individual with a biological sex of female.
**Gender Dysphoria**— A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM-5), page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.
**Gender Identity**— An individual's internal or personal sense of gender, which may or may not match their biological sex.
**Gender Marker**— Data element in DEERS that identifies a Service member's gender.
**Gender Transition**— Gender transition in the military begins when a Service member process receives a diagnosis from a military medical provider (or a civilian medical provider validated by a military medical provider indicating the Service member's gender transition is medically necessary,

and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender. This process may involve:

**Social transition**, also known as "real life experience," that allows the service member to live and work in their preferred gender with or without any cross-sex hormone treatment. This may also include a legal change of gender, including changing gender on a passport, birth certificate, or through a court order; or

**Medical transition** to align secondary sex characteristics with a service member's preferred gender using any combinations of cross-sex hormone therapy, surgical/cosmetic procedures; or

**Surgical transition**, also known as sex reassignment surgery, gender affirming surgery, or gender confirmation surgery; to make the physical body, both primary and secondary sex characteristics, resemble as closely as possible the service member's preferred gender.

**Medically Necessary**—Those health-care services or supplies necessary to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine.

**Personally Identifiable Information (PII)**—Information used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, biometric records, home phone numbers, other demographic, personnel, medical, and financial information. PII includes any information that is linked or linkable to a specified individual, alone, or when combined with other personal or identifying information.

**Self-identified gender (Preferred Gender)**—The gender with which an individual identifies.

**Real Life Experience (RLE)**—The phase in gender transition process when the individual begins living in accordance with their gender identity. RLE may or may not be preceded by the start of cross-sex hormone therapy, depending on the individualized MTP for in-service gender transition. Full time continuous RLE, on a daily basis and across all settings of life, is required before any gender transition surgery that affects fertility. If a service member's MTP identifies gender-affirming surgeries, then an ETP or GMC is a required to track the duration of full-time continuous RLE. RLE generally encompasses dressing in the preferred gender, as well as using bathrooms, locker rooms, dormitory areas and showers of the preferred gender.

**Service Central Coordination Cell (SCCC)**—Representatives including, but not limited to: SAF/MR, AF/SG, AF/A1, SF/S1, AF/A3, AF/A4, AFRC, ANG, AF/JA, SAF/GC, and THMEU as subject matter experts who serve as a primary resource for commanders and provide guidance for all inquiries related to service of exempt and non-exempt members with a diagnosis of gender dysphoria.

**Short Term Tour/Short-Tour**—A tour that does not authorize an accompanied tour; or both the accompanied tour is 24 months and the unaccompanied tour is less than 18 months.

**Stable or Stability**—Service member with a diagnosis of gender dysphoria undergoing in-service gender transition are considered clinically stable when, as determined by a military medical provider, significant medical or mental health conditions, if present, are well controlled.

**Transgender Health Medical Evaluation Unit (THMEU)**—Is a centrally located medical unit which is available to service members, MTF providers, and commanders working with transgender service members. Its functions include assuring service members are receiving appropriate treatment in accord with accepted medical practice; service members are evaluated for readiness issues and appropriately profiled; validating all MTPs, surgical requests, and gender marker change requests; and assisting service members, MTF providers, and commanders in DoD and DAF policy and procedures.

**Transgender**—Individuals who identify with a gender that differs from their biological sex.

**App. 095**

### ATTACHMENT 4

**SAMPLE:  Exception to Policy (ETP) Request Memorandum for routing to Squadron Commander, Group Commander, Wing Commander and/or Installation Commander**

(Date)

MEMORANDUM FOR [Grade/Name of Immediate Commander]

FROM: [Grade, Name of Requester]

SUBJECT: Exception to Policy (ETP) to [military dress and appearance standards, use of designated facilities, and/or fitness standards]

   I am a transgender [female/male] Service member in the process of gender transition. Pending my gender marker change in the Defense Enrollment Eligibility Reporting System (DEERS), I request an ETP to allow me to adhere to the requirements of the [insert preferred gender] gender with regard to
   ☒  Dress and appearance (AFI 36-2903, *Dress and Personal Appearance*),
   ☒  Use of lodging, bathroom, and shower facilities that are subject to regulation by the military, Add (AFI 32-6000*, Housing Management)*
   ☒  My current gender Fitness Assessment standards while undergoing cross-sex hormone therapy pending a gender marker change in DEERS (AFMAN 36-2905, *Air Force Physical Fitness Program*).

I have enclosed:

Medical diagnosis and treatment summary from a military medical provider (or a diagnosis made by a civilian provider and validated by a military medical provider) in consultation with the Transgender Health Medical Evaluation Unit that states gender transition is medically necessary.

DD Form 2870, *Authorization for Disclosure of Medical or Dental Information*, with Section II, number 6 filled out to state that my patient information will be released to my Unit Commander (Name, Rank, Duty Title, Unit Name) and servicing Military Personnel Flight (MPF).

Documentation confirming the ETP request is a component of the member's gender transition plan. [Note this applies only if the ETP request is for dress and appearance and/or use of lodging, bathroom, and shower facilities that are subject to regulation by the military].

The point of contact for this memorandum is the undersigned at (insert telephone number and email address).

SERVICE MEMBER SIGNATURE BLOCK

**App. 096**

# EXHIBIT F

HOME   >   SPOTLIGHT ANALYSIS   >

# Young Americans' Views on LGBTQ Rights

PRRI Staff, 04.09.2024

Topics:  LGBTQ

## Introduction

Young Americans (ages 18-29) have consistently been more supportive of LGBTQ rights compared with other age groups. The majority of young Americans favor nondiscrimination protections for LGBTQ Americans and allowing same-sex couples to marry legally and oppose allowing businesses to refuse service to LGBTQ Americans if doing so goes against their religious beliefs. However, overall support for LGBTQ rights among 18 to 29-year-olds has seen a decline over the past few years, with the most notable drops among Republicans.

## Support for Nondiscrimination Protections

Three in four young Americans 18 to 29 (75%) favor laws that would protect LGBTQ Americans from discrimination in jobs, public accommodations, and housing. However, there has been a gradual decline from 2020 to 2023, with the most significant drop from 80% in 2022 to 75% in 2023.

Support for nondiscrimination protections among Democrats ages 18 to 29 has shifted little, with around nine in ten favoring LGBTQ nondiscrimination protections from 2020 to 2023. Young independents' support for nondiscrimination protections showed little change from 2020 to 2022 but dropped 5 percentage points from 83% in 2022 to 78% in 2023. Support among Republicans 18 to 29 has seen the most significant declines in the past four years, dropping by nearly 20 percentage points from 72% in 2020 to 53% in 2023.

**FIGURE 1. Support for Nondiscrimination Protections Among Americans 18-29, by Party Affiliation**

Percent who support:



Source: PRRI, American Values Atlas, 2020-2023.

## Opposition to Religiously Based Service Refusals

In 2023, about two-thirds of Americans ages 18 to 29 (64%) oppose allowing small businesses to refuse providing goods or services to LGBTQ Americans if doing so goes against their religious beliefs. This is about a 5 percentage point decrease from around seven in ten opposing such religiously based service refusals in 2021 (69%) and 2022 (70%) but is similar to the rate of opposition to refusals in 2020 (66%). In 2023, the vast majority of young Democrats (83%) oppose religiously based service refusals compared with 62% of young independents and 38% of young Republicans.

Young Democrats have fluctuated the most among partisan groups. In 2023, 83% of Democrats ages 18 to 29 oppose religiously based service refusals. Even though this percentage decreased from 89% in 2022, it is notably up from 75% in 2020. Sixty-two percent of independents in 2023 also oppose these refusals, a decrease from 68% in 2020. Young Republicans' opposition to religiously based refusals has seen the most dramatic decline, from 49% in 2020 to 38% in 2023.

**FIGURE 2. Opposition to Religiously Based Refusals Among Americans 18-29, by Party Affiliation**

Percent who oppose:



Source: PRRI, American Values Atlas, 2020-2023.

## Support for Same-Sex Marriage

Around seven in ten  Americans ages 18 to 29 (71%) support allowing same-sex couples to marry legally. This percentage has gradually declined from 77% in 2020. More than eight in ten young Democrats (85%) support same-sex marriage compared with three-fourths of young independents (75%) and just under half of young Republicans (49%).

Both young Democrats and young independents have shown little change in their support for allowing same-sex couples to marry legally from 2020 to 2023. However, there has been a substantial decrease in support among young Republicans (25 percentage points). In 2023, under half (49%) of young Republicans support same-sex marriage, compared with 64% in 2020.

**App. 100**

**FIGURE 3. Support for Same-Sex Marriage Among Americans 18-29, by Party Affiliation**

Percent who support:



Source: PRRI, American Values Atlas, 2020-2023.

Although there is still broad support for LGBTQ rights among young Americans, the dramatic decline in support among young Republicans is noteworthy.

**PRRI**

1023 15th Street NW, Floor 9
Washington, DC 20005

**GENERAL INFORMATION**

info@prri.org

(202) 238-9424

**MEDIA INQUIRIES**

press@prri.org

(202) 238-9424

**TERMS OF USE PRIVACY POLICY**

**App. 101**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE )
COLE, GORDON HERRERO, DANY )
DANRIDGE, JAMIE HASH, KODA NATURE, )
and CAEL NEARY, )
            )
               Plaintiffs, )
            )
v. )
            )
DONALD J. TRUMP, in his official capacity as )
President of the United States; the UNITED )
STATES OF AMERICA; PETER B. HEGSETH, )
in his official capacity as Secretary of Defense; )    Civil Action No. 25-cv-240-ACR
MARK AVERILL, in his official capacity as )
Acting Secretary of the Army; the UNITED )
STATES DEPARTMENT OF THE ARMY; )
TERENCE EMMERT, in his official capacity as )
Acting Secretary of the Navy; the UNITED )
STATES DEPARTMENT OF THE NAVY; )
GARY ASHWORTH, in his official capacity as )
Acting Secretary of the Air Force; the UNITED )
STATES DEPARTMENT OF THE AIR FORCE; )
TELITA CROSLAND, in her official capacity as )
Director of the Defense Health Agency; and the )
DEFENSE HEALTH AGENCY, )
            )
               Defendants. )
_____ )

## <u>DECLARATION OF YVETTE BOURCICOT</u>

I, Yvette Bourcicot, declare as follows:

    1.   I served as the Acting Assistant Secretary of the Army for Manpower and Reserve Affairs

from January 18, 2022, to December 23, 2022, and as Principal Deputy Assistant Secretary of the

Army for Manpower and Reserve Affairs from December 23, 2022 to January 20, 2025.  In those

roles, I managed manpower, personnel, and Reserve Component affairs for the Department of the

Army and advised the Secretary of the Army on matters of policy and performance oversight.  As

1

**App. 103**

a former Department of Defense official, Department of the Army official, and Air Force veteran, I can attest that personnel policies must be based on merit and objective criteria to promote readiness and unit cohesion.

## PROFESSIONAL BACKGROUND

2.  I attended Princeton University on an Air Force Reserve Officer Training Corps scholarship and obtained an undergraduate degree in English literature in 2000.  I later attended Georgetown University Law Center on an Air Force scholarship, earning a Juris Doctor degree in 2008, having focused on public international law and national security law.

3.  From May of 2000 to December of 2010, I served as an officer in the U.S. Air Force in various positions, culminating in my service as a Judge Advocate General (JAG).  I later ran my own law practice from March of 2011 to September of 2012, specializing in family law, criminal law, military justice, and administrative law.

4.  From September of 2012 to July of 2014, I served as Special Assistant to the General Counsel of the Army, providing legal advice to the General Counsel, the Secretary of the Army, and Army staff on issues including the Army's response to the Washington Navy Yard shooting, accommodating transgender prisoner populations, updating background check procedures for Army Child Development Center workers, compliance with e-discovery requirements, coordinating an enterprise-wide review of Army Medicine, and reforming the Army Behavioral Health system.

5.  Following this work, I was asked to join a working group in 2015 studying whether and how transgender individuals could serve in the military (the "Working Group") as a subject matter expert.  The Working Group brought together representatives from all branches of the military,

**App. 104**

including the Surgeons General from each branch.  The Working Group also received extensive input from subject matter experts and members of the transgender community.

6.  From July of 2014 to December of 2016, I served as Senior Advisor for International Humanitarian Policy in the Office of the Under Secretary of Defense (Policy) at the Department of Defense.  In December of 2016, I became an Associate Deputy General Counsel in the Office of Legal Counsel, Department of Defense, advising on foreign and international litigation, matters pending before the U.S. Supreme Court, and litigation risk associated with personnel policies.

7.  From February of 2018 to January of 2022, I worked in the private sector, filling a number of policy and communications roles at technology firms, including Facebook, Airbnb, and Match Group.

8.  In January of 2022, I returned to the Department of the Army where I served as Acting Assistant Secretary for Manpower and Reserve Affairs and Principal Deputy Assistant Secretary for Manpower and Reserve Affairs.  I advised the Secretary of the Army on matters including human capital, training, readiness, mobilization, military health policies, force structure, manpower management, equal opportunity, recruiting, marketing, and other critical matters.

## THE ARMY

9.  The United States Army is the largest of the service branches of the United States Armed Forces and performs land-based military operations.  The Department of the Army is one of the three military departments of the DoD.  The Army has an annual budget of more than $185.9 billion.  For fiscal year 2025, the projected end strength for the Active Army is 442,300 soldiers, with an additional 325,000 soldiers in the Army National Guard, and 175,800 in the United States Army Reserve, for a total of 943,100.  The Army's command structure includes four Army

**App. 105**

Commands, nine Army Service Component Commands, and thirteen Direct Reporting Units, operating across the United States and around the world.

10. The Army's core mission is to fight and win our Nation's wars by providing prompt, sustained land dominance across the full range of military operations and spectrum of conflict in support of combatant commanders.  It does this by executing statutory directives, including organizing, equipping, and training forces for the conduct of prompt and sustained combat operations on land, and by accomplishing missions assigned by the President, Secretary of Defense, and combatant commanders.

11. The Army is the most formidable ground combat force on earth and one of the largest employers in the United States.  The Army's continued excellence in executing its many missions is largely due to deliberate investments in soldier training, equipping, and leader development. Soldiers receive training at the highest level, not only in the classroom, but also through rigorous instruction under intense pressure and realistic battlefield conditions.  Many Army personnel are employed in highly technical roles that require lengthy and expensive specialized training. Particularly in light of these investments in personnel, recruitment and retention of capable and qualified soldiers is crucial to Army readiness.

**THE WORKING GROUP AND DEVELOPMENT OF DOD EQUAL SERVICE POLICY**

12. On July 28, 2015, after consultations with the secretaries of the military departments, Secretary of Defense Ashton Carter directed Brad Carson, Acting Undersecretary of Defense for Personnel and Readiness, to convene a Working Group to study the policy and readiness implications of allowing transgender persons to serve in the armed forces.  Shortly after Brad Carson's directive, I joined the Working Group as a subject matter expert.  Initially, the Working Group was asked to begin with the presumption that transgender individuals could serve unless

4

**App. 106**

objective, practical impediments were identified, and to develop an implementation plan that addressed those issues with the goal of maximizing military readiness.

13. The Working Group's process was extremely rigorous. We considered information and presentations from a variety of sources, including medical and other experts, drawn from both within and outside of the Department of Defense; senior uniformed officers and senior civilian officers from each military department; senior military personnel who supervised transgender service members; and transgender people on active duty. We also drew specific medical input from Surgeons General from each of the Armed Service branches.

14. One of the many sources that the Working Group relied upon was the RAND Report, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, which the DoD commissioned in 2016. RAND is a non-profit institution, which seeks to make its research freely and readily available to the public. Accordingly, the research provided in RAND's publications is held to high-quality peer-review standards for objective analysis. The RAND Report reviewed all of the relevant scholarly literature and empirical data, including the extensive medical literature, actuarial data, and research and reports from the then- eighteen other countries that permitted service by transgender personnel. The RAND report found that the military's costs, readiness, and unit cohesion would not be impacted by allowing transgender servicemembers to serve equally in the Armed Forces. A true and correct copy of the RAND Report is attached as Exhibit A.

15. In consideration of the RAND Report's empirical findings, along with the multitude of opinions from military and civilian personnel, the Working Group concluded that transgender individuals who meet the standards for military service should be permitted to serve. Accordingly, Secretary of Defense Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), which required the Secretaries of the

5

**App. 107**

Military Departments, including the Army, to implement the Working Group's equal service policy. The Army implemented two Directives: 2016-30 and 2016-35, which applied to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States. Directive 2016-30 disallowed discrimination based on gender identity and stated, "The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect." Meanwhile, Directive 2016-35 provided policies and standards for transgender soldiers to obtain transition-related medical care.

**THE 2021 AUSTIN POLICY**

16. On January 25, 2021, President Joseph R. Biden replaced the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." The EO relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender

**App. 108**

dysphoria—to exclude them from military service or to limit their access to medically necessary care."

17. On April 30, 2021, the DoD implemented this policy through the issuance of DoD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28"), which applies to all military departments. This guidance authorizes "service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

18. To implement DoDI 1300.28, the Secretary of the Army issued Army Directive 2021-22 (Army Service by Transgender Persons and Persons With Gender Dysphoria) (the "Policy Memorandum").

19. Under the policy, a transgender service member who wished to transition during service was required to first make a request to their brigade commander. Those requests were routed through several offices within the Army before coming to Manpower and Reserve Affairs for final review. As Acting Assistant Secretary for Manpower and Reserve Affairs, I reviewed each request and made a recommendation on whether to grant the service member's request. Subsequently, as Principal Deputy Assistant Secretary for Manpower and Reserve Affairs, I was notified of each request. Because the transgender population makes up a very small fraction of total Army military personnel, I only reviewed one or two such requests per quarter. To my best recollection, every request I received met the requirements of the policy, and every requesting service member met the necessary standards for serving, so I never had cause to recommend that a request be denied.

20. The Policy Memorandum states that "[t]he Army is open to all who can meet the standards for military service and readiness. It remains committed to treating all Soldiers with dignity and

respect while ensuring good order and discipline, including allowing transgender Soldiers to serve openly . . . ." For any standard, requirement, or policy that "appl[ies] differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS)."

21. The Policy Memorandum specifies that personnel will either be accessed or commissioned in accordance with medical standards issued by the Department of the Army and the DoD.

22. The Policy Memorandum also confirms that "[n]o otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service, or otherwise subjected to adverse action or treatment, solely on the basis of gender identity." Additionally, for any "whose fitness for duty or ability to serve is adversely affected by a medical condition or medical treatment related to gender identity or gender transition," the Policy Memorandum states that they "should be treated, for purposes of separation and retention, just as any other Soldier whose fitness for duty or ability to serve is similarly affected by non-gender identity or gender transition reasons."

23. In implementing the Policy Memorandum, I observed no negative impact from permitting transgender service in the Army or on our military capabilities.

24. The Austin Policy fosters trust among team members and advances unit cohesion. This unit cohesion is vital in protecting America's national security interests around the world. In order to ensure America's Army is effective, we need to be able to be seen as a top-choice employer in a highly competitive market for talent. Any organization that American youth perceive as discriminatory will be at a competitive disadvantage in this contest. The Austin Policy further enables our military to retain highly trained and specialized service members by providing an opportunity to progress and develop leadership and other skills within the military.

8

**App. 110**

25. In my positions as Acting Assistant Secretary of the Army for Manpower and Reserve Affairs and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs, I would have been aware of any issues arising from the Austin Policy, and responsible for resolving them. However, in all of my time serving in these roles I heard no complaints from the field about how the inclusion of transgender service members caused problems for unit readiness or individual deployability. Although some transgender service members required medical procedures to treat their gender dysphoria that temporarily affected their deployability, this is no different than the myriad medical reasons that any service member might become temporarily non-deployable.

26. I am also unaware of any complaints regarding unit cohesion resulting from permitting transgender people to serve. Consistent with the military's experience integrating other previously excluded groups into the ranks, unit cohesion hangs on an individual's ability to do the job in front of them, rather than any concerns regarding identity. Transgender service members have proven themselves able to serve and indeed are serving capably throughout the military. To the extent their service has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering greater openness and trust among team members.

### RECENT REVERSAL OF POLICY

27. On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021, executive order permitting equal service by transgender individuals. On January 27, 2025, President Trump issued an executive order revoking "all policies, directives, and guidance issued pursuant to" the order establishing that equal service policy and directing the Department of Defense "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service.

**App. 111**

28. Such an abrupt reversal of established military policy is highly unusual, especially without a significant change in the analysis supporting the policy.  As part of the 2015 Working Group, I can attest to the DOD's lengthy review in deciding whether to adopt an equal service policy.  The Working Group's conclusion that transgender individuals should be allowed to serve on equal terms was the result of a rigorous process involving consultation with experts and military personnel.  President Trump's executive order reverses this carefully considered policy and was ordered without any evidence that allowing transgender individuals to serve over the past four years resulted in any negative impact whatsoever.  The executive order claims that permitting transgender individuals to serve harms military effectiveness and lethality and disrupts unit cohesion; however, as the actual experience of transgender service shows, these claims have no evidentiary basis.

29.  Prohibiting transgender individuals from serving in the military is harmful to the military and to the public interest for several reasons.

30. **Erosion of Merit-Based Accession and Retention.**  The 2021 policy required the Army to make accession and retention decisions based upon merit, not based upon a soldier's transgender status.  This policy upheld an important tenet of military service: that anyone who meets the necessary qualifications and raises their hand to serve should be allowed to serve.  The policy required transgender soldiers to meet the same high standards as all other soldiers.  Under the policy, transgender soldiers served with distinction.  The recision of the policy and implementation of the ban on transgender servicemembers means that an individual's ability to serve is not based on standards and merit but solely based on the outcome of a presidential election.

31. Uniformed service entails dedication and sacrifice—long hours, time away from home, and risk of injury or death are all part of that service.  In return, the Nation promises those service

10

**App. 112**

members that we will honor their service and respect them.  Summarily dismissing transgender service members without cause breaks the faith they placed in their leaders and the military as an institution.  More broadly, it signals to all service members that their service could also end if they are determined to be members of a politically unpopular group.  This sows division and undermines the unit cohesion that is absolutely essential for fighting forces to be effective.

32. **Detriment to Recruitment.**  The military is competing for, and successfully attracting talent in today's robust job market.   This success is due in large part to policies such as the 2021 Austin Policy.  Research shows that the vast majority of young people in our recruit demographic (17-24 years old) do not want to be associated with institutions that are perceived as discriminatory on the basis of race, sex, sexual orientation, religion, or gender identity.  This sudden reversal of policy will damage the reputation of the military and diminish its attractiveness as a career path among the young people we most need to persuade to join our ranks.

33. **No Detriment to the Military.**  The Austin Policy was implemented following years of thoughtful and careful planning by experts and stakeholders across the military.  It takes into account the medical needs of transgender service members and any associated impacts on their ability to serve.  Because of this careful planning, I am confident that allowing transgender individuals to serve in the military and accommodating their medical needs is no greater a burden on the military than the accommodation of all other service members' medical needs.  The transgender population is so small that the impact of their medical needs on unit readiness is virtually nonexistent.  Moreover, many transgender individuals do not require extensive medical interventions, particularly those who have accessed after an 18-month medical assessment of stability.   Those few transgender service members who require more extensive medical

**App. 113**

burden on the military than the accommodation of all other service members' medical needs. The transgender population is so small that the impact of their medical needs on unit readiness is virtually nonexistent.  Moreover, many transgender individuals do not require extensive medical interventions, particularly those who have accessed after an 18-month medical assessment of stability.   Those  few  transgender  service  members  who  require  more  extensive  medical interventions, such as surgeries, are only temporarily unavailable for deployment, similar to any other service member requiring surgery.

## CONCLUSION

34. The Austin Policy was based on years of thoughtful policymaking supported by peer-reviewed scientific research.  It has resulted in a stronger, not a weaker military.  The sudden reversal of that policy is backed by no research and can be attributable only to animus.  It disrespects the transgender service members who have served honorably in the military and threatens to undermine the military's culture, cohesion, and lethality.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: *3 Feb 25*

_____
Yvette Bourcicot

12

**App. 114**

# EXHIBIT A



# Assessing the Implications of Allowing Transgender Personnel to Serve Openly

Agnes Gereben Schaefer, Radha Iyengar,
Srikanth Kadiyala, Jennifer Kavanagh, Charles C. Engel,
Kayla M. Williams, Amii M. Kress

Date visited: November 2, 2016

For more information on this publication, visit www.rand.org/t/RR1530

Library of Congress Cataloging-in-Publication Data is available for this publication.
ISBN: 978-0-8330-9436-0

Published by the RAND Corporation, Santa Monica, Calif.
© Copyright 2016 RAND Corporation
RAND® is a registered trademark.

Limited Print and Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law. This representation of RAND intellectual property is provided for noncommercial use only. Unauthorized posting of this publication online is prohibited. Permission is given to duplicate this document for personal use only, as long as it is unaltered and complete. Permission is required from RAND to reproduce, or reuse in another form, any of its research documents for commercial use. For information on reprint and linking permissions, please visit www.rand.org/pubs/permissions.html.

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonpartisan, and committed to the public interest.

RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

Support RAND
Make a tax-deductible charitable contribution at
www.rand.org/giving/contribute

www.rand.org

**App. 117**

## Preface

U.S. Department of Defense (DoD) policies have rendered both the physical and psychological aspects of "transgender conditions" as disqualifying conditions for accession and allow for the administrative discharge of service members who fall into these categories. However, in July 2015, Secretary of Defense Ashton Carter announced that DoD would "create a working group to study the policy and readiness implications of welcoming transgender persons to serve openly." In addition, he directed that "decision authority in all administrative discharges for those diagnosed with gender dysphoria[1] or who identify themselves as transgender be elevated to the Under Secretary of Defense (Personnel and Readiness), who will make determinations on all potential separations" (DoD, 2015b).

It is against this backdrop that DoD is considering allowing transgender personnel to serve openly. To assist in identifying the potential implications of such a change in policy, the Office of the Under Secretary of Defense for Personnel and Readiness asked the RAND National Defense Research Institute to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly. This report documents the findings from that study. This research should be of interest to DoD and military service leadership, members of Congress, and others who are interested in the potential implications of allowing transgender personnel to serve openly in the U.S. armed forces.

This research was sponsored by the Office of the Under Secretary of Defense for Personnel and Readiness and conducted within the Forces and Resources Policy Center of the RAND National Defense Research Institute, a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint

---

[1] *Gender dysphoria* is "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth" (World Professional Association for Transgender Health, 2011, p. 2).

**App. 118**

Date visited: November 2, 2016

iv    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community.

For more information on the RAND Forces and Resources Policy Center, see www.rand.org/nsrd/ndri/centers/frp or contact the director (contact information is provided on the web page).

# Contents

**Preface** ................................................................................. iii
**Figures and Tables** ..................................................................... vii
**Summary** ............................................................................... ix
**Acknowledgments** ...................................................................... xvii
**Abbreviations** .......................................................................... xix

CHAPTER ONE
**Introduction** ............................................................................ 1
Study Approach ........................................................................... 1
Organization of This Report ............................................................... 4

CHAPTER TWO
**What Are the Health Care Needs of the Transgender Population?** ......................... 5
Definitions of Key Terms and Concepts .................................................... 5
Health Care Needs of the Transgender Population .......................................... 6
Military Health System Capacity and Gender Transition–Related Treatment ................. 7
Potential Consequences of Not Providing Necessary Gender Transition–Related Care ...... 9

CHAPTER THREE
**What Is the Estimated Transgender Population in the U.S. Military?** ..................... 11
General Population Estimates of Transgender Prevalence .................................... 11
Prevalence-Based Approach to Estimating the Number of Transgender Service Members
    in the U.S. Military .................................................................. 14

CHAPTER FOUR
**How Many Transgender Service Members Are Likely to Seek Gender
    Transition–Related Medical Treatment?** ............................................. 19
Prevalence-Based Approach to Estimating the Number of Gender Transition–Related
    Treatments in the U.S. Military ...................................................... 20
Utilization-Based Approach to Estimating the Number of Gender Transition–Related
    Treatments in the U.S. Military ...................................................... 22
Summarizing the Estimates ................................................................ 30

**App. 120**

Date visited: November 2, 2016

vi   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**CHAPTER FIVE**

**What Are the Costs Associated with Extending Health Care Coverage for Gender Transition–Related Treatments?**....................................................33

Private Health Insurance Cost Estimates ..........................................................33

Sensitivity Analyses .......................................................................................35

Summarizing the Estimates............................................................................ 36

**CHAPTER SIX**

**What Are the Potential Readiness Implications of Allowing Transgender Service Members to Serve Openly?**..................................................39

Impact on Ability to Deploy............................................................................39

Impact on Unit Cohesion .............................................................................. 44

Costs of Separation Requirements Related to Transgender Service Members................ 46

**CHAPTER SEVEN**

**What Lessons Can Be Learned from Foreign Militaries That Permit Transgender Personnel to Serve Openly?**...............................................49

Policies on Transgender Personnel in Foreign Militaries....................................... 50

Effects on Cohesion and Readiness.................................................................. 60

Best Practices from Foreign Militaries............................................................. 61

Lessons Learned and Issues to Consider for U.S. Military Policy.............................62

**CHAPTER EIGHT**

**Which DoD Policies Would Need to Be Changed if Transgender Service Members Are Allowed to Serve Openly?**...............................................65

Accession Policy......................................................................................... 66

Retention Policy......................................................................................... 66

Separation Policy........................................................................................ 67

Deployment Policy...................................................................................... 67

**CHAPTER NINE**

**Conclusion**.................................................................................................69

**APPENDIXES**

**A.  Terminology** ........................................................................................73

**B.  History of DSM Terminology and Diagnoses**.......................................... 77

**C.  Treatments for Gender Dysphoria**............................................................79

**D.  Review of Accession, Retention, and Separation Regulations** ........................ 83

**References**..................................................................................................85

**App. 121**

## Figures and Tables

### Figures

4.1.   Comparison of Annual Estimated Gender Transition–Related Health Care
       Utilization and Mental Health Care Utilization, Active Component............32
5.1.   Gender Transition–Related Health Care Cost Estimates Compared with
       Total Health Spending, Active Component.........................................37

### Tables

3.1.   DoD Military Force Demographics...................................................15
3.2.   Prevalence-Based Estimates of the Number of Transgender
       Active-Component and Selected Reserve Service Members......................16
4.1.   Estimated Number of Transgender Service Members Who May Seek to
       Transition per Year ..................................................................21
4.2.   Lifetime Surgery Preferences Among NTDS Survey Respondents..............22
4.3.   Estimated Annual Number of Surgeries and Hormone Therapy Users..........23
4.4.   Enrollee Utilization of Gender Transition–Related Benefits in Private
       Health Insurance Firms...............................................................25
4.5.   Utilization Estimates from Applying Private Health Insurance Parameters.....28
4.6.   Incidence of Penectomies and Bilateral Mastectomies Performed on
       Transgender Individuals .............................................................28
4.7.   Prevalence and Incidence of Gender Identity Disorder Diagnoses in VHA
       Claims Data ...........................................................................29
4.8.   Annual Gender Transition–Related Treatment Estimates from All Data
       Sources ................................................................................31
5.1.   Actuarial Estimated Costs of Gender Transition–Related Health Care
       Coverage from the Literature.........................................................34
5.2.   Estimated Annual MHS Costs of Gender Transition–Related Health Care,
       Active Component.....................................................................36
6.1.   Gender Transition–Related Readiness Constraints................................41
6.2.   Estimated Number of Nondeployable Man-Years Due to Gender
       Transition–Related Treatments ......................................................43

**App. 122**

Date visited: November 2, 2016

## Summary

The U.S. Department of Defense (DoD) is reviewing its policy on transgender personnel serving openly and receiving gender transition–related treatment during military service. The prospect of transgender personnel serving openly raises a number of policy questions, including those regarding access to gender transition–related health care, the range of transition-related treatments to be provided, the potential costs associated with these treatments, and the impact of gender transition–related health care needs (i.e., surgical, pharmacologic, and psychosocial) on military readiness—specifically, in terms of the deployability of transgender service members. The Office of the Under Secretary of Defense for Personnel and Readiness asked the RAND National Defense Research Institute to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly. This report presents the study findings centered around the following research questions:

- What are the health care needs of the transgender population?
- What is the estimated transgender population in the U.S. military?
- How many transgender service members are likely to seek gender transition–related medical treatment?
- What are the costs associated with extending health care coverage for gender transition–related treatments?
- What are the potential readiness implications of allowing transgender service members to serve openly?
- What lessons can be learned from foreign militaries that permit transgender personnel to serve openly?
- Which DoD policies would need to be changed if transgender service members are allowed to serve openly?

**App. 124**

x    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

In the following sections, we summarize the findings associated with each research question.

## What Are the Health Care Needs of the Transgender Population?

For the purposes of this analysis, we use *transgender* as an umbrella term to refer to individuals who identify with a gender different from the sex they were assigned at birth. Under the recently established criteria and terminology in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), the American Psychiatric Association (APA) publication that provides standard language and criteria for classifying mental health conditions, transgender status alone does not constitute a medical condition (APA, 2013). Instead, under the revised diagnostic guidelines, only transgender individuals who experience significant related distress are considered to have a medical condition called *gender dysphoria* (GD). Some combination of psychosocial, pharmacologic (mainly but not exclusively hormonal), or surgical care may be medically necessary for these individuals. Psychotherapy to confirm a diagnosis of GD is a common first step in the process, often followed by hormone therapy and, perhaps, gender reassignment surgery involving secondary or primary sex characteristics. Not all individuals seek all forms of care.

A subset of transgender individuals may choose to *transition*, the term we use to refer to the act of living and working as a gender different from that assigned at birth. For some, the transition may be primarily social, with no accompanying medical treatment; we refer to this as *social transition*. For others, medical treatments, such as hormone therapy and hair removal, are important steps to align their physical body with their target gender. We refer to this as *medical transition*. A subset of those who medically transition may choose to undergo gender reassignment surgery to make their body as congruent as possible with their gender identity. This process of surgical transition is also often referred to as *sex* or *gender reassignment* or *gender confirmation*.

## What Is the Estimated Transgender Population in the U.S. Military?

Estimates of the transgender population in the U.S. military and the analyses presented in this report should be interpreted with caution, as there have been no rigorous epidemiological studies of the size or health care needs of either the transgender population in the United States or the transgender population serving in the military. As a result, much existing research relies on self-reported, nonrepresentative survey samples. We applied a range of prevalence estimates from published research to fiscal year (FY) 2014 personnel numbers to estimate the number of transgender individuals serving in the U.S. military. We estimate that there are between 1,320 and

6,630 transgender personnel serving in the active component (AC) and 830–4,160 in the Selected Reserve (SR). Combining survey evidence from multiple states and adjusting for the male/female distribution in the military gave us a midrange estimate of around 2,450 transgender personnel in the AC and 1,510 in the SR.

### How Many Transgender Service Members Are Likely to Seek Gender Transition–Related Medical Treatment?

We developed two estimates of demand for gender transition–related medical treatments based on private health insurance data and self-reported data from the National Transgender Discrimination Survey (NTDS). Based on our analyses of available private health insurance data on transition-related health care utilization, we expect only a small number of AC service members to access transition-related health care each year. Our estimates based on private health insurance data ranged from 0.022 to 0.0396 annual claimants per 1,000 individuals. Applied to the AC population, these estimates led to a lower-bound estimate of 29 AC service members and an upper-bound estimate of 129 AC service members annually utilizing transition-related health care, out of a total AC force of 1,326,273 in FY 2014.

We also projected health care utilization using the estimated prevalence of transgender service members and self-reported survey data from the NTDS describing the proportion of the transgender population seeking transition-related treatments by age group. Based on these calculations, we estimated, as an upper-bound, 130 total gender transition–related surgeries and 140 service members initiating transition-related hormone therapy (out of a total AC force of 1,326,273 in FY 2014). To put these numbers in perspective, an estimated 278,517 AC service members accessed mental health services in FY 2014. Hence, we expect annual gender transition–related health care to be an extremely small part of the overall health care provided to the AC population.

### What Are the Costs Associated with Extending Health Care Coverage for Gender Transition–Related Treatments?

To determine the budgetary implications of gender transition–related treatment for Military Health System (MHS) health care costs, we again used data from the private health insurance system on the cost of extending coverage for this care to the transgender personnel population. We estimate that AC MHS health care costs will increase by between $2.4 million and $8.4 million annually—an amount that will have little impact on and represents an exceedingly small proportion of AC health care expendi-

tures (approximately $6 billion in FY 2014)[1] and overall DoD health care expenditures ($49.3 billion actual expenditures for the FY 2014 Unified Medical Program; Defense Health Agency, 2015, p. 22). These estimates imply small increases in annual health care costs; results that are consistent with the low prevalence of transgender personnel and the low annual utilization estimates that we identified.

## What Are the Potential Readiness Implications of Allowing Transgender Service Members to Serve Openly?

Similarly, when assessing the readiness impact of a policy change, we found that less than 0.0015 percent of the total available labor-years would be affected, based on estimated gender transition–related health care utilization rates.[2] This is because even at upper-bound estimates, less than 0.1 percent of the total force would seek transition-related care that could disrupt their ability to deploy.[3] Existing data also suggest a minimal impact on unit cohesion as a result of allowing transgender personnel to serve openly. However, we caution that these results rely on data from the general civilian population and foreign militaries, as well as previous integration experiences in the military (e.g., gays, lesbians, women), which may not hold for transgender service members.

## What Lessons Can Be Learned from Foreign Militaries That Permit Transgender Personnel to Serve Openly?

There are 18 countries that allow transgender personnel to serve openly in their militaries: Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and the United Kingdom (Polchar et al., 2014). Our analysis focused on the policies of the four countries—Australia, Canada, Israel, and the United Kingdom—with the most well-developed and publicly available policies on transgender military personnel. Several common themes emerged from our analysis of their experiences:

- The service member's gender is usually considered to have shifted to the target gender in areas such as housing, uniforms, identification cards, showers, and restrooms when a service member publicly discloses an intention to live as the target

---

[1]   AC beneficiaries make up less than 15 percent of TRICARE beneficiaries (Defense Health Agency, 2015).

[2]   We define a labor-year as the amount of work done by an individual in a year.

[3]   We note that the ability to deploy is not exactly equivalent to readiness. A service member's readiness could be measured by the ability to participate in required training and exercises, which could be affected by treatments as well. Our estimates include days of inactivity due to medical treatments, which could also apply in these settings.

gender and receives a diagnosis of gender incongruence. However, physical fitness standards typically do not fully shift until the medical transition is complete. In many cases, personnel are considered exempt from physical fitness tests during transition.

- Because the gender transition process is unique for each individual, issues related to physical standards and medical readiness are typically addressed on a case-by-case basis. This flexibility has been important in addressing the needs of transgender personnel.
- The foreign militaries we analyzed permit the use of sick leave for gender transition–related medical issues and cover some, if not all, medical or surgical treatments related to a service member's gender transition.
- In no case was there any evidence of an effect on the operational effectiveness, operational readiness, or cohesion of the force.

The case studies also suggested a number of key best practices:

- Ensure strong leadership support.
- Develop an explicit written policy on all aspects of the gender transition process.
- Provide education and training to the entire force on transgender personnel policy, but integrate this training with other diversity-related training and education.
- Develop and enforce a clear anti-harassment policy that addresses harassment aimed at transgender personnel alongside other forms of harassment.
- Make subject-matter experts and gender advisers serving within military units available to commanders seeking guidance or advice on gender identity issues.
- Identify and communicate the benefits of an inclusive and diverse workforce.

### Which DoD Policies Would Need to Be Changed if Transgender Service Members Are Allowed to Serve Openly?

We reviewed 20 current accession, retention, separation, and deployment regulations across the services and the Office of the Secretary of Defense to assess the impact of changes that may be required to allow transgender individuals to serve openly. We also reviewed 16 other regulations that have been replaced by more recent regulations or that did not mention transgender personnel.[4] Based on the experiences of foreign militaries, we recommend that DoD issue clear and comprehensive policies.

---

[4]   These additional policies can are listed in Appendix D of this report.

xiv    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Accession Policy**

We recommend that DoD review and revise the language in accession instructions to match the DSM-5 for conditions related to mental fitness, ensuring the alignment of mental health–related language and facilitating appropriate screening and review processes for disorders that may affect fitness for duty. Similarly, physical fitness standards should specify physical requirements (rather than physical conditions). Finally, physical fitness policies should clarify when the service member's target gender requirements will begin to apply.

**Retention Policy**

We recommend that DoD expand and enhance its guidance and directives to clarify retention standards for review during and after medical transition. For example, evidence from Canada and Australia suggests that transgender personnel may need to be held medically exempt from physical fitness testing and requirements (Canadian Armed Forces, 2012; Royal Australian Air Force, 2015). However, after completing medical transition, the service member could be required to meet the standards of the acquired gender.

**Separation Policy**

DoD may wish to revise the current separation process based on lessons learned from the repeal of Don't Ask, Don't Tell. The current process relies on administrative decisions outside the purview of the standard medical and physical review process. This limits the documentation and review of discharges, and it could prove burdensome if transgender-related discharges become subject to re-review and redetermination. When medically appropriate, DoD may wish to establish guidance on when such discharge reviews should be handled through the existing medical fitness processes. We also recommend that DoD develop and disseminate clear criteria for assessing whether and how transgender-related conditions may interfere with duty performance.

**Deployment Policy**

The degree of austerity will differ across deployment environments, and some locations may be able to meet the health care needs of some transgender individuals. Moreover, recent advancements can minimize the invasiveness of treatments and allow for telemedicine or other forms of remote medical care.

Given this, DoD may wish to adjust some of its processes and deployment restrictions in the context of medical and technological advancements (e.g., minimally invasive treatments, telemedicine). Such reforms could minimize the readiness impact of medical procedures that are common among the transgender population. For example, current regulations specifying that conditions requiring regular laboratory visits that cannot be accommodated in a deployed environment can leave service members ineligible for deployment and would affect all individuals receiving hormone treatments

**App. 129**

Date visited: November 2, 2016

Summary    xv

(Office of the Assistant Secretary of Defense for Health Affairs, 2013, p. 3). These treatments require laboratory monitoring every three months for the first year as hormone levels stabilize (Hembree et al., 2009; Elders et al., 2014). To avoid this cost, DoD would need to either permit more flexible monitoring strategies[5] or provide training to deployed medical personnel.[6]

_____

[5]  Some experts suggest that alternatives, such as telehealth reviews, would address this issue for rural populations with limited access to medical care (see, for example, World Professional Association for Transgender Health, 2011).

[6]  "Independent duty corpsmen, physician assistants, and nurses can supervise hormone treatment initiated by a physician" (Elders et al., 2014).

Date visited: November 2, 2016

Date visited: November 2, 2016

## Acknowledgments

The authors would like to extend thanks to our DoD sponsors who provided valuable feedback on various briefings over the course of this study. Deputy Assistant Secretary of Defense for Military Personnel Policy Anthony Kurta was also extremely helpful in providing oversight of this research effort.

We also benefited from the contributions of our RAND colleagues. Bernard Rostker, Michael Johnson, John Winkler, Lisa Harrington, Kristie Gore, and Sarah Meadows provided helpful formal peer reviews of this report. Michelle McMullen provided administrative support, and Lauren Skrabala provided editorial assistance.

We thank them all, but we retain full responsibility for the objectivity, accuracy, and analytic integrity of the work presented here.

**App. 132**

Date visited: November 2, 2016

## Abbreviations

| | |
|---|---|
| AC | active component |
| APA | American Psychiatric Association |
| DoD | U.S. Department of Defense |
| DoDI | U.S. Department of Defense instruction |
| DSM-5 | *Diagnostic and Statistical Manual of Mental Disorders*, fifth ed. |
| FY | fiscal year |
| GD | gender dysphoria |
| IDF | Israel Defense Forces |
| LGBT | lesbian, gay, bisexual, and transgender |
| MHS | Military Health System |
| MTF | military treatment facility |
| NTDS | National Transgender Discrimination Survey |
| SR | Selected Reserve |
| VHA | Veterans Health Administration |
| WPATH | World Professional Association for Transgender Health |

**App. 134**

Date visited: November 2, 2016

Date visited: November 2, 2016

CHAPTER ONE

## Introduction

U.S. Department of Defense (DoD) policies have rendered both the physical and psychological aspects of "transgender conditions" disqualifying conditions for accession and allowed for the administrative discharge of service members who fall into these categories. However, in July 2015, Secretary of Defense Ashton Carter announced that DoD would "create a working group to study the policy and readiness implications of welcoming transgender persons to serve openly." In addition, he directed that "decision authority in all administrative discharges for those diagnosed with gender dysphoria[1] or who identify themselves as transgender be elevated to the Under Secretary of Defense (Personnel and Readiness), who will make determinations on all potential separations" (DoD, 2015b). It is against this backdrop that DoD is considering allowing transgender service members to serve openly. To assist in identifying the potential implications of such a policy change, the Office of the Under Secretary of Defense for Personnel and Readiness asked the RAND National Defense Research Institute to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly.

### Study Approach

Our study approach centered around the following research questions:

- What are the health care needs of the transgender population?
- What is the estimated transgender population in the U.S. military?

---

[1] *Gender dysphoria*, or GD, is "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth" (World Professional Association for Transgender Health [WPATH], 2011, p. 2).

**App. 136**

USCA Case #25-5087     Document #2108715     Filed: 04/01/2025     Page 142 of 394
Date visited: November 2, 2016
Case 1:25-cv-00240-ACR     Document 13-29     Filed 02/03/25     Page 23 of 113

2   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

- How many transgender service members are likely to seek gender transition–related medical treatment?
- What are the costs associated with extending health care coverage for gender transition–related treatments?
- What are the potential readiness implications of allowing transgender service members to serve openly?
- What lessons can be learned from foreign militaries that permit transgender personnel to serve openly?
- Which DoD policies would need to be changed if transgender service members are allowed to serve openly?

We explain our methodological approaches in detail in each chapter of this report, but, here, we present overviews of the various methodologies that we employed. We began our analysis by defining the term *transgender* and then identifying the health care needs of the transgender population. This entailed an extensive literature review of these health care needs, along with treatment standards and medical options—particularly for those who have been diagnosed with gender dysphoria (GD).

We then undertook a review of existing data to estimate the prevalence and likely utilization rates of the transgender population in the U.S. military. Based on our estimates of the potential utilization of gender transition–related health care services, we estimated the Military Health System (MHS) costs for transgender active-component (AC) service members and reviewed the potential effects on force readiness from allowing these service members to serve openly.

We adopted two distinct but related approaches to estimating health care utilization and readiness impact. The first is what we label the *prevalence-based approach*, in which we estimated the prevalence of transgender personnel in the military and applied information on rates of gender transition and reported preferences for different medical treatments to measure utilization and the implied cost and readiness impact. This approach has the benefit of including those who may seek other forms of accommodation, even if they do not seek medical care. It also provides detailed information on the types of medical treatments likely to be sought, which can improve the accuracy of cost and readiness estimates. However, this approach suffers from a lack of rigorous evidence in terms of the rates at which transgender individuals seek treatment and instead relies on the nonscientific National Transgender Discrimination Survey (NTDS). This approach also relies on prevalence measures from only two states, Massachusetts and California, which may not be directly applicable to military populations.

Using our second approach, which we label the *utilization-based approach*, we estimated the rates of utilization of gender transition–related medical treatment. This approach has the benefit of providing real-world measures of utilization, which may be more accurate and more rigorously collected than survey information. However, it suffers from a lack of large-scale evidence and instead relies on several case studies

**App. 137**

that may not be directly applicable to the U.S. military. Given the caveats described, these approaches provide the best available estimate of the potential number of transgender service members likely to seek medical treatment or require readiness-related accommodations.[2] In both cases, we applied measures of population prevalence and utilization to fiscal year (FY) 2014 DoD force size estimates to provide estimates of prevalence within the U.S. military.

We also reviewed the policies of foreign militaries that allow transgender service members to serve openly. Our primary method supporting the observations presented in this report was an extensive document review that included primarily publicly available policy documents, research articles, and news sources that discussed policies on transgender personnel in these countries. The information about the transgender personnel policies of foreign militaries came directly from the policies of these countries, as well as from research articles describing the policies and their implementation. Findings on the effects of open transgender service on cohesion and readiness drew largely from research articles that specifically examined this question using interviews and an analysis of studies completed by the foreign militaries themselves. Finally, insights on best practices and lessons learned emerged both directly from research articles describing the evolution of policy and experience and indirectly from commonalities in the policies and experiences of our four in-depth case studies. Recommendations provided in this report are based on these best practices and lessons learned, as well as a consideration of the unique characteristics of the U.S. military.

Finally, for our analysis of DoD policies, we reviewed 20 current accession, retention, separation, and deployment regulations across the services and the Office of the Secretary of Defense. We also reviewed 16 other regulations that have been replaced by more recent regulations or that did not mention transgender personnel.[3] Our review focused on transgender-specific DoD instructions (DoDIs) that may contain unnecessarily restrictive conditions and reflect outdated terminology and assessment processes. However, in simply removing these restrictions, DoD could inadvertently affect standards overall. While we focused on reforms to specific instructions and directives, we note that DoD may wish to conduct a more expansive review of personnel policies to ensure that individuals who join and remain in service can perform at the desired level, regardless of gender identity.

## Limitations and Caveats

A critical limitation of such a comprehensive assessment is the lack of rigorous epidemiological studies of the size or health care needs of either the U.S. transgender population or the transgender population serving in the military. Indeed, much of the

---

[2]  We define *accommodations* as adjustments in military rules and policies to allow individuals to live and work in their target gender.

[3]  These additional policies are listed in Appendix D of this report.

Date visited: November 2, 2016

4    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

existing research on the transgender population relies on self-reported, nonrepresentative survey data, along with unstandardized calculations using results from available studies. Because there are no definitive data on this topic, the information presented here should be interpreted with caution and, therefore, we present the full range of estimates.

## Organization of This Report

The report is organized around our seven research questions. Chapter Two defines what is meant by the term *transgender*, identifies the health care needs of the transgender population, explains the various treatment options for those diagnosed with GD, and examines the capacity of the MHS to provide treatment options to service members diagnosed with GD. Chapter Three estimates the number of transgender service members in the AC and Selected Reserve (SR). Chapter Four estimates how many transgender service members are likely to seek medical treatment. Chapter Five estimates the costs associated with extending health care coverage for gender transition–related treatments. Chapter Six assesses the potential readiness implications of allowing transgender service members to serve openly. Chapter Seven identifies lessons learned from foreign militaries that allow transgender personnel to serve openly. Chapter Eight offers recommendations regarding which DoD accession, retention, separation, and deployment policies would need to be changed if a decision is made to allow transgender service members to serve openly. Chapter Nine summarizes key findings presented in the report and suggests best practices for implementing policy changes.

Appendix A presents definitions of common terms related to gender transition and transgender identity. Appendix B provides a history of the historical nomenclature associated with transgender identity. Appendix C provides details on the psychosocial, pharmacologic, surgical, and other treatments for GD. Appendix D lists the DoD accession, retention, separation, and deployment policies that we reviewed.

CHAPTER TWO

## What Are the Health Care Needs of the Transgender Population?

This report begins by describing the health care needs of the U.S. transgender population overall. To discern the potential impact of changing DoD policies to allow transgender military personnel to serve openly and to ensure appropriate health care for those who seek gender transition–related treatment, it is also important to consider whether the MHS has the capacity to provide this care.

### Definitions of Key Terms and Concepts

A challenge to our efforts to understand the health care needs of the transgender population in general, as well as in the military, is the varied and shifting terminology used in the clinical literature. Consequently, here, we define a range of terms that we will use throughout this review.[1] Consistent with the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), the American Psychiatric Association (APA) publication that provides standard language and criteria for classifying mental health conditions, we use the term *transgender* to refer to "the broad spectrum of individuals who . . . identify with a gender different from their natal gender" (APA, 2013).[2] *Natal gender* or *birth sex*, which is the sex that an individual was assigned at birth and typically correlates with primary sex characteristics (e.g., genitalia).

We refer to the subset of the population whose gender identity does not conform with the expressions and behaviors typically associated with the sex to which they were assigned at birth as *transgender* or *gender nonconforming*. Many identities fall under these umbrella terms, including individuals who identify as androgynous, multigendered, third gender, and two-spirit people. The *gender nonconforming* category also includes individuals who *cross-dress*, which means they wear clothing that is traditionally worn by a gender different from that of their birth sex. The exact definitions of each of these identities vary under the term *gender nonconforming*, and individuals may

---

[1]   A comprehensive list of terms and definitions is provided in Appendix A.

[2]   A brief history of the DSM language and diagnostic criteria for related conditions is presented in Appendix B.

5

**App. 140**

fluidly change, blend, or alter their gender identity over time. For the purposes of this analysis, we use *transgender* as an umbrella term that refers to individuals who identify with a gender different from the sex they were assigned at birth.

Importantly, under the recently established criteria and terminology outlined in DSM-5, transgender status alone does not constitute a medical condition (APA, 2013). Instead, under the revised diagnostic guidelines, only transgender individuals who experience significant related distress are considered to have a medical condition called *gender dysphoria* (GD). Some combination of psychosocial, pharmacologic (mainly but not exclusively hormonal), or surgical care may be medically necessary for these individuals. Psychotherapy to confirm a diagnosis of GD is a common first step in the process, often followed by hormone therapy and, perhaps, by gender reassignment surgery involving secondary or primary sex characteristics. Not all patients seek all forms of care. However, recognized standards of care require documentation of 12 continuous months of hormone therapy and living in the target gender role consistently and in all aspects of life. Unfortunately, the diagnosis is newly established, and data from which to estimate the size of these subgroups are lacking. In the future, however, transgender individuals seeking gender transition–related treatment are likely to require a GD diagnosis as the clinical justification.

Among transgender individuals, a subset may choose to *transition*, the term used to refer to the act of living and working in a gender different from one's sex assigned at birth. For some individuals, this may involve primarily social change but no medical treatment; this is referred to as *social transition*. For others, medical treatments, such as hormone therapy and hair removal, are important steps to align their physical body with their target gender. This is referred to as *medical transition*. A subset of those who medically transition may choose to undergo *gender reassignment surgery* to make their physical body as congruent as possible with their gender identity. This process of *surgical transition* is also often referred to as *sex* or *gender reassignment* or *gender confirmation*.

## Health Care Needs of the Transgender Population

The main types of gender transition–related treatments are psychosocial, pharmacologic (primarily but not exclusively hormonal), and surgical. While one or more of these types of treatments may be necessary for some transgender individuals with GD, the course of treatments varies and must be determined on an individual basis by patients and clinicians. Since little is known about currently serving transgender service members, the following discussion draws primarily from available research on nonmilitary transgender populations.[3]

---

[3] The 2015 DoD Health Related Behavior Survey of active-duty service members was being fielded concurrently to this research. It marked the first time a U.S. military survey asked questions relating to gender identity.

**Diagnosis and Treatments for Gender Dysphoria**

Treatments deemed necessary for transgender populations have shifted over time based on research advancements and the accumulation of clinical knowledge. The World Professional Association for Transgender Health (WPATH) regularly publishes revised versions of its *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*; the most current at the time of our research was version 7. The standards are designed to guide the treatment of patients experiencing GD while recognizing that not all expressions of gender nonconformity require treatment (WPATH, 2011, p. 2). Some transgender individuals (again, the proportion is largely unknown) experience significant dysphoria (distress) with the sex and gender they were assigned at birth, and they meet formal DSM-5 diagnostic criteria for GD, as described in Appendix B of this report. For those diagnosed with GD, treatment options include psychotherapy, hormone therapy, surgery, and changes to gender expression and role (i.e., how people present themselves to the world; WPATH, 2011, pp. 9–10). We discuss these treatment options in detail in Appendix C.

Not all patients will prefer or need all or any of these options; however, when clinically indicated, appropriate care can "alleviate gender dysphoria by bringing one's physical characteristics into alignment with one's internal sense of gender" (Herman, 2013b, p. 4). There have been no randomized controlled trials of the effectiveness of various forms of treatment, and most evidence comes from retrospective studies. The widely endorsed consensus-based practice guidelines outlined in the WPATH *Standards of Care* suggest that transition-related mental health care, hormone therapy, and surgery are generally effective and constitute necessary health care for many individuals with GD.[4] The appropriate treatment plan is best determined collaboratively by patients and their health care providers. Optimally, specialized transgender health care will be provided by an interdisciplinary team (WPATH, 2011, p. 26).

## Military Health System Capacity and Gender Transition–Related Treatment

To discern the potential impact of changing DoD policies to allow transgender military personnel to serve openly and to ensure appropriate health care for GD, it is also important to consider whether the MHS has the capacity to provide this care.

---

We anticipate that these survey results will provide additional information regarding how many transgender personnel currently serve in the U.S. military and their health behaviors.

[4]   These standards are endorsed by the American Medical Association, American Psychological Association, American Academy of Family Physicians, National Association of Social Workers, World Professional Association for Transgender Health, and American College of Obstetricians and Gynecologists (see Lambda Legal, 2012). Major insurers, including Aetna and UnitedHealthcare, have incorporated many of these standards of care into their policies (see, for example UnitedHealthcare, 2015).

8    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Psychotherapy, Hormone Therapies, and Gender Transition–Related Surgery**

Both psychotherapy and hormone therapies are available and regularly provided through the military's direct care system, though providers would need some additional continuing education to develop clinical and cultural competence for the proper care of transgender patients. Surgical procedures quite similar to those used for gender transition are already performed within the MHS for other clinical indications.

**Reconstructive Surgery**

Reconstructive breast/chest and genital surgeries are currently performed on patients who have had cancer, been in vehicular and other accidents, or been wounded in combat. The skills and competencies required to perform these procedures on transgender patients are often identical or overlapping. For instance, mastectomies are the same for breast cancer patients and female-to-male transgender patients. Perhaps most importantly, the surgical skills and competencies for some gender transition surgeries also overlap with skills required for the repair of genital injuries sustained in combat, which have increased dramatically among troops deployed to Afghanistan. From 2009 to 2010, the percentage of wounded troops with genitourinary injuries transiting through Landstuhl Regional Medical Center in Germany nearly doubled from 4.8 percent to 9.1 percent—a dramatic increase that led some health providers to call this the "new 'signature wound'" of Operation Enduring Freedom (D. Brown, 2011).[5] There are particular similarities to the procedures recommended to treat those experiencing dismounted complex blast injuries, which typically involve multiple amputations with other injuries, often to the genitals (Wallace, 2012). Providing high-quality surgery to treat the 5 percent of combat wounds that require penile reconstruction requires extensive knowledge and practice in reconstructive techniques (Williams and Jezior, 2013). Assuming the MHS continues to directly provide health services as it has in the past, there are at least two potential implications: First, military surgeons may currently have the competencies required to surgically treat patients with GD, and, second, performing these surgeries on transgender patients may help maintain a vitally important skill required of military surgeons to effectively treat combat injuries during a period in which fewer combat injuries are sustained.

**Cosmetic Surgery**

Recognition of the requirement for reconstructive plastic surgery as a result of the wartime mission drives the existing DoD policy for cosmetic surgery procedures in the MHS; the services have requirements and manpower authorizations for specialists who can perform reconstructive plastic surgery (Office of the Assistant Secretary of Defense

---

5   Experimental penis transplants, expected to be performed for the first time within the next year at Johns Hopkins School of Medicine, are being developed in the United States specifically for combat-wounded veterans; however, there may be benefits for transgender patients as well (Welsh, 2015).

for Health Affairs, 2005, p. 1). Cosmetic/reconstructive surgery skills need to be maintained with practice, and surgeons must also "meet board certification, recertification, and graduate medical education program requirements" (Office of the Assistant Secretary of Defense for Health Affairs, 2005, p. 1).

Current DoD policy draws a distinction between elective cosmetic plastic surgery performed "to improve the patient's appearance or self-esteem" and reconstructive plastic surgery performed on bodily structures that are abnormal due to health conditions to improve function or approximate a normal appearance (Office of the Assistant Secretary of Defense for Health Affairs, 2005, p. 3). While reconstructive surgeries constitute necessary treatment, access to elective cosmetic surgical procedures is subject to added constraints. For example, cosmetic procedures are performed on a space-available basis and restricted to those who will be TRICARE-eligible for at least six months. These procedures also require written permission from the commander of the service member's active-duty unit, and the patient must pay surgical, institutional, and anesthesia fees (Office of the Assistant Secretary of Defense for Health Affairs, 2005, p. 3).[6] DoD recognizes the need for these reconstructive surgery competencies and has crafted a policy to cover plastic surgeries to maintain providers' surgical skills and certification requirements.

## Potential Consequences of Not Providing Necessary Gender Transition–Related Care

The discussion of the health care needs of transgender military personnel is incomplete without considering the potential unintended effects of constraining or limiting gender transition–related treatment. Little question remains that there are transgender personnel currently serving in the AC. Adverse consequences of not providing transition-related health care to transgender personnel could include avoidance of other necessary health care, such as important preventive services, as well as increased rates of mental and substance use disorders, suicide, and reduced productivity.

Research indicates that, "due to discrimination and problematic interactions with health care providers, transgender individuals frequently do not access health care, resulting in short and long-term adverse health outcomes" (Roller, Sedlak, and Draucker, 2015, p. 418).[7] Further, patients denied appropriate health care may turn to other solutions, such as injecting construction-grade silicone into their bodies to alter

---

[6]  Interestingly, according to Elders et al. (2014, p. 19), there is no difference in leave policies related to recovery time between the two.

[7]  For example, among NTDS respondents, 28 percent reported postponing or avoiding treatment when sick or injured, and 33 percent delayed or skipped preventive care due to discrimination or disrespect from health care providers (Grant et al., 2011, p. 76). In one study, transgender respondents had fewer self-reports of good health and were more likely to report limitations on daily activities due to health issues (Kates et al., 2015, p. 5).

Date visited: November 2, 2016

10   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

their shape (State of California, 2012, p. 12). There are also potential costs related to mental health care services for individuals who do not receive such care (Herman, 2013b, p. 20). Multiple observational studies have suggested significant and sometimes dramatic reductions in suicidality, suicide attempts, and suicides among transgender patients after receiving transition-related treatment (State of California, 2012, p. 10). A study by Padula, Heru, and Campbell (2015) found that removing exclusions on transgender care "could change the trajectory of health for all transgender persons" at a minimal cost per member per month.[8]

However, we caution that it is not known how well these findings generalize to military personnel. Moreover, while the existing data offer some indication of the needs for and costs of gender transition–related health care, it is important to note that none of these studies were randomized controlled trials (the gold standard for determining treatment efficacy). In the absence of quality randomized trial evidence, it is difficult to fully assess the outcomes of treatment for GD.

---

[8]   Specifically, they found that insurance provider coverage for transgender-related services resulted in "greater effectiveness, and was cost-effective relative to no health benefits at 5 and 10 years from a willingness-to-pay threshold of $100,000/[quality-adjusted life year]."

Date visited: November 2, 2016

CHAPTER THREE

## What Is the Estimated Transgender Population in the U.S. Military?

This chapter provides several estimates of the number of transgender service members in the U.S. military. To date, there have been no systematic studies of the number of transgender individuals in the U.S. general population or in the U.S. military. Current studies rely on clinical samples of health care service utilizers, nonrepresentative samples assembled in ways that are difficult to replicate, and self-reported survey data from a small number of states.

### General Population Estimates of Transgender Prevalence

The transgender prevalence in the U.S. general population is thought to be significantly less than 1 percent (Gates, 2011, p. 6; APA, 2013, p. 454). However, there have been no rigorous epidemiological studies in the general U.S. population that confirm this estimate. Our subsequent estimates must be qualified, therefore, as somewhat speculative; they are based on numerous sources, including health services claims data, representative state-level health surveillance survey data, a convenience (i.e., nonrepresentative) sample recruited by an advocacy network, the experiences of foreign militaries, and selected other data sources.

The Williams Institute at the University of California, Los Angeles, School of Law, calculated that, based on estimates from Massachusetts and California, 0.3 percent of the U.S. population is transgender (Gates, 2011, p. 6). The Massachusetts data were collected between 2007 and 2009 as part of the Massachusetts Behavioral Risk Factor Surveillance System initiative. The survey suggests that 0.5 percent of the population in Massachusetts identifies as "transgender" (95-percent confidence interval: 0.3 to 0.6 percent; Conron et al., 2012). The California data combine information on the percentage of individuals who are transgender from the California Lesbian, Gay, Bisexual, and Transgender (LGBT) Tobacco Survey and the percentage of the overall population that is LGBT from the 2009 California Health Interview Survey. Gates

11

**App. 146**

12   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

multiplies these values together to estimate that 0.1 percent of the population of California is transgender.[1]

To develop an estimate of transgender prevalence for the entire United States, Gates (2011) simply averages the Massachusetts and California values, yielding 0.25 percent, then rounds that up to 0.3 percent. This measure is very problematic, however. While survey-based estimates of transgender prevalence are likely to be accurate measures of true state-level transgender prevalence, it is not clear that taking an unweighted average from states with vastly different population sizes is appropriate for estimating national prevalence. For example, a weighted average calculation using the 2009 census population estimates for California and Massachusetts implies a 0.16 percent "national" prevalence estimate, as opposed to the 0.3 percent estimate calculated by Gates (2011)—a nearly 50-percent difference. We used this 0.16 percent weighted average as our combined, national estimate using the California and Massachusetts studies. This estimate was our midrange starting point, though we included both the 0.1 percent (from California) and 0.5 percent (from Massachusetts) as comparison points.

We note that there have been and continue to be other efforts to measure the prevalence of transgender identity in the general population. The two most prominent examples are the meta-analysis conducted by WPATH and a recent effort from the U.S. census. We did not use these estimates due to concerns that they systematically undercounted the prevalence of transgender identity for a variety of reasons detailed in the discussions that follow.

Separately, in 2007, the WPATH reviewed ten studies of prevalence with estimates for transgender individuals presenting for gender transition–related care, ranging from 1:11,900 to 1:45,000 for male-to-female transitions and 1:30,400 to 1:200,000 for female-to-male transitions (WPATH, 2011).[2] The studies cited were largely based on clinical usage. The WPATH authors note that these numbers should be considered "minimum estimates at best":

> The published figures are mostly derived from clinics where patients met criteria for severe gender dysphoria and had access to health care at those clinics. These estimates do not take into account that treatments offered in a particular clinic setting might not be perceived as affordable, useful, or acceptable by all self-identified gender dysphoric individuals in a given area. By counting only those people who

---

[1]   Although Gates (2011) states that 3.2 percent of the LGBT population is transgender, we note that an earlier document (California Department of Health Services, 2004) reporting analyses from the same survey states that 2 percent of this population is transgender. We were not able to obtain the raw data and could not verify which of the two values is correct. We used the 3.2-percent estimate to calculate the California transgender prevalence estimate.

[2]   The studies were Wålinder, 1968; Wålinder, 1971; Hoenig and Kenna, 1974; Eklund, Gooren, and Bezemer, 1988; Tsoi, 1988; Bakker et al., 1993; van Kesteren, Gooren, and Megens, 1996; Weitze and Osburg, 1996; De Cuypere et al., 2007; and Zucker and Lawrence, 2009.

**App. 147**

Date visited: November 2, 2016

present at clinics for a specific type of treatment, an unspecified number of gender dysphoric individuals are overlooked. (WPATH, 2011, p. 7)

Additionally, the information is based on utilization rates from the ten studies, mostly conducted in European countries, such as the United Kingdom, the Netherlands, Sweden, Germany, and Belgium. One study was conducted in Singapore. This raises concerns about the applicability of these estimates to the U.S. population due to differences in costs and social tolerance, both of which would likely make health utilization behavior in Europe significantly different from that in the United States. Moreover, the studies were conducted over a 30-year period in which utilization was dramatically increasing, suggesting that the estimates were not stable. This concern is reported in the WPATH report, with the authors noting that the trend (over time) was due to higher rates of individuals seeking care. In one example, the estimated transgender population doubled in just five years in the United Kingdom. If the numbers are increasing over time based on the use of clinics, then an estimate from ten to 15 years ago would likely be very low relative to utilization in those same places today, and again not representative of likely utilization in the United States.[3]

Harris (2015) used information on name and sex changes in Social Security Administration data files to estimate the number of transgender individuals in the U.S. population. Using information on male-to-female and female-to-male name changes, he estimates that there were 89,667 transgender individuals in the United States in 2010. Of this group, 21,833 (24 percent) also changed their sex, according to Social Security records; during some periods in U.S. history, this required documented proof of either initiation or completion of medical transition. Since name changes are not required, prevalence estimated in this manner is likely to be a lower-bound estimate of the true transgender prevalence rate in the United States. Using the 2010 population of adults age 18 and over as the denominator (234,564,071), 89,667 transgender cases implies a lower-bound transgender prevalence rate of 0.038 percent in the United States.

---

[3] According to the WPATH authors,

   The trend appears to be towards higher prevalence rates in the more recent studies, possibly indicating increasing numbers of people seeking clinical care. Support for this interpretation comes from research by Reed and colleagues (2009), who reported a doubling of the numbers of people accessing care at gender clinics in the United Kingdom every five or six years. Similarly, Zucker and colleagues (2008) reported a four- to five-fold increase in child and adolescent referrals to their Toronto, Canada clinic over a 30-year period. (WPATH, 2011, p. 7)

## Prevalence-Based Approach to Estimating the Number of Transgender Service Members in the U.S. Military

Before discussing estimates of prevalence of transgender individuals in the U.S. military, it is important to note that, to our knowledge, no studies have directly measured the prevalence or incidence of transgender individuals currently serving in the active or reserve component.[4] To estimate prevalence in the military, we have constructed estimates using a combination of data sources.[5] One of those sources, the NTDS, provides detailed information on the choices and preferences of transgender individuals but it is not a randomized, representative sample of the military and thus is not generalizable.

We applied measures of population prevalence to DoD force size estimates to estimate prevalence in the U.S. military. We measured force size using information from DoD's 2014 demographics report (DoD, 2014; see Table 3.1). The demographics are separated into AC and SR. For much of the discussion of our medical care analysis, we focus on the AC. We did not include reserve-component service members, retirees, or dependents in the cost analyses because we did not have information on age and sex distribution within these beneficiary categories. Some of these beneficiary categories also have limited eligibility for health care provided through military treatment facilities (MTFs) and may receive their health care through TRICARE coverage in the purchased care setting or through other health insurance plans. For our readiness analysis, we included both the AC and SR because both components may be used for deployments. Although there are ongoing discussions regarding the feasibility of activating the Individual Ready Reserve, we excluded this population because we lacked the detailed information on gender and age needed to conduct our analysis.

Table 3.2 contains estimates of the number of transgender personnel in the AC and SR using the baseline prevalence from existing studies and shows the results of several tests that provide a range of estimates based on different assumptions in the literature. To estimate prevalence in the military, we conducted analyses using five values: (1) a lower-bound estimate of 0.1 percent based on a study in California

---

[4]   G. Brown (1988) found that eight out of 11 evaluated natal males with severe GD had a military background; he explains his findings by positing a "hypermasculine" phase among transgender individuals that coincides with the age of enlistment. Since the sample size in that study was extremely small, we do not consider this good evidence for this theory. Gates and Herman (2014) used estimates from the NTDS, combined with estimates of transgender prevalence (0.3 percent) from Gates (2011) and history of military service in the U.S. population from the American Community Survey, to estimate transgender prevalence in the military. Data from the National College of Health Administration showed that military experience was significantly higher among transgender individuals than among those who did not identify as transgender (9.4 percent versus 2.1 percent; Blosnich, Gordon, and Fine, 2015). However, these data were collected from only 51 institutions, and the response rate for the survey was only 20 percent, which again raises questions regarding the validity of the estimates.

[5]   Our estimates were constructed using Gates (2011), which combined estimates from the Massachusetts Behavioral Risk Factor Social Surveys with the California LGBT Tobacco Survey, and Gates and Herman (2014), which used data from the NTDS, Gates (2011), and the American Community Survey.

**Table 3.1**
**DoD Military Force Demographics**

| Category | Number | % |
|---|---|---|
| **Active Component** | | |
| Sex | | |
| Female | 200,692 | 15 |
| Male | 1,125,581 | 85 |
| Age | | |
| <25 | 572,293 | 43 |
| 26–30 | 293,698 | 22 |
| 31–35 | 201,137 | 15 |
| 36–40 | 137,653 | 11 |
| 41+ | 121,492 | 9 |
| Total | 1,326,273 | — |
| **Selected Reserve** | | |
| Sex | | |
| Female | 149,759 | 18 |
| Male | 682,233 | 82 |
| Age | | |
| <25 | 285,494 | 34 |
| 26–30 | 156,983 | 19 |
| 31–35 | 124,179 | 15 |
| 36–40 | 86,151 | 10 |
| 41+ | 179,185 | 22 |
| Total | 831,992 | — |

SOURCE: DoD, 2014.

(Conron, 2012); (2) an upper-bound estimate of 0.5 percent based on a study in Massachusetts (Gates, 2011); (3) a population-weighted average of the California and Massachusetts studies, yielding a prevalence estimate of 0.16 percent; (4) an adjustment of this population-weighted approach based on the natal male/female distribution in the military, yielding a prevalence estimate of 0.19 percent; and (5) a doubling of the population-weighted, gender-adjusted value, yielding a prevalence estimate of 0.37 percent.

**App. 150**

16   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Table 3.2**
**Prevalence-Based Estimates of the Number of Transgender Active-Component and Selected Reserve Service Members**

| Component | Total Force Size (FY 2014) | 0.1%[a] (CA study) | 0.16%[b] (combined, population-weighted CA + MA studies) | 0.19%[c] (gender-adjusted rate) | 0.37%[d] (twice gender-adjusted rate) | 0.5%[e] (MA study) |
|---|---|---|---|---|---|---|
| Active | 1,326,273 | 1,320 | 2,120 | 2,450 | 4,900 | 6,630 |
| Selected Reserve | 831,992 | 830 | 1,330 | 1,510 | 2,930 | 4,160 |

SOURCES: Estimates for force size are based on RAND calculations using FY 2014 data from DoD, 2014.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

Based on the 0.1 percent lower bound, we estimate that there are approximately 1,320 transgender individuals in the AC and approximately 830 in the SR. Using the Massachusetts study (0.5 percent) as an upper bound, we estimate that there are approximately 6,630 transgender service members in the AC and 4,160 in the SR. Because these estimates are based on selected populations in the state and the variation in these populations is significant, we were concerned that they were not representative of broader national numbers, especially as they pertain to the gender mix of the military. Therefore, we adjusted the population-weighted combination of these estimates to account for the male/female distribution in the U.S. military populations. This gender adjustment is critical, as most research indicates that male-to-female transitions are two to three times more common than female-to-male transitions (APA, 2013; Horton, 2008; Gates, 2011; Grant et al., 2011). This assumption of a two to one difference in underlying prevalence across genders applied to the 0.16 percent aggregate estimate implies a natal male-specific prevalence of 0.2 percent and a natal female-specific prevalence of 0.1 percent. Assigning these values to the male/female AC distributions increases the military prevalence estimate from 0.16 percent to 0.19 percent, which implies that there are 2,450 transgender individuals in the AC and 1,510 in the SR.

The estimate of 0.37 percent doubles the gender-adjusted rate based on information provided by the NTDS that 20 percent of the transgender population in its sample reported a history of military service, which is twice the rate of the general population,

**App. 151**

Date visited: November 2, 2016

What Is the Estimated Transgender Population in the U.S. Military?    17

as reported in the American Community Survey (Grant et al., 2011). We note that this is likely to be an overestimate of the overall transgender population for two reasons. First, given the highly tolerant environment in Massachusetts and California, the prevalence estimates in those two states are likely to overstate the nationwide prevalence.[6] Second, the evidence that transgender individuals are twice as likely to serve in the military is based on extrapolations from a nonrepresentative sample of individuals and not on direct, rigorous study of the transgender military population.

_____

[6] For example, both California and Massachusetts are rated as "top places for LGBT rights" (Keen, 2015).

Date visited: November 2, 2016

CHAPTER FOUR

# How Many Transgender Service Members Are Likely to Seek Gender Transition–Related Medical Treatment?

We adopted two distinct but related approaches to estimate the health care utilization and impact on readiness of allowing transgender personnel to serve openly in the U.S. military. The first is what we label the *prevalence-based approach*, in which we estimated the prevalence of transgender individuals in the military and applied information on rates of gender transition and reported preferences for different medical treatments to measure utilization and the implied cost and readiness impact. This approach has the benefit of including those who may seek other forms of accommodation, even if they do not seek medical care. It also provides detailed information on the types of medical treatments likely to be sought, which can improve the accuracy of cost and readiness estimates. However, this approach suffers from a lack of rigorous evidence in terms of the rates at which transgender individuals seek treatment and instead relies on the nonscientific NTDS. It also relies on prevalence measures from only two states—Massachusetts and California—that may not be directly applicable to military populations.

We refer to our second approach as the *utilization-based approach*, which we used to estimate the rates of utilization of medical treatment. This approach has the benefit of providing real-world measures of utilization based on health insurance claims, which may be more accurate and more rigorously collected than survey information. However, this approach suffers from a lack of large-scale evidence and instead relies on several case studies that may not be directly applicable to the U.S. military. Despite these caveats, these approaches provide the best available estimate of the range in the potential number of transgender service members likely to seek medical treatment or require readiness-related accommodations.[1]

In both cases, we applied measures of population prevalence and utilization to DoD force size demographics to provide estimates of prevalence within the U.S. military. As indicated in the previous chapter, our calculations of population prevalence and health care utilization used FY 2014 data from DoD's 2014 demographics report (DoD, 2014; see Table 3.1 in Chapter Three).

---

[1]   Again, we define *accommodations* as adjustments in military rules and policies to allow individuals to live and work in their target gender.

**App. 154**

## Prevalence-Based Approach to Estimating the Number of Gender Transition–Related Treatments in the U.S. Military

To estimate the utilization of gender transition–related health care treatments, we scaled the prevalence of transgender service members identified in Chapter Three by the rates of transition and reported take-up of medical treatments. We based our transition rates on self-reported transitions in the NTDS data. According to the NTDS, 55 percent of transgender individuals reported living and working as their target gender; we refer to this as *social transition*.[2] For others, medical treatments, such as hormone therapy and hair removal, are important steps to align their physical body with their target gender. We refer to this as *medical* or *surgical transition*.[3]

Using the prevalence estimates from Table 3.2 in Chapter Three, we used information from the NTDS on the age of transition for individuals under 25, 26–30, 31–35, 36–40, and over 40 and calibrated our estimates with the age distribution in the military. Fifty-five percent of NTDS respondents reported that they had socially transitioned over their lifetime, and the data indicate that male-to-female transition ages differ from female-to-male transition ages. Nearly 54 percent of female-to-male transitions occurred before the age of 25, compared with only 23 percent of male-to-female transitions.

We focus on social transition because we assess this as most relevant for individuals who may need accommodations as they live and work in a different gender. This was also used as the basis in some foreign militaries, as discussed in Chapter Seven. Table 4.1 presents the estimated number of individuals who may seek to transition each year under each of our prevalence assumptions. We found that a lower bound of 40 AC and 20 SR service members and an upper bound of 190 AC and 110 SR service members will seek to transition each year and may need some sort of accommodations. The population-weighted, gender-adjusted estimate implies a middle range of 65 AC and 40 SR service members who will seek to transition each year.

Next, we combine the estimates of the number of transgender service members with information on the proportion undergoing transition and the age-specific proportion undergoing gender transition–related treatment to generate the number of annual treatments. Surgical preference rates vary by transition type (male-to-female versus female-to-male transition; see Table 4.2). Surgeries are distributed evenly across

---

[2]   We note that an additional 27 percent of those who had not yet socially transitioned wished to transition at some point in the future. Because the timeline and desire for transition are difficult to translate to concrete numbers, we used the estimate of 55 percent of transgender individuals living and working full-time as their target gender as our planning parameter for readiness accommodations.

[3]   In the NTDS sample, 65 percent of transgender individuals had medically transitioned, and 33 percent had surgically transitioned. Note that the rate of medical transitions is higher than the rate of social transitions because some individuals receive hormone treatments but do not live full-time as their target gender.

USCA Case #25-5087     Document #2108715     Filed: 04/01/2025     Page 161 of 394
Date visited: November 2, 2016
Case 1:25-cv-00240-ACR     Document 13-29     Filed 02/03/25     Page 42 of 113

**Table 4.1**
**Estimated Number of Transgender Service Members Who May Seek to Transition per Year**

| Estimate Source | Active Component (total force: 1,326,273) | Selected Reserve (total force: 831,992) |
|---|---|---|
| 0.1% (CA study)[a] | 40 | 20 |
| 0.16% (combined, population-weighted CA + MA studies)[b] | 60 | 30 |
| 0.19% (gender-adjusted rate)[c] | 65 | 40 |
| 0.37% (twice gender-adjusted rate)[d] | 130 | 80 |
| 0.5% (MA study)[e] | 190 | 110 |

SOURCES: Estimated proportions of subgroups based on Grant et al., 2011, p. 25. Estimates for the AC and SR are based on RAND calculations using FY 2014 data from DoD, 2014.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

NOTE: The table excludes Individual and Inactive Ready Reserve members because comparable information on their demographics was not available for analysis.

four procedures for male-to-female transitions and primarily over two procedures for female-to-male transitions.

Recall, not all of the individuals seeking to transition would meet the diagnostic criteria for GD, which is a requirement for these surgeries. Moreover, even among individuals who transition in some manner, surgical treatment rates are typically only around 20 percent, with the exception of chest surgery among female-to-male transgender individuals (see Table 4.2).

Table 4.3 shows the estimated annual number of hormone therapy treatments and surgeries in the AC and SR calculated using the same prevalence assumptions described in Chapter Three (see Table 3.2). The surgeries included in the calculations are vaginoplasty, chest surgeries, orchiectomy, hysterectomy, metoidioplasty, and phalloplasty. Note that these estimates constitute the number of treatments, not necessarily the number of individuals. For hormone therapy recipients, the number of treatments and recipients is the same, and these estimates can be treated as counts of individuals. However, the number of individuals is likely smaller for surgical counts because the

22    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Table 4.2**
**Lifetime Surgery Preferences Among NTDS Survey Respondents**

| Procedure | Have Had (%) | Want Someday (%) | Do Not Want (%) |
|---|---|---|---|
| Male-to-female | | | |
| Augmentation mammoplasty | 21 | 53 | 26 |
| Orchiectomy | 25 | 61 | 14 |
| Vaginoplasty | 23 | 64 | 14 |
| Facial surgery | 17 | Not reported | Not reported |
| Female-to-male | | | |
| Chest surgery | 43 | 50 | 7 |
| Hysterectomy | 21 | 58 | 21 |
| Metoidioplasty | 4 | 53 | 44 |
| Phalloplasty | 2 | 27 | 72 |

SOURCE: NTDS data (Grant et al., 2011).
NOTE: These estimates are from cross-sectional data; individuals likely received each treatment only once and varied in the age at treatment initiation.

same individual may receive more than one type of surgical treatment.[4] Using the lower-bound estimate from the California study and the upper-bound estimate from the Massachusetts study (see Table 4.3), we estimated that there will be between 45 and 220 hormone treatments and between 40 and 200 transition-related surgeries annually in the AC and SR. The combined population-weighted and gender-adjusted estimate indicates a midrange of 80 hormone treatments and 70 transition-related surgical treatments annually. Although surgical procedures are most likely to be one-time events, hormone therapy treatment rates are likely to be used indefinitely, and the cost and manpower effects will apply until individuals leave the MHS. We did not have information on the length of service conditional on age and therefore could not calculate the total number of service members who would be receiving hormone therapy at any given point in time. We recommend that this line of analysis be explored in the future.

## Utilization-Based Approach to Estimating the Number of Gender Transition–Related Treatments in the U.S. Military

While the prevalence-based approach provides a tractable means to estimate potential utilization of gender transition–related care, there are a number of concerns regard-

---

[4]    For example, a female-to-male transition might include both chest surgery and phalloplasty.

Date visited: November 2, 2016

How Many Transgender Service Members Are Likely to Seek Treatment?    23

**Table 4.3**
**Estimated Annual Number of Surgeries and Hormone Therapy Users**

| Assumption Regarding Underlying Prevalence | Active Component | | Selected Reserve | |
|---|---|---|---|---|
| | Annual Major Surgeries | Annual Hormone Therapy | Annual Major Surgeries | Annual Hormone Therapy |
| 0.1% (CA study)[a] | 25 | 30 | 15 | 15 |
| 0.16% (combined, population-weighted CA + MA studies)[b] | 40 | 45 | 20 | 25 |
| 0.19% (gender-adjusted)[c] | 45 | 50 | 25 | 30 |
| 0.37% (twice gender-adjusted rate)[d] | 90 | 100 | 50 | 55 |
| 0.5% (MA study)[e] | 130 | 140 | 70 | 80 |

SOURCE: RAND analysis.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

NOTE: Hormone therapy is person-level; surgery statistics are counts of surgeries, and one person may have multiple surgeries.

ing the information on which these estimates rely. As stated previously, these concerns include both a reliance on prevalence estimates from just two states and a reliance on data from the NTDS, which were not collected from a random sample. Our utilization estimates were taken primarily from three sources:

- private health insurance utilization data on annual rates of enrollee transgender-related health care utilization in health insurance plans that cover transition-related health care, as reported by Herman (2013b)
- private health clinic data showing estimates of the rates of penectomies and bilateral mastectomies in the U.S. population in 2001, as reported by Horton (2008)[5]

---

[5] A penectomy is the surgical removal of the penis. A bilateral mastectomy is the surgical removal of both breasts.

**App. 158**

- Veterans Health Administration (VHA) claims data, which were used to calculate prevalence and incidence rates of gender identity disorder (now referred to as GD in DSM-5) from 2006 to 2013, as reported by Kauth et al. (2014).

Each of these data sources provides information on a different outcome, which makes understanding the results more complicated. However, collectively, the information taken from these three studies provides a broad, useful picture regarding potential gender transition–related health care utilization in the AC population. In the following sections, we review each of these studies in detail, identify key estimates from each, and apply the estimates to the AC population identified in Table 3.2 in Chapter Three.

**Private Health Insurance Utilization Estimates**

Herman (2013b) reports on the experiences of 34 employers that provided gender transition–related health care benefits to their employees and dependents via their health insurance plans. This study specifically reports on the annual number of enrollees who accessed "transition-related care." This information is derived from health insurance claims data and thus is dependent on the treatments that were covered by the health insurance companies.[6] The firms surveyed typically covered major gender transition–related surgeries and hormone therapy, but they varied in their coverage of other transition-related treatments, such as vocal cord surgery.[7]

Firms reviewed by Herman (2013b) also typically did not report information on the number of dependents covered but included dependents in their utilization estimates. Data from several sources (e.g., Sonier et al., 2013; Gould, 2012) imply an approximate average one-to-one ratio of employees to dependents in privately insured firms in the United States. Thus, not accounting for the role of dependents in these utilization estimates would overstate utilization by approximately 100 percent.[8] For

---

[6]   If firms do not cover particular treatments, it is not possible to file a claim for reimbursement. If individuals in these firms utilized services that were not covered, thus paying for treatments out of pocket or through some other form of health insurance, these utilization estimates will be biased downward.

[7]   One hundred percent of firms covered major gender transition–related surgeries, including hysterectomy, oophorectomy, metoidioplasty, phalloplasty, urethroplasty, vaginectomy, orchiectomy, vaginoplasty, labiaplasty, and clitoroplasty. Ninety-two percent of firms covered bilateral mastectomy for female-to-male patients, but only 59 percent covered female-to-male chest reconstruction, and only 59 percent covered male-to-female augmentation mammoplasty (breast augmentation). All firms covered hormone therapies, specifically estrogen, progesterone, spironolactone, and testosterone.

[8]   We used two different data sources to determine the typical number of dependents covered by the main policyholder in private health insurance firms in the United States. First, we used information from the Robert Wood Johnson Foundation on the number of people who are covered by employer-sponsored health insurance and are the main policyholders and on the number of people who are covered by employer-sponsored health insurance and are dependents. Using these figures, we estimated a 1-to-0.99 policyholder-to-dependent ratio in employer-sponsored private health insurance. The Economic Policy Institute also reports information on this question using data from the U.S. census Current Population Survey. Using this information, we calculated a policyholder-to-dependent ratio of 1 to 0.94.

firms that did not provide information on dependents, we imputed a one-to-one ratio of employees to dependents to identify the total number of enrolled individuals in a given health plan.

Table 4.4 presents the information from Herman (2013b) on the utilization of gender transition–related care in private health insurance firms. The first column shows available information on the identity of the firm. The second describes the number of firms in each category for which we had utilization estimates. The third contains our estimates regarding the total number of enrollees and dependents from all firms in that category. For confidentiality reasons, some surveyed data sources report only ranges for the number of employees in a firm. Therefore, we used the midpoint of the range to impute the number of employees in a particular firm, then assigned the total number of dependents based on this employee value. For example, we had utilization data from two firms in the "private 1,000–9,999 employees" category. Since we assume the midpoint value for firm size, this implies that there are 5,000 employees in each firm, or 10,000 total employees across the two firms. Assuming a one-to-one employee-to-dependent ratio implies an additional 10,000 covered individuals, resulting in a combined total of 20,000 enrollees.

The estimates presented in Table 4.4 indicate that utilization rates range from an annual low of zero individuals per 1,000 enrollees to an annual high of 0.064 individuals per 1,000 enrollees. To obtain a combined estimate of the different values, we constructed a weighted average using the existing utilization estimates, weighting by the number of covered individuals that generated each of the estimates in Table 4.4. A weighted average of all the estimates results in an overall utilization estimate of 0.0396 individuals per 1,000 enrollees.

**Table 4.4**
**Enrollee Utilization of Gender Transition–Related Benefits in Private Health Insurance Firms**

| Private and Public Firms | Number of Firms | Total Contribution (enrollees + dependents) | Individual Claimants per 1,000 Enrollees |
|---|---|---|---|
| Private, fewer than 1,000 employees | 1 | 1,000 | 0.0000 |
| Private, 1,000–9,999 employees | 2 | 20,000 | 0.0540 |
| Private, 10,000–49,000 employees | 5 | 250,000 | 0.0220 |
| City and County of San Francisco | NA | 80,000 | 0.0640 |
| University of California | NA | 100,000 | 0.0620 |
| Weighted average per 1,000 enrollees | | | 0.0396 |

SOURCE: Data from Herman, 2013b.

USCA Case #25-5087     Document #2108715     Filed: 04/01/2025     Page 166 of 394
Date visited: November 2, 2016
Case 1:25-cv-00240-ACR     Document 13-29     Filed 02/03/25     Page 47 of 113

26   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

We conducted two sets of calculations using these estimates. First, we used the lowest non-zero utilization figure (0.022 claimants per 1,000 enrollees);[9] then, we used the weighted average calculation of 0.0396 per 1,000 enrollees. Applying the 0.022 claimants per 1,000 figure to the AC population of 1,326,273 implies that 29 AC service members would receive gender transition–related care annually. Applying the weighted average estimate of 0.0396 per 1,000 enrollees to the AC population implies that 53 service members would receive gender transition–related care annually.

### Sensitivity Analyses

We also conducted two additional sensitivity analyses to determine the full potential scope of gender transition–related health care utilization in the AC. A key consideration when applying estimates from civilian populations to the military is that the underlying male/female distribution in the AC is different, with 85 percent of the AC population being male (versus approximately 50 percent in the civilian population). Studies suggest that the prevalence of transgender individuals is higher in the male population than in the female population (APA, 2013; Horton, 2008; Gates, 2011; Grant et al., 2011), so applying civilian estimates directly to the AC would underestimate the true utilization rates.

Accurately accounting for this issue required sex-specific utilization estimates that we could then multiply with the male/female AC distribution (85 percent male, 15 percent female). Unfortunately, we could not identify any sex-specific utilization estimates in the available private health insurance data; the aggregate cost and utilization estimates that we were able to identify already included underlying prevalence differences between the sexes. We posited that utilization would be twice as large for male-to-female transitions than for female-to-male transitions based on an assumption of linearity between transgender prevalence, for which we have sex-specific estimates, and total utilization (Horton, 2008).

Combining this assumption about differing utilization rates with the fact that the male/female labor force participation in the civilian population is close to 50 percent male and 50 percent female, we were able to solve for the sex-specific utilization estimates implied by the aggregate lower-bound (0.022) and weighted average (0.0396) values. Solving for the sex-specific utilization estimates in this manner, for the 0.022 aggregate estimate, we estimated a utilization rate of 0.0293 per 1,000 natal male enrollees and a utilization rate of 0.0146 per 1,000 natal female enrollees.[10] Similarly, for the 0.0396 weighted average figure, solving for the natal sex–specific utiliza-

---

[9]   The unadjusted version of this figure (0.0044 percent) was also used in Belkin (2015) to estimate health care utilization in the military.

[10]   The equation we solved to calculate the natal male–specific and natal female–specific utilization rates is as follows: $0.5(x) + 0.5(2x) = 0.022$. In this equation, the variable $x$ is the natal female–specific utilization rate, and solving for $x$ results in a value of 0.0146. Since the natal male–specific utilization rate is assumed to be twice the natal female rate, it equals 0.0293.

How Many Transgender Service Members Are Likely to Seek Treatment?    27

tion estimates, we identified a utilization rate of 0.0528 per 1,000 natal male enrollees and a utilization rate of 0.0264 per 1,000 natal female enrollees.

Applying these solved sex-specific estimates to the AC male/female distribution (1,125,581, or 85 percent male, versus 200,692, or 15 percent female) increased our initial lower-bound estimate of claimants from 29 to 36 and increased our estimate from applying the weighted average from 53 to 65.

Finally, the sociology and psychology literature speculates that there is a higher transgender prevalence in the military compared with the civilian population (G. Brown, 1988). Gates and Herman (2014) also calculated that transgender prevalence in the military is approximately twice the civilian prevalence (Gates, 2011; Gates and Herman, 2014).[11] Although we believe that the current body of empirical evidence validating this theory is weak, we take it seriously and consider the possible implications for transition-related health care utilization in the military. Assuming that transgender prevalence in the military is twice the transgender prevalence in the civilian population, and, again, assuming a direct relationship between prevalence and utilization, this would inflate our male/female distribution-adjusted estimates of individuals receiving transition-related care annually from 36 to 72, and from 65 to 129 in the AC. Table 4.5, which summarizes the results from applying the private health insurance estimates to the AC population, allows for a comparison of the different estimates.

### Private Health Clinic Estimates

A second source of information regarding gender transition–related health care utilization comes from a survey of surgical clinics conducted by Horton (2008). In 2001, Horton surveyed all major clinics in the United States known to provide transition-related care to determine the number of penectomies and bilateral mastectomies performed on transgender patients. Table 4.6 reports surgery incidence estimates broken out by male-to-female transitions and female-to-male transitions. The third column shows estimates using clinic-reported data only. Horton also developed lower- and upper-bound estimates via assumptions regarding treatment counts for clinics with missing data, and these numbers are reported in the second and fourth columns of Table 4.6.[12] These data were collected in 2001 and coverage of gender transition-related benefits have increased over time, so it is also reasonable to assume that surgical tran-

---

[11]  As stated previously, Gates and Herman (2014) used estimates from the NTDS and Gates (2011) for a transgender prevalence of 0.3 percent. That study also used data on history of military service in the U.S. population from the American Community Survey to estimate transgender prevalence in the military. Data from the National College of Health Administration show that military experience was significantly higher among transgender individuals than among those who did not identify as transgender (9.4 percent versus 2.1 percent; Blosnich, Gordon and Fine, 2015). However, data were collected from only 51 institutions, and the response rate for the survey was only 20 percent, which again raises questions regarding the validity of the estimates.

[12]  Horton generated upper- and lower-bound estimates by assigning the largest and smallest surgical counts in the data to the clinics with missing values.

28   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Table 4.5**
**Utilization Estimates from Applying Private Health Insurance Parameters**

| | | Estimates Using Private Employer Data | | |
| Annual Individual Claimants | Estimate from the Literature | Baseline | Sensitivity Analysis 1[a] | Sensitivity Analysis 2[b] |
|---|---|---|---|---|
| Active component, lower-bound estimate | 0.022 claimants per 1,000 individuals | 29 | 36 | 72 |
| Active component, weighted average estimate | 0.0396 claimants per 1,000 individuals | 53 | 65 | 129 |

NOTES: Each cell in the "Estimates Using Private Employer Data" columns represents a unique prediction for utilization in the AC population. In the second column of the table, we describe the estimate from the literature that is applied to the AC population. See the text for details on each of the calculations.

[a] Sensitivity Analysis 1: We calculated a set of estimates that accounted for differences in the male/female distribution between the civilian and AC populations.

[b] Sensitivity Analysis 2: We calculated a set of estimates that accounted for differences in the male/female distribution between the civilian and AC populations and the possibility that transgender prevalence is twice as high in the military population as in the civilian population.

**Table 4.6**
**Incidence of Penectomies and Bilateral Mastectomies Performed on Transgender Individuals**

| | Incidence Estimates (%) | | |
| Transition Type | Low | Clinic-Reported Data | High |
|---|---|---|---|
| Male-to-female | 0.00048 | 0.00053 | 0.00103 |
| Female-to-male | 0.00020 | 0.00030 | 0.00084 |

SOURCE: 2001 data from Horton, 2008.

NOTE: The table includes data on penectomies and bilateral mastectomies only.

sitions have also increased over time. Thus, these utilization rates of penectomies and bilateral mastectomies should be considered lower-bound estimates.

Applying these estimates to the AC male/female distribution results in low, medium, and high annual estimates of 5.8, 6.6, and 13.2 AC service members receiving these two surgeries, respectively. We reiterate here that these estimates are not directly comparable to the private health insurance estimates presented in the previous section because these estimates apply to only two specific procedures, while the private health insurance estimates include any gender transition–related procedures that private health insurance firms cover. One would expect estimates for two specific surgeries from 2001 to be lower than estimates generated from the private health insurance system in the later 2000s. Indeed, they are, but it is more difficult to make other direct

**App. 163**

comparisons between these two estimates, given the private health insurance utilization data presented in Herman (2013b).

**Veterans Health Administration Estimates**

In this analysis, we used VHA data to calculate the expected annual incidence of gender identity disorder (the condition now known as GD in the DSM-5) in the AC population. As described previously, those with a gender identity disorder diagnosis are a subset of transgender individuals. Kauth et al. (2014) used VHA health claims data to identify incidence rates of new diagnoses. They also calculated prevalence rates of gender identity disorder in each year using previous yearly incidence rates. Because 2006 was the first year in their data set, the prevalence rate in the first year of their data is equivalent to the incidence rate. In the years after 2006, the prevalence rate is essentially a running total of the incidence rates in the previous years added to the most recent incidence rates.

The data in Table 4.7 imply that the incidence of gender identity disorder increased from 3.5 of 100,000 enrollees in FY 2006 to 6.7 of 100,000 enrollees in FY 2013 among veterans who use VHA health care (Kauth et al., 2014). Before applying these estimates to the AC population, we note two important points with respect to the analyses in Kauth et al. (2014). First, because the prevalence rate is simply a running total of new cases diagnosed since the first year of the study's data (2006), adding years of data prior to 2006 would mechanically increase the prevalence estimates. Thus, Kauth et al.'s prevalence calculations are a lower-bound for the total gender

Table 4.7
**Prevalence and Incidence of Gender Identity Disorder Diagnoses in VHA Claims Data**

| Fiscal Year | New Diagnosis Rate (%) | Prevalence (%) |
|---|---|---|
| 2006 | 0.0035 | 0.0035 |
| 2007 | 0.0034 | 0.0068 |
| 2008 | 0.0034 | 0.0098 |
| 2009 | 0.0038 | 0.0131 |
| 2010 | 0.0046 | 0.0172 |
| 2011 | 0.0051 | 0.0217 |
| 2012 | 0.0060 | 0.0270 |
| 2013 | 0.0067 | 0.0329 |

SOURCE: Kauth et al., 2014.

NOTE: The authors calculated new cases diagnosed and total existing cases in a given year based on the entirety of the data since 2006.

identity disorder prevalence rate in this population. Second, estimates based on claims data will likely be lower-bound estimates of incidence and prevalence, since individuals are identified only if they interact with the health care system for reasons related to gender identity disorder. These two caveats should be kept in mind when interpreting the extrapolations here.

Applying estimates from the 2013 data in Table 4.7 to the AC population, one would expect approximately 90 new cases of gender identity disorder each year and that approximately 440 AC service members would be diagnosed with this condition. Although the male/female distribution in the VHA system mirrors that of the AC, veterans who use VHA health care services may have lower socioeconomic and health status than veterans who do not use VHA health care, other military retirees, and AC service members. The VHA population also differs by age and, potentially, by other unmeasured characteristics related to underlying health status. For these varied reasons, these estimates may not be generalizable to the military population overall.

## Summarizing the Estimates

Table 4.8 summarizes the key results after applying the estimates from the various data sets to the AC and SR populations. The largest estimate—270 treatments (surgeries and hormone therapies)—was calculated by combining the upper-bound population-level transgender prevalence estimate from Massachusetts with information from the NTDS data on the age of those receiving common transition-related treatments. When applied to the AC population, estimates from VHA and the private health insurance literature imply that only 30–90 AC service members will receive some type of gender transition–related treatment annually.

To understand the full implications of our estimates regarding the expected annual number of AC service members likely to obtain gender transition–related care, in Figure 4.1 we compare the above utilization estimates with the number of AC service members who self-reported visiting a mental health care provider in a given year (21 percent) and the number of AC service members who visited a mental health care specialist in a given year (7 percent; Hoge et al., 2006; McKibben et al., 2013). We chose this outcome because mental health care among military populations is an important, well-studied topic, and data were readily accessible for us to conduct the comparison. The mental health care utilization estimates represent unique service members accessing health care; thus, they compare most directly to the estimates using the private health insurance data and the NTDS hormone therapy estimates. For clarity's sake, we do not present all of the private health insurance and NTDS hormone therapy estimates in Figure 4.1. We do include the smallest, middle, and largest estimates using the private health insurance data and the largest hormone therapy estimate drawn from the NTDS data.

Date visited: November 2, 2016

How Many Transgender Service Members Are Likely to Seek Treatment?    31

**Table 4.8**
**Annual Gender Transition–Related Treatment Estimates from All Data Sources**

| Estimate Type | Active Component | | | Selected Reserve | | |
|---|---|---|---|---|---|---|
| | Hormone Treatment | Surgical Treatments | All Treatments | Hormone Treatment | Surgical Treatments | All Treatments |
| **Prevalence-based estimates (using NTDS data)** | | | | | | |
| Annual treatments based on CA study estimate (0.1%) | 30 | 25 | 55 | 15 | 15 | 30 |
| Annual treatments based on combined, population-weighted, gender-adjusted rate (0.19%) | 50 | 45 | 95 | 25 | 30 | 55 |
| Annual treatments based on MA study estimate (0.5%) | 140 | 130 | 270 | 70 | 80 | 150 |
| **Utilization-based estimates** | | | | | | |
| Private health insurance annual individual claimants (0.022 per 1,000) | NA | NA | 29 | NA | NA | 20 |
| Private health insurance annual individual claimants (0.0396 per 1,000) | NA | NA | 53 | NA | NA | 30 |
| VHA-based annual new diagnoses (0.0067%) | 90 | NA | NA | 60 | NA | NA |
| Clinical utilization of penectomies and bilateral chest surgeries (0.0005%) | NA | 10 | NA | NA | 5 | NA |

SOURCE: RAND analysis.

As Figure 4.1 shows, our estimates of the number of AC personnel who will use the gender transition–related health care benefits are overwhelmingly small compared with the number of AC personnel who access mental health treatment. Overall, based on our calculations, we expect annual gender transition–related health care to be an extremely small part of overall health care provided to the AC population.

**App. 166**

32    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Figure 4.1**
**Comparison of Annual Estimated Gender Transition–Related Health Care Utilization and Mental Health Care Utilization, Active Component**



SOURCE: RAND analysis. Utilization rates in the figure are derived from both the prevalence-based and utilization-based approaches presented in Table 4.8.

NOTES: The non–hormone therapy transgender utilization estimates are from the application of estimates from the private health insurance data. The hormone therapy upper-bound transgender utilization estimate is from calculations using the NTDS data.

**RAND** *RR1350-4.1*

CHAPTER FIVE

## What Are the Costs Associated with Extending Health Care Coverage for Gender Transition–Related Treatments?

In this chapter, we provide estimates for the costs associated with extending health care coverage for gender transition–related treatments. We focused on transgender service members in the AC because they have uniform MHS access. We did not include reserve-component service members in our analyses, but their MHS utilization and the associated cost will be negligible, given their highly limited military health care eligibility. Likewise, we did not include retirees or dependents in the cost analyses because we did not have information on age and sex distribution within these beneficiary categories. Some of these beneficiary categories also have limited eligibility for health care provided through MTFs and may receive their health care through TRICARE coverage in the purchased care setting or through other health insurance plans. Given these unknowns, it was only feasible to estimate the costs of gender transition–related care for AC service members; however, we recommend expanding these analyses in the future to include reserve-component members, as well as all individuals eligible for treatment under TRICARE. For the following analyses, we used demographic characteristics of the 2014 AC population to estimate the cost of providing such services.

### Private Health Insurance Cost Estimates

To determine the potential costs of covering gender transition–related health care for transgender service members, we collected information on private health insurers' experiences with covering this care from two sources (Herman, 2013b; State of California, 2012). These actuarial estimates represent the expected increase in health care costs from covering a new set of treatments or a new group of beneficiaries. If employers decide to provide coverage for a particular treatment, these actuarial estimates are translated into premium increases for covered employees. These estimates should be thought of as the expected costs of extending coverage for gender transition–related care to transgender AC service members. Moreover, we note that the military may already be incurring the cost of some transgender treatments, as some patients and their providers use "omissions and ambiguities" to acquire needed care (Roller, Sedlak, and Draucker, 2015, p. 420). For example, a currently serving female-to-male patient

33

**App. 168**

34   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

who had undergone a hysterectomy reported taking only the testosterone and not the estrogen prescribed as part of hormone therapy with his endocrinologist's knowledge and tacit support, while another was trying to get breast reduction surgery due to back pain rather than GD (Parco, Levy, and Spears, 2015, pp. 235–236).

Table 5.1 presents available data from public employers and private firms on the actuarial costs of covering gender transition–related care. It identifies the particular institution, the number of employees and dependents covered, and the identified premium increases due to expanding benefits.

Data from Table 5.1 show, generally, that the actuarial estimates of providing benefits for gender transition–related care increased total premiums (employee + employer share) by only a small fraction of a percent—and, in the most extreme cases, by only approximately 1 percent. Taking a weighted average of most of the information,[1] we estimated that extending insurance coverage to transgender individuals would increase health care spending by 0.038 percent. Applying this figure to total AC health care spending of $6.27 billion,[2] we find that covering gender transition–related care will increase AC health care spending by approximately $2.4 million (see Table 5.2).

The data in Table 5.1 suggest that the University of California, with 100,000 enrollees in its health plan, is one of the key drivers of the 0.038-percent weighted

**Table 5.1**
**Actuarial Estimated Costs of Gender Transition–Related Health Care Coverage from the Literature**

| Public Employer Data | Actuarially Calculated Premium Increase | Total Contribution (employees + dependents) |
|---|---|---|
| City of Seattle | 0.19% increase in health care budget | 23,090 |
| City of Portland | 0.08% increase in health care budget | 18,000 |
| City of San Francisco | 0% increase in health care budget | 100,000 |
| University of California | 0% increase in health care budget | 100,000 |

| Private Employer Data | Estimate | Total Contribution (employees + dependents) |
|---|---|---|
| 22 firms | Many employers reported no actuarial costs to adding benefit; estimates range from 0 to 0.2% | Mix of firm sizes |
| 2 firms | Approximately 1% increase in premiums | 5,800 |
| 1 firm | Much less than 1% increase in premium | 77,000 |

SOURCE: Estimates are from Herman, 2013b, and State of California, 2012.

---

[1]   We did not use information about the firm with 77,000 enrollees because it is not clear what "much less than 1 percent" implies with respect to the premium increase.

[2]   Pharmaceutical and direct and purchased care inpatient and outpatient data calculated from TRICARE costs in Defense Health Agency, 2015.

**App. 169**

Date visited: November 2, 2016

average result. In addition to the actuarial increases, the University of California also reported a realized increase in health care spending of 0.05 percent, so we recalculated the weighted average figure by replacing the 0-percent estimate with the 0.05 percent estimate. This new calculation raised the overall cost estimate from 0.038 percent to 0.054 percent, or from $2.4 million to $3.4 million when applied to the AC. To summarize, our baseline estimates regarding expected gender transition–related health care costs in the AC are between $2.4 million and $3.4 million.

## Sensitivity Analyses

To understand the potential full range of cost effects in the AC population, we conducted two additional sensitivity analyses similar to those described for our utilization ranges in Chapter Four. We used these sensitivity analyses to account for the skewed male/female distribution in the military population and for the possibility that transgender prevalence is higher in the military population. As in the utilization case, we were not able to identify any sex-specific effects on the premium increases. Thus, as in our utilization analysis, we assume that cost estimates are linearly related to prevalence,[3] and cost estimates for male-to-female transitions are twice the cost estimates for female-to-male transitions. Using this relationship, we again calculated natal male– and natal female–specific estimates from the aggregate estimates.

Given the assumption about differing cost effects, we calculated a natal male–specific cost estimate of 0.05 percent and a natal female–specific cost estimate of 0.025 percent for the aggregate premium estimate of 0.038 percent. Applying these sex-specific estimates to the AC male/female distribution increased our initial premium estimate from 0.038 percent to 0.047 percent. A similar calculation can be performed for our realized cost estimate of 0.054 percent. Assuming that gender transition–related health care costs are twice as large for male-to-female transitions as for female-to-male transitions, we calculated a natal male–specific cost effect of 0.072 percent and a natal female–specific cost effect of 0.036 percent. Applying these sex-specific estimates to the AC male/female distribution increased our initial premium estimate from 0.054 percent to 0.067 percent. Applying these newly calculated health care costs to the 2014 AC health care expenditures ($6.27 billion) increased our estimate of costs from the initial range of $2.4–3.4 million to a range of $2.9–4.2 million.

Finally, as noted previously, Gates (2011) and Gates and Herman (2014) calculated that transgender prevalence in the military is approximately twice that in civilian

---

[3]  We also note that built into this linearity assumption and how it is applied in the two sensitivity analyses is the assumption that the cost of male-to-female transitions is the same as the cost of female-to-male transitions. Since there is no sex-specific information in the private health insurance cost data, the validity of the cost per case being equivalent is unknown. Padula, Heru, and Campbell (2015) estimated that a male-to-female surgical case is 33 percent more expensive than a female-to-male surgical case, but these estimates were not based on private employer data, so we did not directly incorporate this result into our calculations.

populations. Assuming that this estimate is valid, and, again, assuming that health care costs are linearly related to underlying prevalence, this would increase the above calculated value of $2.9 million to $5.8 million and the calculated value of $4.2 million to $8.4 million. Table 5.2 summarizes the results from the calculations described in this section.

To better understand the relative importance of our estimates regarding expected AC annual gender transition–related health care spending, we compared our cost estimates to the MHS spending on mental health in 2012 and to total AC health care spending in FY 2014. As Figure 5.1 shows, gender transition–related health care spending is expected to be extremely small compared with MHS spending on mental health (Blakely and Jansen, 2013) and overall AC health care expenditures (Defense Health Agency, 2015).

## Summarizing the Estimates

A direct application of estimates from the private health insurance system implies a baseline spending range between $2.4 million and $3.4 million for AC gender transition–related health care. Sensitivity analyses that attempt to account for the fact that the male/female distribution in the AC population skews more heavily male than the civilian population and that transgender prevalence might be higher in the military increase this initial range to $5.8 million to $8.4 million. The implication is that even in the most extreme scenario that we were able to identify using the private health insurance data, we expect only a 0.13-percent ($8.4 million out of $6.2 billion) increase in AC health care spending.[4]

**Table 5.2**
**Estimated Annual MHS Costs of Gender Transition–Related Health Care, Active Component**

| Analysis Type | Calculations Using Only Actuarial Premium Estimates 0.038% (actuarial) | Calculations Using Actuarial Premiums and Realized Values 0.054% (actuarial + realized) |
|---|---|---|
| Baseline | $2.4 million | $3.4 million |
| Sensitivity analysis 1: Adjusts for the male/female distribution in the AC population | $2.9 million | $4.2 million |
| Sensitivity analysis 2: Adjusts for the male/female distribution in the AC population and the assumption that transgender prevalence is twice as high in the military compared to the civilian population | $5.8 million | $8.4 million |

SOURCE: RAND analysis.

---

[4]  AC beneficiaries make up less than 15 percent of total TRICARE beneficiaries (Defense Health Agency, 2015).

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 177 of 394

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 02/03/25    Page 58 of 113

**Figure 5.1**
**Gender Transition–Related Health Care Cost Estimates Compared with Total Health Spending, Active Component**



SOURCES: RAND analysis; Blakely and Jansen, 2013; Defense Health Agency, 2015. Estimates of premium increased and realized costs are reported in Table 5.1.

NOTES: The lower-bound estimate refers to premium increases only. The middle estimate includes premium increases and realized costs after adjusting for male/female distribution in the military. The upper-bound estimate includes premium increases and realized costs after adjusting for male/female distribution in the military and assuming the prevalence rate of transgender individuals in the military is twice that of civilian populations.

**RAND** *RR1350-5.1*

Date visited: November 2, 2016

CHAPTER SIX

## What Are the Potential Readiness Implications of Allowing Transgender Service Members to Serve Openly?

As DoD considers whether to allow transgender personnel to serve openly and to receive transition-related treatment during the course of their military service, it must consider the implications of such a policy change on the service members' ability to deploy and potential reductions in unit cohesion. In prior legal challenges to the transgender military discharge policy, DoD has expressed concern that the medical needs of these service members would affect military readiness and deployability. To address these concerns, this chapter provides estimates of the potential effects on force readiness from a policy change allowing these service members to serve openly.

A critical limitation of such an assessment is that much of the current research on transgender prevalence and medical treatment rates relies on self-reported, nonrepresentative samples. Thus, the information cited here must be interpreted with caution because it may have varying degrees of reliability. In addition, to estimate effects on readiness, we focused on transgender personnel in the AC and SR only. We did not include the Individual Ready Reserve because of the lack of publicly available, detailed demographic information. We used the same approach that applied to our analysis of health care utilization, applying both the prevalence-based and utilization-based approaches to force size. We note that the prevalence-based approach was the only approach that allowed us to estimate the number of transgender service members who may seek to live and work as their target gender. Transition does not necessarily imply the use of medical treatments, and we emphasize that some of these service members may still require accommodations in terms of housing and administrative functions (e.g., military identification cards, restrooms).

### Impact on Ability to Deploy

The most salient and complex issue in allowing transgender personnel to serve openly is how DoD should regulate and manage operational deployment requirements for these personnel in the context of their transition to their target gender.

39

**App. 174**

40    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Pre-Transition**

If transgender personnel are allowed to serve openly prior to transition, DoD will need to establish policies on when individuals may use the uniforms, physical standards, and facilities (e.g., barracks, restrooms) of their target gender. Additionally, DoD will need to clarify policies related to qualifications for deployment. Current deployment rules suggest that to qualify for deployment, individuals with diagnosed mental health disorders must show a "pattern of stability without significant symptoms or impairment for at least three months prior to deployment."[1] Ensuring appropriate screening will be critical to minimizing any mental health–related readiness issues. Secondary prevention measures prior to deployment, such as screening for GD, may be needed to ensure a pattern of stability and readiness for deployment.

**During Transition**

DoD would also need to determine when transitioning service members would be able to change uniforms and adhere to the physical standards of their target gender, as well as which facilities and identification cards they will use. Other countries have found that, in some cases, it may be necessary to restrict deployment of transitioning individuals to austere environments where their health care needs cannot be met. Deployment restrictions may also be required for individuals seeking medical treatment, including those seeking hormone therapy and surgical treatments.

We detail the constraints associated with transition-related medical treatments in Table 6.1. These constraints typically include a postoperative recovery period that would prevent any work and a period of restricted physical activity that would prevent deployment. The rightmost column of Table 6.1 presents the estimated number of non-deployable days we used to estimate the readiness impact. We note that these estimates do not account for any additional time required to determine medical fitness to deploy. Army guidelines, for example, do not permit deployment within six weeks of surgery. Nevertheless, there may be a significant difference between the estimated availability to deploy and the actual impact on deployability, as it is possible that transgender service members would time their medical treatments to minimize the effect on their eligibility to deploy.[2]

In addition to an expected, short-term inability to deploy during standard postoperative recovery time, some individuals experience postoperative complications that would render them unfit for duty. For instance, among those receiving vagino-

---

[1]  Detailed guidance is provided in a memorandum from the Office of the Assistant Secretary of Defense for Health Affairs, 2013, p. 2.

[2]  See for example, Personnel Policy Guidance Tab A (known as PPG-TAB A) that accompanies the medical guidelines document MOD TWELVE, Section 15.C, which articulates the minimal standards of fitness for deployment to the U.S. Central Command area of responsibility (U.S. Central Command, 2013).

**App. 175**

USCA Case #25-5087      Document #2108715      Filed: 04/01/2025      Page 181 of 394
Date visited: November 2, 2016
Case 1:25-cv-00240-ACR      Document 13-29      Filed 02/03/25      Page 62 of 113

plasty surgery, 6–20 percent have complications.[3] This implies that between three and 11 service members per year would experience a long-term disability from gender reassignment surgery. Among those receiving phalloplasty surgery, as many as 25 percent experience some medical complications (Elders et al., 2014).

**Table 6.1**
**Gender Transition–Related Readiness Constraints**

| Transition Type and Treatment | Recovery Time | Leave and Deployment Implications | Estimated Nondeployable Days |
|---|---|---|---|
| **Male-to-Female** | | | |
| Hormone therapy only | Long-term, no recovery required | None (pending accommodations) | N/A |
| Augmentation mammoplasty | 1 week no work, 4–6 weeks restricted physical activity | Up to 14 days medical leave, up to 60 days medical disability | 75 |
| Genital surgery (orchiectomy, vaginoplasty) | 4–6 weeks no work, 8+ weeks restricted physical activity | Up to 45 days medical leave, up to 90 days medical disability | 135 |
| **Female-to-Male** | | | |
| Hormone therapy only | Long-term, no recovery required | None (pending accommodations) | N/A |
| Chest surgery | 1 week no work, 4–6 weeks restricted physical activity | Up to 14 days medical leave, up to 60 days medical disability | 75 |
| Hysterectomy | 2 weeks no work, 4–8 weeks restricted physical activity | Up to 21 days medical leave, up to 90 days medical disability | 111 |
| Genital surgery (metoidioplasty, phalloplasty) | 2–4 weeks no work, 4–6 weeks restricted physical activity | Up to 21 days medical leave, up to 60 days medical disability | 81 |

SOURCES: Treatment times based on RAND research compiled for this study. Estimates of numbers of treatments based on rates in Gates, 2011. Estimated nondeployable days based on RAND calculations using FY 2014 data from DoD, 2014.

NOTES: The total population in the table includes AC and SR personnel. Estimates of treatments are non-unique per person. Individuals may (and likely will) seek multiple treatments simultaneously. As such, deployment days are measured per treatment, not per individual. Estimates of nondeployable days do not include estimated delays generated by Medical Evaluation Board/Physical Evaluation Board review, which may be required depending on service rules.

---

[3]   According to Elders et al. (2014, p. 15), summarizing findings from 15 studies, "2.1 percent of patients had rectal-vaginal fistula, 6.2 percent with vaginal stenosis, 5.3 percent had urethral stenosis, 1.9 percent with clitoral necrosis, and 2.7 percent with vaginal prolapse," and approximately 2.3 percent of patients experienced complications after vaginoplasty.

Taking the estimates for treatment and recovery time, we then applied the standards for leave and restricted physical activity.[4] We applied the recovery times and translated those into nondeployable days separated into medical leave, in which the service member is off the job, and medical disability, in which the service member can be at work but is subject to restricted physical requirements (e.g., no physical training, no heavy lifting). This provided us with the total number of nondeployable days per treatment type. We scaled this estimate by the number of days an individual can be deployed per year. For the AC, we assumed this to be 330 days per year (allowing 30 days of leave plus five days of processing time).[5] For the SR, we assumed 270 days per year (which allows nine months of deployment time). We counted each treatment separately and applied the number of treatments by treatment type shown in Table 6.1.

Note that because individuals may seek multiple treatments, sometimes at the same time, this number is not the same as the total number of individuals who will be nondeployable. Therefore, the estimates presented in Table 6.2 should be considered an upper bound in each category. Moreover, the prevalence-based estimates are significantly larger than the utilization-based estimates as shown in Table 4.8. Using the prevalence-based approach, we found that between eight and 43 of the available 1.2 million labor-years in the AC may be unavailable for deployment.[6] The combined, population-weighted, and gender-adjusted estimate implies that about 16 labor-years from the AC and about 11 labor-years from the SR may be nondeployable. This represents 0.0015 percent of available deployable labor-years across the AC and SR.

These estimates are based on surgical take-up rates ranging from 25 to 130 per year in the AC, with 55–270 total treatments, including hormone treatments. Similarly, the prevalence-based estimates imply 15–80 surgical treatments per year in the SR, with between 30 and 150 total treatments, including hormone therapy.

The utilization-based approach implies many fewer treatments. Although we could not estimate the impact on labor-years because we did not have information on specific treatments, based on usage rates in California, the utilization-based approach implies 30–50 total treatments, including surgeries and hormone therapy. Evidence from the VHA suggests that 90 service members in the AC and 50 in SR are diagnosed with GD in any given year. Such a diagnosis would be a prerequisite for any surgical treatments, suggesting that true utilization rates in the military may be significantly lower than suggested by the prevalence-based approach.

We caution that our labor-year estimates also likely overcount actual nondeployable time because our estimate captures "availability to deploy," rather than the deploy-

---

[4]    For reference, we used the Army Regulation 40-501 (revised 2011), which governs leave and disability, and the Navy Medical Policy 07-009 (2007), which provides guidance on pre-clearance, accommodations for deployment readiness, and additional requirements in the U.S. Central Command area of operations.

[5]    We based this estimate on Army Regulation 600-8-101 (2015).

[6]    We define a labor-year as the amount of work done by an individual in a year.

**Table 6.2**
**Estimated Number of Nondeployable Man-Years Due to Gender Transition–Related Treatments**

| Component | Total Labor-Years Available (FY 2014) | Estimated Number of Nondeployable Labor-Years | | | | |
|---|---|---|---|---|---|---|
| | | 0.1%[a] (CA study) | 0.16%[b] (combined, population-weighted CA + MA studies) | 0.19%[c] (gender-adjusted rate) | 0.37%[d] (twice gender-adjusted rate) | 0.5%[e] (MA study) |
| Active | 1,199,096 | 8.2 | 13.7 | 16.2 | 32.3 | 42.8 |
| Selected Reserve | 615,446 | 5.9 | 9.9 | 10.7 | 21.3 | 29.9 |

SOURCES: Estimates for nondeployable labor-years are based on RAND calculations using FY 2014 data from DoD, 2014.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

ment impact itself. This difference comes from three key assumptions that we make to calculate these estimates: (1) service members who are seeking treatment will also be deployed; (2) service members who are seeking treatment cannot time those treatments to avoid affecting their deployment eligibility; and (3) service members seek only one treatment at a time rather than having multiple treatments at the same time, which would allow concurrent (rather than sequential) recovery times. Thus, it is likely that a service member's care would have a substantial overall impact on readiness only if that service member worked in an especially unique military occupation, if that occupation was in demand at the time of transition, and if the service member needed to be available for frequent, unpredicted mobilizations.

**Post-Transition**

Having completed medical transition, a service member could resume activity in an operational unit if otherwise qualified. As in other cases in which a service member receives a significant medical treatment, DoD should review and ensure that any longer-term medical care or other accommodations relevant to the transgender service member's specific medical needs are addressed.

## Impact on Unit Cohesion

A key concern in allowing transgender personnel to serve openly is how this may affect unit cohesion—a critical input for unit readiness. The underlying assumption is that if service members discover that a member of their unit is transgender, this could inhibit bonding within the unit, which, in turn, would reduce operational readiness. Similar concerns were raised in debates over whether to allow gay and lesbian personnel to serve openly (Rostker et al., 1993; RAND National Defense Research Institute, 2010), as well as whether to allow women to serve in ground combat positions (Schaefer et al., 2015; Szayna et al., 2015). Evidence from foreign militaries and surveys of the attitudes of service members have indicated that this was not the case for women or for lesbian and gay personnel (Schaefer et al., 2015; Harrell et al., 2007; RAND National Defense Research Institute, 2010). In examining the experiences of foreign militaries, the limited publicly available data we found indicated that there has been no significant effect of openly serving transgender service members on cohesion, operational effectiveness, or readiness. (For a more in-depth discussion of this topic, see Chapter Seven.) However, we do not have direct survey evidence or other data to directly assess the impact on the U.S. military.

### Evidence from the General U.S. Population

According to recent research on the U.S. general population, attitudes toward transgender individuals are significantly more negative than attitudes toward other sexual minorities (Norton and Herek, 2013). However, heterosexual adults' positive attitudes toward and acceptance of transgender individuals are strongly correlated with their attitudes and acceptance of gay, lesbian, and bisexual individuals (Flores, 2015). As such, similar to changes seen in public attitudes toward homosexuality, tolerance and acceptance toward the transgender population could change over time. Additionally, evidence does indicate that direct interactions with transgender individuals significantly reduce negative perceptions and increase acceptance (Flores, 2015), which would suggest that those who have previously interacted with transgender individuals would be more likely to be tolerant and accepting of them in the future. Similar findings have arisen from surveys and focus groups with service members regarding attitudes toward the integration of women into direct combat positions (Szayna et al., 2015) and attitudes toward allowing gay and lesbian service members to serve openly in the U.S. military (RAND National Defense Research Institute, 2010).[7]

---

[7]   A recent article examined the attitudes of military academy, Reserve Officers' Training Corps, and civilian undergraduates in the United States toward transgender people in general, in the workplace, and in the military (see Ender, Rohall, and Matthews, 2016).

**Evidence from Foreign Militaries**

While there are limited data on the effects of transgender personnel serving openly in foreign militaries, the available research revealed no significant effect on cohesion, operational effectiveness, or readiness. In the case of Australia, there is no evidence and there have been no reports of any effect on cohesion, operational effectiveness, or readiness (Frank, 2010). In the case of Israel, there has also been no reported effect on cohesion or readiness (Speckhard and Paz, 2014). Transgender personnel in these militaries have reported feeling supported and accommodated throughout their gender transition, and there is no evidence of any impact on operational effectiveness (Speckhard and Paz, 2014). In fact, commanders have reported that transgender personnel perform their military duties and contribute effectively to their units (Speckhard and Paz, 2014). Interviews with commanders in the United Kingdom also found no effect on operational effectiveness or readiness (Frank, 2010). Some commanders reported that increases in diversity had led to increases in readiness and performance. Interviews with these same commanders also found no effect on cohesion, though there were some reports of resistance to the policy change within the general military population, which led to a less-than-welcoming environment for transgender personnel. However, this resistance was apparently short-lived (Frank, 2010).

The most extensive research on the potential effects of openly serving transgender personnel on readiness and cohesion has been conducted in Canada. This research involved an extensive review of internal defense reports and memos, an analysis of existing literature, and interviews with military commanders. It found no evidence of any effect on operational effectiveness or readiness. In fact, the researchers heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges (Okros and Scott, 2015). They also found no evidence of any effect on unit or overall cohesion. However, there have been reports of bullying and hostility toward transgender personnel, and some sources have described the environment as somewhat hostile for transgender personnel (Okros and Scott, 2015).

To summarize, our review of the limited available research found no evidence from Australia, Canada, Israel, or the United Kingdom that allowing transgender personnel to serve openly has had any negative effect on operational effectiveness, cohesion, or readiness. However, it is worth noting that the four militaries considered here have had fairly low numbers of openly serving transgender personnel, and this may be a factor in the limited effect on operational readiness and cohesion.

**App. 180**

## Costs of Separation Requirements Related to Transgender Service Members

We considered the costs and benefits of providing appropriate care to transgender service members, the requirements for those who would serve openly if the current policy changed, and the costs of continuing the current administrative separation process. We analyzed the costs of separation under several assumptions: (1) some transgender personnel are currently serving but are not able to reveal their transgender status, (2) some individuals who would be desirable recruits could be excluded for reasons only related to their gender identity, and (3) some individuals who are transgender are or have been separated for reasons only related to their gender identity, which imposes separation costs.

Separation and a continued ban on open service (i.e., manpower losses) are the alternatives to meeting the medical needs of transgender individuals. As detailed in Chapter Two, the continued ban on open service may result in worsening mental health status, declining productivity, and other negative outcomes due to lack of treatment for gender identity–related issues. In addition, if DoD actively pursues separation, the process can be tedious, especially now that it requires the approval of the Under Secretary of Defense for Personnel and Readiness. Under current DoD regulations, transgender personnel can be declared administratively unfit for service if their gender identity affects their ability to meet operational or duty requirements. A June 2015 revision to DoD policy requires that a discharge justification be based on inability to meet duty requirements. However, any "administratively unfit" finding prohibits the individual from being medically evaluated for continued service.[8] Absent this process, transgender service members do not have recourse to allow mental health experts or medical professionals to review their case concurrently. This can result in unnecessary and inconsistent approaches to discharging transgender service members. As was the case in enforcing the policy on homosexual conduct, this can involve costly administrative processes and result in the discharge of personnel with valuable skills who are otherwise qualified (U.S. Government Accountability Office, 2011).

Moreover, the total cost in lost days available for deployment is negligible and significantly smaller than the lack of availability due to medical conditions. For example, in 2015 in the Army alone, there were 102,500 nondeployable soldiers, 50,000 of whom were in the AC (Tan, 2015). This accounted for about 14 percent of the AC—personnel who were ineligible to deploy for legal, medical, or administrative reasons.

---

[8]  These boards provide an established process and mechanism for evaluating whether a service member with an ailment or diagnosis, such as a mental health diagnosis, could continue military service. The services use the Medical Evaluation Board and Physical Evaluation Board systems to determine whether personnel "with an ailment or diagnosis, such as a mental health diagnosis, can continue . . . military service," based on a thorough review of fitness to serve (DoDI 1332.38, 1996).

**App. 181**

Date visited: November 2, 2016

Of those, 37,000 could not deploy due to medical conditions.[9] Excluding those who were severely injured and required longer-term care, there were 28,490 service members who had either category 1 (up to 30 days) or category 2 (more than 30 days) restrictions. Assuming those in category 1 cannot deploy for 30 days and those in category 2 cannot deploy for 90 days, we estimate there are currently 5,300 nondeployable labor-years in the Army alone. Thus, we anticipate a minimal impact on readiness from allowing transgender personnel to serve openly.

─────────────

[9]   Rates of injury and nondeployability time as reported in Cox (2015).

Date visited: November 2, 2016

CHAPTER SEVEN

## What Lessons Can Be Learned from Foreign Militaries That Permit Transgender Personnel to Serve Openly?

As the U.S. military considers changes to its transgender personnel policy, revisions to several other policies may be necessary. Policies in need of change would cover a range of personnel, medical, and operational issues affecting individuals and units, including some policies that currently vary by gender. Examples of the latter would include housing assignments, restrooms, uniforms, and physical standards. While these are new questions for the U.S. military, there are other countries that already allow transgender personnel to serve openly in their militaries and have already addressed these policy issues.

We reviewed policies in foreign militaries that allow transgender service members to serve openly. Our primary source for the observations presented in this report was an extensive document review that included primarily publicly available policy documents, research articles, and news sources that discussed policies on transgender personnel in these countries. The information about the policies of foreign militaries came directly from the policies of these countries as well as from research articles describing the policies and their implementation. Our findings on the effects of policy changes on readiness draw largely from research articles that have specifically examined this question using interviews and analyses of studies completed by the militaries themselves. Finally, our insights on best practices and lessons learned emerged both directly from research articles describing the evolution of policy and the experiences of foreign militaries and indirectly from commonalities in the policies and experiences across our four case studies. Recommendations provided in this report are based on these best practices and lessons learned, as well as a consideration of unique characteristics of the U.S. military.

This review and analysis of the policies in foreign militaries can serve as a reference for U.S. decisionmakers as they consider possible policy revisions to support the integration of openly transgender personnel into the U.S. military. We include information on how, when, and why each country changed its policy. We also detail the policies of each country, covering such issues as the medical and administrative

**App. 184**

50    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

requirements before gender transition can begin, housing assignments, uniform wear, and physical fitness standards.

## Policies on Transgender Personnel in Foreign Militaries

According to a report by the Hague Center for Security Studies, there are 18 countries that allow transgender personnel to serve openly in their militaries: Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and the United Kingdom (Polchar et al., 2014). This chapter describes the policies of the four countries—Australia, Canada, Israel, and the United Kingdom—with the most well-developed and publicly available policies on transgender military personnel. It focuses explicitly on policies that describe how these foreign militaries treat transgender personnel and how they address this population's gender transition needs. While the focus of the chapter is on the specific policies integrating openly transgender military personnel in these four foreign militaries, we also provide some information about what happened after the policy change, including bullying and harassment, and summarize best practices and challenges that emerged from our four case studies.[1]

The formal policies on transgender personnel in the four countries address a number of aspects of the gender transition process.[2] Generally, these policies do not explicitly address such issues as the recruitment or retention of transgender personnel, though we provide information on the qualification of transgender personnel to serve when it is available. They do generally address such issues as the requirements for transitioning, housing assignments, restroom use, uniforms, identity cards, and physical standards. They also address whether the transitioning personnel remain with their old units or shift to new ones and how other members of a unit should be informed. Finally, the policies address access to medical care and what is or is not covered by the military health care system.

In addition to addressing these crucial issues, foreign military policies on transgender personnel typically lay out a gender transition plan, which describes the timeline or steps in the transition process. However, it is worth noting that each individual's

---

[1]    We looked for information on the policies of the other 14 countries but were unable to find any publicly available documents in English.

[2]    We note a few interesting points about other countries that we investigated but for which we were unable to find sufficient publicly available information to construct a complete case. The Netherlands was the first country to allow transgender personnel to serve openly in its military, opening its ranks in 1974. New Zealand opened its military to transgender personnel in 1993; although we could not find a written policy, a 2014 report by Hague Center for Strategic Studies referred to New Zealand's as the most friendly military to transgender personnel. The New Zealand Defence Force also has an advocacy group, OverWatch, that provides support to lesbian, gay, bisexual, and transgender personnel (see Polchar et al., 2014).

gender transition is unique. While some choose to undergo hormone therapy or gender reassignment surgery, this is not required for gender transition. As a result, the timelines outlined in the policies are intended to be examples only.

### Australia

In 2010, the Australian Defence Force revoked the defense instruction that prohibited transgender individuals from serving openly, stating that excluding transgender personnel from service was discrimination that could no longer be tolerated (Ross, 2014). The Australian Department of Defence, with the advocacy group Defence Lesbian, Gay, Bisexual, Transgender, and Intersex Information Service, has produced guides to support commanders, transitioning service members, and the units in which transitioning members are serving (Royal Australian Air Force, 2015). The guide outlines five stages in the gender transition process: diagnosis, commencement of treatment, disclosure to commanders and colleagues, the post-transition experience, and, if applicable, gender reassignment surgery (Royal Australian Air Force, 2015). There is no public information on the number of transgender personnel in the Australian military or the costs associated with covering gender transition–related medical care.

A service member's gender transition begins after receiving a medical diagnosis of gender incongruence from a doctor approved by the Australian Defence Force. According to Australian Defence Force policy, once service members receive this diagnosis and present a medical certification form to their commanders, they can begin the "social transition," which policy defines as the time when an individual begins living publicly as the target gender. Under the current policy, after this point, the service member's administrative record is updated to indicate the target gender for the purposes of uniforms, housing, name, identification cards, showers, and restrooms (Royal Australian Air Force, 2015). This means that, after this point, the service member is assigned to housing of the target gender, may use the restrooms of the target gender, has an identification card with the target gender and new name, and can wear the uniform of the target gender.

During the social transition, the service member may undergo hormone therapy. However, neither hormone therapy nor gender reassignment surgery is required for the administrative changes to occur. Importantly, this shift in gender for military administrative purposes may not always match the legal transition (with respect to the Australian government) to the target gender (Royal Australian Air Force, 2015). Finally, when transgender service members choose to transition, they may choose whether to stay with their current unit or transfer to a different one. They may also choose how colleagues are informed of the gender transition—that is, whether they wish to tell colleagues themselves or have a senior leader do so.

Australia's policy also addresses matters related to physical standards and medical readiness. During the transition period, a service member may be downgraded in terms of physical readiness or declared unable to deploy for some time. However, this

Date visited: November 2, 2016

determination is decided on a person-by-person basis and is only temporary. According to the guide provided to service members and commanders, most individuals are placed on "MEC [Medical Employment Classification] 3—Rehabilitation" status during their medical transition or if they require four consecutive weeks of sick leave. Others may be able to remain "MEC 2—Employable and Deployable with Restrictions" for the majority of the gender transition period. In most cases, this determination is made by a certification board, though commanders are also given discretion to downgrade transitioning service members or declare them unfit to deploy, contingent on a stated inability to accommodate the service member's needs or a determination that the transitioning service member's presence would undermine the unit's performance. However, there is no public information available on the types of justifications a commander might give in making such a determination.

The deployment status of each individual will vary during the gender transition based on the transition path chosen (for example, whether hormone therapy or surgery is undertaken). Some of these treatments are covered by military health care. In Australia, medical treatments associated with gender transition, including both hormone therapy and gender reassignment surgery, are covered, but treatments considered "cosmetic" might not be (Royal Australian Air Force, 2015). However, it is not clear what is classified as cosmetic or what might be considered medically necessary. Importantly, gender transition–related medical procedures are provided only at certain facilities, so service members who wish to receive these treatments may need to make special requests for specific assignments where their needs can be met. In general, personnel are permitted to take sick leave to facilitate their medical transition (Royal Australian Air Force, 2015).

Transitioning service members' deployment status will also depend on their ability to meet physical fitness standards. During the transition period, a service member may be considered medically exempt from meeting physical fitness standards, with a coinciding readiness classification of nondeployable. Once deemed medically able to complete the test by a medical professional, the service member may be asked to meet the standards of the target gender. However, which gender standards the individual is required to meet and when is determined by the medical officer overseeing the gender transition (Royal Australian Air Force, 2015). Thus, the point at which each transitioning service member is required to meet the target-gender standards varies.

### Canada

In Canada, a 1992 lawsuit from a member of the armed forces resulted in the repeal of a regulation banning gay, lesbian, and transgender individuals from serving openly in the military (Okros and Scott, 2015). In 1998, the Canadian military explicitly recognized gender identity disorder and agreed to cover gender reassignment surgery. In 2010, Canadian military policy was revised to clarify transgender personnel issues, such as name changes, uniforms, fitness standards, identity cards, and records (Okros

**App. 187**

and Scott, 2015). An updated policy, Military Personnel Instruction 01/11, "Management of Transsexual Members," was released in 2012 (Canadian Armed Forces, 2012). It stated, "The CF [Canadian Forces] shall accommodate the needs of CF transsexual members except where the accommodation would: constitute undue hardship; or cause the CF member to not meet, or to not be capable of meeting. . . . Minimum Operational Standards Relating to Universality of Service" (Canadian Armed Forces, 2012, p. 5). Other considerations that can be used to determine whether an accommodation is reasonable include cost and the safety of other service members and the public (Canadian Armed Forces, 2012, p. 5). Data suggest that there are approximately 265 transgender personnel serving openly and that the Canadian military pays for about one gender reassignment surgery per year (Okros and Scott, 2015).

Canada's policy on transgender personnel covers such issues as housing, identification cards, restrooms, physical standards, deployment, medical treatment, and uniforms. The process is similar in most ways to that in Australia, described earlier. In Canada, one of the first steps in the gender transition process is a medical assessment in which the individual is given a diagnosis of gender incongruence and assigned a temporary medical category that defines both employment limitations and accommodations that will be needed to support the service member during gender transition. After receiving this diagnosis, service members are responsible for informing their commanders and are asked to give commanders as much notice as possible before beginning their gender transition. After that, the service member, the service member's manager, and the unit's commanding officer are expected to meet to discuss the service member's gender transition plan and to addresses any necessary accommodations. The policy recommends frequent meetings between the service member and relevant leaders and medical professionals to ensure that the transitioning service member's needs are met. The policy also identifies subject-matter experts, such as chaplains and mental health professionals, who might be available to provide advice (Canadian Armed Forces, 2012).

The policy states that the gender transition plan should address housing, uniforms, deployments, and other administrative considerations. While the timeline will vary for each individual, in most cases, after receiving the diagnosis and informing the commander, the service member is able to begin living openly as the target gender. At this point, the service member is assigned to housing of the target gender, given ID cards with the target gender and new name, given uniforms of the target gender, and permitted to use restrooms of the target gender. However, while the individual is considered a member of the target gender for all administrative purposes within the military at this point, an official name and gender change in the military personnel system requires both medical certificates and legal documentation (Canadian Armed Forces,

54    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

2012).[3] Finally, medals and awards earned by the service member prior to transitioning cannot be transferred to the new name when the service member transitions to the target gender (Okros and Scott, 2015).

While the policy expects accommodations to be made to meet the needs of transgender personnel, it also notes that commanders must strike a balance between meeting the needs and legal rights of transgender personnel and the privacy needs of other service members in restrooms, showers, and housing. It does not, however, provide guidance on how this should be accomplished (Canadian Armed Forces, 2012). The policy also makes clear that incidents of harassment must be dealt with according to the Canadian military's discrimination and harassment policy. Finally, if the transgender service member is assigned to a new unit permanently or temporarily, any required accommodations are to be communicated to the new commanding officer prior to the service member's arrival (Canadian Armed Forces, 2012).

The medical assessment and gender transition plan developed at the start of transition are also used to determine a service member's readiness status and deployability. The policy states that service members can be downgraded temporarily in terms of their readiness, ability to deploy, and eligibility for remote assignments until gender transition is complete (Canadian Armed Forces, 2012). This determination is made primarily by the medical professionals overseeing the service member's gender transition. After the gender transition is complete, the continued need for a reduced medical standard is decided on a case-by-case basis based on the service member's overall health, chronic conditions, and need for access to medical care. After beginning the gender transition, and based on the medical assessment, the service member is considered medically exempt from physical fitness testing and requirements until legally assuming the acquired or target gender (which, as noted earlier, requires provincial recognition). At that point, the fitness standards for the acquired or target gender apply. More specifically, once personnel are removed from the medical exemption list, they have 90 days to meet the new standards (Canadian Armed Forces, 2012).

A reduced medical readiness determination during gender transition is intended primarily to ensure that the service member has uninterrupted access to medical care. Once gender transition is complete, transgender service members and their commanders are responsible for identifying the service member's specific needs and how they will be addressed (Canadian Armed Forces, 2012). Gender reassignment surgery will not, however, automatically result in permanent deployment restrictions. As in Australia, gender reassignment surgery and hormone therapy are covered by military health care. The Canadian military paid for one gender reassignment surgery in 1998 and has paid for one or two surgeries per year since then (Canadian Armed Forces, 2012).

---

[3]  Also note that the requirements for the legal change vary by province but typically involve only a statement that the individual has assumed the target gender and a medical certification from a doctor of a diagnosis of gender incongruence.

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 195 of 394
Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 02/03/25    Page 76 of 113

What Lessons Can Be Learned from Foreign Militaries?    55

**Israel**

The Israel Defense Forces (IDF) have allowed transgender personnel to serve openly since 1998 (Speckhard and Paz, 2014).[4] The IDF experience with transgender personnel is somewhat unique because Israel's military is composed largely of conscripts who serve two or three years and then serve in the reserves with extended periods of active service. As a result, a very high percentage of the population spends extended periods of time mixing military and civilian life. From the perspective of this report, this blending of civilian and military life creates unique challenges for transgender personnel, as they cannot be one person in their civilian life and then a different person in their military life. Some transgender individuals receive a discharge or exemption from their military service based on their gender incongruence, but this decision is currently at the discretion of the commander. There is no official IDF policy on transgender personnel, but according to one report, senior members of the IDF are working to draft one (Speckhard and Paz, 2014). In 2014, the IDF announced that it would support transgender individuals throughout the transition process. Under this new policy, transgender teens who have not yet begun to transition to another gender will be enlisted according to their birth sex, but after enlistment, they will be given support and assistance with the gender transition process (Zitun, 2014). As a result, Speckhard and Paz (2014) noted, experiences vary for transgender personnel in the IDF. Some individuals report that once they ask to transition, they are allowed to dress and serve as their target gender. However, it is unclear how generalizable this is.

Typically, IDF administrative records use the gender at that time of enlistment. Since conscription occurs at age 18, and because hormone treatment for gender incongruence cannot legally begin until age 18, the administrative records of most personnel show their birth gender. Under a newly announced policy, personnel enlisted using their birth gender who identify as transgender can immediately receive support and treatment to begin the gender transition (Zitun, 2014). Importantly, however, as of 2014, the military identification card carries the birth gender until a service member undergoes gender reassignment surgery, even if the service member is living publically as the target gender (Speckhard and Paz, 2014). It should be noted that, in Israel, only one hospital can perform gender reassignment surgery, and this surgery cannot be performed until age 21, though some people go abroad for it (Speckhard and Paz, 2014). This creates some complications for housing and other matters, discussed in more detail later. The new policy will also allow transgender recruits to receive support for gender transition after enlistment.

Available evidence suggests that, in the IDF, assignment of housing, restrooms, and showers is typically linked to the birth gender, which does not change in the military system until after gender reassignment surgery. Service members who are undergo-

---

[4]    We do not know the exact date for this change because there was never a formal policy allowing or prohibiting transgender personnel from serving. It was in 1998 that the first openly transgender individual served in the IDF.

ing gender transition are accommodated, however, through the use of ad hoc solutions, including giving transitioning personnel their own showers, housing, or restrooms (Speckhard and Paz, 2014). Once transitioning personnel have completed gender reassignment surgery, they can be assigned to the housing, restrooms, and showers of their acquired gender. It is also worth noting that the majority of noncombat personnel are able to live at home, off base. As a result, the housing issue does not affect a large number of transitioning personnel (Speckhard and Paz, 2014). The issue of uniforms is usually easier to address, and service members are able to wear the uniform of the target gender once they begin their gender transition.

In addition to addressing housing and other administrative matters for conscripts and career soldiers, the IDF must address transitioning reservists. The limited information available suggests that the approach to addressing the needs of this group also varies from person to person. Usually, if reserve members are in the process of transitioning or have transitioned when called to active duty, they are permitted to return to service as their target or acquired gender (following the same administrative policies described earlier). For example, a service member who served in an all-male combat unit and is transitioning to female may be moved to another position. Again, many reservists serve their duty while living at home, so housing is not usually an issue. Restroom and shower assignments are addressed on an ad hoc basis (Speckhard and Paz, 2014). Finally, some personnel who have transitioned or are in the process of transitioning are exempted from their reserve duty. However, this is becoming less common as the IDF strives to accommodate the needs of these personnel rather than exempting them from service (Speckhard and Paz, 2014).

The IDF does not have a formal policy on physical standards for transgender individuals serving their conscription duty, reserve duty, or as professional soldiers. Available information suggests only that transgender personnel can serve in any unit or occupation for which they meet the requirements, with the exception of a few male-only combat units and certain security-related positions (Speckhard and Paz, 2014). Personnel transitioning from female to male are able to serve in male-only combat units only if they can meet the requirements set for other men. Personnel transitioning from male to female cannot serve in male-only combat units once they begin hormone treatment (Speckhard and Paz, 2014).

There do appear to be some limitations on the assignment of transgender personnel, particularly in combat units. Because of austere living conditions in these types of units, necessary accommodations may not be available for service members in the midst of a gender transition. As a result, transitioning individuals are typically not assigned to combat units (Speckhard and Paz, 2014). Transgender personnel are also limited from assignment to certain security-related positions due to concerns about blackmail, based on the assumption that these service members might be open about their gender identity in the military but might not have told others, including family members. Keeping

these types of secrets might make an individual susceptible to blackmail or extortion (Speckhard and Paz, 2014).

In the IDF, medical issues and matters related to the readiness of transgender personnel are addressed on a case-by-case basis, though a more formal policy is being developed. For conscripts, the only treatment that can be provided by the military is hormone therapy because gender reassignment surgery is possible in Israel only after age 21, by which point the conscription duty is usually completed (Speckhard and Paz, 2014). Those who choose to stay in the military full-time after the age of 21, as well as those in the reserve called to back to active service, may receive both hormone therapy and gender reassignment surgery. Those who choose to undergo surgery are permitted to take a period of sick leave for the surgery and recovery, as they can for any other medical treatment or surgery (Speckhard and Paz, 2014). Israel has nationalized health care that typically covers all treatments associated with gender transition, ranging from psychiatric care to pre- and postoperative care, hormone treatment, breast augmentation, and facial feminization. Apart from the approaches used to address physical standards for transitioning individuals (discussed earlier), there are no specific policies governing the readiness classification of transitioning IDF personnel, though some are in development (Zitun, 2014).

### United Kingdom

The United Kingdom lifted the ban on transgender personnel in 2000 following a European Court of Human Rights ruling that the country's policy violated the right to privacy under the European Convention on Human Rights (Frank, 2010). The policy change was implemented with guidance to commanders, as well as a code of social conduct that allowed commanders to address inappropriate behavior toward transgender personnel by appealing to broader principles of tolerance and diversity and to guard operational effectiveness (Yerke and Mitchell, 2013). In 2009, the British Armed Forces released the "Policy for Recruitment and Management of Transsexual Personnel in the Armed Forces" to offer clearer guidance to commanders on how gender transition–related issues should be addressed (Yerke and Mitchell, 2013). While transgender personnel are able to serve openly, under the current policy, they can be excluded from sports that organize around gender to ensure the safety of the individual or other participants. The British Army also provides its official policy on transgender personnel on its website:

> The Army welcomes transgender personnel and ensures that all who apply to join are considered for service subject to meeting the same mental and physical entry standard as any other candidate. If you have completed transition you will be treated as an individual of your acquired gender. Transgender soldiers serve throughout the Army playing their part in the country's security. There is a formal network that operates in the Army to ensure that transgender soldiers can find advice and support with issues that affect their daily lives. (British Army, undated)

**App. 192**

However, the military encourages those who have not yet started their gender transition to complete their transition before joining (UK Ministry of Defence, 2009).

The 2009 UK policy is similar to those in Canada and Australia in terms of the areas covered and approaches to addressing key issues, though the UK policy provides some additional room for individual differences. The policy also includes an extensive discussion of the legal and privacy protections afforded to transgender personnel. These protections are important because they also apply to administrative and medical records in the military system.

The UK policy defines five stages of gender transition: diagnosis, social transition (the individual begins living openly as the target gender), medical treatment/hormone therapy, surgical reassignment, and postoperative transition. However, it also recognizes that the process of gender transition may be different for each person. The policy suggests that each individual work with commanders and service authorities to develop a plan that includes a timeline for transition. The gender transition plan agreed to by the service member and commanders should specify the timing of changes, such as to housing assignments and uniforms. The specific point at which a service member transitions for the purposes of name, uniform, housing, restrooms, and ID cards may vary from person to person. Typically, when service members begin living publicly as the target gender (the social transition) they are reassigned to housing of the target gender, use the restrooms and uniforms of the target gender, and are given an ID card indicating that they are a member of the target gender. Importantly, this shift in gender for administrative purposes does not have to correspond to the point at which an individual transitions gender within the UK legal system, a process that involves a diagnosis of gender incongruence and two years of living as the acquired gender (UK Ministry of Defence, 2009). The policy also notes that it is unlawful to force transgender personnel to use separate toilet or shower facilities or occupy separate housing accommodations from the rest of the force.

The gender transition plan addresses other logistics of the transition. For example, it should specify scheduled time off required for medical procedures, including gender reassignment surgery. In general, medical treatment associated with gender transition is treated like any other medical issue experienced by a service member. However, while hormone replacement therapy is covered by military health care, gender reassignment surgery is not (UK Ministry of Defence, 2009). The policy notes that the timeline and timing of the transition must take into consideration the needs of the service. As a result, at least four weeks notice is typically needed prior to the start of a service member's gender transition. The gender transition plan should also specify whether service members wish to transition in their current post or transfer to a new position and whether they want to tell their colleagues about the gender transition themselves or would like someone else to do this. This decision may depend on the size of the unit. In a small unit, it may be easy to inform fellow service members personally. In a larger organization, it may not be necessary to tell every individual. Commanders of units

with transgender personnel are encouraged to consult members of the Service Equality and Diversity staff about how to approach education and management in matters associated with transgender service members.

The UK policy also addresses medical readiness and physical standards. Transgender personnel are evaluated for medical readiness and deployability on a case-by-case basis following a medical evaluation. During the transition period, specifically during hormone treatment and immediately before and after surgery, service members may receive a reduced Medical Employment Standard, which restricts deployability and sea service (UK Ministry of Defence, 2009). Transitioning service members who continue to meet physical standards throughout this period and are able to perform their jobs may retain normal readiness standards. Usually, those who do not undergo hormone therapy or gender reassignment surgery are able to maintain a fully deployable status throughout their gender transition (UK Ministry of Defence, 2009). Service members who are undergoing hormone therapy are able to deploy, as long as the hormone dose is steady and there are no major side effects. However, deployment to all areas may not be possible, depending on the needs associated with any medication (e.g., refrigeration). Some service members may also be required to have a psychiatric evaluation, but only if they show signs of mental health distress (UK Ministry of Defence, 2009). Individuals who have finished their gender transition and can meet the requirements of their legal gender are considered fully deployable. However, those who remain in a state of reduced readiness for an extended period may have to be discharged (UK Ministry of Defence, 2009). Importantly, the British military encourages individuals who are in the midst of their gender transition and are considering joining the military to wait until the gender transition is complete before joining, as the military may not always be able to provide the support the individual needs during gender transition.

The specific physical standards a transitioning individual must meet during and after the gender transition period are determined on a case-by-case basis. The policy allows that there may be a period of time—especially for individuals transitioning from female to male—during which a service member is not yet able to meet the standards of the target gender. In these cases, medical staff and commanders may assess the individual and determine the appropriate interim standards (UK Ministry of Defence, 2009). Once the gender transition is considered "complete," personnel are required to meet the standards of the target gender (UK Ministry of Defence, 2009). However, the policy recognizes that the point at which the gender transition is complete may vary: It may be complete after hormone therapy or after surgery, or simply after the individual begins living as the target gender. Therefore, the policy continues to allow for some flexibility in physical standards, even for members at the end of their gender transition process (UK Ministry of Defence, 2009). Modified standards may be set by medical staff and commanders, if necessary. Continued failure to meet whatever physical stan-

dards are determined to be appropriate (modified or otherwise) can lead to administrative discharge (UK Ministry of Defence, 2009).

The policy also addresses positions that are "gender-restricted" or have unique standards. The United Kingdom still has a number of combat occupations closed to women. Personnel who are transitioning from male to female may not serve in male-only occupations as long as this policy remains in place. Those transitioning from female to male may hold these jobs, assuming that they are able to meet the physical standards (UK Ministry of Defence, 2009). Transgender personnel may hold positions that have unique standards related to the occupation, as long as they can meet the physical and other requirements for the specific position. Finally, according to the policy, service members may request that their medals be transferred to a new name by submitting the request in writing. They are allowed to continue wearing qualifications earned while serving as their birth gender. However, this may indicate their transgender status to others (UK Ministry of Defence, 2009).

## Effects on Cohesion and Readiness

As indicated in Chapter Six, while there is limited research on the effects of transgender personnel serving openly in foreign militaries, the available evidence indicated no significant effect on cohesion, operational effectiveness, or readiness. In the Australian case, there is no evidence and there have been no reports of any effect on cohesion, operational effectiveness, or readiness (Frank, 2010). In the Israeli case, there has also been no reported effect on cohesion or readiness (Speckhard and Paz, 2014). Transgender personnel in these militaries report feeling supported and accommodated throughout their gender transition, and there has been no evidence of any effect on operational effectiveness (Speckhard and Paz, 2014). As noted earlier, commanders report that transgender personnel perform their military duties and contribute to their units effectively (Speckhard and Paz, 2014). Interviews with commanders in the United Kingdom also found no effect on operational effectiveness or readiness (Frank, 2010). Some commanders reported that increases in diversity had led to increases in readiness and performance. Interviews with these same commanders also found no effect on cohesion, though there were some reports of resistance to the policy change within the general military population, which led to a less-than-welcoming environment for transgender personnel. However, this resistance was apparently short-lived (Frank, 2010).

The most extensive research on the potential effects of openly serving transgender personnel on readiness and cohesion has been conducted in Canada. This research involved an extensive review of internal defense reports and memos, an analysis of existing literature, and interviews with military commanders. It found no evidence of any effect on operational effectiveness or readiness. In fact, the researchers

heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges (Okros and Scott, 2015). They also found no evidence of any effect on unit or overall cohesion. However, there have been reports of bullying and hostility toward transgender personnel, and some sources have described the environment as somewhat hostile for transgender personnel (Okros and Scott, 2015).

To summarize, our review of the limited available research found no evidence from Australia, Canada, Israel, or the United Kingdom that allowing transgender personnel to serve openly has had any negative effect on operational effectiveness, cohesion, or readiness. However, it is worth noting that the four militaries considered here have had fairly low numbers of openly serving transgender personnel, and this may be a factor in the limited effect on operational readiness and cohesion.

## Best Practices from Foreign Militaries

Several best practices and lessons learned emerged both directly from research articles describing the evolution of policy and the experiences of foreign militaries and indirectly from commonalities in the policies and experiences across our four case studies. The best practices that extended across all cases include the following:

### The Importance of Leadership

Sources from each of our case-study countries stressed that leadership support was important to executing the policy change. Leaders provided the impetus to draft and implement new policies and were integral to communicating a message of inclusion to the entire force. Supportive leaders were also important in holding accountable those personnel who participated in discrimination (Okros and Scott, 2015; Speckhard and Paz, 2014). Each of the cases underscores the importance of having strong leadership support to back and enforce the policy change, along with clearly written policies that are linked to national policy wherever possible (Frank, 2010). The militaries found that presenting a "business case" for diversity and emphasizing the advantages of an inclusive military, including better retention and recruiting, can help reduce resistance to a policy change (Frank, 2010).

### Awareness Through Broad Diversity Training

The most effective way to educate the force on matters related to transgender personnel is to integrate training on these matters into the diversity and harassment training already given to the entire force. This training addresses all forms of harassment and bullying, including that based on religion, race, and ethnicity (Frank, 2010; Okros and Scott, 2015; Belkin and McNichol, 2000–2001).

In the four cases we reviewed in-depth, we found that targeting only commanders with training and information on what it means to be transgender is not as effective in fostering an inclusive and supportive environment as training that targets the entire force and is integrated into broader forcewide diversity training. The foreign militaries that we examined train not only units with transitioning individuals but also the entire force by including gender identity alongside sexual orientation, religion, ethnicity, and other markers of difference in diversity training and education. However, efforts must be made simultaneously to protect the privacy of transitioning service members. In some cases, telling a unit that a transgender member is arriving before that individual arrives can be counterproductive (Frank, 2010).

### The Importance of an Inclusive Environment

An all-inclusive military environment—not just as it pertains to transgender personnel, sexual orientation, or gender identity, but a culture that embraces diversity—can support the integration of openly serving transgender personnel. In this context, gender identity is just one marker of diversity.[5]

### Ensuring Availability of Subject-Matter Experts to Advise Commanders

Most of the four countries we examined in-depth also make subject-matter experts (e.g., chaplains, psychiatrists) and gender advisers (individuals who have special training in gender awareness and gender mainstreaming in the military context) available to commanders tasked with the integration of transgender personnel. Gender advisers were originally intended to deal primarily with issues associated with integrating women into male-dominated military environments, but they could also help with other gender-related matters, including transgender personnel policy. They serve directly within military units and are a readily available resource to commanders. Adopting a similar practice of integrating advisers with expertise in the area of transgender personnel policy and gender transition-related matters might also support the integration of transgender service members in the U.S. military.

## Lessons Learned and Issues to Consider for U.S. Military Policy

Based on these best practices and the broader experiences of four foreign militaries, there are some key lessons to be learned and possible issues to consider when crafting U.S. military transgender personnel policy. First, in each of the four foreign militaries, there were some reports of resistance, bullying, and harassment of transgender personnel who made their gender transition public. This harassment ranged from exclusion to more aggressive behavior. In most cases, this behavior was relatively limited; however,

---

[5]    Remarks by a Canadian subject-matter expert in a phone discussion with RAND researchers, November 2015.

in some cases, it did contribute to a hostile work environment for transgender person-nel and had the effect of discouraging these personnel from being open about their gender transition or gender identity (Okros and Scott, 2015; Frank, 2010). Although the foreign militaries we examined tended to adopt a policy of no tolerance for this type of harassment, some bullying behavior may have gone unreported (Okros and Scott, 2015; Frank, 2010). In the case of Canada, the issue of restrooms for transgender personnel is an ongoing topic of discussion, and restrooms have been a common site of harassment and discrimination (Okros and Scott, 2015).

A second lesson learned is related to problems caused by the lack of an explicit, clearly written policy. For instance, in the IDF, without a clear policy, some transitioning individuals are placed in difficult and uncomfortable situations. For example, in some cases, personnel who have been permitted to begin hormone therapy cannot be housed with members of their target gender or grow their hair and fingernails (in the case of individuals transitioning from male to female). Others have been isolated, assigned to separate housing, or asked to use separate restrooms (Speckhard and Paz, 2014). Recog-nizing these challenges, IDF leadership is working to design a clear and explicit policy. In the Israeli case, transgender individuals were allowed to serve openly before a formal policy was written. Only when it was faced with questions about the integration of transgender personnel did the IDF begin to create a formal policy.[6] In Canada, a similar policy gap arose when transgender personnel were allowed to serve openly following a national policy revision that ended discrimination based on sexual orientation or gender. However, the focus at that point was on gay and lesbian service members, and no formal policy was created to address transgender personnel explicitly. When matters related to the medical care of transgender personnel arose, Canadian defense leaders developed a policy that just addressed this narrow, pressing issue, and did not develop policies to address the other matters (e.g., housing, restrooms, name changes). Commanders complained that the original policy was too vague and lacked sufficient details. A new, revised policy was written in 2012, and commanders have responded with positive feed-back.[7] The lack of a clear, written policy has also been an issue in Australia.

A third and final issue that has come up in at least two of the countries we sur-veyed is that of awards and medals. In the UK case, medals and awards received prior to gender transition can be transferred to the service member's post-transition name (UK Ministry of Defence, 2009). In the Canadian case, this is not possible, and the awards remain associated only with the original name. This is a cause for concern among transgender personnel in the Canadian military, but Canadian officials have responded that they cannot rewrite history (Okros and Scott, 2015). This is a policy area that the United States should consider alongside other administrative policies.

---

[6]  Remarks by a Canadian subject-matter expert in a phone discussion with RAND researchers, November 2015.

[7]  Remarks by a Canadian subject-matter expert in a phone discussion with RAND researchers, November 2015.

Date visited: November 2, 2016

CHAPTER EIGHT

## Which DoD Policies Would Need to Be Changed if Transgender Service Members Are Allowed to Serve Openly?

This chapter reviews DoD accession, retention, separation, and deployment policies and provides an assessment of the impact of changes required to allow transgender personnel to serve openly. For our analysis of DoD policies, we reviewed 20 current accession, retention, separation, and deployment regulations across the services and the Office of the Secretary of Defense. We also reviewed 16 other regulations that have been replaced by more recent regulations or did not mention transgender policies.[1] DoDI 6130.03 establishes medical standards for entry into military service, including a list of disqualifying physical and mental conditions, some of which are transgender-related.[2] Current DoD policy also authorizes, but no longer requires, the discharge of transgender personnel for reasons related to both medical conditions that generate disabilities, as well as mental health concerns.[3] However, a July 2015 directive from the Office of the Secretary of Defense elevated decisions to administratively separate transgender service members to the Office of the Under Secretary of Defense for Personnel and Readiness (DoD, 2015b).

Note that our review focused on transgender-specific DoD instructions that may contain unnecessarily restrictive conditions and reflect outdated terminology and assessment processes. However, in simply removing these restrictions, DoD could inadvertently affect overall standards. While we focus on reforms to specific instruc-

---

[1]  These additional policies are listed in Appendix D.

[2]  The instruction specifies conditions that disqualify accessions, including "current or history of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias"; "history of major abnormalities or defects of the genitalia including but not limited to change of sex, hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis"; and "history of major abnormalities or defects of the genitalia such as change of sex, hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis" (DoDI 6130.03, 2011, enclosure 4).

[3]  "Sexual gender and identity disorders" are specified as medical conditions that may generate disabilities under DoDI 1332.38, enclosure 5 (2006). Mental health conditions are specified in DoDI 1332.14 (2014) and DoDI 1332.30 (2013) for enlisted and officers, respectively. DoDI 1332.18, issued on August 5, 2014, updated these guidelines and established general criteria for referral for disability evaluation and defers to service-specific standards for retention. However, a recent review of this revision suggests that service-specific regulations may still disqualify transgender personnel, and the new guidance may not overrule those service policies (Pollock and Minter, 2014).

**App. 200**

tions and directives, we note that DoD may wish to conduct a more expansive review of personnel policies to ensure that individuals who join and remain in service can perform at the desired level, regardless of gender identity.

## Accession Policy

The language pertaining to transgender individuals in accession instructions does not match that used in DSM-5.[4] This results in restrictions in DoD policy that do not match current medical understanding of gender identity issues and thus may be misapplied or difficult to interpret in the context of current medical treatments and diagnoses. Under current guidelines, otherwise qualified individuals could be excluded for conditions that are unlikely to affect their military service, and individuals with true restrictions may be more difficult to screen for and identify. Modernizing the terminology to match current psychological and medical understanding of gender identity would help ensure that existing procedures do not inadvertently exclude otherwise qualified individuals who might want to join the military. We recommend that DoD review and revise the language to match the DSM-5 for conditions related to mental fitness so that mental health screening language matches current disorders and facilitates appropriate screening and review processes for disorders that may affect fitness for duty. Similarly, physical fitness standards should specify physical requirements, rather than physical conditions. Finally, the physical fitness language should clarify when in the transition process the service member's target gender requirements will begin to apply.

## Retention Policy

We recommend that DoD expand and enhance its guidance and directives to clarify and adjust, where necessary, standards for retention of service members during and after gender transition. Evidence from Canada and Australia suggests that transgender personnel may need to be held medically exempt from physical fitness testing and requirements during transition (Canadian Armed Forces, 2012; Royal Australian Air Force, 2015). However, after completing transition, the service member could be required to meet the standards of the acquired gender. The determination of when the service member is "medically ready" to complete the physical fitness test occurs on a case-by-case basis and is typically made by the unit commander.

---

[4]  Two key changes are that the term *transsexualism* has been replaced, and *gender dysphoria* is no longer in the chapter "Sexual Desire Disorders, Sexual Dysfunctions, and Paraphilias" but, rather, has its own chapter (Milhiser, 2014).

**App. 201**

## Separation Policy

DoD may wish to revise the current separation process based on lessons learned from the repeal of Don't Ask, Don't Tell. The current process relies on administrative decisions outside the purview of the standard medical and physical review process. This limits the available documentation and opportunities for review, and it could prove burdensome if transgender-related discharges become subject to re-review. When medically appropriate, DoD may wish to establish guidance on when and how such discharge reviews should be handled. We also recommend that DoD develop and disseminate clear criteria for assessing whether transgender-related conditions may interfere with duty performance.

## Deployment Policy

Deployment conditions vary significantly based on the unique environment of each deployment, with some deployed environments able to accommodate transgender individuals, even those who are undergoing medical treatments. Moreover, recent medical advancements can minimize the invasiveness of treatments and allow for telemedicine or other forms of remote medical care. Given medical and technological advances, DoD may wish to adjust some of its processes and deployment restrictions to minimize the impact on readiness. For example, current regulations specify that conditions requiring regular laboratory visits make service members ineligible for deployment, including all service members who are receiving hormone treatments,[5] since such treatments require laboratory monitoring every three months for the first year as hormone levels stabilize (Hembree et al., 2009; Elders et al., 2014). Such a change would require DoD to either permit more flexible monitoring strategies[6] or provide training to deployed medical personnel.[7] Similarly, the use of refrigerated medications is a disqualifying condition for deployment,[8] even though nearly all hormone therapies are available in other formats that do not require refrigeration.

---

[5]  Current regulations state that "medications that require laboratory monitoring or special assessment of a type or frequency that is not available or feasible in a deployed environment" disqualify an individual from deployment (Office of the Assistant Secretary of Defense for Health Affairs, 2013, p. 3).

[6]  Some experts suggest that alternatives, such as telehealth reviews, would address this issue for rural populations with limited access to medical care (see, for example, WPATH, 2011).

[7]  "Independent duty corpsmen, physician assistants, and nurses can supervise hormone treatment initiated by a physician" (Elders et al., 2014).

[8]  The memo issued by the Office of the Assistant Secretary of Defense for Health Affairs states, "Medications that disqualify an individual for deployment include . . . [m]edications that have special storage considerations, such as refrigeration (does not include those medications maintained at medical facilities for inpatient or emergency use)" (Office of the Assistant Secretary of Defense for Health Affairs 2013, p. 3).

**App. 202**

Date visited: November 2, 2016

CHAPTER NINE

## Conclusion

By many measures, there are currently serving U.S. military personnel who are transgender. Overall, our study found that the number of U.S. transgender service members who are likely to seek transition-related care is so small that a change in policy will likely have a marginal impact on health care costs and the readiness of the force. We estimate, based on state-level surveys of transgender prevalence, that between 1,320 and 6,630 transgender personnel may be serving in the AC, and 830–4,160 may be serving in the SR. Estimates based on studies from multiple states, weighted for population and the gender distribution in the military, imply that there are around 2,450 transgender service members in the AC and 1,510 in the SR.[1]

However, only a small proportion of these service members will seek gender transition–related treatment each year. Employing utilization and cost data from the private health insurance system, we estimated the potential impact of providing this care to openly serving transgender personnel on AC health care utilization and costs. Directly applying private health insurance utilization rates to the AC military population indicated that a very small number of service members will access gender transition–related care annually. Our estimates based on private health insurance data ranged from a lower-bound estimate of 29 AC service members to an upper-bound estimate of 129 annually using care, including those seeking both surgical and other medical treatments.

Using estimates from two states and adjusting for the male/female AC distribution, we also estimate a total of 45 gender transition–related surgeries, with 50 service members initiating transition-related hormone therapy annually in the AC.[2] We estimate 30 gender transition-related surgeries and 25 service members initiating hormone therapy treatments in the SR. These are likely to be upper-bound estimates, given the nonrepresentative sample selection procedures used in the NTDS. Furthermore, the best prevalence estimates that we were able to identify were from two of the more transgender-tolerant states in the country, and the empirical evidence that trans-

---

[1] Estimates are based on FY 2014 AC and SR personnel numbers.

[2] For hormone therapy recipients, the number of treatments and recipients is the same, and these estimates can be treated as counts of individuals.

**App. 204**

gender prevalence is higher in the military than in the general population is weak. As a point of comparison, we also compared these estimated values to mental health utilization in the AC population overall. Using data from McKibben et al. (2013), we calculated that approximately 278,517 AC service members accessed mental health care treatment in 2014, the implication being that health care for the transgender population will be a very small part of the total health care provided to AC service members across the MHS.

With respect to health care costs, actuarial estimates from the private health insurance sector indicate that covering gender transition–related care for transgender employees increased premiums by less than 1 percent. Taking a weighted average of the identified firm-level data, we estimate that covering transgender-related care for service members will increase the U.S. military's AC health care spending by only 0.038–0.054 percent. Using these baseline estimates, we estimate that MHS health care costs will increase by between $2.4 million and $8.4 million. These numbers represent only a small proportion of FY 2014 AC health care expenditures ($6.27 billion) and the FY 2014 Unified Medical Program budget ($49.3 billion). This is consistent with our estimate of relatively low AC rates of gender transition–related health care utilization in the MHS.

Similarly, when considering the impact on readiness, we found that using either the prevalence-based approach or the utilization-based approach yielded an estimate of less than 0.0015 percent of total labor-years likely to be affected by a change in policy. This is much smaller than the current lost labor-years due to medical care in the Army alone.

Even if transgender personnel serve in the military at twice the rate of their prevalence in the general population and we use the upper-bound rates of health care utilization, the total proportion of the force that is transgender and would seek treatment would be less than 0.1 percent, with fewer than 130 AC surgical cases per year even at the highest utilization rates. Given this, true usage rates from civilian case studies imply only 30 treatments in the AC, suggesting that the total number of individuals seeking treatment may be substantially smaller than 0.1 percent of the total force. Thus, we estimate the impact on readiness to be negligible.

We conclude with some general recommendations and insights based on the experiences of foreign militaries that permit transgender individuals to serve openly—specifically, Australia, Canada, Israel, and the United Kingdom. Our case studies provide some guidance that policymakers should consider as they develop policies to govern the employment of transgender personnel in the U.S. military. These cases also suggested a number of key implementation practices if a decision is made to allow transgender service members to serve openly:

- Ensure strong leadership support.
- Develop an explicit written policy on all aspects of the gender transition process.

Date visited: November 2, 2016

Conclusion   71

- Provide education and training to the rest of the force on transgender personnel policy, but integrate this training with other diversity-related training and education.
- Develop and enforce a clear anti-harassment policy that addresses harassment aimed at transgender personnel alongside other forces of harassment.
- Make subject-matter experts and gender advisers serving within military units available to commanders seeking guidance or advice on gender transition-related issues.
- Identify and communicate the benefits of an inclusive and diverse workforce.

Date visited: November 2, 2016

APPENDIX A
# Terminology

*Augmentation mammoplasty:* breast augmentation involving implants or lipofilling

*Buccal administration:* placement of medication between the gums and cheek

*Chest surgery:* surgery to create a contoured, male-looking chest

*Clitoroplasty:* surgical creation/restoration of a clitoris

*Cross-dresser:* someone who dresses in the clothes of the other gender, not always on a full-time basis

*Female-to-male:* those assigned female sex at birth who identify as male; transgender men; transmen

*Gender:* an individual's gender identity, which is influenced by societal norms and expectations; public, lived role as male or female

*Gender assignment:* initial assignment at birth as male or female; yields "natal gender" (APA, 2013, p. 451)

*Gender atypical:* behaviors not typical for one's gender "in a given society and historical era" (APA, 2013, p. 451)

*Gender identity:* "one's inner sense of one's own gender, which may or may not match the sex assigned at birth" (Office of Personnel Management, 2015, p. 2)

*Gender dysphoria:* "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)" (WPATH, 2011, p. 2).

*Gender nonconformity:* "the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex" (WPATH, 2011, p. 5, citing Institute of Medicine definition)

*Gender transition–related surgery/gender-confirming surgery/sex reassignment surgery:* surgery to mitigate distress associated with gender dysphoria by aligning sex characteristics with gender identity

**App. 208**

*Genderqueer:* those who "define their gender outside the construct of male or female, such as having no gender, being androgynous, or having elements of multiple genders" (Roller, Sedlak, and Draucker, 2015, p. 417)

*Gluteal augmentation:* buttocks augmentation involving implants or lipofilling

*Hormone therapy:* "the administration of exogenous endocrine agents to induce feminizing or masculinizing changes" (WPATH, 2011, p. 33)

*Hysterectomy:* surgery to remove the uterus

*Intersex:* "a general term used for a variety of conditions in which a person is born with a reproductive or sexual anatomy that doesn't seem to fit the typical definitions of female or male" (Intersex Society of North America, undated)

*Labiaplasty:* plastic surgery for altering or creating the labia

*Lipofilling:* injection of fat rather than artificial implants

*Male-to-female:* those assigned male sex at birth who identify as female; transgender females; transwomen

*Mastectomy:* surgical removal of one or both breasts

*Metoidioplasty:* surgically relocating a clitoris that has been enlarged by hormone therapy to a more forward position that more closely resembles that of a penis; average length is 1.5–2 inches

*Oophorectomy:* surgical removal of one or both ovaries

*Orchiectomy:* surgical removal of one or both testicles

*Ovariectomy:* surgical removal of one or both ovaries

*Parenteral administration:* intravenous injection (into a vein) or intramuscular infusion (into muscle) of medication

*Penectomy:* surgical removal of the penis

*Phalloplasty:* surgical creation/reconstruction of a penis using one of a variety of techniques including free or pedicled (attached) flap (see Rashid and Tamimy, 2013)

*Primary sex characteristics:* physical characteristics/sex organs directly involved in reproduction

*Salpingo-oophorectomy:* removal of the ovaries and fallopian tubes

*Scrotoplasty:* surgical creation/reconstruction of testicles; in transmen, native labia tissue is used; testicular implants can be used

*Secondary sex characteristics:* physical characteristics that appear at puberty and vary by sex but are not directly involved in reproduction (e.g., breasts)

Date visited: November 2, 2016

Terminology    75

*Sex:* a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals (intersex is a rare exception)

*Sexual orientation:* sexual identity in relation to the gender to which someone is attracted: heterosexual, homosexual, or bisexual

*Thyroid chondroplasty:* removal or reduction of the Adam's apple

*Transdermal administration:* delivery of medication across the skin with patches

*Transgender:* "an umbrella term used for individuals who have sexual identity or gender expression that differs from their assigned sex at birth" (Roller, Sedlak, and Draucker, 2015, p. 417)

*Transsexual:* someone whose gender identity is inconsistent with their assigned sex and who desires to permanently transition their physical characteristics to match their inner sense of their own gender

*Urethroplasty:* surgical reconstruction or fabrication of the urethra.

*Vaginectomy (colpectomy):* surgical removal of all or part of the vagina

*Vaginoplasty:* surgical creation/reconstruction of a vagina

*Vulvoplasty:* surgical creation/reconstruction of the vulva

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 02/03/25    Page 97 of 113

APPENDIX B

# History of DSM Terminology and Diagnoses

A brief historical understanding of the evolving diagnostic nomenclature pertaining to transgender status is important to discussions of related health care. DSM-III (APA, 1980) first contained the diagnosis of transsexualism. DSM-III-R (APA, 1987) introduced gender identity disorder, non-transsexual type. In DSM-IV (APA, 1994), these two diagnoses were merged and called *gender identity disorder*. Gender identity disorder, together with the paraphilias (disorders of extreme, dangerous, or abnormal sexual desire, including transvestic fetishism, sometimes referred to as cross-dressing), constituted the DSM-IV section "Sexual and Gender Identity Disorders."

With DSM-5 (APA, 2013) came the migration from *gender identity disorder* to *gender dysphoria*. The clinical significance of the shift in DSM-5 was great: For the first time, without accompanying symptoms of distress, transgender individuals were no longer considered to have a diagnosable mental disorder. The historical parallel with homosexuality is hard to miss: In 1980, DSM-III similarly normalized the DSM-II diagnosis of homosexuality, moving instead to ego-dystonic homosexuality, a diagnosis reserved only for gay persons who felt related distress. In the next DSM iteration, DSM-III-R, all reference to homosexuality as a diagnostic term was removed. In the aftermath of depathologizing gender nonconformity, a similar move relating to transgender status appears to be underway.

As noted in this report, there is a consensus among clinicians and their professional organizations that transition-related treatment with hormones or surgery constitutes necessary health care, though there is a divide over whether it serves as "a strategy to diminish the serious suffering" of the patient or "a method to assist people in finding self-actualization" (Gijs and Brewaeys, 2007, p. 184). The conclusion that transition-related surgery "is an effective treatment for gender identity disorder in adults" is based primarily on retrospective studies of satisfaction rather than randomized controlled trials or prospective studies (Gijs and Brewaeys, 2007, p. 199). The prevalence of post-operative regret is very low, though "little empirical research has been done" on related risk and protective factors (Gijs and Brewaeys, 2007, pp. 201, 204). Overall, surgery is considered "the most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals," but rigorous controlled-outcome studies evaluating its

**App. 212**

Date visited: November 2, 2016

78    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

effectiveness should be conducted despite feasibility and ethical challenges (Gijs and Brewaeys, 2007, pp. 215–216; Buchholz, 2015, p. 1786).

---

**DSM-5 Diagnostic Criteria: Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)**

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
    1.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
    2.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
    3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.
    4.    A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
    5.    A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
    6.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

APPENDIX C

## Treatments for Gender Dysphoria

In this appendix, we provide additional details about psychosocial, pharmacologic, surgical, and other treatments for gender dysphoria (GD).

**Psychotherapy**

The emphasis of psychotherapy for this population today is on "affirming a unique transgender identity," rather than focusing on gender transition (Institute of Medicine, 2011, p. 52). Mental health professionals can also help patients presenting with GD navigate the process of coming out to family, friends, and peers; treat comorbid mental health conditions;[1] weigh options related to gender identity, gender expression, and transition-related treatment interventions; and conduct assessments, make referrals, and guide preparation for and provide support through the transition-related treatment process (WPATH, 2011, pp. 22–26). Referral from a mental health professional is necessary under the standards of care for those seeking breast/chest or genital surgeries, and the latter also requires confirmation from an independent mental health provider (WPATH, 2011, p. 27). Mental health providers may also serve an important role on behalf of their patients by providing education and advocacy within the community and supporting changes to identity documents (WPATH, 2011, p. 31).

Of note, treatment aimed at changing one's gender identity to align with the sex assigned at birth has proven unsuccessful and is no longer considered ethical care; mental health providers who are unwilling or unable to provide appropriate care should refer patients to a provider who is (WPATH, 2011, p. 32).

**Hormone Therapy**

Hormone therapy is necessary for many individuals with GD (WPATH, 2011, p. 33). It has two major goals: (1) reduce naturally occurring hormones to minimize secondary sex characteristics and (2) maximize desired feminization/masculinization using the principles and medications used for hormone replacement in non-transgender patients who do not produce enough hormones, such as women who have had hyster-

---

[1]  Co-occurring mental health conditions could range from anxiety and depression, which are common among the transgender population, to more severe and rare illnesses, such as schizophrenia or bipolar disorder.

**App. 214**

ectomies or men with low testosterone (WPATH, 2011, p. 33; Hembree et al., 2009). As with most medications, there are risks, which may increase in the presence of some health conditions or behaviors (such as smoking); these should be evaluated and managed (Hembree et al., 2009).

For those transitioning from female to male, hormone therapy should lead to "deepened voice, clitoral enlargement (variable, 3–8 cm), growth in facial and body hair, cessation of menses, atrophy of breast tissue, increased libido, and increased percentage of body fat." For those transitioning from male to female, hormone therapy should lead to "breast growth (variable), decreased libido and erections, decreased testicular size, and increased percentage of body fat" (WPATH, 2011, p. 36). The timeline for these and other physical changes varies by individual; expected onset is within months, and maximum expected effect (such as body fat and muscle mass changes) is generally achieved in three or more years. Feminizing hormone therapy typically involves both estrogen and antiandrogens.[2] Masculinizing hormone therapy consists primarily of testosterone, which is available in oral, transdermal, parenteral (intravenous/intramuscular), buccal (cheek), and implantable administrations; brief use of progestin can help stop menstrual periods early in treatment (WPATH, 2011, p. 49). Detailed clinical practice guidelines are available from the Endocrine Society (Hembree et al., 2009).

**Gender Transition–Related Surgery**

As noted, gender transition–related surgery (also called sex reassignment surgery or gender-confirming surgery) is necessary for some transgender patients. Under the standards of care, mental health professionals must refer patients for surgery; in addition, criteria for both breast/chest and genital surgery include persistent and well-documented GD, the capacity to make informed decisions and to consent, and for other mental or general health concerns to be reasonably well controlled if present (WPATH, 2011, p. 59). Hormone therapy is not a prerequisite for breast/chest (also called "top") surgery, though it is recommended for 12–24 months for male-to-female patients to achieve optimal results (Hembree et al., 2009).

For genital (also called "bottom") surgery, 12 continuous months of hormone therapy are required prior to oophorectomy or orchiectomy (surgical removal of ovaries or testicles), unless contraindicated; health record documentation of "12 continuous months of living in a gender role that is congruent with their gender identity . . . consistently, on a day-to-day basis and across all settings of life" is also required for metoidioplasty (surgical relocation of an enlarged clitoris), phalloplasty (surgical creation of a penis), or vaginoplasty (surgical creation of a vagina; WPATH, 2011,

---

[2]   Transdermal rather than oral estrogen is recommended. Common antiandrogens include spironolactone (an antihypertensive agent that requires electrolyte monitoring); cyproterone acetate (not approved in the United States); GnRH agonists, such as gosrelin, buserelin, or triptorelin (available as injectables or implants); and 5-alpha reductase inhibitors, such as finasteride and dutasteride (WPATH, 2011, p. 48).

Treatments for Gender Dysphoria    81

pp. 60–61). Mastectomy is often the only surgery undertaken by the female-to-male population; for those who do undergo genital surgery, phalloplasty is relatively uncommon, as it often requires multiple procedures and has frequent complications (WPATH, 2011, pp. 63–64). Surgeons should work closely with patients and other care providers, if needed, to ensure that the advantages, disadvantages, and risks of various treatments and procedures are well understood.

### Other Treatments

Aside from breast/chest and genital surgery, other surgical interventions may include liposuction, lipofilling, and various aesthetic procedures. For male-to-female patients, these may include "facial feminization surgery, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), [and] hair reconstruction"; female-to-male patients may seek pectoral implants (WPATH, 2011, pp. 57–58). There is ongoing debate regarding whether these and other transition-related treatments are "medically necessary" (and therefore covered by insurance). For example, in some circumstances, facial hair removal for male-to-female patients may constitute necessary transition-related treatment: One study found that those who have undergone the procedure were "less likely to experience harassment in public spaces," and harassment can "have a negative impact on the success of a person's treatment for gender dysphoria" (Herman, 2013b, p. 19). In addition, voice and communication therapy to develop vocal characteristics and nonverbal communication patterns congruent with gender identity may prevent "vocal misuse and long-term vocal damage" (WPATH, 2011, pp. 52–54).

Date visited: November 2, 2016

APPENDIX D

# Review of Accession, Retention, and Separation Regulations

| Directive | Date | Department |
|---|---|---|
| Air Force Instruction 36-2002, *Regular Air Force and Special Category Accessions* | 4/7/1999, revised 6/2/2014 | Air Force |
| Air Force Instruction Guidance Memorandum AFI48-123_AFGM2015-01, "Guidance Memorandum: AFI 48-123, *Medical Examinations and Standards*" | 8/27/2015 | Air Force |
| Air Force Instruction Guidance Memorandum 48-123_AFGM4, "Air Force Guidance Memorandum to AFI 48-123, *Medical Examinations and Standards*" | 1/29/2013 | Air Force |
| Air Force Recruiting Service Instruction 36-2001, *Recruiting Procedures for the Air Force* | 8/1/2012 | Air Force |
| Air Force Instruction 41-210, *TRICARE Operations and Patient Administration Functions* | 6/6/2012 | Air Force |
| U.S. Army Recruiting Command, *Pocket Recruiter Guide* | 7/1/2013 | Army |
| Army Regulation 635-40, *Physical Evaluation for Retention, Retirement, or Separation* | 3/20/2012 | Army |
| Army Regulation 601-280, *Army Retention Program* | 9/15/2011 | Army |
| Army Regulation 40-501, *Standards of Medical Fitness* | 8/4/2011 | Army |
| Army Regulation 40-66, *Medical Record Administration and Healthcare Documentation* | 1/4/2010 | Army |
| Army Regulation 635-200, *Active Duty Enlisted Administrative Separations* | 9/6/2011 | Army |
| Army Regulation 601-210, *Active and Reserve Components Enlistment Program* | 3/12/2013 | Army |
| DoDI 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* | 4/28/2010, revised 9/13/11 | DoD |
| DoDI 1332.18, *Disability Evaluation System (DES)* | 8/5/2014 | DoD |
| Office of the Under Secretary of Defense for Personnel and Readiness, *Disability Evaluation System (DES) Pilot Operations Manual* | 12/2008 | DoD |

**App. 218**

Date visited: November 2, 2016

84    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

| Directive | Date | Department |
|---|---|---|
| Marine Corps Order 1040.31, *Enlisted Retention and Career Development Program* | 9/8/2010 | Marine Corps |
| Marine Corps Order 6110.3, *Marine Corps Body Composition and Military Appearance Program* | 8/8/2008 | Marine Corps |
| Marine Administrative Message 064/11, "Amplification to Testing Accession Standards for the Purpose of Application to Marine Office Commissioning Programs" | 1/26/2011 | Marine Corps |
| Navy Military Personnel Manual 1306-964, "Recruiting Duty" | 5/9/2014 | Navy |
| Navy Medicine Manual P-117, *Manual of the Medical Department*, Chapter 15, Article 15-31, "Waivers of Physical Standards" | 5/3/2012 | Navy and Marine Corps |

**App. 219**

# References

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, 3rd ed., Arlington, Va., 1980.

———, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)*, 3rd ed., revised, Arlington, Va., 1987.

———, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 4th ed., revised, Arlington, Va., 1994.

———, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, 5th ed., Arlington, Va., 2013a.

———, "Gender Dysphoria," fact sheet, 2013b. As of January 5, 2016: http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf

APA—*See* American Psychiatric Association.

Army Regulation 40-501, *Standards of Medical Fitness*, December 14, 2007, revised August 4, 2011.

Army Regulation 600-8-101, *Personnel Processing (In-, Out-, Soldier Readiness, and Deployment Cycle)*, February 19, 2015.

Bakker, A., P. J. van Kesteren, L. J. Gooren, and P. D. Bezemer, "The Prevalence of Transsexualism in the Netherlands," *Acta Psychiatrica Scandinavica*, Vol. 87, No. 4, April 1993, pp. 237–238.

Belkin, Aaron, "Caring for Our Transgender Troops—The Negligible Cost of Transition-Related Care," *New England Journal of Medicine*, Vol. 373, No. 12, September 17, 2015, pp. 1089–1092.

Belkin, Aaron, and Jason McNichol, "Homosexual Personnel Policy in the Canadian Forces: Did Lifting the Gay Ban Undermine Military Performance?" *International Journal*, Vol. 56, No. 1, Winter 2000–2001, pp. 73–88.

Blakely, Katherine, and Don J. Jansen, *Post-Traumatic Stress Disorder and Other Mental Health Problems in the Military: Oversight Issues for Congress*, Washington, D.C.: Congressional Research Service, August 8, 2013.

Blosnich, John R., Adam J. Gordon, and Michael J. Fine, "Associations of Sexual and Gender Minority Status with Health Indicators, Health Risk Factors, and Social Stressors in a National Sample of Young Adults with Military Experience," *Annals of Epidemiology*, Vol. 25, No. 9, September 2015, pp. 661–667.

British Army, "Diversity," web page, undated. As of January 4, 2016: http://www.army.mod.UK/join/38473.aspx

**App. 220**

Brown, David, "Amputations and Genital Injuries Increase Sharply Among Soldiers in Afghanistan," *Washington Post*, May 4, 2011. As of January 5, 2016: https://www.washingtonpost.com/national/amputations-and-genital-injuries-increase-sharply-among-soldiers-in-afghanistan/2011/02/25/ABX0TqN_story.html

Brown, George R., "Transsexuals in the Military: Flight into Hypermasculinity," *Archives of Sexual Behavior*, Vol. 17, No. 6, December 1988, pp. 527–537.

Buchholz, Laura, "Transgender Care Moves into the Mainstream," *Journal of the American Medical Association*, Vol. 314, No. 17, November 3, 2015, pp. 1785–1787.

California Department of Health Services, *California Lesbian, Gay, Bisexual, and Transgender Tobacco Survey 2004*, San Francisco, Calif., 2004.

Canadian Armed Forces, Military Personnel Instruction 01/11, "Management of Transsexual Members," 2012.

Conron, Kerith, Gunner Scott, Grace Sterling Stowell, and Stewart J. Landers, "Transgender Health in Massachusetts: Results from a Household Probability Sample of Results," *American Journal of Public Health*, Vol. 102, No. 1, January 2012, pp. 118–122.

Cox, Matthew, "Army Has 50,000 Active Soldiers Who Can't Deploy, Top NCO Says," *Military.com*, November 25, 2015. As of March 16, 2016: http://www.military.com/daily-news/2015/11/25/army-has-50000-active-soldiers-who-cant-deploy-top-nco-says.html

De Cuypere, G., M. Van Hemelrijck, A. Michel, B. Carael, G. Heylens, R. Rubens, P. Hoebeke, and S. Monstrey, "Prevalence and Demography of Transsexualism in Belgium," *European Psychiatry*, Vol. 22, No. 3, 2007, pp. 137–141.

Defense Health Agency, TRICARE Management Activity, *Evaluation of the TRICARE Program: Access, Cost, and Quality, Fiscal Year 2015*, 2015. As of January 5, 2016: http://www.health.mil/Military-Health-Topics/Access-Cost-Quality-and-Safety/Health-Care-Program-Evaluation/Annual-Evaluation-of-the-TRICARE-Program

DoD—*See* U.S. Department of Defense.

Eklund, P. L., L. J. Gooren, and P. D. Bezemer, "Prevalence of Transsexualism in the Netherlands," *British Journal of Psychiatry*, Vol. 152, No. 5, May 1988, pp. 638–640.

Elders, Joycelyn, Alan M. Steinman, George R. Brown, Eli Coleman, and Thomas A. Kolditz, *Report of the Transgender Military Service Commission*, Santa Barbara, Calif.: Palm Center, March 2014.

Ender, Morten G., David E. Rohall, and Michael D. Matthews, "Cadet and Civilian Undergraduate Attitudes Toward Transgender People: A Research Note," *Armed Forces and Society*, Vol. 42, No. 2, April 2016, pp. 427–435.

Flores, Andrew R., "Attitudes Toward Transgender Rights: Perceived Knowledge and Secondary Interpersonal Contact," *Politics, Groups, and Identities*, Vol. 3, No. 3, 2015.

Frank, Nathaniel, *Gays in Foreign Militaries 2010: A Global Primer*, Santa Barbara, Calif.: Palm Center, 2010.

Gates, Gary J., *How Many People Are Lesbian, Gay, Bisexual, and Transgender?* Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, April 2011.

Gates, Gary J., and Jody L. Herman, "Transgender Military Service in the United States," Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, May 2014.

Gijs, Luk, and Anne Brewaeys, "Surgical Treatment of Gender Dysphoria in Adults and Adolescents: Recent Developments, Effectiveness, and Challenges," *Annual Review of Sex Research*, Vol. 18, No. 1, 2007, pp. 178–224.

Gould, Elise, *A Decade of Declines in Employer-Sponsored Health Insurance Coverage*, Washington, D.C.: Economic Policy Institute, February 2012. As of January 5, 2016: http://www.epi.org/publication/bp337-employer-sponsored-health-insurance

Grant, Jaime M., Lisa A. Mottet, and Justin Tanis, with Jack Harrison, Jody L. Herman, and Mara Keisling, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Washington, D.C.: National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011.

Harrell, Margaret C., Laura Werber, Peter Schirmer, Bryan W. Hallmark, Jennifer Kavanagh, Daniel Gershwin, and Paul S. Steinberg, *Assessing the Assignment Policy for Army Women*, Santa Monica, Calif.: RAND Corporation, MG-590-1-OSD, 2007. As of March 17, 2016: http://www.rand.org/pubs/monographs/MG590-1.html

Harris, Benjamin Cerf, *Likely Transgender Individuals in the U.S. Federal Administrative Records and the 2010 Census*, Washington, D.C.: U.S. Census Bureau, May 4, 2015.

Hembree, Wylie C., Peggy Cohen-Kettenis, Henriette A. Delemarre–van de Waal, Louis J. Gooren, Walter J. Meyer III, Norman P. Spack, Vin Tangpricha, and Victor M. Montori, "Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline," *Journal of Clinical Endocrinology and Metabolism*, Vol. 94, No. 9, September 2009, pp. 3132–3154.

Herman, Jody L., *The Cost of Employment and Housing Discrimination Against Transgender Residents of New York*, Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, April 2013a.

———, *Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers*, Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, September 2013b.

Hoenig, J., and J. C. Kenna, "The Prevalence of Transsexualism in England and Wales," *British Journal of Psychiatry*, Vol. 124, No. 579, 1974, pp. 181–190.

Hoge, Charles W., Jennifer Auchterlonie, and Charles S. Millike, "Mental Health Problems, Use of Mental Health Services, and Attrition from Military Service After Returning from Deployment to Iraq or Afghanistan," *Journal of the American Medical Association*, Vol. 295, No. 9, March 1, 2006, pp. 1023–1032.

Horton, Mary Ann, "The Incidence and Prevalence of SRS Among US Residents," paper presented at the Out and Equal Workplace Summit, September 12, 2008. As of January 5, 2016: http://www.tgender.net/taw/thb/THBPrevalence-OE2008.pdf

Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*, Washington, D.C.: National Academies Press, 2011.

Intersex Society of North America, "What Is Intersex?" web page, undated. As of January 5, 2016: http://www.isna.org/faq/what_is_intersex

Kates, Jen, Usha Ranji, Adara Beamesderfer, Alina Salganicoff, and Lindsey Dawson, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, Menlo Park, Calif.: Henry J. Kaiser Family Foundation, July 2015.

Kauth, Michael R., Jillian C. Shipherd, Jan Lindsay, John R. Blosnich, George R. Brown, and Kenneth T. Jones, "Access to Care for Transgender Veterans in the Veterans Health Administration: 2006–2013," *American Journal of Public Health*, Vol. 104, No. S4, September 2014, pp. S532–S534.

Keen, Lisa, "Mass. Ranks Sixth for LGBT-Friendly Laws, Study Says," *Boston Globe*, May 28, 2015. As of March 17, 2016:
https://www.bostonglobe.com/news/politics/2015/05/27/mass-ranks-sixth-for-lgbt-friendly-laws-study-says/sBX5TpZdNeusUo7Iuqs2qN/story.html

Lambda Legal, "Professional Organization Statements Supporting Transgender People in Health Care," last updated June 8, 2012. As of January 4, 2016:
http://www.lambdalegal.org/sites/default/files/publications/downloads/fs_professional-org-statements-supporting-trans-health_1.pdf

McKibben, Jodi B. A., Carol S. Fullerton, Christine L. Gray, Ronald C. Kessler, Murray B. Stein, and Robert J. Ursano, "Mental Health Service Utilization in the U.S. Army," *Psychiatric Services*, Vol. 64, No. 4, April 2013, pp. 347–353.

Milhiser, Mark R., "Transgender Service: The Next Social Domino for the Army," *Military Law Review*, Vol. 220, Summer 2014, pp. 191–217.

Navy Medical Policy 07-009, *Deployment Medical Readiness*, April 6, 2007.

Norton, Aaron T., and Gregory M. Herek, "Heterosexuals' Attitudes Toward Transgender People: Findings from a National Probability Sample of U.S. Adults," *Sex Roles*, Vol. 68, No. 11, June 2013, pp. 738–753.

Office of the Assistant Secretary of Defense for Health Affairs, "Policy for Cosmetic Surgery Procedures in the Military Health System," Health Affairs Policy 05-020, October 25, 2005.

———, "Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications," memorandum, October 7, 2013.

Office of Personnel Management, *Addressing Sexual Orientation and Gender Identity Discrimination in Federal Civilian Employment*, Washington, D.C., June 2015.

Okros, Alan, and Denise Scott, "Gender Identity in the Canadian Forces," *Armed Forces and Society*, Vol. 41, No. 2, April 2015, pp. 243–256.

Padula, William V., Shiona Heru, and Jonathan D. Campbell, "Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis," *Journal of General Internal Medicine*, October 19, 2015.

Parco, James E., David A. Levy, and Sarah R. Spears, "Transgender Military Personnel in the Post-DADT Repeal Era: A Phenomenological Study," *Armed Forces and Society*, Vol. 41, No. 2, 2015, pp. 221–242.

Polchar, Joshua, Tim Sweijs, Phillip Marten, and Jan Gladega, *LGBT Military Personnel: A Strategic Vision for Inclusion*, The Hague, Netherlands: The Hague Centre for Strategic Studies, 2014.

Pollock, Gale S., and Shannon Minter, *Report of the Planning Commission on Transgender Military Service*, Santa Barbara, Calif.: Palm Center, August 2014.

RAND National Defense Research Institute, *Sexual Orientation and U.S. Military Personnel Policy: An Update of RAND's 1993 Study*, Santa Monica, Calif.: RAND Corporation, MG-1056-OSD, 2010. As of March 17, 2016:
http://www.rand.org/pubs/monographs/MG1056.html

Rashid, Mamoon, and Muhammad Sarmad Tamimy, "Phalloplasty: The Dream and the Reality," *Indian Journal of Plastic Surgery*, Vol. 46, No. 2, May 2013, pp. 283–293.

Reed, Bernard, Stephenne Rhodes, Pietà Schofiled, and Kevan Wylie, *Gender Variance in the UK: Prevalence, Incidence, Growth and Geographic Distribution*, Surrey, UK: Gender Identity Research and Education Society, June 2009.

Roller, Cyndi Gale, Carol Sedlak, and Claire Burke Draucker, "Navigating the System: How Transgender Individuals Engage in Health Care Services," *Journal of Nursing Scholarship*, Vol. 47, No. 5, September 2015, pp. 417–424.

Ross, Allison, "The Invisible Army: Why the Military Needs to Rescind its Ban on Transgender Service Members," *Southern California Interdisciplinary Law Journal*, Vol. 23, No. 1, 2014, pp. 185–216.

Rostker, Bernard D., Scott A. Harris, James P. Kahan, Erik J. Frinking, C. Neil Fulcher, Lawrence M. Hanser, Paul Koegel, John D. Winkler, Brent A. Boultinghouse, Joanna Heilbrunn, Janet Lever, Robert J. MacCoun, Peter Tiemeyer, Gail L. Zellman, Sandra H. Berry, Jennifer Hawes-Dawson, Samantha Ravich, Steven L. Schlossman, Timothy Haggarty, Tanjam Jacobson, Ancella Livers, Sherie Mershon, Andrew Cornell, Mark A. Schuster, David E. Kanouse, Raynard Kington, Mark Litwin, Conrad Peter Schmidt, Carl H. Builder, Peter Jacobson, Stephen A. Saltzburg, Roger Allen Brown, William Fedorochko, Marilyn Fisher Freemon, John F. Peterson, and James A. Dewar, *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment*, Santa Monica, Calif.: RAND Corporation, MR-323-OSD, 1993. As of March 17, 2016: http://www.rand.org/pubs/monograph_reports/MR323.html

Royal Australian Air Force, *Air Force Diversity Handbook: Transitioning Gender in Air Force*, July 2015.

Schaefer, Agnes Gereben, Jennie W. Wenger, Jennifer Kavanagh, Jonathan P. Wong, Gillian S. Oak, Thomas E. Trail, and Todd Nichols *Implications of Integrating Women into the Marine Corps Infantry*, Santa Monica, Calif.: RAND Corporation, RR-1103-USMC, 2015. As of March 17, 2016: http://www.rand.org/pubs/research_reports/RR1103.html

Sonier, Julie, Brett Fried, Caroline Au-Yeung, and Breanna Auringer, *State-Level Trends in Employer-Sponsored Health Insurance, A State-by-State Analysis*, Minneapolis, Minn.: State Health Access Data Center and Robert Wood Johnson Foundation, April 2013.

Speckhard, Anne, and Reuven Paz, "Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service," unpublished research paper, 2014. As of January 4, 2016: http://www.researchgate.net/publication/280093066

State of California, Department of Insurance, "Economic Impact Assessment: Gender Nondiscrimination in Health Insurance," Regulation File Number: REG-2011-00023, April 13, 2012. As of January 5, 2016: http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf

Szayna, Thomas S., Eric V. Larson, Angela O'Mahony, Sean Robson, Agnes Gereben Schaefer, Miriam Matthews, J. Michael Polich, Lynsay Ayer, Derek Eaton, William Marcellino, Lisa Miyashiro, Marek Posard, James Syme, Zev Winkelman, Cameron Wright, Megan Zander-Cotugno, and William Welser, *Considerations for Integrating Women into Closed Occupations in the U.S. Special Operations Forces*, Santa Monica, Calif.: RAND Corporation, RR-1058-USSOCOM, 2015. As of March 17, 2016: http://www.rand.org/pubs/research_reports/RR1058.html

Tan, Michelle, "SMA Calls for Bonus Money for Soldiers on Deployment, at NTC," *Army Times*, November 1, 2015. As of March 16, 2016: http://www.armytimes.com/story/military/benefits/pay/allowances/2015/11/01/sma-calls-bonus-money-soldiers-deployment-ntc/74821828

Tsoi, W. F., "The Prevalence of Transsexualism in Singapore," *Acta Psychiatrica Scandinavica*, Vol. 78, No. 4, 1988, pp. 501–504.

**App. 224**

UK Ministry of Defence, "Policy for the Recruitment and Management of Transsexual Personnel in the Armed Forces," January 2009.

UnitedHealthcare, "Gender Dysphoria (Gender Identity Disorder) Treatment," Coverage Determination Guideline CDG.011.05, effective October 1, 2015. As of January 5, 2016: https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/Medical%20Policies/Medical%20Policies/Gender_Identity_Disorder_CD.pdf

U.S. Central Command, "PPG-TAB A: Amplification of the Minimal Standards of Fitness for Deployment to the CENTCOM AOR; to Accompany MOD ELEVEN to USCENTCOM Individual Protection and Individual/Unit Deployment Policy," December 2, 2013. As of March 17, 2016: http://www.tam.usace.army.mil/Portals/53/docs/UDC/medical-disqualifiers.pdf

U.S. Department of Defense, *2014 Demographics: Profile of the Military Community*, Washington, D.C., 2014. As of January 5, 2016: http://download.militaryonesource.mil/12038/MOS/Reports/2014-Demographics-Report.pdf

———, "DoD Announces Recruiting and Retention Numbers for Fiscal 2015, Through November 2014," press release, No. NR-001-15, January 6, 2015a. As of January 4, 2016: http://www.defense.gov/News/News-Releases/News-Release-View/Article/605335

———, "Statement by Secretary of Defense Ash Carter on DoD Transgender Policy," press release, No. NR-272-15, July 15, 2015b. As of March 16, 2016: http://www.defense.gov/News/News-Releases/News-Release-View/Article/612778

U.S. Department of Defense Instruction 1332.14, *Enlisted Administrative Separations*, January 27, 2014, incorporating change 1, December 4, 2014.

U.S. Department of Defense Instruction 1332.18, *Disability Evaluation System (DES)*, August 5, 2014.

U.S. Department of Defense Instruction 1332.30, *Separation of Regular and Reserve Commissioned Officers*, November 25, 2013.

U.S. Department of Defense Instruction 1332.38, *Physical Disability Evaluation*, November 14, 1996, incorporating change 1, July 10, 2006.

U.S. Department of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, April 28, 2010, incorporating change 1, September 13, 2011.

U.S. Government Accountability Office, *Personnel and Cost Data Associated with Implementing DOD's Homosexual Conduct Policy*, Washington, D.C., GAO-11-170. January 2011.

Van Kesteren, Paul J., Louis J. Gooren, and Jos A. Megens, "An Epidemiological and Demographic Study of Transsexuals in the Netherlands," *Archives of Sexual Behavior*, Vol. 25, No. 6, 1996, pp. 589–600.

Wålinder, Jan, "Transsexualism: Definition, Prevalence and Sex Distribution," *Acta Psychiatrica Scandinavica*, Vol. 43, No. S203, August 1968, pp. 255–257.

———, "Incidence and Sex Ratio of Transsexualism in Sweden," *British Journal of Psychiatry*, Vol. 119, No. 549, 1971, pp. 195–196.

Wallace, Duncan, "Trends in Traumatic Limb Amputation in Allied Forces in Iraq and Afghanistan," *Journal of Military and Veterans' Health*, Vol. 20, No. 2, April 2012.

Date visited: November 2, 2016

Weitze, Cordula, and Susanne Osburg, "Transsexualism in Germany: Empirical Data on Epidemiology and Application of the German Transsexuals' Act During Its First Ten Years," *Archives of Sexual Behavior*, Vol. 25, No. 4, 1996, pp. 409–425.

Welsh, Ashley, "First U.S. Penis Transplants Planned to Help Wounded Vets," CBS News, December 7, 2015. As of January 5, 2016:
http://www.cbsnews.com/news/first-penis-transplants-planned-in-u-s-to-help-wounded-vets

Williams, Molly, and James Jezior, "Management of Combat-Related Urological Trauma in the Modern Era," *Nature Reviews Urology*, Vol. 10, No. 9, September 2013, pp. 504–512.

World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, version 7, Elgin, Ill., 2011.

WPATH—*See* World Professional Association for Transgender Health.

Yerke, Adam F., and Valory Mitchell, "Transgender People in the Military: Don't Ask? Don't Tell? Don't Enlist!" *Journal of Homosexuality*, Vol. 60, Nos. 2–3, 2013, pp. 436–457.

Zitun, Yoav, "IDF to Support Transgender Recruits Throughout the Sex Change Process," *YNET News*, December 26, 2014. As of January 4, 2016:
http://www.ynetnews.com/articles/0,7340,L-4608141,00.html

Zucker, Kenneth J., Susan J. Bradley, Allison Owen-Anderson, Sarah J. Kibblewhite, and James M. Cantor, "Is Gender Identity Disorder in Adolescents Coming out of the Closet?" *Journal of Sex and Marital Therapy*, Vol. 34, No. 4, June 2008, pp. 287–290.

Zucker, Kenneth J., and Anne A. Lawrence, "Epidemiology of Gender Identity Disorder: Recommendations for the Standards of Care of the World Professional Association for Transgender Health," *International Journal of Transgenderism*, Vol. 11, No. 1, 2009, pp. 8–18.

Current U.S. Department of Defense (DoD) policy bans transgender personnel from serving openly in the military. DoD has begun considering changes to this policy, but the prospect raises questions regarding access to gender transition–related health care, the range of transition-related treatments that DoD will need to provide, the potential costs associated with these treatments, and the impact of these health care needs on force readiness and the deployability of transgender service members. A RAND study identified the health care needs of the transgender population and transgender service members in particular. It also examined the costs of covering transition-related treatments, assessed the potential readiness implications of a policy change, and reviewed the experiences of foreign militaries that permit transgender service members to serve openly.



NATIONAL DEFENSE RESEARCH INSTITUTE

**www.rand.org**

$22.50

ISBN-10 0-8330-9436-X
ISBN-13 978-0-8330-9436-0



RR-1530-OSD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | Civil Action No. 25-cv-240-ACR |

## DECLARATION OF GILBERT R. CISNEROS, JR.

I, Gilbert R. Cisneros, Jr., declare as follows:

1.  I served as the Under Secretary of Defense for Personnel and Readiness from August 24, 2021 – September 8, 2023. In this role, I served as the principal staff assistant and advisor to the Secretary of Defense for force readiness; force management; health affairs; National Guard and Reserve component affairs; education and training; and military and civilian personnel

**App. 228**

requirements and management, including equal opportunity, morale, welfare, recreation, and quality of life matters. As a Department of Defense official and naval veteran, I can attest to the importance of non-discriminatory policies in bolstering military preparedness and to the adverse impact of excluding qualified individuals from military service because they are transgender.

## PROFESSIONAL BACKGROUND

2.  I attended the George Washington University on a Navy Reserve Officer Training Corps scholarship and obtained an undergraduate degree in political science in 1994. I later attended Regis University, earning a Master of Business Administration in 2002, and Brown University, earning a master's degree in urban education policy in 2015.

3.  After college, I was commissioned as an officer in the United States Navy in 1994 and served as a Supply Officer until 2004. After I left the Navy, I worked as a logistics manager for Frito-Lay. In 2010, I co-founded the Gilbert & Jacki Cisneros Foundation, focused on helping students find a path to higher education with scholarships and college access programs. In 2015, I founded the Cisneros Hispanic Leadership Institute at my alma mater, the George Washington University, which provides scholarships for Latino students and is becoming a leading institute for policy issues that affect the Latino community.

4.  In 2018, I ran for California's 39th Congressional District and was elected to the U.S. House of Representatives. I served on both the Armed Services and Veterans' Affairs Committees. I championed language in the National Defense Authorization Act to foster greater diversity in our military officer corps, while also supporting military families on issues of housing, child abuse, and exceptional family members. As the co-founder of the Military Transition Assistance Pathway (MTAP) Caucus, I supported and advocated on behalf of military service members returning to civilian life.

**App. 229**

5. On August 24, 2021, I was confirmed by the Senate to be the Under Secretary of Defense for Personnel and Readiness. In this role, I served as the principal staff assistant and advisor to the Secretary of Defense for force readiness; force management; health affairs; National Guard and Reserve component affairs; education and training; and military and civilian personnel requirements and management, including equal opportunity, morale, welfare, recreation, and quality of life matters.

6. In September 2023, I resigned from my position as Under Secretary of Defense for Personnel and Readiness to run for California's 31st Congressional District. I was elected to the U.S. House of Representatives in 2024.

## THE NON-DISCRIMINATORY POLICY

7. On January 25, 2021, President Joseph R. Biden overturned the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General

-3-

**App. 230**

. . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

8. On April 30, 2021, the DoD implemented the non-discriminatory policy through the issuance of DoD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28"). DoDI 1300.28 applies to all military departments and sets forth guidance to ensure service by transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

9. DoDI 1300.28 provides guidance on the in-service transition process for transgender service members: "Gender transition begins when a Service member receives a diagnosis from a military medical provider indicating that gender transition is medically necessary, and then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan as necessary to achieve stability in the self-identified gender. It concludes when the Service member's gender marker in [the Defense Enrollment Eligibility Reporting System ("DEERS")] is changed and the Service member is recognized in his or her self-identified gender. Care and treatment may still be received after the gender marker is changed in DEERS as described in Paragraph 3.2.c. of this issuance, but at that point, the Service member must meet all applicable military standards in the self-identified gender."

10. DoDI 1300.28 explicitly addresses military readiness considerations with respect to in-service transitions: "Unique to military service, the commander is responsible and accountable for

the overall readiness of his or her command. The commander is also responsible for the collective morale, welfare, good order, and discipline of the unit, and establishing a command climate that creates an environment where all members of the command are treated with dignity and respect. When a commander receives any request from a Service member that entails a period of nonavailability for duty (e.g., necessary medical treatment, ordinary leave, emergency leave, temporary duty, other approved absence), the commander must consider the individual need associated with the request and the needs of the command in making a decision on that request."

11. DoD Instruction 6130.03 ("DoDI 6130.03") outlines the medical standards for appointment, enlistment, or induction. Individuals with a history of gender dysphoria are eligible for accession if they have been stable in their gender for at least 18 months, and individuals who have received transition-related health care are likewise eligible for accession if they meet certain medical stability criteria.

12. As Under Secretary of Defense for Personnel and Readiness, my responsibilities included implementing the policy permitting service by transgender troops, including evaluating any proposed new Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with policy. In implementing this policy, I observed the benefits of non-discriminatory policies for America's military capabilities.

13. The non-discriminatory policy fosters openness and trust among team members, thereby enhancing unit cohesion. This unit cohesion is vital in protecting America's national security interests around the world. Unit cohesion is especially important given the ongoing challenge of recruitment and the need to recruit individuals who can perform the broad range of roles and

**App. 232**

capabilities required for our military to operate effectively. Everyone deserves a fair opportunity to be able to serve their country based on their own merit and without regard to their racial, ethnic, sexual orientation, or transgender status.

14. The non-discriminatory policy further enables our military to retain highly trained and experienced service members by enabling transgender service members to serve and to obtain needed medical care on the same terms as other service members rather than discharging them simply because they are transgender. There are no special rules or considerations for a person who is diagnosed with gender dysphoria, including those who may require surgery. I had hernia surgery while I was in the military and had three weeks off to recover for this. My experience is no different from a transgender servicemember taking time off related to gender transition surgery. There are no special circumstances or other considerations outside the ordinary time off given for all other surgeries.

15. The RAND Corporation's 2016 report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND Report"), predicted that allowing transgender individuals to serve would have no significant impact on healthcare costs. As part of my role as Under Secretary of Defense for Personnel and Readiness, I oversaw provision of health services to the Joint Force, which includes 2.1 million active duty, reserve, and National Guard service members as well as their dependents, and retired military members and their dependents, a total of approximately 9.6 million Americans. Transgender service members make up a very small proportion of the Joint Force, such that the cost of providing transgender health care is trivial when compared with the cost of providing other health care. Providing transgender health care did not require any significant changes to the DoD health care system, and any additional costs related to providing transgender health care have been insignificant, as the RAND Report predicted.

**App. 233**

16. The RAND Report was also correct in predicting that allowing transgender individuals to serve would not have a negative impact on readiness or unit cohesion. The military has successfully integrated individuals from a very wide array of different backgrounds, and our ability to do so is a central foundation of our strength and effectiveness. The military is an intensely meritocratic institution: what counts is a person's ability to do the job and to lead; their identity is irrelevant. Transgender service members have more than proven themselves and are serving honorably, ably, and, in many cases, with distinction throughout the military. I am not aware of any complaints regarding unit cohesion or anything else resulting from the service of transgender individuals.

17. If there were complaints or problems about transgender service members, I would have known of them through my role as Under Secretary of Defense for Personnel and Readiness. In that role, I did hear complaints about some other issues, but I never received or heard about a single complaint relating to transgender service members.

18. Personnel policies that allow transgender service members to be evaluated based on skill and merit, rather than transgender status, do not jeopardize the military's mission of protecting the United States, but strengthen it.

## RECENT REVERSAL OF POLICY

19. On January 20, 2025, President Trump issued an executive order reversing the non-discriminatory policy and banning transgender individuals from joining or continuing to serve in our nation's Armed Forces.

20. This mode of making military policy is highly atypical. As a general rule, military policies are developed carefully, based on a structured process that involves a comprehensive gathering and review of relevant facts and data, input from multiple stakeholders and sectors, and multiple drafts and iterations based on input and review.

-7-

**App. 234**

21. The abrupt reversal of an existing policy that was adopted after just such a thorough and comprehensive review, and that has been working extremely well, is unprecedented in my experience. This is an extreme departure from how military policy is typically made.

22. The executive order claims that transgender people are inherently unfit to serve and that they undermine readiness and lethality. There is absolutely no factual basis for these claims, which are refuted by more than three years of experience under the non-discriminatory policy. They are also refuted by the nearly ten years of performance of those transgender service members who transitioned under the original Obama Administration policy, serving successfully, earning multiple promotions and performing in roles of increasing importance and responsibility. The U.S. military is a merit-based organization, and individuals move through the ranks based on fitness and aptitude; there are no diversity-based promotions in the U.S. military. Transgender service members must meet the same standards as other service members. The success of transgender service members under the non-discriminatory policy is a testament to their skill and fitness for service.

23. Prohibiting transgender individuals from serving in the military is harmful to the military and to the public interest for several reasons.

24. First, banning qualified individuals simply because they are transgender would undermine military readiness and capabilities. Many transgender service members have undergone extensive training and education, have specialized skills, are in critical positions, or are performing at high levels. Separating these service members will deprive our military and our country of their skills and talents which took years of training and experience—and significant investment from the military—to acquire. The military makes an investment in each individual; when you remove an individual, it is not plug and play. It takes time to fill positions, and this negatively impacts

**App. 235**

readiness. It is senseless to discharge service members who are meeting standards because they are transgender; the only impact of such a policy is to exclude qualified personnel.

25. Second, baselessly excluding transgender persons from service would needlessly narrow the pool of applicants from which the military could recruit service members. There is no credible reason to exclude transgender persons from opportunities within the military, especially given the military's acute need to recruit qualified individuals with specialized skills.

26. Third, the sudden and arbitrary reversal of the DoD policy allowing transgender personnel to serve is disruptive and erodes trust in leadership. Transgender service members relied on statements from their commanders that they are permitted to serve based on the same rules and standards applied to others. Breaking that commitment sends a message that leadership cannot be trusted and that the military as an institution will not honor its own rules. Furthermore, removing transgender personnel for reasons unrelated to their performance will undermine the military's merit-based culture, which will negatively impact morale, as I have seen firsthand. I served in the Navy during Don't Ask, Don't Tell. Early in my service, a sailor was removed from the ship after his sexual orientation was discovered. He was a valued member of the crew, and his abrupt removal dampened morale.

27. Fourth, in addition to the breach of transgender service members' trust resulting in the deprivation of their careers and livelihood, President Trump's policy reversal will cause service members who belong to other groups to question whether they may be subjected to the same type of arbitrary discrimination based on who they are rather than their ability to do the job.

28. Fifth, military service already demands challenging and hazardous duties from personnel. By changing the existing policy, transgender service members, their commanding officers, and

**App. 236**

their fellow service members all face unnecessary additional pressure and burden in carrying out their responsibilities.

29. President Trump's reversal of the policy permitting military service by transgender individuals will have a deleterious effect on readiness, force morale, and trust in the chain of command in the military.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:

Gilbert R. Cisneros, Jr.

-10-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE )
COLE, GORDON HERRERO, DANY )
DANRIDGE, JAMIE HASH, KODA NATURE, )
and CAEL NEARY, )
)
          Plaintiffs, )
)
v. )
)
DONALD J. TRUMP, in his official capacity as )
President of the United States; the UNITED )
STATES OF AMERICA; PETER B. HEGSETH, )
in his official capacity as Secretary of Defense; )
MARK AVERILL, in his official capacity as )    Civil Action No. 25-cv-240-ACR
Acting Secretary of the Army; the UNITED )
STATES DEPARTMENT OF THE ARMY; )
TERENCE EMMERT, in his official capacity as )
Acting Secretary of the Navy; the UNITED )
STATES DEPARTMENT OF THE NAVY; )
GARY ASHWORTH, in his official capacity as )
Acting Secretary of the Air Force; the UNITED )
STATES DEPARTMENT OF THE AIR FORCE; )
TELITA CROSLAND, in her official capacity as )
Director of the Defense Health Agency; and the )
DEFENSE HEALTH AGENCY, )
)
          Defendants. )

_____

## DECLARATION OF SHAWN SKELLY

I, Shawn G. Skelly, declare as follows:

   1. I performed the duties of the Deputy Under Secretary of Defense for Personnel and

Readiness from September 11, 2023 – January 20, 2025. In this role, I oversaw U.S. force

readiness and management, health affairs, and military and civilian personnel requirements related

to equal opportunity, welfare, and quality of life matters. As a Department of Defense official and

**App. 238**

United States Navy veteran, I can attest to the importance of rigorous, merit-based policies in bolstering military preparedness and to the harms to the military and to national security caused by banning qualified transgender individuals who meet rigorous standards from military service.

## PROFESSIONAL BACKGROUND

2. I attended the University of South Carolina and obtained an undergraduate degree in history in 1988. After college, I attended the U.S. Naval War College and earned a master's degree in national security and strategic studies in 2002.

3. I began my military career in the United States Navy as a Naval Flight Officer, working in various combat and management positions, with a focus on global counter-terrorism operations, Southeast and Oceania policy, and training Naval Flight Officers. From 2003 to 2006, I was the U.S. Pacific Command's Deputy Chief of Staff for South Asia, Southeast Asia, and Oceania Policy. After twenty years, I retired with the rank of Commander.

4. After a period in industry with defense contractor ITT Exelis, I joined the Obama Administration in 2013. During the Obama Administration, I served first as Special Assistant to the Under Secretary of Defense for Acquisition, Technology, and Logistics at the U.S. Department of Defense, and ultimately as the Director of the Office of the Executive Secretariat at the U.S. Department of Transportation.

5. In 2017, President Obama appointed me to serve as a Commissioner on the National Commission on Military, National, and Public Service, which delivered its final report to Congress, Inspired to Serve, in March 2020. This Commission undertook a review of the military selective service process and recommended methods to increase military participation.

6.   On July 21, 2021, I was confirmed by the Senate to be the Assistant Secretary of Defense for Readiness where I served as the principal advisor to the Secretary of Defense and the Under Secretary of Defense for Personnel and Readiness on all matters related to the readiness of the Total Force.  In this role, I developed policies and plans, provided advice, and made recommendations for Total Force Readiness programs, reporting, and assessments of readiness to execute the National Defense Strategy.

7.   From September 11, 2023, through January 20, 2025, I performed the Duties of the Deputy Under Secretary of Defense for Personnel and Readiness.  In this role, I served as the primary assistant to the Under Secretary of Defense for Personnel and Readiness in formulating and directing policy for force readiness; force management; health affairs; National Guard and Reserve Component affairs; education and training; and military and civilian personnel requirements and management to include equal opportunity, morale, welfare, recreation, and quality of life matters.

**THE BIDEN ADMINISTRATION TRANSGENDER SERVICE POLICY**

8.   In 2021, President Biden overturned the first Trump Administration's restrictive ban.  As Assistant Secretary of Defense for Readiness, my responsibilities included implementing the policy permitting service by transgender troops.  In implementing this policy, I observed the benefits of rigorous, merit-based policies for America's military capabilities.

9.   The transgender service policy fosters openness and trust among team members, thereby enhancing unit cohesion.  Ensuring a strong, cohesive team is a selling point of military service, and is especially important given the need to recruit individuals who can perform the broad range of roles and capabilities required for our military to operate effectively.  Everyone deserves a fair opportunity to be able to serve their country based on their own merit.

**App. 240**

10. The transgender service policy further enables our military to retain highly trained and experienced service members by applying the same standards to transgender service members that are applied to others, including standards relating to medical care.

11. The transgender service policy has not negatively impacted readiness. The RAND Corporation's 2016 report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND Report"), predicted that allowing transgender individuals to serve would not undermine military readiness. As part of my role, I managed and oversaw provision of health services to the Total Force, which includes 3.4 million active duty, reserve, and National Guard service members and civilian employees and contractors. To address the health care needs of this large population, the DoD health care system provides access to medical providers across a comprehensive array of specialties, as well as a wide variety of medical services. Transgender health care is not unique and is provided by specialists—like endocrinologists—already embedded in the DoD health care system using medications and procedures that are the same as or substantially similar to those already provided to non-transgender service members. Providing transgender health care therefore did not require any significant changes to the DoD health care system, and any additional costs related to providing transgender health care have been negligible. The real-world increase in health care spending is thus consistent with the RAND Report's predictions.

12. The RAND Report predicted that less that 0.0015 percent of total labor-years would likely be affected by permitting transgender individuals to serve, and that the total proportion of the force that would seek treatment would be less than 0.1 percent. Importantly, those seeking transgender health care are required to go through a formal process that includes seeking a referral from their medical provider and undergoing review by command. An individual who seeks transgender

4

**App. 241**

health care does not abruptly disappear from the ranks, but rather must adhere to timelines and reporting procedures that ensure readiness is not adversely impacted.

13. The RAND Report also predicted that allowing transgender individuals to serve would have little or no effect on unit cohesion. Consistent with the military's experience integrating other disadvantaged groups into the ranks, an individual's ability to do the job in front of them has proven to be more important to unit cohesion than any concerns regarding identity. Transgender service members have proven themselves able to perform and are serving ably throughout the military. I am not aware of any complaints regarding unit cohesion resulting from the Austin policy. To the extent the Austin policy has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering increased trust among team members.

14. Personnel policies that allow transgender service members to be evaluated based on skill and merit, rather than transgender status, do not jeopardize the military's mission of protecting the United States, but strengthen it.

## RECENT REVERSAL OF POLICY

15. On January 27, 2025, President Trump issued an executive order reversing the Biden Administration's policy that allows transgender people to serve. In contrast to the 2017 ban, the policy mandated by this new executive order requires the exclusion both of transgender service members who are currently serving as well those seeking to accede.

16. Such an abrupt reversal of established military personnel policy is highly unusual. Typically, military policies are developed through a systematic and evidence-based process that involves multiple steps and input from various sectors and that addresses a documented issue, problem, or need within the military context. This may arise from operational experiences, strategic assessments, or evolving threats. Once the issue is recognized, a thorough analysis is

**App. 242**

conducted, gathering relevant data and evidence to understand the scope and implications of the problem.  This evidence-based approach ensures that decisions are grounded in factual information and best practices.  Input from diverse stakeholders is typically integral to the policy development process and often includes military personnel at various levels, subject matter experts, government officials, and sometimes civilian advisors.  Engaging different sectors helps to ensure that a wide range of perspectives and expertise are considered, fostering a more comprehensive and effective policy outcome.  The development process is typically orderly and structured, often involving several phases such as drafting, reviewing, and revising the policy proposals.  This may also include public consultations or discussions with key stakeholders to refine the proposed policies.  Finally, once the policy is finalized, it undergoes full coordination through the appropriate military and Office of the Secretary of Defense approval authorities before implementation.  This collaborative and comprehensive approach aims to create military policies that are responsive, effective, and aligned with broader national security objectives.

17.  This abrupt policy reversal mandated by the new executive order bears none of these hallmarks.  It was not prompted by any problem or issue with the service of transgender troops.  It was not developed through a systematic or evidence-based process, did not include input from stakeholders, and was not based on a structured or iterative process.  In my experience, this is not only unusual, but (apart from the similarly abrupt imposition of a ban in 2017) unprecedented.

18. The executive order claims that transgender people are inherently dishonest and unfit to serve and that permitting them to serve hinders military effectiveness and lethality and disrupts unit cohesion.  This purported rationale is unfounded and refuted by more than three years of experience under the Austin policy.

6

**App. 243**

19. Transgender service members have served honorably and met the same standards and expectations as other service members. There is no evidence that transgender individuals are dishonest or morally unfit.

20. Prohibiting transgender individuals from serving in the military is harmful to the military and to our national security for several reasons.

21. First, a prohibition on service by transgender individuals would degrade military readiness and capabilities. Many military units include transgender service members who are highly trained and skilled and who perform outstanding work. Separating these service members will deprive our military and our country of their skills and talents.

22. Second, banning military service by transgender persons would impose significant costs that far outweigh the minimal cost of permitting them to serve.

23. Third, the sudden and arbitrary reversal of the DoD policy allowing transgender personnel to serve will cause significant disruption and thereby undermine military readiness and lethality. This policy bait-and-switch, after many transgender service members relied on statements from the highest levels of the chain of command, conveys to service members that command cannot be relied upon to follow its own rules or maintain consistent standards.

24. Fourth, in addition to the breach of transgender service members' trust resulting in the deprivation of their careers and livelihood, President Trump's policy reversal will cause other historically disadvantaged groups in the military, including religious minorities, women, gay and lesbian people, and people belonging to diverse racial and ethnic communities, to question whether their careers and ability to serve as equal members of the military may also be sacrificed for reasons unrelated to their ability to serve.

**App. 244**

25. Fifth. those serving in our military are expected to perform difficult and dangerous work. The reversal of policy puts tremendous additional and unnecessary stress on transgender service members, their command leaders, and those with whom they serve.

26. President Trump's reversal of the policy permitting military service by transgender individuals will have a deleterious effect on readiness, force morale, and trust in the chain of command in the military.

## CONCLUSION

27. The President's statements and reversal of the Biden Administration is not only extremely painful to thousands of transgender service members, but also risks public safety and military preparedness at a time of heightened international turmoil.


I declare under penalty of perjury that the foregoing is true and correct.


February 3, 2025                    _____
                                    Shawn G. Skelly

8

**App. 245**

# EXHIBIT A



**DEPARTMENT OF THE NAVY**
NAVY RECRUITING COMMAND
5722 INTEGRITY DR.
MILLINGTON, TN 38054-5057

28 Jan 25

DECISION GUIDANCE MEMORANDUM #N00-30

Subj:  Processing of Applicants Identifying as Transgender

1. <u>Purpose</u>. This memorandum provides guidance on the processing of applicants who identify as transgender, in light of the Executive Order titled "Prioritizing Military Excellence and Readiness," signed by the President on January 27, 2025.

2. <u>Background</u>

   a. The recent Executive Order mandates a revision of Department of Defense (DoD) policies concerning the enlistment and service of transgender individuals. As we await detailed guidance from the DoD, it is imperative to align our recruiting practices with this current directive.

3. <u>Guidance</u>

   a. Delayed Entry Program (DEP): Effective immediately, any Future Sailors currently in the DEP who are identified as transgender will have their ship dates postponed pending further DoD guidance. Recruiters should ensure that the chain of command is aware of any transgender Future Sailors currently in DEP.

   b. New Applicants: Applicants who self-identify as transgender are not eligible to process for enlistment at this time.

   c. For new applicants, handle all inquiries from transgender individuals with professionalism and respect. Use the following statement when addressing their interest in enlisting:

   *"Thank you for your interest in serving in the United States Navy. Due to recent policy changes, we are unable to process your application at this time. We appreciate your understanding and encourage you to stay connected with your local recruiting office for future updates."*

   d. If there is doubt as to a candidate's status based on their statements, processing should continue such that the issue is resolved at Military Entrance Processing Station rather than risking a potential conflict between a Recruiter and an applicant.

   e. For further clarification or questions regarding this guidance, please contact your chain of command.

   f. Additional information and updates will be disseminated upon further guidance from the Department of Defense and Department of the Navy.

J. P. WATERS

**App. 247**

# EXHIBIT B



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JAN 3 1 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Defending Women from Gender Ideology Extremism and Restoring Biological
Truth to the Federal Government

Biological sex is an immutable characteristic. It is not fluid, and it cannot transform.
Gender ideology denies this fundamental reality, and places women at risk by allowing
biological males to gain access to intimate, single-sex spaces.

President Trump has given us our marching orders in his Executive Order 14168,
"Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the
Federal Government," January 20, 2025. Effective immediately, the Department of Defense will
remove all traces of gender ideology.

I direct the DoD Components to do the following:

- Review all programs, contracts, and grants, and take appropriate steps to address any
  contract requirements that promote or inculcate gender ideology.

- Review all position descriptions and send a notification to all employees whose
  position description involves inculcating or promoting gender ideology that they are
  being placed on paid administrative leave effective immediately as the Agency takes
  steps to close/end all initiatives, offices, and programs that inculcate or promote
  gender ideology.

- Remove all outward facing media (websites, social media accounts, etc.) that
  inculcate or promote gender ideology.

- Review email systems, such as Outlook, and turn off features that prompt users for
  their pronouns.

- Withdraw any final or pending documents, directives, orders, regulations, materials,
  forms, communications, statements, and plans that inculcate or promote gender
  ideology.

- Cancel any trainings that inculcate or promote gender ideology or have done so in the
  past.

- Disband or cancel any employee resource groups or special emphasis programs that
  inculcate or promote gender ideology or have done so in the past.



OSD000665-25/CMD001040-25

- Review all forms that require entry of an individual's sex and ensure that all list male or female only, and not gender identity. Remove requests for "gender" and substitute requests for "sex."

- Ensure that all applicable policies and documents, including forms, use the term "sex" and not "gender."

- Ensure that intimate spaces for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity.

The Office of the Under Secretary of Defense for Personnel and Readiness (OUSD(P&R)) will formally send a task and oversee the implementation of these actions. DoD Components will provide a list of the actions taken in response to this guidance and their plans to ensure ongoing compliance to OUSD(P&R) by February 7, 2025.

The rights of the men and women who serve our Nation must be protected as we forge the most lethal force the world has ever known.

2

# EXHIBIT C

**From:**
**Sent:** Thursday, January 30, 2025 3:07 PM
**To:** OSD North Chicago USMEPCOM ES List All Medical
**Cc:**

**Subject:** FW: OPS MSG (M) - Immediate Change to Transgender Applicant Processing

FYSA

Respectfully submitted,

Martinez, Juan
Medical Programs Analyst (MPA)
HQ, Eastern Sector, USMEPCOM

**Approved By:** Mr. William Reinhart, J-3 Director
**Released By:** Ms. Danielle Debano, J-3 Support Services

**BLUF:** Immediate changes to transgender applicant processing.

**Background:** Pursuant to Executive Orders "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," "Prioritizing Military Excellence and Readiness," and "Restoring America's Fighting Force," MEPS will immediately implement the following changes for transgender applicant processing.

**Process:**
- Effective **immediately,** each transgender applicant or applicant who expresses gender dysphoria who are currently undergoing an accession medical evaluation will be left in an "open" status.
- The applicant will not be medically qualified or disqualified for Service.
- Further guidance on transgender applicant processing will be forthcoming.
- Every applicant for Military Service will continue to be treated with dignity and respect.
- MEPS will continue to follow all other processes as outlined in reference (d) below until instructed otherwise.

**Deliverable:** MEPS Operations Officer will ensure full dissemination of this message; specifically to the MEPS Medical Department personnel.

**POCs:**
- Sectors:
  - Eastern Sector Medical:
  - Western Sector Medical:
- J-3 Operations:

1

**DECLARATION OF GEORGE RICHARD BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, George R. Brown, MD, DFAPA, declare as follows:

1.      I make this declaration based on my own personal knowledge.

**PROFESSIONAL BACKGROUND**

2.      I am a Professor Emeritus of Psychiatry in the Department of Psychiatry at East Tennessee State University, James H. Quillen College of Medicine.  The majority of my work over the past 3 decades has involves research, teaching, and consulting about transgender health in military and civilian populations, as well as providing direct patient care (psychiatric and endocrinologic) to Veterans with a diagnosis of Gender Dysphoria.

3.      I was one of the few experts in the Department of Veterans Affairs who crafted the policies and procedures for the provision of gender affirming care for our nation's Veterans beginning in 2011, and I was the coauthor of the national formulary for medications used in gender affirming hormonal treatments for the Department of Veterans Affairs.

4.      I graduated from the University of Rochester in Rochester, New York in 1979 Summa Cum Laude with a double major in biology and geology.  I earned my Doctor of Medicine degree with Honors from the University of Rochester School of Medicine in 1983.  From 1983-1984, I served as an intern at the United States Air Force Medical Center at Wright- Patterson Air Force Base in Ohio.  From 1984–1987, I worked in and completed the United States Air Force Integrated Residency Program in Psychiatry at Wright State University and Wright-Patterson Air Force Base in Dayton, Ohio.  A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

1

**App. 253**

5.      I began seeing patients in 1983, and I have been a practicing psychiatrist since 1987 when I completed my residency.  Over the last 37 years, I have evaluated, treated, and conducted research with between 600 and 1,000 individuals with gender disorders in person, and over 5,100 patients with gender dysphoria during the course of research-related chart reviews.  The vast majority of those patients have been active-duty military personnel or veterans.

6.      For three decades, my research and clinical practice has included extensive study of transgender health and care of transgender individuals, including three of the largest studies focused on the health-care needs of transgender service members and veterans.  Throughout that time, I have done research with, taught on, and published peer-reviewed professional publications specifically addressing the needs of transgender military service members.  *See* Brown Ex. A (CV).

7.      I have authored or coauthored 44 papers in peer-reviewed journals and 26 book chapters on topics related to gender dysphoria and transgender healthcare, including the chapter on gender dysphoria in Treatments of Psychiatric Disorders (3d ed. 2001), a definitive medical text published by the American Psychiatric Association, and the chapters on both sexuality and gender in the Merck Manual (from 1999 to present) which is the longest running medical publication in the United States.

8.      In 2014, I coauthored a study along with former Surgeon General Joycelyn Elders and other military health experts, including a retired General and a retired Admiral, entitled "Medical Aspects of Transgender Military Service."  Elders J, Brown GR, Coleman E, Kolditz TA, *Medical Aspects of Transgender Military Service*. Armed Forces and Society, 41(2): 199–220, 2015; published online ahead of print, DOI: 10.1177/0095327X14545625 (Aug. 2014) ("2014 Report").  The study was published in the military peer-reviewed journal, Armed Forces and Society.  A true and correct copy of that report is attached hereto as **Exhibit B**.

2

**App. 254**

9.      I have presented original research work on topics relating to gender dysphoria and the clinical treatment of transgender people nationally and internationally frequently over the past 3 decades.  I have testified or otherwise served as an expert on transgender health issues in cases heard by numerous federal district courts and a federal tax court.  I have provided and continue to provide trainings on transgender health issues for the VHA and previously provided trainings on transgender issues for the Department of Defense.

10.      After the Department of Defense announced the change in policy towards transgender servicemembers in 2016, I conducted the first two large military trainings on the provision of health care to transgender service members.  The first was for the Marine Corps in the spring of 2016.  The second was for a tri-service meeting of several hundred active-duty military clinicians and commanders in the fall of 2016.  Since the issuance of Department of Defense Instruction 1300.28 in October 2016, which, among other things, implemented the policies and procedures in Directive-type Memorandum 16-005 and established a construct by which transgender service members may transition gender while serving, I have also conducted trainings for a national group of military examiners (MEPSCOM) and for Army clinicians at Fort Knox, Kentucky.  I have been centrally involved in the development, writing, and review of all national directives in the VHA relating to the provision of transgender health care for veterans.  Finally, I coauthored the national formulary that lists the medications provided by the VHA for the treatment of gender dysphoria in veterans.

11.      On January 27, 2025, President Donald Trump signed an Executive Order entitled, "Prioritizing Excellence and Readiness."  The Order bars transgender people from military service, even if they have been serving with distinction for many years in uniform.

3

**App. 255**

12.     Based on my decades of providing care and treatment for transgender people in the military there is no medical or scientific basis for the assertion that being transgender conflicts with military standards of troop readiness, lethality, cohesion, honesty, humility, uniformity, or integrity.

## GENDER DYSPHORIA

13.     Gender dysphoria is a well-established and recognized medical condition.  It describes the condition a transgender person experiences if the individual cannot live in a sex different than their birth sex.

14.     The Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM-5-TR") (2022) is the current, generally recognized authoritative handbook on the diagnosis of mental disorders relied upon by mental health professionals in the United States, Canada, and other countries.  The content of the DSM-5-TR reflects a science-based, peer-reviewed process by experts in the field.

15.     The condition of gender dysphoria is included in and defined by the DSM-5-TR.

16.     According to the DSM-5-TR, transgender identity is not a mental disorder.

## TREATMENT FOR GENDER DYSPHORIA

17.     Gender dysphoria is highly treatable.  With appropriate treatment, individuals with a gender dysphoria diagnosis can be fully cured of all symptoms related to the gender dysphoria diagnosis.

18.     Treatment of gender dysphoria is well-established, highly effective, and individualized.  It may include pharmacological and surgical components in some cases.  The goal in all cases for which there is a treatment plan is to enable the individual to live all aspects of one's life in a sex different than their birth sex.

**App. 256**

19.    Pharmacological care, when needed, typically includes hormonal reassignment. Surgical care, often referred to as gender confirmation surgery, includes a range of procedures that conform the person's body to be consistent with a sex different than the individual's birth sex. There is a wide range in the treatment sought by those suffering from gender dysphoria. Some need both hormone therapy and surgery, while others need both or neither.

### THERE ARE NO LEGITIMATE MEDICAL JUSTIFICATIONS FOR BANNING TRANSGENDER INDIVIDUALS FROM MILITARY SERVICE

20.    Based on my extensive research and experience treating transgender people, most of whom have served this country in uniform, my experience reviewing the medical implications of a ban on transgender service members, and my involvement in implementing the 2016 policies allowing transgender individuals who can meet the rigorous terms of military accessions and retention to serve and continue to serve, it is my opinion that there is no basis for any medical, psychological or values-based objections to service by transgender service members.

### CONCLUSION

I declare under penalty of perjury that the foregoing is true and correct.

George R. Brown, M.D.

DATED: _2/2/2025_

5

**App. 257**

# EXHIBIT A

# CURRICULUM VITAE

GEORGE RICHARD BROWN, MD, DFAPA

Professor of Psychiatry and
Associate Chairman for Veterans Affairs
Quillen College of Medicine, Department of Psychiatry
East Tennessee State University

Research, Teaching, and Consulting Psychiatrist
James H. Quillen VAMC
Mountain Home
Johnson City, TN

Mailing address:
549 Miller Hollow Road
Bluff City, Tennessee  37618-4103

(423) 676-5291 (cell)
(423) 538-8655 (fax)
Email: BrownGR@etsu.edu

Date of Preparation: February 1, 2025


**EDUCATION:**

Undergraduate:  University of Rochester, Rochester, New York, 1975-1979;
Bachelor of Science with Highest Honors and Distinction in Research, Summa Cum Laude.
Double major, with BS in both biology and geology

Medical School:  University of Rochester School of Medicine, Early Acceptance Program
(Rochester Plan), 1979-1983; Doctor of Medicine with Honors; Health Professions Scholarship
Program.

Internship:  United States Air Force Medical Center, Wright-Patterson Air Force Base, Ohio,
1983-1984.

Residency:  Wright State University - United States Air Force Integrated Residency in Psychiatry,
Dayton, Ohio, 1984-1987.

**CREDENTIALS:**

FLEX, December, 1983 (Behavioral Sciences, 94%; Psychiatry, 93%).
Full licensure to practice medicine, State of Ohio, December, 1983 to April, 2017; license
        #50119; allowed to expire in 2017 with no intent of practicing in Ohio.
Full licensure to practice medicine, State of Texas, August, 1989 to March, 2023; license
        #H5847, changed to "retired license status" with option to reactivate.
Full Licensure to practice medicine, Commonwealth of Kentucky, 1993 to 1995,
        #30100; allowed to expire with no intent of practicing in Kentucky.
Full licensure to practice medicine, State of Tennessee, 1994-present, license #25192
Florida Expert Witness Certificate, 2023-2025.

Psychiatry Resident In-Training Examinations;

1986: 98th percentile - all U.S. residents, psychiatry.
1985: 90th percentile - all U.S. residents, psychiatry.
1984: 98th percentile - all U.S. residents, psychiatry.
1983: 98th percentile - all U.S. residents, psychiatry.

American Board of Psychiatry and Neurology, Part I, April 1988 (92nd percentile); Part II,
        June 1989; ABPN Certificate #31377.
Electroconvulsive Therapy Administration Certification,
        1985-1990.
Courtesy Staff Privileges, Charter Real Hospital, San Antonio, Texas, 1990-1994.
Courtesy Hospital Staff, Bexar County Hospital District, San Antonio, Texas, 1988-1994.
Full Admitting Privileges, Wilford Hall Medical Center, San Antonio, Texas, 1987-1993.
Full Admitting Privileges, James H. Quillen VAMC Hospital, Johnson City, TN, 1994-2016
Basic Life Support Certification, renewed March 2017-2019.
Research and Teaching Privileges, James H. Quillen VAMC Hospital, Johnson City, TN, 2016-
present.
World Professional Association for Transgender Health GEI Certification (grandparented by
examination)


**PROFESSIONAL EXPERIENCE:**

Current Position:

**Professor Emeritus of Psychiatry, Quillen College of Medicine, East Tennessee State
University.  August 24, 2024 to present.**

**Private Practice, Forensic Psychiatry, 2000-present.**


Past Positions:

**Professor and Associate Chairman for Veterans Affairs, Department of Psychiatry and
Behavioral Sciences, Quillen College of Medicine, East Tennessee State University.** 1995-
2024**.**  Advisory duties to the Chairman, signature authority in absence of the Chair, contributing
to administrative, teaching, and research missions of the Department, liaison between the VAMC
and ETSU psychiatry administrations.

**Research, Teaching, and Resident supervision appointment, James H. Quillen VAMC.**
February 1, 2016- March 1, 2024. Responsibilities include providing teaching, research services,
clinical consultation, and resident supervision/mentoring in the Psychiatry Service.

**Clinical Professor of Psychiatry (Adjunct), University of North Texas Health Sciences
Center.** 2017-2019.  Clinical privileges at Carswell Federal Correctional Institution in association
with UNTHSC appointment.  Responsibilities include teaching and consultation with UNTHSC
and Federal Bureau of Prisons staff about transgender health issues.

**Staff Psychiatrist, Mental Health Outpatient Clinic, James H. Quillen VAMC**.  December,
2014-January 31, 2016.  Responsibilities included treating veterans with chronic, persistent,
mental illnesses in an outpatient setting and providing consultation services to junior staff and
residents in psychiatry. Direct supervision of third year psychiatry residents in the Mental Health
Clinic.

**Transgender Health Care Facility Lead, Mountain Home Health Care System.** 2014-January
31, 2016. Responsibilities included providing direct patient care for transgender veterans,
providing national training for VHA health care providers learning how to provide transgender

2

**App. 260**

health care, direct supervision of other health care providers in teaching evaluation and treatment techniques, leading a multidisciplinary team of health care providers assigned to provide transgender health care in our 70,000 patient health care system.

**Program Officer, Health Care Outcomes, Office of Health Equity (10A6), VA Central Office, Washington, D.C.**  December, 2012, to December, 2014.  Responsibilities included researching medical and psychiatric health disparities in vulnerable populations of Veterans treated by the Veterans Health Administration, and assisting top officials in VHA in the development of policies that lead to elimination of health care outcome disparities in these subpopulations. Continued to see patients at Mountain Home VAMC throughout this appointment.

**Chief of Psychiatry, James H. Quillen VAMC**. November 22, 1995-December 16, 2012. Responsibilities included direct supervision of a staff of 34-42 professional staff, including 24-28 psychiatrists, 2 Clinical Nurse Specialists, and 9-12 psychiatric nurse practitioners.  Represented the Department in all meetings requiring the input of the Chief of Service.  Attended executive meetings in the Medical Center and University.  Contributed to long range planning of services in the Medical Center.

**Research Appointment (WOC), VHA Center of Excellence for Suicide Prevention,** Canandaigua, New York. 2011-2014. Responsibilities of this position included developing research protocols collaboratively with Center of Excellence staff that have national implications related to suicide in VHA.

**Director of Psychiatric Research**, **James H. Quillen VAMC Dept. of Psychiatry.** 1994-2012. Responsibilities included creating a research program de novo and leading a research team at the VAMC,  teaching resident seminars, didactics, research electives, providing direct patient care for inpatients on research protocols (usually those with severe mental disorders), traveling to conferences to present research findings and providing Grand Rounds to other institutions and medical schools.  Major focus of research activities has been working with stigmatized/disenfranchised populations and addressing mental health care aspects and disparities in care.

**Staff psychiatrist**, **Another Chance Recovery Program**, Morristown, Tennessee. March 1995-1996. This is an intensive outpatient drug and alcohol treatment program with a heavy emphasis on dual diagnosis patients, outpatient detoxification from chemical dependency, and a blend of the medical and 12-Step approaches to treatment of the chemically dependent patient. One evening clinic per week.

**Senior Research Scientist and Director of Psychiatric/Neuropsychiatric HIV Research**, Wilford Hall Medical Center, Henry M. Jackson Foundation for the Advancement of Military Medicine, San Antonio, Texas. 1 July 1991 to 1 October 93.  Responsibilities included hiring and then directing a team of approximately 15 civilian and military psychiatric researchers conducting HIV-related psychiatric research; Principal Investigator on longitudinal psychiatric natural history study of early HIV infection (males and females), 1989-1993; preparing manuscripts, presenting research findings at national and international meetings; designing and implementing new protocols; interviewing and assisting in the hiring of personnel; managing administrative and personnel issues.

**Private practice** of adult psychiatry. 1991-November 1993.  Part-time practice primarily focusing on sexuality and gender concerns, including endocrine care, and adult psychodynamic psychotherapy.

**Consulting Psychiatrist for Quality Assurance and Continuing Quality Improvement**

**Programs**:
1) Charter Real Partial Hospitalization Program, San Antonio, Texas. 1990 to 12/93. Responsibilities of this part time position included designing and implementing a medical quality assurance program and assisting Utilization Review personnel with implementing efficient resource utilization procedures.
2) Colonial Hills Hospital Inpatient Services and Adult Partial Hospitalization Program, San Antonio, Texas. 1992.  Responsibilities of this part time position included custom designing a four part program to address QA/CQI concerns on all inpatient units, coordinating the implementation of the program with hospital QA/UR personnel, and quantifying/ databasing physician charting performance to analyze trends.

**Staff Psychiatrist,** Wilford Hall Medical Center, Lackland Air Force Base, San Antonio, Texas:

> 1987-1989: Primary responsibility for inpatient ward of 25-33 patients, resident and medical student teaching, and professional presentations. 1040 admissions; average length of stay 13 days.

> 1989-1991: Outpatient Clinic service, responsible for evaluations and treatment of adult outpatients; supervision of PGY-3 residents in psychiatry and other staff working in the clinic (social workers, psychologists, and mental health technicians). Medical support for comprehensive Smoking Cessation Clinic.

> 1989-1991: Director of Psychiatric Research, half-time position; developed a research program primarily targeting psychiatric resident involvement with research and related activities, including presentations at regional and national professional meetings.  Active in conducting research, reviewing and approving protocols, research design, editing publications submitted from the Department of Psychiatry, and organizing symposia; interviewing and selecting official for research personnel for multicenter collaborative HIV research grant.


**ACADEMIC APPOINTMENTS:**

Professor Emeritus of Psychiatry (2024-present), East Tennessee State University, Quillen College of Medicine.

Professor of Psychiatry (1998-2024), East Tennessee State University, Quillen College of Medicine.  VA Academic Faculty appointment.

Clinical Professor of Psychiatry (Adjunct), University of North Texas Health Sciences Center, Fort Worth, Texas (2017-2020).

Adjunct Professor of Psychology, University of Tennessee at Knoxville (1997).  Served on doctoral dissertation committee as supervisor and mentor for doctoral candidate in clinical psychology.

Associate Professor of Psychiatry (1994-1998), East Tennessee State University, Quillen College of Medicine.  Full time geographic faculty appointment.  Renewal of previously awarded academic ranking. Activities include serving on numerous committees (see below), teaching residents, providing electives, working collaboratively with staff to conduct new research projects, interviewing residency and faculty candidates.

Clinical Associate Professor of Psychiatry (1992-1994), University of Texas Health Science Center at San Antonio, San Antonio, Texas. 1987 to 1994. Primary responsibility of this position was teaching medical students and residents in individual, group, and lecture settings; provision of psychodynamic psychotherapy supervision.  Lectures and seminars include core material on

sexual dysfunction, treatment of paraphilias, gender identity disorders, homosexuality, and psychiatric aspects of HIV infection.

Clinical Associate Professor of Psychiatry (1992-1996), Uniformed Services University for the Health Sciences, School of Medicine, Bethesda, Maryland.  Primary responsibility of this position was teaching medical students from the University who travel to San Antonio for clinical rotations in psychiatry and serving as a visiting lecturer for USUHS.

Full time faculty, Department of Psychiatry, Wilford Hall Medical Center, Lackland Air Force Base, San Antonio, Texas, 1987 to 1991. Adjunct clinical faculty, Department of Psychiatry, 1991 to 1993. Responsibilities included supervising psychiatric residents involved in research activities, sponsoring Distinguished Visiting Professors in conjunction with the Department, and teaching core didactic lectures and seminars.

Assistant Clinical Instructor, Wright State University School of Medicine, 1983-1987.  Primary responsibility of this position was teaching medical students during clinical rotation in psychiatry.

Chief Resident in Psychiatry, November, 1986 to March, 1987, with administrative, teaching, and research responsibilities.


**CONSULTATION EXPERIENCE:**

Psychiatric Liaison and Consultant to Oncology Unit, Good Samaritan Hospital, Dayton,   Ohio, 1985.
Clinical Supervisor and Psychiatric Consultant to Montgomery County Juvenile Court Diversion Program, Dayton, Ohio, 1986-1987.
Consultation/Liaison Rotation, Keesler AFB, MS, 1986.
Psychiatric Consultant to the United States Air Force Child Abuse Task Force (convened by the Surgeon General of the Air Force), 1989-1991.
Lorain Correctional Institution, psychiatric consultant for inmate mental health evaluations and treatment, July-August 1993.
State of Tennessee Mental Health and Mental Retardation, appointed as consultant to develop Best Practice Guidelines for all State programs for Bipolar Disorder.
Health Ed, The Patient Education Agency: consultant for development of patient education materials for chronic mental illnesses, 2006-2007.
Consultant to Batavia Independent School District in assisting on-the-job gender transition for a transgender high school teacher, 2006.
Consultant to Port Ewan/Kingston BOCES School Program in assisting on-the-job transition for a transgender principal,  2007.
Consultant to the Federal Bureau of Prisons on policies relating to medical management of transgender inmates, 2009, 2014.
Consultant to Department of Defense on policy and medical issues related to transgender service members, 2016-2018.
Faculty consultant to Carswell Federal Correctional Institution, Fort Worth, Texas, on transgender health issues, 2017-present.
Research Consultant to Michael Goodman, MD, Principal Investigator, PCORI Grant to study transgender health issues (STRONG protocol), Emory University, 2014-2016.
Department of Justice, National Institute of Corrections, 2017-2018.
Department of Veterans Affairs, LGBT Veterans Program, Washington, DC, 2016-present
Consultant to the Idaho Department of Corrections, April 10, 2019.

**App. 263**

**SPECIALIZED TRAINING EXPERIENCES:**

School of Aerospace Medicine, Course I, Brooks AFB, San Antonio, Texas, 1981.
Administrative Course for Chief Residents, Tarrytown, New York, June, 1985.
Combat Casualty Care Course, San Antonio, Texas, 1985.
Consultation and Liaison Psychiatry, Keesler AFB, Biloxi, Mississippi, 1986.
Center for the Treatment of Impotence, Case Western Reserve University, Cleveland, Ohio,
        July, 1986.
Forensic Psychiatry Course and associated clinical work, 6 months, 1986-87; ongoing case work
        in forensic psychiatry as expert witness and legal consultant, 1987-present.
Gender Identity Clinic, Case Western Reserve University, Cleveland, Ohio, July, 1986.
Paraphilias Clinic, Case Western Reserve University, Cleveland, Ohio, July, 1986.
Chemical Dependency Program, Samaritan Hall, Dayton, Ohio, August, 1986.
Advanced Study of Gender and Sexual Disorders, Institute of Living, Hartford, Connecticut,
        April, 1987.
Electroconvulsive Therapy Administration Training, Jan-June, 1985; June, 1987.
SCID training seminar, September, 1989.
American Board of Psychiatry and Neurology Examiner, 1991-present.
Administrative psychiatry and leadership training, James H. Quillen VAMC,1996 to 2012.
Physician Executive Training, American College of Physician Executives,  (PIM-I Course,
        31 hours; PIM-II Course, 31 hours, PIM-III Course, 31 hours), 1998-1999.
Masters and Johnson workshop on trauma, sexual compulsivity/addiction treatment, 11 hours,
        December, 2003.
Forensic Workshop on sex offenders, National Council on Sexual Addiction and Compulsivity,
        October, 2002
Forensic workshops, including PREA implementation, managing hunger strikes, mental health
        issues in prison, sponsored by National Commission on Correctional Health Care, 2010,
        2012.
Forensic workshops, including 3 hours of training on medical and legal aspects of providing
        health care for transgender inmates, sponsored by National Commission on Correctional
        Health Care, 2015.
 Lexipol Training Certificate, Managing Manipulation by Inmates, 10/17/19.


**COMMITTEE AND BOARD ACTIVITIES:**

Mohonasen Public School Board Member, Schenectady, New York, 1974-1975.
Social Chairman, Wright State University Psychiatry Residency, 1984.
Dayton Representative to the Member-in-Training Committee of the Ohio Psychiatric
        Association, 1984-1986.
Chairman, Member-in-Training Committee, Ohio Psychiatric Association, 1986-1987.
Chairman, Member-in-Training Committee, Dayton Psychiatric Society, 1985-1987.
Peer Review Committee, Ohio Psychiatric Association, 1986-1988.
Long Range Planning Committee, Ohio Psychiatric Association, 1986-1987.
American Psychiatric Association, Area IV Resident Caucus, Ohio Representative, 1987.
American Psychiatric Association, Committee of Residents of the Council on Medical
        Education and Career Development, Ohio Representative, 1986-1987.
Ohio Psychiatrist's Political Action Committee, Board of Directors, 1987.
Bexar County Psychiatric Society Committee on AIDS, 1990-1993.
World Professional Association for Transgender Health (WPATH) Committee to Revise the
        Standards of Care, 1990-present; Cochairman of Standards of Care Revision Committee,
        2001-2005.
Psychiatric Consultant to the Board of Directors, Boulton and Park Society, San Antonio, Texas,
        1988-1998.
President-elect, Society of Air Force Psychiatrists, 1990-1991.
Board of Directors, Alamo Area Resource Center (AIDS/HIV Service Organization), 1991-1992.

**App. 264**

Board of Advisors, American Educational Gender Information Service (Atlanta, Georgia), 1992-1998.

Quality Assurance Committee, Texas Society of Psychiatric Physicians, 1992-1993.

Professional Standards Committee, Texas Society of Psychiatric Physicians, 1992-1993.

Board of Directors, Harry Benjamin International Gender Dysphoria Association (WPAth), 1993-1997; 2001-2007

Ethics Committee, Tennessee Psychiatric Association, 1994-2004.

Advisory Committee on Publications and Advertising, Southern Medical Association, 1994-1996.

Councilor to the Executive Committee, Tennessee Psychiatric Association, East Tennessee Region, 1995-2005.

Vice-Chairman, Section on Neurology and Psychiatry, Southern Medical Association, 1995-1996.

President, New Health Foundation, 2001-2003.

Secretary of the Section on Neurology and Psychiatry, Southern Medical Association, 1997-2000.

American Psychiatric Association PKSAP and Medical Education Committees, appointed by Herb Sachs, M.D. and Harold Eist, M.D. (APA Presidents), 1997-2001.

Scientific Affairs Committee, Southern Medical Association, 1997-1999.

Consultant to the Joint Commission on Public Affairs, American Psychiatric Association, appointed by Rod Munoz, M.D. (APA President), 1998-1999.

Scientific Program Committee, Southern Psychiatric Association, 1999-2000.

Resident Award Committee, Southern Psychiatric Association, 1997-2009.

Ethics Committee; HIV Committee; Harry Benjamin International Gender Dysphoria Association, 1999-2005

Board of Directors, New Health Foundation, Chicago, IL, 2000-present.

Tennessee Department of Mental Health and Retardation Adult Committee on Best Practices (responsible for recommending guidelines for treatment of bipolar disorder), 2000-2003.

Associate Counselor for Tennessee, Southern Medical Association, 2000-2008.

Resident Award Committee, Southern Psychiatric Association, 2003-2009.

Board of Directors, James H. Quillen VAMC Research Corporation, 2003-2010.

HBIGDA Biennial Symposium Scientific Meeting Committee, 2006-2007.

Board of Regents, Southern Psychiatric Association, 2006.

Southern Medical Association, Section Secretary for Psychiatry and Neurology, 2004-2008.

Scientific Review Committee, World Professional Association for Transgender Health Symposium, 2007-2009; 2015-2018.

Board of Regents, Second Year, Southern Psychiatric Association, 2007.

Chairman, Board of Regents, Southern Psychiatric Association, 2009.

WPATH Board of Directors, 3 terms totaling 13 years, with last term 2014 (mandatory rotation off the board).

Secretary-Treasurer, World Professional Association of Transgender Health, 2007-2009.

DSM-V workgroup on Gender Identity Disorders (WPATH advisory work group to American Psychiatric Association DSM-V GID task force), 2009.

World Health Organization advisory committee for ICD-11 (gender identity disorders), 2011-2016.

Department of Veterans Affairs Transgender Directive Communication Plan Education Group, 2011-2012.

VHA Transgender Training Workgroup, Patient Care Services, 2012-2018.

Numerous VA Central Office national workgroups and committees, including the workgroup to add birth sex and gender identity data fields to all VA medical records, 2012-2019.

Commissioner, Palm Center Commission on Transgender Military Service, Appointed by Joycelyn Elders, MD (Surgeon General of the United States 1993-1994), 2013-2014.

7

**App. 265**

**PROFESSIONAL ORGANIZATIONS:**

American Psychiatric Association (1983-2015); #044933, Fellow, 1998; Distinguished Fellow, 2003
Association for the Advancement of Psychotherapy (1985-1993)
World Professional Association for Transgender Health (1986-present)
Ohio Psychiatric Association (1983-1987)
Texas Society of Psychiatric Physicians (1988-1994)
Tennessee Psychiatric Association (1994-2015)
American Medical Students Association (1977-1987)
American Medical Association (1983-1988; 2015-2019)
Ohio State Medical Association (1983-1987)
Montgomery County Medical Society (1983-1987)
Dayton Psychiatric Society (1983-1987)
Society of United States Air Force Psychiatrists (1983-1991)
Bexar County, Texas, Psychiatric Society (1987-1990)
Southern Medical Association (1994-2010)
Southern Psychiatric Association (1997-2009)
New Health Foundation (advocacy organization for transgendered health care; 1996-present)
American Psychological Association Society for the Psychological Study of Men and Masculinity, Division 51, 1996-2000.


**AWARDS AND SPECIAL RECOGNITION:**

Valedictorian, Mohonasen High School, Schenectady, New York, 1975.
New York State Regents Scholarship, 1975-1979.
Bausch and Lomb Science Award and Scholarship, 1975-1979.
Phi Beta Kappa, junior year selection, 1977.
Donald Charles Memorial Award for Research in Biology, 1978.
Recognition for Highest Grade Point Average, Department of Biology-Geology, University of Rochester, 1979.
Dean's Letters of Commendation for Academic Achievement, University of Rochester, 1975-1983.
Letter of Commendation for Excellence in Pathology, University of Rochester, 1981.
Alpha Omega Alpha Medical Honor Society, University of Rochester, 1983.
Wright State University Department of Psychiatry selectee for fellowship in the Group for  the Advancement of Psychiatry (GAP), 1984.
Wright State University Department of Psychiatry nominee for Laughlin Fellowship of the American College of Psychiatrists, 1985, 1986.
Physician's Recognition Award of the American Medical Association, 1986 to present.
President's Award of the Ohio Psychiatric Association for outstanding service to the organization, 1987.
Chairman's Recognition Award For Scholarship and Research, Wright State University Department of Psychiatry, 1987.
Air Force Training Ribbon, 1980.
Air Force Outstanding Unit Decoration, 1987; first oak leaf cluster additional award, 1990.
Air Force Expert Marksman Ribbon, 1988.
Air Force Achievement Medal for research accomplishments, 1990.
1990 American Academy of Psychosomatic Medicine Dlin Fischer Award for Significant Achievement in Clinical Research; corecipient.
Bexar County Medical Society Certificate of Appreciation, 1991.
Air Force Meritorious Service Medal for distinguished clinical and research service to the Department of Psychiatry, Wilford Hall Medical Center, 1991.
Air Force National Defense Ribbon, Desert Storm Campaign, 1991.

8

**App. 266**

Mohonasen High School Hall of Fame for Lifetime Achievement, 1992 inductee.
Health Care Professional of the Year Award, Boulton and Park Society, San Antonio, Texas,
    1992-93.
Special Citation Award, Society of Behavioral Medicine, with Coyle C, et al., for
    presentation at 1993 Society of Behavioral Medicine Annual Meeting, 1993.
Institute for Legislative Action, 1995 Honor Role.
Sterling Who's Who of Health Care Professionals, 1995.
Southern Medical Association 1995 Award for Medical Excellence (Best Scientific Oral
    Presentation in Neurology and Psychiatry), $1,000 Scholarship prize, 1995.
Janssen Clinical Scholar, 1995.
Mountain Home VAMC Group Special Contribution Award, 1995, 1997.
Marquis Who's Who in the South and Southwest, 1996-1998.
Marquis Who's Who in Medicine and Healthcare, 1997-1998.
Certificate of Appreciation, ETSU Psychiatry Residents, 1997, 1998, 1999.
Fellow, American Psychiatric Association, 1998-2002.
Resident Special Recognition Award, June, 2000.
Distinguished Fellow, American Psychiatric Association, January, 2003
Special Group Contribution Award, VAMC, 2003
Secretary of Defense Certificate of Recognition, Cold War Military Service, 2003
VA Performance Award, 2005
First Annual Irma Bland Award for Excellence in Teaching Residents, presented by the American
    Psychiatric Association, May, 2005
Special Contribution Award, Mountain Home VAMC, for assisting in obtaining over 2.5 million in
    new program monies from VA Central Office RFP process,  April 26, 2006
Top Psychiatrists of 2006, Consumer Research Council selectee
ETSU Resident Recognition Award for "dedication to the Resident's Journal Club", 2006
Fellow, Southern Psychiatric Association, 2006
ETSU Psychiatry Faculty Mentor of the Year Award, 2007
Cambridge Who's Who, Executive and Professional Registry, 2007
Southern Medical Association, Third Place Award for Scientific Poster Presentation, Dallas,
    Texas, December 5, 2009
Twenty-five year U.S. Government service award, January 10, 2010
Joint Commission recognition : "Top Performers on Key Quality Measures"  (contributor), 2011
Robert W. Carey Quality Performance Excellence Award (contributor), 2011; Department
    of Veterans Affairs award using Baldrige criteria
James H. Quillen VAMC selected as VA to be featured in the Commonwealth Fund's article
    on successful efforts to improve patient safety (contributor), 2011
Gender Identity Research and Education Society (GIRES) 2011 award to the 34 members
    of the Standards of Care Revision Committee for their work on the WPATH Standards of
    Care, 7th Version.
Robert W. Carey Quality Trophy Award, Mountain Home VAMC.  This is the highest level
    of the Carey Award for those VAMC's seeking performance excellence using the Baldrige
    Criteria.  Awarded by the Secretary of the VA to the leadership team of which I was a
    Part, 2012.
Thirty-year U.S. Government service award, March 12, 2015
Recognized by LGBT Health journal in March, 2016 as having first-authored the #1 and #3 most
    read articles in that journal since its inception.
Lifetime Achievement Award for Distinguished Research, awarded by the World Professional
    Association for Transgender Health for a lifetime of transgender research contributions,
    November 5, 2018.
Southern Trans Health and Wellness Research Award, 2019, presented by the Mountain Area
    Health Education Center, Wake Forest University, NC, March 7, 2019.

**UNIVERSITY/VA COMMITTEE ACTIVITIES:**

Learning Resources Advisory Committee (ETSU), 1995-1996.
Psychiatric Residency Training Committee /Educational Policy Committee (ETSU), 1993-2017.
Peer Review Committee (VAMC), 1995-1996.
Chairman and Founder, Psychiatric Grand Rounds and Visiting Professor Program (ETSU),
　　1993-1997; 2003-2004.
Clinical Executive Board (VAMC), 1995-2012.
Research and Development Committee, Dean's Appointment (VAMC), 1996-1998.
Chairman, VAMC Research and Development Committee, 1999-2000.
Co-Chairman, Mental Health Council (VAMC), 1995-2009.
Academic Partnership Committee (ETSU), member, 1995-2012.
Facility Master Plan and Space Utilization Committee (VAMC), 1995-2010.
Professional Standards Board (VAMC), 1995-2012.
Safety Committee, Department of Psychiatry, Chairman (VAMC)
Resident Selection Committee, ETSU Psychiatry Program, 1998-2012.
Chairman, VAMC Research and Development Committee, 2001-2002.
Veterans Health Affairs, VISN 9, Budget and Finance Committee, 2002-2004.
Institutional Review Board (ETSU/VAMC), member, 1996-2003; served as acting chair as
　　needed.
Cameron University Department of Psychology, Dissertation Committee Consultant for Beth
　　Ryan, Masters Thesis, 2004-2005 (gender identity disorder research).
VISN 9 Mental Health Leadership Committee, 2002-2012.
ETSU/VAMC Subcommittee on Graduate Medical Education, 2008-2012.
Vanderbilt University Department of Nursing, Dissertation Committee member and consultant for
　　Gerald Meredith, 2009-2010.
VA Transgender Directive Education Workgroup; VACO workgroup to advise the Undersecretary,
　　VHA, on how to educate and implement the 2011 and 2013 Directives on providing
　　Healthcare to transgender and intersex Veterans, 2011-2019.
Office of Health Equity (VACO), Health Equity Coalition, 2013-2014.
Numerous research committees and advisory panels for health equity research projects being
　　conducted in VA, 2012-2015.
Chairman, Educational Policy Committee (Residency Training Committee), East Tennessee State
　　University Department of Psychiatry, 2015-2016.
Self-Identified Gender Identity Data Field Training Workgroup (National VA work group to change
　　electronic medical records data collection to include self-identified gender identity), 2012-
　　2019.
Research Committee, East Tennessee State University Department of Psychiatry, 2015-
　　2017.
Promotion and Tenure Committee, East Tennessee State University, Quillen College
　　of Medicine, Department of Psychiatry and Behavioral Sciences, 1999-present.
WPATH International Awards Committee, 2020.

**FORENSIC PSYCHIATRY ACTIVITIES:**

1.  Military court proceedings, two occasions as expert witness at trial; U.S. Air Force, U.S. Army,
　　c.1990-1992.
2.  Military Physical Evaluation Board Proceedings, expert testimony, 2/8/02.
3.  Farmer v. Hawk, United States District Court for the District of Columbia, expert opinion
　　by affidavit on behalf of plaintiff,  1999.
4.  Yolanda Burt v. Federal Bureau of Prisons/Moritsugu, United States District Court for the
　　District of Columbia, deposition testimony  on behalf of plaintiff, 2000.
5.  Kosilek v. Maloney, 221 F.Supp 2d 156,186 (D.Mass. 2002), expert witness by trial testimony
　　on behalf of plaintiff,  2001.

**App. 268**

6.  Family Court expert witness trial testimony, Missouri, (custody issues for transgendered parent),1993.
7.  Thompson v. Idaho Department of Corrections (prison medical care Issues), consultant on behalf of plaintiff, 2002 (citation: Linda Patricia Thompson v. Dave Paskett, et al., Case No. CV00-388-S-BLW).
8.  State of Missouri Medical Board, expert opinion by affidavit on behalf of physician, 10/2001.
9.  State of Tennessee Medical Board, expert opinion by affidavit on behalf of physician, 5/2002.
10. Military Administrative Hearing, consultant, U.S. Army, December, 2002.
11. Oiler v. Winn-Dixie Louisiana, Inc; USDC, Eastern District of Louisiana, No. 00-3114 "L" (3); consultant on behalf of defendant, 2001-2002.
12. Moore v. State of Minnesota, consultant and expert opinion by deposition testimony on behalf of defendant, Attorney General's Office, State of Minnesota, 2003.
13. Woods v. US Air Force, administrative discharge board, consultant, San Antonio, TX, 2003.
14. Ophelia Azriel De'Lonta vs. Ronald Angelone and Prison Health Services, Inc. (Virginia Department of Corrections) United States District Court, Western District of Virginia, 330 F.3d 630,635 (4th Cir 2003) expert opinion by deposition testimony on behalf of plaintiff, 2003.
15. Malpractice case, Tennessee, consultant for defendant (primary care physician), 2004-2005.
16. Josef  v. Ontario Minister of Health, Attorney General of Ontario representing Her Majesty the Queen in Right of Ontario; Ontario Superior Court of Justice; expert opinion by affidavit and consultant on behalf of plaintiff, 2004-2007.
17. Nubel v. New Jersey Board of Nursing, consultant and expert opinion by deposition testimony for defendant, 2004-2005.
18. Malpractice case, Tennessee, consultant for defendant (psychiatrist), 2004-2005 .
19. Malpractice case, Kentucky, consultant for defendants (psychiatrists), 2005-2006.
20. Kosilek v. Mass. Department of Corrections/ Kathleen Dennehy, expert witness by trial testimony and consultant on behalf of plaintiff, 2005-2006 ( Kosilek v. Spencer, 889 F.Supp.2d 190 (D. Mass. Sept. 4, 2012); "Kosilek II."
21. Gammett v. Idaho Department of Corrections, expert opinion by affidavit, trial testimony, for plaintiff, 2005-2007 (Gammett v. Idaho State Bd. of Corrections, No. CV05-257-S-MHW, 2007 WL 2186896 (D. Idaho July 27, 2007).
22. Isaak v. Idaho Department of Corrections, consultant, and  expert opinion by deposition testimony on behalf of plaintiff, 2006-2008.
23. May v. State of Tennessee and multiple codefendants; consultant on behalf of defendant, Attorney General's Office, State of Tennessee, 2006.
24. Fields/Sundstrom v. Wisconsin Department of Corrections, consultant and expert opinion by deposition testimony on behalf of plaintiff,  2007 ( Fields v. Smith, 653 F.3d 550 (7th Cir. 2011).
25. Palmer v. State of TN; malpractice case; consultant and expert opinion by deposition testimony for defendant, Attorney General's Office, State of Tennessee 2007.
26. Spray v. Temp Agency, consultant and expert opinion by affidavits on behalf of plaintiff, 2007.
27. O'Donnabhain v. Internal Revenue Service/Department of the Treasury, expert witness by trial testimony on behalf of plaintiff, 2007 (O'Donnabhain v. Commissioner, 134 T.C. No. 4 (Feb. 2, 2010).
28. Battista v. Mass. Department of Corrections/Kathleen Dennehy, consultant and expert opinion by affidavit  for plaintiff, 2008-2011.
29. Plumley v. State of TN; malpractice case; consultant for defendant, 2009.
30. Kolestani v. State of Idaho, capital murder case, consultant and expert opinion by affidavit for public defender's office, 2009.
31. Smith v. St. Mary's Medical Center, medical malpractice case, consultant for defendant, 2009-2011, expert witness by jury trial testimony, 2011.
32. Finch aka Destiny v. Idaho Department of Corrections, consultant for plaintiff, 2010-2011.
33. Soneeya v. Clarke, Civil Action No. 07-12325 (NG), Massachusetts, consultant for plaintiff, 2011. (see also Soneeya v. Spencer, 851 F.Supp.2d 228 (D. Mass. 2012)

11

**App. 269**

34. Hoyle v. Saha, malpractice case; consultant for defendant, 2011- 2014.
35. Champouillon v. State of TN; malpractice case; consultant for defendant, 2012-2014.
36. Equivel v. State of Oregon; access to transgender health care for Oregon State employees; consultant to Lamdba Legal, 2012.
37. Kosilek v. MA DOC, consultant for plaintiff, 2012-2014.
38. Binney v. South Carolina DOC, consultant and expert opinion by affidavit for plaintiff (death row case), 2013-2015.
39. De'Lonta v. Harold  W. Clarke et al. (Virginia Department of Corrections), consultant and expert opinion by affidavit for plaintiff, 2013-2014 (inmate paroled).
40. U.S. and Tudor v. Southeastern Oklahoma State University, expert consultant for plaintiff and the Department of Justice (Title VII discrimination case), by declaration for plaintiff, 2015-2018. (Case decision 2018)
41. Mott v. State of Kansas, consultant and expert opinion by affidavit for plaintiff (birth certificate change), 2015-2016.
42. Fuller (Charlene) v. MA Department of Corrections and multiple defendants; 1:2014cv14168; expert opinion by affidavit and deposition, for plaintiff, 2015-2016.
43. Franklin v. Hardy, et al. (Illinois Department of Corrections); expert opinion by affidavit, for plaintiff, 2015-2016.
44. Dunn et al. v. Dunn et al. (Alabama Department of Corrections), expert consultant for plaintiff, 2016-2017.
45. Keohane v. Jones (Florida Department of Corrections), Case No.4:16-cv-511-MW-CAS, N. D. Fla, expert opinion by affidavit, deposition, and bench trial testimony for plaintiff, 2016-2017.(Case decision August, 2018)
46. Rodgers v. State of Florida, Case #1998CF274, expert opinion by affidavits for plaintiff (death row case) 2016-present.
47. U.S. v. State of North Carolina, North Carolina Department of Public Safety, & University of North Carolina (HB2); 1:16-CV-00425, expert opinion by affidavits, for plaintiff (DOJ, Civil Rights Division, and ACLU), 2016-2017. Case dropped by Attorney General Sessions.
48. Hicklin v. Lombardi, et al., File No. 3587.53, (Missouri Department of Corrections, Corizon), consultant for defendants (Corizon only), expert opinion by videotaped deposition, 2017-2018 (settled).
49. U.S. v. John Patrick Price, expert opinion by affidavit for defendant (Federal Public Defender, Western NC), 2017.
50. Jane Does 1-5 v. Donald J. Trump, James Mattis, et al, case number 17-cv-1597, District of Columbia, expert opinion by declarations and deposition for plaintiffs, 2017-2021, case mooted.
51. Stockman et al. v. Donald J. Trump, James Mattis, et al., case number 17-CV-6516, United States District Court, Central District of California, expert opinion by declarations and deposition for plaintiffs, 2017-2021, case mooted.
52. Karnoski, et al. v. Donald J. Trump, James Mattis, et al., case number 2:17-cv-01297-MJP, Unites States District Court, Western District of Washington, expert opinion by Declarations and depositions for plaintiffs, 2017-2021; case mooted.
53. Stone, et al. v. Donald J. Trump, James Mattis, et al., case number 1:17-cv-02459 (MJG), United States District Court, District of Maryland, expert opinion by declarations and deposition for plaintiffs, 2017-2021; case mooted.
54. Hampton v. Baldwin et al, CIVIL NO. 17-cv-936-DRH (S.D. Ill. Nov. 29, 2017), Illinois, expert opinion by deposition for plaintiff, 2017-2022, settled in favor of plaintiff.
55. Roy Trost aka Daisy Meadows v. Brian Sandoval, et al, case number 3:14-cv-00611-MMD-WGC, United States District Court, Nevada, expert opinion for plaintiff, 2018-present.
56. Bruce v. South Dakota, case number 5:17-cv-05080-JLV, expert opinion by affidavit and deposition for plaintiff, 2018-2019 (death of plaintiff).
57. Edmo v. Idaho Department of Corrections, Corizon, Inc., et al; case number 1:17-cv-151-BLW, expert opinion by declaration for defendant, 2017-2021.
58. Radan v. Colorado Department of Corrections, Rick Raemisch, and Darren Lish, case numbers 1:16-cv-01717-STV and 16-cv-01717-MSK-STV, expert opinion by declaration for defendants, 2017-2018 (settled).

12

**App. 270**

59. EEOC v. A&E Tire, Inc, case number 1:17-cv-02362-RBJ, expert opinion by declaration on behalf of plaintiff, 2018-2019 (settled).

60. Jamison Rigby v. University of Michigan, et al; expert opinion by deposition (malpractice case), on behalf of plaintiff, 2018-present.

61. Monroe (aka Patterson) v. Baldwin, Illinois Department of Corrections et al, Case No. 1:19-cv-01060 consultant for plaintiff, 2019-2020.

62. Tate (aka Ms. Tay Tay) v. Wexford Health Services, Baldwin, Illinois Department of Corrections, et al; Case 3:16-cv-00092-NJR-MAB; declarations on behalf of plaintiff, 2019-2020.

63. Janiah Monroe (aka Andre Patterson), Marilyn Melendez, et al v. Bruce Rauner, Bruce Baldwin, et al; Case No.3:18-cv-156; consultant for plaintiffs, class action suit, 2018-2020.

64. Kadel v. Folwell, et al., Case No. 1:19-cv-00272-LCB-LPA (M.D.N.C.); consultant for 6 plaintiffs, expert testimony by declarations and deposition, 2019-present.

65. Hoffner v. United States, consultant for plaintiff (death row case, Ohio), 2019-present.

66. State of TN v. Carlton Brown, Docket No. 114791, expert opinion by declaration on behalf of defendant, 2019-2021 (settled).

67. Lt. Jane Doe v. Esper, Trump, et al. Consultant for plaintiff; declaration; 2020-2021.

68. United States v. Anthony Eugene Long, DKT. 0649 2:19CR00030-001, consultant for Federal Public Defender on behalf of defendant; expert opinion by declaration on behalf of defendant; 2020-2021.

69. Drain v. State of Ohio, consultant on behalf of plaintiff (death row case, Ohio), 2021-present.

70. U.S. v. James David Rogers, LA CR 19-700-JAK, consultant on behalf of the defendant (Federal Public Defender, Los Angeles office), 2021-present.

71. Clark v. Quiros, No. 19-cv-575 (D. Conn. 2019), consultant on behalf of plaintiff, expert opinion by affidavit, deposition for plaintiff, 2021-present.

72. Pamela Gregg and Fred Gregg, plaintiffs, v Brooksville Property Resources, inc., d/b/a Springbrook Hospital, Circuit civil division CASE NO. 2018-CA-000133; expert opinion by affidavits for plaintiff, 2023-present.

73. Channien Ojimba, Individually and as Mother and Next Friend of Nnamdi Ezekiel Ojimba, a minor, Plaintiff, v. United States of America; Civil case No. 1:21-cv-00351; consultant for plaintiff, 2023-present.

74. Sofia Cano v. South Carolina Department of Corrections; Civil Case No. 9:22-cv-04247-DCC (D.S.C. Sep. 7, 2023); consultant for plaintiff; expert opinion by affidavit, deposition; 2023-present.

75. Michelle-Lael Norsworthy v Ralph Diaz (California Department of Corrections and Rehabilitation), et al.; Case No. 1:20-cv-00813-DAD-HBK; consultant for defendants, 2024-present.

76. Janiah Monroe v. Illinois Department of Corrections, consultant for defendant, 2024 to present.

77. Towe v. US; Case No. 3:24-cv-184-EDTN, consultant for defendants (Department of Justice contract), 2024-present.


**PUBLICATIONS:**

1. Brown G R:  Morphologic complexity and its relationship to taxonomic rates of evolution. J Undergrad Res, 3:139-168, 1978.

2. Brown G R:  Stadol dependence: another case.  JAMA, 254(7):910, 1985.

3. Brown G R:  Letter to the Editor.  Newsletter of the Ohio Psychiatric Association, 10(1):8, 1986.

4. Brown G R:  Resident Rounds.  Column for Newsletter of the Ohio Psychiatric Association.  10(2), 10(3), 11(1),11(2), 1986-1987.

5.  Brown G R:  Anorexia nervosa complicated by Mycobacterium xenopi pulmonary infection.  J Nerv Ment Dis, 175(10):629-632, 1987.

6. Brown G R: Mycobacterium xenopi infection complicating anorexia nervosa.  Proceedings of

the 29th Annual Meeting of American College of Physicians (Air Force Regional Meeting), 22-25 March, 1987.

7. Brown G R: Buspar, a new anxiolytic.  Letter to the Editor, Journal of the Ohio State Medical Association, Spring, 1987.

8. Brown G R: Transsexuals in the military: flight into hypermasculinity. Abstract. Proceedings of the 10th International Symposium on Gender Dysphoria (Amsterdam, The Netherlands) 7 June, 1987.

9. Brown G R: Transsexuals in the military: flight into hypermasculinity. Arch Sex Behav, 17(6):527-537, 1988.

10. Brown G R:  Therapeutic effect of silence: application to a case of borderline personality disorder.  Current Issues in Psychoanalytic Practice, 4(3-4):123-131, 1988.

11. Brown G R: Bioethical issues in the management of gender dysphoria. Jefferson J Psychiatry, 6(1):33-44, 1988.

12. Brown G R, Rundell J R: Psychiatric disorders at all stages of HIV infection.  Proceedings of the 1988 Annual Session of the Texas Medical Association (San Antonio, Texas), May, 1988.

13. Brown G R, Rundell J R: Suicidal tendencies in HIV-seropositive women.  Am J Psychiatry, 146(4):556-557, 1989.

14. Brown G R, Collier L: Transvestites' women revisited: a nonpatient sample. Arch Sex Behav, 18(1):73-83, 1989.

15. Brown G R, Pace J: Hypoactive sexual desire disorder in HIV-seropositive individuals. JAMA, 261(17):2305, 1989.

16. Brown G R: Prospective study of psychiatric morbidity in HIV-seropositive women. Psychosom Med, 51:246-247, 1989.

17. Brown G R: Current legal status of transsexualism in the military. (Letter) Arch Sex Behav, 18(4):371-373, 1989.

18. Rundell J R, Brown G R: Use of home test kits for HIV is bad medicine. JAMA, 262(17):2385-2386, 1989.

19. Rundell J R, Brown G R, Paolucci S L: Psychiatric diagnosis and attempted suicide in HIV-infected USAF personnel. Abstract. Proceedings of the Fifth International Conference on AIDS (Montreal, Canada), June, 1989.

20. Brown G R: Current legal status of transsexualism in the military. Abstract. Proceedings of the Eleventh Inter-national Symposium on Gender Dysphoria (Cleveland, Ohio), September, 1989.

21. Brown G R: A review of clinical approaches to gender dysphoria. J Clin Psychiatry, 51(2):57-64, 1990.

22. Pace J, Brown G R, Rundell J R, et al.: Prevalence of psychiatric disorders in a mandatory screening program for infection with human immunodeficiency virus: A pilot study.  Milit Med, 155:76-80, 1990.

23. Rundell J R, Brown G R: Persistence of psychiatric symptoms in HIV seropositive persons. Am J Psychiatry, 147(5):674-675, 1990.

24. Praus D, Brown G R, Rundell J R, et al.:  Associations between CSF parameters and high degrees of anxiety or depression in USAF personnel infected with HIV. J Nerv Ment Dis, 178(6):392-395, 1990.

25. Brown G R, Rundell J R: Prospective study of psychiatric morbidity in HIV-seropositive women without AIDS.  Gen Hosp Psychiatry, 12:30-35, 1990.

26. Brown G R: The transvestite husband.  Med Aspects Human Sexuality, 24(6):35-42, 1990.

27. Drexler K, Brown G R, Rundell J R: Psychoactive drug use and AIDS. JAMA, 263(3):371, 1990.

28. Brown G R, Rundell J R: Psychiatric morbidity in HIV-seropositive women without AIDS. Proceedings of the 143rd Annual Meeting of the American Psychiatric Association, pages 75-76 (New York, New York), May, 1990.

29. Rundell J R, Ursano R, Brown G R: HIV infection and perception of social support. Proceedings of the 143rd  Annual Meeting of the American Psychiatric Association, page 76 (New York, New York), May, 1990.

30. Rundell J R, Brown G R, McManis S, et al.:  Psychiatric predisposition and current

psychiatric findings in HIV-infected persons. Proceedings of the Sixth International Conference on AIDS (San Francisco, California), June, 1990.

31. Drexler K, Rundell J R, Brown G R, et al.: Suicidal thoughts, suicidal behaviors, and suicide risk factors in HIV-seropositives and alcoholic controls. Proceedings of the Sixth International Conference on AIDS (San Francisco, California), June, 1990.

31. Brown G R: The inpatient database as a technique to prevent junior faculty burnout.  Acad Psychiatry, 14(4):224-229, 1990.

32. Rundell J R, Wise M, Brown G R, et al: Relative frequency of HIV disease as a cause of mood disorder in a general hospital. Proceedings of the 1990 Update on Neurological and Neuropsychological Complications of HIV Infection, page PSY-4 (Monterrey, California), June, 1990.

33. Rundell J R, Praus D, Brown G R, et al:  CSF parameters, immune status, serum viral titers, anxiety, and depression in HIV disease.  Proceedings of the 1990 Update on Neurological and Neuropsychological Complications of HIV Infection, page PSY-5 (Monterrey, California), June, 1990.

34. Brown G R: Clinical approaches to gender dysphoria. Abstract. Psychiatry Digest, 5:9-10, 1990.

35. Brown G R, Rundell J R, Temoshok L, et al:  Psychiatric morbidity in HIV-seropositive women:  Results of a three year prospective study.  Proceedings of the 37th Annual Meeting of the American Academy of Psychosomatic Medicine, 1990.

36. Rundell J R, Brown G R, Kyle K, et al:  Methods employed by and length of knowledge of HIV-seropositivity of HIV-infected suicide attempters.  Proceedings of the 37th Annual Meeting of the American Academy of Psychosomatic Medicine, 1990.

37. Brown G R: Unzufriedenheit mit dem eigenen Geschlecht:Klinische Behandlungsmoglichkeiten. Abstract for European readership. Psychiatry Digest, 10:3-4, 1990.

38. Brown G R, Anderson B W: Credibility of patients in psychiatric research. Amer J Psychiatry, 148(10):1423-1424, 1991.

39. Brown G R, Anderson B: Psychiatric morbidity in adult inpatients with childhood histories of physical and sexual abuse. Amer J Psychiatry, 148(1):55-61, 1991.

40. Plotnick E, Brown G R: Use of intravenous haloperidol in nonviolent severely regressed adult psychiatric inpatients. Gen Hosp Psychiatry, 13:385-390, 1991.

41. Brock I, Brown G R, Jenkins R: Affect and health locus of control in early HIV infection. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 79, 1991.

42. Brock I, Brown G R, Jenkins R: Early HIV infection and health locus of control. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 79, 1991.

43. Brown G R, Pace J, Brock I, et al: Psychiatric morbidity in HIV-seropositive military women. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 208, 1991.

44. Pace J, Brown G R: Factors associated with length of inpatient psychiatric hospitalization in a military medical center.  Proceedings of the 144th Annual Meeting of the American Psychiatric  Association, 95, 1991.

45. Plotnick E, Brown G R: Sexual functioning in HIV-positive women without AIDS. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 80-81, 1991.

46. Hicks D, Stasko R, Rundell J, Norwood A, Brown G R: Psychiatric treatment in early HIV disease.  Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 208, 1991.

47. McManis S, Brown G R, Rundell J, et al: Subtle, early cognitive impairment in HIV disease. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 77-78, 1991.

48. McManis S, Brown G R, Rundell J, et al: Cognitive impairment and CSF values in HIV disease.  Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 78, 1991.

49. McManis S, Brown G R, Zachary R, et al: Cognitive impairment and gender in HIV-positive

**App. 273**

persons. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 78, 1991.

50. Carey M, Jenkins R, Brown GR, et al: Gender differences in psychosocial functioning in early stage HIV patients. Proceedings of the 7th International Conference on AIDS, M.B. 4230, 1:447, 1991.

51. McManis S, Brown G R, Zachary R, et al: Neuropsychiatric impairment early in the course of HIV infection. Proceedings of the 7th International Conference on AIDS, M.B. 2064, 1:198, 1991.

52. Brown G R, Rundell J, Pace J, et al: Psychiatric morbidity in early HIV infection in women: results of a 4 year prospective study. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p 22, 1991.

53. Brown G R, Kendall S, Zachary R, et al: Psychiatric and psychosocial status of US Air Force HIV-infected personnel. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p 121, 1991.

54. Brown G R, Zachary R, McManis S, et al: Gender effects on HIV-related neuropsychiatric impairment. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p 125, 1991.

55. Temoshok L, Smith M, Brown G R, Jenkins R: Perceptions of zidovudine (AZT) and cooperation with treatment or clinical trials. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p 198, 1991.

56. Jenkins R, Patterson T, Brown G R, Temoshok L: Social functioning in early stage HIV patients. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p P12, 1991.

57. Zachary R, Coyle C, Kendall S, Brown G R: Living with HIV: Mechanisms for coping with psychological distress. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p P13, 1991.

58. Brown G R, Rundell J, McManis S, Kendall S, Jenkins R: Neuropsychiatric morbidity in early HIV disease: Implications for military occupational function. Proceedings of the Aerospace Medicine Symposium on Allergic, Immunological, and Infectious Disease Problems in Aerospace Medicine, NATO Advisory Group for Aerospace Research and Development, AGARD-CP-518, (paper 16):1-14, 1992.

59. Brown G R: Single USAF AIDS center offers unique opportunity to research biopsychosocial aspects of HIV infection. San Antonio, M.D., 1(4):8-9,14-15, 1991.

60. Rundell J, Mapou R, Temoshok L, Brown G R: An overview of the U.S. military HIV testing policy. Proceedings of the American Psychological Association Annual Meeting, August, 1991, page 277.

61. Brown G R: The transvestite husband. J Gender Studies, 13(1):14-19, 1991.

62. Rundell J R, Kyle K, Brown G R, Thomasen J: Factors associated with suicide attempts in a mandatory HIV-testing program. Psychosomatics, 33(1):24-27, 1992.

63. Beighley P, Brown G R: Medication refusal in psychiatric inpatients in the military. Military Med, 157:47-49, 1992.

64. McManis S, Brown G R, Zachary R, et al: Screening for subtle neuropsychiatric deficits early in the course of HIV infection. Psychosomatics, 34(5):424-431, 1993.

65. Brown G R, Kendall S, Ledsky R: Sexual dysfunction in HIV-seropositive women without AIDS. J Psychol Human Sexuality, 7(1-2):73-97, 1995.

66. Brock I, Brown G R: Psychiatric length of stay determinants in a military medical center. Gen Hosp Psychiatry,15(6):392-398, 1993.

67. Brown G R, Rundell J, McManis S, Kendall S, Jenkins R: Neuropsychiatric morbidity in early HIV disease: Implications for military occupational function. Vaccine, 11(5):560-569, 1993.

68. Brown G R, Rundell J: Prospective study of psychiatric aspects of early HIV infection in women. Gen Hosp Psychiatry, 15:139-147, 1993.

69. Brown G R, Rundell J, McManis S, Kendall S, Zachary R, Temoshok L: Prevalence of psychiatric disorders in early stages of HIV infection in United States Air Force Personnel. Psychosomatic Medicine, 54:588-601, 1992.

70. Beighley P, Brown G R, Thompson J: DSM-III-R brief reactive psychosis among Air Force

recruits.  J Clin Psychiatry, 53(8):283-288, 1992.

71.  Brown G R:  Letter to the editor.  Amer J Psychiatry, 149(4):541, 1992.

72.  Lothstein L M, Brown G R: Sex reassignment surgery: current concepts.  Integ Psychiatry, 8(1):21-30, 1992.

73.  Brown G R, Zachary R, Rundell J R: Suicidality before and after HIV seroconversion in men with early stage disease. Proceedings of the 50th Anniversary International Meeting of the American Psychosomatic Society, 43, 1992.

74.  Brock I, Brown G R, Butzin C: Predictors of psychiatric inpatient length of stay.  Proceedings of the 145th Annual Meeting of the American Psychiatric Association, New Research Volume, 101, 1992.

75.  Rundell J R, Brown G R, Jenkins R, Temoshok L: Social support, psychiatric morbidity, and HIV disease.  CME Syllabus and Proceedings of the 145th Annual Meeting of the American Psychiatric Association, 281, 1992.

76.  Plotnick E, Brown G R: IV haloperidol in severe nonviolent psychosis. Psychiatry Drug Alerts, 6(5):40, 1992.

77.  Goethe K, Richie D, Brown G R, Kendall S: Longitudinal neuropsychological findings in HIV-positive males. Proceedings of the 8th International AIDS Conference, Vol. 2, Abstract PuB 3770, Amsterdam, The Netherlands, 1992.

78.  Brown G R, Zachary R, McManis S, Coyle C, Kendall S, Kozjak J: Stability of personality disorder diagnoses in early HIV infection. Proceedings of the 8th International AIDS Conference, Vol 3, Abstract PuB 7063, Amsterdam, The Netherlands, 1992.

79.  Mapou R, Goethe E, Law W, Kendall S, Rundell J, Brown G R, Nannis E, et al.: Minimal impact of self-reported mood on neuropsychological performance in HIV-infected military personnel.  Proceedings of the 8th International AIDS Conference, Vol 3, Abstract PuB 7338, Amsterdam, The Netherlands, 1992.

80.  Nannis E, Temoshok L, Jenkins R, Rundell J, Brown G R, Patterson T: Noncompliance with zidovudine: Psychosocial factors. Proceedings of the 8th International AIDS Conference, Vol 3, Abstract PuB 7377, Amsterdam, The Netherlands, 1992.

81.  Brown G R: 106 women in relationships with crossdressing men: a descriptive study from a nonclinical setting. Arch Sex Behav, 23(5), 515-530, October, 1994.

82.  Nannis E, Temoshok L, Jenkins R, Blake S, Sharp E, Jenkins P, Brown G, Patterson T, Coyle C, Brandt U, Johnson C: Gender differences in transmission risk behavior, affect, and social support in HIV positive individuals.  Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, 1993, #D17; Annals of Behavioral Medicine 15:S105.

83.  Coyle C, Blake S, Brown GR, Ledsky R, Temoshok L: Methodological issues in assessing risk behaviors in an HIV seropositive military sample (Special Citation Award). Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, March, 1993, #D02.  Also in Annals of Behavioral Medicine 15:S101.

84.  Zachary R, Brown GR, Kendall S, Coyle C, McManis S: Psychosocial stressors and vulnerability to psychiatric distress in early-stage HIV. Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, March, 1993, #D08.

85.  Suter E, Cassem E, Murray G, Brown G R, et al: Violence in America-Effective solutions. Journal of the Medical Association of Georgia  84(6):253-263, 1995.

86.  Brown G R: Use of methylphenidate in treating the cognitive decline associated with HIV disease. Intl J Psychiatry Med, 25(1):21-37, 1995.

87.  Brown G R: Teen transvestites. Psychiatric Times, Letter to the Editor, 11(11):9, 1994.

88.  Brown G R: New onset of sexual dysfunction in HIV-seropositive women: Results of a prospective study. Proceedings of the 88th Annual Scientific Meeting of the Southern Medical Association, November 3, 1994, page S54.

89.  Brown G R: Cross-dressing men lead double lives. Menninger Letter, April, 1995.

90.  Richards J, McManis S, Brown G R: Personality disorders in HIV-positive persons: association with other measures of psychiatric morbidity. (abstract) Proceedings  of the Annual Meeting of the American Psychiatric Association, NR1, page 53,  Philadelphia, PA, May 23, 1994.

**App. 275**

91.  Brown G R, Wise T, Costa P, Herbst J, Fagan P, Schmidt C: Personality characteristics and sexual functioning of 188 cross-dressing men.  J Nerv Ment Disease, 184(5):265-273, 1996.

92.  Brown G R: The transvestite husband.  Tapestry 72:52-54, 1995 (substantially similar to publication #26 above).

93.  Brown G R, Wise T, Costa P: Personality characteristics and sexual functioning of 188 American transgendered men: Comparison of patients with nonpatients. Proceedings of the 14th Harry Benjamin International Gender Dysphoria Symposium, pages 12-13, 1995.

94.  Brown G R, Radford M, Greenwood K, Matthew  H: Sertindole Hydrochloride: A novel antipsychotic with a favorable side effect profile.  Southern Medical Journal, (abstract), 88(10):S58, 1995.

95.  Brown G R, Radford M: Sertindole Hydrochloride: A novel antipsychotic with a favorable side effect profile.  Southern Medical Journal, 90(7):691-693, 1997.

96.  Zimbroff D, Kane J, Tamminga C, et al: Controlled, dose-response study of sertindole and haloperidol in the treatment of schizophrenia.  Amer J Psychiatry, 154(6):782-791, 1997.

97.  Ceniceros S, Brown G R, Swartz C: Tattoos, body piercing, and psychiatric disorders. Proceedings of the Fourteenth Annual ETSU Student Research Forum, abstract 501; winner of the best scientific poster in resident/fellow category, 1998.

98.  Ceniceros S, Brown G R, Swartz C: Tattoos, body piercing, and psychiatric disorders.  Proceedings of the Annual Meeting of the American Psychiatric Association, Toronto, Canada, June 1, 1998.

99.  Ceniceros S, Brown G R: Acupuncture: A review of its history, theories, and indications. Southern Medical Journal 91(12):1121-1125, 1998.

100. Levine S, Brown G R, Coleman E, et al.: The Standards of Care for Gender Identity Disorders.  International Journal of Transgenderism, 2(2):2-20, 1998.

101. Ceniceros S, Brown GR, Swartz,C: Tattoos, body piercing, and psychiatric disorders.  Southern Medical Journal 91(10):S52-53, 1998.

102. M N Miller, B E Miller, R Chinouth, B Coyle, GR Brown: Increased premenstrual dosing of nefazodone relieves premenstrual magnification of depression: a double-blind, crossover study. Proceedings of the 1999 Annual Meeting of the Society for Neuroscience, Miami Beach, Florida.

103. Brown G R: Gender identity comorbid with dissociative identity disorder.  Proceedings of the XVI Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, London, England, August, 1999.

104. Levine SB, Brown G R, Coleman E, et al.: The newly revised Standards of Care for Gender Identity Disorders. J Sex Educ Therapy 24(3):117-127, 1999.

105. McKenzie D, Brown G R: A study of internet usage. Southern Medical Journal 93(10):S83, 2000.

106. M N Miller, B E Miller, R Chinouth, B Coyle, GR Brown: Increased premenstrual dosing of nefazodone relieves premenstrual magnification of depression. Depression and Anxiety 15:48-51, 2002.

107. Best Practice Guidelines, Adult Behavioral Health Services, Tennessee Department of Mental Health and Developmental Disabilities, Task Force coauthor (Chairman, Cliff Tennison), July 2002.

108. Brown GR: Application of the HBIGDA Standards of Care to the Prison Setting: Recent Victories for Transgender Care in the USA.  Proceedings of the 18th Biennial Symposium of the HBIGDA, Gent, Belgium, 2003.

109. Ettner R, Brown GR, White T, Shah BJ: Family and Systems Aggression Towards Therapists Working with Transgendered Clients. .  Proceedings of the 18th Biennial Symposium of the HBIGDA, Gent, Belgium, 2003.

110. Brown G R:  Mental disorders among military personnel.  American Journal of Psychiatry, letter to the editor, 160(6):1190-1191, 2003.

111. Brown G R, McBride L, Williford W, Bauer M: Impact of childhood sexual abuse on bipolar

**App. 276**

disorder.    Proceedings of the 5th International Conference on Bipolar Disorders, Pittsburgh, PA, 2003.

112. Brown G R, Bauer M, McBride L, Williford W: Impact of childhood abuse on disease course in veterans with bipolar disorder.  Southern Medical Journal Abstract Supplement 96(10):S34-S35, 2003.

113. Brown G R: Tinnitus: The ever-present tormentor.  The Hearing Journal 57(4):52-53, 2004.

114. Ettner R, Brown G R, White T, Shah B: Transgender client aggression towards therapists. Proceedings of the XIX Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, p. 61, Bologna, Italy, April 9, 2005.

115. Brown G R: Gender identity disorder comorbid with dissociative identity disorder: review of the literature and 7 year followup case presentation. Proceedings of the XIX Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, p. 80-81, Bologna, Italy, April 9, 2005.

116. Brown G R, Bauer M S, McBride L, Williford W O: Impact of childhood abuse on the course of bipolar disorder: A replication study in U.S. veterans.  Journal of Affective Disorders 89:57-67, 2006.

117. Ettner R, White T, Brown G R, Shah, B: Transgender client aggression towards therapists. International Journal of Transgenderism, 9(2): 1-7, 2006. **DOI**: 10.1300/J485v09n02_01

118. Bauer M, McBride L, Williford W,  Glick H,  Kinosian B, Altshuler L,  Beresford T,  Kilbourne A, Sajatovic, M, Brown G R, et al: Collaborative Care for Bipolar Disorder, Part I: Intervention and Implementation in a Multi-Site Randomized Effectiveness Trial, Psychiatric Services, 57(7):927-936, 2006.

119. Bauer M, McBride L, Williford W,  Glick H,  Kinosian B, Altshuler L,  Beresford T,  Kilbourne A, Sajatovic, M, Brown G R, et al: Collaborative Care for Bipolar Disorder, Part II: Impact, Clinical Outcome, Function, and Costs, Psychiatric Services 57(7):937-945, 2006.   [Selected by journal for accompanying editorial, 57:909]

120. Brown G: Autocastration and Autopenectomy as Surgical Self-treatment in Incarcerated Persons with Gender Identity Disorder. Proceedings of the XX Biennial Symposium of the World Professional Association for Transgender Health, Chicago, Illinois, September, 2007.

121. Belkin A, Whitten T, Brown G, Melms, M: Gender Identity and the Military. Abstract.  International Journal of Transgenderism 10(3):174, 2008.

122. Brown G, McDuffie E: Healthcare policies addressing transgender inmates in prison systems in the United States,  Journal of Correctional Healthcare, 15(4):280-291, 2009. DOI: 10.1177/1078345809340423; online version: http://jcx.sagepub.com/cgi/content/abstract/15/4/280.

123. Brown G: Recommended revisions to the World Professional Association for Transgender Health's Standards of Care section on medical care for incarcerated persons with GID, International Journal of Transgenderism, 11(2):133-139, 2009. DOI: 10.1080/15532730903008073.

124. McDuffie E, Brown G: 70 Veterans with Gender Identity Disturbances: A Descriptive Study, International Journal of Transgenderism, 12(1), 2010. DOI: 10.1080/15532731003688962.

125. Brown G: Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder, International Journal of Transgenderism, 12(1):31-39, 2010. DOI: 10.1080/15532731003688970.

126. Brown GR, McDuffie E: 70 Veterans with Gender Identity Disturbances: A Descriptive Study. (published abstract), Southern Medical Journal. 102(12):E10, December 2009. DOI: 10.1097/SMJ.0b013e3181c0401d

127. Rachlin  K, Dhejne C, Brown G: The Future of GID NOS in the DSM 5: Report of the GID NOS Working Group of a Consensus Process Conducted by the World Professional Association for Transgender Health. Interational Journal of Transgenderism 12(2):86-93,  2010. DOI: 10.1080/15532739.2010.509209

128. Crivera C, DeSourza C, Kozma C, Dirani R, et al: Resource utilization in patients with schizophrenia who initiated risperidone long-acting therapy: results from the

schizophrenia outcomes utilization relapse and clinical evaluation (SOURCE),  BMC Psychiatry 11:168, 2011 (contributor as Site Principal Investigator, but not author; refer to acknowledgments) .

129.  Macfadden W, DeSouza C, Crivera C, Kozma C, et al: Assessment of effectiveness measures in patients with schizophrenia initiated on risperidone long-acting therapy: the SOURCE study results.  BMC Psychiatry 11:167, 2011 (contributor as Site Principal Investigator, not author; refer to Acknowledgements section)

130.  Ettner R, White T, Brown G: Family and systems aggression toward therapists. International  Journal of Transgenderism, 12(3):139-143,  2010. DOI: 10.1080/15532739.2010.514218.

131.  King  R, Brown G, McCrea C: Voice parameters that result in identification or misidentification of biological sex in male-to-female transgender veterans.  International Journal of Transgenderism, 13(3):117-130, 2012.

132  Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Fraser L, Green J, Knudson G, Meyer WJ, Monstrey S, Adler RK, Brown GR, Devor AH, Ehrbar R, Ettner R, Eyler E, Garofalo R, Karasic DH, Lev AI, Mayer G, Meyer-Bahlburg H, Hall BP, Pfaefflin F,  Rachlin K, Robinson B, Schechter LS, Tangpricha V, van Trotsenburg M, Vitale A, Winter S, Whittle S, Wylie KR, Zucker K:  Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, Inter J Transgenderism, 13:4,165-232 (2012). http://dx.doi.org/10.1080/15532739.2011.700873

133.  Blosnich, J., Brown, G.R., Shipherd, J.C., Kauth, M., Piegari, R.I., & Bossarte, R. Prevalence of Gender Identity Disorder (GID) and suicide risk among transgender veterans utilizing Veterans Health Administration (VHA) care.  Poster presented at the 140th Annual Meeting  & Exposition of the American Public Health Association, San Francisco, CA, October 30, 2012.

134.  Blosnich J, Brown GR, Shipherd J, Kauth M, Piegari RI, Bossarte R:  Prevalence of Gender Identity Disorder (GID) and suicide risk among transgender veterans utilizing Veterans Health Administration (VHA) care.  American  Journal of Public Health, 103(10):27-32, 2013.

135.  Brown GR: Qualitative analysis of transgender inmates' correspondence: Implications for Departments of Correction.  Journal of Correctional Health Care, 20(4):334-342, 2014.

136.  Brown GR: Qualitative analysis of transgender inmates' letters: Implications for transgender healthcare disparities.  Proceedings of the GLMA 31st Annual Conference, page 56, September, 2013.

137.  Blosnich J, Brown GR, Wojcio S, Jones KT, Bossarte RM: Mortality among veterans with transgender-related diagnoses in the Veterans Health Administration, FY2000-2009. LGBT Health, 1(4):269-276. 2014.

138.  Kauth M, Shipherd J, Lindsay J, Blosnich J, Brown GR, Jones KT: Access to Care for Transgender Veterans in VHA: 2006-2013. American Journal of Public Health, 104(S4):S532-4, 2014.

139.  Brown GR, Jones KT: Racial health disparities in a cohort of 5.135 transgender veterans. J Racial Ethnic Health Disparities, 1:257-266, 2014; published online ahead of print, doi: 10.1007/s40615-014-0032-4, July 16, 2014.

140.  Elders J, Brown GR, Coleman E, Kolditz TA: Medical aspects of transgender military service. Armed Forces and Society, 41(2): 199-220, 2015; published online ahead of print, DOI: 10.1177/0095327X14545625, August, 2014.

141.  Brown GR, Jones KT: Mental health and medical outcome disparities in 5,135 transgender veterans: a case-control study.  Proceedings of the 32nd Annual Conference of the Gay and Lesbian Medical Association, September 11, 2014, Baltimore, MD, page 49.

142.  Brown GR, Jones KT: Incidence of breast cancer in a cohort of 5,135 transgender veterans. Breast Cancer Research and Treatment, 149(1): pp 191-198, 2015; published online ahead of print,  DOI: 10.1007/s10549-014-3213-2, 2014.

143.  Brown GR, Jones KT: Health correlates of criminal justice involvement in 4,793 transgender veterans. LGBT Health, 2(4):297-305, 2015. DOI:

**App. 278**

10.1089/lgbt.2015.0052

144. Brown GR: Breast cancer in transgender veterans: A ten case series. LGBT Health, 2(1):77-80, 2015.

145. Shipherd JC, Kauth  MR, Firek AF, Garcia R,, Mejia S, Laski  SJ, Walden B, Perez-Padilla S, Lindsay JA., Brown GR, et al: Interdisciplinary transgender veteran care: Development of a core curriculum for VHA providers. Transgender Health, 1(1):54-62, 2016.

146. Brown GR, Jones KT: Mental health and medical outcome disparities in 5135 transgender veterans receiving health care in the Veterans Health Administration: A case-control study. LGBT Health. 3(2):122-131, 2016.

147. Feldman J, Brown GR, et al: Priorities for transgender medical and mental health care research. Current Opinion in Endocrinology, Diabetes, and Obesity, February 2016 DOI: 10.1097/MED.0000000000000229

148. Brown GR, Jones KT: Health correlates of criminal justice involvement in 4,793 transgender veterans.  Abstract publication, Proceedings of the Annual National Conference on Correctional Health Care, p43, abstract 505, 2015.

149. Blosnich J, Kauth M, Shipherd J, Gao S, Gordon A, Marsiglio M, Brown GR, Fine M: Mental health of transgender veterans in US states with and without discrimination and hate crime legal protection. Amer J Pub Health. 106(3):534-540, 2016 DOI: 10.2105/AJPH.2015.302981

150. Reisner S, Deutsch M,  Bhasin S, Bockting W, Brown GR, Feldman J, et al:  Advancing methods for US transgender health research.  Current Opinion in Endocrinology, Diabetes, and Obesity. February 2016 DOI: 10.1097/MED.0000000000000229

151. Bukowski L, Blosnich J, Shipherd J, Kauth M, Brown GR, et al: Exploring rural disparities in medical diagnoses among veterans with transgender-related diagnoses utilizing Veterans Health Administration Care. Medical Care, Med Care. 55 Suppl 9 Suppl 2:S97-S103. doi: 10.1097/MLR.0000000000000745, 2017.

152. Blosnich J, Marsiglio M, Dichter M, Gao S, Gordon A, Shipherd J, Kauth M, Brown GR, Fine M: Impact of social determinants of health on medical conditions among transgender veterans. American Journal of Preventive Medicine. Published on line ahead of print, February 1, 2017 DOI: http://dx.doi.org/10.1016/j.amepre.2016.12.019; 52.4 (2017): 491-498, 2017.

153. Blosnich, J, Cashy J, Gordon A, Shipherd J, Kauth M, Brown GR, Fine M:  Using clinician text notes in electronic medical record data to validate transgender-related diagnosis codes.Journal of the American Medical Informatics Association, 25(7):905–908, 2018; https://doi.org/10.1093/jamia/ocy022

154. Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Fraser L, Green J, Knudson G, Meyer WJ, Monstrey S, Adler RK, Brown GR, et al: Normas de Atención para la salud de personas trans y con variabilidad de género: La Asociación Mundial para la Salud Transgénero. Inter J Transgenderism 19(3):287-354, 2018. DOI: 10.1080/15532739.2018.1503902

155. Blosnich JR, Boyer T, Brown GR, Kauth M, Shipherd J:. Differences in methods of suicide death among transgender and non-transgender patients in the Veterans Health Administration, 1999-2016. Medical Care, 59:31-35, 2021.

156. Boyer T, Blosnich JR, Shipherd J, Brown GR, et al: Suicide, homicide, and all-cause mortality among transgender and cisgender patients in the Veterans Health Administration. LGBT Health 8(3):173-180, 2021.

157. Coleman E, Radix A E, Bouman WP, Brown GR, et al: Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, International Journal of Transgender Health, 23:sup1, S1-S259, DOI: 10.1080/26895269.2022.2100644, 2022.

158. Leder SM, McConnell A, Lamba S, Sonnier C, Matza A, Meriwether W, Brown GR, et al: Impact of Gender Identity Field in the Veterans Health Administration Electronic Health Record, 2016-2023. Am J of Public Health, January, 2025; ,https://doi.org/10.2105/AJPH.2024.307920

**App. 279**

**BOOK CHAPTERS:**

1.      Brown G R: Therapeutic Effect of Silence. In Strean H (ed.): Psychoanalytic Technique, Haworth Press, New York, 1988.

2.      Brown G R: Gender reassignment: Psychiatric, endocrinologic, and surgical management (with Leiter E, Futterweit W). Chapter 68. In Webster G, Kirby R, King L, Goldwasser B (eds.): Reconstructive Urology, Blackwell Scientific Publications, London, 1992.

3.      Goldschmidt M, Temoshok L, Brown G R: Women and HIV/AIDS. In Niven C, Carroll D (Eds.): The Health Psychology of Women, Harwood Academic Publishers, London, 1993.

4.      Brown G R, Philbrick K: Sexual and Gender Identity Disorders in the Consultation-Liaison Psychiatry Setting. In  Rundell J, Wise M (Eds.): Textbook of Consultation-Liaison Psychiatry, APA Press, Washington, D.C., 1996.

5.      Brown G R: Transvestism. Chapter 71, pages 1977-2000.  In Gabbard G (Ed.): Treatments of Psychiatric Disorders: The DSM-IV Edition, APA Press, Washington, D.C., 1995.

6.      Brown G R: Women in the Closet: Relationships with Transgendered Men.
In Denny D (Ed.): Current Concepts in Cross-Gender Identity: A New Synthesis, Chapter 21, pp. 353-371, Garland Press, New York, 1998.

7.      Brown G R, Kendall S, Ledsky R: Sexual Dysfunction in HIV-Seropositive Women Without AIDS. In Ross M (Ed): HIV/AIDS and Sexuality, Haworth Press, New York, 73-98, 1995.

8.      Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual, 17th (Centennial) Edition, Merck Research Labs, Rahway, N.J., 1999.

9.      Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information, Home Edition,  Merck Research Labs, Rahway, N.J., 1997.

10.     Brown G R, Philbrick K: Sexual and Gender Identity Disorders in the Consultation-Liaison Psychiatry Setting. In  Rundell J, Wise M (Eds.): Concise Guide to the Textbook of Consultation-Liaison Psychiatry, APA Press, Washington, D.C., 1999.

11.     Brown G R: Transvestism.  In Gabbard G and Atkinson S (Eds.): Synopsis of Treatments of Psychiatric Disorders, Second Edition, APA Press, Washington, D.C., 829-836, 1996.

12.     Brown G R: Transvestism and Gender Identity Disorders. .  In Gabbard G (Ed.): Treatments of Psychiatric Disorders, Third Edition, APPI, Washington, D.C., Chapter  73, pages 2007-2067, 2001.

13.     Brown G R, Gass G, Philbrick K: Sexual and Gender Identity Disorders in the Consultation-Liaison Psychiatry Setting. In  Rundell J, Wise M (Eds.): Textbook of Consultation-Liaison Psychiatry, Second Edition, APA Press, Washington, D.C. Chapter 22, pages 455-476, 2002.

14.     Brown G R, Ceniceros S: Human Sexuality in Health and Disease. In Wedding D (Ed.): Behavior and Medicine, 3rd Edition, Hogrefe & Huber, Seattle, Chapter 12, pages 171-183, 2001.

15.     Brown G R: Sexuality.  In Beers M (Ed): The Merck Manual of Medical Information, Home Edition, 2nd Edition, Merck Research Labs, Rahway, N.J., 2003. Come on God dammit

**App. 280**

16.    Brown GR, Haaser RC: Sexual Disorders in the General Hospital Setting.  In Levenson J (ed): Consultation-Liaison Psychiatry, American Psychiatric Press Inc., Washington, D.C., Chapter 17, pages 359-386, 2004.

17.    Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information,  18th edition,   Chapter 203, Merck Research Labs, Rahway, N.J., 2006.

18.    Rahimian J, Bergman J, Brown G R, Ceniceros S: Human Sexuality. In Wedding D and Stuber M (Ed): Behavior and Medicine, 4th Edition, Hogrefe & Huber, Seattle, Chapter 12, 2006 (currently being used as the core textbook in a number of medical school curricula, including ETSU).

19.    Brown GR: Gender Disorders and Sexual Dysfunctions. The Merck Manual of Women's and Men's Health. Simon & Schuster, Pocket Books, Chapter 2, pages 21-29, 2007.

20.    Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information,  19th edition,  Chapter 203, Merck Research Labs, Rahway, NJ, July, 2011.

21.    Brown G R: Sexual Disorders. In Berkow R (Ed): The Merck Home Health Handbook, Second Edition, Chapter 135, pages 627-630, Merck Research Labs, Whitehouse Station, NJ, 2009.

22.    Rahimian J, Bergman J, Brown G R, Ceniceros S: Human Sexuality. In Wedding D and Stuber M (Ed): Behavior and Medicine, 5th Edition, Hogrefe & Huber, Seattle, Chapter 12, pages 153-164, 2010 (currently being used as the core textbook in a number of medical school curricula).

23.    Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information, 20th edition, Merck Research Labs, Rahway, NJ, , on line open access textbook chapter available at: http://www.merckmanuals.com/professional/psychiatric-disorders/sexuality,-gender-dysphoria,-and-paraphilias/gender-dysphoria-and-transsexualism, 2016.

24.    Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information, Home Edition, 20th edition, Merck Research Labs, Rahway, NJ, on line open access textbook chapter available at: http://www.merckmanuals.com/home/mental-health-disorders/sexuality/gender-dysphoria-and-transsexualism,  2016.

25.    Shipherd J, Kauth M, Brown GR: Implementing a Transgender Care Policy in a National Healthcare System. Chapter 13, in  Shipherd J and Kauth M (Eds): Adult Transgender Care: An Interdisciplinary Approach for Training Mental Health Professionals, Routledge, Taylor and Francis, New York, 2017.

26.    Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information, Home Edition, 21st Edition, Merck Research Labs, Rahway, NJ, on line open access textbook chapter available at: http://www.merckmanuals.com/home/mental-health-disorders/sexuality/gender-dysphoria-and-transsexualism, 2017.

27.    Brown G R: Gender Dysphoria and Sexual Dysfunctions, Chapter 214, pages 1796-1803. In Berkow R (Ed): The Merck Manual of Medical Information, 20th Edition (hard cover),     Merck, Sharp, and Dohme, Kenilworth, NJ, 2018

**App. 281**

28.    Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information, Home Edition, 22nd Edition, Merck Research Labs, Rahway, NJ, on line open access textbook chapter available at: http://www.merckmanuals.com/home/mental-health-disorders/sexuality/gender-dysphoria-and-transsexualism, 2019.

29.    Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck Manual of Medical Information, Professional Edition, 22nd Edition, Merck Research Labs, Rahway, NJ, 2019.

30.    Brown G R: Gender Dysphoria and Paraphilias (6 separate chapters: Sexuality, Paraphilias, Gender Dysphoria/Incongruence; 3 in the Professional Edition, 3 in the Consumer Edition). In Berkow R (Ed): The Merck Manual of Medical Information, Home Edition, and Professional Edition;  Merck Research Labs, Rahway, NJ, on line open access textbook chapters available at https://www.merckmanuals.com/professional/psychiatric-disorders/sexuality-gender-dysphoria-and-paraphilias/gender-dysphoria; 2023; https://www.merckmanuals.com/professional/psychiatric-disorders/paraphilic-disorders/overview-of-paraphilic-disorders. April, 2021; significant revisions published in 2022, 2023.

32.    Brown G R, Wolf-Gould C: A Life of Translational Transgender Health Research. In Wolf-Gould C, Green J, Denny D (Eds.). From Margins to Mainstream: A History of Transgender Medicine in the United States. SUNY Press, Chapter 15, February, 2025.


**BOOK REVIEWS:**

Garner D M, Garfinkel P E (eds.): Diagnostic Issues in Anorexia Nervosa and Bulimia Nervosa. Reviewed for Journal of Nervous and Mental Diseases, 177(5):307-308, 1989.

Kanas N: Group Therapy for Schizophrenic Patients.  Reviewed for Psychiatric Times, June, 1997.


**PROFESSIONAL PUBLICATIONS REVIEWED/EDITED:**

Reviewer, Journal of Clinical Psychiatry, 1987 to present
Reviewer, Psychosomatics, 1989 to present
Reviewer, Journal of AIDS, 1990 to 2001
Reviewer, Psychology and Health, 1992
Editorial Board, San Antonio M.D., 1991-1993
Reviewer, International Journal of Psychiatry in Medicine, 1994-2006
Reviewer, CNS Drugs, 1995-2002.
Reviewer, Southern Medical Journal, 1995-2013
Reviewer, AIDS Patient Care, 1996-2003
Editorial Board, International Journal of Transgenderism, 1997-present
Reviewer, Federal Practitioner, 2000-2022
Reviewer, Journal of the American Geriatrics Society, 2000-2003
Reviewer, Bipolar Disorders, 2005-2017
Reviewer, Journal of Sexual Medicine, 2009-present
Reviewer, European Psychiatry, 2010-present
Reviewer, International Journal of Sexual Health, 2011-present
Reviewer, American Journal of Public Health, 2011-present
Editorial Board, LGBT Health, 2013-present
Reviewer, Canadian Medical Association Journal, 2013-present
Reviewer, Suicide and Life-Threatening Behavior, 2015-present
Editorial Board, Transgender Health, 2015-present
Reviewer, Journal of Correctional Healthcare, 2017-present

**App. 282**

Reviewer, Breast Cancer Research and Treatment, 2017-present
Reviewer, The Lancet Diabetes and Endocrinology, 2019-present
Reviewer, Frontiers in Endocrinology, 2022-present


**PRESENTATIONS:**

Behavioral Medicine Lecture Series, Kettering Medical Center, Kettering, Ohio.  Ten
    parts. January 24-June 25, 1985.
"Sex Reassignment Surgery: Surgical Cure or Well-Meaning Mutilation?", Good Samaritan
    Hospital, Dayton, Ohio. March 5, 1985.
"The Difficult Patient:  Recognition, Understanding, and Management", The Marriott
    Hotel, Dayton, Ohio.  March 6, 1985, (Category I, CME credit).
"Transsexualism:  Literature Review and Case Report", Wright State University, Dayton,  Ohio.
    March 19, 1985.
"Pseudoseizures:  When is a Jerk not a Fit?", Bergamo Conference Center, Kettering,
    Ohio.  April 19, 1985. (Category I, CME credit).
"Transsexualism:  What Sex am I?", University Center, Wright State University, Dayton,
    Ohio.  September 17, 1985.
"Transsexualism and the Military", Good Samaritan Hospital, Dayton, Ohio.  March 18,
    1986.
"Clinical Utility of the House-Tree-Person Test", Diversion Program, Dayton, Ohio. April
    9, 1986.
"The Silent Mitwelt", Bergamo Conference Center, Kettering, Ohio.  April 18, 1986.
    (Category I, CME credit).
"Clinical Recognition of Alexithymia", Diversion Program, Dayton, Ohio. June 3, 1986.
"Male-to-Female Transsexualism - Case Study", Case Western Reserve University,
    Cleveland, Ohio. July 18, 1986.
"Zoophilia: Literature Review and Case Study", Case Western Reserve University,
    Cleveland, Ohio. July 31, 1986.
"Neuropsychiatry of Alexithymia", Good Samaritan Hospital, Dayton, Ohio. October 14,     1986.
"Penile Auto-Injection: New Treatment for Organic Impotence", Diversion Program,
    Dayton, Ohio. August 12, 1986.
"Gender Identity Development in Children and Adolescents", Diversion Program,
    Dayton, Ohio. August 26, 1986.
"Paraphilias", Good Samaritan Hospital Seminar, Dayton, Ohio. November 17, 1986.
"Introduction to Gender Disorders", Good Samaritan Hospital, Dayton, Ohio. December
    15, 1986, January 5, 1987.
"Strategic Psychotherapy, Part I", Wright State University, Department of Psychiatry,
    Dayton, Ohio.  December 23, 1986.
"Strategic Psychotherapy, Part II", Wright State University, Department of Psychiatry,
    Dayton, Ohio. December 30, 1986.
"Transsexualism: Dilemmas in Diagnosis", Good Samaritan Hospital, Dayton, Ohio.
    January 19, 1987.
"Transsexualism: Live Interview Presentation", Wright State University, Department of
    Psychiatry, Dayton, Ohio. January 20, 1987.
"Anxiety Disorders: New Treatment Approaches", Wright State University, Department
    of Family Practice, Dayton, Ohio. January 29, 1987.
"Gender Dysphoria", Wright State University Medical School, Dayton, Ohio. February
    10, 1987.
"Bioethical Issues in Sex Reassignment", Good Samaritan Hospital, Dayton, Ohio.
    February 2, 1987.
"Mycobacterium xenopi Pulmonary Infection Complicated by Anorexia Nervosa",
    presentation at the 29th Annual Meeting of the Society of Air Force
    Physicians, New Orleans, Louisiana. March 23, 1987.
"The Transsexual Flight into Hypermasculinity", presentation at the Tenth International

**App. 283**

Symposium on Gender Dysphoria, Amsterdam, The Netherlands. June 10, 1987.

"Grand Rounds: Gender Disorders", Institute of Living, Hartford, Connecticut, April 30, 1987.

"Affective Disorders", three hour lecture series, Wilford Hall Medical Center, San Antonio, Texas, September, 1987.

"Grand Rounds: Transsexualism", Maine Medical Center, Portland, Maine, November 4,  1987.

"Opportunistic Infection in Anorexia Nervosa", 34th Annual Meeting of The Acadamy of Psychosomatic Medicine, Las Vegas, Nevada, November 14, 1987.

"Grand Rounds: Gender Disorders, An Overview", Wilford Hall Medical Center, San Antonio, Texas, December 17, 1987.

"Women Who Marry Transvestites", accepted for presentation at XXI Annual Meeting of AASECT, San Francisco, California, April 26, 1988 (no funding available).

"Psychiatric Manifestations of HIV Infection", Texas Medical Association Annual Session, San Antonio, Texas, May 13, 1988.

"Introduction to Gender Disorders", University of Texas Health Science Center, San Antonio, Grand Rounds, September 27, 1988.

"Transsexualism and Gender Disorders", Bexar County Psychiatric Society, San Antonio, Texas, October 18, 1988.

"Psychiatric Diagnoses in HIV-seropositive Air Force Personnel", Maine Medical Center, Portland, Maine, November 5, 1988.

"Symposium on HIV-seropositivity and Psychiatry", Program Coordinator, Behavioral Health Sciences Symposium, Sheppard AFB, Wichita Falls, Texas, November 8, 1988.

"Childhood Gender Disorders", Laurel Ridge Hospital, San Antonio, Texas, January 24, 1989.

"Prospective Study of Psychiatric Morbidity in HIV-seropositive Women", Annual Meeting of the American Psychosomatic Society, San Francisco, California, March 10, 1989.

"Psychiatric Findings in HIV-seropositive Air Force Women", Walter Reed Army Institute of Research, Bethesda, Maryland, March 31, 1989.

"Psychiatric findings in HIV-seropositive persons in a mandatory HIV screening program", (abstract and poster session, with J Rundell, S Paolucci), Fifth International Conference on AIDS, Montreal, Canada, June 5, 1989.

"Alcohol Use and HIV-seropositivity", (poster presentation, with K Drexler, J Rundell), American Psychiatric Association Annual Meeting, San Francisco, California, May, 1989.

"Current Legal Status of Transsexualism in the Military Setting", Eleventh International Symposium on Gender Dysphoria, Cleveland, Ohio, September, 1989.

"Grand Rounds: Transsexualism in the Military", Wilford Hall Medical Center, December 14, 1989 (videotape available on request).

"Psychosexual and Gender Disorders", 6 session advanced seminar for psychiatric residents, University of Texas Health Science Center, San Antonio, January to February, 1990.

"Update on HIV Psychiatric Research in the USAF: 1990", Behavioral Health Sciences Symposium, Wichita Falls, Texas, 25 April, 1990.

"Psychiatric Morbidity in HIV-seropositive Women without AIDS", 143rd Annual Meeting of the American Psychiatric Association, New York, May 14, 1990.

"HIV Infection and Perception of Social Support", (Rundell, Ursano, Brown), 143rd Annual Meeting of the American Psychiatric Association, New York, May 14, 1990.

"Relative Frequency of HIV Disease as a Cause of Mood Disorder in a General Hospital", (Rundell, Brown), Neurological and Neuropsychological Complications of HIV Infection Conference, Monterrey, California, June 17, 1990.

"CSF Parameters, Immune Status, Serum Viral Titers, Anxiety, and Depression in HIV Disease", (Rundell, Praus, Brown), Neurological and Neuropsychological Complications of HIV Infection Conference, Monterrey, California, June 17, 1990.

"CSF Findings and Request for Psychiatric Examination in HIV-Infected Patients",

(Rundell, Brown, et al.), poster presentation, Neurological and Neuropsychological
    Complications of HIV Infection Conference, Monterrey, California, June 17-19, 1990.
"Methods Employed by and Length of Knowledge of HIV-Seropositivity of HIV-infected
    Suicide Attempters", (Rundell, Brown, Kyle, et al.), 37th Annual Meeting of
    the Academy of Psychosomatic Medicine, Phoenix, Arizona, November 18, 1990.
"Psychiatric Morbidity in HIV-seropositive Women: Results of a Three Year Prospective
    Study", (Brown, Rundell, Temoshok, et al.), 37th Annual Meeting of the
    Academy of Psychosomatic Medicine, Phoenix, Arizona, November 16, 1990.
"Psychiatric Issues in the Evaluation of Spouses of Cross-dressers," Fairfax Hospital,
    Falls Church, Virginia, November 30, 1990.
"Measurement of Negative Affect in HIV-seropositive Individuals," (Jenkins, Carey,
    Temoshok, Brown, et al.), 12th Annual Meeting of The Society of Behavioral Medicine,
    Washington, D.C., March 20, 1991.
 "Psychiatric and Neuropsychiatric Morbidity in Early HIV Disease," Grand Rounds
    presentation with S. McManis, University of Texas Health Science Center,
    San Antonio, Texas, April 30, 1991.
"Neuropsychiatric Impairment Early in the Course of HIV Infection," (McManis, Brown,
    Zachary, et al.), 7th International Conference on AIDS, Florence, Italy, June 17, 1991.
Nine presentations/new research posters/symposia presented at the 144th Annual
    Meeting of the American Psychiatric Association, New Orleans, Louisiana,
    May 11-15, 1991 (see Publications section, #50-58, for titles).
Two presentations at the 7th International Conference on AIDS, Florence, Italy, June
    15-17, 1991 (see Publications section, #59-60, for titles).
"Methodological Advantages of Comprehensive Multidisciplinary Consultation-Liaison
    Psychiatry Research: HIV Research as a Model," (Rundell, Temoshok, Brown, et al.),
    Annual Meeting of the Academy of Psychosomatic Medicine, Atlanta, Georgia, October
    17, 1991.
"HIV Psychiatric Research in the Air Force," Grand Rounds presentation, Mayo Clinic,
    Rochester, Minnesota, July 9, 1991.
"Neuropsychiatric Morbidity in early HIV Disease: Implications for Military Occupational
    Function," (Brown, Rundell, McManis, Kendall), Aerospace Medicine
    Symposium on Allergic, Immunological, and Infectious Disease Problems
    in Aerospace Medicine, NATO Advisory Group for Aerospace Research and
    Development Conference, Rome, Italy, October, 1991; presented by J. Rundell in my
    absence due to lack of funding.
Four oral presentations and two poster presentations at the First International Conference on the
    Biopsychosocial Aspects of HIV Infection, Amsterdam, The Netherlands, 22-25
    September, 1991 (see Publications section, #61-66, for titles).
"Biopsychosocial HIV Research in the U.S. Military," Invited Grand Rounds presentation,
    University of South Dakota School of Medicine, Sioux Falls, South Dakota, October 25,
    1991.
"Biopsychosocial Issues in Treating HIV-seropositive Women," Fairfax Hospital Evening CME
    Lecture Series, Falls Church, Virginia, December 11, 1991.
"Psychiatric Issues in Women with HIV," Fairfax County Health Department, Falls
    Church, Virginia, December 12, 1991.
"Suicidality in Men with Early HIV Disease," American Psychosomatic Society 50th
    Annual Meeting, New York, New York, April 1, 1992.
USAF HIV "Train-the-Trainer" Course; course organizer, presenter, and comprehensive course
    assessment (pretest, posttests), San Antonio, Texas, April 7-9, 1992.
"Clinical Utility and Diagnostic Sensitivity of the Michigan Alcoholism Screening Test in
    Patients with HIV Disease," (Rundell, Brown), Annual Meeting of the
    Academy of Psychosomatic Medicine, San Diego, CA, October 31, 1992.
"Longitudinal Neuropsychological Findings in HIV Positive Males," (Goethe, Richie,
    Brown, et al), 8th International AIDS Conference, Amsterdam, The
    Netherlands, July 20, 1992.
"HIV and Women: Challenge for the 90's," Grand Rounds presentation, Geisinger

Medical Center, Danville, PA, August 6, 1992.

"Psychosocial Dimensions of Depression in Early HIV Disease," (Jenkins R, Rundell J, Brown G, Law W, Temoshok L), Annual Meeting of the American Psychological Association, Washington, D.C., August 15, 1992.

"Psychiatric Presentations of HIV Disease," AIDS and Mental Health Program sponsored by San Antonio VA and UTHSC-SA, Corpus Christi, TX, September 18, 1992.

"Major Depression in HIV Disease Before AIDS: Clinical Features and Associated Factors," (Rundell J, Brown G, Jenkins R, Kendall S, Temoshok L), Annual Meeting of the Academy of Psychosomatic Medicine, San Diego, CA, 29 October, 1992.

"HIV Risk Behavior Surveys in the U.S. Military -- What Have We Learned?," Wilford Hall Medical Center Scientific Group Meeting, San Antonio, TX, 16 November 1992.

"Biopsychosocial Aspects of Early HIV Disease in Women," Grand Rounds, Michigan State University/St. Lawrence Hospital, Lansing, MI, 18 December 1992.

"Methodological Issues in Assessing Risk Behaviors in an HIV Sero-positive Military Sample," (Coyle C, Blake S, Brown GR, Ledsky R, Temoshok L), Special Citation Poster Presentation, Proceedings of the Fourteenth Annual Meeting of the Society of Behavioral Medicine, San Francisco, CA, March 10, 1993.

"Gender differences in transmission risk behavior, affect, and social support in HIV-positive individuals," (Nannis E, Temoshok L, Jenkins R, Blake S, Sharp E,Jenkins P, Brown G, Patterson T, Coyle C, Brandt U, Johnson C),Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, March 10, 1993.

"Psychosocial stressors and vulnerability to psychiatric distress in early-stage HIV," (Zachary R, Brown GR, Kendall S, Coyle C, McManis S), Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, March 10, 1993.

"Establishing databased research in an academic department of psychiatry," invited address to the Department of Psychiatry, Jefferson Medical College, College of Physicians, Philadelphia, PA, April 30, 1993.

Two Workshops, three poster sessions, 1993 Annual Meeting of the American Psychiatric Association, San Francisco, CA, May 22-24, 1993.

"Treating Depression in Early HIV Disease," Grand Rounds, Oklahoma University School of Medicine, Oklahoma City, OK, December 1, 1993.

"Diagnosis and Treatment of Transvestism," Tulane University School of Medicine, Department of Psychiatry presentation, December 2, 1993.

"Psychiatric Disorders in Early HIV Disease," Grand Rounds, Tulane University School of Medicine, New Orleans, LA, December 3, 1993.

"Diagnosis and Treatment of Gender Identity Disorders," invited presentation at Keesler Air Force Base Medical Center, Biloxi, MS, January 13, 1994.

"Personality Disorders in HIV-positive Persons: Association with Other Measures of Psychiatric Morbidity," poster presentation, (Richards J, McManis S, Brown G), Annual Meeting of the American Psychiatric Association, Philadelphia, PA, May 23, 1994.

"Psychiatric Issues in HIV/AIDS," invited presentation, Huntsville Mental Health Community, Huntsville Space and Science Center, Huntsville, AL, November 12, 1994.

"Diagnosis and Treatment of Gender Identity Disorders," Grand Rounds, Tulane University School of Medicine, New Orleans, LA, April 29, 1994.

"Management of Depression in Early HIV Disease," Upper East Tennessee Psychiatric Association Meeting, Kingsport, TN, June 2, 1994.

"Sertindole in the Treatment of Chronic Schizophrenia: a Phase III Controlled Trial," Grand Rounds, East Tennessee State University, Johnson City, TN, September 30, 1994.

"New Onset of Sexual Dysfunction in HIV-seropositive Women: Results of a Prospective Study," 88th Annual Scientific Assembly of the Southern Medical Association, Orlando, Florida,

November 3, 1994.

"Gender Identity Disorders in the VAMC Setting," Grand Rounds, Atlanta VAMC, December 13, 1994.

"Managing Depression in Early Stage HIV Disease," Grand Rounds, Salem VAMC, December 22, 1994.

"Biopsychosocial Aspects of HIV Disease in Men," Invited Speaker, Mississippi Pharmacists Association MidWinter Meeting, Jackson, MS, February 12, 1995.

"Biopsychosocial Aspects of HIV Disease in Men," Invited Speaker, Mississippi Pharmacists Association MidWinter Meeting, Oxford, MS, February 19, 1995.

"Biopsychosocial Aspects of HIV Disease in Women," Grand Rounds, East Tennessee State University, Johnson City, TN, March 17, 1995.

"Managing Insomnia," primary care provider educational meeting, Bristol, TN, May 22, 1995.

"Diagnosis and Treatment of Gender Identity Disorders: DSM-IV Approach," Grand Rounds, Geisinger Medical Center, Danville, PA, June 15, 1995.

"Psychosocial Characteristics of 739 Transgendered Men," (Brooks G, Brown GR, Askew J), 41st Annual Meeting of the Southeastern Psychological Association, Savannah, GA, March 12, 1995.

"Personality Characteristics and Sexual Functioning of 188 American Transgendered Men: Comparison of Patients with Nonpatients." 14th Harry Benjamin International Gender Dysphoria Symposium, Irsee/Ulm Germany, September 9, 1995.

"Sertindole HCl: A Novel Antipsychotic With a Favorable Side Effect Profile." 89th Scientific Assembly of the Southern Medical Association, Kansas City, Missouri, November 17, 1995.

"Long term Safety of Treatment with Sertindole, a Novel Antipsychotic." (Radford M, Brown GR, Matthew H) poster, 89th Scientific Assembly of the Southern Medical Association, Kansas City, Missouri, November 17, 1995.

"Diagnosis and Newer Treatments for Schizophrenia." Invited Presentation. Central Appalachia Services, Kingsport, TN, December 7, 1995.

"Personality and Sexuality in Transvestism." Grand Rounds, University of Texas Health Sciences Center, San Antonio, Texas, December 12, 1995.

"HIV/AIDS and Sexuality." Grand Rounds, Wilford Hall Medical Center, San Antonio, Texas, December 14, 1995.

"How Research Can Enhance Your Career." Invited Presentation to Department of Psychiatry, Wilford Hall Medical Center, San Antonio, Texas, December 13, 1995.

"Conducting Research With Stigmatized Populations." Journal Club Presentation, University of Texas Health Sciences Center, Department of Psychiatry, San Antonio, Texas, December 12, 1995.

"Sexuality in HIV/AIDS." Grand Rounds, Bowman Gray Medical School, Department of Psychiatry, Wake Forest University, Winston-Salem, North Carolina, January 19, 1996.

"Gender Identity Disorders." Grand Rounds, Lakeshore Mental Health Institute, Knoxville, Tennessee, February 14, 1996.

"New Approaches to the Management of Schizophrenia," Helen Ross McNabb Center, Knoxville, Tennessee, February 14, 1996.

"Diagnosis and Management of Gender Dysphoria," Grand Rounds, University of Alabama at Birmingham, March 5, 1996.

"Depression and Primary Care," Morristown, TN Primary Care Provider's CE Group, Morristown, TN, June 27, 1996.

"Personality and Sexuality in Transgendered Men," paper presentation, American Psychological Association, Toronto, Canada, August 13, 1996.

"Gender Identity Disorders," paper presentation at Southern Psychiatric Association Annual Meeting, Santa Fe, New Mexico, September 25, 1996.

"Sleep Disorders," Grand Rounds, Salisbury VAMC, Salisbury, North Carolina, August 21, 1996.

"Depression in Primary Care Settings," Nurse Practitioner-Physician Assistant Association of

29

**App. 287**

Northeast Tennessee, Johnson City, Tennessee, September 11, 1996.

Visiting Professorship, Menninger Clinic and Foundation; included Grand Rounds, case presentation and discussion, meetings with residents and staff; Topeka,  KS, October 10-11, 1996.

"New Approaches to the Treatment of Schizophrenia," Grand Rounds, Lakeshore Mental Health Institute, Knoxville, Tennessee, October 30, 1996.

"HIV Disease in Women: Sexual Manifestations," symposium presentation at Academy of Psychosomatic Medicine Annual Meeting, San Antonio, Texas, November 14, 1996.

"HIV and Sexuality," Grand Rounds, Atlanta VAMC/Emery University, Atlanta, Georgia, December 3, 1996.

"Santa Claus is a Cross-Dresser (and so are his little elves)," invited address for the Upper East Tennessee Psychiatric Association, a component of the Tennessee District Branch of the American Psychiatric Association, Johnson City, TN, December 9, 1996.

"Depression and Sexuality," Tazewell County Medical Society, Richlands, Virginia, March 25, 1997.

"Identifying and Treating Depression in Primary Care," Annual Meeting of the Nurse Practitioner's and Physician's Assistants of East Tennessee, Johnson City, TN, March 25, 1997.

"Managing Sexual Side Effects of Antidepressant Treatment," Harlan County Medical Society, Harlan, Kentucky, March 11, 1997.

"Depression and Intimacy," Chatanooga Psychiatric Society, Chatanooga, TN, April 21, 1997.

"Depression and Sexuality," Lakeshore Mental Health Institute Grand Rounds, Knoxville, TN, April 9, 1997.

"Managing Sexual Side Effects of Antidepressants," Southern Highlands Pharmacist's Society, Abingdon, Virginia, April 29, 1997.

"Transgendered Families," Lakeshore Mental Health Institute Grand Rounds, Knoxville, TN, April 30, 1997.

"Depression and Intimacy," Buchanan County Medical Society, Grundy, VA, May 8, 1997.

"Depression, Sexuality, and Treatment," Highlands Psychiatric Society, Abingdon, VA, May 9, 1997.

"Managing Sexual Side Effects of Antidepressants in Primary Care," Chatanooga Family Practice Association, Chatanooga, TN, May 20, 1997.

"Double Trouble: Depression and Anxiety in Primary Care," LeFlore County Medical Center, Greenwood Mississippi, May 29, 1997.

"HIV and Sexuality," ETSU Medicine and Sexuality Symposium, Johnson City, TN, June 13, 1997.

"Depression and Sexuality," ETSU Medicine and Sexuality Symposium, Johnson City, TN, June13, 1997.

"Transgenderism," Grand Rounds, Overlook Mental Health Center, Knoxville, TN, June 25, 1997.

"Managing Sexual Side Effects of Antidepressants in Primary Care," Wise County Medical Society, Norton, Virginia, July 11, 1997.

"APA Guideline on the Treatment of Schizophrenia," Smoky Mountain Chapter of the Tennessee Psychiatric Association, Knoxville, TN, July 22, 1997.

"Nicotine Dependence: Kicking the Habit," August Monthly Meeting of the Tricities Nurse Practitioner-Physician Assistants Association, Johnson City, TN, August 14, 1997.

"Biopsychosocial Issues in Women with HIV Disease," Monthly Meeting of OB-GYN Society of Tricities, Johnson City, TN, August 26, 1997.

"Revision of the HBIGDA Standards of Care: Opportunities and Controversies," Biannual Meeting of the Harry Benjamin International Gender Dysphoria  Association, Vancouver, British Columbia, Canada, September 11, 1997.

"Anxiety and Depression in Primary Care: Double Trouble," Primary Care Grand

**App. 288**

Rounds, Fort Campbell, KY, October 1, 1997.

"Treatment Guidelines for Schizophrenia," Psychiatry Grand Rounds, Lexington VAMC, Lexington, KY, September 17, 1997.

"Gender Dysphoria in the Military Setting," Grand Rounds, Wilford Hall Medical Center, San Antonio, TX, December 18, 1997.

"Clinical Issues in Transgendered Families," Grand Rounds, University of Texas Health Sciences Center, San Antonio, December 16, 1997.

"Depression and Sexuality," Southwest Virginia Counsel of Nurse Practitioners, Abingdon, Virginia, November 1, 1997.

"Depression and Anxiety Disorders in Primary Care," Annual Meeting of the Nurse Practitioner Physician Assistant Association of Northeast TN, Johnson City, TN, February 23, 1998.

"Differentiating SSRI's in Clinical Practice," Richmond Psychiatric Society Meeting, Richmond, VA, January 22, 1998.

"Gender Identity Disorders," Grand Rounds, University of VA, Roanoke, VA, February 19, 1998.

"Smoking Cessation: Modern Approaches," Monthly Meeting of the East TN Hospital Pharmacists Association, Kingsport, TN, February 24, 1998.

"Identification and Treatment of Gender Dysphoria Syndromes," Grand Rounds, University of Mississippi, Jackson, MS, February 27, 1998.

"Gender Dysphoria Syndromes in Primary Care," Nurse Practitioner Physician Assistant Association of Northeast TN, Kingsport, TN, March 19, 1998.

"Treatment Guidelines for Schizophrenia," Grand Rounds, University of Kentucky, Louisville, KY, April 23, 1998.

"Gender Identity Disorders," Grand Rounds, University of Alabama at Huntsville, Huntsville, AL, May 21, 1998.

"Nicotine Reduction Strategies," Grand Rounds, Southwest Virginia Mental Health Institute, Marion, VA, May 27, 1998.

"Depression and Anxiety Management in Primary Care," East Tennessee State University Dept. of Psychiatry Symposium on "Psychiatry in the Trenches", Johnson City, TN, June 12, 1998.

"Managing Depression in Primary Care," Grand Rounds, Internal Medicine Department, East Tennessee State University, Johnson City, TN, June 16, 1998.

"Mood Disorders in Women," Roanoke Psychiatric Society, Roanoke, VA, June 17, 1998.

"Gender Identity Disorders," Grand Rounds, Loyola University Strich School of Medicine, Chicago, IL, June 18, 1998.

"Standards of Care for Gender Identity Disorders," Grand Rounds, University of Louisiana, Baton Rouge, LA, July 21, 1998.

"Depression and Sexuality," Fall Symposium of the Mental Health Association of Knoxville, September 11, 1998.

"Pharmacotherapy of Agitation in the Elderly," Kentucky Pharmacists' Association, Lexington, Kentucky, September 20, 1998.

"Women and Mood/Anxiety Disorders," monthly meeting of the Nurse Practitioners-Physician Assistants, Johnson City, TN, October 1, 1998.

"Killing the Bore: How to Give Effective Medical Presentations That Keep an Audience Awake," Grand Rounds, ETSU Dept. of Psychiatry, Johnson City, TN, October 16,1998.

"Pharmacologic Management of Agitation in the Elderly," Detroit Psychiatric Society, Detroit, Michigan, December 22, 1998.

"Nicotine Dependence: Kicking the "Habit," Wise County Medical Society, Wise, Virginia, January 14, 1999.

"Mood Disorders in Women," Chatanooga Psychiatric Society, Chatanooga, TN, January 18, 1999.

"From Menarche to Menopause: Mood and Anxiety Disorders in Women," Greene County Medical Society, Greeneville, TN, February 2, 1999.

31

**App. 289**

"From Menarche to Menopause: Mood and Anxiety Disorders in Women," Annual Meeting of the TriCities Nurse Practitioner-Physician Assistant Association, Johnson City, TN, February 23, 1999.

"Comparison of Risperidone and Olanzapine: RIS-112 Study," Upper East TN Psychiatric Society, Johnson City, TN, March 4, 1999.

"New Directions in Treating Schizophrenia," CME, Inc. sponsored faculty member, Los Angeles, California, March 27, 1999.

"Pharmacologic Management of Agitation in Dementia," University of Alabama Pharmacotherapeutics Conference, Huntsville, AL, April 24, 1999.

"Mood and Anxiety Disorders in Women," University of Alabama Pharmacotherapeutics Conference, Huntsville, AL, April 24, 1999.

"Behavioral Problems in Dementia," Grand Rounds, Alvin York VAMC, Murfreesboro, TN, April 29, 1999.

Pharmacological Management of Agitation in Dementia," Grand Rounds, Lakeshore Mental Health Institute, Knoxville, TN, May 7, 1999.

"Psychiatric Disorders in Women," Women's Health Symposium, University of Alabama, Huntsville, AL, May 14, 1999.

"Loxitane: A New Look at an Old Drug," Lakeshore Mental Health Institute, Knoxville, TN, June 4, 1999.

"Psychiatric Disorders in Women," University of Tennessee at Knoxville, OB-GYN Grand Rounds, June 4, 1999.

"Working With Transgendered Clients," workshop presented at A Search for New Understanding of Lesbian, Gay, and Bisexual Issues, East Tennessee State University, Johnson City, TN, September 24, 1999.

"Optimizing Treatment for Schizophrenia", CME, Inc. Symposium, Cleveland, Ohio, September 25, 1999.

"Diagnosis and Treatment of Depression in Primary Care," Grand Rounds, James H. Quillen VA Medical Center-ETSU Department of Medicine, Johnson City, TN, September 28, 1999

"Gender Identity Disorder," Annual Meeting of the Southern Psychiatric Association, Hot Springs, Virginia, September 30, 1999.

"Management of Insomnia," Annual Meeting of the Tennessee Association of Physicians' Assistants, Gatlinburg, TN, October 12, 1999.

"Sexual Dysfunction in Primary Care Practice," Behavioral Health in Primary Care Symposium, East Tennessee State University, Johnson City, TN, October 16, 1999.

"Management of Insomnia: New Directions," monthly meeting of the Upper East Tennessee Psychiatric Association, Bristol, TN, October 19, 1999.

"Depression and Anxiety in Women Through the Life Cycle," Johnson City Women's Health Center Grand Rounds, Johnson City, TN, October 27, 1999.

"Selecting Antidepressant Treatment," invited presentation and panel discussion, New Orleans Academy of Internal Medicine, January 10, 2000.

"Managing Insomnia in Primary Care," Grand Rounds, Holston Valley Medical Center, Kingsport, TN, January 31, 2000.

"Gender Identity Disorders." Grand Rounds, University of Cincinnati, Cincinnati, OH, January 26, 2000.

"Selecting Antidepressants in Primary Care, " Rural Health Cooperative, Kingsport, TN, February 7, 2000.

Visiting Professor, Loyola University Medical School, Chicago, IL (two presentations), February 10, 2000.

"Managing Insomnia in the New Millennium," Annual Meeting of the East TN Nurse Practitioner's and Physicians' Assistants Association, Johnson City, TN, February 22, 2000.

"Sexual Dysfunction in Primary Care," Annual Meeting of the East TN Nurse Practitioner's and Physicians' Assistants Association, Johnson City, TN, February 22, 2000.

"Depression and PTSD in Women," Grand Rounds, Department of OB-GYN, University of Tennessee, Knoxville, March 17, 2000.

"Depression and Anxiety in Primary Care Practice," Grand Rounds, Department of Internal Medicine, University of Tennessee, Knoxville, March 16, 2000.

**App. 290**

"Diabetes, Glucose Regulation, and Schizophrenia," Upper East Tennessee Psychiatric Society, Johnson City, TN, April 13, 2000

"Sexual Dysfunction in Primary Care Practice," Annual Meeting of the Tennessee Osteopathic Medicine Association, Chatanooga, TN, May 7, 2000.

"Diabetes, Weight Gain, and Schizophrenia," Grand Rounds, Lakeshore Mental Health Institute, Knoxville, TN, July 20, 2000.

"Bipolar Disorder: Monotherapy versus Combination Therapy", national CME Category I lecture series sponsored by Medical Education Resources and Curry, Martin, and Schiavelli, to 17 cities between May and November, 2000.

"Managing Depression and Anxiety Disorders," invited presentation to the Annual Meeting of the Tennessee Academy of Family Practice, Jackson, TN, August 19, 2000.

"Managing Insomnia," monthly meeting of the Tazwell County Medical Society, Richlands, Virginia, August 23, 2000.

"Sexual Dysfunction," Grand Rounds, ETSU Department of OB/GYN, Johnson City, TN, September 6, 2000.

"Depression and Sexuality," Grand Rounds, Holston Valley Hospital, Bristol, TN, September 25, 2000.

"Depression and Anxiety in Primary Care: Case Conference/Grand Rounds," Southern Medical Association Annual Meeting, Orlando, Florida, November 2, 2000.

"Depression in Primary Care Settings," Hamblen County Medical Society, Morristown, TN, November 21, 2000.

"Sleep Disorders," Nurse Practitioners-Physicians Assistant Association Monthly Meeting, Johnson City, TN, December 7, 2000.

"CD-ROM Workshop, Anxiety and Depression", Annual Meeting of the Holston Valley Nurse Practitioners-Physicians Assistants Association, Johnson City, TN, February 26, 2001.

"The Harry Benjamin Standards of Care in Prison: Benefits for Transsexual Healthcare," International Foundation for Gender Education Annual Symposium, Chicago, Il, March 24, 2001.

"Why Internists Should Care About Treating Depression," Grand Rounds, Department of Internal Medicine, ETSU, Johnson City, TN, April 3, 2001.

"Antidepressants: Effective Side Effect Management," Annual Meeting of the Tennessee Osteopathic Medicine Association, Memphis, TN, April 21, 2001.

"Gender Identity Disorder: Management," invited presentation, Smokey Mountain Chapter of the Tennessee Psychiatric Association, Knoxville, TN, April 24, 2001.

"Gender Identity Disorder," Grand Rounds, Department of Psychiatry, Memphis VAMC, May 24, 2001.

"Antipsychotic Efficacy Uncompromised by Side Effects," Grand Rounds, Department of Psychiatry, UT Memphis, May 25, 2001.

"Sexual Dysfunctions in Primary Care," International Medical Update Symposium, Johnson City, TN, August 2, 2001.

"Diagnosis and Treatment of Gender Dysphoria," Grand Rounds, Department of Psychology, James H. Quillen VAMC, August 3, 2001.

"Management of Bipolar Disorder," Grand Rounds, Meharry Medical College, Nashville, TN, August 21, 2001.

"Medical Treatment of Agitation in Dementia," Fall Symposium of the Mental Health Association of Knoxville, September 13, Knoxville, TN.

"Monotherapy vs. Combination Therapy in the Management of Mania," Fall Symposium of the Mental Health Association of Knoxville, September 14, Knoxville, TN

"Optimizing Treatment for Bipolar Disorder," quarterly meeting of the Upper East Tennessee Psychiatric Association, Johnson City, TN, September 20, 2001.

"Gender Identity Disorders: Diagnosis and Management," Grand Rounds, Institute of Living/Hartford Hospital Departments of Psychiatry and Psychology, Hartford, CT, October 17, 2001.

"Gender Identity Disorder Complicated by Dissociative Identity Disorder: Report of a Successful Case," XVII Symposium of the Harry Benjamin International Gender Dysphoria Association, Galveston, TX, November 3, 2001.

**App. 291**

"Mood Disorders in Women," monthly meeting of the TriCities Nurse Practitioners Association, Johnson City, TN, December 10, 2001.

"Substance Use Disorders Complicating Common Psychiatric Disorders," Grand Rounds, Holston Valley Hospital, Bristol, TN, December 18, 2001.

"Women's Health Issues in Psychiatry," OB-GYN Grand Rounds, East Tennessee State University, Johnson City, TN, May 8, 2002.

"Matching the Neurotransmitter to the Patient," ½ day CME presentation, World Medical Conferences, Jackson, Mississippi, May 18, 2002.

"Matching the Neurotransmitter to the Patient," ½ day CME presentation, World Medical Conferences, Albany, New York, June 1, 2002.

"Killing the Bore: How to Give Effective Medical Presentations That Keep People Awake," Grand Rounds, Dept. of Psychiatry, ETSU, Johnson City, TN, August 9, 2002.

"Current Issues in Treatment of Dementia," Roanoke Psychiatric Society, Roanoke, VA, June 26, 2002.

"Comfort Foods: Should We Just Surrender Now?," Northeast Tennessee Nurse Practitioner's Association Annual Meeting, Bristol, TN, September 14, 2002.

"Gender Identity Disorders: Diagnosis and Management," Psychiatry Grand Rounds, University of Florida, Gainesville, Florida, September 20, 2002.

"Gender Identity Disorders: Diagnosis and Management," Psychiatry Grand Rounds, Meharry Medical College, Nashville, TN, October 9, 2002.

"New Issues in the Management of Bipolar Disorder," Grand Rounds, Lakeshore Mental Health Institute, Knoxville, TN, October 5, 2002.

"Pharmacological Management of Dementia," Psychiatry Grand Rounds, Western State Hospital, Staunton, Virginia, March 19, 2003.

"Appropriate Use of Antipsychotics in Primary Care Practice," Tricounty Medical Society Meeting, Johnson City, TN, April 3, 2003.

"Appropriate Use of Antipsychotics in Primary Care Practice," 2003 Primary Care Conference, Johnson City, TN, April 1, 2003.

"Pharmacological Management of Dementia," Grand Rounds, Gaston Memorial Hospital, Gastonia, NC, May 13, 2003.

"Brown G R, McBride L, Williford W, Bauer M: Impact of childhood sexual abuse on bipolar disorder. Proceedings of the 5th International Conference on Bipolar Disorders, Pittsburgh, PA, 2003 (poster presented by Dr. Bauer in my absence).

"Aripiprazole Use in Psychiatry," Grand Rounds, Lakeshore Mental Health Institute, Knoxville, TN, August 22, 2003.

"Use of Anticonvulsants in Psychotic Disorders," Tennessee Psychiatric Association, Smoky Mountain Chapter Meeting, Knoxville, TN, August 28, 2003.

"Application of the Harry Benjamin International Gender Dysphoria Association's Standards of Care to the Prison Setting: Recent Victories for Transgender Healthcare in the USA," 18th Biennial Symposium of the HBIGDA, Gent, Belgium, September 11, 2003.

"Family and Systems Aggression Towards Therapists Working with Transgendered Clients," 18th Biennial Symposium of the HBIGDA, Gent, Belgium, September 12, 2003.

"Impact of Childhood Abuse on Disease Course in Veterans with Bipolar Disorder," 97th Annual Meeting of the Southern Medical Association, Atlanta, Georgia, November 8, 2003.

"Gender Dysphoria: Diagnosis and Management," Grand Rounds presentation, Marshall Medical School, Huntington, West Virginia, January 9, 2004.

"Gender Dysphoria: Diagnosis and Management," Grand Rounds presentation, Catawba State Hospital, Roanoke, Virginia, March 17, 2004.

"Treatment Resistant Schizophrenia," Grand Rounds presentation, Broughton State Hospital, Morganton, North Carolina, March 25, 2004.

"Antipsychotic Use in Geriatric Populations," Grand Rounds presentation, Tampa VAMC, Tampa, Florida, April 23, 2004.

"Gender Identity Disorders,", Grand Rounds presentation, University of TN College of Medicine, Memphis, TN, May 14, 2004.

"Overcoming Barriers to Treatment Success in Chronic Mental Illnesses," Grand Rounds, Salisbury VAMC, Salisbury, NC, June 3, 2004.

"Dissociative Identity Disorder Comorbid with Gender Identity Disorder: Review of the Literature
and Long-term Case Presentation," Southern Psychiatric Association, Savannah,
Georgia, October 2, 2004.

"Bipolar Disorder in Primary Care," CME Cat 1 presentation, Knoxville, TN, December 1, 2004.

"Bipolar Disorder and Impulsive Aggression in Primary Care Settings," CME Cat 1 presentation to
Tricities Nurse Practitioner Association, December 16, 2004.

"Overcoming Barriers to Treatment in Chronic Mental Illnesses," North Carolina Advanced
Practice Nurses Association, Greensboro, NC, February 13, 2005.

"Bipolar Disorder in the Primary Care Setting: What to do?," 9th Annual Update for Nurse
Practitioners, Johnson City, TN, March 21, 2005.

"Current Controversies in the Use of SSRI's," TriCounty Medical Society, Johnson City, TN, May
5, 2005.

"Transgender client aggression towards therapists," XIX Biennial Symposium of the Harry
Benjamin International Gender Dysphoria Association, Bologna, Italy, April 9, 2005.

"Gender identity disorder comorbid with dissociative identity disorder: review of the literature and
7 year followup case presentation. XIX Biennial Symposium of the Harry Benjamin
International Gender Dysphoria Association, Bologna, Italy, April 9, 2005.

"Current Controversies in the Use of SSRI's," CME symposium, Southern Medical Association
9th Annual Scientific Symposium, San Antonio, TX, November 12, 2005.

"Gender Identity Disorder: Diagnosis and Management," Grand Rounds, University of South
Florida, Tampa, Florida, January 6, 2006 (Videotaped version of presentation available at
www.TheCJC.com).

"Gender Identity Disorders," East Tennessee State University Women's Health Program, CME
Cat 1 symposium, Johnson City, TN, March 24, 2006.

"Update on Bipolar Disorder," Millennium Center, CME Cat I program, Johnson City, TN, March
31, 2006.

"Dealing with Chronic Mental Illness: Barriers to Treatment Success," Southside Virginia
Psychiatric Society Quarterly Meeting, Richmond, Virginia, April 3, 2006.

"Management of Gender Identity Disorders," Intermountain Psychological Association, invited
presentation, Johnson City, TN, June 8, 2006.

"Transgender Health Issues," Emory and Henry Lyceum Series, Emory, Virginia, September 18,
2006.

"Impact of Childhood Abuse in Veterans with Bipolar Disorder," 65th Annual Scientific Meeting of
the Southern Psychiatric Association, Baltimore, Maryland, September 29, 2006.

"Appropriate Use of Antipsychotics in Primary Care Settings," 100th Annual Meeting of the
Southern Medical Association, Charlotte, NC, October 14, 2006.

"Impact of Childhood Abuse on the Course of Bipolar Disorder," Keynote speaker, Perspectives
In Health, Texas Department of State Health Services Annual CME Symposium, Austin,
Texas, October 27, 2006.

"Autocastration as Surgical Self-Treatment in Incarcerated Persons with Gender Identity
Disorder," Southern Psychiatric Association Annual Meeting, Memphis, TN, August,
2007.

"Autocastration as Surgical Self-Treatment in Incarcerated Persons with Gender Identity
Disorder," XX Biennial Symposium of the World Professional Association for
Transgender Health, Chicago, Illinois, September, 2007.

"Gender Identity Disorders in the Military and VA," Panel discussion and presentation. XX
Biennial Symposium of the World Professional Association for Transgender Health,
Chicago, Illinois, September, 2007.

"Diagnosis and Treatment of Gender Identity Disorders," Mountain Update on Psychiatry, ETSU
CME Symposium, October 19, 2007.

"Voice Parameters That Result in Identification or Misidentification of Biological Gender in Male-
to-Female Transgender Veterans," poster presentation at the First Annual Gender
Spectrum Health Fair, Sponsored by the Alliance for Gender Awareness, Inc and Rutgers
Office of Social Education LGBT Communities Rutgers University College, New
Brunswick, NJ, November 8, 2007 (with R King et al, coauthors).

"Voice Parameters That Result in Identification or Misidentification of Biological Gender in Male-

to-Female Transgender Veterans," poster presentation at the XX Biennial Symposium of the World Professional Association for Transgender Health, Chicago, Illinois, September, 2007 (with R King, et al, coauthors).

"Voice Parameters That Result in Identification or Misidentification of Biological Gender in Male-to-Female Transgender Veterans," poster presentation at the Southern Medical Association Annual Scientific Meeting, Nashville, TN, September, 2008 (presented by E McDuffie on behalf of Brown, King, et al, coauthors).

"Evaluation and Management of Gender Identity Disorders," Cat I, 1.5 hour CME program, Annual Meeting of the Alaska Psychiatric Association, Alyeska, Alaska, April 18, 2009.

"Forensic Issues and Case Presentations on GID," Cat I, 1.5 hour CME program, Annual Meeting of the Alaska Psychiatric Association, Alyeska, Alaska, April 18, 2009.

"70 Veterans with Gender Identity Disturbances: A Descriptive Study," XXI Biennial Symposium of the World Professional Association for Transgender Health, Oslo, Norway, June 18, 2009.

"70 Veterans with Gender Identity Disturbances: A Descriptive Study", Annual Scientific Meeting of the Southern Medical Association, Dallas , Texas, December 4, 2009.

"Overview of Autocastration and Surgical Self Treatment in Prisons", National Commission on Correctional Healthcare Annual Meeting, October 10, 2010, Las Vegas, Nevada (invited two hour CME CAT I program)

"Autocastration- Overview and Case Series Presentation," Grand Rounds, East Tennessee State University, Johnson City, TN, April 29, 2011.

"Providing Healthcare for Transgender and Intersex Veterans," Live Meeting Series broadcast nationally by VA Talent Management System.  Co-Presenters Leonard Pogache, MD, Meri Mallard, RN; CME category I credit for each of 3 programs completed, November 22 (2 programs) and November 30, 2011.

"PBM Guidelines for Providing Care for Transgender and Intersex Veterans," copresenter with Lisa Longo, Pharm.D, Live Meeting Series broadcast nationally by VA Talent Management System, May 10 and May 14, 2012.

"Providing Culturally Competent Care for Transgender Veterans," invited Keynote address at Houston VAMC for symposium (CEU accredited) on LGBT Veteran healthcare, Houston, TX, August 17, 2012.

"Update on Version 7 of the WPATH Standards of Care," invited Keynote address for Mountain Area Health Education Center's Southeastern Summit on Transgender Healthcare, Category 1 CME accredited, Asheville, NC, August 24, 2012.

"History of Transgender Healthcare in the Department of Veterans Affairs," invited Keynote address for Mountain Area Health Education Center's Southeastern Summit on Transgender Healthcare, Category 1 CME accredited, Asheville, NC, August 25, 2012.

"Qualitative Analysis of Transgender Inmates' Correspondence: Implications for health Services in Departments of Correction", National Commission on Correctional Healthcare Annual Meeting, October 14, 2012, Las Vegas, Nevada (invited one hour CME CAT I program).

"Cross Sex Hormonal Treatment for Transgender Veterans," national Live Meeting for Women's Health Program, Department of Veterans Affairs, July 16, 2013.

 "Transgender Health Care Training for VA Health Care Providers", 3 hours Category 1 CME accredited , Minneapolis, MN, September 26, 2013.

"Sex Reassignment Options", national presentation to VA SCAN-ECHO and regional consultation teams responsible for VA transgender health consultations, July 2, 2013.

"Access to Care for Gender Dysphoric Inmates: Issues and Cases," Invited plenary speaker for the 21st Annual Forensic Rights and Treatment Conference, sponsored by Drexel University College of Medicine, Category 1 CME credit (1.5 hours), Harrisburg, PA, December 5, 2013.

"Forensic Aspects of Transgender Health Care in Prison," Grand Rounds, East Tennessee State University, Category 1 CME, March 7, 2014.

"Health Disparities Research: Suicidality in Gender Minorities as a Research Model," Grand Rounds, East Tennessee State University, Category 1 CME credit, May 20, 2014.

"Sex reassignment surgeries:  female-to-male," national presentation to VA SCAN-ECHO and regional consultation  teams responsible for VA transgender health consultations, Cat I

**App. 294**

CME, June 24, 2014.

"Sex reassignment surgeries:  male-to-female," national presentation to VA SCAN-ECHO and regional consultation  teams responsible for VA transgender health consultations, Cat I CME, July 8, 2014.; December 2, 9, 16, 23, 2014; February 24, 20-15.

"Medico-Legal Aspects of Providing Transgender Healthcare for Inmates," invited 2.5 hour presentation for national training program in LGBT healthcare for the Federal Bureau of Prisons, September 4, 2014.

"Mental health and medical outcome disparities in 5,135 transgender veterans: a case-control study,"  32nd Annual Conference of the Gay and Lesbian Medical Association, Category 1 CME credit, Baltimore, MD, September 11, 2014.

"Mental health and medical outcome disparities in 5,135 transgender veterans: a case-control study,"  Vanderbilt University Grand Rounds, Department of Psychiatry, Cat 1 CME credit, Nashville, TN, September 26, 2014.

"Mental health and medical outcome disparities in 5,135 transgender veterans: a case-control study,"  Drexel University Grand Rounds, Department of Psychiatry, Cat 1 CME credit, Philadelphia, PA, October 23, 2014.

"Pharmacotherapy issues with gender dysphoria," College of Psychiatric and Neuropsychiatric Pharmacists, Annual Meeting, Cat I CME credit, Tampa, FL, April 19, 2015.

"Lesbian, gay, bisexual, and transgender (LGBT) sociopolitical indicators and mental health diagnoses among transgender Veterans receiving VA care. Blosnich, J.R., Marsiglio, M.C., Gao, S., Gordon, A.J., Shipherd, J.C., Kauth, M., Brown, G.R., Fine, M.J. (2015, July). Department of Veterans Affairs Health Services   Research & Development/Quality Enhancement Research Initiative National Conference, Philadelphia, PA, July, 2015.

"Killing the Bore: How to Give Effective Medical Presentations," East Tennessee State University Department of Psychiatry and Behavioral Sciences Grand Rounds (Cat I CME), May 1, 2015.

 "Sex reassignment surgeries:  male-to-female," national presentation to VA SCAN-ECHO and regional consultation teams responsible for VA transgender health consultations, Cat I CME, July 21, July 28, 2015

"Sex reassignment surgeries:  female-to-male," national presentation to VA SCAN-ECHO and regional consultation teams responsible for VA transgender health consultations, Cat I CME, September 15, September 22, 2015.

"Transgender military service: Moving past ignorance in DoD and VHA," invited Keynote Address, Rush Medical University, Cat I CME credit, Chicago, IL, October 9, 2015.

"Health correlates of criminal justice involvement in 4,793 transgender veterans. Poster Presentation at the Annual National Conference on Correctional Health Care, Denver, CO, October 18, 2015.

"Open Transgender Military Service: Health Considerations," presentation to medical leadership of the USMC, Washington, DC, by videolink, January 27, 2016.

"Sex reassignment surgeries; masculinizing and feminizing," national presentations to VA SCAN-ECHO and regional consultation teams responsible for VA transgender health consultations, Cat I CME, June 7 and 28, 2016.

"Orange is not the new black—yet," Symposium on prison transgender mental health care and update on recent court cases supporting access to transgender health care in US prisons, 24th Biennial Scientific Symposium of the World Professional Association for Transgender Health, Amsterdam, The Netherlands, Cat I CME (1.5 hours), June 20, 2016.

"Harry Benjamin Plenary Lecture," invited Keynote address for the 24th Biennial Scientific Symposium of the World Professional Association for Transgender Health, Amsterdam, The Netherlands, Cat 1 CME, June 18, 2016. Available at www.wpath2016.com, timer marker 4:20.

"Health correlates of criminal justice involvement in 4,793 transgender veterans. Poster Presentation at the 24th Biennial Scientific Symposium of the World Professional

**App. 295**

Association for Transgender Health, Amsterdam,The Netherlands, Cat I CME, June 18, 2016.

"Breast cancer in a cohort of 5,135 transgender veterans over time," 24th Biennial Scientific Symposium of the World Professional Association for Transgender Health, Amsterdam, The Netherlands, Cat 1 CME, June 20, 2016.

"Impact of social determinants of health on medical conditions among transgender Veteran," Blosnich J, Marsiglio M, Dichter M., Gao S., Gordon M, Shipherd J, Kauth M, Brown G, Fine M. VA HSR&D Field-Based Meeting to Engage Diverse Stakeholders and Operational Partners in Advancing Health Equity in the VA Healthcare System. Philadelphia, PA, September, 2016

"Current and past military context and overview of transgender military service," Caring for Transgender Persons in a Changing Environment, Walter Reed National Military Medical Center and Uniformed Services University of the Health Sciences, Bethesda, MD, Cat I CME, 13 September, 2016.

"State of the Science: Current VHA research findings, policies, and transgender health care delivery model," Caring for Transgender Persons in a Changing Environment, Walter Reed National Military Medical Center and Uniformed Services University of the Health Sciences, Bethesda, MD, Cat I CME, September 13, 2016.

"Social determinants of health and their associations with medical conditions among transgender veterans," presented by first author John Blosnich, Ph.D., Field-Based Meeting to Engage Diverse Stakeholders and Operational Partners in Advancing Health Equity in the VA Healthcare System, Philadelphia, PA, September 20, 2016.

"Update on the Mountain Home Transgender Veteran Research Protocol," Grand Rounds, East Tennessee State University, Johnson City, TN, Cat 1 CME, September 23, 2016.

"History of transgender people in the military," Southeastern Transgender Health Summit 2016 Overcoming Barriers, Mountain Area Health Education Center, Asheville, NC, Cat 1 CME, September 25, 2016.

"Update on VA care for transgender veterans and summary of research." Southeastern Transgender Health Summit     2016 Overcoming Barriers, Mountain Area Health Education Center, Asheville, NC, Cat 1 CME, September 25, 2016.

"Transgender inmates in prison: perspectives from expert witnesses," Symposium Chair and presenter, United States Professional Association for Transgender Health, First Scientific Meeting, Los Angeles, CA, Cat 1 CME (1.5 hours), February 3, 2017.

"Changes in prescriptions of cross-sex hormones and psychotropic medications for 4,409 transgender veterans receiving services at VHA facilities," United States Professional Association for Transgender Health, First Scientific Meeting, Los Angeles, CA, Cat 1 CME, February 3, 2017.

"Sex reassignment surgeries; masculinizing and feminizing," national presentations to VA SCAN-ECHO and regional consultation teams responsible for VA transgender health consultations, Cat I CME, 4 hours, February 21, 28; May 9, 16, 2017.

"Transgender Health Care, Research, and Regulations in the Department of Defense," 4 hour/half day CME Cat I symposium (solo presenter), 2017 USMEPCOM Medical Leadership Training Seminar, San Antonio, TX, May 2, 2017.

"Transgender Health Care, Research, and Regulations in the Department of Defense," 4 hour CME Cat I symposium (solo presenter), Department of the Army, Fort Knox, KY, July 25, 2017.

"Transgender Health in the Prison Setting: Medical and Legal Issues," Oklahoma Department of Corrections statewide training workshop, Oklahoma City, OK, August 21, 2017.

"Role of the Psychiatrist in the Death Penalty," East Tennessee State University, Department of Psychiatry and Behavioral Sciences, Grand Rounds, Cat I CME, March 30, 2018.

"A Life of Translational Health Research: From Basements, Prison Cells, and Big Data to the Courtroom " (invited presentation), WPATH 25TH Scientific Symposium,

Buenos Aires, Argentina, Cat I CME, November 5, 2018.

"Nationwide Transgender Veteran E-Consultation," WPATH 25th Scientific Symposium, Buenos Aires, Argentina, Cat I CME, November 5, 2018.

"Overview of the Mountain Home/VHA Transgender Veteran Cohort" (invited Plenary Presentation), WPATH 25th Scientific Symposium, Buenos Aires, Argentina, Cat I CME, November 5, 2018.

"Grand Rounds: Diagnosis and Management of Gender Dysphoria," Ballad Health/Bristol Regional Medical Center (invited presentation), Bristol, TN, Cat I CME, February 5, 2019.

"Medico-Psychiatric-Legal Issues with Transgender Inmates in the Corrections Environment," invited four hour CME workshop, Idaho Department of Corrections, Boise, Idaho, April 10, 2019.

"Veterans and Gender Dysphoria," invited presentation, Rotary Club of Johnson City, Johnson City, TN, August 12, 2019.

"Gender Dysphoria: Forensic Psychiatry Issues," invited Grand Rounds presentation, New York Medical College, Westchester, NY, Cat I CME, March 24, 2020.

"Role of the Psychiatrist In The Death Penalty," Psychiatry Grand Rounds, East Tennessee State University, Johnson City, TN, Cat I CME, Aug 14, 2020

"Psychiatric Implications of Gender Confirming Hormonal Treatment," invited 1 hour Cat I CME presentation, College of Psychiatric and Neurologic Pharmacists, San Antonio Texas, April 25, 2022.

"Medical and Mental Health Aspects of Gender Affirming Hormonal Treatment in Transgender and Gender Diverse Patients," Invited Cat I CME presentation, 1 hour, 3rd National Psychiatry Summit, Clinical Education Alliance, May 17, 2024 (2300+ registrants).

"Evolution Of Transgender and Gender Diverse Prisoners' Access To Health Care Behind Bars: 25 Years Of Expert Witness Experience Using The WPATH Standards Of Care (Versions 5-8)," CME Cat I presentation, WPATH Biennial Scientific Symposium, Lisbon, Portugal, September 28, 2024.


**SYMPOSIA ORGANIZED AND/OR MODERATED:**

1.      Psychosocial Aspects of HIV Disease in the Military, organizer/moderator/ presenter, Wichita Falls, Texas, 25 April, 1990.

2.      Full Day Roundtable Symposium on Atypical Antipsychotics, organizer/moderator, Excerpta Medica, Asheville, North Carolina, 22 April, 1995.

3.      Mountain Update on Anxiety Disorders, Course Director, East Tennessee State University, Blowing Rock, North Carolina, 28-29 April, 1995.

4.      Medicine and Sexuality Course, Course Director, East Tennessee State University and James H. Quillen VAMC, Johnson City, TN, 13 June, 1997.

5.      Half Day audiotaped symposium moderator/organizer on Innovative Uses of Atypical Antipsychotics, Excerpta Medica, Blackberry Inn, Townsend, TN, 16 November, 1997.

6.      Novel Uses of Atypical Antipsychotics, Symposium Moderator, Marriot Griffin Resort, Janssen Research Foundation, Lexington, KY, 4 December, 1998.

7.       Novel Uses of Atypical Antipsychotics, Symposium Moderator, Blackberry Inn, Townsend, TN, 10 April, 1999.

8.   Psychiatry and Neurology Poster Session Moderator for Southern Medical Association's 97th Annual Scientific Assembly, Atlanta, Georgia, November 6, 2003.

**App. 297**

9.  Moderator for East Tennessee State University Department of Psychiatry monthly Journal Club/Critical Evaluation of the Literature series, 2002-2011.

10. Chairman's Rounds Program, Mountain Home VA/ETSU Department of Psychiatry, monthly live patient interview series, 2014-present.


**TELEVISED and TAPED MEDIA EVENTS:**

WKPT local television interview on sleep disorders, Johnson City, 1995.

TNN (The Nashville Network), filmed winning an international revolver competition and then interviewed on silhouette handgun shooting, Oakridge, TN, 1998.

CME, Inc. audiotaped faculty presentations as advertised in "Psychiatric Times," various cities and topics.

Channel 5, London, England; documentary on psychiatric aspects of firearms, 2004.

"Cruel and Unusual", documentary on transgender health care issues in the prison setting, 2005 release, available from jbaus@aol.com; aired on Women's Entertainment channel on July 2, 2007

ABC 20/20, "Becoming Diane" segment on gender identity disorders, October 12, 2005.

The Carter Jenkins Center, www.thecjc.org, taped CME cat I lecture available on the internet, "Evaluation and Management of Gender Identity Disorder," January 6, 2006.

CNN, Kosilek Trial testimony/interview, June 1, 2006.

CNBC, "The Big Idea with Donny Deutsch," interview, June 6, 2006.

PBS News Hour, Transgender Soldiers Gain Ground as US Military Transitions, May 9, 2016, http://www.pbs.org/newshour/bb/transgender-soldiers-gain-ground-as-u-s-military-transitions/

Multiple Psychiatry Grand Rounds completed at ETSU, 2010-present, available on line at the ETSU CME Office website, www.etsu.edu/CME and on Youtube.

**RESEARCH PROJECTS AND GRANT SUPPORT:**

Principal Investigator, "Phase III Comparison of Two Doses of Risperidone For Acute Exacerbations of Chronic Schizophrenia." Inpatient setting, grant support from Janssen Pharmaceutica, approximately $50,000. Completed 1996.

Principal Investigator, Sexual Functioning and Personality Characteristics of Transgendered Men in a Nonclinical Setting. Collaboration with Tom Wise, M.D. (Chair, Dept. of Psychiatry, Fairfax Hospital, Falls Church, VA), Peter Fagan, Ph.D. (Johns Hopkins Sexual Behaviors Consultation Unit), and Paul Costa, Ph.D. (NIMH). Completed 1990-1995.

DSM-IV Reliability Field Trials, Site Coordinator, 10 investigators, completed in 1995.

Principal Investigator, Psychosocial Adjustment of Spouses of Transgendered Men; study involving long-term support group work and nationwide questionnaire data collection from 1986 to 1997. Completed. Private non-profit organization grant support received.

**App. 298**

Coinvestigator, International Study of 800 Transgender Men: The Boulton and Park Experience. 1988-1992. This was the largest community based survey study of transgender people in the U.S. conducted to date. Completed.

Principal Investigator, "A Double-Blind, Placebo-Controlled, Dose-Response Comparison of the Safety and Efficacy of Three Doses of Sertindole and Three Doses of Haloperidol in Schizophrenic Patients." Phase III trial, inpatient setting. Grant support by Abbott Laboratories, approximately $60,000 over one year. Completed 1994-1995. Contributed to FDA consideration of Serlect for U.S. marketing, 1996-1997.

Principal Investigator, "An Open Label, Long Term, Safety Study of Sertindole in Schizophrenic Patients." Phase II trial, outpatient setting. Grant support from Abbott Laboratories, approximately $50,000 over two years. Completed 1996.

Principal Investigator, "Biopsychosocial Natural History Study of HIV Infection in the USAF." RO-1 equivalent grant from Henry M. Jackson Foundation for the Advancement of Military Medicine, approximately $2,000,000. Completed 1987-1993, including pilot data collection.

Unrestricted Educational Grants, $19,000, for Mountain Update on Anxiety Disorders CME conference (SKB, Lilly, Mead-Johnson), 1995.

Unrestricted Educational Grants totaling approximately $30,000 annually in support of the VAMC/ETSU Psychiatry Grand Rounds and Visiting Professor Program, 1994-2000; 2002-2006. Grant funding following CME guidelines and administered through the ETSU Office of Continuing Education.

Principal Investigator, "Double-Blind Crossover Study of Zolpidem and Temazepam in Elderly, Hospitalized Patients." Funded through Psychiatry Research Fund, Mountain Home VAMC, and Chair of Excellence in Geriatrics, ETSU. Approved study, ultimately closed due to lack of appropriate subjects available for recruitment.

Principal Investigator, "A Randomized, Double-Blind Placebo Controlled Study of Risperidone for Treatment of Behavioral Disturbances in Subjects with Dementia." Collaboration with R. Hamdy, Cecile Quillen Chair of Excellence in Geriatrics, approximately $100,000 at full recruitment, 1995-1997; completed.

Associate Investigator, "Use of Nefazodone in Depressed Women with Premenstrual Amplification of Symptoms: a Pilot Study." Principal Investigator: Merry Miller, M.D. $5,000 pilot study grant, 1996-1999; completed.

Associate Investigator, "Voice Characteristics Associated with Gender Misidentification: A Pilot Study." Principal Investigator: Robert King, M.A. Unfunded study in data analysis phase, 2001-2005; completed in 2007.

Principal Investigator, Johnson City site, VA Cooperative Study #430, "Reducing the Efficacy-Effectiveness Gap in Bipolar Disorder." Health services research conducted at 12 sites nationwide. Grant for this site's operations total $435,000 over five years of study, 1997-2003; completed.

Coinvestigator, "Treatment for Erectile Disorder with Viagra in a VA Population: Efficacy and Patient and Partner Satisfaction." Principal Investigator: William Finger, Ph.D. Approximately $30,000 total grant over two year period, 2000-2001; study concluded.

Principal Investigator, Johnson City site, "A Multicenter, Randomized, Double-Blind, Placebo Controlled Study of Three Fixed Doses of Aripiprazole in the Treatment of Institutionalized Patients with Psychosis Associated with Dementia of the Alzheimer's Type." Phase III clinical

**App. 299**

trial, sponsored by Bristol-Meyers Squibb, 2000-2001, $174,000 at full recruitment.  Extension phase, 42 weeks, separate grant at maximum of $232,800. Approved April, 2000; completed.

Coinvestigator, "Effects of zaleplon on postural stability in the elderly." Principal Investigator: Faith Akin, Ph.D. $1000 grant for subject recruitment expenses, 2000-2001.

Principal Investigator, James H. Quillen VA site, "ZODIAK study; An International, Multicenter Large Simple Trial (LST) To Compare the Cardiovascular Safety of Ziprasidone and Olanzapine." Pfizer Pharmaceuticals, approximately $20,000 at full recruitment.  Approved April, 2002, recruitment completed and closed in 2004. Results published: Strom B, Eng S, Faich G, et al: comparative mortality associated with ziprasidone and olanzapine in real-world use among 18,154 patients with schizophrenia: The ziprasidone Observational Study of Cardiac Outcomes (ZODIAC). Amer J Psychiatry 168(2):193-201, 2011.

Coinvestigator, "Survey of Family and Systems Aggression Against Therapists."
Unfunded study, completed between 2002 and 2003; Randi Ettner, Ph.D., Principle Investigator; completed.

Coinvestigator, "Effect of Olanzapine on the Auditory Gating Deficit in Patients with Schizophrenia."  Principal Investigator: Barney Miller, Ph.D. Investigator-initiated study funded by Lilly, approximately $85,000.  2002.  Study did not recruit subjects at ETSU and was closed 2003.

Principal Investigator, multicenter study, "The SOURCE Study: Schizophrenia Outcomes, Utilization, Relapse, and Clinical Evaluation."  Janssen Research, $100,000 grant at full recruitment (two year open label follow-up study of risperidone Consta), 2005-2007; second highest recruitment of 43 centers in multicenter study. Completed.  See publications from this study under the Publications section, numbers 128 and 129.

Coauthor on grants to VA Central Office for program enhancements to mental health programs at Mountain Home VAMC; approximately $2,000,000 received for additional staff and support for residential treatment programs and PTSD clinic expansion, 2006-2007.

Principal Investigator in conjunction with Herbert Meltzer, MD, Vanderbilt University,
" High Dose Risperidone Consta for Patients with Schizophrenia with Unsatisfactory Response to Standard Dose Risperidone or  Long-Acting Injectable."  Phase IV study of outpatients with schizophrenia who are partially responsive to risperidone oral and/or long-acting injectable, using a double-blind methodology to study doses between 50 and 100 mg every two weeks.  Site funding of approximately $100,000.  2008-2010. Approved by ETSU IRB but negotiations between sponsor and Department of Veterans Affairs were not completed on intellectual property rights. Study not initiated at Mountain Home VAMC.

Principal Investigator (Everett McDuffie, MD, coinvestigator), "Descriptive study of veterans with gender identity disturbances: Characteristics and comorbidities, 1987-2007."  Unfunded study that is first to characterize a population of 75 U.S. veterans with gender identity disturbances over a 20 year time frame.  Completed 2009.

Principal Investigator: "Analysis of State and Federal Prison Directives Related to Transgender Inmate Medical Care and Placement."  Unfunded review of existing prison policies through the end of 2007.  Completed 2008.

Principal Investigator: "Qualitative Analysis of Concerns of Transgender Inmates in the United States. Unfunded analysis of 129 letters from self-identified transgender inmates across the US." Completed 2012.

Coinvestigator, "Prevalence and Suicidality in Transgender Veterans"; coinvestigator with collaborators at the VA Center of Excellence for Suicide Prevention. 2011-2013. Completed;

publication of results in October, 2013.

Principal Investigator, "Assessing Health Outcomes, Health Care Utilization, and Health Disparities in Transgender Veterans Receiving Care in the Veterans Health Administration." Approved by ETSU IRB 7/1/13; protocol completed 2019.  Six manuscripts published.

Consultant, Patient-Centered Outcomes Research Institute grant on transgender healthcare outcomes (STRONG), Michael Goodman, MD, Principal Investigator, Emery University, 2014-2020.

Advisory Board Member, Health Outcomes and Health Care Use Among Transgender Veterans (CDA 14-408), John Blosnich, Principal Investigator, VHA HSR&D Career Development Award, 2016 – 2021, total award: $863,394

**References available upon request.**

**App. 301**

# EXHIBIT B

*Special Section Article*

# Medical Aspects of Transgender Military Service

Armed Forces & Society
2015, Vol. 41(2) 199-220
© The Author(s) 2014
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0095327X14545625
afs.sagepub.com

Ⓢ SAGE

**M. Joycelyn Elders[1], George R. Brown[2],
Eli Coleman[3], Thomas A. Kolditz[4],
and Alan M. Steinman[5]**

**Editor's note:** This is the first of three articles in this issue on transgender issues in the military.

## Abstract

At least eighteen countries allow transgender personnel to serve openly, but the United States is not among them. In this article, we assess whether US military policies that ban transgender service members are based on medically sound rationales. To do so, we analyze Defense Department regulations and consider a wide range of medical data. Our conclusion is that there is no compelling medical reason for the ban on service by transgender personnel, that the ban is an unnecessary barrier to health care access for transgender personnel, and that medical care for transgender individuals should be managed using the same standards that apply to all others. Removal of the military's ban on transgender service would improve health outcomes, enable commanders to better care for their troops, and reflect the military's commitment to providing outstanding medical care for all military personnel.

## Keywords

transgender service members, medical care, mental health, "don't ask, don't tell"

[1] University of Arkansas College of Medicine (Emeritus), Little Rock, AR, USA
[2] East Tennessee State University, Johnson City, TN, USA
[3] Department of Family Medicine and Community Health, University of Minnesota Medical School, Duluth, MN, USA
[4] Yale School of Management, New Haven, CT, USA
[5] US Coast Guard (Retired), Olympia, WA, USA

**Corresponding Author:**
Thomas A. Kolditz, Yale School of Management, P.O. Box 208200, New Haven, CT 06520-8200, USA.
Email: thomas.kolditz@yale.edu

## Introduction

At least eighteen countries allow transgender personnel to serve openly, but the United States is not among them.[1] When ''don't ask, don't tell'' was overturned in 2011, gay, lesbian, and bisexual personnel were allowed to serve openly, but regulations banning transgender military service remained in place. Unlike the rationales that justified excluding gays, lesbians, and that emphasized operational issues including readiness, cohesion, recruitment and morale, the rules barring transgender military service are, for the most part, embedded in medical regulations, and are premised on assumptions about the medical fitness of transgender personnel.[2] Despite the repeal of ''don't ask, don't tell,'' and the fact that the Veterans Health Administration (VHA) enacted a 2011 policy mandating the provision of health care benefits to transgender veterans, medical regulations that bar the service of transgender personnel have not been updated.[3] In this article, we conduct the first-ever analysis of the plausibility of rationales that justify regulations prohibiting transgender service.[4] After a brief introduction, we discuss Defense Department regulations barring transgender service as well as the four medical rationales that justify them. Then, we assess the plausibility of each rationale.

The term *transgender* is a broad, umbrella term that refers to individuals who do not identify with the physical gender that they were assigned at birth.[5] There are an estimated 700,000 transgender American adults, representing 0.3 percent of the nation's adult population. While some military regulations and legal cases that we discuss refer to *transsexuals*, and while some transgender people use the term transsexual to describe someone who lives permanently with a gender different from their sex at birth, many view the term as outdated and no longer use it, which is why we use the term transgender in this article.

There is no single medical treatment for transgender individuals who undergo gender transition. Surgical transition refers to the use of gender-confirming surgery to change one's gender while medical transition refers to the use of surgery and/or cross-sex hormone therapy (CSH) to do so. Survey data indicate that 76 percent of transgender individuals have had cross-sex hormone therapy and that only a small minority have had genital reconstructive surgery.[6] The transition period for most people lasts between one and six months.[7]

Scholars estimate that 15,500 transgender individuals serve in the US armed forces, including 8,800 in the active component and 6,700 in the National Guard and Reserve components, and that 134,000 veterans are transgender.[8] Transgender adult citizens are more than twice as likely as non-transgender Americans (2.2 percent transgender vs. 0.9 percent non-transgender) to serve currently in the military.[9] We are only aware, however, of approximately two dozen service members who have been discharged because of their transgender identity in recent years.[10]

## Defense Department Regulations Barring Transgender Service

Transgender individuals are not allowed to enlist or serve in the US armed forces, and the rules barring their participation in the military are articulated in medical regulations that govern accession and retention. Medical standards for enlistment and retention are designed to ensure that service members are free of conditions that would interfere with duty performance, endanger oneself or others, or impose undue burdens for medical care, and current regulations contain a list of disqualifying conditions that preclude applicants from joining or remaining in the military. Accession regulations that are articulated in Department of Defense Instruction (DODI) 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* disqualify physical conditions including "abnormalities or defects of the genitalia including but not limited to change of sex, hermaphroditism, pseudo-hermaphroditism, or pure gonadal dysgenesis" and "learning, psychiatric, and behavioral" conditions such as "current or history of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[11] Thus, the accession prohibition against transgender military service includes both a physical component barring "change of sex" and a psychological component barring "psychosexual conditions, including but not limited to transsexualism."

Retention regulations contained in DODI 1332.14, *Enlisted Administrative Separations* include "sexual gender and identity disorders" as grounds for administrative separation at the discretion of a commander.[12] Even though retention regulations do not include a physical component such as "change of sex," gender-confirming surgery would surely be taken as evidence of a "sexual gender and identity disorder" and would thus subject any service member who changed their gender surgically to discharge. Even transgender service members who do not wish to take hormones, have surgery, or undergo any other aspect of gender transition are subject to discharge under the psychological components of the accession and retention regulations.

Medical regulations generally allow for waivers of accession standards under some circumstances. Under DODI 6130.03, the services shall "Authorize the waiver of the standards [for entry] in individual cases for applicable reasons and ensure uniform waiver determinations."[13] Service-specific implementing rules affirm the possibility of accession waivers. By Army rules, for example, "Examinees initially reported as medically unacceptable by reason of medical unfitness . . . may request a waiver of the medical fitness standards in accordance with the basic administrative directive governing the personnel action."[14]

While accession standards allow for the possibility of waivers, they also specify that accession waivers will not be granted for conditions that would disqualify an individual for the possibility of retention: "Waivers for initial enlistment or appointment, including entrance and retention in officer procurement programs, will not be

granted if the applicant does not meet the retention standards."[15] As discussed previously, because some conditions related to transgender identity are grounds for discharge, and because recruiters cannot waive a condition upon enlistment that would be disqualifying for retention, transgender individuals cannot obtain medical waivers for entrance into the military.

We conducted a comprehensive review of all Department of Defense (DOD)-wide as well as Army and Navy/Marine regulations governing transgender service, but we do not address service-specific rules here because they are largely consistent with DOD-wide regulations discussed in this section.[16] Air Force medical standards governing enlistment and retention were removed from public access upon the latest revision of Air Force Instruction 48-123, *Medical Examinations and Standards*, in November 2013.

US military policies that ban transgender service members do not include rationales that explain why the armed forces prohibit them from serving, although the policies are embedded in comprehensive medical and other regulations that are designed to preserve health and good order. While regulations do not offer reasons for banning transgender service members, several transgender individuals have challenged the policy in court and military representatives have presented rationales via testimony and affidavit. In *Doe v. Alexander*, a federal district court noted "evidence that transsexuals would require medical maintenance to ensure their correct hormonal balances and continued psychological treatment and that the army would have to acquire the facilities and expertise to treat the endocrinological complications which may stem from the hormone therapy. The army might well conclude that those factors could cause plaintiff to lose excessive duty time and impair her ability to serve in all corners of the globe."

In testimony for *Leyland v. Orr*, an Air Force consulting physician testified that assigning individuals who had undergone a sex change operation to remote geographic areas "would be equivalent to placing an individual with known coronary artery disease in a remote location without readily available coronary care." Finally, in *DeGroat v. Townsend*, an Air Force consulting physician stated that "Individuals who have undergone sex change procedures would not be qualified for world-wide service" in part because they could be "without access to potentially acute specialized tertiary medical care, which would only be available at major medical centers. Overall, it is neither in the best interest of the individual patient to have their access to necessary health care limited during potential Air Force duties nor is it in the best interest of the Air Force to have to provide the medical care that these individuals may require."[17]

The regulations, in short, appear to be premised on the notion that in four different ways, transgender personnel are not medically fit and that addressing their medical needs would place an undue burden on commanders and doctors. Specifically, the regulations appear to be justified by the notions that (1) transgender personnel are too prone to mental illness to serve, (2) cross-sex hormone therapy is too risky for medical personnel to administer and monitor, (3) gender-confirming surgery is too

complex and too prone to postoperative complications to permit, and (4) transgender personnel are not medically capable of deploying safely.[18] We address each of these rationales in turn.

## Mental Health

Some of the regulatory provisions that prohibit transgender service emphasize psychological factors. In turn, scholars have found that some transgender service members report poor mental health. One recent study concluded that the transgender community faces "elevated rates of suicide, risk for HIV infection, exposure to trauma, and other health challenges."[19] In a sample of 1,261 transgender respondents with prior military service, 40 percent had attempted suicide. Among seventy veterans evaluated for gender identity disorder between 1987 and 2007, 4 percent "had actively harmed their genitals," 61 percent "revealed a history of serious suicidal thoughts," and 43 percent "had additional psychiatric diagnoses exclusive of [gender identity disorder]."[20]

Despite such data, arguments based on mental health are not convincing rationales for prohibiting transgender military service for two reasons. First, and as discussed in greater detail subsequently, DODI 6130.03, the document that lays out medical standards that bar service for transgender personnel, is based on the outdated view that simply having a transgender identity is a mental illness.[21] Indeed, scientists have abandoned psychopathological understandings of transgender identity, and no longer classify gender nonconformity as a mental illness. Second, in contrast to rules categorically barring all transgender personnel regardless of fitness for duty, military regulations governing most psychological conditions strike a careful balance between admitting those whose conditions can be managed without imposing undue burdens on commanders or doctors while excluding those whose conditions would impair their service. Given that many service members diagnosed with a range of psychological conditions are allowed to serve and, as discussed subsequently, having a transgender identity is no longer considered a mental illness, it is implausible to suggest that the military must ban transgender personnel because they are not mentally fit to serve.

While mental health professionals used to consider transgender identity as a mental illness, this is no longer the case. In the newest edition of the *Diagnostic and Statistical Manual* (*DSM-5*), a comprehensive classification of psychological conditions and mental disorders that reflects the most up-to-date medical understandings, gender identity disorder has been replaced with gender dysphoria, a diagnostic term that refers to an incongruence between a person's gender identity and the physical gender that they were assigned at birth, and to clinically significant distress that may follow from that incongruence.[22] While gender identity disorder was pathologized as an all-encompassing mental illness, gender dysphoria is understood as a condition that is amenable to treatment.[23] And mental health professionals agree that not all transgender individuals suffer from dysphoria. In addition, the World Health

Organization's Working Group on the Classification of Sexual Disorders and Sexual Health (WGCSDSH) has recommended that the forthcoming version of the *International Statistical Classification of Diseases and Related Health Problems* (*ICD*-11), due for publication in 2015, ''abandon the psychopathological model of transgender people based on 1940's conceptualizations of sexual deviance.''[24]

The reclassification of transgender identity in both *DSM* and *ICD* is based, in part, on the understanding among scientists and medical practitioners that distress can be the result of prejudice and stigmatization, not mental illness, and that many individuals who do not identify with the physical gender that they were assigned at birth do not suffer from clinically significant distress, and therefore do not have a medical or psychological condition.[25] WGCSDSH members wrote recently that ''there are individuals who today present for gender reassignment who may be neither distressed nor impaired.''[26] The high reported rates of distress among transgender veterans and service members have been based on clinical samples that overrepresented patients requiring psychological care. In addition, a significant body of evidence shows that treatment can alleviate symptoms among those who do experience distress. A meta-analysis of more than 2,000 patients in seventy-nine studies published between 1961 and 1991 found ''Favorable effects of therapies that included both hormones and surgery ... Most patients reported improved psychosocial outcomes, ranging between 87% for MTF patients and 97% for FTM patients.'' Satisfaction rates have increased over time: ''studies have been reporting a steady improvement in outcomes as the field becomes more advanced.''[27]

Defense Department rules concerning mental health, deployment, and fitness for duty do not regulate gender identity in a manner that is consistent with the management of other psychological conditions, and have the effect of singling out transgender personnel for punishment even when they are mentally healthy. Defense Department rules categorically ban all recruits who have a ''learning, psychiatric, and behavioral'' condition such as a ''current or history of psychosexual conditions, including but not limited to transsexualism,'' as well as all currently serving personnel with a ''sexual gender and identity disorder,'' regardless of whether the individual in question is fit for duty or suffers from any mental distress. By contrast, Defense Department regulations governing many other psychological conditions carefully balance between admitting those whose conditions can be managed without imposing undue burdens on commanders or doctors while excluding those whose conditions would impair their service. For example, DODI 6130.03 prohibits individuals suffering from serious mental illnesses such as autistic, schizophrenic, and delusional disorders from enlisting in the armed forces. Yet for less serious disorders, regulations strike a careful balance. Thus, individuals with attention deficit hyperactivity disorder are prohibited from enlisting unless they meet a number of criteria, including documenting that they maintained a 2.0 grade point average after the age of fourteen, and individuals with simple phobias are banned from enlisting unless they meet other criteria, including documenting that they have not required medication for the past twenty-four continuous months.

Retention regulations strike a balance as well. For those who develop mood or anxiety disorders while in the military, regulations require a referral for physical disability evaluation only if their condition requires extended or recurrent hospitalization or interferes with duty performance. Service members requiring medication for mood and anxiety disorders are not categorically barred from deployment. The determination depends on the seriousness and stability of the condition, logistical difficulties in providing medication, and the need for clinical monitoring.

Finally, empirical data suggest that many non-transgender service members continue to serve despite psychological conditions that may not be as amenable to treatment as gender dysphoria. A 2012 meta-analysis of available scholarship estimated that 5.7 percent of active-duty service members who had never been deployed suffered from major depressive disorder and that the prevalence rate among deployed service members was approximately 12 percent.[28] In 2009, at least 15,328 service members were hospitalized for mental health disorders, and the *Los Angeles Times* reported in 2012 that "110,000 active-duty Army troops last year were taking prescribed antidepressants, narcotics, sedatives, antipsychotics and anti-anxiety drugs."[29] According to the Congressional Research Service, "Between 2001 and 2011 ... [a] total of 936,283 servicemembers, or former servicemembers during their period of service, have been diagnosed with at least one mental disorder over this time period ... Nearly 49 percent of these servicemembers were diagnosed with more than one mental disorder."[30] During manpower shortages, non-transgender individuals whose psychological well-being has not met entrance standards outlined in DODI 6130.03 have been able to obtain waivers allowing them to enlist in the military. According to the National Academy of Sciences, 1,468 of the 4,303 applicants (34 percent) who failed to meet psychiatric entrance standards from May 1, 2003, through April 30, 2005, received waivers.[31]

While regulations are intended to prevent individuals with significant psychological impairments from serving, the regulations themselves pose significant obstacles to the well-being of some troops. Current restrictions discourage transgender individuals from getting the care they need, exacerbating symptoms and in some cases leading to dependence on alcohol or drugs.[32] And, research has also shown that policies that force individuals to conceal their identities can have significant mental health consequences.[33] The British regulatory provision on mental health and transgender military service may warrant consideration at this point: "Although transsexual people generally may have an increased risk of suicide, depression and self-harm, transsexual applicants should not automatically be referred to a Service Psychiatrist. Transsexual applicants with no history of mental health problems or deliberate self-harm who meet other fitness standards should be passed as being fit to join the Armed Forces."[34]

## Cross-sex Hormone Treatment

Military representatives cited previously have indicated that cross-sex hormone treatment is too risky and complicated for medical personnel to administer and

monitor. Our argument, by contrast, is that the risks associated with cross-sex hormone treatment are low and that despite various restrictions that prohibit military members from seeking medical treatments, the military's unwillingness to allow any transgender service members to undergo cross-sex hormone therapy is inconsistent with the fact that many non-transgender personnel are permitted to take hormones.[35]

Many, but not all, transgender people wish to take cross-sex hormones in order to achieve feminization or masculinization of their hair and fat distribution, genitalia, and musculature, and to achieve and maintain a gender presentation consistent with their gender identity. Hormonal therapy for male-to-female (MTF) reassignment involves medications that block the production and effects of testosterone (antiandrogen therapy) and simultaneously produce feminizing effects (estrogen therapy). For female-to-male (FTM) patients, the main treatment for hormonal reassignment is testosterone, which can be administered through patches, gels, or injection and which usually produces satisfactory results. Most effects take place beginning at eight weeks and maximize at about two years and vary depending on age and genetic makeup.

Despite some mild risks associated with cross-sex hormone therapy, over fifty years of clinical experience have demonstrated that hormones are an effective treatment for gender dysphoria, that psychological benefits follow from cross-sex hormone administration, and that the incidence of complications is quite low.[36] Studies looking at the risk of blood clots from estrogen found an occurrence of anywhere from 0 to 142 blood clots per 10,000 people per year, with much lower rates in more recent studies with newer estrogens and non-oral administration.[37] Clinics with a high volume of transgender patients on estrogen therapy report having "rarely seen adverse effects."[38]

While the use of hormones may entail some risk, the military consistently retains non-transgender men and women who have conditions that may require hormone replacement. For example, the military lists several gynecological conditions (dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, hysterectomy, or oophorectomy) as requiring referral for evaluation only when they affect duty performance. And the only male genitourinary conditions that require referral for evaluation involve renal or voiding dysfunctions. The need for cross-sex hormone treatment is not listed as a reason for referral for either men or women. The military also allows enlistment in some cases despite a need for hormone replacement. DODI 6130.03, for example, does not disqualify all female applicants with hormonal imbalance. Polycystic ovarian syndrome is not disqualifying unless it causes metabolic complications of diabetes, obesity, hypertension, or hypercholesterolemia. Virilizing effects, which can be treated by hormone replacement, are expressly not disqualifying.

Hormonal conditions whose remedies are biologically similar to cross-sex hormone treatment are grounds neither for discharge nor even for referral for medical evaluation, if service members develop them once they join the armed forces. Male hypogonadism, for example, is a disqualifying condition for enlistment, but does not

**App. 310**

require referral for medical evaluation if a service member develops it after enlisting. Similarly, DODI 6130.03 lists "current or history of pituitary dysfunction" and various disorders of menstruation as disqualifying enlistment conditions, but personnel who develop these conditions once in service are not necessarily referred for evaluation. Conditions directly related to gender dysphoria are the only gender-related conditions that carry over from enlistment disqualification and continue to disqualify members during military service, and gender dysphoria appears to be the only gender-related condition of any kind that requires discharge irrespective of ability to perform duty.

Military policy allows service members to take a range of medications, including hormones, while deployed in combat settings. According to a Defense Department study, 1.4 percent of all US service members (approximately 31,700 service members) reported prescription anabolic steroid use during the previous year, of whom 55.1 percent (approximately 17,500 service members) said that they obtained the medications from a military treatment facility. One percent of US service members exposed to high levels of combat reported using anabolic steroids during a deployment.[39] According to Defense Department deployment policy, "There are few medications that are inherently disqualifying for deployment."[40] And, Army deployment policy requires that "A minimum of a 180-day supply of medications for chronic conditions will be dispensed to all deploying Soldiers." A former primary behavioral health officer for brigade combat teams in Iraq and Afghanistan told *Army Times* that "Any soldier can deploy on anything."[41] Although Tricare officials claimed not to have estimates of the amounts and types of medications distributed to combat personnel, Tricare data indicated that in 2008, "About 89,000 antipsychotic pills and 578,000 anti-convulsants [were] being issued to troops heading overseas."[42] The Military Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide.[43]

## Gender-confirming Surgery

According to the official policies of the American Medical Association, American Psychological Association, Endocrine Society, and World Professional Association for Transgender Health, gender-confirming surgeries can be medically necessary for some transgender individuals to mitigate distress associated with gender dysphoria.[44] Surgeries may include chest reconstruction and surgeries to create testes (scrotoplasty) and penises (phalloplasty or metoidioplasty, with or without urethral lengthening) for FTMs, and facial feminization, breast augmentation and surgeries to remove testes (orchiectomy) and create vaginas (vaginoplasty) for MTFs. That said, other transgender individuals do not want or require surgery to alleviate symptoms. A recent study noted that "As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither."[45]

**App. 311**

In considering the question of gender-confirming surgery among military personnel, it is important to recognize that regulations permit service members to have elective cosmetic surgeries at military medical facilities and that some of those elective procedures risk postoperative complications that can be more serious than those of medically necessary gender-confirming surgeries.[46] For example, the LeFort osteotomy procedures and mandibular osteotomies that service members may elect to have are associated with a number of possible complications based upon the technique, surgical level, and anatomic site at which the surgery/osteotomies are performed.[47] The incidence of complications in craniofacial surgery depends upon the type of surgery and anatomic location at which the procedure is performed, and infection rates may range from approximately 1 to 3 percent.[48] Treatment for these complications may require additional surgical or other interventional procedures, antibiotics, and/or local wound care.

Even if the Military Health Service provided gender-confirming surgeries, however, the demand for such procedures would be low. Research on civilian employers whose insurance plans cover transition-related health care has found that very few employees submit claims for such benefits in any given year. If extrapolated to the active, Guard and Reserve components of the military, the data suggest that if transgender service members were allowed to serve, and if the military covered medically necessary care related to gender transition, fewer than 2 percent of transgender service members, a total of 230 individuals, would seek gender-confirming surgery in any particular year.[49] A recent study reported the average cost of transition-related health care at US$29,929.[50]

As with any surgical procedures, gender-confirming surgeries entail a risk of short-term and chronic postoperative complications.[51] Yet, despite the presence of risk, research shows that the complications rate is low. Across fifteen studies from 1986 to 2001, 2.1 percent of patients had rectal–vaginal fistula, 6.2 percent with vaginal stenosis, 5.3 percent had urethral stenosis, 1.9 percent with clitoral necrosis, and 2.7 percent with vaginal prolapse.[52] A follow-up study of eighty women who had vaginoplasties found three postoperative complications and another determined that among eighty-nine vaginoplasties, there was one major complication.[53] If transgender service members were allowed to serve and to have gender-confirming surgery while in the military, we estimate that ongoing postoperative complications would render ten MTF service members unfit for duty each year.[54]

Research suggests that a minority of individuals having FTM genital surgery may expect long-term complications that would require ongoing care.[55] Yet, very few FTMs have genital surgery, and of the 1,594 FTMs who responded to a recent survey, only forty-eight individuals (3 percent) had genital surgery, including twenty-four who had metoidioplasty and phalloplasty, one who had just phalloplasty, and twenty-three who had just metoidioplasty.[56] Given such low demand, even using conservative assumptions, it is estimated that only six postoperative FTM transgender men would become unfit for duty each year as a result of ongoing, postoperative complications following genital surgery.[57]

**App. 312**

*Elders et al.*                                                                                      209

In sum, while the risks of genital surgery are real, they are no higher than risks associated with other genitourinary procedures, and they are lower than risks that accompany some elective non-transgender-related surgeries which the military allows and which, unlike genital surgeries for transgender individuals, are cosmetic and not medically necessary. As well, the low rate of demand for genital surgeries would mean that in absolute and relative terms, allowing such procedures would place almost no burden on the military.

## Deployment

In explaining the rationale for the military's ban on transgender service, spokespersons have emphasized non-deployability, medical readiness, and constraints on fitness for duty.[58] While personnel policy must be designed to promote deployability and medical readiness, arguments invoked to oppose transgender service on these grounds do not withstand scrutiny. With few exceptions, transgender service members are deployable and medically ready. As noted in other sections of this article, cross-sex hormone treatment and mental health considerations do not, in general, impede the deployability of transgender service members, and the public record includes instances in which transgender individuals deployed after having undergone transition. With two exceptions, all transgender service members who are otherwise fit would be as deployable as their non-transgender peers. The first exception is postoperative transgender service members whose genital surgeries result in long-term complications. Using conservative assumptions, an estimated maximum of sixteen postoperative service members (ten MTF transgender women and six FTM transgender men) would become permanently undeployable each year as a result of ongoing postoperative medical complications following genital surgery.

The second exception would be those undergoing surgical transition while in service. But as discussed, the number of service members undergoing surgical transition in any given period would be low, both in relative and absolute terms, either because they would have already transitioned prior to joining the military, would prefer to wait until the end of military service to transition, or would not want to surgically transition, regardless of the timing. Thus, with very few exceptions, transgender service members would be deployable and medically ready on a continuous basis.

Straightforward and fair-minded regulatory options are available for managing transgender military service and deployability. According to Army regulations (which do not apply to transgender-related conditions), "Personnel who have existing medical conditions may deploy" if deployment is unlikely to aggravate the condition, if an unexpected worsening of the condition would not pose a grave threat, if health care and medications are immediately available in theater, and if "no need for significant duty limitation is imposed by the medical condition."[59] British military policy concerning transgender service and deployability is equally sensible: "Applicants who are about to undergo, or are still recovering from surgery to change the

**App. 313**

external appearance of their body into that of the acquired gender should be graded
P8 [medically unfit], as with any other condition that is being treated or requires sur-
gery at the time of application, until they are fully recovered from the surgery."[60]

Many non-transgender service members are temporarily or permanently non-
deployable, but they are not automatically discharged as a result, and military pol-
icies accommodate them within reason. Defense Department regulations confirm
that when evaluating a service member's fitness for duty, non-deployability is not
grounds for a determination of unfitness: "Inability to perform the duties of his or
her office, grade, rank, or rating in every geographic location and under every con-
ceivable circumstance will not be the sole basis for a finding of unfitness." Even ser-
vice members who are permanently constrained by serious medical conditions and
defects are allowed, under some circumstances, to remain in the military. According
to DODI 1332.38, "A service member who has one or more of the listed conditions
or physical defects is not automatically unfit," including systemic diseases such as
tuberculosis, leprosy, lymphoma, leukemia, or Hodgkin's disease. Regulations pro-
vide service members suffering from these and other serious, non-transgender-
related, medical conditions with opportunities to serve in a limited capacity and to
recover: "A member previously determined unfit and continued in a permanent lim-
ited duty status . . . may be determined fit when the member's condition has healed
or improved so that the member would be capable of performing his or her duties in
other than a limited duty status."[61]

Although deployability is a crucial component of readiness, many non-transgender
service members are temporarily or permanently non-deployable. According to a 2011
Defense Department study of health-related behaviors, 16.6 percent of active duty ser-
vice members (244,000 service members) were unable to deploy for a variety of rea-
sons during the twelve-month period prior to the survey's administration, including
22.5 percent of Marines.[62] Yet, non-deployable service members (who are not trans-
gender) are not automatically banned, and policies accommodate them to the extent
possible. Indeed, the services have adopted leave and assignment policies that provide
for prolonged absences and restrictions on duty as a result of medical conditions, as
well as life choices that service members make. These include ordinary and advance
leave. By law, members of the armed forces are entitled to thirty days of paid leave
per year (generally referred to as "ordinary" or "annual" leave), accruing at a rate
of 2½ days per month.[63] Service members need not provide any justification in order
to take their annual leave. On the contrary, military commanders "shall encourage and
assist all Service members to use" their leave.[64] Leave is scheduled "consistent with
operational requirements, training workloads, and the desires of the Service member,"
including "at least one extended leave period each year of approximately 14 consec-
utive days in length or longer."[65]

Service members may also be granted special leave on top of their ordinary leave.
This leave is in addition to the thirty days per year provided for by federal law and is
not counted against the member's ordinary leave balance. And in addition to the
elective leave programs, the services provide for situations in which a member may

be absent owing to a medical condition or procedure. A member unable to be present for duty due to hospitalization is excused from duty while hospitalized, and the absence is not counted against the member's leave balance.[66]

Military convalescent leave policy does not discriminate against elective procedures such as Botox treatments and "plastic surgery for unacceptable cosmetic appearance."[67] Soldiers receiving such procedures may be expected to reimburse the service for their cost, but they "will be afforded convalescent leave and will not be required to use regular leave for their post-operative recovery."[68] Finally, the services recognize that members may on occasion have medical conditions which limit their availability to be assigned overseas. Members with such medical conditions may be deferred from reassignment for up to twelve months.[69] Personnel with more persistent medical needs are given assignment limitation codes and may be excluded from overseas service altogether, while still remaining on active duty.[70]

While the operational needs of the service are critical considerations, existing military law and policy contemplate that members may be absent from duty for extended periods of time. Despite concerns expressed by those such as the judge in the 1981 *Alexander* case, existing military policies and procedures are designed to ensure a capable fighting force while at the same time anticipating and providing for prolonged absences by service members based on medical conditions, elective medical procedures, personal life choices, and morale and personal welfare. Transgender service members, however, are automatically discharged, in part because of assumed constraints on their deployability and medical readiness, even though such constraints would apply to no more than a few hundred transgender service members at any one time and would normally last less than the twelve months allowed for deferrals of reassignment. In contrast, non-transgender service members are given multiple opportunities to demonstrate their deployability and fitness for duty despite medical limitations, and many are retained even if they are not fully deployable or fit. Even those service members deemed permanently unfit "may be retained as an exception to the general policy rule" if their skills or experience warrant continuing service.[71]

## Conclusion

Medical standards are designed to ensure that service members are free of conditions that would interfere with performance or burden the military. Current regulations, however, bar the service of transgender individuals regardless of ability to perform or degree of medical risk. They include transgender conditions on a list of disqualifying, maladaptive traits assumed to be resistant to treatment and inconsistent with either fitness for duty or good order and discipline. Unlike other medical disqualifications, however, which are based on the latest medical expertise and military experience, it is the transgender bar itself that is inconsistent with current medical understanding and is based on standards that are decades out-of-date.

Medical regulations requiring the discharge of transgender personnel are inconsistent with how the military regulates all other medical and psychological conditions,

and transgender-related conditions appear to be the only gender-related conditions that require discharge irrespective of fitness for duty. Transgender medical care should be managed in terms of the same standards that apply to all medical care, and there is no medical reason to presume transgender individuals are unfit for duty. Their medical care is no more specialized or difficult than other sophisticated medical care the military system routinely provides, and existing policies and practices are adequate for identifying rare and extreme circumstances that may affect duty performance.

Simply treating transgender service members in accordance with established medical practices and standards, as it does with the provision of all medical care, is all that's needed to end the unnecessary and harmful policy of discrimination against transgender service. While no new medical rules are needed, the Defense Department could look to foreign military experiences as it formulates administrative guidance to address fitness testing, records and identification, uniforms, housing, and privacy. As mentioned previously, at least eighteen countries allow transgender personnel to serve. Foreign military regulations that apply to transgender military service are straightforward, sensible, and fair, offering a sound model for US military policy. In light of the research presented here, taking these steps to reform current military policy governing transgender service would improve care for US service members without burdening the military's pursuit of its vital missions.

## Declaration of Conflicting Interests

The authors declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The Palm Center, a research initiative of the Political Science Department of San Francisco State University, provided research funding for this project.

## Notes

1. In an earlier, self-published version of this article, we referred to twelve countries that allow transgender military service. Since that time, scholars at the Hague Centre for Strategic Studies have published a comprehensive study of rules governing gay, lesbian, bisexual, and transgender service in 103 countries. While the report does not include a list of nations allowing transgender military service, we are grateful to its authors, who provided us with their data indicating that 18 nations allow transgender military service while 9 nations probably allow it, but could not be confirmed. The 18 confirmed cases are Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and United Kingdom. See Joshua Polchar et al., *LGBT Military Personnel; A Strategic Vision for Inclusion* (The Hague, the Netherlands: The Hague Centre for Strategic Studies, 2014).
2. Aaron Belkin et al., "Readiness and DADT Repeal: Has the New Policy of Open Service Undermined the Military?," *Armed Forces & Society* 39, 4 (2013): 587-601; Robert

MacCoun, Elizabeth Kier, and Aaron Belkin, "Does Social Cohesion Determine Motivation in Combat? An Old Question with an Old Answer," *Armed Forces & Society* 32, 4 (2006): 646-54.

3. Veterans Health Administration (VHA) updated the policy in 2013. See Department of Veterans Affairs, VHA Directive 2013-003, *Providing Health Care for Transgender and Intersex Veterans*, February 8, 2013. The VHA provides cross-sex hormone therapy, but not gender-confirming surgery.

4. In this article, we do not address cross-dressing, which is governed by grooming and uniform regulations that are distinct from the medical rules that apply to transgender military service.

5. For most people, gender identity is a stable, deep-seated component of their sense of self. For a broader discussion of gender identity, see Jaime M. Grant, Lisa A. Mottet, and Justin Tanis, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011), 24-25.

6. Although fewer than 20 percent of transgender women and 5 percent of transgender men have had genital reconstructive surgeries, more have had other types of gender-confirming surgery such as breast augmentation, and demand for surgeries could increase if they were affordable and available. Grant, Mottet, and Tanis, *Injustice at Every Turn*, 78-79.

7. See, for example, durations associated with variants of cross-sex hormone therapy in Eli Coleman et al., "Standards of Care for the Health of Transsexual, Transgender, and Gender-nonconforming People, Version 7," *International Journal of Transgenderism* 13, 4 (2011): 188-89.

8. Gary Gates and Jody Herman, *Transgender Military Service in the United States* (Los Angeles, CA: Williams Institute, 2014), accessed July 18, 2014, http://williamsinstitute. law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf. At the time of writing, the active, Guard and Reserve components included 2,280,875 personnel.

9. In response to a recent Freedom of Information Act request for discharge data submitted by the Palm Center, a Pentagon spokesperson said that the military does not track the number of service members who have been separated for transgender-related reasons.

10. Private communication between staff of Sparta, an organization representing currently serving transgender service members, and Palm Center research staff.

11. Department of Defense Instruction (DODI) 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, April 28, 2010, Incorporating Change 1, September 13, 2011. Paraphilia is sexual arousal to an atypical object. See American Psychiatric Association, *Diagnostic and Statistical Manual*, 5th ed. (Arlington, VA: American Psychiatric Publishing, 2013).

12. Department of Defense Instruction (DODI) 1332.14, *Enlisted Administrative Separations*, August 28, 2008, Incorporating Change 3, September 30, 2011, Enclosure 3, at ¶ 3(a)8. DODI 1332.14 incorporates a list of administratively disqualifying conditions, including sexual gender and identity disorders, found in Enclosure 5 to DODI 1332.38,

    *Physical Disability Evaluation*, November 14, 1996, Incorporating Change 2, April 10, 2013.

13. Department of Defense Instruction 6130.03, *Medical Standards for Appointment*, Enclosure 2, at ¶ 3(b).

14. Army Regulation 40-501, *Standards of Medical Fitness*, December 14, 2007 (updated August 4, 2011), at ¶ 1-6(b).

15. AR 40-501, *Standards of Medical Fitness*, at ¶ 1-6(h).

16. See AR 40-501, *Standards of Medical Fitness* ¶¶ 2-14, 3-35(a), (b); NAVMED P-117, U. S. Navy Manual of the Medical Department, Chapter 15, §§ 15-45, 15-46, 15-58; SEC-NAV Instruction 1850.4E, Department of the Navy Disability Evaluation Manual, Enclosure 8, § 8013(a); SECNAV Instruction 1850.4E, Enclosure 8, Attachment (b) (page 8-43); and NAVMED P-117, Chapter 18, § 18-5(3).

17. *Doe v. Alexander*, 510 F. Supp. 900 (D. Minn. 1981); *Leyland v. Orr*, 828 F. 2d 584 (9th Cir. 1987); *DeGroat v. Townsend*, 495 F. Supp. 2d 845 (S.D. Ohio 2007).

18. We consider deployability to be a medical aspect of military service because deployment regulations specifically address medical readiness. See, for example, DODI 6490.07, *Deployment-Limiting Medical Conditions for Service Members and DOD Civilian Employees*, February 5, 2010; or Department of Defense, Assistant Secretary of Defense for Health Affairs Memorandum, *Policy Guidance for Deployment-Limiting Psychiatric Conditions and Medications*. (Washington, DC: Department of Defense, November 7, 2006).

19. Jillian C. Shipherd et al., "Male-to-female Transgender Veterans and VA Health Care Utilization," *International Journal of Sexual Health* 24, 1 (2012): 85.

20. Jack Harrison-Quintana and Jody L. Herman, "Still Serving in Silence: Transgender Service Members and Veterans in the National Transgender Discrimination Survey," *LGBTQ Policy Journal at the Harvard Kennedy School* 3, accessed July 18, 2014, http://williamsinstitute.law.ucla.edu/wp-content/uploads/Harrison-Quintana-Herman-LGBTQ-Policy-Journal-2013.pdf; Everett McDuffie and George R. Brown, "Seventy U.S. Veterans with Gender Identity Disturbances: A Descriptive Study," *International Journal of Transgenderism* 12, 1 (2010): 21-30.

21. Department of Defense Instruction 6130.03 requires a reference to diagnostic codes in the International Classification of Diseases (*ICD*-9), and the *ICD* does list diagnoses for both transsexualism and gender identity disorder. Department of Defense translates *DSM-IV* diagnoses to the closest ICD code.

22. In the World Professional Association for Transgender Health Standards of Care, dysphoria refers to the distress itself, not the incongruence between gender identity and assigned sex. See Coleman et al., "Standards of Care for the Health of Transsexual, Transgender, and Gender-nonconforming People, Version 7," 168. Indeed, non-transgender people can experience gender dysphoria. For example, some men who are disabled in combat, especially if their injury includes genital wounds, may feel that they are no longer men because their bodies do not conform to their concept of manliness. Similarly, a woman who opposes plastic surgery, but who must undergo mastectomy because of breast cancer, may find that she requires reconstructive breast surgery in order to resolve gender dysphoria arising from the incongruence between her body without breasts and her sense of herself as a woman.

**App. 318**

23. Coleman et al., "Standards of Care for the Health of Transsexual, Transgender, and Gender-nonconforming People, Version 7," 168.

24. Jack Drescher, Peggy Cohen-Kettenis, and Sam Winter, "Minding the Body: Situating Gender Identity Diagnoses in the ICD-11," *International Review of Psychiatry* 24, 6 (2012): 575, 569, 574.

25. Ilan H. Meyer and Mary E. Northridge, eds., *The Health of Sexual Minorities: Public Health Perspectives on Lesbian, Gay, Bisexual and Transgender Populations* (New York: Springer, 2007).

26. Drescher, Cohen-Kettenis, and Winter, "Minding the Body," 573.

27. Coleman et al., "Standards of Care for the Health of Transsexual, Transgender, and Gender-nonconforming People, Version 7," 230, citing findings of multiple studies including Richard Green and Davis Fleming, "Transsexual Surgery Follow-up: Status in the 1990s," *Annual Review of Sex Research* 1, 1 (1990): 163-74. See Coleman et al. for additional references.

28. Anne Gaderman et al., "Prevalence of DSM-IV Major Depression Among U.S. Military Personnel," *Military Medicine* 177, 8 (2012): 47-59.

29. Kim Murphy, "A Fog of Drugs and War," *Los Angeles Times,* April 7, 2012, accessed July 18, 2014, http://articles.latimes.com/2012/apr/07/nation/la-na-army-medication-20120408.

30. Katherine Blakeley and Don J. Jansen, *Post-traumatic Stress Disorder and Other Mental Health Problems in the Military: Oversight Issues for Congress* (Washington, DC: Congressional Research Service, 2013), 2, citing "Mental Disorders and Mental Health Problems, Active Component, US Armed Forces, 2000-2011," *Medical Surveillance Monthly Report* 19, 6 (June 2012): 11-17.

31. Paul R. Sackett and Anne S. Mavor, eds., *Assessing Fitness for Military Enlistment Physical, Medical, and Mental Health Standards* (Washington, DC: The National Academies Press, 2006), 144.

32. Adam F. Yerke and Valory Mitchell, "Transgender People in the Military: Don't Ask? Don't Tell? Don't Enlist!," *Journal of Homosexuality* 60, 2-3 (2013): 445. Also see Drescher, Cohen-Kettenis, and Winter, "Minding the Body," 573.

33. Meyer and Northridge, *The Health of Sexual Minorities*, 2007.

34. Ministry of Defence, *Policy for the Recruitment and Management of Transsexual Personnel in the Armed Forces* (London, UK: Ministry of Defence, January 2009).

35. Although service members are not prohibited explicitly from obtaining cross-sex hormone treatment, the use of hormones to modify primary or secondary sex characteristics would almost certainly constitute evidence of having a transgender identity, which is grounds for discharge.

36. H. Asscheman et al., "A Long-term Follow-up Study of Mortality in Transsexuals Receiving Treatment with Cross-sex Hormones," *European Journal of Endocrinology* 164, 4 (2011): 635-42; Paul Van Kesteren et al., "Mortality and Morbidity in Transsexual Subjects Treated with Cross-sex Hormones," *Clinical Endocrinology* 47, 3 (1997): 337-43; M. Colizzi, R. Costa, and O. Todarello, "Transsexual Patients' Psychiatric Comorbidity and Positive Effect of Cross-sex Hormonal Treatment on Mental Health: Results from a Longitudinal Study," *Psychoneuroendocrinology* 39 (2014): 65-73.

37. H. Asscheman et al., "Venous Thrombo-embolism as a Complication of Cross-sex Hormone Treatment of Male-to-Female Transsexual Subjects: A Review," *Andrologia*, August 14, 2013. doi: 10.1111/and.12150.

38. Tom Waddell Health Center, *Protocols for Hormonal Reassignment of Gender*, 2006, accessed November 6, 2013, http://www.sfdph.org/dph/comupg/oservices/medSvs/hlthCtrs/TransGendprotocols122006.pdf.

39. Department of Defense, *Health Related Behaviors Survey of Active Duty Military Personnel 2011* (Washington, DC: Department of Defense, 2013), 119-20, 130-31, 248, 264-65.

40. Department of Defense, *Policy Guidance for Deployment-limiting Psychiatric Conditions and Medications* (Washington, DC: Department of Defense, 2006) at ¶ 4.2.3.

41. Andrew Tilghman, "'Any Soldier Can Deploy on Anything': Pentagon Rules Bar Some Drugs from Combat Zone, but Oversight Is Suspect," *Army Times*, March 17, 2010, accessed July 18, 2014, http://www.armytimes.com/article/20100317/NEWS/3170310/-8216-Any-soldier-can-deploy-anything-.

42. Tilghman, "Any Soldier Can Deploy on Anything," 2010.

43. Department of the Army, *Personnel Policy Guidance for Overseas Contingency Operations* (Washington, DC: Department of the Army, 2009), at ¶ 7-13(b)1.

44. See, for example, American Medical Association, Resolution 122 (A-08), 2008, accessed July 18, 2014, http://www.tgender.net/taw/ama_resolutions.pdf.

45. Coleman et al., "Standards of Care for the Health of Transsexual, Transgender, and Gender-nonconforming People, Version 7," 170-71.

46. For a list of 313 allowable, elective cosmetic procedures, see Tricare Management Activity, Uniform Business Office, *Provider's Guide to the Elective Cosmetic Surgery Superbill*. (Falls Church, VA: TRICARE Management Activity, Uniform Business Office, 2013).

47. Patel, Morris, and Gassman show that these complications may include "airway, vascular, hemorrhage, vascular compromise, neurologic, infectious, skeletal, unfavorable osteotomy, tooth injury, nonunion, postoperative malocclusion, temporomandibular joint disorders, and unfavorable aesthetic results." See P. Patel, D. Morris, and A. Gassman, "Complications of Orthognathic Surgery," *Journal of Craniofacial Surgery* 18, 4 (2007): 975-85. The military allows personnel to have elective cosmetic surgeries on a space-available basis and at their own expense.

48. Patel, Morris, and Gassman, "Complications of Orthognathic Surgery," 2007; F. Kramer et al., "Intra- and Perioperative Complications of the LeFort I Osteotomy: A Prospective Evaluation of 1000 Patients," *Journal of Craniofacial Surgery* 15, 6 (2004): 971-77; K. Jones, "Le Fort II and Le Fort III Osteotomies for Midface Reconstruction and Considerations for Internal Fixation," in *Craniomaxillofacial Reconstructive and Corrective Bone Surgery*, eds. A. Greenberg and J. Prein (New York: Springer, 2006), 667-68.

49. Herman found in a recent study that the highest annualized utilization rate for large employers is 0.044 claimants per thousand employees annually (Table 8). If the military were similar to civilian firms, and given that the active, Guard and Reserve components currently include 2,280,875 personnel, then one would expect $0.044 \times 2,281 = 100$ claimants per year if the Military Health System covered gender-confirming surgery.

**App. 320**

However, transgender people are over-represented in the military (15,450/2,280,875 million = 0.68 percent military as compared to 0.3 percent of the civilian adult population), and so the figure of 100 claimants per year should be adjusted upward by .68/.3 = 2.3×. Hence, if the military paid for transition-related surgery, one would expect 2.3 × 100 = 230 claims per year. See Jody L. Herman, *Costs and Benefits of Providing Transition-related Health Care Coverage in Employee Health Benefits Plans* (Los Angeles, CA: Williams Institute, 2013).

50. Herman, *Costs and Benefits of Providing Transition-related Health Care Coverage in Employee Health Benefits Plans*, 6.

51. Short-term surgical complications can include rectal injury, infection, delayed wound healing, bleeding, venous thromboembolism, and/or urethral stream abnormalities. While many of these complications are either self-limited or may be treated with local wound care, antibiotics, or anticoagulants, some, such as rectal injury, may require additional surgical procedures such as a temporary colostomy. Long-term complications can include vaginal stenosis and unsatisfactory appearance of the surgically reconstructed genitalia, and vaginal stenosis may require additional procedures such as skin grafts or intestinal transposition.

52. A. A. Lawrence, "Patient-reported Complications and Functional Outcomes of Male-to-female Sex Reassignment Surgery," *Archives of Sexual Behavior* 35, 6 (2006): 717-27.

53. Cameron Bowman and Joshua M. Goldberg, "Care of the Patient Undergoing Sex Reassignment Surgery," *International Journal of Transgenderism* 9, 3-4 (2006): 135-65; Miroslav L. Djordjevic, Dusan S. Stanojevic, and Marta R. Bizic, "Rectosigmoid Vaginoplasty: Clinical Experience and Outcomes in 86 Cases," *Journal of Sexual Medicine* 8, 12 (2011): 3487-94; Ji-Xiang Wu et al., "Laparoscopic Vaginal Reconstruction Using an Ileal Segment," *International Journal of Gynecology and Obstetrics* 107, 3 (2009): 258-61; L. Jarolím et al., "Gender Reassignment Surgery in Male-to-female Transsexualism: A Retrospective 3-month Follow-up Study with Anatomical Remarks," *Journal of Sexual Medicine* 6, 6 (2009): 1635-44; S. V. Perovic, D. S. Stanojevic, and M. L. J. Djordjevic, "Vaginoplasty in Male Transsexuals Using Penile Skin and a Urethral Flap," *BJU International* 86, 7 (2000): 843-50.

54. Presumably, any postoperative MTF individuals with ongoing complications would be screened out at the time of enlistment. Hence, the only MTF troops who would be unfit for duty would be those experiencing ongoing postoperative complications from genital surgeries they elected to have after joining the military. As explained previously, if the Military Health Service paid for transition-related care, one would expect 230 claimants per year. Approximately 90 percent of transgender troops are MTF's, thus suggesting .9 × 230 = 207 claimants per year for MTF transition-related coverage. If 5 percent of such claims entailed ongoing postoperative complications, this would mean that ten MTF transgender troops would become permanently unfit for duty each year.

55. For example, see S. Baumeister et al., "Phalloplasty in Female-to-male Transsexuals: Experience from 259 Cases [Article in German]," *Handchir Mikrochir Plast Chir* 43, 4 (2011): 215-21; J. E. Terrier et al., "Surgical Outcomes and Patients' Satisfaction with Suprapubic Phalloplasty," *Journal of Sexual Medicine* 11, 1 (September 12, 2013):

288-98; P. A. Sutcliffe et al., "Evaluation of Surgical Procedures for Sex Reassignment: A Systematic Review," *Journal of Plastic, Reconstructive and Aesthetic Surgery* 62, 3 (2009): 294-306.

56. These figures are derived from raw data that informed Grant, Mottet, and Tanis, *Injustice at Every Turn*, 2011.

57. Presumably, any postoperative FTM individuals with ongoing complications would be screened out at the time of enlistment. Hence, the only FTM troops who, as a class, would be unfit for duty would be those experiencing ongoing postoperative complications from genital surgeries they elected to have after joining the military. As explained previously, if the Military Health Service paid for transition-related care, one would expect 230 claimants per year. However, only 10 percent of transgender troops are FTMs, thus suggesting $.1 \times 230 = 23$ claimants per year for FTM transition-related coverage. If one quarter of such claims entailed ongoing postoperative complications, this would mean that six FTM transgender troops would become permanently unfit for duty each year.

58. Chris Johnson, "Pentagon's Gay-inclusive Human Goals Charter Omits Trans People," *Washington Blade*, April 28, 2014, accessed July 18, 2014, http://www.washingtonblade.com/2014/04/28/pentagons-gay-inclusive-human-rights-charter-omits-trans-people/.

59. Department of the Army, *Personnel Policy Guidance for Overseas Contingency Operations*, 2009, 7-9(e).

60. Ministry of Defence, *Policy for the Recruitment and Management of Transsexual Personnel in the Armed Forces*, 2009.

61. DODI 1332.38, *Physical Disability Evaluation,* Enclosure 3, at ¶¶ P3.4.1.3, P3.4.3, and Enclosure 4, at ¶ 1.1.2.

62. Department of Defense, *Health Related Behaviors Survey of Active Duty Military Personnel 2011*, 2013.

63. United States Code, Title 10, Section 701(a).

64. Department of Defense Instruction 1327.06, *Leave and Liberty Policy and Procedures*, June 16, 2009, Incorporating Change 2, effective August 13, 2013, Enclosure 2, at ¶ 1c.

65. DODI 1327.06, *Leave and Liberty Policy*, Enclosure 2, at ¶¶ 1j(1), 1a.

66. Army Regulation 600-8-10, *Leave and Passes* (August 4, 2011 revision), at ¶ 5-3e.

67. Army Medical Command, OTSG/MEDCOM Policy Memo 12-076, *Revised Policy for Cosmetic Surgery Procedures and Tattoo/Brand Removal/Alteration in the Military Health System* (November 20, 2012), at ¶¶ 5e(15), 5f(2).

68. Army Medical Command, *Revised Policy for Cosmetic Surgery*, at ¶ 5(e)(7).

69. See, for example, Department of the Air Force Instruction 36-2110, *Assignments* (Change 2, June 8, 2012), at ¶ 2.17.1.

70. Department of the Air Force Instruction 36-2110, *Assignments,* at ¶ 2.17.3 and table 2.2.

71. DODI 1332.38, *Physical Disability Evaluation*, Enclosure 3, at ¶ P7.3.

## Author Biographies

**M. Joycelyn Elders** was appointed the sixteenth surgeon general of the United States by President Clinton in 1993 and was the second woman to head the US

Public Health Service. After high school, she earned a scholarship to the all-black liberal arts Philander Smith College in Little Rock. She then joined the Army and trained in physical therapy at the Brooke Army Medical Center at Fort Sam Houston, Texas. After discharge in 1956, she enrolled at the University of Arkansas Medical School on the G.I. Bill. She did an internship in pediatrics at the University of Minnesota, and in 1961 returned to the University of Arkansas for her residency. She became chief resident in charge of the all-white, all-male residents and interns, earned her master's degree in biochemistry in 1967 and became an assistant professor of pediatrics at the university's medical school in 1971 and full professor in 1976. Over the next twenty years, she combined her clinical practice with research in pediatric endocrinology, publishing well over a hundred articles, most dealing with problems of growth and juvenile diabetes. She left office in 1994 and in 1995 she returned to the University of Arkansas as a faculty researcher and professor of pediatric endocrinology at the Arkansas Children's Hospital. In 1996, she wrote her autobiography, *Joycelyn Elders, M.D.: From Sharecropper's Daughter to Surgeon General of the United States of America*. Now retired from practice, she is a professor emeritus at the University of Arkansas, School of Medicine and remains active in public health education.

**George R. Brown** is an associate chairman and professor of psychiatry at East Tennessee State University in Johnson City, TN. He is currently serving his third term on the Board of Directors for the World Professional Association for Transgender Health, where he also serves as a member of the Incarceration/Institutionalization Committee and the Standards of Care Committee. He is a coauthor on the last three versions of the Standards of Care. He served as chief of psychiatry at Mountain Home VAMC for eighteen years and served twelve years in the US Air Force as a psychiatrist. He has served as an expert witness in several national precedent-setting cases that have benefitted transgender persons. He has published over 135 articles and scientific abstracts, as well as twenty-two book chapters, many of which have been on transgender health care issues. He has presented his work on transgender issues at one-third of the medical schools in the United States as well as in seven nations. He is a University of Rochester School of Medicine graduate who subsequently did residency at Wright State University as an officer in the USAF. He is board certified in General Psychiatry and a Distinguished Fellow in the American Psychiatric Association. His areas of expertise include gender identity disorders/gender dysphoria and psychopharmacology.

**Eli Coleman** is the director of the program in human sexuality, Department of Family Medicine and Community Health, University of Minnesota Medical School in Minneapolis, where he holds the first and only endowed academic chair in sexual health. He has authored articles and books on a variety of sexual health topics, including compulsive sexual behavior, sexual orientation, and gender dysphoria. He is the founding editor of the *International Journal of Transgenderism* and founding and current editor of the *International Journal of Sexual Health*. He is past president of the Society for the Scientific Study of Sexuality, the World Professional

Association for Transgender Health, the World Association for Sexual Health, and the International Academy for Sex Research. In 2013, he was elected President of the Society for Sex Therapy and Research for a two-year term. He has been the recipient of numerous awards including the US Surgeon General's Exemplary Service Award for his role as senior scientist on *Surgeon General's Call to Action to Promote Sexual Health and Responsible Sexual Behavior*, released in 2001. In 2007, he was awarded the gold medal for his lifetime contributions to the field of sexual health by the World Association for Sexual Health. In 2007, he was appointed the first endowed Chair in Sexual Health at the University of Minnesota Medical School.

**Thomas A. Kolditz** is a professor in the Practice of Leadership and Management and director of the Leadership Development Program at the Yale School of Management. A professor emeritus at the US Military Academy, he led the Department of Behavioral Sciences and Leadership at West Point for twelve years. He served for two years as a leadership and human resources policy analyst in the Pentagon, and a year as a concept developer in the Center for Army Leadership, and was the founding director of the West Point Leadership Center. He is also the managing member of Saxon Castle LLC, a leader development consultancy. He has published extensively across a diverse array of academic and leadership trade journals, and serves on the editorial and advisory boards of several academic journals. He is a fellow in the American Psychological Association and is a member of the Academy of Management. His most recent book is *In Extremis Leadership: Leading as if Your Life Depended on It.* In 2009, he was named to the Council of Senior Advisors, Future of Executive Development Forum.

**Alan M. Steinman** was first commissioned in the United States Public Health Service as a lieutenant in July 1972 and served in a number of senior medical officer capacities at the USCG. In 1993, he was selected for promotion to flag officer for the position of Director of Health and Safety at USCG HQ. Steinman retired from the Coast Guard and the Public Health Service in 1997. His educational degrees include a Bachelor of Science from the Massachusetts Institute of Technology, a Doctor of Medicine from the Stanford University School of Medicine, and a Master of Public Health from the University of Washington. He also graduated from the US Navy School of Aerospace Medicine. He is board certified in Occupational Medicine and is a Fellow of the American College of Preventive Medicine. He also served as the director of the Coast Guard's Safety and Environmental Health programs, overseeing the safety of all USCG personnel. He has an international reputation in cold-weather medicine, hypothermia, and sea survival, and he is widely published in these areas, including numerous articles in medical journals and chapters in textbooks of emergency medicine and cold-weather medicine. He currently serves as a consultant in cold-weather medicine and holds the position of professional affiliate with the Health, Leisure and Human Performance Research Institute at the University of Manitoba. For the past five years, he has lectured to college classes on Joint Base Lewis-McChord on the issue of gays and lesbians in the military.



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

FEB – 7 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
            COMMANDERS OF THE COMBATANT COMMANDS
            DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Prioritizing Military Excellence and Readiness

    The Department of Defense's (DoD) mission requires Service members to abide by strict mental and physical standards. The lethality, readiness, and warfighting capability of our Force depends on Service members meeting those standards.

    The Department must ensure it is building "One Force" without subgroups defined by anything other than ability or mission adherence. Efforts to split our troops along lines of identity weaken our Force and make us vulnerable. Such efforts must not be tolerated or accommodated.

    As the President clearly stated in Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025: "Expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service."

    Effective immediately, all new accessions for individuals with a history of gender dysphoria are paused, and all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused.[1]

    Individuals with gender dysphoria have volunteered to serve our country and will be treated with dignity and respect. The Under Secretary of Defense for Personnel and Readiness is authorized and delegated the authority to provide additional policy and implementation guidance outside of the normal DoD issuance process, including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria, to implement this direction.

---

[1] For the purposes of this guidance, these procedures include unscheduled, scheduled, or planned genital reconstruction surgery associated with gender transition, gender affirming surgery, sex reassignment surgery, or newly initiated gender-affirming hormone therapy.



OSD000959-25/CMD001366-25

**App. 325**

UNCLASSIFIED//

---

**CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE

Originator: DA WASHINGTON DC

DTG: **DRAFT** Precedence: Priority

To: ARLINGTON NATIONAL CEMETERY ARLINGTON VA, ARNG NGB COMOPS ARLINGTON VA, ARNG NGB J3 JOC WASHINGTON DC, ARNGRC ARLINGTON VA, ARNGRC WATCH ARLINGTON VA, CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX, CDR ARMY FUTURES COMMAND AUSTIN TX, CDR ATEC ABERDEEN PROVING GROUND MD, CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC, CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC, CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC, CDR MDW J3 FT MCNAIR DC, CDR MDW JFHQ-NCR FT MCNAIR DC, CDR NETCOM 9THSC FT HUACHUCA AZ, CDR TRADOC CG FT EUSTIS VA, CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA, CDR USAR NORTH FT SAM HOUSTON TX, CDR USARCENT SHAW AFB SC, CDR USASOC COMMAND CENTER FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC, CDRAMC REDSTONE ARSENAL AL, CDRAMC REDSTONE ARSENAL AL, CDRFORSCOM FT LIBERTY NC, CDRHRC G3 DCSOPS FT KNOX KY, CDRINSCOM FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRMDW WASHINGTON DC, CDRUSACE WASHINGTON DC, CDRUSACIDC FT BELVOIR VA, CDRUSACYBER FT EISENHOWER GA, CDRUSACYBER G3 FT EISENHOWER GA, CDRUSACYBER G33 FT EISENHOWER GA, CDRUSAEIGHT G3 CUROPS SEOUL KOR, CDRUSAEIGHT SEOUL KOR, CDRUSAFRICA VICENZA IT, CDRUSAMEDCOM FT SAM HOUSTON TX, CDRUSARC G33 READ FT LIBERTY NC, CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA, CDRUSARPAC CG FT SHAFTER HI, CDRUSARPAC FT SHAFTER HI, COMDT USAWC CARLISLE BARRACKS PA, HQ IMCOM FT SAM HOUSTON TX, HQ INSCOM IOC FT BELVOIR VA, HQ SDDC CMD GROUP SCOTT AFB IL, HQ SDDC OPS MSG CNTR SCOTT AFB IL, HQ USARSO FT SAM HOUSTON TX, HQ USARSO G3 FT SAM HOUSTON TX, HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC, HQDA ARMY STAFF WASHINGTON DC, HQDA ASALT ASC HQ WASHINGTON DC, HQDA EXEC OFFICE WASHINGTON DC, HQDA IMCOM OPS DIV WASHINGTON DC, HQDA SEC ARMY WASHINGTON DC, HQDA SURG GEN WASHINGTON DC, MEDCOM HQ EOC FT SAM HOUSTON TX, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NGB WASHINGTON DC, SMDC ARSTRAT CG ARLINGTON VA, SMDC ARSTRAT G3 ARLINGTON VA, SUPERINTENDENT USMA WEST POINT NY, SURGEON GEN FALLS CHURCH VA, USAR AROC FT LIBERTY NC, USAR CMD GRP FT LIBERTY NC, USAR DCS G33 OPERATIONS FT LIBERTY NC, USARCENT G7 FWD, USARPAC COMMAND CENTER FT SHAFTER HI, CDR USAREUR WIESBADEN GE

CC: HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC

---

UNCLASSIFIED//

SUBJECT: (U) **CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE//

(U) REFERENCES. NONE.

NARR// (U) THIS IS **CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE. THIS CORRECTED COPY PROVIDES A CORRECTED CLASSIFICATION OF THIS MESSAGE//

1. (U) SITUATION. IN ANTICIPATION OF UPDATED DOD POLICY, THIS MESSAGE PRESCRIBES INITIAL GUIDANCE ON IMPLEMENTATION OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

2. (U) MISSION. EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL IMPLEMENT INITIAL GUIDANCE OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

**App. 326**

3.  (U) EXECUTION.

3.A.  (U) INTENT.  NOT USED.

3.B.  (U) CONCEPT OF OPERATIONS.  NOT USED.

3.C.  (U) TASKS TO ARMY STAFF, SUBORDINATE UNITS AND REQUESTS
FOR SUPPORT.

3.C.1.  (U) ARMY SECRETARIAT, ARMY STAFF, SUBORDINATE HQDA
OFFICES/ORGANIZATIONS, COMMANDERS, ARMY COMMANDS (ACOM), ARMY
SERVICE COMPONENT COMMANDS (ASCC), DIRECT REPORTING UNITS (DRU),
AND DIRECTOR, ARMY NATIONAL GUARD (ARNG).

3.C.1.A.  (U) ENSURE IMPLEMENTATION OF INITIAL GUIDANCE AS
FOLLOWS:

3.C.1.A.1.  (U) ALL SERVICEMEMBERS, WILL BE TREATED WITH DIGNITY
AND RESPECT AT ALL TIMES. COMMANDERS MUST MAINTAIN GOOD ORDER
AND DISCIPLINE AND THE SAFETY, DIGNITY, AND RESPECT OF ALL OF
THEIR ASSIGNED PERSONNEL.

3.C.1.A.2.  (U) ENSURE THAT INTIMATE SPACES, INCLUDING BUT NOT
LIMITED TO LATRINES, CHANGING FACILITIES, SLEEPING QUARTERS, AND
BATHING FACILITIES DESIGNATED FOR WOMEN, GIRLS, OR FEMALES (OR
FOR MEN, BOYS, OR MALES) ARE DESIGNATED BY BIOLOGICAL SEX AND
NOT GENDER IDENTITY.  BIOLOGICAL SEX IS DEFINED AS A BIOLOGICAL
TRAIT DETERMINED BY CHROMOSOMAL PATTERN.

3.C.1.A.3.  (U) MAINTAIN CURRENT LIVING CONDITIONS, PENDING
IMPLEMENTATION GUIDANCE.  IAW WITH CURRENT EXECUTIVE ORDERS AND
EXISTING POLICIES, REGULATIONS, AND DIRECTIVES, COMMANDERS MUST
BPT MODIFY SLEEPING, CHANGING, AND BATHING AREAS UPON RECEIPT OF
IMPLEMENTATION GUIDANCE.

3.C.1.A.4.  (U) AT THIS TIME, DO NOT INITIATE ANY MEDICAL BOARD
OR ADVERSE PERSONNEL ACTION SOLELY RELATED TO TRANSGENDER
STATUS. POLICY AND IMPLEMENTATION GUIDANCE RELATED TO CURRENT
EXECUTIVE ORDERS WILL BE PUBLISHED WHEN AVAILABLE.

3.C.1.A.5.  (U) UNTIL FURTHER GUIDANCE IS ISSUED AND CONSISTENT
WITH THE PROTECTIONS OF HIPPA AND THE PRIVACY ACT, DO NOT ACCESS
OR UTILIZE MEDICAL AND PERSONNEL SYSTEMS OF RECORD SPECIFICALLY
TO IDENTIFY TRANSGENDER SOLDIERS.

**App. 327**

3.C.1.A.6.  (U) ANY SOLDIER CURRENTLY UNDER MEDICAL CARE FOR
GENDER DYSPHORIA OR TRANSITION WILL CONTINUE TO RECEIVED MEDICAL
TREATMENT CONSISTENT WITH THE STANDARD OF CARE.

3.D.  (U) COORDINATING INSTRUCTIONS.  NOT USED.

4.  (U) SUSTAINMENT.  NOT USED.

5.  (U) COMMAND AND SIGNAL.

5.A.  (U) HQDA POC THIS MESSAGE, SERVICE CENTRAL COORDINATION
CELL (SCCC), AVAILABLE AT: usarmy.pentagon.hqda-dcs-g-
1.mbx.sccc@army.mil

6.  (U) THE EXPIRATION DATE OF THIS MESSAGE IS 30 SEPTEMBER
2025, UNLESS FORMALLY RESCINDED, SUPERSEDED OR MODIFIED.


ATTACHMENTS: NONE.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-00240-ACR |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL DECLARATION OF ALEX WAGNER**

I, Alex Wagner, declare as follows:

1. I write this declaration to supplement the declaration I signed February 3, 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on February 3, 2025. *See* ECF No. 13-20.

**App. 329**

2.   The military maintains different medical standards for accession (entry into service) versus retention (continued service).  For accessions, the standards are deliberately and appropriately stringent because the military makes a substantial long-term commitment to each service member it accepts, including comprehensive medical care that may extend throughout their lifetime.

3.   The military must ensure that newly accessed service members can fulfill their initial contract term and potentially serve for many years beyond.  Given the significant financial and resource investment the military makes in training and developing each recruit, it can only accept individuals whose potential service value will equal or exceed the resources invested in them.  This creates a necessarily high bar for medical qualification at accession.

4.   The 18-month stability requirement for transgender individuals seeking to enter military service, as set forth in Volume 1 of DOD Instruction 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction* (May 28, 2024) ("DoDI 6130.03 Vol. 1"), Ex. H to Wardenski Dec., ECF No. 13-11, *see* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1),  is based on the same considerations applied to other treatable medical conditions at accession, reflecting standard military medical policy rather than any unique restriction on transgender service.

5.   In contrast, retention medical standards, as set forth in Volume 2 of DOD Instruction 6130.03, *Medical Standards for Military Service: Retention* (Jun. 6, 2022) ("DoDI 6130.03 Vol. 2"), attached hereto as **<u>Exhibit A</u>**, focus on a service member's ability to perform their duties, deploy when required, and contribute effectively to the military mission.  *See* DoDI 6130.03 Vol. 2 at 1.2. The military recognizes that there are numerous roles and positions within its ranks, and importantly, it has made a commitment to those who have already chosen to serve.

**App. 330**

6.  This is why DoDI 6130.03 Vol. 2 explicitly requires that every medical condition be evaluated on a case-by-case basis to determine if continued service is appropriate.  *See* DoDI 6130.03 Vol. 2 at 1.2.b(1), 3.2, 3.3.a(1).  The instruction specifically mandates consideration of each service member's ability to safely complete common military tasks at their grade level, their specific duty requirements, and whether they can serve in deployed or garrison conditions.  *See* DoDI 6130.03 Vol. 2 at 3.2.a.

7.  I can't think of any medical condition that bars continued service—rather, the impact of the condition on the individual service member's ability to perform their duties must be evaluated. In my experience, it would be highly unusual, and I cannot think of another example, where a medical condition would result in a categorical bar to retention without such individualized assessment.

8.  For transgender service members, service in the military means serving in a sex different from their sex assigned at birth.  The process for gender transition is detailed in DOD Instruction 1300.28, *In-Service Transition for Transgender Service Members* (Dec. 20, 2022) ("DoDI 1300.28"), Ex. D to Wagner Dec, ECF No. 13-25, which establishes a protocol for transgender service members.  This includes notifying their command, obtaining a medical diagnosis from a military medical provider, developing and completing an approved medical treatment plan for gender transition, and changing their sex designation in the Defense Enrollment Eligibility Reporting System (DEERS).  *See* DoDI 1300.28 at 3.3.

9.  Once a transgender service member has changed their sex marker in DEERS, they live and serve fully in the sex designated on the DEERS marker.  This means they are referred to by the pronouns associated with their DEERS marker, use facilities consistent with their DEERS marker,

**App. 331**

are assigned berthing consistent with their DEERS marker, and have to meet all of the military standards consistent with their DEERS marker.

10. If a transgender service member were prevented from serving in accordance with their DEERS marker, that individual could not serve in the military as a transgender person.

11. Based on my knowledge, many of the medications that transgender service members may take as part of their medical care are also prescribed to numerous non-transgender service members for various medical conditions, demonstrating that these medications are compatible with military service.

12. As is generally true, there are different criteria for accessions than for retention for transgender service members. For accession into the military, a transgender person must be stable for 18 months following completion of gender transition before they can enter service. *See* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1).

13. However, for retention of currently serving transgender service members, there is no set time period during which a person must be stable following gender transition. Instead, consistent with the case-by-case assessment required by DoDI 6130.03 Vol. 2, the determination of stability and readiness for duty is individualized and based on each service member's specific medical circumstances and needs.

14. In fact, for most transgender service members, there is often no period of non-deployability associated with their gender transition. This reflects the military's recognition that medical needs vary among individuals and that blanket time requirements are neither necessary nor appropriate for retention determinations.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

4

**App. 332**

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 14, 2025

_____
Alex Wagner

**App. 333**

# EXHIBIT A



# DoD Instruction 6130.03, Volume 2

## Medical Standards for military service: Retention

---

**Originating Component:** Office of the Under Secretary of Defense for Personnel and Readiness

**Effective:** September 4, 2020
**Change 1 Effective** June 6, 2022

**Releasability:** Cleared for public release. Available on the Directives Division Website at https://www.esd.whs.mil/DD/.

**Approved by:** Matthew P. Donovan, Under Secretary of Defense for Personnel and Readiness
**Change 1 Approved by:** Lloyd J. Austin III, Secretary of Defense

---

**Purpose:** This instruction is composed of two volumes, each containing its own purpose. In accordance with the authority in DoD Directive 5124.02:

• This instruction establishes policy, assigns responsibilities, and prescribes procedures for medical standards for the Military Services.

• This volume establishes medical retention standards and the Retention Medical Standards Working Group (RMSWG), under the Medical and Personnel Executive Steering Committee (MEDPERS), to provide policy recommendations related to this instruction.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ................................................................. 4
    1.1. Applicability. ................................................................................................................ 4
    1.2. Policy. ........................................................................................................................... 4
    1.3. Summary of Change 1. ................................................................................................. 5
SECTION 2: RESPONSIBILITIES .......................................................................................... 6
    2.1. Under Secretary of Defense for Personnel and Readiness (USD(P&R)). .................. 6
    2.2. Assistant Secretary of Defense For Health Affairs (ASD(HA)). ............................... 6
    2.3. Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
        (DASD(HSP&O)). ....................................................................................................... 6
    2.4. Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)).... 6
    2.5. Director, DHA ............................................................................................................. 7
    2.6. Secretaries of the Military Departments and Commandant, United States Coast Guard
        (USCG). ....................................................................................................................... 7
SECTION 3: PROCEDURES FOR APPLYING MEDICAL STANDARDS .......................................... 8
    3.1. Applicability of Retention Medical Standards. ........................................................... 8
    3.2. Application of Criteria Used to Develop Standards. ................................................... 8
    3.3. Implementation. .......................................................................................................... 9
SECTION 4: ACTIVITIES OF THE RMSWG ........................................................................ 11
    4.1. Purpose of the RMSWG. ........................................................................................... 11
    4.2. Overall Goals of the RMSWG. ................................................................................. 11
    4.3. Co-Chairs of the RMSWG. ....................................................................................... 11
    4.4. Membership of the RMSWG. .................................................................................... 11
SECTION 5: DISQUALIFYING CONDITIONS ....................................................................... 12
    5.1. General. ...................................................................................................................... 12
    5.2. Head. ......................................................................................................................... 12
    5.3. Eyes. .......................................................................................................................... 12
    5.4. Vision. ....................................................................................................................... 13
    5.5. Ears. .......................................................................................................................... 13
    5.6. Hearing. ..................................................................................................................... 13
    5.7. Nose, Sinuses, Mouth, and Larynx. .......................................................................... 14
    5.8. Dental. ....................................................................................................................... 14
    5.9. Neck. ......................................................................................................................... 14
    5.10. Lungs, Chest Wall, Pleura, and Mediastinum ........................................................ 14
    5.11. Heart. ....................................................................................................................... 16
    5.12. Abdominal Organs and Gastrointestinal System. ................................................... 18
    5.13. Female Genital System. ........................................................................................... 20
    5.14. Male Genital System. .............................................................................................. 20
    5.15. Urinary System. ....................................................................................................... 21
    5.16. Spine and Sacroiliac Joint Conditions. ................................................................... 22
    5.17. Upper Extremity Conditions. .................................................................................. 23
    5.18. Lower Extremity Conditions. .................................................................................. 24
    5.19. Generalized Conditions of the Musculoskeletal System. ....................................... 25
    5.20. Vascular System. ..................................................................................................... 25

**App. 336**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

5.21.  Skin and Soft Tissue Conditions. ................................................................... 27
5.22.  Blood and Blood Forming Conditions. ............................................................ 28
5.23.  Systemic Conditions. ....................................................................................... 29
5.24.  Endocrine and Metabolic Conditions ............................................................... 30
5.25.  Rheumatologic Conditions ............................................................................... 32
5.26.  Neurologic Conditions. .................................................................................... 33
5.27.  Sleep Disorders. ............................................................................................... 34
5.28.  Behavioral Health. ........................................................................................... 35
5.29.  Tumors and Malignancies. ............................................................................... 36
5.30.  Miscellaneous Conditions. ............................................................................... 36
GLOSSARY ................................................................................................................... 38
    G.1.  Acronyms. ..................................................................................................... 38
    G.2.  Definitions. .................................................................................................... 38
REFERENCES ................................................................................................................ 40

**App. 337**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

a.  This volume applies to OSD, the Military Departments (including the Coast Guard at all times, including when it is a Service in the Department of Homeland Security by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this volume as the "DoD Components").

b.  Gender dysphoria-related standards in this volume do not apply to Service members considered exempt pursuant to DoDI 1300.28.

## 1.2. POLICY.

It is DoD policy that:

a.  Service members meet DoD medical standards established in this volume to be retained in the Military Services.

b.  Service members who are unable to successfully complete their assigned duties while deployed, stationed with only operational healthcare unit support, or while in garrison conditions, be referred to:

(1)  The Disability Evaluation System (DES), on a case-by-case basis, in accordance with DoD Instruction (DoDI) 1332.18 and DoDI 1332.45; or

(2)  For conditions not constituting a disability, the responsible Military Department for possible administrative action, in accordance with DoDI 1332.14 or DoDI 1332.30.

c.  DoD medical standards for military retention are consistent with:

(1)  The criteria for DES referral, in accordance with DoDI 1332.18 and other military requirements, as further defined in Paragraph 3.2 of this volume.

(2)  Deployment requirements, as defined in DoDI 6490.07, and a broader definition of deployability, as defined in DoDI 1332.18.

(3)  Retention determinations for certain non-deployable Service members in accordance with DoDI 1332.45.

(4)  Military Health System (MHS) efforts to improve performance, economy, and efficiency.

**App. 338**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

d.  Additional, more selective medical standards for military retention may be established by the Secretaries of the Military Departments based on the Service member's office, grade, rank, or rating, as long as such standards are objectively applied and are not inconsistent with applicable laws or DoD policies.

## 1.3.  SUMMARY OF CHANGE 1.

In accordance with the June 6, 2022 Secretary of Defense memorandum, the changes to this issuance update DoD policy with respect to individuals who have been identified as HIV-positive.  Individuals who have been identified as HIV-positive, are asymptomatic, and who have a clinically confirmed undetectable viral load will have no restrictions applied to their deployability or to their ability to commission while a Service member solely on the basis of their HIV-positive status.  Nor will such individuals be discharged or separated solely on the basis of their HIV-positive status.

**App. 339**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 2: RESPONSIBILITIES

## 2.1.  UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R):

　　a.  Eliminates inconsistencies and inequities based on race, sex, or duty location in DoD Component application of these standards.

　　b.  Maintains and convenes the chartered MEDPERS, in accordance with Volume 1 of this instruction.

## 2.2.  ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA)).

Under the authority, direction, and control of the USD(P&R), the ASD(HA):

　　a.  Reviews, approves, and issues technical modifications to the standards in Section 5 to the DoD Components.

　　b.  Reviews implementation of medical standards for military retention throughout the MHS and provides guidance to the Director, Defense Health Agency (DHA) and the Secretaries of the Military Departments.

## 2.3.  DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR HEALTH SERVICES POLICY AND OVERSIGHT (DASD(HSP&O)).

Under the authority, direction, and control of the ASD(HA), the DASD(HSP&O):

　　a.  Reviews the standards in Section 5, associated Service-specific regulations, and Service-specific medical standards for retention, in terms of performance, economy, and efficiency throughout the MHS, and provides appropriate policy recommendations to the ASD(HA).

　　b.  Coordinates revisions to policies related to this volume with relevant DoD Components.

　　c.  Selects a co-chair for the RMSWG and requires records of the RMSWG be maintained and retained, in accordance with all legal requirements.

## 2.4.  DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR MILITARY PERSONNEL POLICY (DASD(MPP)).

Under the authority, direction, and control of the ASD(M&RA), the DASD(MPP):

　　a.  Coordinates revisions to policies related to this volume with relevant DoD Components.

**App. 340**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

   b.  Selects a co-chair for the RMSWG.


## 2.5.  DIRECTOR, DHA.

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), the Director, DHA:

   a.  Publishes DHA procedural instructions necessary to implement this volume.

   b.  Uses the planning, programing, budgeting, and execution process to allocate resources necessary for the evaluation of medical conditions, in accordance with this volume and Service-specific medical standards for military retention.

   c.  Supports MHS efforts to monitor and improve medical standards for military retention.

   d.  Selects a representative for the RMSWG.


## 2.6.  SECRETARIES OF THE MILITARY DEPARTMENTS AND COMMANDANT, UNITED STATES COAST GUARD (USCG).

The Secretaries of the Military Departments and the Commandant, USCG:

   a.  Provide guidance necessary to implement this volume and Service-specific retention medical standards, as required, to refer Service members to the:

      (1)  DES, in accordance with DoDI 1332.18, DoDI 1332.45, and this volume; or

      (2)  For members of the USCG, the USCG Physical DES, pursuant to the Commandant Instruction M1850.2 series.

   b.  Select a representative for the RMSWG.

**App. 341**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 3: PROCEDURES FOR APPLYING MEDICAL STANDARDS

## 3.1. APPLICABILITY OF RETENTION MEDICAL STANDARDS.

The medical standards in Section 5 apply to:

 a.  All current Service members, including those:

   (1)  Accessed with a medical waiver in accordance with Volume 1 of this instruction and DoDI 1332.18.

   (2)  Previously found fit by the DES, in accordance with DoDI 1332.18, when the condition progresses and has become potentially unfitting.

 b.  Former Service members being medically evaluated for return to military service when the applicability criteria in Paragraph 4.1 of Volume 1 of this instruction does not apply.

## 3.2. APPLICATION OF CRITERIA USED TO DEVELOP STANDARDS.

The standards in Section 5 will be applied on a case-by-case basis considering the following criteria:

 a.  The affected Service member's ability to safely complete common military tasks at a general duty level.  Tasks may include, but are not limited to:

   (1)  Climbing and going down structures such as stairs, a ladder, ladderwells, or a cargo net.

   (2)  Wearing personal protective gear.

   (3)  Running 100 yards.

   (4)  Standing in formation.

   (5)  Carrying personal equipment.

   (6)  Operating a vehicle.

   (7)  Operating an assigned weapons system, to include safe operation of an individual firearm.

   (8)  Subsisting on field rations.

   (9)  Working in extreme environments or confined spaces.

   (10)  Operating for extended work periods.

**App. 342**

(11)  Communicating effectively.

b.  Limitations or requirements due to medical condition(s) or objections to recommended medical interventions that:

(1)  Impose unreasonable medical requirements on the Military Services to maintain or protect the Service member.

(2)  Require diagnostic(s), treatment(s), or surveillance for longer than 12 months that is not anticipated to be routinely available in operational locations, unless approved by the Service member's unit commander in accordance with DoDI 1332.45.

(3)  Present an obvious risk to the health or safety of the member, other Service members, or other personnel serving with or accompanying an armed force in the field.

(4)  Are of such a nature or duration that progressive worsening or effects of external stressors are reasonably expected to result in a grave medical outcome or an unacceptable negative impact on mission execution.

(5)  Are incompatible with the physical and psychological demands required for deployment and the Service member's office, grade, rank, or rating.

## 3.3.  IMPLEMENTATION.

a.  The Military Department(s) concerned will:

(1)  Apply the standards in Section 5 on a case-by-case basis.

(2)  Consider which criteria in Paragraph 3.2. apply to the Service member's office, grade, rank, or rating.

(3)  Determine if the Service member should be referred to the DES.

(4)  Perform these evaluations in accordance with Service-specific regulations before or during the medical evaluation board component of the DES process.

b.  Service members will be referred to the DES in accordance with DoDI 1332.18.  The standards listed in Section 5 do not include all of the conditions that may be referred to the DES or that are compensable in accordance with Part 4 of Title 38, Code of Federal Regulations also known as "the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)".  In the event of conflicting guidance or lack of a defined standard in this volume, DoDI 1332.18 will take precedence.

c.  Military Departments may authorize administrative separation processing of Service members with medical conditions and circumstances not constituting a physical disability, in accordance with DoDI 1332.14 or DoDI 1332.30, that interfere with assignment or performance

**App. 343**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

of duty, if the Service member is ineligible for referral to the DES, pursuant to DoDI 1332.18, or the USCG Physical DES, pursuant to the Commandant Instruction M1850.2 series.

d.  Military Department regulations regarding presumption of fitness are considered by medical and administrative personnel when applying the standards in Section 5.

e.  Medical diagnoses and duty limitations will be made in conjunction with referrals or information provided by the appropriate medical specialty, in accordance with this volume and Military Service-specific regulations.

f.  Military Departments will coordinate requirements for clinical evaluations, information technology, and access to medical records with the Director, DHA.

g.  If a Service member fails to consent to medically appropriate treatment for a potentially disqualifying condition, the condition is considered refractory to treatment and may result in the Service member not being eligible for retention.  The Military Department concerned will take appropriate administrative action in accordance with Military Department-specific policies.

**App. 344**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 4: ACTIVITIES OF THE RMSWG

## 4.1. PURPOSE OF THE RMSWG.

The RMSWG—a chartered working group under the MEDPERS—convenes at least twice a year, under the joint guidance of the DASD(HSP&O) and the DASD(MPP), to review and develop policy relevant to this volume.

## 4.2. OVERALL GOALS OF THE RMSWG.

The RMSWG will:

  a.  Review and develop proposed changes to this volume in accordance with DoDI 5025.01.

  b.  Draft DoD medical standards for military retention based on DoD mission requirements, available scientific evidence, and expert opinion.

  c.  Evaluate DoD Component implementation of the standards in Section 5 of this volume.

  d.  Respond to requests from the MEDPERS.

  e.  Periodically reassess the goals of the RMSWG.

## 4.3. CO-CHAIRS OF THE RMSWG.

The DASD(HSP&O) and the DASD(MPP) will each select one representative to co-chair the RMSWG.  The RMSWG co-chairs will:

  a.  Draft the RMSWG charter for MEDPERS approval.

  b.  Record and retain meeting minutes and other committee records.

  c.  Schedule meetings as required.

## 4.4. MEMBERSHIP OF THE RMSWG.

The RMSWG membership will include medical and personnel representatives from:

  a.  Each Military Service.

  b.  The Joint Staff.

  c.  Other organizations as required in accordance with the RMSWG charter.

**App. 345**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 5: DISQUALIFYING CONDITIONS

## 5.1. GENERAL.

The medical standards for military retention are classified into general systems in this section. Unless otherwise stipulated, these are the conditions that do not meet the retention standard. These conditions must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.2. HEAD.

Defects of the skull, face, or mandible to a degree that prevents the member from properly wearing required protective equipment (e.g., military headgear) are not compatible with retention. The condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.3. EYES.

   a. When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

   b. Any chronic disease process or condition of the eye, lids, or visual system that is resistant to treatment and does not meet the vision standards in Paragraph 5.4.

   c. Corneal degeneration, when contact lenses or other special corrective devices (e.g., telescopic lenses, electronic magnifiers) are required to prevent progression or to meet the standards in Paragraph 5.4.

   d. Aphakia, bilateral if not a surgical candidate. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.3.a does not apply.

   e. Binocular diplopia, not correctable by surgery, that is severe, constant, and in a zone less than 20 degrees from the primary position.

   f. Bilateral concentric constriction to less than 40 degrees interfering with the ability to safely perform duty.

   g. Absence of an eye or enucleation. This condition is not compatible with retention and the Services should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.3.a. does not apply.

**App. 346**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

h.  Night blindness requiring assistance to travel at night or resulting in duty limitations due to an inability to perform night missions.

i.  Any chronic eye diseases requiring treatment with systemic immunosuppressant medication.

## 5.4.  VISION.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Vision standards must be met with the unaided eye or clear glasses without specialized optical aids including, but not limited to, telescopic, magnifying, or tinted lenses (excluding sunglasses for routine wear). Color vision standards will be set by the individual DoD Components.

a.  With both eyes open, best corrected for both distant and near vision of at least 20/40.

b.  Any condition that specifically requires contact lenses for correction of vision.

c.  Anisometropia worse than 3.5 diopters (spherical equivalent difference).

d.  Any scotoma large enough to impair duty performance including, but not limited to, permanent hemianopsia.

## 5.5.  EARS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Persistent defect that prevents the proper wearing of required military equipment (e.g., hearing protection).

b.  Ménière's disease and other disorders of balance or sensorium with frequent and severe attacks that interfere with satisfactory performance of duty.

c.  Any conditions of the ear that persist despite appropriate treatment and necessitate frequent and prolonged medical care or hospitalization (e.g., cholesteatoma, chronic otitis infections, and associated secondary changes).

## 5.6.  HEARING.

Hearing loss that prohibits safe performance of duty, with or without hearing aids or other assistive devices is not compatible with retention.  The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

SECTION 4:  DISQUALIFYING CONDITIONS                                                                 13

**App. 347**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.7.  NOSE, SINUSES, MOUTH, AND LARYNX.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

   a.  Vocal cord dysfunction characterized by bilateral vocal cord paralysis or dysfunction significant enough to interfere with speech or cause respiratory compromise upon exertion.

   b.  Any persistent condition of the sinuses or nasal cavity that requires ongoing medical care beyond operationally available maintenance medications to maintain sinonasal function.

   c.  Conditions or defects of the mouth, tongue, palate, throat, pharynx, larynx, and nose that interfere with chewing, swallowing, speech, or breathing.


## 5.8.  DENTAL.

Diseases and abnormalities of the jaw or associated tissues that prevent normal mastication, speech, or proper wear of required protective equipment are not compatible with retention.  The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.


## 5.9.  NECK.

Limited range of motion of the neck that impairs normal function is not compatible with retention.  The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.


## 5.10.  LUNGS, CHEST WALL, PLEURA, AND MEDIASTINUM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this paragraph do not meet the standards if the Service member cannot meet Service-specific pulmonary functional assessment (e.g., trial of duty or established standard) or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

   a.  Asthma or airway hyper responsiveness with:

      (1)  Persistent symptoms;

      (2)  Forced expiratory volume in one second (FEV1) persistently below 70 percent despite treatment with inhaled corticosteroids; or

**App. 348**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(3)  More than once required oral steroid or emergent asthma treatment in the previous 12 months.

b.  Chronic obstructive pulmonary disease with:

(1)  Persistent symptoms;

(2)  FEV1 between 50 percent and 79 percent of predicted FEV1 that cannot pass Service-determined functional assessments;

(3)  FEV1 of less than 50 percent of predicted FEV1, despite treatment with inhaled corticosteroids; or

(4)  More than one required hospitalization in the previous 12 months.

c.  Bronchiectasis, if severe or symptomatic.

d.  Thoracic cavity malformation or dysfunction, including pectus excavatum, pectus carinatum, or diaphragmagtic defect, if it is symptomatic or interferes with the wearing of military equipment or the performance of military duty.

e.  Chronic or recurrent pulmonary disease or symptoms including, but not limited to:

(1)  Pulmonary fibrosis;

(2)  Emphysema;

(3)  Interstitial lung disease;

(4)  Pulmonary sarcoidosis;

(5)  Pleurisy; or

(6)  Residuals of surgery that prevent satisfactory performance of duty.

f.  Recurrent spontaneous pneumothorax, when the underlying defect is not correctable by surgery.

g.  Tuberculosis, pulmonary or extra pulmonary, with clinically significant sequelae following treatment, if resistant to treatment or if the condition is of such severity that the individual is not expected to return to full duty despite appropriate treatment.

h.  Pulmonary embolism, recurrent or a single episode, if anticoagulation medications, other than aspirin, are clinically indicated for longer than 12 months.

i.  Cystic fibrosis.

j.  Any condition for which chronic use of supplemental oxygen is indicated.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.11. HEART.

a. When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating. Conditions in this paragraph do not meet the standards if the Service member cannot meet Service-specific cardiac functional assessment (e.g., a Service-defined trial of duty period) or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing due to risk of disease progression or adverse cardiac event.

b. Heart valve disease; including:

(1) Any valve replacement. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions after post-operative recovery (or a period of Limited Duty). Paragraph 5.11.a does not apply.

(2) Moderate or worse valvular insufficiency or regurgitation if a cardiologist determines that the Service member has physical activity or duty restrictions to reduce the risk of disease progression or an adverse cardiac event.

(3) Mild or worse valvular stenosis if a cardiologist determines the Service member has physical activity or duty restrictions to reduce the risk of disease progression or adverse cardiac event.

c. Cardiomyopathy or heart failure; including:

(1) Persistent cardiomyopathy or heart failure related to a potentially reversible condition when a cardiologist determines that the underlying etiology is uncorrectable.

(2) Cardiomyopathy or heart failure, upon diagnosis, when secondary to an underlying permanent condition including, but not limited to: hypertrophic cardiomyopathy, amyloidosis, sarcoidosis, ventricular non-compaction syndrome, and arrhythmogenic right ventricular cardiomyopathy. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.11.a does not apply.

d. Clinical indication or presence of pacemaker or implantable cardioverter-defibrillator. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.11.a does not apply.

e. Atrial and ventricular arrhythmias, other than isolated Premature Ventricular Contractions and Premature Atrial Contractions, unless successfully ablated (if indicated) and cleared by a cardiologist for unrestricted exercise.

f. Channelopathies reliably diagnosed by a cardiologist that predisposes to sudden cardiac death and syncope including, but not limited to:

(1) Brugada pattern;

**App. 350**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(2)  Acquired or Congenital Long QT syndrome; or

(3)  Catecholiminergic Polymorphic Ventricular Tachycardia.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

g.  Pre-excitation pattern (e.g., Wolff-Parkinson-White pattern) unless it is asymptomatic and associated with low-risk accessory pathway by appropriate diagnostic testing, or successfully treated with ablation.

h.  Conduction disorders associated with potentially fatal or severely symptomatic events including, but not limited to:

(1)  Disorders of sinus arrest;

(2)  Asystole;

(3)  Mobitz type II second-degree atrioventricular block;

(4)  Third-degree atrioventricular block; or

(5)  Sudden cardiac death unless associated with recognizable temporary precipitating conditions (e.g., perioperative period, hypoxia, electrolyte disturbance, drug toxicity, infection, or acute illness).  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

i.  Coronary artery disease; including:

(1)  Acute Coronary Syndrome (ST-elevation myocardial infarction or Non-ST elevation myocardial infarction):

(a)  That required intervention including, but not limited to:

1.  Percutaneous coronary intervention;

2.  Coronary artery bypass grafting; or

3.  Thrombolytic medication.

(b)  For which anti-platelet therapy, other than aspirin, occurs for longer than 12 months.

(2)  Stable coronary disease, unless there is no evidence of ischemia and the Service member can achieve 10 metabolic equivalents while on optimal medical therapy.

j.  Chronic pericardial disease, reliably diagnosed by a cardiologist.

**App. 351**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

k.  Complex congenital heart disease including, but not limited to: tetrology of Fallot, coarctation of the aorta, and Ebstein's anomaly, unless successfully treated by surgical or percutaneous correction.

l.  Symptomatic or hemodynamically significant anatomic intracardiac shunts including, but not limited to: patent foramen ovale, atrial septal defect, and ventricular septal defect, if persistent despite surgical or percutaneous correction (as indicated).

m.  Recurrent syncope or near syncope (including postural orthostatic tachycardia syndrome) that interferes with duty, if no treatable cause is identified or it persists despite conservative therapy.

n.  Rheumatic heart disease, if sequelae present.

o.  History of spontaneous coronary artery dissection.

p.  Surgery of the heart or pericardium with persistent duty limitations.

## 5.12.  ABDOMINAL ORGANS AND GASTROINTESTINAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if associated with the inability to maintain normal weight or nutrition, require repeated procedures or surgery, or if the condition requires immunomodulating or immunosuppressant medications.

a.  Esophageal stricture, including manifestations of eosinophilic esophagitis, that requires a restricted diet or frequent dilatation.

b.  Persistent esophageal disease (e.g., dysmotility disorders, achalasia, esophagitis, esophageal spasm) that is severe, or results in dysphagia.

c.  Gastritis, if severe, with recurring symptoms not relieved by medication, surgery, or endoscopic intervention.

d.  Non-ulcerative or functional dyspepsia not controlled by medications.

e.  Recurrent gastric or duodenal ulcer, with or without obstruction or perforation confirmed by laboratory, imaging, or endoscopy.

f.  Inflammatory bowel disease including, but not limited to:

(1)  Crohn's disease;

(2)  Ulcerative colitis;

(3)  Ulcerative proctitis;

**App. 352**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(4)  Regional enteritis;

(5)  Granulomatous enteritis;

(6)  Chronic or recurrent indeterminate colitis; or

(7)  Microscopic colitis that requires treatment with immune modulator or biologic medications.

g.  Chronic proctitis with moderate to severe symptoms of bleeding, painful defecation, tenesmus, or diarrhea.

h.  Malabsorption syndromes including those related to:

(1)  Celiac sprue;

(2)  Pancreatic insufficiency; or

(3)  Sequelae of surgery including, but not limited to:

(a)  Bariatric surgery;

(b)  Colectomy; or

(c)  Gastrectomy.

i.  Functional gastrointestinal disorders, including but not limited to irritable bowel syndrome.

j.  Familial adenomatous polyposis syndrome (e.g., classic or attenuated) or hereditary non-polyposis colon cancer (i.e., Lynch syndrome).

k.  Chronic hepatitis with impairment of liver function.

l.  Cirrhosis of the liver, portal hypertension, esophageal varices, esophageal bleeding, or other complications of chronic liver disease, resulting from conditions including, but not limited to:

(1)  Hemochromatosis.

(2)  Alpha-1 anti-trypsin deficiency.

(3)  Wilson's disease.

(4)  Alcoholic and non-alcoholic fatty liver disease.

m.  Chronic gallbladder disease or biliary dyskinesia with frequent abdominal pain or recurrent jaundice.

**App. 353**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

n.  Chronic liver disease because of trauma or infection, to include amoebic abscess or liver transplant recipient(s).

o.  Chronic or recurrent pancreatitis.

p.  Pancreatectomy or pancreas (whole organ or islet cell) transplant recipient(s).

q.  Pancreaticduodenostomy, pancreaticgastrostomy, or pancreaticojejunostomy, with chronic digestive system dysfunction.

r.  Acquired fecal incontinence or obstruction characterized by intractable constipation or pain on defecation.

s.  Severe symptomatic hernia, including abdominal wall or hiatal.

t.  Total colectomy or any partial colectomy with residual limitations.

u.  Total gastrectomy, or any partial gastroectomy or gastrojejunostomy with residual limitations.

v.  Colostomy, jejunostomy, ileostomy, or gastrostomy, if permanent.

## 5.13.  FEMALE GENITAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Genital trauma or abnormalities that result in urinary incontinence or the need for catheterization.

b.  Chronic pelvic pain, with or without an identifiable diagnosis, such as dysmenorrhea, endometriosis, or ovarian cysts.

c.  Premenstrual dysphoric disorder.

d.  Abnormal uterine bleeding resulting in anemia.

e.  Chronic breast pain, so as to prevent satisfactory wearing of military equipment.

## 5.14.  MALE GENITAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Absence of both testicles with medically required injectable hormone therapy.

**App. 354**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

b. Epispadias or hypospadias when accompanied by persistent urinary complications.

c. Chronic pelvic pain, with or without an identifiable diagnosis, to include chronic prostatitis, epididymitis, scrotal pain, or orchitis.

d. Genital trauma or abnormalities that result in urinary incontinence or the need for catheterization.

## 5.15. URINARY SYSTEM.

a. When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

b. Chronic or interstitial cystitis.

c. Chronic incontinence, dysfunction, or urinary retention requiring catheterization.

d. Cystoplasty, if reconstruction is unsatisfactory or if refractory symptomatic infections persist.

e. Ureterointestinal or direct cutaneous urinary diversion.

f. Urethral abnormalities, if they:

    (1) Result in chronic incontinence;

    (2) Result in the persistent need for catheterization; or

    (3) Require a urethrostomy, if a satisfactory urethra cannot be restored.

g. Ureteral abnormalities, including ureterocystostomy, if both ureters are markedly dilated with irreversible changes, or if they result in:

    (1) Recurrent obstruction;

    (2) Kidney infection; or

    (3) Other chronic kidney dysfunction.

h. Kidney transplant recipient(s). This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.15.a. does not apply.

i. Chronic or recurrent pyelonephritis with secondary hypertension or hypertensive end-organ damage.

j. Kidney abnormalities, including:

SECTION 4: DISQUALIFYING CONDITIONS    21

**App. 355**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

    (1)  Polycystic kidney disease;

    (2)  Horseshoe kidney;

    (3)  Hypoplasia of the kidney; or

    (4)  Residuals of perirenal abscess when renal function is:

        (a)  Impaired;

        (b)  Associated with secondary hypertension or hypertensive end-organ damage; or

        (c)  The focus of frequent infection.

    k.  Hydronephrosis associated with significant systemic effects, renal impairment, secondary hypertension, hypertensive end-organ damage, or frequent infections.

    l.  Chronic kidney disease, stage 3A or worse, according to the Kidney Disease Improving Global Outcomes Guidelines Standard, as reliably diagnosed by a nephrologist.  Any level of chronic kidney disease for which chronic immunosuppressant medications (e.g.,  medication for steroid relapsing glomerulonephritis) are required.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.15.a does not apply.

    m.  Chronic nephritis or nephrotic syndrome.  Service-specific criteria for proteinuria may apply.

    n.  Recurrent calculi that:

    (1)  Result in recurring infections;

    (2)  Result in obstructive uropathy unresponsive to medical or surgical treatment; or

    (3)  Are symptomatic and occur with a frequency that prevents satisfactory performance of duty.

### 5.16.  SPINE AND SACROILIAC JOINT CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Spondyloarthritis.  Chronic or recurring episodes of axial or peripheral arthritis that may include extra-articular involvement that:

**App. 356**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  Causes functional impairment interfering with successful performance of duty supported by objective, subjective, and radiographic findings; or

(2)  Requires medication for control that needs frequent monitoring by a physician due to debilitating or serious side effects including, but not limited to:

(a)  Ankylosing spondylitis;

(b)  Reactive arthritis;

(c)  Psoriatic arthritis; or

(d)  Arthritis associated with inflammatory bowel disease.

b.  Radicular or non-radicular pain involving the cervical, thoracic, lumbosacral, or coccygeal spine, whether idiopathic or secondary to degenerative disc or joint disease.

c.  Kyphosis:

(1)  Resulting in greater than 50 degrees of curvature, if symptomatic, so as to limit the wearing of military equipment; or

(2)  If recurrently symptomatic, regardless of the degree of curvature.

d.  Scoliosis:

(1)  Resulting in severe deformity—greater than 30 degrees of curvature—if symptomatic, so as to limit the wearing of military equipment; or

(2)  If recurrently symptomatic, regardless of the degree of curvature.

e.  Congenital or surgical fusion or disc replacement.

f.  Vertebral fractures after radiographic evidence of complete healing and experiencing moderate or severe symptoms that result in repeated acute medical visits.

g.  Spina bifida with demonstrable signs and moderate symptoms of root or cord involvement.

h.  Spondylolysis or spondylolisthesis with moderate or severe symptoms resulting in repeated acute medical visits.

## 5.17.  UPPER EXTREMITY CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this

**App. 357**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Limitation of joint motion.

    b.  Amputation of any part of hand and fingers.

    c.  Intrinsic paralysis or weakness of upper limbs when symptoms are severe and persistent.

## 5.18.  LOWER EXTREMITY CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Limitation of joint motion.

    b.  Foot and ankle conditions that include:

       (1)  Amputation of any part of the foot or toes.

       (2)  Conditions of the foot or toes that prevent the satisfactory performance of required military duty or the wearing of required military footwear, such as:

          (a)  Deformity of the toes;

          (b)  Clubfoot;

          (c)  Rigid pes planus;

          (d)  Recurrent plantar fasciitis; or

          (e)  Symptomatic neuroma.

    c.  Chronic foot, leg, knee, thigh, and hip conditions, such as:

       (1)  Chronic anterior knee pain;

       (2)  Instability after knee ligament reconstruction; or

       (3)  Recurrent stress fracture.

    d.  Coxa vara to such a degree that it results in chronic pain.

**App. 358**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.19. GENERALIZED CONDITIONS OF THE MUSCULOSKELETAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating. Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a. Persistent symptoms after any dislocation, subluxation, or instability of the hip, knee, ankle, subtalar joint, foot, shoulder, hand, wrist, or elbow.

    b. Osteoarthritis or infectious arthritis with severe symptoms or traumatic arthritis.

    c. Malunion, non-union, or hypertrophic ossification with persistent severe deformity or loss of function.

    d. Prosthetic replacement of any joints, if there is resultant loss of function or persistent pain.

    e. History of neuromuscular paralysis, weakness, contracture, or atrophy that is not completely resolved.

    f. Osteopenia, osteoporosis, or osteomalacia resulting in fracture with residual symptoms after therapy.

    g. Recurrent episodes of chronic osteomyelitis that:

        (1) Are not responsive to treatment; or

        (2) Involve the bone to a degree that interferes with stability and function.

    h. Osteonecrosis, to include avascular necrosis of bone.

    i. Chronic tendonitis, tenosynovitis, or tendinopathy.

    j. Osteitis deformans (i.e., Paget's disease) that involve single or multiple bones and result in deformities or symptoms that severely interfere with function.

    k. Chronic mechanical low back pain.

## 5.20. VASCULAR SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

    a. Abnormalities of the arteries including, but not limited to, aneurysms, arteriovenous malformations, or arteritis.

**App. 359**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

b. Peripheral artery disease including claudication and renal artery stenosis.

c. Hypertensive cardiovascular disease and hypertensive vascular disease.

   (1) Essential hypertension that:

      (a) Is not controlled despite an adequate period of therapy in an ambulatory status;

      (b) Is associated with end organ damage; or

      (c) Requires a treatment regimen that is not compatible with an operational environment.

   (2) Secondary hypertension, unless the underlying cause has been treated with subsequent control of blood pressure.

d. Persistent peripheral vascular disease.

e. Venous disease that, despite appropriate treatment, results in:

   (1) Persistent duty limitations.

   (2) Limitations in the wearing of the military uniform.

f. Deep vein thrombosis (recurrent or a single episode), if anticoagulation medications, other than aspirin, are clinically indicated for longer than 12 months.

g. Surgery of the vascular system with persistent duty limitations.

h. Thoracic Outlet Syndrome including:

   (1) Thoracic Outlet Syndrome—either neurogenic, arterial, or venous:

      (a) With symptoms that are not controlled, despite an adequate period of therapy and surgery;

      (b) That is associated with end organ damage, or

      (c) That requires anticoagulation medication other than aspirin.

   (2) Venous Thoracic Outlet Syndrome that required venous reconstruction with a stent or open surgery.

   (3) Arterial Thoracic Outlet Syndrome that required arterial reconstruction with a bypass or interposition graft.

i. Popliteal Entrapment Syndrome:

**App. 360**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  With symptoms that are not controlled despite an adequate period of therapy and surgery, is associated with end organ damage, or requires anticoagulation medication other than aspirin.

(2)  That required arterial reconstruction with a bypass or interposition graft.

### 5.21.  SKIN AND SOFT TISSUE CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet standard if the Service member cannot properly wear the required military uniform or equipment.

a.  Skin or soft tissue conditions, such as:

(1)  Severe nodulocystic acne;

(2)  Hidradenitis suppurativa;

(3)  Inflammatory or scarring scalp disorders;

(4)  Bullous dermatoses (including, but not limited to, dermatitis herpetiformis, emphigus, and epidermolysis bullosa);

(5)  Lichen planus; or

(6)  Panniculitis that prevents the proper wearing required military uniform or equipment.

b.  Severe atopic dermatitis that prevents the proper wearing of required military uniform or equipment.

c.  Any dermatitis, including eczematous or exfoliative, that prevents the proper wearing of required military uniform or equipment.

d.  Persistent or recurrent symptomatic cysts, including pilonidal cysts or furunculosis, that prevent the proper wearing of required military uniform or equipment.

e.  Chronic or current lymphedema.

f.  Severe hyperhidrosis.

g.  Scars or keloids that:

(1)  Prevent the proper wearing of required military uniform or equipment; or

(2)  Interfere with the function of an extremity or body area, including by limiting range of motion or causing chronic pain.

**App. 361**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

h.  Neurofibromatosis, other than cutaneous neurofibromas.

i.  Psoriasis or parapsoriasis that is uncontrolled or requires:

    (1)  Systemic immunomodulating;

    (2)  Immunosuppressant medications; or

    (3)  Ultraviolet light therapy.

j.  Scleroderma that seriously interferes with the function of an extremity or body area.

k.  Chronic urticaria or angioedema that is not responsive to treatment or requires duty limitations despite appropriate treatment.

l.  Intractable symptomatic plantar keratosis.

m.  Intractable superficial or deep fungal infections.

n.  Malignant neoplasms (refer to Paragraph 5.29 for malignancies):

    (1)  Including melanoma, melanoma in situ, and cutaneous lymphoma (mycosis fungoides).

    (2)  Not including basal cell and squamous cell carcinomas.

o.  Any photosensitive dermatosis, including, but not limited to:

    (1)  Cutaneous lupus erythematosus;

    (2)  Dermatomyositis;

    (3)  Polymorphous light eruption; or

    (4)  Solar urticaria.

p.  Severe or chronic erythema multiforme.

q.  Chronic, non-healing ulcers of the skin.

## 5.22.  BLOOD AND BLOOD FORMING CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Anemia, hereditary or acquired, when:

**App. 362**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

    (1)  Response to therapy is unsatisfactory; or

    (2)  Therapy requires prolonged, intensive, medical supervision or intervention.

  b.  Hypercoagulable disease associated with vascular thrombosis when anticoagulation medication of any type (except aspirin) is clinically indicated for longer than 12 months.

  c.  Bleeding disorders including, but not limited to:

    (1)  Hemophilia or other clinically significant factor deficiencies;

    (2)  Thrombocytopenia with persistent platelet count less than 50,000;

    (3)  Clinically significant Von Willebrand disease; or

    (4)  Platelet function disorders.

  d.  Chronic leukopenia:

    (1)  If therapy is clinically indicated due to a malignant process; or

    (2)  Where therapy is indicated for longer than 12 months.

  e.  Primary Polycythemia Vera, Essential Thrombocytosis, or Chronic Myelogenous Leukemia, if therapy beyond aspirin is clinically indicated.

  f.  Chronic and clinically significant splenomegaly.

  g.  Chronic or recurrent symptomatic hemolytic crisis.

## 5.23.  SYSTEMIC CONDITIONS.

  a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions listed in this paragraph do not meet medical retention standards if they require medication for control with frequent monitoring by a medical provider due to potential debilitating or serious side effects.

  b.  Disorders involving the immune system, including immunodeficiencies with progressive clinical illness.

    (1)  A Service member with laboratory evidence of Human Immunodeficiency Virus infection will be referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses, including evaluation on a case-by-case basis.  Covered personnel will not be discharged or separated solely on the basis of their HIV-positive status.

**App. 363**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(2)  Primary immunodeficiencies—including, but not limited to, hypogammaglobulinemia, common variable immune deficiency, or complement deficiency—with objective evidence of function deficiency and severe symptoms that are not controlled with treatment, or when injectable medications are clinically indicated.

c.  Tuberculosis (pulmonary or extra pulmonary) with clinically significant sequelae following treatment, if:

(1)  Resistant to treatment; or

(2)  The condition is of such severity that the individual is not expected to return to full duty despite appropriate treatment.

d.  Severe chronic complications of sexually transmitted diseases including neurosyphilis.

e.  Recurrent anaphylaxis, if:

(1)  Immunotherapy is not sufficient in reducing the risk;

(2)  Avoidance of the trigger results in long-term duty limitations; or

(3)  The individual is not expected to return to duty.

f.  Chronic, severe, urticarial, or histaminergic angioedema.

g.  Hereditary angioedema.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.23.a does not apply.

h.  Recurrent rhabdomyolysis, a single episode of idiopathic rhabdomyolysis, or a single episode of rhabdomyolysis that is associated with underlying metabolic or endocrine abnormalities.

i.  Severe motion sickness.  If due to an underlying disorder, process via the relevant standard.  Otherwise, it may require processing through Service specific separation guidance.

j.  Sarcoidosis, eosinophilic granuloma, or amyloidosis progressive with severe or multiple organ involvement.

k.  Infections (superficial, local, or systemic) that are not responsive to appropriate treatment.

## 5.24.  ENDOCRINE AND METABOLIC CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Adrenal dysfunction, including Addison's disease or Cushing's disease.

**App. 364**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

b.  Diabetes mellitus, unless hemoglobin A1c can be maintained at less than eight percent using only lifestyle modifications (e.g., diet and exercise) or with the following medications (alone or in combination):

(1)  Metformin;

(2)  Dipeptidyl peptidase 4 inhibitors; or

(3)  Glucagon-like peptide-1 receptor agonists.

c.  Pituitary dysfunction or mass effect from pituitary tumor.

d.  Diabetes insipidus, after treatment and resolution of an underlying etiology.

e.  Hyperparathyroidism, when residuals or complications are present.

f.  Hypoparathyroidism, when severe, persistent, and difficult to manage.

g.  Goiter, if mass effect.

h.  Persistent, symptomatic, hypothyroidism or hyperthyroidism that is not responsive to therapy.

i.  Persistent metabolic bone disease—including, but not limited to, osteoporosis, Paget's disease, and osteomalacia—if:

(1)  Associated with pathological fractures; or

(2)  The condition prevents the wearing of military equipment.

j.  Osteogenesis imperfecta.

k.  Hypogonadism with medically required injectable hormone replacement.

l.  Hypoglycemia when caused by an insulinoma or other hypoglycemia-inducing tumor.

m.  Gout with frequent acute exacerbations or severe bone, joint, or kidney damage.

n.  Endocrine hyperfunctioning syndromes including, but not limited to:

(1)  Multiple endocrine neoplasia;

(2)  Pheochromocytoma;

(3)  Salt-wasting congenital adrenal hyperplasia;

(4)  Carcinoid syndrome; or

(5)  Endocrine tumors of the gastrointestinal tract.

**App. 365**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.25. RHEUMATOLOGIC CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating. Conditions listed in this paragraph do not meet medical retention standards if the condition requires geographic limitations to protect the individual from infectious disease risk or due to limited monitoring capabilities, is associated with adverse effects from medication, or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

   a. Systemic lupus erythematosus.

   b. Mixed connective tissue disease.

   c. Progressive systemic sclerosis, including:

      (1) Calcinosis;

      (2) Raynaud's phenomenon;

      (3) Esophageal dysmotility;

      (4) Scleroderma; or

      (5) Telangiectasia syndrome.

   d. Rheumatoid arthritis.

   e. Sjögren's syndrome.

   f. Chronic autoimmune vasculitides or autoimmune diseases including, but not limited to:

      (1) Polyarteritis nodosa.

      (2) Behçet's disease.

      (3) Takayasu's arteritis.

      (4) Giant cell arteritis.

      (5) Anti-neutrophil cytoplasmic antibody associated vasculitis.

      (6) IgG-4 disease.

      (7) Henoch-Schonlein Purpura.

   g. Myopathy or polymyositis.

   h. Fibromyalgia or myofascial pain syndrome.

**App. 366**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

i.  Connective tissue disorders if associated with cardiac manifestations or limitations from recurrent musculoskeletal dysfunction.

### 5.26.  NEUROLOGIC CONDITIONS.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

b.  Cerebrovascular conditions including, but not limited to:

(1)  Subarachnoid or intracerebral hemorrhage;

(2)  Vascular stenosis;

(3)  Stroke;

(4)  Aneurysm;

(5)  Arteriovenous malformation; or

(6)  Recurrent transient ischemic attack unless underlying etiology is identified and definitively treated.

c.  Anomalies of the central nervous system or meninges with persistent sequelae including, but not limited to:

(1)  Pain.

(2)  Significant sensory or motor impairment.

(3)  Severe headaches.

(4)  Seizures.

(5)  Alteration of consciousness, personality, or mental function.

d.  Permanent or progressive cognitive impairment due to Alzheimer's disease or other dementias.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.26.a does not apply.

e.  Neuromuscular disorders and muscular dystrophy including, but not limited to:

(1)  Facioscapulohumeral muscular dystrophy.

(2)  Limb girdle dystrophy.

(3)  Myotonic dystrophy.

**App. 367**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

   f. Chronic or recurrent demyelinating processes (e.g., multiple sclerosis, transverse myelitis, or recurrent optic myelitis).

   g. Migraine, tension, or cluster headaches, when manifested by frequent incapacitating attacks.

   h. Traumatic brain injury associated with persistent sequelae including, but not limited to:

     (1) Pain.

     (2) Significant sensory, cognitive, or motor impairment.

     (3) Severe headaches.

     (4) Seizures.

     (5) Alteration of consciousness, personality, or mental function.

   i. Peripheral neuropathy or paralytic disorders resulting in permanent functional impairment.

   j. Provoked seizures, if recurrent more than 6 months after the Service member begins treatment and the effects of medication:

     (1) Prohibit satisfactory performance of duty;

     (2) Require significant follow-up; or

     (3) Require modifications to reduce psychological stressors or enhance safety.

   k. Epilepsy. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.26.a does not apply.

   l. Myasthenia gravis, unless only involving extraocular muscles.

   m. Tremor, tic disorders, or dystonia (e.g., Tourette's Syndrome) with significant functional impairment.

   n. Recurrent, neurogenic, or unexplained syncope or near syncope that interferes with duty.

## 5.27. SLEEP DISORDERS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

   a. Clinical sleep disorders—including circadian rhythm disorders, insomnia, narcolepsy, cataplexy, or other hypersomnia disorders—that cause sleep disruption resulting in excessive daytime somnolence or other impacts on duty such as:

**App. 368**

(1)  Mood disturbance;

(2)  Irritability; or

(3)  Chronic use of prescription medication to promote sleep or maintain daytime wakefulness.

b.  Obstructive sleep apnea, of any severity:

(1)  With continued symptoms despite treatment with positive airway pressure machines or oral positional devices; or

(2)  That requires supplemental oxygen or any chronic medication to maintain wakefulness.

c.  Sleep-related movement disorder that causes sleep disruption resulting in excessive daytime somnolence or other impacts on duty, such as:

(1)  Mood disturbance;

(2)  Irritability; or

(3)  Chronic use of prescription medication to promote sleep or maintain daytime wakefulness.

## 5.28.  BEHAVIORAL HEALTH.

The following conditions, defined using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, unless otherwise stated, are not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.

a.  Schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, and brief psychotic disorder.  Substance- or medication–induced psychotic disorder and psychotic disorder(s) due to another medical condition should be considered on a case-by-case basis.

b.  Bipolar I disorder.

c.  Other bipolar spectrum disorders—including bipolar II disorder, cyclothymic disorder, substance- or medication–induced bipolar disorder—will be considered on a case-by-case basis if, despite appropriate treatment, they:

(1)  Require persistent duty modifications to reduce psychological stressors or enhance safety; or

(2)  Impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

d.  Other behavioral health conditions, defined using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders—including, but not limited to, anxiety disorders, depressive disorders, or eating or feeding disorders—will be considered on a case-by-case basis if, despite appropriate treatment, they:

(1)  Require persistent duty modifications to reduce psychological stressors or enhance safety; or

(2)  Impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

e.  Per Paragraph 3.3, disqualifying behavioral health conditions should either be referred to the DES or processed for administrative separation, based on whichever is appropriate for that condition.

## 5.29.  TUMORS AND MALIGNANCIES.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  All malignancies will be evaluated for potential recurrence and need for medical surveillance that could require permanent duty limitations, in accordance with Military Department regulations.

b.  Malignant neoplasms that are not responsive to therapy or have residuals of treatment that limit satisfactory performance of duty.

c.  Benign tumors with mass effect or that interfere with the wearing of military equipment.

## 5.30.  MISCELLANEOUS CONDITIONS.

Conditions listed in this paragraph do not meet medical retention standards if they require medication for control with frequent monitoring by a medical provider due to potential debilitating or serious side effects or geographic limitations to protect the individual from infectious disease risk.

a.  Porphyria.

b.  Cold-related disorders or injuries with sequelae.

c.  Organ or tissue transplantation for which long-term immunosuppressant therapy is clinically indicated.

d.  History of heatstroke or heat injury.

**App. 370**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  Three or more episodes of heat exhaustion or heat injury within 24 months.  A single episode of heat injury with severe complications (e.g., compartment syndrome) that affects successful performance of duty or persistent end organ effects.

(2)  Heat stroke, when symptoms fail to resolve or when sequelae pose significant risks for future operations.

e.  Any chronic condition that requires immunomodulating or immunosuppressant medications.

f.  Any chronic pain condition that requires chronic controlled medications listed under Controlled Substance Schedules 2-4, pursuant to Title 21, United States Code.

g.  Chronic complications or effects of surgery that:

(1)  Present a significant risk of infection;

(2)  Result in duty limitations; or

(3)  Require frequent specialty care resulting in an unreasonable requirement on mission execution.

h.  Any persistent condition that requires geographic limitations to the member for assignment, temporary duty, or deployment to protect the individual from infectious disease risk, due to limited monitoring capabilities or other reasons.

**App. 371**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# GLOSSARY

## G.1.  ACRONYMS.

| ACRONYM | MEANING |
|---------|---------|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| DASD(HSP&O) | Deputy Assistant Secretary of Defense for Health Services Policy and Oversight |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DHA | Defense Health Agency |
| DoDI | DoD instruction |
| FEV1 | forced expiratory volume in one second |
| MEDPERS | Medical and Personnel Executive Steering Committee |
| MHS | Military Health System |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |
| USCG | United States Coast Guard |
| RMSWG | Retention Medical Standards Working Group |

## G.2.  DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purpose of this volume.

| TERM | DEFINITION |
|------|-----------|
| **covered personnel** | Individuals who have been identified as HIV-positive, are asymptomatic, and who have a clinically confirmed undetectable viral load. |
| **garrison conditions** | Defined in DoDI 6465.03 |
| **heat exhaustion** | A syndrome of hyperthermia (core temperature at time of event usually ≤40ºC or 104ºF) with physical collapse or debilitation occurring during or immediately following exertion in the heat, with no more than minor central nervous system dysfunction (e.g., headache or dizziness). |

**App. 372**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

| TERM | DEFINITION |
|---|---|
| **heat injury** | Heat exhaustion with clinical evidence of organ or muscle damage without sufficient neurological symptoms to be diagnosed as heat stroke. |
| **heat stroke** | A syndrome of hyperthermia (core temperature at time of event usually ≥40ºC or 104ºF), physical collapse or debilitation, and encephalopathy as evidenced by delirium, stupor, or coma, occurring during or immediately following exertion or significant heat exposure.  It can be complicated by organ or tissue damage, systemic inflammatory activation, and disseminated intravascular coagulation. |
| **medical condition** | Any disease or residual of an injury that results in a lessening or weakening of the capacity of the body or its parts to perform normally, according to accepted medical principles. |
| **medically required** | A medically necessary health care treatment or supply for which there is no medically appropriate substitute that can meet operational requirements. |
| **office, grade, rank, or rating** | Defined in DoDI 1332.18. |
| **operational healthcare unit** | Defined in DoD Manual 6025.13. |
| **persistent** | Twelve months, or less if reasonably anticipated to exceed 12 months. |
| **trial of duty** | Service-defined assessment of a Service member's ability to perform the duties of their office, grade, rank, or rating, considering their physical and psychological demands and tasks, medical history, and prognosis. |

**App. 373**

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## REFERENCES

Code of Federal Regulations, Title 38, Part 4 (also known as "the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)")

Commandant Instruction Ml 850.2 (series), "Physical Disability Evaluation System," May 19, 2006

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1300.28, "Military Service By Transgender Persons And Persons With Gender Dysphoria", September, 4, 2020

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1332.45, "Retention Determinations For Non-Deployable Service Members," July 30, 2018

DoD Instruction 5025.01, "DoD Issuances Program," August 1, 2016, as amended

DoD Instruction 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction" May 5, 2018, as amended

DoD Instruction 6465.03, "Anatomic Gifts and Tissue Donation," June 8, 2016

DoD Instruction 6490.07. "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees," February 5, 2010

DoD Manual 6025.13, "Medical Quality Assurance (MQA) and Clinical Quality Management in the Military Health System (MHS)," October 29, 2013

Kidney Disease: Improving Global Outcomes, "Clinical Practice Guideline for the Evaluation and Management of Chronic Kidney Disease (CKD)," 2012 or current version[1]

Secretary of Defense Memorandum, "Policy Regarding Human Immunodeficiency Virus-Positive Personnel within the Armed Forces," June 6, 2022

United States Code, Title 21

---

[1] Accessible at https://kdigo.org/guidelines/ckd-evaluation-and-management

**App. 374**

# EXHIBIT C



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON DC 20350-1000

SECNAVINST 1000.11A
ASN (M&RA)
27 Jun 2023

SECNAV INSTRUCTION 1000.11A

From:  Secretary of the Navy

Subj:  SERVICE OF TRANSGENDER SAILORS AND MARINES

Ref:   (a) DoD Instruction 1300.28 of 30 April 2021
       (b) DoD Instruction 6130.03, Volume 1 of 6 May 2018
       (c) DoD Instruction 1350.02 of 4 September 2020
       (d) NAVMED P-117
       (e) SECNAV M-5214.1
       (f) 42 U.S.C 2000e
       (g) SECNAVINST 5300.28F
       (h) ASD (HA) Memo, Guidance for Medical Care in Military
           Treatment Facilities for Service Members Diagnosed
           with Gender Dysphoria of 12 March 2019
       (i) DoD Instruction 1332.18 of 10 November 2022

Encl:  (1) In-Service Transition Policies and Procedures
       (2) Responsibilities

1. <u>Purpose</u>.  To establish Department of the Navy (DON) policy for
the accession and service of transgender Sailors and Marines, to
include the process for transgender Service Members to transition
gender in-service in accordance with references (a) through (i).

2. <u>Cancellation</u>.  SECNAVINST 1000.11.

3. <u>Definitions</u>.  Definitions are provided in reference (a).

4. <u>Applicability</u>.  This instruction applies to all DON military
personnel.  For the purpose of this instruction, the term "Service
Member" includes midshipmen in a contracted Navy Reserve Officer
Training Corps (NROTC) status, or attending the United States
Merchant Marine Academy (USMMA) or the United States Naval Academy
(USNA).  Reference (a) provides specific considerations for Reserve
Component personnel, including but not limited to Selected
Reserves, Individual Ready Reserves, NROTC, and USMMA midshipmen.
Refer all DON civilian transgender questions to the DON Office of
Civilian Human Resources or the DON Office of the General Counsel.
Refer all questions regarding transgender contractors to the
Contracting Officer's Representative.

SECNAVINST 1000.11A
27 Jun 2023

5.  <u>Policy</u>

    a.  Consistent with the policies and procedures set forth in references (a) and (b), transgender individuals shall be allowed to serve openly in the DON.

    b.  All Service Members must be treated with dignity and respect.  No person, solely on the basis of gender identity, will be:

        (1)  Involuntarily separated or discharged from the DON.

        (2)  Denied reenlistment or continuation of service in the DON.

        (3)  Subjected to adverse action or mistreatment.

    c.  Department of Defense (DoD) and DON policy entitles all Service Members to an environment free from sexual harassment and unlawful discrimination on the basis of race, color, national origin, religion, sex (including pregnancy), gender identity, or sexual orientation.  It is the DoD's and DON's position that discrimination based on gender identity is a form of sex discrimination.  DoD military equal opportunity policy is set forth in reference (c).  All personnel will continue to treat each other with dignity and respect.  There is zero tolerance for harassing, hazing, or bullying in any form.

    d.  Specific policies and procedures related to the in-service transition process for transgender Service Members are provided in enclosure (1).

6.  <u>Responsibilities</u>.  See enclosure (2).

7.  <u>Accessions</u>

    a.  The Navy and Marine Corps will access transgender applicants as medically qualified if they meet all standards delineated in reference (b) or most current published version.  The gender identity of an otherwise qualified individual will not bar them from joining the Navy or Marine Corps, from admission to USNA, or from participating in NROTC or any other accession program.

    b.  Medical standards for accession into the Navy and Marine Corps help to ensure that those entering service are free from medical conditions or physical defects that may require excessive time lost from duty due to necessary medical treatment or

2

**App. 377**

SECNAVINST 1000.11A
27 Jun 2023

hospitalization, or result in separation from the service for
medical unfitness.

    c.  Accessions standards applicable to a diagnosis of gender
dysphoria and related treatment will be applied in accordance with
reference (b) or its most current published version.

    d.  Those applicants who do not meet the standards in
accordance with reference (b) or its most current published version
may be processed for a waiver in accordance with references (b) and
(d), and addressed in the same manner as with any other medical
condition that requires a waiver for accession, enlistment, or
induction.

8.  <u>Records Management</u>

    a.  Records created as a result of this instruction, regardless
of format or media, must be maintained and dispositioned according
to the records disposition schedules found on the Directives and
Records Management Division (DRMD) portal page:
<u>https://portal.secnav.navy.mil/orgs/DUSNM/DONAA/DRM/SitePages/Home.
aspx</u>.

    b.  For questions concerning the management of records related
to this instruction or the records disposition schedules, please
contact your local Records Manager or the DRMD program office.

9.  <u>Information Management Control</u>.  The reporting requirements
contained in enclosure (2), paragraph 2l and 2o are exempt from
information control in accordance with reference (e), Part IV,
paragraphs 7l and 7n.

ERIK K. RAVEN
Under Secretary of the Navy


Distribution:
Electronic only, via Department of the Navy Issuances Website
<u>https://www.secnav.navy.mil/doni/default.aspx</u>

**App. 378**

SECNAVINST 1000.11A
27 Jun 2023

**IN-SERVICE TRANSITION POLICIES AND PROCEDURES**

1.  Reference (a) provides Sailors and Marines an in-service process to transition to their self-identified gender.  These policies are based on the premise that open service by transgender persons who are subject to the same medical, fitness for duty, physical fitness, uniform and grooming, deployability, and retention standards and procedures is consistent with military service and readiness.

2.  The DON recognizes a Sailor's or Marine's gender by their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).  Coincident with that gender marker, the Navy and Marine Corps shall apply, and the Service Member is responsible to meet, all standards for uniforms and grooming, body composition, physical fitness, Military Personnel Drug Abuse Testing Program (MPDATP) participation, and other military standards applied with consideration of the Service Member's gender, unless an Exception to Policy (ETP) is approved in accordance with enclosure (2).

    a.  For facilities subject to regulation by the military, the Sailor or Marine will use those berthing, bathroom, and shower facilities associated with the Service Member's gender marker in DEERS.

    b.  Commanders and Commanding Officers will assess expected impacts on mission and readiness after consideration of the advice of military medical providers.  As the situation allows, Commanders and Commanding Officers are expected to implement appropriate policies to ensure the privacy protection of individual Sailors and Marines out of courtesy to all, and to maintain good order and discipline.  A Commander or Commanding Officer will not accommodate biases against transgender individuals.

    c.  In official communications, gender pronouns aligned with the gender marker in DEERS will be used.  Use of gender pronouns will be minimized in these communications to the extent practical.

    d.  If situationally appropriate and with agreement of the Service Member, commands are encouraged to refer to the Service Member by their self-identified name and pronouns in spoken and

Enclosure (1)

SECNAVINST 1000.11A
27 Jun 2023

unofficial written communication prior to DEERS marker change.
This recommendation is in accordance with standards for
transgender care set forth by the American Medical Association,
numerous other medical professional organizations, and reference
(f).

3.  Reference (g) requires direct observation of urinalysis
specimen collection.  MPDATP policy considers the terms "sex"
and "gender marker" as equivalent.  Therefore, transgender
Service Members providing a urinalysis specimen will be observed
by an individual with the same gender marker indicated in DEERS.
In selecting an observer, a Commander or Commanding Officer may
employ reasonable accommodations, to include utilizing medical
personnel to observe, to respect the privacy interests of the
Service Members.  Commanders and Commanding Officers must ensure
the integrity of the urinalysis program and that the program
environment remains free from harassment and discrimination.

4.  Sailors and Marines with a diagnosis from a military medical
provider indicating that gender transition is medically
necessary will receive the associated medically necessary care
and treatment.  A medical treatment plan developed by the
military medical provider will outline the date of initial
diagnosis, the severity of the Service Member's medical
condition, the urgency of any proposed medical treatment,
projected timeline for completion of gender transition, and
estimated periods of non-deployability and absence.  Medical
advice to Commanders and Commanding Officers will be provided in
a manner consistent with processes used for other medical
conditions that may limit the Service Member's performance of
official duties or deployment status.

5.  Any medical care and treatment provided to an individual
Sailor or Marine in the process of gender transition will be
provided in the same manner as other medical care and treatment.
Nothing in this instruction will be construed to authorize a
Commander or Commanding Officer to deny medically necessary
treatment to a Sailor or Marine.

6.  Any determination that a transgender Sailor or Marine is
non-deployable at any time will be consistent with established
DON and Service standards, as applied to other Sailors and
Marines whose deployability is similarly affected in comparable
circumstances unrelated to gender transition.

**App. 380**

SECNAVINST 1000.11A
27 Jun 2023

7.  In considering the timing of the transition request,
Commanders and Commanding Officers will assess expected impacts
on mission and readiness after consideration of the advice of
military medical providers and will address such following this
instruction and reference (a).  In applying the tools described
in reference (a), a Commander or Commanding Officer will not
accommodate biases against transgender individuals.  During a
period of gender transition, the majority of Sailors and Marines
will not be able to meet standards, and all applicable tools,
including those described in reference (a), will be available to
Commanders and Commanding Officers to minimize impacts to the
mission and unit readiness.  Gender transition dates in the
transition plan may be adjusted by Commanders and Commanding
Officers per reference (a) and enclosure (2) as necessary to
support organizational needs.  Medical care in the transition
plan which is provided via routine medical appointments shall be
accommodated by the command in the same manner as any other
medical appointment.

8.  Real Life Experience (RLE) is the phase in the gender
transition process during which the individual commences living
socially in the gender role consistent with their self-
identified gender.  RLE in an on-duty status before a gender
marker change in DEERS may be necessary for Service Members
during the transition process.  If a Service Member's medical
treatment plan identifies the requirement for full-time
continuous RLE, an ETP, in accordance with enclosure (2) of this
issuance, is required for the duration of the full-time
continuous RLE.

9.  When the military medical provider determines that a Service
Member's gender transition is stable, and at a time approved by
the Commander or Commanding Officer in consultation with the
transgender Sailor or Marine, the Service Member may submit a
request for gender marker change in DEERS, per reference (a).
Once the gender marker is changed in DEERS, the Service Member
will be recognized in their self-identified gender and must meet
all applicable military standards in their self-identified
gender.

10.  If additional care and treatment that were not part of an
original treatment plan are required after a gender marker
change in DEERS, and that additional care and treatment may

**App. 381**

SECNAVINST 1000.11A
27 Jun 2023

impact the Service Member's fitness for duty, the Service Member
must provide medical documentation to the Commander or
Commanding Officer identifying the additional care, treatment,
and projected schedule of such treatment.

11.  Policy for service during initial entry training and
considerations associated with the first term of service are
outlined in reference (a).

12.  Service Members who have not yet completed their DEERS
marker change and who do not have an ETP in place may request
informally (i.e., through a conversation with their chain of
command) that their self-identified pronouns be used, and
commands are encouraged to do so when situationally appropriate
(e.g., in communication within the workplace).  Intentional
misuse of transgender Service Member pronouns is inappropriate
and inconsistent with the DoD military equal opportunity policy
as set forth in reference (c).

13.  Intentional misuse of the Service Member's birth or other
former name is generally considered disrespectful and may
constitute conduct inconsistent with the DoD military equal
opportunity policy as set forth in reference (c).  Service
Members who have not yet legally changed their names may request
informally (i.e., in a conversation with their Chain of
Command), that commands use their self-identified names, and
commands are encouraged to do so when situationally appropriate.

**App. 382**

SECNAVINST 1000.11A
27 Jun 2023

**RESPONSIBILITIES**

1. <u>Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN (M&RA))</u>.  The ASN (M&RA) will assess Navy and Marine Corps compliance with reference (a) in coordination with the Chief of Naval Operations (CNO) and the Commandant of the Marine Corps (CMC).  ASN (M&RA) will review triennial Inspector General Special Inspections.

2. <u>CNO and CMC</u>.  The CNO and CMC will:

    a.  Issue policy and procedures addressing the military service of transgender Service Members, to include establishing a process by which transgender Sailors and Marines may transition gender while serving, consistent with mission, training, operational, and readiness needs, and a procedure whereby a Service Member's gender marker may be changed in DEERS.

    b.  Establish policies and procedures for the submission and approval of ETPs associated with the following:

        (1) Changes in the Service Member's physical appearance and body composition during gender transition, such as accommodations in the application of standards for uniforms and grooming and MPDATP participation.

        (2) The application of RLE in an on-duty status.

        (3) Establishment of, or adjustment to, local policies on the use of berthing, bathroom, and shower facilities subject to regulation by the military.

    c.  Establish policy requiring that Commanders and Commanding Officers respond to any request for medical treatment or an ETP associated with gender transition, as soon as practicable, but not later than 90 days after receiving a request determined to be complete as directed by reference (a) and this instruction.

    d.  Issue policy and procedures per reference (a) and this instruction, outlining the actions a Commander or Commanding Officer may take to minimize impacts to the mission and ensure continued unit readiness in the event that a transitioning

Enclosure (2)

SECNAVINST 1000.11A
27 Jun 2023

individual is unable to meet fitness for duty, physical fitness, uniform and grooming, and deployability standards during a period of transition. Such actions shall be comparable to actions that could be initiated with regard to others whose ability to serve is similarly affected for reasons unrelated to gender transition.

e.  Maintain a service central coordination cell to provide multi-disciplinary expert advice and assistance to commanders with regard to service by transgender Service Members and gender transition in the DON, and to assist Commanders in the execution of DoD, DON, and Service policies and procedures.

f.  Ensure uniform, grooming, Body Composition Analysis, Physical Readiness Test, MPDATP, and all other standards applied with consideration of a Service Member's gender, are applicable to the Service Member's gender marker as reflected in DEERS, unless the Sailor or Marine has an approved ETP.

g.  Direct the use of berthing, bathroom, and shower facilities according to the Service Member's gender marker as reflected in DEERS, for facilities that are subject to regulation by the military, unless the Sailor or Marine has an approved ETP.

h.  Provide appropriate privacy for all Sailors and Marines. This may be achieved through expenditure of funds to modify bathroom and shower facilities at Navy and Marine Corps military installations that do not provide reasonable privacy.

i.  Ensure that policies and procedures governing Service urinalysis testing program are performed using accepted and established operating procedures which conform to the requirements outlined in reference (g).

j.  Ensure access to medically necessary treatment of transgender Active Duty Service Members (ADSM) is available, in alignment with reference (h).

k.  Educate appropriate Active and Reserve Component Forces to ensure an adequate understanding within those Forces of policies and procedures pertaining to gender transition in the DON.

**App. 384**

SECNAVINST 1000.11A
27 Jun 2023

l.  Beginning in Fiscal Year 2023 and triennially thereafter, support Naval Inspector General Special Inspections of Service compliance with DoD and DON transgender service policy and procedures.

m.  Provide a climate in which all Sailors and Marines are able to perform their duties free from unlawful discrimination and harassment.

n.  Ensure the protection of personally identifiable information and personal privacy considerations in the implementation of references (a) through (i), this instruction, and Service regulations, policy, and guidance.

o.  Submit the text of any proposed revision to existing Service regulations, policies, and guidance, and of any proposed new issuance at least 30 business days in advance of proposed publication to ASN (M&RA) for submission to the Under Secretary of Defense (Personnel and Readiness).

3.  Naval Inspector General (NAVIG).  NAVIG will, beginning in 2023 and triennially thereafter, conduct a Special Inspection of Navy and Marine Corps compliance with reference (a), this instruction, and Service regulations, policy, and guidance.

4.  Chief, Bureau of Medicine and Surgery (BUMED).  BUMED will:

a.  Collaborate with the Defense Health Agency (DHA) to ensure consultation for medically necessary care is available to ADSM per references (a) and (h), ensuring standardized healthcare.

b.  If applicable, refer Service Members for a determination of fitness in the disability evaluation system per reference (i).

c.  Collaborate with DHA to provide and disseminate a relevant education and training plan for both privileged and non-privileged medical personnel.

d.  Establish procedures and standards for advising Commanders and Commanding Officers on transition requests.

3                          Enclosure (2)

**App. 385**

PAGE 1 OF 4

## FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS

**Originator:** DA WASHINGTON DC

**TOR:** 02/14/2025 21:32:41

**DTG:** 142129Z Feb 25

**Prec:** Priority

**DAC:** General

**To:** ARLINGTON NATIONAL CEMETERY ARLINGTON VA, ARNG NGB COMOPS ARLINGTON VA, ARNG NGB J3 JOC WASHINGTON DC, ARNGRC ARLINGTON VA, ARNGRC WATCH ARLINGTON VA, CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX, CDR ARMY FUTURES COMMAND AUSTIN TX, CDR ATEC ABERDEEN PROVING GROUND MD, CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC, CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC, CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC, CDR MDW J3 FT MCNAIR DC, CDR MDW JFHQ-NCR FT MCNAIR DC, CDR NETCOM 9THSC FT HUACHUCA AZ, CDR TRADOC CG FT EUSTIS VA, CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA, CDR USAR NORTH FT SAM HOUSTON TX, CDR USARCENT SHAW AFB SC, CDR USAREUR-AF WIESBADEN GE, CDR USASOC COMMAND CENTER FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC, CDRAMC REDSTONE ARSENAL AL, CDRFORSCOM FT LIBERTY NC, CDRHRC G3 DCSOPS FT KNOX KY, CDRINSCOM FT BELVOIR VA, CDRINSCOM FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRMDW WASHINGTON DC, CDRUSACE WASHINGTON DC, CDRUSACIDC FT BELVOIR VA, CDRUSAEIGHT G3 CUROPS SEOUL KOR, CDRUSAEIGHT SEOUL KOR, CDRUSAMEDCOM FT SAM HOUSTON TX, CDRUSARC G33 READ FT LIBERTY NC, CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA, CDRUSAREC FT KNOX KY, CDRUSARPAC CG FT SHAFTER HI, CDRUSARPAC FT SHAFTER HI, COMDT USAWC CARLISLE BARRACKS PA, HQ IMCOM FT SAM HOUSTON TX, HQ INSCOM IOC FT BELVOIR VA, HQ SDDC CMD GROUP SCOTT AFB IL, HQ SDDC OPS MSG CNTR SCOTT AFB IL, HQ USARSO FT SAM HOUSTON TX, HQ USARSO G3 FT SAM HOUSTON TX, HQDA ARMY STAFF WASHINGTON DC, HQDA CSA WASHINGTON DC, HQDA EXEC OFFICE WASHINGTON DC, HQDA IMCOM OPS DIV WASHINGTON DC, HQDA SEC ARMY WASHINGTON DC, HQDA SECRETARIAT WASHINGTON DC, HQDA SURG GEN WASHINGTON DC, MEDCOM HQ EOC FT SAM HOUSTON TX, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NGB WASHINGTON DC, SMDC ARSTRAT CG ARLINGTON VA, SMDC ARSTRAT G3 ARLINGTON VA, SUPERINTENDENT USMA WEST POINT NY, SURGEON GEN FALLS CHURCH VA, USAR AROC FT LIBERTY NC, USAR CMD GRP FT LIBERTY NC, USAR DCS G33 OPERATIONS FT LIBERTY NC, USARCENT G3 FWD, USARPAC COMMAND CENTER FT SHAFTER HI

**CC:** HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC

```
PAAUZYUW RUEADWD3692 0452132-UUUU--RUIAAAA RUEADWD.
ZNR UUUUU ZUI RUEWMCM0310 0452132
P 142129Z FEB 25
FM DA WASHINGTON DC
TO RUIAAAA/ARLINGTON NATIONAL CEMETERY ARLINGTON VA
RUIAAAA/ARNG NGB COMOPS ARLINGTON VA
RUIAAAA/ARNG NGB J3 JOC WASHINGTON DC
RUIAAAA/ARNGRC ARLINGTON VA
RUIAAAA/ARNGRC WATCH ARLINGTON VA
RUIAAAA/CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX
RUIAAAA/CDR ARMY FUTURES COMMAND AUSTIN TX
RUIAAAA/CDR ATEC ABERDEEN PROVING GROUND MD
RUIAAAA/CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC
RUIAAAA/CDR MDW J3 FT MCNAIR DC
RUIAAAA/CDR MDW JFHQ-NCR FT MCNAIR DC
RUIAAAA/CDR NETCOM 9THSC FT HUACHUCA AZ
RUIAAAA/CDR TRADOC CG FT EUSTIS VA
RUIAAAA/CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA
RUIAAAA/CDR USAR NORTH FT SAM HOUSTON TX
RUIAAAA/CDR USARCENT SHAW AFB SC
RUIAAAA/CDR USAREUR-AF WIESBADEN GE
RUIAAAA/CDR USASOC COMMAND CENTER FT LIBERTY NC
RUIAAAA/CDR USASOC FT LIBERTY NC
RUIAAAA/CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC
RUIAAAA/CDRAMC REDSTONE ARSENAL AL
```

## UNCLAS

```
RUIAAAA/CDRFORSCOM FT LIBERTY NC
RUIAAAA/CDRHRC G3 DCSOPS FT KNOX KY
RUIAAAA/CDRINSCOM FT BELVOIR VA
RUEPINM/CDRINSCOM FT BELVOIR VA
RUIAAAA/CDRINSCOMIOC FT BELVOIR VA
RUEPINF/CDRINSCOMIOC FT BELVOIR VA
RUIAAAA/CDRMDW WASHINGTON DC
RUIAAAA/CDRUSACE WASHINGTON DC
RUIAAAA/CDRUSACIDC FT BELVOIR VA
RUIAAAA/CDRUSAEIGHT G3 CUROPS SEOUL KOR
RUIAAAA/CDRUSAEIGHT SEOUL KOR
RUIAAAA/CDRUSAMEDCOM FT SAM HOUSTON TX
RUIAAAA/CDRUSARC G33 READ FT LIBERTY NC
RUIAAAA/CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA
RUIAAAA/CDRUSAREC FT KNOX KY
RUIAAAA/CDRUSARPAC CG FT SHAFTER HI
RUIAAAA/CDRUSARPAC FT SHAFTER HI
RUIAAAA/COMDT USAWC CARLISLE BARRACKS PA
RUIAAAA/HQ IMCOM FT SAM HOUSTON TX
RUEPHII/HQ INSCOM IOC FT BELVOIR VA
RUIAAAA/HQ SDDC CMD GROUP SCOTT AFB IL
RUIAAAA/HQ SDDC OPS MSG CNTR SCOTT AFB IL
RUIAAAA/HQ USARSO FT SAM HOUSTON TX
RUIAAAA/HQ USARSO G3 FT SAM HOUSTON TX
RUEADWD/HQDA ARMY STAFF WASHINGTON DC
RUEADWD/HQDA CSA WASHINGTON DC
RUEADWD/HQDA EXEC OFFICE WASHINGTON DC
RUEADWD/HQDA IMCOM OPS DIV WASHINGTON DC
RUEADWD/HQDA SEC ARMY WASHINGTON DC
RUEADWD/HQDA SECRETARIAT WASHINGTON DC
RUEADWD/HQDA SURG GEN WASHINGTON DC
RUIAAAA/MEDCOM HQ EOC FT SAM HOUSTON TX
RUIAAAA/NETCOM G3 CURRENT OPS FT HUACHUCA AZ
RUIAAAA/NGB WASHINGTON DC
RUIAAAA/SMDC ARSTRAT CG ARLINGTON VA
RUIAAAA/SMDC ARSTRAT G3 ARLINGTON VA
RUIAAAA/SUPERINTENDENT USMA WEST POINT NY
RUEAUSA/SURGEON GEN FALLS CHURCH VA
RUIAAAA/USAR AROC FT LIBERTY NC
RUIAAAA/USAR CMD GRP FT LIBERTY NC
RUIAAAA/USAR DCS G33 OPERATIONS FT LIBERTY NC
RUIAAAA/USARCENT G3 FWD
RUIAAAA/USARPAC COMMAND CENTER FT SHAFTER HI
INFO RUIAAAA/HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC
BT
UNCLAS
SUBJ/FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS
RELATED TO TRANSGENDER MILITARY SERVICE
UNCLASSIFIED//

SUBJECT: (U) FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE
ORDERS RELATED TO TRANSGENDER MILITARY SERVICE//

(U) REFERENCES.
REF//A/ (U) **CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF
EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE (U), DTG:
122036Z FEB 25//

NARR// (U) THIS IS FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF
EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE. FRAGO 1
```

## UNCLAS

# UNCLAS

PAGE 3 OF 4

PROVIDES CLARIFICATION AND ADDITIONAL GUIDANCE TO HQDA EXORD 150-25//

1. (U) SITUATION. [RESTATED] IN ANTICIPATION OF UPDATED DOD POLICY, THIS MESSAGE PRESCRIBES INITIAL GUIDANCE ON IMPLEMENTATION OF RELEVANT
EXECUTIVE ORDER REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

2. (U) MISSION. [RESTATED] EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL IMPLEMENT INITIAL GUIDANCE OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO TRANSGENDER MILITARY SERVICE.

3. (U) EXECUTION.

3.A. (U) INTENT. NOT USED.

3.B. (U) CONCEPT OF OPERATIONS. NOT USED.

3.C. (U) TASKS TO ARMY STAFF, SUBORDINATE UNITS AND REQUESTS FOR SUPPORT.

3.C.1. (U) ARMY SECRETARIAT, ARMY STAFF, SUBORDINATE HQDA OFFICES/ORGANIZATIONS, COMMANDERS, ARMY COMMANDS (ACOM), ARMY SERVICE COMPONENT COMMANDS (ASCC), DIRECT REPORTING UNITS (DRU), AND DIRECTOR,
ARMY NATIONAL GUARD (ARNG).

3.C.1.A. (U) [RESTATED] ENSURE IMPLEMENTATION OF INITIAL GUIDANCE AS FOLLOWS:

3.C.1.A.1. (U) [RESTATED] ALL SERVICEMEMBERS, WILL BE TREATED WITH DIGNITY AND RESPECT AT ALL TIMES. COMMANDERS MUST MAINTAIN GOOD ORDER AND DISCIPLINE AND THE SAFETY, DIGNITY, AND RESPECT OF ALL OF THEIR ASSIGNED PERSONNEL.

3.C.1.A.2. (U) [RESTATED] ENSURE THAT INTIMATE SPACES, INCLUDING BUT NOT LIMITED TO LATRINES, CHANGING FACILITIES, SLEEPING QUARTERS, AND BATHING FACILITIES DESIGNATED FOR WOMEN, GIRLS, OR FEMALES (OR FOR MEN, BOYS, OR MALES) ARE DESIGNATED BY BIOLOGICAL SEX AND NOT GENDER IDENTITY. BIOLOGICAL SEX IS DEFINED AS A BIOLOGICAL TRAIT DETERMINED BY CHROMOSOMAL PATTERN.

3.C.1.A.3. (U) [RESTATED] MAINTAIN CURRENT LIVING CONDITIONS, PENDING
IMPLEMENTATION GUIDANCE. IAW WITH CURRENT EXECUTIVE ORDERS AND EXISTING POLICIES, REGULATIONS, AND DIRECTIVES, COMMANDERS MUST BPT MODIFY SLEEPING, CHANGING, AND BATHING AREAS UPON RECEIPT OF IMPLEMENTATION GUIDANCE.

3.C.1.A.4. (U) [RESTATED] AT THIS TIME, DO NOT INITIATE ANY MEDICAL BOARD OR ADVERSE PERSONNEL ACTION SOLELY RELATED TO TRANSGENDER STATUS. POLICY AND IMPLEMENTATION GUIDANCE RELATED TO CURRENT EXECUTIVE ORDERS WILL BE PUBLISHED WHEN AVAILABLE.

3.C.1.A.5. [DELETED].

3.C.1.A.6. (U) [CHANGE TO READ] PAUSE ON MEDICAL CARE. AS DIRECTED BY PRESIDENTIAL EXECUTIVE ORDER AND SECRETARY OF DEFENSE MEMORANDUM, ALL UNSCHEDULED, SCHEDULED, OR PLANNED MEDICAL PROCEDURES ASSOCIATED WITH AFFIRMING OR FACILITATING A GENDER TRANSITION FOR SERVICE MEMBERS
ARE PAUSED. THIS INCLUDES UNSCHEDULED, SCHEDULED, OR PLANNED GENITAL

# UNCLAS

App. 388

# UNCLAS

RECONSTRUCTION SURGERY ASSOCIATED WITH GENDER TRANSITION, GENDER
AFFIRMING SURGERY, SEX REASSIGNMENT SURGERY, OR NEWLY INITIATED
GENDER-AFFIRMING HORMONE THERAPY.

3.C.1.A.7. (U) [ADD] THE ARMY WILL CONTINUE TO PROVIDE FURTHER
CLARIFICATION AND UPDATE ITS POLICIES AS ADDITIONAL IMPLEMENTATION
GUIDANCE IS RECEIVED.

3.D. (U) COORDINATING INSTRUCTIONS. NOT USED.

4. (U) SUSTAINMENT. NOT USED.

5. (U) COMMAND AND SIGNAL.

5.A. (U) [RESTATED] HQDA POC THIS MESSAGE, SERVICE CENTRAL
COORDINATION CELL (SCCC), AVAILABLE AT: usarmy.pentagon.hqda-dcs-g-
1.mbx.sccc@army.mil

6. (U) THE EXPIRATION DATE OF THIS FRAGO COINCIDES WITH THE
EXPIRATION DATE OF HQDA EXORD 150-25 ON IS 30 SEPTEMBER 2025, UNLESS
FORMALLY RESCINDED, SUPERSEDED OR MODIFIED.


ATTACHMENTS: NONE.

BT
#3692




NNNN
Received from AUTODIN 142132Z Feb 25

# UNCLAS