**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5087**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**NICOLAS TALBOTT** *et al.*,
Plaintiffs-Appellees,
v.

**UNITED STATES OF AMERICA** *et al.*,
Defendants-Appellants.

_____

ON APPEAL FROM THE DISTRICT COURT
OF THE DISTRICT OF COLUMBIA
No. 25-cv-240 (ACR)
(The Honorable Ana C. Reyes)

_____

**APPENDIX TO PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION
TO DEFENDANTS-APPELLANTS' MOTION FOR STAY
Volume II of II (App. 390 - App. 799)**

_____

Jennifer Levi
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter
Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257

(continued on next page)

Joseph J. Wardenski*
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

*Application for admission
forthcoming

Sara E. Kropf
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

*Counsel for Plaintiffs-Appellees*

April 01, 2025

# TABLE OF CONTENTS

**Page**

**VOLUME 1**

Declaration of Alex Wagner (ECF 13-20) .....................................................App. 001

  Ex. A: DTM 16-005 (ECF 13-22)...............................................................App. 016

  Ex. B: Army Directive 2016-30 (ECF 13-23) ...........................................App. 023

  Ex. C: Army Directive 2016-35 (ECF 13-24) ...........................................App. 028

  Ex. D: DoD Instruction 1300.28 (ECF 13-25) ..........................................App. 048

  Ex. E: Air Force Policy Memorandum 2021-36-01 (ECF 13-26)...........App. 071

  Ex. F: PRRI Survey (ECF 13-27) ..............................................................App. 097

Declaration of Yvette Bourcicot (ECF 13-28) .............................................App. 103

  Ex. A: RAND Report (ECF 13-29)............................................................App. 115

Declaration of Gilbert Cisneros (ECF 13-30)...............................................App. 228

Declaration of Shawn Skelly (ECF 13-31) ...................................................App. 238

Navy Decision Guidance Memo #N00-30 (ECF 14-2) ................................App. 246

Secretary of Defense Memorandum to Senior Pentagon Leadership,
  Commanders of the Combatant Commands, and Def. Agency and DOD
  Field Activity Dirs. (Jan. 31, 2025) (ECF 14-3).....................................App. 248

MEPS Email re: Pause on Transgender Accessions (ECF 14-4).................App. 251

Declaration of George Brown (ECF 32)........................................................App. 253

i

Secretary of Defense Memorandum to Senior Pentagon Leadership,
    Commanders of the Combatant Commands, and Def. Agency and DOD
    Field Activity Dirs. (Feb. 7, 2025) (ECF 33-1) ........................................App. 325

Dep't of the Army, Implementation of Executive Orders related to
    Transgender Military Service (EXORD 150-25) (Feb. 7, 2025), (ECF No.
    37-1) ...................................................................................................App. 326

Supplemental Declaration of Alex Wagner (ECF 48-27) ............................App. 329

    Ex. A: DoD Instruction 6130.03 Vol. 2 (ECF 48-28) .............................App. 334

Secretary of the Navy Instruction 1000.11A (ECF 48-32) ..........................App. 375

Dep't of the Army, Fragmentary Order ("FRAGORD") 1 amending EXORD
    150-25 (Feb. 14, 2025), (ECF No. 49-1) .................................................App. 386

**VOLUME 2**

Supplemental Declaration of Gilbert Cisneros (ECF 53-1).........................App. 390

Office of the Under Sec'y of Defense, Additional Guidance on Prioritizing
    Military Excellence and Readiness (Feb. 26, 2025),
    (ECF No. 63-1) .....................................................................................App. 393

Additional Guidance for Executive Order 14183, "Prioritizing Military
    Excellence and Readiness" (Mar. 1, 2025) (ECF 67-1) .........................App. 406

Second Supplemental Declaration of Alex Wagner (ECF 72-68) ...............App. 409

Supplemental Declaration of Yvette Bourcicot (ECF 72-71) ......................App. 413

Supplemental Declaration of Shawn Skelly (ECF 72-73)............................App. 417

Second Supplemental Declaration of Gilbert Cisneros (ECF 72-76)...........App. 423

Supplemental Declaration of George Brown (ECF 72-78) ..........................App. 427

Declaration of Martha Soper (ECF 72-82) ..................................................App. 443

ii

Ex. A: DoD Instruction 1332.14 (ECF 72-84) .........................................App. 449

Ex. B: DoD Instruction 1332.30 (ECF 72-85) .........................................App. 513

Ex. C: DoD Instruction 1332.18 (ECF 72-86) .........................................App. 541

Sec'y of the Army, Prioritizing Military Excellence and Readiness
    Implementation Guidance (Mar. 6, 2025), (ECF No. 75-1) ...................App. 613

Dep't of the Army, Implementing Guidance for Executive Order
    (EXORD175-25) (superseding EXORD 150-25) (Mar. 7, 2025),
    (ECF No. 75-2) ........................................................................................App. 620

DoD Public Affairs Guidance (ECF 79-1)....................................................App. 631

Sec'y of the Navy, Initial Direction on Prioritizing Military Excellence and
    Readiness (ALNAV 023/25) (Mar. 13, 2025), (ECF No. 84-1) .............App. 641

Chief of Naval Operations, Initial Execution Related to Prioritizing Military
    Excellence and Readiness (NAVADMIN 055/25) (Mar. 13, 2025), (ECF
    No. 87-1) ...............................................................................................App. 649

Memorandum from Jules W. Hurst III, Performing the Duties of the Under
    Sec. of Def. for Personnel and Readiness to Senior Pentagon Leadership,
    Commanders of the Combatant Commands, and Def. Agency and DOD
    Field Activity Dirs. (Mar. 21, 2025) (ECF 93-1).....................................App. 656

Temporary Restraining Order in *Ireland v. Hegseth et al.*, No. 25-01918-
    CPO (D.N.J.)...........................................................................................App. 657

Memorandum Opinion in *Shilling v. United States*, No. 25-cv-241-BHS,
    2025 U.S. Dist. LEXIS 57869 (W.D. Wash. Mar. 27, 2025)...................App. 665

Chart of Classification Based on Transgender Status...................................App. 730

D.C. Circuit Handbook of Practice and Internal Procedures (2024).............App.732

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:25-cv-00240 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**SUPPLEMENTAL DECLARATION OF GILBERT R. CISNEROS, JR.**

I, Gilbert R. Cisneros, Jr., declare as follows:

1.  I write this declaration to supplement my declaration submitted in support of the Motion for Preliminary Injunction in this matter on February 3, 2025. *See* ECF No. 13-30.

2.  I have read the Declaration of Timothy Dill ("Dill Declaration") filed by Defendants on February 14, 2025. *See* ECF No. 52-1.

3.  The Dill Declaration states that "it would be highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary unless the Under

Secretary specifically sought such information through a data call or a study." Dill Decl. at 2 ¶ 6.

4.  This statement does not accurately describe my degree of awareness of these matters as Under Secretary of Defense for Personnel and Readiness. As the Under Secretary in charge of readiness, it was my responsibility to be aware of unit cohesion, military readiness, medical readiness, deployability, and lethality. If a unit or service was dealing with readiness issues due to the service by transgender service members, that would have been brought to my attention.

5.  This is true even though in my role I would not necessarily be apprised of the daily goings on of individual units with respect to morale or discipline problems.

6.  For example, I was made aware of—and kept well informed of—an issue related to Junior Reserve Officers' Training Corps ("JROTC") units and instructors surrounding sexual harassment. I did not know the ins and outs of every JROTC unit, but when a problem arose, I was made aware of it so that I could deal with it in my capacity as Under Secretary.

7.  In addition and in further response, I am aware of no study that has identified a negative impact on unit cohesion, military readiness, medical readiness, deployability, or lethality due to service by transgender individuals or individuals diagnosed with gender dysphoria since transgender persons have been permitted to serve in the last 4 years under the Austin Policy.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.


Date: February 16, 2025

Gilbert R. Cisneros, Jr.



**PERSONNEL AND READINESS**

**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

FEB 2 6 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                             COMMANDERS OF THE COMBATANT COMMANDS
                             DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Additional Guidance on Prioritizing Military Excellence and Readiness

As directed by the Secretary of Defense in his February 7, 2025, memorandum, "Prioritizing Military Excellence and Readiness," it is Department policy that, pursuant to Executive Order 14183, "Prioritizing Military Excellence and Readiness," the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service.

The attachment to this memorandum provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance.  The policy guidance in the attachment:  (1) supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda; and (2) is effective immediately and will be incorporated into respective Department issuances, as appropriate.

The following DoD issuances will be updated to reflect guidance in this attachment, as appropriate:

- Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service:  Appointment, Enlistment, or Induction," May 6, 2018, as amended

- DoDI 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020, as amended

- DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

- DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

- DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

- DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

**App. 393**

Effective immediately, the following issuances, policies, and memoranda are cancelled:

- DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended

- Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023

- Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016

- Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019

The Assistant Secretary of Defense for Manpower and Reserve Affairs will be responsible for all data collection and reporting. The first report is due March 26, 2025. All Department of Defense and Military Service policy recissions and updates must be completed no later than June 25, 2025.

Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

Darin S. Selnick
Performing the Duties of the Under Secretary of Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General, Public Health Service
Administrator, National Oceanic and Atmospheric Administration

**App. 394**

**ATTACHMENT**
**Service Members and Applicants for Military Service**
**who Have a Current Diagnosis or History of, or**
**Exhibit Symptoms Consistent with, Gender Dysphoria**

1. **Policy.**  It is DoD policy that:

    a.  Service in the Military Services is open to all persons who can meet the high standards for military service and readiness without special accommodations.

    b.  It is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity.  This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

    c.  Military service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service.  Service by these individuals is not in the best interests of the Military Services and is not clearly consistent with the interests of national security.

    d.  Individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in sections 4.1.c. and 4.3.c. of this attachment.

    e.  Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service in accordance with section 4.4. of this attachment.  Characterization of service under these procedures will be honorable except where the Service member's record otherwise warrants a lower characterization.

    f.  The Department only recognizes two sexes: male and female.  An individual's sex is immutable, unchanging during a person's life.  All Service members will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

    g.  Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

    h.  Pronoun usage when referring to Service members must reflect a Service member's sex.  In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

i.  Absent extraordinary operational necessity, the Military Services will not allow male Service members to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Service members to use or share sleeping, changing, or bathing facilities designated for males.

j.  No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k.  Consistent with existing law and Department policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information.  Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties.  Personnel shall also be accountable for safeguarding this health information consistent with existing law and Departmental policy.

**2.  Applicability.**  This policy guidance applies to the Office of the Secretary of Defense, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff, the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

**3.  Responsibilities.**

3.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)).

The USD(P&R) will:

a.  Update or rescind existing DoD issuances, or publish new issuances, as necessary pursuant to this guidance.

b.  Ensure all Military Department and Military Service regulations, policies, and guidance are consistent with this attachment.

3.2.  Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA) will:

a.  Coordinate with the Assistant Secretary of Defense for Health Affairs (ASD(HA)) in the management and implementation of this guidance, and issue clarifying guidance, as appropriate.

b.  Serve as the primary point of contact, through the Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)), for those responsibilities assigned in sections 3.3. through 3.6. of this attachment and provide reports in accordance with section 7 of this attachment, until a determination is made and notification provided to the Secretaries of the Military Departments that the reports may be cancelled.

2

**App. 396**

   c. Oversee the recission and updates to applicable DoD issuances, policy memoranda, and other guidance documents in accordance with this guidance.

3.3. ASD(HA).

Under the authority, direction, and control of the USD(P&R), the ASD(HA) will:

   a. Coordinate with the ASD(M&RA) in the management and implementation of health care matters associated with this guidance, and issue clarifying guidance, as appropriate.

   b. Oversee the recission of, and updates to, applicable DoD issuances, Defense Health Agency issuances, and other policy memoranda or guidance documents in accordance with this guidance.

   c. Consider requests submitted by the Secretaries of the Military Departments, on a case-by-case basis, for an exception to section 1.j.. The ASD(HA) may authorize an exception to section 1.j. of this attachment for non-surgical care if required to protect the health of Service members. This authority may not be further delegated.

   d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.4. Secretaries of the Military Departments.

The Secretaries of the Military Departments will:

   a. Adhere to all provisions of this guidance.

   b. Update or publish new regulations, policies, and guidance to implement the provisions of this attachment.

   c. Ensure the protection of personally identifiable information, protected health information, and personal privacy considerations, consistent with existing law and DoD policy.

   d. Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service regulations, policies, and guidance applicable to Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

   e. Establish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum.

   f. Within 30 days of identification pursuant to section 3.4.e. of this attachment, begin separation actions, in accordance with section 4.4. of this attachment, for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3.c. of this attachment.

**App. 397**

g. Ensure all Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and other Joint assignments are reassigned to their respective Military Services for the purpose of initiating administrative separation processes.

h. Ensure all personnel systems accurately reflect each Service member's sex.

i. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.5. <u>Chairman of the Joint Chiefs of Staff</u>.

The Chairman of the Joint Chiefs of Staff will:

a. Adhere to all provisions of this guidance.

b. Ensure the Commanders of the Combatant Commands adhere to all provisions of this guidance.

c. Consolidate and submit to the DASD(MPP) a report on Combatant Command compliance with section 5 of this attachment, in accordance with section 7 of this attachment.

d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.6. <u>Defense Agency and DoD Field Activity Directors</u>.

The Defense Agency and DoD Field Activity Directors will:

a. Ensure compliance with section 5 of this attachment.

b. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

**4. Procedures.**

4.1. <u>Appointment, Enlistment, or Induction into the Military Services</u>.

a. Applicants for military service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified for military service.

b. A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

c. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities. The applicant

**App. 398**

must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

d. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment and not granted a waiver pursuant to section 4.1.c. of this attachment shall not ship to Initial Entry Training.

e. Offers of admission to a Military Service Academy or the Senior Reserve Officers' Training Corps to individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment shall be rescinded except where the individual is granted a waiver pursuant to section 4.1.c. of this attachment. Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may still participate in classes taught or coordinated by the Senior Reserve Officer's Training Corps that are open to all students at the college or university concerned. All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with section 5 of this attachment.

f. Individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment are subject to separation from a Military Service Academy in accordance with DoDI 1322.22, or from the Senior Reserve Officers' Training Corps in accordance with DoDI 1215.08, unless the individual is granted a waiver consistent with section 4.1.c. of this attachment. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

4.2. <u>Medical Care</u>.

a. In accordance with DoDI 6025.19 and DoDI 1215.13, Service members have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report any medical and health (including mental health) issues that may affect their readiness to deploy or fitness to continue serving in an active status.

b. All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.

c. Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider (HCP) in order to prevent further complications, be continued until separation is complete.

d. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria. The retention or processing for separation of such Service members will follow procedures in section 4.3. or section 4.4. of this attachment, as appropriate.

5

**App. 399**

4.3. <u>Retention</u>.

a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

b. Service members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service.

c. Service members disqualified pursuant to sections 4.3.a. and 4.3.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

1. The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

2. The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and

3. The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

4.4. <u>Separation</u>.

a. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3. of this attachment will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections in, DoDI 1332.14 and DoDI 1332.30. The Secretaries of the Military Departments will direct the administrative separation of (1) any enlisted Service member prior to the expiration of the member's term of service following a determination that doing so is in the best interest of the relevant Military Service; or (2) any officer whose retention is not clearly consistent with the interests of national security.

1. Service members are ineligible for referral to the Disability Evaluation System (DES) when they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria, not constituting a physical disability pursuant to DoDI 1332.18.

2. Service members may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with DoDI 1332.18, prior to processing for administrative separation.

3. Service members who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

**App. 400**

4. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance. Such Service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29.

5. Service members separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174 and DoDI 1332.29.

6. All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board.

7. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with 10 U.S.C. § 1182.

8. Service members identified pursuant to section 3.4.e. of this attachment with over 18 but less than 20 years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

9. Eligible Service members (including active duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

10. Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(1). The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

11. The Secretaries of the Military Departments shall waive any remaining military service obligation for Service members who are separated pursuant to this policy.

b. Separation proceedings for individuals identified pursuant to section 3.4.e. of this attachment will be initiated after the Secretaries of Military Departments complete the requirements in section 3.4.e. of this attachment.

c. Nothing in this attachment precludes appropriate administrative or disciplinary action for Service members who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

**App. 401**

**5. Sex.**

5.1. Military Records. All military records will reflect the Service member's sex.

5.2. Military Standards.

a. Access to intimate spaces will be determined by Service members' or applicants for military service's sex. The Military Services will apply all standards that involve consideration of the Service members' sex, to include, but not limited to:

1. Uniforms and grooming.

2. Body composition assessment.

3. Medical fitness for duty.

4. Physical fitness and body fat standards.

5. Berthing, bathroom, and shower facilities.

6. Military personnel drug abuse testing program participation.

b. All such shared intimate spaces will be clearly designated for either male, female, or family use.

c. Exceptions to this requirement may be made only in cases of extraordinary operational necessity. During deployments, or in austere environments where space is limited, commanders will prioritize unit cohesion and readiness while adhering to this policy.

**6. Administrative Absence for Service Members with a Current History or Diagnosis of, or Symptoms Consistent with, Gender Dysphoria.**

6.1. Administrative Absence.

a. In order to maintain good order and discipline in accordance with section 5 of this attachment, the Secretary of the Military Department concerned may place Service members being processed for separation under the criteria in section 4.4.a. of this attachment in an administrative absence status, with full pay and benefits, until their separation is complete.

b. Service members in an administrative absence status in accordance with this section will be designated as non-deployable until their separation is complete.

c. Service members in an administrative absence status in accordance with this section will complete the Transition Assistance Program in accordance with DoDI 1332.35.

**App. 402**

7. **Reporting**.

7.1. Report Requirements.

    a. No later than March 26, 2025, and every 30 days thereafter, submit via a Correspondence and Task Management System (CATMS) tasker a memorandum to the DASD(MPP) providing the following:

    1. Identification of all DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance where the content of which relate to, or may be affected by, guidance provided in this attachment.

    2. Status of updates to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

    3. Draft revisions to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

    4. Status of system of records updates.

    5. Status of, and progress on, separations of Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria in accordance with section 4.4. of this attachment.

    6. Status of, and progress on, compliance with section 5 of this attachment.

**App. 403**

## GLOSSARY

### G.1. Acronyms

| Acronym | Meaning |
| --- | --- |
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CATMS | Correspondence and Task Management System |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DoDI | DoD Instruction |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

### G.2. Definitions

Unless otherwise noted, these terms and their definitions are for the purposes of this attachment.

| Term | Definition |
| --- | --- |
| **cross-sex hormone therapy** | The use of feminizing hormones by a male or the use of masculinizing hormones by a female. |
| **gender dysphoria** | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| **gender identity** | Defined in Executive Order 14168 as a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex. |
| **sex** | Defined in Executive Order 14168 as an individual's immutable biological classification as either male or female. |

10

**App. 404**

## REFERENCES

Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025

Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025

DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoDI 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

DoDI 1332.14, "Enlisted Administrative Separations," August 1, 2024

DoDI 1332.18, "Disability Evaluation System," November 10, 2022

DoDI 1332.29, "Involuntary Separation Pay (Non-Disability)," March 3, 2017

DoDI 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoDI 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoDI 1332.43, "Voluntary Separation Pay (VSP) Program for Service Members," November 28, 2017

DoDI 1332.46, "Temporary Early Retirement Authority (TERA) for Service Members," December 21, 2018

DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoDI 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended

DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Title 10, United States Code

Title 37, United States Code

**App. 405**



**DEPARTMENT OF THE AIR FORCE**
**WASHINGTON DC**

OFFICE OF THE ASSISTANT SECRETARY

March 1, 2025

MEMORANDUM FOR ALMAJCOM-ALFLDCOM-FOA-DRU/CC DISTRIBUTION C

FROM:  SAF/MR
      1660 Air Force Pentagon
      Washington, DC 20330-1660

SUBJECT:  Additional Guidance for Executive Order 14183, "Prioritizing Military Excellence and Readiness"

References: (a) Executive Order 14183, "Prioritizing Military Excellence and Readiness,"
           27 January 2025
          (b) Secretary of Defense Memorandum, "Prioritizing Military Excellence and
           Readiness Memo," 7 February 2025
          (c) OUSD (P&R) Memorandum, "Additional Guidance on Prioritizing Military
           Excellence and Readiness," 26 February 2025
          (d) OUSD (M&RA) Memorandum, "Clarifying Guidance on Prioritizing Military
           Excellence and Readiness," 28 February 2025

    On 26 February 2025, the Office of the Under Secretary of Defense Personnel & Readiness (USD P&R) (reference (c)) directed that the medical, surgical and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service.  Policy and procedures will be updated as necessary to reflect this new guidance as soon as possible.

    Service members subject to the requirements in reference (c) are encouraged to elect to separate voluntarily no later than 26 March 2025. Such service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43, *Voluntary Separation Pay (VSP) Program for Service Members*. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount for which the service member would have been eligible under involuntary separation pay, in accordance with DoDI 1332.29, *Involuntary Separation Pay (Non-Disability)*.

    Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l).  Characterization of service under these procedures will be honorable, except where the service member's record otherwise warrants a lower characterization. Further guidance and processes for voluntary and involuntary separation and retirement will be forthcoming.

Service members who wish to voluntarily separate should be instructed to submit their "intent" via myFSS. They will go to "Ask a Question", choose "Personnel Question" and fill out the requested information, selecting "Separation" or "Retirement" as the program. For the subject line, the member should use "Gender Dysphoria Separation." In the remarks section, the member must include the following comment: "This is for the gender dysphoria voluntary separation category and I wish to voluntarily separate (or retire if eligible)". A verification memorandum from the unit Commander (template attached) must be uploaded and then the request submitted. After the requested intent is received, further guidance, including instructions regarding medical verification of the member's diagnosis, will be forthcoming to the member. Note that the system does not accept PII/PHI, however you may use the terms Gender Dysphoria in the subject line and in the comment section.

Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to issuance of the USD (P&R) 26 February 2025 memorandum, may be continued until separation is complete, if recommended by a DoD health care provider (HCP) in order to prevent further complications. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria.

Reference (c) directs that access to intimate spaces, such as showers, bathrooms, and lodging facilities, and applicable dress and appearance and physical fitness standards, will be determined by a member's biological sex. The memorandum also rescinds the authority for the DAF to grant Exceptions to Policy (ETPs) for a member to use facilities, dress and appearance, or fitness standards other than those associated with their biological sex. Accordingly, effective immediately, all ETPs granted pursuant to DAFPM 2021-36-01, *Accessions and In-service Transition for Persons Identifying as Transgender*, are rescinded. In the interim, reference (c) provides commanders the latitude to place members on administrative absence to promote good order and discipline while they are being processed for separation. For those members on administrative absence pending separation, the requirements to adhere to the standards associated with their biological sex (including uniform, grooming, fitness, and access to intimate facilities) is temporarily waived. Members will receive full pay and benefits until their separation is completed.

We recognize the dedication and service of all our members and aim to ensure our military remains focused on its core mission with the highest standards of readiness and cohesion. Questions and inquiries may be directed to SAF.mreo.readinessTigerTeam@us.af.mil.

DEFILIPPI.GWENDOL YN.RUTH.1123618960    Digitally signed by DEFILIPPI.GWENDOLYN.RUTH.11236 18960 Date: 2025.03.01 21:06:29 -05'00'

GWENDOLYN R. DEFILIPPI, SES, DAF
Acting Assistant Secretary of the Air Force for
Manpower and Reserve Affairs

2

**App. 407**

Attachments
1. Commanders Verification Memorandum template
2. OUSD (M&RA) Memorandum, "Clarifying Guidance on Prioritizing Military Excellence and Readiness"
3. OUSD (P&R) Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," dated 26 February 25
4. Prioritizing Military Excellence and Readiness Frequently Asked Questions
5. Executive Order 14183 "Prioritizing Military Excellence and Readiness," 27 January 2025
6. Secretary of Defense Memorandum "Prioritizing Military Excellence and Readiness Memo," 7 February 25

cc:
AF/A1
USSF/S1
NGB/A1
AF/RE
MAJCOM/A1
FLDCOM/S1

**App. 408**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,                    )
                                             )
      Plaintiffs,                          )
                                             )
v.                                           )        Civil Action No. 1:25-cv-00240
                                             )
UNITED STATES OF AMERICA *et al.*,           )
                                             )
      Defendants.                          )
                                             )

**SECOND SUPPLEMENTAL DECLARATION OF ALEX WAGNER**

I, Alex Wagner, declare as follows:

1.      According to the February 26, 2025, policy providing additional guidance on implementing the transgender military ban announced by President Trump, transgender service members will face dismissal though administrative separation.

2.      Consistent with the purpose and policy of the Order, which is to bar transgender people from military service, the "waiver" in Section 4.3( c) of the Implementing Guidance creates barriers that make it impossible for a transgender person to qualify by excluding anyone who has transitioned or who cannot demonstrate three years of serving in their birth sex without clinically significant distress.

3.      The " waiver" for accession in 4.1(c) also fails to provide transgender applicants with any avenue for service because it similarly requires that an individual must serve in their birth sex—i.e., must suppress or deny their transgender identity.

4.      In my experience, dismissal through administrative separation is typically used for misconduct or failing to meet standards, not for treatable medical conditions where the service member meets the requirements for service, including both job performance and fitness standards.

1

**App. 409**

5.      I am not aware of administrative separation ever being used to separate service members with a medical condition which can be successfully managed via treatment, and moreover where, when treated, the medical condition does not interfere with a member's ability to deploy and meet standards.

6.      Normally, when a service member has a medical condition that would limit their ability to serve or deploy, they go through a medical review, not administrative separation.

7.      My understanding is that administrative separation is most often used as disciplinary procedure to effect eventual military discharge. The ordinary path for evaluating impacts from medical conditions is the Disability Evaluation Service (DES) with administrative separation largely reserved for misconduct (including drug abuse) or repeated failure to meet standards, given the significant financial investment the military has already made in the member.

8.      In addition, based on my experience, individual or aggregated costs associated with medication or medical procedures is not a justification for administrative separation. Transgender service members constitute a small fraction of military personnel, and their health care costs represent a de minimis amount of overall health care spending. In fact, non-transgender service members may be prescribed the same medications transgender service members need for gender transition. There is no reason for this group to bear the burden of cost cutting measures when other service members have similar medical needs.

9.      I am aware of congressional testimony that coverage for Viagra for service members in 2023 accounted for $41M of the Department of Defense's budget. These expenditures are important investments and just one of many examples of the full spectrum health care that represents a benefit of service necessary to maintaining an all-volunteer force. I raise this only to note that the relative costs associated with providing essential health care for transgender troops

2

**App. 410**

represents a miniscule part of the defense budget for the years they have been permitted to serve.

10.     The rushed and haphazard manner in which this policy has been issued and implemented is highly unusual. Ordinarily, the reversal of an existing policy—especially one adopted after careful study and review—would take place only in response to significant, documented problems with existing policy, after careful consideration and review including an explanation of what led to the problematic outcomes, and would be rolled out in a careful, orderly fashion that provided commanders and members clear guidance.

11.     The process leading to the Order and Implementing Guidance has taken a very different and, in my experience, highly unusual course. The decision to target and purge transgender troops was not based on any documented problem. It was not based on a careful study and review. It has been rolled out on an extremely expedited timeline that puts the affected service members under enormous pressure to make life-altering decisions without adequate time to seek counsel or reflect. It comes with no guidance on how units should adapt, reconfigure, or adjust to the loss of a teammate performing an important role.

12.     The issuance of a series of vague and in some cases conflicting directives undermines confidence in civilian leadership.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]


3

**App. 411**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

_____

Alex Wagner

**App. 412**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                        )
                                                 )
                Plaintiffs,                      )
                                                 )
v.                                               )          Civil Action No. 1:25-cv-00240
                                                 )
UNITED STATES OF AMERICA *et al.*,               )
                                                 )
                Defendants.                      )
                                                 )

**SUPPLEMENTAL DECLARATION OF YVETTE BOURCICOT**

I, Yvette Bourcicot, declare as follows:

1.      I have reviewed the February 26 memorandum implementing the executive order

banning transgender people from serving in the military. It is apparent from my review that this

memo is designed to make accession of transgender people virtually impossible and to entirely

purge currently serving transgender personnel from the armed forces. It is also clear that the

interest that the policy serves is entrenching invidious discrimination against a minority group, and

not military readiness.

2.      I have reviewed the waiver provisions in sections 4.1. (accessions) and 4.3.

(retention) in the February 26 memorandum.

3.      The accessions waiver provision in 4.1. is designed to exclude anyone who is

transgender from being able to obtain a waiver. The vast majority of accessions candidates are

entry-level and presenting themselves to be trained as warfighters. Therefore, they would be unable

to support the claim required by section 4.1.c. that "there is a compelling Government interest in

accessing the applicant that directly supports warfighting capabilities."

4.      Moreover, the policy is designed to exacerbate a candidate's gender dysphoria. Per

1

**App. 413**

section 4.1.c., the waiver requires a transgender person to serve in their birth sex. To the extent any transgender person could obtain a waiver for accessions under 4.1.c, they would be required to suppresses who they are as a transgender person. In my experience, such a person will experience distress directly stemming from their attempt to serve in their birth sex despite having a gender identity different than their birth sex. This would make them susceptible to administrative separation as set forth in section 4.3.

5.      Lastly, given the defendants' well-publicized animus towards transgender service members, it is extraordinarily unlikely that even if an accessions candidate were able to meet the onerous burdens imposed by the policy, that an approval authority would risk the personal and professional consequences of signing such a waiver. As a result, section 4.1 is effectively a ban on accessions for transgender people.

6.      Similarly, section 4.3 is an effective ban on retention of transgender service members, no matter how honorable their service or essential their duties. The waiver provisions are a barrier for anyone with a gender dysphoria diagnosis who is receiving supportive treatment.

7.      A transgender service member is only eligible to be considered for a waiver if they meet all of the following conditions: 1) they have been stable for 36 consecutive months in their birth sex without distress, 2) they have never attempted to transition their sex to align with their gender identity, and 3) they are willing to serve in their birth sex going forward. Given the previous policy which encouraged service members to work with their commands and medical providers to resolve their dysphoria with supportive treatment, no one can meet that standard. People who meet the first waiver condition are definitionally not transgender. Anyone stable in their birth sex for 36 consecutive months does not have gender dysphoria and is not covered by this policy. The second condition is equally problematic -- it is unlikely that anyone who received a gender dysphoria

2

**App. 414**

diagnosis under the previous policy "never attempted" to experience inhabiting their gender identity. And the third requirement that a transgender service member must serve in their birth sex as a condition of a waiver is indeed no waiver – a waiver indicates the service will accept the service member's condition, rather than willfully ignoring and exacerbating it.

8.      To the final point, the discussion above regarding accessions recruits' requirement to serve in their birth sex applies to retention cases as well. If a person has an accurate gender dysphoria diagnosis, they cannot live in their birth sex without experiencing the distressing symptoms of gender dysphoria. Treatment for gender dysphoria includes providing a transgender person the opportunity to express themselves consistent with their gender identity and not in their birth sex. Accordingly, there is no retention waiver that requires a transgender person to live in their birth sex that would not specifically contradict their treatment plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

**App. 415**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

_____
Yvette Bourcicot

4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                )
                                         )
    Plaintiffs,        )
                                         )
v.                                       )          Civil Action No. 1:25-cv-00240
                                         )
UNITED STATES OF AMERICA *et al.*,       )
                                         )
    Defendants.        )
_____    )

## SUPPLEMENTAL DECLARATION OF SHAWN SKELLY

I, Shawn Skelly, declare as follows:

1.      I have reviewed the February 26, 2025, memorandum titled "Additional Guidance on Prioritizing Military Excellence and Readiness" issued by the Office of the Under Secretary of Defense for Personnel and Readiness. I have significant concerns about the immediate and long-term harms this guidance will cause to transgender service members and the ways in which it conflicts with established military policy and practices.

2.      This categorical approach to administratively separate an entire class of people who demonstrate their ability to serve and meet military standards represents a significant departure from standard military practice. There are no other circumstances where service members with a treatable condition that allows them to deploy and meet all readiness standards are nevertheless deemed categorically incapable of service.

3.      The policy makes transgender service members ineligible for the Disability Evaluation System (DES), which is both punitive and based on animus. This approach effectively declares that transgender service members are useless and cannot serve despite their demonstrated ability to do so successfully. The guidance separates these service members not based on any

1

**App. 417**

independent evaluation of their ability to meet service obligations, which is standard military policy, but solely based on their transgender status.

4.    I am aware of many transgender and non-transgender service members who have successfully deployed while on hormone therapy, and I know of no problems that arose because of these circumstances. Transgender and non-transgender service members have proven their ability to meet all deployment and readiness standards while receiving hormone therapy in austere conditions.

5.    The administrative separation procedures will severely disrupt the chain of command and erode unit cohesion and trust. This guidance will interfere with appointments, promotions, and assignments as commanders will be unwilling and unable to assign responsibilities to transgender service members they perceive will be subject to imminent separation.

6.    The damage to transgender service members began immediately upon the issuance of this guidance. Their career progression is already being negatively affected as their future viability within the military is foreclosed. This will undoubtedly interfere with deployments, assignments, leadership opportunities, and unit cohesion.

7.    Service members are currently losing educational and professional development opportunities as their commands anticipate separation.

8.    The waiver provisions in sections 4.1(c) and 4.3(c) of the implementing guidance are designed to exclude transgender service members both from accessions and retention rather than provide genuine pathways for continued service. The requirements for waivers in both contexts bar transgender service members from receiving them.

9.    This guidance goes beyond mere exclusion; it actively inflicts harm. No medical

2

**App. 418**

professional with expertise in this field could reasonably find this policy to be anything but harmful to transgender service members.

10.     By disqualifying transgender service members from treatments for gender transition and ongoing care for gender dysphoria, the guidance cuts off access to medically necessary care. Based on my observations and experience throughout my military career, it is harmful for individuals with gender dysphoria not to obtain appropriate medical treatment.

11.     The guidance's approach is cruel in its implementation, particularly in immediately cancelling "all unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria."

12.     I am aware of no other medical condition for which service members are prohibited from receiving the only known and established means of treatment.

13.     The implementing guidance includes financial incentives designed to pressure transgender service members to leave voluntarily, despite the trust and reliance service members have placed in the military's commitment to allow them to serve following gender transition. While financial incentives have previously been used during reductions in force or for elimination of military programs, to my knowledge, they have not been used for separation due to a group-based characteristic or due to a medical condition.

14.     Medical costs cannot justify this policy. During my time as Deputy Undersecretary, I was briefed by the Assistant Secretary for Health Affairs and Defense Health Agency staff regarding provision of medical care for transgender service members. In that context, I would have heard of problems, if there were any, including any concerns about costs. In those briefings, no one reported that there were cost issues associated with medical treatment for transgender service members. It was never brought to my attention, nor did I hear anything that suggested this

**App. 419**

particular course of care was impactful on the military health system or involved any costs that weren't lost in the wash.

15.    The rollout of this policy is unprecedented in the chaos and confusion associated with it. For one, Section 3.4(e) of the February 26 implementing guidance instructs that transgender service members are to be identified within 30 days of the memorandum. Then, two days later on February 28, a clarification was sent out stating that DoD personnel are not to identify affected service members. And an FAQ posted on the DoD website answers a question about how to identify affected personnel by saying that instructions are forthcoming. It is highly unusual to direct the Department to identify service members within 30 days for administrative separation and provide no guidance about how to do that. At the same time, directives have issued halting deployments, halting medical treatments, and directing service members to return from combat posts, all alongside directions not to identify affected service members. Such a process is chaotic and harmful and unprecedented in its lack of clarity and manifestation of confusion.

16.    Based on my professional experience in military personnel and readiness, I conclude that this guidance will cause immediate and lasting harm to transgender service members currently serving in the military. The policy disrupts ongoing medical treatment, creates unjustifiable barriers to continued service, and damages the careers and well-being of capable service members who have demonstrated their ability to serve effectively.

17.    Rather than enhancing military readiness, this guidance undermines it by removing qualified personnel from service based solely on their transgender status, regardless of their demonstrated ability to meet all service requirements.

18.    I have also reviewed Secretary Hegseth's February 7, 2025, Memorandum for Senior Pentagon Leadership entitled, "Prioritizing Military Excellence and Readiness."  In that

**App. 420**

Memorandum, Secretary Hegseth states: "The Under Secretary of Defense for Personnel Readiness is authorized and delegated the authority to provide additional policy implementation guidance outside of the normal DoD issuance process[.]"  In the three-and-one-half (3.5) years I served in the DoD, I never saw an authorization of this sort.  It is ahistorical, in terms of doing away with the normal issuance of policy.  The reason the DoD has its standard issuance process is to ensure that the potential impacts are considered, including potential harms, costs, and implementation considerations and are as fully understood as could possibly be determined.  As a part of this review, the DoD gets comments from all the various stakeholders including uniformed services, military departments, military health, joint staff with respect to impact on combat readiness. General Counsel in DoD, and others would all have a chance to review as well. Then we would submit a document that listed both our recommendations for improving implementation of proposed policy, as well as things we would change based on what we learned from the review.  A policy change as significant as the one currently being undertaken by the Administration, would take over a year and should involve a review of the longitudinal data that DoD has from the ten years in which transgender service members have been serving, as well as three-and-a-half years of data related to service members who transitioned under existing policy.  Rather than consult with stakeholders and review and consider the data, what Secretary Hegseth authorized allows someone to act by fiat, without any review or consultation whatsoever.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**App. 421**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March  4 , 2025

Shawn Skelly

6

**App. 422**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,           )
                                    )
         Plaintiffs,                )
                                    )
v.                                  )        Civil Action No. 1:25-cv-00240
                                    )
UNITED STATES OF AMERICA *et al.*,  )
                                    )
         Defendants.                )
                                    )

**SECOND SUPPLEMENTAL DECLARATION OF GILBERT CISNEROS, JR.**

I, Gilbert Cisneros, Jr., declare as follows:

1.    I have reviewed the February 26 memorandum providing additional guidance on implementing the transgender military ban issued by President Trump.

2.    The procedures set forth in the February 26 memorandum are highly unusual. They describe a process of identifying transgender service members for separation and putting people through administrative separation proceedings even though they are meeting standards and performing their duties.

3.    This is unusual and not ordinary. Transgender service members have been serving with distinction and doing their job; there is no appropriate or fair administrative reason identified for separating transgender service members who meet standards that relates to military interests.

4.    Administrative separation is reserved typically for circumstances where someone is violating standards of conduct or failing to meet military performance standards. In rare circumstances it has been used for force reductions. It has never, in my experience, been used to purge the military of service members performing their duties honorably and meeting standards.

5.    The ordinary path for addressing issues relating to medical issues is the Disability

1

**App. 423**

Evaluation System (DES). The DES ensures that a service member who has committed their career to service receives an individualized evaluation of how a person's medical condition impacts their deployability and service options.

6.    The February 26 memorandum is not a regulation of service members because of a medical condition. If that were the case, resorting to the DES would be the appropriate procedure.

7.    The DES ensures that people's individual circumstances are assessed. It also allows individuals subject to evaluation to present medical support for their continued service and to ensure that they have an opportunity to rebut any medical evidence being used to change their military status. It is a fair and individualized process.

8.    Administrative separation will not afford transgender service members the process that allows them to rebut the conditions established for their separation based on their medical needs. It is a fast-track process being used to separate transgender people as a group for being transgender.

9.    The February 26 memo is clear that anyone who is transgender, who has transitioned or will transition, or even who has "symptoms" of gender dysphoria will face separation. That will be true even though people subjected to the process are meeting standards.

10.   That is a violation of the trust and commitment that the military makes to service members and that service members make in committing to service.

11.   I have reviewed responses provided to this Court about cost justifications for excluding transgender people from service. I reject that costs justify excluding transgender people from service.

12.   In my role as undersecretary, cost was never identified as an issue of concern relating to providing medical care for transgender service members. If it was an issue, it would

**App. 424**

have been brought to my attention.

13.     Many service members receive medical care for far more common medical conditions, at a far greater cost and with a significant impact on the military budget.

14.     To my knowledge and based on my experience, medical care for transgender service members is miniscule relative to the military budget. There is no reason transgender people should bear the burden of cost concerns for the entire military.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**App. 425**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

Gilbert Cisneros, Jr.

**App. 426**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,  )
                                )
      Plaintiffs,  )
                                )
v.  )      Civil Action No. 1:25-cv-00240
                                )
UNITED STATES OF AMERICA *et al.*,  )
                                )
      Defendants.  )
              ___  )

**SUPPLEMENTAL DECLARATION OF GEORGE BROWN, M.D.**

I, George R. Brown, M.D., declare as follows:

1.  I understand that Plaintiffs submit me as an expert in two primary areas based on my clinical experience with transgender civilian and military members, work with the Department of Veterans Affairs, and knowledge of the scientific and other research about transgender persons: (1) the diagnosis and treatment of gender dysphoria; and (2) the application of military medical standards to transgender persons. My background, education, clinical experience, and research efforts are set forth in my previous declaration (ECF No. 32) and my *curriculum vitae* (ECF No. 32-1).

2.  I submit this declaration to clarify statements attributed to me in the *Doe 2 v. Shanahan* opinion regarding the definition of transgender identity and to address the government's guidance about how to discharge transgender service members and the government's asserted justifications for doing so.

3.  In my previous declarations, based on my extensive clinical experience and training in treating transgender patients, I defined transgender individuals as "people who have a gender identity that is different from the sex they were assigned at birth." This definition was quoted in the *Doe 2 v. Shanahan* opinion.

4.  In the present case, again based on my extensive clinical experience and training in treating transgender patients, I offered a definition that a transgender person is someone who lives in a different sex than their birth sex or would if able to. These definitions are not different in substance as I explain below.

5.  I wish to clarify that in my decades of extensive experience and training in treating transgender patients and engaging in medical research about transgender people, the

1

**App. 427**

definition of transgender has always presumed that transgender individuals live—or would live if permitted—in accordance with their gender identity.  The very core of being transgender necessarily involves a drive to align one's internal gender identity and one's lived experience.  Just as a non-transgender person is naturally driven to live and interact with others consistently with their gender identity, so is a transgender person.  It would be no easier for a transgender man to live as a woman than for a non-transgender man to live as a woman.  *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146 (noting that all "people strive for consistency between how they view themselves and how others react and respond to them" and describing the serious harms caused when transgender people are unable to live and be treated by others consistently with the sex with which they identify).

6. While I defined transgender individuals in terms of how one "identifies," rather than explicitly stating how one "lives," the concept of gender identity inherently encompasses behavioral and social aspects, including how a person experiences and expresses that identity and how they are seen by others as someone who is a man or a woman.  The term "identify" was never meant to suggest that transgender status is merely an internal recognition that can be readily suppressed.  This is no different than for the majority of people who "identify" as cisgender.

7. The opinion in *Doe 2 v. Shanahan* creates a false distinction between transgender individuals who "identify" differently from their birth sex and those who "live in accordance" with their gender identity.  Such a distinction fundamentally misunderstands the nature of being transgender.  *Id*.

8. Significant and growing research shows that gender identity has a biological foundation and that being transgender is an immutable characteristic.  *See*, for example, C.E. Roselli, *Neurobiology of gender identity and sexual orientation*, J Neuroendocrinology 2018 July; 30(7); Fisher, A. D., Ristori, J., Morelli, G., & Maggi, M. (2018*). The molecular mechanisms of sexual orientation and gender identity*. Mol Cell Endocrinol, 467, 3–13; Fisher, A. D., & Cocchetti, C. (2020). *Biological basis of gender identity*. In *The Plasticity of Sex* (pp. 89–107); Saraswat, A., Weinand, J. D., & Safer, J. D. (2015). *Evidence supporting the biologic nature of gender identity*. Endocr Pract, 21(2), 199–204; Roselli, C. E. (2018). *Neurobiology of gender identity and sexual orientation*. J Neuroendocrinol, 30(7), e12562; Steensma, T. D., Kreukels, B. P., de Vries, A., & Cohen-Kettenis, P. T. (2013). *Gender identity development in adolescence*. Horm Behav, 64(2), 288–297; Savic, I., Garcia-Falgueras, A., & Swaab, D. F. (2010). *Sexual differentiation of the human brain in relation to gender identity and sexual orientation*. Prog Brain Res, 186, 41–62; Foreman, M., Hare, L., York, K., et al. (2019). *Genetic Link Between Gender Dysphoria and Sex Hormone Signaling*. J Clin Endocrinol Metab, 104(2), 390–396; Polderman, T. J. C., Kreukels, B. P. C., Irwig, M. S., et al. (2018). *The Biological Contributions to Gender Identity and Gender Diversity: Bringing Data to the*

*Table*. Behav Genet, 48(2), 95–108; Kruijver, F. P., Zhou, J.-N., Pool, C. W., Hofman, M. A., Gooren, L., & Swaab, D. F. (2000). *Male-to-female transsexuals have neuron numbers in a limbic nucleus*. J Clin Endocrinol Metab, 85(5), 2034–2041; Garcia-Falgueras, A., & Swaab, D. F. (2008). *A sex difference in the hypothalamic uncinate nucleus: relationship to gender identity*. Brain, 131(Pt 12), 3132–3146; Zhou, J.-N., Hofman, M. A., Gooren, L. J. G., & Swaab, D. F. (1995). *A sex difference in the human brain and its relation to transsexuality*. Nature, 378, 68–70.

9. This is consistent with decades of clinical experience confirming that being transgender is deeply rooted and not susceptible to voluntary or coercive efforts to change. In the past, therapists and state officials used a variety of methods to try to change transgender identity, including involuntary confinement, aversion therapies, electroshock therapy, and medications. These methods caused severe harm to transgender individuals but did not change their gender identities. Based on contemporary medical science and practice, attempts to change a person's gender identity are unethical and harmful. For example, *see* Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). *Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults*. JAMA Psychiatry, 77(1); Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). *Stigma, mental health, and resilience in an online sample of the US transgender population*. American Journal of Public Health, 103(5), 943-951; D'Augelli, A. R., Grossman, A. H., & Starks, M. T. (2006). *Childhood gender atypicality, victimization, and PTSD among lesbian, gay, and bisexual youth*. Journal of Interpersonal Violence, 21(11), 1462-1482; Green, A. E., Price-Feeney, M., Dorison, S. H., & Pick, C. J. (2020). *Self-reported conversion efforts and suicidality among US LGBTQ youths and young adults*, 2018. American Journal of Public Health, 110(8), 1221- 1227.

10. Forcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions. *See* American Psychological Association, Resolution on Gender Identity Change Efforts (2021). Within the medical and psychological community, that discomfort when it rises to the level of clinically significant distress is called gender dysphoria. Gender dysphoria is a serious but treatable condition. The treatment includes enabling someone to go through gender transition, a process by which a transgender person goes from living in their birth sex to living in a different sex. *See* Boedecker A: *Adjunctive interventions: Supportive services for gender role transition*. In *Adult Transgender Care*, edited by Michael Kauth and Jillian Shipherd; Chapter 10, pp 161-174; Taylor and Francis, NY, 2018.

11. Of course, everyone initially lives in their birth sex. That is true by definition of it being a person's birth sex. But the fact that a transgender person initially lives in their birth sex does not make living in one's birth sex a characteristic associated with being transgender, nor does it mean that any significant number of transgender people could or would do so

3

**App. 429**

if they had an option that did not jeopardize their employment, cause family rejection, or stigmatize them in ways that keep them from being able to support themselves or their family. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146 (describing how social and family rejection, economic pressures, and the threat of violence affects when and how transgender people transition and the harmful impact of these barriers to transition on their mental and physical wellbeing).

12. In addition, it is well-established throughout the medical community that practices that aim to suppress or change a person's gender identity are harmful and traumatizing. Such practices are referred to as "conversion therapy," "reparative therapy," or "gender identity change efforts" and are rejected by the medical and mental health community because of the harms they cause. *See*, *e.g.*, American Psychological Association, Resolution on Gender Identity Change Efforts (2021). Just as conversion or reparative therapy that strives to make gay people suppress their sexual orientation is harmful and traumatizing, so are efforts to make a transgender person live in their birth sex harmful and traumatizing and rejected by the medical and the mental health community. Many national and international professional healthcare organizations have publicly warned against the harmful effects of these practices, including the American Psychological Association, American Academy of Family Physicians, American Academy of Nursing, American Counseling Association, American Medical Association, and many others.

13. Therefore, when I stated that transgender individuals are those who "have a gender identity that is different from the sex they were assigned at birth," I was describing individuals who live—or would live if permitted—in accordance with that gender identity. I did not mean to suggest that there are transgender people who have a gender identity different than their birth sex who do not wish to be able to live consistent with their gender identity.

14. It is simply not accurate to suggest, as the *Doe 2* opinion does, that many transgender individuals comfortably live or serve in their birth sex. While some transgender individuals may do so due to external constraints like prejudice or discrimination, or because they are in a developmental process to understand and accept their gender identity, or because they do not have access to medical support for transition, or because they will lose jobs or families if they transition, this does not represent a sustainable situation. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146 (describing external restraints that prevent or delay transition for some transgender people and the harms caused by those external restraints).

15. To be clear, it can be difficult for a transgender person to understand and accept that they have a gender identity different than their birth sex. Some live in denial of their true identity, especially in late adolescence and early adulthood. Others do not embrace their

4

**App. 430**

transgender identity for a variety of reasons. They may have family that might reject them or they may lose their job if others know that the person is transgender. But for transgender people, living in one's birth sex causes serious distress and being made to do so exacerbates that distress and can be disabling and traumatizing.

16. Based on my clinical experience with hundreds of transgender people who have served on active duty and on my extensive research and training in this specialized area of medicine, the medical and psychological understanding of what it means to be transgender has always encompassed both internal identity and its external manifestations. This is true in the same way that the medical and psychological understanding of sexual orientation includes aspects both of a person's identity – that internalized sense of how someone feels being a gay person – as well as the external manifestation of that identity which includes being romantically or sexually intimate with someone of the same sex.

17. The *Doe 2* opinion's implication that many transgender individuals neither transition nor wish to transition also fails to recognize that people transition in different ways – whether through social transition, medications, surgeries, or combinations of those interventions. The determination of which modalities to use depends on an individualized medical assessment. Not all transgender individuals transition in the same way. That said, gender transition, steps a person takes to live in a different sex, is a crucial component of ameliorating gender dysphoria for transgender people. *See, e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146.

18. To clarify the discussion of statistics cited in the opinion: while some studies show varying percentages of transgender individuals who have undergone specific medical interventions, these statistics should not be misinterpreted to suggest that many transgender individuals have no desire to live in accordance with their gender identity. Social transition—changing one's name, pronouns, dress, documents, and other aspects associated with being able to live in a different sex—is often the most critical aspect of transition for many transgender individuals, whether or not a person pursues using medications or undergoing surgery as part of a prescribed transition plan. *See, e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146.

19. In addition, data about transgender individuals' desire to transition taken in the context of a person facing hostility, social opprobrium, or negative consequences if they transition, which would be the case for people serving in the military prior to 2016, should not be interpreted to mean that there are transgender people who do not wish to live consistent with their gender identity.

20. The suggestion that "transgender individuals can serve and are serving with distinction under the standards for their biological sex" means that there are transgender people who do not wish to live consistent with their gender identity misrepresents my testimony and the extensive clinical evidence regarding the psychological harm caused by forcing transgender individuals to deny who they are.  What it means is that there are many transgender individuals who have the incredible fortitude and resilience to serve their country despite the unbearable societal pressures under which they live.  I have observed that this resilience can last from weeks, to months, and occasionally to years, but rarely for the lifetime of an individual who identifies as transgender.  It would be a distortion to use that fact to justify continued and further oppression of this group.

21. In conclusion, my definition of transgender has always encompassed individuals who live or would live in accordance with their gender identity if permitted to do so.  To interpret my statements otherwise is to fundamentally misunderstand both my testimony and the medical consensus on what it means to be transgender.

22. I have read the document dated February 26, 2025, titled "Additional Guidance on Prioritizing Military Excellence and Readiness," including the attachment labeled "Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria."

23. This attachment sets forth a general policy requiring the separation of transgender service members and barring accession by transgender individuals.

24. With respect to the retention of current transgender service members, the attachment offers an apparent waiver in Section 4.3(c); however, its conditions prevent any transgender person from qualifying for exemption from administrative separation for the following reasons:

- **No transgender person who has transitioned or taken any steps to transition is eligible.**  Anyone disqualified under Section 4.3(b) for receiving gender transition treatment cannot qualify for a waiver because Section 4.3(c)(2) requires proof they "have never attempted to transition."  This includes anyone who transitioned or took any steps to transition during service.

- **No person accurately diagnosed with gender dysphoria is eligible.**  Service members disqualified under Section 4.3(a) for having a gender dysphoria diagnosis cannot qualify because Section 4.3(c)(1) requires "36 consecutive months of stability in the service member's sex without clinically significant distress"—a medical impossibility since those diagnosed with gender dysphoria, by definition, have clinically significant distress.  Therefore, no transgender person with an accurate gender dysphoria diagnosis could ever meet this requirement.

- **No transgender person forced to serve in their birth sex is eligible**. Similarly, Section 4.3(c)(3) requires service members to be "willing and able" to serve in their birth sex as a condition for waiver—which would cause gender dysphoria and clinical distress in a transgender person and subject them to discharge.

25. The only practical impact of the waiver would be to permit a person who was *inaccurately* diagnosed with gender dysphoria, or who transiently "displays symptoms consistent with gender dysphoria" but does not actually have gender dysphoria, to demonstrate that they are not in fact transgender or gender dysphoric.

26. I have read the document dated 2/26/2025 entitled: Action Memo from Tim Dill, which states that the policy requiring discharge of transgender service member was based on the following:

(1) **SecDef Memorandum, "Military Service by Transgender Individuals," February 22, 2018**, which "conclude[d] that there are substantial risks associated with allowing accession and retention of individuals with a history or diagnosis of gender dysphoria… ."

(2) **A 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity** which found that "rates of disability evaluation were estimated to be higher among [transgender] service members… . Additionally, this review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period."

(3) **A 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs** that included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime,…[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts," "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of evidence on transgender mental health and gender-affirming care is low to moderate.

27. These three sources do not provide any legitimate medical basis for banning transgender people from military service.

28. The misconceptions and faulty analysis employed by the 2018 SecDef Memorandum are thoroughly explained in a 2018 report authored by former surgeons general of several branches, titled: "DoD's Rationale for Reinstating the Transgender Ban Is Contradicted by Evidence."

7

**App. 433**

29. I have read that report and agree with its analysis and conclusions, including that the 2018 SecDef Memorandum is based largely on misconceptions about transgender healthcare, the application of double standards to transgender service members, and speculative concerns about potential problems with deployability. To the extent it relied on any data about actual transgender service members, the data showed no basis for concern.

30. I was an expert in the 2017 case challenging the Mattis Policy and, in that capacity, reviewed the underlying data regarding transgender service members discussed in the 2018 DecDef Memorandum, which was produced during that litigation and provided to me by the plaintiffs in that case. My career as an academic research psychiatrist, including conducting extensive research within the Department of Defense and the Department of Veterans Affairs for many years, enables me to critically assess research design, methodology, and outcomes.

31. As an initial matter, none of the data relates to service members who have completed transition and are enlisting for the first time—the group of people who meet the Open Service standards and began the process of enlisting on or after January 1, 2018. The data are exclusively from service members who were diagnosed with gender dysphoria while already serving, in some cases well before any guidance was provided by DOD for treatment. Again, this means that the data reflects a group of people who were serving in the shadows for months to years before they were allowed to serve openly.

32. Even with respect to these service members, the data is fundamentally flawed and presented in a grossly misleading manner. The study period for the data was for the 22-month period from October 1, 2015 to July 26, 2017. But Secretary Carter's Open Service Directive was not issued until June 30, 2016, and the military did not issue force-wide treatment protocols for gender dysphoria until October 1, 2016. As a result, for 12 out of the 22 months in the study, the service members were, with few exceptions, not serving openly and not receiving DOD-sanctioned treatments for gender dysphoria.

33. If the purpose of the study is to draw conclusions about the health of transgender service members under the Carter policy, it is fundamentally illegitimate to include data from before that policy went into effect and before those service members were allowed to receive health care under DOD guidelines to treat their gender dysphoria.

34. For example, the 2018 SecDef Memorandum cited data from the study for the proposition that transgender service members had an average of 28.1 mental health encounters over a 22-month period. *See id.* at 24. But it is impossible to determine whether these mental health encounters occurred before or after the Carter policy went into effect. If the utilization rate dropped once service members started receiving care for gender dysphoria, then the data would actually support the efficacy of the Carter policy.

35. The 2018 SecDef Memorandum also ignored the critical fact that service members were required to meet with mental health providers numerous times to document their gender dysphoria as a precondition for receiving health care for gender dysphoria, and for continued access to cross-sex hormones. It is unknown how many of these "mental health" visits were mandated/required, as opposed to visits voluntarily requested by service members for mental health care. As a result, without more specific data, there is no reason to conclude that mental health visits by transgender service members who are initiating transition-related care are a sign of co-morbid mental health conditions. The report is quite misleading is this regard, as it implied that all mental health visits by transgender service members were initiated for the treatment of mental illnesses, when an unknown, but likely significant, percentage were actually administrative visits rather than mental health treatment visits.

36. Similarly, the 2018 SecDef Memorandum cited data from the study for the proposition that service members with gender dysphoria are "eight times more likely to attempt suicide than Service members as a whole." *Id*. at 12. In fact, the underlying data refer to "suicidal ideation," not actual suicide attempts. Moreover, with respect to suicidal ideation, the data does not reveal whether the suicidal ideation was reported before or after the service member was allowed to serve openly and receive treatment. Given the fundamental flaws with the study methodology and the low number of observed events, the data presented on this, and other, mental health questions are not interpretable in any meaningful way.

37. The 2018 SecDef Memorandum distorts my own work by citing a study in which I documented that some transgender veterans who have received treatment after years of living in the shadows continue to have health disparities even after their gender dysphoria is resolved through treatment. *See id*. at 21 n.60. The veterans in my study were untreated veterans for a long period of time and survived—but did not thrive—while living an inauthentic life in the shadows on active duty. Many of the transgender veterans included in this large study had never received treatment for gender dysphoria. Clearly, the population group of transgender individuals in that study is not comparable to the population group of people who have already received medical care, resolved their gender dysphoria, and are coming to the military openly stating they are transgender.

38. In short, transgender individuals should be screened and evaluated for mental health conditions the same way every other person is screened and evaluated. There is no medical basis for using a transgender individual's history of gender dysphoria as a proxy for other mental health conditions that they do not have.

39. The Action Memo's description of the 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity is highly selective and misleading.

40. The Action Memo omits the main findings of the 2021 review, which were: (1) "Transgender service members appear similar to the full military applicant pool in terms of the proportion with history of any pre-accession medical disqualification status as well as the distribution of specific medical disqualifications." (2) "Rates of adverse attrition and existing prior to service (EPTS) discharge among transgender service members were similar to the total force."

41. While it is true that "the rates of disability evaluation were estimated to be higher among TG service members," no negative conclusions can be drawn from that statistic for at least two reasons. First, research has found that transgender service members are likely to volunteer for and participate in high-risk combat activities and are therefore more likely to suffer combat-related injuries such as PTSD and traumatic brain injury than a matched cohort of cisgender Veterans (George R. Brown & Kenneth T. Jones, *Mental Health and Medical Health Disparities* in 5135 *Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study*, 3 LGBT Health 128 (2016)). The data in the 2021 review specifically show that transgender service members have the same distribution of psychiatric diagnoses as non-transgender service members. Accordingly, the top three diagnoses in the AMSARA report associated with medical separation were those associated with combat and other stressful military service: psychiatric conditions like PTSD and depression, musculoskeletal issues, and neuropsychiatric conditions such as traumatic brain injuries.

42. In addition, the review includes a period of time in which a transgender service member who was diagnosed with gender dysphoria could not receive medical care because they had not transitioned before the reliance exception in the Mattis Plan went into effect. It is not surprising that a disproportionate number of such individuals would have been recommended for discharge by the Disability Evaluation System.

43. In addition, the Action Memo misleadingly states that the "review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period." In fact, the relevant sentence from the review is focused on conveying the absence of significant concerns regarding deployability and states: "We estimate that fewer than 40% of the transgender service members identified as part of this study would have been deemed non-deployable due to mental health reasons at some time during the 24 months following initial diagnosis." That is, fewer than 40% were estimated to have been non-deployable *at any time* during that 24-month period. By taking that statement out of context and paraphrasing it in a misleading way, the Action Memo falsely suggests that 40% of transgender service members were non-deployable for 24 months.

44. In addition, the review is clear that this data figure cannot be used to compare the deployability of transgender and non-transgender service members, stating: **"Importantly, data were not available from non-transgender service members that**

**could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-depolyability rate.”** *Id.* Therefore, it is not reported whether or not the transgender service members with a gender dysphoria-related diagnosis were more likely or less likely to have any period of nondeployability compared to matched cisgender service members.

45. Notably, the review *was* able to meaningfully compare retention and deployability data from the cohort of transgender service members with data from a cohort of presumably cisgender service members diagnosed with depression. The review found that transgender service members **“stayed in service longer, on average, than did the depression cohort” and “also had a greater proportion of members available for deployment than the depression cohort.”**

46. Short periods of non-deployability are common for virtually all service members. There is nothing about the medical treatments received by transgender service members for gender dysphoria that would have any significant impact on their deployability. For example, the review noted that **transgender service members “with hormone therapy did not appear to differ meaningfully in their deployability from those without hormone therapy,”** underscoring that hormone therapy is not a significant impediment to deployability. *Id*.

47. In sum, nothing in the review supports banning accession or retention of transgender people. To the extent the data examined in the review permits meaningful comparisons between transgender and non-transgender service members, transgender service members stay in service longer and are more deployable than those with another much more common diagnosis (depression) which is not a *de facto* basis for discharge. In addition, the data show that the use of hormone therapy by transgender service members does not have any discernable impact on deployability. *Id*.

48. The military allows people with a history of other medical conditions to enlist and serve even when the condition is currently being managed by medication. Individuals with abnormal menstruation, dysmenorrhea, and endometriosis may enlist if their conditions are adequately managed through hormone medication. See DODI 6130.03, Enclosure 4 §§ 14(a), (d), (e). Individuals with Gastro-Esophageal Reflux Disease or high cholesterol may enlist if they are taking medication with no relevant side effects. *Id.* §§ 13(a), 25(i).

49. Military policy also allows service members to take a range of medications, including hormones, while deployed in combat settings. Access to medication is predictable, as “[t]he Military Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide.” *See* M. Joycelyn Elders et al., *Medical Aspects of Transgender Military Service*, 41 Armed Forces & Soc'y 199, 207 (Aug. 2014) (the “Elders Commission Report”).

50. Hormone therapy is neither too risky nor too complicated for military medical personnel to administer and monitor.  The risks associated with use of cross-sex hormone therapy to treat gender dysphoria are low and not any higher than for the hormones that many non-transgender active-duty military personnel currently take.  The medications do not have to be refrigerated, and alternatives to injectables are readily available, further simplifying treatment plans.  Clinical monitoring for risks and effects is not complicated and, with training and/or access to consultations, can be, and is, performed by a variety of medical personnel in the DOD.  This is the military services' current practice in support of the limited medical needs of their transgender troops in CONUS (Continental United States) and in deployment stations worldwide.  Stable, transitioned troops require only yearly laboratory monitoring for cross-sex hormone treatment (which is consistent with the yearly, routine laboratory health screenings that all active-duty troops receive).

51. The 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs likewise provides no support for banning transgender people from military service.

52. The review found that '[r]esearch findings consistently show.........the benefits of gender-affirming care." *Id*. at 1.

53. That conclusion is consistent with an extremely broad consensus within the medical community that the treatments for gender dysphoria are well-established, safe, and effective.  Seventy years of clinical experience and data have demonstrated the efficacy of treatment for the distress resulting from gender dysphoria.  *See*, for example, the multi-country, long-term follow up study: Tim C. van de Grift et al., *Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study*, 79 Psychosomatic Med. 815 (Sept. 2017).

54. It is true that the strength of the evidence on the efficacy of that care is "low to moderate" on one type of scale used in evidence-based medical studies that grade studies in a hierarchy, if such studies are possible to conduct on a given condition.  However, it is also true that many other types of standard healthcare is delivered daily in a routine fashion in spite of the inherent limitations of the research currently available.  Based on this GRADE scale (the authors do not cite what type of grading system they are using in the AMSARA report and attached Tabs) only randomized, double-blind placebo controlled studies are considered "high" quality evidence.  *See* Linan Zeng, Romina Brignardello-Petersen, Monica Hultcrantz, Reed A.C. Siemieniuk, Nancy Santesso, Gregory Traversy, Ariel Izcovich, Behnam Sadeghirad, Paul E. Alexander, Tahira Devji, Bram Rochwerg, Mohammad H. Murad, Rebecca Morgan, Robin Christensen, Holger J. Schünemann, Gordon H. Guyatt, GRADE guidelines 32: *GRADE offers guidance on choosing targets of GRADE certainty of evidence ratings*, Journal of Clinical Epidemiology, Volume 137, 2021, Pages 163-175.  However, performing such studies is difficult or impossible for many types of healthcare.  For example, one of the most

common surgical procedures performed in the United States is a tonsillectomy on minors, with over 530,000 cases completed a year, using multiple, competing surgical techniques. However, a review of the evidence base for this very common procedure, including when to apply it and the best surgical techniques to utilize, is not supported by "double blind" controlled studies in spite of the common use of this treatment over centuries. *See* Reginald F. Baugh et al., *Clinical Practice Guideline: Tonsillectomy in Children*, 144 Otolaryngology–Head and Neck Surgery S1 (2011)). Baugh and coauthors noted: "While there is a body of literature from which the guidelines were drawn, significant gaps remain in knowledge about preoperative, intraoperative, and postoperative care in children who undergo tonsillectomy." *Id.* at S22.

55. Similarly, acute appendicitis is one of the most common causes of acute abdominal pain in the United States. However, it remains unclear whether the common approach of appendectomy is superior to nonsurgical treatment with antibiotics in many patients. A Cochrane review of the evidence for this common procedure performed in DoD medical treatment facililties was inconclusive: "We could not conclude whether antibiotic treatment is or is not inferior to appendectomy. Because of the low to moderate quality of the trials, appendectomy remains the standard treatment for acute appendicitis." See Ingrid M. H.A. Wilms et al., *Appendectomy Versus Antibiotic Treatment for Acute Appendicitis,* Cochrane Database of Systematic Rev. (2011). In other words, the prevailing standard of care, in spite of the "low quality" of evidence in support of surgery over a nonsurgical alternative, remains the accepted standard. *See also* Brett Doleman et al, *Appendectomy versus antibiotic treatment for acute appendicitis*, Cochrane Database of Systematic Rev. (2024) (noting continued absence of high-quality evidence).

56. There is no valid basis for insisting that treatment for gender dysphoria—unlike treatment for virtually every other medical condition—be supported by "high" quality evidence, a standard that few if any medical conditions are required to (or could) meet.

57. The review found that while transgender individuals experience higher rates of suicidality than non-transgender people, that disparity is "driven by discrimination and minority stress," not any inherent pathology. As the review repeatedly states, the increased risk of suicidality is due to "discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization." *Id*. at 2.

58. The review also found: "Research demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination." *Id*.

59. In addition, what is important from a military perspective is not whether a person has suicidal ideation but whether they can competently serve and be deployable. The

military's own research showed that transgender service members are more deployable than service members with depression, another condition associated with high rates of suicidality. *See* Analysis of Psychological Stability as a Factor in Determining Medical Accession Standards for Transgender Individuals (2021).

60. There is no medical basis for using a transgender person's history of gender dysphoria as a proxy for other medical conditions that the person does not actually have. This approach is akin to assuming non-transgender female applicants are, or should be considered, clinically depressed, as it is well known that depressive disorders are about twice as common in non-transgender females than in non-transgender males. *See* Paul R. Albert, *Why Is Depression More Prevalent in Women?* 40 J. of Psychiatry & Neuroscience 219-21 (2015). Women are twice as likely as men to have anxiety disorders, but the military does not bar women from military service. Research indicates that Black and Latino people are more likely to experience chronic, prolonged, and severely debilitating depression than white people (Rahn Kennedy Bailey et al, *Racial and ethnic differences in depression: current perspectives.* Neuropsychiatric Disease and Treatment, 019:15 603–609). One study of California school children shows that children of service members are more than 50 percent more likely to have attempted suicide than the general population. *See* Exhibit B, Vice Admiral Donald C. Arthur, USN (Ret.), Former Surgeon General of the U.S. Navy, et al., DoD's Rationale for Reinstating the Transgender Ban is Contradicted by Evidence, Palm Center (April 2018).

61. Despite these elevated risk factors, the military does not disqualify these groups from service because these statistical differences reflect population-level patterns influenced by social determinants of health, systemic factors, and access to care. They do not predict individual outcomes, as many people within these groups never develop mental health conditions, while others outside these groups do. If a transgender individual who seeks to enlist in the military has already transitioned, no longer experiences gender dysphoria, and has been screened for other mental health conditions (including depression, anxiety, and suicidal ideation) there is no valid reason to conclude that individual is at elevated risk of developing one of these comorbidities in the future.

62. For all non-transgender people, the military uses an individualized assessment of fitness. There is no reason to apply a different standard to transgender people than to all other groups.

63. There is no reason to use a person's transgender status as a proxy for depression, anxiety, or suicidal ideation because the military directly screens for those conditions. Anyone with a history of suicidal behavior—whether transgender or not—is categorically barred from enlisting. See DODI 6130.03, Enclosure 4 § 29(n). Anyone with a history of anxiety or depression—whether transgender or not—is barred from enlisting unless, inter alia, they have been stable and without medical treatment for 24 consecutive months or 36 consecutive months respectively. *See id.* §§ 29(f), (p). As a result, any transgender

**App. 440**

individual who actually has one of those conditions is already screened out without a need for a categorical ban.

64. Any argument that the costs of providing medical care to transgender service members justifies a ban is specious. The costs of the treatments used to treat gender dysphoria are far lower than for many other routinely provided mental health, medical and surgical treatments. For example a hospital workup of a person presenting to an emergency room with chest pain averaged over $32,000 in 2010 dollars (over $46,000 in 2025 dollars). Priest, V, Scuffham, P, Hachamovitch, R. et al. *Cost-Effectiveness of Coronary Computed Tomography and Cardiac Stress Imaging in the Emergency Department: A Decision Analytic Model Comparing Diagnostic Strategies for Chest Pain in Patients at Low Risk of Acute Coronary Syndromes*. J Am Coll Cardiol Img. 2011 May, 4 (5) 549–556. https://doi.org/10.1016/j.jcmg.2011.03.008. The health care dollars expended by DoD on transgender troops with gender dysphoria on an annual basis, considered as a fraction of the military's overall health care expenses, are de minimis.

65. In addition, the same medications (hormone therapies) and surgeries (mastectomies, hysterectomies, genital reconstruction) are provided to non-transgender service members, so any reliance on this factor would be based on bias toward transgender people, not on costs.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**App. 441**

I declare under penalty of perjury that the foregoing  is true and correct.

· Dated: March 3, 2025

George R. Brown, MD, DFAPA

16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,     )
                  )
     Plaintiffs,      )
                  )
v.                  )     Civil Action No. 1:25-cv-00240 (ACR)
                  )
UNITED STATES OF AMERICA *et al.*,   )
                  )
     Defendants.     )
                  )

## <u>DECLARATION OF MARTHA SOPER</u>

I, Martha Soper, declare as follows:

1.     I served as Assistant Deputy, Health Policy in the Office of the Deputy Assistant Secretary of the Air Force, Reserve Affairs & Airman Readiness from October 2014 to September 2020.  In this role, I served as the principal advisor in all matters pertaining to the development and management of Air Force-wide and DoD-wide health policy.  This included the development and oversight of total force strategic plans and policies pertaining to a full range of direct and indirect health care programs.  I also served as the principal advisor to senior leaders in all matters pertaining to reorganizing and integration of programs for support and care of wounded Service members and their families.  I also oversaw the medical incentive programs to include retention and special bonus pays and appraised senior leaders of the effectiveness of the programs in maintaining, retaining and providing a quality force in the medical fields.  From September 2020 to November 2022, I served as Deputy Director of the Discharge Appeal Review Board ("DARB"), which is an administrative board constituted by the Secretary of Defense and vested with the authority to conduct a final review of a request for an upgrade in the characterization of a discharge or dismissal.  In this role, I was responsible for managing the DARB's day-to-day

**App. 443**

operations. As a former Department of Defense official and a former Department of the Air Force official, I can attest that subjecting service members to administrative separation due to treatable medical conditions is a departure from standard practices and will result in immediate and severe career harm regardless of the outcome of the proceedings.

**PROFESSIONAL BACKGROUND**

2.      I attended Touro University and obtained a Bachelor of Science in Health Sciences in 2005 and a Master of Science in Health Sciences in 2007.

3.      From February 2007 to April 2021, I served as an officer in the U.S. Air Force in various positions, culminating in my service as Commander of the Aeromedical Evacuation Formal Training Unit.

4.      From May 2012 to October 2014, I served as Director, Reserve Medical Programs in the Office of the Secretary of Defense, Reserve Affairs developing and reviewing policy guidance pertaining to National Guard and Reserve medical personnel, force structure equipment and training to include analysis of medical defense planning guidance and POM instructions, analysis of service POME and budgets, analysis of manpower requirements, and development of proposals for Reserve Corps medical incentives for accession and retention programs.

5.      From October 2014 to September 2020, I served as Assistant Deputy, Health Policy in the Office of the Deputy Assistant Secretary of the Air Force, Reserve Affairs & Airman Readiness. In this role, I served as the principal advisor in all matters pertaining to the development and management of Air Force-wide and DoD-wide health policy. This included the development and oversight of total force strategic plans and policies pertaining to a full range of direct and indirect health care programs. I also served as the principal advisor to senior leaders in all matters pertaining to reorganizing and integration of programs for support and care of wounded

- 2 -

**App. 444**

Service members and their families.  I also oversaw the medical incentive programs to include retention and special bonus pays and appraised senior leaders of the effectiveness of the programs in maintaining, retaining and providing a quality force in the medical fields.

6.      From September 2020 to November 2022, I served as Deputy Director of the Discharge Appeal Review Board ("DARB"), which is an administrative board constituted by the Secretary of Defense and vested with the authority to conduct a final review of a request for an upgrade in the characterization of a discharge or dismissal.  In this role, I was responsible for managing the DARB's day-to-day operations.

### THE FEBRUARY 26, 2025 MEMORANDUM

7.      Under the February 26, 2025, memorandum, transgender service members who cannot secure a waiver will be directed for administrative separation.

8.      These administrative separation proceedings (or "Administrative Board") are governed by DoDI 1332.14 for enlisted personnel and DoDI 1332.30 for officers, along with Service-specific implementing policies.  A true and correct copy of DoDI 1332.14 is attached as **Exhibit A** and a true and correct copy of DoDI 1332.30 is attached as **Exhibit B**.

9.      The Administrative Board is ordered to follow Department of Defense (DoD) and Service branch instructions. While the outcome is not predetermined, it is rare for a board to disregard DoD policy directives in arriving at its recommendation.

10.    Once the Administrative Board makes a recommendation to the separation authority, the only options available are to follow the recommendation of the Administrative Board or to refer the case to the member's Service secretary. Only the Secretary of the relevant Service has authority to overturn the Administrative Board's decision.

11.    Administrative separation is typically based on misconduct or failure to meet standards. It is unusual for administrative separation to be used for medical conditions, particularly

**App. 445**

for a treatable medical condition where the service member was able to meet all military standards.

12.     To my knowledge, there is no precedent for using administrative separation to remove service members with a medical condition that was previously authorized for service, then prohibited, and then authorized again, as is the case with continued service for transgender service members with gender dysphoria or a history of gender dysphoria.

13.     In the typical circumstance, when a service member presents with a medical condition, they go through the Medical Evaluation Board (MEB) process at the wing level. From there, they would be referred to the Disability Evaluation System (DES), which allows the military to consider how a person's medical condition impacts their service and potential deployability.  A true and correct copy of DoDI 1332.18 is attached as **Exhibit C**.

14.     Being placed in administrative separation proceedings can cause immediate and severe career harm. Service members in administrative separation proceedings are designated as non-deployable and cannot be promoted.

15.     Moreover, because the entire premise of the February 26 memorandum is that having gender dysphoria is "incompatible with military service," I do not believe that any service member subjected to this process will be able to continue in service.

16.     Administrative separation is normally reserved for  misconduct or failure to meet standards.  This sends a message to service members that those with gender dysphoria are unable to standards.  The harm to a service member's ability to continue to serve from initiating this process alone, regardless of outcome, is harmful to a military career.

17.     Under generally applicable accessions criteria, all prospective military service members must undergo a rigorous examination to identify any preexisting physical or mental health diagnoses that would preclude accessions.

18.     Any individual with a history of suicidality is screened as part of this standard

- 4 -

**App. 446**

process. This screening applies to everyone who seeks to access, regardless of gender identity or transgender status.

19.     There is no rational basis to single out transgender people for categorical exclusion based on claims of elevated suicide risk. The military's existing screening procedures are designed to identify individuals who may pose a risk, regardless of demographic group.

20.     Anyone with a history of anxiety or depression—whether transgender or not—is barred from accessing unless they meet generally applicable criteria to demonstrate those conditions will not limit their ability to serve.

21.     The irrationality of excluding otherwise fit applicants based solely on demographic characteristics is why the military does not adopt a categorical approach to other demographic groups who have or may have disproportionate rates of depression, suicidality, anxiety, or other mental health conditions.

22.     The policy at issue irrationally excludes transgender people from universal deployment standards that already mandate the discharge of service members who are nondeployable for extended periods of time.

23.     Subjecting people with a current or past diagnosis of gender dysphoria, or with symptoms of gender dysphoria to administrative separation proceedings represents a significant departure from the current process for evaluating a person's fitness for continued service when they experience a health condition.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March __3__, 2025

Martha Soper

4

Case 1:25-cv-00240-ACR     Document 72-84     Filed 03/07/25     Page 1 of 64

# EXHIBIT A



# DoD Instruction 1332.14

## Enlisted Administrative Separations

---

**Originating Component:** Office of the Under Secretary of Defense for Personnel and Readiness

**Effective:** August 1, 2024

**Releasability:** Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/.

**Reissues and Cancels:** DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

**Incorporates:** Enlisted separation policy as outlined in Directive-type Memorandum 19-008, "Expedited Screening Protocol," July 31, 2019, as amended

**Approved by:** Ashish S. Vazirani, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness

---

**Purpose:**  In accordance with the authority in DoD Directive (DoDD) 5124.02, this issuance:

- Establishes policy, assigns responsibilities, and provides procedures governing administrative separation of enlisted Service members from the Military Services.

- Supersedes any conflicting guidance in Directive-type Memorandum (DTM) 19-008 regarding enlisted separation policy.

*DoDI 1332.14, August 1, 2024*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ......................................................... 6
  1.1. Applicability. ......................................................................................................... 6
  1.2. Policy. ..................................................................................................................... 6
SECTION 2: RESPONSIBILITIES ........................................................................................ 8
  2.1. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)) ...... 8
  2.2. Director, Department of Defense Human Resources Activity ................................. 8
  2.3. Secretaries of the Military Departments. ............................................................... 8
SECTION 3: REASONS FOR SEPARATION ..................................................................... 10
  3.1. Expiration of Service Obligation. ........................................................................ 10
    a. Basis. ................................................................................................................. 10
    b. Service Characterization or Separation Description. ........................................ 10
  3.2. Selected Changes in Service Obligations. ........................................................... 10
    a. Basis. ................................................................................................................. 10
    b. Service Characterization or Separation Description. ........................................ 11
  3.3. U.S. Government Convenience. ............................................................................ 11
    a. Basis. ................................................................................................................. 11
    b. Service Characterization or Separation Description. ........................................ 14
    c. Procedures. ........................................................................................................ 14
  3.4. Disability. ............................................................................................................. 15
    a. Basis. ................................................................................................................. 15
    b. Service Characterization or Separation Description. ........................................ 15
    c. Procedures. ........................................................................................................ 15
  3.5. Defective Enlistments and Inductions. ................................................................ 15
    a. Minority. ............................................................................................................ 15
    b. Erroneous Entry into the Military Services. ..................................................... 16
    c. Defective Enlistment Agreements .................................................................... 17
    d. Fraudulent Entry into the Military Services. .................................................... 18
    e. Separation from the Delayed Entry Program (DEP). ....................................... 19
  3.6. Entry-Level Performance and Conduct. ............................................................... 20
    a. Basis. ................................................................................................................. 20
    b. Counseling and Rehabilitation. ........................................................................ 21
    c. Service Characterization or Separation Description. ........................................ 21
    d. Procedures. ........................................................................................................ 21
  3.7. Unsatisfactory Performance. ................................................................................ 21
    a. Basis. ................................................................................................................. 21
    b. Counseling and Rehabilitation. ........................................................................ 21
    c. Service Characterization or Separation Description. ........................................ 22
    d. Procedures. ........................................................................................................ 22
  3.8. Drug Misuse Rehabilitation. ................................................................................ 22
    a. Basis. ................................................................................................................. 22
    b. Provision Clarification. ..................................................................................... 22
    c. Service Characterization or Separation Description. ........................................ 22
    d. Procedures. ........................................................................................................ 23

**App. 451**

*DoDI 1332.14, August 1, 2024*

3.9.  Alcohol Misuse Rehabilitation. ....................................................................... 23
    a.  Basis. ......................................................................................................... 23
    b.  Provision Clarification. .............................................................................. 23
    c.  Service Characterization or Separation Description. ................................. 23
    d.  Procedures. ................................................................................................. 23
3.10.  Misconduct. ................................................................................................... 24
    a.  Basis. ......................................................................................................... 24
    b.  Counseling and Rehabilitation. .................................................................. 25
    c.  Service Characterization or Separation Description. ................................. 25
    d.  Procedures. ................................................................................................. 25
3.11.  Separation in Lieu of Trial by Court-Martial ............................................... 25
    a.  Basis. ......................................................................................................... 25
    b.  Service Characterization or Separation Description. ................................. 26
    c.  Procedures. ................................................................................................. 26
3.12.  Security. ........................................................................................................ 27
    a.  Basis. ......................................................................................................... 27
    b.  Service Characterization or Separation Description. ................................. 27
    c.  Procedures. ................................................................................................. 27
3.13.  Unsatisfactory Participation in the Ready Reserve ....................................... 28
    a.  Basis. ......................................................................................................... 28
    b.  Service Characterization or Separation Description. ................................. 28
    c.  Procedures. ................................................................................................. 28
3.14.  Secretarial Plenary Authority ....................................................................... 28
    a.  Basis. ......................................................................................................... 28
    b.  Service Characterization or Separation Description. ................................. 28
    c.  Procedures. ................................................................................................. 28
3.15.  Reasons Established by the Military Departments. ....................................... 29
    a.  Basis. ......................................................................................................... 29
    b.  Counseling and Rehabilitation. .................................................................. 29
    c.  Service Characterization or Separation Description. ................................. 29
    d.  Procedures. ................................................................................................. 29
3.16.  Physical Fitness or Body Composition Standards. ....................................... 29
    a.  Basis. ......................................................................................................... 29
    b.  Counseling and Rehabilitation. .................................................................. 29
    c.  Service Characterization or Separation Description. ................................. 30
    d.  Procedures. ................................................................................................. 30
SECTION 4:  GUIDELINES ON CHARACTERIZATION AND SEPARATION ......................... 31
4.1.  Separation. ...................................................................................................... 31
    a.  Scope. ......................................................................................................... 31
    b.  Guidance. ................................................................................................... 31
    c.  Limitations on Separation Actions. ............................................................ 32
4.2.  Suspension of Separation. .............................................................................. 33
    a.  Suspension. ................................................................................................ 33
    b.  Action During the Period of Suspension. .................................................. 33
4.3.  Service Characterization or Separation Description. ...................................... 34

**App. 452**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 69 of 415
Case 1:25-cv-00240-ACR    Document 72-84    Filed 03/07/25    Page 5 of 64

*DoDI 1332.14, August 1, 2024*

a.  Types of Service Characterization or Separation Description. ................................... 34
b.  Characterization of Service. ......................................................................................... 34
c.  Uncharacterized Separation. ........................................................................................ 37

SECTION 5:  PROCEDURES FOR SEPARATION ...................................................................... 39
5.1.  Scope............................................................................................................................ 39
5.2.  Notification Procedures. .............................................................................................. 39
a.  Notice. .......................................................................................................................... 39
b.  Additional Notice Requirements.................................................................................. 40
c.  Response. ...................................................................................................................... 41
d.  Separation Authority.................................................................................................... 41
5.3.  Administrative Board Procedures. ............................................................................... 42
a.  Notice. .......................................................................................................................... 42
b.  Additional Notice Requirements.................................................................................. 43
c.  Response. ...................................................................................................................... 43
d.  Waiver. ......................................................................................................................... 44
e.  Hearing Procedures. ..................................................................................................... 44
f.  Separation Authority.................................................................................................... 48
5.4.  Additional Provisions Concerning Enlisted Service Members Confined by Civil
Authorities................................................................................................................. 49
5.5.  Additional Requirements for Certain Enlisted Service Members of Reserve
Components. .............................................................................................................. 50
a.  Enlisted Service members of Reserve Components not on Active Duty..................... 50
b.  Transfer to the IRR. ..................................................................................................... 51
c.  Notification of Administrative Board. ......................................................................... 51
d.  Service Expiration........................................................................................................ 51
e.  Notice to Member. ....................................................................................................... 51
5.6.  Additional Requirements for Enlisted Service Members Beyond Military Control by
Reason of Unauthorized Absence. ........................................................................... 52
a.  Determination of Applicability. .................................................................................. 52
b.  Notice. .......................................................................................................................... 52
c.  Separation Limitations for Reserve Component Enlisted Service Members.............. 52
5.7.  Additional Requirements for Administrative Separation Processing Timelines. ........... 53
5.8.  Additional Requirements for Informing Enlisted Service Members About Separation
Policy. ....................................................................................................................... 53
5.9.  Additional Requirements for Pre-Separation Health Assessments................................ 54
5.10.  Additional Counseling Required for a Discharge Under Other than Honorable
Conditions Resulting from a Continuous, Unauthorized Absence of 180 Days or More. 55
5.11.  Additional Requirements for Involuntary Administrative Separation of Enlisted
Service Members Who Made an Unrestricted Report of Sexual Assault. ................. 55
5.12.  Additional Requirement to Process for Administrative Separation of Enlisted Service
Members Convicted of Certain Sexual Offenses.................................................... 55
5.13.  Additional Requirement for Members Receiving an Other than Honorable
Characterization of Service. ..................................................................................... 56
SECTION 6:  PROCEDURES FOR EARLY RELEASE OF ENLISTED SERVICE MEMBERS FOR COLLEGE,
VOCATIONAL, OR TECHNICAL SCHOOL ENROLLMENT ................................................ 57

**App. 453**

*DoDI 1332.14, August 1, 2024*

6.1. Scope...................................................................................................................... 57

6.2. Procedures............................................................................................................. 57

    a. General.................................................................................................................. 57

    b. Criteria................................................................................................................. 58

GLOSSARY ........................................................................................................................ 59

G.1. Acronyms............................................................................................................. 59

G.2. Definitions............................................................................................................ 59

REFERENCES ..................................................................................................................... 62

FIGURES

Figure 1.  Unfavorable ESP Notice............................................................................... 20

**App. 454**

*DoDI 1332.14, August 1, 2024*

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this issuance as the "DoD Components").

## 1.2. POLICY.

a. The readiness of the Military Services is preserved by maintaining high standards of performance, conduct, and discipline. Separation promotes the readiness of the Military Services by providing an orderly means to:

(1) Evaluate the suitability of people to serve in the enlisted ranks of the Military Services based on their ability to meet required performance, conduct, and disciplinary standards.

(2) Maintain standards of performance, conduct, and discipline through characterization of service in a system that emphasizes the importance of honorable service.

(3) Achieve authorized force levels and grade distributions.

(4) Provide an orderly means of discharge for enlisted personnel.

b. Separations are used to strengthen the concept that military service is a unique calling, different from that of a civilian occupation. The acquisition of military status, whether through enlistment or induction, involves an individual's unconditional commitment to the United States, their Military Service, fellow citizens, and fellow Service members.

c. Organizing, training, and equipping newly enlisted Service members represent a considerable investment. Separation of enlisted Service members before completion of their obligated service periods results in a significant loss of investment and increased need for recruitment.

d. DoD provides enlisted Service members with the training, motivation, and professional leadership to enable them to meet required standards of performance, conduct, and discipline.

(1) Reasonable efforts should be made by the chain of command to:

(a) Identify enlisted Service members who seem to be candidates for early separation.

**App. 455**

*DoDI 1332.14, August 1, 2024*

(b)  Work to improve their chances for retention through counseling, retraining, and rehabilitation.

(2)  Enlisted Service members who do not demonstrate the commitment or potential for further service should be separated.

e.  Enlisted Service members may be discharged or released from active service before expiration of their obligated service to further their education at a college, university, or vocational or technical school when it is determined that discharge or release is appropriate.

**App. 456**

*DoDI 1332.14, August 1, 2024*

# SECTION 2: RESPONSIBILITIES

## 2.1. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS (ASD(M&RA)).

Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, the ASD(M&RA):

a. Develops, maintains, and oversees implementation of policy and guidance for enlisted administrative separations.

b. Adjudicates exceptions to policy requests for enlisted administrative separations.

c. Establishes appropriate separation reporting requirements.

## 2.2. DIRECTOR, DEPARTMENT OF DEFENSE HUMAN RESOURCES ACTIVITY.

Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, the Director, Department of Defense Human Resources Activity:

a. Provides data quality control, analysis, reporting, and inquiry capabilities on all Service member separation data in accordance with DoD Instruction (DoDI) 7730.68.

b. Acts as the official source of such related data for use throughout the DoD, by other government agencies, the Congress, and for appropriate public release by the Assistant to the Secretary of Defense for Public Affairs.

c. Distributes, as applicable and in accordance with DoDI 1336.01, personnel service and separation data to:

(1) Department of Veterans Affairs.

(2) Department of Labor.

(3) States' or territories' Departments of Veteran Affairs to ensure the adjudication of veteran's benefits.

## 2.3. SECRETARIES OF THE MILITARY DEPARTMENTS.

The Secretaries of the Military Departments:

a. Develop and maintain Service policies, standards, and procedures in accordance with this instruction to provide clear guidance and ensure uniform implementation of enlisted separation policy to the extent practicable for an administrative process based on command discretion.

b. Ensure that:

**App. 457**

*DoDI 1332.14, August 1, 2024*

(1)  Enlisted Service member separation policies, standards, and procedures are applied consistently.

(2)  Fact-finding inquiries are conducted properly.

(3)  Abuses of authority do not occur.

(4)  Failure to follow the provisions contained in this instruction results in appropriate corrective action.

c.  Establish processing time goals for the types of administrative separations authorized by this instruction.

d.  Prescribe appropriate internal procedures for periodically informing enlisted Service members about separation policies.  Ensure enlisted Service members are provided required information, as described in the procedures of this instruction, during the separation process.

e.  Provide separation data to the Director, Department of Defense Human Resources Activity, in accordance with DoDI 7730.68.

**App. 458**

*DoDI 1332.14, August 1, 2024*

# SECTION 3:  REASONS FOR SEPARATION

## 3.1.  EXPIRATION OF SERVICE OBLIGATION.

### a.  Basis.

An enlisted Service member may be separated upon expiration of enlistment or fulfillment of service obligation.  This includes separation authorized by the Secretary of the Military Department concerned when the enlisted Service member is:

(1)  Within 30 days of the date of expiration of term of service.

(2)  Serving outside the continental United States in a location other than their jurisdiction or domicile.

### b.  Service Characterization or Separation Description.

Honorable, unless the separation is under one of the following circumstances:

(1)  An entry-level separation is required in accordance with Paragraph 4.3.

(2)  Characterization of service as general (under honorable conditions) is warranted in accordance with Paragraph 4.3. based on numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

(3)  Another characterization is warranted upon discharge from the Individual Ready Reserve (IRR) in accordance with Paragraph 5.5.

## 3.2.  SELECTED CHANGES IN SERVICE OBLIGATIONS.

### a.  Basis.

An enlisted Service member may be separated for the following reasons:

(1)  General demobilization or reduction in authorized strength.

(2)  Early separation of personnel under a program established by the Secretary of the Military Department concerned.  A copy of the document authorizing such program is forwarded to the Office of the ASD(M&RA) at least 45 days before the desired date of announcement of an involuntary separation board or program.

(3)  Acceptance of an active-duty commission or appointment, or acceptance into a program leading to such commission or appointment in any branch of the Military Services.

(4)  Immediate enlistment or reenlistment.

(5)  Inter-Service transfer in accordance with DoDI 1300.04.

**App. 459**

*DoDI 1332.14, August 1, 2024*

**b.  Service Characterization or Separation Description.**

Honorable, unless the separation is under one of the following circumstances:

(1)  An entry-level separation is required in accordance with Paragraph 4.3.

(2)  Characterization of service as general (under honorable conditions) is warranted in accordance with Paragraph 4.3. based on numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

(3)  Another characterization is warranted upon discharge from the IRR in accordance with Paragraph 5.5.

### 3.3.  U.S. GOVERNMENT CONVENIENCE.

**a.  Basis.**

An enlisted Service member may be separated for convenience of the U.S. Government for these reasons:

(1)  Early Release to Further Education.

An enlisted Service member may be separated to attend a college, university, vocational school, or technical school under guidelines outlined in Section 6.

(2)  Early Release to Accept Public Office.

An enlisted Service member may be separated to accept public office only under circumstances authorized by the Military Department concerned and in accordance with DoDD 1344.10.

(3)  Dependency or Hardship.

Undue hardship does not necessarily exist solely because of altered present or expected income, family separation, or other inconveniences normally incident to military service.  Upon request of the enlisted Service member and concurrence of the separation authority, separation may be directed when genuine dependency or undue hardship exists in accordance with Paragraph 4.1. and under these circumstances:

(a)  The hardship or dependency is not temporary.

(b)  Conditions have arisen or have been aggravated to an excessive degree since entry into military service, and the enlisted Service member has made every reasonable effort to remedy the situation.

(c)  The administrative separation will eliminate or alleviate the condition.

(d)  There are no other means of alleviation reasonably available.

**App. 460**

*DoDI 1332.14, August 1, 2024*

(4)  Pregnancy or Childbirth.

An enlisted Service member may be separated upon request due to pregnancy or childbirth, unless retention is determined to be in the best interests of the Military Service in accordance with Paragraph 4.1. and guidance established by the Military Department concerned.

(5)  Parenthood.

An enlisted Service member may be separated by reason of parenthood in accordance with Paragraph 4.1. if it is determined that the enlisted Service member is unable to satisfactorily perform their duties or is unavailable for worldwide assignment or deployment because of parenthood.  Before involuntary separation under this provision, the notification procedure in Paragraph 5.2. will be used.  Separation processing may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns, as reflected in appropriate counseling or personnel records.

(6)  Conscientious Objection.

An enlisted Service member may be separated if authorized in accordance with DoDI 1300.06.

(7)  Surviving Family Member.

An enlisted Service member may be separated if authorized in accordance with DoDI 1315.15.

(8)  Conditions and Circumstances not Constituting a Physical or Mental Disability.

(a)  In accordance with DoDI 1332.18, the Secretary of the Military Department concerned may authorize separation based on congenital or developmental defects not compensable under the Department of Veterans Affairs Schedule for Rating Disabilities if defects, circumstances, or conditions interfere with assignment to, or performance of, duty.  Separation processing is not initiated until the enlisted Service member:

1.  Is formally counseled on the basis for proposed separation and given an opportunity to correct it.

2.  Is counseled in writing that the interfering condition does not qualify as a disability.

(b)  The Secretary of the Military Department concerned will not authorize involuntary administrative separation based on a determination that the enlisted Service member is unsuitable for deployment or worldwide assignment because of a medical condition if a physical evaluation board has determined the member to be fit for duty for the same medical condition, unless the administrative separation is approved by the Secretary of Defense.  If the Secretary of the Military Department concerned has reason to believe the medical condition considered by the physical evaluation board renders the enlisted Service member unsuitable for

**App. 461**

USCA Case #25-5087     Document #2108715        Filed: 04/01/2025     Page 78 of 415
Case 1:25-cv-00240-ACR     Document 72-84     Filed 03/07/25     Page 14 of 64

*DoDI 1332.14, August 1, 2024*

continued military service, the Secretary may direct the physical evaluation board to reevaluate the member.

<u>1</u>.  If, based on re-evaluation by a physical evaluation board, an enlisted Service member is determined to be unfit to perform the duties of their office, grade, rank, or rating, they may be retired or separated for physical disability consistent with Chapter 61 of Title 10, United States Code (U.S.C.).

<u>2</u>.  A "fit for duty" finding by a physical evaluation board does not automatically entitle an enlisted Service member to reenlist upon completion of their current period of required active service.  However, an enlisted Service member may not be denied reenlistment based on the same condition for which a physical evaluation board previously found them fit for duty.

(c)  Separation based on any mental health disorder not constituting a physical disability is not authorized unless:

<u>1</u>.  A diagnosis by an authorized mental health provider concludes that the enlisted Service member's disorder is so severe that their ability to function effectively in the military environment is significantly impaired.  The diagnosis must be conducted:

<u>a</u>.  By an authorized mental health provider as defined in DoDI 6490.04.

<u>b</u>.  Using the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

<u>c</u>.  In accordance with procedures established by the Military Department concerned.

<u>2</u>.  The enlisted Service member has been formally counseled in writing on the basis for proposed separation as reflected in appropriate counseling or personnel records and has been afforded an opportunity to resolve it.

<u>3</u>.  The enlisted Service member has been counseled in writing on the diagnosis of a personality disorder, or other mental disorder not constituting a physical disability.

<u>4</u>.  For enlisted Service members who have served or are currently serving in imminent danger pay areas, a diagnosis of a mental disorder not constituting a physical disability will:

<u>a</u>.  Be supported by a peer or higher-level mental health professional.

<u>b</u>.  Be endorsed by the Surgeon General of the Military Department concerned.

<u>c</u>.  Address post-traumatic stress disorder (PTSD) and other mental illness co-morbidity.  Unless found fit for duty by the disability evaluation system, a separation for a mental disorder not constituting a physical disability is not authorized if service-related PTSD is also diagnosed.

**App. 462**

*DoDI 1332.14, August 1, 2024*

　　　　5.  For enlisted Service members who have made an unrestricted report of sexual assault or who have self-disclosed that they are the victim of a sex-related offense, an intimate partner violence-related offense, or a spousal-abuse offense during service, a diagnosis of a mental health condition not constituting a physical disability will be supported by a peer or higher-level mental health professional and endorsed by the Surgeon General of the Military Department concerned.

　　　　(d)  Separation for a mental health disorder not constituting a physical disability is not appropriate, nor should it be pursued when separation is warranted based on unsatisfactory performance or misconduct.  In such circumstances, the enlisted Service member should not be separated under Paragraph 3.3.a.(8) regardless of the existence of a mental health disorder not constituting a disability.

　　　　(e)  Nothing in Paragraph 3.3.a.(8) precludes separation of an enlisted Service member who has a condition or circumstance not constituting a physical disability under any other basis described in Paragraph 3.3.a. or for any other reason authorized by this instruction.

　　　　(f)  Before initiating involuntary separation under the provisions in Paragraph 3.3.a.(8), the enlisted Service member will be notified following the procedures in Paragraph 5.2. Documentation must include evidence that the enlisted Service member is unable to function effectively because of a mental health disorder not constituting a physical disability.

　　　　(g)  The reasons designated by the Secretary of the Military Department concerned will be separately reported.

　　　　(9)  Additional Grounds.

　　The Secretary of the Military Department concerned may provide additional grounds for separation for the convenience of the U.S. Government.  A copy of the document authorizing such grounds will be forwarded to the ASD(M&RA) at least 45 days before the desired date of announcement of an involuntary separation board or program.

**b.  Service Characterization or Separation Description.**

Honorable, unless the separation is under one of the following circumstances:

　　(1)  An entry-level separation is required in accordance with Paragraph 4.3.

　　(2)  The characterization of service is general (under honorable conditions) as warranted in accordance with Paragraph 4.3.

**c.  Procedures.**

　　(1)  The narrative reason for the separation, discharge, or release of an enlisted Service member when the basis for the separation, discharge, or release is a mental health condition not constituting a physical disability must be "condition, not a disability."  The appropriate separation program designator code is used in accordance with DoDI 1336.01.

**App. 463**

USCA Case #25-5087   Document #2108715      Filed: 04/01/2025   Page 80 of 415
Case 1:25-cv-00240-ACR   Document 72-84   Filed 03/07/25   Page 16 of 64

*DoDI 1332.14, August 1, 2024*

(2)  Procedural requirements may be established by the Secretary of the Military Department concerned, subject to procedures established in Paragraph 4.3.  Before characterizing the service as general (under honorable conditions), the Military Service concerned will notify the enlisted Service member, following the procedures in Paragraph 5.2., of the specific factors in their service record that warrant such a characterization.  However, such notice and procedures are not required when the characterization of service as general (under honorable conditions) is based upon numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

## 3.4.  DISABILITY.

### a.  Basis.

An enlisted Service member may be separated or retired for disability under the provisions of Chapter 61 of Title 10, U.S.C.

### b.  Service Characterization or Separation Description.

Honorable, unless:

(1)  An entry-level separation is required in accordance with Paragraph 4.3.; or

(2)  Characterization of service as general (under honorable conditions) is warranted in accordance with Paragraph 4.3.

### c.  Procedures.

The Military Departments may establish procedural requirements for separation or retirement due to disabilities consistent with Chapter 61 of Title 10, U.S.C., and DoDI 1332.18.  If separation is recommended, these requirements apply before characterization of service as general (under honorable conditions):

(1)  The Military Department concerned will notify the enlisted Service member, following the procedures in Paragraph 5.2., of the specific factors in their service record that warrant such a characterization.

(2)  Such notice is not required when the characterization of service as general (under honorable conditions) is warranted based on numerical scores accumulated in a formal, Service-wide rating system that evaluates conduct and performance on a regular basis.

## 3.5.  DEFECTIVE ENLISTMENTS AND INDUCTIONS.

### a.  Minority.

#### (1)  Basis.

**App. 464**

*DoDI 1332.14, August 1, 2024*

An enlisted Service member will be separated based on being a minor at the time of enlistment, induction, or extension of enlistment under the guidance in Paragraph 4.1. and this section.

(a)  Under Age 17.

If an enlisted Service member is under the age of 17, their enlistment is void, and the Service member will be separated.

(b)  Age 17.

An enlisted Service member will be separated in accordance with Section 1170 of Title 10, U.S.C., except when the enlisted Service member is retained for the purpose of trial by court-martial, in these circumstances:

1.  There is evidence satisfactory to the Secretary of the Military Department concerned that the enlisted Service member is under 18 years of age.

2.  The enlisted Service member enlisted without the written consent of their parent or guardian.

3.  An application for the enlisted Service member's separation is submitted to the Secretary of the Military Department concerned by the parent or guardian within 90 days of the Service member's enlistment.

(2)  Service Characterization or Separation Description.

An enlisted Service member separated in accordance with Paragraph 3.5.a.(1)(a) will receive an order of release from the custody and control of the Military Service by reason of void enlistment or induction.  The separation of an enlisted Service member in accordance with Paragraph 3.5.a.(1)(b) will be described as an entry-level separation.

(3)  Procedures.

The notification procedures in Paragraph 5.2. will be used.

**b.  Erroneous Entry into the Military Services.**

(1)  Basis.

An enlisted Service member may be separated based on an erroneous enlistment, induction, or extension of enlistment following the guidance in Paragraph 4.1.  An enlistment, induction, or extension of enlistment is erroneous if:

(a)  It would not have occurred if relevant facts were known by the U.S. Government or if appropriate directives were followed.

(b)  It was not the result of fraudulent conduct on the part of the enlisted Service member as described in Paragraph 3.5.d.

**App. 465**

*DoDI 1332.14, August 1, 2024*

(c)  The error is unchanged in material respects.

(2)  Service Characterization or Separation Description.

Honorable, unless an entry-level separation or an order of release from the custody and control of the Military Service is required (by reason of void enlistment or induction) as described in Paragraph 4.3.

(3)  Procedures.

(a)  If the command recommends that the individual continue military service, the initiation of separation processing is not required in these circumstances:

<u>1</u>.  The defect is no longer present; or

<u>2</u>.  A waiver is obtained from the appropriate authority.

(b)  If separation processing is initiated, the notification procedures in Paragraph 5.2. will be used.

**c.  Defective Enlistment Agreements.**

(1)  Basis.

A defective enlistment agreement exists in these circumstances:

(a)  As a result of a material misrepresentation by recruiting personnel, upon which the enlisted Service member reasonably relied.  For example, the Service member was induced to enlist with a commitment for which the enlisted Service member was not qualified;

(b)  The enlisted Service member received a written enlistment commitment from recruiting personnel for which the enlisted Service member was qualified, but which cannot be fulfilled by the Military Service; or

(c)  The enlistment was involuntary, in accordance with Section 802 of Title 10, U.S.C.

(2)  Service Characterization or Separation Description.

Honorable, unless an entry-level separation or an order of release from the custody and control of the Military Service (by reason of void enlistment) is required in accordance with Paragraph 4.3.

(3)  Procedures.

This provision does not bar appropriate disciplinary action or other administrative separation proceedings regardless of when the defect is raised.  Separation is appropriate under this provision only in these circumstances:

**App. 466**

*DoDI 1332.14, August 1, 2024*

(a)  The enlisted Service member did not knowingly participate in creation of the defective enlistment.

(b)  The enlisted Service member brings the defect to the attention of appropriate authorities within 30 days after the defect is discovered or reasonably should have been discovered by the enlisted Service member.

(c)  The enlisted Service member requests separation instead of other authorized corrective action.

(d)  The request otherwise meets such criteria as may be established by the Secretary of the Military Department concerned.

**d.  Fraudulent Entry into the Military Services.**

(1)  Basis.

An enlisted Service member may be separated in accordance with Paragraph 4.1. based on procurement of a fraudulent enlistment, induction, or period of military service through any deliberate material misrepresentation, omission, or concealment that, if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

(2)  Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with Paragraph 4.3.  If the fraud involves concealment of a previous separation in which service was not characterized as honorable, characterization normally will be under other than honorable conditions.

(3)  Procedures.

The notification procedures in Paragraph 5.2. will be used except as follows:

(a)  Characterization of service under other than honorable conditions may not be issued unless the administrative board procedure in Paragraph 5.3. is used.

(b)  When the sole reason for separation is fraudulent entry, suspension of separation as described in Paragraph 4.2. is not authorized.  When there are approved reasons for separation in addition to fraudulent entry, suspension of separation is authorized only in these circumstances:

1.  A waiver of the fraudulent entry is approved.

2.  The suspension pertains to reasons for separation other than the fraudulent entry.

(c)  If the command recommends that the enlisted Service member be retained in military service, the initiation of separation processing is unnecessary in these circumstances:

**App. 467**

*DoDI 1332.14, August 1, 2024*

1.  The defect is no longer present; or

2.  A waiver is obtained from appropriate authority.

**e.  Separation from the Delayed Entry Program (DEP).**

(1)  Basis.

(a)  An individual who is in the DEP may be separated because of:

1.  Ineligibility for enlistment in accordance with DoDI 1304.26;

2.  Additional standards prescribed by the Secretary of the Military Department concerned; or

3.  Upon the enlisted Service member's request when authorized by the Secretary of the Military Department concerned.

(b)  Separations include individuals in DEP who have been determined to no longer meet eligibility requirements for enlistment or induction based upon unfavorable expedited screening protocol (ESP) results in accordance with DTM-19-008.

(2)  Service Characterization or Separation Description.

This is an entry-level separation.

(3)  Procedures.

(a)  Notice of Separation.

1.  The person will be notified of the proposed separation and the reasons for it.  If the reasons include classified information, unclassified summaries may be used; however, any summaries derived from classified information will be consistent with U.S. national security interests and other applicable law.  The individual will be notified in writing of:

a.  The basis of the proposed separation, including the circumstances upon which the separation is based, reference to this instruction, and any applicable provisions of the appropriate Military Department's implementing regulation.  If the basis includes classified information, unclassified summaries may be used.  However, any summaries derived from classified information will be consistent with U.S. national security interests and other applicable law.

b.  Whether the proposed separation could result in discharge, release from active duty to a Reserve Component, transfer from the Selected Reserve to the IRR, release from Service custody or control, or other form of separation.  When determining the results of the proposed separation, the least favorable characterization of service or description of separation is authorized.

**App. 468**

*DoDI 1332.14, August 1, 2024*

        <u>c</u>.  The right to obtain copies of documents that will be forwarded to the separation authority supporting the basis of the proposed separation.

        2.  Individuals facing administrative separation from military service based on unfavorable ESP results will receive the notice in writing consistent with Paragraph 3.5.e.(3)(a)<u>1</u>. The notice will include the language in Figure 1.

<strong style="color:blue">Figure 1.  Unfavorable ESP Notice.</strong>

> A review of information indicates that you present an unacceptable risk to good order and discipline within the Armed Forces and that it is not in the best interests of the Military Department for you to continue to serve.  Accordingly, you are being notified that, 30 days from your receipt of this memorandum, we intend to act to administratively separate you from the Armed Forces.

        3.  The notice will be delivered personally or sent by registered or certified mail, return receipt requested, or by an equivalent form of formal notice under regulations prescribed by the Secretary of the Military Department concerned.  An individual's contact, acknowledgement, or failure to acknowledge receipt will be formally documented in their military record as prescribed in regulation by the Secretary of the Military Department concerned.

      (b)  Rebuttal Statement.

        The person will be given an opportunity to submit to the separation authority a rebuttal statement by a specified date that is not less than 30 days from the date of delivery.

## 3.6.  ENTRY-LEVEL PERFORMANCE AND CONDUCT.

### a.  Basis.

    (1)  An enlisted Service member may be separated while in entry-level status (defined in the Glossary), including the DEP, when it is determined that the member:

      (a)  No longer meets the requirements for eligibility for enlistment or induction as specified in DoDI 1304.26; or

      (b)  Is unqualified for further military service by reason of unsatisfactory performance, conduct, or both.

    (2)  Evidence of an enlisted Service member being unqualified may include lack of capability, lack of reasonable effort, failure to adapt to the military environment, or minor disciplinary infractions.

<strong>App. 469</strong>

USCA Case #25-5087     Document #2108715     Filed: 04/01/2025     Page 86 of 415
Case 1:25-cv-00240-ACR     Document 72-84     Filed 03/07/25     Page 22 of 64

*DoDI 1332.14, August 1, 2024*

(3)  When separation is warranted in accordance with Paragraphs 3.6.a.(1)(a) and 3.6.a.(1)(b), the enlisted Service member should be processed for entry-level separation. However, entry-level status does not preclude separation for any other reason authorized by this issuance when such separation is warranted by the circumstances of the case.

(4)  An entry-level separation will not be considered a separation for cause.

**b.  Counseling and Rehabilitation.**

Except in separations based on applicants not meeting eligibility requirements for enlistment or induction, separation processing may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation as reflected in appropriate counseling or personnel records.  An enlisted Service member in entry-level status should not be separated for unsatisfactory performance, minor disciplinary infractions, or both when this is the sole reason, unless appropriate efforts at rehabilitation have been made under standards prescribed by the Secretary of the Military Department concerned.

**c.  Service Characterization or Separation Description.**

This is an entry-level separation.

**d.  Procedures**.

The notification procedures in Paragraph 5.2. will be used.

**3.7.  UNSATISFACTORY PERFORMANCE.**

**a.  Basis.**

An enlisted Service member may be separated when it is determined in accordance with Paragraph 4.1. that the member is unqualified for further military service by reason of unsatisfactory performance.  This reason will not be used if the enlisted Service member is in entry-level status.

**b.  Counseling and Rehabilitation.**

Counseling and rehabilitation requirements are of particular importance to this reason for separation.  Separation processing may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records.  An enlisted Service member should not be separated when unsatisfactory performance is the sole reason unless appropriate efforts at rehabilitation have been made in accordance with standards prescribed by the Secretary of the Military Department concerned.

**App. 470**

*DoDI 1332.14, August 1, 2024*

### c. Service Characterization or Separation Description.

The service will be characterized as honorable or general (under honorable conditions) in accordance with Paragraph 4.3.

### d. Procedures.

The notification procedures in Paragraph 5.2. will be used.

## 3.8. DRUG MISUSE REHABILITATION.

### a. Basis.

An enlisted Service member who has been referred to a rehabilitation program for personal drug misuse may be separated for:

(1) Refusal to participate in recommended drug misuse treatment; or

(2) Once enrolled in treatment, they:

(a) Do not demonstrate the potential for continued military service; or

(b) Are transferred to a civilian medical facility because long-term rehabilitation is determined to be necessary.

### b. Provision Clarification.

(1) Nothing in this provision precludes separation of an enlisted Service member who has been referred to such a program under any other provision of this instruction.

(2) Separation due to drug misuse rehabilitation failures will be reported separately from that of alcohol misuse rehabilitation failures as described in Paragraph 3.9. If separation is based on both, the primary basis will be used for reporting requirements.

(3) An enlisted Service member's voluntary submission to a DoD treatment and rehabilitation program and voluntarily disclosed evidence of previous personal drug use by the Service member as part of a course of treatment in such a program may not be used against them on the issue of characterization as specified in accordance with Paragraph 4.3.b.(3)(f).

### c. Service Characterization or Separation Description.

When an enlisted Service member is separated under the provisions of Paragraph 3.8., characterization of service as honorable or general (under honorable conditions) is authorized except when an entry-level separation is required in accordance with Paragraph 4.3.

(1) The relationship between voluntary submission for treatment and the evidence that may be considered on the issue of characterization is described in Paragraph 4.3.b.(3)(f).

**App. 471**

*DoDI 1332.14, August 1, 2024*

(2)  The relationship between mandatory urinalysis and the evidence that may be considered on the issue of characterization is described in Paragraph 4.3.b.(3)(g).

**d.  Procedures.**

The notification procedures in Paragraph 5.2. will be used.

## 3.9.  ALCOHOL MISUSE REHABILITATION.

**a.  Basis.**

An enlisted Service member who has been referred to a rehabilitation program for alcohol misuse may be separated for:

(1)  Refusal to participate in recommended alcohol misuse treatment; or

(2)  Once enrolled in treatment, they:

(a)  Do not demonstrate the potential for continued military service; or

(b)  Are transferred to a civilian medical facility because long-term rehabilitation is determined to be necessary.

**b.  Provision Clarification.**

(1)  Nothing in this provision precludes separation of an enlisted Service member who has been referred to such a program under any other provision of this instruction.

(2)  Separation due to alcohol misuse will be reported separately from that of drug misuse rehabilitation failures as described in Paragraph 3.8.  If separation is based on both, the primary basis will be used for reporting purposes.

**c.  Service Characterization or Separation Description.**

When an enlisted Service member is separated under this provision, characterization of service as honorable or general (under honorable conditions) is authorized except when an entry-level separation is required in accordance with Paragraph 4.3.

**d.  Procedures.**

The notification procedures in Paragraph 5.2. will be used.

**App. 472**

*DoDI 1332.14, August 1, 2024*

### 3.10. MISCONDUCT.

#### a. Basis.

An enlisted Service member may be separated for misconduct when it is determined in accordance with Paragraph 4.1. that the enlisted Service member is unqualified for further military service by reason of one or more of the following circumstances:

(1) Minor Disciplinary Infractions.

A pattern of misconduct consisting solely of minor disciplinary infractions. If separation of an enlisted Service member in entry-level status is warranted solely by reason of minor disciplinary infractions, the action should be processed under entry-level performance and conduct in accordance with Paragraph 3.6.

(2) A Pattern of Misconduct.

A pattern of misconduct consisting of:

(a) Discreditable involvement with civil or military authorities; or

(b) Conduct prejudicial to good order and discipline.

(3) Commission of a Serious Offense.

Commission of a serious military or civilian offense if a punitive discharge would be authorized for the same or a closely related offense in accordance with the Manual for Courts-Martial.

(4) Civilian Conviction.

(a) Conviction by civilian authorities or action taken that is equivalent to a finding of guilty, including similar adjudications in juvenile proceedings, and if these conditions apply:

1. A punitive discharge would be authorized for the same or a closely related offense in accordance with the Manual for Courts-Martial; or

2. The sentence by civilian authorities includes confinement for 6 months or more without regard to suspension or probation.

(b) Separation processing may be initiated whether an enlisted Service member has filed an appeal of a civilian conviction or has stated an intention to do so. Execution of an approved separation should be withheld pending outcome of the appeal or until the time for appeal has passed, but the enlisted Service member may be separated before final action on the appeal upon the member's request or upon direction of the Secretary of the Military Department concerned.

**App. 473**

*DoDI 1332.14, August 1, 2024*

**b. Counseling and Rehabilitation.**

Separation processing for minor disciplinary infractions or a pattern of misconduct in accordance with Paragraphs 3.10.a.(2)(a) and 3.10.a.(2)(b) may not be initiated until the enlisted Service member has been formally counseled concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records. If the sole basis of separation is commission of a serious offense as described in Paragraph 3.10.a.(3) or a civilian conviction as described in Paragraph 3.10.a.(4)(a), the counseling and rehabilitation requirements are not applicable.

**c. Service Characterization or Separation Description.**

(1)  Characterization of service will normally be under other than honorable conditions, but characterization as general (under honorable conditions) may be warranted in accordance with Paragraph 4.3. For respondents who have completed entry-level status, characterization of service as honorable is not authorized unless the respondent's record is otherwise so meritorious that any other characterization clearly would be inappropriate. In such cases, separations for misconduct with an honorable characterization will be approved by a commander exercising general court-martial jurisdiction or higher authority as specified by the Secretary of the Military Department concerned.

(2)  As an exception, the Secretary of the Military Department concerned may authorize general court-martial convening authorities to delegate authority to special court-martial convening authorities to approve separations with service characterized as honorable. This delegation may be done when the sole evidence of misconduct is command-directed urinalysis results that cannot be used for characterization of service, or when an administrative discharge board has recommended separation with an honorable discharge.

(3)  When characterization of service under other than honorable conditions is not warranted for an enlisted Service member in entry-level status in accordance with Paragraph 4.3., the separation will be described as an entry-level separation.

**d. Procedures.**

The administrative board procedure in Paragraph 5.3. will be used. However, use of the notification procedures in Paragraph 5.2. is authorized if characterization of service under other than honorable conditions is not warranted in accordance with Paragraph 4.3.

**3.11.  SEPARATION IN LIEU OF TRIAL BY COURT-MARTIAL.**

**a. Basis.**

Upon request by the enlisted Service member, they may be separated in lieu of trial by court-martial if charges have been preferred with respect to an offense for which a punitive discharge is authorized, and it is determined that the enlisted Service member is unqualified for further military service in accordance with Paragraph 4.1. This provision may not be used when Rule

**App. 474**

*DoDI 1332.14, August 1, 2024*

1003(d) of the Manual for Courts-Martial provides the sole basis for a punitive discharge unless the charges have been referred to a court-martial empowered to adjudge a punitive discharge.

**b. Service Characterization or Separation Description.**

Characterization of service normally will be under other than honorable conditions, but characterization as general (under honorable conditions) may be warranted in accordance with Paragraph 4.3.

(1)  For respondents who have completed entry-level status, characterization of service as honorable is not authorized unless the respondent's record is otherwise so meritorious that any other characterization clearly would be inappropriate.

(2)  When characterization of service under other than honorable conditions is not warranted for an enlisted Service member in entry-level status in accordance with Paragraph 4.3., the separation will be described as an entry-level separation.

**c. Procedures.**

(1)  The request for discharge must be submitted in writing and signed by the enlisted Service member.

(2)  The enlisted Service member will be afforded an opportunity to consult with counsel qualified pursuant to Section 827(b) of Title 10, U.S.C.  If the enlisted Service member refuses to consult with legal counsel, counsel will prepare a statement to this effect, which will be attached to the file to document that the enlisted Service member has waived the right to consult with counsel.

(3)  Except when the enlisted Service member has waived the right to counsel, the request will be signed by counsel.

(4)  In the written request, the enlisted Service member will state that they understand:

(a)  The elements of the offense or offenses charged.

(b)  That characterization of service under other than honorable conditions is authorized.

(c)  The adverse nature of such a characterization and its possible consequences.

(5)  The Secretary of the Military Department concerned will also require that the request include:

(a)  An acknowledgment of guilt of one or more of the offenses or any lesser included offenses for which a punitive discharge is authorized; or

**App. 475**

*DoDI 1332.14, August 1, 2024*

    (b)  A summary of the evidence or list of documents (or copies of these) provided to the enlisted Service member pertaining to the offenses for which a punitive discharge is authorized.

    (6)  The separation authority will be a commander exercising general court-martial jurisdiction or higher authority as specified by the Secretary of the Military Department concerned.  As an exception, the Secretary may authorize general court-martial convening authorities to delegate authority to the special court-martial convening authorities to approve requests for discharge in the case of enlisted Service members who:

    (a)  Have been absent without leave for more than 30 days.

    (b)  Have been dropped from the rolls of their units as absent in desertion.

    (c)  Have been returned to military control.

    (d)  Are assigned to a regional personnel control or separation processing facility.

    (e)  Are charged only with being absent without leave for more than 30 days.

    (7)  Statements by the enlisted Service member or their counsel submitted in connection with a request under Paragraph 3.11.c. are not admissible against the enlisted Service member in a court-martial except as authorized under Military Rule of Evidence 410 of the Manual for Courts-Martial.

### 3.12.  SECURITY.

#### a.  Basis.

When retention is clearly inconsistent with the interest of national security, an enlisted Service member may be separated by reason of security and under conditions and procedures prescribed in DoDI 5200.02.

#### b.  Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with Paragraph 4.3.

#### c.  Procedures.

The procedures established by the Military Departments will be consistent with the procedures contained in this instruction as practical.

**App. 476**

USCA Case #25-5087     Document #2108715          Filed: 04/01/2025     Page 93 of 415
Case 1:25-cv-00240-ACR     Document 72-84     Filed 03/07/25     Page 29 of 64

*DoDI 1332.14, August 1, 2024*

### 3.13. UNSATISFACTORY PARTICIPATION IN THE READY RESERVE.

#### a. Basis.

An enlisted Service member may be separated for unsatisfactory participation in the Ready Reserve under criteria established by the Secretary of the Military Department concerned in accordance with DoDI 1215.13.

#### b. Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with DoDI 1215.13 and Paragraph 4.3. of this instruction.

#### c. Procedures.

The administrative board procedures in Paragraph 5.3. will be used. However, the notification procedures in Paragraph 5.2. may be used if characterization of service under other than honorable conditions is not warranted in accordance with Paragraph 4.3.

### 3.14. SECRETARIAL PLENARY AUTHORITY.

#### a. Basis.

(1) Notwithstanding any limitation on separations provided in this instruction, the Secretary of the Military Department concerned may direct the separation of any enlisted Service member before expiration of term of service after determining it to be in the best interest of the Military Service.

(2) The Military Departments will use Secretarial plenary authority for enlisted Service members who:

(a) Are not in the DEP or Delayed Training Program or are otherwise not in entry-level status.

(b) Have been determined to no longer meet eligibility requirements for enlistment or induction based on unfavorable ESP results.

#### b. Service Characterization or Separation Description.

Characterization of service or description of separation is honorable or general (under honorable conditions), as warranted, in accordance with Paragraph 4.3. unless an entry-level separation is required in accordance with Paragraph 4.3.

#### c. Procedures.

The notification procedures in Paragraph 5.2. will be used, except for Paragraph 5.2.a.(8) regarding the procedure for requesting an administrative board, which is not applicable.

**App. 477**

*DoDI 1332.14, August 1, 2024*

### 3.15.  REASONS ESTABLISHED BY THE MILITARY DEPARTMENTS.

#### a.  Basis.

The Military Departments may establish additional reasons for separation for circumstances not otherwise provided for in this instruction to meet their specific requirements, subject to ASD(M&RA) approval.

#### b.  Counseling and Rehabilitation.

Separation processing may not be initiated until the enlisted Service member has been counseled formally concerning the basis for proposed separation and has been afforded an opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records.  An exception to these requirements may be granted when the Military Department concerned provides in its implementing document that counseling and rehabilitation requirements are not applicable for the specific reason for separation.

#### c.  Service Characterization or Separation Description.

Characterization of service or description of separation will be in accordance with Paragraph 4.3.

#### d.  Procedures.

The procedures established by the Military Departments will be consistent with the procedures contained in this instruction as practical.

### 3.16.  PHYSICAL FITNESS OR BODY COMPOSITION STANDARDS.

#### a.  Basis.

An enlisted Service member may be separated for not meeting physical fitness or body composition standards established in DoDI 1308.03 when it is determined that the enlisted Service member is unqualified for further military service and meets the following conditions:

   (1)  The enlisted Service member is not medically diagnosed with a medical condition that precludes or interferes with achieving DoD physical fitness or body composition standards. Enlisted Service members with a medically diagnosed condition that precludes or interferes with meeting these standards may be separated either through medical channels, if appropriate, or in accordance with Paragraph 3.4.

   (2)  The sole reason for separation is the enlisted Service member's inability to meet DoD physical fitness or body composition standards.

#### b.  Counseling and Rehabilitation.

Separation processing may not be initiated until the enlisted Service member has been counseled formally concerning the basis for proposed separation and has been afforded an

**App. 478**

*DoDI 1332.14, August 1, 2024*

opportunity to relieve Service concerns as reflected in appropriate counseling or personnel records.

### c. Service Characterization or Separation Description.

Characterization of service or description of separation is honorable, unless:

(1)  Characterization of service as general under honorable conditions is warranted in accordance with Paragraph 4.3. based on numerical scores accumulated in a formal, Service-wide rating system that evaluated conduct and performance on a regular basis; or

(2)  An entry-level separation is required in accordance with Paragraph 4.3.

### d. Procedures.

The notification procedures in Paragraph 5.2. will be used.

**App. 479**

*DoDI 1332.14, August 1, 2024*

# SECTION 4: GUIDELINES ON CHARACTERIZATION AND SEPARATION

## 4.1. SEPARATION.

### a. Scope.

This general guidance applies when referenced in Section 3. Further guidance is provided under the specific reasons for separation in Section 3.

### b. Guidance.

(1) A substantial investment is made in the training of individuals enlisted or inducted into the Military Services. Thus, reasonable efforts at rehabilitation should be made before initiating separation proceedings for enlisted Service members who do not conform to required standards.

(2) Unless separation is mandatory, the potential for rehabilitation and further useful military service will be considered by the separation authority and, where applicable, the administrative board. If separation is warranted despite the potential for rehabilitation, consideration should be given to suspension of the separation, if authorized.

(3) Counseling and rehabilitation efforts are a prerequisite to initiation of separation proceedings only in so far as expressly described under specific requirements for separation in Section 3. An alleged or established inadequacy in previous rehabilitative efforts does not provide a legal bar to separation.

(4) The following factors may be considered on the issue of retention or separation, depending on the circumstances of the case:

(a) The seriousness of the circumstances forming the basis for initiation of separation proceedings and the effect of the enlisted Service member's continued retention on military discipline, good order, and morale.

(b) The likelihood of continuation or recurrence of the circumstances forming the basis for initiation of separation proceedings.

(c) The likelihood that the enlisted Service member will be a disruptive or undesirable influence in present or future duty assignments.

(d) The ability of the enlisted Service member to perform duties effectively in the present and in the future, including potential for advancement or leadership.

(e) The enlisted Service member's rehabilitative potential.

(f) The enlisted Service member's entire military record.

1. This may include:

**App. 480**

*DoDI 1332.14, August 1, 2024*

      <u>a</u>.  Past contributions to the Military Service, assignments, awards and decorations, evaluation ratings, and letters of commendation.

      <u>b</u>.  Letters of reprimand or admonition, counseling records, records of nonjudicial punishment, records of conviction by court-martial, and records of involvement with civilian authorities.

      <u>c</u>.  Any other matter deemed relevant by the board or separation authority, based on the specialized training, duties, and experience of persons entrusted by this instruction with recommendations and decisions on the issue of separation or retention.

      2.  This guidance applies to consideration of matters described in Paragraph 4.1.b.(4)(f)<u>1</u>.:

      <u>a</u>.  Adverse matters from a previous enlistment or period of military service, such as records of nonjudicial punishment and conviction by courts-martial, may be considered only when such records would have a direct and strong probative value in determining whether separation is appropriate.  The use of such records will ordinarily be limited to those cases involving patterns of conduct manifested over an extended period.

      <u>b</u>.  Isolated incidents and events that are remote in time normally have little probative value.

    **c.  Limitations on Separation Actions.**

  An enlisted Service member may not be separated based on any one of the following types of conduct:

   (1)  Conduct that has been the subject of judicial proceedings resulting in acquittal or action having the same effect except when:

    (a)  Such action is based on a judicial determination not going to the guilt or innocence of the respondent.

    (b)  The judicial proceeding was conducted in a State or foreign court and the separation is approved by the Secretary of the Military Department concerned.

    (c)  The acquittal from the judicial proceedings was based on a finding of not guilty only by reason of lack of mental responsibility.  Enlisted Service members in this category normally will be separated under Secretarial plenary authority in accordance with Paragraph 3.14. unless separation for disability in accordance with Paragraph 3.4. is appropriate.

   (2)  Conduct that has been the subject of a previous administrative board action in which the board entered an approved finding that the evidence did not sustain the factual allegations concerning the conduct, except when the conduct is the subject of a rehearing ordered based on fraud or collusion.

**App. 481**

*DoDI 1332.14, August 1, 2024*

(3)  Conduct that has been the subject of an administrative separation proceeding resulting in a final determination by a separation authority that the enlisted Service member should be retained, except:

(a)  When there is subsequent conduct or performance forming the basis, in whole or in part, for a new proceeding;

(b)  When there is new or newly discovered evidence that was not reasonably available at the time of the previous proceeding; or

(c)  When the conduct is the subject of a rehearing ordered based on fraud or collusion.

## 4.2.  SUSPENSION OF SEPARATION.

### a.  Suspension.

(1)  Unless prohibited by this instruction, a separation may be suspended for a specified period of not more than 12 months by the separation authority or higher authority if the circumstances of the case indicate a reasonable likelihood of rehabilitation.

(2)  During the period of suspension, the enlisted Service member will be afforded an opportunity to meet appropriate conduct, disciplinary, and performance standards.

(3)  Unless sooner cancelled or completed, the approved separation will be closed upon:

(a)  Completion of the probationary period;

(b)  Termination of the enlisted Service member's enlistment or period of obligated service; or

(c)  Decision of the separation authority that the goal of rehabilitation has been achieved.

### b.  Action During the Period of Suspension.

(1)  During the period of suspension, if there are further grounds for separation under Section 3, one or more of these actions may be taken:

(a)  Disciplinary action;

(b)  New administrative action; or

(c)  Cancellation of the suspension accompanied by execution of the separation if the enlisted Service member:

1.  Engages in conduct similar to that for which separation was approved, but suspended; or

**App. 482**

USCA Case #25-5087     Document #2108715     Filed: 04/01/2025     Page 99 of 415
Case 1:25-cv-00240-ACR     Document 72-84     Filed 03/07/25     Page 35 of 64

*DoDI 1332.14, August 1, 2024*

2.  Otherwise fails to meet appropriate standards of conduct and duty performance.

(2)  Before cancellation of a suspension, the enlisted Service member will be notified in writing of the basis for the action and will be afforded the opportunity to consult with counsel, as provided in Paragraph 5.2.a.(6), and to submit a statement in writing to the separation authority.

(a)  The respondent will be provided a reasonable period, not less than 2 working days, to act on the notice.

(b)  If the respondent identifies specific legal issues for consideration by the separation authority, the matter will be reviewed by a judge advocate or civilian lawyer employed by the U.S. Government before final action by the separation authority.

## 4.3.  SERVICE CHARACTERIZATION OR SEPARATION DESCRIPTION.

### a.  Types of Service Characterization or Separation Description.

(1)  At separation, these types of service characterization or separation description are authorized under this instruction:

(a)  Separation with service characterization as honorable, general (under honorable conditions), or under other than honorable conditions.

(b)  Entry-level separation.

(c)  Order of release from Service custody and control by reason of void enlistment or induction.

(d)  Separation by being dropped from the Service rolls.

(2)  Any of these types of separation may be used in appropriate circumstances unless a limitation is described in this section or in Section 3, which explains reasons for separation.

### b.  Characterization of Service.

#### (1)  General Considerations.

(a)  Characterization at separation will be based upon the quality of the enlisted Service member's service, including the reason for separation and guidance in Paragraph 4.3.b.(2), subject to the limitations under various reasons for separation described in Section 3. The quality of service will be determined in accordance with standards of acceptable personal conduct and performance of duty for Service members.  These standards are found in the Manual for Courts-Martial directives and regulations issued by the DoD and the Military Departments, and the time-honored customs and traditions of military service.

(b)  The quality of service of an enlisted Service member on active duty or active duty for training is adversely affected by conduct that is of a nature to bring discredit on the Military

**App. 483**

*DoDI 1332.14, August 1, 2024*

Services or is prejudicial to good order and discipline, regardless of whether jurisdiction under Chapter 47 of Title 10, U.S.C., (also known and referred to in this instruction as the "Uniform Code of Military Justice (UCMJ)") is exercised.  Characterization may be based on conduct in the civilian community, and the burden is on the respondent to demonstrate that such conduct did not adversely affect the respondent's service.

(c)  The reasons for separation, including the specific circumstances that form the basis for the separation, will be considered on the issue of characterization.  In general, characterization will be based on a pattern of behavior rather than an isolated incident.  However, there are circumstances in which the conduct or performance of duty reflected by a single incident provides the basis for characterization.

(d)  Due consideration will be given to the enlisted Service member's age, length of service, grade, aptitude, physical and mental condition, and the standards of acceptable conduct and performance of duty.

(2)  Types of Characterization.

(a)  Honorable.

The honorable characterization is appropriate when the quality of the enlisted Service member's service generally has met the standards of acceptable conduct and performance of duty for Service members or is otherwise so meritorious that any other characterization would be clearly inappropriate.

(b)  General (Under Honorable Conditions).

If an enlisted Service member's service has been honest and faithful, it is appropriate to characterize that service as general (under honorable conditions).  Characterization of service as general (under honorable conditions) is warranted when the positive aspects of the enlisted Service member's conduct or performance of duty outweigh negative aspects of the enlisted Service member's conduct or performance of duty as documented in their service record.

(c)  Under Other Than Honorable Conditions.

1.  This characterization may be issued:

a.  When the reason for separation is based on a pattern of behavior that constitutes a significant departure from the conduct expected of enlisted Service members.

b.  When the reason for separation is based on one or more acts or omissions that constitute a significant departure from the conduct expected of enlisted Service members.  Examples of factors that may be considered include the use of force or violence to produce serious bodily injury or death; abuse of a special position of trust; disregard by a superior of customary superior-subordinate relationships; acts or omissions that endanger U.S. security or the health and welfare of other Service members; and deliberate acts or omissions that seriously endanger the health and safety of other persons.

**App. 484**

*DoDI 1332.14, August 1, 2024*

2.  This characterization is authorized only if the enlisted Service member has been afforded the opportunity to request an administrative board action, except as provided in Paragraph 3.11. regarding separation in lieu of trial by court-martial.

(3)  Limitations on Characterization.

Except as otherwise provided in Paragraph 4.3., characterization will be determined solely by the enlisted Service member's military record during the current enlistment or period of service to which the separation pertains, plus any extensions to that period prescribed by law or regulation or effected with the consent of the enlisted Service member.

(a)  Previous service activities, including records of conviction by court-martial, records of absence without leave, or commission of other offenses for which punishment was not imposed will not be considered on the issue of characterization.  To the extent that such matters are considered on the issue of retention or separation in accordance with Paragraph 4.1.b., the record of proceedings may reflect express direction that such information will not be considered on the issue of characterization.

(b)  Pre-service activities may not be considered on the issue of characterization except:

1.  In a proceeding concerning fraudulent entry into military service in accordance with Paragraph 3.5.d.

2.  When evidence is found of pre-service misrepresentations about matters that would have precluded, postponed, or otherwise affected the enlisted Service member's eligibility for enlistment or induction.

(c)  The limitations in Paragraph 4.1.c. as to matters that may be considered on the issue of separation are applicable to matters that may be considered on the issue of characterization.

(d)  When the sole basis for separation is a serious offense that resulted in a conviction by a court-martial authorized to impose a punitive discharge, and a punitive discharge was not imposed, the enlisted Service member's service may not be characterized under other than honorable conditions unless such characterization is approved by the Secretary of the Military Department concerned.

(e)  Conduct in the civilian community of an enlisted Service member of a Reserve Component who is not on active duty or active duty for training may form the basis for characterization under other than honorable conditions only if such conduct directly affects the performance of the enlisted Service member's military duties.  Such conduct may form the basis of characterization as general (under honorable conditions) only if such conduct has an adverse impact on the overall effectiveness of the Military Service, including military morale and efficiency.

(f)  An enlisted Service member's voluntary submission to a DoD treatment and rehabilitation program and voluntarily disclosed evidence of previous personal drug use by the

**App. 485**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 102 of 415
Case 1:25-cv-00240-ACR    Document 72-84    Filed 03/07/25    Page 38 of 64

*DoDI 1332.14, August 1, 2024*

enlisted Service member as part of a course of treatment in such a program may not be used against the enlisted Service member on the issue of characterization. This limitation does not apply to:

      <u>1</u>. The introduction of evidence for impeachment or rebuttal purposes in any proceeding in which the evidence of drug misuse (or lack of evidence) has been introduced first by the enlisted Service member.

      <u>2</u>. Taking action based on independently derived evidence, including evidence of continued drug misuse after initial entry into a treatment and rehabilitation program.

      (g) The results of mandatory urinalysis may be used on the issue of characterization except as provided in DoDI 1010.01.

**c. Uncharacterized Separation.**

    (1) Entry-Level Separation.

      (a) A separation will be described as an entry-level separation if separation processing is initiated while an enlisted Service member is in entry-level status, except when:

      <u>1</u>. Characterization as under other than honorable conditions is authorized under the reason for separation and is warranted by the circumstances of the case; or

      <u>2</u>. The Secretary of the Military Department concerned, on a case-by-case basis, determines that characterization of service as honorable is clearly warranted by the presence of unusual military duty. The characterization is authorized when the enlisted Service member is separated in accordance with Section 3 by reason of:

        <u>a</u>. Selected changes in service obligation in accordance with Paragraph 3.2.;

        <u>b</u>. Convenience of the U.S. Government in accordance with Paragraph 3.3.;

        <u>c</u>. Disability in accordance with Paragraph 3.4.;

        <u>d</u>. Secretarial plenary authority in accordance with Paragraph 3.14.; or

        <u>e</u>. An approved reason established by the Military Department concerned in accordance with Paragraph 3.15.

      (b) In time of mobilization or in other appropriate circumstances, the ASD(M&RA) may authorize the Secretary of the Military Department concerned to delegate the authority in Paragraph 4.3.c.(1)(a)<u>2</u>. (concerning the honorable characterization) to a general court-martial convening authority with respect to enlisted Service members serving in operational units.

    (2) Void Enlistments or Inductions.

    Under void enlistments or inductions, an enlisted Service member will not receive a discharge, characterization of service at separation, or an entry-level separation except when a

**App. 486**

*DoDI 1332.14, August 1, 2024*

constructive enlistment arises and such action is required in accordance with Paragraph 4.3.c.(2)(c). If characterization or an entry-level separation is not required, the separation will be described as an order of release from Service custody or control.

(a)  An enlistment is void:

1.  If it was performed without the voluntary consent of a person who has the capacity to understand the significance of enlisting in the Military Services, including enlistment of a person who is intoxicated or insane at the time of enlistment, in accordance with Section 504 of Title 10, U.S.C.

2.  If the person is under 17 years of age, in accordance with Section 505 of Title 10, U.S.C.

3.  If the person is a deserter from another Military Service in accordance with Section 504 of Title 10, U.S.C.

(b)  Although an enlistment may be void at its inception, a constructive enlistment will arise in the case of a person serving with a Military Service who:

1.  Submitted voluntarily to military authority.

2.  Met the mental competency and minimum age qualifications of Sections 504 and 505 of Title 10, U.S.C., at the time of voluntary submission to military authority.

3.  Received military pay or allowances.

4.  Performed military duties.

(c)  If an enlistment that is void at its inception is followed by a constructive enlistment within the same term of service, characterization of service or description of separation will be in accordance with Paragraph 4.3.b. or 4.3.c.(1), as appropriate.

1.  If the enlistment was void by reason of desertion from another Military Service, the enlisted Service member will be separated by an order of release from the custody and control of the second Military Service regardless of any subsequent constructive enlistment.

2.  The occurrence of such a subsequent constructive enlistment does not preclude the Military Departments, in appropriate cases, from either retaining the enlisted Service member or separating the enlisted Service member in accordance with Paragraph 3.5., based on the circumstances that initiated the original void enlistment or upon any other basis for separation provided in this instruction.

(3)  Dropping from the Rolls.

An enlisted Service member may be dropped from the Service rolls when such action is authorized by the Military Department concerned and a characterization of service or other description of separation is not authorized or warranted.

**App. 487**

*DoDI 1332.14, August 1, 2024*

# SECTION 5: PROCEDURES FOR SEPARATION

## 5.1. SCOPE.

a. The supplementary procedures in this section are applicable only when required under a specific reason for separation as described in Section 3.

b. When an enlisted Service member is processed based on multiple reasons for separation these guidelines apply to procedural requirements, including procedural limitations on service characterization or separation description.

(1) The requirements for each reason will be applied to the extent practicable.

(2) If a reason for separation in the notice of proposed action requires processing using the administrative board procedure, the entire matter will be processed in accordance with Paragraph 5.3.

(3) If more than one reason for separation is approved, the guidance on characterization that provides the greatest latitude will apply.

(4) When there is any other clear conflict between a specific requirement applicable to one reason and a general requirement applicable to another reason, the specific requirement will be applied.

(5) If a conflict in separation procedures cannot be resolved by applying the guidance in Paragraphs 5.1.b.(1) through 5.1.b.(4), the procedure deemed by the separation authority to be most favorable to the respondent will be used.

## 5.2. NOTIFICATION PROCEDURES.

### a. Notice.

If the notification procedure is initiated in accordance with Section 3, the person will be notified of the proposed separation and the reasons for it.  If the reasons include classified information, unclassified summaries may be used; however, any summaries derived from classified information will be consistent with U.S. national security interests and other applicable law.  The individual will be notified in writing of:

(1) The basis of the proposed separation, including the circumstances upon which the separation is based and a reference to this instruction and any applicable provisions of the appropriate Military Department's or the U.S. Coast Guard's implementing regulation.

(2) Whether the proposed separation could result in discharge, release from active duty to a Reserve Component, transfer from the Selected Reserve to the IRR, release from Service custody or control, or other form of separation.

**App. 488**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 105 of 415
Case 1:25-cv-00240-ACR    Document 72-84    Filed 03/07/25    Page 41 of 64

*DoDI 1332.14, August 1, 2024*

(3)  The least favorable characterization of service or description of separation authorized for the proposed separation.

(4)  If appropriate, notice of administrative separation from military service based on unfavorable ESP results in accordance with DTM-19-008.  Notice in writing must include the required language in Figure 1.

(5)  The right to obtain copies of documents that will be forwarded to the separation authority supporting the basis of the proposed separation.  Classified information in such documents may be provided to the individual in unclassified summarized format in accordance with the classification requirements in Paragraph 5.2.a.

(6)  The respondent's right to submit statements.

(7)  The respondent's right to consult with counsel qualified pursuant to Article 27(b) of the UCMJ.  Non-lawyer counsel may be appointed when the respondent is deployed aboard a vessel or in similar circumstances of distance from sufficient judge advocate resources as determined under standards and procedures specified by the Secretary of the Military Department concerned.  The respondent may also consult with civilian counsel retained at their own expense.

(8)  If the respondent has 6 or more years of total active and reserve military service, the right to request an administrative board action in accordance with Paragraph 5.3.

(9)  The right to waive the rights in Paragraphs 5.2.a.(5) through 5.2.a.(8) after being afforded a reasonable opportunity to consult with counsel and advised that failure to respond will constitute a waiver of the right.

(10)  The requirement to complete all components of the Transition Assistance Program in accordance with DoDI 1332.35.

**b.  Additional Notice Requirements.**

(1)  If separation processing is initiated based on more than one reason in accordance with Section 3, the requirements of Paragraph 5.2.a.(1) apply to all proposed reasons for separation.

(2)  If the respondent is in civil confinement, absent without leave, or in a Reserve Component not on active duty, the relevant notification procedures in Paragraphs 5.4., 5.5., or 5.6. apply.

(3)  Additional notification requirements in Paragraphs 3.3. and 3.4. apply when:

(a)  Characterization of service as general (under honorable conditions) is authorized.

(b)  The enlisted Service member is processed for separation by reason of U.S. Government convenience or disability.

**App. 489**

*DoDI 1332.14, August 1, 2024*

### c. Response.

The respondent will be provided a reasonable period, but not less than 2 working days, to act on the notice. An extension may be granted upon a timely showing of good cause by the respondent. The decision of the respondent on each of the rights described in Paragraphs 5.2.a.(5) through 5.2.a.(9), and applicable provisions referenced in Paragraph 5.2., will be recorded and signed by the respondent and counsel, subject to the following limitations:

(1) If notice by other than personal means is authorized in accordance with Paragraphs 5.4., 5.5., or 5.6., and the respondent fails to acknowledge receipt or submit a timely reply, that fact will constitute a waiver of rights and will be documented.

(2) If the respondent declines to respond as to the selection of rights, such declination will constitute a waiver of rights and will be documented. If the respondent indicates that one or more of the rights will be exercised, the selection of rights will be documented.

### d. Separation Authority.

(1) The separation authority for actions initiated under the notification procedures will be a special court-martial convening authority or higher authority.

(a) Subject to approval by the ASD(M&RA), the Secretary of the Military Department concerned may authorize the following persons to act as a separation authority for a specified reason for separation:

1. A commanding officer in grade O-5 or above; or

2. A commanding officer in the grade of O-4 who:

a. Is on an approved list for promotion to O-5 and is assigned to command a unit that is authorized a commanding officer in the grade of O-5 or above.

b. Has a judge advocate or other legal advisor available to the command.

(b) If the case was initiated under the administrative board procedures and the respondent waived the right to a hearing in accordance with Paragraph 5.3.d., the separation authority will be an official designated in accordance with Paragraph 5.3.f.

(2) The action of the separation authority will be recorded.

(3) The separation authority will determine whether there is sufficient evidence to verify the allegations in the notification of the basis for separation. If an allegation is not supported by a preponderance of the evidence, it may not be used as a basis for separation.

(4) If there is a sufficient factual basis for separation, the separation authority will determine whether separation is warranted following the guidance in Paragraphs 4.1. and 4.2. Based on that guidance, the separation authority directs:

**App. 490**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 107 of 415
Case 1:25-cv-00240-ACR    Document 72-84    Filed 03/07/25    Page 43 of 64

*DoDI 1332.14, August 1, 2024*

(a)  Retention;

(b)  Separation for a specific reason in accordance with Section 3; or

(c)  Suspended separation in accordance with the guidance in Paragraph 5.2.d.

(5)  If the separation authority directs separation or suspended separation based on more than one reason in accordance with Section 3, the separation authority will designate the most appropriate basis as the primary reason for reporting purposes.

(6)  If separation or a suspended separation is directed, the separation authority will assign a service characterization or separation description in accordance with Paragraph 4.3.

(7)  Except when service characterization under other than honorable conditions is directed or the enlisted Service member is separated based on a void enlistment or induction, the Secretary of the Military Department concerned may authorize the separation authority or higher authority to make a recommendation or determination as to whether the respondent should be retained in the Ready Reserve as a mobilization asset to fulfill their total military service obligation.  This option applies in cases involving separation from active duty or from the Selected Reserve.  Paragraph 5.5. is applicable if such action is approved.

## 5.3.  ADMINISTRATIVE BOARD PROCEDURES.

### a.  Notice.

If an administrative board is required, the respondent will be notified in writing of:

(1)  The basis of the proposed separation, including the circumstances upon which the action is based and reference to the applicable provisions of the Military Department's implementing regulation.

(2)  Whether the proposed separation could result in discharge, release from active duty to a Reserve Component, transfer from the Selected Reserve to the IRR, release from Service custody or control, or other form of separation.

(3)  The least favorable service characterization or separation description authorized for the proposed separation.

(4)  The respondent's right to consult with counsel as prescribed in Paragraph 5.2.a.(6). A non-lawyer counsel may not represent a respondent before an administrative board unless:

(a)  The respondent expressly declines appointment of counsel qualified pursuant to Article 27(b) of the UCMJ and requests a specific non-lawyer counsel; or

(b)  The separation authority assigns non-lawyer counsel as assistant counsel.

(5)  The right to obtain copies of documents that will be forwarded to the separation authority supporting the basis of the proposed separation.  Classified information in such

**App. 491**

USCA Case #25-5087      Document #2108715           Filed: 04/01/2025      Page 108 of 415
Case 1:25-cv-00240-ACR      Document 72-84      Filed 03/07/25      Page 44 of 64

*DoDI 1332.14, August 1, 2024*

documents may be provided to the individual in unclassified summarized format.  However, any summaries derived from classified information provided to the individual will be consistent with U.S. national security interests and other applicable law.

(6)  The respondent's right to request a hearing before an administrative board.

(7)  The respondent's right to present written statements instead of board proceedings.

(8)  The respondent's right to representation at the administrative board either by:

(a)  Military counsel appointed by the convening authority; or

(b)  Military counsel of the respondent's own choice, if counsel of choice is determined to be reasonably available under regulations of the Military Department concerned.

(9)  The right to representation at the administrative board by civilian counsel at the respondent's own expense.

(10)  The right to waive the rights in Paragraphs 5.3.a.(4) through 5.3.a.(9).

(11)  That failure to respond after being afforded a reasonable opportunity to consult with counsel constitutes a waiver of the rights in Paragraphs 5.3.a.(4) through 5.3.a.(9).

(12)  That failure to appear without good cause at a hearing constitutes waiver of the right to be present at the hearing.

**b.  Additional Notice Requirements.**

(1)  If separation processing is initiated based on more than one reason in Section 3, the requirements of Paragraph 5.3.a.(1) apply to all proposed reasons for separation.

(2)  If the respondent is in civil confinement, absent without leave, or in a Reserve Component not on active duty, the relevant notification procedures in Paragraphs 5.4., 5.5., or 5.6. apply.

(3)  Additional notification requirements in Paragraphs 3.3. and 3.4. apply when service characterization as general (under honorable conditions) is authorized and the enlisted Service member is processed for separation by reason of convenience of the U.S. Government or disability.

**c.  Response.**

The respondent will be provided a reasonable period, but not less than 2 working days, to act on the notice.  An extension may be granted upon a timely showing of good cause by the respondent.  The decision of the respondent on each of the rights in Paragraphs 5.3.a.(4) through 5.3.a.(9), and applicable provisions referenced in Paragraph 5.2., will be recorded and signed by the respondent and counsel, subject to these limitations:

**App. 492**

*DoDI 1332.14, August 1, 2024*

(1)  If notice by other than personal means is authorized in accordance with Paragraphs 5.4., 5.5., or 5.6. and the respondent fails to acknowledge receipt or submit a timely reply, that fact will constitute a waiver of rights and will be documented.

(2)  If the respondent declines to respond as to the selection of rights, such declination will constitute a waiver of rights and will be documented.  If the respondent indicates that one or more of the rights will be exercised, the selection of rights will be documented.

**d.  Waiver.**

(1)  If the right to a hearing before an administrative board is waived, the case will be processed in accordance with Paragraph 5.2.d. regarding notification procedures.  The separation authority in such cases will be an official designated in accordance with Paragraph 5.3.f.

(2)  When authorized by the Secretary of the Military Department concerned, a respondent entitled to an administrative board hearing may exercise a conditional waiver after a reasonable opportunity to consult with counsel, in accordance with Paragraph 5.3.a.(4).

**e.  Hearing Procedures.**

If a respondent requests a hearing before an administrative board, these procedures are applicable:

(1)  Composition.

(a)  The convening authority will appoint to the administrative board at least three experienced commissioned, warrant, or noncommissioned officers.

1.  Enlisted personnel appointed to the board will be in grade E-7 or above and will be senior to the respondent.  At least one member of the board will be serving in the grade of O-4 or higher, and a majority will be commissioned or warrant officers.  The senior member will be the president of the board.

2.  The convening authority may also appoint a non-voting recorder to the board.

3.  A non-voting legal advisor may be appointed to assist the board if authorized by the Secretary of the Military Department concerned.

(b)  If the respondent is an enlisted member of a Reserve Component, the board will include at least one Reserve officer as a voting member.  Additionally, all board members will be commissioned officers if an "under other than honorable conditions" service characterization from the Reserve Component is authorized to be issued.  Voting board members will be senior to the respondent's Reserve grade.

(c)  The convening authority will ensure that the opportunity to serve on administrative boards is given to a demographically diverse representation of Service members.  However, the mere appointment or failure to appoint a member of any particular demographic group to the board does not provide a basis for challenging the proceeding.

**App. 493**

*DoDI 1332.14, August 1, 2024*

(d)  The respondent may challenge a voting member of the board or the legal advisor, if any, for cause only.

(2)  Presiding Officer.

The presiding officer will preside and rule finally on all matters of procedure and evidence, but their rulings may be overruled by a majority of the board.  If appointed, the legal advisor will rule finally on all matters of evidence and challenges except their own challenges.

(3)  Witnesses.

(a)  The respondent may request the attendance of witnesses in accordance with the implementing instructions of the Military Department concerned.

(b)  In accordance with such instructions, the respondent may submit a written request for temporary duty or invitational travel orders for witnesses.  Such a request will contain:

1.  A synopsis of the testimony that the witness is expected to give.

2.  An explanation of the relevance of such testimony to the issues of service characterization or separation description.

3.  An explanation as to why written or recorded testimony would not be sufficient to provide for a fair determination of the issues of service characterization or separation description.

(c)  The convening authority may authorize expenditure of funds for production of witnesses only if the presiding officer (after consultation with a judge advocate) or the legal advisor, if appointed, determines that:

1.  The testimony of a witness is not cumulative.

2.  The personal appearance of the witness is essential to a fair determination on the issues of service characterization or separation description.

3.  Written or recorded testimony will not adequately accomplish the same objective.

4.  The need for live testimony is substantial, material, and necessary for a proper disposition of the case.

5.  The significance of the personal appearance of the witness, when balanced against the practical difficulties in producing the witness, favors production of the witness. Factors to be considered in relation to the balancing test include, but are not limited to:

a.  The cost of producing the witness;

b.  The timing of the request for production of the witness;

**App. 494**

*DoDI 1332.14, August 1, 2024*

c.  The potential delay in the proceeding that may be caused by producing the witness; or

d.  The likelihood of significant interference with military operational deployment, mission accomplishment, or essential training.

(d)  If the convening authority determines that the personal testimony of a witness is required, the hearing will be postponed or continued if necessary to permit the attendance of the witness.

(e)  The hearing will be continued or postponed to provide the respondent with a reasonable opportunity to obtain a written statement from the witness if a witness requested by the respondent is unavailable:

1.  When the presiding officer or the legal officer, if appointed, determines that the personal testimony of the witness is not required.

2.  When the commanding officer of a military witness determines that military necessity precludes the witness' attendance at the hearing.

3.  When a civilian witness declines to attend the hearing.

(f)  Paragraph 5.3.e.(3) does not authorize a Federal employee to decline to appear as a witness if directed to do so in accordance with applicable procedures of the employing agency.

(4)  Record of Proceedings.

(a)  In cases where the board recommends separation, the record of the proceedings will be kept in summarized form unless a verbatim record is required by the Secretary of the Military Department concerned.

(b)  In cases where the board recommends retention, a record of the proceedings is optional unless required by the Secretary of the Military Department concerned.  However, a summarized or verbatim record will be prepared in any case where the board recommends retention, and the separation authority elects to forward the matter to the Secretary of the Military Department concerned in accordance with Paragraph 5.3.f.(4)(b)2.

(c)  The board reporter will retain all materials necessary to prepare a transcript should the separation authority elect to forward the case to the Secretary of the Military Department concerned.

(d)  In all cases, the findings and recommendations of the board will be in verbatim form.

**App. 495**

*DoDI 1332.14, August 1, 2024*

(5)  Presentation of Evidence.

The rules of evidence for courts-martial and other judicial proceedings are not applicable before an administrative board.  However, reasonable restrictions will be observed concerning relevancy and competency of evidence.

(6)  Rights of the Respondent.

(a)  The respondent may testify in their own behalf, subject to Article 31(a) of the UCMJ.

(b)  At any time during the proceedings, the respondent or counsel may submit written or recorded matter for consideration by the board.

(c)  The respondent or counsel may call witnesses in their behalf.

(d)  The respondent or counsel may question any witness who appears before the board.

(e)  The respondent or counsel may present argument before the board convening in closed session for deliberation on findings and recommendations.

(7)  Findings and Recommendations.

(a)  The board will determine its findings and recommendations in closed sessions.  Only voting members of the board will be present.

(b)  The board will determine whether each allegation in the notice of proposed separation is supported by a preponderance of the evidence.  If more than one reason was contained in the notice, there will be a separate determination for each reason.

(c)  The board will make recommendations on:

1.  Retention or separation in accordance with the guidance in Paragraph 4.1.

2.  Suspension of separation.  If the board recommends separation, it may recommend that the separation be suspended in accordance with Paragraph 4.2., but the recommendation of the board as to suspension is not binding on the separation authority.

3.  Service characterization or separation description.  If separation or suspended separation is recommended, the board will recommend a service characterization or separation description as authorized in Section 3 in accordance with the guidance in Paragraph 4.3.

4.  Transfer to the Ready Reserve.  Except when the board has recommended service characterization under other than honorable conditions, the Secretary of the Military Department concerned may authorize the board to make a recommendation as to whether the respondent should be retained in the Ready Reserve as a mobilization asset to fulfill their total

**App. 496**

USCA Case #25-5087   Document #2108715      Filed: 04/01/2025   Page 113 of 415
Case 1:25-cv-00240-ACR   Document 72-84   Filed 03/07/25   Page 49 of 64

*DoDI 1332.14, August 1, 2024*

military service obligation.  This option applies to cases involving separation from active duty or from the Selected Reserve.  Paragraph 5.5. is applicable if the action is approved.

**f.  Separation Authority.**

(1)  The separation authority for actions initiated under the administrative board procedure will be a general court-martial convening authority or higher authority.  The Secretary of the Military Department concerned may also authorize a commanding officer in grade O-7 or above with a judge advocate or other legal advisor available to their command to act as a separation authority in specified circumstances.

(a)  When an administrative board recommends service characterization as honorable or general (under honorable conditions), the separation authority may be exercised by an officer designated in accordance with Paragraph 5.2.d.

(b)  When the case has been initiated under the notification procedures and the hearing is a result of a request in accordance with Paragraph 5.2.a.(7), the separation authority will be as designated in Paragraph 5.2.d.

(2)  In every case in which service characterization under other than honorable conditions is recommended, the record of the board's proceedings will be reviewed by a judge advocate or civilian attorney employed by the Military Department concerned before action by the separation authority.  Such review is not required when another characterization is recommended unless the respondent identifies specific legal issues for consideration by the separation authority.

(3)  The respondent will be provided a copy of the board's findings and recommendations.

(4)  The separation authority will act in accordance with this paragraph, the requirements in Section 3 with respect to the reason for separation, and the guidance in Section 4 on separation and characterization.

(a)  If the separation authority approves the recommendations of the board on the issue of service characterization, separation description, or both, this constitutes approval of the board's findings and recommendations in accordance with Paragraph 5.3.e.(7) unless the separation authority expressly modifies such findings or recommendations.

(b)  If the board recommends retention, the separation authority may:

1.  Approve the recommendation; or

2.  Forward the matter to the Secretary of the Military Department concerned with a recommendation for separation based upon the circumstances of the case.  In such a case, the Secretary concerned may direct retention or separation.  If they approve separation, the service characterization or separation description will be honorable, general (under honorable conditions), or an entry-level separation in accordance with the guidance in Paragraph 4.3.

**App. 497**

*DoDI 1332.14, August 1, 2024*

(c)  If the board recommends separation, the separation authority may take one of these actions:

<u>1</u>.  Approve the board's recommendations.

<u>2</u>.  Approve the board's recommendations, but modify the recommendations by, when appropriate:

<u>a</u>.  Approving the separation, but suspending execution as provided in Paragraph 4.2.;

<u>b</u>.  Changing the service characterization or separation description to a more favorable characterization or description; or

<u>c</u>.  Changing the board's recommendation, if any, concerning transfer to the IRR.

<u>3</u>.  Disapprove the board's recommendations and retain the respondent.

<u>4</u>.  Approve the board's findings and recommendations in whole or in part with respect to more than one reason in accordance with Section 3, designating the most appropriate basis as the primary reason for reporting purposes.

<u>5</u>.  Refer the case to a new board if the separation authority finds legal prejudice to a substantial right of the respondent or determines that the findings of the board have been obtained by fraud or collusion.

<u>a</u>.  No member of the new board will have served on a previous board that considered the case.

<u>b</u>.  The separation authority may not approve findings and recommendations less favorable to the respondent than those rendered by the previous board unless the separation authority finds that fraud or collusion in the previous board is attributable to the respondent or an individual acting on the respondent's behalf.

## 5.4.  ADDITIONAL PROVISIONS CONCERNING ENLISTED SERVICE MEMBERS CONFINED BY CIVIL AUTHORITIES.

a.  If proceedings in this section have been initiated against a respondent confined by civil authorities, the case may be processed in the absence of the respondent.  Paragraph 5.3.a. is not applicable except in so far as such rights can be exercised by counsel on behalf of the respondent.

b.  The following requirements apply:

(1)  The notice will contain the matter described in Paragraphs 5.2.a. or 5.3.a. regarding notice in the notification procedures or administrative board procedures, as appropriate.

**App. 498**

*DoDI 1332.14, August 1, 2024*

(a)  The notice will be delivered personally to the respondent or sent by registered or certified mail, return receipt requested, or by an equivalent form of formal notice as prescribed in regulation by the Secretary of the Military Department concerned.

(b)  The enlisted Service member's contact, acknowledgement, or failure to acknowledge receipt will be formally documented in their military record as prescribed in the appropriate Military Department regulation.

(2)  If delivered personally, receipt will be acknowledged in writing by the respondent.  If the respondent does not acknowledge receipt, the notice will be re-sent by registered or certified mail and failure to acknowledge receipt documented in accordance with Paragraph 5.4.b.(1)(b).

(3)  The notice will state that the action has been suspended until a specific date (not less than 30 days from the date of delivery) to give the respondent the opportunity to exercise the rights in the notice.  If the respondent does not reply by that date, the separation authority will take appropriate action in accordance with Paragraph 5.2.d.

(4)  The name and address of the military counsel appointed for consultation will be specified in the notice.

(5)  If the case involves entitlement to an administrative board, the respondent will be notified that the board will proceed in the respondent's absence and that the case may be presented on the respondent's behalf by counsel for the respondent.

## 5.5.  ADDITIONAL REQUIREMENTS FOR CERTAIN ENLISTED SERVICE MEMBERS OF RESERVE COMPONENTS.

### a.  Enlisted Service members of Reserve Components not on Active Duty.

(1)  If proceedings have been initiated against an enlisted Service member of a Reserve Component not on active duty, the case may be processed in the absence of the enlisted Service member in these circumstances:

(a)  At the request of the enlisted Service member;

(b)  If the enlisted Service member does not respond to the notice of proceedings on or before the suspense date provided in the notice; or

(c)  If the enlisted Service member fails to appear at a hearing as provided in Paragraph 5.3.a.(12).

(2)  The notice will contain the matters described in Paragraphs 5.2.a. or 5.3.a., as appropriate.

(3)  If the action involves a transfer to the IRR under circumstances in which the procedures in this section are applicable, the procedures in Paragraph 5.5.b. will be followed.

**App. 499**

**b. Transfer to the IRR.**

Upon transfer to the IRR, the enlisted Service member will be notified of:

(1) The service characterization upon transfer from active duty or the Selected Reserve to the IRR, and that the service characterization upon completion of the military service obligation will be the same unless specified conditions established by the Secretary of the Military Department concerned are met.

(2) The date upon which the military service obligation will expire.

(3) The date by which the enlisted Service member must submit evidence of satisfactory completion of the specified conditions.

**c. Notification of Administrative Board.**

If the enlisted Service member submits evidence of completion of the specified conditions but the Military Department proposes to issue a discharge other than an honorable discharge, the notification procedure will be used. An administrative board is not required at this point, notwithstanding the enlisted Service member's years of service.

**d. Service Expiration.**

If the enlisted Service member does not submit such information on or before the date specified in the notice, no further proceedings are required. The character of discharge at the completion of the military service obligation will be the same as the service characterization upon transfer from active duty or the Selected Reserve to the IRR.

**e. Notice to Member.**

These requirements apply to the notices required by Paragraphs 5.2.a. or 5.3.a.:

(1) Reasonable effort should be made to furnish copies of the notice to the enlisted Service member through personal contact by a representative of the command. In such a case, a written acknowledgment of the notice will be obtained.

(2) If the enlisted Service member cannot be contacted or refuses to acknowledge receipt of the notice, the notice will be sent by registered or certified mail, return receipt requested, or by an equivalent form of formal notice, to the most recent address furnished by the enlisted Service member as an address for receipt or forwarding of official mail, as prescribed in regulation by the Secretary of the Military Department concerned. The enlisted Service member's contact, acknowledgement, or failure to acknowledge receipt will be formally documented in their military record as prescribed in regulation by the Secretary of the Military Department concerned.

**App. 500**

*DoDI 1332.14, August 1, 2024*

## 5.6. ADDITIONAL REQUIREMENTS FOR ENLISTED SERVICE MEMBERS BEYOND MILITARY CONTROL BY REASON OF UNAUTHORIZED ABSENCE.

### a. Determination of Applicability.

If the general court-martial convening authority or higher authority determines that separation is otherwise appropriate in accordance with this instruction, an enlisted Service member may be separated without return to military control in one or more of these circumstances:

(1)  Absence without authority after being sent notice of initiation of separation processing.

(2)  When prosecution of an enlisted Service member who is absent without authority appears to be barred by the statute of limitations in accordance with Section 843 of Title 10, U.S.C.

(3)  When an enlisted Service member who is an alien is absent without leave and appears to have gone to a foreign country where the United States has no authority to apprehend the enlisted Service member under a treaty or other agreement.

### b. Notice.

Before execution of the separation in accordance with Paragraphs 5.6.a.(1), 5.6.a.(2), or 5.6.a.(3), the enlisted Service member will be notified of the imminent action by registered or certified mail (return receipt requested) or by an equivalent form of formal notice to the most recent address furnished by the Service member or to the next of kin under the appropriate Military Department regulations.  An individual's contact acknowledgement, or failure to acknowledge receipt, is formally documented in their military record as prescribed in their Military Department's regulations.

(1)  The notice will contain the matters described in Paragraphs 5.2.a. or 5.3.a., as appropriate, and will specify that the action has been suspended until a specific date (not less than 30 days) in order to give the respondent the opportunity to return to military control.

(2)  If the respondent does not return to military control by that date, the separation authority will take appropriate action in accordance with Paragraph 5.2.d.

### c. Separation Limitations for Reserve Component Enlisted Service Members.

See Section 12685 of Title 10, U.S.C., for guidance on separation limitations for Reserve Component enlisted Service members.

**App. 501**

*DoDI 1332.14, August 1, 2024*

## 5.7. ADDITIONAL REQUIREMENTS FOR ADMINISTRATIVE SEPARATION PROCESSING TIMELINES.

a. The Secretaries of the Military Departments will establish a timeline designed to facilitate the efficient separation of enlisted Service members from their Military Service that is measured from the date of notification to the date of separation.

(1) Processing goals should not exceed 15 working days for the notification procedure described in Paragraph 5.2., and 50 working days for the administrative board procedure described in Paragraph 5.3.

(2) While goals of shorter processing times are encouraged, variations may be established for complex cases or cases in which the separation authority is not located on the same facility as the respondent.

(3) Separation processing timeline goals, and the procedures for monitoring effectiveness, will be established in the Military Departments' implementing documents.

b. Failure to process an administrative separation within the prescribed goals will not create a bar to separation or affect characterization.

## 5.8. ADDITIONAL REQUIREMENTS FOR INFORMING ENLISTED SERVICE MEMBERS ABOUT SEPARATION POLICY.

a. The Secretaries of the Military Departments will prescribe procedures for periodically informing enlisted Service members about separation policy. This includes:

(1) Information on the types of separations and the basis for their issuance.

(2) The possible effects of various actions upon reenlistment, civilian employment, veterans' benefits, and related matters concerning denial of certain benefits to enlisted Service members who fail to complete at least 2 years of an original enlistment.

(3) The purpose and authority of the Discharge Review Board and the Board for Correction of Military and Naval Records established pursuant to Sections 1552 and 1553 of Title 10, U.S.C., DoDD 1332.41, DoDI 1332.28, and Part 70 of Title 32, Code of Federal Regulations.

b. The Military Departments will, at a minimum, inform enlisted Service members each time certain provisions of the UCMJ are explained in accordance with Section 937 of Title 10, U.S.C. The required information may be provided in the form of a written fact sheet or similar document.

c. Explaining the effects of the various types of separations to enlisted Service members is a command responsibility of the Military Departments, not a procedural entitlement. However, failure on the part of an enlisted Service member to read or to understand such separation information will not create a bar to separation or affect service characterization.

**App. 502**

*DoDI 1332.14, August 1, 2024*

## 5.9. ADDITIONAL REQUIREMENTS FOR PRE-SEPARATION HEALTH ASSESSMENTS.

a. The Secretary of the Military Department concerned prescribes procedures to ensure compliance with statutory requirements in accordance with Sections 1145 and 1177 of Title 10, U.S.C., to conduct a health assessment sufficient to evaluate the health of enlisted Service members at the time of separation. This assessment should determine any existing medical condition incurred during active-duty service, provide baseline information for future care, complete an enlisted Service member's military medical record, and provide a final opportunity before separation to document any health concerns, exposures, or risk factors associated with active-duty service.

(1) To comply with Section 1177 of Title 10, U.S.C., an enlisted Service member must receive a medical examination to assess whether the effects of PTSD or traumatic brain injury (TBI) constitute matters in extenuation that relate to the basis for administrative separation if the member meets all the following criteria:

(a) Is being administratively separated under a service characterization that is neither honorable nor general (under honorable conditions).

(b) Was deployed overseas to a contingency operation or was sexually assaulted during the previous 24 months.

(c) Is diagnosed by a physician, clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse as experiencing PTSD or TBI, or reasonably alleges the influence of PTSD or TBI based on deployed service to a contingency operation or a sexual assault during the previous 24 months.

(d) Is not being separated pursuant to a sentence of a court-martial or other UCMJ proceeding. Administrative separation in lieu of court-martial does not constitute a court-martial or other proceeding conducted pursuant to the UCMJ; therefore, compliance with Section 1177 of Title 10, U.S.C., is required.

(2) To comply with Section 518 of Public Law 112-239, the medical examination required in Paragraph 5.9.a.(1) will be performed:

(a) By a clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse for cases involving PTSD.

(b) By a physician, clinical psychologist, psychiatrist, or other health-care professional as appropriate for cases involving TBI.

b. An enlisted Service member receiving a medical examination in accordance with Paragraphs 5.9.a.(1) and 5.9.a.(2) will not be separated until the examination results have been reviewed by appropriate authorities responsible for evaluating, reviewing, and approving the separation case, as determined by the Secretary of the Military Department concerned.

**App. 503**

*DoDI 1332.14, August 1, 2024*

**5.10.  ADDITIONAL COUNSELING REQUIRED FOR A DISCHARGE UNDER OTHER THAN HONORABLE CONDITIONS RESULTING FROM A CONTINUOUS, UNAUTHORIZED ABSENCE OF 180 DAYS OR MORE.**

a.  Specific counseling is required regarding Section 5303 of Title 38, U.S.C., which states that a discharge under other than honorable conditions resulting from a period of continuous, unauthorized absence of 180 days or more is a conditional bar to benefits administered by the Department of Veterans Affairs, notwithstanding any action by a Discharge Review Board.

b.  Failure on the part of the enlisted Service member to read or to understand such explanation does not create a bar to separation or affect characterization.

**5.11.  ADDITIONAL REQUIREMENTS FOR INVOLUNTARY ADMINISTRATIVE SEPARATION OF ENLISTED SERVICE MEMBERS WHO MADE AN UNRESTRICTED REPORT OF SEXUAL ASSAULT.**

An enlisted Service member who made an unrestricted report of sexual assault and who is recommended for involuntary separation from the Military Services within 1 year of final disposition of their sexual assault case may request a general officer or flag officer (GO/FO) review of the circumstances of and grounds for the involuntary separation.  The notification process in Paragraph 5.2.a. must include notification of these requirements:

a.  A qualified enlisted Service member must submit their written request to the first GO/FO in the separation authority's chain of command before the separation authority approves the member's final separation action.

b.  Requests submitted after final separation action is complete will not be acted upon for GO/FO review.  However, the separated enlisted Service member may apply to the appropriate Service Discharge Review Board or Board of Correction of Military and Naval Records for consideration.

c.  A qualified enlisted Service member who submits a timely request may not be separated until the GO/FO conducting the review concurs with the circumstances of and the grounds for the involuntary separation.

**5.12.  ADDITIONAL REQUIREMENT TO PROCESS FOR ADMINISTRATIVE SEPARATION OF ENLISTED SERVICE MEMBERS CONVICTED OF CERTAIN SEXUAL OFFENSES.**

An enlisted Service member whose conviction for rape, sexual assault, forcible sodomy, or an attempt to commit one of those offenses is final, and who is not punitively discharged in connection with such conviction, will be processed for administrative separation for misconduct in accordance with Paragraph 3.10.a.(3).

a.  Any separation decision will be based on the full facts of the case, and due process will be provided to the enlisted Service member.

**App. 504**

*DoDI 1332.14, August 1, 2024*

b.  The requirement in Paragraph 5.12.a. will not be interpreted to limit or alter the authority of the Secretary of the Military Department concerned to process enlisted Service members for administrative separation for other offenses or under other provisions of law.

### 5.13.  ADDITIONAL REQUIREMENT FOR MEMBERS RECEIVING AN OTHER THAN HONORABLE CHARACTERIZATION OF SERVICE.

a.  In accordance with Section 528 of Public Law 115-91, the Secretary of the Military Department concerned ensures that enlisted Service members being separated with anything other than an honorable discharge are informed, in writing, that they may petition the Veterans Benefits Administration of the Department of Veterans Affairs for certain benefits under the laws administered by the Secretary of Veterans Affairs, despite their service characterization.

b.  Notification is provided to the enlisted Service member in conjunction with the notification of the separation, or as soon thereafter as practical.

**App. 505**

*DoDI 1332.14, August 1, 2024*

# SECTION 6:  PROCEDURES FOR EARLY RELEASE OF ENLISTED SERVICE MEMBERS FOR COLLEGE, VOCATIONAL, OR TECHNICAL SCHOOL ENROLLMENT

## 6.1.  SCOPE.

a.  The Military Services may permit enlisted Service members to further their education at a college, university, vocational or technical school by approving a discharge or release from active service before expiration of obligated service.

b.  The provisions of this section cover all enlisted Service members except for:

(1)  Reservists ordered to active duty for training as provided in Section 12103 of Title 10, U.S.C., and reservists ordered to active duty due to unsatisfactory participation in reserve assignment, as provided in Section 12303 of Title 10, U.S.C.

(2)  Aliens seeking to qualify for citizenship by completion of active-duty military service unless they are to be transferred to inactive duty in a Reserve Component, as provided in DoDI 5500.14.

## 6.2.  PROCEDURES.

### a.  General.

(1)  Implementation of this section will apply to applicants who meet the criteria of Paragraph 6.2.b. and under these circumstances:

(a)  Enlisted Service members, including aliens transferred to inactive duty in a Reserve Component as outlined in DoDI 5500.14, who would be unduly penalized in the pursuit of their education if required to remain in service until expiration of their term of enlistment or induction may be released early, subject to meeting all the criteria in Paragraph 6.2.b.

(b)  Separation date will be at the convenience of the U.S. Government but will normally not be later than 10 days before the class starting date.  In no event will the separation date be earlier than 30 days before such starting date.

(2)  Before separation, enlisted Service members being separated in accordance with this instruction will be counseled in accordance with DoDI 1332.35.

(3)  The Secretaries of the Military Departments may, in exceptional cases, approve applications not fully meeting the criteria established in Paragraph 6.2.b.

**App. 506**

*DoDI 1332.14, August 1, 2024*

**b. Criteria.**

If the provisions of this section are implemented by a Military Department, the following criteria should be used in making determinations governing the early release of enlisted Service members:

(1)  In general, enlisted Service members who will have a Reserve Component obligation upon separation will not be released under this program until they have completed a minimum of 21 months active duty on their current term of obligated service.

(2)  The individual's service is not critical to the mission of the assigned organization.

(3)  The latest acceptable class starting date is within the last 3 months of remaining service.

(4)  Applicants have done one of the following:

(a)  Furnished documentary evidence when applying for separation that they have been accepted for enrollment, commencing with a specific school term, in a full-time resident course of instruction at a recognized institution of higher education leading to an associate, baccalaureate, or higher degree.  A recognized institution is one that:

1.  Is listed in the Department of Education's "Education Directory for Post-secondary Education"; or

2.  Has been determined by the Department of Education to be eligible for such listing.

(b)  Presented documentary evidence when applying for separation that they have been accepted for enrollment, commencing with a specific school term, in a full-time resident course of instruction of no less than 3 months at a recognized vocational or technical school.  A recognized school is one that is approved by the cognizant State Board for Vocational Education or is accredited by a nationally recognized accrediting agency or association listed by the Department of Education.

(5)  The applicant has demonstrated their ability and willingness to make the required payment of an entrance fee, if any, if they have not already done so.

(6)  The applicant has clearly established that the specific school term for which they seek separation is academically the most opportune time to begin or resume education and that delay of enrollment until normal expiration of service would cause undue handicap.

**App. 507**

*DoDI 1332.14, August 1, 2024*

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| DEP | Delayed Entry Program |
| DoDD | DoD directive |
| DoDI | DoD instruction |
| DTM | directive-type memorandum |
| ESP | expedited screening protocol |
| GO/FO | general officer or flag officer |
| IRR | Individual Ready Reserve |
| PTSD | post-traumatic stress disorder |
| TBI | traumatic brain injury |
| UCMJ | Uniform Code of Military Justice |
| U.S.C. | United States Code |

## G.2. DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purposes of this instruction.

| TERM | DEFINITION |
|---|---|
| alien | Any person not a citizen or national of the United States. |
| commander | A commissioned or warrant officer who, by virtue of rank and assignment, exercises primary command authority over a military organization or prescribed territorial area that, under pertinent official directives, is recognized as a "command." |
| conditional waiver | A statement initiated by a respondent waiving the right to a board proceeding contingent upon receiving a service characterization or separation description higher than the least favorable characterization or description authorized for the basis of separation in the notice to the respondent. |

**App. 508**

*DoDI 1332.14, August 1, 2024*

| TERM | DEFINITION |
|------|------------|
| **convening authority** | The separation authority, or a commanding officer who has been authorized by the Secretary of the Military Department concerned to process a case, except for final action, and who otherwise has the qualifications to act as a separation authority. |
| **discharge** | Complete severance from all military status gained through enlistment or induction. |
| **domicile** | Legal residence. |
| **dropped from the Service rolls** | A type of release from military service that may be used to separate enlisted Service members who are away without official leave for 30 days or more and reported as a deserter; or enlisted Service members who are confined by civilian authorities for at least 6 months. |
| **enlisted Service member** | A Service member serving in an enlisted grade of E-1 through E-9. |
| **entry-level status** | Upon enlistment, a Service member qualifies for entry-level status during the first 365 days of continuous active military service; or the first 365 days of continuous active service after a service break of more than 92 days of active service. |

A Service member of a Reserve Component who is not on active duty or who is serving under a call or order to active duty for 365 days or less begins entry-level status upon enlistment in a Reserve Component. Entry-level status for such a Service member of a Reserve Component terminates:

    If the Service member is ordered to active duty for training for one continuous period of 180 days or more, 365 days after beginning training; or

    If the Service member is ordered to active duty for training under a program that splits the training into two or more separate periods of active duty, 180 days after the beginning of the second period of active-duty training.

    For the purposes of characterization of service or description of separation, the Service member's status is determined by the date of notification as to the initiation of separation proceedings.

| | |
|------|------------|
| **ESP** | Defined in DTM-19-008. |

**App. 509**

*DoDI 1332.14, August 1, 2024*

| TERM | DEFINITION |
|------|------------|
| **military record** | An individual's overall performance while a Service member, including personal conduct and performance of duty. |
| **release from active duty** | Termination of active-duty status and transfer to a Reserve Component not on active duty, including transfer to the IRR. |
| **respondent** | An enlisted Service member who has been notified that action has been initiated to separate them from active-duty military service. |
| **separation** | A general term that includes discharge, release from active duty, release from Service custody and control, transfer to the IRR, and similar changes in active or Reserve status. |
| **separation authority** | An official authorized by the Secretary of the Military Department concerned to take final action with respect to a specified type of separation. |
| **Service member** | An enlisted, warrant officer, or commissioned officer. |
| **sexual assault** | Defined in Volume 1 of DoDI 6495.02 |
| **sexual offense** | Rape, sexual assault, forcible sodomy, or an attempt to commit one or more of these offenses. |

**App. 510**

*DoDI 1332.14, August 1, 2024*

# REFERENCES

American Psychiatric Association's Committee on Nomenclature and Statistics, "Diagnostic and Statistical Manual of Mental Disorders," current edition

Code of Federal Regulations, Title 32

Directive-type Memorandum 19-008, "Expedited Screening Protocol (ESP)," July 31, 2019, as amended

DoD Directive 1332.41, "Boards for Correction of Military Records (BCMRs) and Discharge Review Boards (DRBs)," March 8, 2004, as amended

DoD Directive 1344.10, "Political Activities by Members of the Armed Forces," February 19, 2008

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1010.01, "Military Personnel Drug Abuse Testing Program (MPDATP)," September 13, 2012, as amended

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoD Instruction 1300.04, "Inter-Service and Inter-Component Transfer of Service Members," July 25, 2017

DoD Instruction 1300.06, "Conscientious Objectors," July 12, 2017

DoD Instruction 1304.26, "Qualification Standards for Enlistment, Appointment, and Induction," March 23, 2015, as amended

DoD Instruction 1308.03, "DoD Physical Fitness/Body Composition Program," March 10, 2022

DoD Instruction 1315.15, "Separation Policies for Survivorship," May 19, 2017

DoD Instruction 1332.18, "Disability Evaluation System," November 10, 2022

DoD Instruction 1332.28, "Discharge Review Board (DRB) Procedures and Standards," April 4, 2004

DoD Instruction 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoD Instruction 1336.01, "Certificate of Uniformed Service (DD Form 214/5 Series)," February 17, 2022

DoD Instruction 5200.02, "DoD Personnel Security Program (PSP)," March 21, 2014, as amended

DoD Instruction 5500.14, "Naturalization of Aliens Serving in the Armed Forces of the United States and of Alien Spouses and/or Alien Adopted Children of Military and Civilian Personnel Ordered Overseas," January 4, 2006

DoD Instruction 6490.04, "Mental Health Evaluations of Members of the Military Services," March 4, 2013, as amended

DoD Instruction 6495.02, Volume 1, "Sexual Assault Prevention and Response:  Program Procedures," March 28, 2013, as amended

DoD Instruction 7730.68, "Uniformed Services Human Resources Information System," September 1, 2023

**App. 511**

*DoDI 1332.14, August 1, 2024*

Manual for Courts-Martial, United States, current edition

National Center for Education Statistics of the Department of Education, "Education Directory for Post-secondary Education," current edition[1]

Public Law 112-239, Section 518, "National Defense Authorization Act for Fiscal Year 2013," January 2, 2013

Public Law 115-91, Section 528, "National Defense Authorization Act for Fiscal Year 2018," December 12, 2017

United States Code, Title 10

United States Code, Title 38, Section 5303

---

[1] Available at https://nces.ed.gov/

**App. 512**

# EXHIBIT B



# DoD Instruction 1332.30

## Commissioned Officer Administrative Separations

---

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | May 11, 2018 |
| **Change 3 Effective:** | September 9, 2021 |
| **Releasability:** | Cleared for public release. Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 1332.30, "Separation of Regular and Reserve Commissioned Officers," November 25, 2013 |
| **Approved by:** | Stephanie A. Barna, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness |
| **Change 3 Approved by:** | Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness |

---

**Purpose:** In accordance with the authority in DoD Directive 5124.02, this issuance:

• Establishes policy, assigns responsibilities, and prescribes procedures governing administrative separation of Regular and Reserve commissioned officers.

• Implements Sections 572(a)(2) and 578 of Public Law 112-239.

• Implements Section 528 of Public Law 115-91.

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ................................................................. 4
  1.1  Applicability. .......................................................................................................... 4
  1.2.  Policy. ..................................................................................................................... 4
  1.3.  Summary of Change 3. ........................................................................................... 4
SECTION 2: RESPONSIBILITIES .......................................................................................... 5
  2.1.  Assistant Secretary of Defense for Manpower and Reserve Affairs. .................... 5
  2.2.  Secretaries of the Miltary Departments. ................................................................ 5
  2.3.  Secretaries of the Army and Air Force. ................................................................. 5
SECTION 3: REASONS FOR SEPARATION ............................................................................ 7
  3.1.  Substandard Performance of Duty. ........................................................................ 7
  3.2.  Acts of Misconduct or Moral or Professional Dereliction. ................................... 7
  3.3.  Retention Not Clearly Consistent with National Security Interests. ...................... 7
  3.4.  Sentence by Court-Martial and Dropping from the Rolls (DFR). .......................... 8
    a.  Sentence by Court Martial. ................................................................................. 8
    b.  DFR. ................................................................................................................... 8
  3.5.  Multiple Reasons. ................................................................................................... 9
  3.6.  Separation Review Requirements. .......................................................................... 9
SECTION 4: PROCEDURES FOR NON-PROBATIONARY COMMISSIONED OFFICERS ............... 10
  4.1.  Initiation of Action. ............................................................................................... 10
  4.2.  Show-Cause Authority (SCA). .............................................................................. 10
  4.3.  Board of Inquiry. .................................................................................................... 10
  4.4.  Retirement or Discharge. ....................................................................................... 12
  4.5.  Application for Retirement or Discharge. .............................................................. 13
  4.6.  Limitations. ............................................................................................................ 13
SECTION 5: BOARD OF INQUIRY PROCEDURES .................................................................. 14
  5.1.  Board Membership Challenges. ............................................................................. 14
  5.2.  Legal Advisor. ....................................................................................................... 14
  5.3.  Recorder. ................................................................................................................ 14
  5.4.  Rights of Respondent. ............................................................................................ 14
  5.5.  Board Determination. ............................................................................................. 15
  5.6.  Report of Proceedings. ........................................................................................... 16
SECTION 6: PROCEDURES FOR CERTAIN PROBATIONARY COMMISSIONED OFFICERS ......... 17
  6.1.  Initiation of Action. ............................................................................................... 17
  6.2.  Processing. ............................................................................................................. 17
SECTION 7: CHARACTERIZATION OF SERVICE ................................................................... 19
  7.1.  Discharge for Substandard Performance of Duty. ................................................. 19
  7.2.  Discharge for Misconduct, Moral or Professional Dereliction, or in the Interest of
    National Security. .................................................................................................... 19
  7.3.  Dropped from the Rolls. ......................................................................................... 19
  7.4.  Counseling on Rights and Benefits. ....................................................................... 19
SECTION 8: REVIEW REQUIREMENTS FOR UNRESTRICTED REPORT OF SEXUAL ASSAULT ..... 20
  8.1.  Review. ................................................................................................................... 20

**App. 515**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

8.2.  Processing. .................................................................................................................. 20
SECTION 9:  OTHER SEPARATION REVIEW REQUIREMENTS .......................................................... 21
    9.1.  Additional Requirements for Pre-Separation Health Assessments.................................. 21
    9.2.  Mental Health Conditions and Circumstances................................................................. 22
GLOSSARY ............................................................................................................................... 24
    G.1.  Acronyms. ....................................................................................................................... 24
    G.2.  Definitions....................................................................................................................... 24
REFERENCES ............................................................................................................................ 27

**App. 516**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1 APPLICABILITY.

a.  This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

b.  This issuance applies to commissioned officers as defined in the Glossary.  That definition does not include commissioned warrant officers or retired commissioned officers.

## 1.2.  POLICY.

a.  DoD will:

(1)  Promote the readiness of the Military Services by maintaining high standards of conduct and performance.

(2)  Judge the suitability of persons for military service based on their conduct and their ability to meet required standards of duty, performance, and discipline.

(3)  Separate from military service those commissioned officers who will not or cannot:

(a)  Meet rigorous and necessary standards of duty, performance, and discipline.

(b)  Maintain those high standards of performance and conduct through appropriate actions that sustain the traditional concept of honorable military service.

(c)  Exercise the responsibility, fidelity, integrity, or competence required of them.

b.  Commissioned officers of the Army National Guard of the United States or the Air National Guard of the United States not on active duty, including officers released from active duty for cause and returned to the control of the State, are subject to withdrawal of Federal recognition in accordance with Section 323 of Title 32, United States Code (U.S.C.).

c.  Any commissioned officer convicted of an offense found in Article 120, Uniform Code of Military Justice (Section 920 of Title 10 U.S.C), who is not punitively discharged for such a conviction will be processed for administrative separation once the conviction is final, in accordance with Section 572(a)(2) of Public Law 112-239.

## 1.3.  SUMMARY OF CHANGE 3.  The administrative change to this issuance removes separation language based on gender dysphoria pursuant to DoD Instruction 1300.28.

**App. 517**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 2: RESPONSIBILITIES

**2.1.  ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS.**  Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness, the Assistant Secretary of Defense for Manpower and Reserve Affairs provides guidance for the administration of this issuance and interprets its provisions when requested to do so by representatives of the Military Departments or others outside the DoD.

**2.2.  SECRETARIES OF THE MILTARY DEPARTMENTS.**  The Secretaries of the Military Departments:

a.  Administer Service commissioned officer separation programs consistent with Sections 1181 and 14902 of Title 10, U.S.C., and this issuance.

b.  Prescribe regulations that:

(1)  Are consistent with the policy and procedures established in this issuance.

(2)  Comply with Section 572(a)(2) of Public Law 112-239.

(3)  Comply with Section 578 of Public Law 112-239, as described in Section 8 of this issuance.

c.  May discharge from military service officers on the Active Duty List (ADL) and the Reserve Active Status List (RASL) who have fewer than 6 years commissioned service when there is a need to reduce the number of officers in that Military Service to meet budgetary or force size requirements, in accordance with Sections 630(1)(A) and 14503(a)(1) of Title 10, U.S.C.  When using this authority, the procedures in Section 7 for discharging probationary officers do not apply.

d.  Submit recommendations for changes in this issuance to the Under Secretary of Defense for Personnel and Readiness.

**2.3.  SECRETARIES OF THE ARMY AND AIR FORCE.**  In addition to the responsibilities in Paragraph 2.2., the Secretaries of the Army and the Air Force will prescribe regulations implementing Section 323 of Title 32, U.S.C.

a.  All officers considered for withdrawal of Federal recognition in accordance with Section 323 of Title 32, U.S.C., will receive an efficiency board review to determine general fitness of the officer for continued Federal recognition.

b.  In accordance with Section 14907(b) of Title 10, U.S.C., an officer of the Army National Guard of the United States or the Air National Guard of the United States whose Federal recognition as an officer of the National Guard is withdrawn in accordance with Section 323(b)

**App. 518**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

of Title 32, U.S.C., will be discharged from appointment as a Reserve officer of the Army or the Air Force, as applicable.

**App. 519**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 3:  REASONS FOR SEPARATION

**3.1.  SUBSTANDARD PERFORMANCE OF DUTY.**  A commissioned officer may be separated from a Military Service, in accordance with regulations prescribed by the Secretary of the Military Department concerned, when found to be substandard in:

a.  Performance of duty, including leadership.

b.  Efficiency.

c.  Response to training in the officer's assigned specialty.

d.  Attitude or character.

e.  Maintenance of satisfactory progress while in an active duty status skills awarding program.

**3.2.  ACTS OF MISCONDUCT OR MORAL OR PROFESSIONAL DERELICTION.**  A commissioned officer may be separated from a Military Service, in accordance with regulations prescribed by the Secretary of the Military Department concerned, when found to have committed an act or acts of misconduct or moral or professional dereliction, which include (but are not limited to):

a.  Serious or recurring misconduct, punishable by military or civilian authorities.

b.  Discreditable mismanagement, whether intentional or not, of personal affairs, including financial affairs.

c.  Substance or drug misuse.

d.  Culpable failure to perform assigned duties or to complete required training.

e.  Culpable loss or compromise of professional status; qualifications or licensure; or certification required for performance of military duties.

f.  Intentional misrepresentation of facts in obtaining an appointment or in official statements or records.

g.  Final conviction for rape or sexual assault, forcible sodomy, or an attempt to commit one of those offenses.

**3.3.  RETENTION NOT CLEARLY CONSISTENT WITH NATIONAL SECURITY INTERESTS.**  In accordance with DoD Manual 5200.02, a commissioned officer may be separated from military service when it is determined that the commissioned officer's retention is not clearly consistent with the interest of national security.

**App. 520**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

### 3.4. SENTENCE BY COURT-MARTIAL AND DROPPING FROM THE ROLLS (DFR).

**a. Sentence by Court Martial.** A commissioned officer sentenced by a court-martial to a period of confinement for more than 6 months may be separated from military service, in accordance with Sections 1167 and 12687 of Title 10, U.S.C. Separation from military service may occur at any time after the sentence to confinement has become final, and the person has served in confinement for a period of 6 months, in accordance with Chapter 47 of Title 10, U.S.C. (also known and referred to in this issuance as the "Uniform Code of Military Justice".)

**b. DFR.**

(1) General Policy.

(a) Any Regular commissioned officer and any Reserve commissioned officer, may be dropped from the rolls of the Military Service concerned when any of the following criteria in Sections 1161(b) and 12684 of Title 10, U.S.C. are met:

<u>1</u>. The officer may be separated from the Military Service concerned in accordance with Paragraph 3.4.a.;

<u>2</u>. The officer has been absent without authority for at least 3 months; or

<u>3</u>. The officer was sentenced to confinement in a Federal or State penitentiary or correctional institution after being found guilty of an offense by a court, other than a military court, and whose sentence is final.

(b) DFR requests should be made only in cases where severing all of an officer's ties with his or her Military Service and the loss of retirement eligibility are warranted.

(2) Approval Authority.

(a) Regular Officers. The President is the approval authority for DFR requests for Regular officers in a grade above O-3. The Secretary of Defense is the approval authority for DFR requests for all other Regular officers.

(b) Reserve Officers. The President is the approval authority for DFR requests for Reserve officers in a grade above O-5. The Secretary of Defense is the approval authority for DFR requests for all other Reserve officers.

(3) Procedures.

(a) The Secretary of the Military Department concerned will endorse a DFR package routed for approval.

(b) Once approved by the appropriate authority, the Secretary of the Military Department concerned will:

**App. 521**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

    1.  In the case of an officer on the ADL or RASL, issue a DD Form 214 in accordance with Paragraph 7.3. of this issuance and DoD Instruction 1336.01.  Block 18 will contain the entry "Dropped from the Rolls by the President of the United States" or "Dropped from the rolls by the Secretary of Defense," as appropriate.  The characterization of service in Block 24 will be "Uncharacterized."

    2.  Remove the name of the officer from the ADL, RASL, as applicable.

    3.  Remove the officer from the Defense Finance and Accounting Service system and any associated pay databases.

    4.  Remove the officer from the Defense Enrollment Eligibility Reporting System.

**3.5.  MULTIPLE REASONS.**  A commissioned officer may be considered for separation for more than one of the reasons described in this section.  Separate findings under each applicable paragraph will be required for each separation basis identified.

**3.6.  SEPARATION REVIEW REQUIREMENTS.**  Before a commissioned officer may be separated under the provisions of Paragraph 3.2., the Military Service must ensure compliance with the review requirements in Paragraph 9.1. of this issuance.

**App. 522**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 4:  PROCEDURES FOR NON-PROBATIONARY COMMISSIONED OFFICERS

**4.1.  INITIATION OF ACTION.**  The Secretaries of the Military Departments will prescribe procedures for the initiation of separation recommendations for non-probationary commissioned officers.

**4.2.  SHOW-CAUSE AUTHORITY (SCA).**

a.  The SCA will determine whether an officer is required to show cause for retention in military service for one or more of the reasons listed in Section 3 of this issuance, and as further defined by the Secretary of the Military Department concerned.

b.  The SCA will:

(1)  Evaluate all Service information about the case under consideration.

(2)  Determine if the record is sufficient to require the officer to show cause for retention in military service.

(a)  If the officer is not required to show cause, close the case.

(b)  If the officer is required to show cause, the SCA:

1.  Refers the case to a Board of Inquiry.

2.  Provides the reasons for making the show-cause determination to the officer in writing.

(3)  Consider the initiation of a separation action if the record supports a finding of drug misuse in accordance with Section 3.

c.  In accordance with Sections 618(c)(2) or 14109(c) of Title 10, U.S.C., the Secretary of the Military Department concerned may require an officer to show cause for retention on active duty or in an active status based on the recommendation of a promotion selection board.

d.  The SCA will appoint members of Boards of Inquiry, unless his or her Departmental regulations reserve that authority to another official.

**4.3.  BOARD OF INQUIRY.**

**a.  Function.**  A Board of Inquiry is an administrative board that considers all relevant and material evidence about the case and functions in accordance with rules and procedures established by this instruction and the Secretary of the Military Department concerned.

**App. 523**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

(1)  The Board of Inquiry will give a fair and impartial hearing to an officer required by the Secretary of the Military Department concerned to show cause for retention on active duty or in an active status.

(2)  The Board of Inquiry makes findings on each reason for separation and recommends if a respondent should be retained in the military service.  The board recommends the characterization of service, in accordance with this instruction and regulations prescribed by the Secretary of the Military Department concerned, if it recommends discharge.

(3)  The Board of Inquiry's findings must be supported by a preponderance of the evidence.

(a)  An officer is given the opportunity to respond and rebut the basis for contemplated separation in a hearing before a Board of Inquiry once they are informed of the pending separation.

(b)  The hearing provides a forum for the officer concerned to present reasons the contemplated action should not be taken.

**b.  Composition.**

(1)  Each board convened will be composed of at least three commissioned officers, each with the qualifications prescribed in Paragraph 4.3.c.

(2)  If the respondent is a Reserve Component officer, one or more of the voting members will be a Reserve Component officer, preferably of the same component.  This requirement cannot be waived by the respondent.

(3)  The senior member will be the president of the board.

(4)  A nonvoting legal advisor may also be appointed to assist the Board of Inquiry.

**c.  Officers Eligible to Serve on Boards.**

(1)  Each commissioned officer who serves on a board must be an officer on the ADL or on the RASL of the same Military Service as the respondent.

(2)  A commissioned officer may not serve on a board unless they are:

(a)  On active duty or in an active status in a grade above major or lieutenant commander.

(b)  Senior in grade to any respondent being considered by the board.

(3)  At least one member of the board will be in a grade above lieutenant colonel or commander.

SECTION 4:  PROCEDURES FOR NON-PROBATIONARY COMMISSIONED OFFICERS                11

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

(4)  If qualified commissioned officers from the ADL or from the RASL are not available in sufficient numbers to comprise a Board of Inquiry, the Secretary of the Military Department concerned will appoint retired Regular or Reserve commissioned officers of the same Military Service.  The retired grade of these officers must:

(a)  Be above the grade of major or lieutenant commander; or

(b)  In the case of an officer who will be the senior officer of the board, above the grade of lieutenant colonel or commander; and

(c)  Senior in grade to the respondent being considered by the board.

(5)  A retired general or flag officer (GO/FO) who is on active duty solely for the purpose of serving on a board will not be counted against any limitations on the number of GO/FOs who may be on active duty.

(6)  An individual cannot be a member of more than one board convened pursuant to this issuance to consider the same respondent.

**d.  Convening.**  A Board of Inquiry will convene in accordance with the regulations prescribed by the Secretary of the Military Department concerned.

**e.  Determinations.**  Following the board procedure, the Board of Inquiry will make a recommendation in writing to the Secretary of the Military Department concerned.

(1)  If a Board of Inquiry determines that the officer established that they should be retained on active duty or in an active status, the initiating SCA will close the case.

(2)  If a Board of Inquiry determines that an officer failed to establish that they should be retained on active duty or in an active status, the SCA forwards the case and its recommendation regarding characterization of service to the Secretary of the Military Department concerned in accordance with the Departmental regulations.

## 4.4.  RETIREMENT OR DISCHARGE.

**a.  Retirement.**  A commissioned officer separated from active duty or from an active status in accordance with this issuance who is eligible for voluntary retirement under any law on the date of separation may request retirement and be retired in the grade and with the retired pay for which the officer is eligible if retired under such provision.

**b.  Discharge.**  A commissioned officer separated from military service in accordance with this issuance who is not eligible for retirement under any law on the date of such separation will be discharged:

(1)  In the grade then held with an honorable or general (under honorable conditions) characterization of service if separated only for substandard performance of duty; or

**App. 525**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

(2)  In the grade then held with a characterization of service determined by the Secretary of the Military Department concerned, but no less favorable that that recommended by the board of Inquiry, if separated for misconduct, moral or professional dereliction, or in the interest of national security.

## 4.5.  APPLICATION FOR RETIREMENT OR DISCHARGE.

a.  At any time before final action in the case, the Secretary of the Military Department concerned may grant a request by the commissioned officer concerned for:

(1)  Voluntary retirement.

(2)  Transfer to the Retired Reserve when the officer is a reservist.

(3)  Discharge.

b.  This action of the Secretary of the Military Department concerned is final.

## 4.6.  LIMITATIONS.

a.  A commissioned officer who is required to show cause for retention in military service because of substandard performance of duty and is retained on active duty or in an active status by a Board of Inquiry may not again be required to show cause for retention for the same reasons within the one-year period beginning on the date of the determination to retain.

b.  Subject to Paragraph 4.6.c., a commissioned officer required to show cause for retention in military service because of misconduct, moral or professional dereliction, or in the interest of national security, and who is retained on active duty or in an active status by a Board of Inquiry, may again be required to show cause for retention at any time.

c.  A commissioned officer may not again be required to show cause for retention in military service solely because of conduct that was the subject of previous proceedings, unless the findings and recommendations of the Board of Inquiry that considered the case are determined to have been the result of fraud or collusion.  Nothing in this paragraph will prohibit the SCA from reconvening a defective Board of Inquiry prior to final action.

d.  An acquittal or a not-guilty finding in a civilian or military criminal proceeding, conviction and punishment by a civilian or military court, or military nonjudicial punishment in accordance with Article 15 of the Uniform Code of Military Justice, do not preclude an administrative discharge action.

**App. 526**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

## SECTION 5:  BOARD OF INQUIRY PROCEDURES

**5.1.  BOARD MEMBERSHIP CHALLENGES.**  In accordance with regulations prescribed by the Secretary of the Military Department concerned, board members are subject to challenge for cause only.  If the membership of the board is reduced to less than three officers, the Board of Inquiry convening authority will appoint additional members.

**5.2.  LEGAL ADVISOR.**  The legal advisor, if appointed, performs such functions as the Secretary of the Military Department concerned may prescribe, except that they cannot dismiss any allegation against the respondent or terminate the proceedings.

**5.3.  RECORDER.**  The government may be represented before the board by a recorder whose duties will be prescribed by the Secretary of the Military Department concerned.

**5.4.  RIGHTS OF RESPONDENT.**

 a.  When a case is referred to a Board of Inquiry, the respondent must be notified at least 30 days before the hearing in writing.

  (1)  The notification will include the reasons for which they are required to show cause for retention in the Military Service and of the least favorable characterization of discharge for which the officer may be recommended.

  (2)  Respondent will be notified by personal service with written receipt by the respondent (or duly witnessed by a third party, if the respondent refuses to acknowledge receipt).

  (3)  When personal service is unavailable, respondent will be notified by:

   (a)  Registered or certified mail or electronic mail equivalent.  A return receipt, or equivalent, will be requested.

   (b)  Notification is sent to the respondent's last known address, or to the next of kin under regulations prescribed by the Military Department concerned.

 b.  The respondent will respond within the timeframe given by the Board of Inquiry.  Failure to respond within the timeframe given may be construed as the respondent voluntarily electing not to appear before the board.

 c.  The respondent may appear in person at all proceedings of the Board of Inquiry.

 d.  The respondent may be represented either by:

  (1)  Military counsel appointed by the convening authority; or

**App. 527**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

(2)  Military counsel of the respondent's own choice, (if the counsel of choice is determined to be reasonably available under regulations prescribed by the Secretary of the Military Department concerned); or

(3)  Civilian counsel without expense to the government.  If civilian counsel is employed, military counsel need not be assigned, if so provided by the regulations of the Secretary of the Military Department concerned.

e.  In accordance with regulations prescribed by the Secretary of the Military Department concerned, the respondent will be allowed full access to, and given copies of, records that are determined to be relevant to the case pursuant to such regulations.

(1)  The Board of Inquiry may withhold any records that the Secretary of the Military Department concerned determines should be withheld in the interest of national security.

(2)  When any records are withheld, the respondent will receive, to the extent practicable, a summary of the records withheld.

f.  The respondent may request any witness appear before the board of whose testimony is considered pertinent to their case.

(1)  A determination on the availability of the witness, witness appearance requirements, and the materiality of the witness are made in accordance with regulations of the Secretary of the Military Department concerned.

(2)  Witnesses not on active duty must appear voluntarily and at no expense to the government, unless otherwise authorized by the Secretary of the Military Department concerned.

g.  The respondent may submit documents from his or her record of service, letters, answers, depositions, sworn or unsworn statements, affidavits, certificates, or stipulations at any time before the board convenes or during the proceedings, subject to regulations prescribed by the Secretary of the Military Department concerned.  Those documents may include depositions of witnesses not deemed to be reasonably available or of witnesses unwilling to appear voluntarily.

h.  The respondent may testify in their behalf subject to Section 831 of Title 10, U.S.C.

i.  The respondent and their counsel may question any witness who appears before the board.

j.  The respondent or counsel for the respondent may present oral or written argument to the board.

k.  The respondent may request a continuance, in accordance with his or her Military Departmental regulations, for the preparation of their case before the board, when necessary.

## 5.5.  BOARD DETERMINATION.  The Board of Inquiry will decide retention or separation on the evidence received or developed during open hearings.  Voting will be conducted in closed

**App. 528**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

session with only voting board members in attendance.  All findings and recommendations will be determined by a majority vote.

**5.6.  REPORT OF PROCEEDINGS.**  The record of proceedings will be kept in summarized form unless a verbatim record is required by the SCA or the Secretary of the Military Department concerned.

    a.  In all cases, board findings and recommendations must be stated in clear and concise language and signed by all board members concurring.

    b.  Any board members who disagree with the board's findings or recommendations may file a statement of non-concurrence, including their reasons, for inclusion in the record.

    c.  The respondent will be given a copy of the report of the proceedings and the board's findings and recommendations.  The respondent will have an opportunity to submit written comments to the SCA for consideration.

    d.  When the Board of Inquiry determines retention in military service is warranted and the case is closed, a summarized report of the proceedings will be prepared in accordance with the regulations of the Military Department concerned.

**App. 529**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 6: PROCEDURES FOR CERTAIN PROBATIONARY COMMISSIONED OFFICERS

## 6.1. INITIATION OF ACTION.

a.  If the SCA determines that an honorable or general characterization of service is appropriate, the SCA may initiate separation action without a Board of Inquiry (subject to the regulations of the Military Department concerned) for any of the reasons stated in Section 3, or for reasons that the Secretary of the Military Department concerned may prescribe by regulation. In such cases, the respondent will be advised in writing:

(1)  The reason separation action was initiated and the characterization of service (honorable or general) recommended.

(2)  That they may tender a resignation.

(3)  That they may submit or decline to submit a rebuttal statement, or other matters for the SCA to consider instead of a resignation.

(4)  That they may confer with appointed or retained counsel.  The officer will be given a reasonable period of time to prepare their response.

b.  If the SCA deems that an other than honorable discharge may be appropriate, the SCA may refer the case directly to a Board of Inquiry.

## 6.2. PROCESSING.

a.  In cases in which the SCA recommends an honorable or general characterization of service, the recommendation for separation, supporting documentation, respondent's rebuttal statement (if submitted), and any resignation (if tendered) will be forwarded to the Secretary of the Military Department concerned.  The Secretary will:

(1)  Accept the resignation (if tendered);

(2)  Deny the resignation (if tendered) and discharge the respondent with an honorable or general characterization of service;

(3)  Deny the resignation (if tendered) and refer the case to a Board of Inquiry if the Secretary decides that an other than honorable characterization of service is appropriate; or

(4)  Retain the respondent.

b.  Cases referred to a Board of Inquiry by the SCA or the Secretary of the Military Department concerned will be processed in accordance with Section 4 and Section 5, when applicable.

**App. 530**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

c.  In all cases, the action of the Secretary of the Military Department concerned is final.

SECTION 6:  PROCEDURES FOR CERTAIN PROBATIONARY COMMISSIONED OFFICERS                    18

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 7: CHARACTERIZATION OF SERVICE

**7.1.  DISCHARGE FOR SUBSTANDARD PERFORMANCE OF DUTY.**  The characterization of service will be honorable or general (under honorable conditions) when substandard performance of duty is the sole basis for the discharge.


**7.2.  DISCHARGE FOR MISCONDUCT, MORAL OR PROFESSIONAL DERELICTION, OR IN THE INTEREST OF NATIONAL SECURITY.**  The characterization of service will be honorable, general (under honorable conditions), or under other than honorable conditions.

   **a.  Consideration.**  The characterization of service is predicated on the commissioned officer's behavior and performance of duty while a member of a Military Service.

      (1)  The characterization of service will normally be based on a pattern of behavior and an officer's entire duty performance rather than an isolated incident.

      (2)  There are limited circumstances in which conduct reflected by a single incident may provide the basis for the characterization of service.

   **b.  Exceptions.**  The characterization of service will be honorable when the grounds for discharge are based solely on pre-service activities, other than intentional misrepresentation or omission of facts in obtaining an appointment or in official statements or records.


**7.3.  DROPPED FROM THE ROLLS.**  A commissioned officer who is dropped from the rolls of the military service in accordance with Section 1161 or 12684 of Title 10, U.S.C., and this issuance will receive an uncharacterized characterization of service in DD-214, Block 24.


**7.4.  COUNSELING ON RIGHTS AND BENEFITS.**  In all instances, officers will be counseled as to the impact of the characterization of their service on rights and benefits, including civilian employment and veterans' benefits.  All officers being separated from the military with an other than honorable discharge will be informed, in writing, that they may petition the Veterans Benefits Administration of the Department of Veterans Affairs to receive, despite the characterization of their service, certain benefits under the laws administered by the Secretary of Veterans Affairs.  This written notification will be provided in conjunction with notification of the administrative separation or as soon thereafter as practicable.

**App. 532**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 8:  REVIEW REQUIREMENTS FOR UNRESTRICTED REPORT OF SEXUAL ASSAULT

## 8.1.  REVIEW.

a.  A commissioned officer may request GO/FO review of the circumstances of and grounds for an involuntary separation if:

(1)  They made an unrestricted report of sexual assault, in accordance with Volume 1 of DoD Instruction 6495.02.

(2)  They is recommended for involuntary separation from military service within 1 year of final disposition of his or her sexual assault case.

b.  This review requirement expands the requirement of Section 578 of Public Law 112-239 to ensure that an involuntary separation is not initiated in retaliation for making an unrestricted report of sexual assault.

## 8.2.  PROCESSING.

a.  A commissioned officer who meets the requirements of Paragraph 8.1.a. must submit their written request to the first GO/FO in the officer's chain of command before approval of final separation action.

b.  A request submitted after final separation action is complete will not be considered, but the separated commissioned officer may apply to the appropriate Military Department Discharge Review Board or Board for Correction of Military or Naval Records for consideration.

c.  A commissioned officer who meets the requirements of Paragraph 8.1.a. and who submits a timely request may not be separated until the GO/FO conducts a review and concurs with the circumstances and grounds for the involuntary separation.

**App. 533**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# SECTION 9: OTHER SEPARATION REVIEW REQUIREMENTS

## 9.1. ADDITIONAL REQUIREMENTS FOR PRE-SEPARATION HEALTH ASSESSMENTS.

a. The Secretary of the Military Department concerned will prescribe procedures to comply with statutory requirements and conduct a health assessment sufficient to evaluate the health of commissioned officers at the time of separation, in accordance with Sections 1145 and 1177 of Title 10, U.S.C.

b. The health assessment should determine any existing medical condition incurred during active duty, provide baseline information for future care, complete an officer's military medical record, and provide a final opportunity before separation to document any health concerns, exposures, or risk factors associated with active duty.

(1) A commissioned officer must receive a medical examination to determine if the effects of post-traumatic stress disorder (PTSD) or traumatic brain injury (TBI) could be related to the basis for involuntary separation in order to comply with Section 1177 of Title 10, U.S.C. The assessment will occur if the officer:

(a) Is separated under a characterization that is not either honorable or general (under honorable conditions).

(b) Was deployed overseas to a contingency operation or was sexually assaulted during the previous 24 months.

(c) Is diagnosed by a physician, clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse as experiencing PTSD or TBI, or reasonably alleges the influence of PTSD or TBI based on deployed service to a contingency operation or sexual assault during the previous 24 months.

(d) Is not separated by a court-martial or other Uniform Code of Military Justice proceeding. Separation in lieu of court-martial does not constitute a court-martial or other Uniform Code of Military Justice proceeding, and therefore, compliance with Section 1177 of Title 10, U.S.C., is required.

(2) In a case involving PTSD, the required medical examination will be performed by a clinical psychologist, psychiatrist, licensed clinical social worker, or psychiatric advanced practice registered nurse.

(3) In a case involving TBI, the medical examination may be performed by a physician, clinical psychologist, psychiatrist, or other health-care professional, as appropriate.

c. A commissioned officer receiving a medical examination for PTSD or a TBI will not be separated until the result of the medical examination is reviewed by the individuals responsible

**App. 534**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

for evaluating, reviewing, and approving the separation case, as determined by the Secretary of the Military Department concerned.

## 9.2. MENTAL HEALTH CONDITIONS AND CIRCUMSTANCES.

a. The Secretary of the Military Department concerned may authorize separation of a commissioned officer on the basis of conditions and circumstances not constituting a physical disability that interfere with assignment to or performance of duty. Separation processing will not be initiated until the commissioned officer:

(1) Is formally counseled on their deficiencies and given an opportunity to correct those deficiencies.

(2) Is counseled in writing that the condition does not qualify as a disability.

b. The Secretary of the Military Department concerned may not authorize involuntary separation based on a determination that the member is unsuitable for deployment or worldwide assignment because of a medical condition if a physical evaluation board determined the member to be fit for duty for the same medical condition. The only exception is if the separation is approved by the Secretary of Defense.

(1) If the Secretary of the Military Department concerned has reason to believe the medical condition considered by the physical evaluation board renders the officer unsuitable for continued military service, that Secretary may direct the physical evaluation board to reevaluate the officer.

(2) If, based on reevaluation by a physical evaluation board, a commissioned officer is determined to be unfit to perform the duties of his or her office, grade, or rank, the member may be retired or separated for physical disability consistent with Chapter 61 of Title 10, U.S.C.

c. Separation on the basis of personality disorder or other mental disorder not constituting a physical disability is authorized only if:

(1) An examination is made by an authorized mental health provider in accordance with DoD Instruction 6490.04, the Diagnostic and Statistical Manual of Mental Disorders, and Military Department procedures and the health provider concludes that the disorder is so severe that the Service member's ability to function effectively in the military environment is significantly impaired.

(a) Observed behavior of specific deficiencies should be documented in appropriate counseling or personnel records.

(b) Documentation will include history from supervisors, peers, and others, as necessary, to establish that the behavior is persistent; interferes with assignment to or performance of duty; and continued after the commissioned officer was counseled and afforded an opportunity to overcome the deficiencies.

**App. 535**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

(2)  The commissioned officer was formally counseled in writing on deficiencies as reflected in appropriate counseling or personnel records and has been afforded an opportunity to overcome those deficiencies.

(3)  The commissioned officer has been counseled in writing on the diagnosis of a personality disorder or other mental disorder not constituting a physical disability.

(4)  For commissioned officers who have served, or are currently serving in imminent danger pay areas, a diagnosis of personality disorder or other mental disorder not constituting a physical disability will:

(a)  Be corroborated by a peer, or higher-level, mental health professional.

(b)  Be endorsed by the Surgeon General of the Military Department concerned.

(c)  Address PTSD and other mental illness co-morbidity.  A separation for personality disorder or other mental disorder not constituting a physical disability is not authorized if service-related PTSD is also diagnosed unless the Service member is found fit for duty by the disability evaluation system.

(5)  For commissioned officers who have made an unrestricted report of sexual assault or who have self-disclosed that they are a victim of a sex-related offense, an intimate partner violence-related offense, or a spousal abuse offense during service, a diagnosis of a mental health condition not constituting a physical disability must be:

(a)  Corroborated by a peer or higher-level mental health professional.

(b)  Endorsed by the Surgeon General of the Military Department concerned.

d.  The narrative reason for the separation, discharge, or release of a commissioned officer when the basis of the separation, discharge, or release is a mental health condition not constituting a physical disability must be a "condition, not a disability."  The appropriate separation program designator code will be used in accordance with DoD Instruction 1336.01.

**App. 536**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

# GLOSSARY

## G.1. ACRONYMS.

| | |
|---|---|
| ADL | Active Duty List |
| DFR | dropping from the rolls |
| GO/FO | general or flag officer |
| PTSD | post-traumatic stress disorder |
| RASL | Reserve Active Status List |
| SCA | show-cause authority |
| TBI | traumatic brain injury |
| U.S.C. | United States Code |

## G.2. DEFINITIONS. Unless otherwise noted, these terms and their definitions are for the purpose of this issuance.

**active duty.** Defined in the DoD Dictionary of Military and Associated Terms.

**active status.** Defined in the DoD Dictionary of Military and Associated Terms.

**ADL.** A single list for the Army, the Navy, the Air Force, and the Marine Corps required to be maintained by each Military Service in accordance with Section 620 of Title 10, U.S.C., containing the names of all officers of that Military Service, other than officers described in Section 641 of Title 10 U.S.C., who are serving on active duty.

**Characterizations of service.**

   **honorable.** When the quality of an officer's service generally has met the standards of acceptable conduct and performance of duty for military personnel or is otherwise so meritorious that any other characterization would be clearly inappropriate, it is appropriate to characterize that service as honorable.

   **general (under honorable conditions).** When an officer's service was honest and faithful, it is appropriate to characterize that service under honorable conditions. Characterization of service as general (under honorable conditions) is warranted when the negative aspects of the officer's conduct or performance of duty outweigh positive aspects of his or her conduct or performance of duty as documented in their service record.

**App. 537**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

**under other than honorable conditions**.  When separation is based on a pattern of behavior that is a significant departure from the conduct expected of Service members, or when separation is based upon one or more acts or omissions that constitute a significant departure from the conduct expected of Service members, it is appropriate to characterize an officer's service as under other than honorable conditions.  Examples of factors that may be considered include the use of force or violence to produce serious bodily injury or death, abuse of a special position of trust, disregard by a superior of customary superior-subordinate relationships, acts or omissions that endanger the security of the United States or the health and welfare of other Service members, and deliberate acts or omissions that seriously endanger the health and safety of other persons.

**commander.**  A commissioned or warrant officer who, by virtue of rank and assignment, exercises primary command authority over a military organization or prescribed territorial area that under pertinent official directives is recognized as a "command."

**commissioned officer.**  An officer in any of the Military Services who holds a grade and office under a commission signed by the President and who is appointed as a Regular or Reserve officer.  For the purposes of this issuance, the term "commissioned officer" does not include a commissioned warrant officer or a retired commissioned officer.

**convening authority.**  The Secretary of the Military Department concerned or other official to whom the authority to convene a Board of Inquiry was delegated.

**counsel.**  A judge advocate qualified pursuant to Section 827(b) of Title 10, U.S.C., or a civilian lawyer retained at the commissioned officer's expense.

**DFR.**  An administrative action that may be taken in limited circumstances that terminates a commissioned officer's military status along with any rights, benefits, and pay to which they may have otherwise been entitled because of that status.  DFR is distinguished from dropping from the unit rolls, which is an administrative procedure used by the Military Services to remove a Service member from the unit of assignment but does not end the member's military status.

**forcible sodomy.**  Defined in Section 925 of Title 10, U.S.C.

**legal advisor.**  A judge advocate who is qualified in accordance with Section 827(b) of Title 10, U.S.C., and appointed to assist a Board of Inquiry.

**non-probationary commissioned officer.**  A commissioned officer other than a probationary commissioned officer.

**probationary commissioned officer.**  A commissioned officer on the ADL with fewer than 6 years of active commissioned service or a Reserve commissioned officer with fewer than 6 years of commissioned service.

**rape.**  Defined in Section 920 (a) of Title 10, U.S.C.

**RASL.**  A single list for each Military Service required to be maintained under Section 14002 of Title 10, U.S.C., which contains the names of all officers of that Military Service, except warrant

**App. 538**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

officers (including commissioned warrant officers), who are in an active status in a Reserve Component of the Army, the Navy, the Air Force, or the Marine Corps, and are not on an ADL.

**release from active duty.**  Release from full-time duty in the active military service of the United States.

**respondent.**  A commissioned officer required to show cause for retention on active duty.

**SCA.**  Any of the following individuals, as determined by the Secretary of the Military Department concerned:

   The Secretary of the Military Department concerned or officers (not below the grade of major general or rear admiral (O-8)) designated by that Secretary to determine, based on a record review, that an officer be required to show cause for retention in the military service.

   Commanders of reserve personnel centers, commanders exercising general court-martial authority, and all GO/FOs in command who have a judge advocate or legal advisor available.

   For Title 10 Active Guard Reserve officers, the Directors of the Army and Air National Guard, as applicable.

**separation.**  A general term that includes discharge, release from active duty, release from custody and control of the Military Services, transfer to the Individual Ready Reserve, DFR, and similar changes in active or Reserve status.

**sexual assault.**  Defined in Section 920(b) of Title 10, U.S.C.

**show cause.**  What the respondent must do by a preponderance of the evidence to justify his or her retention in the service after the government has made a prima facie showing that one or more of the reasons for discharge in the letter of notification exist.

**substance or drug misuse.**  Defined in DoD Instruction 1010.04.

**App. 539**

*DoDI 1332.30, May 11, 2018*
*Change 3, September 9, 2021*

## REFERENCES

Diagnostic and Statistical Manual of Mental Disorders Fifth Edition: DSM-5

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1010.04, "Problematic Substance Use by DoD Personnel," February 20, 2014, as amended

DoD Instruction 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021

DoD Instruction 1336.01, "Certificate of Release or Discharge from Active Duty (DD Form 214/5 Series)," August 20, 2009, as amended

DoD Instruction 6490.04, "Mental Health Evaluations of Members of the Military Services" March 4, 2013, as amended

DoD Instruction 6495.02, Volume 1, "Sexual Assault Prevention and Response: (SAPR) Program Procedures," March 28, 2013, as amended

DoD Manual 5200.02, "Procedures for the DoD Personnel Security Program (PSP)," April 03, 2017

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

Public Law 112-239, Sections 572 and 578, "National Defense Authorization Act for Fiscal Year 2013," January 2, 2013

Public Law 115-91, Section 528, "National Defense Authorization Act of Fiscal Year 2018," December 12, 2017

United States Code, Title 10

United States Code, Title 32, Section 323

**App. 540**

# EXHIBIT C



# DoD Instruction 1332.18

# Disability Evaluation System

---

**Originating Component:** Office of the Under Secretary of Defense for Personnel and Readiness

**Effective:** November 10, 2022

**Releasability:** Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/.

**Reissues and Cancels:** DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended

**Incorporates and Cancels:** Directive-Type Memorandum, 18-004, "Revised Timeliness Goals for the Integrated Disability Evaluation System (IDES)," July 30, 2018, as amended

Directive-Type Memorandum, 20-001, "Policy Revisions for the Disability Evaluation System (DES)," February 12, 2020, as amended

**Approved by:** Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness

---

**Purpose:**  In accordance with the authority in DoD Directive (DoDD) 5124.02, this issuance establishes policy, assigns responsibilities, and prescribes procedures for:

- Referral, evaluation, return to duty, separation, or retirement of Service members for disability in accordance with Title 10, United States Code (U.S.C.).

- Related determinations pursuant to Sections 6303, 8332, and 8411 of Title 5, U.S.C.; Section 104 of Title 26, U.S.C.; Sections 303a and 373 of Title 37, U.S.C.; Section 2082 of Title 50, U.S.C.; Sections 3.310(b) and 3.321(b), Part 4, and Part 14 of Title 38, Code of Federal Regulations (CFR).

*DoDI 1332.18, November 10, 2022*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ............................................................. 6
    1.1. Applicability. ......................................................................................................... 6
    1.2. Policy. .................................................................................................................... 6
SECTION 2: RESPONSIBILITIES .................................................................................... 9
    2.1. Assistant Secretary of Defense for Health Affairs (ASD(HA)). ........................... 9
    2.2. Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)). ...... 9
    2.3. Deputy Assistant Secretary of Defense for Health Services Policy and Oversight (DASD(HSP&O)). ............................................................................................... 9
    2.4. Director, DHA. ..................................................................................................... 11
    2.5. General Counsel of the Department of Defense. .................................................. 11
    2.6. Secretaries of the Military Departments. ............................................................ 11
SECTION 3: OPERATIONAL STANDARDS OF THE DES ..................................................... 14
    3.1. DES Process Overview. ....................................................................................... 14
    3.2. MEB. ................................................................................................................... 15
        a. Purpose. .......................................................................................................... 15
        b. Composition. .................................................................................................. 15
        c. Resourcing. .................................................................................................... 15
        d. Referral to PEB. ............................................................................................. 16
        e. Service Member Medical Evaluations. ........................................................... 16
        f. Content. .......................................................................................................... 17
        g. Competency. .................................................................................................. 17
        h. Medical Documentation for RC Service Members with Non-Duty-Related Conditions. ........................................................................................................ 17
        i. Non-Medical Documentation. ........................................................................ 18
    3.3. PEB. .................................................................................................................... 18
        a. Purpose. .......................................................................................................... 18
        b. Informal Physical Evaluation Board (IPEB). ................................................. 18
        c. FPEB. ............................................................................................................ 19
        d. Appeal of FPEB Determination of Fitness ..................................................... 20
        e. Resourcing. .................................................................................................... 21
        f. Record of Proceedings. ................................................................................... 22
        g. Quality Assurance. ......................................................................................... 23
    3.4. Counseling. .......................................................................................................... 23
        a. Purpose. .......................................................................................................... 23
        b. MDB. ............................................................................................................. 23
        c. Non-MDB Requirements. .............................................................................. 23
        d. Service Member Competency. ....................................................................... 23
        e. Pre-separation Counseling. ............................................................................ 24
    3.5. Case Management. ............................................................................................... 24
    3.6. Final Disposition. ................................................................................................ 24
    3.7. Administrative Decisions. .................................................................................... 24
    3.8. Training and Education. ....................................................................................... 25

**App. 543**

*DoDI 1332.18, November 10, 2022*

a. Assignment of Personnel to the DES. ................................................................ 25
b. Standardized DES Training. ............................................................................. 25
3.9. Disability Case Management Continuum. ............................................................ 26
a. PEBLO ............................................................................................................ 26
b. MSC. ............................................................................................................... 27
3.10. Facility Resources. .............................................................................................. 27
Section 4:  Provision of Legal Counsel in the DES .................................................. 28
4.1. Requirements. ...................................................................................................... 28
4.2. Legal Advice and Representation. ....................................................................... 28
4.3. Access to Documentation. ................................................................................... 29
4.4. Service Member Appeals and Hearings. .............................................................. 29
a. FPEB. .............................................................................................................. 29
b. FPEB Appeal. ................................................................................................. 30
4.5. Legal Counsel in Advance of FPEB and FPEB Appeal. ..................................... 30
4.6. Delay for Good Cause. ........................................................................................ 30
4.7. Qualifications and Training of Legal Counsel. .................................................... 30
Section 5:  DES Referral ............................................................................................ 32
5.1. General. ............................................................................................................... 32
5.2. Criteria for Referral. ........................................................................................... 32
5.3. Eligibility for Referral. ....................................................................................... 32
a. Duty-Related Determinations. ......................................................................... 32
b. Non-Duty-Related Determinations. ................................................................. 33
5.4. Ineligibility for Referral. ..................................................................................... 33
5.5. Service Members with Medical Waivers. ............................................................. 34
5.6. Waiver of DES Referral or PEB Evaluation. ....................................................... 35
5.7. Prohibition from Waiving Disability Evaluation. ................................................ 35
5.8. Referral Implications. .......................................................................................... 35
Section 6:  Standards for Determining Unfitness Due to Disability or Medical
Disqualification ........................................................................................................... 36
6.1. Uniformity of Standards. ..................................................................................... 36
6.2. General Criteria for making Unfitness Determinations. ...................................... 36
6.3. Relevant Evidence. .............................................................................................. 36
a. Referral Following Illness or Injury. ............................................................... 36
b. Referral for Chronic Condition. ...................................................................... 36
c. Cause-and-effect Relationship. ........................................................................ 37
6.4. Reasonable Performance of Duties. ..................................................................... 37
a. Considerations. ................................................................................................ 37
b. General, Flag, and Medical Officers. ............................................................... 37
c. Service Members on Permanent Limited Duty. ............................................... 38
d. Combined Effect. ............................................................................................. 38
6.5. Presumption of Fitness. ....................................................................................... 38
a. Presumptive Period. ......................................................................................... 38
b. Overcoming the Presumption of Fitness. ......................................................... 39
c. When The Presumption of Fitness Does Not Apply. ........................................ 39
6.6. Evidentiary Standards for Determining Unfitness Because of Disability. ........... 40

**App. 544**

USCA Case #25-5087     Document #2108715          Filed: 04/01/2025     Page 161 of 415
Case 1:25-cv-00240-ACR     Document 72-86     Filed 03/07/25     Page 5 of 72

*DoDI 1332.18, November 10, 2022*

   a. Objective Evidence. ...................................................................................... 40
   b. Preponderance of Evidence. ......................................................................... 40
6.7. Unfit Determinations. ..................................................................................... 40
SECTION 7: STANDARDS FOR DETERMINING COMPENSABLE DISABILITIES ................... 41
7.1. Disability Compensation Criteria Overview.................................................... 41
7.2. Disability Retirement Criteria for Regular Component Members and Members on
Active Duty for more than 30 Days. .................................................................... 41
7.3. Disability Retirement Criteria for Members on Active Duty for 30 Days or Fewer, on
IDT, Funeral Honors Duty, or Training Pursuant to Section 1204 of Title 10, U.S.C. ..... 42
7.4. Disability Separation Criteria for Regular Component Members and Members on Active
Duty for More Than 30 Days. .............................................................................. 43
7.5. Disability Separation Criteria for Members on Active Duty for 30 Days or Less, on IDT,
Funeral Honors Duty, or Training Pursuant to Section 1206 of Title 10, U.S.C. ............. 44
7.6. LOD Requirements. ......................................................................................... 45
   a. Relationship of LOD Findings to DES Determinations................................. 45
   b. Referral Requirement. .................................................................................. 45
   c. Presumptive Determinations. ....................................................................... 45
   d. Required Determinations. ............................................................................. 45
7.7. Evidentiary Standards for Determining Compensibility of Unfitting Conditions. ......... 46
   a. Misconduct and Negligence. ........................................................................ 46
   b. Presumption of Sound Condition for Members on Continuous Orders to Active Duty
      Specifying a Period of More Than 30 Days. ................................................. 46
   c. Presumption of Incurrence or Aggravation in the LOD for Members on Continuous
      Orders to Active Duty Specifying a Period of More Than 30 Days. ....................... 47
   d. RC Service Members Serving on Orders of 30 Days or Fewer. .................... 48
   e. Prior Service Condition. ............................................................................... 48
   f. Medical Waivers. ......................................................................................... 48
   g. Treatment of Pre-existing Conditions. .......................................................... 48
   h. Elective Surgery or Treatment. ..................................................................... 49
   i. Rating Disabilities. ....................................................................................... 49
SECTION 8: VASRD ................................................................................................. 50
8.1. General. ........................................................................................................... 50
8.2. Behavioral Disorders Due to Traumatic Stress. .............................................. 51
8.3. Disability Rating Based on Unemployability. ................................................... 51
8.4. Extra-Schedular Ratings. ................................................................................ 51
SECTION 9: TDRL MANAGEMENT .............................................................................. 52
9.1. Initial Placement on the TDRL. ....................................................................... 52
9.2. TDRL Re-Evaluation. ...................................................................................... 52
   a. Initiating the TDRL Re-evaluation Process. ................................................. 52
   b. Disability Reexaminations. ........................................................................... 53
   c. PEB Re-adjudication. .................................................................................... 53
   d. PEB Disposition. ......................................................................................... 53
   e. Cases on VA Appeal. .................................................................................... 54
   f. Administrative Finality. ................................................................................ 54
   g. Required Determinations. ............................................................................. 54

**App. 545**

USCA Case #25-5087      Document #2108715      Filed: 04/01/2025      Page 162 of 415
Case 1:25-cv-00240-ACR      Document 72-86      Filed 03/07/25      Page 6 of 72

*DoDI 1332.18, November 10, 2022*

    h.  Service Member Medical Records. .................................................................................... 55
    i.  Compensability of New Diagnoses. ................................................................................. 55
    j.  Current Physical Examination. ........................................................................................ 55
    k.  Refusal or Failure to Report. ........................................................................................... 55
    l.  Priority. ............................................................................................................................ 55
    m.  Reports from Civilian Providers. .................................................................................. 55

SECTION 10:  ADMINISTRATIVE DETERMINATIONS ........................................................................ 56
    10.1.  Administrative Determinations for Purposes of Employment Under Federal Civil
    Service. ................................................................................................................................... 56
    10.2.  Determination for Federal Tax Benefits. ......................................................................... 57
        a.  Status. ............................................................................................................................ 57
        b.  Combat Related. ............................................................................................................ 57
        c.  Non-Taxable Compensation. ......................................................................................... 58
    10.3.  Recoupment of Benefits. ................................................................................................. 58
    10.4.  Determination for RC Service Members who are DUAL STATUS Technicians and
    Determined Unfit by the DES. ............................................................................................... 58

SECTION 11:  FINAL DISPOSITION .................................................................................................. 59
    11.1.  Final Decision Authority. ................................................................................................ 59
        a.  Secretary of Defense. .................................................................................................... 59
        b.  USD(P&R). ..................................................................................................................... 59
        c.  Secretaries of the Military Departments. ...................................................................... 59
    11.2.  General rules regarding Disposition. ............................................................................... 59
        a.  Retirement. .................................................................................................................... 59
        b.  Removal from the TDRL. .............................................................................................. 59
    11.3.  Continuance of Unfit Service Members on Active Duty or in the Reserves. ............... 61
    11.4.  Transition Assistance Program Eligibility. ..................................................................... 61
    11.5.  Dispositions for Unfit Service Members. ....................................................................... 61
        a.  Permanent Disability Retirement. ................................................................................. 61
        b.  Placement on the TDRL. ............................................................................................... 61
        c.  Separation with Disability Severance Pay. ................................................................... 62
        d.  Separation without Entitlement to Benefits. ................................................................. 63
        e.  Discharge Pursuant to Other Than Chapter 61 of Title 10, U.S.C. .............................. 63
        f.  Revert with Disability Benefits. .................................................................................... 63

GLOSSARY ................................................................................................................................... 64
    G.1.  Acronyms. ...................................................................................................................... 64
    G.2.  Definitions. ..................................................................................................................... 65

REFERENCES ................................................................................................................................ 70

**App. 546**

*DoDI 1332.18, November 10, 2022*

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

This issuance applies to OSD, Secretaries of the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

## 1.2. POLICY.

a.  The Disability Evaluation System (DES) is the mechanism for determining fitness for duty because of disability, and whether a Service member (including initial entry trainees, Military Academy cadets, and midshipmen) found unfit for duty due to disability will be separated or retired.

b.  Service members will proceed through one of the DES processes, the Legacy Disability Evaluation System (LDES) or Integrated Disability Evaluation System (IDES).

c.  Service members will process through the IDES unless the Secretary of the Military Department concerned:

(1)  Approves a Service member's request to be enrolled in LDES;

(2)  Directs the Service member into LDES for a compelling and individualized reason; or

(3)  Directs the Service member into LDES after the Service member refuses to claim or submit a Department of Veterans Affairs (VA) disability claim for a potentially unfitting condition.

d.  In accordance with Title 10, U.S.C. and Part 4 of Title 38, CFR, the standards for all determinations related to disability evaluation will be consistently applied to all Service members, both Active Component (AC) and Reserve Component (RC).  This includes Service members in active duty and non-active duty (NAD) status.

e.  Pursuant to Chapter 61 of Title 10, U.S.C., RC Service members who are in an NAD status, not on a call to active duty for more than 30 days, and are pending separation for non-duty-related medical conditions, may, with the consent of the Service member, receive a determination of fitness and whether the unfitting condition is duty related.

f.  Pursuant to Section 12301(h) of Title 10, U.S.C., RC Service members may, with the consent of the Service member, be ordered to active duty to receive authorized medical care or to be medically evaluated for disability or other purposes.

**App. 547**

*DoDI 1332.18, November 10, 2022*

g.  The DoD and the VA should complete 80 percent of all active duty and NAD Service member cases in no more than 180 days from referral to the DES ending on the date of return to duty, retirement, or separation.  The calculation of processing time excludes any amount of administrative absences or accrued leave the Service member is authorized to take during transition, or any amount of time in deferment status.  When measuring time in this issuance, "days" are defined as "calendar days."

h.  In determining a Service member's disability rating, the Secretary of the Military Department concerned will consider all medical conditions, whether singularly, collectively, or through combined effect, that render the Service member unfit to perform the duties of their office, grade, rank, or rating.

i.  Service members who are pending permanent or temporary disability retirement and who are eligible for a length of service retirement at the time of their disability evaluation may elect to be retired for disability or for length of service.  However, when retirement for length of service is elected, the Service member's retirement date must occur within the time frame that their disability retirement is expected to occur.

j.  Before a Service member may be discharged or released from active duty because of a disability, they must elect whether to file a claim for compensation, pension, or hospitalization with the VA.  Such Service members may elect to file a claim or refuse to make such a claim.

(1)  If refusing to file a claim, the Service member will be requested to sign a statement that their right to make such a claim has been explained.

(2)  The Service member may refuse to sign such a statement and that decision will be documented in the VA electronic claims folder.

(3)  The Secretaries of the Military Departments may not deny a Service member who refuses to sign such a claim any rights within DES policy as noted in this issuance.

k.  RC Service members on active duty orders specifying a period of more than 30 days, who incur a potentially unfitting condition during that time will, with their consent, be kept on active duty for disability evaluation processing until final disposition by the Secretary of the Military Department concerned.  In accordance with DoD Instruction (DoDI) 1241.01, RC Service members may elect to be released from active duty before completing DES processing.  If the RC Service member elects to be released from active duty before completing DES processing:

(1)  The Secretary of the Military Department concerned will assign responsibility for completing the resolution of the condition(s) or completion of the DES to the Service member's appropriate command.

(2)  The Secretary concerned will provide a line of duty (LOD) determination to document the Service member's entitlement to medical and dental treatment comparable to that in Section 1074a of Title 10, U.S.C.

(3)  The Service member may receive legal counseling in accordance with the regulations of the Military Department concerned.

**App. 548**

*DoDI 1332.18, November 10, 2022*

l.  The Secretaries of the Military Departments may authorize separation due to mere congenital or developmental defects not being compensable under the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD) if defects, circumstances, or conditions interfere with assignment to, or performance of, duty.  The basis for separation will be appropriately documented following guidelines and criteria in accordance with DoDI 6040.42. These Service members will not be referred to the DES unless the defect was subject to super imposed disease or injury during military service, or other potentially unfitting conditions exist that may have been incurred or aggravated by military service.

m.  Each Military Department and the Defense Health Agency (DHA) will conduct quality assurance reviews to monitor and assess the accuracy and consistency of medical evaluation boards (MEBs) and physical evaluation boards (PEBs), as well as the proper performance of MEB, PEB, and PEB liaison officer (PEBLO) duties, conducted under their respective jurisdictions pursuant to Volume 2 of DoD Manual (DoDM) 1332.18.

n.  In accordance with Section 552a of Title 5, U.S.C.; Part 164 of Title 45, CFR; DoDIs 5400.11 and 5400.16; and Volume 2 of DoDM 5400.11, personally identifiable information collected, used, maintained, or disseminated in executing this issuance will be appropriately maintained and safeguarded to prevent its unauthorized access, use, disclosure, or loss.

**App. 549**

*DoDI 1332.18, November 10, 2022*

# SECTION 2: RESPONSIBILITIES

## 2.1. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA)).

Under the authority, direction, and control of the Under Secretary of Defense for Personnel and Readiness (USD(P&R)), the ASD(HA):

    a. Oversees the Director, DHA, in executing programmatic and operational responsibilities, which includes supporting the DES through the Military Health System, within both military medical treatment facilities (MTF) and private sector facilities in accordance with Title 10, U.S.C., and applicable implementing policy and guidance.

    b. Establishes the Disability Advisory Council (DAC) to advise and recommend improvements to the DES and designates its chair.

    c. Monitors DES performance and recommends improvements in DES policy to the USD(P&R).

    d. Determines DES funding requirements in coordination with the Secretaries of the Military Departments, and tracks DoD DES examination funding expenditures.

    e. Directs the Secretaries of the Military Departments in operating DoD IDES stages concurrently with the VA's disability processes, as applicable.

## 2.2. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA):

    a. In coordination with the ASD(HA) and the Secretaries of the Military Departments, ensures that DES policies are applied for RC personnel consistent with those established for AC personnel and reflect the needs of RC Service members pursuant to Title 10, U.S.C.

    b. Provides O-6 level or civilian-equivalent representation to the DAC with sufficient understanding of all DES components.

    c. Reviews annual DES performance and recommends DES improvements to the ASD(HA) to ensure process efficiency and equity for RC Service members.

## 2.3. DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR HEALTH SERVICES POLICY AND OVERSIGHT (DASD(HSP&O)).

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), the DASD(HSP&O):

**App. 550**

USCA Case #25-5087     Document #2108715          Filed: 04/01/2025     Page 167 of 415
Case 1:25-cv-00240-ACR     Document 72-86     Filed 03/07/25     Page 11 of 72

*DoDI 1332.18, November 10, 2022*

a.  In coordination with the ASD(M&RA) and the Secretaries of the Military Departments, oversees, assesses, and reports on DES performance and recommends changes in policy, procedure, or resources to improve DES performance to the ASD(HA).

b.  Monitors changes to military personnel*,* compensation statutes and DoD policy, and other pertinent authorities, to assess their impact on disability evaluation, RC medical disqualification, and related benefits.

c.  Reviews Military Departments' policies and procedures for disability evaluation that affect the uniformity of standards for separation or retirement for unfitness because of disability, or separation of RC Service members for medical disqualification, and suggests recommended changes to the ASD(HA).

d.  Develops quality assurance procedures to ensure that policies are fairly and consistently applied and reports the results of the Military Departments' DES quality control programs to the ASD(HA).

e.  Establishes reporting requirements for the Military Departments and advises DES stakeholders on the accurateness and completeness of DES performance and the Military Departments' compliance with this issuance.

(1)  No later than October 31 every 3 fiscal years, for the preceding 3-fiscal-year period, provides the Secretaries of the Military Departments with guidance for their respective inspector general for conducting the DES triennial review of their respective programs pursuant to Paragraph 2.6.(l).

(2)  Not later than July 1 each year, publishes the data requirements the Military Departments must include in the DES annual report.

(3)  Analyzes quarterly data submitted by the Military Departments and provides the DES annual report to the ASD(HA).

(4)  Analyzes monthly DES data to assess trends that might inform policy adjustments.

f.  Monitors changes to VA laws and regulations to assess their impact on DoD's application of the VASRD, in accordance with Section 8, to Service members determined unfit because of disability, and recommends timely guidance to the ASD(HA).

g.  Recommends guidance and performance monitoring necessary to implement this issuance, including performance metrics and areas of emphasis.

h.  In conjunction with the Secretaries of the Military Departments and the Director, DHA, develops program planning, allocation, and use of healthcare resources for activities within the DoD related to the DES.

i.  In coordination with the Military Departments and DHA information technology offices, ensures information technology support and access to programs used at the MTFs and other

**App. 551**

*DoDI 1332.18, November 10, 2022*

related systems for medical record input and retrieval are available to each Military Department PEB.

j.  Provides grade O-6 or civilian equivalent representation with a sufficient understanding of the DES to the DAC.

## 2.4.  DIRECTOR, DHA.

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), and in accordance with DoDD 5136.13, the Director, DHA:

a.  In coordination with the Secretaries of the Military Departments, establishes procedures to support the DES through the provision of MEBs and any other necessary clinical or health care services delivered in an MTF or through the TRICARE program.

b.  In coordination with the ASD(HA) and the Secretaries of the Military Departments, ensure an adequate supply of resources, including personnel, supplies, and available appointments, are maintained in all locations where DES examinations and MEBs are required.

## 2.5.  GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE.

In consultation with the general counsels and the judge advocates general of the Military Departments, the General Counsel of the Department of Defense provides policy guidance on legal matters relating to DES policy, issuances, proposed exceptions to policy, legislative proposals, and provides legal representation for the DAC, upon request.

## 2.6.  SECRETARIES OF THE MILITARY DEPARTMENTS.

The Secretaries of the Military Departments:

a.  Comply with Title 10, U.S.C.; Part 4 of Title 38, CFR; Volume 2 of DoDI 6130.03; and any implementing guidance in this issuance.

b.  Comply with the January 16, 2009 and June 16, 2010, memorandums of agreement between the DoD and the VA pertaining to the IDES.

c.  Manage the temporary disability retired list (TDRL) in accordance with Section 9.

d.  Staff and provide resources to meet DES timeliness goals, without reducing Service members' access to due process, in accordance with DES procedures in Volume 1 of DoDM 1332.18.

e.  Establish procedures to develop and implement standardized training programs, guidelines, and curricula for Military Department personnel who administer DES processes, including PEBLOs, non-medical case managers, and personnel assigned to the MEB, PEB, and appellate review authorities.

**App. 552**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 169 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 13 of 72

*DoDI 1332.18, November 10, 2022*

f.  In accordance with this issuance, establish procedures for Service members to appeal determinations for fitness in accordance with Section 1214 of Title 10, U.S.C., and Section 524 of Public Law 117-81 (also known as the "National Defense Authorization Act for Fiscal Year 2022").

g.  In coordination with the Director, DHA, establish and execute agreements to support the disability processing of Service members who receive medical care from an MTF staffed or supported by another Military Department.

h.  Establish procedures to ensure Service members who are hospitalized or receiving treatment at a VA or a non-U.S. Government facility are referred, processed, and counseled in a manner similar to their peers.

i.  Establish procedures to provide Service members a standardized multi-disciplinary briefing (MDB) that will at least explain each stage of the DES process and inform the Service member on their responsibilities during the DES process.

j.  In coordination with their respective judge advocates general, establish policy, training, and procedures for the provision of legal counsel to Service members in the DES.

k.  Establish a quality assurance program to:

(1)  Ensure policies and procedures established by this issuance are fairly and consistently implemented.

(2)  Establish procedures to ensure the accuracy and consistency of MEB and PEB decisions.

(3)  Establish procedures to monitor and sustain proper duty performance of MEBs, PEBs, and PEBLOs.

l.  Prepare and forward data submissions for the DES Annual Report to the DASD(HSP&O).

m.  Through their respective inspectors general, review compliance with the requirements in Section 3 every 3 fiscal years for the preceding 3-fiscal-year period.  Forward a copy of their final inspector general's compliance reports to the USD(P&R).

n.  Investigate matters of potential fraud pertaining to the DES and resolve as appropriate.

o.  Provide grade O-6 or civilian-equivalent representation with a sufficient understanding of the DES to the DAC.

p.  Comply with the privacy procedures outlined in Part 164 of Title 45, CFR; DoDIs 5400.11, 1000.30, and 6025.18; DoD 5400.11-R; and Volume 2 of DoDM 5400.11.

q.  Establish procedures to ensure that, with the Service member's consent, the Service member's address and contact information are securely transmitted to the department, agency, or

**App. 553**

*DoDI 1332.18, November 10, 2022*

other appropriate veterans' affairs authority of the State in which the Service member intends to reside after retirement or separation.

r.  Establish procedures to provide, with the Service member's consent, notification of a Service member's hospitalization under their jurisdiction evacuated from a theater of combat and admitted to an MTF within the United States to the senators representing the State, and the Member, Delegate, or Resident Commissioner of the House of Representatives representing the district, that includes the Service member's home of record or a different location as provided by the Service member.

s.  Before demobilizing or separating an RC Service member who incurred or aggravated an injury or illness while in an active or inactive duty status pursuant to Chapter 61 of Title 10, United States Code, provide information to the Service member on:

    (1)  The availability of care and assistance through military-affiliated or community support services.

    (2)  The location of the support services, whether military-affiliated or community, closest to the Service member's permanent place of residence.

    (3)  The method and necessity for obtaining an LOD determination regarding the injury or illness, including time limits for obtaining medical or incapacitation benefits.

t.  Develop defense health program resource requirements pertaining to the DES for submission to the ASD(HA) through the appropriate Military Health System governance process.

u.  In coordination with the Director, DHA, identify the appropriate military medical personnel to assign to each MTF to achieve the DES timeliness goals.

**App. 554**

*DoDI 1332.18, November 10, 2022*

# SECTION 3: OPERATIONAL STANDARDS OF THE DES

## 3.1. DES PROCESS OVERVIEW.

a.  The DES will consist of:

(1)  Referral and MDB.

(2)  Medical evaluation, including the MEB, impartial medical reviews, and rebuttal.

(3)  Disability evaluation, including the PEB, counseling, case management, adjudication, and final disposition.

b.  The Secretaries of the Military Departments will use the IDES process for all newly initiated cases referred under the duty-related process.

c.  The Secretaries of the Military Departments may enroll a Service member into the LDES if:

(1)  Requested by a Service member;

(2)  There is a compelling and individualized reason; or

(3)  A Service member refuses to claim or submit a VA disability claim for a potentially unfitting condition.

d.  Before the Secretary concerned enrolls a Service member into the LDES, the Service member or their personal representative must acknowledge, in writing, that they received briefings on:

(1)  The procedural differences between the LDES and the IDES from a representative of their respective Military Department's legal counsel.

(2)  The VA Benefits Delivery at Discharge Program.

e.  LDES and IDES disability examinations will include a general medical examination and any other applicable medical examinations that meet VA compensation and pension examination standards.

(1)  The LDES and IDES examinations will be sufficient to:

(a)  Assess the Service member's referred condition(s).

(b)  Assist the VA in ratings determinations.

(c)  Assist Military Departments to determine if the medical conditions, singularly, collectively, or through combined effect, prevent the Service member from performing the duties of their office, grade, rank, or rating.

**App. 555**

*DoDI 1332.18, November 10, 2022*

(2)  IDES examinations must also be sufficient to assess the Service member's claimed condition(s).

## 3.2.  MEB.

### a.  Purpose.

The Director, DHA, is responsible for provision of MEBs in support of the DES process.  An MEB will:

(1)  Review all available medical evidence, including examinations completed as part of DES processing, and document whether the Service member has medical conditions that either singularly, collectively, or through combined effect, may prevent them from reasonably performing the duties of their office, grade, rank, or rating.

(2)  Document the medical status and duty limitations of Service members who meet the referral eligibility criteria in Paragraph 5.3.

### b.  Composition.

(1)  The MEB will be comprised of at least two members.  At least one member will be a physician (DoD civilian employee or military).  No board member will be influenced by another member on their determination.  At least one medical professional must have knowledge of application of the standards pertaining to medical retention standards, the disposition of patients, and disability separation processing.

(2)  In exceptional circumstances, when it is impracticable to have two or more physicians, the other members may be either physician assistants or nurse practitioners (DoD civilian employee or military member).

(3)  Any MEB listing a behavioral health diagnosis must contain a thorough behavioral health evaluation and include the signature of a psychologist with a doctorate in psychology or a board-certified or board-eligible psychiatrist.

### c.  Resourcing.

When an MTF fails to meet the MEB stage goal for 3 consecutive months, the Director, DHA, in coordination with the Secretaries of the Military Departments, will:

(1)  Allocate additional personnel to the MEB stage process at the underperforming MTF.

(2)  Inform the ASD(HA) by memorandum when an MTF receives additional MEB personnel.  The memorandum will contain information regarding:

(a)  The MTF's performance metrics, including the number of days the MTF exceeded the MEB stage goal for the previous 3 months.

(b)  The number of additional personnel allocated to the MTF.

SECTION 3:  OPERATIONAL STANDARDS OF THE DES                                    15

*DoDI 1332.18, November 10, 2022*

(c) Additional steps the MTF will take to meet the MEB stage goal.

(d) The timeline within which the MTF will meet the MEB stage goal.

**d.  Referral to PEB.**

If the MEB determines that the Service member has medical conditions that, either singularly, collectively or through combined effect, may prevent them from reasonably performing the duties of their office, grade, rank, or rating, the MEB will refer the case to the PEB.

**e.  Service Member Medical Evaluations.**

**(1)  Medical Evaluations.**

An MEB will evaluate the medical status and duty limitations of:

(a)  Service members referred into the DES who incurred or aggravated an illness or injury while under orders to active duty specifying a period of more than 30 days.

(b)  RC Service members, not on active duty and referred for a duty-related condition.

**(2)  MEB Requirements.**

An MEB will not be required:

(a)  For Service members temporarily retired for disabilities who are due for a periodic physical medical examination.

(b)  When an RC Service member, who is not on active duty, is referred for conditions unrelated to military status and performance of duty.

**(3)  MEB Prerequisites.**

A Service member will not be required to sign a statement relating to the origin, incurrence, or aggravation of a disease or injury.  Any statement resulting from a requirement to sign such a statement, which is against the Service member's interests and is signed by the Service member, will be invalid.

**(4)  Impartial Medical Reviews.**

In accordance with Section 1612 of Public Law 110-181, the Director, DHA, upon the Service member's request, will assign an impartial physician or other appropriate health care professional who is independent of the MEB to:

(a)  Serve as an independent source of review of the MEB findings and recommendations.

**App. 557**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 174 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 18 of 72

*DoDI 1332.18, November 10, 2022*

(b)  Advise and counsel the Service member regarding the findings and recommendations of the MEB.

(c)  Advise the Service member on whether the MEB findings adequately reflect the complete spectrum of their injuries and illnesses.

(5)  Review Report.

After the physician or health care professional has counseled the Service member and the member has received the impartial medical review report, they will have an opportunity to consult with legal counsel during the election period to either concur or submit a written rebuttal to the MEB's findings.

(6)  MEB Rebuttal.

Service members referred into the DES will, upon request, be permitted at least one rebuttal of the MEB findings.

**f.  Content.**

(1)  Medical information used in the DES must be sufficiently recent to substantiate the existence or severity of potentially unfitting conditions.  The Secretaries of the Military Departments may not request additional medical exams or diagnostic tests if more current information would not substantially affect identification of the existence or severity of potentially unfitting conditions.

(2)  MEBs will confirm the medical diagnosis for and document the full clinical information, including history, treatment status, and potential for recovery of the Service member's medical conditions that, singularly, collectively, or through combined effect, may prevent the Service member from performing the duties of their office, grade, rank, or rating; and state whether each condition is cause for referral to a PEB.

**g.  Competency.**

When the Service member's capability of managing their affairs is unclear, the MEB or TDRL packet will include the results of a competency board conducted in accordance with Section 602 of Title 37, U.S.C., and Volume 7B, Chapter 16 of the DoD 7000.14-R.  This issuance does not prescribe processes or requirements related to competency boards; refer to applicable laws and policies regarding competency boards.

**h.  Medical Documentation for RC Service Members with Non-Duty-Related Conditions.**

The medical documentation for RC Service members with non-duty-related conditions referred for disability evaluation must provide a clear and adequate written description of the medical condition(s) that, singularly, collectively, or through combined effect, may prevent the RC Service member from performing the duties of their office, grade, rank, or rating.

**App. 558**

*DoDI 1332.18, November 10, 2022*

### i. Non-Medical Documentation.

If the MEB refers a case to the PEB, the MTF will forward the case's non-medical documentation to the PEB, including:

(1)  The LOD determinations, when required by Paragraph 7.6.

(2)  Except in cases in which the illness or injury is so severe that return to duty is not likely, a statement from the Service member's immediate commanding officer describing the impact of the member's medical condition on their ability to perform the duties of their office, grade, rank, or rating.

(3)  An official document identifying the next of kin, court-appointed guardian, or trustee when a Service member is determined incompetent to manage their affairs, if applicable, in accordance with Section 602 of Title 37, U.S.C.

### 3.3.  PEB.

#### a.  Purpose.

Pursuant to Chapter 61 of Title 10, U.S.C., PEBs determine the fitness of Service members with medical conditions that are, either singularly, collectively, or through combined effect, potentially unfitting and, for members determined unfit, determine their eligibility for compensation.

#### b.  Informal Physical Evaluation Board (IPEB).

##### (1)  Background.

The IPEB will review the case file to make initial findings and recommendations without the Service member present.  The Service member may accept the findings, rebut the findings, request a formal physical evaluation board (FPEB) if found fit, or, if found unfit, demand a FPEB in accordance with Section 1214 of Title 10, U.S.C.  If the Service member declines a FPEB, the PEBLO will document the Service member's declination.

##### (2)  Composition.

The IPEB will be comprised of at least two members, at field grade or civilian equivalent or higher; additionally, one military person at the grade of E-9 may be a board member for enlisted cases.  In cases of a split opinion, a third voting member that meets the same qualification requirements will be assigned to provide the majority vote.  No board member will be unduly influenced by another member on their determination.  Contract personnel may not serve as IPEB adjudicators.

**App. 559**

*DoDI 1332.18, November 10, 2022*

**c. FPEB.**

(1) Background.

(a) In accordance with Section 1214 of Title 10, U.S.C., Service members are entitled to a full and fair hearing, upon request, before the Service member may be separated or retired for physical disability.

(b) If the Secretary of the Military Department concerned unilaterally changes the IPEB findings or determinations of "fit" or "unfit" following a Service member's concurrence, the Service member may demand a FPEB to contest the changes.

(2) Composition.

(a) The FPEB must be comprised of at least three members, at least one of whom will be military officers in accordance with Paragraph 3.3.c.(2)(b)(1). DoD civilian employees may also be included as additional members.

(b) Should a Service member demand, FPEB members cannot have participated in the adjudication process of the same case at the IPEB.

1. The FPEB will consist of at least a board president who will be a military officer in the grade of O-5 or higher (or civilian equivalent); a physician (military or DoD civilian); and a line officer (or non-commissioned officer at the E-9 level for enlisted cases) familiar with duty assignments. No board member will be unduly influenced by another member on their determination.

2. The physician cannot:

a. Be the Service member's physician.

b. Have served on the Service member's MEB or Impartial Medical Reviewer.

c. Have participated in a TDRL reexamination of the Service member.

3. For RC Service members, the Secretaries of the Military Departments will ensure RC representation on the PEBs is consistent with Section 12643 of Title 10, U.S.C., and related policies.

4. Contract personnel may not serve as FPEB adjudicators.

(3) Eligibility.

Service members who receive an unfit determination from the IPEB will be entitled to a FPEB hearing.

**App. 560**

*DoDI 1332.18, November 10, 2022*

(4) **Issues.**

At the FPEB, the Service member will be entitled to address issues pertaining to their fitness, the percentage of disability, degree or stability of disability, administrative determinations, a determination that their injury or disease was non-duty related, or that their injury or disease was combat-related or took place in a combat-zone.

(5) **Hearing Rights.**

Service members will, at a minimum, have the right to:

(a) Have their case considered by FPEB members, who were not voting members of their IPEB, if requested.

(b) Appear themselves, through a personal representative, or by videoconference. Unless otherwise directed by the Secretary of the Military Department concerned, RC Service members referred only for non-duty-related conditions, are responsible for their personal travel and other expenses.

(c) Be represented by government-appointed counsel provided by the Military Department concerned. Service members may choose their own civilian counsel at no expense to the U.S. Government. The PEB President will notify the Secretary of the Military Department concerned if the lack of government-appointed counsel affects timely PEB caseload adjudication.

(d) Make a sworn or an unsworn statement. A Service member will not be required to sign a statement relating to the origin, incurrence, or aggravation of a disease or injury.

(e) Remain silent. When the Service member exercises the right to remain silent, the member may not selectively respond, but must remain silent throughout the hearing.

(f) Request witnesses and introduce depositions, documents, or other evidence, and to question all witnesses who testify at the hearing. The FPEB president will determine whether witnesses are essential. If the FPEB president determines witnesses are essential to the hearing, travel expenses and per diem may be reimbursed or paid in accordance with the Joint Travel Regulation. Other people may attend formal hearings at no expense to the U.S. Government.

(g) Access all records and evidence the PEB receives before, during, and after the formal hearing, unless such records are exempt from disclosure by law, which were relied upon by the FPEB in making their recommendation.

**d. Appeal of FPEB Determination of Fitness**

Upon the Service member's decision to appeal the FPEB fitness determination, the Secretary of the Military Department concerned will ensure their respective Military Department has procedures to:

(1) Inform Service members that they are entitled to appeal their FPEB fitness for duty determinations to the official designated by the Secretary of the Military Department concerned

**App. 561**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 178 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 22 of 72

*DoDI 1332.18, November 10, 2022*

as the FPEB appellate authority.  A Service member may submit the appeal in writing or, if requested by the Service member, a hearing will be conducted and the Service member will have the option to be represented at the hearing by legal counsel.  The Service member will make election whether to present a FPEB appeal in a reasonable timeframe specified by Military Department regulations and consistent with other similar processes.

(2)  Inform the Service member that, in lieu of a hearing, they may submit a written appeal explaining why they do not agree with the FPEB fitness determinations.

(3)  Require the FPEB appellate authority to consider all records comprising the Service member's DES case file, including the Impartial Medical Review, if one was prepared; the IPEB and FPEB decisions; and any additional relevant documentation submitted by the Service member for consideration.

(a)  Provide access to relevant records to the Service member and the appellate authority.  However, if the Service member desires to have documentation considered by the appellate authority, not previously considered or available to the Military Department concerned, the Service member must provide such documentation in the time and manner prescribed by the Military Department concerned.

(b)  Identify for the Service member what documents within the Military Department's custody were provided to the appellate authority for consideration in rendering a decision.

(4)  Inform the Service member that they are entitled, upon their request, to appeal a unilateral change to FPEB findings or determinations by the Military Department concerned following a Service member's concurrence to the FPEB findings or determinations.

(5)  Provide Service members with additional levels of review within the Military Department concerned subsequent to the FPEB appeal process outlined in this section, if appropriate.

**e.  Resourcing.**

When a PEB fails to meet a PEB stage goal for 3 consecutive months, the Secretary of the Military Department concerned will:

(1)  Allocate additional personnel to the applicable PEB stage process at the underperforming PEB.  When increasing the staffing of an existing PEB or organizing an additional PEB, the Military Departments should coordinate with the judge advocate general concerned to ensure appropriate staffing levels for government legal counsel.

(2)  Inform the ASD(HA), by memorandum, when a PEB receives additional personnel. The memorandum will contain information regarding:

(a)  The PEB's performance metrics, including the number of days the PEB exceeded a PEB stage goal for the last 3 months.

*DoDI 1332.18, November 10, 2022*

(b)  The number of additional personnel allocated to the PEB.

(c)  Additional steps the PEB will take to meet the PEB stage goal.

(d)  The timeline within which the PEB will meet the PEB stage goal.

#### f.  Record of Proceedings.

The Military Department concerned will provide the Service member with a record of the PEB's proceedings, including IPEB, and, if applicable, the FPEB and subsequent appeals of the FPEB fitness determination, in accordance with Section 1222 of Title 10, U.S.C.  The PEB record of proceedings must convey the PEB findings and rationale in an orderly and itemized fashion, with specific attention to each issue presented by the Service member regarding their case, and the basis for applying total or extra-schedular ratings or unemployability determinations, as applicable.

##### (1)  Duty-related Determinations.

The PEB record of proceedings will at least document:

(a)  The PEB's determination whether the Service member is fit or unfit.

(b)  The code and percentage rating assigned an unfitting and compensable disability based on the VASRD.  The standards for determining compensable disabilities are specified in Section 7.

(c)  The reason(s) an unfitting condition is not compensable, including:

<u>1</u>.  The specific accepted medical principle, as stated in Section 7, for overcoming the presumption of sound condition and the presumption of service aggravation for all cases with a finding of preexisting condition without service aggravation.

<u>2</u>.  The accepted medical principle that an RC Service member performing inactive duty training (IDT), active duty training, or on active duty of 30 days or less, has a preexisting disability that was not permanently aggravated by service.

<u>3</u>.  The basis upon which a determination that a disability that was incurred in the LOD before September 24, 1996, and that was not permanently aggravated by service since September 23, 1996, was not the proximate result of military service.

(d)  The nature of the disability and the stability and permanency of the disability for Service members being placed on the TDRL or permanently retired.

(e)  Administrative determinations made in accordance with Section 8.

(f)  The record of all proceedings of the PEB evaluation, including the evidence used to overcome any applicable presumption listed in this issuance and any changes made by a subsequent reviewing authority, including a written explanation supporting each finding and

**App. 563**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 180 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 24 of 72

*DoDI 1332.18, November 10, 2022*

recommendation.  If applicable, the basis for applying or not applying total or extra-schedular ratings or unemployability determinations.

    (2)  Non-Duty-Related Determinations.

The record of proceedings will document only:

    (a)  The PEB's determination whether the Service member is fit or unfit.

    (b)  For RC Service members determined fit, a determination of whether the member is deployable, if Service regulations require such a determination.

**g.  Quality Assurance.**

Each Military Department will establish and publish quality review procedures specific to the MEB and PEB and conduct quality assurance reviews in accordance with Volume 2 of DoDM 1332.18 and the applicable laws, directives, and regulations governing disability evaluation.

## 3.4.  COUNSELING.

**a.  Purpose.**

Service members processing through the DES must receive counsel regarding the significance and consequences of the determinations being made and their associated rights, benefits, and entitlements.

**b.  MDB.**

Each Military Department will develop and provide a standardized MDB to all Service members referred into the DES, or, if incapacitated, their personal representatives.  PEBLOs, Military Services coordinators (MSCs), and government legal counsel, or their designees, will participate in the MDB.  For IDES cases, the MDB should be completed before the Service member meets individually with the MSC.  For LDES cases, the MDB should be completed within 10 days of Service member's referral into the LDES.

**c.  Non-MDB Requirements.**

Each Military Department will publish and provide standard information booklets that contain specific information on DES processes, including the Service member's rights and responsibilities while navigating through the DES.  The information will be made available at the servicing MTFs and PEBs.

**d.  Service Member Competency.**

When a competency board determines a Service member is incompetent, the Service member's personal representative will be counseled and afforded the opportunity to assert the rights granted to the Service member, to the extent authorized by applicable law.

**App. 564**

*DoDI 1332.18, November 10, 2022*

### e. Pre-separation Counseling.

Service members on orders to active duty for more than 30 days will not be separated or retired because of disability before completing pre-separation counseling pursuant to DoDI 1332.35.

## 3.5. CASE MANAGEMENT.

a. Service members undergoing a DES evaluation must be advised on the status of their case, issues that must be resolved for their case to progress, and the expected time frame for completing the DES at their installation.

b. PEBLOs will contact Service members undergoing disability evaluation at least monthly and provide any necessary DES assistance.

## 3.6. FINAL DISPOSITION.

After adjudicating all appeals, the personnel authorities specified in Section 11 will:

a. Issue orders and instructions to implement the determination of the respective Service's final reviewing authority.

b. Consider Service member requests to continue on active duty or in the RC in a permanent limited duty status if the member is determined unfit.

## 3.7. ADMINISTRATIVE DECISIONS.

a. The Secretary of the Military Department concerned may:

(1) Direct the PEB to reevaluate any Service member determined to be unsuitable for continued military service.

(2) Retire or separate for disability any Service member determined, upon re-evaluation, to be unfit to perform the duties of their office, grade, rank, or rating.

b. The Secretary of the Military Department concerned may not:

(1) Authorize a Service member's involuntary administrative separation based on a determination that the member is unsuitable for deployment or worldwide assignment due to a medical condition after a PEB has found the member fit for the same medical condition; or

(2) Deny the Service member's request to reenlist based on a determination that the member is unsuitable for deployment or worldwide assignment due to a medical condition after a PEB has found the member fit for the same medical condition.

**App. 565**

*DoDI 1332.18, November 10, 2022*

c.  Pursuant to Section 1214a of Title 10, U.S.C., the Secretary of Defense will be the final approval authority for any case determined by the Secretary of the Military Department concerned to warrant a Service member's administrative separation or reenlistment denial based on a determination that the member is unsuitable for continued service due to the same medical condition(s) considered by a PEB that found the member fit for duty.

## 3.8.  TRAINING AND EDUCATION.

### a.  Assignment of Personnel to the DES.

In coordination with the Director, DHA, the Secretaries of the Military Departments will annually certify that the personnel assigned to or impacting the DES outlined in Paragraphs 3.8.a.(1)-(6) were formally trained before being assigned to performing DES duties:

(1)  Physicians (military and DoD civilian).

(2)  PEBLOs.

(3)  Patient administration officers, administrative MEB staff, and DES program managers.

(4)  PEB adjudicators.

(5)  Judge advocates.

(6)  Military Department civilian attorneys.

### b.  Standardized DES Training.

Training curriculums must at least provide instruction on:

(1)  An overview of the statutory and policy requirements of the DES.

(2)  Electronic and paper recordkeeping policies of the Military Department concerned.

(3)  Customer service philosophies.

(4)  Medical administration processes.

(5)  Roles and responsibilities of a Service member's assigned government legal counsel.

(6)  Applicable VA services and benefits.

(7)  Online and other resources about the DES, DoD, and VA.

(8)  The chain of supervision and command.

(9)  The inspector general hotlines for resolving issues.

**App. 566**

*DoDI 1332.18, November 10, 2022*

### 3.9. DISABILITY CASE MANAGEMENT CONTINUUM.

All DES stakeholders, including medical care and case managers, non-medical case managers, patient administration personnel, wounded warrior program liaisons or advocates, MSCs, legal counsel (military or civilian), and recovery care coordinators, share in the responsibility to maintain continuity in all aspects of managing Service member cases and should communicate with each other on an ongoing, frequent basis to prevent delays in care or in the DES process.

#### a. PEBLO

##### (1) Responsibilities.

The PEBLO will:

(a) Inform and assist the Service member or their personal representative, as applicable, during the DES.

(b) Help manage expectations, coordinate medical appointments related to the disability process, and oversee the Service member's case file.

##### (2) Assignment.

PEBLOs will, at a minimum, be a noncommissioned officer in the grade of E-5 or above, or civilian equivalent, whenever practical. The unique duties of the PEBLO require the individual to possess the requisite experience, knowledge, and maturity to provide appropriate support and information to the Service member or their personal representative.

(a) The PEBLO must be able to carefully handle administrative tasks, including:

1. Scheduling and managing all appointments and consultations.

2. Communicating with senior members of the medical and non-medical communities.

(b) PEBLOs should be assigned the role for at least 2 years. Because of the frequency of military reassignments, a civilian employee may fill this position. PEBLOs should not be assigned additional duties that would conflict with their PEBLO duties.

(c) PEBLOs must be trained and certified in accordance with Paragraph 3.8.b. and Paragraphs 3.9.a.(2)(c)1.-3., before assignment of their duties.

1. PEBLOs will be trained through formal classroom or web-based training and will not be considered qualified to perform their duties until demonstrating proficiency in the minimum DoD core competencies. The Secretaries of the Military Departments may supplement these minimum core competencies to qualify a PEBLO to perform duties in the DES. Qualification will be documented and filed with the PEBLO's training records.

**App. 567**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 184 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 28 of 72

*DoDI 1332.18, November 10, 2022*

2.  Before assuming their full duties, PEBLOs will receive at least 1 week of on-the-job training with the incumbent or another PEBLO who is fully trained and has at least 1 year of experience.  During this transition and before case transfer, the incoming PEBLO will make personal contact with each Service member in their portfolio.  The PEBLO's supervisor must verify transfer and accountability of existing cases before the PEBLO assumes full duties.3. After completing initial training, an annual refresher or continuing education and training will be required to ensure PEBLOs remain current in their understanding and application of DES procedures.  When DES procedures or processes significantly change, appropriate specialized education and training will be conducted to ensure a fundamental understanding and the ability to follow new procedures.  Changes to standardized processes will be documented in updates to applicable DoD policy.(3)  Caseload.

The number of Service members assisted by a PEBLO will not exceed 34 at any given time.

**b.  MSC.**

The MSC will:

(1)  Assist Service members in the IDES with the VA claims process, case development, and notification of VA findings and proposed ratings, and provide additional information and clarification of VA findings and proposed ratings after the PEBLO provides the initial information.  This assistance includes completing VA Form 21-526EZ, "Application for Disability Compensation and Related Compensation Benefits," available at https://www.vba.va.gov/pubs/forms/VBA-21-526EZ-ARE.pdf.

(2)  Educate Service members and their assigned recovery care coordinator about the IDES process, disability examinations, and veteran benefits.

## 3.10.  FACILITY RESOURCES.

The Secretaries of the Military Departments and the Director, DHA, will provide PEBLOs and MSCs with adequate space for counseling and access to online resources.  This includes a private counseling space, computer, printer, telephone line, and internet and e-mail connectivity.

**App. 568**

*DoDI 1332.18, November 10, 2022*

# SECTION 4: PROVISION OF LEGAL COUNSEL IN THE DES

## 4.1. REQUIREMENTS.

In conjunction with the judge advocate general of the Military Department concerned, the Secretaries of the Military Departments will:

   a. Advise all Service members referred into the DES on the availability of government legal counsel, who will advise them on their rights and elections.

   b. Provide government legal counsel to advise and represent Service members during the DES process, including after an adverse LOD determination and any subsequent appeals to the Secretary of the Military Department concerned or their designee, relating to the final disposition of Service member disability cases. Legal counsel, whether military judge advocates or civilian attorneys employed by the Military Departments, will be provided at no expense to the Service member.

   c. Provide training for government legal counsel advising or representing Service members in the DES process.

   d. Through their respective judge advocate general, ensure appropriate staffing levels for government legal counsel advising or representing Service members in the DES process by:

      (1) Assigning sufficient numbers of trained legal counsel to advise and represent Service members in DES proceedings and LOD determinations.

      (2) Reviewing counsel workloads periodically to ensure both quality and timeliness of legal services rendered to Service members.

      (3) Adjusting staffing as circumstances dictate. Normally, government legal counsel will not be assigned an overall caseload that requires them to represent more than 10 Service members per week at FPEB hearings.

## 4.2. LEGAL ADVICE AND REPRESENTATION.

Government legal counsel will:

   a. Be available to consult (by telephone or otherwise) with a Service member regarding rights and elections at the time of referral into the DES. Government legal counsel or their designees will participate in the MDB.

   b. Be assigned to represent each Service member who elects to proceed to a hearing before a FPEB or FPEB appeal. Representation will continue through the respective Military Department's individual DES appellate process until the Service member's discharge from active duty or RC from active status for unfitness.

**App. 569**

*DoDI 1332.18, November 10, 2022*

(1)  A Service member may waive their right to representation by government legal counsel.  Such a waiver must be in writing.

(2)  In lieu of government legal counsel, a Service member may elect to be represented by a non-government representative, including, but not limited to, private legal counsel or a representative from a veterans' organization.  Any non-government representation will be at no expense to the U.S. Government.

(a)  If a Service member elects a non-government representative, government legal counsel will remain available to the Service member and their representative for advice and consultation but will not participate in a representative capacity during the DES.

(b)  If a Service member's non-government representation is released, in writing by the Service member, or terminated, government legal counsel will be available to represent the Service member for further proceedings and appeals.

## 4.3.  ACCESS TO DOCUMENTATION.

A Service member may provide appropriate authorization for assigned government legal counsel, private legal counsel, or their designated representative to have access to all documentation pertaining to their disability case, including medical records, MEB narrative summary, ratings, diagnostic codes, LOD determinations, and any additional documentation that the MEB or PEB may request.  Government legal counsel may also have full access to documentation from computerized databases and electronic medical records that relate to the Service member's disabilities.

## 4.4.  SERVICE MEMBER APPEALS AND HEARINGS.

Government legal counsel will explain the general legal counsel duties during the disability evaluation system process to the Service member and inform them about the DES, including requesting a hearing before the FPEB and FPEB appeal.  Service members will also be advised that:

### a.  FPEB.

(1)  If found unfit by the IPEB, the Service member may demand a FPEB.  If a FPEB hearing is demanded, they may appear themselves, through a personal representative, or by videoconference.  Service members may also elect to appear telephonically.

(2)  The FPEB will provide the Service member at least 10 calendar days advance written notice of their hearing before the FPEB.  The Service member may waive this 10-day requirement in writing.

**App. 570**

USCA Case #25-5087      Document #2108715      Filed: 04/01/2025      Page 187 of 415
Case 1:25-cv-00240-ACR      Document 72-86      Filed 03/07/25      Page 31 of 72

*DoDI 1332.18, November 10, 2022*

**b. FPEB Appeal.**

If found fit or unfit by a FPEB, Service members will be entitled, upon their request, to a FPEB appeal consistent with this instruction. Any additional review will be in accordance with the remedies offered by their respective Military Department.

## 4.5. LEGAL COUNSEL IN ADVANCE OF FPEB AND FPEB APPEAL.

Assigned government legal counsel will consult with the Service member at least 24 hours before the scheduled FPEB or FPEB appeal. Service members traveling to a FPEB or FPEB appeal must be afforded more than 1 calendar day to arrive before their scheduled hearing to confer with government legal counsel. Before the hearing starts, the Service member may waive, in writing, the right to confer with government legal counsel before the hearing.

## 4.6. DELAY FOR GOOD CAUSE.

A Service member or representative may request a delay of a hearing for good cause in accordance with applicable Military Department guidance. Any requests for delay must be submitted to the FPEB president or, if in the case of a FPEB appeal, the Secretary of the Military Department concerned or their FPEB appellate authority, in writing and before the scheduled hearing as prescribed by the Military Departments. The FPEB president or the FPEB appellate authority will respond to requests for delay in writing and, if applicable, will include the grounds for a denial of a request for delay.

## 4.7. QUALIFICATIONS AND TRAINING OF LEGAL COUNSEL.

a. The Secretary of the Military Department concerned, in conjunction with their judge advocate general, will provide legal training programs to ensure government legal counsel participating in the DES have adequate training in the process and associated procedures.

b. The Judge Advocate General concerned will ensure that government legal counsel is assigned to represent Service members in the DES in accordance with the regulations and procedures of the Military Department concerned.

c. For IDES cases, uniformed or civilian legal counsel of the Military Department concerned, claims agents, and private attorneys may represent a member before the VA if the representative complies with VA regulations in Part 14 of Title 38, CFR.

d. Training programs should provide an overview of:

(1) The statutory and policy requirements of the DES, including DoD issuances pertaining to the physical disability evaluation system, the VASRD, and laws and regulations pertaining to combat-related special compensation.

**App. 571**

*DoDI 1332.18, November 10, 2022*

(2)  VA services and Federal benefits, including compensation tables based on ratings determinations in effect at the time a rating is adjudicated.

(3)  The resources available to Service members in the DES.

(4)  Online and other resources pertaining to the DES and DoD and VA services.

(5)  The VASRD, the U.S. Court of Federal Claims, the Court of Appeals for Veterans Claims, the U.S. Court of Appeals for the Federal Circuit, and the U.S. Supreme Court. Additionally, although not binding, published decisions by the VA General Counsel may be informative.

(6)  The Inspector General of the Department of Defense hotline, the inspectors general of the Military Departments' respective hotlines, ombudsman programs, and Service programs for resolution of issues of concern to recovering Service members.

**App. 572**

*DoDI 1332.18, November 10, 2022*

# SECTION 5: DES REFERRAL

## 5.1. GENERAL.

The Secretary of the Military Department concerned may refer Service members who meet the criteria for disability evaluation regardless of eligibility for disability compensation.

## 5.2. CRITERIA FOR REFERRAL.

a.  When the course of further recovery is relatively predictable or within 1 year of diagnosis, whichever is sooner, medical authorities will refer eligible Service members into the DES who have:

(1)  One or more medical conditions that may, singularly, collectively, or through combined effect, prevent the Service member from reasonably performing the duties of their office, grade, rank, or rating, including those duties remaining on a Reserve obligation for more than 1 year after diagnosis;

(2)  A medical condition that represents an obvious medical risk to the health of the member or to the health or safety of other members; or

(3)  A medical condition that imposes unreasonable requirements on the military to maintain or protect the Service member.

b.  In all cases, competent medical authorities will refer Service members who meet the criteria in this section into the DES within 1 year of diagnosis.

## 5.3. ELIGIBILITY FOR REFERRAL.

### a. Duty-Related Determinations.

Except as provided in Paragraph 5.4., the categories of Service members in Paragraphs 5.3.a.(1)-(6), who also meet the criteria in Paragraph 5.2., are eligible for referral to the DES for duty-related determinations.

(1)  Service members on active duty or in the RC who are on orders to active duty specifying a period of more than 30 days.

(2)  RC Service members who are not on orders to active duty specifying a period of more than 30 days but who incurred or permanently aggravated a medical condition while ordered to active duty for more than 30 days.

(3)  Cadets at the United States Military Academy or United States Air Force Academy, or midshipmen of the United States Naval Academy.  These cadets or midshipmen will not be

**App. 573**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 190 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 34 of 72

*DoDI 1332.18, November 10, 2022*

placed in a leave of absence status or excess leave status during DES processing, including the transition period.

(4)  Service members previously determined unfit, serving in a permanent limited duty status, and for whom the period of continuation has expired.

(5)  Other Service members who are on orders to active duty specifying a period of 30 days or fewer if they have a medical condition that was incurred or permanently aggravated in the LOD while the Service member was:

(a)  Performing active duty or IDT;

(b)  Traveling directly to or from the place at which such duty is performed;

(c)  Remaining overnight immediately before starting IDT or while remaining overnight between successive periods of IDT at or near the site of the IDT; or

(d)  Serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C. while the Service member was traveling directly to or from the place at which the member was to serve; or while the member remained overnight at or near that place immediately before serving.

(6)  Pursuant to Section 1206a of Title 10, U.S.C., RC Service members ordered to active duty for a period of more than 30 days and released from active duty within 30 days of commencing such period of active duty for failure to meet physical standards for retention due to a pre-existing condition not aggravated during the period of active duty or medical or dental standards for deployment due to a pre-existing condition not aggravated during the period of active duty will be considered to have been serving under an order to active duty for a period of 30 days or less.

### b. Non-Duty-Related Determinations.

RC Service members with only non-duty-related conditions, who are otherwise eligible as described in Paragraph 5.2., will be referred solely for a fitness for duty determination when either:

(1)  The RC Service member does not qualify in accordance with Paragraph 5.3.a.;

(2)  The RC Service member requests referral for a fitness determination upon being notified that they do not meet medical retention standards; or

(3)  Service regulations direct the RC Service member be referred to the DES for a fitness determination before being separated by the RC for not meeting medical retention standards.

### 5.4.  INELIGIBILITY FOR REFERRAL.

a.  Service members will be ineligible for referral to the DES when either:

**App. 574**

*DoDI 1332.18, November 10, 2022*

(1)  The Service member has a condition, circumstance, or defect of a developmental nature, not constituting a physical disability as described in Paragraph 1.2.l., that interferes with assignment to, or performance of, duty and that was not service aggravated;

(2)  The Service member is pending an approved, unsuspended punitive, or administrative discharge or dismissal, except as provided by applicable Military Service regulations;

(3)  The Service member is pending separation in accordance with provisions that authorize a characterization of service of under other than honorable conditions, except as provided by applicable Military Service regulations.  This restriction is based on the provisions upon which the member is being separated and not on the actual characterization the member receives;

(4)  The Service member is not physically present or accounted for; or

(5)  The disability results from intentional misconduct or willful neglect or was incurred during a period of unauthorized absence or excess leave unless the Service member is eligible pursuant to Section 1201(c)(3) of Title 10, U.S.C.

b.  However, the Secretaries of the Military Departments should evaluate for disability those Service members who would be ineligible for referral to the DES due to Paragraphs 5.4.a.(2) and 5.4.a.(3) when the medical impairment condition or disability evaluation is warranted as a matter of equity or good conscience.

## 5.5.  SERVICE MEMBERS WITH MEDICAL WAIVERS.

a.  Service members who enter the military with a medical waiver may be separated without a disability evaluation when:

(1)  The responsible medical authority, designated by Service regulations, determines within 6 months of the member's entry into active service that the waived condition represents a risk to the member or prejudices the U.S. Government's best interests.

(2)  No permanent service aggravation has occurred to a medical condition for which a medical waiver was given.

b.  After 6 months of the member's entry into active service, the Secretary of the Military Department concerned may refer the Service member for a disability evaluation if the Service member meets the criteria in Paragraph 5.2. and is eligible for referral in accordance with Paragraph 5.3.

c.  Members who entered the Service with a medical waiver for a pre-existing condition and who are subsequently determined unfit for the preexisting condition will not be entitled to disability separation or retired pay for that condition unless military service permanently aggravated the condition.  Members granted medical waivers will be advised of this provision at the time of waiver application and when it is granted.

**App. 575**

*DoDI 1332.18, November 10, 2022*

## 5.6.  WAIVER OF DES REFERRAL OR PEB EVALUATION.

Except as prohibited by Paragraph 5.7., Service members may waive referral into the DES or referral to the PEB with the approval of the Secretary of the Military Department concerned.

    a.  The Service member must be counseled on the DES process, the right to a PEB, and the potential benefits of remaining in an active duty or active reserve status to complete processing through the DES.

    b.  The Service member must request a waiver in writing.  Such request, or an affidavit, must attest that the member has received the counseling described in Paragraph 5.6.a. and declines referral into the DES or referral to the PEB.

## 5.7.  PROHIBITION FROM WAIVING DISABILITY EVALUATION.

A Service member cannot waive disability evaluation if they:

    a.  Are approved for voluntary early separation from active duty.

    b.  Incur a Reserve obligation.

    c.  Have conditions that are cause for referral into the DES.

## 5.8.  REFERRAL IMPLICATIONS.

Neither referral into the DES nor a finding of unfitness constitutes entitlement to disability benefits.

**App. 576**

*DoDI 1332.18, November 10, 2022*

# SECTION 6:  STANDARDS FOR DETERMINING UNFITNESS DUE TO DISABILITY OR MEDICAL DISQUALIFICATION

## 6.1.  UNIFORMITY OF STANDARDS.

The standards listed in this issuance for determining unfitness due to disability will be followed unless the USD(P&R) approves exceptions based on the unique needs of the respective Military Department.

## 6.2.  GENERAL CRITERIA FOR MAKING UNFITNESS DETERMINATIONS.

A Service member may be considered unfit when:

   a.  The evidence establishes that the member, due to disability, is unable to reasonably perform the duties of their office, grade, rank, or rating, including those during a remaining period of Reserve obligation; or

   b.  The evidence establishes that their disability:

      (1)  Represents a decided medical risk to their health or to the welfare or safety of other members; or

      (2)  Imposes unreasonable requirements on the military to maintain or protect the Service member.

## 6.3.  RELEVANT EVIDENCE.

The Secretaries of the Military Departments will consider all relevant evidence in assessing Service member fitness, including the circumstances of referral.  To reach a finding of unfit, the PEB must be satisfied that the evidence supports that finding.

### a.  Referral Following Illness or Injury.

   When referral for disability evaluation immediately follows acute, grave illness or injury, the medical evaluation may stand alone, particularly if medical evidence establishes that continued service would be harmful to the member's health or is not in the Military Department's best interest.

### b.  Referral for Chronic Condition.

   When a Service member is referred for disability evaluation under circumstances other than as described in Paragraph 6.3.a., a supervisor's evaluation or personal testimony of the Service member's duty performance may more accurately reflect the capacity to perform.  Supervisors may include letters, efficiency reports, and, in the case of medical officers, credential reports and

**App. 577**

*DoDI 1332.18, November 10, 2022*

status of medical privileges, to provide evidence of the Service member's ability to perform their duties.

### c. Cause-and-effect Relationship.

Regardless of the presence of illness or injury, inadequate duty performance alone will not be considered evidence of unfitness due to disability, unless a cause-and-effect relationship is established between the two factors.

## 6.4. REASONABLE PERFORMANCE OF DUTIES.

### a. Considerations.

Determining whether a Service member can reasonably perform their duties includes considering:

#### (1) Common Military Tasks.

Whether the Service member can perform the common military tasks required for their office, grade, rank, or rating, including those during a remaining period of Reserve obligation. Examples include routinely firing a weapon, performing field duty, or wearing load-bearing equipment or protective gear.

#### (2) Physical Fitness Test.

Whether the Service member is medically prohibited from taking the respective Service's required physical fitness test. When a Service member has been found fit by a PEB for a condition that prevents the member from taking the Service physical fitness test, the inability to take the physical fitness test will not form the basis for an adverse personnel action against the member.

#### (3) Deployability.

Whether the Service member is deployable individually or as part of a unit, with or without prior notification, to any vessel or location specified by the Military Department. When deployability is used by a Service as a consideration in determining fitness, the standard must be applied uniformly to both the AC and RC of that Service.

#### (4) Special Qualifications.

Service members whose medical condition disqualifies them for specialized duties, whether the specialized duties constitute their current duty assignment; they have an alternate branch or specialty; or reclassification or reassignment is feasible.

### b. General, Flag, and Medical Officers.

An officer in pay grade O-7 or higher, or a medical officer in any grade, being processed for retirement by reason of age or length of service, or being re-evaluated on the TDRL, will not be

SECTION 6:  STANDARDS FOR DETERMINING UNFITNESS DUE TO DISABILITY OR MEDICAL DISQUALIFICATION                                                                                37

**App. 578**

*DoDI 1332.18, November 10, 2022*

determined unfit unless the determination of the Secretary of the Military Department concerned, with respect to unfitness, is approved by the USD(P&R) on the recommendation of the ASD(HA).

**c.  Service Members on Permanent Limited Duty.**

(1)  A Service member previously determined unfit and continued in a permanent limited duty status or otherwise continued on active duty will normally be found unfit at the expiration of their period of continuation.  However, the Service member may be determined fit when the condition has healed or improved such that the Service member would be capable of performing their duties in other than a limited-duty status.

(2)  Likewise, Service members placed on permanent limited duty following a PEB evaluation and later found unfit at the expiration of their period of continuation, are eligible to retire or separate from the military for the unfitting condition(s) as determined by the PEB, in accordance with Chapter 61 of Title 10, U.S.C.

**d.  Combined Effect.**

(1)  A Service member may be determined unfit as a result of the combined effect of two or more conditions even though each of them, standing alone, would not cause the Service member to be referred into the DES or be found unfit because of disability.

(2)  The PEB will include in its official findings, in cases where two or more medical conditions (referred or claimed) are present in the service treatment record, that the combined effect was considered in the fitness determination rendered by the PEB, as referred by the MEB.

(3)  Combined effect includes the pairing of a singularly unfitting condition with a condition that standing alone would not be unfitting.


**6.5.  PRESUMPTION OF FITNESS.**

Service members who are pending retirement at the time they are referred for disability evaluation will be presumed fit for military service.

**a.  Presumptive Period.**

The Secretaries of the Military Departments will presume Service members are pending retirement when the Service member's referral into the DES occurs after any of these circumstances:

(1)  A Service member's request for voluntary retirement has been approved.  Revoking voluntary retirement orders for purposes of referral into the DES does not negate application of the presumption.

(2)  An officer has been approved for selective early retirement or is within 12 months of mandatory retirement due to age or length of service.

Section 6:  Standards for Determining Unfitness Due to Disability or Medical Disqualification                                                                                           38

*DoDI 1332.18, November 10, 2022*

(3)  An enlisted member is within 12 months of their retention control point, high year of tenure, or expiration of active obligated service, but will be eligible for retirement at that point.

(4)  An RC Service member is within 12 months of mandatory retirement or removal date and qualifies for a 20-year letter at the time of referral for disability evaluation.

(5)  A retiree is recalled, including those who transferred to the Retired Reserve, with eligibility to draw retired pay upon reaching the age prescribed by Title 10, U.S.C. unless the recalled retiree incurred or aggravated the medical condition while on their current active duty orders and overcomes the presumption of fitness.

**b.  Overcoming the Presumption of Fitness.**

Service members may overcome the presumption of fitness by presenting a preponderance of evidence that they are unfit for military service.  The presumption of fitness may be overcome when:

(1)  An illness or injury occurs within the presumptive period that would prevent the Service member from performing further duty if they were not retiring;

(2)  A serious deterioration of a previously diagnosed condition, including a chronic one, occurs within the presumptive period, and the deterioration would preclude further duty if the Service member were not retiring; or

(3)  The condition for which the Service member is referred is a chronic condition and a preponderance of evidence establishes that they were not performing duties befitting either their experience in the office, grade, rank, or rating before entering the presumptive period because of the condition.

**c.  When The Presumption of Fitness Does Not Apply.**

Service members will not be presumed fit for military service if either:

(1)  The disability is one for which a Service member was previously determined unfit and continued in a permanent limited duty status.  The presumption of fitness will be applied to other medical impairments or conditions unless the medical evidence establishes they were impacted by the previously unfitting disability;

(2)  The Service member is a Selected Reserve member who is eligible to qualify for non-regular retirement pursuant to Section 12731b of Title 10, U.S.C.; or

(3)  The Service member is an RC Service member referred for a non-duty-related determination.

SECTION 6:  STANDARDS FOR DETERMINING UNFITNESS DUE TO DISABILITY OR MEDICAL DISQUALIFICATION                                                                                                    39

*DoDI 1332.18, November 10, 2022*

## 6.6. EVIDENTIARY STANDARDS FOR DETERMINING UNFITNESS BECAUSE OF DISABILITY.

### a. Objective Evidence.

(1)  The Secretary of the Military Department concerned must cite objective evidence in the record, as distinguished from opinion, speculation, or conjecture, to determine a Service member is unfit because of disability.

(2)  Doubt that cannot be resolved with evidence will be resolved in favor of the Service member's fitness through the presumption that the Service member desires to be found fit for duty.

### b. Preponderance of Evidence.

Except for presumption of fitness cases, the Secretary of the Military Department concerned will determine fitness or unfitness for military service based on the preponderance of the objective evidence in the record.

## 6.7. UNFIT DETERMINATIONS.

If the Service member is found unfit, a determination will be made as to the Service member's entitlement to separation or retirement for disability with benefits pursuant to Chapter 61 of Title 10, U.S.C. and administrative determinations in accordance with Section 10 of this issuance.

**App. 581**

*DoDI 1332.18, November 10, 2022*

# SECTION 7:  STANDARDS FOR DETERMINING COMPENSABLE DISABILITIES

## 7.1.  DISABILITY COMPENSATION CRITERIA OVERVIEW.

Service members who are determined unfit to perform the duties of their office, grade, rank, or rating because of disability in accordance with Section 5 may be eligible for disability benefits when:

   a.  The disability is not the result of the Service member's intentional misconduct or willful neglect and was not incurred during unauthorized absence or excess leave.

   b.  The Service member incurred or permanently aggravated the disability while they were:

      (1)  A member of a regular component of the Military Services entitled to basic pay;

      (2)  A Service member entitled to basic pay, called or ordered to active duty (other than for training pursuant to Section 10148 of Title 10, U.S.C.) for a period of more than 30 days;

      (3)  A Service member on active duty for a period more than 30 days but not entitled to basic pay, pursuant to Section 502(b) of Title 37, U.S.C., due to authorized absence to participate in an educational program or for emergency purpose, as determined by the Secretary of the Military Department concerned;

      (4)  A cadet at the United States Military Academy or United States Air Force Academy, or a midshipman of the United States Naval Academy; or

      (5)  A Service member called or ordered to active duty for a period of 30 days or fewer, performing IDT or traveling directly to or from the place of IDT, to funeral honors duty, or for training pursuant to Section 10148 of Title 10, U.S.C.

## 7.2.  DISABILITY RETIREMENT CRITERIA FOR REGULAR COMPONENT MEMBERS AND MEMBERS ON ACTIVE DUTY FOR MORE THAN 30 DAYS.

Service members described in Paragraphs 7.1.a. and 7.1.b.(1) through 7.1.b.(4) will be retired with disability benefits when:

   a.  The disability is permanent and stable.

   b.  The member has:

      (1)  At least 20 years of service computed in accordance with Section 1208 of Title 10, U.S.C.; or

      (2)  A disability of at least 30 percent, pursuant to Part 4, Title 38, CFR, and that disability either:

**App. 582**

*DoDI 1332.18, November 10, 2022*

(a)  Was not noted at the time of the member's entrance on active duty unless the Secretary of the Military Department concerned demonstrates with clear and unmistakable evidence that both the disability existed before the member's entrance on active duty and the disability was not permanently aggravated by active military service;

(b)  Is the proximate result of performing active duty;

(c)  Was incurred in the LOD in time of war or national emergency; or

(d)  Was incurred in the LOD after September 14, 1978.

## 7.3.  DISABILITY RETIREMENT CRITERIA FOR MEMBERS ON ACTIVE DUTY FOR 30 DAYS OR FEWER, ON IDT, FUNERAL HONORS DUTY, OR TRAINING PURSUANT TO SECTION 1204 OF TITLE 10, U.S.C.

Service members described in Paragraphs 7.1.a. and 7.1.b.(5) will be retired with disability benefits when:

a.  The disability is permanent and stable.

b.  The Service member has:

(1)  At least 20 years of service computed in accordance with Section 1208 of Title 10, U.S.C.; or

(2)  A disability of at least 30 percent, pursuant to Part 4 of Title 38, CFR, that was either:

(a)  Incurred or aggravated before September 24, 1996, as the proximate result of:

<u>1</u>.  Performing active duty or IDT;

<u>2</u>.  Traveling directly to or from the place of active duty or IDT; or

<u>3</u>.  An injury, illness, or disease incurred or aggravated immediately before the commencement of IDT or while remaining overnight, between successive periods of IDT, at or near the site of the IDT, if the site of the IDT is outside reasonable commuting distance of the Service member's residence.

(b)  The result of injury, illness, or disease that was incurred or aggravated in the LOD after September 23, 1996:

<u>1</u>.  While performing active duty or IDT;

<u>2</u>.  While traveling directly to or from the place of active duty or IDT;

<u>3</u>.  While remaining overnight immediately before the commencement of IDT; or

**App. 583**

*DoDI 1332.18, November 10, 2022*

    4.  While remaining overnight between successive periods of IDT at or in the vicinity of the site of the IDT.

    (c)  The result of an injury, illness, or disease incurred or aggravated in the LOD:

    1.  While serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C.;

    2.  While traveling to or from the place at which the member was to serve; or

    3.  While remaining overnight at or in the vicinity of that place immediately before serving, if it is outside reasonable commuting distance from the member's residence.

## 7.4.  DISABILITY SEPARATION CRITERIA FOR REGULAR COMPONENT MEMBERS AND MEMBERS ON ACTIVE DUTY FOR MORE THAN 30 DAYS.

Service members described in Paragraphs 7.1.a. and 7.1.b.(1) through 7.1.b.(4) will be separated with disability benefits when:

    a.  The Service member has fewer than 20 years of service as computed in accordance with Section 1208 of Title 10, U.S.C.;

    b.  Based on accepted medical principles, the disability is or may be of a permanent nature and is either:

    (1)  Less than 30 percent, pursuant to Part 4 of Title 38, CFR, at the time of the determination, and the disability was:

    (a)  The proximate result of performing active duty;

    (b)  Incurred in the LOD in time of war or national emergency; or

    (c)  Incurred in the LOD after September 14, 1978.

    (2)  Less than 30 percent, pursuant to Part 4 of Title 38, CFR, at the time of the determination and was not noted at the time of the Service member's entrance on active duty (unless the Secretary of the Military Department concerned overcomes both the presumption of sound condition and the presumption of service aggravation, if applicable, by demonstrating with clear and unmistakable evidence that both the disability existed before the Service member's entrance on active duty and the disability was not aggravated by active military service).

    (3)  At least 30 percent, pursuant to Part 4 of Title 38, CFR, and at the time of the determination, the disability was neither:

    (a)  The proximate result of performing active duty;

    (b)  Incurred in the LOD in time of war or national emergency; nor

**App. 584**

*DoDI 1332.18, November 10, 2022*

(c)  Incurred in the LOD after September 14, 1978, and the Service member had fewer than 8 years of service computed pursuant to Section 1208 of Title 10, U.S.C. on the date when they:

    <u>1</u>.  Would otherwise be retired pursuant to Section 1201 of Title 10, U.S.C.; or

    <u>2</u>.  Were placed on the TDRL pursuant to Section 1202 of Title 10, U.S.C.

## 7.5.  DISABILITY SEPARATION CRITERIA FOR MEMBERS ON ACTIVE DUTY FOR 30 DAYS OR LESS, ON IDT, FUNERAL HONORS DUTY, OR TRAINING PURSUANT TO SECTION 1206 OF TITLE 10, U.S.C.

a.  Service members described in Paragraphs 7.1.a. and 7.1.b.(5) will be separated with disability benefits when:

(1)  The Service member has fewer than 20 years of service.

(2)  The disability:

(a)  Is or may be permanent.

(b)  Is the result of an injury, illness, or disease incurred or aggravated in the LOD while:

    <u>1</u>.  Performing active duty or IDT;

    <u>2</u>.  Traveling directly to or from the place of such duty;

    <u>3</u>.  Remaining overnight immediately before the commencement of IDT, between successive periods of IDT, at or in the vicinity of the site of the IDT if the site is outside reasonable commuting distance of the Service member's residence; or

    <u>4</u>.  Serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C. while traveling to or from the place at which they were to serve; or while remaining overnight at or in the vicinity of that place immediately before serving.

(c)  Is less than 30 percent under the VASRD at the time of the determination and, in the case of a disability incurred before October 5, 1999, was the proximate result of performing active duty or IDT or of traveling directly to or from the place at which such duty is performed.

b.  If the Service member is eligible for transfer to the inactive status list pursuant to Section 1209 of Title 10, U.S.C. and chooses to, they may be transferred to that list instead of being separated.

**App. 585**

*DoDI 1332.18, November 10, 2022*

## 7.6. LOD REQUIREMENTS.

In the DES, LOD determinations will assist the PEB in meeting the statutory requirements in accordance with Chapter 61 of Title 10, U.S.C. for separation or retirement for disability.

### a. Relationship of LOD Findings to DES Determinations.

(1) LOD determinations will be made in accordance with the regulations of the respective Military Department. When an LOD determination is required, the PEB may consider the finding made for those issues mutually applicable to LOD and DES determinations. These issues include whether a condition is pre-existing, is aggravated, is aggravated by military service, and whether there are any issues of misconduct or negligence.

(2) When the PEB has reasonable cause to believe an LOD finding appears to be contrary to the evidence, disability evaluation will be suspended for a review of the LOD determination in accordance with the regulations of the respective Military Department. The PEB will forward the case to the final LOD reviewing authority designated by the Secretary of the Military Department concerned with a memorandum documenting the reasons for questioning the LOD finding.

### b. Referral Requirement.

When an LOD determination is required, it will be done before sending a Service member's case to the PEB.

### c. Presumptive Determinations.

The determination will be presumed to be in the LOD without an investigation in the case of:

(1) Disease, except as described in Paragraphs 7.6.d.(1) to 7.6.d.(6).

(2) Injuries clearly incurred as a result of enemy action or attack by terrorists.

(3) Injuries while a passenger in a common commercial or military carrier.

### d. Required Determinations.

LOD determinations will at least be required when:

(1) The injury, disease, or medical condition may be due to the Service member's intentional misconduct or willful negligence, such as a motor vehicle accident;

(2) The injury involved alcohol or drug abuse;

(3) The injury was self-inflicted;

(4) The injury or disease was possibly incurred during a period of unauthorized absence;

**App. 586**

*DoDI 1332.18, November 10, 2022*

(5)  The injury or disease was apparently incurred during a course of conduct for which charges have been preferred; or

(6)  The injury, illness, or disease is of an RC Service member on orders specifying a period of active duty of 30 days or fewer while:

(a)  Performing active duty or IDT;

(b)  Traveling directly to or from the place of active duty or IDT;

(c)  Remaining overnight immediately before the commencement of IDT, between successive periods of IDT, at or in the vicinity of the site of the IDT if the site is outside reasonable commuting distance of the Service member's residence; or

(d)  Serving on funeral honors duty pursuant to Section 12503 of Title 10, U.S.C. or Section 115 of Title 32, U.S.C. while traveling to or from the place at which they were to serve; or while remaining overnight at or in the vicinity of that place immediately before serving if the place is outside reasonable commuting distance from their residence.

## 7.7.  EVIDENTIARY STANDARDS FOR DETERMINING COMPENSIBILITY OF UNFITTING CONDITIONS.

### a.  Misconduct and Negligence.

LOD determinations concerning intentional misconduct and willful negligence will be judged by the evidentiary standards established by the Secretary of the Military Department concerned.

### b.  Presumption of Sound Condition for Members on Continuous Orders to Active Duty Specifying a Period of More Than 30 Days.

(1)  The Secretaries of the Military Departments will presume Service members, including RC Service members and recalled retirees, on continuous orders to active duty specifying a period of more than 30 days, entered their current period of military service in sound condition when the disability was not noted at the time of the Service member's entrance to the current period of active duty.

(2)  The Secretaries of the Military Departments may overcome this presumption if clear and unmistakable evidence demonstrates that both the disability existed before the Service member's entrance on their current period of active duty and the disability was not aggravated by their current period of military service.  Absent such clear and unmistakable evidence, the Secretary of the Military Department concerned will conclude that the disability was incurred or aggravated during their current period of military service.

(3)  The Secretary of the Military Department concerned must base a finding that the Service member's condition was not incurred in, or aggravated by, their current period of military service on objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture.  When the evidence is unclear concerning whether the condition

**App. 587**

*DoDI 1332.18, November 10, 2022*

existed before their current period of military service, or if the evidence is equivocal, and the presumption of sound condition at the Service member's entry to the current period of military service has not been rebutted, the Secretary of the Military Department concerned will find the Service member's condition was incurred in or aggravated by military service.

(4)  Hereditary or genetic disease will be evaluated to determine whether clear and unmistakable evidence demonstrates that both the disability existed before the Service member's entrance on active duty and the disability was not aggravated by their current period of military service.  However, even if the disability is determined to have been incurred before entry on their current period of active duty, any aggravation of that disease incurred during the Service member's current period of active duty beyond that determined to be due to natural progression, will be determined to be service-aggravated.

(5)  There is no presumption of sound condition for RC Service members serving on orders of 30 days or fewer.

**c.  Presumption of Incurrence or Aggravation in the LOD for Members on Continuous Orders to Active Duty Specifying a Period of More Than 30 Days.**

(1)  The Secretaries of the Military Departments will presume that diseases or injuries incurred by Service members on continuous orders to active duty, specifying a period of more than 30 days, were incurred or aggravated in the LOD unless the disease or injury was noted at time of entry into service.  The Secretaries of the Military Departments may overcome the presumption that a disease or injury was incurred or aggravated in the LOD only when clear and unmistakable evidence indicates both that the disease or injury existed before their current period of military service and that the disease or injury was not aggravated by their current period of military service.

(2)  Pursuant to Sections 1206a and 1207a of Title 10, U.S.C, a preexisting condition will be deemed to have been incurred while entitled to basic pay and will be considered for purposes of determining whether the disability was incurred in the LOD when:

(a)  The Service member was ordered to active duty for more than 30 days (other than for training pursuant to Section 10148(a) of Title 10, U.S.C.) when the disease or injury was determined to be unfitting by the PEB;

(b)  The Service member was not an RC Service member released within 30 days of their orders to active duty, in accordance with Section 1206a of Title 10, U.S.C., due to the identification of a preexisting condition not aggravated by the current call to duty;

(c)  The Service member will have a career total of at least 8 years of active service and be in an active duty status at the time of separation; or

(d)  The disability was not the result of intentional misconduct or willful neglect or was incurred during a period of unauthorized absence.

**App. 588**

*DoDI 1332.18, November 10, 2022*

### d. RC Service Members Serving on Orders of 30 Days or Fewer.

(1)  The Secretary of the Military Department concerned will determine if injuries and diseases to RC Service members serving on orders of 30 days or fewer were incurred or aggravated in the LOD as described in Paragraph 7.4.

(2)  For RC Service members being examined in accordance with Paragraph 7.3., aggravation must constitute the worsening of a preexisting medical condition beyond the natural progression of the condition.

(3)  There is no presumption of incurrence or aggravation in the LOD for RC Service members serving on orders of 30 days or fewer.

### e. Prior Service Condition.

Any medical condition incurred or aggravated during one period of active service or authorized training in any of the Military Services that recurs, is aggravated, or otherwise causes the Service member to be unfit, should be considered incurred in the LOD, provided the origin of such condition or its current state is not due to the Service member's misconduct or willful negligence, or progressed to unfitness as the result of intervening events when the Service member was not in a duty status.

### f. Medical Waivers.

(1)  Service members who entered the Military Service with a medical waiver for a preexisting condition and are subsequently determined unfit for the condition will not be entitled to disability separation or retired pay unless:

(a)  Military service permanently aggravated the condition or hastened the condition's rate of natural progression; or

(b)  The Service member will have a career total of at least 8 years of active service and be in an active duty status at the time of separation.

(2)  Service members granted medical waivers will be advised of the waiver application process when applying for a waiver and when it is granted.

### g. Treatment of Pre-existing Conditions.

(1)  Generally recognized risks associated with treating preexisting conditions will not be considered service aggravation.

(2)  Unexpected adverse events, over and above known hazards, directly attributable to treatment, anesthetic, or operation performed or administered for a medical condition existing before entry on active duty, may be considered service aggravation.

**App. 589**

*DoDI 1332.18, November 10, 2022*

### h.  Elective Surgery or Treatment.

A Service member choosing to have elective surgery or treatment done at their own expense will not be eligible for compensation in accordance with the provisions of this issuance for any adverse residual effect resulting from the elected treatment, unless it can be shown that such election was reasonable or resulted from a significant impairment of judgment that is the product of a ratable medical condition.

### i.  Rating Disabilities.

(1)  When a disability is established as compensable, it will be rated in accordance with Part 4 of Title 38, CFR.

(2)  If a service-connected condition aggravated a non-service-connected condition, the Service member may be compensated for that degree of disability that is over and above the degree of disability existing before the aggravation or natural progression in accordance with Section 3.310(b) of Title 38, CFR.

(a)  The rating will reflect only the degree of disability over and above the degree existing at the time of entrance into the active service whether the particular condition was noted at the time of entrance into the active service or it is determined upon the evidence of record to have existed at that time.

(b)  When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the Service member.

**App. 590**

*DoDI 1332.18, November 10, 2022*

# SECTION 8: VASRD

## 8.1. GENERAL.

a. The Secretaries of the Military Departments will assign disability ratings based on Part 4 of Title 38, CFR.

(1) The Secretaries of the Military Departments may not deviate from the VASRD, including any applicable interpretation of the VASRD by the U.S. Court of Appeals for Veterans Claims, U.S. Court of Appeals for the Federal Circuit, or U.S. Supreme Court.

(2) In lieu of the VASRD, the Secretaries of the Military Departments may use criteria prescribed jointly by the Secretary of Defense and the Secretary of Veterans Affairs if using such criteria will result in a greater percentage of disability than would be determined using the VASRD.

b. Using the VASRD is required in accordance with Section 1216a of Title 10, U.S.C., and will be utilized in accordance with Part 4 of Title 38, CFR, to the greatest extent feasible. In applying the VASRD, any determination of infeasibility must be based on statutory differences between the DoD and VA disability systems, compelling differences in mission grounded in statute, or some other major difference between the two systems. A policy disagreement or differing medical opinion does not constitute infeasibility.

c. To be rated as unfitting for a condition, the Service member must be impaired to such extent that their condition is unfitting whether singularly, collectively, or through combined effect. Physical examination findings, laboratory tests, radiographs, and other findings do not, in and of themselves, constitute a basis for determining that a Service member will be rated for a condition.

d. The VASRD is used to make rating determinations for each of the medical conditions determined to be unfitting, whether singularly, collectively, or through combined effect. When a Service member has more than one compensable disability, the percentages are combined in accordance with Section 4.25 of Title 38, CFR, rather than added.

(1) The PEB will include in its official findings that combined effect was considered in the fitness determination (and whether it was applied in the final adjudication) of cases where two or more medical conditions (referred or claimed) are present in the service treatment record.

(2) The PEB will use the VASRD to establish the Service member's proposed disability rating under the LDES process.

(3) In addition to the requirements in Paragraph 7.7.i., the PEB will apply ratings provided by the VA for unfitting conditions to establish the Service member's DoD disability rating under the IDES process.

(4) In the IDES process, the PEB will use the VASRD to rate an unfitting condition the VA refuses to rate.

**App. 591**

*DoDI 1332.18, November 10, 2022*

e.  While not legally binding, DoD rating personnel may use the VA's various applicable internal publications, including VA M21-1, to assist in making disability rating determinations when rating cases under the LDES.

## 8.2. BEHAVIORAL DISORDERS DUE TO TRAUMATIC STRESS.

The Secretary of the Military Department concerned will comply with Section 1216a of Title 10, U.S.C. and Sections 4.129 and 4.130 of Title 38, CFR for disposition of Service members found unfit because of a behavioral disorder due to traumatic stress.  When a behavioral disorder develops on active duty because of a highly stressful event severe enough to bring about a Service member's release from active military service, the Secretary of the Military Department concerned will:

a.  Permanently retire Service members assigned a rating of 80 percent or greater for any unfitting permanent and stable condition(s) not related to the behavioral disorder due to traumatic stress.

b.  For all other Service members, assign a rating of at least 50 percent to the behavioral disorder due to traumatic stress, combine ratings in accordance with the VASRD, temporarily retire the Service member for disability, and schedule an examination to determine whether a change in rating and disposition is warranted.  The reexamination will be scheduled within 6 months from the date of placement on the TDRL, but completed no earlier than 90 days after placement on the TDRL.

## 8.3. DISABILITY RATING BASED ON UNEMPLOYABILITY.

The Secretary of the Military Department concerned may assign a total disability rating for compensation, even if the VASRD rating is less than the total disability rating, when, in the Secretary's judgment, the Service member is unable to secure or follow a substantially gainful occupation because of service-connected disabilities.  Sections 4.15, 4.16, and 4.18 of Title 38, CFR contain additional guidance for determining total disability ratings.

## 8.4. EXTRA-SCHEDULAR RATINGS.

Section 3.321(b) of Title 38, CFR addresses extra-schedular evaluations for Service members and veterans.

a.  The Secretary of the Military Department concerned may assign ratings in unusual cases not covered by the VASRD.  In such cases, the Secretary of the Military Department concerned may assign extra-schedular ratings commensurate with the average earning capacity impairment due exclusively to the unfit conditions.

b.  The PEB will document the basis of the conclusion that the case is not covered by the VASRD standards.

**App. 592**

*DoDI 1332.18, November 10, 2022*

# SECTION 9: TDRL MANAGEMENT

## 9.1. INITIAL PLACEMENT ON THE TDRL.

a.  A Service member will be placed on the TDRL when they meet the requirements for permanent disability retirement, except when the disability is not determined to be stable but may be permanent.  A disability will be determined stable when the preponderance of medical evidence indicates the severity of the condition will probably not change enough within the next 3 years to increase or decrease the disability rating percentage, pursuant to Section 1210 of Title 10, U.S.C.

b.  Service members with unstable conditions rated at least 80 percent, and are not expected to improve to less than an 80 percent rating, will be permanently retired.

## 9.2. TDRL RE-EVALUATION.

The TDRL will be managed to meet the requirements for periodic disability examination, suspension of retired pay, and prompt removal from the TDRL pursuant to Chapter 61 of Title 10, U.S.C., including reexamining temporary retirees at least once every 18 months to determine whether there has been a change in the disability for which the member was temporarily retired.  For Service members diagnosed with behavior disorders because of traumatic stress, the reexamination will be scheduled within 6 months from the date of placement on the TDRL, but completed no earlier than 90 days after placement on the TDRL.

### a.  Initiating the TDRL Re-evaluation Process.

(1)  No later than 16 months after temporarily retiring a Service member for disability or after their previous re-evaluation, the Military Department will obtain and consider available DoD medical treatment documentation, VA or veteran-provided medical treatment documentation or the disability examination that occurred within 16 months of the member being placed on the TDRL, and rating documentation.

(2)  If the documents reviewed are deemed sufficient and consistent with the requirements of Chapter 61, of Title 10, U.S.C., the Military Department may rely on that documentation to determine whether there has been a change in disability for which the Service member was temporarily retired.

(3)  The PEB will review the available evidence to determine if the documentation is sufficient to fully describe:

(a)  Each disability that the Secretary of the Military Department concerned determined was unfitting and may be permanent, but was unstable at the time the Service member was placed on the TDRL.

(b)  The status of the Service member's disabilities.

**App. 593**

*DoDI 1332.18, November 10, 2022*

(c)  The progress of the Service member's disabilities and a suggested time frame (not to exceed 18 months) for the next examination.

(d)  Treatment and etiology, any new disability that was caused by, or directly related to, treating a disability for which the Service member was previously placed on the TDRL.

**b.  Disability Reexaminations.**

If the Military Department determines the available medical records and examination reports, including those available from VA, do not meet the requirements in Paragraph 9.2.a.(3), the Secretary of the Military Department concerned, in coordination with the Director, DHA, will comply with their responsibilities in Chapter 61 of Title 10, U.S.C. regarding the TDRL, including performing TDRL examinations that meet the requirements of Paragraphs 9.2.a.(3).

**c.  PEB Re-adjudication.**

(1)  The Military Department will request that the VA provide their most current rating and medical evidence upon which the most current rating was based for the condition for which the veteran was placed on the TDRL.  If, at the time of the request, the most current rating is not based on the most current version of the respective section of the VASRD, the Military Department will request the VA update the Service member's rating to reflect the current version of the VASRD.

(2)  The PEB will consider the future examination requirements set by the disability rating activity site as an indicator of stability when recommending stability determinations and case disposition to the Secretary of the Military Department concerned.

(3)  If the PEB decides to continue a veteran on temporary retirement for disability for which the disability rating activity site has not scheduled a future examination, the Military Department concerned will execute required TDRL examinations and ratings in accordance with Chapter 61 of Title 10, U.S.C.  Service members placed on the TDRL will be rated at the applicable VASRD rating in effect at the time of their periodic examination.

**d.  PEB Disposition.**

(1)  If the PEB finds the veteran fit for duty for the condition(s) for which they were placed on the TDRL, finds that the condition(s) is now stable, and the veteran wishes to return to active duty, the Military Department concerned will administer any additional examinations required to evaluate whether the veteran is otherwise fit for duty in accordance with the Military Department's regulations and this issuance.  The Military Department will administer other dispositions in accordance with this issuance.

(2)  If, upon re-evaluation while on the TDRL, the veteran is still found unfit due to the unstable condition for which they were placed on the TDRL, evaluation of other conditions will not be required.

**App. 594**

*DoDI 1332.18, November 10, 2022*

### e. Cases on VA Appeal.

When a Service member who was temporarily retired for disability has appealed a VA decision and the appeal resides with the Board of Veterans Appeals or Court of Appeals for Veterans' Claims, the Military Department concerned will obtain a copy of the most current rating and medical evidence available from the VA.

(1)  The Military Department will obtain and review the available DoD and VA medical treatment and disability examination documentation for the condition for which the Service member was placed on the TDRL.

(2)  If the PEB determines that the Service member requires an additional disability examination, the PEB will coordinate the actions needed to meet the statutory, 18-month examination requirement in accordance with Chapter 61 of Title 10, U.S.C.  Upon receipt of all necessary medical evidence, the PEB will adjudicate the case.

### f. Administrative Finality.

During TDRL re-evaluation, as described in Paragraph 9.2.a., previous determinations concerning application of any presumption established by this issuance, LOD, misconduct, and whether a medical condition was permanent, service-incurred, or preexisting and aggravated will be considered administratively final for conditions for which the Service member was placed on the TDRL unless there is:

(1)  Evidence of fraud;

(2)  A change of diagnosis that warrants the application of accepted medical principles for a preexisting condition; or

(3)  A correction of error in favor of the Service member.

### g. Required Determinations.

(1)  The Secretary of the Military Department concerned will determine whether the conditions for which the Service member was placed on the TDRL are unfitting and compensable.

(2)  When, upon re-evaluation, a temporarily retired veteran is determined fit for the conditions for which they were placed on the TDRL and has no other DoD compensable disabilities, they will be removed from the TDRL and may be separated in accordance with Section 1203 or 1206 of Title 10, U.S.C., whichever applies.

(3)  If found fit, the veteran may be returned to duty in accordance with Section 1211, Title 10, U.S.C.

**App. 595**

*DoDI 1332.18, November 10, 2022*

**h.  Service Member Medical Records.**

The Service member will provide copies of all their medical records (e.g., civilian, VA, and military) documenting treatment since the last TDRL re-evaluation to the examining physician for submission to the PEB.

**i.  Compensability of New Diagnoses.**

Conditions newly diagnosed during temporary retirement will be compensable when both:

(1)  The condition is unfitting.

(2)  The condition was caused by, or directly related to, the treatment of a condition for which the Service member was previously placed on the TDRL.

**j.  Current Physical Examination.**

Service members on the TDRL will not be entitled to permanent retirement or separation with disability severance pay without a current periodic physical examination acceptable to the Secretary of the Military Department concerned pursuant to Chapter 61 of Title 10, U.S.C.

**k.  Refusal or Failure to Report.**

In accordance with Chapter 61 of Title 10, U.S.C., when a Service member on the TDRL refuses or fails to report for a required periodic physical examination or provide their medical records in accordance with Paragraph 9.2.h., disability retired pay will be suspended.

(1)  If the Service member later reports for the physical examination, retired pay will be resumed effective on the date the examination was performed.

(2)  If the Service member shows just cause for failure to report, disability retired pay may be paid retroactively for a period not to exceed 1 year before the date the physical examination was performed.

(3)  If the Service member does not undergo a periodic physical examination after disability retired pay has been suspended, they will be administratively removed from the TDRL on the third anniversary of the original placement on the list and separated without benefits.

**l.  Priority.**

TDRL examinations, including hospitalization in connection with the conduct of the examination, will be furnished with the same priority given to active duty members.

**m.  Reports from Civilian Providers.**

MTFs designated to conduct TDRL periodic physical examinations may use disability examination reports from any medical facility or physician.  The designated MTF will remain responsible for the adequacy of the examination and the completeness of the report.  The report must include the competency information specified in Paragraph 3.2.g.

**App. 596**

*DoDI 1332.18, November 10, 2022*

# SECTION 10:  ADMINISTRATIVE DETERMINATIONS

## 10.1.  ADMINISTRATIVE DETERMINATIONS FOR PURPOSES OF EMPLOYMENT UNDER FEDERAL CIVIL SERVICE.

a.  The PEB will render a final decision on whether an injury or disease that makes the Service member unfit, or contributes to unfitness, was:

(1)  Incurred in combat with an enemy of the United States;

(2)  The result of armed conflict; or

(3)  Caused by an instrumentality of war during war.

b.  The determinations in Paragraphs 10.1.b.(1)-(3) pertain to whether a former Service member, later employed in Federal civil service, will be entitled to credit of military service toward a Federal civil service retirement in accordance with Sections 8332 and 8411 of Title 5, U.S.C., and Section 2082 of Title 50, U.S.C.; retention preference in accordance with Section 3502 of Title 5, U.S.C.; and credit of military service for civil service annual leave accrual in accordance with Section 6303 of Title 5, U.S.C.

(1)  Armed Conflict.

The disease or injury was incurred in the LOD as a direct result of armed conflict in accordance with Sections 3502 and 6303 of Title 5, U.S.C.  The fact that a Service member may have incurred a disability during a period of war, in an area of armed conflict, or while participating in combat operations will not be sufficient to support this finding.  For purposes of creditable service, there must be a definite causal relationship between the armed conflict and the resulting unfitting disability.

(2)  Instrumentality of War During a Period of War.

Pursuant to Sections 3502 and 6303 of Title 5, U.S.C., the injury or disease was caused by an instrumentality of war and incurred in the LOD during a period of war, as defined in Sections 101 and 1101 of Title 38, U.S.C.

(3)  Creditable service.

For civil service annual leave accrual and retention preference, in accordance with Section 3502 and 6303 of Title 5, U.S.C., the applicable periods of war will be:

(a)  Vietnam Era.

1.  The period beginning August 5, 1964 and ending May 7, 1975.

2.  The period beginning February 28, 1961, and ending May 7, 1975, in the case of a veteran who served in the Republic of Vietnam during that period.

**App. 597**

*DoDI 1332.18, November 10, 2022*

(b)  Persian Gulf War.

The period beginning August 2, 1990, through date to be prescribed by Presidential proclamation or law.

## 10.2.  DETERMINATION FOR FEDERAL TAX BENEFITS.

The disability evaluation will include a determination and supporting documentation on whether the Service member's disability compensation will be excluded from Federal gross income in accordance with Section 104 of Title 26, U.S.C.  For compensation to be excluded, the Service member must meet the criteria in Paragraphs 10.2.a. or 10.2.b.

### a.  Status.

On September 24, 1975, the individual was a Service member, including the RC, or was under binding written agreement to become a Service member.

(1)  A Service member who was a member of an armed force of another country on that date is entitled to the exclusion.

(2)  A Service member who was a contracted cadet of the Reserve Officers Training Corps on that date is entitled to the exclusion.

(3)  A Service member who separates from the Military Service after that date and incurs a disability during a subsequent enlistment is entitled to the exclusion.

### b.  Combat Related.

This standard covers injuries and diseases attributable to the special dangers associated with armed conflict or the preparation or training for armed conflict.  A disability is considered combat-related if it makes the Service member unfit or contributes to unfitness and the preponderance of evidence shows it was incurred either:

(1)  As a Direct Result of Armed Conflict.

The criteria are the same as those in Paragraph 10.1.b.

(2)  While Engaged in Hazardous Service.

Such service will include, but will not be limited to, aerial flight duty, parachute duty, demolition duty, experimental stress duty, and diving duty.

(3)  Under Conditions Simulating War.

In general, this will cover disabilities resulting from military training, such as war games, practice alerts, tactical exercises, airborne operations, and leadership reaction courses; grenade and live fire weapons practice; bayonet training; hand-to-hand combat training; rappelling; and

**App. 598**

USCA Case #25-5087    Document #2108715    Filed: 04/01/2025    Page 215 of 415
Case 1:25-cv-00240-ACR    Document 72-86    Filed 03/07/25    Page 59 of 72

*DoDI 1332.18, November 10, 2022*

negotiation of combat confidence and obstacle courses.  It will not include physical training activities, such as calisthenics and jogging or formation running and supervised sports.

(4)  Caused by an Instrumentality of War.

(a)  Occurrence during a period of war will not be a requirement to qualify.  If the disability was incurred during any period of service as a result of wounds caused by a military weapon, accidents involving a military combat vehicle, injury or sickness caused by fumes, gases, or explosion of military ordnance, vehicles, or material, the criteria will be met.

(b)  There must be a direct causal relationship between the instrumentality of war and the disability.  For example, an injury resulting from a Service member falling on the deck of a ship while participating in a sports activity would not normally be considered an injury caused by an instrumentality of war (the ship) since the sports activity and not the ship caused the fall.  The exception occurs if the operation of the ship caused the fall.

**c.  Non-Taxable Compensation.**

Compensation granted to Service members for service-connected combat-zone disability must be in accordance with DoDI 1340.25 and DoD 7000.14-R.

## 10.3.  RECOUPMENT OF BENEFITS.

In accordance with Sections 303a and 373 of Title 37, U.S.C., when a Service member is retired, separated, or dies as a result of a combat-related disability and has received a bonus, incentive pay, or similar benefit, the Secretary of the Military Department concerned will:

a.  Not require the Service member or their family to repay the unearned portion of any bonus, incentive pay, or similar benefit previously paid to the Service member.

b.  Require the payment to the Service member or their family the remainder of any bonus, incentive pay, or similar benefit that was not yet paid to the member, but to which they were entitled immediately before the death, retirement, or separation.

c.  Not apply Paragraphs 10.3.a. and 10.3.b. if the death or disability was the result of the Service member's misconduct.

## 10.4.  DETERMINATION FOR RC SERVICE MEMBERS WHO ARE DUAL STATUS TECHNICIANS AND DETERMINED UNFIT BY THE DES.

In accordance with Section 10216(g) of Title 10, U.S.C., the record of proceedings for RC Service members who are dual status technicians and determined unfit by the DES must include whether the member was determined unfit due to a combat-related disability.

**App. 599**

*DoDI 1332.18, November 10, 2022*

# SECTION 11:  FINAL DISPOSITION

## 11.1.  FINAL DECISION AUTHORITY.

### a.  Secretary of Defense.

Pursuant to Section 1214a of Title 10, U.S.C., the Secretary of Defense will be the final approval authority for any case determined by the Secretary of the Military Department concerned to warrant a Service member's administrative separation or denial of reenlistment based on a determination that the member is unsuitable for continued service due to the same medical condition(s) considered by a PEB that found the member fit for duty.

### b.  USD(P&R).

After considering the ASD(HA)'s recommendation, the USD(P&R) will approve or disapprove the disability retirement of any general officer, flag officer, or medical officer being processed for, scheduled for, or receiving non-disability retirement for age or length of service.

### c.  Secretaries of the Military Departments.

Except as stated in Paragraphs 11.1.a. and 11.1.b., the Secretary of the Military Department concerned may make all determinations in accordance with this issuance regarding unfitness, disability percentage, and entitlement to disability severance or retired pay.

## 11.2.  GENERAL RULES REGARDING DISPOSITION.

### a.  Retirement.

(1)  Except for Service members approved for permanent limited duty in accordance with Paragraph 11.3., any Service member on active duty or in the RC who is found to be unfit will be retired, if eligible, or separated.  This general rule will not prevent disciplinary or other administrative separations from the Military Services.

(2)  Selected Reserve members with at least 15 years, but no more than 20 years, of qualifying service pursuant to Section 12732 of Title 10, U.S.C. who are to be separated, may elect either separation for disability or early qualification for retired pay at age 60 pursuant to Sections 12731 and 12731b of Title 10, U.S.C.  However, the separation or retirement for disability cannot be due to the member's intentional misconduct, willful failure to comply with standards and qualifications for retention, or willful neglect, and cannot have been incurred during a period of unauthorized absence or excess leave.

### b.  Removal from the TDRL.

Service members determined fit as a result of TDRL re-evaluation will be processed in accordance with Paragraphs 11.b.(1)-(5).

(1)  Appointment and/or Enlistment.

**App. 600**

*DoDI 1332.18, November 10, 2022*

Upon the Service member's request, and provided they are otherwise eligible, the Secretary of the Military Department concerned will appoint or enlist them in the applicable grade and component in accordance with Section 1211 of Title 10, U.S.C.

(2)  Recall to Active Duty.

(a)  Regular Officers and Enlisted Members.

<u>1</u>.  Subject to their consent, regular officers and enlisted Service members will be recalled to duty, if they are otherwise eligible and were not required to be separated in accordance with applicable law or regulation at the time they were placed on the TDRL.

<u>2</u>.  Regular officers and enlisted Service members will be deemed medically qualified for those conditions on which a finding of fit was determined.

<u>3</u>.  New condition arising between the DES evaluation and recall must meet the respective Military Service's medical standards for retention.

(b)  RC.

Subject to their consent, RC officers, warrant officers, and enlisted Service members will be reappointed or reenlisted as an RC Service member for service in their respective RC in accordance with Section 1211 of Title 10, U.S.C.  RC Service members determined fit by TDRL re-evaluation will not be involuntarily assigned to the Individual Ready Reserve.

(3)  Separation.

In accordance with Section 1210(f) of Title 10, U.S.C., Service members required to be separated or retired for non-disability reasons at the time they were referred for disability evaluation and placed on the TDRL, if determined fit, will be separated or retired, as applicable.

(4)  Termination of TDRL Status.

TDRL status and retired pay will be terminated upon discharge, recall, reappointment, or reenlistment in accordance with Section 1211 of Title 10, U.S.C.

(5)  Right to Apply for VA Benefits.

A Service member may not be discharged or released from active duty due to a disability until they are counseled on their right to make a claim for compensation, pension, or hospitalization with the VA.

**App. 601**

*DoDI 1332.18, November 10, 2022*

## 11.3.  CONTINUANCE OF UNFIT SERVICE MEMBERS ON ACTIVE DUTY OR IN THE RESERVES.

a.  Upon the Service member's request or the exercise of discretion based on the Military Department's needs, the Secretary of the Military Department concerned may:

(1)  Consider transfer to another Military Service; or

(2)  Allow unfit Service members to continue in a permanent limited-duty status, either active or reserve duty in the same or different rating or occupational specialty.

b.  Such continuation may be justified by the Service member's service obligation or special skill and experience.

c.  In cases where the Service member's retention on limited duty status is more than 1 year from the previous PEB results, or the unfitting condition has significantly changed during the period of limited duty status, subsequent DES processing of the Service member before separation from service may be required.

## 11.4.  TRANSITION ASSISTANCE PROGRAM ELIGIBILITY.

AC and RC Service members who meet the Transition Assistance Program eligibility criteria in DoDI 1332.35 are eligible for Transition Assistance Program benefits.

## 11.5.  DISPOSITIONS FOR UNFIT SERVICE MEMBERS.

### a.  Permanent Disability Retirement.

If the Service member is unfit, retirement for a permanent and stable disability may be directed pursuant to Section 1201 or 1204 of Title 10, U.S.C. either:

(1)  When the total disability rating is at least 30 percent in accordance with the VASRD and the Service member has fewer than 20 years of service, computed pursuant to Section 1208 of Title 10, U.S.C.; or

(2)  When the Service member has at least 20 years of service, computed pursuant to Section 1208 of Title 10, U.S.C., and the disability is rated at less than 30 percent.

### b.  Placement on the TDRL.

Retirement will be directed pursuant to Section 1202 or 1205 of Title 10, U.S.C., when the requirements for permanent disability retirement are met, except that one or more of the disabilities is not permanent and stable, except as outlined in Paragraph 9.1.b.

**App. 602**

*DoDI 1332.18, November 10, 2022*

**c. Separation with Disability Severance Pay.**

(1) Criteria.

(a)  Except as outlined in Paragraph 11.5.c.(3), separation may be directed pursuant to Section 1203 or 1206 of Title 10, U.S.C. when the Service member is unfit for a disability determined in accordance with this issuance and:

1.  The Service member has fewer than 20 years of service computed pursuant to Section 1208 of Title 10, U.S.C.

2.  The disability is rated at less than 30 percent.

(b)  Stability is not a factor for this disposition.

(2) Service Credit.

(a)  Pursuant to Section 1212 of Title 10, U.S.C., a part of a year of active service that is 6 months or more will be counted as a whole year, and a part of a year that is fewer than 6 months will be disregarded.

(b)  The Secretary of the Military Department concerned will credit members separated from the Military Services for a disability with at least 3 years of service.

(c)  The Secretary of the Military Department concerned will credit at least 6 years of service to members separated from the Military Services for a disability incurred:

1.  In the LOD in a designated combat zone tax exclusion area; or

2.  During the performance of duty in combat-related operations consistent with the criteria in Paragraph 10.2.b.

(d)  For the purposes of calculating active service for disability severance pay, the Secretary of the Military Department concerned will consider disabilities to be incurred in combat-related operations when they are in accordance with Paragraph 10.2.b.

(3) Transfer to Retired Reserve.

(a)  Pursuant to Section 1209 of Title 10, U.S.C., RC Service members who have completed at least 20 qualifying years of Reserve service and who would otherwise be qualified for retirement may forfeit disability severance pay and elect to transfer to an inactive status list to receive non-disability retired pay at age 60.  The Secretary of the Military Department concerned may offer the member the option to transfer to the Retired Reserve.

(b)  When disability severance pay is accepted, the Service member forfeits all rights to receive retired pay at age 60 pursuant to Chapter 1223 of Title 10, U.S.C.

**App. 603**

*DoDI 1332.18, November 10, 2022*

    (4)  Selected Reserve Early Qualification for Retired Pay.

        RC Service members with at least 15 years and less than 20 years of qualifying service, who would otherwise be qualified for non-regular retirement, may waive disability disposition and request early qualification for retired pay in accordance with Section 12731b of Title 10, U.S.C.

    **d.  Separation without Entitlement to Benefits.**

        Discharge will be directed in accordance with Section 1207 of Title 10, U.S.C. when the Service member:

        (1)  Is unfit for a disability incurred as a result of intentional misconduct or willful neglect or during a period of unauthorized absence;

        (2)  Has an unfitting condition that existed before service and was not aggravated by service; or

        (3)  Is administratively removed from the TDRL in accordance with Paragraph 9.2.k.(3).

    **e.  Discharge Pursuant to Other Than Chapter 61 of Title 10, U.S.C.**

        An unfit Service member will be directed for discharge in accordance with Title 10, U.S.C. and DoDIs 1332.14 and 1332.30 when they are not entitled to disability compensation due to the circumstances when either:

        (1)  The Service member will not be entitled to disability compensation but may be entitled to benefits in accordance with Section 1174 of Title 10, U.S.C.; or

        (2)  The medical condition of an RC Service member is non-duty related and it disqualifies the member for retention in the RC.

    **f.  Revert with Disability Benefits.**

        Revert with disability benefits will be used to return a retiree recalled to active duty who was previously retired for disability and determined unfit during the period of recall.  For Service members previously retired for age or years of service, the compensable percentage of disability must be at least 30 percent to receive disability benefits.

**App. 604**

*DoDI 1332.18, November 10, 2022*

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| AC | Active Component |
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CFR | Code of Federal Regulations |
| DAC | Disability Advisory Council |
| DASD(HSP&O) | Deputy Assistant Secretary of Defense for Health Services Policy and Oversight |
| DHA | Defense Health Agency |
| DES | Disability Evaluation System |
| DoDD | DoD directive |
| DoDI | DoD instruction |
| DoDM | DoD manual |
| FPEB | formal physical evaluation board |
| IDES | Integrated Disability Evaluation System |
| IDT | inactive duty training |
| IPEB | informal physical evaluation board |
| LDES | Legacy Disability Evaluation System |
| LOD | line of duty |
| MEB | medical evaluation board |
| MDB | multi-disciplinary briefing |
| MSC | Military Services coordinator |
| MTF | medical treatment facility |
| NAD | non-active duty |
| PEB | physical evaluation board |
| PEBLO | physical evaluation board liaison officer |
| RC | Reserve Component |
| TDRL | temporary disability retired list |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

**App. 605**

*DoDI 1332.18, November 10, 2022*

| ACRONYM | MEANING |
|---|---|
| VA | Department of Veterans Affairs |
| VASRD | Department of Veterans Affairs Schedule for Rating Disabilities |

## G.2.  DEFINITIONS.

These terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
|---|---|
| **accepted medical principles** | Fundamental deductions, consistent with medical facts, that are so reasonable and logical as to create a virtual certainty that they are correct.  The Service PEB will state with specificity the basis(es) for the conclusion. |
| **active duty** | Defined in the DoD Dictionary of Military and Associated Terms. |
| **acute** | Characterized by sharpness or severity. |
| **armed conflict** | A war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerilla action, riot, or any other action in which Service members are engaged with a hostile or belligerent nation, faction, force, or terrorist.  Armed conflict may also include such situations as incidents involving a member while interned as a prisoner of war or while detained against their will in the custody of a hostile or belligerent force or while escaping or attempting to escape from such confinement, prisoner-of-war, or detained status. |
| **claims agents** | An individual recognized by the Secretary of the VA as an agent for the preparation, presentation, and prosecution of claims under applicable laws administered by the Secretary of the VA. |
| **clear and unmistakable evidence** | Undebatable information that the condition existed before military service and was not aggravated by military service (i.e., evidence that cannot be misinterpreted and misunderstood).  In other words, reasonable minds could only conclude that the condition existed prior to military service from a review of all of the evidence in the record. |
| **compensable disability** | A medical condition that is determined to be unfitting due to disability and that meets the statutory criteria of Chapter 61 of Title 10, U.S.C. for entitlement to disability retired or severance pay. |

**App. 606**

*DoDI 1332.18, November 10, 2022*

| TERM | DEFINITION |
|------|------------|
| **competency board** | A board consisting of at least three medical officers or physicians (including one psychiatrist) convened to determine whether a member is competent (capable of making a rational decision regarding his or her affairs). |
| **DAC** | A DoD-only group that evaluates DES functions, identifies best practices, addresses inconsistencies in policy, discusses inconsistencies in law, addresses problems and issues in the administration of the DES, and provides a forum to develop and plan improvements. |
| **day** | Calendar day. |
| **DES** | The DoD mechanism for determining fitness for duty, separation, or retirement of Service members because of disability in accordance with Chapter 61 of Title 10, U.S.C. |
| **disability** | A medical impairment, mental disease, or physical defect which is severe enough to interfere with the Service member's ability to adequately perform his or her duties, regardless of assignment or geographic location.  A medical impairment, mental disease, or physical defect standing alone does not constitute a disability.  The term includes mental disease, but not such inherent defects as developmental or behavioral disorders. |
| **election** | The Service member's decision to accept or appeal the MEB or PEB findings. |
| **elective surgery** | Surgery that is not essential, especially surgery to correct a condition that is not life-threatening; surgery that is not required for survival. |
| **final reviewing authority** | The final approving authority for the findings and recommendations of the PEB. |
| **grave** | Very serious:  dangerous to life-used of an illness or its prospects. |
| **IDES** | The joint DoD/VA process by which DoD determines whether ill or injured Service members are fit for continued military service, and the DoD and VA determine appropriate benefits for Service members who are separated or retired for disability. |
| **instrumentality of war** | A vehicle, vessel, or device designed primarily for military service and in use by a military service at the time of the occurrence or injury. |

**App. 607**

*DoDI 1332.18, November 10, 2022*

| TERM | DEFINITION |
|---|---|
| **LDES** | A DES process by which DoD determines whether eligible wounded, ill, or injured Service members are fit for continued military service and determines appropriate benefits for Service members who are separated or retired for disability. Service members processed through the LDES may also apply for veterans' disability benefits through the VA Benefits Delivery at Discharge Program or upon attaining veteran status. |
| **LOD determination** | An inquiry used to determine whether a Service member incurred an injury or disease while in a duty status; whether it was aggravated by military duty; and whether incurrence or aggravation was due to the Service member's intentional misconduct or willful negligence. |
| **MDB** | A briefing that consists of information from, at a minimum, PEBLOs, MSCs, and government legal counsel, and establishes Service member expectations; prepares Service members for each stage of the DES process; and informs Service members of what is expected of them during the DES process. |
| **MEB** | For Service members entering the DES, the MEB conducts the medical evaluation on conditions that potentially affect the Service member's fitness for duty. The MEB documents the Service member's medical condition(s) and history with an MEB narrative summary as part of an MEB packet. |
| **medical impairment condition** | Any disease or residual of an injury that results in a lessening or weakening of the capacity of the body or its parts to perform normally, according to accepted medical principles. |
| **NAD** | Service members not on active duty orders, to include Service members on active duty for 30 days or less or on inactive-duty training. |
| **non-duty-related medical conditions** | Conditions that were neither incurred nor aggravated while the AC or RC Service member was in a qualified military duty status. |
| **office, grade, rank, or rating** | **office.** A position of duty, trust, and authority to which an individual is appointed.<br>**grade.** A step or degree in a graduated scale of office or military rank that is established and designated as a grade by law or regulation.<br>**rank.** The order of precedence among members of the Military Services. |

**App. 608**

*DoDI 1332.18, November 10, 2022*

| Term | Definition |
|------|------------|
| | **rating.** The name (e.g., "Boatswain's Mate") prescribed for Service members of a Military Service in an occupational field. |
| **PEB findings** | The PEB's record of proceedings, which includes the fitness decision, code and percentage rating for each unfitting and compensable condition, stability and permanency of the disability, and administrative determinations. |
| **PEBLO** | The non-medical case manager who provides information, assistance, and case status updates to the affected Service member throughout the DES process. |
| **period of active service** | A period of time in which a Service member serves on active duty. |
| **permanent limited duty** | The continuation on active duty or in the Ready Reserve in a limited-duty capacity of a Service member determined unfit because of disability evaluation or medical disqualification; however, the Service member is entitled to reconsideration for separation or retirement based on their previous PEB results. |
| **personal representative** | A person designated to make DES decisions for the Service member. This could be a court-appointed guardian or a representative in accordance with DoDI 6025.18. |
| **presumption** | An inference of the truth of a proposition or fact reached through a process of reasoning and based on the existence of other facts. Matters that are presumed need no proof to support them, but may be rebutted by evidence to the contrary. |
| **prior service** | When a Service member has previous military service and reenlists in a Regular or Reserve Component of a Military Service after a break in active duty or reserve duty. |
| **proximate result** | A permanent disability the result of, arising from, or connected with active duty, annual training, active duty for training, or IDT, to include travel to and from such duty or remaining overnight between successive periods of IDT. The proximate result statutory criterion for entitlement to disability compensation under Chapter 61 of Title 10, U.S.C. does not apply to applicable RC Service members being retired for disability as of September 24, 1996, or being separated with disability severance pay as of October 5, 1999. |
| **qualified duty status** | Defined in DoDI 1241.01. |

**App. 609**

*DoDI 1332.18, November 10, 2022*

| TERM | DEFINITION |
|---|---|
| **retention control point** | The number of years a Service member may serve at a particular rank. |
| **retention standards** | Guidelines that establish medical conditions or physical defects that could render a Service member unfit for further military service and may be cause for referral of the Service member into the DES. |
| **service aggravation** | The permanent worsening of a pre-Service medical condition over and above the natural progression of the condition. |
| **service treatment record** | A chronological record documenting the medical care, dental care and treatment received primarily outside of a hospital (outpatient) but may contain a synopsis of any inpatient hospital care and behavioral health treatment.  The chronologic record of medical, dental, and mental health care received by Service members during the course of their military career.  It includes documentation of all outpatient appointments (i.e., without overnight admittance to a hospital, clinic, or treatment facility), as well as summaries of any inpatient care (discharge summaries) and care received while in a military theater of operations.  The service treatment record is the official record used to support continuity of clinical care and the administrative, business-related, and evidentiary needs of the DoD, the VA, and the individual. |

**App. 610**

*DoDI 1332.18, November 10, 2022*

# REFERENCES

Code of Federal Regulations, Title 38

Code of Federal Regulations, Title 45, Part 164

DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

DoD 7000.14-R "Department of Defense Financial Management Regulations (FMRs)," current edition

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Directive 5136.13, "Defense Health Agency, (DHA)," September 30, 2013

DoD Instruction 1000.30, "Reduction of Social Security Number (SSN) Use Within DoD," August 1, 2012, as amended

DoD Instruction 1241.01, "Reserve Component (RC) Line of Duty Determination for Medical and Dental Treatments and Incapacitation Pay Entitlements," April 19, 2016

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoD Instruction 1340.25, "Combat Zone Tax Exclusion (CZTE)," September 28, 2010

DoD Instruction 5400.11, "DoD Privacy and Civil Liberties Programs," January 29, 2019, as amended

DoD Instruction 5400.16, "DoD Privacy Impact Assessment (PIA) Guidance," July 14, 2015, as amended

DoD Instruction 6025.18, "Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule Compliance in DoD Health Care Programs," March 13, 2019

DoD Instruction 6040.42, "Management Standards for Medical Coding of DoD Health Records," June 8, 2016

DoD Instruction 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020

DoD Manual 1332.18, Volume 1, "Disability Evaluation System (DES) Manual: General Information and Legacy Disability Evaluation System (LDES) Time Standards," August 5, 2014, as amended

DoD Manual 1332.18, Volume 2, "Disability Evaluation System (DES) Manual: Integrated Disability Evaluation System (IDES)," August 5, 2014, as amended

DoD Manual 5400.11, Volume 2, "DoD Privacy and Civil Liberties Programs:  Breach Preparedness and Response Plan," May 6, 2021

Joint Travel Regulations, "Uniformed Service Members and DoD Civilian Employees," current edition

Memorandum of Agreement Between the Department of Defense and Department of Veterans Affairs, January 16, 2009

**App. 611**

*DoDI 1332.18, November 10, 2022*

Memorandum of Agreement Between the Department of Defense and Department of Veterans Affairs, June 16, 2010

U.S. Department of Veterans Affairs M21-1, "Adjudication Procedures Manual," September 3, 2021

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

Public Law 110-181, Section 1612, "National Defense Authorization Act for Fiscal Year 2008," January 28, 2008

Public Law 117-81, Section 524, "National Defense Authorization Act for Fiscal Year 2022," December 27, 2021

United States Code, Title 5

United States Code, Title 10

United States Code, Title 26, Section 104

United States Code, Title 32, Section 115

United States Code, Title 37

United States Code, Title 38

United States Code, Title 50, Section 2082

**App. 612**



**SECRETARY OF THE ARMY**
**WASHINGTON**

**0 6 MAR 2025**

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

1. References.

    a. Office of the Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," 7 February 2025

    b. Office of the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," 26 February 2025

    c. Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs Memorandum, "Clarifying Guidance on Prioritizing Military Excellence and Readiness," 28 February 2025

2. Purpose. To prescribe guidance for Army implementation of requirements directed by Executive Order 14183, "Prioritizing Military Excellence and Readiness," and accompanying Department of Defense policy and guidance.

3. Applicability. The provisions of this guidance apply to the Regular Army, Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

4. Guidance.

    a. Service in the Army is open to all persons who can meet the high standards for military service and readiness without special accommodations.

    b. It is the policy of the United States Army to establish high standards for Soldier readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. The medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with gender dysphoria, is inconsistent with Army policy.

    c. Soldiers and applicants for service in the Army who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with military service. Service by these individuals is not in the best interests of the Army and is not clearly consistent with the interests of national security.

    d. Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in paragraph 5.

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

e. Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from the Army as set forth in the policy below. Characterization of service under these procedures will be honorable except where the Soldiers' record otherwise warrants a lower characterization.

f. The Army only recognizes two sexes:  male and female. An individual's sex is immutable, unchanging during a person's life. All Soldiers will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

g. Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness, and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

h. Pronoun usage when referring to Soldiers must reflect a Soldier's sex. In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

i. Absent extraordinary operational necessity, the Army will not allow male Soldiers to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Soldiers to use or share sleeping, changing, or bathing facilities designated for males.

j. No DoD funds will be used to pay for Soldiers' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k. Consistent with existing law, DoD, and Army policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information. Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties. Personnel shall also be accountable for safeguarding this health information consistent with existing law, DoD, and Army policy.

5. Procedures.

a. Appointment. Enlistment, or Induction into the Army.

(1) Applicants for Army service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from accession.

2

**App. 614**

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

(2) A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

(3) This office will consider waivers on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex. Waivers will be routed through the Assistant Secretary of the Army for Manpower and Reserve Affairs (ASA M&RA).

(4) Applicants disqualified pursuant to this policy and not granted a waiver shall not ship to Initial Entry Training.

(5) Offers of admission to the United States Military Academy or Army Senior Reserve Officers' Training Corps programs to individuals disqualified pursuant to paragraphs 5a(1) and 5a(2) of this guidance shall be rescinded except where the individual is granted a waiver pursuant to paragraph 5a(3) of this guidance. Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 5a(1) and 5a(2) of this guidance may still participate in classes taught or coordinated by the Senior Reserve Officers' Training Corps that are open to all students at the college or university concerned. All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with this guidance.

(6) Individuals disqualified pursuant to paragraphs 5a(1) and 5a(2) of this guidance are subject to separation or disenrollment from the United States Military Academy pursuant to AR 150-1, or from the Senior Reserve Officers' Training Corps pursuant to AR 145-1, unless the individual is granted a waiver. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

b. Retention

(1) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from Army service.

(2) Soldiers who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from Army service.

(3) Soldiers disqualified pursuant to paragraphs 5a(1) and 5b(2) of this guidance may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Soldier that directly supports warfighting capabilities and the Soldier concerned meets the following criteria:

3

**App. 615**

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

(a) The Soldier demonstrates 36 consecutive months of stability in the Soldier's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

(b) The Soldier demonstrates that he or she has never attempted to transition to any sex other than their sex; and

(c) The Soldier is willing and able to adhere to all applicable standards, including the standards associated with the Soldier's sex.

(4) Waivers will be routed through ASA M&RA to this office for consideration.

c. Separation

(1) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections outlined in, existing Army policy found in AR 600-8-24, AR 635-200, AR 135-175, and AR 135-178. Enlisted Soldiers subject to separation pursuant to this guidance will be separated prior to their expiration of term of service following a determination that doing so is in the best interest of the Army. Officers subject to separation pursuant to this guidance will be separated if their retention is not clearly consistent with the interests of national security.

(2) Soldiers are ineligible for referral to the Disability Evaluation System (DES) solely for a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria as it does not constitute a physical disability pursuant to DoDI 1332.18.

(3) Soldiers may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with AR 635-40, prior to completion of their separation physical.

(4) Soldiers who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

(5) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily until 26 March 2025. Such Soldiers may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43. Soldiers eligible for voluntary separation pay will be paid at a rate that is twice the amount the Soldier would have been eligible for from involuntary separation pay, in accordance with DoDI 1332.29 and AR 637-2.

4

**App. 616**

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

(6) Soldiers separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174, DoDI 1332.29, and AR 637-2.

(7) All enlisted Soldiers who are initiated for involuntary separation pursuant to this policy will, if desired by the Soldier, be afforded an administrative separation board in accordance with AR 635-200 and AR 135-178.

(8) All officers who are initiated for elimination or separation pursuant to this policy will be afforded a Board of Inquiry or Board of Officers, if desired by the officer, in accordance with 10 U.S.C. § 1182, AR 600-8-24, and AR 135-175.

(9) Soldiers who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria with over 18 but less than 20 years of total active-duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

(10) Eligible Soldiers (including active-duty Soldiers and Reserve or National Guard members when on active-duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

(11) Soldiers choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l). The Army may recoup any bonuses received prior to the date of this memorandum for Soldiers choosing to be involuntarily separated.

(12) All military service obligations for Soldiers separated pursuant to this policy are waived.

(13) To maintain good order and discipline all Soldiers being processed for separation pursuant to the guidance will be placed in an administrative absence status, with full pay and benefits, until their separation is complete. Soldiers undergoing concurrent DES processing must attend their medical appointments as stated in existing Army policy. Soldiers in an administrative absence status will complete the Transition Assistance Program in accordance with AR 600-81.

(14) Nothing in this guidance precludes investigation of or appropriate administrative or disciplinary action for Soldiers who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

d. Additional Guidance.

(1) ASA M&RA is directed to establish procedures to identify Soldiers who have a current diagnosis or history, of, or exhibit symptoms consistent with, gender dysphoria prior to

5

SUBJECT: Prioritizing Military Excellence and Readiness Implementation Guidance

26 March 2025 consistent with the requirements of the USD(P&R) guidance. Further, the ASA(M&RA) will ensure all reporting requirements in the USD(P&R) guidance are met.

(2) Army personnel and employees will take no action to identify Soldiers subject to this guidance until 26 March 2025, to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by the proponent of this guidance. Further guidance will be provided by the proponent on actions to take regarding identification of Soldiers subject to this guidance on or prior to 26 March 2025.

(3) Army personnel and employees will not direct or request Soldiers to self-identify as having a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria, unless otherwise directed by the proponent of this guidance.

(4) Paragraphs 5a(1) and 5b(2) of this guidance do not apply to medical qualification determinations for applicants for military service, including eligibility determinations for individuals preparing to ship to initial entry training.

(5) Soldiers subject to this guidance are encouraged to elect to separate voluntarily by 26 March 2025.

6. Proponent. The ASA(M&RA) is the proponent of this guidance and authorized to provide additional clarifying guidance as necessary and rescind existing policy that conflicts with this memorandum. The Deputy Chief of Staff, G-1, will incorporate the provisions of this guidance into regulation.

Daniel Driscoll

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
    U.S. Army Forces Command
    U.S. Army Training and Doctrine Command
    U.S. Army Materiel Command
    U.S. Army Futures Command
    U.S. Army Pacific
    U.S. Army Europe and Africa
    U.S. Army Central
    U.S. Army North
    U.S. Army South
(CONT)

**App. 618**

DISTRIBUTION: (CONT)
    U.S. Army Special Operations Command
    Military Surface Deployment and Distribution Command
    U.S. Army Space and Missile Defense Command/Army Strategic Command
    U.S. Army Cyber Command
    U.S. Army Medical Command
    U.S. Army Intelligence and Security Command
    U.S. Army Corps of Engineers
    U.S. Army Military District of Washington
    U.S. Army Test and Evaluation Command
    U.S. Army Human Resources Command
    U.S. Army Corrections Command
    U.S. Army Recruiting Command
Superintendent, U.S. Military Academy
Director, U.S. Army Criminal Investigation Division
Commandant, U.S. Army War College
Director, U.S. Army Civilian Human Resources Agency
Executive Director, Military Postal Service Agency
Director, Civilian Protection Center of Excellence
Director, U.S. Army Joint Counter-Small Unmanned Aircraft Systems Office
Superintendent, Arlington National Cemetery
Director, U.S. Army Acquisition Support Center

CF:
Principal Cyber Advisor
Director of Enterprise Management
Director, Office of Analytics Integration
Commander, Eighth Army

**App. 619**

## UNCLAS

# HQDA EXORD 175-25 IMPLEMENTATION GUIDANCE FOR EXECUTIVE ORDER

**Originator:** DA WASHINGTON DC

**TOR:** 03/07/2025 18:24:44

**DTG:** 071814Z Mar 25

**Prec:** Priority

**DAC:** General

**To:** ARLINGTON NATIONAL CEMETERY ARLINGTON VA, ARNG NGB COMOPS ARLINGTON VA, ARNG NGB J3 JOC WASHINGTON DC, ARNGRC ARLINGTON VA, ARNGRC WATCH ARLINGTON VA, CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX, CDR ARMY FUTURES COMMAND AUSTIN TX, CDR ATEC ABERDEEN PROVING GROUND MD, CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC, CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC, CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC, CDR MDW J3 FT MCNAIR DC, CDR MDW JFHQ-NCR FT MCNAIR DC, CDR NETCOM 9THSC FT HUACHUCA AZ, CDR TRADOC CG FT EUSTIS VA, CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA, CDR USAR NORTH FT SAM HOUSTON TX, CDR USARCENT SHAW AFB SC, CDR USAREUR-AF WIESBADEN GE, CDR USASOC COMMAND CENTER FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR USASOC FT LIBERTY NC, CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC, CDRAMC REDSTONE ARSENAL AL, CDRFORSCOM FT LIBERTY NC, CDRHRC G3 DCSOPS FT KNOX KY, CDRINSCOM FT BELVOIR VA, CDRINSCOM FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRINSCOMIOC FT BELVOIR VA, CDRMDW WASHINGTON DC, CDRUSACE WASHINGTON DC, CDRUSACIDC FT BELVOIR VA, CDRUSAEIGHT G3 CUROPS SEOUL KOR, CDRUSAEIGHT SEOUL KOR, CDRUSAMEDCOM FT SAM HOUSTON TX, CDRUSARC G33 READ FT LIBERTY NC, CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA, CDRUSAREC FT KNOX KY, CDRUSARPAC CG FT SHAFTER HI, CDRUSARPAC FT SHAFTER HI, COMDT USAWC CARLISLE BARRACKS PA, HQ IMCOM FT SAM HOUSTON TX, HQ SDDC CMD GROUP SCOTT AFB IL, HQ SDDC OPS MSG CNTR SCOTT AFB IL, HQ USARSO FT SAM HOUSTON TX, HQ USARSO G3 FT SAM HOUSTON TX, HQDA ARMY STAFF WASHINGTON DC, HQDA CSA WASHINGTON DC, HQDA EXEC OFFICE WASHINGTON DC, HQDA IMCOM OPS DIV WASHINGTON DC, HQDA SEC ARMY WASHINGTON DC, HQDA SECRETARIAT WASHINGTON DC, HQDA SURG GEN WASHINGTON DC, MEDCOM HQ EOC FT SAM HOUSTON TX, NETCOM G3 CURRENT OPS FT HUACHUCA AZ, NGB WASHINGTON DC, SMDC ARSTRAT CG ARLINGTON VA, SMDC ARSTRAT G3 ARLINGTON VA, SUPERINTENDENT USMA WEST POINT NY, SURGEON GEN FALLS CHURCH VA, USAR AROC FT LIBERTY NC, USAR CMD GRP FT LIBERTY NC, USAR DCS G33 OPERATIONS FT LIBERTY NC, USARCENT G3 FWD, USARPAC COMMAND CENTER FT SHAFTER HI

**CC:** HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC, HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC, HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC

**Attachments:** HQDA EXORD 175-25 Annex A - Soldiers Memo (Final).docx

---

```
PAAUZATZ RUEADWD0600 0661824-UUUU--RUIAAAA RUEADWD.
ZNR UUUUU
P 071814Z MAR 25
FM DA WASHINGTON DC
TO RUIAAAA/ARLINGTON NATIONAL CEMETERY ARLINGTON VA
RUIAAAA/ARNG NGB COMOPS ARLINGTON VA
RUIAAAA/ARNG NGB J3 JOC WASHINGTON DC
RUIAAAA/ARNGRC ARLINGTON VA
RUIAAAA/ARNGRC WATCH ARLINGTON VA
RUIAAAA/CDR 5 ARMY NORTH AOC FT SAM HOUSTON TX
RUIAAAA/CDR ARMY FUTURES COMMAND AUSTIN TX
RUIAAAA/CDR ATEC ABERDEEN PROVING GROUND MD
RUIAAAA/CDR FORSCOM DCS G3 CENTRAL TASKING DIV FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 CURRENT OPS FT LIBERTY NC
RUIAAAA/CDR FORSCOM DCS G3 WATCH OFFICER FT LIBERTY NC
RUIAAAA/CDR MDW J3 FT MCNAIR DC
RUIAAAA/CDR MDW JFHQ-NCR FT MCNAIR DC
RUIAAAA/CDR NETCOM 9THSC FT HUACHUCA AZ
RUIAAAA/CDR TRADOC CG FT EUSTIS VA
RUIAAAA/CDR TRADOC DCS G-3-5-7 OPNS CTR FT EUSTIS VA
RUIAAAA/CDR USAR NORTH FT SAM HOUSTON TX
RUIAAAA/CDR USARCENT SHAW AFB SC
RUIAAAA/CDR USAREUR-AF WIESBADEN GE
RUIAAAA/CDR USASOC COMMAND CENTER FT LIBERTY NC
```

## UNCLAS

**App. 620**

## UNCLAS

```
RUIAAAA/CDR USASOC FT LIBERTY NC
RUIAAAA/CDR USASOC FT LIBERTY NC
RUIAAAA/CDR3RD ARMY USARCENT WATCH OFFICER SHAW AFB SC
RUIAAAA/CDRAMC REDSTONE ARSENAL AL
RUIAAAA/CDRFORSCOM FT LIBERTY NC
RUIAAAA/CDRHRC G3 DCSOPS FT KNOX KY
RUIAAAA/CDRINSCOM FT BELVOIR VA
RUEPINM/CDRINSCOM FT BELVOIR VA
RUIAAAA/CDRINSCOMIOC FT BELVOIR VA
RUEPINF/CDRINSCOMIOC FT BELVOIR VA
RUIAAAA/CDRMDW WASHINGTON DC
RUIAAAA/CDRUSACE WASHINGTON DC
RUIAAAA/CDRUSACIDC FT BELVOIR VA
RUIAAAA/CDRUSAEIGHT G3 CUROPS SEOUL KOR
RUIAAAA/CDRUSAEIGHT SEOUL KOR
RUIAAAA/CDRUSAMEDCOM FT SAM HOUSTON TX
RUJAAAA/CDRUSARC G33 READ FT LIBERTY NC
RUIAAAA/CDRUSARCYBER WATCH OFFICER FT EISENHOWER GA
RUIAAAA/CDRUSAREC FT KNOX KY
RUIAAAA/CDRUSARPAC CG FT SHAFTER HI
RUIAAAA/CDRUSARPAC FT SHAFTER HI
RUIAAAA/COMDT USAWC CARLISLE BARRACKS PA
RUIAAAA/HQ IMCOM FT SAM HOUSTON TX
RUIAAAA/HQ SDDC CMD GROUP SCOTT AFB IL
RUIAAAA/HQ SDDC OPS MSG CNTR SCOTT AFB IL
RUIAAAA/HQ USARSO FT SAM HOUSTON TX
RUIAAAA/HQ USARSO G3 FT SAM HOUSTON TX
RUEADWD/HQDA ARMY STAFF WASHINGTON DC
RUEADWD/HQDA CSA WASHINGTON DC
RUEADWD/HQDA EXEC OFFICE WASHINGTON DC
RUEADWD/HQDA IMCOM OPS DIV WASHINGTON DC
RUEADWD/HQDA SEC ARMY WASHINGTON DC
RUEADWD/HQDA SECRETARIAT WASHINGTON DC
RUEADWD/HQDA SURG GEN WASHINGTON DC
RUIAAAA/MEDCOM HQ EOC FT SAM HOUSTON TX
RUIAAAA/NETCOM G3 CURRENT OPS FT HUACHUCA AZ
RUIAAAA/NGB WASHINGTON DC
RUIAAAA/SMDC ARSTRAT CG ARLINGTON VA
RUIAAAA/SMDC ARSTRAT G3 ARLINGTON VA
RUIAAAA/SUPERINTENDENT USMA WEST POINT NY
RUIAAAA/SURGEON GEN FALLS CHURCH VA
RUIAAAA/USAR AROC FT LIBERTY NC
RUIAAAA/USAR CMD GRP FT LIBERTY NC
RUIAAAA/USAR DCS G33 OPERATIONS FT LIBERTY NC
RUIAAAA/USARCENT G3 FWD
RUIAAAA/USARPAC COMMAND CENTER FT SHAFTER HI
ZEN/HQ INSCOM IOC FT BELVOIR VA
INFO RUIAAAA/HQDA AOC DAMO ODO OPS AND CONT PLANS WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO CAT OPSWATCH WASHINGTON DC
RUIAAAA/HQDA AOC G3 DAMO OD DIR OPS READ AND MOB WASHINGTON DC
BT
UNCLAS
SUBJ/HQDA EXORD 175-25 IMPLEMENTATION GUIDANCE FOR EXECUTIVE ORDER
(EO) 14183: "PRIORITIZING MILITARY EXCELLENCE AND READINESS"
UNCLASSIFIED//

(U) SUBJECT: HQDA EXORD 175-25 IMPLEMENTATION GUIDANCE FOR EXECUTIVE
ORDER (EO) 14183: "PRIORITIZING MILITARY EXCELLENCE AND READINESS"//

(U) REFERENCES:
REF//A/ (U) **CORRECTED COPY 2** HQDA EXORD 150-25 IMPLEMENTATION OF
EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY SERVICE, DTG:
```

## UNCLAS

## UNCLAS

```
122036Z
FEB 25 (SUPERSEDED)//
REF//B/ (U) FRAGO 1 TO HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE
ORDERS RELATED TO TRANSGENDER MILITARY SERVICE, DTG: 142129Z FEB 25
(SUPERSEDED)//
REF//C/ (U) SECRETARY OF DEFENSE MEMO, "PRIORITIZING MILITARY
EXCELLENCE AND READINESS", DATED: 07 FEBRUARY 2025.
REF//D/ (U) UNDER SECRETARY OF DEFENSE, PERSONNEL AND READINESS MEMO,

"ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS, DATED: 26 FEBRUARY 2025.
REF//E// (U) UNDER SECRETARY OF DEFENSE, MANPOWER AND RESERVE
AFFAIRS,
"CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS", DATED: 28 FEBRUARY 2025//
REF//F// (U) UNDER SECRETARY OF DEFENSE, MANPOWER AND RESERVE
AFFAIRS,
"CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS: RETENTION AND ACCESSION WAIVERS", DATED: 04 MARCH 2025
REF//G// (U) SECRETARY OF THE ARMY, "PRIORITIZING MILITARY EXCELLENCE
AND READINESS IMPLEMENTATION GUIDANCE," DATED: 06 MARCH 2025.
REF//H// (U) ARMY REGULATIONS FOR SEPARATION AUTHORITIES//


1. (U) SITUATION.

1.A. (U) PUBLICATION OF THIS EXORD SUPERSEDES **CORRECTED COPY 2**
HQDA EXORD 150-25 IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO
TRANSGENDER MILITARY SERVICE AND FRAGO 1 TO HQDA EXORD 150-25
IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO TRANSGENDER MILITARY
SERVICE, REFERENCES A AND B.

1.B. (U) FURTHER CLARIFYING GUIDANCE WILL BE PUBLISHED IN A
SUBSEQUENT FRAGO.

1.C. (U) DOD POLICY PRESCRIBES GUIDANCE ON IMPLEMENTATION OF
REQUIREMENTS RELATED TO EXECUTIVE ORDER (EO) 14183: "PRIORITIZING
MILITARY EXCELLENCE AND READINESS."

2. (U) MISSION. EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL
IMPLEMENT GUIDANCE RELATED TO THE OFFICE OF SECRETARY OF DEFENSE
GUIDANCE, "PRIORITIZING MILITARY EXCELLENCE AND READINESS." WITH
COMMANDERS USING THE UTMOST PROFESSIONALISM, AND TREAT ALL SOLDIERS,
CADETS, AND APPLICANTS WITH DIGNITY AND RESPECT WHILE REMAINING
COMPLIANT TO GUIDANCE WHILE IMPLEMENTING THIS POLICY.

3. (U) EXECUTION.

3.A. (U) INTENT.

3.A.1. (U) IMPLEMENTATION OF THIS GUIDANCE WILL BE PHASED.

3.A.1.A. (U) PHASE 1 IS EFFECTIVE ON 26 FEBRUARY 2025 AND WILL END
ON
26 MARCH 2025. PHASE 1 IS THE VOLUNTARY SEPARATION PHASE.

3.A.1.B. (U) PHASE 2 WILL BE EFFECTIVE ON 27 MARCH 2025 WITH THE
START OF INVOLUNTARY SEPARATIONS. FURTHER GUIDANCE WILL BE ISSUED
PRIOR TO THE EXECUTION OF PHASE 2.

3.A.1.C. (U) ARMY PERSONNEL AND EMPLOYEES WILL TAKE NO ACTION TO
IDENTIFY SOLDIERS SUBJECT TO THIS GUIDANCE, TO INCLUDE THE USE OF
```

## UNCLAS

## UNCLAS

MEDICAL RECORDS, PERIODIC HEALTH ASSESSMENTS, AD HOC PHYSICAL
ASSESSMENTS, OR ANY OTHER DIAGNOSTIC MECHANISM, UNLESS OTHERWISE
DIRECTED BY THE ASSISTANT SECRETARY OF THE ARMY (MANPOWER AND RESERVE

AFFAIRS) (ASA M&RA). FURTHER GUIDANCE WILL BE PROVIDED ON ACTIONS
WITH
REGARD TO IDENTIFICATION OF SOLDIERS SUBJECT TO THIS GUIDANCE ON OR
PRIOR TO PHASE 2.

3.A.1.D. (U) WAIVER AUTHORITY RESIDES WITH THE SECRETARY OF THE ARMY

(SECARMY).

3.A.1.E. (U) SEPARATION AUTHORITY FOR REGULAR ARMY (RA) AND UNITED
STATES ARMY RESERVES (USAR) FOR ALL PHASES RESIDES WITH THE
ASA(M&RA).

3.A.1.F. (U) SEPARATION AUTHORITY FOR THE ARMY NATIONAL GUARD (ARNG)

FOR PHASE 1 RESIDES WITH THE ASA(M&RA) FOR ENLISTED SOLDIERS. THE
CHIEF, NATIONAL GUARD BUREAU (NGB) WILL PROVIDE GUIDANCE FOR OFFICER
ELIMINATION.

3.A.2. (U) PHASE 1 VOLUNTARY SEPARATION: INTENT.

3.A.2.A. (U) SERVICE IN THE ARMY IS OPEN TO ALL PERSONS WHO CAN MEET

THE HIGH STANDARDS FOR MILITARY SERVICE AND READINESS WITHOUT SPECIAL

ACCOMMODATIONS.

3.A.2.B. (U) IT IS THE POLICY OF THE UNITED STATES ARMY TO ESTABLISH

HIGH STANDARDS FOR SOLDIER READINESS, LETHALITY, COHESION, HONESTY,
HUMILITY, UNIFORMITY, AND INTEGRITY. THIS POLICY IS INCONSISTENT WITH

THE MEDICAL, SURGICAL, AND MENTAL HEALTH CONSTRAINTS ON INDIVIDUALS
WITH GENDER DYSPHORIA OR WHO HAVE A CURRENT DIAGNOSIS OR HISTORY OF,
OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER DYSPHORIA.

3.A.2.C. (U) SOLDIERS, CADETS, AND APPLICANTS WHO HAVE A CURRENT
DIAGNOSIS OR HISTORY OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER
DYSPHORIA ARE DISQUALIFIED FROM MILITARY SERVICE IN THE ARMY.

3.A.2.D. (U) SOLDIERS, CADETS, AND APPLICANTS WHO HAVE A HISTORY OF
CROSS-SEX HORMONE THERAPY OR A HISTORY OF SEX REASSIGNMENT OR GENITAL

RECONSTRUCTION SURGERY AS TREATMENT FOR GENDER DYSPHORIA OR IN
PURSUIT
OF A SEX TRANSITION, ARE DISQUALIFIED FROM MILITARY SERVICE IN THE
ARMY.

3.A.2.E. (U) SOLDIERS PURSUANT TO 3.A.2.C. AND 3.A.2.D. WILL BE
PROCESSED FOR SEPARATION FROM THE ARMY. CHARACTERIZATION OF SERVICE
UNDER THESE PROCEDURES WILL BE HONORABLE EXCEPT WHERE THE SOLDIERS'
RECORD OTHERWISE WARRANTS A LOWER CHARACTERIZATION.

3.A.2.F. (U) AT NO SUCH TIME WILL A COMMANDER, EMPLOYEE, OR STAFF,
DIRECT OR REQUEST SOLDIERS OR CADETS TO SELF IDENTIFY AS HAVING A
CURRENT DIAGNOSIS OR HISTORY OF, OR EXHIBITING SYMPTOMS CONSISTENT
WITH, GENDER DYSPHORIA.

## UNCLAS

# UNCLAS

3.A.2.G. (U) THE ARMY ONLY RECOGNIZES TWO SEXES: MALE AND FEMALE. AN
INDIVIDUAL'S SEX IS IMMUTABLE, UNCHANGING DURING A PERSON'S LIFE. ALL

SOLDIERS WILL ONLY SERVE IN ACCORDANCE WITH THEIR SEX, DEFINED IN
EXECUTIVE ORDER 14168, "DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM
AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT," AS "AN
INDIVIDUAL'S IMMUTABLE BIOLOGICAL CLASSIFICATION AS EITHER MALE OR
FEMALE."

3.A.2.H. (U) WHERE A STANDARD, REQUIREMENT, OR POLICY DEPENDS ON
WHETHER THE INDIVIDUAL IS A MALE OR FEMALE (E.G., MEDICAL FITNESS FOR

DUTY, PHYSICAL FITNESS, AND BODY FAT STANDARDS; BERTHING, BATHROOM,
AND SHOWER FACILITIES; AND UNIFORM AND GROOMING STANDARDS), ALL
PERSONS WILL BE SUBJECT TO THE STANDARD, REQUIREMENT, OR POLICY
ASSOCIATED WITH THEIR BIOLOGICAL SEX.

3.A.2.I. (U) PRONOUN USAGE WHEN REFERRING TO SOLDIERS MUST REFLECT A

SOLDIER'S BIOLOGICAL SEX. IN KEEPING WITH GOOD ORDER AND DISCIPLINE,
SALUTATIONS (E.G., ADDRESSING A SENIOR OFFICER AS "SIR" OR "MA'AM")
MUST ALSO REFLECT AN INDIVIDUAL'S BIOLOGICAL SEX.

3.A.2.J. (U) CONSISTENT WITH EXISTING LAW, DOD, AND ARMY POLICY,
COMMANDERS SHALL PROTECT THE PRIVACY OF PROTECTED HEALTH INFORMATION
THEY RECEIVE UNDER THIS POLICY IN THE SAME MANNER AS THEY WOULD WITH
ANY OTHER PROTECTED HEALTH INFORMATION. SUCH HEALTH INFORMATION SHALL

BE RESTRICTED TO PERSONNEL WITH A SPECIFIC NEED TO KNOW; THAT IS,
ACCESS TO INFORMATION MUST BE NECESSARY FOR THE CONDUCT OF OFFICIAL
DUTIES. PERSONNEL SHALL ALSO BE ACCOUNTABLE FOR SAFEGUARDING THIS
HEALTH INFORMATION CONSISTENT WITH EXISTING LAW, DOD, AND ARMY
POLICY.

3.A.2.K. (U) WAIVERS WILL BE PROCESSED FOR APPLICANTS REQUESTING
MILITARY SERVICE DURING PHASE 1. CLARIFYING GUIDANCE WILL BE ISSUED
FOR THE WAIVER PROCESS DURING PHASE 2 IN A SUBSEQUENT FRAGO.

3.A.2.L. (U) DISQUALIFIED INDIVIDUALS PURSUANT TO PARAGRAPH 3.A.2.K.

MAY BE CONSIDERED FOR A WAIVER IF THERE IS A COMPELLING GOVERNMENT
INTEREST THAT DIRECTLY SUPPORTS WARFIGHTING CAPABILITIES TO INCLUDE
SPECIAL EXPERIENCE, SPECIAL TRAINING, AND ADVANCED EDUCATION IN A
HIGHLY TECHNICAL CAREER FIELD DESIGNATED AS MISSION CRITICAL AND HARD

TO FILL BY THE SECRETARY OF THE ARMY, IF SUCH EXPERIENCE, TRAINING,
AND EDUCATION IS DIRECTLY RELATED TO THE OPERATIONAL NEEDS OF THE
ARMY. THE SOLDIER CONCERNED MUST MEET ALL THE FOLLOWING CRITERIA:

3.A.2.L.1. (U) THE SOLDIER, CADET, OR APPLICANT DEMONSTRATES 36
CONSECUTIVE MONTHS OF STABILITY IN THE SOLDIER'S BIOLOGICAL SEX
WITHOUT CLINICALLY SIGNIFICANT DISTRESS OR IMPAIRMENT IN SOCIAL,
OCCUPATIONAL, OR OTHER IMPORTANT AREAS OF FUNCTIONING.

3.A.2.L.2. (U) THE SOLDIER, CADET, OR APPLICANT DEMONSTRATES THAT HE

OR SHE HAS NEVER ATTEMPTED TO TRANSITION TO ANY SEX OTHER THAN THEIR
SEX.

3.A.2.L.3. (U) THE SOLDIER, CADET, OR APPLICANT IS WILLING AND ABLE

# UNCLAS

# UNCLAS

TO ADHERE TO ALL APPLICABLE STANDARDS ASSOCIATED WITH THE SOLDIER'S BIOLOGICAL SEX.

3.A.2.L.4. (U) DISQUALIFIED APPLICANTS REQUESTING ENTRY INTO MILITARY
SERVICE MAY SUBMIT A WRITTEN WAIVER REQUEST FOR ACCESSION THROUGH THEIR RECRUITER TO SECARMY FOR CONSIDERATION.

3.B. (U) CONCEPT OF OPERATIONS

3.B.1. (U) PHASE 1: VOLUNTARY SEPARATION.

3.B.1.A. (U) ACCESSIONS

3.B.1.A.1. (U) APPLICANTS FOR ARMY SERVICE AND INDIVIDUALS IN THE DELAYED TRAINING/ENTRY PROGRAM WHO HAVE A CURRENT DIAGNOSIS OR HISTORY
OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER DYSPHORIA ARE DISQUALIFIED.

3.B.1.A.2. (U) APPLICANTS FOR ARMY SERVICE AND INDIVIDUALS IN THE DELAYED TRAINING/ENTRY PROGRAM WHO HAVE A HISTORY OF CROSS-SEX HORMONE
THERAPY OR SEX REASSIGNMENT OR RECONSTRUCTIVE SURGERY IN PURSUIT OF A

SEX TRANSITION, ARE DISQUALIFIED.

3.B.1.A.3. (U) APPLICANTS DISQUALIFIED PURSUANT TO PARAGRAPH 3.A.2.C.
AND 3.A.2.D. WILL NOT SHIP TO INITIAL ENTRY TRAINING.

3.B.1.A.4. (U) OFFERS OF ADMISSION TO THE UNITED STATES MILITARY ACADEMY (USMA) OR ARMY SENIOR RESERVE OFFICERS' TRAINING CORPS (SROTC)
PROGRAMS TO INDIVIDUALS DISQUALIFIED PURSUANT TO PARAGRAPHS 3.A.2.C. AND 3.A.2.D. WILL BE RESCINDED EXCEPT WHERE THE INDIVIDUAL IS GRANTED

A WAIVER PURSUANT TO PARAGRAPH 3.A.2.K.

3.B.1.A.5. (U) CADETS DISQUALIFIED PURSUANT TO PARAGRAPHS 3.A.2.C. AND 3.A.2.D. ARE ENCOURAGED TO ELECT VOLUNTARY SEPARATION BEGINNING 26
FEBRUARY 2025 UNTIL 26 MARCH 2025. DISQUALIFIED CADETS WILL BE SEPARATED OR DISENROLLED FROM THE USMA PURSUANT TO AR 150-1, OR FROM THE SROTC PURSUANT TO AR 145-1, UNLESS GRANTED A WAIVER.

3.B.1.A.6. (U) SROTC CADETS OTHERWISE DISQUALIFIED PURSUANT TO PARAGRAPH 3.A.2.C. AND 3.A.2.D. OF THIS GUIDANCE MAY STILL PARTICIPATE
IN CLASSES THAT ARE OPEN TO ALL STUDENTS AT THE COLLEGE OR UNIVERSITY

CONCERNED UNTIL SEPARATED OR DISENROLLED. USMA CADETS OTHERWISE DISQUALIFIED PURSUANT TO PARAGRAPHS 3.A.2.C. AND 3.A.2.D. OF THIS GUIDANCE MAY STILL PARTICIPATE IN CLASSES UNTIL SEPARATED.

3.B.1.A.7. (U) ALL INDIVIDUALS ENROLLED OR PARTICIPATING IN THE SROTC, WHETHER UNDER CONTRACT OR NOT CONTRACTED, WILL FOLLOW STANDARDS
FOR UNIFORM WEAR CONSISTENT WITH THE INDIVIDUAL'S BIOLOGICAL SEX IN ACCORDANCE WITH ARMY REGULATION (AR) 670-1.

3.B.1.A.8. (U) SROTC PARTICIPATING STUDENTS WILL NOT CONTRACT OR

# UNCLAS

# UNCLAS

BECOME DESIGNATED APPLICANTS WHERE A STANDARD OR REQUIREMENT REQUIRES

ADHERENCE TO PARAGRAPH 3.A.2.C. AND 3.A.2.D. UNLESS GRANTED A WAIVER PURSUANT TO PARAGRAPH 3.A.2.K.

3.B.1.A.9. (U) ABSENT ANY OTHER BASIS FOR SEPARATION OR DISENROLLMENT, USMA AND SROTC CADETS WILL NOT BE SUBJECT TO MONETARY REPAYMENT OF EDUCATIONAL BENEFITS (I.E., RECOUPMENT) NOR SUBJECT TO COMPLETION OF A MILITARY SERVICE OBLIGATION.

3.B.1.A.10. (U) CADETS ENROLLED IN THE GREEN TO GOLD ACTIVE DUTY OPTION DISQUALIFIED PURSUANT TO 3.A.2.C. AND 3.A.2.D. WILL BE RELEASED
FROM THE PROGRAM AND BE SEPARATED IAW ENLISTED SEPARATIONS.

3.B.1.A.11. (U) CADETS ENROLLED IN A SENIOR MILIARY COLLEGE MAY CONTINUE TO PARTICIPATE IN THE ADVANCED COURSE IF ATTENDANCE IN MILITARY SCIENCE COURSES IS A REQUIREMENT FOR GRADUATION AT THAT SCHOOL. UPON COMPLETION OF COURSEWORK AND SROTC PARTICIPATION, STUDENTS WILL BE PRESENTED A DA FORM 134 (MILITARY TRAINING CERTIFICATE - RESERVE OFFICERS' TRAINING CORPS) FOR ANY SROTC TRAINING
SUCCESSFULLY COMPLETED. THE FORM WILL BE ANNOTATED TO REFLECT THAT THE
CERTIFICATE DOES NOT ENTITLE THE STUDENT TO A COMMISSION.
3.B.2. (U) REGULAR ARMY (RA), UNITED STATES ARMY RESERVES (USAR) AND

THE ARMY NATIONAL GUARD (ARNG).

3.B.2.A. (U) REGULAR ARMY (RA), UNITED STATES ARMY RESERVES (USAR), AND THE ARMY NATIONAL GUARD SOLDIERS (ARNG) DISQUALIFIED FROM MILITARY
SERVICE PURSUANT TO PARAGRAPH 3.A.2.C. AND 3.A.2.D. ARE ENCOURAGED TO

ELECT VOLUNTARY SEPARATION FROM MILITARY SERVICE BEGINNING 26 FEBRUARY
2025 UNTIL 26 MARCH 2025. COMMANDERS WILL NOT ASK FOR VERIFICATION OF
DIAGNOSIS. SOLDIERS AND CADETS WHO ELECT TO VOLUNTARILY SEPARATE WILL
PROVIDE A STATEMENT VERIFYING ELECTION OF VOLUNTARY SEPARATION PURSUANT TO 3.A.2.C. AND 3.A.2.D. (ANNEX A).

3.B.2.B. (U) ACTIVE COMPONENT AND ACTIVE GUARD RESERVE (USAR AND ARNG) (AGR) SOLDIERS IDENTIFIED FOR SEPARATION WITH OVER 18 BUT LESS THAN 20 YEARS OF TOTAL ACTIVE-DUTY SERVICE ARE ELIGIBLE FOR EARLY RETIREMENT UNDER TERA IAW DODI 1332.46. TERA AUTHORITY IS WITHHELD TO
THE ASA (M&RA).

3.B.2.C. (U) ELECTION OF VOLUNTARY SEPARATION OR EARLY RETIREMENT UNDER THE TEMPORARY EARLY RETIREMENT AUTHORITY (TERA) WILL BE MADE BY

THE SOLDIER TO THE FIRST COMMANDER IN THE CHAIN OF COMMAND BY SUBMITTING A PERSONNEL ACTION REQUEST (PAR) IN THE INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPPS-A). THOSE SOLDIERS AND COMMANDS THAT ARE NOT INTEGRATED TO IPPS-A, WILL SUBMIT THE SOLDIERS MEMORANDUM
ENCLOSED IN ANNEX A. NO PERSONAL HEALTH INFORMATION (PHI) OR PERSONAL
IDENTIFYING INFORMATION (PII) WILL BE UPLOADED TO IPPS-A.

# UNCLAS

# UNCLAS

3.B.2.D. (U) SUCH SOLDIERS MAY BE ELIGIBLE FOR VOLUNTARY SEPARATION
PAY IAW 10 U.S.C. 1175A AND DODI 1332.43 AT A RATE THAT IS TWICE THE
AMOUNT THE SOLDIER WOULD HAVE BEEN ELIGIBLE FOR INVOLUNTARY
SEPARATION
PAY.

3.B.2.E. (U) SOLDIERS WHO ELECT TO VOLUNTARILY SEPARATE WILL NOT
HAVE
TO REPAY ANY BONUSES RECEIVED PRIOR TO 26 FEBRUARY 2025, EVEN IF THEY

HAVE A REMAINING SERVICE OBLIGATION. ALL REMAINING MILITARY SERVICE
OBLIGATIONS PURSUANT TO 10 U.S.C. 651 OR OTHER AUTHORITIES FOR
SOLDIERS WHO ARE SEPARATED WILL BE WAIVED. THE ARMY MAY RECOUP ANY
BONUS RECEIVED PRIOR TO 26 FEBRUARY 2025 WHO DO NOT ELECT VOLUNTARY
SEPARATION.

3.B.2.F. (U) COMMANDERS WILL INITIATE VOLUNTARY SEPARATION
IMMEDIATELY UPON NOTIFICATION BY THE SOLDIER IN ACCORDANCE WITH (IAW)

THE FOLLOWING GUIDANCE:

3.B.2.F.1. (U) REGULAR ARMY (RA) AND ACTIVE GUARD RESERVE (AGR)
OFFICERS WILL BE SEPARATED IAW AR 600-8-24, PARAGRAPH 3-5.

3.B.2.F.2. (U) ARNG AND USAR OFFICERS WILL BE SEPARATED IAW AR 135-
175, PARAGRAPH 6-8.

3.B.2.F.3. (U) RA ENLISTED SOLDIERS WILL BE SEPARATED IAW AR
635-200,
CHAPTER 15.

3.B.2.F.4. (U) ARNG AND USAR ENLISTED SOLDIERS WILL BE SEPARATED IAW

AR 135-178, CHAPTER 13.

3.B.2.G. (U) SOLDIERS WILL BE SEPARATED NO LATER THAN THE 1ST DAY OF

THE 7TH MONTH AFTER NOTIFICATION TO THEIR COMMANDER. TRAINING AND
DOCTRINE COMMAND (TRADOC) TRAINEES ARE EXEMPT FROM THIS REQUIREMENTS.

3.B.2.H. (U) SOLDIERS ARE INELIGIBLE FOR REFERRAL TO THE DISABILITY
EVALUATION SYSTEM (DES) WHEN THEY HAVE A CURRENT DIAGNOSIS OR HISTORY

OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH, GENDER DYSPHORIA, NOT
CONSTITUTING A PHYSICAL DISABILITY PURSUANT TO DODI 1332.18.

3.B.2.I. (U) SOLDIERS MAY BE REFERRED TO THE DES IF THEY HAVE A CO-
MORBIDITY, OR OTHER QUALIFYING CONDITION, THAT IS APPROPRIATE FOR
DISABILITY EVALUATION PROCESSING IN ACCORDANCE WITH AR 635.40, PRIOR
TO THE COMPLETION OF THEIR SEPARATION PHYSICAL.

3.B.2.J. (U) ALL SOLDIERS WHO ARE PROCESSED FOR SEPARATION WILL BE
DESIGNATED NON-DEPLOYABLE UNTIL THEIR SEPARATION IS COMPLETE.
FURTHER
GUIDANCE IS FORTHCOMING.

3.B.2.K. (U) ELIGIBLE SOLDIERS (INCLUDING ACTIVE-DUTY SOLDIERS AND
RESERVE OR NATIONAL GUARD MEMBERS WHEN IN A TITLE 10 STATUS OR ON
ACTIVE-DUTY ORDERS FOR 30 OR MORE CONSECUTIVE DAYS) WHO ARE PROCESSED

FOR SEPARATION ALONG WITH THEIR COVERED DEPENDENTS, MAY REMAIN
ELIGIBLE FOR TRICARE FOR 180 DAYS POST SEPARATION IAW 10 U.S.C. 1145.

# UNCLAS

## UNCLAS

3.B.2.L. (U) TO MAINTAIN GOOD ORDER AND DISCIPLINE ALL SOLDIERS BEING
PROCESSED FOR SEPARATION PURSUANT TO THE GUIDANCE WILL BE PLACED IN AN
ADMINISTRATIVE ABSENCE STATUS, WITH FULL PAY AND BENEFITS, UNTIL THEIR
SEPARATION IS COMPLETE. COMMANDERS WILL MAINTAIN ACCOUNTABILITY AND
ENSURE THE HEALTH AND WELFARE OF THEIR SOLDIERS AND CADETS THROUGHOUT

THE SEPARATION PROCESS. TRAINING AND DOCTRINE COMMAND (TRADOC)
TRAINEES ARE EXEMPT FROM THE ADMINISTRATIVE ABSENCE REQUIREMENTS.

3.B.2.M. (U) ALL SOLDIERS WILL COMPLETE THE TRANSITION ASSISTANCE
PROGRAM (TAP) IAW 600-81. COMMANDERS WILL AUTHORIZE SOLDIERS WEAR OF

APPROPRIATE BUSINESS CASUAL CIVILIAN ATTIRE DURING TAP, INSTALLATION
OUT PROCESSING ACTIVITIES, AND WHILE ON ADMINISTRATIVE ABSENCE. IF
FEASIBLE, COMMANDERS WILL ALLOW SOLDIERS TO PARTICIPATE IN A HYBRID OR
VIRTUAL TAP.

3.B.2.M.1. (U) CIVILIAN ATTIRE WILL BE WORN IAW DA PAM 670-1,
APPENDIX B, TABLE B-2 (SERVICE EQUIVALENT UNIFORMS).

3.B.2.M.2. (U) THIS GUIDANCE DOES NOT PRECLUDE APPROPRIATE
ADMINISTRATIVE OR DISCIPLINARY ACTION FOR SOLDIERS WHO REFUSE LAWFUL
ORDERS TO COMPLY WITH APPLICABLE STANDARDS OR OTHERWISE DO NOT MEET
STANDARDS FOR PERFORMANCE AND CONDUCT. THIS GUIDANCE DOES NOT LIMIT A
COMMANDER'S AUTHORITY TO FLAG, INVESTIGATE, OR PROCESS ANY ACTION
UNDER THE UNIFORM CODE OF MILITARY JUSTICE OR ADVERSE ADMINISTRATIVE
ACTION.

3.B.2.N. (U) EFFECTIVE IMMEDIATELY, PURSUANT TO PARAGRAPH 3.A.2.C.
AND 3.A.2.D., SOLDIERS WHO ARE ASSIGNED TO THE OFFICE OF THE SECRETARY
OF DEFENSE, DEFENSE AGENCIES, DOD FIELD ACTIVITIES, COMBATANT
COMMANDS, AND OTHER JOINT ASSIGNMENTS WILL BE REASSIGNED TO THEIR
RESPECTIVE ARMY COMMAND FOR THE PURPOSE OF INITIATING ADMINISTRATIVE
SEPARATION PROCESSES.

3.B.2.N. (U) PURSUANT TO PARAGRAPH 3.B.2.N. SOLDIERS WILL BE UNDER
ADMINISTRATIVE CONTROL (ADCON) OF THE ARMY COMMAND, ARMY SERVICE
COMMAND, OR DIRECT REPORTING UNIT NEAR THEIR GEOGRAPHIC LOCATION.

3.B.2.O. (U) FOR SOLDIERS WHO ARE CURRENTLY DEPLOYED AND VOLUNTARILY

ELECT SEPARATION, COMMANDERS WILL INITIATE RETURN BACK TO HOME STATION
WITHIN 30 DAYS OF BEING NOTIFIED, OR AS PRACTICABLE.

3.B.3. (U) MEDICAL

3.B.3.A. (U) NO DOD FUNDS WILL BE USED TO PAY FOR SOLDIERS'
UNSCHEDULED, SCHEDULED, OR PLANNED MEDICAL PROCEDURES ASSOCIATED WITH

FACILITATING SEX REASSIGNMENT SURGERY, GENITAL RECONSTRUCTION SURGERY

AS TREATMENT FOR GENDER DYSPHORIA, OR NEWLY INITIATED CROSS-SEX
HORMONE THERAPY.

## UNCLAS

## UNCLAS

3.B.3.B. (U) CROSS-SEX HORMONE THERAPY FOR SOLDIERS WHO HAVE A
CURRENT DIAGNOSIS OR HISTORY OF, OR EXHIBIT SYMPTOMS CONSISTENT WITH,

GENDER DYSPHORIA THAT BEGAN PRIOR TO 26 FEBRUARY 2025, MAY, IF
RECOMMENDED BY A HEALTH CARE PROVIDER (HCP) IN ORDER TO PREVENT
FURTHER COMPLICATIONS, MAY BE CONTINUED UNTIL SEPARATION IS COMPLETE.

3.B.3.C. (U) NO COMMANDER WILL ACCESS PROTECTED HEALTH INFORMATION
FOR PURPOSES OF IDENTIFYING SOLDIERS OR CADETS WITH A CURRENT
DIAGNOSIS OR HISTORY OF GENDER DYSPHORIA.

3.B.4. (U) INTIMATE SPACES

3.B.4.A. (U) ACCESS TO INTIMATE SPACES WILL BE DETERMINED BY
SOLDIERS, CADETS, OR APPLICANTS' BIOLOGICAL SEX. COMMANDERS WILL
APPLY ALL STANDARDS THAT INVOLVE CONSIDERATION OF THE SOLDIERS' SEX,
TO INCLUDE, BUT NOT LIMITED TO UNIFORMS AND GROOMING, BODY
COMPOSITION
ASSESSMENT, MEDICAL FITNESS FOR DUTY, PHYSICAL FITNESS AND BODY FAT
STANDARDS, BATHROOM, AND SHOWER FACILITIES AND MILITARY PERSONNEL
DRUG
ABUSE TESTING PROGRAM PARTICIPATION.

3.B.4.B. (U) COMMANDERS WILL ENSURE ALL SUCH SHARED INTIMATE SPACES
WILL BE CLEARLY DESIGNATED FOR EITHER MALE, FEMALE, OR FAMILY USE.

3.B.4.C. (U) COMMANDERS MAY APPROVE EXCEPTIONS TO SHARED INTIMATE
SPACES ONLY IN CASES OF EXTRAORDINARY OPERATIONAL NECESSITY. DURING
DEPLOYMENTS, OR IN AUSTERE ENVIRONMENTS WHERE SPACE IS LIMITED,
COMMANDERS WILL PRIORITIZE UNIT COHESION AND READINESS WHILE ADHERING

TO THIS POLICY.

3.C. (U) TASKS ARMY STAFF, SUBORDINATE UNITS AND REQUESTS FOR
SUPPORT.

3.C.1. (U) ALL ARMY ORGANIZATIONS.

3.C.1.A. (U) EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL
IMPLEMENT GUIDANCE WITHIN THIS EXORD RELATED TO THE OFFICE OF
SECRETARY OF DEFENSE GUIDANCE, "PRIORITIZING MILITARY EXCELLENCE AND
READINESS." (SEE REFERENCE C).

3.D. (U) COORDINATING INSTRUCTIONS.

3.D.1. (U) ARMY COMMANDS, ARMY SERVICE COMMANDS, AND DIRECT
REPORTING
UNITS WILL PROVIDE REPORTS TO HQDA. FORMAT AND DEADLINES WILL BE
PROVIDED IN FORTHCOMING GUIDANCE.

4. (U) SUSTAINMENT. NOT USED

5. (U) COMMAND AND SIGNAL.

5.A. (U) HQDA POC THIS MESSAGE, SERVICE CENTRAL COORDINATION CELL
(SCCC), AVAILABLE AT: USARMY.PENTAGON.HQDA-DCS-G1.MBX.SCCC@ARMY.MIL

6. (U) THE EXPIRATION DATE OF THIS EXORD IS 30 SEPTEMBER 2025,
UNLESS
FORMALLY RESCINDED, SUPERSEDED OR MODIFIED.

## UNCLAS

## UNCLAS

PAGE 11 OF 11


ATTACHMENTS:
ANNEX A - SOLDIERS MEMO.
BT
#0600




NNNN
Received from AUTODIN 071824Z Mar 25

## UNCLAS

Case 1:25-cv-00240-ACR    Document 79-1    Filed 03/11/25    Page 1 of 10

# EXHIBIT Z

U.S. Department *of* Defense

# PUBLIC AFFAIRS GUIDANCE:
## DEPARTMENT OF DEFENSE IMPLEMENTATION OF EXECUTIVE ORDER PRIORITIZING MILITARY EXCELLENCE AND READINESS

**Background**:
On January 27, 2025, the President signed Executive Order 14183, *Prioritizing Military Excellence and Readiness*. The executive order states that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service." On February 7, 2025, the Secretary of Defense signed a memorandum that paused all new accessions and medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) to provide additional policy guidance to senior Department of Defense (DoD) leadership on implementation. That guidance was signed on February 26, 2025.

On February 26, 2025, USD(P&R) signed a memorandum that provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance. The policy guidance in this memorandum is effective immediately upon signature and supersedes any conflicting policy guidance in Department issuances or other policy guidance and memoranda.

- Accessions: Applicants for military service are disqualified if they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria or have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as a treatment for gender dysphoria or in pursuit of a sex transition.
  - Applicants for military service may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities.
  - The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.
- Retention: Service members are disqualified from military service if they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria or have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as a treatment for gender dysphoria or in pursuit of a sex transition.
  - Service members may be retained and considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

CUI//NOT FOR RELEASE

1

CUI//NOT FOR RELEASE

- The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and
- The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and
- The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

- Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.
- Service members who elect to separate voluntarily in the 30 days following signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy. Those eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.
- Service members separated involuntarily may be provided full involuntary separation pay in accordance with applicable law and Department policy.
- All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.
- Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider in order to prevent further complications, be continued until separation is complete.

**Public Affairs Posture**: Active.

**Key Audiences**:
- Service members and their families
- Potential recruits and their families
- DoD health care providers
- Congress
- Military and Veteran Support Organizations
- Advocacy Groups

**Topline Messages**:
- Joining the military is open to all persons who can meet the high standards for military service and readiness without special accommodation.

**App. 633**

FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

- Individuals wanting to join the military service, who express a false "gender identity" divergent from an individual's sex distracts from the mission and is inconsistent with the humility and selflessness required of a Service member.
- Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptom consistent with, gender dysphoria is incompatible with military service and are no longer eligible for military service.
- Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service.
- Separated Service members will receive an honorable characterization of service except where the Service member's record otherwise warrants a lower characterization.

**Talking Points**:
- No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.
- All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.
- Where a standard, requirement, or policy depends on whether the individual is a male or female, such as medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards, all persons will be subject to the standard, requirement, or policy associated with their sex.
- Pronoun usage when referring to Service members must reflect a Service member's sex. In keeping with good order and discipline, salutations, such as addressing a senior officer as "Sir" or "Ma'am", must also reflect an individual's sex.
- Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

**Approved Questions and Answers for Media and Congressional Requests**:

**SECDEF and USD(P&R) Memoranda**
**Q: What did the Secretary of Defense's February 7, 2025 memorandum do?**
**A:** The Secretary of Defense memorandum paused all new accessions and most medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the USD(P&R) to provide additional policy guidance to the Military Departments on implementation.

CUI//NOT FOR RELEASE

3

FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

**Q: What did the USD(P&R) February 26, 2025 memorandum do?**
**A:** The USD(P&R) memorandum provides policy guidance addressing issues such as accession, retention, and separation of Service members and applicants for military service who have been diagnosed with gender dysphoria, as well as provides guidance on the implementation of adhering to the standards associated with one's sex.

The policy guidance directs that Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation. It also directs that similarly situated applicants are ineligible for military service.

The memorandum also directs the update of applicable policies addressing accession and retention standards as well as the cancellation of policies and memoranda that addressed Service members serving with a diagnosis of gender dysphoria.

<u>Definitions</u>
**Q: How does the Department define gender dysphoria?**
**A:** Gender dysphoria refers to a marked incongruence between one's experienced or expressed gender and assigned gender of at least six months' duration, as manifested by conditions associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Q: How does the Department define "gender identity?"**
**A:** Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'gender identity' as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

**Q: How does the Department define sex?**
**A:** Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'sex' as "an individual's immutable biological classification as either male or female."

<u>Applicability</u>
**Q: Who exactly is impacted by this policy?**
**A:** Any Service member or applicant for military service who has a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service

CUI//NOT FOR RELEASE

4

**App. 635**

CUI//NOT FOR RELEASE

member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition.

**Q: How many Service members are impacted by this policy?**
**A:** We do not have an exact number of active-duty Service members diagnosed with gender dysphoria.

**Q: Is there a breakdown of individuals by service, gender, race, and occupation (MOS)?**
**A:** We do not have that data readily available.

**Q: How will the Department identify Service members who are impacted by this policy?**
**A:** The Department will provide supplemental guidance which will address the identification of Service members diagnosed with gender dysphoria.

<u>Accessions</u>
**Q: If an individual was diagnosed with gender dysphoria as a child, are they disqualified from military service?**
**A:** Yes. However, applicants may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Q: Will offers of admission to Military Service Academies or ROTC programs be rescinded?**
**A:** Yes, offers of admission to a Military Service Academy or the Reserve Officers' Training Corps to individuals disqualified under these policies will be rescinded. Waivers will be considered on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Q: Will cadets or midshipmen be required to reimburse the government for their education?**
**A:** No. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

CUI//NOT FOR RELEASE

**App. 636**

FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

**Retention**

**Q: Will Service members currently serving with a diagnosis of gender dysphoria be allowed to continue to serve?**

**A:** No. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service members who have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation.

**Q: Will any waivers be permitted?**

**A:** Service members may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria: (1) the Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; (2) the Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and (3) the Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

**Separations**

**Q: Will Service members diagnosed with gender dysphoria be honorably discharged?**

**A:** Yes. Characterization of service will be honorable except where the Service member's record otherwise warrants a lower characterization.

**Q: Are Service members separated under this policy eligible for separation pay?**

**A:** Yes. Service members who elect to voluntarily separate within 30 days following the signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.

Service members who choose to be involuntarily separated may be provided full involuntary separation pay in accordance with applicable law and Department policy.

| Common Example | Involuntary Sep. Pay | Voluntary Sep. Pay |
|---|---|---|
| E-5 w/10 YOS | $50,814 | $101,628 |
| O-3 w/7 YOS | $62,612 | $125,224 |

**Q: Will Service members being separated under this policy be afforded a separation board?**

CUI//NOT FOR RELEASE

6

**App. 637**

CUI//NOT FOR RELEASE

**A:** All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with applicable law.

**Q: Will Service members being separated under this policy be eligible for the Temporary Early Retirement Authority?**
**A:** Yes. Service members with over 18 but less than 20 years of total active-duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with Department policy.

**Q: Will Service member being separated under this policy remain eligible for TRICARE benefits?**
**A:** Yes. Eligible Service members (including active-duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with applicable law.

**Q: Are Service members separated under this policy eligible to participate in the Transition Assistance Program?**
**A:** Yes. Service members, whether separated voluntarily or involuntarily are eligible for the Transition Assistance Program.

**Q: Will Service members separated under this policy have to repay any bonuses received prior to their separation?**
**A:** Service members choosing to voluntarily separate will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to applicable law.

The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

**Q: Will the Secretaries of the Military Departments waive any remaining military service obligations?**
**A:** Yes. The Secretaries of the Military Departments will waive any remaining military service obligation for Service members who are separated pursuant to this policy.

**Q: If Service members are required to serve in their sex, will Service members diagnosed with gender dysphoria who have already had sex reassignment surgery be required to serve in their sex?**

CUI//NOT FOR RELEASE

**App. 638**

FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

**A:** The Secretaries of the Military Departments may place a Service member being separated under this policy in an administrative absence status until their separation is complete. Service members in this status will be designated as non-deployable.

**Q: Will the records for Service members being separated under this policy be updated to reflect their sex?**
**A:** Yes. All military records, regardless of whether a Service member is being separated under this policy, will reflect the Service member's sex.

**Q: Will the records for Service members being separated under this policy be updated to reflect their name at birth?**
**A:** All military records will reflect the Service member's legal name.

<u>Medical Providers</u>
**Q: Will Service members being separated under this policy be allowed to continue hormone therapy?**
**A:** Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this guidance may, if recommended by a DoD health care provider to prevent further complications, be continued until separation is complete.

<u>Decision-Making</u>
**Q: The Secretary of Defense has said that the focus needs to be on "lethality, meritocracy, accountability, standards, and readiness." Specifically focusing on 'meritocracy,' will consideration be given to high performing transgender Service members?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

**Q: Transgender Service members have been serving without exception since 2021 and were previously 'grandfathered' under the previous Trump administration policies. Why are all transgender Service members being targeted for separation now?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, express a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service. Further, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

CUI//NOT FOR RELEASE

**App. 639**

CUI//NOT FOR RELEASE

**Q: Did the Department consider reinstating the Mattis policy regarding a Service member diagnosed with gender dysphoria and allow them to be grandfathered?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

**Q: Does this policy establish a de facto "Don't Ask, Don't Tell" for Service members diagnosed with gender dysphoria?**
**A:** No. This policy applies to Service members with a current diagnosis or history of or exhibit symptoms consistent with gender dysphoria. A history of cross-sex hormone therapy, sex reassignment, or genital reconstruction surgery as treatment for gender dysphoria in pursuit of a sex transition is disqualifying.

**Q: Will this policy have a negative impact on readiness, recruiting, and retention?**
**A:**
*Readiness:* This policy will remove Service members who are unable to satisfy the rigorous standards required for military service.

*Recruiting:* There is no direct evidence to suggest that recruiting will be impacted by this policy.

*Retention:* There is no direct evidence to suggest that this policy will have an impact on retention beyond the impacted individuals.

**Q: How is this legal? Do these actions violate Service members human rights?**
**A:** These actions are fully consistent with federal law.

**Q: Can you comment on the ongoing litigation?**
**A:** The Department does not comment on ongoing litigation. We respectfully refer you to the Department of Justice.

**References**:
For more information on the Departments actions:
https://www.dcpas.osd.mil/hottopics/executive-orders-and-presidential-memorandums

https://www.defense.gov/Spotlights/Guidance-for-Federal-Personnel-and-Readiness-Policies/

**Resources**:
https://www.whitehouse.gov/presidential-actions/

https://www.whitehouse.gov/fact-sheets/

CUI//NOT FOR RELEASE

**App. 640**

CLASSIFICATION: UNCLASSIFIED//


Generated by OIX GATEWAY NORFOLK VA. Only authorized users may reply.


-----OFFICIAL INFORMATION DISPATCH FOLLOWS-----

RTTUZYUW RHOIAAA0001 0721512-UUUU--RHSSSUU.

ZNR UUUUU

R 131511Z MAR 25 MID120001788533U

FM SECNAV WASHINGTON DC

TO ALNAV

INFO SECNAV WASHINGTON DC

CNO WASHINGTON DC

CMC WASHINGTON DC

BT

UNCLAS


ALNAV 023/25


MSGID/GENADMIN/SECNAV WASHINGTON DC/-/MAR//


SUBJ/INITIAL DIRECTION ON PRIORITIZING MILITARY EXCELLENCE AND

READINESS//


REF/A/EXECUTIVE ORDER 14168/20JAN25//

REF/B/EXECUTIVE ORDER 14183/27JAN25//

REF/C/SECDEF MEMORANDUM/7FEB25//

REF/D/PTDO USD-PR MEMORANDUM/26FEB25//

REF/E/SECNAVINST 1000.11A/27JUN23

REF/F/ PTDO ASD-MRA MEMORANDUM/28FEB25//

REF/G/ PTDO ASD-MRA MEMORANDUM/4MAR25//

REF/H/10 USC 1175A//

REF/I/DODI 1332.43/28NOV17//

REF/J/DODI 1332.29/3MAR17//

REF/K/DODI 1332.46/21DEC18//

REF/L/DODI 1332.35/26SEP19//

NARR/REF A IS EXECUTIVE ORDER 14168 "DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT."

REF B IS EXECUTIVE ORDER 14183 "PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF C IS SECRETARY OF DEFENSE MEMORANDUM "PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF D IS PERFORMING THE DUTIES OF UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS MEMORANDUM "ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF E IS SECRETARY OF THE NAVY INSTRUCTION 1000.11A "SERVICE OF TRANSGENDER SAILORS AND MARINES."

REF F IS PERFORMING THE DUTIES OF ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS MEMORANDUM "CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS."

REF G IS PERFORMING THE DUTIES OF ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS MEMORANDUM "CLARIFYING GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND READINESS: RETENTION AND ACCESSION WAIVERS."

REF H IS SECTION 1175A OF TITLE 10, UNITED STATES CODE "VOLUNTARY SEPARATION PAY AND BENEFITS."

REF I IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.43 "VOLUNTARY SEPARATION PAY (VSP) PROGRAM FOR SERVICE MEMBERS."

REF J IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.29 "INVOLUNTARY SEPARATION PAY (NON-DISABILITY)."

REF K IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.46 "TEMPORARY EARLY RETIREMENT AUTHORITY (TERA) FOR SERVICE MEMBERS."

REF L IS DEPARTMENT OF DEFENSE INSTRUCTION 1332.35 "TRANSITION ASSISTANCE PROGRAM (TAP) FOR MILITARY PERSONNEL."//

**App. 642**

RMKS/1.  Pursuant to reference (a), the Department of the Navy (DON) recognizes two sexes:  male and female.  An individual's sex is immutable, unchanging during a person's life.  References (b), (c), and (d) establish that individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as described in reference (d).  After 28 March 2025, the DON will initiate involuntary administrative separation for these personnel and others who are disqualified for military service per references (c) and (d).  This message provides procedures for voluntary separation of impacted personnel.

2.  Pursuant to reference (d), reference (e) is cancelled.  Navy and Marine Corps policies based in reference (e) must be rescinded or updated, as appropriate, as soon as practicable, with the first report on progress due 24 March 2025 to the Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN(M&RA)).

   a.  Effective immediately, all exceptions to policy allowing a member to conform to standards associated with a sex different from their identification in the Defense Enrollment Eligibility Reporting System (DEERS) approved in accordance with reference (e) are revoked and no further exceptions will be approved.

   b.  The Chief of Naval Operations (CNO) and Commandant of the Marine Corps (CMC) will maximize the use of all available command authorities to ensure impacted personnel are afforded dignity and respect.

   c.  Navy and Marine Corps personnel will take no action to identify Service Members, pursuant to references (d) and (f), to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by an appropriate official in the Office of the Under

**App. 643**

Secretary of Defense for Personnel and Readiness.  Nothing in this paragraph prevents commanders from taking appropriate action in support of Service Members who request to voluntarily separate in accordance with paragraph 5 below.

3.  Appointment, enlistment, or induction into the Navy and Marine Corps.

    a.  Per reference (d), applicants for military service and individuals currently in the Delayed Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.  Individuals with offers of admission to the United States Naval Academy (USNA) or the Naval Reserve Officers' Training Corps (NROTC) who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service and offers of admission will be rescinded except as outlined in paragraph 4.

    b.  A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition is disqualifying for applicants for military service, and incompatible with military service for military personnel.

4.  Waivers.  Per reference (g), military personnel who are no longer eligible for military service, as well as applicants for military service who are disqualified, may be considered for retention or accession waiver on a case-by-case basis, provided there is a compelling government interest in retaining or accessing such individuals that directly supports warfighting capabilities.  Only the Secretary of the Navy has authority to grant a waiver.  Further guidance on submission of waivers will be provided; however, submission of a waiver will not change the deadline to request voluntary

**App. 644**

separation in paragraph 5, below.  To be eligible for a waiver, military personnel or applicants for military service must meet the following criteria:

a.  The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

b.  The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

c.  The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

5.  Voluntary Separation.  Per reference (d), military personnel, including USNA and NROTC midshipmen, who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may request voluntary separation by 28 March 2025, subject to the following:

a.  At this time and per reference (f), commanders will not direct or request any information described in paragraph 2c, above, be provided by the requesting member or any other Department of Defense (DoD) personnel as part of a request for separation in accordance with this ALNAV.  As appropriate, further guidance for potential medical verification of applicable diagnoses will be provided.

b.  Any remaining military service obligation will be waived for members requesting voluntary separation; any bonus received prior to 26 February 2025 and subject to a service obligation will not be recouped. Absent any other basis for separation or disenrollment, USNA and NROTC midshipmen will not be subject to monetary repayment of education

**App. 645**

benefits.

c.  No later than 14 March 2025, the CNO and CMC will each designate a single flag or general officer responsible for receiving requests for voluntary separation and publish via widest distribution the method by which members may submit these requests.  Further guidance will be provided on adjudication and execution of voluntary separation requests.

d.  Characterization of service will be honorable except where the member's record otherwise warrants a different characterization.  The applicable separation program designator codes and associated narrative reasons for separation will be provided at a later date by an appropriate official of the Office of the ASN(M&RA) in coordination with the Office of the Under Secretary of Defense for Personnel and Readiness.

e.  For military personnel requesting voluntary separation and eligible for voluntary separation pay in accordance with references (h) and (i), CNO and CMC will authorize voluntary separation pay at a rate that is twice the amount of involuntary separation pay for which the member would have been eligible in accordance with reference (j). Voluntary separation pay is not payable to those with less than six years or more than 20 years of service.  No member receiving Voluntary Separation Pay in accordance with this ALNAV will be required to serve in the Ready Reserve.

f.  CNO and CMC are authorized Temporary Early Retirement Authority for members with over 18 but less than 20 years of total active-duty service eligible per reference (k) and separated in accordance with this ALNAV.

g.  CNO and CMC will reassign to their respective military service,

**App. 646**

members who request voluntary separation in accordance with this ALNAV

and are currently assigned to the Office of the Secretary of Defense,

Defense Agencies, DoD Field Activities, Combatant Commands, or other

joint assignments.

6.  Administrative Absence

   a.  Members with an approved exception to policy that is revoked

pursuant to paragraph 2a above will be offered administrative absence

status pending action on the member's separation.  CNO and CMC should

place members who request voluntary separation in accordance with this

ALNAV in an administrative absence status.  Members placed in an

administrative absence status in accordance with this ALNAV will be

entitled to full pay and benefits and they will be designated as non-

deployable until separation is complete.

   b.  Members in an administrative absence status will complete any

pre-separation requirements, including the Transition Assistance

Program per reference (l), and be afforded maximum flexibility to

complete such requirements remotely or in civilian attire.

7.  Consistent with existing law and policy, commanders will protect

the privacy of protected health information they may receive under this

policy in the same manner as they would any other protected health

information.  Such health information will be restricted to personnel

with a specific need to know in order to conduct official duties.

Personnel will be accountable for safeguarding health information

consistent with law and policy.

8.  CNO and CMC will prepare and maintain status updates in accordance

with the reporting requirements of reference (d) and deliver to

ASN(M&RA) beginning 24 March 2025 and continuing every 30 days

thereafter.

**App. 647**

9.  Additional direction will be provided concerning adjudication and

execution of voluntary separation requests and procedures for

involuntary separation of personnel outlined in references (c) and (d).


10.  Released by Mr. Terence G. Emmert, Acting Secretary of the Navy.//

BT

#0001

NNNN

<DmdsSecurity>UNCLASSIFIED//</DmdsSecurity>

<DmdsReleaser>WALLACE.JAMES.DOUGLAS.1402926232</DmdsReleaser>


CLASSIFICATION: UNCLASSIFIED//

```
CLASSIFICATION: UNCLASSIFIED//
ROUTINE
R 132108Z MAR 25 MID120001789513U
FM CNO WASHINGTON DC
TO NAVADMIN
INFO CNO WASHINGTON DC
BT
UNCLAS

NAVADMIN 055/25

PASS TO OFFICE CODES:
FM CNO WASHINGTON DC//N1//
INFO CNO WASHINGTON DC//N1//
MSGID/GENADMIN/CNO WASHINGTON DC/N1/MAR//

SUBJ/INITIAL EXECUTION RELATED TO PRIORITIZING MILITARY EXCELLENCE AND
READINESS//

REF/A/MEMO/OUSD(PR)/26FEB25//
REF/B/MEMO/OUSD(PR)/28FEB25//
REF/C/ALNAV/SECNAV WASHINGTON DC/131511ZMAR25
REF/D/NAVADMIN/OPNAV/031311ZJUN21//
REF/E/DOC/COMNAVPERSCOM/07NOV16//
REF/F/MEMO/OSD/07FEB25//
REF/G/DOC/SECDEF/DODI 1332.43/28NOV17//
REF/H/DOC/SECDEF/DODI 1332.29/03MAR17//
REF/I/DOC/SECDEF/DODI 1332.46/21DEC18//
REF/J/DOC/BUPERS/1001.39, CHANGE 1/03MAY13//
REF/K/DOC/COMNAVPERSCOM/11NOV21//
REF/L/DOC/COMNAVPERSCOM/12AUG24//
REF/M/DOC/OPNAV/1300.20A/03OCT23//
REF/N/DOC/COMNAVPERSCOM/10MAY17//
REF/O/DOC/COMNAVPERSCOM/01JUN16//


NARR/REF A IS UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
MEMORANDUM, ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE AND
READINESS.
REF B IS CLARIFYING GUIDANCE ON UNDERSECRETARY OF DEFENSE FOR PERSONNEL AND
READINESS MEMORANDUM, ADDITIONAL GUIDANCE ON PRIORITIZING MILITARY EXCELLENCE
AND READINESS.
REF C IS ALNAV 023/25, INITIAL DIRECTION PRIORITIZING MILITARY EXCELLENCE AND
READINESS.
REF D IS NAVADMIN 112/21, INTERIM GUIDANCE FOR SERVICE OF TRANSGENDER NAVY
PERSONNEL.
REF E IS MILPERSMAN 1000-131, MEMBER GENDER MARKER CHANGE.
REF F IS SECRETARY OF DEFENSE MEMORANDUM FOR PRIORITIZING MILITARY EXCELLENCE
AND READINESS.
REF G IS DODI 1332.43, VOLUNTARY SEPARATION PAY (VSP) PROGRAM FOR SERVICE
MEMBERS.
REF H IS DODI 1332.29, INVOLUNTARY SEPARATION PAY (NON-DISABILITY).
REF I DODI 1332.46, TEMPORARY EARLY RETIREMENT AUTHORITY (TERA) FOR SERVICE
MEMBERS.
REF J IS BUPERSINST 1001.39 CHANGE 1,
ADMINISTRATIVE PROCEDURES FOR NAVY RESERVE PERSONNEL.
REF K IS MILPERSMAN 1920-190, TYPES OF RESIGNATIONS BY OFFICERS.
REF L IS MILPERSMAN 1920-200, OFFICER RESIGNATION TYPES AND PROCEDURES.
REF M IS OPNAVINST 1300.20A, DEPLOYABILITY ASSESSMENT AND ASSIGNMENT PROGRAM.
REF N IS MILPERSMAN 1050-270, ADMINISTRATIVE ABSENCES.
REF O, IS MILPERSMAN 1320-314, TEMPORARY DUTY (TDY) TRAVEL ORDERS. //


RMKS/1.  Pursuant to references (a) through (c), this NAVADMIN cancels
references (d) and (e), and establishes voluntary separation procedures for
Service Members who have a current diagnosis or history of, or exhibit
```

symptoms consistent with, gender dysphoria in line with references (a) through (c).

a.  Effective immediately, all exceptions to policy allowing a member to conform to standards associated with a sex different from their identification in the Defense Enrollment Eligibility Reporting System (DEERS) approved in accordance with reference (d) are revoked and no further exceptions will be approved.  Gender marker change requests previously submitted under references (d) and (e), will no longer be accepted or processed by MyNavy Career Center (MNCC).

b.  Navy and Marine Corps personnel will take no action to identify Service Members, pursuant to references (a) and (b), to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by an appropriate official in the Office of the Under Secretary of Defense for Personnel and Readiness.  Nothing in this paragraph prevents commanders from taking appropriate action in support of Service Members who request to voluntarily separate in accordance with paragraph 3 below.

c.  Cross-sex hormone therapy that began prior to the issuance of reference (f) will be continued for the duration of the Service Member's time in service if recommended by a DoD health care provider.

d.  Service Members may consult with a Department of Defense health care provider concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria.


2.  Voluntary Separation Request Deadline.  Active-Duty and Reserve Service Members that meet the criteria outlined in reference (a) may request voluntary separation or, for those eligible, retirement no later than (NLT) 2359Y (UTC-12:00), Friday, 28 March 2025.

a.  Service Members that meet the eligibility requirements for Voluntary Separation Pay (VSP) in line with reference (g) may receive VSP at a rate that is twice the amount of involuntary separation pay for which the Service Member would have been eligible in line with reference (h).

(1) VSP is not payable to Service Members with less than 6 Years of Service (YOS) or immediately eligible for retired pay upon separation.

(2) VSP is not payable to the Reserve Component.

(3) In line with reference (c), Service Members who receive VSP will not be required to serve in the Ready Reserve.

b.  Service Members requesting voluntary separation in line with reference (c) are not required to pay back any bonus or incentive pays received where the required obligation has not been met.

c.  Service Members identified after 2359Y, 28 March 2025 who meet the criteria outlined in section 4.4 of reference (a) and who have not submitted a voluntary separation or retirement request will be subject to involuntary separation and will no longer be eligible for the benefits outlined in paragraphs 2.a and 2.b and may be required to pay back any bonus or incentive pays received where the required obligation has not been met.  Procedures for involuntary separation will be promulgated via future guidance.


3.  Voluntary Separation Process.  The process for requesting voluntary separation or retirement differs depending on rank, time in service, and active or reserve status.  Requests for voluntary separation or retirement will be submitted to the Deputy Chief of Naval Personnel (DCNP) via the applicable process as outlined below.
For all submissions via Navy Standard Integrated Personnel System (NSIPS), Service Members who receive system notifications that they are ineligible for the type of retirement or separation they are requesting, but are eligible in line with this NAVADMIN, should disregard the notifications and request waivers for all constraining conditions (e.g. Time in Grade (TIG)).

a.  The Service Member's Commanding Officer (CO) for Active Duty or, for Selected Reservists (SELRES), the Service Member's Navy Reserve Activity (NRA) CO, is required to expeditiously forward the request to DCNP with an endorsement.

b.  All requests must include an affidavit in the form of a permanent NAVPERS 1070/613 signed by the Service Member and witnessed by a command representative with the statement:  "In line with OSD memos "Additional

Guidance on Prioritizing Military Excellence and Readiness" of 26 February 2025, and "Clarifying Guidance on Military Excellence and Readiness" of 28 February 2025, and ALNAV 023/25, I seek to voluntarily separate [or retire, as appropriate] from Naval Service.  I certify that I meet the criteria for this program as described in ALNAV 023/25 and understand this is an official statement under the meaning of Article 107 of the Uniform Code of Military Justice.  I understand that my eligibility for this program may be verified via medical records, service records, and/or diagnosis by a medical provider, as determined by future guidance."  The signed NAVPERS 1070/613 shall be uploaded in each of the requisite systems outlined below for each separation or retirement request.

    c.  Service Members that have issues accessing or submitting their separation or retirement request via NSIPS may contact the NSIPS helpdesk using the contact information in section 9.b of this NAVADMIN.

    d.  After submitting the separation or retirement request, Service Members will email the NPC Point of Contact (POC) at molly.bergeron-conway7.mil@us.navy.mil and the Service Central Coordination Cell (SCCC) at usn_navy_sccc@navy.mil NLT 2359Y, 28 March 2025 with their name and notification that the request for voluntary separation or retirement was submitted in line with ALNAV 023/25.

4.  Active-Duty Voluntary Separation Process.
    a.  Officer and enlisted Service Members with 20 years or more of total Active-Duty service who are regular retirement eligible:
        (1) Service Members with 20 years or more of total Active- Duty service who wish to voluntarily retire under this policy must submit their request for transfer to the Fleet Reserve/Retired List via NSIPS.
        (2) Service Members will complete the following steps:
            (a) Log into NSIPS (https://www.nsips.cloud.navy.mil/).
            (b) Navigate to the "Employee Self-Service" tab.
            (c) From the drop-down menu, select "Request Retirement/Separation".
            (d) Select "Regular Retirement" or "Fleet Reserve" as the request type as applicable.
            (e) Choose a requested date NLT 1 June 2025.
            (f) Request waivers for all constraining conditions as applicable.  In the waiver tab of the request, add the following comment as applicable: "Waiver request submitted in line with ALNAV 023/25."
            (g) Add the following comment to the Attach/Comment/Recommend tab:  "Request submitted in line with ALNAV 023/25."
            (h) Upload the signed affidavit under the Attach/Comment/Recommendation tab.
            (i) Fill out and edit all remaining sections of the request tab, the Attach/Comment/Recommendation tab, and the contact information tab as applicable.
            (j) Route the request for approval using the button at the bottom of the page.  Route to either the command separation specialist or command reviewer, as appropriate.
            (k) Notify the NPC POC and the SCCC of the retirement request submitted in line with ALNAV 023/25.
        (3) Once in receipt, the command reporting senior will expeditiously review the request and provide comments and recommendations.  The comments will include the following:  "Request submitted in line with ALNAV 023/25". COs must also state in their comments or endorsement whether the Service Member has any pending misconduct, including but not limited to: undergoing/pending investigation, Non-Judicial Punishment (NJP), Administrative Separation (ADSEP), possible court-martial, or civilian trial.
        (4) Submit the request electronically to NPC.
        (5) COs will verify that the Service Member has emailed the NPC POC and the SCCC as outlined in paragraph 3. of this NAVADMIN.
    b.  Officer and enlisted Service Members eligible for early retirement:
        (1) Service Members with over 18 years, but less than 20 years of total Active-Duty service by 28 March 2025 are eligible for early retirement under Temporary Early Retirement Authority (TERA), in line with references (i) and (c).  Service Members must submit their early retirement request via

**App. 651**

NSIPS Retirement and Separations (RnS).
        (2) Service Members will complete the following steps:
            (a) Log into NSIPS (https://www.nsips.cloud.navy.mil/).
            (b) Navigate to the "Employee Self-Service" tab.
            (c) From the drop-down menu, select "Request
Retirement/Separation".
            (d) Under the request "Request details" section, select "Regular
TERA (Early Retirement)".
            (e) Choose a requested date NLT 1 June 2025.
            (f) Request waivers for all constraining conditions as
applicable.  In the waiver tab of the request add the following comment as
applicable:  "Request submitted in line with ALNAV 023/25".
            (g) Upload the signed affidavit under the
Attach/Comment/Recommendation tab.
            (h) Fill out and edit all remaining sections of the request tab,
the Attach/Comment/Recommendation tab, and the contact information tab as
applicable.
            (i) Route the request for approval using the button at the bottom
of the page.  Route to either the command separation specialist or command
reviewer as appropriate.
            (j) Notify the NPC POC and the SCCC of the retirement request
submitted in line with ALNAV 023/25.
        (3) Once in receipt, the command reporting senior will expeditiously
review the request and provide comments and recommendations.  The comments
will include the following:  "Request submitted in line with ALNAV 023/25".
COs must also state in their comments or endorsement whether the Service
Member has any pending misconduct, including but not limited to:
undergoing/pending investigation, NJP, ADSEP processing, possible court-
martial, or civilian trial.
        (4) Submit the request electronically to NPC.
        (5) COs will verify that the Service Member has emailed the NPC POC
and the SCCC as outlined in paragraph 3.d of this NAVADMIN.
    c.  Enlisted Service Members not eligible for retirement:
        (1) Requests for voluntary separation from enlisted Service Members
with less than 18 YOS on 28 March 2025 will be submitted to NPC Career
Progression Division (PERS-8) for Active Duty Service Members via their CO.
        (2) Service Members may initiate this process by filling out and
submitting NAVPERS 1306/7, electronic Personnel Action Request (ePAR).  To
initiate this request, log into MyNavy Portal (MNP) at
https://www.my.navy.mil/ and complete the following steps:
            (a) Select "Career and Life Events" at the top right of the
webpage.
            (b) Select "Career Planning".
            (c) Select "Submit/Manage an ePAR".
            (d) Select "Sailor Submit".
            (e) Under the section labeled "electronic Personnel Action
Request", select "CONTINUE".
            (f) Fill in the required information on the electronic form.
            (g) Under the "Requested Action, Reason for Submission" section,
write the following:  "Request submitted in line with ALNAV 023/25".  Add any
additional information in this section as applicable.
            (h) Under the "Requested Action, Date Available" section, the
latest date available will be NLT 1 June 2025.
            (i) When ready to submit to the Command Career Counselor (CCC),
click "Send" at the bottom right of the page.
            (j) After clicking "Send", a pop-up window will appear.
Attach the signed affidavit and any other supporting documents to the ePAR by
clicking "choose file" and following the prompt to attach a file.
            (k) Click "Continue" to submit.
            (l) Notify the NPC POC and the SCCC of the voluntary separation
request submitted in line with ALNAV 023/25.
        (3) CCCs will expeditiously route the NAVPERS 1306/7 (ePAR) through
the Chain of Command to obtain command endorsement.
        (4) COs should endorse the Service Member's request and must add the
following statement to their endorsement:  "Request submitted in line with

ALNAV 023/25". COs must also state in their comments or endorsement whether the Service Member has any pending misconduct, including but not limited to: undergoing/pending investigation, NJP, ADSEP processing, possible court-martial, or civilian trial.

(5) Commands will submit requests via MNP or via email to MNCC at askmncc@navy.mil.

(6) COs will verify that the Service Member has emailed the NPC POC and the SCCC as outlined in paragraph 3.d of this NAVADMIN.

    d.  Officers not eligible for retirement:

(1) Officers with less than 18 years of total Active-Duty service on 28 March 2025 who wish to voluntarily separate under this policy will submit their resignation request via NSIPS RnS.

(2) To initiate the resignation request, complete the following steps:

        (a) Log into NSIPS (https://www.nsips.cloud.navy.mil/).
        (b) Navigate to the "Employee Self-Service" tab.
        (c) From the drop-down menu, select "Request Retirement/Separation".
        (d) Select "Regular Officer Resignation" as the request type.
        (e) Choose a requested date NLT 1 June 2025.
        (f) Reason for Separation will be "Other".
        (g) Add the following comment to the Attach/Comment/Recommend tab: "Request submitted in line with ALNAV 023/25."
        (h) Request waivers for all constraining conditions as applicable. In the waiver tab of the request add the following comment: "Request submitted in line with ALNAV 023/25."
        (i) Upload the signed affidavit under the Attach/Comment/Recommendation tab.
        (j) Fill out and edit all remaining sections of the request tab, Attach/Comment/Recommendation, and the contact information tab as applicable.
        (k) Route the request for approval using the button at the bottom of the page. Route to either the command separation specialist or command reviewer as appropriate.
        (l) Notify the NPC POC and the SCCC of the resignation request submitted in line with ALNAV 023/25.

(3) The command reporting senior will expeditiously review the request and provide comments and recommendations. The comments will include the following: "Request submitted in line with ALNAV 023/25".

(4) COs will verify that the Service Member has emailed the NPC POC and the SCCC as outlined in paragraph 3.d of this NAVADMIN.


5.  Reserve Voluntary Separation Process.

    a.  Reservists with 20 or more years of qualifying service (YQS) who wish to request non-regular retirement in line with reference
(j) will use the process outlined in section 4.a.(2)-(5) of this NAVADMIN. NRA COs will provide the endorsement.

    b.  Reserve Service Members who request voluntary separation are not eligible for TERA.

    c.  Reserve Service Members with fewer than 20 YQS who request separation from the service will use the following process:

(1) Enlisted SELRES will submit a NAVPERS 1306/7 (ePAR) to Reserve Personnel Management Department (PERS-9) via their NRA CO using the process outlined in section 4.c. (2)-(6) of this NAVADMIN.

(2) Officer SELRES will submit a resignation request via NSIPS using the procedure outlined in section 4.d. (2)-(4) of this NAVADMIN.

    d.  For Reservists in the Individual Ready Reserve (IRR), S1 or S2, all requests for retirement or separation should be submitted using the process outlined in section 5.a or 5.c of this NAVADMIN as applicable and if able. No command endorsement is required as these Service Members are directly assigned to IRR Administration (PERS- 93).

    e.  In alignment with the guidance provided in section 8 of this NAVADMIN, NRAs may submit authorized absences for Service Members being processed for resignation or retirement.

    f.  Further guidance for the Reserve Component will be forthcoming in ALNAVRESFORs.

**App. 653**

6.  Service Members, Active Duty and Reserve, unable to submit a voluntary separation or retirement request electronically.

a.  If unable to complete a voluntary separation or retirement request electronically as outlined in sections 4 and 5 of this NAVADMIN, Service Members may submit a paper request to their CO or NRA CO NLT 28 March 2025 indicating their desire and intention to voluntarily separate or retire from the Service.

b.  The process and required paperwork will mirror the processes outlined in section 4 and 5 of this NAVADMIN.

(1) Officer and enlisted Service Members eligible for retirement:

(a) Service Members will submit requests via the Officer Personnel Information System (OPINS) or the NSIPS Career Information Management System (CIMS) as applicable and if able.

(b) Reservists submitting applications for voluntary retirement or transfer to Retired Reserve status will submit their request in the format shown in figure 20-4 of reference (j).
Applications may be faxed to the Reserve Retirement Branch (PERS-912) at (901) 874-7044 or mailed to:

        Commander Navy Personnel Command (PERS-912)
        5720 Integrity Drive
        Millington, TN 38055
Upon submission of the request, Service Members will email the NPC POC and the SCCC of their retirement request submitted in line with ALNAV 023/25.

(c) Enlisted Service Members may submit a TIG waiver request to their Enlisted Community Manager via a NAVPERS 1306/7 (ePAR) form.

(2) Enlisted Service Members not eligible for retirement:

(a) Service Members will print out NAVPERS Form 1306/7 (ePAR) and fill out the form as directed in steps 6 through 9 of section 4.c. (2) of this NAVADMIN.  Route the request, with the signed affidavit as an enclosure to the CCC for processing.  The CCC will expeditiously review and route to the CO for endorsement.
Commanders must endorse the Service Member's request and must add the following statement:  "Request submitted in line with ALNAV 023/25".

(b) Upon submission of the request, Service Members will email the NPC POC and the SCCC of their voluntary separation request submitted in line with ALNAV 023/25.

(3) Officers not eligible for retirement:

(a) Active Duty and Reserve officers will submit an Unqualified Resignation request using the appropriate format provided in reference (k) to PERS-8 for Active Duty or PERS-9 for reservists, via their CO or NRA CO and as directed by reference (l).

(b) Upon submission of the request, Service Members will email the NPC POC and the SCCC of their voluntary resignation request submitted in line with ALNAV 023/25, NLT 2359Y, 28 March 2025.


7. Command Actions on Voluntary Separation Request.

a.  In addition to forwarding the separation or retirement request to DCNP via NPC, commands will verify that notification of the Service Member's voluntary separation, retirement, and/or placement on administrative absence or temporary duty is sent to the NPC POC at molly.bergeron-conway7.mil@us.navy.mil and the SCCC at usn_navy_sccc@navy.mil.

b.  Service Members who request separation will be placed in an administrative non-deployable status.  They will be assigned a "Category 3" Deployability Category code, identifying them as temporarily non-deployable, as described in reference (m).


8.  Administrative Absences.  In line with reference (a) and in line with reference (c), administrative absence is authorized for Active Duty and Reserve Service Members who elect voluntary separation when in the best interest of the unit and well-being of the Service Member.  Additionally, where rescission of an exception to policy will impact good order and discipline, the CO may consider placing the Service Member on administrative absence.  Administrative absence or temporary duty is not required but should be considered based on the criteria below.  In either case, commands will

**App. 654**

follow the procedures outlined in reference (n) or (o) as applicable.
    a.  Pursuant to reference (c), all Service Members with an approved
exception to policy that is revoked pursuant to paragraph 1a above will be
offered administrative absence status pending action on the member's
separation request.
    b.  COs should consider the impact to good order and discipline within
their unit, the well-being of the Service Member, and their ability to
maintain effective oversight and support for the Service Member during the
process.
    c.  COs will proactively communicate with the impacted Service Member,
ensure they have accurate and up to date contact information, monitor their
well-being, and keep the Service Member apprised of their status.
    d.  Service Members will receive full pay and benefits until their
separation is complete.

9.  Points of Contact:
    a.  Command triads may contact the SCCC at (703) 604-5084/DSN
664 or via e-mail at usn_navy_sccc@navy.mil, the NPC POC at molly.bergeron-
conway7.mil@us.navy.mil, or MNCC at (833) 330-6622 or via e-mail at
askmncc@navy.mil with questions, concerns, notification of a member's
voluntary separation or retirement, or notification of a member's placement
on administrative absence or temporary duty.
    b.  Service Members that face issues using NSIPS may contact the NSIPS
helpdesk at nesd@nesd-mail.onbmc.mil or 1-833-637-3669 (1-833- NESDNOW).

10.  This NAVADMIN will remain in effect until superseded or canceled,
whichever occurs first.

11.  Released by Vice Admiral Richard J. Cheeseman, Jr., N1.//

BT
#0001
NNNN
CLASSIFICATION: UNCLASSIFIED//



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

MAR 2 : 2025

PERSONNEL AND
READINESS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                COMMANDERS OF THE COMBATANT COMMANDS
                DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Compliance with Federal Court Order in *Talbott v. United States*,
           No. 25-cv-00240 (D.D.C.)

      On Tuesday, March 18, 2025, the United States District Court for the District of
Columbia issued the attached preliminary injunction order and memorandum opinion in the case
of *Talbott v. United States*.

      On Friday, March 21, 2025, the Court extended its stay of its preliminary injunction order
until 48 hours after the Court rules on the U.S. Government's motion to dissolve the preliminary
injunction or until such other time as the Court deems appropriate.

      Accordingly, the attached preliminary injunction order is not currently in effect.  If a
preliminary injunction order goes into effect, I will provide updated guidance at that time.

      Additionally, I direct that no involuntary separation processes may be initiated pursuant
to Performing the Duties of the Under Secretary of Defense for Personnel and Readiness
Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness,"
February 26, 2025, until March 28, 2025.

                                         *Jules W. Hurst III*

                              Jules W. Hurst III
                              Performing the Duties of the Under Secretary of
                                    Defense for Personnel and Readiness

Attachments:
As stated

**App. 656**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LOGAN IRELAND, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>PETER B. HEGSETH, in his official<br>capacity as Secretary of Defense, *et al.*,<br><br>　　　　Defendants. | No. 25-cv-01918<br><br><br>**TEMPORARY RESTRAINING<br>ORDER** |

**THIS MATTER** comes before the Court by way of a Motion for a Temporary Restraining Order ("TRO") filed by Plaintiffs Logan Ireland and Nicholas Bear Bade (collectively, "Plaintiffs"). (ECF No. 4). Plaintiffs request a TRO to prevent Peter B. Hegseth, in his official capacity as Secretary of Defense; the United States of America; Gary Ashworth, in his official capacity as Acting Secretary of the Air Force; and the United States Department of the Air Force (collectively, "Defendants") from initiating involuntary separation proceedings against them pursuant to a January 27, 2025 Executive Order, titled "Prioritizing Military Excellence and Readiness," ("EO 14183") and subsequent Implementing Guidance issued by the Secretary of Defense and the Air Force in January, February, and March 2025 (collectively, "Orders"). Having considered Plaintiffs' Motion and Reply, (ECF Nos. 4, 25); Defendants' Opposition, (ECF No. 21); and the arguments of the parties at the March 24, 2025 hearing, the Court **GRANTS** Plaintiffs' Motion for a 14-day TRO effective immediately upon entry of this Order. The Court makes the following findings of fact and conclusions of law.

## I.　　FACTUAL BACKGROUND

Plaintiffs Master Sergeant Ireland and Staff Sergeant Bade are both transgender men

**App. 657**

currently serving in the United States Air Force. (Pls.' Mot., ECF No. 4 at 15, 18; Compl., ECF No. 1 at ¶¶ 2, 9). Both Plaintiffs have exemplary service records: Master Sergeant Ireland, who has honorably served for over fourteen years including deployment to Afghanistan, South Korea and the United Arab Emirates, has earned four Air Force Commendation Medals, two Air Force Achievement Medals, two Military Outstanding Volunteer Service Medals, and three Non-Commissioned Officer of the Year awards, while Staff Sergeant Bade, who has honorably served for over six years including deployment in Kuwait as a member of the base's Security forces, has received a Diamond Sharp Award, a Wing level scholarship, the Military Outstanding Volunteer Service Medal, and an Achievement Medal. (Pls.' Mot., ECF No. 4 at 16, 19; Compl., ECF No. 1 ¶¶ 14-15, 42, 45). At the time the challenged Orders took effect, Master Sergeant Ireland was part of a training program at Joint Base McGuire-Dix-Lakehurst in New Jersey, and Staff Sergeant Bade was deployed to Ali Al Salem Airbase in Kuwait. (Pls.' Mot., ECF No. 4 at 17–18; Compl., ECF No. 1 ¶¶ 11, 42). Following the Orders, which require transgender service members to adhere to regulations based on their birth sex and effectively prohibit transgender individuals from serving in the United States military,[1] Plaintiffs were subjected to immediate adverse actions, including forced administrative absence and removal from their training assignments and active deployment. (Pls.' Mot., ECF No. 4 at 17–18, 20; Compl., ECF No. 1 at ¶¶ 3, 24–27, 51–52). Plaintiffs face further imminent harm in the form of involuntary separation proceedings expected to begin as early as March 26, 2025. (Pls.' Mot., ECF No. 4 at 18, 20; Compl., ECF No. 1 at ¶¶ 3, 32, 59); *see*

---

[1]  *See* EO 14183, ECF No. 1-4; Jan. 31, 2025 Sec. of Defense Memo, ECF No. 1-5; Feb. 4, 2025 Air Force Implementing Memo, ECF No. 1-6; Feb. 7, 2025 Sec. of Defense Memo, ECF No. 1-7; Feb. 26, 2025 Additional Guidance on Prioritizing Military Excellence and Readiness, ECF No. 1-8; Feb. 28, 2025 Clarifying Guidance on Prioritizing Military Excellence and Readiness, ECF No. 1-9; Mar. 1, 2025 Additional Guidance for Executive Order 14183, ECF No. 1-10.

2

**App. 658**

*also* Feb. 26, 2025 Additional Guidance on Prioritizing Military Excellence and Readiness, ECF No. 1-8 at §§ 4.3–4.4 (setting forth the procedure for administratively separating transgender service members)). These harms are immediate, ongoing, and significant, and cannot be remedied in the ordinary course of litigation. Accordingly, a TRO against Defendants, as provided below, is necessary until the Court can consider Plaintiffs' forthcoming motion for a preliminary injunction.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. FED. R. CIV. P. 65; *Vuitton v. White*, 945 F.2d 569, 573 (3d Cir. 1991). Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–1427 (3d Cir. 1994) (quoting *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)). To obtain relief, the moving party must show: (1) a likelihood of success on the merits; (2) they will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief. *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004) (citation omitted). Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

While courts must balance all four factors, *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982), this Circuit has placed significant weight "on the probability of irreparable harm and the likelihood of success on the merits" factors. *FM 103.1, Inc. v. Universal Broad.*, 929 F. Supp. 187, 193 (D.N.J. 1996) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990)). A court should only issue an injunction "if the plaintiff produces evidence

3

**App. 659**

sufficient to convince the district court that all four factors favor preliminary relief." *AT&T*, 42 F.3d at 1427.

## III.    DISCUSSION

As an initial matter, Plaintiffs have made the threshold showings necessary to proceed on their Motion for a TRO. Specifically, the Court finds that:  (1) it has jurisdiction over Defendants and the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1343; (2) no security bond is required under Rule 65(c) because the injunction does not subject Defendants to compensable monetary losses, *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015); *see also Talbott v. United States*, No. 25-cv-240, 2025 WL 842332, at \*36–37 (D.D.C. Mar. 18, 2025) (finding entry of preliminary injunction on same Orders did not harm defendants); and (3) Plaintiffs were not required to exhaust their administrative remedies because all three exceptions to the exhaustion doctrine apply here. That is, (1) the Orders present a clear and unambiguous violation of constitutional rights; (2) resort to administrative procedures would be "inadequate to prevent irreparable injury;" and (3) exhaustion is "futile," as there is no doubt as to the outcome of any separation actions based on the plain language of the Orders. *See Facchiano v. U.S. Dep't of Lab.*, 859 F.2d 1163, 1167–1168 (3d Cir. 1988) (citation omitted).

### A.  Issuance of a Temporary Restraining Order is Appropriate.

The Court finds that Plaintiffs have easily met their burden to satisfy the four elements favoring issuance of a TRO.

First, Plaintiffs have demonstrated a likelihood of success on the merits of their claims that the Orders, at a minimum, violate the Equal Protection Clause of the Fifth Amendment. (Pls.' Mot., ECF No. 4 at 24–48); *see also Talbott*, 2025 WL 842332 (granting nationwide injunction). The Court finds the district court's reasoning in *Talbott* to be thorough and persuasive, and the

4

**App. 660**

Court is inclined to agree with much of it. Specifically, the Court finds Plaintiffs have demonstrated a likelihood of success on the merits because (1) the Orders classify Plaintiffs based on their sex and thus warrant intermediate scrutiny;[2] and (2) Defendants cannot meet their burden to show an "exceedingly persuasive" justification for such differential treatment. *United States v. Virginia*, 518 U.S. 515, 531 (1996).

Second, Plaintiffs have established irreparable harm.[3] Specifically, Plaintiffs have already been pulled from their assignments and forced on administrative absence and face imminent involuntary administrative separation proceedings that would cause lasting damage to their otherwise exemplary military careers and reputations. (Pls.' Mot., ECF No. 4 at 21–23). Such adverse actions clearly constitute irreparable harm, whether framed as the loss of their military

---

[2]   In the alternative, the Court concludes that intermediate scrutiny is appropriate because transgender individuals meet the criteria for a quasi-suspect class. Despite Defendants' argument otherwise, doing so is not novel. Rather, this Court follows numerous circuit and district courts, including courts within this Circuit, which have recognized that classifications based on transgender status warrant heightened scrutiny. See *Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *see also Talbott*, 2025 WL 842332, at *25–28; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–613 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 872–74 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015).

[3]   The Court also rejects Defendants' contention that a TRO is unnecessary due to the preliminary injunction entered in *Talbott*. (Defs.' Opp., ECF No. 21 at 18). There is a pending motion to dissolve, and the injunction in *Talbott* could be stayed or reversed at any time, leaving Plaintiffs without protection. The existence of another court's preliminary injunction—especially one subject to ongoing challenge—is no basis to deny Plaintiffs the emergency relief they independently merit. *See California v. U.S. Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421, 423 (9th Cir. 2019) (explaining that no precedent supports the view that one court's nationwide injunction deprives another court of jurisdiction to consider similar equitable relief and emphasizing the importance of allowing legal issues to develop across multiple jurisdictions), *cert. granted, judgment vacated on other grounds*, *Little Sisters of Poor Jeanne Jugan Residence v. California*, 141 S. Ct. 192 (2020); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279–86 (11th Cir. 2021) (same).

**App. 661**

careers,[4] *Nelson v. Miller*, 373 F.2d 474, 479–480 (3d Cir. 1967) (finding "discharge itself may result in irreparable harm" notwithstanding possible reinstatement);[5] *Crawford v. Davis*, 249 F. Supp. 943, 946 (E.D. Pa. 1966) (finding general discharge under honorable conditions caused irreparable harm due to "injury and stigma attached" despite possibility of reinstatement); damage to reputation, *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 601 (3d Cir. 1979) (finding irreparable injury established where eviction from place of employment harmed plaintiff's business and reputation and denied him the right to pursue his professional license); *Talbott*, 2025 WL 842332, at *36 (finding same Orders caused "irreparable reputational stigma" to servicemembers); disclosure of Plaintiffs' personal information, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998) (finding irreparable harm stemming from release of personal information because "[n]o remedy at law could adequately compensate [plaintiffs] for any physical, psychological, or emotional trauma they might suffer at the hands of one obtaining this personal information"); *Doe v. Megless*, 654 F.3d 404, 410 (3d Cir. 2011) (suggesting disclosure of highly sensitive personal information would be irreparable harm); the loss of the opportunity

---

[4] While Defendants attempt to frame the harm to Plaintiff as a mere "loss of employment," (Defs.' Opp., ECF No. 21 at 19–20), this grossly undervalues that which is at stake for Plaintiffs. The loss of military service under the stigma of a policy that targets gender identity is not merely a loss of employment; it is a profound disruption of personal dignity, medical continuity, and public service. Plaintiffs' involuntary loss of decorated military status, military healthcare, and the ability to serve their country under a policy they have faithfully abided by for years cannot be repaired by monetary damages.

[5] It is hard to imagine how Defendants can cite *Nelson v. Miller* with a straight face to argue that there is no irreparable harm here because Plaintiffs can supposedly obtain relief later from the relevant record correction board. (Defs.' Opp., ECF No. 21 at 20). *Nelson* squarely recognized that "post-discharge review may be inadequate by the very fact that the interim between discharge and board action harbors a potential for irreparable harm, notwithstanding possible reinstatement." 373 F.2d at 479. *Nelson* also acknowledged that requiring a servicemember "to submit to needless harm even in a case of a patently meritorious claim" would be "unjust." *Id.* at 480. In short, *Nelson* actually supports Plaintiffs' position—not Defendants' position. Quoting it for the opposite proposition can only result from inattention or invention.

**App. 662**

for skill-building and camaraderie, *Hecox v. Little*, 79 F.4th 1009, 1036 (9th Cir. 2023) (finding exclusion of a transgender athlete constituted irreparable harm due to deprivation of opportunity to improve skills and experience team camaraderie); or the harms stemming from an unconstitutional policy,[6] *Miller v. Sessions*, 356 F. Supp. 3d 472, 485 (E.D. Pa. 2019) (explaining the deprivation of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). Being summarily and involuntarily dismissed from military service after years of unblemished and decorated service under the cloud of being suddenly deemed unfit and disqualified for military service for no reason other than one's gender identity is irreparable harm.

Finally, the balance of equities and public interest warrants issuing a TRO. As discussed above, Plaintiffs face severe personal and professional harm absent a preliminary injunction. In contrast, Defendants have not demonstrated any compelling justification whatsoever for immediate implementation of the Orders, particularly since transgender persons have been openly serving in the military for a number of years. *Talbott*, 2025 WL 842332, at *37 (explaining that defendants were unable to provide any testimony regarding the burden an injunction would place on the military). Additionally, granting temporary relief is in the public interest, as it prevents unconstitutional discrimination and maintains the status quo of policies that have now governed the military for years. *Fulton v. City of Phila.*, 922 F.3d 140, 165 (3d Cir. 2019) (deterring

---

[6] While "[c]onstitutional harm[s are] not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction," *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989), the Third Circuit in *Hohe* set forth considerations for when an infringement on constitutional rights rises to the level of irreparable harm. Specifically, courts should look for: (1) "a chilling effect;" (2) "a purposeful unconstitutional government suppression of [constitutional rights];" and (3) a "direct penalization, as opposed to incidental inhibition, of [constitutional rights]." *Id.* (cleaned up) (citations omitted); While the Third Circuit has not articulated the precise metric for balancing these considerations, the Court has no trouble finding that all three exist in this case and warrant the finding of irreparable harm.

7

**App. 663**

discrimination is a "paramount public interest"); *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered."); *see also Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 109 (3d Cir. 2022) (finding strong public interest in upholding constitutional rights).

*        *        *        *        *

For the foregoing reasons,

**IT IS HEREBY** on this 24th day of <u>March</u>, 2025,

**ORDERED** that Plaintiffs' Motion, (ECF No. 4), is **GRANTED.** Defendants and all their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with them are hereby fully enjoined from initiating administrative separation proceedings against Plaintiffs based on their transgender status and are further enjoined from enforcing or implementing any aspect of the Orders as to Plaintiffs; and

**ORDERED** that Defendants **immediately** provide notice of this Court's Order to all relevant personnel to ensure full and complete compliance; and it is finally

**ORDERED** that this Temporary Restraining Order shall remain in effect for fourteen days from the date of this Order, unless otherwise extended by the Court.



**CHRISTINE P. O'HEARN**
**United States District Judge**

8

**App. 664**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING, et al.,

                        Plaintiffs,

      v.

UNITED STATES, et al.,

                       Defendants.

CASE NO. 25-cv-241-BHS

MEMORANDUM OPINION

The day he was inaugurated the second time, President Trump issued Executive Order 14148, revoking President Biden's Executive Order 14004, which permitted transgender individuals to serve openly. A week later, the President issued Executive Order 14183, explaining that the United States Armed Forces had been "recently afflicted with a radical gender ideology to appease activists unconcerned with the requirements of military service[.]" He proclaimed that, "consistent with longstanding Department of Defense policy," expressing a false "gender identity" conflicts with a soldier's commitment to an "honorable, truthful, and disciplined lifestyle, even in one's personal life," and that requiring others to recognize this "falsehood is not consistent with the

**App. 665**

1  humility and selflessness required of a service member." The President's "Military Ban"

2  required Secretary of Defense Hegseth to implement his policy—to root out and separate

3  every transgender service member—within 60 days.

4          Hegseth issued his Policy on February 26. It requires all military branches to begin

5  the identification and separation process on March 26.[1] Unlike President Trump's first-

6  term 2018 Mattis Policy on transgender service, and unlike President Biden's 2021

7  Austin Policy, the 2025 Hegseth Policy does not rely on any recent study, evaluation, or

8  evidence. Indeed, consistent with the Military Ban, and unlike the Mattis Policy, the

9  Hegseth Policy imposes a *de facto* blanket prohibition on transgender service. It does so

10  without considering the military's experience under the Austin Policy, whether positive,

11  neutral, or negative.[2] It purports to rely on the outdated Mattis Policy, but goes further

12  than that policy in seeking to eradicate transgender service. An active-duty transgender

13  service member can obtain a waiver and continue to serve if and only if there is "a

14  compelling governmental interest" in their retention *and* they have not had symptoms of

15  gender dysphoria for 36 months, have never attempted to transition, and are willing to

16  serve in their birth sex. The government does not contend that any of the active-duty

17

18

---

19          [1] There is unrebutted record evidence that this process is already underway.

20          [2] Plaintiffs submit evidence that their service and that of other transgender service
   members has not had the damaging effects that purportedly support the Military Ban. The
   government has in turn provided no evidence supporting the conclusion that military readiness,
21  unit cohesion, lethality, or any of the other touchstone phrases long used to exclude various
   groups from service have in fact been adversely impacted by open transgender service under the
22  Austin Policy. The Court can only find that there is none.

ORDER - 2

**App. 666**

1  plaintiffs (or any other transgender service member) could meet this strict standard.

2  Plaintiffs contend that that is the goal: to erase them from the military.

3      Each of the seven active-duty service member plaintiffs is transgender. Each has

4  been serving openly for almost four years, and some for much longer than that.

5  Commander Emily "Hawking" Shilling, for example, transitioned within the Navy

6  beginning in the fall of 2021 in reliance on the Austin Policy. She has been a Naval

7  Aviator for 19 years. She has flown more than 60 combat missions, including in Iraq and

8  Afghanistan, and was a Navy test pilot. She has 1750 flight hours in high performance

9  Navy jets—including the F/A-18 Super Hornet—and has earned three air medals. She

10  asserts without contradiction that the Navy already spent $20 million training her. There

11  is no claim and no evidence that she is now, or ever was, a detriment to her unit's

12  cohesion, or to the military's lethality or readiness, or that she is mentally or physically

13  unable to continue her service. There is no claim and no evidence that Shilling herself is

14  dishonest or selfish, or that she lacks humility or integrity. Yet absent an injunction, she

15  will be promptly discharged solely because she is transgender.

16      Plaintiffs ask the Court[3] to preliminarily enjoin implementation of the Military

17  Ban and the ensuing Hegseth Policy as a violation of their constitutional rights, and of

18  _____

19      [3] This suit is one of three challenging the Military Ban and the Hegseth Policy. Like the parties, the Court has been following the parallel proceeding in *Talbott v. United States*, No.

20  C25-00240-ACR, 2025 WL 842332 (D.D.C. Mar. 18, 2025). It has read the briefing, the transcripts, and Judge Reyes's thorough memorandum opinion preliminarily enjoining implementation and enforcement of the Military Ban and the Hegseth Policy. The active-duty

21  plaintiffs in each case are separate (though similarly situated) individuals, but other than plaintiffs' declarations, the rest of the evidence appears to be essentially identical. Judge Reyes's

22  factual findings are consistent with that evidence, and the Court similarly finds as facts for

**App. 667**

1  fundamental, established principles of fairness, pending a trial on the merits. They assert

2  Equal Protection, First Amendment, Procedural Due Process, and equitable estoppel

3  claims. They argue that under clear, binding precedent, they are likely to succeed on the

4  merits of each of these claims, and that in the absence of injunctive relief, they face

5  imminent, irreparable harm. They argue there is no creditable claim that the balance of

6  equities or the public interest supports allowing the Military Ban to immediately

7  terminate their honorable service to this country.

8       The government responds primarily that the Court must defer to the military's

9  (current) judgment; if it says that unit cohesion and readiness, etc., requires the exclusion

10  of—as Judge Reyes aptly phrases it, "fill in the blank"—from military service, then the

11  Court has no authority or ability to question it. Thus, it argues, plaintiffs are unlikely to

12  succeed on the merits of any of their claims. It also argues that plaintiffs face no threat of

13  irreparable injury because, in the military context, a plaintiff must make a much higher

14  showing of such harm than is required in the ordinary case.

15       It argues that any service member is free to administratively challenge their

16  impending discharge and thus their failure to exhaust such remedies is itself a ripeness

17  bar to their claims. It contends that equity and the public interest are served by exclusion

18  of transgender service members because the Commander in Chief has "determined" that,

19

20     purposes of this motion the unrefuted factual assertions in the record. A similar suit was filed in
the District of New Jersey on March 17. *Ireland v. Hegseth et al.*, No. 25-01918-CPO (D.N.J.).

21

22

ORDER - 4

**App. 668**

1  as a class, they lack honesty, humility, and integrity,[4] and there is a strong public interest

2  in deferring to his judgment on which military policies would best protect the nation.

3      The government's arguments are not persuasive, and it is not an especially close

4  question on this record. The government's unrelenting reliance on deference to military

5  judgment is unjustified in the absence of any evidence supporting "the military's" new

6  judgment reflected in the Military Ban—in its equally considered and unquestionable

7  judgment, that very same military had only the week before permitted active-duty

8  plaintiffs (and some thousands of others) to serve openly. Any evidence that such service

9  over the past four years harmed any of the military's inarguably critical aims would be

10  front and center. But there is none.

11      Plaintiffs' motion for a preliminary injunction is **GRANTED**. The Court's

12  reasoning is outlined below.[5] To be clear: the government's implementation of the

13  Military Ban and the Hegseth Policy, and any other attempt to identify and separate

14  transgender service members for being transgender is **PRELIMINARILY ENJOINED**,

15  **NATIONALLY**, pending a trial on the merits. A written Order accompanies this

16  Memorandum Opinion.

17

18      [4] This unsupported language originated in the Military Ban. It is repeated in the Hegseth
19  Policy, and again in the government's opposition to plaintiffs' motion. Dkt. 76 at 41–42. At oral
    argument, the government's attorney confirmed there was "no" support in the record that
20  transgender service members lack honesty, humility, or integrity.

21      [5] This Court must make findings of fact and conclusions of law when adjudicating an
    interlocutory injunction. Fed. R. Civ. P. 52(a)(2). The Court makes such preliminary findings
    and conclusions via this memorandum opinion. *See FTC v. H. N. Singer, Inc.*, 668 F.2d 1107,
22  1109 (9th Cir. 1982) ("explicit findings of fact were not necessary").

**App. 669**

# I.    BACKGROUND

## A.    History of Department of Defense Transgender Policy

### 1.    Secretary Carter's Policy: 2015 to 2017

Historically, the Department of Defense did not permit transgender personnel to serve openly in the military. In 2015, then-Secretary of Defense Ashton Carter convened a working group of military and medical experts to review this policy. Bourcicot Decl., Dkt. 32 at 4–5.

The Department of Defense also commissioned the RAND National Defense Research Institute to study the implications of allowing transgender service members to serve openly. RAND Report, Dkt. 32-1 at 4, 10. After extensive research into potential healthcare costs, military readiness, and deployability, RAND found that "a change in policy [would] likely have a marginal impact on healthcare costs and the readiness of the force." *Id.* at 90.

Carter's working group considered the RAND report, as well as expert opinions of senior uniformed and civilian officers and Surgeon Generals from each military department. Dkt. 32 at 5. It concluded that "transgender individuals who meet the standards for military service should be permitted to serve." *Id.*

In 2016, Carter directed the military and all defense organizations to allow transgender service members to serve openly. Carter Policy, Dkt. 33-1 at 2–3. The Policy stated that "open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty,

**App. 670**

1    physical fitness, uniform and grooming, deployability, and retention, is consistent with

2    military readiness and strength through diversity." *Id.* at 3.

3        The Carter Policy modified the military's medical accession and retention

4    standards. *Id.* at 5. Transgender individuals with a history of gender dysphoria and related

5    medical or surgical treatment would not be medically disqualified so long as they had

6    been stable for 18 months. *Id.* at 5–6. Transgender service members could no longer be

7    separated or discharged solely based on their transgender status. *Id.* The Carter Policy

8    also established gender transition processes for service members who sought to transition

9    while serving. *Id.* at 6; 2016 DoD Implementation Handbook, Dkt. 31-5 at 15–16.

10    **2.    Secretary Mattis's Policy: 2017 to 2021**

11        In 2017, President Trump "tweeted" that transgender individuals would no longer

12    be allowed to "serve in any capacity in the U.S. Military." Dkt. 31-7. President Trump

13    and then-Secretary of Defense James Mattis issued a memorandum announcing the

14    military's policy would be revised accordingly. Dkt. 31-8.

15        Several challenges to President Trump's 2017 policy ensued, including, in this

16    District,[6] *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash.

17    2017). Judge Pechman preliminarily enjoined enforcement of the 2017 memorandum,

18    concluding the plaintiffs were likely to succeed on the merits of their Equal Protection,

19    Substantive Due Process, and First Amendment claims. *Id.* at *10.

20

21    _____

    [6] Three other district courts preliminary enjoined President Trump's 2017 policy: *Doe1 v. Trump*, 275 F.Supp.3d 167 (D.D.C. 2017); *Stockman v. Trump*, 331 F.Supp.3d 990 (C.D. Cal.

22    2017); *Stone v. Trump*, 280 F.Supp.3d 747 (D. Md. 2017).

**App. 671**

1    Meanwhile, Mattis established an expert panel to review the impact of transgender

2  service members on military readiness and lethality, citing "significant shortcomings" in

3  the RAND report. Mattis Policy, Dkt. 31-10 at 3, 22. The panel met 13 times over 90

4  days. *Id.* The Department of Defense memorialized the panel's recommendations in a

5  2018 report that later became the Mattis Policy. *Id.* at 1; Dkt. 76 at 14.

6    The Mattis Policy promulgated new limitations on transgender service in the

7  military. Transgender individuals with a history of gender dysphoria were disqualified

8  unless they were clinically stable for 36 months, willing to serve in their birth sex, and

9  had not gender transitioned. Mattis Policy, Dkt. 31-10 at 10. Transgender service

10  members diagnosed with gender dysphoria after joining the military were permitted to

11  stay in service if they adhered to their birth sex. *Id.* The Mattis Policy exempted

12  transgender service members diagnosed with gender dysphoria by military medical

13  providers while the Carter Policy was in effect, recognizing their reliance on it: "The

14  reasonable expectation of these Service members that the Department would honor their

15  service on the terms that then existed cannot be dismissed . . . the Department believes

16  that its commitment to these Service members, including the substantial investment it has

17  made in them, outweigh the risks identified in the [Policy]." *Id.* at 48. Existing

18  transgender service members could "continue to receive all medically necessary care, to

19  change their gender marker in the Defense Enrollment Eligibility Reporting System

20  (DEERS), and to serve in their preferred gender, even after the new policy

21  commence[d]." *Id.* at 10–11.

22

ORDER - 8

**App. 672**

1    The *Karnoski* defendants moved to dissolve the preliminary injunction based on

2    the Mattis Policy, which the district court denied. *Karnoski v. Trump*, No. C17-1297-

3    MJP, 2018 WL 1784464 (W.D. Wash. 2018). The Ninth Circuit vacated and remanded

4    the decision, concluding that the Mattis Policy constituted a significant change from the

5    2017 memorandum that could warrant dissolution of the preliminary injunction. 926 F.3d

6    1180, 1199 (9th Cir. 2019). It directed the district court to give "appropriate military

7    deference" to the Mattis Policy, which "appears to have been the product of independent

8    military judgment." *Id.* at 1202. The parties ultimately stipulated to vacating the

9    preliminary injunction. No. C17-1297-MJP, Dkt. 350.

10    **3.    Secretary Austin's Policy: 2021 to 2025**

11    In 2021, President Biden issued an executive order that, once again, instructed the

12    Department of Defense to allow transgender individuals to serve openly in the military.

13    Dkt. 31-11. Under then-Secretary of Defense Lloyd Austin, the Department of Defense

14    reverted to the medical standards for accession and retention of transgender individuals

15    established under the Carter Policy. DoD Instruction 1300.28 on In-Service Transition,

16    Dkt. 33-4; DoD Instruction 6130.03 on Accession and Retention Medical Standards,

17    Dkts. 76-3, 73-5.

18    Several former military officials under President Biden testify about their positive

19    observations and experiences under the Austin Policy.

20    Former Navy Secretary, Carlos Del Toro, testifies that in his review of "thousands

21    of disciplinary cases and personnel matters at the highest levels of the Department," he

22    "cannot recollect a single disciplinary case or performance issue related directly to a

**App. 673**

1   service member's transgender status." Del Toro Decl., Dkt. 35 at 3. His experience

2   indicates that "being transgender does not inherently affect a service member's ability to

3   meet [military] standards or to deploy worldwide." *Id.* Rather, he observed "that allowing

4   transgender individuals to serve strengthens unit cohesion by fostering honesty and

5   mutual trust," and helping service members "focus more fully on their duties and build

6   stronger bonds" with their peers. *Id.* at 4.

7       Former Assistant Air Force Secretary for Manpower and Reserve Affairs, Alex

8   Wagner, testifies he "was not aware of any negative impact that service by transgender

9   Airmen or Guardians had on the Air Force, the Space Force, or our overall military

10  readiness." Wagner Decl., Dkt. 33 at 8. Like Del Toro, Wagner observed that the "Austin

11  policy foster[ed] openness and trust among team members," resulting in "stronger unit

12  cohesion." *Id.* at 8. He did not observe any negative impact on military readiness. *Id.* at 9.

13      Former Acting Assistant Secretary of the Army for Manpower and Reserve

14  Affairs and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve

15  Affairs, Yvette Bourcicot, was responsible for reviewing gender transition requests from

16  transgender Army personnel. Bourcicot Decl., Dkt. 32 at 7. She testifies she received

17  "only or two such requests per quarter," and "every requesting service member met the

18  necessary standards for serving." *Id.* She also observed "no negative impact from

19  permitting transgender service in the Army or on our military capabilities." *Id.* at 8. In her

20  role, Bourcicot would have been "responsible for resolving" issues relating to the Austin

21  Policy. *Id.* at 9. She did not receive any complaints about transgender service negatively

22  affecting unit readiness and cohesion. *Id.* She notes that while some transgender service

**App. 674**

1  members were temporarily undeployable due to medical procedures, this was "no

2  different than the myriad medical reasons that any service member might become

3  temporarily non-deployable." *Id.*

4       Former Under Secretaries of Defense for Personnel and Readiness—Gilbert

5  Cisneros, Jr., who served from August 24, 2021 to September 8, 2023, and Ashish

6  Vazirani, who served from September 8, 2023 to January 20, 2025—were tasked with

7  implementing and administering the Austin Policy during virtually all of the Biden

8  Administration. Cisneros Decl., Dkt. 36; Vazirani Decl., Dkt. 34. Cisneros testifies that in

9  his role, he would have been apprised of any "complaints or problems about transgender

10  service members." Cisneros Decl., Dkt. 36 at 6. He "never received or heard a single

11  complaint relating to transgender service members." *Id.* Vazirani observed that the Austin

12  Policy enabled the military to invest in highly trained service members and did not

13  require "any significant changes to the DoD health care system." Vazirani Decl., Dkt. 34

14  at 3–4. He too did not observe any negative effects on unit readiness and saw

15  improvements in unit cohesion. *Id.* at 5–6.

16       The government's only rebuttal to the declarations of these senior Department of

17  Defense officials is that of Timothy Dill, the current Assistant Secretary of Defense for

18  Manpower and Reserve Affairs. Dill Decl., Dkt. 76-6. Dill challenges Cisneros and

19  Vazirani's declarations.[7] He asserts the role of Under Secretary of Defense for Personnel

20  and Readiness is "far removed . . . from the individual command level" and that it

21  _____

22      [7] Dill does not refute Bourcicot's testimony that she was directly responsible for resolving issues that would have arisen out of the Austin Policy.

ORDER - 11

**App. 675**

1  involves "large oversight responsibilities" that make it "highly unusual for individualized

2  service member complaints regarding unit cohesion, military readiness, medical

3  readiness, deployability, and lethality to reach" the Under Secretary without "a data call

4  or a study." *Id.* at 3. He testifies that, to his knowledge, "neither Mr. Cisneros nor Mr.

5  Vazirani ever directed a study" on the effects of open transgender service on the military.

6  *Id.*

7      Cisneros rebuts Dill's assertions. *Talbott*, No. C25-00240-ACR, Cisneros Supp.

8  Decl., Dkt. 53-1.[8] He asserts that it was his "responsibility to be aware of unit cohesion,

9  military readiness, medical readiness, deployability, and lethality. If a unit or service was

10  dealing with readiness issues due to the service by transgender service members, that

11  would have been brought to my attention." *Id.* He testifies he is "aware of no study that

12  has identified a negative impact on unit cohesion, military readiness, medical readiness,

13  deployability, or lethality due to service by transgender individuals or individuals

14  diagnosed with gender dysphoria since transgender persons have been permitted to serve

15  in the last 4 years under the Austin Policy." *Id.*

16      **4.    Secretary Hegseth's Policy: 2025**

17      In January 2025, President Trump issued Executive Order No. 14168, "Defending

18  Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal

19  Government," and Executive Order No. 14183, "Prioritizing Military Excellence and

20  Readiness." Dkts. 31-1, 31-13.

21  _____

22      [8] Because Cisneros's supplemental declaration has not been filed here, the Court takes
judicial notice of the filing in *Talbott*. Fed. R. 201(b)(2).

ORDER - 12

**App. 676**

1      The President's Military Ban declares:

2
- "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service";

3

4
- "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"; and

5

6
- the government's policy to "establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity . . . is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" as well as "shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex."

7

8  Dkt. 31-1. It directs the Department of Defense to update its accession and retention

9  policies accordingly. *Id.* The order relies on the Gender Ideology Executive Order to

10  define "sex" as "an individual's immutable biological classification as either male or

11  female," and "gender identity" as "a fully internal and subjective sense of self,

12  disconnected from biological reality and sex and existing on an infinite continuum, that

13  does not provide a meaningful basis for identification and cannot be recognized as a

14  replacement for sex." *Id.*; Gender Ideology Executive Order, Dkt. 31-13.

15      President Trump also issued a corresponding "Fact Sheet" declaring the Biden

16  Administration "allowed gender insanity to pervade our military organizations," by "not

17  only permitting the military to increase the number of individuals not physically or

18  mentally prepared to serve, but also ordering the Department of Defense to pay for

19  servicemembers' transition surgeries . . . at a cost of millions of dollars to the American

20

21

22

ORDER - 13

**App. 677**

1  taxpayer." Fact Sheet: President Donald J. Trump Ensures Military Excellence and

2  Readiness, The White House (Jan. 27, 2025).[9]

3       Promptly resolving to "remove all traces of gender ideology," the Department of

4  Defense paused all new "accessions for individuals with a history of gender dysphoria"

5  and "all . . . medical procedures associated with affirming or facilitating a gender

6  transition for Service members." Jan. 31 DoD Memorandum, Dkt. 58-2; Feb. 7 DoD

7  Memorandum, Dkt. 58-4. The Department of Defense posted on its official Rapid

8  Response X account that "Transgender troops are disqualified from service without an

9  exemption." Amended Complaint, Dkt. 59 at 30. Hegseth reposted the announcement on

10  his official X account.[10]

11       On February 26, 2025, Dill directed Under Secretary Darin Selnick to implement

12  the Military Ban. 2025 Action Memo, Dkt. 71-1. He explained that the new policy "was

13  informed through consideration of, among other things, the President and Secretary's

14  written direction, existing and prior DoD policy, and prior DoD studies and reviews of

15  service by individuals with gender dysphoria, including a review of medical literature

16  regarding the medical risks associated with presence and treatment of gender dysphoria."

17  *Id.* at 3.

18       The Department of Defense responded with guidance implementing the Military

19  Ban. The guidance declared that effective March 26, 2025, the policy will be that:

20  

21       [9] The Court takes judicial notice of the Fact Sheet. Fed. R. Evid. 201(b)(2).

22       [10] The Court takes judicial notice of these social media posts. *See* @DODResponse, X
(Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost). Fed. R. Evid. 201(b)(2).

**App. 678**

- Individuals who have a history or diagnosis of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

- Individuals with a history of hormone therapy or surgical treatment for gender dysphoria or sex transition are disqualified from military service.

- Current service members who have a history or diagnosis of, or exhibit symptoms consistent with, gender dysphoria will be separated from military service.

- Current service members with a history of hormone therapy or surgical treatment for gender dysphoria or sex transition are disqualified from military service.

- Pronoun usage and salutations must reflect service members' biological sex.

- No funds from the Department of Defense will be used to pay for any medical procedures and treatments associated with gender dysphoria.

Feb. 26 DoD Guidance, Dkt. 58-7.

The Department of Defense may waive these requirements on a "case-by-case basis" if there is a "compelling Government interest . . . that directly supports warfighting capabilities." *Id.* at 6. Current service members disqualified under this policy may only be eligible for a waiver if there is a "compelling Government interest in retaining [them]," they have been clinically stable for 36 months, never attempted to transition to any other sex, and are willing to adhere to their birth sex. *Id.* at 8. Service members ineligible for a waiver could choose to voluntarily separate by March 26. *Id.* at 9. Otherwise, they will be involuntarily separated and "if desired . . . , afforded an administrative separation board." *Id.* The Department of Defense intends to update its medical standards for accession and retention accordingly. *Id.* at 1–2. Service members who involuntarily separate may be

ORDER - 15

**App. 679**

1  eligible for "involuntary separation pay," though the "Military Departments may recoup

2  any bonuses received" before February 26. *Id.* at 9.

3        A February 26 "Action Memo" on "Implementing Guidance for Prioritizing

4  Military Excellence and Readiness Executive Order (EO)" accompanied the Hegseth

5  Policy. Dkt. 71-1. It asserts the Hegseth Policy was "informed through consideration of,

6  among other things, the President and Secretary's written direction, existing and prior

7  DoD policy, and prior DoD studies and reviews of service by individuals with gender

8  dysphoria." *Id.* at 3. It cited:

9        • the Mattis Policy;

10        • the Department of Defense's 2021 Psychological Health Center of
11          Excellence and the Accession Medical Standards Analysis and Research
           Activity (AMSARA), which estimated higher rates of disability evaluation
12          among transgender service members and "found that nearly 40% of service
           members with gender dysphoria in an observed cohort were non-deployable
13          over a 24 month period";

14        • the Assistant Secretary of Defense for Health Affairs 2025 medical
           literature review, which found:
15            o  "55% of transgender individuals experienced suicidal ideation and
               29% attempted suicide in their lifetime";
16            o  "the suicide attempt rate is estimated to be 13 times higher among
               transgender individuals compared to their cisgender counterparts"; 
               and
17            o  "transgender individuals are approximately twice as likely to receive
               a psychiatric diagnosis compared to cisgender individuals," and that
18              the "strength of evidence on transgender mental health and gender-
               affirming care is low to moderate";

19        • the Assistant Secretary of Defense for Health Affairs review of 2015 to
20          2024 cost data related to the healthcare needs of transgender service
           members, which found "DoD spent $52,084,407 providing care to active
21          duty Service members to treat gender dysphoria, including $15,233,158 for

22

ORDER - 16

**App. 680**

1              psychotherapy; $3,135,593 for hormone therapy, and $14,324,739 for
               surgical care."

2  *Id.* at 3–4 (citing Mattis Policy, Dkt. 71-2; AMSARA Report, Dkt. 71-3; literature

3  review, Dkt. 71-4).

4       The Action Memo does not accurately summarize the AMSARA report's findings

5  and limitations. *See Talbott*, 2025 WL 842332, at *12–13. AMSARA studied the

6  psychological stability and deployability of individuals with a history or diagnosis of

7  gender dysphoria by comparing available accession records of transgender service

8  members with those of a cohort of other service members with depression. Dkt. 71-3 at

9  1–2, 8. It confirms that transgender service members were subject to disability

10  *evaluations* far more than all other service members—likely because "members of the

11  transgender community are encouraged (and in many cases required)" to be evaluated

12  more frequently than their cisgender peers. *Id.* at 8, 24 (rate of disability evaluation for

13  transgender service members was 12%, compared to 1–2% among all service members).

14       One of AMSARA's "key findings" is that rates of transgender service members

15  *experiencing* disability conditions—psychiatric, musculoskeletal, and neurological—

16  were "comparable to those of all service members evaluated for disability." *Id.* at 24.

17  AMSARA acknowledges that the study has several limitations, including that "data w[as]

18  not available from non-transgender service members that could serve as a basis for

19  comparison to indicate if supposed non-deployability rates amongst the transgender

20  cohorts differed from the overall non-deployability rate." *Id.* at 11–12.

21

22

**App. 681**

1    The 2025 medical literature review is not specific to military data. Dkt. 71-4.

2    Instead, it compiles 34 prior national and international studies about the "level of

3    evidence for gender-affirming treatments for gender dysphoria." *Id.* at 1. The literature

4    review highlights that "suicide risk among transgender . . . individuals is mitigated by

5    access to gender-affirming care strong social and family support, legal and social

6    recognition, affirming mental health services, community connectedness, and protections

7    against discrimination." *Id.* at 3–4.

8    Judge Reyes asked the government to submit additional data on the Department's

9    spending and budgets. *Talbott*, No. C25-00240-ACR, Dkts. 66, 66-1.[11] The government

10   responded that in fiscal year 2024, the Department of Defense was appropriated $918.1

11   billion, stipulating that "the amount cited in the Action Memo"— $52,084,407 spent in

12   treating gender dysphoria—is "but a small fraction of DoD's overall budget." *Id.*, Dkt. 66

13   at 2. That amounts to approximately $5.2 million per year on average spent on gender

14   dysphoria treatment between 2015 and 2024. If the Department of Defense spent $5.2

15   million on treating gender dysphoria in 2024, that was about 0.00057% of its 2024

16   budget. It provided gender-affirming care to 1,892 active-duty service members—less

17   than 0.02% of the 9.5 million beneficiaries covered under the military's TRICARE health

18

19

20

21   _____

22   [11] The Court takes judicial notice of the government's filing, Dkt. 66, as to the
Department of Defense's budgets and costs in *Talbott*. Fed. R. Evid. 201(b)(2).

**App. 682**

1  system, assuming coverage under TRICARE was similar from 2016 to 2021 to that in

2  2024. [12] *Id.*, Dkt. 66-1 at 1–2.

3      Three days after the *Talbott* preliminary injunction and hours before it was to go

4  into effect, the Department of Defense issued new "guidance to assist the Military

5  Departments in identifying" service members who will be affected by the Military Ban.

6  Dkt. 92-1. It clarifies that "[t]he phrase 'exhibit symptoms consistent with gender

7  dysphoria' refers to the diagnostic criteria outlined in the [DSM-5]" and that "[t]his

8  language applies only to individuals who exhibit such symptoms as would be sufficient to

9  constitute a diagnosis." *Id.* at 1 n.2. The military plans to identify such service members

10  "through reviewing medical records," as well as a "Period Health Assessment" in which

11  service members must "attest whether they have a current diagnosis or history of, or

12  exhibit symptoms consistent with, gender dysphoria." *Id.* at 2. Significantly, the March

13  21 Guidance also reiterates that service members must serve in their birth sex. *Id.* at 1.

14      Following its March 21 Guidance, the Department of Defense extended its

15  deadline for implementing the Hegseth Policy to March 28, 2025. Dkt. 94-1.

16  **B.    The Parties**

17      Plaintiffs include seven transgender service members who have served honorably

18  for years. Plaintiffs Commander Emily Shilling, Commander Blake Dremann, Lieutenant

19

20      [12] The Court (gratefully) adopts Judge Reyes's math on this subject: "From January 1,
21  2016, to May 14, 2021, the military provided gender-affirming care to 1,892 active duty
   servicemembers. Dkt. 66-1 at 2. That number represents about two hundredths of one percent
   (0.02%) of the 9.5 million beneficiaries TRICARE covered in 2024. *See id.*" 2025 WL 842332,
22  at *14 n.19.

**App. 683**

1    Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class

2    Jane Doe, Sergeant First Class Sierra Moran, and Staff Sergeant Videl Leins are openly

3    transgender active-duty service members. Amended Complaint, Dkt. 59. Throughout

4    their 115 years of collective military service, they have been awarded over 70 medals for

5    their honorable service and distinctive performance—in many instances after coming out

6    as transgender. *Id.* at 10, 12, 17, 18; Shilling Decl., Dkt. 24; Dremann Decl., Dkt. 25;

7    Morgan Decl., Dkt. 26; Doe Decl., Dkt. 27; Leins Decl., Dkt. 28; Schmid Decl., Dkt. 39;

8    Moran Decl., Dkt. 87.[13] Many have been deployed on significant domestic and overseas

9    missions after transitioning. *See, e.g.,* Doe Decl., Dkt. 27 at 3.

10       Each plaintiff testifies that serving openly has improved their focus on their

11    military careers, forged stronger relationships with their peers and commands, and

12    improved trust and transparency among their units, ultimately making each of them a

13    "stronger asset to the military." Dremann Decl., Dkt. 25 at 3; Plaintiffs' Decls., Dkts. 24–

14    28, 39, 87. Plaintiffs assert they would like to continue serving openly in the military in

15    the gender they transitioned to. *Id.* They fear the effect separation would have on their

16    careers, lives, and families. *Id.*

17       Accession plaintiff Matthew Medina is a 23-year-old transgender man who seeks

18    to join the Marine Corps. Medina Decl., Dkt. 29. Because the Marines "have an age cap

19

20

---

21      [13] All plaintiffs have submitted declarations, which the government does not contest. The Court provided the parties the opportunity to cross examine any witnesses, Dkt. 65, and the

22    government declined to do so. Dkt. 66. None of the parties requested to present live testimony.

ORDER - 20

**App. 684**

1  of 28-years-old," Medina fears he will not be eligible to enlist if he waits for the next

2  administration to change its policy on open service by transgender individuals. *Id.* at 3.

3        Plaintiff Gender Justice League is a human rights organization whose members

4  include openly transgender service members and transgender individuals seeking to join

5  the military. *Id.*

6        21 States and the Constitutional Accountability Center join as amici. Dkts. 53 and

7  42.

8        Defendants include the United States, the Army, the Navy, the Air Force,

9  Secretary of Defense Peter Hegseth, Secretary of the Army Daniel Driscoll, Acting

10  Secretary of the Navy Terence Emmert, and Acting Secretary of the Air Force Gary

11  Ashworth.

12  **C.**    **Challenges to the Military Ban and Hegseth Policy**

13        Plaintiffs assert that the Military Ban violates their constitutional Equal Protection,

14  First Amendment, and Procedural Due Process rights. Active-duty plaintiffs also assert

15  they reasonably and detrimentally relied on the Austin Policy that permitted them to

16  enlist and serve openly, and that equitable estoppel and fundamental fairness preclude the

17  government from this sort of "bait and switch." Dkt. 23 at 32.

18        They ask the Court to enjoin the military's impending implementation of the

19  Military Ban, arguing that they are likely to succeed on the merits of their claims, that the

20

21

22

ORDER - 21

**App. 685**

1   balance of hardships weighs in their favor, and that maintaining the status quo pending a

2   trial is equitable and in the public interest. *Id.* at 20.

3        The government argues that because its military judgment is entitled

4   "unquestionable" deference, plaintiffs are unlikely to succeed on the merits of their

5   claims. Dkt. 76. at 8, 10, 21, 34. It also contends plaintiffs' claims are unripe because

6   they have failed to exhaust the Military Ban's administrative remedies. *Id.* at 19.

7        Although the Department of Defense's guidance set March 26, 2025, as the

8   effective date of the Military Ban, plaintiffs testify that the Hegseth Policy has already

9   adversely affected them. They have had career opportunities rescinded, had flights

10   booked home from overseas deployment, and been placed on involuntary administrative

11   leave. *See, e.g.,* Moran Decl., Dkt. 87 at 2–3 (Sergeant First Class Moran's application

12   for Officer Candidate School was effectively denied due to the 2025 Military Ban);

13   Morgan Supp. Decl., Dkt. 88 at 1–2 (Lieutenant Commander Morgan's duty assignment

14   to the Armed Forces Radiobiology Research Institute, a significant career milestone that

15   increases chances of promotion to Navy Commander, was rescinded); Leins Supp. Decl.,

16   Dkt. 89 at 1–2 (Staff Sergeant Leins was placed on involuntary administrative absence

17   and told she must attend a course to prepare for civilian life); Morgan Supp. Decl., Dkt.

18   62 at 3–4 (Staff Sergeant Regan Morgan was removed from her forward operating base in

19   a combat zone and was booked on a flight back from overseas deployment).[14]

20        The government does not challenge this evidence.

21   ————————————

22   [14] Staff Sergeant Morgan is a member of the organizational plaintiff, Gender Justice
League. Dkt. 60 at 8.

ORDER - 22

**App. 686**

## II.  DISCUSSION

**A.     Plaintiffs' claims are ripe.**

The government argues as a threshold matter that active-duty plaintiffs' claims are not ripe because they have failed to exhaust the Hegseth Policy's administrative remedies: "All enlisted Service members who are involuntarily separated   . . . will, if desired by the Service member, be afforded an administrative separation board." Dkt. 76 at 19 (citing Feb. 26 DoD Guidance, Dkt. 58-7 at 9).

It asks the Court to accept *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002) as authority for the proposition that "an internal military decision is unreviewable unless the plaintiff alleges . . . exhaustion of available intraservice remedies." Dkt. 76 at 19. A closer look, however, reveals that *Wenger* itself expressly obviates the need for exhaustion in this case.

*Wenger* indeed provides, "'An internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies.'" 282 F.3d at 1072 (quoting *Khalsa v. Weinberger*, 779 F.2d 1393, 1398 (9th Cir. 1985)). However, it also makes clear that exhaustion is not required if "administrative appeal would be futile; or . . . if substantial constitutional questions are raised." *Id.* (citing *Muhammad v. Sec'y of Army*, 770 F.2d 1494, 1495 (9th Cir. 1985)). Both are true here.

Active-duty plaintiffs' constitutional assertions about the Hegseth Policy are substantial. They also demonstrate that any internal remedies would be futile. Dkt. 23 at 32–33 (citing *Watkins v. United States Army*, 875 F.2d 699, 705 (9th Cir. 1989)); *see also*

**App. 687**

1   *Se. Alaska Conservation Council v. Watson*, 687 F.2d 1305, 1309 (9th Cir. 1983)

2   (exhaustion not required "where pursuit of administrative remedies would be a futile

3   gesture"). The Hegseth Policy provides that transgender service members will only be

4   exempt from disqualification if, among other requirements, they have "never attempted to

5   transition" *and* are willing to serve in their birth sex. Feb. 26 DoD Guidance, Dkt. 58-7 at

6   8. All active-duty plaintiffs have taken steps to transition and seek to continue serving

7   openly. As the Policy stands, any attempt to seek internal review necessarily would be

8   fruitless, and thus futile.

9       The government's opposition falls flat at the outset. Plaintiffs' claims are ripe.

10   **B.**   **Preliminary Injunction Standard.**

11       A party seeking a preliminary injunction "must establish that it is likely to succeed

12   on the merits, that it is likely to suffer irreparable harm in the absence of preliminary

13   relief, that the balance of equities tips in its favor, and that an injunction is in the public

14   interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two

15   factors merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

16   1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary

17   remedy, . . . courts must balance the competing claims of injury and consider the effect of

18   granting or withholding the requested relief, paying particular regard to the public

19   consequences." *Winter*, 555 U.S. at 24.

20       The Ninth Circuit recently reiterated that even after *Winter*, its alternate "serious

21   questions" preliminary injunction standard remains viable. *Flathead-Lolo-Bitterroot*

22   *Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (citing *All. for the*

**App. 688**

1   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) ("[T]he 'serious questions'

2   version of the sliding scale test for preliminary injunctions remains viable after

3   [*Winter*].")).

4         Under this test, a party is entitled to a preliminary injunction if it demonstrates (1)

5   serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance

6   of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public

7   interest. *Id.* at 1190 (citing *Cottrell*, 632 F.3d at 1135). As to the first factor, the serious

8   questions standard is "a lesser showing than likelihood of success on the merits." *Id.*

9   (citing *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

10        "Serious questions" are ones that "cannot be resolved one way or the other at the

11   hearing on the injunction because they require more deliberative investigation." *Id.*

12   (citation omitted). They "need not promise a certainty of success, nor even present a

13   probability of success, but must involve a fair chance of success on the merits." *Id.* at

14   1192 (cleaned up).

15        A preliminary injunction "prohibits a party from taking action" and preserves the

16   *status quo ante litem*, which refers not simply to any situation before the lawsuit was

17   filed, but instead to the "last uncontested status which preceded the pending controversy."

18   *Id*. at 1191.

19        The parties here seek a preliminary injunction as to all active-duty and accession

20   plaintiffs. Medina and the other accession plaintiffs would still be subject to all other

21

22

ORDER - 25

**App. 689**

1 standards for accession into the Armed Forces.[15] They instead seek to enjoin the

2 Department of Defense from disqualifying them based on their transgender identity—the

3 status quo.

4     Here, that status quo is before January 20, 2025—before President Trump's first

5 day in office, when he issued Executive Order No. 14148. The last uncontested status

6 preceding this controversy is the Austin Policy, that, for almost four years, had allowed

7 active-duty transgender plaintiffs to serve openly.

8 **C.    Likelihood of Success on the Merits.**

9     **1.    Plaintiffs are Likely to Succeed on the Merits of their Equal Protection Claim.**

10     Plaintiffs' primary claim is that the Military Ban, and the Hegseth Policy and other

11 guidance implementing it, violate their Fifth Amendment constitutional right to Equal

12 Protection under the law. They argue that the government is not free to disregard this

13 protection even when it acts in the area of military affairs; there is no "different equal

14 protection test" for the "military context." Dkt. 23 at 20 (citing *Rostker v. Goldberg*, 453

15 U.S. 57, 67 (1981)). They argue that the February 26 Guidance does not warrant any

16 deference because it is not the product of a meaningful exercise of independent military

17 judgment. Dkt. 60 at 9.

18     They argue that the Hegseth Policy is subject to, and cannot survive, heightened

19 scrutiny because it facially classifies and purposefully discriminates based on their

20 transgender status. *Id.* at 20–21 (citing *United States v. Virginia*, 518 U.S. 515, 555

21

22     [15] Oral Argument Transcript, Dkt. 102 at 49.

**App. 690**

1  (1996) (heightened scrutiny applied to military college co-education); *Karnoski*, 926 F.3d

2  at 1201 (heightened scrutiny applied to the previous transgender military service ban);

3  and *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (heightened scrutiny

4  applied to military's former "Don't Ask, Don't Tell" policy on an as applied basis)).[16]

5      They also argue that because the Hegseth Policy classifies based on sex, it is also

6  subject to heightened scrutiny, and that it cannot in any event survive even rational basis

7  review. *Virginia*, 518 U.S. at 555.

8      Finally, plaintiffs argue that the Military Ban "drips with contempt" and that it,

9  the Hegseth Policy, and related federal policy and directives "reflect and are based on

10  impermissible animus towards transgender people, which renders them invalid as a

11  whole" under any standard of review. Dkt. 59 at 33; Dkt. 23 at 21; Dkt. 82 at 9.

12      The government denies that the Hegseth Policy discriminates on either transgender

13  or sex status. Dkt. 76 at 15. Instead, it insists it discriminates on gender dysphoria,

14  triggering only rational basis review. But its primary argument, here and elsewhere, is

15  that the Court is ill-equipped to second guess the military's judgment, and if there is a

16  rational basis for its judgment, it is not subject to challenge. *Id*. at 19. It insists that its

17  judgment is entitled to deference. *Id*. at 14. It does not strenuously dispute that the

18

19

---

20      [16] The Constitutional Accountability Center's amicus brief emphasizes that the military
21  has long relied on concerns about "unit cohesion" and "military effectiveness" to bar racial
   integration, gay and lesbian service members, and women in combat. Dkt. 42 at 8–9. It asserts
   "military experts agree that ending those discriminatory policies and ensuring diversity in the
22  military's ranks actually strengthened the military." *Id.* at 9.

ORDER - 27

**App. 691**

1  Military Ban was motivated by animus towards transgender people, but does contend that

2  even so, there are legitimate reasons for it. *Id.* at 34.

3      The Fifth Amendment provides that "[n]o person shall . . . be deprived of life,

4  liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The Due

5  Process Clause of the Fifth Amendment contains an equal protection component

6  prohibiting the United States from invidiously discriminating between individuals or

7  groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). "The Constitution's guarantee

8  of equality 'must at the very least mean that a bare [governmental] desire to harm a

9  politically unpopular group cannot' justify disparate treatment of that group." *United*

10 *States v. Windsor*, 570 U.S. 744, 770 (2013) (quoting *Dep't of Agric. v. Moreno*, 413 U.S.

11 528, 534–35 (1973)).

12     The first step in evaluating an Equal Protection claim is to "determine what level

13 of scrutiny applies to a classification under a law or policy, and to then decide whether

14 the policy at issue survives that level of scrutiny." *Hecox v. Little*, 104 F.4th 1061, 1073

15 (9th Cir. 2024). The government urges that courts owe deference to its judgment in

16 evaluating Equal Protection claims in the military context. When a policy results from the

17 "professional judgment of military authorities concerning the relative importance of a

18 particular military interest," courts generally defer to the military's determination.

19 *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986); *see also Rostker*, 453 U.S. at 67-

20 72 (1981) ("judicial deference ... is at its apogee when legislative action under the

21 congressional authority to raise and support armies and make rules and regulations for

22 their governance is challenged."). But "deference does not mean abdication" and the

**App. 692**

1    court need not defer to unreasonable uses or *omissions in evidence*. *Id.* at 68–70; *see also*

2    *Witt*, 527 F.3d at 821.

3    Although they are conceptually distinct, scrutiny and deference are "intertwined"

4    where, as here, the Court considers "the propriety of a military decision concerning

5    transgender persons." *Karnoski*, 926 F.3d at 1199.

6    **a.    The Military Ban and Hegseth Policy trigger intermediate scrutiny**

7    **(i)    The Hegseth Policy discriminates against transgender status**

8    The government argues that the Hegseth Policy does not discriminate against

9    transgender people, but rather only against people who have or have had gender

10    dysphoria. Dkt. 76 at 15. Their efforts are unavailing. Unlike the Mattis Policy, the text of

11    Hegseth Policy scrupulously avoids using the word "transgender"—the word does not

12    appear in the Hegseth Policy. But common sense and binding authority defeat the

13    government's claim that it does not discriminate against transgender people.

14    The Hegseth Policy uses gender dysphoria as a proxy to ban all transgender

15    service members. Even if transgender service members somehow slip through the current

16    policy, a "law is not immune to an equal protection challenge if it discriminates only

17    against some members of a protected class but not others." *Hecox*, 104 F.4th at 1079. In

18    *Talbott*, the government essentially conceded that "gender dysphoria" and transgender

19    are interchangeable. During oral argument its counsel there asserted that Hegseth likely

20    used "transgender" as "shorthand" for gender dysphoria in his tweet that reads

21    "Transgender troops are disqualified from service without an exemption." *Talbott*, No.

22

ORDER - 29

**App. 693**

1  C25-00240-ACR, Dkt. 90, Tr. Mar. 12, 2025, at 19–22. Furthermore, the government

2  here does not dispute that the Hegseth Policy would exclude each plaintiff.

3       Gender dysphoria is plainly "closely correlated" with being transgender.[17] The

4  Military Ban and Hegseth Policy are certainly not the first attempt to discriminate against

5  disfavored groups by targeting conduct or characteristics "closely correlated" with the

6  group. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law*

7  *v. Martinez*, 561 U.S. 661, 689, (2010) (citing *Lawrence*, 539 U.S. 558, 583 (2003))

8  (O'Connor, J., concurring) ("While it is true that the law applies only to conduct, the

9  conduct targeted by this law is conduct that is closely correlated with being homosexual.

10 Under such circumstances, [the] law is targeted at more than conduct. It is instead

11 directed toward gay persons as a class.") (alteration in original). Ample other authority

12 has reached the same conclusion. *See C.P. ex rel. Pritchard v. Blue Cross Blue Shield of*

13 *Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) (Bryan, J.) ("A person cannot

14 suffer from gender dysphoria without identifying as transgender.") (cleaned up); *Kadel v.*

15 *Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) (en banc) ("gender dysphoria is so intimately

16 related to transgender status as to be virtually indistinguishable from it."). In sum, the

17 government's attempt to evade the strictures of intermediate scrutiny by using the term

18

19

---

20  [17] *Karnoski* did not conduct this analysis because the Mattis Policy used the term
    transgender. 926 F.3d at 1201 n.18 ("Because the 2018 Policy discriminates on the basis of
21  transgender status on its face, we need not address whether it constitutes discrimination against
    transgender persons on the alternative ground that gender dysphoria and transition are closely
22  correlated with being transgender").

ORDER - 30

**App. 694**

1  gender dysphoria fails. The Hegseth Policy plainly discriminates on basis of transgender

2  status.

3      The Ninth Circuit has repeatedly affirmed that classifications based on

4  transgender status warrant heightened or intermediate scrutiny, and that transgender is at

5  least a quasi-suspect class. [18] *See Karnoski*, 926 F.3d at 1200; *Doe v. Horne*, 115 F.4th

6  1083, 1102 (9th Cir. 2024); *Hecox*, 104 F.4th at 1079, *as amended* (June 14, 2024); *see*

7  *also Roe v. Critchfield*, No. 23-2807, -- F.4th--, 2025 WL 865721, at *17 (9th Cir. Mar.

8  20, 2025) (law regulating transgender bathroom usage discriminates on the basis of

9  transgender status and sex and triggers intermediate scrutiny). The government's primary

10 response to *Karnoski* is that it was wrongly decided. Dkt. 76 at 23. It provides no binding

11 authority or persuasive arguments compelling the Court to break from that precedent. To

12 the contrary, the history the government provides showing how various presidential

13 administrations have given and taken away transgender rights illustrate the "political

14 powerlessness" of the group, one of the factors in determining a quasi-suspect class. Dkt.

15 76 at 24; *see Lying v. Castillo*, 477 U.S. 635, 638 (1986) (political powerlessness part of

16 quasi suspect class analysis).

17     *Talbott* also demonstrates the flaw in the government's argument, repeated here,

18 that the Hegseth Policy does not target transgender service members; it merely addresses

19 a medical condition, gender dysphoria. *Talbott*, 2025 WL 842332, at *10. Judge Reyes's

20

21     [18] The government suggests that the Supreme Court is likely to change this determination.
   Dkt. 76 at 23 (citing *United States v. Skrmetti*, No. 23-477 (*argued* Dec. 4, 2024)). The Court
   will not decide a case on a party's prediction of what a higher court will decide in the future.
22 *Karnoski* is binding authority.

ORDER - 31

**App. 695**

1   recent Order denying the government's motion to dissolve the *Talbott* preliminary

2   injunction persuasively explains why the government's March 21 Guidance does not alter

3   the conclusion that, because the Hegseth Policy and subsequent Department of Defense

4   guidance implementing it expressly target transgender service members, intermediate

5   scrutiny applies. It demonstrates that the new guidance instead supports the application of

6   intermediate scrutiny, and why that March 21 Guidance actually *undercuts* each of the

7   government's claimed bases for removing all transgender service members. *Talbott*, 2025

8   WL 914716, at *3–5.

9         **(ii)    The Hegseth Policy discriminates on the basis of sex**

10          The Supreme Court, Ninth Circuit, and many other courts have concluded that

11   discriminating against a person for being transgender inherently discriminates against that

12   individual based on sex. It is "impossible to discriminate against a person for being

13   homosexual or transgender without discriminating against that individual based on sex."

14   *Bostock v. Clayton Cnty*, 590 U.S. 644, 660 (2020). The government argues that *Bostock*

15   is inapplicable in Fifth Amendment Equal Protection analysis because it was a Title VII

16   case. Dkt. 76 at 25. Title VII prohibits discrimination "because of . . . sex." Dkt. 76 at 75

17   (quoting 42 U.S.C. § 2000e-2(a)(1)). Nothing about differences between Title VII and

18   Fifth Amendment Equal Protection jurisprudence "prevent[s] *Bostock*'s commonsense

19   reasoning—based on the inextricable relationship between transgender status and sex—

20   from [being] appl[ied] to the initial inquiry of whether there has been discrimination on

21   the basis of sex in the equal protection context." *Fowler v. Stitt*, 104 F.4th 770, 790 (10th

22

**App. 696**

1  Cir. 2024) (citing *Bostock*, 590 U.S. at 660); *see also Talbott*, 2025 WL 842332, at *23–

2  24; *Hecox*, 104 F.4th at 1079 (quoting *Bostock*, 590 U.S. at 660).

3        *Bostock* provides a helpful hypothetical involving an employer and two employees

4  that illustrates the "inextricable" relationship between transgender and sex discrimination.

5  590 U.S. at 660. The two hypothetical employees are identical except that one was a

6  transgender woman and the other a cisgender woman. *Id.* Justice Gorsuch explained that

7  if the employer fires only the transgender woman because she is transgender, it has

8  "intentionally penalize[d]" her "for traits or actions that it tolerates in an employee

9  identified as female at birth." *Id.* He concluded that "if changing the employee's sex

10  would have yielded a different choice by the employer," then the discrimination is based

11  on sex. *Id.* at 659–60.

12        So too with the Hegseth Policy. The Policy penalizes transgender service members

13  for complying with standard grooming, pronoun usage, and performance metrics that the

14  military requires in cisgender service members. Since it is the birth sex of the service

15  member that triggers the adverse employment action rather than a failure to meet set

16  standards, the discrimination is based on sex.

17        *Bostock* aside, the Ninth Circuit has already determined that "discrimination

18  against transgender individuals constitute sex-based discrimination for purposes of the

19  Equal Protection Clause because such policies punish transgender persons for gender

20  non-conformity, thereby relying on sex stereotypes." *Hecox*, 104 F.4th at 1080 (internal

21  quotation marks omitted).

22

ORDER - 33

**App. 697**

1      The Military Ban and Hegseth Policy do just that. First, the Military Ban and

2  Hegseth Policy plain text and ensuing guidance classify repeatedly based on sex. *See,*

3  *e.g.*, Military Ban, Dkt. 31-1 ("adoption of a gender identity *inconsistent with an*

4  *individual's [birth] sex* conflicts with" military standards) (emphasis added); Hegseth

5  Policy, Dkt. 58-7 at 7 (requires that service members "be willing and able to … [meet]

6  the standards associated with *his or her [birth] sex*" and that they "ha[ve] never

7  attempted to transition to *any sex other than his or her [birth] sex*.") (emphasis added);

8  *id.* at 3 ("All Service members will only serve in accordance with their sex, defined in

9  Executive Order 14168, 'Defending Women from Gender Ideology Extremism and

10 Restoring Biological Truth to the Federal Government'"). "If one must know the sex of a

11 person to know whether or how a provision applies to the person, the provision draws a

12 line based on sex." *Dekker v. Weida*, 679 F.Supp.3d 1271, 1289-90 (N.D. Fla. 2023),

13 *argued*, No. 23-12155 (11th Cir. Nov. 22, 2024). The Hegseth Policy mandates that

14 service members conform with the gender stereotypes of their birth sex by requiring them

15 to dress, meet grooming standards, and use pronouns typically associated with it. Put

16 another way, it relies on overbroad generalizations about sex by assuming that all people

17 born, for example, female must groom and use pronouns typically associated with

18 females and confine themselves to female performance standards[19] in order to have

19 "honesty and integrity." Hegseth Policy, Dkt. 58-7 at 3. If they refuse to conform to these

20

21  _____

22      [19] It is uncontested that some named plaintiffs whose birth sex was female successfully meet male performance standards (and vice versa) in accordance with the Austin Policy.

**App. 698**

1   gender stereotypes associated with their birth sex, the government will separate them, and

2   seek a refund of any retention bonuses earned over their military careers.

3       In sum, the Military Ban and Hegseth Policy discriminates based on sex, which

4   provides an additional, independent basis for the Court to apply intermediate scrutiny.

5   *Virginia*, 518 U.S. at 555 ("[A]ll gender-based classifications …warrant heightened

6   scrutiny.").

7       **b.    Military deference**

8       Under intermediate scrutiny, the government bears the burden to demonstrate that

9   the Military Ban "serves important governmental objectives and that the discriminatory

10   means employed are substantially related to the achievement of those objectives."

11   *Virginia*, 518 U.S. at 524 (internal quotation marks and citations omitted). The

12   government must proffer justifications which are "exceedingly persuasive," "genuine,"

13   "not hypothesized," not "invented post hoc in response to litigation," and "must not rely

14   on overbroad generalizations." *Id.* at 531. This "burden of justification" is

15   "demanding"—not "deferential"—and "rests entirely on the [government]." *Id.* at 533.

16       The government argues that because this case involves judicial review of military

17   decision making, mere rational basis review applies. Dkt. 76 at 14. *Karnoski* rejected this

18   exact argument: "Deference informs the application of intermediate scrutiny, but it does

19   not displace intermediate scrutiny and replace it with rational basis review." 926 F.3d at

20   1201. The government's suggestion that it is plaintiffs' burden to provide data of the

21   *success* of their service under the Austin Policy (and under the Mattis Policy) is not

22   correct in any event, but it certainly is not true where, as here, the military's judgment is

ORDER - 35

**App. 699**

1    subject to heightened scrutiny. Intermediate scrutiny places that burden squarely on the

2    government. *Id.* at 1202 (government carries the "not trivial" burden to establish that its

3    policy "significantly furthers" the government's important interests).

4         Plaintiffs also argue that the Court need not defer to the military's judgment

5    because the Hegseth Policy is not the product of a meaningful exercise of independent

6    military judgment, but rather is a "mere implementation of the Military Ban that itself

7    was issued within a week of President Trump's inauguration." Dkt. 60 at 9. *Karnoski*

8    rejected a similar argument regarding the 2018 Mattis Policy. It determined that "a

9    presumption of deference is owed, because the Mattis Policy appears to have been the

10   product of independent military judgment." 926 F.3d at 1202. Because the Hegseth

11   Policy purports to rely extensively on the Mattis Policy, the Court rejects plaintiffs'

12   argument that it is entitled to no deference at all. Action Memo, Dkt. 71-1 at 4–5.

13        But the rush to issue the Military Ban and Hegseth Policy with no new military

14   study, evaluation, or evidence does not warrant the same baseline level of deference as

15   the Supreme Court gave in *Rostker* or *Goldman*. In *Rostker*, the gender discrimination in

16   the draft at issue was born from "hearings, floor debate, and in committee" discussions.

17   453 U.S. at 72. In *Goldman*, the Court noted that the Air Force promulgated a 190-page

18   document (AFR 35–10) detailing the specifics of military uniform, and that this effort

19   evidenced "considered professional judgment" that warranted deference and in part

20   justified the military's refusal to allow the plaintiff to wear a yarmulke. 475 U.S. at 509.

21   The government here has nothing comparable to the military decision making evident in

22   *Rostker* or *Goldman.*

**App. 700**

1    The Department of Defense explains that the Hegseth Policy "was informed

2    through consideration of, among other things," four sources: the Mattis Policy, the

3    AMSARA Report, the 2025 medical literature review, and the cost data review. Action

4    Memo, Dkt. 71-1 at 4–5.

5    The Court must "apply appropriate military deference" to the Hegseth Policy

6    while applying intermediate scrutiny. It cannot substitute its "own evaluation of evidence

7    for a reasonable evaluation" by the military. *Rostker*, 453 U.S. at 68. But "deference does

8    not mean abdication." *Witt*, 527 F.3d at 821 (quoting *Rostker*, 453 U.S. at 70). If the

9    military's use of the evidence is not reasonable, the Court cannot defer to it. The

10   government bears the burden of establishing that they reasonably determined the Hegseth

11   Policy "significantly furthers" the government's important interests, and that is not a

12   trivial burden.

13   **c.    The Military Ban and Hegseth Policy fail intermediate scrutiny**

14   The first step is analyzing whether the government's stated interests are

15   "important." *Virginia*, 518 U.S. at 533. This is self-evident here. It is uncontested that the

16   government has an important interest in maintaining military "readiness, cohesion, good

17   order, discipline" and managing the military's costs.

18   The next step is determining whether the military ban "significantly furthers"

19   those interests. It does not. The most pointed problem for the government is not just its

20   irrational use of the evidence that it relies on, but the lack of evidence it provides and the

21   ample evidence it simply ignores. The government fails to contend with the reality that

22   transgender service members have served openly for at least four years under the Austin

**App. 701**

1 Policy (some since the Carter Policy in 2016) without any discernable harm to military

2 readiness, cohesion, order, or discipline. It provides no evidence to counter plaintiffs'

3 showing that open transgender service has in fact enhanced each of these interests. Nor

4 does it have any response to plaintiffs' evidence that excluding transgender service would

5 do irreparable harm to those interests. Instead, the government relies on the Mattis

6 Policy's concerns about problems transgender service "could" cause. It uses out of

7 context quotes from medical studies. And it repeatedly asserts that military deference

8 should insulate it from any meaningful review of its rushed decision to revert back to

9 banning transgender service and punishing those who refuse to "voluntarily" separate

10 before it takes away their bonuses and separates them anyway. The Military Ban and the

11 Hegseth Policy do not survive intermediate scrutiny.

12 **(i)  Military readiness**

13    The government contends that transgender service members compromise military

14 readiness in at least two ways. First it asserts it is "concerned" about "subjecting those

15 with a history of gender dysphoria to the unique stresses of military life" because it

16 believes they already have high suicidality rates and military life alone can be a

17 contributor to suicidality. Dkt. 76 at 29. Second, it asserts their gender affirming care can

18 make them less deployable. *Id*. at 30.

19    The government fails to provide rational support for these conclusions and fails to

20 address the evidence to the contrary. Regarding suicide risk, the government relies on the

21 medical literature review. Action Memo, Dkt. 71-1 at 4. But that review does not study

22 the military population. And, unlike the Mattis Policy, because the report is not itself the

**App. 702**

1    product of military decision making, it does not warrant its own military deference. In

2    any event, the review repeatedly emphasized that gender dysphoria is highly treatable and

3    that suicidality reduces with treatment. *Id.* at 2. The government similarly has provided

4    no data supporting the conclusion that transgender service members posed more mental

5    health or suicidality issues than the general military population since the Austin Policy. It

6    similarly fails to acknowledge AMSARA's "key finding" that compared to cisgender

7    service members with depression (from the studied depression cohort), transgender

8    servicemembers "are more likely to remain on active duty longer following cohort

9    eligibility" and "spend less time in a non-deployable status due to mental health reasons."

10   Dkt. 71-3 at 8. The government also fails to acknowledge that military screening for

11   accession already assesses suicide risk, and it offers no explanation for why this is not

12   sufficient to root out suicidality. *See* DoD Instruction 6130.03 on Appointment,

13   Enlistment, or Induction Medical Standards 6.28(m), Dkt. 76-3 at 51. Instead, the

14   government relies only on predictions from the Mattis Policy.

15       Regarding deployability, the government relies on Mattis Policy data and the

16   AMSARA report, both of which could only make educated predictions about

17   deployability of transgender service members, because they lacked the benefit of four

18   years of transgender service members being deployable. Indeed, the AMSARA report

19   emphasized that more data was needed to determine deployability. Dkt. 71-3 at 11–12.

20       The government also ignore plaintiffs' persuasive data showing that there have not

21   been deployability concerns. Dkt. 23 at 26 (citing Wagner Decl., Dkt. 33 ¶ 44; Bourcicot

22   Decl., Dkt. 32 ¶ 27). It similarly fails to address plaintiffs' persuasive data that the

**App. 703**

1  military would incur a significant burden to fill vacancies due to the Military Ban and

2  Hegseth Policy, many of whom are deployed oversees. Cisneros Decl., Dkt. 36 ¶¶ 26-27;

3  Skelly Decl., Dkt. 38 ¶ 23. In short, none of the government's data supports its

4  conclusion that banning transgender persons from serving is substantially related to

5  achieving military readiness. And the data the government ignores supports that the

6  Military Ban and Hegseth Policy impedes readiness. It would be an "abdication" of the

7  Court's role to review to defer to the government's out of date and out of context data on

8  this point.

9  **(ii)    Unit cohesion, good order, and discipline**

10       The government relies exclusively on the Mattis Policy's predictions to justify

11  concluding that banning transgender service members is substantially related to achieving

12  unit cohesion, good order, and discipline. Dkt. 76 at 32.

13       First, it raises privacy concerns. It points to the Mattis Policy prediction that

14  allowing transgender service people to use the facilities of their preferred gender "would

15  invade the expectations of privacy" of the other service members sharing living and

16  bathing facilities. Dkt. 76 at 30 (quoting Mattis Policy, Dkt. 31-10 at 42). The

17  government argues that "absent the creation of separate facilities for transitioned or

18  transitioning servicemembers, which could be both 'logistically impracticable for the

19  Department,' as well as unacceptable to those servicemembers, the military would face

20  irreconcilable privacy demands." *Id.* at 30-31 (quoting Mattis Policy, Dkt. 31-10 at 42). It

21  correctly observes that the implementation handbook for the Carter Policy, "repeatedly

22  stressed the need to respect the 'privacy interests' and 'rights of Service members who

ORDER - 40

**App. 704**

1  are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning

2  Service member[,]' and urged commanders to try to accommodate competing interests to

3  the extent that they could." *Id*. at 31 (quoting 2016 DoD Implementation Handbook, Dkt.

4  31-5 at 38) (citing *id.* at 22, 29, 33, 60–61, 63–64).

5        Although respecting the privacy needs of all service members is a worthy

6  objective, the government does not carry its burden to show that reverting to a ban on

7  open transgender service members is a justifiable means of achieving those ends. It relies

8  exclusively on the *predictions* of the Mattis Policy about what issues open transgender

9  service "*could*" pose to privacy concerns. It once again fails to provide any argument or

10  evidence that those predictions came to pass in the years that transgender service

11  members served openly. There is nothing in the record to support that open service

12  required "the creation of separate facilities for transitioned or transitioning

13  servicemembers," Dkt. 76 at 30, and the government does not address the far less drastic

14  suggestions for mitigating privacy concerns outlined in the Carter and Austin Policies.

15  *See, e.g.*, Dkt. 31-5 at 23 (Carter Policy proposes strategies for easing privacy concerns

16  including "adjusting personal hygiene hours"); Dkt. 33-4 at 17 (Austin Policy encourages

17  commanders to consult with "service member and [Service Central Coordination Cell]"

18  for expert advice and assistance with transgender service members' gender transitions

19  when employing privacy measures).

20        Again relying only on the Mattis Policy predictions, the government argues that

21  "exempting servicemembers from sex-based standards in training and athletic

22  competitions based on gender identity *would* generate perceptions of unfairness in the

**App. 705**

1    ranks" and that allowing a transgender woman to compete with a cisgender woman

2    "could" pose a serious safety risk. Dkt. 76 at 31 (quoting Mattis Policy, Dkt. 31-10 at 35,

3    41) (emphasis added). The government does not provide any evidence that any of these

4    concerns materialized during the past years of open transgender service. It similarly lacks

5    any evidence to support the assertion that allowing open transgender service would

6    require leadership to "divert" too much time away from military tasks. *Id*.

7        Plaintiffs provide affirmative evidence from a variety of service member

8    declarants that these past four years of open transgender service helped, rather than hurt,

9    unit cohesion, good order, and discipline. Dkt. 23 at 25–27 (citing Vazirani Decl., Dkt. 34

10   ¶ 24, Dremann Decl., Dkt. 25 ¶¶ 8, 10-11; Morgan Decl., Dkt. 26 ¶¶ 13, 17-18; Shilling

11   Decl., Dkt. 24 ¶¶ 12-14; Schmid Decl., Dkt. 39 ¶¶ 13-19: Cisneros Decl., Dkt. 36). They

12   also provide evidence from military officials, including former Under Secretary of

13   Defense Cisneros, who testifies that allowing open transgender service "fosters openness

14   and trust among team members, thereby enhancing unit cohesion." Dkt. 36 ¶ 15.

15       The government does not provide any evidence in support of its claim that open

16   transgender service hurt cohesion. Instead, Assistant Secretary of Defense Timothy Dill

17   testifies merely that "it would be highly unusual for individualized service member

18   complaints regarding unit cohesion, military readiness, medical readiness, deployability,

19   and lethality to reach the level of [Cisneros]." Dkt. 76-6 ¶ 6. But Cisneros clearly

20   explains that "[i]t was [his] responsibility to be aware of unit cohesion military readiness,

21   medical readiness, deployability, and lethality." Dkt. 36 ¶ 3. The Court credits Cisneros's

22   testimony as to his own awareness over Dill's guess as to what he thinks Cisneros's

**App. 706**

1  awareness would have been. The government could have cross examined Cisneros or any

2  of plaintiffs' declarants, but chose not to.

3      In short, the government falls well short of its burden to show that banning

4  transgender service is substantially related to achieving unit cohesion, good order, or

5  discipline. Although the Court gives deference to military decision making, it would be

6  an abdication to ignore the government's flat failure to address plaintiffs' uncontroverted

7  evidence that years of open transgender service promoted these objectives. It would

8  similarly be an abdication to indulge the government's irrational reliance on predictions

9  from the over 7-year-old Mattis Policy and ignore its failure to provide any updated data.

10  **(iii)    Costs**

11      The government asserts that the costs associated with gender-affirming health care

12  make service by transgender members are "disproportionate" and that the money "should

13  be better devoted elsewhere." Dkt. 76 at 33. But its estimate for transgender care costs is

14  a negligible fraction of the military's budget. *Talbott*, No. C25-00240-ACR, Dkt. 66-1.

15  The government provide no updated data comparisons to support its assertion that costs

16  expended on transgender service members are disproportionate. Instead, they rely on the

17  Mattis Policy's assertion that the medical costs for service members with gender

18  dysphoria was "nearly three times" compared to service members without the condition.

19  *Id.* (quoting Mattis Policy, Dkt. 31-10 at 46).

20      The government does not analyze the costs of discharging and replacing thousands

21  of trained service members, many with decades of experience and specialized skills.

22  Plaintiffs estimate the cost of "separating transgender servicemembers and finding and

ORDER - 43

**App. 707**

1    training replacements" is "nearly one billion dollars— *more than 100 times greater* than

2    the cost to provide transition-related healthcare.'" Dkt. 23 at 28 (quoting *Karnoski*, 2017

3    WL 6311305, at *8) (citing Gordon Decl., Dkt. 31-24; Vazirani Decl., Dkt. 34 ¶ 13;

4    Cisneros Decl., Dkt. 36 ¶ 13; Skelly Decl., Dkt. 38 ¶¶ 14, 24).

5         In any event, the costs associated with providing transition-related care to active-

6    duty service members plainly "are exceedingly minimal." *Karnoski*, 2017 WL 6311305,

7    at *8. Even the government concedes that gender affirming care "is small relative to

8    DoD's total healthcare expenditure." Dkt. 76 at 33. On this record, it cannot show that

9    that banning transgender service is "substantially related" to cost effectiveness.

10        **d.    The Government's failure to provide and confront evidence reveal the
     Military Ban and Hegseth Policy would not survive even rational basis review**

11        Omissions in the Hegseth Policy further undermine the government's argument

12   that the Military Ban forwards its stated interests. The government concedes[20] there is no

13   evidence that being transgender is inconsistent with "honesty," "humility," or "integrity,"

14   Military Ban § 2, Dkt. 31-1, and that being transgender "conflicts with a soldier's

15   commitment to an honorable, truthful, and disciplined lifestyle," *id.* § 1.

16        All of the government's failures illustrate that the Military Ban is not rationally

17   related to the government's stated interest, let alone that it "significantly furthers"

18   important governmental interests. The reliance on seven-year-old predictions from the

19   Mattis Policy while ignoring the reality of years of open service is not reasonable and is

20   not comparable to congressional debates and extensive records supporting the military

21   _____

22        [20] *See* Oral Argument Transcript, Dkt. 102 at 31.

**App. 708**

1    decision in *Rostker* and *Goldman*. The near complete absence of updated data here speaks

2    for itself. The government had every opportunity to provide their own declarants to

3    support their points or counter plaintiffs' evidence that open service did not hurt its stated

4    interests. But it did not.

5         The government's assertion that "trans-identifying persons achieved at least some

6    version of their desired military policy from the last two Democratic Administrations and

7    can *reasonably be expected to do so again* from the next Democratic Administration" is

8    telling. Dkt. 76 at 24 (emphasis added). It very well is reasonable for transgender service

9    members to expect that they be allowed to serve openly when they have done so

10   successfully for years and the government lacks any evidence to justify banning them

11   now. Equal Protection scrutiny does not fluctuate depending on what political party is in

12   administration. The government's "better luck next administration" argument belies its

13   assumption that the Court will defer blindly to the Military Ban without any meaningful

14   review. It cannot and will not. The Military Ban and Hegseth Policy on the present record

15   fails any level of Equal Protection scrutiny.

16        e.    **Animus**

17        Plaintiffs contend that the Military Ban and Hegseth Policy are fueled by animus,

18   and consequently fail any level of scrutiny. Dkt. 23at 21–22; Dkt. 82 at 9. The

19   government argues that even if the Court were to find that the Military Ban is motivated

20   by animus, the Court still must uphold it "so long it can be understood to result from a

21   justification independent of unconstitutional grounds." Dkt. 76 at 33–34 (quoting *Trump

22   v. Hawaii*, 585 U.S. 667, 705 (2018)).

ORDER - 45

**App. 709**

1    Because the Military Ban and Hegseth Policy here cannot survive the intermediate

2    scrutiny that its discrimination triggers nor the rational basis review that the government

3    argues for, the Court need not make an animus determination to grant a preliminary

4    injunction. The Military Ban and Hegseth Policy would fail on this record even if animus

5    was not plain. Although the parties are welcome to raise the implications of animus as

6    litigation continues, this preliminary injunction rests exclusively on the government's

7    failure to meet their burden under any level of review to uphold this ban.

8    **2.    Plaintiffs are Likely to Succeed on the Merits of Their First Amendment Claim.**

9    Plaintiffs allege the Hegseth Policy violates the First Amendment's free speech

10    guarantees. Dkt. 23 at 28. They argue the Policy constitutes impermissible content-based

11    and viewpoint-based restrictions on speech by penalizing only transgender service

12    members for expressing a gender identity different from their birth sex, even in their

13    personal lives. *Id.* at 28–29; Dkt. 59 at 34.[21]

14    The government argues, correctly, that the First Amendment's guarantees in the

15    military context do not reach as far as they do as in civilian society. Dkt. 76 at 34–35

16    (citing *Goldman v. Weinberger*, 475 U.S. 503 (1986)). It posits the Hegseth Policy's

17    requirement that service members use pronouns consistent with their birth sex reasonably

18    furthers the government's important interest in "uniformity." *Id.* at 35–36. It also asserts

19

20    _____

21    [21] Plaintiffs' reply also alleges the Hegseth Policy is speaker-based discrimination for the sole purpose of exercising a content preference. Dkt. 82 at 20. The Court does not entertain legal arguments raised for the first time in a reply brief. *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006).

22

ORDER - 46

**App. 710**

1  the Policy "does not ban anyone based on speech or expressive conduct;" it just

2  "presumptively disqualifies individuals with gender dysphoria." *Id.* at 35.

3       Under the First Amendment, the government "'has no power to restrict expression

4  because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of*

5  *Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S.

6  92, 95 (1972)). Content-based speech restrictions, comprising discrimination against

7  "particular speech because of the topic discussed or the idea or message expressed," are

8  presumptively unconstitutional and subject to strict scrutiny. *Id.*; *see Karnoski*, 2017 WL

9  6311305, at *9. Viewpoint-based restrictions, based on the "motivating ideology or the

10  opinion or perspective of the speaker," are a particularly "egregious form of content

11  discrimination." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995). *See*

12  *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (First Amendment prevents government

13  from restricting speech "because of disapproval of the ideas expressed."); *Hurley v. Irish-*

14  *Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995) ("While the

15  law is free to promote all sorts of conduct in place of harmful behavior, it is not free to

16  interfere with speech for no better reason than promoting an approved message or

17  discouraging a disfavored one, however enlightened either purpose may strike the

18  government.").

19       In the military context, judicial review of regulations implicating the First

20  Amendment is more deferential than review of "similar laws or regulations designed for

21  civilian society." *Goldman*, 475 U.S. at 507. *See Parker v. Levy*, 417 U.S. 733, 760

22  (1974). This is because the "essence of military service 'is the subordination of the

ORDER - 47

**App. 711**

1    desires and interests of the individual to the needs of the service.'" *Goldman*, 475 U.S. at

2    507 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 92 (1953)). While military service

3    requires some sacrifices for the sake of "obedience, unity, commitment, and esprit de

4    corps," it does not, "of course, render entirely nugatory the guarantees of the First

5    Amendment." *Id.*

6       The government cites *Goldman* for the proposition that military deference defeats

7    all of plaintiffs' constitutional claims. Dkt. 76 at 34–36. But *Goldman* concerned Air

8    Force uniform regulations that impinged on religious beliefs, not a free speech restriction.

9    *Goldman*, 475 U.S. at 509–10. More apposite is *Brown v. Giles*, involving an Air Force

10   regulation that required service members to seek permission from their commander

11   before distributing circulating any printed or written material, including petitions for

12   signatures. 444 U.S. 348, 350 (1980).

13       This case, unlike *Brown*, entails a viewpoint-based restriction on transgender

14   service members' speech and expression. The Hegseth Policy requires that transgender

15   service members "adhere to all . . . standards" associated with their birth sex, including

16   the use of pronouns consistent with their birth sex. Feb. 26 DoD Guidance, Dkt. 58-7 at

17   3, 7–8. By prohibiting transgender service members from presenting in—effectively,

18   identifying with—a gender different than their birth sex, the Policy imposes a restriction

19   on gender expression that does not conform with their birth sex. *Rosenberger*, 515 U.S. at

20   829. The Military Ban goes so far as to restrict transgender expression "even in one's

21   personal life." Dkt. 31-1 at 2.

22

ORDER - 48

**App. 712**

1    Despite the viewpoint-based restriction at play, the Court applies intermediate

2    scrutiny because of the deference it must give to the military's judgment. But the Hegseth

3    Policy does not survive heightened scrutiny even under such deference. As with

4    plaintiffs' Equal Protection claim, the government has not demonstrated that infringing

5    upon transgender service members' gender expression even in their personal life furthers

6    an important government interest. The military already has separate pronoun, uniform,

7    and grooming standards for men and women. *See Singh v. Berger*, 56 F.4th 88, 101 (D.C.

8    Cir. 2022) (Marine Corps did not have a compelling interest in mandating that male

9    recruits shave their beards and cut their hair in violation of their Sikh faith, partially in

10   view of different shaving and hair styling standards for women). Unlike *Goldman*, where

11   the plaintiff sought to wear a yarmulke that did not conform with military uniform

12   standards, plaintiffs here do not seek to create new pronoun or uniform standards for

13   transgender service members. They instead want the freedom to choose from existing

14   pronoun, uniform, and grooming standards to express their own gender. The government

15   fails to justify denying transgender service members the right to choose between standard

16   military uniforms and pronouns.

17       **3.**    **Plaintiffs are Likely to Succeed on the Merits of Their Procedural Due Process Claim.**

18

19       Active-duty plaintiffs[22] argue that the Military Ban and the ensuing Hegseth

20   Policy violate their constitutional Procedural Due Process rights because it retroactively

21       [22] Only active-duty plaintiffs assert Procedural Due Process and equitable estoppel claims. To the extent the Court's preliminary injunction is based on the likelihood of success on

22   the merits of these claims, it applies only to active-duty service members.

ORDER - 49

**App. 713**

1  punishes them for conduct the government previously approved, offending basic notions

2  of fairness. Dkt. 23 at 31. They accurately assert that the Military Ban and Hegseth Policy

3  retroactively deem them categorically unfit for service based on explicit, stigmatizing,

4  and wholly unsupported labels of dishonesty and dishonor. *Id.*

5       Plaintiffs implicitly concede, and the government affirmatively asserts, they have

6  no stand-alone constitutionally protected liberty or property interest in continued military

7  service. *See* Dkt. 76 at 36 (citing *Smith v. Harvey*, 541 F.Supp.2d 8, 15–16 (D.D.C.

8  2008)). But active-duty plaintiffs' Procedural Due Process claim is instead a "stigma

9  plus" claim, based on the insulting language used, and reputational harm and adverse

10  employment status it causes. Dkt. 23 at 31 (citing *Ulrich v. City of San Francisco*, 308

11  F.3d 968, 981-82 (9th Cir. 2002) ("stigma-plus" test does not require separate protectible

12  interest in employment and stigmatizing statements need only be related to adverse

13  action)).

14       Plaintiffs also argue, persuasively, that the Military Ban punishes them for "doing

15  precisely what the government invited and induced them to do"—serve openly, provided

16  they met the other requirements for service (which they do). Dkt. 23 at 32. They argue

17  that the government created a reasonable expectation that active-duty plaintiffs would not

18  be punished for disclosing their status and transitioning under the military's approved

19  process for doing so and that due process forbids such a "bait and switch." *Id.* (citing

20  *Baker v. City of SeaTac*, 994 F.Supp.2d 1148, 1154 (W.D. Wash. 2014) (public

21  employees have "property interest in continued employment" when they have

22  "reasonable expectation" based on "existing rules" or mutually explicit

ORDER - 50

**App. 714**

1    "understandings")). They argue that "elementary considerations of fairness" dictate that

2    individuals should have an opportunity to what the law is and to conform their conduct

3    accordingly; "settled expectations" should not be "lightly disrupted." *Id.* (citing *Landgraf*

4    *v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). Plaintiffs argue that Procedural Due

5    Process protects against precisely this sort of "retribution" against unpopular groups by

6    restraining arbitrary and potentially vindictive measures. *Id.* (citing *Landgraf*, 511 U.S. at

7    269).

8        The government's response ignores this second argument entirely; it does not

9    address *Baker*, *Landgraf*, principles of fairness, settled expectations, or the "bait and

10    switch" nature of the Military Ban. Dkt. 76 at 36–38.

11        As to plaintiffs' stigma-plus Procedural Due Process claim, the government argues

12    that *Smith*'s holding that there is no constitutionally protected property interest in

13    continued military service is the reason Judge Pechman dismissed the plaintiffs'

14    Procedural Due Process claim in *Karnoski*. Dkt. 76 at 36. But the *Karnoski* plaintiffs did

15    not assert a stigma-plus Procedural Due Process claim and the Court's opinion did not

16    address or dismiss such a claim. Instead, it noted that the plaintiffs' preliminary

17    injunction motion did not "elaborate in detail" on the Procedural Due Process claim they

18    did assert. *Karnoski*, 2017 WL 6311305 at *10 n.5.

19        The government cites *Christoffersen v. Washington State Air Nat. Guard*, 855

20    F.2d 1437, 1443 (9th Cir. 1988) for the same proposition: absent a constitutionally

21    protected property interest in continued employment in the Washington Air National

22    Guard, plaintiffs facing separation had no plausible Procedural Due Process claim. Dkt.

ORDER - 51

**App. 715**

1   76 at 36–37. But the plaintiffs there did not assert a stigma-plus claim, either.

2   *Christoffersen*, 855 F.2d at 1440.

3        The government correctly cites *Chaudhry v. Aragón*, 68 F.4th 1161, 1170 (9th Cir.

4   2023) for the proposition that to successfully lodge a stigma-plus Procedural Due Process

5   claim, plaintiffs must show: "(1) the public disclosure of a stigmatizing statement by the

6   government; (2) the accuracy of which is contested; (3) *plus* the denial of some more

7   tangible interest such as employment." Dkt. 76 at 37.

8        It argues that plaintiffs are not likely to succeed on the merits of their stigma-plus

9   claim because they are "mistaken" that "separation brands them as being dishonest or

10  dishonorable." *Id*. Instead, it asserts, under the Hegseth Policy, the military's

11  characterization of their service on discharge will be "honorable." *Id.* at 41. Because this

12  is not stigmatizing, it argues, such a discharge cannot support a stigma-plus Procedural

13  Due Process claim. *Id*. (citing *Ben-Shalom v. Sec'y of Army*, 489 F. Supp. 964, 972 (E.D.

14  Wis. 1980) (no Procedural Due Process claim where plaintiff's "discharge was

15  honorable, and there was no public disclosure by the Army of the reasons for her

16  discharge.")).

17       But the government's cite is again incomplete, and the rest of the story supports

18  plaintiffs, not the government. *Ben-Shalom* went on: "To support a 'liberty' interest

19  claim, the petitioner would be required to show that her discharge was based upon 'an

20  unsupported charge which could wrongfully injure (her reputation).'" 489 F.Supp. at 972

21  (quoting *Arnett v. Kennedy*, 416 U.S. 134, 157 (1974)). Like *Chaudhry* in 2023, *Ben-*

22  *Shalom* in 1980 recognized that the result is different where "there [is] a public disclosure

ORDER - 52

**App. 716**

1    of the reasons for discharge by the government which necessarily impose[s] a 'badge of

2    infamy' on the employee." *Id.*

3         The Court details above the many ways in which the government has already very

4    publicly "branded" transgender service members with demeaning, cruel, and unsupported

5    "badges of infamy." These instances are in the public record. The government cites no

6    authority supporting its claim that the reputational harm is erased for Due Process

7    purposes if the discharge caused by the public stigmatization is nevertheless "honorable."

8         The Military Ban and Hegseth Policy's demeaning language is repeated even here

9    in the government's response: "The Commander has determined that it is 'the policy of

10   the United States Government to establish high standards for troop . . . honesty, humility,

11   uniformity, and integrity,' and that this policy is 'inconsistent with the . . . constraints on

12   individuals with gender dysphoria.'" Dkt. 76 at 41 (quoting Military Ban). In effect, the

13   government, in line with the Military Ban and Hegseth Policy, posits that, as a class,

14   transgender service members are only in the military as the result of a radical, insane,

15   false gender ideology. *See, e.g.*, Military Excellence and Readiness Fact Sheet ("During

16   the Biden Administration, the Department of Defense allowed gender insanity to pervade

17   our military organizations."). There is no evidence in the record supporting these

18   assertions.

19        One discharged from service based on these grounds is plainly stigmatized. The

20   accuracy of the government's proclamations is obviously contested, and plaintiffs are

21   about to lose their military careers because of them. An honorable discharge does not

22

**App. 717**

1    erase or sanitize the language the government uses to describe the character of separated

2    service members under the Military Ban and Hegseth Policy.

3          Plaintiffs have demonstrated the *Chaudhry* elements of a stigma-plus Procedural

4    Due Process claim. They have also demonstrated that the Military Ban violates "bedrock"

5    Due Process fairness principles precluding arbitrary or vindictive measures that upset

6    settled expectations. On the record before the Court, they are likely to succeed on the

7    merits of their Procedural Due Process claim.

8          The government's argument that plaintiffs cannot establish the denial of adequate

9    procedural protections because the Hegseth Policy affords them "all statutorily required

10   rights and benefits," Dkt. 76 at 37, is a variation of their ripeness argument, discussed and

11   rejected above.

12        **4.      Plaintiffs are Likely to Succeed on the Merits of Their Equitable Estoppel Claim.**

13        Active-duty plaintiffs also assert an equitable estoppel claim, based on similar

14   reasoning: justice and fair play preclude even the military from reneging on its promises

15   and punishing service members for conduct it expressly sanctioned. Dkt. 23 at 33–35.

16   They correctly contend the Hegseth Policy is not only a drastic shift from the recent

17   Austin Policy, it stands in "stark contrast" to even the Mattis Policy upon which it

18   purports to rely. The Mattis Policy incorporated a reliance exception for current service

19   members. Dkt. 31-10 at 3. It did so because the expert report Mattis had commissioned

20   found that such service members' "reasonable expectation" that the military would

21   "honor their service on the terms that then existed cannot be lightly dismissed"—

22

ORDER - 54

**App. 718**

1    particularly considering the "substantial investment" the military had made in them. *Id*. at

2    48.

3           Plaintiffs rely on *Watkins*, which equitably estopped the Army from refusing in

4    1982 to again re-enlist Perry Watkins, whom it had drafted in 1967. 875 F.2d at 711.

5    Watkins told the Army in writing he was gay when he was drafted, they accepted him

6    anyway, and he served honorably for more than 14 years despite a regulation clearly

7    prohibiting his service on that basis. *Id.* at 701–03.

8           *Watkins* held that equitable estoppel applies to the government if, in addition to the

9    traditional elements, the plaintiff can establish two additional, threshold elements: (1)

10   "affirmative misconduct going beyond mere negligence," and (2) that the government's

11   act will "cause a serious injustice" and the public's interest will not suffer "undue

12   damage" by the imposition of the liability. *Id*. at 707 (citations omitted).

13          In *Watkins*, the "misconduct" was the Army's affirmative "misrepresentation" that

14   Watkins was qualified when admitting, reclassifying, reenlisting, retaining, and

15   promoting him throughout his exemplary military career, in violation of its own policy.

16   *Id*. The Ninth Circuit had no trouble concluding that Watkins's injury in reliance on the

17   Army's prior approval of his military career—the loss of that career—satisfied "serious

18   injustice" part of the second element, and that any harm to the public interest if he were

19   permitted to re-enlist was "nonexistent." *Id*. at 709.

20          The Ninth Circuit also easily concluded that Watkins had met the remaining,

21   traditional elements of an equitable estoppel claim:

22          (1) The party to be estopped must know the facts;

**App. 719**

1    (2) he must intend that his conduct shall be acted on or must so act that the party

2    asserting the estoppel has a right to believe it is so intended;

3    (3) the latter must be ignorant of the true facts; and

4    (4) he must rely on the former's conduct to his injury.

5    *Id.* (citations omitted). It held that "equity cries out and demands the Army be estopped

6    from refusing to reenlist Watkins." *Id.* at 711.

7    The government cites *Watkins* for the propositions that equitable estoppel against

8    it requires some "affirmative misrepresentation" on its part, and the threat of "serious

9    injustice" to plaintiffs. Dkt. 76 at 39–40. But it does not attempt to distinguish *Watkins*'s

10    result or otherwise discuss or acknowledge its obvious similarities to the facts and issues

11    here. *Id.*

12    The government argues that estoppel cannot apply to prevent a federal agency

13    from "changing" its "generally applicable[23] policies." *Id.* at 38. It asserts it made no

14    "definite representations" to induce any specific plaintiff to rely on the Carter or Austin

15    Policy, and that any service member's reliance on the Austin Policy to enlist or transition

16    was not reasonable because governmental policies change all the time, for any number of

17    reasons. *Id.* at 39.

18    The Court does not agree. The first Trump administration's Mattis Policy

19    recognized that it would be unfair to exclude otherwise qualified service members who

20    had relied on the prior Carter Policy, and that their "reasonable expectations" should not

21    _____

22    [23] A policy excluding a quasi-suspect class from service is not remotely "generally applicable."

**App. 720**

1    be "lightly dismissed." Dkt. 31-10 at 48. *Landgraf* used similar language to explain that

2    "elementary considerations of fairness dictate that individuals should have an opportunity

3    to know what the law is and to conform their conduct accordingly; settled expectations

4    should not be lightly disrupted." 511 U.S. at 265. The government's current claim that a

5    service member could not have reasonable relied on its unambiguous rules is

6    unsupportable and unpersuasive.

7        The government's argument is essentially that no one can rely on any of its rules,

8    because, obviously, things change. There is no cite, no authority, and no logical support

9    for this proposition. There is ample and ancient authority for the opposite conclusion:

10    "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and

11    embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265

12    at n.17 (citing *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 842–844,

13    855–856 (1990) (Scalia, J., concurring); and *Dash v. Van Kleeck*, 7 Johns, *477, *503

14    (N.Y. 1811) ("It is a principle of the *English* common law, as ancient as the law itself,

15    that a statute, even of its omnipotent parliament, is not to have a retrospective effect")).

16        If it were true that one could not rely on the government's policies, the Army

17    would not have been estopped from precluding Perry Watkins's re-enlistment. The only

18    difference between *Watkins* and this case is that there, the government's rule was that he

19    could not serve but they let him, for 14 years, before changing its rule and attempting to

20    unfairly enforce its new rule to exclude him. Here, the government's position was that

21    transgender service members were eligible, but the government changed its rule,

22    notwithstanding any justifiable reliance or unjust consequences.

ORDER - 57

**App. 721**

1    There is "no single test" for "detecting the presence of affirmative misconduct;

2    each case must be decided on its own facts and circumstances." *Watkins*, 875 F.2d at 707.

3    The "misconduct" in *Watkins* was letting him serve when there was a rule saying he

4    could not, and it was estopped from changing its mind. Here, the government allowed

5    transgender service members to serve and transition openly, but the government has now

6    changed its rule and seeks to exclude those service members for the very conduct it

7    previously assured them was not exclusionary. It was misconduct to lull plaintiffs into a

8    false sense of approval and security as to the military's policies on open transgender

9    service. The facts are not exactly the same as in *Watkins*, but the unmistakable and

10   fundamental unfairness is.

11    Like the Ninth Circuit in *Watkins* this Court has little trouble concluding that all

12   elements of equitable estoppel against the government are present. Active-duty plaintiffs

13   are likely to succeed on the merits of this claim. Equity does not permit this sort of "bait

14   and switch" any more than Due Process does.

15   **D.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.**

16    Plaintiffs argue, and the Court agrees, that they will suffer irreparable harm absent

17   an injunction. Dkt. 23 at 35. The government responds that plaintiffs' claimed harm

18   "related to loss of employment and . . . reputational damage" in the military context does

19   not amount to irreparable harm. Dkt. 76 at 40 (citing *Hartikka v. United States*, 754 F.2d

20   1516, 1518 (9th Cir. 1985)). They further contend that because plaintiffs can "contest any

21   separation in the administrative separation board . . . and seek further [internal] review,"

22   their asserted harm is remediable, not irreparable. *Id.* at 41.

**App. 722**

1    Irreparable harm is "harm for which there is no adequate legal remedy, such as an

2 award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir.

3 2014). When the "internal affairs of the armed forces" are at issue—such as in "cases

4 where military personnel seek preliminary injunctive relief prohibiting a discharge"—

5 plaintiffs must make "stronger showing of irreparable harm than the ordinary standard."

6 *Hartikka*, 754 F.2d at 1518.

7    For active-duty plaintiffs, loss of employment does not ordinarily constitute

8 irreparable harm if "the temporary loss of income" can ultimately be recovered, and

9 "adequate compensatory or other corrective relief will be available at a later date."

10 *Sampson v. Murray*, 415 U.S. 61, 90 (1974). However, in some "genuinely extraordinary

11 situation[s]," the "circumstances surrounding an employee's discharge, together with the

12 resultant effect of the employee, . . . so far depart from the normal situation that

13 irreparable injury might be found." *Id.* at 92 n.68. For example, the "deprivation of

14 constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v.*

15 *Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990,

16 1002 (9th Cir. 2012)). *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (public employees

17 discharged from employment due to partisan political affiliation incurred the loss of First

18 Amendment freedoms that "unquestionably constitute[d] irreparable injury"). *See also*

19 *Assoc. Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412

20 (9th Cir. 1991) (alleged constitutional infringement often alone constitutes irreparable

21 harm).

22

ORDER - 59

**App. 723**

1      Accession plaintiff Medina alleges he will be unable to realize his long-term

2 military career goals if the Hegseth Policy and Military Ban go into effect. Dkt. 29 at 2–

3 4. He may no longer be eligible to join the Marine Corps even if the Policy is reversed by

4 the next presidential administration. *Id.* at 3. While these harms are specific to Medina,

5 the overarching basis for his irreparable harm is the Policy's violation of his

6 constitutional rights.

7      Active-duty plaintiffs not only allege constitutional harms, they are disqualified

8 from military service in circumstances far from "common to most discharged

9 employees." *Sampson*, 415 U.S. at 92 n.68. Plaintiffs' disqualification from military

10 service is not simply a "temporary loss of income" for which they will later receive

11 monetary compensation. *Id.* at 90. It is a definitive loss of career in service to their

12 country directly attributable to the likely unconstitutional Hegseth Policy and Military

13 Ban. A service member's choice to pursue a military career and develop unique skills in

14 that career, once wrongfully discharged, cannot find another military employer outside of

15 the United States Armed Forces.

16      The Court concludes plaintiffs unequivocally meet the heightened standard for

17 irreparable harm.

18 **E.**     **The Balance of Equities and Public Interest Support Injunctive Relief.**

19      The final two elements of *Winter*'s preliminary injunction standard—the balance

20 of equities and the public interest—merge when the government is a party. *Drakes Bay*,

21 747 F.3d at 1092 (9th Cir. 2014). The Court must balance the competing claims of injury

22

**App. 724**

1   and must consider the effect on each party of granting or withholding the requested relief.

2   *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44 (9th Cir. 2007).

3        Plaintiffs contend that the public's interest is in protecting constitutional rights and

4   that where, as here, they have established a violation of those rights, the balance of

5   equities favor injunctive relief. Dkt. 23 at 37 (citing *Ariz. Dream Act Coal.*, 757 F.3d at

6   1068). Active-duty plaintiffs argue that without an injunction, the government will cut

7   short their long and honorable military careers, irrevocably damaging their professional

8   and personal lives. *Id.* Similarly, accession plaintiffs face deprivation of constitutional

9   rights and a meaningful opportunity to serve their country.

10       The government again insists that the Court must defer to its and the Commander

11  and Chief's judgment in military matters. Dkt. 76 at 41. It reiterates that the judgment is

12  "based on" the recommendations of "senior military leaders and experts" who conducted

13  "extensive review and deliberation" and who were "uniquely qualified to evaluate the

14  impacts of policy changes on the combat effectiveness and lethality of the force." *Id.* at

15  41–42 (citing Mattis Policy, Dkt. 31-10 at 23).

16       The flaw in this argument is addressed above. The Court (and plaintiffs) cannot

17  and should not dispute the government's assertion that "the Constitution charges the

18  Commander in Chief with ultimate responsibility over the Nation's military policy." *Id.*

19  But the government's exclusive reliance on the Mattis Policy does not support the

20  unquestionable judgment it claims to have reached. First, the military leaders and experts

21  responsible for the Mattis Policy expressly recognized that both settled expectations and

22  the military's investment in transgender service members counseled *against* separating

ORDER - 61

**App. 725**

1  currently serving transgender service members. Dkt. 31-10 at 48. Mattis—and President

2  Trump—agreed, and the Mattis Policy included a reliance exception. *Id*.

3        Second, the government's response, like the Hegseth Policy implementing the

4  Military Ban, simply ignores the military's experience under the Mattis Policy *and* the

5  subsequent Austin Policy that permitted open transgender service, together for seven

6  years.

7        The Court's deference is not absolute. Absent any evidence that such service

8  requires the immediate implementation of the Military Ban and Hegseth Policy, equity

9  and the public interest support enjoining an unsupported, dramatic and facially unfair

10  exclusionary policy.

**F.    There are Serious Questions Going to the Merits of Each of Plaintiffs'**
**Claims.**

      The Court concludes plaintiffs are entitled to a preliminary injunction under the

alternate *Cottrell* "serious questions" test. Plaintiffs raise serious questions going to their

Equal Protection, Due Process, and First Amendment rights. *Flathead-Lolo-Bitterroot*

*Citizen Task Force*, 98 F.4th at 1190. And, the balance of hardships tips sharply towards

plaintiffs, who suffer not only loss of employment, income, and reputation, but also a

career dedicated to military service. A preliminary injunction is warranted to preserve the

status quo.

**G.    Scope of Injunction.**

      Plaintiffs ask the Court to enjoin the Military Ban and the Hegseth Policy's

enforcement as to themselves and "other current and aspiring transgender

ORDER - 62

**App. 726**

1    servicemembers" nationwide. Dkt. 23 at 10. The government argues that any injunctive

2    relief should be limited to plaintiffs, and must not "interfere with military assignment,

3    deployment, and operational decisions." Dkt. 76 at 42.

4         Injunctions are typically "limited . . . only to named plaintiffs where there is no

5    class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th

6    Cir. 1996). However, district courts have "considerable discretion in ordering an

7    appropriate equitable remedy." *City of S.F. v. Trump*, 897 F.3d 1225, 1245 (9th Cir.

8    2018). "The scope of an injunction is 'dependent as much on the equities of a given case

9    as the substance of the legal issues it presents,' and courts must tailor the scope 'to meet

10    the exigencies of the particular case.'" *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018)

11    (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)) (citations

12    omitted). Where, as here, there is a "sufficiently developed [record] on the nationwide

13    impact" of the challenged actions, courts can craft an injunction to provide nationwide

14    relief. *City of S.F.*, 897 F.3d at 1231, 1244–45.

15         This is the rare case that warrants a nationwide injunction. The record is clear that

16    the Military Ban would impact all branches of the military nationwide. *See, e.g.*, Dkt. 58-

17    1 (Navy implementation); Dkt. 31-15 (Air Force implementation); Dkt. 58-3 (Army

18    implementation). The Court also notes that 21 States have filed an amicus brief indicating

19    that they and their residents will be harmed by the Military ban if this Court fails to

20    enjoin it. Dkt. 53. While these States are not parties, their participation through an amicus

21    brief demonstrates the ultimate national implications of the Military Ban. If the Court

22    were to limit the injunction to the named plaintiffs, it would surely result in a flood of

ORDER - 63

**App. 727**

1   virtually identical litigation nationwide. The fact there are two other district courts

2   adjudicating similar cases, one of which has already entered a preliminary injunction,[24]

3   provides an additional basis for issuing a nationwide injunction here. *See California v.*

4   *United States Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421, 423 (9th Cir. 2019),

5   *judgment vacated on other grounds, Little Sisters of the Poor Saints Peter and Paul*

6   *Home v. Penn.*, 591 U.S. 657 (2020) (no court has held that "an injunction imposed by

7   one district court against a defendant deprives every other federal court of subject matter

8   jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the

9   same defendant").

10         The government does not contest the nationwide impact of the Military Ban or the

11   Hegseth Policy, and they do not explain how a narrower injunction would square with

12   their stated interests in uniformity and unit cohesion. If the Court enjoined the

13   government from implementing the Hegseth Policy and ensuing guidance only as to

14   plaintiffs in this case, the military would presumably begin separating thousands of other

15   transgender service members and refusing to enlist otherwise qualified transgender

16   accession candidates. On the other hand, enjoining such action nationwide pending trial

17   simply continues the status quo. The military has operated under the Austin Policy

18   without any identified complaints about unit cohesion or readiness, for the last four years.

19

20

21   _____

[24] The Talbott preliminary injunction is stayed until 7:00 pm EDT on Friday, March 28.

22   2025 WL 914716, at *8.

ORDER - 64

**App. 728**

1    Without nationwide injunctive relief, there will surely be many more lawsuits,

2  leading to the extraordinary and unnecessary expenditure of effort and resources, and the

3  duplication of discovery and motions practice in district courts across the country.

4    The Court therefore enjoins the Military Ban and Hegseth Policy on a nationwide

5  basis.

6                    **III.  CONCLUSION**

7    Plaintiffs have established their right to a preliminary injunction. They are likely

8  to succeed on the merits of their claims, and they have raised serious and important

9  questions going to the merits of those claims. Absent an injunction, all transgender

10  service members are likely to suffer the irreparable harm of losing the military service

11  career they have chosen, while otherwise qualified accession plaintiffs will lose the

12  opportunity to serve. Because the military has operated smoothly for four years under the

13  Austin Policy, any claimed hardship it may face in the meantime pales in comparison to

14  the hardships imposed on transgender service members and otherwise qualified

15  transgender accession candidates, tipping the balance of hardships sharply toward

16  plaintiffs. There can be few matters of greater public interest in this country than

17  protecting the constitutional rights of its citizens.

18    **IT IS SO ORDERED.**

19    Dated this 27th day of March, 2025.

20

21    _____

22    BENJAMIN H. SETTLE
       United States District Judge

ORDER - 65

**App. 729**

| Document | Classification based on transgender status |
|---|---|
| Dep't of the Navy, Navy Recruiting Command, *Decision Guidance Memorandum #N00-30: Processing of Applicants Identifying as Transgender* (Jan. 28, 2025), ECF No. 14-2. | "Processing of Applicants Identifying as **Transgender**"<br>"This memorandum provides guidance on the processing of applicants who identify as **transgender** in light of the executive order titled "Prioritizing Military Excellence and Readiness," signed by the President on January 27, 2025."<br>"The recent Executive Order mandates a revision of Department of Defense (DoD) policies concerning the enlistment and service of **transgender** individuals."<br>"Effective immediately, any Future Sailors currently in the DEP who are identified as **transgender** will have their ship dates postponed pending further DoD guidance."<br>"Applicants who self-identify as **transgender** are not eligible to process for enlistment at this time." |
| Email: OPS MSG (M) – Immediate Change to Transgender Applicant Processing (Jan. 30, 2025), ECF No. 14-4. | "BLUF: Immediate changes to **transgender** applicant processing."<br>"Process: […] Effective immediately, each **transgender** applicant or applicant who expresses gender dysphoria who are currently undergoing an accession medical evaluation will be left in an 'open' status." |
| Secretary of Defense, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 31, 2025), ECF No. 14-3. | "**Biological sex is an immutable characteristic**. It is not fluid, and it cannot transform."<br>"Review all email systems, such as Outlook, and turn off features that prompt users for their pronouns." |
| Sec'y of Defense, *Prioritizing Military Excellence and Readiness* (Feb. 7, 2025), ECF No. 33-1. | "**Expressing a false 'gender identity' divergent from an individual's sex** cannot satisfy the rigorous standards necessary for military service." |
| Dep't of the Army, *Implementation of Executive Orders related to Transgender Military Service* (EXORD 150-25) (Feb. 7, 2025), ECF No. 37-1. | "SUBJECT: […] IMPLEMENTATION OF EXECUTIVE ORDERS RELATED TO **TRANSGENDER** MILITARY SERVICE."<br>"SITUATION. IN ANTICIPATEION OF UPDATED DOD POLICY, THI SMESSAGE PRESCRIBES INITIAL GUIDANCE ON IMPLEMENTATION OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO **TRANSGENDER** MILITARY SERVICE."<br>"MISSION. EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL IMPLEMENT INITIAL GUIDANCE OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO **TRANSGENDER** MILITARY SERVICE." |
| Dep't of the Army, Fragmentary Order ("FRAGORD") 1 amending EXORD 150-25 (Feb. 14, 2025), ECF No. 49-1. | "SITUATION. [RESTATED] IN ANTICIPATION OF UPDATED DOD POLICY, THI SMESSAGE PRESCRIBES INITIAL GUIDANCE ON IMPLEMENTATION OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO **TRANSGENDER** MILITARY SERVICE." |

**App. 730**

| | "MISSION. [RESTATED] EFFECTIVE IMMEDIATELY, ALL ARMY ORGANIZATIONS WILL IMPLEMENT INITIAL GUIDANCE OF RELEVANT EXECUTIVE ORDER REQUIREMENTS RELATED TO **TRANSGENDER** MILITARY SERVICE." |
|---|---|
| Office of the Under Sec'y of Defense, *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025), ECF No. 63-1. | Page 2: "Effective immediately, the following issuances, policies, and memoranda are cancelled: […] DoDI 1300.28 'In-Service Transition for **Transgender** Service Members,' April 30, 2021, as amended." <br> Page 3: "The Department recognizes two sexes: male and female. **An individual's sex is immutable**, unchanging during a person's life. **All Service members will only serve in accordance with their sex**. . . ." |
| Dep't of the Air Force, Acting Assistant Sec'y for Manpower & Readiness, *Additional Guidance for Executive Order 14183, "Prioritizing Military Excellence and Readiness"* (Mar. 1, 2025), ECF No. 67-1. | Page 2: Accordingly, effective immediately, all ETPs granted pursuant to DAFPM 2021-36-01, *Accessions and In-service Transition for Persons Identifying as **Transgender***, are rescinded." |
| Sec'y of the Army, *Prioritizing Military Excellence and Readiness Implementation Guidance* (Mar. 6, 2025), ECF No. 75-1. | Page 2: "The Army only recognizes two sexes: male and female. **An individual's sex is immutable**, unchanging during a person's life. All Soldiers will only serve in accordance with their sex. . . ." <br> Page 3: "**The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex**." |
| Dep't of the Army, *Implementing Guidance for Executive Order* (EXORD175-25) (superseding EXORD 150-25) (Mar. 7, 2025), ECF No. 75-2. | Page 5: "THE ARMY ONLY RECOGNIZES TWO SEXES: MALE AND FEMALE**. AN INDIVIDUAL'S SEX IS IMMUTABLE, UNCHANGING DURING A PERSON'S LIFE. ALL SOLDIERS WILL ONLY SERVE IN ACCORDANCE WITH THEIR SEX**…." |
| Sec'y of the Navy, *Initial Direction on Prioritizing Military Excellence and Readiness* (ALNAV 023/25) (Mar. 13, 2025), ECF No. 84-1. | Page 3: "**Department of the Navy (DON) recognizes two sexes: male and female. An individual's sex is immutable, unchanging during a person's life.**" <br> Page 3: "[Secretary of the Navy Instruction 1000.11A 'Service of **Transgender** Sailors and Marines'] is cancelled." |
| Chief of Naval Operations, *Initial Execution Related to Prioritizing Military Excellence and Readiness* (NAVADMIN 055/25) (Mar. 13, 2025), ECF No. 87-1. | Page 2: "Gender marker change requests previously submitted under references (d) and (e), will no longer be accepted or processed by MyNavy Career Center (MNCC)." |

**HANDBOOK OF PRACTICE**

**and**

**INTERNAL PROCEDURES**

**UNITED STATES COURT OF APPEALS**

**for the**

**DISTRICT OF COLUMBIA CIRCUIT**

**As Amended Through December 12, 2024**

**PREFACE**

The Handbook of Practice and Internal Procedures of the United States Court of Appeals for the District of Columbia Circuit was first published in 1978. That publication anticipated Section 208(a) of the Federal Courts Improvement Act of 1982, 96 Stat. 54, 28 U.S.C. § 2077, which provides, in pertinent part, "[t]he rules for the conduct of the business of each court of appeals, including the operating procedures of such court, shall be published."

The Handbook was revised in 1987 to reflect major changes in the operations of the D.C. Circuit. These changes included the implementation of the Civil Appeals Management Plan and, in August 1986, a comprehensive new program for managing the Court's entire caseload (Case Management Plan). The Court also began an appellate mediation program. In 1987 the Court issued a full revision of its General Rules — the first complete revision of those rules in nearly a decade.

The 1994 edition of the Handbook accompanied the Court's 1993 revision of its Circuit Rules. The rules were revised and renumbered to parallel more closely the Federal Rules of Appellate Procedure. Additionally, while the basic structure of the Case Management Plan remained, significant modifications were adopted, and the Court completely restructured its Appellate Mediation Program. The Handbook has been revised numerous times since then to reflect federal and local rules amendments as well as changes in court practice.

This Handbook is a practitioner's guide to the Court's rules and internal case management procedures. Counsel and litigants should bear in mind, however, that the Handbook is for guidance only. *The Federal Rules of Appellate Procedure and the Court's Circuit Rules, as well as any orders issued in a particular case, dictate the specific requirements for litigating a case in the D.C. Circuit, and counsel's first obligation is to consult and comply with those rules.*

The Court will continue to revise the Handbook periodically as necessary to reflect changes in its rules and case processing. The Court also encourages practitioners to forward their suggested revisions to the Clerk or the Court's Advisory Committee on Procedures. In publishing the Handbook, the Court seeks to facilitate the efficient disposition of its cases, while maintaining the high standards of appellate litigation and adjudication that are the tradition of the D.C. Circuit.

# TABLE OF CONTENTS

PREFACE. ............................................................................................. i
I. INTRODUCTION TO THE COURT ...................................................... 1
   A. Courthouse. ................................................................................ 1
      1. *Chambers*. ........................................................................... 1
      2. *Office of the Circuit Executive* ............................................... 1
      3. *Office of the Clerk*. ............................................................... 1
      4. *Legal Division*. ..................................................................... 1
      5. *Circuit Library*. .................................................................... 2
      6. *Mediation Office*. .................................................................. 2
   B. PERSONNEL ................................................................................ 2
      1. *Judges*. ................................................................................ 2
      2. *Judges' Staffs*. ..................................................................... 2
      3. *Legal Division*. ..................................................................... 2
      4. *Circuit Executive's Office*. ..................................................... 3
      5. *Clerk's Office*. ...................................................................... 4
      6. *Circuit Library*. .................................................................... 4
      7. *Mediation Office*. .................................................................. 4
   C. COURT ADMINISTRATION ........................................................... 4
      1. *Judicial Council* ................................................................... 4
      2. *Meetings of the Court of Appeals in Executive Session* ............... 4
      3. *Committees* .......................................................................... 5
          (a) Advisory Committee on Procedures ................................... 5
          (b) Committee on Admissions and Grievances ......................... 5
          (c) Criminal Justice Act Panel Committee. .............................. 5
      4. *Judicial Conference*. .............................................................. 5
   D. THE CIRCUIT RULES. ................................................................. 5
II. PRELIMINARY MATTERS ................................................................ 6
   A. ADMISSION TO PRACTICE ........................................................... 6
      1. *When Required* ..................................................................... 6
      2. *Obtaining Admission*. ............................................................ 6
      3. *Exclusion from Practice* ........................................................ 7
   B. REQUESTS FOR INFORMATION. ................................................... 7
      1. *Procedural Questions*. ........................................................... 7
      2. *Court Records*. ..................................................................... 7
      3. *Electronic Public Access to Information*. ................................. 7
      4. *Court Operations During Inclement Weather or Emergency Situations* ................. 8
      5. *The Appeals Management Plan; Complex Cases* ......................... 8
      6. *General Information* .............................................................. 8
      7. *Pending Cases*. ..................................................................... 8
      8. *Disclosure of Panels and Dates* .............................................. 8
          (a) Merits Panels. ................................................................ 8
          (b) Panels Deciding Motions . ................................................ 9
          (c) Disposition of Matters Under Submission ........................... 9
      9. *Press Relations* .................................................................... 9
   C. FILINGS ...................................................................................... 9
      1. *Compliance with Rules* .......................................................... 9
      2. *Timeliness* .......................................................................... 10
      3. *Service* ............................................................................... 11

**App. 736**

4. *Dockets* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
5. *Privacy Protection* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
D. CLERK'S FEES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
E. COMPLAINTS AGAINST JUDGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
III. COMMENCING THE APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
A. PRELIMINARY MATTERS — JURISDICTION. . . . . . . . . . . . . . . . . . . . . 12
1. *Jurisdiction — District Court Cases.* . . . . . . . . . . . . . . . . . . . . 12
2. *Jurisdiction — Administrative Agency Cases.* . . . . . . . . . . . . . . 13
3. *Original Jurisdiction.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
4. *Collateral Review of Local Court Decisions.* . . . . . . . . . . . . . . 13
B. APPEALS FROM THE DISTRICT COURT AS OF RIGHT. . . . . . . . . . . . . 14
1. *How Taken.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
2. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
(a) General Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
(b) Civil Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
(c) Criminal Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
(d) Collateral Challenges in Criminal Proceedings . . . . . . . 15
C. APPEALS FROM THE DISTRICT COURT BY PERMISSION . . . . . . . . . . 16
1. *How Taken* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
D. APPEALS FROM THE TAX COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . 17
1. *How Taken.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
2. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
E. REVIEW OF ADMINISTRATIVE AGENCY ORDERS. . . . . . . . . . . . . . . 17
1. *How Obtained.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
2. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
3. *Intervention.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
F. ENFORCEMENT OF ADMINISTRATIVE AGENCY ORDERS . . . . . . . . . 18
1. *How Obtained.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
2. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
G. ORIGINAL PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
1. *How Taken.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
2. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
3. *Petitions for Writs of Mandamus Challenging District Court Transfers.* . . . . . . . . . . 19
4. *Petitions for Writs of Mandamus Alleging Unreasonable Agency Delay.* . . . . . . . . . . 19
H. JOINT APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
I. CROSS-APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
J. APPEALS EXPEDITED BY STATUTE. . . . . . . . . . . . . . . . . . . . . . . . . . 20
K. CASES WITH RECORDS UNDER SEAL. . . . . . . . . . . . . . . . . . . . . . . . 20
IV. DOCKETING THE APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
A. CASES FROM THE DISTRICT COURT AND THE TAX COURT. . . . . . . . 21
1. *Preliminary Record on Appeal and Preparation of Transcripts.* . . . . . . . . . 21
2. *Transmission of the Record.* . . . . . . . . . . . . . . . . . . . . . . . . . 22
3. *Docketing the Appeal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
B. CASES FROM ADMINISTRATIVE AGENCIES . . . . . . . . . . . . . . . . . . . 23
C. ORIGINAL PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
D. MEDIATION PROGRAM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
V. MULTI-PARTY CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
A. CONSOLIDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**App. 737**

B. Appeals Management Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI. APPEALS *IN FORMA PAUPERIS* AND PURSUANT TO THE CRIMINAL JUSTICE ACT;
    APPOINTMENT OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
A. When Permitted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
B. District Court Dismissal of Suits Brought *In Forma Pauperis*. . . . . . . . . . . . . . . . . . 26
C. Procedural Consequences of *In Forma Pauperis* Status. . . . . . . . . . . . . . . . . . . . . . 26
D. Appointment of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   1. *Time and Manner of Appointment.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   2. *Withdrawal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   3. *Duties in Criminal Appeals.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   4. *Compensation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VII. MOTIONS PRACTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
A. Formal Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
B. Processing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
C. Disposition by the Clerk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
D. Disposition by a Panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
E. Disposition by a Merits Panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
F. Distribution of Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VIII. SPECIFIC MOTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
A. Motions for Stay or Emergency Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
B. Motions to Expedite Consideration of the Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . 34
C. Motions for Release Pending Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
D. Motions for Voluntary Dismissal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
E. Motions for Remand. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
F. Motions to Transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
G. Motions for Summary Disposition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
H. Motions to Unseal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IX. BRIEFS AND APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
A. Briefs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   1. *Timing.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   2. *Consolidated and Joint Appeals.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   3. *Cross-Appeals.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   4. *Amici Curiae and Intervenors.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   5. *Number of Copies.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   6. *Format.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   7. *Length.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   8. *Contents.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   9. *Citation of Supplemental Authorities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
  10. *Briefs Containing Material Under Seal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
B. Appendix. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   1. *Contents.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   2. *Preparation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   3. *Timing; Deferred Appendix.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   4. *Format.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   5. *Number of Copies.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   6. *In Forma Pauperis Appeals* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   7. *Appendix Containing Matters Under Seal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

X. THE COURT'S CALENDAR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
A. Scheduling Sitting Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**App. 738**

B. MERITS PANELS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
C. CASELOAD AND CASE MIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
D. SCHEDULING CASES FOR ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
E. SCHEDULING IN PARTICULAR CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   1. *Special Panel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   2. *Related Cases* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   3. *Cases on Remand to this Court* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   4. *Stipulated Stand-by Pool* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
XI. ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
A. NOTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
B. POSTPONEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
C. ARGUMENT TIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
   1. *Screening by the Panel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
   2. *Rule 34(j) Dispositions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
D. NUMBER OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
E. ARGUMENTS BY *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
F. FORM AND CONTENT OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
G. COURT CLOSINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
H. PROCEDURES FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
I. RECORDINGS AND TRANSCRIPTS OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . 53
XII. MAKING THE DECISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
A. FORMS OF DECISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
B. CASE CONFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
C. PREPARATION OF OPINIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
D. TIMING OF DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
E. NOTICE OF DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
XIII. POST-DECISION PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
A. TERMINATING THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   1. *Enforcement Judgments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   2. *Mandates* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   3. *Remands* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   4. *Costs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
   5. *Disposal of Sealed Records* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
B. RECONSIDERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
   1. *Rehearing by the Panel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
   2. *Rehearing En Banc* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
C. REVIEW BY THE SUPREME COURT OF THE UNITED STATES . . . . . . . . . . . . . . . 59

# I. INTRODUCTION TO THE COURT

## A. COURTHOUSE

The United States Court of Appeals for the District of Columbia Circuit is located in the E. Barrett Prettyman United States Courthouse and William B. Bryant Annex on Constitution Avenue between Third Street and John Marshall Park, Northwest, Washington, D.C. The mailing address is: E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001-2866. The principal facilities of the Court are the judges' chambers, the courtrooms, the Office of the Circuit Executive, the Office of the Clerk, the Legal Division, the Circuit Library, and the Mediation Office.

The United States District Court for the District of Columbia, the United States Bankruptcy Court, the United States Marshal's Office, and the United States Probation Office also are located in the Courthouse.

The Courthouse became a "smoke-free" building in 1996. Smoking is not permitted in the public areas or in any of the Courthouse offices.

### 1. *Chambers*

Access to the area of the judges' chambers is limited to court personnel and others with legitimate reasons for visiting. Visitors should make advance arrangements with the judges' chambers and must be admitted through the security system on the third or fifth floor.

### 2. *Office of the Circuit Executive*

The Office of the Circuit Executive is located in Room 4712 on the fourth floor of the Prettyman Courthouse. Access to the Office is limited to court personnel and others with legitimate reasons for visiting. Visitors should make advance arrangements and must be admitted through the court security system.

### 3. *Office of the Clerk*

The Office of the Clerk's public counter is located in Room 5205. This is where the Court's dockets—the official records of cases before the Court—and orders of the Court may be accessed, paper filings with the Court may be made, and fees for Court services may be paid. The Court's website lists the hours when the Clerk's Office is open. The Clerk's Office is closed on federal holidays and any other day designated by the Chief Judge. A filing depository, available 24 hours a day, 7 days a week, is located inside the entrance to the William B. Bryant Annex on the Third Street side of the Courthouse. *See infra* Part II.C.2. The Clerk's Office does not accept cash as payment, and all in-person payments must be made via check, cashier's check, or money order.

### 4. *Legal Division*

The Legal Division is located on the third floor of the Courthouse. Access to the Legal Division is limited to court personnel and others with legitimate reasons for visiting. Visitors should make advance arrangements and must be admitted through the court security system.

**5.  *Circuit Library***

The Circuit Library, located on the third floor of the Courthouse, may be used by court personnel, members of the bar of the Court of Appeals or the District Court, and any person who is counsel or a party in a case pending in this Circuit, or by the permission of a judge of this Circuit.  Any person wishing to use the government document collection will be admitted for that purpose, subject to generally applicable security and other restrictions.  Library hours and policies are posted on the Court's website.

**6.  *Mediation Office***

The Mediation Office is located in Room 5217 on the fifth floor of the Prettyman Courthouse. Mediation sessions scheduled by the Mediation Office are held in the Mediation Conference Rooms 5720-A, 5720-B, and 5720-C.

**B.  PERSONNEL**

**1.  *Judges***

The Court has eleven authorized Circuit Judgeships.  By statute, the administrative head of the Court is the Chief Judge, a position filled by the most senior judge under the age of 65 at the time the vacancy occurs.  The Chief Judge serves until the age of 70, or for a period of 7 years, whichever occurs first.

In addition to carrying a regular caseload, the Chief Judge is responsible for the administrative business of the Court and the Circuit.  The Chief Judge presides in the courtroom, at the Judicial Council meetings, at the Court's Executive Sessions, and at the Circuit Judicial Conference.  The Chief Judge is also a member of the Judicial Conference of the United States.

Supplementing the judges in full-time "active" service on the Court are Senior Circuit Judges, who handle as full a caseload as they are willing and able to undertake.

**2.  *Judges' Staffs***

Circuit Judges are authorized to hire a total of five staff members.  Typically, active judges employ one judicial assistant and four law clerks.  In addition, the Chief Judge usually hires a Special Assistant for the duration of his or her term.  No contact relating to court business is permitted between the judges' law clerks or judicial assistants and attorneys or other persons outside the Court.  All communications must be made through the Clerk's Office.

**3.  *Legal Division***

The Legal Division is part of the Office of the Clerk.  The Court's central legal staff consists of the Director, Deputy Directors, staff attorneys, and support staff.  The office also occasionally hires attorneys for the Court's Legal Fellows Program; these positions are temporary and unpaid.  The primary duties of the staff attorneys fall into three broad categories:  (1) screening and classifying cases and pleadings filed in the Court; (2) making recommendations to three-judge panels and preparing proposed dispositions in all contested motions and emergency matters; and (3) making recommendations and preparing proposed dispositions in cases decided without oral argument, pursuant to Circuit Rule 34(j).

In addition to supervising the work of the staff attorneys, the Director and Deputies assist panels in managing motions practice, briefing, and oral argument in major cases designated "Complex" under the Court's 1986 Case Management Plan, and in other cases deemed appropriate for management. The Legal Division also screens cases for inclusion in the Court's Appellate Mediation Program.

The Director is responsible for the hiring, training, and supervision of the central legal staff. The Director also works with the Court on major projects related to the Court's overall functioning, including the development and implementation of case processing procedures, and the revision of the Court's Circuit Rules and Handbook of Practice and Internal Procedures.

### 4.  *Circuit Executive's Office*

The Circuit Executive is appointed by the Circuit Judicial Council and serves the United States Court of Appeals, the United States District Court, and the United States Bankruptcy Court in the D.C. Circuit. As secretary to the Council, the Circuit Executive serves as the executive officer of the Council and is responsible for implementing Council policies, developing circuit-wide programs, organizing and staffing Council committees, and other duties mandated by the Judicial Conference of the United States or Congress.

The Circuit Executive's Office was created in 1971 to improve the judicial process throughout the Circuit and to reduce the administrative burden on the judges. Circuit-wide responsibilities include:

Program management for: the judicial conduct and disability program; district and appellate court mediation programs; mailroom services; special events and ceremonies; occupant emergency plan; contract for cafeteria services; temporary emergency personnel fund; security coordination; space and facilities; and the circuit rent budget.

Program support for: senior judge designations; senior judge certifications; bankruptcy judge selection; federal public defender selection; and judges serving on committees of the Judicial Conference.

Serves as: Secretary to the Circuit Judicial Council; Secretary to the Circuit Judicial Conference; Secretary to the Historical Society of the D.C. Circuit; and Secretary to the D.C. Circuit's Court Security Committee and Facility Security Committee.

Generally, the Circuit Executive provides support and advice to the Chief Judges of the Court of Appeals and the District Court on issues affecting the courts in the Circuit.

The Circuit Executive's Office is also responsible for coordinating nonjudicial aspects of the Court of Appeals operations such as: budget development and oversight for appropriated and non-appropriated funds; emergency preparedness coordination including the continuity of operations; IT management and systems administration; management of the employment dispute resolution program and the equal employment opportunity program; property management; and administrative support for court advisory committees. Generally, the Circuit Executive works closely with the appellate court executives and the Circuit Chief Judge on administrative matters affecting the Court of Appeals.

The Circuit Executive's Office staff includes the Circuit Executive, a Deputy Circuit Executive, an Assistant Circuit Executive for Space and Facilities, an Assistant Circuit Executive for IT, an Assistant Circuit Executive for Administration, Administrative Specialists, IT and other staff, and a Director of Workplace Relations.

**5.** *Clerk's Office*

The Clerk's Office is composed of an administrative division, an operations division, and a legal division. *See supra* Part I.B.3. The Clerk's Office maintains the docket of the Court, the official record of all proceedings before the Court, and receives and maintains all filings in the Court, keeping them available for public inspection. It prepares and distributes the judges' sitting schedules and the Court's oral argument calendar; handles attorney admissions to the Court's bar; and prints, records, and distributes all opinions and orders of the Court. The Clerk's Office serves as the Court's liaison with attorneys, litigants, the media, and the general public.

The Clerk's Office also provides the Court with statistical, fiscal, personnel, training, and property and procurement services, as well as other administrative support services. The Clerk's Office assists with investitures, portrait ceremonies, and other ceremonies, presentations, and special events.

**6.** *Circuit Library*

The Circuit Library is administered by the Circuit Librarian and the Associate Circuit Librarian.

**7.** *Mediation Office*

The Mediation Office is administered by the Chief Circuit Mediator, the Circuit Mediators, and a Program Coordinator. The work of the Office's Appellate Mediation Program is described in Part IV.D, *infra*.

## C. COURT ADMINISTRATION

**1.** *Judicial Council*

The Judicial Council of the Circuit, as established by 28 U.S.C. § 332, is composed of the Chief Judge of the Court of Appeals and an equal number of the judges of this Court and of the District Court. The Chief Judge of this Court presides. The Circuit Executive serves as the secretary and administrative officer to the Council. Most business of the Council is conducted through e-mail discussions and votes. Meetings are closed.

The Council is empowered under 28 U.S.C. § 332(d)(1) to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." Any member of the Council may place an item on the agenda by forwarding it to the Circuit Executive for inclusion.

**2.** *Meetings of the Court of Appeals in Executive Session*

Periodically, the judges of the Court of Appeals meet in executive session to discuss the business of the Court. The Chief Judge may also call special meetings to address specific issues. Both active and senior judges attend these meetings and vote on matters of concern to the entire Court. The Chief Judge presides; also generally present are the Circuit Executive and the Clerk. At each meeting the Circuit Executive and the Clerk report to the Court about the Court's caseload and other matters affecting Court operations. Any judge may place an item on the agenda by instructions to the Clerk, who serves as secretary at these meetings. The meetings of the Court in executive session are closed, although on occasion the Chief Judge may request an individual from outside the Court to attend to discuss a matter of concern to the Court.

Six items regularly included on the agenda of the executive sessions reflect the Court's concern with the status of its work:  a report by the Circuit Executive on matters affecting Circuit and Court operations; a report by the Clerk on the Legal Division's caseload of motions, Rule 34(j) cases, and emergency matters; reports providing monthly caseload statistics such as the number of filings and dispositions; reports by each judge on the status of cases assigned to that judge for opinions; reports on cases that have been argued but not yet assigned for the writing of an opinion; and reports on motions or petitions pending before the judges.

### 3.  *Committees*

The Court uses permanent, as well as *ad hoc*, committees in conducting its internal business.  Of particular interest to the bar are the following:

### (a) Advisory Committee on Procedures

Circuit Rule 47.4, in accordance with 28 U.S.C. § 2077(b), formally establishes this Committee.  The Advisory Committee is composed of no less than 15 local attorneys representing all sectors of the profession — government, private, public interest, and academic.  The Committee initiates recommended rule changes and evaluates internal operating procedures in effect or under consideration.  The Committee also serves as a channel of communication between the Court, and the bar and the public.

### (b) Committee on Admissions and Grievances

Rule II of the Court's Rules of Disciplinary Enforcement establishes this Committee, composed of 6 members of the Court's bar.  The Court may refer to the Committee, for investigation, hearing, and report, any allegation of professional misconduct by any member of the Court's bar.  The Committee also advises the Court on its admission policies and practices.

### (c) Criminal Justice Act Panel Committee

Rule II.D of the Court's Plan to Implement the Criminal Justice Act of 1964 establishes a committee to review the operation and administration on the CJA list.  The Committee consists of two active Circuit Judges, the Federal Public Defender, and one experienced criminal practitioner who is on the list and one who is not on the list.

### 4.  *Judicial Conference*

As provided in 28 U.S.C. § 333, the Chief Judge may convene biennially or annually the judges of this Court, the District Court, and the Bankruptcy Court to discuss improvements in the administration of justice within the Circuit.  Public officials especially concerned with the work of these courts, deans of local law schools, and a representative group of local attorneys from the public and private sectors are also invited to participate in the Conference.  The Circuit also will occasionally convene a Conference including only judges and court staff.  Further information on the Conference is contained in Circuit Rule 47.3.

### D.  THE CIRCUIT RULES

Federal Rule of Appellate Procedure 47 permits each court of appeals to make local rules not inconsistent with the Federal Rules of Appellate Procedure.  To become effective, local rules must be approved by a majority of the judges in active service.  In this Circuit the local rules are called the Circuit Rules (cited as "D.C. Cir. Rule ___").

Circuit Rule 47 provides for notice and an opportunity to comment on proposed changes to the Court's local rules. Proposed rule changes are posted in the Court's public office and on the Court's website. Notice of proposed amendments is also published in *The Daily Washington Law Reporter* and sent to the presidents of the District of Columbia Bar, the Bar Association of the District of Columbia, the Washington Bar Association, the Women's Bar Association, and the presidents of any other organization described in Circuit Rule 47(c)(4)(E), who notify the Clerk of the Court that they wish to receive notice of proposed rule changes.

Comments on proposed changes may be submitted in writing to the Advisory Committee on Procedures. The Committee will consider them in formulating its recommendation to the Court and will transmit these comments to the Court, together with its recommendation. The comment period will ordinarily be no less than 45 days.

Circuit Rule 47(b) also provides that any person may propose a change in the rules by submitting a written request directly to the Court or to the Advisory Committee on Procedures.

## II. PRELIMINARY MATTERS

### A. ADMISSION TO PRACTICE
(*See* Fed. R. App. P. 46; D.C. Cir. Rules 1, 46.)

#### 1. *When Required*

An attorney practicing before the Court must be a member of the bar of the Court, except as otherwise provided by law. Membership in the bar of another court does not confer membership in the bar of this Court. The Clerk's Office will not file briefs, motions, or other papers not signed by a member of this Court's bar. The pleading will, however, be lodged with the Court and filed once the attorney becomes a member of the bar of this Court.

There are three qualifications to this rule. First, in order to file a notice of appeal in the district court or a petition for review, an attorney need not be a member of the bar of this Court. The docketing statement and any further filing in the case, however, must be signed by a member of the bar of this Court. Second, the requirement is temporarily suspended whenever a problem of timeliness might arise. Where this is the case, the Clerk will file the pleading and immediately notify counsel of the admission requirement. Third, law students may participate in a case under the direction of a supervising attorney, as provided in Circuit Rule 46(g).

An attorney who is not a member of the Court's bar may be granted leave by the Court to present oral argument in a case. A motion for leave to argue *pro hac vice* must be filed at least 7 days before the date of oral argument by a sponsoring attorney who is a member of the bar of this Court. Counsel may not make repeated appearances *pro hac vice*, but must apply for admission to the bar of the Court instead. Similarly, counsel may not seek to appear *pro hac vice* in order to file pleadings; rather, counsel must apply for admission to the bar of the Court. Counsel who are not members of the bar of the Court or who have not been granted leave to appear *pro hac vice* will not appear on the opinion heading.

#### 2. *Obtaining Admission*

The Court admits to practice before it attorneys who have previously been admitted to the bar of the highest court of a state or to the bar of other federal courts. Applicants must fill out the forms supplied by

the Clerk's Office and submit them with certification of their membership and good standing in the bar that qualifies them for admission. They must also remit the fee specified by order of the Court. Attorneys may be admitted on the written application without a personal appearance. The Clerk's Office will send the attorney a certificate of membership in the bar of the Court.

### 3. *Exclusion from Practice*

As a general rule, employees of the Court may not engage in the practice of law while employed by the Court. *See* D.C. Cir. Rule 1(c). No person employed by the Court, including law clerks, after leaving the employ of the Court, may practice as an attorney in any case that was pending in the Court during the person's term of service. A case is pending in the Court from the moment the appeal or petition for review is docketed until final disposition of the appeal or petition. This prohibition includes signing briefs and giving advice in connection with the case. No former employee of this Court may appear at counsel table or on pleadings in any case in this Court for a period of one year after leaving Court employment.

Suspension or disbarment by any other court of record may result in the suspension or disbarment of a member of this Court's bar. Before any reciprocal discipline is imposed, the attorney will be afforded an opportunity to show cause why he or she should not be suspended from practice in the Court or disbarred. The Court may refer to its Committee on Admissions and Grievances this or any other suggestion of professional misconduct on the part of a member of the bar. *See* D.C. Cir. Rules, Appx. II.

## B. REQUESTS FOR INFORMATION

### 1. *Procedural Questions*

Personnel in the Clerk's Office and the Legal Division are available to answer procedural questions about matters not covered in the Federal Rules of Appellate Procedure, the Circuit Rules, or this Handbook.

### 2. *Court Records*

The Clerk's Office will make available, and will assist in locating, all public records in the possession of the Court. Public records consist primarily of information entered in the docket of the Court and any briefs, motions, or other filings not under seal.

### 3. *Electronic Public Access to Information*

The Court's website, www.cadc.uscourts.gov, provides additional court information to the public. The website allows on-line viewing and printing of court forms; the Circuit Rules, Handbook, and electronic filing procedures; the oral argument calendar; court opinions that are not sealed; and other information concerning the Court. Case information is also available on the PACER website to individuals having a PACER account. There is a fee for access to PACER. To set up an account, interested parties should visit the PACER website, which is accessible via a link from the Court's website.

Persons and organizations funded by federal judiciary appropriations, *e.g.*, attorneys appointed under the Criminal Justice Act, are exempt from the PACER access fee. Anyone exempt under this provision must follow the instructions on the PACER website to activate CJA privileges on their account. In addition, the Court may, for good cause, exempt persons from the PACER access fee to avoid unreasonable burdens and promote public access. Anyone seeking an exemption under this provision should complete an exemption request form and return it to the Clerk's Office.

Under the Court's electronic filing system, attorneys and pro se litigants who have registered as electronic filers will receive electronic notification of docket activity. Only pro se parties and attorneys who have entered an appearance and are listed on the Court's docket will receive electronic notices in a particular case. To register as an electronic filer, consult the PACER Service Center's website. Additional information on the electronic filing system is available on the Court's website.

**4.  *Court Operations During Inclement Weather or Emergency Situations***

Counsel with filing deadlines or who are scheduled to appear for oral argument must check with the Clerk's Office when there is a possibility that the Court may be closed because of inclement weather or an emergency situation. Special announcements on closings can be obtained by calling the Clerk's Office general information number (202-216-7000) or by checking the Court's website.

**5.  *The Appeals Management Plan; Complex Cases***

Questions concerning multi-party, multi-issue cases handled pursuant to the Appeals Management Plan, or designated "Complex" under the Case Management Plan, should be directed to the Legal Division. Questions that can be answered by reference to the dockets should be resolved by consulting the PACER website. *See supra* Part II.B.3. For further assistance, questions can be directed to the Clerk's Office. The Legal Division will, however, advise practitioners whether a case is being managed by the Legal Division, or whether such management would be appropriate.

**6.  *General Information***

Requests for information of a general nature about cases, such as whether a brief or specific pleading has been filed, or whether the Court has acted on a motion, should be directed to the Clerk's Office or obtained by accessing docket information through the PACER website. *See supra* Part II.B.3.

**7.  *Pending Cases***

It is the strict policy of the Court that telephone calls to judges' chambers, or to judges' law clerks or judicial assistants, concerning the status of any pending case or motion will not be accepted. All such calls will be immediately referred to the Clerk or to the Legal Division.

If the inquiry as to a pending case involves procedural questions or matters of public record, it should be made in accordance with the instructions above. If counsel is experiencing a more specialized problem with a case, he or she should call the Clerk, the Chief Deputy Clerk, or the Director of the Legal Division. If the problem does not require immediate attention, the Clerk will usually direct that counsel's inquiry be submitted in writing. The Clerk's Office will forward the letter or motion to the Court or Legal Division, as appropriate.

**8.  *Disclosure of Panels and Dates***

**(a) Merits Panels**

It is the Court's policy not to disclose the identity of the merits panel in the order setting the case for oral argument. The composition of the merits panel will be posted on the Court's website, usually 30 days before the date of oral argument, and will not be disclosed before that time.

When the Court determines a case will be decided without oral argument pursuant to Circuit Rule 34(j), parties will learn the identity of the panel from the order notifying them of that determination. If the case had originally been calendared for argument, the panel will be the one that was assigned to hear the case (posted on the Court's website 30 days before the scheduled argument date).

### (b) Panels Deciding Motions

It is generally the Court's policy not to reveal the identity of panels before whom motions are pending until the order disposing of the motion is issued.

### (c) Disposition of Matters Under Submission

It is also the Court's policy not to reveal in advance the prospective date of disposition of any matter under submission. This policy applies to the Clerk's Office and to the Legal Division, as well as to chambers personnel. Requests for information of this nature are inappropriate. Opinions are available on the Court's website and through PACER. *See infra* Part XII.E.

### 9. *Press Relations*

The Circuit Executive is the designated press officer of the Court.

Requests by artists to sketch court proceedings should be directed to the Clerk's Office well in advance of the scheduled argument. The Court will accommodate all requests unless the panel for reasons of security decides otherwise. Additionally, if the Court receives multiple requests, space considerations may limit the number of sketch artists that can be accommodated.

## C. FILINGS

### 1. *Compliance with Rules*

The Clerk's Office examines all items submitted for filing to ensure that they comply with the Federal Rules of Appellate Procedure and the Circuit Rules. All filings must include the name of the attorney or party making the filing, the firm name, if any, the attorney's or party's postal address and telephone number, and e-mail address for electronic filers. The Clerk's Office has the authority to direct the correction of any filing that is not in compliance with the Federal Rules of Appellate Procedure or the Circuit Rules, or direct the filing of an appropriate motion. If a party fails to comply with the Clerk's direction, the matter will be submitted to a panel for disposition.

Pursuant to Federal Rule of Appellate Procedure 25, the Court has authorized the filing and service of documents by electronic means. *See* D.C. Cir. Rule 25. Electronic filers must consult and comply with the Circuit Rules governing the Court's electronic filing system and with the electronic filing procedures posted on the Court's website. Upon motion and a showing of good cause, the Court may exempt a party from the electronic filing requirements and authorize filing by means other than use of the electronic filing system. *See* D.C. Cir. Rule 25(c)(2).

Audio and video files should be submitted pursuant to the Court's Procedures for Filing Audio and Video Files, which can be found on the Court's website.

**2.** *Timeliness*
(*See* Fed. R. App. P. 25(a), 26; D.C. Cir. Rules 25, 26, 27(g), 28(e).)

In computing times prescribed for filings, the day of the event from which the prescribed period begins to run is not included. All intermediate days are included. If the last day of the period falls on a Saturday, Sunday, legal holiday, or a day on which the Clerk's Office is otherwise closed or inaccessible, the period is extended to the next business day. Fed. R. App. P. 26(a)(1), (3); D.C. Cir. Rule 45(b). For forward-counted periods – that is, periods that are measured after an event – "legal holiday" is defined to include a day declared a holiday by the state in which the circuit clerk's principal office is located. Fed. R. App. P. 26(a)(6)(C). Because "state" includes the District of Columbia for purposes of these rules (Fed. R. App. P. 1(b)), any day that has been declared a holiday by the District of Columbia counts as a legal holiday that extends a deadline, but only when computing a forward-counted period. By contrast, if a filing is due 7 days before an event (for example, before a brief is due), that is considered a "backward-counted period," and if the 7th day falls on a District of Columbia holiday, the filing is due that day because state holidays are not legal holidays when computing a backward-counted deadline.

A document filed electronically is deemed filed on the date and at the time stated on the Notice of Docket Activity from the Court. To be considered timely filed that day, filing must be completed before midnight Eastern Time unless a specific time is set by Court order. *See* D.C. Cir. Rule 26(a). Unless the Court has ordered filing by hand or other means, electronic filers may file paper copies of non-emergency documents by first-class mail, or other class of mail that is at least as expeditious, within 2 business days of the electronic filing. *See* D.C. Cir. Rules 25(d), 32(d)(4).

For non-electronic filers, a motion may be filed by mail addressed to the Clerk, but the papers must reach the Clerk's Office within the time prescribed. Only briefs, not motions or other pleadings, are timely if mailed on the date due. The Court, however, prefers to receive briefs on the date due. Briefs must be filed according to the schedule set by the Court.

Service by methods other than personal or electronic service extends by 3 calendar days the time for responding to the paper served (other than briefs, whose due dates are set by schedule). In addition, for good cause, the Court may extend the time prescribed for filing any papers or allow filings out of time. However, the Court lacks the authority to extend the time for filing papers that commence an appeal, such as a notice of appeal, a petition for review, or a petition filed pursuant to 28 U.S.C. § 1292(b) or Federal Rule of Civil Procedure 23(f).

Any filing or brief (with the exception of emergency, confidential, or sealed documents) may be left, on the date due, in the Court of Appeals filing depository, located inside the William B. Bryant Annex on the Third Street side of the Courthouse, unless the Court has ordered that the filing be made at a time certain. The filing depository is available 24 hours a day, 7 days a week. All filings must be enclosed in an envelope or otherwise securely wrapped. The maximum dimensions for documents deposited are 14 ½ inches by 11 ½ inches by 10 inches. Materials exceeding these dimensions must be split into separate packages and clearly marked. A form provided near the depository must be completed, date/time stamped, and affixed to each package.

Under the Court's Case Management Plan, briefing schedules are usually set after the case has been screened and classified by the Legal Division, and after all outstanding procedural and dispositive motions have been resolved. In cases classified as "Regular Merits" cases, the oral argument date is usually announced by a separate order that is issued after the order establishing the briefing schedule. In cases classified as potential "Rule 34(j)" cases, the briefing schedule is set in the order notifying the parties that

the case might be disposed of without oral argument under Circuit Rule 34(j). Finally, in cases classified as "Complex," or otherwise identified for management under the Case Management Plan, the briefing format and schedule are formulated by the special panel in conjunction with the Legal Division, in most cases based on the parties' responses to an order soliciting a proposed briefing schedule and format. The amount of time for briefing a case may vary, depending on whether it is a district court or agency case, whether there are intervenors or *amici curiae*, whether there are cross-appeals, and whether there is a deferred appendix.

Deadlines are monitored by the Clerk's Office; when the deadlines are not met, the matter is called to the party's attention by phone call, email, letter, or an order from the Court directing the party to show cause why certain action should not be taken. Depending on the nature of the deadline, such action could include dismissal for failure to prosecute the appeal.

The Clerk's Office has been directed to bring to the attention of the Court the names of counsel who repeatedly abuse the time limits in the rules. In extreme instances, this has led to a referral to the Court's Committee on Admissions and Grievances.

*Counsel are advised that whenever there are serious settlement negotiations in progress, including post-argument settlement discussions, the parties must advise the Clerk of that fact and must notify the Clerk at the earliest possible moment if settlement is reached.*

### 3. *Service*
(*See* Fed. R. App. P. 25; D.C. Cir. Rule 25.)

Parties or counsel filing papers must serve copies on all other parties to the case, at or before the time of filing, unless the rules provide for service by the Clerk. Service must be on counsel if a party is represented by counsel. The Notice of Docket Activity that is generated by the Court's electronic filing system constitutes service on all parties who are registered electronic filers. Parties who are not electronic filers must be served by an alternative method of service authorized by Federal Rule of Appellate Procedure 25(c). Any filing that is not served electronically must contain a certificate of service. Service by mail or by commercial carrier is complete on mailing or delivery to the carrier. Service by electronic means is complete on filing or sending, unless the party making service is notified that the paper was not received by the party served. In emergency situations, upon authorization by the Clerk, papers may be filed with the Court electronically or by facsimile transmission.

### 4. *Dockets*

When an appeal is filed in the Court, the Clerk's Office establishes a docket using an annual sequential numbering series. Docket numbers in agency cases begin with "1000" and are prefixed by the year, *e.g.*, 24-1001, 24-1002, *etc*. Docket numbers in criminal cases begin with "3000"; docket numbers in district court civil cases in which the federal government is a party begin with "5000"; docket numbers in district court civil cases involving private parties begin with "7000"; docket numbers in cases which have not yet been accepted for filing begin with "8000"; and docket numbers in attorney disciplinary matters begin with "8500."

### 5. *Privacy Protection*

Litigants must be aware of the federal rules and take all necessary precautions to protect the privacy of parties, witnesses, and others whose personal information appears in court filings. Sensitive personal data must be removed from documents filed with the Court and made available to the public — whether the

**App. 750**

document is filed electronically or in paper form.  All filers must comply with Federal Rule of Appellate Procedure 25(a)(5) and Circuit Rule 25(e) and must follow the guidance on redacting personal data identifiers that is posted on the Court's website.

**D.  CLERK'S FEES**

(*See* D.C. Cir. Rule 45.)

The Judicial Conference of the United States prescribes certain fees to be paid for services performed by the Clerk's Office, including docketing a case on appeal, searching records and certifying the results, providing copies of records or papers, certifying copies of records or papers, and providing copies of the Court's opinions.  These fees, which change periodically, are set forth in a schedule appended to the Circuit Rules and posted on the Court's website.

**E.  COMPLAINTS AGAINST JUDGES**

The procedure for filing complaints against judges is set forth in the Rules for Judicial-Conduct and Judicial-Disability Proceedings.  A copy of these rules may be obtained from the Circuit Executive's Office or the Court's website.

## III.  COMMENCING THE APPEAL

**A.  PRELIMINARY MATTERS — JURISDICTION**

Before filing a notice of appeal or petition for review, parties should consider the following questions:

- Is there subject matter jurisdiction in this case?

- Has the district court or agency fully and finally resolved all issues in the case?

- Is the notice of appeal or petition for review timely?

- Is there a pending motion listed in Federal Rule of Appellate Procedure 4(a)(4) or 4(b)(3) that would make the filing of a notice of appeal ineffective?

- Have the points of error been properly preserved?

- Does the proposed appeal have genuine merit or is it frivolous?

It is critically important for parties to be certain that the Court has jurisdiction to entertain the appeal.  In district court cases, parties should consult the relevant jurisdictional provisions of Titles 18 and 28 of the United States Code; in agency cases, parties should consult the particular statutory provisions and agency regulations bearing on jurisdiction.  This Handbook does not purport to provide a complete and comprehensive guide to federal appellate jurisdiction.  The following summary is intended only to identify generally the bases for the Court's review of district court and agency cases.

### 1.  *Jurisdiction — District Court Cases*

The Court has jurisdiction over all criminal appeals and most civil appeals from the United States District Court for the District of Columbia.  Ordinarily, only final judgments of the district court are

reviewable. *See* 28 U.S.C. § 1291. The question whether an order is "final" may be very complex and requires careful examination of the rules and case law. *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). In suits involving multiple claims or parties, parties should consult Federal Rule of Civil Procedure 54(b), which governs appeals from district court orders that do not dispose of the entire case.

There are certain interlocutory or non-final orders that also can be reviewed, some as a matter of right, and others as a matter of judicial discretion. Interlocutory civil orders reviewable as of right consist of orders granting, continuing, modifying, dissolving, or denying injunctions, and certain orders in receivership, bankruptcy, and admiralty. *See* 28 U.S.C. § 1292(a). With respect to many other interlocutory orders in civil actions, appellate review is possible only if the trial court certifies, pursuant to 28 U.S.C. § 1292(b), that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." In that case, this Court, in its discretion, may permit an appeal from the order. Similarly, the Court may permit an appeal from an order of a district court granting or denying class action certification under Federal Rule of Civil Procedure 23(f). *See* Fed. R. App. P. 5.

With respect to appeals from district court cases, parties also should bear in mind the Federal Courts Improvement Act of 1982, which transferred to the United States Court of Appeals for the Federal Circuit the jurisdiction to hear certain types of cases formerly reviewable in this Court, including appeals where the district court's jurisdiction was based "in whole or in part" on the Tucker Act. *See* 28 U.S.C. § 1295(a)(2).

### 2. *Jurisdiction — Administrative Agency Cases*

The Court reviews final orders of many federal administrative agencies, as well as the Tax Court of the United States. In these cases, the Court's jurisdiction often depends on whether the petitioner or appellant resides, maintains its principal place of business, or does business within the Circuit. Moreover, the statutes providing for judicial review of certain agency decisions also may specify this Circuit as an alternative or a special forum, even where the petitioner or appellant has no contacts with the District of Columbia. Because the criteria vary from agency to agency, counsel must examine the statutes governing reviewability of the particular administrative action in each instance.

### 3. *Original Jurisdiction*

To aid its appellate jurisdiction, the Court may entertain original proceedings pursuant to the All Writs Act, 28 U.S.C. § 1651. These proceedings are usually petitions for writs of mandamus or prohibition. *See* Fed. R. App. P. 21.

### 4. *Collateral Review of Local Court Decisions*

The Court has no authority to entertain direct appeals from orders of the Superior Court of the District of Columbia or the District of Columbia Court of Appeals. Only where a party first makes a collateral challenge to a local court ruling by bringing suit in the United States District Court for the District of Columbia, and the district court enters an appealable order, may the matter be reviewed by this Court on appeal from that order.

**B. APPEALS FROM THE DISTRICT COURT AS OF RIGHT**

**1.** *How Taken*
(*See* Fed. R. App. P. 3, 7.)

Appeals from district court judgments are taken by filing a notice of appeal with the *Clerk of the district court*, at which time the fees for filing and docketing the appeal must be paid to the district court Clerk. The notice must state the court to which the appeal is taken, the ruling being appealed, and the party who is appealing. The Clerk of the district court notifies the other parties when the notice of appeal has been filed. As a matter of courtesy, however, the party taking an appeal also should serve all other parties a copy of the notice of appeal. In civil cases, the district court may require a bond or other security to cover the costs of appeal.

**2.** *Timing*
(*See* Fed. R. App. P. 4.)

**(a) General Rules**

The time for noting an appeal in civil and criminal cases is set forth in Federal Rule of Appellate Procedure 4. Upon a showing of excusable neglect or good cause, however, the district court may enlarge the time for filing a notice of appeal in civil and criminal cases, but only for limited periods. *See* Fed. R. App. P. 4(a)(5), (b)(4).

In addition, the district court may reopen the time to appeal in a civil case if (1) the district court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry; (2) the motion to reopen is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and (3) the district court finds that no party would be prejudiced by reopening the appeal period. *See* Fed. R. App. P. 4(a)(6).

**(b) Civil Cases**

Regardless of which party is appealing, if a party to a case in district court is the United States, one of its agencies, a federal officer or employee sued in an official capacity, or, under certain circumstances, a federal officer or employee sued in an individual capacity, the notice of appeal must be filed within 60 days after entry of the judgment or order, unless a statute provides otherwise. If no party fits into one of these categories, the notice of appeal must be filed within 30 days.

A notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order will ordinarily be treated as filed on the date of and after the entry. If any party has filed a timely motion in the district court for relief under Federal Rules of Civil Procedure 50(b), 52(b), 59, or 60(b) (if filed within the time allowed for filing a motion under Rule 59), however, the time for appeal begins to run from the entry of the order granting or denying that motion. A notice of appeal filed *before* the disposition of any of these motions has a limited effect, and a notice or an amended notice of appeal must be filed within the prescribed time measured from entry of the order disposing of the motion if the party wishes to appeal from an aspect of the judgment affected by the resolution of such a motion. *See* Fed. R. App. P. 4(a)(4).

If Federal Rule of Civil Procedure 58(a)(1) does not require the district court to set forth its judgment on a separate document, the district court's judgment or order is deemed entered for purposes of Federal Rule of Appellate Procedure 4(a) when it is entered on the civil docket under Federal Rule of Civil Procedure 79(a). If Federal Rule of Civil Procedure 58(a)(1) does require the district court to set forth its judgment on a separate document, the district court's judgment or order is deemed entered for purposes of Federal Rule of Appellate Procedure 4(a) when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when either: (1) the judgment or order is set forth on a separate document or (2) 150 days have passed since the entry of the judgment or order in the civil docket, whichever occurs first.

The Clerk of the district court is required to provide notice of the entry of judgment to all parties not in default for failure to appear. A party also may serve an adversary with notice of entry. Lack of notice does not suspend the running of the time prescribed.

If one party files a timely notice of appeal, any other party may file a notice within 14 days thereafter if the usual time to appeal has expired. Thus, if one party files a notice of appeal on the 29th day in a case in which the federal government is not a party, another party may file a notice of appeal on the 43rd day. If one party files a notice of appeal on the 5th day, however, the other party may still wait until the 30th day to file a notice of appeal. If more than one timely appeal is filed, the 14-day period begins to run from the time the first appeal is filed.

### (c) Criminal Cases

The defendant must appeal within 14 days after entry of the judgment or order being appealed or within 14 days of the government's notice of appeal. The government has 30 days to appeal in those limited situations when it is allowed to do so by statute. *See* 18 U.S.C. §§ 3731, 3742.

A timely motion for judgment of acquittal, arrest of judgment, or for a new trial on any ground other than newly discovered evidence, terminates the running of the time prescribed for appealing from a criminal conviction. A motion for a new trial on the ground of newly discovered evidence also terminates the running of time to file a notice of appeal, if the motion is made within 14 days of the entry of judgment. A new 14-day period within which to appeal from the judgment, as well as from the denial of any of the enumerated motions, begins to run after entry of the order disposing of the last such remaining motion or after entry of the judgment, whichever is later. *See* Fed. R. App. P. 4(b); Fed. R. Crim. P. 33, 34.

Absent extraordinary circumstances, direct criminal appeals will not be held in abeyance pending the filing and disposition of a postconviction motion in the district court. *See* D.C. Cir. Rule 47.5.

### (d) Collateral Challenges in Criminal Proceedings

Petitions for writs of habeas corpus and motions attacking sentence under 28 U.S.C. § 2255 are civil cases for purposes of computing the time for appeal. Parties should consult appropriate authorities to determine whether other proceedings are deemed civil or criminal in nature to determine the appropriate filing period.

## C. APPEALS FROM THE DISTRICT COURT BY PERMISSION
(*See* Fed. R. App. P. 5; D.C. Cir. Rules 5, 25(c)(3), 32(d)(3).)

### 1. *How Taken*

Currently, discretionary appeals from interlocutory decisions of the district court are authorized in two instances, under 28 U.S.C. § 1292(b) and Federal Rule of Civil Procedure 23(f).  *See* 28 U.S.C. § 1292(e). Under either provision, interlocutory appeals from the district court are taken by filing with the Clerk of this Court a petition for permission to appeal, served on all parties to the action in the district court, and accompanied by a certificate of parties and *amici curiae* as described in Circuit Rule 28(a)(1)(A), and any disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1.  *See* D.C. Cir. Rule 5(a).  The petition is limited to 5,200 words if produced using a computer and 20 pages if handwritten or typewritten.  The petition must state the facts necessary to understand the question presented, the question itself, the relief sought, and the reasons why the appeal should be allowed and is authorized by a statute or rule.  The petition must include a copy of the order complained of and any related opinion or memorandum, as well as any required order stating the district court's permission to appeal or finding that the necessary conditions to appeal are met.  The petition may be filed either electronically or in paper form. *See* D.C. Cir. Rule 25(c)(3).  In addition to the electronic filing or the original in paper form, 4 paper copies of the petition must also be filed.  *See* D.C. Cir. Rules 5(c), 32(d)(3).

Because the petition is not itself an appeal, but rather a request to the Court asking that docketing of the appeal be allowed, a docketing fee is not required unless the Court grants the petition.

The adverse party may respond to the petition within 10 days.  A response may not exceed 5,200 words if produced using a computer and 20 pages if handwritten or typewritten.  Any reply, limited to 2,600 words if produced using a computer and 10 pages if handwritten or typewritten, is due within 7 days thereafter. *See* D.C. Cir. Rule 5(b).  There is no oral argument on the application unless the Court so orders.  The Court refers these petitions to a special panel for disposition as soon as the matter has been fully briefed.

If the Court grants permission to appeal, a notice of appeal is unnecessary.  This Court enters an order granting permission to appeal, and transmits a certified copy of it to the Clerk of the district court.  This certified copy serves as a notice of appeal.  The appellant must pay the docketing fee to the Clerk of the district court within 14 days after entry of the order granting permission to appeal.  Once the Clerk is notified by the district court that the fee has been paid, the appeal will be docketed and the case transmitted to the Legal Division for screening.

### 2. *Timing*

The petition for permission to appeal under 28 U.S.C. § 1292(b) must be filed within 10 days after the entry of the interlocutory order containing the statement prescribed in the statute, or within 10 days after the entry of an order amending the prior interlocutory order to include the district judge's statement required by that section.  The petition for permission to appeal under Federal Rule of Civil Procedure 23(f) must be filed within 14 days after entry of the order granting or denying class action certification.

## D.  APPEALS FROM THE TAX COURT
(*See* Fed. R. App. P. 13, 14.)

### 1.  *How Taken*

These appeals are taken by filing a notice of appeal with the Clerk of the Tax Court in the District of Columbia.  Filing by mail is permitted.  The notice must identify the court to which the appeal is taken, the ruling being appealed, and the party who is appealing.  The Clerk of the Tax Court notifies the other parties that a notice of appeal has been filed, but it is good practice for the party taking an appeal also to serve all other parties with a copy of the notice of appeal.

### 2.  *Timing*

The notice of appeal must be filed within 90 days after entry of the decision of the Tax Court.  If a timely notice is filed, any other party may take an appeal by filing a notice of appeal within 120 days after entry of the decision.  A notice of appeal mailed and postmarked *before* the prescribed time expires, but received *after* it expires, is treated as timely under 26 U.S.C. § 7502.

A motion to vacate or revise a decision, timely filed under the Rules of Practice of the Tax Court, terminates the running of time for filing a notice of appeal from that decision.  The new time begins to run for all parties from entry of an order disposing of the motion, or from entry of a new decision, whichever is later.

## E.  REVIEW OF ADMINISTRATIVE AGENCY ORDERS
(*See* Fed. R. App. P. 15; D.C. Cir. Rules 15, 25(c)(3).)

### 1.  *How Obtained*

To obtain review of an administrative agency order, a party must file a petition for review (or other document prescribed by the applicable statute) with the Clerk of this Court.  The petition for review must designate the party seeking relief, the respondent(s), and the order to be reviewed.  The respondent is the appropriate agency or officer of that agency.  Some statutes also require the United States to be named as a respondent, and some statutes require the petitioner to attach a copy of the agency order or rule for which review is sought.  The petition may be filed either electronically or in paper form.  *See* D.C. Cir. Rule 25(c)(3).  No additional paper copies of the petition are required unless the court directs otherwise.  *See* D.C. Cir. Rule 25(d).  In addition, the petitioner must serve a copy of the petition on all other parties who were participants in the agency proceeding, except in informal rulemaking proceedings, such as, for example, those covered by the Administrative Procedure Act, 5 U.S.C. § 553, or other statutory authority.  In these informal rulemaking cases, petitioner need serve copies only on the respondent agency, and on the United States if required by statute.  Petitioner also must file a list of those served.  When the number of parties filing comments in informal rulemaking proceedings is not too great to impose an undue burden, it is courteous to serve those parties with a copy of the petition for review, although a copy of the agency order need not be attached.

### 2.  *Timing*

The time for filing the petition for review is prescribed by the statute that sets forth the procedures for obtaining judicial review of the particular agency's orders.

**3.** *Intervention*

Unless the applicable statute provides otherwise, a party who wishes to intervene must file a motion for leave to intervene with service on all parties to the proceeding before this Court. The motion must contain a concise statement of the party's interest in the case, and the grounds for intervention. The motion must be filed within 30 days of the filing of the petition for review and must be accompanied by any disclosure statement required by Circuit Rule 26.1. A motion to intervene in a proceeding before this Court concerning direct review of an agency action will be deemed a motion to intervene in all cases before the Court involving the same agency action or order, including later filed cases, unless the moving party specifically advises otherwise. An order granting such a motion has the effect of granting intervention in all such cases, which are typically consolidated.

**F. ENFORCEMENT OF ADMINISTRATIVE AGENCY ORDERS**

**1.** *How Obtained*
(*See* Fed. R. App. P. 15(b); D.C. Cir. Rule 25(c)(3).)

When authorized by statute, a party may seek enforcement of an administrative agency order by filing an application with the Clerk of this Court. A cross-application for enforcement also may be filed by a respondent to a petition for review, if the Court has jurisdiction to enforce the order. Any application for enforcement must contain a concise statement of the proceedings in which the order sought to be enforced was entered, the party against whom the order is to be enforced, the facts upon which jurisdiction and venue are based, and the relief sought. The application for enforcement may be filed either electronically or in paper form. *See* D.C. Cir. Rule 25(c)(3). No additional paper copies of the application are required unless the Court directs otherwise. *See* D.C. Cir. Rule 25(d). The Clerk's Office serves the respondents; the petitioner serves all other parties who participated before the agency.

The respondent to the enforcement petition must serve and file an answer within 21 days. Where no answer is filed, the Court will enter a judgment in favor of the moving party.

**2.** *Timing*

The time for filing an enforcement application is prescribed by the applicable statute.

**G. ORIGINAL PROCEEDINGS**
(*See* Fed. R. App. P. 21; D.C. Cir. Rules 21, 25(c)(3), 32(d)(3).)

**1.** *How Taken*

A party seeking a writ of mandamus or prohibition directed to a judge, or seeking any other extraordinary writ, must file a petition with the Clerk of this Court and serve the respondent judge or agency and all parties to the action in the trial court or to proceedings before the agency. The petition is limited to 7,800 words if produced using a computer and 30 pages if handwritten or typewritten. The petition must comply with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The petition must contain a statement of the issues, the necessary facts, the relief sought, and the reasons the writ should issue. It must include copies of any relevant order or opinion, necessary parts of the record, a certificate of parties and *amici curiae* as described in Circuit Rule 28(a)(1)(A), and any disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1. Circuit Rule 21 prescribes the manner of captioning the action. The petition

may be filed either electronically or in paper form. *See* D.C. Cir. Rule 25(c)(3). In addition to the electronic filing or the original in paper form, 4 paper copies of the petition must also be filed. *See* D.C. Cir. Rules 21(c), 32(d)(3).

The Court handles petitions for extraordinary writs in the same way as dispositive motions, referring them to a special panel for disposition. *See infra* Part VII.D. If the panel finds the petition to be without merit, it may deny the petition without calling for an answer. Otherwise, the panel issues an order fixing a time within which an answer must be filed. The Court may order oral argument on the petition.

### 2. *Timing*

No time limits are applicable.

### 3. *Petitions for Writs of Mandamus Challenging District Court Transfers*

Any order by the district court transferring a case to another district is not an appealable order. Therefore, litigants seeking to challenge such a transfer frequently file petitions for writ of mandamus with this Court. *See In re Scott*, 709 F.2d 717 (D.C. Cir. 1983) (per curiam); *see also supra* Part III.G.1. Unless the case was transferred to an improper forum or there is a substantial issue whether the district court had power to order the transfer, once physical or electronic transfer of the original record takes place, jurisdiction is exclusive in the transferee court, and this Court has no power to review the transfer decision. *See In re Asemani,* 455 F.3d 296, 300 (D.C. Cir. 2006); *In re Briscoe*, 976 F.2d 1425 (D.C. Cir. 1992); *Starnes v. McGuire*, 512 F.2d 918, 924 (D.C. Cir. 1974) (*en banc*).

### 4. *Petitions for Writs of Mandamus Alleging Unreasonable Agency Delay*

The Court has identified a category of petitions for writ of mandamus to compel administrative agency action unreasonably delayed. *See In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 n.5 (D.C. Cir. 1985); *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984). These petitions are treated in the same manner as other petitions for writ of mandamus, *i.e.*, petitions are limited to 7,800 words if produced using a computer and 30 pages if handwritten or typewritten and must comply with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), the petition is initially considered by the special panel, and no petition will be granted unless the Court orders an answer.

### H. JOINT APPEALS
(*See* Fed. R. App. P. 3(b), 15(a).)

Persons entitled to appeal whose interests make joinder practicable may file a joint notice of appeal or petition for review, or they may move to consolidate their cases after filing separate timely notices or petitions. Parties taking joint appeals must list individually each appellant or petitioner. The Court also may consolidate cases on its own. *See infra* Part V.A.

### I. CROSS-APPEALS
(*See* Fed. R. App. P. 28.1; D.C. Cir. Rule 28.1.)

Appellees, in cases appealed from the district court, may generally, without filing a cross-appeal, defend a judgment on any ground raised in the district court, even if that ground was rejected, not considered, or raised *sua sponte* by the district court. They may not, however, attack the judgment, either to enlarge their

own rights or to lessen the rights of their adversary, except by filing a cross-appeal. A cross-appeal also is necessary where appellees seek to correct an error in, or to supplement, the district court's judgment. Unless the parties otherwise agree and notify the Clerk's Office, or the designation is modified by court order, the party that files the first notice of appeal files the first brief. *See* Fed. R. App. P. 28.1(b); D.C. Cir. Rule 28.1(a). The time for taking cross-appeals is set out *supra* at Part III.B.2.(b).

## J. APPEALS EXPEDITED BY STATUTE
(*See* Fed. R. App. P. 9(a); D.C. Cir. Rule 47.2.)

For several categories of appeals, the Federal Rules of Appellate Procedure and the Circuit Rules expressly prescribe special procedures. For example, the following matters are to be expedited, but this list is not exhaustive: appeals by the government from dismissal of an indictment or information or from suppression of evidence in a criminal proceeding, pursuant to 18 U.S.C. § 3731; appeals by recalcitrant witnesses from summary confinement, pursuant to 28 U.S.C. § 1826; appeals from denial or grant of pretrial release in criminal cases, pursuant to 18 U.S.C. § 3145; appeals from habeas corpus proceedings, pursuant to 28 U.S.C. chapter 153; appeals of certain orders entered in any case brought by the Federal Deposit Insurance Corporation, pursuant to 12 U.S.C. § 1821(q)(1); and appeals from any action for temporary or preliminary injunctive relief, pursuant to 28 U.S.C. § 1657(a). Counsel should consult these statutes and the relevant rules with care. A party desiring a more expedited schedule than that entered by the Clerk, or expedited oral argument, must file a motion. *See infra* Part VIII.B.

Other sections of this Handbook bear on emergency motions, motions for release pending appeal, and the calendaring of emergency and expedited appeals. *See infra* Parts VIII.A, B, C.

## K. CASES WITH RECORDS UNDER SEAL
(*See* D.C. Cir. Rules 25(c)(4), 47.1.)

Any portion of the record that was placed under seal in the district court or before an agency remains under seal in this Court unless otherwise ordered. Parties and their counsel are responsible for assuring that materials under seal remain under seal and are not publicly disclosed. Matters under seal may not be filed in the Court of Appeals drop box. For privacy protections that govern all cases filed in this Court, see *supra* Part II.C.5.

In any case in which the record in the district court or before an agency is under seal in whole or in part, each party must review the record to determine whether any portions of the record under seal should remain under seal on appeal. If a party determines that some portion should be unsealed, that party must seek an agreement on the unsealing. Such agreement must be promptly presented to the district court or agency for its consideration and issuance of an appropriate order. *See* D.C. Cir. Rule 47.1(b); *see also infra* Parts VIII.H (discussing motions to unseal), IX.A.10 (discussing briefs containing material under seal), IX.B.7 (discussing appendices containing matters under seal). For procedures governing disposal of sealed records, see *infra* Part XIII.A.5.

Any document containing material under seal, or containing material that a party is seeking to place under seal, may not be filed using the Court's electronic filing system. *See* D.C. Cir. Rule 25(c)(4). Such documents must be filed in paper form or in a nonpublic electronic format as set forth on the Court's website.

## IV.  DOCKETING THE APPEAL

### A.  CASES FROM THE DISTRICT COURT AND THE TAX COURT

#### 1.  *Preliminary Record on Appeal and Preparation of Transcripts*
(*See* Fed. R. App. P. 10.)

The preliminary record on appeal, prepared in the district court Clerk's Office or the Tax Court Clerk's Office, consists of the notice of appeal and the district court docket entries.  Upon receipt of the preliminary record, a case administrator in this Court's Clerk's Office dockets the appeal, assigns it a number, and gives notice of the filing to all parties by issuing an order scheduling certain submissions.  In addition, a case administrator checks to see that the docketing fee has been paid and issues an appropriate order if it has not.

The documents and exhibits filed in the district court; the transcript of proceedings, if any; and the docket entries prepared by the Clerk of the district court, constitute the record on appeal.  The parties may correct errors or omissions in the record by stipulation.  In the event of a dispute, this Court has the power to require that the record be corrected or amplified, but disputes about the accuracy of the record must first be submitted to the district court.

Within 14 days of filing the notice of appeal in a civil case, or entry of an order disposing of the last timely remaining motion as specified in Federal Rule of Appellate Procedure 4(a)(4)(A), appellants must order from the court reporter a transcript of such parts of the proceedings not already on file that they consider necessary to dispose of the appeal.

Counsel has the responsibility for assuring expeditious preparation of the transcript in a criminal appeal.  If any unusual problems arise with the court reporter, they should be brought to this Court's attention immediately.  Where the defendant proceeded *in forma pauperis* in the district court, that court, by local practice, requires appointed counsel to order the transcript at the same time as filing the notice of appeal.

Unless the entire transcript is ordered, the appellant must file and serve on the appellee a designation of the parts of the transcript ordered, and a statement of the issues to be presented on appeal.  The appellee has 14 days to file and serve a cross-designation of additional parts of the transcript.  If the appellant refuses to order the additional portions, appellee should do so, or ask the district court to compel the appellant to comply.

When, as is often the case, a complete transcript has been made during the trial, and it is filed with the Clerk, no designation need be made.  The parties, however, must include in the appendix to the briefs only those portions of the transcript that are pertinent to the appeal.  Awards of costs and sanctions may be imposed where a party has included unnecessary material in the appendix.  *See infra* Part IX.B.

If no transcript is available, the appellant may prepare and file with the district court a statement of the evidence or proceedings based on the best available means, including recollection, and serve it on the appellee.  The appellee has 14 days to serve objections or proposed amendments in response.  The district court then approves the statement as submitted or amended, and certifies it to this Court as the record on appeal.

As with transcript designations, the parties are encouraged to agree on what exhibits are necessary to resolve the appeal, but in the absence of an agreement they may cross-designate exhibits.

**App. 760**

In civil cases, the district court returns the exhibits to the parties who filed them. In criminal cases, the exhibits are given to the United States Attorney. If a party wants an exhibit presented in the courtroom during oral argument to this Court, counsel must notify the Court in writing at least 7 days before the argument date, and deliver the exhibit to the Clerk's Office. If the Court requests an exhibit, the parties will be notified and directed to deliver the exhibit to the Clerk's Office.

### 2. *Transmission of the Record*
(*See* Fed. R. App. P. 11; D.C. Cir. Rule 11.)

The district court transmits the preliminary record in all cases a few days after the notice of appeal is filed. Counsel should keep in mind that, unlike other federal circuits, briefing schedules in this Court, where the case has been scheduled for argument, are *not* computed from the date on which the record is filed in this Court. Rather, briefing schedules are established by order. *See infra* Part IX.A.1.

### 3. *Docketing the Appeal*
(*See* Fed. R. App. P. 12; D.C. Cir. Rule 12.)

After an appeal has been docketed, the Clerk's Office enters an initial scheduling order that specifies the dates on which the docketing statement and initial submissions, procedural motions, and dispositive motions are due. In civil cases, the order directs the appellant to file within 30 days a docketing statement on a form provided by the Clerk's Office and to serve a copy on all other parties and *amici curiae*. The docketing statement includes information about the type of case; the district court or agency case number; relevant dates; the order sought to be reviewed; related cases; relevant statutes; and counsel's name, e-mail address, postal address, and telephone number. A copy of the district court judgment under review must be submitted with the docketing statement, as well as a preliminary statement of the issues for appeal and a transcript status report. This material assists the Clerk's Office and the Legal Division in screening and classifying all new appeals, identifying related cases in this Court, and detecting possible jurisdictional problems. The information about preparation of the transcript is especially important to ensure against delays as the case is processed. The parties also may include a stipulation to be placed in the stand-by pool for argument or a request to be included in the Court's mediation program. *See infra* Part IV.D (discussing the Court's mediation program), and Part X.E.4 (discussing the requirements to enter the stand-by pool).

Appellants must provide with the docketing statement a provisional certificate setting forth the information specified in Circuit Rule 28(a)(1), identifying parties, intervenors, and *amici* in the district court proceedings and in this Court, including any disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1. Circuit Rule 26.1 requires corporations, associations, joint ventures, partnerships, syndicates, or other similar entities appearing before the Court to file a disclosure statement that identifies all parent companies and any publicly-held company that has a 10% or greater ownership interest (such as stock or partnership shares) in the entity. The statement also must identify the represented entity's general nature and purpose, as relevant to the litigation, and if the entity is unincorporated and its members have no ownership interests, the statement must include the names of any members of the entity that have issued shares or debt securities to the public. No listing need be made, however, of the names of members of a trade association or professional association.

In civil cases, the provisional certificate filed with the docketing statement is necessary to enable the Clerk's Office to avoid assigning matters to a judge who would be recused because of an association with a party or counsel in the case.

Appellees must file, within 7 days of service of the docketing statement, or upon filing a motion, response, or answer, whichever occurs first, any disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1. *See* Fed. R. App. P. 26.1(d). Any disclosure statement required by Circuit Rule 26.1 must also accompany a motion to intervene, a written representation of consent to participate as *amicus curiae,* and a motion for leave to participate as *amicus. See* D.C. Cir. Rules 12(f), 15(c)(6). The disclosure statement and a Rule 28(a)(1)(A) certificate of parties and *amici* must likewise accompany a petition for panel rehearing or rehearing *en banc,* and the disclosure statement must be attached to any response to a petition. *See* D.C. Cir. Rule 40(c).

In an appeal from a pretrial release or detention order in a criminal case, the government must file any disclosure statement required by Federal Rule of Appellate Procedure 26.1(b) with the memorandum of law and fact or any response thereto, unless the statement has been filed previously with the Court. *See* D.C. Cir. Rule 9(a)(4). For applications for release after a judgment of conviction, the government must file any disclosure statement required by Federal Rule of Appellate Procedure 26.1(b) with any response to the application, unless the statement has been filed previously with the Court. *See* D.C. Cir. Rule 9(b).

A revised corporate disclosure statement must be filed any time there is a change in corporate ownership interests that would affect the disclosures required under Circuit Rule 26.1. Similarly, the statement required by Federal Rule of Appellate Procedure 26.1 must be supplemented whenever the required information changes.

## B. CASES FROM ADMINISTRATIVE AGENCIES
(*See* Fed. R. App. P. 15, 16, 17; D.C. Cir. Rules 15, 17.)

In cases from administrative agencies, docketing occurs at the time the petition for review or notice of appeal is filed and precedes transmission of the record. The appellant or petitioner must remit the docketing fee to this Court at that time. For information the parties are required to provide with the docketing statement, motions, and rehearing petitions, see *supra* Part IV.A.3. In addition, in cases involving direct review of administrative agency actions, the docketing statement must contain a brief statement of the basis for the appellant's or petitioner's claim of standing. *See* D.C. Cir. Rule 15(c)(2).

The record on review consists of the order sought to be reviewed or enforced; the findings or report on which it is based; and the pleadings, evidence, and proceedings before the agency. The record may later be corrected or supplemented by stipulation or by order of this Court, as in the case of an appeal from the district court.

Because of a lack of storage space, the record before the administrative agency is not transmitted to this Court at the time of docketing; only a certified index to the record is submitted by the agency. Any party to the proceeding may, by motion, subsequently request that part or all of the record be transmitted to the Court, or the Court on its own may require transmission of the record. It is the duty of the agency to maintain the record so that it can be transmitted to the Court with a minimum of delay. In most cases, however, transmission of the actual record will be unnecessary because the appendix must contain those documents necessary for the Court's review.

The administrative agency submits to this Court the certified index to the record within 40 days of the filing of the petition for review or application for enforcement, unless the statute authorizing review or the Court's scheduling order sets a different time. The date of filing the certified index is deemed to be the date the record is filed.

## C. Original Proceedings

No record is prepared or transmitted to the Court in original proceedings. Any documents from the district court or agency proceedings that are necessary to understand the issues being presented should, however, be attached to the petition or included in an appendix. The petitioner seeking a writ of mandamus or other extraordinary relief must remit the docketing fee to the Clerk of this Court before the petition will be accepted for filing.

## D. Mediation Program

Program procedures are described in the Court's Revised Order establishing the Appellate Mediation Program. All civil cases docketed in the Court are screened by the Mediation Office and the Legal Division. Those deemed appropriate for mediation, in whole or in part, are referred to the Chief Circuit Mediator for further assessment and placement into the Program. Litigants may request mediation using the Clerk's Office "Confidential Request to Enter Appellate Mediation Program" form. The form is submitted directly to the Mediation Office and not entered into the docket or served upon the other parties.

Mediation procedures are explained to counsel when a case is selected for mediation. Counsel are also advised of the Mandatory Notification of Settlement Proceedings notice (issued by the Clerk on March 1, 2016). The notice provides that the parties must notify the Clerk when serious settlement negotiations begin and at the earliest possible moment if a settlement is reached.

## V. MULTI-PARTY CASES

### A. Consolidation

In order to achieve the most efficient use of the Court's resources, as well as to maintain consistency in its decisions, the Court generally will consolidate, on its own motion or on motion of the parties, all appeals and cross-appeals from the same district court judgment or order, and all petitions for review of agency orders entered in the same administrative proceeding. In addition, other cases involving essentially the same parties or the same, similar, or related issues, may be consolidated. When cases are consolidated, the Clerk's Office designates one case (usually the one with the lowest docket number) as the "lead" case but usually enters items filed in any of the consolidated cases on the dockets of all the cases.

As noted in Part III.H, *supra*, parties with common interests also may file a joint notice of appeal or petition for review.

Once cases are consolidated, they are treated as one appeal for most purposes. They generally follow a single briefing schedule, they are assigned for hearing on the same day before the same panel, argument time is allotted to the cases as a group, and they are decided at the same time. Each case retains some of its individual identity, however. For example, motions may be filed in one case and not in others, and extensions of time in one case do not necessarily extend the time in any others. Joint briefs are encouraged pursuant to Federal Rule of Appellate Procedure 28(I). Briefing by intervenors is governed by Circuit Rule 28(d). *See infra* Part IX.A.4.

### B. Appeals Management Plan

The Director of the Legal Division administers the Court's plan for the management of its caseload. The objectives of this plan are: (1) to achieve an efficient and organized presentation of appeals in complex,

multi-party litigation; (2) to identify early in the appellate process cases that either are not ripe for review or are appropriate for summary disposition; and (3) to enhance the Court's control of the pace of the appellate process. An important characteristic of the plan is its flexibility and informality. Although the Director of the Legal Division ordinarily determines which cases will require special attention or management under the plan, counsel for the parties are encouraged to notify the Director or the Clerk of cases that may be appropriate for such treatment.

In carrying out the plan, the Director of the Legal Division is authorized to obtain from counsel information that will assist the Court in making decisions about the appointment of lead or liaison counsel, joint briefing, briefing schedules, motions dispositions, and oral argument dates and formats. The Director may obtain this information informally by letter, email, or telephone, by meeting with counsel, or by requesting the Clerk's Office to issue directives to counsel.

In any case pending before the Court, counsel may independently file proposals to facilitate briefing and other matters. On the recommendation of the Director of the Legal Division, the Clerk's Office may issue procedural orders that reflect the agreement of counsel. Where agreement is not achieved, or where the Director believes the circumstances warrant it, the Court will issue procedural orders in cases managed under the plan.

## VI. APPEALS *IN FORMA PAUPERIS* AND PURSUANT TO THE CRIMINAL JUSTICE ACT; APPOINTMENT OF COUNSEL

### A. WHEN PERMITTED
(*See* Fed. R. App. P. 24; D.C. Cir. Rule 24.)

The district court and this Court are authorized by 28 U.S.C. § 1915 and Federal Rule of Appellate Procedure 24 to allow an appeal, civil or criminal, to be taken without payment of the docketing fee or costs by a non-incarcerated person who makes an affidavit of indigence. While an incarcerated litigant may also proceed *in forma pauperis,* in civil cases the prisoner will be required to pay the full amount of the filing fee — albeit in monthly installments. *See* 28 U.S.C. § 1915(b). Any non-incarcerated person who has been permitted to proceed *in forma pauperis* in the district court may proceed *in forma pauperis* in this Court, unless the district court finds and states in writing that the appeal is not taken in good faith, or that the party is otherwise not entitled to that status. A party who wishes to claim *in forma pauperis* status for the first time in this Court, or a prisoner who seeks to appeal *in forma pauperis*, must first apply to the district court and, if permission is granted, no further authorization from this Court is necessary. If that party is a prisoner, however, a fee will nonetheless be assessed by this Court.

If the district court denies permission to proceed on appeal *in forma pauperis*, or revokes *in forma pauperis* status previously granted in the district court, the party may, within 30 days of service of notice of the district court's action, move this Court for leave to proceed on appeal *in forma pauperis*. The filing of a new notice of appeal is not required. If the Court grants the motion, the docketing fee is waived for non-incarcerated parties but will be assessed for incarcerated parties in civil cases; if the Court denies the motion, the appellant must pay the docketing fee or the appeal will be dismissed.

A party to an administrative agency proceeding who wishes to take an appeal or file a petition for review *in forma pauperis* must file a motion with this Court for leave to so proceed.

**B. DISTRICT COURT DISMISSAL OF SUITS BROUGHT *IN FORMA PAUPERIS***

Under 28 U.S.C. § 1915(e), the district court must dismiss a civil suit in which the plaintiff seeks to proceed *in forma pauperis* if the court concludes that the action is "frivolous or malicious." *See Denton v. Hernandez*, 504 U.S. 25 (1992) (discussing the "frivolous or malicious" standard).

In *Sills v. Bureau of Prisons*, 761 F.2d 792 (D.C. Cir. 1985), this Court established procedures to be followed by the district court in dismissing a complaint under § 1915 in order to facilitate appellate review. The district court must provide a clear statement of reasons for its conclusion that the suit is frivolous or malicious, and the court also should revoke the plaintiff's *in forma pauperis* status when it dismisses the complaint. This latter procedure permits this Court to evaluate the correctness of the § 1915(e) dismissal in the context of ruling on appellant's motion to proceed *in forma pauperis* on appeal.

**C. PROCEDURAL CONSEQUENCES OF *IN FORMA PAUPERIS* STATUS**
    (*See* D.C. Cir. Rules 24, 31.)

Parties proceeding *in forma pauperis* who are authorized to file electronically need not provide paper copies of any motions papers; those not authorized to file electronically need file only the original of any motions papers. The Clerk's Office will make the necessary copies for the Court. Litigants proceeding *in forma pauperis* who are *not* represented by counsel are also exempt from filing the usual number of briefs; such unrepresented parties need submit only the electronic version if authorized to file electronically, or the original of the brief if not authorized to file electronically. All other parties must file the standard number of briefs required by the Circuit Rules, but appointed counsel in criminal appeals may be reimbursed for the expense of producing copies of the brief in accordance with the Criminal Justice Act (CJA).

Represented parties proceeding *in forma pauperis* and *amicus curiae* appointed by the Court must comply with the standard requirements for an appendix. *See* Fed. R. App. P. 30; D.C. Cir. Rule 30. If an appellant or petitioner proceeding *in forma pauperis* is unrepresented, the Court may decide the appeal on the original record without an appendix. Under Circuit Rule 24, if an appendix is not used, the pro se appellant or petitioner must file with the brief 1 copy of those pages of the trial transcript the appellant or petitioner wishes to call to the Court's attention, a list of those pages of the transcript, and any other portions of the record to which the appellant or petitioner wishes to direct the Court's attention. Although the Clerk's Office will reproduce enough copies of these items to provide them to the panel, parties are encouraged to provide the Court 4 copies of these items so as not to delay processing of the case. The appellee or respondent must furnish with the brief 4 copies of an appendix containing any additional pages of transcript or portions of the record to which the Court's attention is directed.

**D. APPOINTMENT OF COUNSEL**

**1. *Time and Manner of Appointment***

The CJA, 18 U.S.C. § 3006A, does not provide for the appointment of counsel in non-criminal cases. Thus, even though a party in a civil appeal may be granted leave to proceed in forma pauperis, counsel will not ordinarily be provided by the Court. The appellant may file a motion for the appointment of counsel. If the Court grants the motion or elects to appoint *amicus curiae* in lieu of counsel, it may select a member of a legal aid organization or a law school clinical program, or it may appoint an attorney who has indicated a willingness to serve without compensation in non-criminal cases. The decision whether to appoint counsel or an *amicus* in a civil case is usually made by the special panel, and the Court will appoint a private attorney or *amicus* only when a panel determines it is in the interest of the Court.

Counsel who wish to be considered for appointment in civil cases should write to the Clerk, providing information about their background and experience, and listing any cases they have previously handled in this Court. Counsel and *amici* appointed in civil appeals serve without compensation. Counsel are encouraged to volunteer their services for civil matters.

### 2. *Withdrawal*

Appointed counsel who are unable to continue to represent an appellant in a civil or criminal appeal must promptly move this Court to withdraw, stating specific reasons.

In a criminal appeal, if counsel wishes to withdraw because of a belief there is no merit to the appeal, counsel should refer to *Anders v. California*, 386 U.S. 738 (1967), and *Suggs v. United States*, 391 F.2d 971 (D.C. Cir. 1968), for guidance. Counsel in a criminal appeal also should confer with the Office of the Federal Public Defender to help assure uniformity of practice in this regard.

Counsel must serve the appellant with the motion to withdraw. When filing a motion to withdraw because of lack of merit to the appeal in a criminal case, counsel also must submit to the Court and serve on the appellant, *but not on government counsel*, a confidential memorandum under seal setting forth the points the appellant wishes to assert, any other points counsel has considered, and the most effective arguments counsel can make on the appellant's behalf. The Court gives the appellant 30 days to respond to this memorandum; if the Court thereafter concludes there are no meritorious issues on appeal, it will grant counsel's motion to withdraw and ordinarily dismiss the appeal.

### 3. *Duties in Criminal Appeals*

Upon notice of appointment in a criminal appeal, counsel must so advise the defendant, and if the defendant is incarcerated, counsel must explore the possibility of obtaining release pending appeal. *See infra* Part VIII.C. Counsel also should check the district court record to ensure that the transcript has been or is being prepared. It is trial counsel's duty to order the transcript when the notice of appeal is filed, but counsel appointed on appeal must make sure that all necessary portions of the transcript have been designated. The failure of trial counsel to order the necessary transcript does not justify an extension of time for filing defendant's brief.

Appointed counsel ordinarily should interview the defendant in person at least once if the defendant is within the jurisdiction. If the defendant is incarcerated outside the jurisdiction, the Court may authorize counsel to visit the defendant at his or her place of incarceration. Such visits must be approved in advance and must be fully justified in order for counsel to be reimbursed. Requests for such advance authorization are first to be submitted to the Federal Public Defender.

If the defendant is dissatisfied with court-appointed counsel's handling of the appeal and wishes counsel to withdraw, counsel must file a motion for leave to withdraw, and the Clerk will refer the matter to the Legal Division for presentation to a panel. *See infra* Part VII.D. The Court does not respond favorably to general complaints about counsel, only to specific grievances.

Counsel's responsibility when appointed in a criminal case extends through the filing of a nonfrivolous petition for a writ of *certiorari*. Appointed counsel must advise the defendant of the right to file a *certiorari* petition and counsel's opinion as to the merit and likelihood of success in obtaining such a writ. If the defendant asks counsel to file a petition for writ of *certiorari* and there are nonfrivolous grounds for doing so, counsel must prepare and file one. If counsel determines that there are no nonfrivolous grounds for filing

a petition, counsel must, within 20 days of the entry of judgment, notify the defendant in writing that counsel will not file a petition, briefly explaining why. Counsel must also inform the defendant about the procedures both for filing a petition for *certiorari* pro se and for asking this Court to appoint new counsel to prepare a petition for *certiorari*. Counsel should caution the defendant that it is unlikely the Court will appoint new counsel and that the client should be prepared to file a petition for *certiorari* pro se within the prescribed time. Once counsel has provided this notice to the client, counsel must notify the Court that counsel's representation has ceased. (A model letter withdrawing from representation at the *certiorari* stage can be found on the Court's website.) The Clerk will notify the defendant in writing of the effective date of the termination of counsel's appointment. The cost of this work is recoverable in this Court pursuant to the original appointment, and counsel may not submit his or her voucher until all work is completed. Failure to comply with the foregoing procedures may result in the Court's refusal to approve counsel's voucher.

### 4. *Compensation*

The CJA prescribes the rate at which appointed counsel is compensated for time spent in court, and for time spent on the case out of court. While total compensation is limited to a specific dollar amount in direct criminal appeals and collateral proceedings, the Chief Judge, or another judge designated by the Chief Judge, may authorize payments in excess of these limitations. Awards of excess compensation are not made lightly in view of budgetary constraints, and require strong justification and documentation.

Counsel also may be reimbursed for certain out-of-pocket expenses, as provided by the CJA Guidelines, which can be found on the Court's website. General office costs are not reimbursable.

Counsel must submit claims for reimbursement within 45 days of the date after which no further action before this Court or the Supreme Court is possible. Counsel's services and expenses must be itemized on the electronic voucher form in the CJA eVoucher system, which can be accessed from the Court's website. The Clerk reviews the form for mathematical and technical accuracy and for conformity with applicable regulations. The completed form is then sent for approval to the judge who wrote the opinion in the case, or, if no opinion was issued, to the presiding judge of the panel.

## VII. MOTIONS PRACTICE

### A. FORMAL REQUIREMENTS
(*See* Fed. R. App. P. 27; D.C. Cir. Rules 27, 32.)

Motions practice in this Court has become a means of achieving early resolution of cases that would otherwise unnecessarily go the full route of briefing and oral argument. Parties are particularly encouraged to file dispositive motions where a sound basis exists for summary disposition. The result can be a major savings of time, effort, and resources for the parties, counsel, and the Court. In order to achieve this economy, however, it is essential for counsel to comply fully with the procedural requirements for motions practice. The following section discusses general motions practice; specific motions are discussed *infra* at Part VIII.

At the outset, there are two important time limits to observe: typically, there are 30 days from docketing for filing procedural motions, and 45 days from docketing for filing dispositive motions. The actual dates when both types of motions are due are specified in the initial order sent out by the Clerk's Office at the time of docketing.

Procedural motions are those that may affect the progress of the case through the Court, *e.g.*, motions to intervene, motions to consolidate, motions to defer the appendix, motions to hold the case in abeyance, motions for stay, and motions to expedite.

Dispositive motions are defined in Circuit Rule 27(f) as those which, if granted, would dispose of the appeal or the petition for review in its entirety, or would transfer the case to another court. They include motions for summary affirmance or reversal, motions to dismiss (on any ground, including jurisdiction), and motions to transfer. The dispositive motion deadline does not apply to a motion by an appellant or a petitioner for voluntary dismissal, which may be filed at any time.

Normally, cases will not be given oral argument dates or briefing schedules until all pending motions have been resolved. Counsel can assist the Clerk's Office in processing the case by stipulating within the first 45 days that no dispositive motions will be filed. Any motions filed after the oral argument date is set are referred to the panel assigned to hear the case on the merits.

There are certain formal requirements common to most motions. Unless a party is proceeding *in forma pauperis*, or the Court directs otherwise in a particular case or by standing order, non-electronic filers must submit an original and 4 paper copies of any motion, except in *en banc* cases, for which an original and 19 copies are required. Electronic filers must, in addition to the electronic original, file 4 paper copies of any motion specified in Circuit Rule 32(d)(2), or 19 paper copies in *en banc* cases. These motions include dispositive motions, contested procedural motions, and motions for emergency relief.

Motions, responses thereto, and replies must be prepared in conformity with Federal Rule of Appellate Procedure 27(d)(1) and (2). Thus, all papers relating to motions must be submitted in standard typographical printing or by any duplicating or copying process that produces a clear black image on light paper, in a plain, roman style, with a proportionally spaced typeface of 14-point or larger or a monospaced typeface containing no more than 10 and one-half characters per inch. Except by permission or direction of the Court, a motion may not, under any printing method utilized, exceed 5,200 words if produced using a computer and 20 pages if handwritten or typewritten. All legal arguments must be presented in the body of the motion; a separate brief or memorandum supporting or responding to a motion may not be filed. A copy of the trial court's opinion or agency's decision must accompany a motion seeking any substantive relief.

The front page of the motion must give the name of this Court, the title and number of the case, and a brief descriptive title (*e.g.*, Motion for Summary Affirmance). If a case has been scheduled for oral argument, has already been argued, or is being submitted without oral argument, a motion, response, or reply must so state in capital letters at the top of the first page. Where applicable, the date of the argument also must be included.

The motion must specify the grounds and the relief sought. Parties may seek more than one form of relief in a single motion if the matters are related. For example, a single motion may be filed where, in addition to seeking dismissal, a party requests in the alternative summary affirmance. If a party seeks more than one form of relief in a single motion, the descriptive title on the front page of the motion must clearly set forth the matters presented in the pleading. If the matters are unrelated, parties should file separate motions. Requests for permission to file an untimely or overlong motion should not be included in the substantive motion but should be filed as a separate motion.

All motions must be signed by a party or by a member of the bar of the Court and served on all other parties to the proceeding before the Court. Except as prescribed by Federal Rule of Appellate Procedure 28(j), parties, other than pro se litigants proceeding *in forma pauperis*, may not plead by letter. *See* D.C.

Cir. Rule 32(f).  Generally, for motions, responses, and replies, filing is complete on *receipt* of the pleading in the Clerk's Office, *not* on mailing.  A document filed electronically is deemed filed on the date and at the time stated on the Notice of Docket Activity from the Court.  For incarcerated litigants, filing is complete upon deposit in the institution's internal mailing system in accordance with the federal rules.  *See* Fed. R. App. P. 25(a)(2)(A)(iii).

Any response must be filed within 10 days after service of the motion.  It may not exceed 5,200 words if produced using a computer and 20 pages if handwritten or typewritten.  Any reply to the response must be filed within 7 days after service of the response and may not exceed 2,600 words if produced using a computer and 10 pages if handwritten or typewritten.  The response may contain a motion for other relief. If so, the caption must clearly denote that the response includes the separate motion, and the document may not exceed 7,800 words if produced using a computer and 30 pages if handwritten or typewritten.  When the response includes a motion for affirmative relief, the reply must be joined in the same pleading with a response to the motion for affirmative relief, and counsel has 10 days to file it.  Such reply may not exceed 5,200 words if produced using a computer and 20 pages if handwritten or typewritten.  The final reply on a combined filing is limited to 2,600 words if produced using a computer and 10 pages if handwritten or typewritten.  Replies must not reargue positions presented in an opening paper and may not present any matters that are not strictly in reply to the response.  After the filing of a reply, no further pleadings on a motion or petition are permitted, except by leave of the Court.  The above filing times are extended by 3 days if service was effected on the responding party by a method of service authorized by Federal Rule of Appellate Procedure 25 other than personal or electronic service.  *See* Fed. R. App. P. 26(c).

Circuit Rule 27(g) establishes the requirements for seeking extensions of time to file motions, responses, and replies, and for seeking leave to exceed the length limits set forth in Federal Rule of Appellate Procedure 27(d)(2).  Such motions must be filed 5 days before the pleading is due.  A motion to extend time for filing a motion, response, or reply must indicate in the first paragraph when the motion, response, or reply is currently due.  Motions under Rule 27(g) for extension of time or to exceed the length limits that are filed less than 5 days before the document is due will be denied as untimely, absent exceptional circumstances, except that the Clerk may grant unopposed late filed motions for extension of time for good cause shown. The Circuit Rules explicitly state that requests to exceed the length limits are disfavored and will be granted "only for extraordinarily compelling reasons."  D.C. Cir. Rule 27(g)(3).

Circuit Rule 27(g)(2) establishes requirements for consulting the opposing side to obtain consent to motions for extension of time and motions to exceed the length limit, and to inquire whether an opposition or other form of response will be filed.  The opening paragraph of any such motion must recite the position taken by the opposing party, or the efforts made to obtain a response.  Where the other side has indicated an intention to file an opposition or other form of response, or has not been reached after reasonable effort, the moving party must serve the motion by personal service if the opposing party is not an electronic filer or if the motion is not filed electronically.  If personal service is not feasible, the moving party must give telephone notice of the filing and serve the motion by another form of expedited service authorized by Federal Rule of Appellate Procedure 25.  Where the moving party is unable to effect personal service or telephone notice at the time of the filing, the opening paragraph of the motion must recite the efforts made to do so.

Circuit Rule 27(g)(4) provides for an automatic extension of the original deadline for filing motions or petitions, or to exceed length limits for such pleadings, if the motion is filed in accordance with the requirements of subparagraphs (1) and (2) of Circuit Rule 27(g) and the Court does not act on the motion by the end of the second business day before the filing deadline.  If the Court thereafter denies the motion, the filing deadline will be extended automatically for 7 days.  If the Court denies the motion to extend the

length, it ordinarily will allow time to file a conforming document. *This automatic extension provision applies **only** to motions deadlines; there are no comparable provisions in the Circuit Rules for automatic extension of the deadline for filing briefs.* Motions to extend time or length limits for filing briefs are separately addressed in Circuit Rule 28(e).

Finally, when an untimely, overlength, or otherwise nonconforming motion or response is filed along with a motion for leave to file out of time or to exceed the length limitations, no response is required to the nonconforming document until a decision is rendered on the motion to file out of time or to exceed the length limitations.

### B. PROCESSING

When counsel files a motion, it is handled in one of three ways, depending on the nature of the relief sought: by the Clerk, by a panel designated to decide motions, or by the merits panel in the case.

Motions are generally considered ripe for decision once a reply has been filed or the time allowed for a reply has expired. An exception is made for emergency motions, discussed below, and for procedural motions that reflect the consent of all parties. Motions filed in cases assigned to merits panels are delivered immediately to the judges. It is in the merits panel's discretion whether to await a response.

### C. DISPOSITION BY THE CLERK
(*See* Fed. R. App. P. 27(b); D.C. Cir. Rule 27(d).)

The Circuit Rules authorize the Clerk to dispose of procedural motions of a routine character, in accordance with the Court's instructions.

Any party adversely affected by the action of the Clerk on a motion may move for reconsideration within 10 days of entry of the Clerk's order. The motion for reconsideration will be submitted to a special panel or to the merits panel, if a merits panel has been assigned.

Motions disposed of by the Clerk can be identified by the form of the order. Orders are signed by the Clerk "For the Court." Clerk's orders never carry the phrase "Per Curiam" above the signature block.

### D. DISPOSITION BY A PANEL

In cases not assigned to a merits panel, the Clerk's Office refers dispositive and many procedural motions to the Legal Division. Each motion (or all motions in a single case) is assigned to one of the staff attorneys, who reviews the motion, response, and reply, and any other papers filed; examines the record; and then prepares a confidential memorandum setting forth the issues, the facts, an analysis of the law, and a recommended disposition. The staff attorney also drafts a proposed order and, where appropriate, an accompanying memorandum disposing of the motion. Except for emergency matters and other matters requiring expedition or motions to hold a case in abeyance, matters are generally assigned chronologically by filing date, and staff attorneys work on them in that order.

The staff attorney's recommendation, proposed disposition, and the underlying pleadings are routed to the special panel for resolution.

The special panel consists of judges who are assigned on a rotational basis throughout the year to consider and decide motions, cases recommended for disposition without oral argument under Circuit Rule

34(j), and emergency matters, presented by the Legal Division. *See infra* Part VIII and Part XI.C.2. The special panel members also are engaged in their regular merits sittings while they serve on the special panel.

The Legal Division circulates to the panel the necessary papers and the recommendations of the staff attorneys regarding the motions that will be presented. The panel may adopt or reject the staff attorney's recommendation, request more research, take the matter under advisement, or refer the motion for disposition to the panel ultimately assigned to hear the case on the merits.

The Court does not publish or disclose in advance the names of the judges on the special panel, nor does it notify counsel or the public of the date on which a particular motion will be considered. The panel does not hear oral argument on motions, except, very rarely, in emergency matters or for extraordinary cause.

Orders of the special panel disposing of motions are usually not published, although in some cases the panel may decide that a published *per curiam* opinion will be useful to establish the law of the Circuit on a particular issue. The unpublished orders reflect the names of the panel members beneath the case caption. The order, or a separate memorandum accompanying the order, will explain the basis for the Court's disposition of the motion.

If a party disagrees with the special panel's disposition of a non-dispositive motion, it may move for reconsideration by the same panel or by the full Court. The Court rarely grants these motions. Petitions for rehearing of orders deciding dispositive motions are addressed in Part XIII.B, *infra*.

## E.  DISPOSITION BY A MERITS PANEL

Once a case is assigned to a merits panel, everything relating to the case comes under the exclusive control of the panel. All motions filed in the case are submitted to the panel.

When a motion is filed, it is transmitted to the panel with the motions papers, any supporting material, and any memorandum prepared by the Legal Division recommending a disposition. Once the panel members vote on the disposition of the motion, an order is prepared disposing of the motion. The order usually shows the names of the panel members.

## F.  DISTRIBUTION OF ORDERS

The Clerk's Office files and distributes all orders. When an order or judgment is entered in a case assigned to the Court's electronic filing system, the Clerk's Office electronically transmits a Notice of Docket Activity to all parties who have consented to electronic service, and mails notice and a copy of any opinion or judgment to parties who are not electronic filers. *See* D.C. Cir. Rules 36(b), 45(d). The Clerk's Office maintains a record of all persons to whom copies of an order are sent.

## VIII.  SPECIFIC MOTIONS

## A.  MOTIONS FOR STAY OR EMERGENCY RELIEF
(*See* Fed. R. App. P. 8, 18; D.C. Cir. Rules 8, 18, 27(e).)

Filing a notice of appeal, or obtaining permission to appeal, generally does not automatically stay the operation of the judgment or order under review. Except in cases involving money judgments against the United States or the District of Columbia, or where the appellant posts a bond or other security in accordance with Federal Rule of Civil Procedure 62(d), the losing party must move to obtain a stay or injunction

pending appeal to prevent immediate execution of the judgment or order being appealed, or immediate enforcement of an agency order under review. Such motions are procedural motions; they can be filed as soon as possible, but usually no later than 30 days after docketing unless the Court's scheduling order sets a different date.

Application for a stay or any other appropriate emergency relief must first be made to the district court or agency whose order is being appealed, or the motion filed in this Court must explain why such relief was not sought. If the district court or agency denies the relief requested, an application may then be made to this Court. A motion for a stay must describe any prior applications for relief and their outcome.

If the facts are in dispute, evidentiary material supporting the request for a stay should be furnished. Relevant portions of the record must be included with the motion. At a minimum, these include a copy of the judgment or order involved, and any explanation, written or oral, that accompanied the ruling. The motion also should contain, in a prominent place, a specific statement of the time exigencies involved.

Because many motions for stay are filed on an emergency basis, Circuit Rules 8, 18, and 27(e), which prescribe the procedures for seeking emergency relief, should be reviewed carefully. In particular, counsel or a party must identify the motion as an "Emergency Motion," and file it at least 7 days before the date on which court action is necessary, or explain why the motion could not have been filed sooner. Where counsel or a party gives only a vague or general explanation as to why it was not filed at least 7 days before the date of the requested court action, the Court may conclude that expedited consideration of the motion is unwarranted.

Counsel or a party seeking expedition of a stay application or any other matter must communicate the request for emergency consideration in person or by telephone to the Clerk's Office and to the opposing side. If the motion is not filed electronically or if the opposing party has not consented to electronic service, the motion must be served by hand or, in the case of out-of-town parties, by another form of expedited service authorized by Federal Rule of Appellate Procedure 25. The motion must describe the efforts made to notify the opposing side.

When an emergency motion is filed in a case not yet assigned for hearing on the merits, it is referred to the Director of the Legal Division for assignment to a staff attorney and immediate referral to the special panel for disposition. The special panel does not normally grant the relief requested before receiving a response. However, it may enter an administrative stay of very short duration before receiving a response to give the Court more time to consider the matter. The administrative stay order will usually direct that responses to the motion be expedited. Alternatively, the special panel may order expedited responses without issuing a temporary stay. The judges might conclude that the matter does not require unusual expedition and take no action prior to the filing of a response, or they may deny the motion without awaiting a response.

The motion for stay or for emergency relief must specifically discuss four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public interest. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921 (D.C. Cir. 1958). In seeking a stay or injunction pending appeal, counsel also should address the question whether the appeal should be expedited if a stay or injunction is granted.

A party filing or opposing a motion for stay or other emergency relief may, in addition or in the alternative, file a motion to dispose of the appeal or petition for review in its entirety. If the Court grants a motion for stay or for injunction pending appeal, it may, pursuant to Federal Rules of Appellate Procedure 8(a)(2)(E) and 18(b), condition the stay or injunction on the posting of a bond or other security in the appropriate court. No such bond is required where the federal government or the District of Columbia is the appellant. *See* Fed. R. Civ. P. 62(e); D.C. Superior Court Rule 62.

## B. MOTIONS TO EXPEDITE CONSIDERATION OF THE APPEAL
   (*See* 28 U.S.C. § 1657; D.C. Cir. Rules 27(e), 47.2.)

The Court accords expedited consideration to a case when required to do so by statute, or when the Court grants a motion for expedition.

Circuit Rule 47.2(a) lists many of those statutory provisions that mandate expedited appellate review: 18 U.S.C. §§ 3145, 3731; 28 U.S.C. chapter 153; and 28 U.S.C. §§ 1657, 1826. *See supra* Part III.J. Whenever a party takes an appeal pursuant to one of these provisions, the district court Clerk must transmit the notice of appeal and certified docket entries forthwith to this Court, so that the appeal can be docketed and an appropriate schedule set. Counsel must advise the Clerk of this Court in writing of counsel's arrangements to order any necessary portions of the transcript on an expedited basis, and make arrangements with the district court Clerk to send the record promptly to this Court. A party desiring a more expedited schedule than that entered by the Clerk, or expedited oral argument, must file a motion.

When expedition is not required by statute, counsel seeking expedited review must file a motion. The movant must demonstrate that the delay will cause irreparable injury and that the decision under review is subject to substantial challenge. The Court also may expedite cases in which the public generally, or in which persons not before the Court, have an unusual interest in prompt disposition; the reasons must be strongly compelling.

When the Court disposes of a motion for stay or injunction pending appeal, it may at the same time expedite the case to minimize possible harm to the parties or the public. In moving for a stay or injunction pending appeal, counsel should address the appropriateness of expediting the appeal if a stay is entered.

An order granting expedition does not automatically shorten the briefing schedule. When time is a critical consideration, counsel may wish to propose a specific date for the hearing and to move for an abbreviated briefing schedule.

When counsel files a motion to expedite consideration of an appeal, the Clerk's Office refers it to the Legal Division. Staff attorneys give priority to such motions.

Parties might be able to have their appeal calendared earlier than normal by agreeing to place their case in the Court's stand-by pool of cases for oral argument. The requirements to enter the stand-by pool are discussed *infra* in Part X.E.4.

## C. MOTIONS FOR RELEASE PENDING APPEAL
   (*See* 18 U.S.C. § 3143; Fed. R. App. P. 9(b); D.C. Cir. Rule 9(b).)

A defendant who has filed a notice of appeal from a criminal conviction may apply for release while the appeal is pending. The defendant must apply first to the district court for release. If the district court denies the application, or imposes conditions of release, the defendant may then move this Court for release or for

modification of the conditions. A new notice of appeal is not necessary. Circuit Rule 9 sets forth the required contents of this motion, which must be prepared in conformity with Federal Rule of Appellate Procedure 27(d)(1) and (2), and must be served on opposing counsel. Staff attorneys give priority to motions for release pending appeal and send them to the special panel for disposition as soon as a recommendation is prepared.

The criteria for release are specified by statute and rule. *See* Fed. R. App. P. 9. The burden is on the defendant to show that he or she will not flee or pose a danger to others if released, *and* that the appeal is not for purposes of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial.

If this Court denies the motion for release, the defendant may seek Supreme Court review by submitting an application for release on conditions to the Circuit Justice for the District of Columbia Circuit, who is the Chief Justice of the United States. Counsel must file the application with the Clerk of the Supreme Court and serve the opposing party pursuant to Rule 29 of the Rules of the Supreme Court. Such motions are rarely granted.

## D. MOTIONS FOR VOLUNTARY DISMISSAL
(*See* Fed. R. App. P. 42; D.C. Cir. Rule 42.)

An appeal from the district court not yet docketed in this Court may be dismissed by the district court. Once an appeal has been docketed, however, it can be dismissed only by this Court.

In a civil appeal or agency proceeding, the parties may stipulate that the case should be dismissed, or the appellant or the petitioner may file a motion, with service on the opposing party, requesting dismissal and indicating whether the other parties agree. Before joining in a request for dismissal, the parties also should attempt to reach an agreement as to who will pay costs, if any. A motion for dismissal or stipulation of dismissal predicated on mootness may not be acted on by the Clerk. *See Northern California Power Agency v. Nuclear Regulatory Comm'n*, 393 F.3d 223 (D.C. Cir. 2004). And conditional motions for dismissal or stipulations of dismissal, such as those requesting that the dismissal be without prejudice, will usually be denied by the Clerk.

In a criminal case, counsel *must* submit a motion to the Court requesting dismissal, with service on opposing counsel. The motion must be accompanied by an affidavit from the appellant, stating that the appellant has been fully informed of the circumstances of the case and of the consequences of a dismissal, and wishes to dismiss the appeal. The affidavit also must recite the appellant's satisfaction with the services of counsel.

## E. MOTIONS FOR REMAND
(*See* Fed. R. App. P. 12.1; D.C. Cir. Rule 41(b).)

Parties may file a motion to remand either the case or the record for a number of reasons, including to have the district court or agency reconsider a matter, to adduce additional evidence, to clarify a ruling, or to obtain a statement of reasons. The Court also may remand a case or the record on its own motion.

It is important to note that where an appellant, either in a criminal or a civil case, seeks a new trial on the ground of newly discovered evidence while his or her appeal is pending, or where other relief is sought in the district court, the appellant must file the motion seeking the requested relief in the district court. *See Smith v. Pollin*, 194 F.2d 349, 350 (D.C. Cir. 1952); Fed. R. Crim. P. 33; Fed. R. Civ. P. 60. If that court

**App. 774**

indicates that it will grant the motion, the appellant should move this Court to remand the case to enable the district court to act.  *See* Fed. R. App. P. 12.1; *Smith v. Pollin*, 194 F.2d at 350.

### F. MOTIONS TO TRANSFER

Motions to transfer are dispositive motions that must be filed within 45 days of the date the case is docketed unless the Court's scheduling order sets a different date for dispositive motions.

In the context of administrative agency cases, a motion to transfer may be predicated on the Court's power under 28 U.S.C. § 2112(a) to transfer a case to any other court "[f]or the convenience of the parties in the interest of justice."  In addition, where this Court concludes that it lacks jurisdiction over an appeal or a petition for review, the Court may, instead of dismissing the case outright, order it transferred to a court where jurisdiction exists.  *See* 28 U.S.C. § 1631.

### G. MOTIONS FOR SUMMARY DISPOSITION

Motions for summary affirmance or summary reversal must be filed within 45 days of the date the case is docketed unless the Court's scheduling order sets a different date for dispositive motions.  Parties are encouraged to file such motions where a sound basis exists for summary disposition.

Motions for summary disposition may be granted in whole or in part.  Summary affirmance is appropriate where the merits are so clear as to justify summary action.  *See Cascade Broadcasting Group, Ltd. v. FCC,* 822 F.2d 1172, 1174 (D.C. Cir. 1987) (per curiam); *Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam).  Summary reversal is rarely granted and is appropriate only where the merits are "so clear, plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision."  *Sills v. Federal Bureau of Prisons,* 761 F.2d 792, 793-94 (D.C. Cir. 1985).  Parties should avoid requesting summary disposition of issues of first impression for the Court.

### H. MOTIONS TO UNSEAL
(*See* D.C. Cir. Rule 47.1.)

Parties or other interested persons may move at any time to unseal any portion of the record in this Court, including confidential briefs or appendices filed under Circuit Rule 47.1.  *See* D.C. Cir. Rule 47.1(c).  If the case arises from the district court, the motion will ordinarily be referred to that court, and, if necessary, the record will be remanded for that purpose.  This Court may, when the interests of justice require, decide such a motion itself.  If unsealing is ordered by this Court, the record may be remanded to the district court for unsealing.  Unless otherwise ordered, the filing of a motion to unseal any portion of the record does not delay the filing of any brief under any scheduling order.

## IX.  BRIEFS AND APPENDIX

### A. BRIEFS
(*See* Fed. R. App. P. 28-32.1; D.C. Cir. Rules 25, 28-32.1)

A well-written brief is of prime importance to success on appeal.  Three precepts should guide counsel in drafting briefs:

- Be clear.

- Cite the record and legal authorities fully, fairly, and accurately and, in particular, cite to controlling D.C. Circuit or Supreme Court law.

- Be concise.

### 1. *Timing*

Normally, the Clerk's Office establishes a briefing schedule after the case has been screened and classified by the Legal Division, and after any pending motions in the case have been resolved. In cases designated as "Regular Merits" cases, the date for oral argument is announced by a separate order after the briefing order has issued. Typically, the final brief will be due at least 45 days before the argument date.

In general, the appellee's or respondent's brief is due 30 days after the appellant's or petitioner's brief. A reply brief is due 21 days later. To avoid repetition of factual statements or legal arguments made in the principal briefs, the Clerk's Office will stagger the briefing so that intervenors and *amici curiae* file their briefs 7 days after the brief of the party they support. A briefing schedule also will contain additional time if the parties utilize a deferred appendix, as provided in Federal Rule of Appellate Procedure 30(c). *See infra* Part IX.B.3.

Once a case has been calendared for oral argument, the Court strongly disfavors motions to extend the briefing schedule. Such motions will be granted only for extraordinarily compelling reasons. In those extraordinary situations where counsel must seek such an extension, Circuit Rule 28(e)(2) requires the motion to be filed at least 7 calendar days before the brief is due. Circuit Rule 28(e)(3) requires that, before filing the motion, counsel attempt to obtain the consent of other counsel, and recite in the motion the result of such an attempt. Circuit Rule 28(e)(3) also specifies the requirements for service of motions to extend time or to exceed length limits. On a showing of good cause, the Clerk may grant a late-filed motion to extend time if it is unopposed and will not affect the oral argument schedule. Otherwise, motions for extension of time to file a brief that are filed less than 7 days before the brief is due will be denied as untimely, absent extraordinary circumstances. Counsel should be aware that, while the Court will attempt to rule on the motion prior to the date on which the brief is due, submission of a motion to extend time or exceed length limits does not toll the time for compliance with the filing requirements for briefs. Under Circuit Rule 28(e)(4), movants are required to meet all filing requirements absent an express order from the Court granting a waiver.

With respect to cases that have been calendared for oral argument, the Court has instructed the Clerk to deny motions for extensions of time to file briefs (except for very modest extensions of 1 or 2 days) where no explanation for the request is provided or where the need for the extension is attributed to: (1) production difficulties such as malfunctioning equipment, delivery problems, or the lack of secretarial help; or (2) the press of other business. The Clerk may, upon an appropriate showing, grant extensions of up to 7 days.

Untimely or unwarranted motions for extensions of time may result in the imposition of sanctions. If sanctions are appropriate, the Court will consider issuing an order to show cause that requires further explanation from counsel; imposing a fine payable to the Court; assessing attorneys' fees; or referring counsel to the Court's disciplinary committee.

If the appellant or petitioner fails to file the opening brief within the time allowed by the Court, the appellee or respondent may move to dismiss the case, or the Court may dismiss it on the Court's own motion. If the appellee or respondent fails to file a timely answering brief, the Court may order the case submitted

on the appellant's or petitioner's brief alone. Circuit Rule 34(f) forecloses oral argument by any party who fails to file a brief, except by permission of the Court.

### 2. *Consolidated and Joint Appeals*
(*See* Fed. R. App. P. 3(b), 28, 32; D.C. Cir. Rules 28, 32.)

Parties with common interests in consolidated or joint appeals must join in a single brief where feasible. The Court has admonished counsel that it looks with extreme disfavor on the filing of duplicative briefs in consolidated cases. To avoid repetitious arguments, a party may adopt or incorporate by reference all or any part of the brief of another.

It is important in consolidated cases that the parties caption their briefs correctly and uniformly. Each brief cover must bear the lead docket number and corresponding case name and reflect the particular docket number and case name pertaining to that party.

### 3. *Cross-Appeals*
(*See* Fed. R. App. P. 28.1; D.C. Cir. Rule 28.1.)

In cross-appeals, the first party to appeal is deemed the appellant; if cross-notices are filed on the same day, the plaintiff is deemed the appellant. These designations may be modified by the Court, or by agreement of the parties if the parties notify the Clerk's Office at the time the docketing statements are filed in civil cases, or at the time the final transcript status report is filed in criminal cases. The brief of the appellee serves both as the response brief to appellant's appeal and as the main brief on appellee's appeal. For length limitation purposes, both appellant's opening and reply/response briefs are treated as principal briefs. They are limited to 30 pages each unless the briefs comply with the type-volume limitation of 13,000 words or use a monospaced face and contain no more than 1,300 lines of text. *See* Fed. R. App. P. 28.1(e). The appellee's opening brief is limited to 35 pages unless it complies with the type-volume limitation of 15,300 words or uses a monospaced face and contains no more than 1,500 lines of text. *See id.* The appellee may file a second brief, but only in reply to the appellant's answer on the appellee's cross-appeal. That brief is limited to half the type-volume of appellant's principal brief or 15 pages. *See* Fed. R. App. P. 28.1(e)(2)(C); *see also* Part IX.A. 6, 7. Further briefing requires permission of the Court. *See* Fed. R. App. P. 28.1(c)(5). The cover of appellant's opening brief must be blue; appellee/cross-appellant's response and opening brief, red; appellant/cross-appellee's reply and response brief, yellow; and appellee's reply brief, gray. *See* Fed. R. App. P. 28.1(d).

### 4. *Amici Curiae and Intervenors*
(*See* Fed. R. App. P. 29; D.C. Cir. Rules 28(d), 29, 32, 40(f).)

A brief of an *amicus curiae* may be filed only by consent of all the parties or by leave of the Court, unless the *amicus* is the United States or an officer or agency thereof, a state, a territory, a commonwealth, or the District of Columbia, or has been appointed by the Court. A motion for leave to file an *amicus* brief must set forth the movant's interest, the reason why briefing is desirable, and why the matters asserted are relevant. Motions for leave to participate as *amicus curiae*, or written representation of the consent of all parties to such participation, must be accompanied by any disclosure statement required by Circuit Rule 26.1. Parties seeking leave to participate as *amicus curiae* after the merits panel has been assigned or at the rehearing stage should be aware that the Court will not accept an *amicus* brief where it would result in the recusal of a member of the panel or recusal of a member of the *en banc* Court.

The Court encourages those who wish to participate as *amici*, including governmental entities, to notify the Court as soon as practicable after a case is docketed in this Court, by filing a notice of intent to participate, a representation of consent, or a motion for leave of court when necessary. Prompt notification will enable the Court to accommodate *amici* briefs in setting the briefing format and schedule in each case, and assist the Court in the early identification of potential recusals caused by the participation of *amici*. An *amicus* brief will be due as set by the briefing order in each case; in the absence of provision for such a brief in the order, the brief must be filed in accordance with the time limitations of Federal Rule of Appellate Procedure 29(a)(6).

Federal Rule of Appellate Procedure 29(a)(4)(E) requires an *amicus* (other than the United States or its officer or agency, or a state) to disclose whether a party's counsel authored the *amicus* brief in whole or in part and whether a party or a party's counsel contributed money with the intention of funding the preparation or submission of the brief, and to identify every person (other than the *amicus*, its members, and its counsel) who contributed money that was intended to fund the brief's preparation or submission.

The brief of an *amicus curiae* not appointed by the Court may not exceed one-half the maximum length authorized by the Federal Rules of Appellate Procedure for a party's main brief. *See* Fed. R. App. P. 29(a)(5). The brief of an *amicus* appointed by the Court is usually subject to the length limitations set forth in Federal Rule of Appellate Procedure 32(a)(7).

This Court's rules define an "intervenor" as an interested person who has sought and obtained this Court's leave to participate in an already instituted proceeding. *See* D.C. Cir. Rule 28(d). The principal brief of an intervenor is limited to 19 pages unless the brief complies with the type-volume limitation of 9,100 words or uses a monospaced face and contains no more than 813 lines of text. *See* D.C. Cir. Rule 32(e)(2).

The briefs are due approximately 7 days after the brief of the party that the intervenor or *amicus* supports, and the briefs may not repeat facts or legal arguments made and adequately elaborated upon in the parties' briefs. Circuit Rule 28(d)(4) requires consolidated briefing by intervenors on the same side, to the extent practicable. Similarly, Circuit Rule 29(d) requires *amici curiae* on the same side to join in a single brief, to the extent practicable. Where an intervenor or *amicus* files a separate brief, counsel must certify in the brief why a separate brief is necessary. Grounds that are *not* acceptable as reasons for filing a separate brief include representations that the issues presented require greater length than allowed under the rules, that counsel cannot coordinate filing a single brief because of geographical dispersion, or that separate presentations were permitted in the proceedings below. When a governmental entity is an *amicus curiae* or an intervenor, it is not required to file a joint brief with other *amici* or intervenors. For this purpose, a governmental entity includes the United States or an officer or agency thereof, a state, a territory, a commonwealth, and the District of Columbia.

An intervenor supporting an appellant or petitioner may file a reply brief when the appellant's or petitioner's reply brief is due, but an *amicus*, other than one appointed by the Court, may not file a reply brief unless otherwise directed by the Court. An intervenor's reply brief is limited to half the type-volume of the intervenor's opening brief or 9 pages.

**5.** ***Number of Copies***
(*See* Fed. R. App. P. 31(b); D.C. Cir. Rule 31.)

Except when an unrepresented party is proceeding *in forma pauperis*, the original and 8 copies of each brief must be filed and 2 copies served on each party separately represented. Parties who are not represented by counsel and are proceeding *in forma pauperis* need file only the original brief, and the Clerk's Office will

duplicate the necessary copies.  If a deferred appendix is used (*see infra* Part IX.B.3), the parties are required to file only one copy of the initial briefs.  Electronic filers should submit the initial brief in electronic format only, unless the Court requests paper copies.

### 6. *Format*
(*See* Fed. R. App. P. 32(a); D.C. Cir. Rules 28(a), 32.)

Briefs may use either a proportionally spaced or a monospaced face and must be set in a plain, roman style, although italics and boldface may be used for emphasis.  Case names must be italicized or underlined.  If a brief uses a proportionally spaced face, the typeface must be at least 14-point and must include serifs, but sans-serif type may be used in headings and captions.  Certain typefaces can be easier to read, such as Century and Times New Roman.  The Court encourages the use of these typefaces.  Briefs that use Garamond as the typeface can be more difficult to read and the use of this typeface is discouraged.  If a brief uses a monospaced face, it may have no more than 10 ½ characters per inch.  *See* Fed. R. App. P. 32(a)(5), (6).  Briefs must be double-spaced and printed on one side of the page only.  Evasion of the length limitations may result in the Court's rejection of the brief.

Briefs other than those submitted by unrepresented parties proceeding *in forma pauperis* must have colored covers as follows:  appellant - blue; appellee - red; intervenor or *amicus curiae* - green; any reply - gray; supplemental brief - tan.  In cases designated "Complex," the cover of the briefs and the first page of motions and other pleadings should indicate the designation "Complex."  In cases being considered for disposition without oral argument under Circuit Rule 34(j), the cover of the briefs and the first page of motions and other pleadings should indicate "Case being considered for treatment pursuant to Rule 34(j)."

The front cover of the brief must set forth the following:  (1) the name of this Court; (2) the docket number of the appeal and the caption of the case, including the docket number and caption of the lead case in a consolidated appeal; (3) the nature of the proceeding and the name of the court or agency below (*e.g.*, Appeal from the United States District Court for the District of Columbia; Petition for Review of an Order of the Federal Communications Commission); (4) the title of the document (*e.g.*, Brief for Appellant); (5) the names, postal addresses, and telephone numbers of an unrepresented party or counsel representing the party filing the brief, and e-mail addresses for electronic filers; and (6) the date on which the case has been scheduled for oral argument.  One of the attorneys designated on the cover must be a member of the bar of the Court, except as otherwise provided by law.

The Federal Rules of Appellate Procedure require that briefs and appendices be bound in a manner that permits the document to lie reasonably flat when open.  The following types of binding ensure that the brief will lie flat when open:  spiral (also known as coil), comb, and wire binding.  The following types of binding do *not* permit a brief to lie flat when open:  velo (also known as strip) binding, metal fasteners or posts, and staples.  Accordingly, the use of such methods is not acceptable for a brief, nor is the use of a three-ring binder.

If a brief does not conform to the Federal Rules of Appellate Procedure or to the Circuit Rules, the party will be notified and directed either to file a conforming brief (if the problems are numerous) or an errata to the brief (if the problems are minor).  If the brief exceeds the page, line, or word limitations, the party will be directed to submit either a corrected brief or a motion for leave to exceed the limits on length.

### 7. *Length*
(*See* Fed. R. App. P. 32(a); D.C. Cir. Rules 28(c), 28(e), 32.)

Briefs may not exceed the word, line, or page limitations set forth in the Federal and Circuit Rules absent the Court's permission.  A principal brief is limited to 30 pages unless the brief complies with the type-

volume limitation of 13,000 words or uses a monospaced face and contains no more than 1,300 lines of text. *See* Fed. R. App. P. 32(a)(7). A reply brief is limited to half the type-volume of the principal brief or 15 pages. The length limitations for briefs in cross-appeals are set out in Federal Rule of Appellate Procedure 28.1. *See* Part IX.A.3. These limits do not include the table of contents; table of citations; statement with respect to oral argument; certificate of parties, rulings, and related cases; the glossary; any addendum containing statutory material, regulations, or evidence supporting the claim of standing; and certificates of service and compliance with type-volume limitations. *The summary of argument, footnotes, and citations are included for purposes of computing the word or page limits.*

Parties submitting briefs under the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) must include in the brief a certificate, signed by counsel of record or, in the case of parties filing briefs pro se, by the party, stating the number of words in the brief or the number of lines of monospaced text. Certificates that include generalized statements that the brief does not exceed the maximum length limitations, without indicating the specific number of words or lines, are not allowed. The person preparing this certificate may rely on word or line counts reported by word processing systems provided the word processing system counts words in footnotes and citations. Parties using word processing systems that do not count words may use the page limitations of 30 pages for principal briefs and 15 pages for reply briefs.

Parties wishing to submit a brief that exceeds the length limitations must, not less than 7 days before the brief is due, file a motion requesting permission to exceed the length limitations. Such motions are granted only for extraordinarily compelling reasons, and motions filed less than 7 days before the brief is due will be denied as untimely, absent exceptional circumstances. *See* D.C. Cir. Rule 28(e).

**8. *Contents***
(*See* Fed. R. App. P. 28, 32.1; D.C. Cir. Rules 28, 32.1.)

Briefs must contain the following in the order indicated. Note, however, that intervenors and *amici* might not be required to include each of the specified items in their briefs.

(a) A "Certificate as to Parties, Rulings, and Related Cases" immediately inside the cover of the brief and preceding the table of contents. Three items must be included in this certificate:

I.   The certificate must identify by name all parties, intervenors, and *amici* who appeared before the district court and all parties, intervenors, or *amici* in this Court. The appellee or the respondent may omit from the certificate those listed by the appellant or the petitioner but must identify the briefs in which the lists are set forth. The certificate also must include the name of any parent company and any publicly-held company that has a 10% or greater ownership interest in the certifying party. Circuit Rule 26.1 specifies precisely what must be included as to corporate entities, and counsel should consult that provision for greater detail. In a criminal case, the government must make the disclosure required by Federal Rule of Appellate Procedure 26.1(b), and the appropriate party in a bankruptcy case must make the disclosure required by Federal Rule of Appellate Procedure 26.1(c).

ii.  The certificate must identify the rulings under review, including the date, the name of the district court judge, the place in the appendix where the ruling is reproduced, and any official citation to the ruling, the Federal Register or other citation when the ruling is an agency decision, or a statement that no such citation exists. In briefs filed after the opening brief, the certificate may incorporate by reference the opening brief's certificate of rulings under review, but must so indicate.

iii. The certificate must indicate whether the case was previously before this or any other court, and, if so, identify it by court number and caption. The certificate also must identify "related cases," as defined in Circuit Rule 28(a)(1)(C), or state that there are none.

(b) A table of contents, with page references.

(c) A table of cases, statutes, and other authorities cited, arranged alphabetically and referring to the pages of the brief where they are cited. The table may include asterisks in the left margin to denote those authorities upon which the brief chiefly relies. All sources listed in the table of authorities must refer to the specific pages of the brief on which a source is cited; *passim* or the use of similar terms is prohibited.

(d) A glossary defining abbreviations and acronyms, other than those that are part of common usage. *See* D.C. Cir. Rule 28(a)(3). In briefs the use of acronyms other than those that are widely known should be avoided.

(e) A statement indicating the basis for this Court's jurisdiction and the basis for the district court's or agency's subject matter jurisdiction, with statutory citations and, if necessary, relevant case citations. *See* Fed. R. App. P. 28(a)(4); D.C. Cir. Rule 28(a)(4). Only appellant's or petitioner's brief must contain this statement; any party, intervenor, or *amicus* may include a counter statement regarding jurisdiction. If the basis of the district court's or agency's subject matter jurisdiction or this Court's jurisdiction is in dispute, the parties should so state and should reference the pages in the brief that address this issue. In cases involving direct review of administrative actions, the petitioner or appellant must also recite in a separate section the basis on which it claims standing. *See* D.C. Cir. Rule 28(a)(7); *Sierra Club v. EPA*, 292 F.3d 895, 900-01 (D.C. Cir. 2002).

(f) A section containing pertinent statutes and regulations. *See* D.C. Cir. Rule 28(a)(5). If these are extensive, they may be included as an addendum, which must be bound separately from the brief if the addendum exceeds 40 pages. If the statutes and regulations are contained in another party's brief, they may be incorporated by reference.

(g) A statement of the issues presented for review, which appellee or respondent may omit if satisfied with appellant's or petitioner's statement.

(h) A statement of the case setting out the facts relevant to the issues presented for review, describing the relevant procedural history, and identifying the rulings presented for review, with appropriate references to the record. *See* Fed. R. App. P. 28(a)(6). Appellee or respondent may omit or shorten the statement of the case if satisfied with that of the appellant or petitioner.

(i) A summary of argument that contains a succinct, clear statement of the arguments made in the body of the brief. The summary must not merely repeat the argument headings.

(j) The argument, which contains the contentions of the parties on the issues presented, with citations to authorities, statutes, and portions of the record upon which the parties rely, and the standard of review for each issue.

(k) A succinct conclusion setting forth the precise relief sought.

(l) A certificate of compliance if required by Federal Rule of Appellate Procedure 32(g).

Citation requirements for briefs are set out in Federal Rule of Appellate Procedure 32.1 and Circuit Rule 32.1. Counsel must cite to the Federal Reporter for published D.C. Circuit decisions and to the National Reporter System for published D.C. and state court decisions. Parallel citations to the U.S. App. D.C. for D.C. Circuit decisions are not required. All federal statutes, including those applicable to the District of Columbia, must be cited by the current official code or its supplement, or, if there is no current official code, to the current unofficial code or its supplement. Citation to the official session laws is not required unless there is no code citation. When citing to the record, authorities, or any other material, citations must refer to specific pages of the source; *passim* or similar terms may not be used.

Unpublished orders, judgments, sealed dispositions, or explanatory memoranda entered by this Court before January 1, 2002, may not be cited as precedent. An unpublished disposition may, however, be cited for its *res judicata*, law of the case, or preclusive effect.

Unpublished dispositions of the D.C. Circuit entered on or after January 1, 2002, may be cited as precedent. Unpublished dispositions include any order, judgment, explanatory memorandum, or other disposition, including interlocutory rulings and summary orders (but not sealed dispositions). (As before, an unpublished disposition of this Court may always be cited for its *res judicata*, law of the case, or preclusive effect.)

Unpublished dispositions of other federal courts entered before January 1, 2007, may be cited where they are relevant for purposes of *res judicata*, law of the case, or their preclusive effect. Otherwise, unpublished dispositions of other courts of appeals entered before January 1, 2007, may be cited only in the circumstances and for the purposes allowed by the court issuing the disposition, and unpublished dispositions of district courts entered before that date may not be cited. Unpublished dispositions of other federal courts entered on or after January 1, 2007, may be cited in accordance with Federal Rule of Appellate Procedure 32.1.

If unpublished dispositions cited in a brief are not available in a publicly accessible electronic database, a copy of each must be included in an appropriately labeled addendum to the brief. The addendum may be bound together with the brief, but it should be separated from the body of the brief and any other addendum by a distinctly colored separation page. Any addendum exceeding 40 pages must be bound separately from the brief. If the addendum is bound separately, it must be filed and served concurrently with, and in the same number of copies as, the brief itself.

It is important to understand an important caveat in connection with reliance upon unpublished dispositions of this Court. For example, counsel are permitted to argue that an unpublished disposition is binding precedent on a particular issue; they may also argue that an unpublished disposition establishes an intra-circuit conflict in decisions warranting a rehearing *en banc*. On the other hand, counsel are reminded that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition. *See* D.C. Cir. Rule 36(e)(2). Thus, counsel should recognize that the Court believes its published precedents already establish and adequately explain the legal principles applied in the unpublished disposition, and that there is accordingly no need for counsel to base their arguments on unpublished dispositions. (See generally Circuit Rule 36, which sets out the criteria for published and unpublished opinions.)

Counsel should avoid use of designations such as "appellant" and "appellee." In the interest of clarity, it is preferable to use the designations in the court or agency below, the actual names of the parties, or terms descriptive of them, such as "the employee." In addition, parties are strongly urged to limit the use of

acronyms. While acronyms may be used for entities and statutes with widely recognized initials, such as FERC and FOIA, parties should avoid using acronyms that are not widely known.

The excessive use of footnotes also should be avoided. The Court prefers that substantive arguments not be made in footnotes. Footnotes should be used primarily for citations.

Finally, counsel may not refer this Court to sections of pleadings filed in the district court to support those contentions upon which it relies on appeal in lieu of addressing such arguments in the brief.

**9.** *Citation of Supplemental Authorities*
(*See* Fed. R. App. P. 28(j); D.C. Cir. Rule 28(f).)

When pertinent and significant authorities come to a party's attention after briefing or oral argument but before decision, a party may promptly advise the Clerk by letter, limited to 350 words, with copies to all other parties as provided in Federal Rule of Appellate Procedure 28(j). Other parties may file a response to the letter, but any response must be similarly limited.

**10.** *Briefs Containing Material Under Seal*
(*See* D.C. Cir. Rule 47.1(d).)

If it is necessary to refer in a brief to material under seal, two sets of briefs must be filed. The briefs are to be identical except for references to sealed materials. One set of briefs must bear the legend "Under Seal" on the cover, and each page containing sealed material must bear the legend "Under Seal" at the top of the page. The second set of briefs must bear the legend "Public Copy — Sealed Material Deleted" on the cover, and each page from which material under seal has been deleted must bear a legend stating "Material Under Seal Deleted" at the top of the page. The original and 6 copies of the sealed brief plus the original and 8 copies of the public brief must be filed, and 2 copies of the public brief and 2 copies of the brief under seal served on each party, if such party is entitled to receive the material under seal. *See, e.g.*, Fed. R. Crim. P. 6(e). Both sets of briefs must comply with the remainder of the rules, including Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32(e), on the length of briefs. Litigants proceeding *in forma pauperis* must file 1 copy of the sealed brief and 1 copy of the public brief. Briefs filed with the Court under seal are available only to authorized court personnel and are not made available to the public.

**B.** **APPENDIX**
(*See* Fed. R. App. P. 30; D.C. Cir. Rules 25(c)(5), 30, 32.)

**1.** *Contents*

While the original record is available to the judges, it may contain far more than is necessary to a proper disposition of the case. To reduce the record to a manageable size, counsel must prepare an appendix, reproducing those parts of the record that are relevant to the issues on appeal. The Court does not require unrepresented parties proceeding *in forma pauperis* to file an appendix. *See* D.C. Cir. Rule 24.

The appendix must include the relevant docket entries in the proceeding below; the relevant portions of the pleadings, charge, findings, or opinion; the judgment or order in question; and any other parts of the record to which the parties intend to direct the Court's attention. The relevant portions of all pleadings, transcripts, and exhibits that are cited in the brief must also be included. Exhibits may be reproduced in a separate volume of the appendix. *See* Fed. R. App. P. 30(e). Memoranda of law must not be included in the appendix unless there is an issue as to which arguments were raised in the district court or some point

that was admitted below. Failure to include relevant parts of the record in the appendix does not preclude the Court or the parties from relying on that material.

The appendix must contain a table of contents describing each item included, with the page of the appendix on which it can be found. This is followed by the relevant docket entries, and then by the other items from the record, set out in chronological order. All the material in the appendix must be consecutively paginated to facilitate citation to the appendix in the briefs.

### 2. *Preparation*

The appellant or the petitioner bears the burden of preparing the appendix, but the parties are encouraged to agree informally on the contents. If the parties do not agree, the appellant or the petitioner must, not later than 14 days after the date on which the record is filed, serve on the appellee or the respondent a designation of the parts of the record the appellant or petitioner intends to include in the appendix. If the appellee or the respondent wishes to direct the Court's attention to parts of the record not designated by the appellant or the petitioner, the appellee or the respondent must, within 14 days after receipt of the designation, serve upon the appellant or the petitioner a designation of those parts. The appellant or the petitioner must include in the appendix the parts thus designated with respect to the appeal and any cross-appeal. In designating parts of the record for inclusion in the appendix, the parties should have regard for the fact that the entire record is always available to the Court for reference and examination, and the parties should not engage in unnecessary designation.

The appellant or the petitioner pays for the appendix but may be reimbursed when costs are taxed at the conclusion of the case. Appointed counsel in criminal appeals may be reimbursed for the expense of reproducing the appendix by photocopy process in accordance with the Criminal Justice Act. If the appellant or the petitioner believes that opposing counsel is designating material that is unnecessary, the appellant or the petitioner may request the appellee or the respondent to advance the cost of reproducing the materials. If either party causes the inclusion of unnecessary material in the appendix, the Court may require that party to bear the cost of reproducing it, and the Court also may impose sanctions.

Parties to a joint appeal file a joint appendix. In consolidated cases where there are several appellants, the parties must designate someone to assume the primary responsibility for preparing the joint appendix. Intervenors may ask the appellant or the petitioner to include certain material in the appendix, or intervenors may include that material as an addendum to their brief. Any addendum exceeding 40 pages must be bound separately from the brief.

If anything material to the appeal is omitted from the appendix, the Clerk, on the written request of any party, may allow the appendix to be supplemented.

### 3. *Timing; Deferred Appendix*
(*See* Fed. R. App. P. 30; D.C. Cir. Rule 30.)

Federal Rule of Appellate Procedure 30 authorizes either of two timetables for preparing the appendix, and the appellant or petitioner must notify the Court as to which method will be utilized. Under one method, the appendix is complete and available to the parties as they prepare their briefs. In the absence of informal cooperation, the appellant or the petitioner serves the appellee or the respondent with a designation of the proposed contents of the appendix, plus a statement of the issues that the party intends to present for review. The appellee or the respondent then has 14 days to respond with a cross-designation. The appellant or petitioner thereafter files and serves the appendix at the time of filing the brief.

The alternate method allows preparation of the appendix *after* the briefs are filed. Absent informal cooperation, each party serves its designation of the proposed contents of the appendix at the time of filing that party's main brief. *See* Fed. R. App. P. 30(c)(1); D.C. Cir. Rule 30(c). The deferred appendix then must be filed in accordance with the briefing schedule issued by the Court. If a party objects to the use of a "deferred appendix," the matter will be submitted to the Court for resolution.

When parties file their briefs before the appendix has been prepared, they must nonetheless clearly cite to the record, and may do so in one of two ways. *See* Fed. R. App. P. 30(c)(2). They may cite in their briefs to the original pagination of the record (*e.g.*, "Tr. 1154"), in which case the original page numbers also must be indicated on the material reproduced in the appendix. The second and preferred procedure is to file an initial version of the briefs containing references to the original record. Thereafter, the parties must, in accordance with the briefing schedule, serve and file their briefs in final form, replacing references to the original record with references to the appendix. *See* Fed. R. App. P. 30(c); D.C. Cir. Rule 31. No changes other than citations to the deferred appendix and correction of typographical errors may be made in the final briefs filed under this method.

### 4. *Format*
(*See* Fed. R. App. P. 32(b); D.C. Cir. Rule 30(a).)

Unlike the brief, the appendix may be duplicated on both sides of each page. If the appendix is separately produced, it must have a white cover. The Federal Rules of Appellate Procedure require that briefs and appendices be bound in a manner that permits the document to lie reasonably flat when open. The following types of binding ensure that the appendix will lie flat when open: spiral (also known as coil), comb, and wire binding. The following types of binding do *not* permit an appendix to lie flat when open: velo (also known as strip) binding, metal fasteners or posts, and staples. Accordingly, the use of such methods is not acceptable for an appendix, nor is the use of a three-ring binder. If an appendix is submitted that does not conform with these requirements, the party will be notified and directed to file an appendix that is properly bound.

### 5. *Number of Copies*
(*See* Fed. R. App. P. 30(e); D.C. Cir. Rule 30(a).)

The appellant or the petitioner must file 8 copies of the appendix, and serve 1 copy on counsel for each party separately represented. When an appendix is filed electronically, 7 paper copies must be filed in addition to the electronic version. If exhibits are reproduced in a separate volume, only 4 copies of that volume need be filed.

### 6. *In Forma Pauperis Appeals*
(*See* D.C. Cir. Rule 24.)

An unrepresented appellant or petitioner proceeding *in forma pauperis* is not required to file an appendix. The appellant or petitioner may instead furnish, with the brief, 1 copy of the transcript pages he or she wishes to call to the Court's attention; 1 copy of a list setting forth the page numbers of the transcript so furnished; and 1 copy of other portions of the record to which the appellant or petitioner directs the Court's attention. Pro se parties, however, are encouraged to submit 4 copies of these materials if they can. An appellee or respondent must furnish, with the brief, 4 copies of an appendix containing any pages of

transcript or other portions of the record not furnished by appellant or petitioner to which the appellee or respondent directs the Court's attention.

**7.** ***Appendix Containing Matters Under Seal***
   (*See* D.C. Cir. Rule 47.1(e).)

If it is necessary to include material under seal in an appendix, the appendix must be filed in two segments. One segment must contain all sealed material and must bear the legend "Supplement — Under Seal" on the cover, and each page of that segment containing sealed material must bear the legend "Under Seal" at the top of the page. The second appendix segment must bear the legend "Public Appendix — Material Under Seal in Separate Supplement" on the cover; each page from which material under seal has been deleted must bear the legend "Material Under Seal Deleted" at the top of the page. Seven copies of the sealed segment and 7 copies of the public segment of the appendix must be filed, and 1 copy of the public segment of the appendix and 1 copy of the sealed segment served on each party, if such party is entitled to receive the material under seal. *See, e.g.*, Fed. R. Crim. P. 6(e). Segments of appendices filed with the Court under seal are available only to authorized court personnel and are not made available to the public.

## X. THE COURT'S CALENDAR

The Court usually hears cases in 8 sitting periods consisting of 3-4 weeks each. Except when it is sitting *en banc*, the Court hears cases in panels of three judges. The Court usually does not hear cases on Wednesdays. Judges are usually assigned to no more than 4 sitting days during a calendar month.

### A. SCHEDULING SITTING PERIODS

The sitting periods ordinarily begin in September and end in May. While there are usually no formal sitting periods in June, July, and August, panels of the Court are available throughout the summer to hear appeals in which there is an urgent need for immediate consideration. These summer panels also continue to decide motions and cases submitted without argument pursuant to Circuit Rule 34(j).

The sitting periods for each term are scheduled the preceding winter. The Clerk prepares a proposed schedule and submits it to the Court in executive session. The Court accepts the schedule as prepared by the Clerk or modifies it, if necessary.

### B. MERITS PANELS

The Clerk assigns the judges in panels of three to the sitting days for which they are available for an entire term. The Clerk attempts to pair each active judge with each other active judge an equal number of weeks during the year, insofar as availability permits. If a judge becomes unavailable, he or she may arrange to switch sitting dates with another judge. Depending on their availability, senior judges of this Court also serve on panels.

### C. CASELOAD AND CASE MIX

The Clerk's Office usually schedules at least three cases for each day of a panel's sitting period. The "mix" of cases (criminal appeals, private civil appeals, civil appeals where the federal government is a party, and administrative agency cases) in a given sitting period reflects roughly the proportions of the Court's overall caseload.

## D. SCHEDULING CASES FOR ARGUMENT

Most appeals screened by the Legal Division are classified as "Regular Merits" cases.  Normally, the Clerk's Office sets a briefing schedule in these cases after all pending motions have been resolved.  Thereafter, the parties are notified by separate order of the date and time of oral argument.  Scheduling is done by a computer program, which automatically checks for known recusals and makes certain that the case mix both for a specific date and for that week's sitting is acceptable.  As a general rule, once they become ready, cases are calendared in order of age, with the oldest cases set first.

Typically, the argument date will be a minimum of 45 days after briefing is completed.  Arguing counsel should advise the Clerk's Office by letter, filed electronically, of any dates counsel will be unavailable to appear for oral argument.  The notification should be filed as soon as possible and updated if a potential scheduling conflict later arises or if there is any change in availability.  To the extent possible, the Clerk's Office will endeavor to schedule oral argument to avoid conflicts that have been brought to the Court's attention in advance.  Counsel will not be notified of the argument date until it is established by Court order.  *See infra* Part XI. A. Notification, B. Postponements.

Counsel are advised that whenever there are serious settlement negotiations in progress, the parties must advise the Clerk of that fact and must notify the Clerk at the earliest possible moment if settlement is reached.

From time to time a judge must recuse himself or herself from consideration of a particular case.  *See* 28 U.S.C. § 455; Canon 3C, Code of Conduct for United States Judges, Judicial Conference of the United States.  The judge is not required to state the reasons for recusal.  The provisional certificate of parties filed with the docketing statement, pursuant to Circuit Rules 12(c) and 15(c), or with a petition for permission to appeal or a petition for an extraordinary writ, pursuant to Circuit Rules 5 and 21, affords the Clerk's Office the opportunity to determine in advance of briefing those judges who would be recused.  In most cases, this ensures that the case will not be set for hearing on a day when the recused judge is sitting.  In some cases, however, a judge discovers the basis for recusal only after the case has been scheduled before a particular panel.  In those cases, a replacement judge is assigned to hear the case on that date.

## E. SCHEDULING IN PARTICULAR CASES

### 1. *Special Panel*

From time to time in deciding motions, the special panel may have considered in great detail a matter that is closely related to the merits of a case; this consideration may have included oral argument.  If that panel determines that judicial efficiency would be served by the panel retaining the case, it will so advise the Clerk.  The special panel then controls the case from that point on to disposition.

### 2. *Related Cases*

Most related cases are consolidated before they are calendared, as described *supra* in Parts III.H and V.A.  Occasionally, however, a case is identified after a related case has been scheduled for argument or even argued.  In these and other instances in which the cases would normally have been consolidated, or at least joined for hearing before the same panel, the Clerk's Office advises the panel to which the earlier case has been assigned.  If the panel determines, in the interest of judicial economy and consistency of decisions, to take the new case, it will so advise the Clerk.

**3.** *Cases on Remand to this Court*

When the Supreme Court remands a case to this Court for further proceedings, the case is assigned to the same panel that previously considered it.

**4.** *Stipulated Stand-by Pool*

Parties may agree to enter the Court's stipulated stand-by pool, which would allow the case to be used as a replacement for cases that are removed from the calendar too close to the argument date to be replaced in the normal course. Utilization of the stand-by pool may result in significant expedition.

In order to enter the stand-by pool, parties must: (1) stipulate that they do not object to inclusion in the stand-by pool; (2) stipulate that they will not file any dispositive motions; and (3) agree to an expedited briefing schedule. Usually, counsel will be given at least 45 days' notice of the argument date and that date will be no earlier than 45 days after the last brief is due. If counsel is unavailable for the selected date, every effort will be made to calendar the case so that consideration is not delayed. Parties should note that the Court will not ordinarily include in the stand-by pool cases that are inappropriate for oral argument, *see* Circuit Rule 34(j), or cases that require special internal management pursuant to this Court's Appeals Management Plan.

## XI.  ORAL ARGUMENT

### A.  NOTIFICATION
(*See* Fed. R. App. P. 34(b); D.C. Cir. Rule 34(c).)

The Clerk's Office ordinarily gives notice of the date for oral argument after the briefs have been filed. Generally, the members of the panel of judges who will hear the case are not named in the order setting the date for oral argument. The composition of the merits panel will be posted on the Court's website, usually 30 days before the date of oral argument, and will not be disclosed before that time.

The Clerk's Office does not confer with counsel regarding availability before the calendaring order is released but will take into account any scheduling conflicts identified by arguing counsel. *See supra* Part X.D. The calendaring order will contain an electronic link to Form 71 – a memorandum that provides important information on the requirements and logistics for oral argument. Subsequently, in the order allocating the amount of argument time, there will be an electronic link to Form 72, which counsel must complete and file  no less than 7 days before oral argument, giving the name of the attorney or attorneys who will present the argument to the Court.

Requests by artists to sketch court proceedings should be directed to the Clerk's Office well in advance of the scheduled argument. The Court will accommodate all requests unless the panel for reasons of security decides otherwise. Additionally, if the Court receives multiple requests, space considerations may limit the number of sketch artists that can be accommodated.

### B.  POSTPONEMENTS
(*See* Fed. R. App. P. 34(b); D.C. Cir. Rule 34(g).)

Once a case has been calendared, the Clerk's Office cannot change the argument date, and the Court will not ordinarily reschedule it. Any request to reschedule must be made by motion, which will be presented

to a panel of the Court for disposition. The Court disfavors motions to postpone oral argument and will grant them only upon a showing of "extraordinary cause." Unless the panel that grants a motion to postpone argument is prepared to retain the case and hear it outside its normal sitting period, the case will have to be rescheduled for the first available date on the calendar — possibly months later than the original date. Accordingly, it is in counsel's interest to avoid seeking to postpone argument.

**C. ARGUMENT TIME**
    (*See* D.C. Cir. Rule 34(b).)

### 1. *Screening by the Panel*

When cases are assigned to panels, the Clerk designates one judge of the Court on the panel for each day to have primary responsibility for screening cases for that day. The screening function is concerned with alignment of parties and issues, and allotment of times for the arguments. Senior judges of this Court do not serve as screening judges. The name of the screening judge is not made public.

The Clerk's Office distributes the briefs, appendices, and other relevant materials to the judges. In addition, the panel has before it any motions for allotment of argument time. The screening judge reviews the assigned cases and then sends a memorandum to the other judges on the panel containing his or her screening decisions.

There is no standard length of oral argument time, although the allotment of 15 minutes per side is perhaps the most common. The screening judge determines the amount of argument time and may set a particular format for oral argument. The argument may be limited to certain issues, counsel may be advised that the panel wishes additional questions to be addressed at oral argument, and the usual order of presentation contemplated by Federal Rule of Appellate Procedure 34(c) may be altered. The screening judge also advises the Clerk of the order in which cases set for a particular day will be heard.

When the screening judge allots time for argument, that decision is automatically effective, and no concurrences are necessary from the other members of the panel. If the screening judge recommends instead that the case be submitted without oral argument, pursuant to Circuit Rule 34(j), it is necessary that the other two members of the panel concur in this recommendation. After receiving the judge's screening memoranda, the Clerk's Office issues orders that reflect the screening decisions.

Parties allotted less time than they believe is warranted may move promptly for additional time. The Court rarely grants such motions. If the Court orders a case to be submitted without argument pursuant to Circuit Rule 34(j), counsel has 10 days from the date of the screening order within which to move to restore the case to the argument calendar. The Court rarely grants these motions. On the other hand, a party in a case that has been set for argument may wish to move to submit the case on the briefs alone. Counsel should file such a motion as soon as possible after receiving the argument date and briefing schedule.

If a case is screened and then postponed before oral argument, the screening decision will be subject to redetermination when the argument is rescheduled.

### 2. *Rule 34(j) Dispositions*

Pursuant to Federal Rule of Appellate Procedure 34(a)(2), the Court may, under certain circumstances, decide a case without oral argument. Among the factors the Court considers are: (1) whether the appeal is frivolous; (2) whether the dispositive issue has previously been authoritatively decided; and (3) whether the

facts and legal arguments are adequately presented in the briefs and record so that oral argument would not significantly aid the decisional process. The decision to dispense with oral argument must be unanimously made by a three-judge panel.

The Court's Case Management Plan is designed to identify early in the appellate process cases suitable for disposition without oral argument under Circuit Rule 34(j). When a staff attorney screens a new appeal and concludes that Rule 34(j) treatment might be appropriate, that screening recommendation goes to the Clerk's Office, and a briefing schedule (but no oral argument date) is set. A staff attorney then reviews the briefs, and if the staff attorney concludes that the case should be disposed of without oral argument, the staff attorney recommends to the special panel that it decide the case on the merits, pursuant to the Rule. The staff attorney also proposes a disposition, embodied in a draft judgment and, where appropriate, an accompanying memorandum. If the special panel accepts the recommendation for Rule 34(j) disposition, the panel issues an order advising the parties that the case will be decided without oral argument. Counsel may move within 10 days for reconsideration of that order. In the absence of a successful motion to reconsider, the special panel will decide the case on the merits, usually by an unpublished *per curiam* judgment.

The second way in which a case may be submitted for decision without oral argument is if the screening judge, with the concurrence of the other two members of the merits panel, determines that a case, originally set for argument as a "Regular Merits" case, should be removed from the calendar and handled pursuant to Rule 34(j). The Clerk's Office issues an order notifying counsel of that decision, and counsel has 10 days to move for reconsideration. The Court rarely grants such motions.

The merits panel discusses cases submitted without oral argument at a conference following oral argument on the day on which the case was originally scheduled to be heard. The disposition is usually in the form of an unpublished *per curiam* judgment.

**D.  NUMBER OF COUNSEL**
(*See* D.C. Cir. Rules 34(c), (d).)

There is generally a limit of two counsel per side who may argue in cases allotted more than 15 minutes per side. In cases allotted 15 minutes or less per side, only one counsel may argue. This rule applies to consolidated cases, and it may be waived only by leave of the Court.

An intervenor may argue only to the extent that counsel whose side the intervenor supports is willing to share argument time. If counsel wishes to share time with an intervenor in a case in which more than 15 minutes per side has been allotted for argument, no leave of the Court is necessary. Counsel should inform the Clerk's Office of such arrangements no less than 7 days before the date of argument. The counsel for the intervenor will be counted as one of the two counsel per side permitted under the rules.

Counsel on the same side should make their own apportionment of time among themselves; otherwise the Court will do so. The courtroom deputy should be advised of the arrangement before the case is called; the attorney making the opening presentation should announce the arrangement to the Court. Each attorney is thereafter limited to the time specifically allotted, unless the Court permits otherwise.

### E.  ARGUMENTS BY *AMICI CURIAE*
(*See* D.C. Cir. Rule 34(e).)

An *amicus curiae*, other than one appointed by the Court, may not present oral argument without permission of the Court, and such permission is sparingly granted.  If counsel for the party supported by the *amicus* consents to share oral argument time with the *amicus*, no motion is necessary, subject to the limitation in Circuit Rule 34(c) that no more than two attorneys may argue.  Otherwise, an *amicus* seeking leave to argue must file a motion no later than 14 days prior to the date oral argument is scheduled.

### F.  FORM AND CONTENT OF ARGUMENT
(*See* Fed. R. App. P. 34; D.C. Cir. Rule 34.)

The appellant or petitioner is entitled to open and conclude the argument.  If the case involves a cross-appeal, the first party to file a notice of appeal is deemed the appellant, unless the parties agree or the Court orders otherwise.  *See* Fed. R. App. P. 28.1(b).  In cases in which separate time is allotted to a number of parties, the screening order will indicate the order of presentation of argument to be followed by those parties.

The opening argument should include a brief introductory statement of the case and the issues presented.  Counsel may not read from a prepared text, nor should counsel read at length from briefs, records, or authorities.  *See* Fed. R. App. P. 34(c); D.C. Cir. Rule 34(a).  Counsel should be prepared to answer questions from the bench, and attorneys on the same side should take care not to duplicate their arguments.

If counsel wishes to use any exhibits in the courtroom, counsel must make arrangements with the Clerk's Office and advise the Court and all other counsel by letter at least 7 days prior to the argument.  The letter must set forth the justification for the use of the exhibits.  After the argument, counsel should remove the exhibits, unless directed otherwise by the panel.  *See* D.C. Cir. Rule 34(I).

In this Circuit, the judges will always have read the briefs prior to the hearing.  Counsel should keep this in mind when preparing and presenting argument.

Argument for the day usually begins at 9:30 a.m.  As a general rule, the panel will hear all cases scheduled for that day, even if it is necessary to recess for lunch and reconvene.

### G.  COURT CLOSINGS

As noted in Part II.B.4, if there is any possibility that the Court will not be in session because of inclement weather or an emergency situation, counsel should call the Clerk's Office at 202-216-7000 (Option 2, Special Announcements), or check the Court's website, to determine whether the Court is open.  In the absence of official notice *from the Court* to the contrary, counsel should assume that the Court *will* be in session.  A general announcement by the media that the "government" is closed does not necessarily include this Court.

### H.  PROCEDURES FOR ORAL ARGUMENT

Counsel must arrive at the courtroom at least 20 minutes before the start of argument for the scheduled session.  The identity of the panel and the order in which the cases will be heard will be posted outside the courtroom.  Counsel also may call the Clerk's Office in the afternoon of the day before argument to find out the order in which the cases will be heard or consult the Court's website.  If more than one panel is sitting

that day, the notice also will disclose the other hearing location. The presiding judge may alter the order in which the cases are to be heard from the schedule posted. Counsel must sign in with the courtroom deputy upon arrival. Except as stated below, counsel must remain in the courtroom, or arrange with the courtroom deputy to be on call in the attorney waiting room next to the courtroom. Counsel scheduled to appear in the third and subsequent cases on the calendar, however, may be excused by the courtroom deputy after signing in, unless the panel directs otherwise. Prior to leaving the courtroom, excused counsel must inform the courtroom deputy of the places and, if available, telephone numbers, where they can be reached in the interim.

All counsel who have not remained in the courtroom must return to the courtroom 15 minutes before their cases are due to be heard, based on the time set for each preceding case.

The courtroom deputy will explain the warning light system used to signal the time remaining during the oral argument. Counsel for the appellant or petitioner also must inform the courtroom deputy whether he or she wishes to reserve time for rebuttal.

The presiding judge of the panel is the member of the panel in active service who is first in seniority. The presiding judge sits in the center of the bench, and the next ranking judge is seated to his or her right. The names and seating arrangement of the panel for the day are marked on the bench.

Facing the bench, counsel for the appellant or petitioner sits at the table to the right of the lectern, and counsel for the appellee or respondent to the left. Additional counsel may sit at the tables or elsewhere in the well of the courtroom.

A digital timer is on the lectern in front of counsel. The numbers are displayed in green when counsel begins arguing. The numbers turn purple when counsel reaches his or her rebuttal time. If counsel does not wish to reserve rebuttal time (or does not have rebuttal time), the numbers turn purple when there are 2 minutes remaining in the allotted time. The numbers turn red when all the allotted time is used. Counsel wishing to reserve time for rebuttal must observe the timer and preserve the time counsel has reserved for rebuttal.

When the questioning has been extensive, the presiding judge in his or her discretion may grant counsel additional time for argument. The Court also may terminate the hearing before the allotted time is up, if further argument appears unnecessary.

## I. RECORDINGS AND TRANSCRIPTS OF ARGUMENTS

All arguments are recorded for future reference of the Court. Audio recordings of oral arguments will be available on the Court's website free of charge, usually by 2:00 p.m. on the same day of the oral argument. Any person may request that a transcript of the oral argument be made. Information on how to order a transcript and current pricing is available on the Court's website.

## XII.    MAKING THE DECISION

### A. FORMS OF DECISION
(*See* Fed. R. App. P. 32.1, 36; D.C. Cir. Rules 32.1, 36.)

Four possible forms for disposing of cases that have been considered by a merits panel are currently used: a published signed opinion, a published *per curiam* opinion, an unpublished judgment or order with

memorandum, and a judgment or order without memorandum. An unpublished judgment or order with memorandum is addressed primarily to those immediately concerned with the case. The memorandum usually is fairly brief, stating only the facts and law necessary for an understanding of the Court's decision. A judgment or order without memorandum indicates affirmance or reversal, or grant or denial of a petition for review, with a brief explanation, such as citation of a governing precedent. With the exception of orders filed under seal and some scheduling orders generated by the Court's docketing system, all orders and judgments, including Clerk's orders, issued on or after June 1, 2001, are available online via PACER, the Judiciary's electronic public access service. A small document icon appears next to the docket entry for any order or judgment that can be viewed online. A PACER account is required (available from the PACER Service Center), and a per page fee applies. The PACER Service Center can be accessed through a link at the Court's website.

Circuit Rule 36(c)(2) sets out the criteria the Court employs in determining whether to publish an opinion. The Court's policy is to publish an opinion or memorandum if it meets one or more of the following criteria: (1) the opinion resolves a substantial issue of first impression generally or an issue presented for the first time in this Court; (2) the opinion alters, modifies, or significantly clarifies a rule of law previously announced by the Court; (3) the opinion calls attention to an existing rule of law that appears to have been generally overlooked; (4) the opinion criticizes or questions existing law; (5) the opinion resolves a conflict in decisions within the Circuit or creates a conflict with another circuit; (6) the opinion reverses a published district court or agency decision, or affirms it on grounds different from those in a published opinion of the district court; or (7) the opinion warrants publication in light of other factors that give it general public interest.

An unpublished disposition will be used where the Court's decision does not satisfy the criteria for publication under Circuit Rule 36(c). Citation of unpublished dispositions is governed by Federal Rule of Appellate Procedure 32.1 and Circuit Rule 32.1(b). Although Circuit Rule 32.1(b)(1) permits citation, as precedent, of unpublished dispositions of this Court issued on or after January 1, 2002, Circuit Rule 36(e)(2) makes clear that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition, *i.e.*, the order or judgment does not add anything to the body of law already established and explained in the Court's published precedents.

## B. CASE CONFERENCES

In this Circuit, cases decided on the merits are generally discussed at a case conference. If the case was argued, the conference generally takes place later the same day; if the case was submitted without argument, it is usually discussed at the same conference as the cases with which it was originally scheduled. This Court does not ordinarily decide argued cases from the bench.

At the conference, the members of the panel reach agreement on the form as well as the substance of the decision. If the panel decides to issue an opinion or memorandum, the presiding judge assigns the responsibility for writing it, unless he or she is in the minority, in which event the senior member of the panel in the majority designates the author. When a case has been submitted without oral argument, the screening judge usually prepares the opinion or memorandum.

## C. PREPARATION OF OPINIONS

If the case is to be decided with an opinion or memorandum, the author circulates a draft to the other members of the panel. The other judges are free to suggest changes in the proposed text, or they may draft and circulate concurring or dissenting opinions. These may lead to further changes in the majority opinion.

Final drafts of all opinions to be published also are circulated to all judges on the Court. Following circulation of the drafts to the panel and the Court, the opinion is printed in house.

## D. TIMING OF DECISIONS

Each month there is an internal report on the status of every case that has been argued but not yet assigned, and each judge reports on the status of every opinion assigned to the judge that either has not been circulated or is awaiting clearance by other members of the panel.

Occasionally, a panel defers decision of a case pending disposition of another case in this Court or before another tribunal. The Clerk's Office usually notifies the parties by an order holding the case in abeyance pending a decision or some other event.

Counsel are advised that whenever there are serious post-argument settlement negotiations in progress, the parties must advise the Clerk of that fact and must notify the Clerk at the earliest possible moment if settlement is reached.

## E. NOTICE OF DECISIONS

When an order or judgment is entered in a case assigned to the Court's electronic filing system, the Clerk's Office electronically transmits a Notice of Docket Activity to all parties who have consented to electronic service, and mails notice and a copy of any opinion or judgment to parties who are not electronic filers. *See* D.C. Cir. Rules 36(b), 45(d). Members of the bar should call the Clerk's attention to typographical or other errors in slip opinions.

The Clerk's Office typically releases opinions on Tuesdays and Fridays beginning at 10:00 a.m. However, a panel can direct the release of an opinion at any other time. Opinions are added to the Court's website, in PDF format, soon after they are publicly released, and may be accessed from a computer terminal in the public area of the Clerk's Office. An archive of past opinions issued since September 1997 is also available on the Court's website.

Although certain decisions are not published, all unsealed judgments and memoranda are available to the public upon proper application to the Clerk's Office, and those issued since June 2000 are posted on the Court's website.

## XIII. POST-DECISION PROCEDURES

## A. TERMINATING THE CASE

### 1. *Enforcement Judgments*
   (*See* Fed. R. App. P. 19.)

After the Court files an opinion directing entry of judgment enforcing in part an agency order, the agency within 14 days must submit a proposed judgment to the Court. If a party disagrees with the agency's proposal, that party has 10 days thereafter to file an alternative judgment. The panel will then settle the judgment and direct its entry.

**2.** *Mandates*
(*See* Fed. R. App. P. 41; D.C. Cir. Rule 41.)

The Court will enter its judgment in a case on the same date its decision is issued. Ordinarily, the Clerk's Office will issue a formal mandate 7 days after the period for seeking rehearing has expired or a petition for rehearing has been decided. The Court, however, retains discretion to direct immediate issuance of its mandate in an appropriate case, and any party may move at any time for expedited issuance of the mandate on a showing of good cause. Counsel should not confuse the mandate with the judgment itself because the time for filing a petition for a writ of *certiorari* with the United States Supreme Court runs from the date of this Court's judgment or disposition of a timely petition for rehearing or for rehearing *en banc*.

A motion for stay of the mandate must set forth facts showing good cause. Unless the motion recites that the other parties do not object to a stay, the motion will not be acted upon until the response time has expired. Subject to these limitations, the Clerk has been given authority to grant unopposed motions for stays for a period of up to 90 days. The Clerk also has the discretion to instead submit the motion to the panel that decided the case. Motions to reconsider a decision by the Clerk are referred to the panel that decided the case. If a motion to stay issuance of the mandate is denied, the mandate ordinarily will be issued 7 days thereafter. Stays ordinarily will not extend beyond 90 days from the date the mandate otherwise would have issued.

If the party who obtained a stay of the mandate files a petition for a writ of *certiorari* during the term of the stay issued by this Court, and so notifies the circuit Clerk in writing, the stay will continue until the Supreme Court's final disposition. A petition for a writ of *certiorari* filed under any other circumstances has no effect on the mandate.

**3.** *Remands*
(*See* Fed. R. App. P. 12.1; D.C. Cir. Rule 41(b).)

When the Court remands the *record* in any case to the district court or to an agency, the Court retains jurisdiction over the case. When the Court remands the *case*, the Court does not retain jurisdiction, and a new notice of appeal or petition for review is required if a party seeks review of the proceedings conducted on remand.

**4.** *Costs*
(*See* Fed. R. App. P. 39; D.C. Cir. Rule 39.)

Costs, when requested, are usually charged to the losing party or to an appellant who withdraws the appeal. When the government is a party to a suit, costs are governed by statute. Costs are not taxed for briefs of *amici curiae* or intervenors or separate replies thereto except on motion granted by the Court.

The items allowed as costs are set forth in Circuit Rule 39(a). Reimbursable printing costs are limited to the cost of the most economical means of reproduction. In addition to the docketing fee, costs are allowed for reproducing the number of copies of briefs and appendices that must be filed with the Court and served on parties, intervenors, and *amici curiae*, plus 3 for the submitting party.

Counsel has 14 days after entry of judgment to submit the bill of costs with service on opposing counsel. Printing and reproduction costs must be itemized and verified to show the charge per page. Opposing counsel may file objections. The Clerk's Office provides forms for itemizing bills of costs, and parties that

submit bills not presented on these forms (or reasonable facsimiles thereof) will be directed to provide a conforming request.

The Clerk reviews the bill for compliance with the rules and then prepares a statement of costs. Ordinarily, the directions as to costs are issued at the same time as the mandate. If the matter of costs has not been settled by that time, the Clerk's Office will at a later date send a supplemental statement to the district court or agency.

Once a party is ordered to pay costs, there is usually no further action on the matter in this Court. Any action to enforce an award of costs is brought in the district court. In addition, various expenses incidental to the appeal must be settled in the district court. Among these are the costs of the reporter's transcript, the filing fee for the notice of appeal, the Clerk's fee for preparing and transmitting the record, and the premiums paid for any required appeal bond. The successful party on appeal must apply for recovery of these expenses in the district court after issuance of the mandate of this Court.

### 5. *Disposal of Sealed Records*
   (*See* D.C. Cir. Rule 47.1(f).)

In any case in which all or part of the record has been maintained under seal, the Clerk will order the parties to show cause why the record should not be unsealed, unless the nature of the materials themselves (*e.g.*, grand jury material) makes it clear that unsealing would be impermissible. This order will be entered in conjunction with the issuance of the mandate. If the parties agree to unsealing, the record will be unsealed by Clerk's order. Otherwise, the matter will be referred to the Court for disposition. Counsel to an appeal involving sealed records must promptly notify the Court when it is no longer necessary to maintain the record or portions of the record under seal.

## B. RECONSIDERATION

### 1. *Rehearing by the Panel*
   (*See* Fed. R. App. P. 32, 40; D.C. Cir. Rule 40.)

Very few petitions for rehearing are granted. Sanctions may be imposed as a penalty for filing a petition for rehearing found to be wholly without merit.

A party seeking rehearing must file a petition within 45 days after entry of the judgment in any case in which a party is either the United States, one of its agencies, a federal officer or employee sued in an official capacity, or, under certain circumstances, a federal officer or employee sued in an individual capacity. *See* Fed. R. App. P. 40(d)(1); D.C. Cir. Rule 40(a). If no party fits into one of these categories, the petition must be filed within 30 days. These time limits will not be extended except for good cause shown. The petition must state with particularity the errors that the panel is claimed to have made. An original and 4 copies must be filed. A copy of the panel's opinion, a Rule 28(a)(1)(A) certificate of parties and *amici*, and any disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1 must be attached as an addendum to the petition. *See* D.C. Cir. Rule 40(c). The form of a petition for rehearing is governed by Federal Rule of Appellate Procedure 32, and the petition may not exceed 3,900 words if produced using a computer and 15 pages if handwritten or typewritten. *See* Fed. R. App. P. 40(d)(2)-(3); D.C. Cir. Rule 40(b). Motions to exceed this length limitation are viewed with disfavor and will be granted only for extraordinarily compelling reasons.

A response to the petition is not permitted unless the panel requests one. A petition for rehearing, however, will not ordinarily be granted, nor will an opinion or judgment be modified in any significant respect, in the absence of a request by the Court for a response. The length limits for a petition for rehearing also apply to a response. *See* Fed. R. App. P. 40(d)(4); D.C. Cir. Rule 40(d).

The Clerk does not send the mandate to the district court or agency until a timely petition for rehearing has been decided, unless the Court expressly so orders. The Clerk also will delay issuing the mandate when a party moves for an extension of the time within which to petition for rehearing or rehearing *en banc*. A timely petition for rehearing or rehearing *en banc* extends the time for petitioning the United States Supreme Court for a writ of *certiorari*.

The Clerk's Office transmits the petition to the panel members via an electronic vote sheet. When voting is complete, the Clerk enters an appropriate order for the Court. If a petition for rehearing *en banc* also has been filed, the Clerk will withhold entry of an order denying rehearing by the panel until the *en banc* question has been resolved. If rehearing *en banc* is granted, the panel's judgment, but ordinarily not its opinion, is vacated, but the panel may act on the petition for rehearing without waiting for final termination of the *en banc* proceeding. On termination of the *en banc* proceeding (including when the *en banc* Court divides evenly), a new judgment will be issued.

Prior to either a decision by the Court to grant rehearing *en banc* or issuance of the Court's mandate, a panel may reconsider or amend its decision *sua sponte*, or on consideration of a petition for panel rehearing, or upon consideration of a petition for rehearing *en banc*. If a panel decides to reconsider or amend its decision, voting may be deferred on any pending petition for rehearing *en banc* or the *en banc* petition may be dismissed as moot with notice to the parties that a new period for seeking rehearing *en banc* will begin to run after the panel concludes its reconsideration of its decision. The panel may order new or supplemental briefing and oral argument. If the panel reconsiders the case, it may issue a new opinion along with a new judgment.

### 2. *Rehearing En Banc*
(*See* Fed. R. App. P. 40; D.C. Cir. Rule 40.)

Like petitions for rehearing by a panel, petitions for rehearing *en banc* are rarely granted. Federal Rule of Appellate Procedure 40(c) expressly states that *en banc* hearings are not favored and ordinarily will be allowed only if one of the criteria in Rule 40(b)(2)(A)-(D) is met.

The timing requirements for a petition for rehearing *en banc* are the same as those for panel rehearing. The petition must begin with a section that sets forth why the case is of exceptional importance or cites the decisions with which the panel judgment is claimed to be in conflict. An original and 19 copies must be filed. As with panel rehearing petitions, a copy of the panel opinion, a Rule 28(a)(1)(A) certificate of parties and *amici*, and any disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1 must be attached as an addendum to the petition. *See* D.C. Cir. Rule 40(c). The petition may not exceed 3,900 words if produced using a computer and 15 pages if handwritten or typewritten. Motions to exceed this limitation are viewed with disfavor and will be granted only for extraordinarily compelling reasons.

If a party is submitting both a petition for rehearing by the panel and a petition for rehearing *en banc*, the two must be combined in the same document, in which event an original and 19 copies must be filed. The combined pleading may not exceed 3,900 words if produced using a computer and 15 pages if handwritten or typewritten.

As in the case of petitions for panel rehearing, the rules do not provide for a response to a petition for rehearing *en banc*, except by request of the Court. If any member of the Court wishes a response, the Clerk will enter an order to that effect. The length limits for a petition for rehearing *en banc* also apply to a response. *See* Fed. R. App. P. 40(d)(4); D.C. Cir. Rule 40(d). There is no oral argument on the question whether rehearing *en banc* should be granted.

The Clerk's Office transmits a vote sheet and the petition for rehearing *en banc* electronically to all members of the original panel, including a senior judge of this Court, and to all other active judges of this Court. A vote may be requested by an active judge of the Court, or by any member of the panel. If no judge asks for a vote within a specified time, and none requests more time to consider the matter, the Clerk will enter an order denying the petition.

If a judge calls for a vote on the petition for rehearing *en banc*, the Clerk's Office transmits electronically to the full Court a new vote sheet, along with any response to the petition ordered by the Court. The question now is whether there should be a rehearing *en banc*. On this question only active judges of the Court may vote, and a majority of all active judges who are not recused must approve rehearing *en banc* in order for it to be granted.

When rehearing *en banc* is granted, the Clerk enters an order granting the rehearing *en banc* and vacating the judgment by the original panel, either in whole or in part, as circumstances warrant. This order is posted on the Court's website and is published in the federal reporter system. An order granting rehearing *en banc* does not indicate the names of the judges who voted against rehearing, but an order denying rehearing *en banc* does indicate the names of the judges who voted to grant rehearing *en banc*, if they wish.

The Court has followed a variety of procedures in conducting rehearing *en banc*. On occasion, only the original briefs have been considered; in other cases, the Court has requested supplemental briefs. The Court almost always hears oral argument in considering a case *en banc*.

The Court sitting *en banc* consists of all active judges, plus any senior judges of the Court who were members of the original panel and wish to participate. When the Court sits *en banc* with an even number of judges, and the result is an evenly divided vote, the Court will enter a judgment affirming the order or judgment under review, and it may publish the *en banc* Court's divided views.

In the absence of a request from a party, any active judge of the Court, or member of the panel, may suggest that a case be reheard *en banc*. If a majority of the active judges who are not recused agree, the Court orders rehearing *en banc*.

In addition, a party may petition for initial *en banc* consideration. Such a petition must include a concise statement of the issue and its importance and conform to the other requirements of Federal Rule of Appellate Procedure 40(b)(2), (c), and (d)(2)-(5). If a party wishes a case to be heard initially *en banc*, the petition ideally should be filed within the first 30 days after docketing, but in no event later than the date on which that party's brief is due. A judge also may suggest *en banc* consideration prior to the panel decision; on occasion this has been done by the panel itself.

## C. REVIEW BY THE SUPREME COURT OF THE UNITED STATES

In general, a party has 90 days from the entry of judgment or the denial of a timely petition for rehearing, whichever is later, in which to petition for a writ of *certiorari*. A circuit court cannot enlarge this period;

**App. 798**

application for an extension must be made to the Supreme Court.  Counsel should be mindful that the judgment is entered on the day of the Court's decision and not when the mandate is issued.

This Court does not transmit any record, or portion of a record, to the Supreme Court unless requested by the Clerk or Deputy Clerk of that Court.

Federal Rule of Appellate Procedure 41(d) provides that a stay pending application for *certiorari* must not exceed 90 days, unless the period is extended for good cause or the Supreme Court extends the time for filing a petition and the party who obtained the stay so notifies the Clerk of this Court in writing within the period of the stay.  When, however, a party files a petition for a writ of *certiorari* before the mandate of this Court is issued, the mandate is stayed until the Supreme Court disposes of the case *if* the party first obtained a stay of the mandate, filed the petition within the period the stay was in effect, and so notified the Clerk of this Court.  Upon receipt of a copy of the Supreme Court order denying the petition, this Court will issue the mandate immediately, unless extraordinary circumstances exist.

**App. 799**