[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NICOLAS TALBOTT, et al.,

    Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA, et al.,

    Defendants-Appellants.

No. 25-5087

---

**REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 2

I. The Government Is Likely To Prevail On The Merits .................... 2

    A. The 2025 Policy Is Subject To Highly Deferential Review ............................................................................... 2

    B. The 2025 Policy Withstands Constitutional Review ............. 7

II. The Equitable Factors Favor A Stay ............................................. 12

CONCLUSION ............................................................................................. 15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

As the government's motion explained, the Department of Defense's 2025 policy readily withstands constitutional scrutiny. Plaintiffs offer scant justification for why this product of the military's professional judgment should have been enjoined at all, let alone worldwide. This is especially true given that the Supreme Court and this Court permitted the Mattis policy—which mirrors the policy challenged here in all relevant respects—to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019); *Doe 2 v. Shanahan*, 755 F. App'x 19, 22, 25 (D.C. Cir. 2019) (per curiam). Plaintiffs ignore this fact entirely.

The district court acknowledged that its preliminary injunction requires the military to maintain the policy adopted by the Secretary of Defense's predecessor (the Austin policy). But plaintiffs do not dispute that the Austin policy, like the 2025 policy, presumptively disqualified individuals with a history of gender dysphoria or related medical interventions (subject to various exceptions) and required individuals without that condition to meet the standards associated with their sex. Plaintiffs' preferred policy differs from the 2025 policy only with respect to the nature of its exceptions, meaning this case reduces to a disagreement over

where to draw the line. Plaintiffs offer no sound basis for concluding that the line the military has once again drawn falls outside constitutional bounds. The Court should grant a stay pending appeal.

## ARGUMENT

### I. The Government Is Likely To Prevail On The Merits

#### A. The 2025 Policy Is Subject To Highly Deferential Review

For multiple reasons, the considered judgment of senior military leaders receives the most deferential form of constitutional scrutiny, and plaintiffs offer no convincing basis for concluding otherwise.

1. The 2025 policy triggers rational-basis review because it—like the Austin policy the district court ordered the military to maintain—draws lines based on a medical condition (gender dysphoria) and related medical interventions, not identity or status. Mot. 11-13. The policy thus applies neutral rules based on objective criteria.

Plaintiffs repeat the error of the district court in describing the 2025 policy as a broad ban that "bans all transgender troops." Opp. 3 (quoting Add.23). At times, plaintiffs seem to recognize that the policy does not exclude individuals without a history of gender dysphoria or related medical interventions who are willing to adhere to the sex-based standards

2

that apply to all servicemembers. *See, e.g.*, Opp. 6. Plaintiffs presume that no one could satisfy these criteria, but their own experience serving in their sex before the Carter policy, or before "their transition was 'complete'" under the Carter and Austin policies, shows otherwise. *Doe 2 v. Shanahan,* 917 F.3d 694, 710-11 (D.C. Cir. 2019) (Williams, J., concurring in the result); *see* Dkt. 69, at 9-37.

Plaintiffs argue that the policy is "subject to heightened scrutiny as both sex-based discrimination and discrimination against a quasi-suspect class." Opp. 3. But the policy draws lines based on a medical condition and a related medical intervention, not based on identity, status, or sex. *See Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification."). Moreover, the Supreme Court itself has counseled reluctance to recognize new suspect classes, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985), and military standards should be the last site for breaking new constitutional ground.

3

2. Even if an analogous civilian policy would trigger heightened scrutiny, military-deference principles require an approach akin to rational-basis review here. Mot. 11-13. The Supreme Court confirmed as much in *Trump v. Hawaii*, 585 U.S. 667, 705 n.5 (2018), when it declined to import "the *de novo* 'reasonable observer' inquiry" into "the national security and foreign affairs context." Instead, the Court applied "rational basis review" and stressed that judicial "inquiry into matters of … national security is highly constrained," *id.* at 704, even when evaluating "a 'categorical' … classification that discriminate[s] on the basis of sex," *id.* at 703 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)). Plaintiffs dismiss *Hawaii* as involving a "facially neutral" policy. Opp. 11. But that is true of the policy here—even though it, like the proclamation in *Hawaii*, is alleged to have discriminatory purposes and effects. *See* 585 U.S. at 699 (discussing allegation that the proclamation "operates as a 'religious gerrymander'").

*Rostker v. Goldberg* similarly declined to apply heightened scrutiny to a sex-based draft-registration law. 453 U.S. 57, 79 (1981). The Court relied on "administrative problems" and post hoc justifications, *id.* at 81; *see id.* at 74-75; granted Congress significant latitude to choose "among

4

alternatives" in furthering military interests, *id.* at 71-72; and deferred to Congress in the face of contrary testimony from military officials, *id.* at 63. Plaintiffs scarcely address any of this. And they do not even mention *Schlesinger v. Ballard*, 419 U.S. 498 (1975), which upheld different mandatory-discharge requirements for male and female officers based on what "Congress may … quite rationally have believed." *Id.* at 508, *quoted in* Mot. 22.

Plaintiffs' authorities (Opp. 9-10) do not support their narrow conception of military deference or their arguments for heightened scrutiny. *Singh v. Berger*, 56 F.4th 88, 92-93 (D.C. Cir. 2022), involved a challenge under the Religious Freedom Restoration Act, which has a statutorily mandated "demanding compelling-interest and least-restrictive-means test" and thus "subjects governmental action to strict scrutiny." No such statutory requirement applies here. And as this Court has explained, the Supreme Court in *Frontiero v. Richardson*, 411 U.S. 677 (1973) (plurality opinion), "extend[ed] no special deference to statutes providing benefits to members of the uniformed services" because those laws "never purported to be a congressional judgment on a uniquely military matter."

5

*Goldman v. Secretary of Def.*, 734 F.2d 1531, 1537 (D.C. Cir. 1984). Further, in *United States v. Virginia*, 518 U.S. 515, 520-23 (1996), the challenged policy was not made by federal military leaders; rather, that case involved a suit brought by the United States against a state-run military school.

Finally, plaintiffs suggest that military deference does not apply because the 2025 policy "was enacted very quickly." Opp. 11. But the Department was able to act quickly because the 2025 policy is materially the same as the Mattis policy, which the Supreme Court and this Court permitted to take effect, *Karnoski*, 586 U.S. at 1124 (staying preliminary injunction pending appeal); *Doe 2,* 755 F. App'x at 22, 25 (vacating the preliminary injunction). Because the Department issued the Mattis policy after "a comprehensive study" conducted by a "panel of experts" during President Trump's first term, the Department was not starting from a blank slate in issuing the 2025 policy. *Doe 2,* 917 F.3d at 714, 730 (Williams, J., concurring in the result) (emphasis omitted). In addition, the Department did consider more recent data and studies beyond the Mattis report. Add.115-116. Moreover, the Supreme Court and this Court have explained that "'there's nothing unusual about a new' administration

6

'coming to office inclined to favor a different policy direction.'" *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (quoting *In re Department of Commerce*, 586 U.S. 956, 958 (2018) (Gorsuch, J., concurring in part, dissenting in part)).

### B. The 2025 Policy Withstands Constitutional Review

Regardless of the level of scrutiny applied, the 2025 policy readily withstands review. Mot. 13-18. Plaintiffs do not seriously dispute that the Department has an important interest in military readiness, unit cohesion and troop discipline, or military resources, but rather insist that the 2025 policy is so discontinuous with those interests that it cannot survive any level of scrutiny. Opp. 8-9, 14-19. They fail to justify that remarkable claim.

1. As explained in the government's motion, the 2025 policy rests on an extensive study and accompanying 44-page report underlying the Mattis policy, as well as a review of more recent evidence and literature. Mot. 13-18. Together, those sources show, among other things, that (1) servicemembers with gender dysphoria "are more likely to attempt suicide" and have more mental-health visits than others; (2) they can be-

7

come non-deployable "for a potentially significant amount of time" in order to receive and recover from medical interventions pertaining to gender dysphoria; (3) there is "considerable scientific uncertainty" regarding whether cross-sex hormones or sex-reassignment surgery actually "remedy … the mental health problems associated with gender dysphoria;" and (4) these therapies are, in any event, "disproportionately costly on a per capita basis." Add.143-144, 154, 157, 163; *see also* Add.188 (noting the evidence of the success of medical interventions for gender dysphoria is "low to moderate").

In light of these and other data, the Department determined that allowing individuals with a history of gender dysphoria and related medical interventions to serve would pose "substantial risks," "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Add.120. As explained above, that determination is entitled to considerable weight, especially in this context, *see Hawaii*, 585 U.S. at 708, and presumptively disqualifying these individuals from service is at least rationally related to achieving those important government interests.

8

2. Plaintiffs do not grapple with any of this. Their response to the Mattis report, for example, amounts to two sentences summarizing the district court's characterizations of the report. Opp. 15. Like the district court, plaintiffs cast the report aside as "outdated" and "irrelevant." *Id.* (quoting Add.65). But the Department was not required to take such a myopic view of the comprehensive study supporting the Mattis policy. In any event, the Department did consider medical literature covering a more recent time period. Add.115-116.

Plaintiffs fault the government for not "rebut[ting]" declarations of former military officials who implemented the Austin policy, but such arguments have not persuaded the Supreme Court. Opp. 18. *Compare Hawaii*, 585 U.S. at 746 (Sotomayor, J., dissenting), *with id.* at 708 (majority opinion); *cf. Goldman v. Weinberger*, 475 U.S. 503, 509 (1986). At most, that these former officials would disagree with the 2025 policy shows that current military leaders simply made a more cautious "evaluation of the underlying facts" than their predecessors, and plaintiffs offer no legitimate basis for why a contrary view should supplant "the Executive's predictive judgments." *Hawaii*, 585 U.S. at 708. And while plaintiffs may

9

think military decisionmaking cannot proceed on "caution" and "uncertainty" alone (Opp.15 (quoting Add.27)), in the "national security" context especially, the Supreme Court has admonished that "conclusions must often be based on informed judgment rather than concrete evidence," and it would be "dangerous" to "demand[] hard proof." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010). Moreover, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59, (1983) (Rehnquist, J., concurring in part, dissenting in part).

Plaintiffs' response to the medical-literature reviews on which the 2025 policy relied is even weaker. Plaintiffs entirely ignore the data demonstrating risks associated with gender dysphoria in favor of other data that plaintiffs claim "contradict[]" the Department's conclusions on deployability and psychological fitness. Opp. 15-16. But this re-evaluation of evidence is precisely what the Supreme Court has cautioned against. *See Rostker*, 453 U.S. at 63 (upholding exemption even though evidence showed "military opinion, backed by extensive study, is that the

availability of women registrants would materially increase flexibility, not hamper it" (quotation marks omitted)); *Hawaii*, 585 U.S. at 708 (Courts should not "substitute [their] own assessment for the Executive's predictive judgments.").

Plaintiffs also take issue with the Department's consideration of costs, asserting that the cost of "transgender healthcare" "represents an infinitesimal fraction of total military healthcare spending" and that the government ignored the "costs of discharging and replacing thousands of trained service members." Opp. 17. But that is the wrong comparison. The relevant metric is the per capita costs of permitting individuals with gender dysphoria to serve. Plaintiffs do not dispute that servicemembers with gender dysphoria cost the Department more than servicemembers without it, Add.163, so in the long-term, excluding individuals with gender dysphoria from service will save costs. Insofar as plaintiffs contend that these cost savings should be disregarded because the Department's overall budget is so large, that argument proves too much, as it would mean that the Department could never take any steps to reduce costs.

Plaintiffs further err in suggesting that the policy was based on animus and thus fails constitutional review. Opp. 8. Plaintiffs have not

11

met the high bar of showing that the policy "lack[s] any purpose other than a 'bare … desire to harm a politically unpopular group,'" that it is "impossible to discern a relationship to legitimate [government] interests' or that the policy is 'inexplicable by anything but animus.'" *Hawaii*, 585 U.S. at 705-706; *see* Mot. 24-25.

Ultimately, plaintiffs retreat to the claim that the military could have chosen to address the risks associated with gender dysphoria by assessing individuals on a case-by-case basis, rather than by presumptively disqualifying them. *See* Opp. 19. But no prior policy has addressed gender dysphoria in such a piecemeal fashion. The Department was not required to start now.

## II.  The Equitable Factors Favor A Stay

Plaintiffs have little to say about the serious injuries to the military and the public associated with maintaining a policy the Department has concluded would pose "substantial risks" to an effective national defense. Add.120; *see* Mot. 13-18. Plaintiffs rely on statements from former officials criticizing the Department's military judgment. Opp.19. But those materials are "quite beside the point." *Goldman*, 475 U.S. at 509; *supra* p.9. Plaintiffs argue that the military must rely on existing medical

standards while this appeal is pending. But plaintiffs provide no response to the Department's determination that these standards are insufficient to address the risks. And the Supreme Court has stressed that courts must "defer" to "specific, predictive judgments" by senior military officials "about how [a] preliminary injunction would reduce the effectiveness" of military operations. *Winter v. NRDC*, 555 U.S. 7, 27 (2008).

Plaintiffs have not demonstrated that they will suffer irreparable harm from a stay pending appeal. A "higher requirement of irreparable injury should be applied in the military context given the federal courts' traditional reluctance to interfere with military matters," and "a military record which carries a stigma" does not meet that standard. *Guerra v. Scruggs*, 942 F.2d 270, 274 (4th Cir. 1991) (applying *Sampson v. Murray*, 415 U.S. 61 (1974)). If "damage to [one's] reputation resulting from the stigma of a less than honorable discharge [is] insufficient … to justify injunctive relief" under that framework, then the harms plaintiffs allege here cannot do so. *Id.*; *see also* Add.101 (explaining that characterization of the service of any servicemembers no longer eligible for service "will be honorable except where [their] record otherwise warrants a lower characterization"); *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir.

1979) (holding that the plaintiff's assertion "that her career" in the Air Force "would be damaged by losing [a] specific position" did not establish "irreparable injury" because "[a]ny harm she might suffer can be remedied adequately by retroactive promotion and back pay").

Finally, plaintiffs do not contest that the universal preliminary injunction is overbroad. Thus, the Court should, at a minimum, stay the universal scope of the injunction and stay the injunction as it pertains to the Department's policy regarding accession, as plaintiffs do not identify any harms suffered by the plaintiffs who have not yet enlisted.

## CONCLUSION

This Court should stay the district court's preliminary injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
    *General*

MICHAEL S. RAAB
ASHLEY C. HONOLD

*/s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this fiiling complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 2593 words, according to Microsoft Word.

*/s/ Amanda L. Mundell*
Amanda L. Mundell

# CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Amanda L. Mundell*
Amanda L. Mundell