**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5087**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

NICHOLAS TALBOTT, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

BRIEF FOR APPELLANTS

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff
  Civil Division, Room 7252
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-1754
  Amanda.L.Mundell@usdoj.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(a), the undersigned counsel certifies as follows:

## A.    Parties and *Amici*

This is an appeal from a preliminary injunction and a denial of a motion to dissolve a preliminary injunction of the U.S. District Court for the District of Columbia.

Appellants are the United States of America, Peter B. Hegseth, Daniel Driscoll[1], United States Department of the Army, John Phelan[2], United States Department of the Navy, Gary Ashworth, United States Department of the Air Force, David J. Smith[3], and the Defense Health Agency.  These entities and individuals appeared as defendants before the district court.

---

[1] Daniel Driscoll (Secretary of the Army) was automatically substituted for Mark F. Averill, who has since left the position and who appeared as a defendant in district court.

[2] John Phelan (Secretary of the Navy) was automatically substituted for Terence Emmert, who has since left the position and who appeared as a defendant in district court.

[3] David J. Smith (Acting Director of the Defense Health Agency) was automatically substituted for Telita Crosland, who has since left the position and who appeared as a defendant in district court.

Appellees are Nicholas Talbott, Erica Vandal, Kate Cole, Gordon Herrero, Dany Danridge, Jamie Hash, Koda Nature, Cael Neary, Miriam Perelson, Clayton McCallister, Greyon Shishkina, Audrie Graham, Roan Pickett, Quinn Tyson, Amiah Sale, Minerva Bettis, Samuel Ahearn, Regan Morgan, Vera Wolf, Michelle Bloomrose, Hunter Marquez, Sean Kersch-Hamar, Kelsey Orth, Taylor Maiwald, Sabrina Bruce, C.J. Dulaney, Micah Jacqueline Gross, Austin Converse, Nathalie Richter, Beck Simpson, Clara Winchell, and Ashley Davis. These individuals also appeared as plaintiffs before the district court.

Constitutional Accountability Center, the State of Vermont, the State of Washington, Frank Kendall, and Christine Wormuth appeared as *amici* in district court.

## B.    Rulings Under Review

Appellants seek review of the March 18, 2025 opinion and order of the district court (Reyes, J.) granting plaintiffs a preliminary injunction that bars the government from implementing the U.S. Department of Defense's policy regarding gender dysphoria. *See* Dkt. Nos. 88, 89. The district court's published opinion is also available at 775 F. Supp. 3d 283.

Appellants also seek review of the March 26, 2025 opinion and order of the district court (Reyes, J.) denying the government's motion to dissolve the preliminary injunction. *See* Dkt. No. 100. The district court's published opinion is also available at 775 F. Supp. 3d 445.

## C.  Related Cases

There are no currently pending related cases in this Court that raise the same issue presented on appeal here.

The following out-of-circuit case presents the same or similar challenges as this appeal:

*Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), *on appeal* No. 25-2039 (9th Cir.)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................. vi

GLOSSARY............................................................................ xi

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION.......................................................... 3

STATEMENT OF THE ISSUE............................................................. 4

STATEMENT OF THE CASE ............................................................. 4

    A.    History Of The Department's 2025 Policy............................. 4

    B.    Prior Proceedings................................................. 14

SUMMARY OF ARGUMENT............................................................... 18

STANDARD OF REVIEW ............................................................... 20

ARGUMENT.......................................................................... 20

I.    The Department's 2025 Policy Complies with Equal
Protection..................................................................... 20

    A.    The Department's 2025 Policy Complies With Equal
        Protection............................................................ 22

        1.    The 2025 Policy Merits The Most Deferential
            Review........................................................ 22

        2.    The 2025 Policy Withstands Constitutional
            Review........................................................ 28

    B.    The District Court's Analysis Is Fundamentally Flawed.... 40

iv

II.    The Balance Of The Equities Precludes An Injunction Of The
       2025 Policy ...................................................................... 53

III.   The Universal Injunction Is Improper.......................................... 57

CONCLUSION........................................................................ 61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s)**

*Anderson v. United States,*
    612 F.2d 1112 (9th Cir. 1979) ........................................................... 56

*Aviel v. Gor,*
    No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025) ................. 55

*Board of Trs. of Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001) ................................................................ 27, 44

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ........................................................................ 58

*Chilcott v. Orr,*
    747 F.2d 29 (1st Cir. 1984) ............................................................. 56

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ............................................................. 28, 46-47

*Dellinger v. Bessent,*
    No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ................. 56

*Department of State v. AIDS Vaccine Advocacy Coal.,*
    145 S. Ct. 753 (2025) ...................................................................... 59

*DHS v. New York,*
    140 S. Ct. 599 (2020) ...................................................................... 59

*Doe 2 v. Shanahan*:
    755 F. App'x 19 (D.C. Cir. 2019) .......... 3, 10, 22, 23, 24, 40, 41, 44, 50
    917 F.3d 694 (D.C. Cir. 2019) ........ 6, 7, 8, 9, 10, 21, 30, 31, 34, 42, 50

*Etsitty v. Utah Transit Auth.,*
    502 F.3d 1215 (10th Cir. 2007) ....................................................... 28

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ........................................................................24

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ........................................................................ 27

*Goldman v. Secretary of Def.*,
  734 F.2d 1531 (D.C. Cir. 1984), *aff'd sub nom.*
  *Goldman v. Weinberger*, 475 U.S. 503 (1986) .................................... 37

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ....................................... 23, 25, 26, 29, 35, 48, 49

*Gore v. Lee*,
  107 F.4th 548 (6th Cir. 2024) ........................................................ 28

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ..................................................................... 57-58

*Guerra v. Scruggs*,
  942 F.2d 270 (4th Cir. 1991) ..................................................... 55, 57

*Hartikka v. United States*,
  754 F.2d 1516 (9th Cir. 1985) .................................................... 55, 56

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ........................................................................ 54

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ............................................. 3, 9, 11, 28

*Labrador v. Poe ex rel. Poe*,
  144 S. Ct. 921 (2024) ...................................................................... 59

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................ 60

*Lyng v. Castillo*,
  477 U.S. 635 (1986) ........................................................................ 46

*Maryland v. King*,
  567 U.S. 1301 (2012) ...................................................................... 53

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ........................................................................ 60

*MediNatura, Inc. v. Food & Drug Admin.*,
  998 F.3d 931 (D.C. Cir. 2021) ........................................................ 20

*Middendorf v. Henry*,
425 U.S. 25 (1976) ............................................................. 40

*Roe ex rel. Roe v. Critchfield*,
131 F.4th 975 (9th Cir. 2025) ........................................... 36

*Rostker v. Goldberg*,
453 U.S. 57 (1981) ...................... 23, 24, 24-25, 25, 35, 46, 47, 48, 49

*Sampson v. Murray*,
415 U.S. 61 (1974) ............................................................ 55

*Schlesinger v. Ballard*,
419 U.S. 498 (1975) ...................................................... 25, 48

*Shilling v. United States*,
773 F. Supp. 3d 1069 (W.D. Wash. 2025) ......................... 18

*Steffan v. Perry*,
41 F.3d 677 (D.C. Cir. 1994) ............................................ 23

*Thomasson v. Perry*,
80 F.3d 915 (4th Cir. 1996) .............................................. 27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................... 60

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) ..................................................... 53

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .............................................. 57, 58, 59

*Trump v. Hawaii*,
585 U.S. 667 (2018) ............................. 24, 46, 47, 51, 52, 59

*Trump v. Karnoski*,
586 U.S. 1124 (2019) ..................................... 1, 10, 54

*Trump v. Stockman*,
586 U.S. 1124 (2019).......................................1, 10, 54

*United States v. Shilling*,
145 S. Ct. 2695 (2025) ................................................. 1, 18

*United States v. Skrmetti,*
   145 S. Ct. 1816 (2025) ................................................ 27, 28, 44, 46, 47

*United States v. Virginia,*
   518 U.S. 515 (1996) ....................................................................... 37

*Wallace v. Lynn,*
   507 F.2d 1186 (D.C. Cir. 1974) ........................................................ 55

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .............................................................. 20, 29, 54

**U.S. Constitution:**

Art. III, § 2, cl. 1 ........................................................................ 59

**Statutes:**

28 U.S.C. § 1292(a)(1) ...................................................................... 3

28 U.S.C. § 1331 ............................................................................. 3

28 U.S.C. § 1343 ............................................................................. 3

**Regulatory Material:**

Exec. Order No. 14148,
   90 Fed. Reg. 8237 (Jan. 28, 2025) ..................................................... 12

**Other Authorities:**

86 Fed. Reg. 7471 (Jan. 28, 2021) ........................................................ 11

90 Fed. Reg. 8757 (Feb. 3, 2025) ......................................................... 12

Memorandum, *Military Service by Transgender Individuals,*
   83 Fed. Reg. 13,367 (Mar. 28, 2018) ................................................... 10

Order, *Shilling v. Trump*, No. 25-2039 (9th Cir. Mar. 31, 2025),
  Dkt. No. 20.1...........................................................................18

Order, *Shilling v. Trump*, No. 25-2039 (9th Cir. Apr. 18, 2025),
  Dkt. No. 31.1...........................................................................18

Secretary of Defense (@SecDef), X (Feb. 27, 2025)................................42

U.S. Dep't of Def., Instr. 1300.28, *In-Service Transition for
  Transgender Service Members* (Apr. 30, 2021).............................11, 34

U.S. Dep't of Def., Instr. 6130.03, vol. 1 (Apr. 28, 2010) ..................... 5-6

U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for
  Military Service: Appointment, Enlistment, or Induction,*
  vol. 1 (May 28, 2024).....................................................4, 11, 22, 30, 50

U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for
  Military Service: Retention*, vol. 2 (June 6, 2022)...........................4, 22

U.S. Dep't of the Army, Dir. 2017-03, *Policy for Brigade-Level
  Approval of Certain Requests for Religious Accommodation*
  (Jan. 3, 2017), https://perma.cc/HB34-GNQC ......................... 37-38, 38

# GLOSSARY

DSM                  Diagnostic and Statistical Manual of Mental Disorders

## INTRODUCTION

For decades, the military generally barred individuals with gender dysphoria from serving.  And on three occasions, the Supreme Court has permitted the Department of Defense to effectuate a policy that disqualifies individuals with a history of gender dysphoria, or who have received related medical interventions, from serving in the military.  Six years ago, the Court stayed two district court injunctions against a policy issued by then-Secretary of Defense Mattis that generally disqualified such individuals from joining the military.  *Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019).  On May 6, 2025, the Supreme Court did so again with respect to the Department's 2025 policy:  The Court stayed a district court's preliminary injunction against the policy pending disposition of the Ninth Circuit appeal and any timely petition for a writ of certiorari, *United States v. Shilling*, 145 S. Ct. 2695 (2025).

The challenged 2025 policy disqualifies individuals with a history of gender dysphoria from military service, unless they obtain waivers.  It is undisputed that gender dysphoria is a medical condition associated with clinically significant distress or impairment in social, occupational,

or other important areas of functioning caused by incongruence between a person's sex and the gender with which he or she identifies. The military does not permit individuals to serve if they have medical conditions that may excessively limit their deployability, pose an increased risk of injury, or otherwise require measures that threaten to impair the effectiveness of their unit. In the military's professional judgment, these criteria are met for gender dysphoria.

The district court, however, substituted its judgment for that of the military and issued a worldwide preliminary injunction barring the Department of Defense from implementing its policy. The court reasoned that the Constitution likely precludes the military from treating gender dysphoria as a disqualifying medical condition.

This disregard for the military's judgment is remarkable. The Supreme Court has repeatedly stressed that special deference is owed to the professional judgments of our Nation's military leaders, yet the district court provided scant explanation for disregarding the Department's reasoned military assessment. Instead, it ordered the military to adhere to the policy adopted by the Secretary's predecessor, which also presumptively disqualified individuals with gender dysphoria

from military service subject to different exceptions and required individuals without gender dysphoria to adhere to the standards associated with their sex. Such line-drawing exercises, however, are matters for military discretion, and one Defense Secretary cannot bind his successors to his chosen contours. *See Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why the Mattis Plan complies with ... equal protection"); *Karnoski v. Trump*, 926 F.3d 1180, 1201-03 (9th Cir. 2019) (per curiam) (staying preliminary injunction and "reject[ing] Plaintiffs' contention that no [military] deference is owed here").

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1343. The district court entered a preliminary injunction on March 18, 2025. JA1207. The government filed a timely notice of appeal on March 26, 2025. JA1310. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in issuing a worldwide preliminary injunction barring the implementation of the Department of Defense's 2025 policy regarding military service by individuals with gender dysphoria.

## STATEMENT OF THE CASE

### A.    History Of The Department's 2025 Policy

1.    Given the stakes of warfare, the Department "has historically taken a conservative and cautious approach" in setting standards for military service. JA74. Individuals seeking to join or continue serving in the military must meet medical requirements designed to ensure that servicemembers are "capable of performing duties," free of conditions that "may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without geographical area limitations." U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); *see* U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022). These requirements render

4

71% of Americans between ages 17 and 24 ineligible to join the military for mental, medical, or behavioral health reasons.

The Department has long disqualified individuals with "physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have" from entering or continuing military service. JA80. And it has taken a particularly cautious approach with respect to mental-health standards given "the unique mental and emotional stresses of military service." JA81. "Most mental health conditions" are "automatically disqualifying" for entry into the military absent a waiver, even when an individual no longer suffers from that condition. JA91. In general, the military has aligned these disqualifying conditions with the ones listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association. JA81. For decades, military standards therefore presumptively disqualified individuals with a history of "transsexualism," consistent with the inclusion of that term in the third edition of the DSM. JA78, 81-82; U.S. Dep't of Def., Instr.

6130.03, vol. 1, at 27, 48 (Apr. 28, 2010); *Doe 2 v. Shanahan,* 917 F.3d 694, 709 (D.C. Cir. 2019) (Williams, J., concurring in the result).

In 2013, the American Psychiatric Association published a new edition of the DSM, which replaced the term "gender identity disorder" (itself a replacement for "transsexualism") with "gender dysphoria." JA81, 83. In doing so, the American Psychiatric Association explained that it no longer considered identification with a gender different from one's sex to itself be a disorder. JA83. It stressed, however, that a subset of trans-identifying people suffer from the medical condition of gender dysphoria, a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration," that is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." JA83-84, 91 (quotation marks omitted). Individuals diagnosed with gender dysphoria sometimes seek medical interventions, such as cross-sex hormones and sex-reassignment surgery. JA93.

2.    In 2016, then-Secretary of Defense Carter "convene[d] a working group to study the 'policy options' for allowing service by 'transgender Service members'" and "instruct[ed] the group to 'start with

6

[the] presumption'" "'that transgender persons can serve openly without adverse impact.'" *Doe 2,* 917 F.3d at 712 (Williams, J., concurring in the result). The Carter working group commissioned the RAND National Defense Research Institute to conduct a study. *Id.* The resulting RAND report concluded that the proposed policy change would have "an adverse impact on health care utilization costs and readiness" but that these harms would be "'negligible' or 'marginal' because of the 'small'" estimated number of trans-identifying servicemembers relative to the size of the armed forces as a whole. *Id.*

Following this review, in June 2016, then-Secretary Carter directed the armed forces to adopt a new policy. *Doe 2,* 917 F.3d at 712-13 (Williams, J., concurring in the result). Under the Carter policy, servicemembers diagnosed with gender dysphoria by a military medical provider could seek medical interventions at government expense. JA85-86. Individuals diagnosed with gender dysphoria while serving could continue to serve if they met deployability standards but had to serve in their sex "until their transition was 'complete.'" *Doe 2,* 917 F.3d at 710-11 (Williams, J., concurring in the result). "[I]ndividuals not suffering from gender dysphoria or undergoing gender transition were eligible for

7

service—*only* in their biological sex." *Id.* at 710. For accessions into the military, a history of "gender dysphoria" and "gender transition" would be disqualifying unless the individual had "been stable without clinically significant distress or impairment" for 18 months. *Id.* (quotation marks omitted).

3.    In 2017, the Department began an extensive review of military service by trans-identifying individuals, as directed by then-Secretary Mattis. *Doe 2,* 917 F.3d at 713 (Williams, J., concurring in the result). Without presupposing the outcome, then-Secretary Mattis established a "panel of experts" and "order[ed] them to implement 'a comprehensive, holistic, and objective approach to study military service by transgender individuals.'" *Id.* The panel of experts "consisted of the Under Secretaries of the Military Departments" and "the Armed Services' Vice Chiefs," among others, and "was chaired by the Under Secretary of Defense for Personnel and Readiness." JA89. Given "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces," these senior military leaders were "uniquely qualified to evaluate the impact of policy changes on the combat

effectiveness and lethality of the force." JA89. The panel of experts was instructed "to provide its best military advice, based on increasing the lethality and readiness of America's armed forces, without regard to any external factors." JA68.

In 13 meetings over 90 days, the panel of experts met with military and civilian medical professionals, commanders of trans-identifying servicemembers, and trans-identifying servicemembers themselves. *Karnoski v. Trump*, 926 F.3d 1180, 1191 (9th Cir. 2019) (per curiam). It reviewed information regarding gender dysphoria, related medical interventions, and the impact of this condition on military effectiveness, unit cohesion, and resources. *Id.* After "extensive review and deliberation," which included consideration of evidence that supported and cut against its proposals, the panel "exercised its professional military judgment" and presented its recommendations to then-Secretary Mattis. JA89. After considering these recommendations, then-Secretary Mattis sent President Trump a memorandum proposing the Mattis policy, consistent with the panel's conclusions, along with a 44-page report explaining the policy (the Mattis report). *Doe 2,* 917 F.3d at 714-15 (Williams, J., concurring in the result). The President then

permitted the Secretaries of Defense and Homeland Security to implement the Mattis policy. Memorandum, *Military Service by Transgender Individuals*, 83 Fed. Reg. 13,367, 13,367 (Mar. 28, 2018); *see also Doe 2,* 917 F.3d at 715 (Williams, J., concurring in the result).

As with the Carter policy, the Mattis policy required all individuals to serve "in their biological sex," with limited exceptions. *Doe 2,* 917 F.3d at 711 (Williams, J., concurring in the result). The Mattis policy "presumptively disqualified for accession purposes individuals with a 'history' of 'gender dysphoria' unless they were stable" for 36 months. *Id.* "[I]ndividuals 'diagnosed with gender dysphoria after entering into service [could] be retained if they [did] not require a change of gender and remain[ed] deployable within applicable retention standards.'" *Id.*

Although there were challenges to the Mattis policy, the Supreme Court, this Court, and the Ninth Circuit all ultimately permitted it to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019) (staying preliminary injunction pending appeal); *Trump v. Stockman*, 586 U.S. 1124 (2019) (same); *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why

the Mattis Plan complies with … equal protection"); *Karnoski*, 926 F.3d at 1201-03 (staying preliminary injunction and "reject[ing] Plaintiffs' contention that no [military] deference is owed here").

4.    In 2021, then-President Biden issued Executive Order 14004 permitting trans-identifying individuals to serve openly and directing then-Secretary Austin to develop a process by which servicemembers "may transition gender[s]" and "prohibit involuntary separations … on the basis of gender identity." 86 Fed. Reg. 7471, 7471-72 (Jan. 28, 2021). Under the Austin policy, a history of "gender dysphoria" was disqualifying unless the individual had been stable for 18 months, and a history of hormones or sex-reassignment surgery was disqualifying unless certain conditions were met. Instruction 6130.03, vol. 1, at 28, 30, 46, 52 (May 28, 2024). The Austin policy recognized that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness," but nonetheless permitted "in-service transitions." U.S. Dep't of Def., Instr. 1300.28, *In-Service Transition for Transgender Service Members* 3, 7-8 (Apr. 30, 2021).

11

5.    In January 2025, President Trump revoked Executive Order 14004, *see* Exec. Order No. 14148, 90 Fed. Reg. 8237, 8238 (Jan. 28, 2025), and issued Executive Order 14183 stating that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion," and "uniformity," among other traits, and that this "policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria."  90 Fed. Reg. 8757, 8757 (Feb. 3, 2025).  The Order directed the Department to update its medical standards.  *Id.* at 8757-58.

6.    On February 26, the Department announced its new policy. JA48-60.  Recognizing the need for servicemembers who can "meet the high standards for military service and readiness without special accommodations," the policy explains that "[m]ilitary service" by those "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria … is not in the best interests of the Military Services."  JA50.  The Department later explained that "[t]he phrase 'exhibits symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders."  JA1289 n.2, 1292.  "This language applies only to

individuals who exhibit symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." JA1289 n.2.

Under the 2025 policy, applicants and servicemembers "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" or "who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery" are disqualified. JA53-55. But these individuals "may be considered" for a waiver where "there is a compelling Government interest," and they (1) "demonstrate[] 36 consecutive months of stability," (2) "demonstrate[] that [they have] never attempted to transition" to a different sex, and (3) are "willing and able to adhere to all applicable standards, including the standards associated with [their] sex." JA55; *see also* JA210-11.

Servicemembers no longer eligible for service "will be processed for administrative separation" and will "be provided full involuntary separation pay." JA55-56. Characterization of their service "will be

13

honorable" unless their "record otherwise warrants a lower characterization." JA50.

The 2025 policy was "informed through consideration of" "prior [Department] studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria," among other things. JA64. In particular, the Department considered the lengthy report underlying the Mattis policy, "[a] 2021 review conducted by [the Department's] Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity," a "2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs," and a review of cost data. JA64-65.

## B.    Prior Proceedings

1.    Plaintiffs are trans-identifying current and aspiring servicemembers. *See* JA1223. They allege that Executive Order 14183 and the 2025 policy violate equal protection. JA1224.

2.    The district court entered a preliminary injunction on March 18, barring the government from implementing the Executive Order and

the 2025 policy and directing the Department to "continue Plaintiffs' military statuses" "pending further order." JA1207-08.

The court concluded that plaintiffs' equal-protection challenge was likely to succeed. 1248-83. The court characterized the 2025 policy as a broad ban without meaningful exemption. JA1210 n.2, 1229-30. The court then declined to apply military deference and concluded that intermediate scrutiny applied because the policy classifies based on "transgender status," which the court equated with sex discrimination, and because "transgender persons are a quasi-suspect class." JA1260-66.

The court discounted the evidence on which the Department relied. JA1267. The court characterized the Mattis report's findings as "outdated" and faulted the Department for failing to consider the impact of service by "persons with gender dysphoria" who "have been deployed under the Austin Policy." JA1267-68, 1271. The court also questioned the Department's reliance on the 2021 review and 2025 medical literature review. JA1234-37, 1267-68.

The court also concluded that the policy was motivated by animus. That determination rested primarily on language in the Executive Order

15

and the court's characterization of the policy as a blanket ban on trans-identifying people serving in the military.  JA1273-83.

The court determined that, absent injunctive relief, plaintiffs would suffer irreparable harms in the form of lost employment, income, and medical care, and that the government would not be harmed by an injunction maintaining the status quo.  JA1284-85.

The court temporarily stayed its injunction.  JA1287; *see also* Minute Order (Mar. 21, 2025) (extending the stay).

On March 21, the Department issued "guidance to assist the Military Departments in identifying" for separation those servicemembers with a history, diagnosis, or symptoms consistent with gender dysphoria.  JA1289.  The guidance makes clear that "[t]he phrase 'exhibit symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders," and that "[t]his language applies only to individuals who exhibit … symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months."  JA1289 n.2.

16

The government moved to dissolve the preliminary injunction in light of this new guidance, but the district court denied the motion on March 26. The court also denied the government's request for a stay pending appeal, but temporarily stayed its injunction until March 28 at 7:00 P.M. JA1308-09. The court repeated its characterization of the policy as "broad enough to cover people who do not have gender dysphoria" regardless of the meaning of the phrase "exhibit symptoms consistent with gender dysphoria." JA1307.

3.    The government immediately appealed and sought an emergency stay pending appeal and an administrative stay. The day before the district court's temporary stay expired, this Court granted the government's request for an administrative stay "to give the court sufficient opportunity to consider the [government's] emergency motion for stay pending appeal." JA1311. The Court held oral argument on the government's stay motion in April and has yet to rule on the motion, although it indicated in August that a decision on the government's motion is forthcoming.

4.    A similar challenge to the Executive Order and the 2025 policy is pending in the Ninth Circuit. In *Shilling v. United States*, the

district court issued a similar universal preliminary injunction. 773 F. Supp. 3d 1069, 1079 (W.D. Wash. 2025). The Ninth Circuit denied the government's request for an administrative stay and a stay pending appeal. *See* Order, *Shilling v. Trump*, No. 25-2039 (9th Cir. Mar. 31, 2025), Dkt. No. 20.1; Order, *Shilling*, No. 25-2039 (Apr. 18, 2025), Dkt. No. 31.1. On May 6, the Supreme Court granted the government's application for a stay of the injunction pending disposition of its appeal and any further review in the Supreme Court. *See United States v. Shilling*, 145 S. Ct. 2695 (2025). The government's appeal is still pending, and the Ninth Circuit has set the case for oral argument on October 20, 2025. *See* Notice of Oral Argument, *Shilling*, No. 25-2039 (Aug. 10, 2025), Dkt. No. 65.

## SUMMARY OF ARGUMENT

The 2025 policy is entitled to the most deferential form of scrutiny. Because the policy rests on a careful balancing of military risk by government officials with the relevant expertise, it readily withstands review.

Plaintiffs cannot succeed on the merits of their equal protection challenge. The military determined that allowing individuals with a

history of gender dysphoria or related medical interventions to serve would pose "substantial risks" and "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on ... military effectiveness and lethality." JA69. That determination is entitled to considerable weight, especially in this context, and presumptively disqualifying these individuals from service is substantially related to achieving those important government interests. While plaintiffs may have preferred the balance struck by the Secretary's predecessor, the Constitution does not freeze in place a single Defense Secretary's choice of where to draw the line.

Even apart from plaintiffs' inability to succeed on the merits, the balance of the harms precludes an injunction. Given the Department's judgment that retaining the Austin policy poses substantial risks to military readiness, the injunction here threatens serious harm to the national defense (and hence to the public interest). The lack of a preliminary injunction, by contrast, would not cause plaintiffs any cognizable irreparable injuries, particularly those plaintiffs who have yet to join the military.

19

At a minimum, the injunction should be narrowed to cover only the named servicemember plaintiffs. The district court's contrary decision to universally enjoin the implementation of the 2025 policy cannot be reconciled with Article III or principles of equity.

## STANDARD OF REVIEW

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). This Court reviews an order regarding preliminary-injunctive relief for abuse of discretion. *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 940 (D.C. Cir. 2021). Any "underlying questions of law," however, are reviewed de novo. *Id.*

## ARGUMENT

## I. The Department's 2025 Policy Complies with Equal Protection

In issuing its 2025 policy, the Department was not writing on a blank slate. The policy was based on "a comprehensive study" conducted during President Trump's first term by a "panel of experts," which was

20

comprised of many of the Department's high-ranking officials, combat veterans, and experts in a variety of subjects. *Doe 2 v. Shanahan*, 917 F.3d 694, 714, 730 (D.C. Cir. 2019) (Williams, J., concurring in the result) (emphasis omitted); JA68-69, 88-89. As part of that study, the Department considered evidence on all sides of the issue of military service by individuals with gender dysphoria and meticulously explained its conclusions in a 44-page report. JA68-70, 89, 115.

The Department also considered more recent data and studies beyond the Mattis report, including "[a] 2021 review conducted by [the Department's] Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity," a "2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs," and a review of cost data. JA64-65, 135-53, 188-97. Given that analysis and based on its expertise, the Department determined that military service by those with "gender dysphoria is incompatible with military service" and "not clearly consistent with the interests of national security." JA50; *see also* JA69 (Secretary Mattis determining, as a matter of "the Department's best

military judgment," that allowing individuals with gender dysphoria to serve posed "substantial risks" to military readiness).

That is the sort of risk assessment the military must make on a regular basis, *see* JA80; Instruction 6130.03, vol. 1 (May 28, 2024); Instruction 6130.03, vol. 2 (June 6, 2022), and one singularly ill-suited for judicial second-guessing. Given that even civilian agencies enjoy significant freedom to change their policies over time, the Department's careful military judgment readily satisfies constitutional demands, and the district court provided no valid reason for concluding otherwise.

## A. The Department's 2025 Policy Complies With Equal Protection

### 1. The 2025 Policy Merits The Most Deferential Review

a. As this Court recognized in permitting the Mattis policy to take effect, the "Constitution vests [t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force exclusively in the legislative and executive branches." *Doe 2*, 755 F. App'x at 24 (quotation marks omitted). "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon

military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986) (quotation marks, alterations, and citations omitted). For these reasons, the 2025 policy warrants highly deferential review.

All of this would be true even if an analogous civilian policy would trigger heightened scrutiny. Although the armed forces are subject to constitutional constraints, the Supreme Court and this Court have stressed that "the tests and limitations to be applied may differ because of the military context," including when sex-based classifications are involved. *Doe 2*, 755 F. App'x at 24 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981)). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman*, 475 U.S. at 507. The same is true for decisions as to "the composition and internal administration of combat-ready military forces." *Doe 2*, 755 F. App'x at 24; *see also, e.g.*, *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) ("It is hard to imagine a more deferential standard than rational basis, but when judging the

23

rationality of a regulation in the military context, we owe even more special deference.").

When "applying this standard in *Rostker*, the Supreme Court concluded that a facially discriminatory, sex-based draft-registration statute was 'not invidious, but rather realistically reflect[ed] the fact that the sexes [were] not similarly situated.'" *Doe 2*, 755 F. App'x at 25 (quoting *Rostker*, 453 U.S. at 79). The Supreme Court reaffirmed this standard in *Trump v. Hawaii*, 585 U.S. 667, 704 (2018), when it applied "rational basis review" and stressed that judicial "inquiry into matters of … national security is highly constrained," even when evaluating a "'categorical' … classification that discriminate[s] on the basis of sex," *id.* at 703-04 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)).

Although the Supreme Court has expressly declined to attach a "label[]" to the type of review applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, the Court's approach most closely resembles rational-basis review in substance. In this context, the Court has accepted concerns about "administrative problems" and post hoc justifications, even when sex-based classifications are involved, as sufficient to uphold military policies. *Id.* at 81; *see id.* at

24

74-75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975) (upholding different mandatory-discharge requirements for male and female naval officers based on what "Congress may … quite rationally have believed"). It has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including testimony from current and former military officials. *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63. And it has granted the political branches significant latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510. Whatever label is assigned this lenient form of review, it is not heightened scrutiny.

Applying this deferential standard, the Supreme Court has upheld military policies that likely would not have survived scrutiny in the civilian context. In *Goldman*, for instance, the Court rejected a free-exercise challenge to the Air Force's judgment that exempting from uniform regulations a Jewish officer's "practice of wearing an unobtrusive yarmulke" while working as a psychologist in an Air Force

25

base hospital would "threaten discipline," even though that claim would have triggered strict scrutiny had it been raised in the civilian context at the time.  475 U.S. at 509; *see id.* at 506.  The Court did so even though the regulations authorized commanders to let servicemembers wear "visible religious headgear … in designated living quarters" and permitted servicemembers to wear "certain pieces of jewelry," *id.* at 508-09—including "emblems of religious … identity," *id.* at 518 (Brennan, J., dissenting).  And the Court rejected this claim even though the plaintiff relied on "expert testimony" from a former Air Force official and claimed that the Air Force's position was "mere *ipse dixit*, with no support from actual experience or a scientific study in the record."  *Id.* at 509 (majority).

b. Even if dispensing with military-deference principles were somehow justified here, heightened scrutiny would remain inappropriate.  The military's new policy, like the policies before it, draws lines based on a medical condition (gender dysphoria)—a condition that involves "clinically significant distress or impairment in social, occupational, or other important areas of functioning," JA59—and related medical interventions, not identity or status.  Such

classifications—which turn on eminently reasonable considerations in setting standards for military service—receive only rational-basis review.

The Supreme Court recently reaffirmed this standard in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), in which the Court applied rational-basis review to a state law prohibiting medical interventions for gender dysphoria in minors. The Court explained that the law "does not prohibit conduct for one sex that it permits for the other" and instead turns on "the underlying medical concern the treatment is intended to address,"—*e.g.*, gender dysphoria—and applies regardless of a minor's sex. *Id.* at 1829-31; *see also, e.g.*, *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001); *Geduldig v. Aiello*, 417 U.S. 484, 494-97 & n.20 (1974). Given that courts should be "reluctant to establish new suspect classes"—a presumption that "has even more force when the intense judicial scrutiny would be applied to the 'specialized society' of the military"—there is no basis for departing from rational-basis review here. *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) (en banc).[4]

---

[4] Even if the new policy could be characterized as turning on trans-identifying status, such classifications do not trigger heightened scrutiny

*Continued on next page.*

## 2.    The 2025 Policy Withstands Constitutional Review

The 2025 policy's presumptive disqualification of individuals with a history of gender dysphoria and related medical interventions easily satisfies this deferential standard.  But even if this Court were to conclude that intermediate scrutiny applies, military deference would "inform[its] application," and the 2025 policy would survive this level of scrutiny.  *Karnoski*, 926 F.3d at 1201.  As Secretary Mattis explained, generally allowing individuals with a history of gender dysphoria or related medical interventions to serve poses "substantial risks" and could "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on … military effectiveness and lethality."  JA69.  There should be no dispute that the military's interest in avoiding those harms is compelling:  Courts must "give great deference to the professional judgment of military authorities concerning the relative

_____

either.  *See, e.g.*, *Skrmetti*, 145 S. Ct. at 1849-55 (Barrett, J., concurring) (explaining that trans-identification is not a quasi-suspect class that warrants heightened scrutiny); *id.* at 1860-67 (Alito, J., concurring in part and concurring in the judgment) (same); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441-47 (1985) (declining to recognize a new quasi-suspect class); *Gore v. Lee*, 107 F.4th 548, 558 (6th Cir. 2024); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227-28 (10th Cir. 2007).

importance of a particular military interest," *Winter*, 555 U.S. at 24 (quoting *Goldman*, 475 U.S. at 507), and here, the Department has concluded that minimizing these risks is "absolutely essential," JA69. At a minimum, this Court should defer to the military's judgment that this presumptive disqualification is not just rationally related to, but actually "necessary" to, furthering that critical interest. JA70.

### a.    Military Readiness

As the Department explained in the Mattis report, which the Department considered in formulating the 2025 policy, service by individuals with a history of gender dysphoria or related medical interventions poses at least two significant risks to military readiness. First, the Department was concerned about subjecting those with gender dysphoria to the unique stresses of military life. JA92, 113. Any mental-health condition characterized by clinically significant distress or impairment in functioning—as gender dysphoria is—raises readiness concerns, as the military must consider the "risk of exacerbation if [a servicemember with gender dysphoria] were exposed to trauma or severe operational stress." JA105. That judgment is also reflected in the Carter and Austin policies, which disqualified individuals with a history of

gender dysphoria absent proof that they had "been stable without clinically significant distress or impairment" in social, occupational, or other important areas of functioning for 18 months. *See Doe 2,* 917 F.3d at 710 (Williams, J., concurring in the result) (quotation marks omitted); Instruction 6130.03, vol. 1, at 52 (May 28, 2024).

The Department considered data indicating that individuals with gender dysphoria suffer from high rates of suicidal ideation, attempts, and completion, as well as other mental-health conditions such as anxiety, depression, and substance-abuse disorders. JA92-93 (servicemembers with gender dysphoria are eight times more likely to attempt suicide and nine times more likely to have mental-health encounters than servicemembers as a whole). Especially given evidence that military service can be a contributor to suicidal thoughts, the Department had legitimate concerns that generally allowing those with gender dysphoria to serve would subject them and their comrades to unacceptable risks. JA90, 92.

All of this was true, the Department explained, even for those who had addressed their gender dysphoria with medical interventions. JA103. The Department had reasonable concerns about the

30

"considerable scientific uncertainty concerning whether [cross-sex hormones and sex-reassignment surgery] fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria." JA103; *see* JA92-98.  In formulating the 2025 policy, the Department also considered more recent studies and evidence that reinforced the points made in the Mattis report, including a 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs, which indicated that "[t]he strength of the evidence" on the efficacy of medical interventions for gender dysphoria "is low to moderate."  JA188 (emphases omitted).

Nor were the Department's concerns new.  Before the issuance of the Carter policy, RAND had cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria as a general matter given "the absence of quality randomized trial evidence"—"the gold standard for determining treatment efficacy."  *Doe 2,* 917 F.3d at 726 (Williams, J., concurring in the result) (quotation marks omitted). Although Secretaries Carter and Austin were willing to tolerate these risks, Secretary Mattis and current Department leaders determined the military should "proceed with caution before compounding the significant

31

challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations." JA69. And there is no constitutional requirement that the current Secretary of Defense hew to the risk tolerance of his predecessors.

Second, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by medical interventions, it remains the case that such interventions—namely, cross-sex hormones and sex-reassignment surgery—could render servicemembers "non-deployable for a potentially significant amount of time." JA106. Some commanders, for example, reported that servicemembers under their authority undergoing medical interventions related to gender dysphoria would be non-deployable for two to two-and-a-half years. JA104-05. More generally, Endocrine Society guidelines recommend "quarterly bloodwork and laboratory monitoring of hormone levels during the first year" of a servicemember's use of cross-sex hormones, meaning that if "the operational environment does not permit access to a lab for monitoring hormones," then the servicemember "must be prepared to forego treatment, monitoring, or the deployment," each of which "carries risks for readiness." JA104. That period of potential non-deployability

only increases for those who obtain sex-reassignment surgery, which in addition to a recommended "12 continuous months of hormone therapy … prior to genital surgery," comes with "substantial" recovery time even without complications. JA104.

In addition to being inherently problematic, these limits on deployability would have harmful effects on units as a whole: Any increase in the number of non-deployable servicemembers requires those who can deploy to bear "undue risk and personal burden," which "negatively impacts mission readiness." JA106 (quotation marks omitted); *see also* JA64. And when servicemembers with conditions do deploy but then fail to meet fitness standards in the field, "there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower." JA105 (quotation marks omitted). All of this, the Department concluded, posed a "significant challenge for unit readiness." JA105.

Again, these are not new concerns. Former-Secretary Carter acknowledged that "[g]ender transition while serving in the military

33

presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness." Instruction 1300.28 at 3, 7-8. This conclusion was reflected the Carter policy's requirement that applicants with a history of medical interventions for gender dysphoria must show that they had been stable and free of complications for an 18-month period in order to serve. *Doe 2,* 917 F.3d at 710 (Williams, J., concurring in the result). Likewise, RAND acknowledged that the Carter policy would have an "adverse impact" on readiness; it simply dismissed this harm as "marginal" due to its estimation of the "small" number of trans-identifying servicemembers relative to the size of the armed forces as a whole. *Id.* at 712 (quotation marks omitted); JA105-06. But in the Department's judgment, "whether the military can absorb periods of non-deployability in a small population" is the wrong question; by that metric, "the readiness impact" of many other disqualifying medical conditions, "from bipolar disorder to schizophrenia," would also be "minimal" because they too "exist only in relatively small numbers." JA106. Instead, the relevant inquiry is "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be

remedied through treatment that renders the person non-deployable for as little time as possible." JA106. Applying that general standard, the Department concluded that the limitations on deployability posed by medical interventions related to gender dysphoria were unacceptably high. JA106.

In other words, the differences between the Carter and Austin policies and the 2025 policy simply reflect different judgments by military leadership over what limits on deployability they are willing to tolerate. The Constitution does not bar one Secretary of Defense from disagreeing with the judgments of his predecessor in this context. *Rostker*, 453 U.S. at 71-72. Such military policy disagreements over where to "draw[] the line" are not constitutional violations. *Goldman*, 475 U.S. at 510.

### b. Unit Cohesion, Good Order, And Discipline

Apart from these readiness concerns, the Department determined that exempting individuals from sex-specific standards would undermine the critical objectives served by those rules, namely, "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality." JA99. "Given the unique nature of military service, Service members … [must] often … live in extremely close

proximity to one another when sleeping, undressing, showering, and using the bathroom." JA108. To protect privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women," including on deployments. JA108.

In the Department's judgment, permitting individuals to serve inconsistently with applicable sex-specific standards "would invade the expectations of privacy" of the other servicemembers sharing those facilities. JA108. Thus, absent the creation of separate facilities for servicemembers with a history of medical interventions for gender dysphoria, which could be both "logistically impracticable for the Department" as well as unacceptable to those individuals, the military would face irreconcilable privacy demands. JA108; *cf. Roe ex rel. Roe v. Critchfield*, 131 F.4th 975, 986-89 (9th Cir. 2025) (plaintiffs were unlikely to succeed on equal protection challenge to statute requiring public-school students to use only the restroom corresponding to their sex). For example, the panel of experts heard from one commander who received dueling equal-opportunity complaints over allowing a male servicemember who identified as a female but had male genitalia to use the female shower facilities—one from the female members of the unit

36

and one from the individual servicemember. JA108. Such considerations are far from suspect. The Supreme Court itself has recognized that it is "necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

Similarly, the Department was concerned that exempting servicemembers from uniform and grooming standards would create friction in the ranks, as other servicemembers may wish to be exempted from sex-specific "uniform and grooming standards as a means of expressing their own sense of identity." JA102; *cf. Goldman v. Secretary of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that it cannot make exceptions … for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly"), *aff'd sub nom. Goldman v. Weinberger*, 475 U.S. 503 (1986). Such resentment is particularly likely when other servicemembers are precluded by these standards from expressing core aspects of their identity. *See, e.g.*, U.S. Dep't of the Army, Dir. 2017-03, *Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation*

37

para. 7(a) (Jan. 3, 2017)[5] (only female servicemembers may wear dreadlocks).

The point of all this is not that the Department deems the needs of certain servicemembers to take priority over those of others. Rather, it is that the inescapable "collision of interests" injected by the Carter and Austin policies' departure from military uniformity poses "a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions," JA108, a problem only compounded by the risks to unit cohesion stemming from significant limits on deployability, *see supra* Part I.A.2.a. Given that "[l]eaders at all levels already face immense challenges in building cohesive military units," JA108-09, the Department reasonably concluded that it would be unwise to maintain a policy that "will only exacerbate those challenges and divert valuable time and energy from military tasks," JA109. There is no reason why military judgment regarding these matters should be disregarded.

---

[5] https://perma.cc/HB34-GNQC.

### c.    Disproportionate Costs

The Department noted that medical interventions related to gender dysphoria were "disproportionately costly on a per capita basis." JA112; *see also* JA65.    Several commanders reported that providing servicemembers in their units with such medical interventions "had a negative budgetary impact" due to the use of "operations and maintenance funds to pay for … extensive travel throughout the United States to obtain specialized medical care." JA112.  This is not surprising given that such medical interventions "require[] frequent evaluations" by both a mental-health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." JA112 n.164 (quotation marks omitted).  Servicemembers undergoing such medical interventions consequently "may have significant commutes to reach their required specialty care," with those "stationed in more remote locations fac[ing] even greater challenges." *Id.* (quotation marks omitted).

Given the military's general interest in maximizing efficiency through minimizing costs, JA74, the Department concluded that its disproportionate expenditures on facilitating medical interventions for

gender dysphoria could be better devoted elsewhere, *see* JA112, a judgment that merits this Court's respect.    Even when alleged constitutional rights are involved, decisions by the political branches on whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" deserve significant deference. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976).

## B.    The District Court's Analysis Is Fundamentally Flawed

The district court erred in concluding that plaintiffs are likely to prevail on their claim that the Constitution precludes the military from treating gender dysphoria as a presumptively disqualifying medical condition.

1.    The court's order hinged on its mischaracterization of the 2025 policy. *See* JA1229-31. As this Court concluded in *Doe 2*, the Mattis policy was not a "blanket ban" despite excluding individuals with "gender dysphoria or who are unwilling to serve in their biological sex."  755 F. App'x at 23-24.  The same is true here.  The 2025 policy, like the Mattis policy, excludes individuals based on a medical condition (gender dysphoria) or related medical interventions, and requires individuals to serve in their sex.  Like the DSM on which it is based, the 2025 policy

uses the term gender dysphoria to refer to the "clinically significant *distress* or impairment in … functioning" that may accompany the incongruence between one's experienced or expressed gender and one's sex.   JA1292 (emphasis added); *see* JA1289 n.2 (adopting the DSM's "diagnostic criteria" for gender dysphoria).  As this Court recognized in permitting the Mattis policy to take effect, not all trans-identifying individuals have gender dysphoria.  *Doe 2,* 755 F. App'x at 24.

The 2025 policy also permits individuals with a history of gender dysphoria to be considered for waivers, "provided there is a compelling Government interest in retaining the Service member," they "demonstrate[] 36 consecutive months of stability," have "never attempted to transition to any sex other than their sex," and are "willing and able to adhere to" "the standards associated with the Service member's sex."  JA55, 210-11; *see Doe 2,* 755 F. App'x at 24 (observing that not all trans-identifying individuals "seek to transition to their preferred gender or have gender dysphoria").

The district court mistakenly relied on language used in a brief social media post by Secretary Hegseth.  *See* JA1229.  But that post merely shared a link to a news article and summarized it using the

language of the article.[6]   It did not "announce[]" anything, much less anything inconsistent with the terms of the policy itself.  JA1229.

The court also faulted the waiver process as applying to "[v]irtually no one."   JA1230.   But the waiver criteria mirror some of the requirements of service under the Mattis policy, which also required 36 months of stability for accessions and required servicemembers to serve in their sex, with limited exceptions.  *Doe 2,* 917 F.3d at 711 (Williams, J., concurring in the result).  And even if the district court were correct that no one could satisfy the waiver criteria, *but see id.* (observing that not all trans-identifying individuals "seek to transition to their preferred gender or have gender dysphoria"), that would not alter the fact that this policy, like the Mattis policy before it, does not turn on one's identity but rather on objective facts and conduct: whether a person has gender dysphoria or has undergone related medical interventions, and whether a person is willing to abide by applicable sex-based standards.

The district court was equally mistaken to presume that the 2025 policy "capture[s] persons who have never had gender dysphoria" because

---

[6] Secretary of Defense (@SecDef), X (Feb. 27, 2025) (stating "Transgender troops are disqualified from service without an exemption" and reposting a CBS News article discussing the policy).

it covers individuals who also "exhibit symptoms *consistent with*[] gender dysphoria." JA1269, 1277 (quotation marks omitted). The Department explained that this language "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria, *i.e.*, "a marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." JA1289 n.2. The district court's decision (JA1307) to brush this explanation aside only underscores why the court's injunction was based on a fundamental misunderstanding of the 2025 policy.

2. The district court erred in applying intermediate scrutiny. None of its rationales is tenable, especially since all of them would equally condemn the Austin policy that the court ordered the Department to maintain.

The court sought to justify intermediate scrutiny on the grounds that that the policy classifies based on sex and targets a quasi-suspect class. But the 2025 policy, like the Carter, Mattis, and Austin policies, draws lines based on a medical condition (gender dysphoria) and related medical interventions—not identity or status. Like the DSM on which it

43

is based, as well as the Carter, Mattis, and Austin policies, the 2025 policy uses the term gender dysphoria to refer to the "clinically significant *distress* or impairment in … functioning" that may accompany the incongruence between one's experienced or expressed gender and one's sex. JA1292 (emphasis added); *see* JA1289 n.2 (adopting the DSM's "diagnostic criteria" for gender dysphoria). As this Court has recognized, not all trans-identifying individuals have gender dysphoria. *Doe 2,* 755 F. App'x at 24. There is nothing suspect about such classifications based on a medical condition, and related medical interventions receive only rational-basis review. *See, e.g.*, *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001); *Skrmetti*, 145 S. Ct. at 1829-35.

The district court was incorrect that the 2025 policy classifies based on sex. The 2025 policy references "sex" in only two contexts, neither of which constitutes sex discrimination. *See Skrmetti*, 145 S. Ct. at 1829 ("This Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny. Such an approach, moreover, would be especially inappropriate in the medical context. Some medical treatments and procedures are uniquely bound up in sex." (citation omitted)). First, certain provisions of the 2025 policy, like provisions of

44

previous Department policies, reference "sex" in the context of describing certain medical interventions. *See*, *e.g.*, JA55. Those provisions, however, turn on the nature of the medical intervention (*e.g.*, "sex reassignment" surgery "in pursuit of a sex transition"), not on the individual's sex. *Id.* They thus do not warrant intermediate scrutiny. Second, the 2025 policy requires servicemembers who have never been diagnosed with gender dysphoria—and who have never received related interventions—to serve in their sex and to meet the standards and requirements applicable to their sex. JA50. But the Carter, Mattis, and Austin policies required the same thing. *See supra* pp. 7-11. What plaintiffs challenge is not the sex-based standards themselves—which the court's injunction leaves in place—but the Department's 2025 decision not to provide a *special exemption* from those sex-based standards for servicemembers who have gender dysphoria and seek to undergo medical interventions and serve in their asserted gender identity. JA50-51. Failing to provide a preferential exemption from valid sex-based standards for individuals who have a particular medical condition (gender dysphoria) and who seek related interventions is not even arguably sex discrimination warranting intermediate scrutiny. In

45

any event, even if the 2025 policy discriminated based on sex, intermediate scrutiny would still be inappropriate because of the deference owed to the military in this context. *See Hawaii*, 585 U.S. at 703-04; *Rostker*, 453 U.S. at 66; *supra* pp. 22-27.

The district court also erred in concluding that the 2025 policy classifies based on trans-identifying status. As explained, the 2025 policy draws lines based on a medical condition and related interventions. *See Skrmetti*, 145 S. Ct. at 1829-35 (concluding that a state law that prohibits medical interventions related to gender dysphoria for minors did not classify based on "sex" or "transgender status" but medical condition). In any event, even if the 2025 policy discriminated based on status or asserted identity, heightened scrutiny would still be inappropriate because trans-identifying people are not a suspect or quasi-suspect class. Whether a group constitutes a suspect class turns on whether they have "obvious, immutable or distinguishing characteristics that define them as a discrete group," whether they have historically "been subjected to discrimination," and whether they are "a minority or politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441-47 (1985) (declining to

46

recognize a new quasi-suspect class). Identifying as transgender does not satisfy any of these strict standards: "transgender status does not turn on an immutable characteristic"; "the category of transgender individuals is large, diverse, and amorphous"; and such individuals have not faced widespread, *de jure* discrimination. *Skrmetti*, 145 S. Ct. at 1849-55 (Barrett, J., concurring) (alterations and quotation marks omitted) (explaining that trans-identification is not a quasi-suspect or suspect class that warrants heightened scrutiny); *see also id.* at 1860-67 (Alito, J., concurring in part and in the judgment) (same).

3.    The court erred in undertaking its own review of the evidence and concluding that it does not support the policy. JA1232-39. The Supreme Court has explained that judicial "inquiry into matters of … national security is highly constrained," *Hawaii*, 585 U.S. at 704, and "in the area of military affairs," courts must be "particularly careful not to substitute" their "own evaluation of evidence for a reasonable evaluation" by the political branches, *Rostker*, 453 U.S. at 67-68.

In the military context, the Supreme Court has accepted concerns about "administrative problems" and post hoc justifications as sufficient to uphold military policies—even when sex-based classifications are

47

involved. *Rostker*, 453 U.S. at 81 (quotation marks omitted); *see id.* at 74-75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *Schlesinger*, 419 U.S. at 508 (upholding sex-based mandatory-discharge requirements for naval officers based on what "Congress may … quite rationally have believed"). It has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including testimony from current and former military officials. *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63. And it has granted the political branches wide latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510.

For instance, the Supreme Court in *Goldman* rejected an argument that the Air Force had "failed to prove that a specific exception for [the] practice of wearing an unobtrusive yarmulke would threaten discipline" and "that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from actual experience or a scientific study in the record, and is contradicted by expert testimony." 475 U.S. at 509. The Court did not question whether the Air Force's judgment rested on adequate evidence,

48

deeming it sufficient that the issue had been "decided by the appropriate military officials" in their "considered professional judgment." *Id.*

In *Rostker*, the Supreme Court similarly acknowledged "testimony of members of the Executive Branch and the military in support" of President Carter's recommendation that Congress "permit the registration and conscription of women," 453 U.S. at 60, 79-81, but held that the lower courts' reliance on this testimony was misplaced. The Court explained that the policy question of participation of women in the selective service was appropriately left to Congress and the military, rather than the courts. *Id.* at 81.

In any event, the district court's evaluation ignored the ample evidence in the 44-page report underlying the Mattis policy, which the Department relied on in issuing the 2025 policy. JA64. The court reasoned that the Mattis report could not support the 2025 policy because the Department did not separately assemble and analyze data from the past four years of the Austin policy. JA1233-34. But nothing required the Department to do so. In making determinations about composition of the force, the Department considers the long-term risks and consequences of service by individuals with medical conditions. *See*

49

Instruction 6130.03, vol. 1, at 4-5 (May 28, 2024). That judgment takes into account not only the current status and severity of a particular medical condition, or how controlled it has been over the past four years, but also how it may progress over time or lead to other complications in the future, such as side effects from treatment or potential comorbidities. The Mattis report and the conclusions of the panel of experts who conducted "a comprehensive study" are thus entitled to military deference and reasonably support the 2025 policy. *Doe 2,* 917 F.3d at 714, 730 (Williams, J., concurring in the result). Indeed, this Court has already "acknowledge[d] that the military has substantial arguments [based on the Mattis report] for why the Mattis Plan complies with … [ ]equal protection principles." *Doe 2*, 755 F. App'x at 25.

The court further erred in faulting the Department's reliance on certain medical literature reviews because some of the data could cut different ways and because some data was not available. JA1234-39. These reviews also contain findings that support the Department's 2025 policy. *See*, *e.g.*, JA188 ("The strength of the evidence on transgender mental health and gender-affirming care is low to moderate." (emphasis omitted)). That data could cut in different ways is no reason to discredit

50

the military's judgment and its conclusions about the level of risk it is willing to tolerate. To the contrary, it is a reason to defer to the military's reasoned judgment.

4.      Finally, the court erred in concluding that the policy is based on animus. JA1271-81. The court relied primarily on the Executive Order in reaching this conclusion, JA1274, 1276, but the operative policy is the Department's 2025 policy, so the Executive Order is irrelevant.

Regardless, plaintiffs have not demonstrated animus. As explained, the 2025 policy allows trans-identifying individuals to serve, unless they suffer (or suffered) from the medical condition of gender dysphoria or have received medical interventions for that condition. And the 2025 policy is "expressly premised on legitimate purposes," *Hawaii*, 585 U.S. at 706, including maintaining "high mental and physical standards necessary for military service," JA48; reducing "the medical and readiness risks associated with" gender dysphoria," *id.* at JA65; addressing "the costs associated with" related medical interventions, *id.*; and "deliver[ing] a ready, deployable force," *id.* The 2025 policy thus belies any suggestion that it is motivated by animus, as opposed to those legitimate purposes.

51

In any event, the 2025 policy should be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705. And "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" *Id.* at 706. Because the 2025 policy has "a legitimate grounding" in the purposes discussed above, "quite apart from any [animus]," this Court "must accept that independent justification." *Id.*

The court concluded that the military's concerns regarding gender dysphoria were pretextual because the 2025 policy does not turn on whether an individual has gender dysphoria. JA1276-77. But as explained, *supra* pp.40-43, this characterization of the policy is incorrect. The court also reasoned that the military could have addressed its concerns in other ways. JA1277. But the court's view that there were other possible ways to conduct military affairs does not demonstrate that the Department's stated concerns about a medical condition were pretextual.

## II.    The Balance Of The Equities Precludes An Injunction Of The 2025 Policy

The Supreme Court's stay in *Shilling* should be all but dispositive on the balance of equities here, because to obtain a stay of the district court's injunction during the pendency of that litigation, the government had to show that it would suffer irreparable harm if the injunction remained in place and that its harms—or the harm to the public interest—outweighed any alleged harms that the plaintiffs may suffer during the pendency of a stay.  *Cf. Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").  A similar calculus applies here.

The district court's injunction is extraordinary.  The district court ordered the military to adhere to a policy that the Department has determined poses "substantial risks" to an effective national defense, JA69, without ever offering a reason why the military (let alone the public) should bear these harms.  *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").  The Supreme Court

has stressed that courts must "defer" to "specific, predictive judgments" by senior military officials "about how [a] preliminary injunction would reduce the effectiveness" of military operations. *Winter*, 555 U.S. at 27. Yet the district court gave short shrift to the military's judgments.

That approach cannot be squared with the Supreme Court's stay in *Shilling* or its previous decisions to stay similar injunctions against the Mattis policy. *See Karnoski*, 586 U.S. at 1124; *Stockman*, 586 U.S. at 1124. In granting each of those stays, the Supreme Court necessarily determined that the government was likely to suffer irreparable harm absent a stay. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) ("To obtain a stay … , an applicant must show … a likelihood that irreparable harm will result from the denial of a stay."). Just as the injunctions against the Mattis policy irreparably harmed the government by requiring the military to maintain a prior policy that was "not conducive to military effectiveness and lethality," JA69, the injunction here irreparably harms the government by requiring the military to do the same.

Against those serious harms to the national defense, plaintiffs will suffer no irreparable injury that outweighs the harms to the military and

the public.  None of the plaintiffs who seek to enlist faces immediate irreparable harm, because they have not yet been accepted into military service.  As for the servicemember plaintiffs, separation from the military along with other attendant harms that plaintiffs allege are not irreparable injury.  As the Supreme Court and this Court have explained in the federal employment context, "loss of income" or reputational harm "falls far short of the type of irreparable injury" necessary to support even temporary injunctive relief.  *Sampson v. Murray*, 415 U.S. 61, 91 (1974); *see also Wallace v. Lynn*, 507 F.2d 1186, 1188 n.8 (D.C. Cir. 1974) (applying *Sampson* and finding no irreparable harm); *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *6 (D.C. Cir. June 5, 2025) (Rao, J., dissenting) (loss of employment is insufficient under *Sampson* to show irreparable harm).

And where judicial interference would intrude on a core area of the executive branch, such as "the internal affairs of the armed forces," courts demand a "much stronger showing of irreparable harm" than in the "ordinary" case.  *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985) (no irreparable harm from loss of income, loss of retirement, or stigma); *Guerra v. Scruggs*, 942 F.2d 270, 274 (4th Cir. 1991) (plaintiffs'

discharge under allegedly unequal procedures did not constitute irreparable injury); *Chilcott v. Orr*, 747 F.2d 29, 33 (1st Cir. 1984) (no irreparable harm from a general discharge); *cf. Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (explaining that "injunctions in federal personnel matters are highly disfavored," and those "that so deeply intrudes into the core concerns of the executive branch . . . must at a minimum" be supported by "an extraordinarily strong showing" that plaintiff deserves relief). If the "loss of income, loss of retirement and relocation pay, and damage to [one's] reputation resulting from the stigma attaching to a less than honorable discharge" are "insufficient … to justify injunctive relief" under that framework, *Hartikka*, 754 F.2d at 1518, then the harms plaintiffs allege here cannot do so. *See* JA50 (explaining that characterization of the service of any servicemembers no longer eligible for service "will be honorable except where [their] record otherwise warrants a lower characterization"); *see also Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (the plaintiff's assertion "that her career" in the Air Force "would be damaged by losing [a] specific position" did not establish "irreparable injury" because "[a]ny harm she might suffer can be

remedied adequately by retroactive promotion and back pay"). Indeed, any alleged harms can be remedied later. *See, e.g., Guerra*, 942 F.2d at 274-75 (employment-related decisions based on discriminatory policy could be remedied by an order reinstating employment and damages).

At a minimum, the Court should vacate the injunction as it pertains to the Department's policy regarding accession, because (as explained) those plaintiffs seeking to enlist face no irreparable harm.

## III. The Universal Injunction Is Improper

Even if this Court concludes that injunctive relief is warranted, the district court should have limited its preliminary injunction to the plaintiffs properly before it.

As the Supreme Court has recently explained, universal injunctions—*i.e.*, injunctions that grant relief to nonparties—"likely exceed the equitable authority that Congress has granted to federal courts." *Trump v. CASA, Inc.*, 606 U.S. 831, 837-38 (2025) (granting three applications for partial stays of universal preliminary injunctions). Federal courts sitting in equity must apply "'traditional principles of equity jurisdiction'" and may award only those remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de*

*Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).
Historically, "suits in equity were brought by and against individual
parties." *CASA*, 606 U.S. at 842. Consequently, "under longstanding
equity practice in England, there was no remedy remotely like a national
injunction." *Id.* at 842-43 (quotation marks omitted). "Nor did founding-
era courts of equity in the United States chart a different course." *Id.* at
843. Indeed, "[t]he universal injunction was conspicuously nonexistent
for most of our Nation's history." *Id.* at 845. "If anything, the approach
traditionally taken by federal courts cuts *against* the existence of such a
sweeping remedy." *Id.*

That is not to say that a court cannot "fashion a remedy that awards
complete relief." *CASA*, 606 U.S. at 850. But "'[c]omplete relief' is not
synonymous with 'universal relief.'" *Id.* at 851. Rather, the question is
"whether an injunction will offer complete relief *to the plaintiffs before
the court.*" *Id.* at 852; *see also Califano v. Yamasaki*, 442 U.S. 682, 702
(1979) ("[I]njunctive relief should be no more burdensome to the
defendant than necessary to provide complete relief to the plaintiffs.").
Accordingly, the Supreme Court has "consistently rebuffed requests for
relief that extended beyond the parties." *CASA*, 606 U.S. at 843. The

district court erred in failing to do the same. Here, an injunction prohibiting the Department from enforcing its policy against only the named plaintiffs would give them complete relief: The servicemember plaintiffs would be permitted to continue to serve in their preferred gender, and the plaintiffs seeking to join the military would not be barred from doing so solely based on their underlying medical condition or history of medical interventions. A broader injunction that extends relief to "all other similarly situated individuals" does not render plaintiffs' relief "any more complete." *Id.* at 853.

In addition to exceeding the district court's equitable authority, the universal injunction here exceeds the scope of the court's power under Article III. *See Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *Department of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., dissenting from the denial of the application to vacate order); *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923-24 (2024) (Gorsuch, J., concurring in the grant of stay); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay). Article III authorizes federal courts to exercise only "judicial Power," which extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. It does

not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).    Thus, courts can adjudicate "claims of infringement of individual rights," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992), and grant the challenger appropriate relief.    But to reach beyond the litigants and to enjoin the Executive Branch's actions toward third parties "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly [courts] do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923).    The court's universal injunction is therefore foreclosed by Article III as well.

## CONCLUSION

The district court's preliminary injunction should be vacated in whole or at least as to everyone except for the servicemember plaintiffs.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
YAAKOV M. ROTH
  *Principal Deputy*
   *Assistant Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD

 *s/ Amanda L. Mundell*
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

September 2025

61

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of D.C. Circuit Rule 32-1(a) because it contains 11,233 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Amanda L. Mundell*
Amanda L. Mundell

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.


*s/ Amanda L. Mundell*
Amanda L. Mundell