**[ORAL ARGUMENT NOT SCHEDULED]**
No. 25-5087

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NICHOLAS TALBOTT, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

JOINT APPENDIX, VOLUME 1
———————————

JENNIFER LEVI
MICHAEL R. HALEY
  *GLBTQ Legal Advocates &*
    *Defenders*
  *18 Tremont Street, Suite 950*
  *Boston, MA 02108*
  *(617) 426-1350*

SHANNON P. MINTER
CHRISTOPHER STOLL
  *National Center for LGBTQ*
    *Rights*
  *870 Market Street, Suite 370*
  *San Francisco, CA 94102*
  *(415) 392-6257*

(cover continued on following page)

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *Amanda.L.Mundell@usdoj.gov*

*Counsel for Defendants-Appellants*

JOSEPH J. WARDENSKI
  *Wardenski P.C.*
  *134 West 29th Street, Suite 709*
  *New York, NY 10001*
  *(347) 913-3311*

SARA E. KROPF
  *Kropf Moseley PLLC*
  *1100 H Street, NW Ste 1220*
  *Washington, DC 20003*
  *(202) 627-6900*

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

**Page**

## VOLUME 1

District Court Docket Sheet................................................................JA1

Additional Guidance on Prioritizing Military Excellence and
    Readiness (2025 policy), Feb. 26, 2025, Dkt. No. 63-1..............JA48

Action Memo: Implementing Guidance for Prioritizing Military
    Excellence and Readiness Executive Order (EO), Feb. 26,
    2025, Dkt. No. 73-23................................................................JA61

    Attachments to Memo:

    Mattis Memorandum and Report, Feb. 22, 2018,
        Dkt. No. 73-8....................................................................JA67

    Analysis of Psychological Stability as a Factor in
        Determining Medical Accession Standards for
        Transgender Individuals with Accession Medical
        Standards Analysis and Research Activity Report
        (2021 Review), July 14, 2021, Dkt. No. 86-1..................JA116

    Literature Review: Level of Evidence for Gender-Affirming
        Treatments (2025 Medical Literature Review),
        Dkt. No. 73-25................................................................JA187

Public Affairs Guidance: Department of Defense Implementation
    of Executive Order Prioritizing Military Excellence and
    Readiness, February 28, 2025, Dkt. No. 79-1.........................JA198

Clarifying Guidance on Prioritizing Military Excellence and
    Readiness, February 28, 2025, Dkt. No. 65-1 (excerpt)..........JA208

i

Office of the Under Secretary of Defense Memorandum, Clarifying
      Guidance on Prioritizing Military Excellence and Readiness:
      Retention and Accession Waivers, March 4, 2025,
      Dkt. No. 92-3 (excerpt)............................................................JA210

Attachments to Memorandum of Law in Support of Plaintiffs'
      Renewed Motion for Preliminary Injunction:

      Declaration of Nicholas Talbott, Dkt. No. 72-18 ....................JA212

      Supplemental Declaration of Nicholas Talbott,
            Dkt. No. 72-19................................................................JA218

      Declaration of Erika Vandal, Dkt. No. 72-20 .........................JA221

      Supplemental Declaration of Erika Vandal,
            Dkt. No. 72-21................................................................JA227

      Second Supplemental Declaration of Erika Vandal,
            Dkt. No. 72-22................................................................JA230

      Declaration of Kate Cole, Dkt. No. 72-23 ...............................JA233

      Supplemental Declaration of Kate Cole, Dkt. No. 72-24........JA238

      Declaration of Gordon Herrero, Dkt. No. 72-25.....................JA241

      Supplemental Declaration of Gordon Herrero,
            Dkt. No. 72-26................................................................JA246

      Second Supplemental Declaration of Gordon Herrero,
            Dkt. No. 72-27................................................................JA250

      Declaration of Dany Dandridge, Dkt. No. 72-28 ....................JA253

      Supplemental Declaration of Dany Dandridge,
            Dkt. No. 72-29................................................................JA261

ii

Declaration of Jamie Hash, Dkt. No. 72-30............................JA264

Supplemental Declaration of Jamie Hash, Dkt. No. 72-31 ....JA272

Second Supplemental Declaration of Jamie Hash,
    Dkt. No. 72-32....................................................................JA275

Declaration of Koda Nature, Dkt. No. 72-33 ..........................JA278

Supplemental Declaration of Koda Nature,
    Dkt. No. 72-34....................................................................JA283

Declaration of Cael Neary, Dkt. No. 72-35.............................JA286

Supplemental Declaration of Cael Neary, Dkt. No. 72-36 .....JA291

Declaration of Miriam Perelson, Dkt. No. 72-37 ....................JA294

Supplemental Declaration of Miriam Perelson,
    Dkt. No. 72-38....................................................................JA299

Second Supplemental Declaration of Miriam Perelson,
    Dkt. No. 72-39....................................................................JA309

Declaration of Minerva Bettis, Dkt. No. 72-40.......................JA313

Supplemental Declaration of Minerva Bettis,
    Dkt. No. 72-41....................................................................JA317

Declaration of Audrie Graham, Dkt. No. 72-42.......................JA320

Supplemental Declaration of Audrie Graham,
    Dkt. No. 72-43....................................................................JA323

Declaration of Roan Pickett, Dkt. No. 72-44 ..........................JA325

Supplemental Declaration of Roan Pickett,
    Dkt. No. 72-45....................................................................JA330

iii

Declaration of Amiah Sale, Dkt. No. 72-46 ............................JA333

Supplemental Declaration of Amiah Sale, Dkt. No. 72-47.....JA337

Declaration of Quinn Tyson, Dkt. No. 72-48 .........................JA345

Supplemental Declaration of Quinn Tyson,
    Dkt. No. 72-49................................................................JA349

Declaration of Greyson Shishkina, Dkt. No. 72-50 ...............JA353

Supplemental Declaration of Greyson Shishkina,
    Dkt. No. 72-51................................................................JA358

Declaration of Clayton McCallister, Dkt. No. 72-52..............JA361

Supplemental Declaration of Clayton McCallister,
    Dkt. No. 72-53................................................................JA366

Declaration of Michelle Bloomrose, Dkt. No. 72-54...............JA369

Declaration of Regan Morgan, Dkt. No. 72-55 ......................JA376

Exhibit A to Declaration of Regan Morgan,
    Dkt. No. 72-56................................................................JA383

Declaration of Samuel Ahearn, Dkt. No. 72-57.....................JA386

Declaration of Vera Wolf, Dkt. No. 72-58...............................JA391

Declaration of Alex Wagner, Dkt. No. 72-59 ..........................JA395

Exhibit A to Declaration of Alex Wagner, DTM 16-005,
    Dkt. No. 72-60................................................................JA410

Exhibit B to Declaration of Alex Wagner, Army Directive
    2016-30, Dkt. No. 72-61.................................................JA417

iv

Exhibit C to Declaration of Alex Wagner, Army Directive 2016-35, Dkt. No. 72-62 .................................................JA422

Exhibit D to Declaration of Alex Wagner, Department of Defense Instruction (DoDI) 1300.28, Dkt. No. 72-63 ....JA442

Exhibit E to Declaration of Alex Wagner, Air Force Policy Memorandum 2021-36-01, Dkt. No. 72-64 ....................JA465

Exhibit F to Declaration of Alex Wagner, PRRI Survey, Dkt. No. 72-65................................................................JA491

Supplemental Declaration of Alex Wagner, Dkt. No. 72-66................................................................JA497

Exhibit A to Supplemental Declaration of Alex Wagner, Department of Defense Instruction (DoDI) 6130.03 Vol. 2, Dkt. No. 72-67 ........................................................JA502

Second Supplemental Declaration of Alex Wagner, Dkt. No. 72-68................................................................JA543

Declaration of Yvette Bourcicot, Dkt. No. 72-69 ....................JA547

Exhibit A to Declaration of Yvette Bourcicot, RAND Report, Dkt. No. 72-70................................................................JA559

Supplemental Declaration of Yvette Bourcicot, Dkt. No. 72-71................................................................JA672

## VOLUME 2

Attachments to Memorandum of Law in Support of Plaintiffs' Renewed Motion for Preliminary Injunction (Cont'd):

Declaration of Shawn Skelly, Dkt. No. 72-72.........................JA676

Supplemental Declaration of Shawn Skelly,
    Dkt. No. 72-73.......................................................JA684

Declaration of Gilbert Cisneros, Dkt. No. 72-74.....................JA690

Supplemental Declaration of Gilbert Cisneros,
    Dkt. No. 72-75.......................................................JA700

Second Supplemental Declaration of Gilbert Cisneros, Dkt.
    No. 72-76............................................................JA703

Declaration of George Brown, Dkt. No. 72-77.......................JA707

Supplemental Declaration of George Brown,
    Dkt. No. 72-78.......................................................JA712

Declaration of Carlos Del Toro, Dkt. No. 72-79.....................JA728

Declaration of Carrie N. Baker, Dkt. No. 72-80.....................JA733

Exhibit A to Declaration of Carrie N. Baker, Curriculum
    Vitae of Carrie N. Baker, Dkt. No. 72-81 .....................JA741

Declaration of Martha Soper, Dkt. No. 72-82.......................JA753

Index of Exhibits to Declaration of Martha Soper,
    Dkt. No. 72-83.......................................................JA759

Exhibit A to Declaration of Martha Soper, Department of
    Defense Instruction (DoDI) 1332.14,
    Dkt. No. 72-84.......................................................JA760

Exhibit B to Declaration of Martha Soper, Department of
    Defense Instruction (DoDI) 1332.30,
    Dkt. No. 72-85.......................................................JA824

vi

Exhibit C to Declaration of Martha Soper, Department of
   Defense Instruction (DoDI) 1332.18,
   Dkt. No. 72-86...............................................................JA852

Declaration of Joseph Wardenski, Dkt. No. 73...............................JA924

   Attachments to Declaration:

   Exhibit H to Declaration of Joseph Wardenski, Department
      of Defense Instruction 6130.03, "Medical Standards for
      Military Service: Appointment, Enlistment, or
      Induction," May 28, 2024, Dkt. No. 73-9 .......................JA930

   Exhibit Q to Declaration of Joseph Wardenski, Navy
      Guidance Memo N000-30, Dkt. No. 73-18.....................JA989

   Exhibit R to Declaration of Joseph Wardenski, MEPS Email,
      Dkt. No. 73-19...............................................................JA993

   Exhibit S to Declaration of Joseph Wardenski, Palm Center
      Report, Dkt. No. 73-20...................................................JA997

   Exhibit T to Declaration of Joseph Wardenski, Army Memo
      2021-22, Dkt. No. 73-21...............................................JA1054

   Exhibit U to Declaration of Joseph Wardenski, Navy
      Instruction 1000.1A, Dkt. No. 73-22............................JA1078

   Exhibit Y to Declaration of Joseph Wardenski,
      Implementation Guidance FAQs, Dkt. No. 73-26 .......JA1090

Declaration of Michael Haley, Dkt. No. 74...................................JA1096

   Attachments to Declaration:

   Index of Exhibits, Dkt. No. 74-1 ..........................................JA1101

vii

"Health info wiped from federal websites following Trump order targeting transgender rights," dated January 31, 2025, Dkt. No. 74-2 ....................................................JA1102

"DOJ ordered review of 'gender ideology' compliance at child safety authority," dated February 7, 2025, Dkt. No. 74-3 ...............................................................JA1105

"Mentions of trans kids scrubbed from national safety clearinghouse website," dated February 7, 2025, Dkt. No. 74-4 ...............................................................JA1110

"Government agencies scrub LGBTQ web pages and remove info about trans and intersex people," dated February 3, 2025, Dkt. No. 74-5 ...................................JA1118

"Federal government scrubs transgender language from websites," dated February 4, 2025, Dkt. No. 74-6 .......JA1124

"C.D.C. Site Restores Some Purged Files After 'Gender Ideology' Ban Outcry," dated February 3, 2025, Dkt. No. 74-7 ...............................................................JA1136

"Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far," dated February 7, 2025, Dkt. No. 74-8 ....................................................JA1144

"Army museum covers display honoring transgender soldiers," dated February 7, 2025, Dkt. No. 74-9 ........JA1166

"The NSA's 'Big Delete,'" dated February 10, 2025, Dkt. No. 74-10 .............................................................JA1182

"They trained on diversity under Trump. Now he's punishing them for it," dated February 7, 2025, Dkt. No. 74-11 .............................................................JA1191

viii

ALLNAV 023/25, Initial Direction on Prioritizing Military
Excellence and Readiness, March 13, 2025,
Dkt. No. 84-1 ..........................................................................JA1197

MARADMINS 128/25, Initial Guidance on Prioritizing Military
Excellence and Readiness, March 14, 2025,
Dkt. No. 85-1 ..........................................................................JA1205

Order Granting Preliminary Injunction, March 18, 2025,
Dkt. No. 88 ..............................................................................JA1207

Memorandum Opinion, March 18, 2025, Dkt. No. 89 ...................JA1210

Prioritizing Military Excellence and Readiness: Military
Department Identification, Mar. 21, 2025, Dkt. No. 91-2
(excerpt) ..................................................................................JA1289

DSM-5 Criteria for Gender Dysphoria, Dkt. No. 92-2...................JA1292

Office of the Under Secretary of Defense Memorandum,
Compliance with Federal Court Order in *Talbott v. United
States,* No. 25-cv-00240 (D.D.C.), March 21, 2025,
Dkt. No. 93-1 ..........................................................................JA1293

Memorandum Opinion and Order Denying Motion to Dissolve,
March 26, 2025, Dkt. No. 100...............................................JA1294

Notice of Appeal, March 27, 2025, Dkt. No. 101............................JA1310

D.C. Circuit Order Granting Administrative Stay, March 27, 2025,
Dkt. No. 2108170 ...................................................................JA1311

Exhibit A to Plaintiffs' Fed. R. App. P. Rule 28(j) Letter,
May 8, 2025, Dkt. No. 2115074.............................................JA1312

Attachment to Response to Plaintiffs' Letter Request to Lift
Administrative Stay, August 12, 2025,
Dkt. No. 2131251 ...................................................................JA1314

ix

Attachment to Plaintiffs' Letter Request to Lift Administrative
    Stay, August 14, 2025, Dkt. No. 2130709.............................JA1318

x

APPEAL,TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00240-ACR

TALBOTT et al v. TRUMP et al
Assigned to: Judge Ana C. Reyes
Case in other court: USCA, 25-05087
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 01/28/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NICOLAS TALBOTT**                     represented by   **Inga S. Bernstein**
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street
Suite 200
Boston, MA 02109
617-742-6020
Email: ibernstein@zalkindlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
NATIONAL CENTER FOR LESBIAN
RIGHTS
1401 21st St.
Ste #11548
Sacramento, CA 95811
415-365-1338
Email: awhelan@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
NATIONAL CENTER FOR LESBIAN
RIGHTS
1401 21st St.
Ste #11548
Sacramento, CA 95811
415-365-1320
Email: cstoll@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950

Boston, MA 02108
617-426-1350
Email: jlevi@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
617-426-1350
Email: mbonauto@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
617-426-1350
Email: mhaley@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
KROPF MOSELEY SCHMITT PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
202-627-6900
Email: sara@kmlawfirm.com
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
617-426-1350
Email: saustin@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
NATIONAL CENTER FOR LESBIAN
RIGHTS
1401 21st St.
Ste #11548
Sacramento, CA 95811

JA2

415-365-1316
Email: SMinter@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
347-913-3311
Fax: 347-467-7237
Email: joe@wardenskilaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ERICA VANDAL**                    represented by    **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KATE COLE**                    represented by **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GORDON HERRERO**                represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANY DANRIDGE**                              represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMIE HASH**                              represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KODA NATURE**                 represented by **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAEL NEARY**                    represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*

JA8

*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MIRIAM PERELSON**                    represented by **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**CLAYTON MCCALLISTER**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**GREYSON SHISHKINA**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**AUDRIE GRAHAM**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**ROAN PICKETT**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**QUINN TYSON**                    represented by   **Christopher F. Stoll**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

                                   **Joseph J. Wardenski**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMIAH SALE**                     represented by   **Christopher F. Stoll**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

                                   **Joseph J. Wardenski**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MINERVA BETTIS**                 represented by   **Christopher F. Stoll**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

                                   **Joseph J. Wardenski**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAMUEL AHEARN**                  represented by   **Christopher F. Stoll**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

                                   **Joseph J. Wardenski**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**REGAN MORGAN**                   represented by   **Christopher F. Stoll**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

                                   **Joseph J. Wardenski**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**VERA WOLF**                      represented by   **Christopher F. Stoll**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

JA11

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHELLE BLOOMROSE**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTER MARQUEZ**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SEAN KERSCH-HAMAR**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KELSEY ORTH**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TAYLOR MAIWALD**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SABRINA BRUCE**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**C.J. DULANEY**                          represented by   **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICAH JACQUELINE GROSS**               represented by   **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AUSTIN CONVERSE**                       represented by   **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATHALIE RICHTER**                      represented by   **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BECK SIMPSON**                          represented by   **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CLARA WINCHELL**                        represented by   **Christopher F. Stoll**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ASHLEY DAVIS**                    represented by    **Christopher F. Stoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**                 represented by    **Jason C. Lynch**
*in his official capacity as President of the*                   U.S. DEPARTMENT OF JUSTICE
*United States*                                                  1100 L Street NW
*TERMINATED: 02/13/2025*                                         Washington, DC 20005
                                                                 202-514-1359
                                                                 Email: Jason.Lynch@usdoj.gov
                                                                 *TERMINATED: 07/23/2025*
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
U.S. DEPARTMENT OF JUSTICE
1100 L Street NW
Washington, DC 20005
771-217-8107
Email: elizabeth.b.layendecker@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jason Manion**
DOJ-Oag
Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-445-6214
Email: jason.manion2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jean Lin**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Room 11532
Washington, DC 20005
(202) 514-3716
Fax: (202) 616-8470

Email: jean.lin@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**              represented by    **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
DOJ
CIVIL, FEDERAL PROGRAMS
1100 L Street NW
Washington, DC 20005
202-514-5578
Email: jared.littman2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
DOJ-Tax
Civil Division
1100 L Street NW
Ste 12404
Washington, DC 20530
202-616-0773
Email: robert.bombard2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**                      represented by    **Jason C. Lynch**
*in his official capacity as Secretary of*                  (See above for address)
*Defense*                                                   *TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK F. AVERILL**
*in his official capacity as Acting Secretary*
*of the Army*

represented by **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF**
**THE ARMY**

represented by **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TERENCE EMMERT**
*in his official capacity as Acting Secretary of the Navy*

represented by **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF THE NAVY**

represented by **Jason C. Lynch**
(See above for address)

JA17

*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GARY ASHWORTH**
*in his official capacity as Acting Secretary of the Air Force*

represented by **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF THE AIR FORCE**

represented by **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TELITA CROSLAND**
*in her official capacity as Director of the Defense Health Agency*

represented by **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

Jean Lin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEFENSE HEALTH AGENCY**                    represented by   **Jason C. Lynch**
(See above for address)
*TERMINATED: 07/23/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Jared Littman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Bombard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**CONSTITUTIONAL**                    represented by   **Brianne Jenna Gorod**
**ACCOUNTABILITY CENTER**                              CONSTITUTIONAL ACCOUNTABILITY
CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, DC 20005
202-296-6889
Email: brianne@theusconstitution.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF VERMONT**                    represented by   **Jonathan T. Rose**
OFFICE OF ATTORNEY GENERAL/VT
109 State Street
Montpelier, VT 05609-1001
802-793-1646
Email: jonathan.rose@vermont.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF WASHINGTON**

**Amicus**

| | | |
|---|---|---|
| **FRANK KENDALL**<br>*Hon.* | represented by | **Andrew Tutt**<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 20001<br>202-942-5242<br>Fax: 202-942-5999<br>Email: andrew.tutt@arnoldporter.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **CHRISTINE WORMUTH** | represented by | **Andrew Tutt**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/28/2025 | 1 | COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against GARY ASHWORTH, MARK AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES OF AMERICA ( Filing fee $ 405 receipt number ADCDC-11437641) filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, KATE COLE, GORDON HERRERO, CAEL NEARY. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons)(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/28/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error(s) need correction: Noncompliance with LCvR 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the name & full residence address of each party and file using the event Errata. Blank/Incomplete/Missing civil cover sheet. Please file the Civil Cover Sheet (JS44) form at www.dcd.uscourts.gov/new-case-forms using the event Civil Cover Sheet. Form filed as fillable PDF. Please file form in a non-fillable PDF format. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsl) (Entered: 01/28/2025) |
| 01/28/2025 | 2 | ERRATA by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Complaint (Corrected))(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/28/2025 | 3 | CIVIL COVER SHEET by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, KATE COLE, GORDON HERRERO, CAEL |

| | | |
|---|---|---|
| | | NEARY filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, KATE COLE, GORDON HERRERO, CAEL NEARY.(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/28/2025 | 4 | SEALED DOCUMENT filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY(This document is SEALED and only available to authorized persons.)(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/29/2025 | | Case Assigned to Judge Ana C. Reyes. (zsl) (Entered: 01/29/2025) |
| 01/29/2025 | 5 | SUMMONS (11) Issued Electronically as to All Defendants. (Attachment: # 1 Notice and Consent)(zsl) (Entered: 01/29/2025) |
| 01/29/2025 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zsl) (Entered: 01/29/2025) |
| 01/30/2025 | 6 | REQUEST FOR SUMMONS TO ISSUE filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, GORDON HERRERO, CAEL NEARY. (Attachments: # 1 Summons)(Wardenski, Joseph) (Entered: 01/30/2025) |
| 01/30/2025 | 7 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zdp) (Entered: 01/30/2025) |
| 01/30/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jennifer L. Levi, Filing fee $ 100, receipt number ADCDC-11445702. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Declaration of Jennifer Levi, # 2 Supplemental Statement of Jennifer Levi, # 3 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 01/30/2025) |
| 01/30/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Mary L. Bonauto, Filing fee $ 100, receipt number ADCDC-11445787. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Declaration of Mary Bonauto, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 01/30/2025) |
| 01/31/2025 | | MINUTE ORDER granting 8 Motion for Leave to Appear Pro Hac Vice. Attorney Jennifer L. Levi is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 01/31/2025. (lcacr2) (Entered: 01/31/2025) |
| 01/31/2025 | | MINUTE ORDER granting 9 Motion for Leave to Appear Pro Hac Vice. Attorney Mary L. Bonauto is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 01/31/2025. (lcacr2) (Entered: 01/31/2025) |
| 02/03/2025 | 10 | STANDING ORDER. The Court hereby ORDERS the parties to comply with its Standing Order. See Standing Order for details. Signed by Judge Ana C. Reyes on 02/03/2025. (lcacr2) (Entered: 02/03/2025) |
| 02/03/2025 | 11 | NOTICE of Appearance by Jennifer Levi on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, |

KODA NATURE, CAEL NEARY (Levi, Jennifer) (Entered: 02/03/2025)

| 02/03/2025 | 12 | NOTICE of Appearance by Mary Bonauto on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY (Bonauto, Mary) (Entered: 02/03/2025) |
|---|---|---|
| 02/03/2025 | 13 | MOTION for Preliminary Injunction by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Joseph J. Wardenski, # 3 Index of Exhibits to Wardenski Decl., # 4 Exhibit A to Wardenski Decl., # 5 Exhibit B to Wardenski Decl., # 6 Exhibit C to Wardenski Decl., # 7 Exhibit D to Wardenski Decl., # 8 Exhibit E to Wardenski Decl., # 9 Exhibit F to Wardenski Decl., # 10 Exhibit G to Wardenski Decl., # 11 Exhibit H to Wardenski Decl., # 12 Exhibit I to Wardenski Decl., # 13 Exhibit J to Wardenski Decl., # 14 Exhibit K to Wardenski Decl., # 15 Exhibit L to Wardenski Decl., # 16 Exhibit M to Wardenski Decl., # 17 Exhibit N to Wardenski Decl., # 18 Exhibit O to Wardenski Decl., # 19 Exhibit P to Wardenski Decl., # 20 Declaration of Alex Wagner, # 21 Index of Exhibits to Wagner Decl., # 22 Exhibit A to Wagner Decl., # 23 Exhibit B to Wagner Decl., # 24 Exhibit C to Wagner Decl., # 25 Exhibit D to Wagner Decl., # 26 Exhibit E to Wagner Decl., # 27 Exhibit F to Wagner Decl., # 28 Declaration of Yvette Bourcicot, # 29 Exhibit A to Bourcicot Decl., # 30 Declaration of Gilbert Cisneros, # 31 Declaration of Shawn Skelly, # 32 Declaration of Nicolas Talbott, # 33 Declaration of Erica Vandal, # 34 Declaration of Kate Cole, # 35 Declaration of Gordon Herrero, # 36 Declaration of Dany Danridge, # 37 Declaration of Jamie Hash, # 38 Declaration of Koda Nature, # 39 Declaration of Cael Neary, # 40 Text of Proposed Order)(Wardenski, Joseph) (Entered: 02/03/2025) |
| 02/04/2025 | | MINUTE ORDER. The Court ORDERS the following schedule for Plaintiffs' 13 Application for Preliminary Injunction: |

02/04/2025 (continued):

1. Defendants shall file their Opposition by February 12, 2025, at 6:00 PM EST;

2. Plaintiffs shall file their Reply by February 14, 2025, at 6:00 PM EST;

3. Amicus briefs, if any, shall be filed by February 14, 2025, at 6:00 PM EST;

4. The Court will hold a hybrid argument / evidentiary hearing on Plaintiffs' 13 Application on February 18, 2025, beginning at 10:00 AM EST and continuing day-to-day until completed.

The Court further AMENDS Section 5 of its 10 Standing Order (courtesy copies to Chambers) as follows:

1. Plaintiffs shall provide three (3) courtesy copies of their 13 Application and key legal references by February 5, 2025, at 12:00 PM EST;

2. Defendants shall provide three (3) courtesy copies of their forthcoming Opposition and key legal references by February 15, 2025, at 12:00 PM EST;

3. Plaintiffs shall provide three (3) courtesy copies of the Application, Opposition, and Reply briefs (without declarations or exhibits) in one binder by February 17, 2025, at 10:00 AM EST.

4. The Parties shall include in the courtesy copies declarations, exhibits, and key academic or government studies.

| | | |
|---|---|---|
| | | The Court DIRECTS Plaintiffs' counsel to send this Minute Order to Defendants' counsel as soon as possible and no later than 12:00 PM EST on Tuesday, February 4, 2025, as Defendants' counsel has not yet entered appearance.<br><br>Signed by Judge Ana C. Reyes on 02/04/2025. (lcacr2) (Entered: 02/04/2025) |
| 02/04/2025 | 14 | MOTION for Temporary Restraining Order by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Declaration of Miriam Perelson, # 6 Exhibit 1 to Perelson Decl., # 7 Text of Proposed Order)(Wardenski, Joseph) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER. The Court will hold a preliminary hearing on Plaintiffs' 14 Application for Temporary Restraining Order at 4:00 PM on Tuesday, February 4, 2025, in Courtroom 12.<br><br>Interested parties may access the Court's dial-in line. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/04/2025. (lcacr2) (Entered: 02/04/2025) |
| 02/04/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Status Conference held on 2/4/2025 regarding the Plaintiffs 14 Application for Temporary Restraining Order. Hearing on the Plaintiff's motion tentatively set for 2/7/2025 at 10:00 AM in Courtroom 12 (in person) before Judge Ana C. Reyes. Parties to submit a Joint Status Report by 4:00 PM on 2/5/2025 to determine if hearing will proceed. Interested members of the public and media may access the Motion Hearing by dialing the Courts toll-free public access line: (833)-990-9400, access code 787605272. ( Status Report due by 2/5/2025, Motion Hearing set for 2/7/2025 at 10:00 AM in Courtroom 12- In Person (Audio Line Available) before Judge Ana C. Reyes.). (Court Reporter Lisa Edwards.) (zakb) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER. Following today's preliminary hearing, the Court ORDERS the parties to submit a joint status report, on or before February 5, 2025, at 4:00 PM, addressing the issues discussed on the record. Signed by Judge Ana C. Reyes on 02/04/2025. (lcacr2) (Entered: 02/04/2025) |
| 02/04/2025 | 15 | AMENDED COMPLAINT against All Defendants filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, KATE COLE, GORDON HERRERO, CAEL NEARY, MIRIAM PERELSON.(Wardenski, Joseph) (Entered: 02/04/2025) |
| 02/04/2025 | 16 | SEALED DOCUMENT filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON(This document is SEALED and only available to authorized persons.)(Wardenski, Joseph) (Entered: 02/04/2025) |
| 02/05/2025 | 17 | TRANSCRIPT OF STATUS CONFERENCE before Judge Ana C. Reyes held on February 4, 2025; Page Numbers: 1-55. Date of Issuance: February 5, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. |

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/26/2025. Redacted Transcript Deadline set for 3/8/2025. Release of Transcript Restriction set for 5/6/2025.(Edwards, Lisa) (Entered: 02/05/2025)

| | | |
|---|---|---|
| 02/05/2025 | 18 | NOTICE of Appearance by Jason C. Lynch on behalf of All Defendants (Lynch, Jason) (Entered: 02/05/2025) |
| 02/05/2025 | 19 | Joint STATUS REPORT by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Declaration of LTC Baker (Feb. 4, 2025))(Lynch, Jason) (Entered: 02/05/2025) |
| 02/05/2025 | | MINUTE ORDER. The Court ORDERS the Government to immediately notify Plaintiffs and the Court if the Department of Defense (or any of its subsidiaries) issues any policy or guidance implementing the challenged Executive Orders in the military. The Court further ORDERS the Government to immediately notify Plaintiffs and the Court before any changes are made to Plaintiffs' status quo in any way, shape, or form. The Court will entertain a motion for a temporary restraining order should any action be taken against Plaintiffs before the preliminary injunction hearing on February 18, 2025. Signed by Judge Ana C. Reyes on 02/05/2025. (lcacr2) (Entered: 02/05/2025) |
| 02/05/2025 | 20 | Supplemental STATUS REPORT by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Lynch, Jason) (Entered: 02/05/2025) |
| 02/06/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Sarah K. Austin, Filing fee $ 100, receipt number ADCDC-11463030. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Michael Robert Haley, Filing fee $ 100, receipt number ADCDC-11463035. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 23 | NOTICE *In Response to February 5, 2025 Minute Order* by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 04 Feb 2025 Army Memorandum)(Lynch, Jason) (Entered: 02/06/2025) |

| 02/06/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Shannon Minter, Filing fee $ 100, receipt number ADCDC-11463119. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Supplement, # 3 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
|---|---|---|
| 02/06/2025 | 25 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Christopher F. Stoll, Filing fee $ 100, receipt number ADCDC-11463121. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 26 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Amy Whelan, Filing fee $ 100, receipt number ADCDC-11463124. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/07/2025 | | MINUTE ORDER granting 21 Motion for Leave to Appear Pro Hac Vice. Attorney Sarah K. Austin is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 22 Motion for Leave to Appear Pro Hac Vice. Attorney Michael Robert Haley is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 24 Motion for Leave to Appear Pro Hac Vice. Attorney Shannon Minter is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 25 Motion for Leave to Appear Pro Hac Vice. Attorney Christopher F. Stoll is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 26 Motion for Leave to Appear Pro Hac Vice. Attorney Amy Whelan is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | 27 | NOTICE of Appearance by Shannon P. Minter on behalf of All Plaintiffs (Minter, Shannon) (Entered: 02/07/2025) |
| 02/07/2025 | 28 | NOTICE of Appearance by Amy Whelan on behalf of All Plaintiffs (Whelan, Amy) (Entered: 02/07/2025) |

| 02/07/2025 | 29 | NOTICE of Appearance by Christopher F. Stoll on behalf of All Plaintiffs (Stoll, Christopher) (Entered: 02/07/2025) |
|---|---|---|
| 02/07/2025 | 30 | NOTICE of Appearance by Sarah K. Austin on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON (Austin, Sarah) (Entered: 02/07/2025) |
| 02/07/2025 | 31 | NOTICE of Appearance by Michael R. Haley on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON (Haley, Michael) (Entered: 02/07/2025) |
| 02/08/2025 | 32 | DECLARATION *of George Richard Brown, MD, DFAPA* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON re 13 MOTION for Preliminary Injunction . (Attachments: # 1 Exhibit A - CV of George Richard Brown, GEORGE RICHARD BROWN, MD, DFAPA, # 2 Exhibit B - Elders et al., Medical Aspects of Transgender Military Service, Armed Forces & Society (2014))(Wardenski, Joseph) (Entered: 02/08/2025) |
| 02/10/2025 | | MINUTE ORDER. The Court ORDERS the parties to appear before Judge Reyes via Zoom on Thursday, February 13 at 12:00 PM to discuss logistics for the preliminary injunction hearing starting on Tuesday, February 18. The Court plans to accept all declarations as direct evidence. The parties should be prepared to discuss whether they wish to cross-examine any witness and/or make any evidentiary challenges, and how they jointly suggest the hearing should proceed.<br><br>Interested parties may access the Court's dial-in line for the February 13 Zoom hearing. The dial-in line will also be available for any part of the February 18 preliminary injunction hearing that does not involve witness testimony. The Public Access telephone number is 1-833-990-9400, and the access code is 371436084.<br><br>Signed by Judge Ana C. Reyes on 02/10/2025. (lcacr2) Modified on 2/13/2025 to correct access code for public (zcll). (Entered: 02/10/2025) |
| 02/10/2025 | 33 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - SecDef Memo)(Lynch, Jason) (Entered: 02/10/2025) |
| 02/11/2025 | 34 | TRANSCRIPT OF STATUS CONFERENCE (CONDUCTED IN CHAMBERS) before Judge Ana C. Reyes held on February 4, 2025; Page Numbers: 1-15. Date of Issuance: February 11, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the |

| | | |
|---|---|---|
| | | public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/4/2025. Redacted Transcript Deadline set for 3/14/2025. Release of Transcript Restriction set for 5/12/2025.(Edwards, Lisa) (Entered: 02/11/2025) |
| 02/12/2025 | 35 | NOTICE of Appearance by Sara E. Kropf on behalf of All Plaintiffs (Kropf, Sara) (Entered: 02/12/2025) |
| 02/12/2025 | 36 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Declaration of Lieutenant Colonel Baker, # 2 Text of Proposed Order)(Layendecker, Elizabeth) (Entered: 02/12/2025) |
| 02/12/2025 | 37 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 07 Feb 2025 Army Guidance)(Lynch, Jason) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER. Upon consideration of Defendants' 36 Unopposed Motion for Leave to File under Seal, the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/12/2025. (lcacr2) Modified on 2/12/2025 (zcll). (Entered: 02/12/2025) |
| 02/12/2025 | 38 | Memorandum in opposition to re 13 Motion for Preliminary Injunction,,,,,, filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Exhibit 1 - 2018 DoD Report, # 2 Exhibit 2 - Feb 2018 Mattis Memo, # 3 Exhibit 3 - Mar 2018 Pres Memo, # 4 Exhibit 4 - Dec 2017 Health Data)(Lynch, Jason) (Entered: 02/12/2025) |
| 02/12/2025 | 39 | NOTICE of Appearance by Elizabeth Brooke Layendecker on behalf of All Defendants (Layendecker, Elizabeth) (Main Document 39 replaced on 2/13/2025) (zdp). (Entered: 02/12/2025) |
| 02/12/2025 | 64 | SEALED DOCUMENT filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. re 36 Sealed Motion for Leave to File Document Under Seal,. (This document is SEALED and only available to authorized persons.)(zdp) (Entered: 02/27/2025) |
| 02/13/2025 | | NOTICE of PUBLIC LINE INFORMATION: Interested parties may access the Court's dial-in line for the February 13 Zoom hearing. The Public Access telephone number is 1-833-990-9400, and the access code is 720718696. (zcll) (Entered: 02/13/2025) |
| 02/13/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Pre-motion Conference held on 2/13/2025. Defendant DONALD J. TRUMP in his official capacity as President of the United States is hereby DISMISSED as a Defendant in this matter. Preliminary |

| | | |
|---|---|---|
| | | injunction hearing remains scheduled for 2/18/2025 at 10:00AM before Judge Ana C. Reyes. (Court Reporter Christine Asif.) (zcll) (Entered: 02/13/2025) |
| 02/13/2025 | 40 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 2/13/2025; Page Numbers: 1-50. Date of Issuance:2/13/2025. Court Reporter Christine T. Asif, Telephone number 2023543247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/6/2025. Redacted Transcript Deadline set for 3/16/2025. Release of Transcript Restriction set for 5/14/2025.(Asif, Christine) (Entered: 02/13/2025) |
| 02/14/2025 | | Minute Order: The Court will provide access for the public to telephonically attend the hearing scheduled for 2/18/2025 at 10AM ET. The hearing can be accessed through dialing the Toll Free Number: 833-990-9400, Meeting ID: 787605272. It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings (including those held by telephone or videoconference). **Parties are also advised that the public line will not be available during witness testimony. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. SO ORDERED. Signed by Judge Ana C. Reyes on 2/14/2025.** (zcll) (Entered: 02/14/2025) |
| 02/14/2025 | 41 | Consent MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Appendix Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER granting 41 Motion for Leave to File an *Amicus Curiae* Brief by the Constitutional Accountability Center. Signed by Judge Ana C. Reyes on 02/14/2025. (lcacr2) (Entered: 02/14/2025) |
| 02/14/2025 | 42 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Inga S. Bernstein, Filing fee $ 100, receipt number ADCDC-11482040. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration of Inga S. Bernstein, # 2 Certificate of Good Standing) (Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 43 | AMICUS BRIEF by STATE OF VERMONT, STATE OF WASHINGTON. (Rose, Jonathan) (Entered: 02/14/2025) |
| 02/14/2025 | 44 | ENTERED IN ERROR.....AMICUS BRIEF by STATE OF VERMONT, STATE OF WASHINGTON. (zdp) Modified on 2/14/2025 (zdp). (Entered: 02/14/2025) |

| | | |
|---|---|---|
| 02/14/2025 | 45 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (zdp) (Entered: 02/14/2025) |
| 02/14/2025 | 46 | MOTION for Leave to Appear on behalf of amici curiae by FRANK KENDALL, CHRISTINE WORMUTH. (Tutt, Andrew) (Entered: 02/14/2025) |
| 02/14/2025 | 47 | Consent MOTION for Leave to File *Amicus Brief in Support of Motion for Preliminary Injunction* by FRANK KENDALL, CHRISTINE WORMUTH. (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order)(Tutt, Andrew) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER granting 46 Motion for Leave to Appear and 47 Motion for Leave to File an *Amicus Curiae* Brief by Former Military Department Heads. Signed by Judge Ana C. Reyes on 02/14/2025. (lcacr2) (Entered: 02/14/2025) |
| 02/14/2025 | 48 | REPLY to opposition to motion re 13 Motion for Preliminary Injunction,,,,,, filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration of Minerva Bettis, # 2 Declaration of Carlos Del Toro, # 3 Declaration of Audrie Graham, # 4 Declaration of Michael Haley, # 5 Exhibit A to Haley Decl., # 6 Exhibit B to Haley Decl., # 7 Exhibit C to Haley Decl., # 8 Exhibit D to Haley Decl., # 9 Exhibit E to Haley Decl., # 10 Exhibit F to Haley Decl., # 11 Exhibit G to Haley Decl., # 12 Exhibit H to Haley Decl., # 13 Exhibit I to Haley Decl., # 14 Exhibit J to Haley Decl., # 15 Exhibit K to Haley Decl., # 16 Declaration of Roan Pickett, # 17 Exhibit A to Pickett Decl., # 18 Declaration of Quinn Tyson, # 19 Declaration of Amiah Sale, # 20 Exhibit A to Tyson Decl., # 21 Exhibit B to Tyson Decl., # 22 Supplemental Declaration of Jamie Hash, # 23 Supplemental Declaration of Gordon Herrero, # 24 Supplemental Declaration of Miriam Perelson, # 25 Supplemental Declaration of Erica Vandal, # 26 Exhibit A to Supplemental Vandal Decl., # 27 Supplemental Declaration of Alex Wagner, # 28 Exhibit A to Supplemental Wagner Decl., # 29 Declaration of Joseph Wardenski, # 30 Exhibit A to Wardenski Decl., # 31 Exhibit B to Wardenski Decl., # 32 Exhibit C to Wardenski Decl.)(Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 49 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - Feb. 14, 2025 amendment to Army EXORD 150-25)(Lynch, Jason) (Entered: 02/14/2025) |
| 02/14/2025 | 50 | DECLARATION *of Greyson Shishkina* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON re 48 Reply to opposition to Motion,,,,,. (Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 51 | DECLARATION *of Clayton McCallister* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON re 48 Reply to opposition to Motion,,,,,. (Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 52 | Unopposed MOTION for Leave to File *Declaration of Timothy Dill* by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Exhibit Dill Declaration, # 2 Text of Proposed Order)(Layendecker, Elizabeth) (Entered: 02/14/2025) |

| | | |
|---|---|---|
| 02/15/2025 | | MINUTE ORDER granting 42 Motion for Leave to Appear Pro Hac Vice. Attorney Inga S. Bernstein is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/15/2025 | | MINUTE ORDER. Upon consideration of Defendants' 52 Unopposed Motion for Leave to File the Declaration of Timothy Dill, the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/15/2025 | | MINUTE ENTRY. The Court extends its appreciation to all *amici* who submitted briefs in this matter. Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/15/2025 | | MINUTE ORDER. After conferring with the parties, the Court ORDERS that oral argument on Plaintiffs' 13 Motion for Preliminary Injunction will be heard on Tuesday, February 18 starting at 10:00 AM.<br><br>Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272. At this time, the Court does not expect to hear live testimony. If that changes, the public line will not be available for that testimony.<br><br>Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/16/2025 | 53 | Unopposed MOTION for Leave to File *Supplemental Declaration of Gilbert R. Cisneros Jr.* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Kropf, Sara) (Entered: 02/16/2025) |
| 02/16/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 53 Unopposed Motion for Leave to File the Supplemental Declaration of Gilbert R. Cisneros, Jr., the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/16/2025. (lcacr2) (Entered: 02/16/2025) |
| 02/18/2025 | 54 | NOTICE of Appearance by Inga S. Bernstein on behalf of All Plaintiffs (zdp) (Entered: 02/18/2025) |
| 02/18/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Preliminary Injunction hearing began on 2/18/2025. Preliminary Injunction Hearing continued to 2/19/2025 at 10:30 AM in Courtroom 12- In Person (Audio Line Available) before Judge Ana C. Reyes. (Court Reporter Lisa Edwards.) (zcll) (Entered: 02/18/2025) |
| 02/19/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Continued Preliminary Injunction hearing held on 2/19/2025. Further Preliminary Injunction Hearing set for 3/3/2025 at 10:30 AM in Courtroom 12- In Person (Audio Line Available) before Judge Ana C. Reyes. (Court Reporter Lisa Edwards.) (zcll) (Entered: 02/19/2025) |
| 02/19/2025 | | MINUTE ORDER. As stated on the record at the preliminary injunction hearing, the Court ORDERS the following briefing schedule for Defendants' surreply and the parties' supplemental briefing:<br><br>1. Defendants shall file a surreply to Plaintiffs' 13 Motion for Preliminary Injunction on or before February 25, 2025, at 6:00 PM.<br><br>2. The parties shall submit supplemental briefing, not to exceed five pages, addressing the questions of biology the Court raised in connection with the immutability analysis. |

| | | |
|---|---|---|
| | | Plaintiffs shall submit their supplemental brief on or before February 24, 2025, at 6:00 PM. Defendants shall submit their response on or before February 28, 2025, at 6:00 PM.<br><br>3. The parties shall submit optional briefing, on or before March 2, 2025, at 2:00 PM, addressing the forthcoming guidance issued by the Secretary of Defense implementing Executive Order 14183.<br><br>The Court further ORDERS that oral argument on Plaintiffs' 13 Motion for Preliminary Injunction will continue on March 3, 2025, at 10:30 AM. Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/19/2025. (lcacr2) (Entered: 02/19/2025) |
| 02/19/2025 | 55 | SEALED DOCUMENT filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE(This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Declaration of Lieutenant Colonel Baker)(Layendecker, Elizabeth) (Entered: 02/19/2025) |
| 02/21/2025 | 56 | MOTION for Leave to File Excess Pages by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Wardenski, Joseph) (Entered: 02/21/2025) |
| 02/21/2025 | 57 | SUPPLEMENTAL MEMORANDUM to re 13 MOTION for Preliminary Injunction *on Immutability* filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Exhibit A 2023 SAMHSA Report, # 2 Exhibit B 2015 SAMHSA Report, # 3 Exhibit C APA Resolution on Gender Identity Change Efforts, # 4 Exhibit D Fish et al., Sexual Orientation and Gender Identity Change Efforts, # 5 Exhibit E Turban et al., Association Between Recalled Exposure, # 6 Exhibit F Zhou et al., Sex Difference in the Human Brain, # 7 Exhibit G Luders et al., Regional Gray Matter Variation, # 8 Exhibit H Rametti et al., White Matter Microstructure, # 9 Exhibit I Berglund et al., Male-to-Female Transsexuals, # 10 Exhibit J Savic et al., Sex Dimorphism of the Brain, # 11 Exhibit K Heylens et al., Gender Identity Disorder in Twins, # 12 Exhibit L Henningsson et al., Sex Steroid-Related Genes, # 13 Exhibit M Rosenthal, Approach to the Patient, # 14 Exhibit N Dessens et al., Gender Dysphoria and Gender Change)(Wardenski, Joseph) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 56 Motion for Leave to File Excess Pages, the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/21/2025. (lcacr2) (Entered: 02/21/2025) |
| 02/24/2025 | 58 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING (PARTIALLY REDACTED) before Judge Ana C. Reyes held on February 18, 2025; Page Numbers: 1-260. Date of Issuance: February 24, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, |

| | | |
|---|---|---|
| | | the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/27/2025. Release of Transcript Restriction set for 5/25/2025.(Edwards, Lisa) Modified text on 3/4/2025 to correct number of pages (zljn). (Main Document 58 replaced on 3/4/2025) (zljn). (Entered: 02/24/2025) |
| 02/24/2025 | 59 | TRANSCRIPT OF CONTINUED PRELIMINARY INJUNCTION HEARING (PARTIALLY REDACTED) before Judge Ana C. Reyes held on February 19, 2025; Page Numbers: 1-121. Date of Issuance: February 24, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354-3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/27/2025. Release of Transcript Restriction set for 5/25/2025.(Edwards, Lisa) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER. The Court will hold a virtual status conference with the parties on Monday, February 24, 2025, at 4:30 PM.<br><br>Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/24/2025. (lcacr2) (Entered: 02/24/2025) |
| 02/24/2025 | 60 | AMENDED COMPLAINT *(Second)* against All Defendants filed by JAMIE HASH, KODA NATURE, DANY DANRIDGE, KATE COLE, ERICA VANDAL, MIRIAM PERELSON, NICOLAS TALBOTT, GORDON HERRERO, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS.(Wardenski, Joseph) (Entered: 02/24/2025) |
| 02/24/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Status Conference held Via Zoom on 2/24/2025. (Court Reporter SONJA REEVES.) (mac) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER. As stated on the record at today's virtual status conference, the Court VACATES the current briefing schedule and ORDERS Defendants to notify Plaintiffs and |

| | | |
|---|---|---|
| | | the Court as soon as practicable after the Secretary of Defense issues his forthcoming guidance implementing Executive Order 14183.The Court further ORDERS the following briefing schedule for Plaintiffs' forthcoming Third Amended Complaint and new motion for preliminary injunction:<br><br>1. Plaintiffs shall file their Third Amended Complaint and new motion for preliminary injunction on or before March 3, 2025, at 6:00 PM.<br><br>2. Defendants shall file their Opposition to Plaintiffs' new motion for preliminary injunction on or before March 10, 2025, at 6:00 PM.<br><br>3. The Court will hold a hearing on Plaintiffs' new motion for preliminary injunction on March 12, 2025, at 10:30 AM in Courtroom 12. Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/24/2025. (lcacr2) (Entered: 02/24/2025) |
| 02/25/2025 | | MINUTE ORDER. By agreement of the parties, the Court ORDERS the following modifications to the February 24, 2025 briefing schedule:<br><br>1. Plaintiffs shall file their Third Amended Complaint and new motion for preliminary injunction on or before March 4, 2025, at 6:00 PM.<br><br>2. Defendants shall file their Opposition to Plaintiffs' new motion for preliminary injunction on or before March 11, 2025, at 6:00 PM.<br><br>3. The Court will hold a hearing on Plaintiffs' new motion for preliminary injunction on March 12, 2025, at 10:30 AM in Courtroom 12. Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/25/2025. (lcacr2) (Entered: 02/25/2025) |
| 02/25/2025 | 61 | TRANSCRIPT OF REMOTE PROCEEDINGS VIA VIDEOCONFERENCE, STATUS CONFERENCE, before Judge Ana C. Reyes held on February 24, 2025; Page Numbers: 1-29. Date of Issuance:February 25, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Reeves, Sonja) Modified on 2/28/2025 to correct docket text (rj). (Entered: 02/25/2025) |
| 02/25/2025 | 62 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Layendecker, Elizabeth) (Entered: 02/25/2025) |
| 02/25/2025 | | Set/Reset Deadlines: Amended Pleadings And New Motion For Preliminary Injunction due no later than 6:00PM on 3/4/2025. Defendants Opposition To Plaintiffs' New Motion For Preliminary Injunction due no later than 6:00PM on 3/11/2025 (mac) (Entered: 02/26/2025) |
| 02/26/2025 | 63 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 26 Feb 2025 OSD Policy)(Lynch, Jason) (Entered: 02/26/2025) |

| | | |
|---|---|---|
| 02/27/2025 | | MINUTE ORDER. The Court is in receipt of the 63 February 26, 2025 memorandum with Additional Guidance on Prioritizing Military Excellence and Readiness. In light of it, the Court Orders Defendants to file on the public docket the following by 10:00 am March 1, 2025:<br><br>1. The total amount of Department of Defense (DoD) spending per year from 2015 to 2024, and the total overall for that time period.<br><br>2. The total amount of DoD spending per year from 2015 to 2024 on psychotherapy for all service members, and the total overall for that time period.<br><br>3. The total amount of DoD spending per year from 2015 to 2024 on surgical care for all service members, and the total overall for that time period.<br><br>4. The total amount of DoD spending per year from 2015 to 2024 on elective surgical care for all service members, and the total overall for that time period.<br><br>5. If publicly available links exist, links to the line-item budget for DoD spending for each year between 2015 and 2024.<br><br>6. Identification of any "mental health constraint," other than gender dysphoria, that DoD has previously found to be inconsistent with "honesty, humility, and integrity."<br><br>7. For each Plaintiff, whether implementation of the Action Memo would require him or her to be separated from the Armed Forces.<br><br>8. The most recent estimate made by the DoD of the number of transgender individuals currently serving in the Armed Forces.<br><br>If Defendants do not have ready access to "spending" amounts, they can provide the budgeted amounts. If Defendants have any questions about this order, they should contact Chambers with Plaintiffs' counsel today, February 27, 2025, to have them addressed. Signed by Judge Ana C. Reyes on 2/27/2025. (lcacr1) (Entered: 02/27/2025) |
| 02/27/2025 | | MINUTE ORDER. The hearing on Plaintiffs' forthcoming motion for preliminary injunction will be on March 12, 2025, at 10:30 AM in Courtroom 12. Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272. Signed by Judge Ana C. Reyes on 2/27/2025. (lcacr1) (Entered: 02/27/2025) |
| 02/28/2025 | 65 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 28 Feb 2025 Clarifyng Guidance)(Lynch, Jason) (Entered: 02/28/2025) |
| 03/01/2025 | 66 | RESPONSE TO ORDER OF THE COURT re 2/27/2025 Order Filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit CRS Report)(Layendecker, Elizabeth) Modified docket text on 3/6/2025 (zdp). (Entered: 03/01/2025) |

| 03/02/2025 | 67 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 01 Mar 2025 USAF Guidance)(Lynch, Jason) (Entered: 03/02/2025) |
|---|---|---|
| 03/04/2025 | 68 | Joint MOTION for Leave to File Excess Pages by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, MIRIAM PERELSON. (Attachments: # 1 Text of Proposed Order) (Wardenski, Joseph) (Entered: 03/04/2025) |
| 03/04/2025 | | MINUTE ORDER. The Court GRANTS, very reluctantly, the parties' 68 Joint Motion for Page Limit Expansion, which Plaintiffs precipitated. Plaintiffs should not have filed this Motion at the last minute. They knew of the brief's excessive length before 3:16 PM on the day of filing. And as Polonius reminds us, "brevity is the soul of wit." William Shakespeare, *Hamlet*, Act 2, Scene 2, Line 90. It is also, almost always, the soul of an effective brief. Signed by Judge Ana C. Reyes on 03/04/2025. (lcacr2) (Entered: 03/04/2025) |
| 03/04/2025 | 69 | AMENDED COMPLAINT *(THIRD)* against All Defendants filed by JAMIE HASH, QUINN TYSON, KODA NATURE, DANY DANRIDGE, KATE COLE, AMIAH SALE, AUDRIE GRAHAM, GREYSON SHISHKINA, ERICA VANDAL, CLAYTON MCCALLISTER, MIRIAM PERELSON, NICOLAS TALBOTT, GORDON HERRERO, ROAN PICKETT, MINERVA BETTIS, CAEL NEARY, SAMUEL AHEARN, Michelle Bloomrose, REGAN MORGAN, VERA WOLF.(Wardenski, Joseph) (Entered: 03/04/2025) |
| 03/05/2025 | 70 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 04 Mar 2025 DoD Clarifying Guidance)(Lynch, Jason) (Entered: 03/05/2025) |
| 03/05/2025 | 71 | NOTICE of Appearance by Jean Lin on behalf of All Defendants (Lin, Jean) (Main Document 71 replaced on 3/6/2025) (zdp). (Entered: 03/05/2025) |
| 03/07/2025 | 72 | MOTION for Preliminary Injunction *(Renewed)* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Supplemental Memorandum on Immutability, # 4 Exhibit A to Supplemental Memorandum - 2023 SAMHSA Report, # 5 Exhibit B to Supplemental Memorandum - 2015 SAMHSA Report, # 6 Exhibit C to Supplemental Memorandum - APA GICE Resolution, # 7 Exhibit D to Supplemental Memorandum - Fish & Russel, # 8 Exhibit E to Supplemental Memorandum - Turban et al., # 9 Exhibit F to Supplemental Memorandum - Zhou et al., # 10 Exhibit G to Supplemental Memorandum - Luders et al., # 11 Exhibit H to Supplemental Memorandum - Rametti et al., # 12 Exhibit I to Supplemental Memorandum - Berglund et al., # 13 Exhibit J to Supplemental Memorandum - Savic & Arver, # 14 Exhibit K to Supplemental Memorandum - Heylens et al., # 15 Exhibit L to Supplemental Memorandum - |

Henningson et al., # 16 Exhibit M to Supplemental Memorandum - Rosenthal, # 17 Exhibit N to Supplemental Memorandum - Dessens et al., # 18 Declaration of Nicolas Talbott, # 19 Supplemental Declaration of Nicolas Talbott, # 20 Declaration of Erica Vandal, # 21 Supplemental Declaration of Erica Vandal, # 22 Second Supplemental Declaration of Erica Vandal, # 23 Declaration of Kate Cole, # 24 Supplemental Declaration of Kate Cole, # 25 Declaration of Gordon Herrero, # 26 Supplemental Declaration of Gordon Herrero, # 27 Second Supplemental Declaration of Gordon Herrero, # 28 Declaration of Dany Danridge, # 29 Supplemental Declaration of Dany Danridge, # 30 Declaration of Jamie Hash, # 31 Supplemental Declaration of Jamie Hash, # 32 Second Supplemental Declaration of Jamie Hash, # 33 Declaration of Koda Nature, # 34 Supplemental Declaration of Koda Nature, # 35 Declaration of Cael Neary, # 36 Supplemental Declaration of Cael Neary, # 37 Declaration of Miriam Perelson, # 38 Supplemental Declaration of Miriam Perelson, # 39 Second Supplemental Declaration of Miriam Perelson, # 40 Declaration of Minerva Bettis, # 41 Supplemental Declaration of Minerva Bettis, # 42 Declaration of Audrie Graham, # 43 Supplemental Declaration of Audrie Graham, # 44 Declaration of Roan Pickett, # 45 Supplemental Declaration of Roan Pickett, # 46 Declaration of Amiah Sale, # 47 Supplemental Declaration of Amiah Sale, # 48 Declaration of Quinn Tyson, # 49 Supplemental Declaration of Quinn Tyson, # 50 Declaration of Greyson Shishkina, # 51 Supplemental Declaration of Greyson Shishkina, # 52 Declaration of Clayton McCallister, # 53 Supplemental Declaration of Clayton McCallister, # 54 Declaration of Michelle Bloomrose, # 55 Declaration of Regan Morgan, # 56 Exhibit A to Morgan Declaration (Development Counseling Form), # 57 Declaration of Samuel Ahearn, # 58 Declaration of Vera Wolf, # 59 Declaration of Alex Wagner, # 60 Exhibit A to Wagner Decl. - DTM 16-005, # 61 Exhibit B to Wagner Decl. - Army Directive 2016-30, # 62 Exhibit C to Wagner Decl. - Army Directie 2016-35, # 63 Exhibit D to Wagner Decl. - DoDI 1300.28, # 64 Exhibit E to Wagner Decl. - Air Force Policy Memorandum 2021-36-01, # 65 Exhibit F to Wagner Decl. - PRRI Survey, # 66 Supplemental Declaration of Alex Wagner, # 67 Exhibit A to Supplemental Wagner Decl. - DoDI 6130.03 Vol. 2, # 68 Second Supplemental Declaration of Alex Wagner, # 69 Declaration of Yvette Bourcicot, # 70 Exhibit A to Bourcicot Decl. - RAND Report, # 71 Supplemental Declaration of Yvette Bourcicot, # 72 Declaration of Shawn Skelly, # 73 Supplemental Declaration of Shawn Skelly, # 74 Declaration of Gilbert Cisneros, # 75 Supplemental Declaration of Gilbert Cisneros, # 76 Second Supplemental Declaration of Gilbert Cisneros, # 77 Declaration of George Brown, # 78 Supplemental Declaration of George Brown, # 79 Declaration of Carlos Del Toro, # 80 Declaration of Carrie Baker, # 81 Exhibit A to Baker Decl. - Baker CV, # 82 Declaration of Martha Soper, # 83 Index of Exhibits to Soper Decl., # 84 Exhibit A to Soper Decl. - DoDI 1332.14, # 85 Exhibit B to Soper Decl. - DoDI 1332.30, # 86 Exhibit C to Soper Decl. - DoDI 1332.18)(Wardenski, Joseph) (Entered: 03/07/2025)

| 03/07/2025 | 73 | DECLARATION *of Joseph Wardenski* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON re 72 MOTION for Preliminary Injunction *(Renewed)*. (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Sec. Carter Remarks, # 3 Exhibit B Implementation Handbook, # 4 Exhibit C Statement on Transgender Accessions, # 5 Exhibit D Wamsley Article, # 6 Exhibit E Palm Center Statement, # 7 Exhibit F August 2017 Presidential Memorandum, # 8 Exhibit G Mattis Report, # 9 Exhibit H DoDI 6130.03, Vol. 1, # 10 Exhibit I Cooper Article, # 11 Exhibit J OPM Memo, # 12 Exhibit K Sears Article, # 13 Exhibit L Currah Article, # 14 Exhibit M Transgender Health Care Report, # 15 Exhibit N Hassan Article, # 16 Exhibit O 2024 GOP Platform, # 17 Exhibit P Deliso Article, # 18 Exhibit Q Navy Guidance Memo |

JA38

| | | |
|---|---|---|
| | | N00030, # [19](#) Exhibit R MEPS Email, # [20](#) Exhibit S Palm Center Report, # [21](#) Exhibit T Army Memo 2021-22, # [22](#) Exhibit U Navy Instruction 1000.1A, # [23](#) Exhibit V Action Memo, # [24](#) Exhibit W Analysis of Medical Administrative Data, # [25](#) Exhibit X Literature Review, # [26](#) Exhibit Y Implementing Guidance FAQs)(Wardenski, Joseph) (Entered: 03/07/2025) |
| 03/07/2025 | [74](#) | DECLARATION *of Michael Haley* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON re [72](#) MOTION for Preliminary Injunction *(Renewed)*. (Attachments: # [1](#) Index of Exhibits, # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Exhibit C, # [5](#) Exhibit D, # [6](#) Exhibit E, # [7](#) Exhibit F, # [8](#) Exhibit G, # [9](#) Exhibit H, # [10](#) Exhibit I, # [11](#) Exhibit J)(Wardenski, Joseph) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. After receiving Plaintiffs' [72](#) Renewed Application for Preliminary Injunction, the Court ORDERS the following:<br><br>1. Defendants shall notify Plaintiffs and the Court, via email by Saturday, March 8 at 12:00 PM EST, whether they wish to cross-examine any of the declarants listed in Plaintiffs' [72](#) Application.<br><br>2. Defendants shall provide Plaintiffs, via email by Saturday, March 8 at 12:00 PM EST, with a list of any declarants they plan to rely on in their forthcoming Opposition to Plaintiffs' [72](#) Application.<br><br>3. Plaintiffs shall notify Defendants and the Court, via email by Sunday, March 9 at 12:00 PM EST, whether they wish to cross-examine any of the declarants listed in Defendants' forthcoming Opposition to Plaintiffs' [72](#) Application.<br><br>Signed by Judge Ana C. Reyes on 03/07/2025. (lcacr2) Modified on 3/7/2025 to correct typo (zakb). (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. At the preliminary injunction hearing on Wednesday, March 12, the Court intends to take judicial notice, pursuant to Federal Rules of Evidence 201(b)(2) and (c)(1), of the following:<br><br>1. "Fact Sheet: President Donald J. Trump Ensures Military Excellence and Readiness." Posted on January 27, 2025, on www.whitehouse.gov.<br><br>2. X post from @DODResponse: "Transgender troops are disqualified from service without an exemption." Posted on February 27, 2025, at 12:08 PM.<br><br>3. X post from @SecDef: Reposting @DODResponse's post above. Posted shortly thereafter.<br><br>The Court will give both parties an opportunity to present any objections and/or arguments to the Court doing so at the preliminary injunction hearing.<br><br>Signed by Judge Ana C. Reyes on 03/07/2025. (lcacr2) (Entered: 03/07/2025) |
| 03/07/2025 | [75](#) | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF THE AIR |

| | | |
|---|---|---|
| | | FORCE re Order,; (Attachments: # 1 Exhibit 1 - 06 Mar 2025 Army Guidance, # 2 Exhibit 2 - 07 Mar 2025 Army EXORD 175-25)(Lynch, Jason) (Entered: 03/07/2025) |
| 03/10/2025 | 76 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Harold Hongju Koh, Filing fee $ 100, receipt number ADCDC-11528788. Fee Status: Fee Paid. by FRANK KENDALL, CHRISTINE WORMUTH. (Attachments: # 1 Declaration of Harold Hongju Koh, # 2 Certificate of Good Standing)(Tutt, Andrew) Modified docket text on 3/10/2025 (mg). (Entered: 03/10/2025) |
| 03/10/2025 | | MINUTE ORDER granting 76 Motion for Leave to Appear Pro Hac Vice. Attorney Harold Hongju Koh is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 03/10/2025. (lcacr2) (Entered: 03/10/2025) |
| 03/11/2025 | 77 | Consent MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Appendix Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 03/11/2025) |
| 03/11/2025 | 78 | MOTION for Leave to File *Documents to Supplement Record* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON. (Attachments: # 1 Supplemental Declaration of Regan Morgan, # 2 Third Supplemental Declaration of Jamie Hash, # 3 Exhibit DoD Public Affairs Guidance, # 4 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 78 Motion for Leave to Supplement the Record, the Court DENIES the Motion as to the supplemental declarations and GRANTS it as to the Public Affairs Guidance.<br><br>Plaintiffs are not permitted to file the supplemental declarations. It would be unfairly prejudicial to Defendants to require them to respond to two substantive declarations 6 hours before their Opposition brief is due and less than 24 hours before the Court's final preliminary injunction hearing. The Court has not and will not review the declarations at this time. Plaintiffs are permitted to refile the declarations during permanent injunction briefing.<br><br>Plaintiffs are permitted to file the Public Affairs Guidance, as admission of a Department of Defense document does not prejudice Defendants.<br><br>Signed by Judge Ana C. Reyes on 03/11/2025. (lcacr2) (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER granting 77 Motion for Leave to File an *Amicus Curiae* Brief by the Constitutional Accountability Center. Signed by Judge Ana C. Reyes on 03/11/2025. (lcacr2) (Entered: 03/11/2025) |

| 03/11/2025 | 79 | DECLARATION *of Joseph Wardenski (Supplemental)* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON re 72 MOTION for Preliminary Injunction *(Renewed)*. (Attachments: # 1 Exhibit Z - DoD Public Affairs Guidance) (Wardenski, Joseph) (Entered: 03/11/2025) |
|---|---|---|
| 03/11/2025 | 80 | MOTION for Leave to File *Exhibit to Supplement Record* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON. (Attachments: # 1 Exhibit March 7 Memo from USAF to Jamie Hash, # 2 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/11/2025) |
| 03/11/2025 | 81 | Memorandum in opposition to re 72 Motion for Preliminary Injunction,,,,,,,,,,,,,,,,,,, filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Exhibit 1 - 7/28/2015 Carter Mem, # 2 Exhibit 2 - 5/26/2018 Mattis Testimony, # 3 Exhibit 3 - May 2017 Service Responses, # 4 Exhibit 4 - 6/30/2017 Mattis Mem, # 5 Exhibit 5 - 6/23/2020 Brown Dep. Tr.)(Lynch, Jason) (Entered: 03/11/2025) |
| 03/11/2025 | 82 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (zdp) (Entered: 03/12/2025) |
| 03/12/2025 | 83 | NOTICE of Appearance by Jason Manion on behalf of All Defendants (Manion, Jason) (Entered: 03/12/2025) |
| 03/12/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 3/12/2025 re 72 MOTION for Preliminary Injunction *(Renewed)* filed by MINERVA BETTIS, CAEL NEARY, VERA WOLF, KATE COLE, NICOLAS TALBOTT, AMIAH SALE, JAMIE HASH, ROAN PICKETT, GREYSON SHISHKINA, QUINN TYSON, SAMUEL AHEARN, DANY DANRIDGE, REGAN MORGAN, MICHELLE BLOOMROSE, GORDON HERRERO, KODA NATURE, MIRIAM PERELSON, ERICA VANDAL, AUDRIE GRAHAM, CLAYTON MCCALLISTER and taken under advisement. (Court Reporter Christine Asif.) (dot) (Entered: 03/14/2025) |
| 03/13/2025 | 84 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - 13 March 2025 ALLNAV 023/25)(Lynch, Jason) (Entered: 03/13/2025) |
| 03/14/2025 | 85 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - MARADMINS)(Lynch, Jason) (Entered: 03/14/2025) |

| | | |
|---|---|---|
| 03/17/2025 | 86 | NOTICE *Pursuant to March 12, 2025 Hearing* by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit 1 - Tab 12 (Complete))(Lynch, Jason) (Entered: 03/17/2025) |
| 03/17/2025 | 87 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 - NAVADMIN 055/25)(Lynch, Jason) (Entered: 03/17/2025) |
| 03/18/2025 | 88 | ORDER granting Plaintiffs' 72 Renewed Application for Preliminary Injunction. See document for details. Signed by Judge Ana C. Reyes on 03/18/2025. (lcacr2) (Entered: 03/18/2025) |
| 03/18/2025 | 89 | MEMORANDUM OPINION regarding Plaintiffs' 72 Renewed Application for Preliminary Injunction. See document for details. Signed by Judge Ana C. Reyes on 03/18/2025. (lcacr2) (Main Document 89 reposted on 3/19/2025) (hmc). (Main Document 89 reposted on 3/25/2025) (hmc). (Entered: 03/18/2025) |
| 03/18/2025 | 90 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 3/12/2025; Page Numbers: 1-259. Date of Issuance:3/18/2025. Court Reporter Christine T. Asif, Telephone number 202-354-3247, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025.(Asif, Christine) (Entered: 03/18/2025) |
| 03/21/2025 | 91 | MOTION To Dissolve Preliminary Injunction, Extend Stay of Injunction Pending Motion to Dissolve or Alternatively, to Stay Injunction Pending Appeal by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Exhibit 1 March 21, 2025, Memorandum)(Lin, Jean). Added MOTION for Extension of Time to, MOTION to Stay on 3/24/2025 (zdp). (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER. The Court will hold an in-person hearing on Defendants' 91 Motions to Dissolve Preliminary Injunction, Extend Stay of Injunction Pending Motion to Dissolve or, Alternatively, to Stay Injunction Pending Appeal, on March 21, 2025, at |

| | | |
|---|---|---|
| | | 11:00 AM in Courtroom 12.<br><br>Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272. Signed by Judge Ana C. Reyes on 03/21/2025. (lcacr2) (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER. The Court ORDERS Defendants to post on the docket all attachments to the March 21, 2025 Memorandum from the Office of the Undersecretary of Defense for Personnel and Readiness. Signed by Judge Ana C. Reyes on 03/21/2025. (lcacr2) (Entered: 03/21/2025) |
| 03/21/2025 | | Set/Reset Hearings: Motion Hearing set for 3/21/2025 at 11:00 AM in Courtroom 12- In Person before Judge Ana C. Reyes. (tj) (Entered: 03/21/2025) |
| 03/21/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 3/21/2025 re 91 MOTION To Dissolve Preliminary Injunction, Extend Stay of Injunction Pending Motion to Dissolve or Alternatively, to Stay Injunction Pending Appeal filed by UNITED STATES DEPARTMENT OF THE ARMY, MARK F. AVERILL, UNITED STATES OF AMERICA, TERENCE EMMERT, TELITA CROSLAND, UNITED STATES DEPARTMENT OF THE AIR FORCE, GARY ASHWORTH, DEFENSE HEALTH AGENCY, UNITED STATES DEPARTMENT OF THE NAVY. Oral argument heard. (Court Reporter: Christine Asif.) (ztj) (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER. The Court ORDERS Defendants to post any guidance concerning the March 26, 2025 separation date in the Hegseth Policy by 6:30 PM eastern on March 21, 2025.<br><br>The Court REINSTATES its stay of the 88 Preliminary Injunction until 48 hours after it rules on Defendants' 91 Motion to Dissolve or until such other time as the Court deems appropriate. The Court ORDERS Plaintiffs to file their Opposition to Defendants' 91 Motion to Dissolve on or before 10:00 AM eastern on Tuesday, March 25, 2025.<br><br>If any action occurs that negatively impacts a servicemember based on their transgender status before the Court lifts the stay, that individual may file a temporary restraining order (TRO), and the Court will consider it expeditiously. If the individual is not a current Plaintiff, Plaintiffs may amend their current Complaint to include that individual along with the filing of the TRO.<br><br>Signed by Judge Ana C. Reyes on 03/21/2025. (lcacr2) (Entered: 03/21/2025) |
| 03/21/2025 | 92 | NOTICE by TELITA CROSLAND, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Layendecker, Elizabeth) (Entered: 03/21/2025) |
| 03/21/2025 | 93 | NOTICE by TELITA CROSLAND, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit Compliance Memo)(Layendecker, Elizabeth) (Entered: 03/21/2025) |
| 03/24/2025 | 94 | AMENDED COMPLAINT *(Fourth)* against GARY ASHWORTH, MARK F. AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE |

| | | |
|---|---|---|
| | | NAVY, UNITED STATES OF AMERICA, HUNTER MARQUEZ, SEAN KERSCH-HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS filed by JAMIE HASH, REGAN MORGAN, QUINN TYSON, KODA NATURE, DANY DANRIDGE, SAMUEL AHEARN, KATE COLE, AMIAH SALE, AUDRIE GRAHAM, GREYSON SHISHKINA, ERICA VANDAL, CLAYTON MCCALLISTER, MIRIAM PERELSON, NICOLAS TALBOTT, GORDON HERRERO, ROAN PICKETT, MINERVA BETTIS, VERA WOLF, MICHELLE BLOOMROSE, CAEL NEARY, HUNTER MARQUEZ, SEAN KERSCH-HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS. (Attachments: # 1 Redline to Third Amended Complaint)(Wardenski, Joseph) (Entered: 03/24/2025) |
| 03/24/2025 | 95 | MOTION for Temporary Restraining Order by JAMIE HASH, SAMUEL AHEARN, VERA WOLF, HUNTER MARQUEZ, ASHLEY DAVIS. (Attachments: # 1 Supplemental Declaration of Samuel Ahearn, # 2 Declaration of Ashley Davis, # 3 Third Supplemental Declaration of Jamie Hash, # 4 Declaration of Hunter Marquez, # 5 Supplemental Declaration of Vera Wolf, # 6 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/24/2025) |
| 03/24/2025 | | MINUTE ORDER Setting Hearing on 95 MOTION for Temporary Restraining Order : Motion Hearing set for 3/24/2025 at 03:30 PM by Zoom (Audio Line Available) before Judge Ana C. Reyes. Interested parties may access the Court's dial-in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1-833-990-9400, and the access code is 787605272. Signed by Judge Ana C. Reyes on 3/24/2025. (lcacr3) (Entered: 03/24/2025) |
| 03/24/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 3/24/2025 re 95 MOTION for Temporary Restraining Order filed by ASHLEY DAVIS, HUNTER MARQUEZ, VERA WOLF, SAMUEL AHEARN, JAMIE HASH. Defense Counsel to provide the Court with further information by 9:00AM ET on 3/25/2025 as stated on the record. The Court takes the motion for TRO under advisement. (Court Reporter Christine Asif.) (zcll) Modified on 3/24/2025 (zcll). (Entered: 03/24/2025) |
| 03/25/2025 | 96 | Memorandum in opposition to re 91 Motion for Miscellaneous Relief,,, Motion for Extension of Time to,,, Motion to Stay,, filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, HUNTER MARQUEZ, SEAN KERSCH-HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS, MIRIAM PERELSON. (Wardenski, Joseph) (Entered: 03/25/2025) |
| 03/25/2025 | 97 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 3/21/2025; Page Numbers: 1-92. Date of Issuance:3/25/2025. Court Reporter Christine T. Asif, Telephone number 202-354-3247, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, |

| | | |
|---|---|---|
| | | the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/15/2025. Redacted Transcript Deadline set for 4/25/2025. Release of Transcript Restriction set for 6/23/2025.(Asif, Christine) (Entered: 03/25/2025) |
| 03/25/2025 | 98 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 3/24/2025; Page Numbers: 1-39. Date of Issuance:3/25/2025. Court Reporter Christine T. Asif, Telephone number 202-354-3247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/15/2025. Redacted Transcript Deadline set for 4/25/2025. Release of Transcript Restriction set for 6/23/2025.(Asif, Christine) (Entered: 03/25/2025) |
| 03/25/2025 | 99 | ERRATA by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, HUNTER MARQUEZ, SEAN KERSCH-HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS, MIRIAM PERELSON re 94 Amended Complaint,,,,, (Attachments: # 1 Fourth Amended Complaint (Corrected), # 2 Redline to Third Amended Complaint (Corrected))(Wardenski, Joseph) (Entered: 03/25/2025) |
| 03/26/2025 | 100 | MEMORANDUM OPINION AND ORDER denying Defendants' 91 Motion to Dissolve the Preliminary Injunction and for a Stay Pending Appeal. See document for details. Signed by Judge Ana C. Reyes on 03/26/2025. (lcacr2) (Main Document 100 reposted on 3/27/2025) (hmc). (Entered: 03/26/2025) |
| 03/26/2025 | 101 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 88 Order on Motion for Preliminary Injunction, 89 Memorandum & Opinion, , Order, 100 Order on Motion for Miscellaneous Relief, Order on Motion for Extension of Time to, Order on Motion to Stay . by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF |

| | | |
|---|---|---|
| | | AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. Fee Status: No Fee Paid. Parties have been notified. (Lin, Jean) Modified on 3/27/2025 to add docket link (zjm). (Entered: 03/26/2025) |
| 03/27/2025 | 102 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 101 Notice of Appeal to DC Circuit Court. (zjm) (Main Document 102 replaced on 3/27/2025) (zjm). (Entered: 03/27/2025) |
| 03/27/2025 | | USCA Case Number 25-5087 for 101 Notice of Appeal to DC Circuit Court,, filed by PETER B. HEGSETH, UNITED STATES DEPARTMENT OF THE ARMY, MARK F. AVERILL, UNITED STATES OF AMERICA, TERENCE EMMERT, TELITA CROSLAND, UNITED STATES DEPARTMENT OF THE AIR FORCE, GARY ASHWORTH, DEFENSE HEALTH AGENCY, UNITED STATES DEPARTMENT OF THE NAVY. (zdp) (Entered: 03/27/2025) |
| 04/02/2025 | 103 | Unopposed MOTION for Extension of Time to File Answer by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Text of Proposed Order) (Layendecker, Elizabeth) (Entered: 04/02/2025) |
| 04/02/2025 | | MINUTE ORDER. Upon consideration of Defendants' 103 Unopposed Motion for Extension of Time to Answer, the Court GRANTS the Motion. Defendants shall file an answer or otherwise respond to Plaintiffs' 94 Fourth Amended Complaint on or before May 7, 2025. No further extensions will be granted. Signed by Judge Ana C. Reyes on 04/02/2025. (lcacr2) (Entered: 04/02/2025) |
| 05/07/2025 | 104 | NOTICE *(Per Section 7(f) of the Standing Order) of Defendants' Intent To File Dispositive Motion* by GARY ASHWORTH, MARK F. AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES OF AMERICA (Lynch, Jason) (Entered: 05/07/2025) |
| 05/11/2025 | 105 | Consent MOTION for Extension of Time to File *Response to Defendants' Notice of Intent to File Dispositive Motion [ECF No. 104]* by SAMUEL AHEARN, MINERVA BETTIS, MICHELLE BLOOMROSE, SABRINA BRUCE, KATE COLE, AUSTIN CONVERSE, DANY DANRIDGE, ASHLEY DAVIS, C.J. DULANEY, AUDRIE GRAHAM, MICAH JACQUELINE GROSS, JAMIE HASH, GORDON HERRERO, SEAN KERSCH-HAMAR, TAYLOR MAIWALD, HUNTER MARQUEZ, CLAYTON MCCALLISTER, REGAN MORGAN, KODA NATURE, CAEL NEARY, KELSEY ORTH, MIRIAM PERELSON, ROAN PICKETT, NATHALIE RICHTER, AMIAH SALE, GREYSON SHISHKINA, BECK SIMPSON, NICOLAS TALBOTT, QUINN TYSON, ERICA VANDAL, CLARA WINCHELL, VERA WOLF. (Attachments: # 1 Text of Proposed Order)(Wardenski, Joseph) (Entered: 05/11/2025) |
| 05/12/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 105 Consent Motion for Extension of Time, the Court GRANTS the Motion. Plaintiffs shall respond to Defendants' 104 Notice of Intent to File Dispositive Motion on or before May 21, 2025. Signed by Judge Ana C. Reyes on 05/12/2025. (lcacr2) (Entered: 05/12/2025) |

| | | |
|---|---|---|
| 05/12/2025 | | Set/Reset Deadlines/Hearings: Response to 104 due by 5/21/2025. (zcdw) (Entered: 05/12/2025) |
| 05/21/2025 | 106 | RESPONSE re 104 Notice (Other), *Response to Defendants' Notice of Intent to File Dispositive Motion* filed by SAMUEL AHEARN, MINERVA BETTIS, MICHELLE BLOOMROSE, SABRINA BRUCE, KATE COLE, AUSTIN CONVERSE, DANY DANRIDGE, ASHLEY DAVIS, C.J. DULANEY, AUDRIE GRAHAM, MICAH JACQUELINE GROSS, JAMIE HASH, GORDON HERRERO, SEAN KERSCH-HAMAR, TAYLOR MAIWALD, HUNTER MARQUEZ, CLAYTON MCCALLISTER, REGAN MORGAN, KODA NATURE, CAEL NEARY, KELSEY ORTH, MIRIAM PERELSON, ROAN PICKETT, NATHALIE RICHTER, AMIAH SALE, GREYSON SHISHKINA, BECK SIMPSON, NICOLAS TALBOTT, QUINN TYSON, ERICA VANDAL, CLARA WINCHELL, VERA WOLF. (Stoll, Christopher) (Entered: 05/21/2025) |
| 06/27/2025 | 107 | NOTICE of Voluntary Dismissal re Miriam Perelson and Greyson Shishkina by All Plaintiffs (Wardenski, Joseph) (Entered: 06/27/2025) |
| 07/23/2025 | 108 | NOTICE of Appearance by M. Jared Littman on behalf of All Defendants (Littman, M.) (Main Document 108 replaced on 7/23/2025) (zdp). (Entered: 07/23/2025) |
| 07/23/2025 | 109 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GARY ASHWORTH, MARK F. AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES OF AMERICA. Attorney Jason C. Lynch terminated. (Lynch, Jason) (Entered: 07/23/2025) |
| 07/29/2025 | 110 | NOTICE of Appearance by Robert Bombard on behalf of All Defendants (Bombard, Robert) (Entered: 07/29/2025) |
| 08/01/2025 | 111 | ANSWER to 94 Amended Complaint,,,, by GARY ASHWORTH, MARK F. AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES OF AMERICA.(Bombard, Robert) (Entered: 08/01/2025) |

**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

PERSONNEL AND
READINESS

FEB 2 6 2025

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                    COMMANDERS OF THE COMBATANT COMMANDS
                    DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Additional Guidance on Prioritizing Military Excellence and Readiness

      As directed by the Secretary of Defense in his February 7, 2025, memorandum, "Prioritizing Military Excellence and Readiness," it is Department policy that, pursuant to Executive Order 14183, "Prioritizing Military Excellence and Readiness," the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service.

      The attachment to this memorandum provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance.  The policy guidance in the attachment:  (1) supersedes any conflicting policy guidance in Department of Defense issuances and other policy guidance and memoranda; and (2) is effective immediately and will be incorporated into respective Department issuances, as appropriate.

      The following DoD issuances will be updated to reflect guidance in this attachment, as appropriate:

- Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service:  Appointment, Enlistment, or Induction," May 6, 2018, as amended

- DoDI 6130.03, Volume 2, "Medical Standards for Military Service:  Retention," September 4, 2020, as amended

- DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

- DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

- DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

- DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

JA48

Effective immediately, the following issuances, policies, and memoranda are cancelled:

- DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended

- Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023

- Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016

- Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019

The Assistant Secretary of Defense for Manpower and Reserve Affairs will be responsible for all data collection and reporting. The first report is due March 26, 2025. All Department of Defense and Military Service policy recissions and updates must be completed no later than June 25, 2025.

Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

*Darin S. Selnick*

Darin S. Selnick
Performing the Duties of the Under Secretary of Defense for Personnel and Readiness

Attachments:
As stated

cc:
Commandant of the Coast Guard
Assistant Secretary of Defense for Health Affairs
Assistant Secretary of Defense for Manpower and Reserve Affairs
Director, Defense Health Agency
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General, Public Health Service
Administrator, National Oceanic and Atmospheric Administration

**ATTACHMENT**
**Service Members and Applicants for Military Service**
**who Have a Current Diagnosis or History of, or**
**Exhibit Symptoms Consistent with, Gender Dysphoria**

1. **Policy.** It is DoD policy that:

    a. Service in the Military Services is open to all persons who can meet the high standards for military service and readiness without special accommodations.

    b. It is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

    c. Military service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service. Service by these individuals is not in the best interests of the Military Services and is not clearly consistent with the interests of national security.

    d. Individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, except as set forth in sections 4.1.c. and 4.3.c. of this attachment.

    e. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service in accordance with section 4.4. of this attachment. Characterization of service under these procedures will be honorable except where the Service member's record otherwise warrants a lower characterization.

    f. The Department only recognizes two sexes: male and female. An individual's sex is immutable, unchanging during a person's life. All Service members will only serve in accordance with their sex, defined in Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," as "an individual's immutable biological classification as either male or female."

    g. Where a standard, requirement, or policy depends on whether the individual is a male or female (e.g., medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their sex.

    h. Pronoun usage when referring to Service members must reflect a Service member's sex. In keeping with good order and discipline, salutations (e.g., addressing a senior officer as "Sir" or "Ma'am") must also reflect an individual's sex.

JA50

i.  Absent extraordinary operational necessity, the Military Services will not allow male Service members to use or share sleeping, changing, or bathing facilities designated for females, nor allow female Service members to use or share sleeping, changing, or bathing facilities designated for males.

j.  No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.

k.  Consistent with existing law and Department policy, commanders shall protect the privacy of protected health information they receive under this policy in the same manner as they would with any other protected health information.  Such health information shall be restricted to personnel with a specific need to know; that is, access to information must be necessary for the conduct of official duties.  Personnel shall also be accountable for safeguarding this health information consistent with existing law and Departmental policy.

**2.  Applicability.**  This policy guidance applies to the Office of the Secretary of Defense, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff, the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

**3.  Responsibilities.**

3.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)).

The USD(P&R) will:

a.  Update or rescind existing DoD issuances, or publish new issuances, as necessary pursuant to this guidance.

b.  Ensure all Military Department and Military Service regulations, policies, and guidance are consistent with this attachment.

3.2.  Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA) will:

a.  Coordinate with the Assistant Secretary of Defense for Health Affairs (ASD(HA)) in the management and implementation of this guidance, and issue clarifying guidance, as appropriate.

b.  Serve as the primary point of contact, through the Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)), for those responsibilities assigned in sections 3.3. through 3.6. of this attachment and provide reports in accordance with section 7 of this attachment, until a determination is made and notification provided to the Secretaries of the Military Departments that the reports may be cancelled.

   c. Oversee the recission and updates to applicable DoD issuances, policy memoranda, and other guidance documents in accordance with this guidance.

3.3. <u>ASD(HA)</u>.

Under the authority, direction, and control of the USD(P&R), the ASD(HA) will:

   a. Coordinate with the ASD(M&RA) in the management and implementation of health care matters associated with this guidance, and issue clarifying guidance, as appropriate.

   b. Oversee the recission of, and updates to, applicable DoD issuances, Defense Health Agency issuances, and other policy memoranda or guidance documents in accordance with this guidance.

   c. Consider requests submitted by the Secretaries of the Military Departments, on a case-by-case basis, for an exception to section 1.j.. The ASD(HA) may authorize an exception to section 1.j. of this attachment for non-surgical care if required to protect the health of Service members. This authority may not be further delegated.

   d. Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.4. <u>Secretaries of the Military Departments</u>.

The Secretaries of the Military Departments will:

   a. Adhere to all provisions of this guidance.

   b. Update or publish new regulations, policies, and guidance to implement the provisions of this attachment.

   c. Ensure the protection of personally identifiable information, protected health information, and personal privacy considerations, consistent with existing law and DoD policy.

   d. Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service regulations, policies, and guidance applicable to Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

   e. Establish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum.

   f. Within 30 days of identification pursuant to section 3.4.e. of this attachment, begin separation actions, in accordance with section 4.4. of this attachment, for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3.c. of this attachment.

3

g.  Ensure all Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and other Joint assignments are reassigned to their respective Military Services for the purpose of initiating administrative separation processes.

h.  Ensure all personnel systems accurately reflect each Service member's sex.

i.  Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.5.  Chairman of the Joint Chiefs of Staff.

The Chairman of the Joint Chiefs of Staff will:

a.  Adhere to all provisions of this guidance.

b.  Ensure the Commanders of the Combatant Commands adhere to all provisions of this guidance.

c.  Consolidate and submit to the DASD(MPP) a report on Combatant Command compliance with section 5 of this attachment, in accordance with section 7 of this attachment.

d.  Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

3.6.  Defense Agency and DoD Field Activity Directors.

The Defense Agency and DoD Field Activity Directors will:

a.  Ensure compliance with section 5 of this attachment.

b.  Submit to the DASD(MPP) a report in accordance with section 7 of this attachment.

**4.  Procedures.**

4.1.  Appointment, Enlistment, or Induction into the Military Services.

a.  Applicants for military service and individuals in the Delayed Training/Entry Program who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified for military service.

b.  A history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, is disqualifying.

c.  Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities.  The applicant

must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

d. Applicants disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment and not granted a waiver pursuant to section 4.1.c. of this attachment shall not ship to Initial Entry Training.

e. Offers of admission to a Military Service Academy or the Senior Reserve Officers' Training Corps to individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment shall be rescinded except where the individual is granted a waiver pursuant to section 4.1.c. of this attachment.  Senior Reserve Officers' Training Corps students otherwise disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment may still participate in classes taught or coordinated by the Senior Reserve Officer's Training Corps that are open to all students at the college or university concerned.  All individuals enrolled or participating in the Senior Reserve Officers' Training Corps, whether under contract or not contracted, will follow standards for uniform wear consistent with the individual's sex in accordance with section 5 of this attachment.

f. Individuals disqualified pursuant to sections 4.1.a. and 4.1.b. of this attachment are subject to separation from a Military Service Academy in accordance with DoDI 1322.22, or from the Senior Reserve Officers' Training Corps in accordance with DoDI 1215.08, unless the individual is granted a waiver consistent with section 4.1.c. of this attachment.  Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

4.2.  <u>Medical Care</u>.

a. In accordance with DoDI 6025.19 and DoDI 1215.13, Service members have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report any medical and health (including mental health) issues that may affect their readiness to deploy or fitness to continue serving in an active status.

b. All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.

c. Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider (HCP) in order to prevent further complications, be continued until separation is complete.

d. Service members may consult with a DoD HCP concerning a diagnosis of gender dysphoria and receive mental health counseling for a diagnosis of gender dysphoria.  The retention or processing for separation of such Service members will follow procedures in section 4.3. or section 4.4. of this attachment, as appropriate.

4.3. <u>Retention</u>.

a.  Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

b.  Service members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service.

c.  Service members disqualified pursuant to sections 4.3.a. and 4.3.b. of this attachment may be considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

1.  The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

2.  The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and

3.  The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

4.4. <u>Separation</u>.

a.  Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver pursuant to section 4.3. of this attachment will be processed for administrative separation in accordance with, and afforded all applicable administrative processing protections in, DoDI 1332.14 and DoDI 1332.30.  The Secretaries of the Military Departments will direct the administrative separation of (1) any enlisted Service member prior to the expiration of the member's term of service following a determination that doing so is in the best interest of the relevant Military Service; or (2) any officer whose retention is not clearly consistent with the interests of national security.

1.  Service members are ineligible for referral to the Disability Evaluation System (DES) when they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria, not constituting a physical disability pursuant to DoDI 1332.18.

2.  Service members may be referred to the DES if they have a co-morbidity, or other qualifying condition, that is appropriate for disability evaluation processing in accordance with DoDI 1332.18, prior to processing for administrative separation.

3.  Service members who are processed for separation pursuant to this policy will be designated as non-deployable until their separation is complete.

4. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance. Such Service members may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29.

5. Service members separated involuntarily pursuant to this policy may be provided full involuntary separation pay in accordance with 10 U.S.C. § 1174 and DoDI 1332.29.

6. All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board.

7. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with 10 U.S.C. § 1182.

8. Service members identified pursuant to section 3.4.e. of this attachment with over 18 but less than 20 years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DoDI 1332.46.

9. Eligible Service members (including active duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with 10 U.S.C. § 1145.

10. Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(1). The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

11. The Secretaries of the Military Departments shall waive any remaining military service obligation for Service members who are separated pursuant to this policy.

b. Separation proceedings for individuals identified pursuant to section 3.4.e. of this attachment will be initiated after the Secretaries of Military Departments complete the requirements in section 3.4.e. of this attachment.

c. Nothing in this attachment precludes appropriate administrative or disciplinary action for Service members who refuse orders from lawful authority to comply with applicable standards or otherwise do not meet standards for performance and conduct.

**5. Sex.**

5.1. <u>Military Records</u>.  All military records will reflect the Service member's sex.

5.2. <u>Military Standards</u>.

   a.  Access to intimate spaces will be determined by Service members' or applicants for military service's sex.  The Military Services will apply all standards that involve consideration of the Service members' sex, to include, but not limited to:

     1.  Uniforms and grooming.

     2.  Body composition assessment.

     3.  Medical fitness for duty.

     4.  Physical fitness and body fat standards.

     5.  Berthing, bathroom, and shower facilities.

     6.  Military personnel drug abuse testing program participation.

   b.  All such shared intimate spaces will be clearly designated for either male, female, or family use.

   c.  Exceptions to this requirement may be made only in cases of extraordinary operational necessity.  During deployments, or in austere environments where space is limited, commanders will prioritize unit cohesion and readiness while adhering to this policy.

**6.  Administrative Absence for Service Members with a Current History or Diagnosis of, or Symptoms Consistent with, Gender Dysphoria.**

6.1. <u>Administrative Absence</u>.

   a.  In order to maintain good order and discipline in accordance with section 5 of this attachment, the Secretary of the Military Department concerned may place Service members being processed for separation under the criteria in section 4.4.a. of this attachment in an administrative absence status, with full pay and benefits, until their separation is complete.

   b.  Service members in an administrative absence status in accordance with this section will be designated as non-deployable until their separation is complete.

   c.  Service members in an administrative absence status in accordance with this section will complete the Transition Assistance Program in accordance with DoDI 1332.35.

**7. Reporting.**

7.1. Report Requirements.

a. No later than March 26, 2025, and every 30 days thereafter, submit via a Correspondence and Task Management System (CATMS) tasker a memorandum to the DASD(MPP) providing the following:

1. Identification of all DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance where the content of which relate to, or may be affected by, guidance provided in this attachment.

2. Status of updates to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

3. Draft revisions to the aforementioned DoD, Military Department, and Military Service issuances, regulations, policy memoranda, and other guidance.

4. Status of system of records updates.

5. Status of, and progress on, separations of Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria in accordance with section 4.4. of this attachment.

6. Status of, and progress on, compliance with section 5 of this attachment.

# GLOSSARY

## G.1. Acronyms

| Acronym | Meaning |
|---------|---------|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| CATMS | Correspondence and Task Management System |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DoDI | DoD Instruction |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

## G.2. Definitions

Unless otherwise noted, these terms and their definitions are for the purposes of this attachment.

| Term | Definition |
|------|------------|
| **cross-sex hormone therapy** | The use of feminizing hormones by a male or the use of masculinizing hormones by a female. |
| **gender dysphoria** | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| **gender identity** | Defined in Executive Order 14168 as a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex. |
| **sex** | Defined in Executive Order 14168 as an individual's immutable biological classification as either male or female. |

# REFERENCES

Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025

Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025

DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoDI 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

DoDI 1332.14, "Enlisted Administrative Separations," August 1, 2024

DoDI 1332.18, "Disability Evaluation System," November 10, 2022

DoDI 1332.29, "Involuntary Separation Pay (Non-Disability)," March 3, 2017

DoDI 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoDI 1332.35, "Transition Assistance Program (TAP) for Military Personnel," September 26, 2019

DoDI 1332.43, "Voluntary Separation Pay (VSP) Program for Service Members," November 28, 2017

DoDI 1332.46, "Temporary Early Retirement Authority (TERA) for Service Members," December 21, 2018

DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoDI 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended

DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Title 10, United States Code

Title 37, United States Code

# EXHIBIT V

## ACTION MEMO

**FOR:**  DARIN S. SELNICK, PERFORMING THE DUTIES OF THE UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS

**FROM:**  Tim Dill, Performing the Duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs DILL.TIMOTHY. Digitally signed by DILL.TIMOTHY.D.1289452547
D.1289452547 Date: 2025.02.26 20:15:13 -05'00'

**SUBJECT:**  Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order (EO)

- **Purpose.**  Recommend you sign the memorandum at TAB A to implement EO 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025, consistent with SecDef guidance provided on February 7, 2025 (TAB B).

- **Discussion**

  - On January 27, 2025, President Trump issued Executive Order 14183 (TAB C), stating that "military service must be reserved for those mentally and physically fit for duty," and that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere conditions and without the benefit of routine medical treatment or special provisions.

  - The EO states that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity.  This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." The EO then instructs SecDef to issue guidance and actions in light of the EO within 30-60 days.

  - The EO further adopts the definitions in EO 14168, "Defending Women from Gender Ideology Extremism and Resorting Biological Truth to the Federal Government," January 20, 2025 (TAB D), including that "'sex' shall refer to an individual's immutable biological classification as either male or female."  As directed by EO 14168, the Department of Health and Human Services has issued further guidance on the definitions of "male" and "female."

  - SecDef issued guidance to the Department on February 7, 2025, directing a pause for "all new accessions for individuals with a history of gender dysphoria" and a pause for "all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members… ."

  - SecDef further authorized and directed you "to provide additional policy and implementation guidance… including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria… ."

  - The memorandum at TAB A, among other actions:

o Cancels the following DoD issuances, policies, and memoranda:
  – DoD Instruction (DoDI) 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended (TAB 1)

  – Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023 (TAB 2)

  – Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016 (TAB 3)

  – Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019 (TAB 4)

o Directs updates to the following DoD issuances, consistent with the memorandum:
  – DoDI 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended (TAB 5)

  – DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended (TAB 6)

  – DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended (TAB 7)

  – DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended (TAB 8)

  – DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended (TAB 9)

  – DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022 (TAB 10)

o Establishes as DoD policy that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" are inconsistent with the "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."

o Determines that "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for

military service," directs that "Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service…," and prohibits their accession, all subject to certain exceptions.

o   Establishes that DoD only recognizes two sexes: male and female, and that these sexes are not changeable.  It further requires all Service members to serve in accordance with their sex as defined in EO 14168, "Defending Women from Gender Ideology Extremism and Resorting Biological Truth to the Federal Government."

o   Establishes clear requirements on pronoun usage when referring to Service members.

o   Prohibits the use of DoD funds to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy, subject to certain exceptions.

–   This policy was informed through consideration of, among other things, the President and Secretary's written direction, existing and prior DoD policy, and prior DoD studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria.  This consideration included:

o   SecDef Memorandum, "Military Service by Transgender Individuals," February 22, 2018, which "conclude[d] that there are substantial risks associated with allowing accession and retention of individuals with a history or diagnosis of gender dysphoria… ." This conclusion was informed by an extensive inquiry conducted by a panel of experts (TAB 11).

o   A 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity which found that "rates of disability evaluation were estimated to be higher among [transgender] service members… ." (TAB 12) Additionally, this review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period.  This level of non-deployability creates significant readiness risk and places additional burdens on Service members without gender dysphoria to meet requirements.

o   A 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs that included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime,…[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts,"

"transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of evidence on transgender mental health and gender-affirming care is low to moderate (TAB 13).

o    A review of cost data by the Office of the Assistant Secretary of Defense for Health Affairs indicated that, between 2015 and 2024, DoD spent $52,084,407 providing care to active duty Service members to treat gender dysphoria, including $15,233,158 for psychotherapy; $3,135,593 for hormone therapy, and $14,324,739 for surgical care.

—    While Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

**RECOMMENDATION:** Sign the memorandum at TAB A.

**Attachments:**

File Folder:

| | |
|---|---|
| TAB A | Performing the Duties of the Under Secretary of Defense for Personnel and Readiness, "Additional Guidance on Prioritizing Military Excellence and Readiness," Memorandum for Signature |
| TAB B | Secretary of Defense Memorandum, "Prioritizing Military Excellence and Readiness," February 7, 2025 |
| TAB C | Executive Order 14183, "Prioritizing Military Excellence and Readiness," January 27, 2025 |
| TAB D | Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," January 20, 2025 |
| TAB E | Coord |

Binder:

| | |
|---|---|
| TAB 1 | DoDI 1300.28, "In-Service Transition for Transgender Service Members," April 30, 2021, as amended |
| TAB 2 | Defense Health Agency Procedural Instruction 6025.21, "Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component Service Members," May 12, 2023 |
| TAB 3 | Acting Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member," July 29, 2016 |
| TAB 4 | Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, "Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria," March 18, 2019 |
| TAB 5 | DoD Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," May 6, 2018, as amended |

TAB 6     DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," September 4, 2020, as amended

TAB 7     DoDI 1327.06, "Leave and Liberty Policy and Procedures," June 16, 2009, as amended

TAB 8     DoDI 1322.22, "Military Service Academies," September 24, 2015, as amended

TAB 9     DoDI 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

TAB 10    DoDI 6025.19, "Individual Medical Readiness Program," July 13, 2022

TAB 11    Secretary of Defense Memorandum, "Military Service by Transgender Individuals," February 22, 2018

TAB 12    Accession Medical Standards Analysis and Research Activity (AMSARA) Report, "Analysis of Medical Administrative Data on Transgender Service Members," July 14, 2021

TAB 13    Office of the Assistant Secretary of Defense for Health Affairs Literature Review: Level of Evidence for Gender-Affirming Treatments

# EXHIBIT G



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

FEB 2 2 2018

MEMORANDUM FOR THE PRESIDENT

SUBJECT: Military Service by Transgender Individuals

"Transgender" is a term describing those persons whose gender identity differs from their biological sex. A subset of transgender persons diagnosed with gender dysphoria experience discomfort with their biological sex, resulting in significant distress or difficulty functioning. Persons diagnosed with gender dysphoria often seek to transition their gender through prescribed medical treatments intended to relieve the distress and impaired functioning associated with their diagnosis.

Prior to your election, the previous administration adopted a policy that allowed for the accession and retention in the Armed Forces of transgender persons who had a history or diagnosis of gender dysphoria. The policy also created a procedure by which such Service members could change their gender. This policy was a departure from decades-long military personnel policy. On June 30, 2017, before the new accession standards were set to take effect, I approved the recommendation of the Services to delay for an additional six months the implementation of these standards to evaluate more carefully their impact on readiness and lethality. To that end, I established a study group that included the representatives of the Service Secretaries and senior military officers, many with combat experience, to conduct the review.

While this review was ongoing, on August 25, 2017, you sent me and the Secretary of Homeland Security a memorandum expressing your concern that the previous administration's new policy "failed to identify a sufficient basis" for changing longstanding policy and that "further study is needed to ensure that continued implementation of last year's policy change would not have … negative effects." You then directed the Department of Defense and the Department of Homeland Security to reinstate the preexisting policy concerning accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." You made clear that we could advise you "at any time, in writing, that a change to this policy is warranted."

I created a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and directed them to consider this issue and develop policy proposals based on data, as well as their professional military judgment, that would enhance the readiness, lethality, and effectiveness of our military. This Panel included combat veterans to ensure that our military purpose remained the foremost consideration. I charged the Panel to provide its best military advice, based on increasing the lethality and readiness of America's armed forces, without regard to any external factors.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical

professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed available information on gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike previous reviews on military service by transgender individuals, the Panel's analysis was informed by the Department's own data obtained since the new policy began to take effect last year.

Based on the work of the Panel and the Department's best military judgment, the Department of Defense concludes that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender. Furthermore, the Department also finds that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all Service members, including transgender Service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.

The prior administration largely based its policy on a study prepared by the RAND National Defense Research Institute; however, that study contained significant shortcomings. It referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own. In short, this policy issue has proven more complex than the prior administration or RAND assumed.

I firmly believe that compelling behavioral health reasons require the Department to proceed with caution before compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations. Preservation of unit cohesion, absolutely essential to military effectiveness and lethality, also reaffirms this conclusion.

Therefore, in light of the Panel's professional military judgment and my own professional judgment, the Department should adopt the following policies:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

2

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

I have consulted with the Secretary of Homeland Security, and she agrees with these proposed policies.

By its very nature, military service requires sacrifice. The men and women who serve voluntarily accept limitations on their personal liberties – freedom of speech, political activity, freedom of movement - in order to provide the military lethality and readiness necessary to ensure American citizens enjoy their personal freedoms to the fullest extent. Further, personal characteristics, including age, mental acuity, and physical fitness – among others – matter to field a lethal and ready force.

In my professional judgment, these policies will place the Department of Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the survival and success of our Service members around the world. The attached report provided by the Under Secretary of Defense for Personnel and Readiness includes a detailed analysis of the factors and considerations forming the basis of the Department's policy proposals.

I therefore respectfully recommend you revoke your memorandum of August 25, 2017, regarding Military Service by Transgender Individuals, thus allowing me and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to implement appropriate policies concerning military service by transgender persons.

Attachment:
As stated

cc:
Secretary of Homeland Security

3

# DEPARTMENT OF DEFENSE REPORT AND RECOMMENDATIONS
## ON
## MILITARY SERVICE BY TRANSGENDER PERSONS



**FEBRUARY 2018**

## Table of Contents

Executive Summary ....................................................................................................................... 2

**History of Policies Concerning Transgender Persons** ........................................................ 7

  Transgender Policy Prior to the Carter Policy ...................................................................... 8

    A. Accession Medical Standards .......................................................................................... 8

    B. Retention Standards ........................................................................................................ 11

  The Carter Policy ....................................................................................................................... 12

    A. Changes to the DSM ........................................................................................................ 12

    B. The Department Begins Review of Transgender Policy .................................................. 13

    C. New Standards for Transgender Persons ....................................................................... 14

      1. Retention Standards .................................................................................................. 14

      2. Accession Standards .................................................................................................. 15

**Panel of Experts Recommendation** ..................................................................................... 17

**Recommended Policy** ............................................................................................................... 19

  Discussion of Standards ............................................................................................................ 19

    A. Mental Health Standards ................................................................................................. 19

    B. Physical Health Standards ............................................................................................... 27

    C. Sex-Based Standards ....................................................................................................... 28

  New Transgender Policy ............................................................................................................ 32

    A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex ................................................................................................................... 32

    B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified ....................................................................................................................... 32

      1. Undermines Readiness ............................................................................................... 32

      2. Incompatible with Sex-Based Standards ................................................................... 35

      3. Imposes Disproportionate Costs ................................................................................ 41

    C. Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances ................................................................ 41

      1. Accession of Individuals Diagnosed with Gender Dysphoria ..................................... 42

      2. Retention of Service Members Diagnosed with Gender Dysphoria ............................ 42

      3. Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria. ..................................................................................................... 42

**Conclusion** .................................................................................................................................. 44

1

# Executive Summary

It is a bedrock principle of the Department of Defense that any eligible individual[1] who can meet the high standards for military service without special accommodations should be permitted to serve. This is no less true for transgender persons than for any other eligible individual. This report, and the recommendations contained herein, proceed from this fundamental premise.

The starting point for determining a person's qualifications for military duty is whether the person can meet the standards that govern the Armed Forces. Federal law requires that anyone entering into military service be "qualified, effective, and able-bodied."[2] Military standards are designed not only to ensure that this statutory requirement is satisfied but to ensure the overall military effectiveness and lethality of the Armed Forces.

The purpose of the Armed Forces is to fight and win the Nation's wars. No human endeavor is more physically, mentally, and emotionally demanding than the life and death struggle of battle. Because the stakes in war can be so high—both for the success and survival of individual units in the field and for the success and survival of the Nation—it is imperative that all Service members are physically and mentally able to execute their duties and responsibilities without fail, even while exposed to extreme danger, emotional stress, and harsh environments.

Although not all Service members will experience direct combat, standards that are applied universally across the Armed Forces must nevertheless account for the possibility that any Service member could be thrust into the crucible of battle at any time. As the Department has made clear to Congress, "[c]ore to maintaining a ready and capable military force is the understanding that each Service member is required to be available and qualified to perform assigned missions, including roles and functions outside of their occupation, in any setting."[3] Indeed, there are no occupations in the military that are exempt from deployment.[4] Moreover, while non-combat positions are vital to success in war, the physical and mental requirements for those positions should not be the barometer by which the physical and mental requirements for all positions, especially combat positions, are defined. Fitness for combat must be the metric against which all standards and requirements are judged. To give all Service members the best chance of success and survival in war, the Department must maintain the highest possible standards of physical and mental health and readiness across the force.

While individual health and readiness are critical to success in war, they are not the only measures of military effectiveness and lethality. A fighting unit is not a mere collection of individuals; it is a unique social organism that, when forged properly, can be far more powerful than the sum of its parts. Human experience over millennia—from the Spartans at Thermopylae to the band of brothers of the 101st Airborne Division in World War II, to Marine squads fighting building-to-building in Fallujah—teaches us this. Military effectiveness requires

---

[1] 10 U.S.C. §§ 504, 505(a), 12102(b).
[2] 10 U.S.C. § 505(a).
[3] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," pp. 8-9 (Apr. 2016).
[4] Id.

2

transforming a collection of individuals into a single fighting organism—merging multiple individual identities into one. This transformation requires many ingredients, including strong leadership, training, good order and discipline, and that most intangible, but vital, of ingredients—unit cohesion or, put another way, human bonding.

Because unit cohesion cannot be easily quantified, it is too often dismissed, especially by those who do not know what Justice Oliver Wendell Holmes called the "incommunicable experience of war."[5] But the experience of those who, as Holmes described, have been "touched with fire" in battle and the experience of those who have spent their lives studying it attest to the enduring, if indescribable, importance of this intangible ingredient. As Dr. Jonathan Shay articulated it in his study of combat trauma in Vietnam, "[s]urvival and success in combat often require soldiers to virtually read one another's minds, reflexively covering each other with as much care as they cover themselves, and going to one another's aid with little thought for safety."[6] Not only is unit cohesion essential to the health of the unit, Dr. Shay found that it was essential to the health of the individual soldier as well. "Destruction of unit cohesion," Dr. Shay concluded, "cannot be overemphasized as a reason why so many psychological injuries that might have healed spontaneously instead became chronic."[7]

Properly understood, therefore, military effectiveness and lethality are achieved through a combination of inputs that include individual health and readiness, strong leadership, effective training, good order and discipline, and unit cohesion. To achieve military effectiveness and lethality, properly designed military standards must foster these inputs. And, for the sake of efficiency, they should do so at the least possible cost to the taxpayer.

To the greatest extent possible, military standards—especially those relating to mental and physical health—should be based on scientifically valid and reliable evidence. Given the life-and-death consequences of warfare, the Department has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members.

Not all standards, however, are capable of scientific validation or quantification. Instead, they are the product of professional military judgment acquired from hard-earned experience leading Service members in peace and war or otherwise arising from expertise in military affairs. Although necessarily subjective, this judgment is the best, if not only, way to assess the impact of any given military standard on the intangible ingredients of military effectiveness mentioned above—leadership, training, good order and discipline, and unit cohesion.

For decades, military standards relating to mental health, physical health, and the physiological differences between men and women operated to preclude from military service transgender persons who desired to live and work as the opposite gender.

---

[5] *The Essential Holmes: Selections from the Letters, Speeches, Judicial Opinions, and Other Writings of Oliver Wendell Holmes, Jr.*, p. 93 (Richard Posner, ed., University of Chicago Press 1992).
[6] Jonathan Shay, *Achilles in Vietnam*, p. 61 (Atheneum 1994).
[7] Id. at 198.

3

Relying on a report by an outside consultant, the RAND National Defense Research Institute, the Department, at the direction of Secretary Ashton Carter, reversed that longstanding policy in 2016. Although the new policy—the "Carter policy"—did not permit all transgender Service members to change their gender to align with their preferred gender identity, it did establish a process to do so for transgender Service members who were diagnosed with gender dysphoria—that is, the distress or impairment of functioning that is associated with incongruity between one's biological sex and gender identity. It also set in motion a new accession policy that would allow applicants who had a history of gender dysphoria, including those who had already transitioned genders, to enter into military service, provided that certain conditions were met. Once a change of gender is authorized, the person must be treated in all respects in accordance with the person's preferred gender, whether or not the person undergoes any hormone therapy or surgery, so long as a treatment plan has been approved by a military physician.

The new accession policy had not taken effect when the current administration came into office. Secretary James Mattis exercised his discretion and approved the recommendation of the Services to delay the Carter accession policy for an additional six months so that the Department could assess its impact on military effectiveness and lethality. While that review was ongoing, President Trump issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security with respect to the U.S. Coast Guard expressing that further study was needed to examine the effects of the prior administration's policy change. The memorandum directed the Secretaries to reinstate the longstanding preexisting accession policy until such time that enough evidence existed to conclude that the Carter policy would not have negative effects on military effectiveness, lethality, unit cohesion, and military resources. The President also authorized the Secretary of Defense, in consultation with the Secretary of Homeland Security, to address the disposition of transgender individuals who were already serving in the military.

Secretary Mattis established a Panel of Experts that included senior uniformed and civilian leaders of the Department and U.S. Coast Guard, many with experience leading Service members in peace and war. The Panel made recommendations based on each Panel member's independent military judgment. Consistent with those recommendations, the Department, in consultation with the Department of Homeland Security, recommends the following policy to the President:

A.      Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex. Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are qualified for service, provided that they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which transgender persons without a history or diagnosis of gender dysphoria must serve, like everyone else, in their biological sex.

4

B.    Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified. Except for those who are exempt under this policy, as described below, and except where waivers or exceptions to policy are otherwise authorized, transgender persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be ineligible for service. For reasons discussed at length in this report, the Department concludes that accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs. Underlying these conclusions is the considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments, such as cross-sex hormone therapy and sex reassignment surgery—interventions which are unique in psychiatry and medicine—remedy the multifaceted mental health problems associated with gender dysphoria.

C.    Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances. Transgender persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver or exception to policy as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1.    *Accession of Individuals Diagnosed with Gender Dysphoria.* Persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex.

2.    *Retention of Service Members Diagnosed with Gender Dysphoria.* Consistent with the Department's general approach of applying less stringent standards to retention than to accession in order to preserve the Department's substantial investment in trained personnel, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[8]

3.    *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.* Transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary care,

---

[8] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

5

to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences. This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order. The Service member must, however, adhere to the Carter policy procedures and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months). While the Department believes that its solemn promise to these Service members, and the investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy.

Although the precise number is unknown, the Department recognizes that many transgender persons who desire to serve in the military experience gender dysphoria and, as a result, could be disqualified under the recommended policy set forth in this report. Many transgender persons may also be unwilling to adhere to the standards associated with their biological sex as required by longstanding military policy. But others have served, and are serving, with distinction under the standards for their biological sex, like all other Service members. Nothing in this policy precludes service by transgender persons who do not have a history or diagnosis of gender dysphoria and are willing and able to meet all standards that apply to their biological sex.

Moreover, nothing in this policy should be viewed as reflecting poorly on transgender persons who suffer from gender dysphoria, or have had a history of gender dysphoria, and are accordingly disqualified from service. The vast majority of Americans from ages 17 to 24—that is, 71%—are ineligible to join the military without a waiver for mental, medical, or behavioral reasons.[9] Transgender persons with gender dysphoria are no less valued members of our Nation than all other categories of persons who are disqualified from military service. The Department honors all citizens who wish to dedicate, and perhaps even lay down, their lives in defense of the Nation, even when the Department, in the best interests of the military, must decline to grant their wish.

Military standards are high for a reason—the trauma of war, which all Service members must be prepared to face, demands physical, mental, and moral standards that will give all Service members the greatest chance to survive the ordeal with their bodies, minds, and moral character intact. The Department would be negligent to sacrifice those standards for any cause. There are serious differences of opinion on this issue, even among military professionals, but in the final analysis, given the uncertainty associated with the study and treatment of gender dysphoria, the competing interests involved, and the vital interests at stake—our Nation's defense and the success and survival of our Service members in war—the Department must proceed with caution.

---

[9] The Lewin Group, Inc., "Qualified Military Available (QMA) and Interested Youth: Final Technical Report," p. 26 (Sept. 2016).

6

JA77

## History of Policies Concerning Transgender Persons

For decades, military standards have precluded the accession and retention of certain transgender persons.[10] Accession standards—i.e., standards that govern induction into the Armed Forces—have historically disqualified persons with a history of "transsexualism." Also disqualified were persons who had undergone genital surgery or who had a history of major abnormalities or defects of the genitalia. These standards prevented transgender persons, especially those who had undergone a medical or surgical gender transition, from accessing into the military, unless a waiver was granted.

Although retention standards—i.e., standards that govern the retention and separation of persons already serving in the Armed Forces—did not require the mandatory processing for separation of transgender persons, it was a permissible basis for separation processing as a physical or mental condition not amounting to a disability. More typically, however, such Service members were processed for separation because they suffered from other associated medical conditions or comorbidities, such as depression, which were also a basis for separation processing.

At the direction of Secretary Carter, the Department made significant changes to these standards. These changes—i.e., the "Carter policy"—prohibit the separation of Service members on the basis of their gender identity and allow Service members who are diagnosed with gender dysphoria to transition to their preferred gender.

Transition-related treatment is highly individualized and could involve what is known as a "medical transition," which includes cross-sex hormone therapy, or a "surgical transition,"

---

[10] For purposes of this report, the Department uses the broad definition of "transgender" adopted by the RAND National Defense Institute in its study of transgender service: "an umbrella term used for individuals who have sexual identity or gender expression that differs from their assigned sex at birth." RAND National Defense Research Institute, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, p.75 (RAND Corporation 2016), available at https://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/ RR1530/RAND_RR1530.pdf ("RAND Study"). According to the Human Rights Campaign, "[t]he transgender community is incredibly diverse. Some transgender people identify as male or female, and some identify as genderqueer, nonbinary, agender, or somewhere else on or outside of the spectrum of what we understand gender to be." Human Rights Campaign, "Understanding the Transgender Community," https://www.hrc.org/resources/ understanding-the-transgender-community (last visited Feb. 14, 2018). A subset of transgender persons are those who have been diagnosed with gender dysphoria. According to the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association, "gender dysphoria" is a "marked incongruence between one's experienced/expressed gender and assigned gender" that "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 452-53 (5th ed. 2013). Based on these definitions, a person can be transgender without necessarily having gender dysphoria (i.e., the transgender person does not suffer "clinically significant distress or impairment" on account of gender incongruity). A 2016 survey of active duty Service members estimated that approximately 1% of the force—8,980 Service members— identify as transgender. Office of People Analytics, Department of Defense, "2016 Workplace and Gender Relations Survey of Active Duty Members, Transgender Service Members," pp. 1-2. Currently, there are 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016. In addition, when using the term "biological sex" or "sex," this report is referring to the definition of "sex" in the RAND study: "a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals (intersex is a rare exception)." RAND Study at 75.

7

which includes sex reassignment surgery. Service members could also forego medical transition treatment altogether, retain all of their biological anatomy, and live as the opposite gender—this is called a "social transition."

Once the Service member's transition is complete, as determined by the member's military physician and commander in accordance with his or her individualized treatment plan, and the Service member provides legal documentation of gender change, the Carter policy allows for the Service member's gender marker to be changed in the DEERS. Thereafter, the Service member must be treated in every respect—including with respect to physical fitness standards; berthing, bathroom, and shower facilities; and uniform and grooming standards—in accordance with the Service member's preferred gender. The Carter policy, however, still requires transgender Service members who have not changed their gender marker in DEERS, including persons who identify as other than male or female, to meet the standards associated with their biological sex.

The Carter policy also allows accession of persons with gender dysphoria who can demonstrate stability in their preferred gender for at least 18 months. The accession policy did not take effect until required by court order, effective January 1, 2018.

The following discussion describes in greater detail the evolution of accession and retention standards pertaining to transgender persons.

Transgender Policy Prior to the Carter Policy

A.    Accession Medical Standards

DoD Instruction (DoDI) 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, establishes baseline accession medical standards used to determine an applicant's medical qualifications to enter military service. This instruction is reviewed every three to four years by the Accession Medical Standards Working Group (AMSWG), which includes medical and personnel subject matter experts from across the Department, its Military Services, and the U.S. Coast Guard. The AMSWG thoroughly reviews over 30 bodily systems and medical focus areas while carefully considering evidence-based clinical information, peer-reviewed scientific studies, scientific expert consensus, and the performance of existing standards in light of empirical data on attrition, deployment readiness, waivers, and disability rates. The AMSWG also considers inputs from non-government sources and evaluates the applicability of those inputs against the military's mission and operational environment, so that the Department and the Military Services can formally coordinate updates to these standards.

Accession medical standards are based on the operational needs of the Department and are designed to ensure that individuals are physically and psychologically "qualified, effective, and able-bodied persons"[11] capable of performing military duties. Military effectiveness requires that the Armed Forces manage an integrated set of unique medical standards and qualifications because all military personnel must be available for worldwide duty 24 hours a day without

---

[11] 10 U.S.C. § 505(a).

8

restriction or delay. Such duty may involve a wide range of demands, including exposure to danger or harsh environments, emotional stress, and the operation of dangerous, sensitive, or classified equipment. These duties are often in remote areas lacking immediate and comprehensive medical support. Such demands are not normally found in civilian occupations, and the military would be negligent in its responsibility if its military standards permitted admission of applicants with physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have.

In sum, these standards exist to ensure that persons who are under consideration for induction into military service are:

- free of contagious diseases that probably will endanger the health of other personnel;
- free of medical conditions or physical defects that may require excessive time lost from duty for necessary treatment or hospitalization, or probably will result in separation from service for medical unfitness;
- medically capable of satisfactorily completing required training;
- medically adaptable to the military environment without the necessity of geographical area limitations; and
- medically capable of performing duties without aggravation of existing physical defects or medical conditions.[12]

Establishing or modifying an accession standard is a risk management process by which a health condition is evaluated in terms of the probability and effect on the five listed outcomes above. These standards protect the applicant from harm that could result from the rigors of military duty and help ensure unit readiness by minimizing the risk that an applicant, once inducted into military service, will be unavailable for duty because of illness, injury, disease, or bad health.

Unless otherwise expressly provided, a current diagnosis or verified past medical history of a condition listed in DoDI 6130.03 is presumptively disqualifying.[13] Accession standards reflect the considered opinion of the Department's medical and personnel experts that an applicant with an identified condition should only be able to serve if they can qualify for a waiver. Waivers are generally only granted when the condition will not impact the individual's assigned specialty or when the skills of the individual are unique enough to warrant the additional risk. Waivers are not generally granted when the conditions of military service may aggravate the existing condition. For some conditions, applicants with a past medical history may nevertheless be eligible for accession if they meet the requirements for a certain period of "stability"—that is, they can demonstrate that the condition has been absent for a defined period

---

[12] Department of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* (Apr. 28, 2010), incorporating Change 1, p. 2 (Sept. 13, 2011) ("DoDI 6130.03").
[13] Id. at 10.

of time prior to accession.[14]  With one exception,[15] each accession standard may be waived in the discretion of the accessing Service based on that Service's policies and practices, which are driven by the unique requirements of different Service missions, different Service occupations, different Service cultures, and at times, different Service recruiting missions.

Historically, mental health conditions have been a great concern because of the unique mental and emotional stresses of military service.  Mental health conditions frequently result in attrition during initial entry training and the first term of service and are routinely considered by in-service medical boards as a basis for separation.  Department mental health accession standards have typically aligned with the conditions identified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), which is published by the American Psychiatric Association (APA).  The DSM sets forth the descriptions, symptoms, and other criteria for diagnosing mental disorders.  Health care professionals in the United States and much of the world use the DSM as the authoritative guide to the diagnosis of mental disorders.

Prior to implementation of the Carter policy, the Department's accession standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[16]  These standards were consistent with DSM-III, which in 1980, introduced the diagnosis of transsexualism.[17]  In 1987, DSM-III-R added gender identity disorder, non-transsexual type.[18]  DSM-IV, which was published in 1994, combined these two diagnoses and called the resulting condition "gender identity disorder."[19]  Due to challenges associated with updating and publishing a new iteration of DoDI 6130.03, the DoDI's terminology has not changed to reflect the changes in the DSM, including further changes that will be discussed later.

DoDI 6130.03 also contains other disqualifying conditions that are associated with, but not unique to, transgender persons, especially those who have undertaken a medical or surgical transition to the opposite gender.  These include:

- a history of chest surgery, including but not limited to the surgical removal of the breasts,[20] and genital surgery, including but not limited to the surgical removal of the testicles;[21]

---

[14] See, e.g., id. at 47.

[15] The accession standards for applicants with HIV are not waivable absent a waiver from both the accessing Service and the Under Secretary of Defense for Personnel and Readiness.  See Department of Defense Instruction 6485.01, *Human Immunodeficiency Virus (HIV) in Military Service Members* (Jun. 7, 2013).

[16] DoDI 6130.03 at 48.

[17] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, pp. 261-264 (3rd ed. 1980).

[18] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)*, pp. 76-77 (3rd ed. revised 1987).

[19] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, pp. 532-538 (4th ed. 1994).

[20] DoDI 6130.03 at 18.

[21] Id. at 25-27.

10

JA81

- a history of major abnormalities or defects of the genitalia, including but not limited to change of sex, hermaphroditism, penis amputation, and pseudohermaphroditism;[22]
- mental health conditions such as suicidal ideation, depression, and anxiety disorder;[23] and
- the use of certain medications, or conditions requiring the use of medications, such as hormone therapies and anti-depressants.[24]

Together with a diagnosis of transsexualism, these conditions, which were repeatedly validated by the AMSWG, provided multiple grounds for the disqualification of transgender persons.

B.    Retention Standards

The standards that govern the retention of Service members who are already serving in the military are generally less restrictive than the corresponding accession standards due to the investment the Department has made in the individual and their increased capability to contribute to mission accomplishment.

Also unlike the Department's accession standards, each Service develops and applies its own retention standards.  With respect to the retention of transgender Service members, these Service-specific standards may have led to inconsistent outcomes across the Services, but as a practical matter, before the Carter policy, the Services generally separated Service members who desired to transition to another gender.  During that time, there were no express policies allowing individuals to serve in their preferred gender rather than their biological sex.

Previous Department policy concerning the retention (administrative separation) of transgender persons was not clear or rigidly enforced.  DoDI 1332.38, *Physical Disability Evaluation*, now cancelled, characterized "sexual gender and identity disorders" as a basis for allowing administrative separation for a condition not constituting a disability; it did not require mandatory processing for separation.  A newer issuance, DoDI 1332.18, *Disability Evaluation System (DES)*, August 5, 2014, does not reference these disorders but instead reflects changes in how such medical conditions are characterized in contemporary medical practice.

Earlier versions of DoDI 1332.14, *Enlisted Administrative Separations*, contained a cross reference to the list of conditions not constituting a disability in former DoDI 1332.38.  This was how "transsexualism," the older terminology, was used as a basis for administrative separation. Separation on this basis required formal counseling and an opportunity to address the issue, as well as a finding that the condition was interfering with the performance of duty.  In practice, transgender persons were not usually processed for administrative separation on account of gender dysphoria or gender identity itself, but rather on account of medical comorbidities (e.g., depression or suicidal ideation) or misconduct due to cross dressing and related behavior.

---

[22] Id.
[23] Id. at 47–48.
[24] Id. at 48.

11

The Carter Policy

At the direction of Secretary Carter, the Department began formally reconsidering its accession and retention standards as they applied to transgender persons with gender dysphoria in 2015. This reevaluation, which culminated with the release of the Carter policy in 2016, was prompted in part by amendments to the DSM that appeared to change the diagnosis for gender identity disorder from a disorder to a treatable condition called gender dysphoria. Starting from the assumption that transgender persons are qualified for military service, the Department sought to identify and remove the obstacles to such service. This effort resulted in substantial changes to the Department's accession and retention standards to accommodate transgender persons with gender dysphoria who require treatment for transitioning to their preferred gender.

A.      Changes to the DSM

When the APA published the fifth edition of the DSM in May 2013, it changed "gender identity disorder" to "gender dysphoria" and designated it as a "condition"—a new diagnostic class applicable only to gender dysphoria—rather than a "disorder."[25] This change was intended to reflect the APA's conclusion that gender nonconformity alone—without accompanying distress or impairment of functioning—was not a mental disorder.[26] DSM-5 also decoupled the diagnosis for gender dysphoria from diagnoses for "sexual dysfunction and parphilic disorders, recognizing fundamental differences between these diagnoses."[27]

According to DSM-5, gender dysphoria in adolescents and adults is "[a] marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following":

- A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
- A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

---

[25] See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 451-459 (5th ed. 2013) ("DSM-5").

[26] RAND Study at 77; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (May 15, 2014), p. 1 ("This change was intended to reflect a consensus that gender nonconformity is not a psychiatric disorder, as it was previously categorized. However, since the condition may cause clinically significant distress and since a diagnosis is necessary for access to medical treatment, the new term was proposed."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, pp. 1182-83 (2016) ("In the DSM-5, [gender dysphoria] has replaced the diagnosis of 'gender identity disorder' in order to place the focus on the dysphoria and to diminish the pathology associated with identity incongruence.").

[27] Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (2016).

12

- A strong desire for the primary and/or secondary sex characteristics of the other gender.
- A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
- A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
- A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Importantly, DSM-5 observed that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[28]

B.    The Department Begins Review of Transgender Policy

On July 28, 2015, then Secretary Carter issued a memorandum announcing that no Service members would be involuntarily separated or denied reenlistment or continuation of service based on gender identity or a diagnosis of gender dysphoria without the personal approval of the Under Secretary of Defense for Personnel and Readiness.[29]  The memorandum also created the Transgender Service Review Working Group (TSRWG) "to study the policy and readiness implications of welcoming transgender persons to serve openly."[30]  The memorandum specifically directed the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[31]

As part of this review, the Department commissioned the RAND National Defense Research Institute to conduct a study to "(1) identify the health care needs of the transgender population, transgender Service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender Service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender Service members to serve openly."[32]  The resulting report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, reached several conclusions.  First, the report estimated that there are between 1,320 and 6,630 transgender Service members already serving in the active component of the Armed Forces and 830 to 4,160 in the Selected Reserve.[33]  Second, the report predicted "annual gender transition-related health care to be an extremely small part of the overall health care provided to the [active component] population."[34]  Third, the report estimated that active component "health care costs will increase by between $2.4 million and $8.4 million annually— an amount that will have little impact on and represents an exceedingly small proportion of

---

[28] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, p. 453 (5th ed. 2013).
[29] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).
[30] Id.
[31] Id.
[32] RAND Study at 1.
[33] Id. at x-xi.
[34] Id. at xi.

13

[active component] health care expenditures (approximately $6 billion in FY 2014)."[35]  Fourth, the report "found that less than 0.0015 percent of the total available labor-years would be affected, based on estimated gender transition-related health care utilization rates."[36]  Finally, the report concluded that "[e]xisting data suggest a minimal impact on unit cohesion as a result of allowing transgender personnel to serve openly."[37]  "Overall," according to RAND, "our study found that the number of U.S. transgender Service members who are likely to seek transition-related care is so small that a change in policy will likely have a marginal impact on health care costs and the readiness of the force."[38]

The RAND report thus acknowledged that there will be an adverse impact on health care utilization and costs, readiness, and unit cohesion, but concluded nonetheless that the impact will be "negligible" and "marginal" because of the small estimated number of transgender Service members relative to the size of the active component of the Armed Forces.  Because of the RAND report's macro focus, however, it failed to analyze the impact at the micro level of allowing gender transition by individuals with gender dysphoria.  For example, as discussed in more detail later, the report did not examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy at the unit and sub-unit levels, all of which are critical to unit cohesion.  Nor did the report meaningfully address the significant mental health problems that accompany gender dysphoria—from high rates of comorbidities and psychiatric hospitalizations to high rates of suicide ideation and suicidality—and the scope of the scientific uncertainty regarding whether gender transition treatment fully remedies those problems.

C.    New Standards for Transgender Persons

Based on the RAND report, the work of the TSRWG, and the advice of the Service Secretaries, Secretary Carter approved the publication of DoDI 1300.28, *In-service Transition for Service Members Identifying as Transgender*, and Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," on June 30, 2016.  Although the new retention standards were effective immediately upon publication of the above memoranda, the accession standards were delayed until July 1, 2017, to allow time for training all Service members across the Armed Forces, including recruiters, Military Entrance Processing Station (MEPS) personnel, and basic training cadre, and to allow time for modifying facilities as necessary.

1.    *Retention Standards*.  DoDI 1300.28 establishes the procedures by which Service members who are diagnosed with gender dysphoria may administratively change their gender.  Once a Service member receives a gender dysphoria diagnosis from a military physician, the physician, in consultation with the Service member, must establish a treatment plan.  The treatment plan is highly individualized and may include cross-sex hormone therapy (i.e., medical transition), sex reassignment surgery (i.e., surgical transition), or simply living as the opposite gender but without any cross-sex hormone or surgical treatment (i.e., social

---

[35] Id. at xi-xii.
[36] Id. at xii.
[37] Id.
[38] Id. at 69.

transition).  The nature of the treatment is left to the professional medical judgment of the treating physician and the individual situation of the transgender Service member.  The Department does not require a Service member with gender dysphoria to undergo cross-sex hormone therapy, sex reassignment surgery, or any other physical changes to effectuate an administrative change of gender.  During the course of treatment, commanders are authorized to grant exceptions from physical fitness, uniform and grooming, and other standards, as necessary and appropriate, to transitioning Service members.  Once the treating physician determines that the treatment plan is complete, the Service member's commander approves, and the Service member produces legal documentation indicating change of gender (e.g., certified birth certificate, court order, or U.S. passport), the Service member may request a change of gender marker in DEERS.  Once the DEERS gender marker is changed, the Service member is held to all standards associated with the member's transitioned gender, including uniform and grooming standards, body composition assessment, physical readiness testing, Military Personnel Drug Abuse Testing Program participation, and other military standards congruent to the member's gender.  Indeed, the Service member must be treated in all respects in accordance with the member's transitioned gender, including with respect to berthing, bathroom, and shower facilities.  Transgender Service members who do not meet the clinical criteria for gender dysphoria, by contrast, remain subject to the standards and requirements applicable to their biological sex.

    2. *Accession Standards*.  DTM 16-005 directed that the following medical standards for accession into the Military Services take effect on July 1, 2017:

(1) A history of gender dysphoria is disqualifying, unless, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

(2) A history of medical treatment associated with gender transition is disqualifying, unless, as certified by a licensed medical provider:

  (a) the applicant has completed all medical treatment associated with the applicant's gender transition; and
  (b) the applicant has been stable in the preferred gender for 18 months; and
  (c) if the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

(3) A history of sex reassignment or genital reconstruction surgery is disqualifying, unless, as certified by a licensed medical provider:

  (a) a period of 18 months has elapsed since the date of the most recent of any such surgery; and

15

(b)   no functional limitations or complications persist, nor is any additional surgery required.[39]

---

[39] Memorandum from Ashton Carter, Secretary of Defense, "Directive-type Memorandum (DTM) 16-005, 'Military Service of Transgender Service Members,'" Attachment, pp. 1-2 (June 30, 2016).

16

## Panel of Experts Recommendation

The Carter policy's accession standards for persons with a history of gender dysphoria were set to take effect on July 1, 2017, but on June 30, after consultation with the Secretaries and Chiefs of Staff of each Service, Secretary Mattis postponed the new standards for an additional six months "to evaluate more carefully the impact of such accessions on readiness and lethality."[40]  Secretary Mattis specifically directed that the review would "include all relevant considerations" and would last for five months, with a due date of December 1, 2017.[41]  The Secretary also expressed his desire to have "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department."[42]

While Secretary Mattis's review was ongoing, President Trump issued a memorandum, on August 25, 2017, directing the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to reinstate longstanding policy generally barring the accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."[43]  The President found that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."[44]  Accordingly, the President directed both Secretaries to maintain the prohibition on accession of transgender individuals "until such time as the Secretary of Defense, after consulting with the Secretary of Homeland Security, provides a recommendation to the contrary" that is convincing.[45]  The President made clear that the Secretaries may advise him "at any time, in writing, that a change to this policy is warranted."[46]  In addition, the President gave both Secretaries discretion to "determine how to address transgender individuals currently serving" in the military and made clear that no action be taken against them until a determination was made.[47]

On September 14, 2017, Secretary Mattis established a Panel of Experts to study, in a "comprehensive, holistic, and objective" manner, "military service by transgender individuals, focusing on military readiness, lethality, and unit cohesion, with due regard for budgetary constraints and consistent with applicable law."[48]  He directed the Panel to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."[49]

---

[40] Memorandum from James N. Mattis, Secretary of Defense, "Accession of Transgender Individuals into the Military Services" (June 30, 2017).
[41] Id.
[42] Id.
[43] Memorandum from Donald J. Trump, President of the United States, "Military Service by Transgender Individuals" (Aug. 25, 2017).
[44] Id. at 1.
[45] Id. at 2.
[46] Id.
[47] Id.
[48] Memorandum from James N. Mattis, Secretary of Defense, "Terms of Reference—Implementation of Presidential Memorandum on Military Service by Transgender Individuals," pp. 1-2 (Sept. 14, 2017).
[49] Id. at 2.

17

The Panel consisted of the Under Secretaries of the Military Departments (or officials performing their duties), the Armed Services' Vice Chiefs (including the Vice Commandant of the U.S. Coast Guard), and the Senior Enlisted Advisors, and was chaired by the Under Secretary of Defense for Personnel and Readiness or an official performing those duties. The Secretary of Defense selected these senior leaders because of their experience leading warfighters in war and peace or their expertise in military operational effectiveness. These senior leaders also have the statutory responsibility to organize, train, and equip military forces and are uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force. The Panel met 13 times over a span of 90 days.

The Panel received support from medical and personnel experts from across the Departments of Defense and Homeland Security. The Transgender Service Policy Working Group, comprised of medical and personnel experts from across the Department, developed policy recommendations and a proposed implementation plan for the Panel's consideration. The Medical and Personnel Executive Steering Committee, a standing group of the Surgeons General and Service Personnel Chiefs, led by Personnel and Readiness, provided the Panel with an analysis of accession standards, a multi-disciplinary review of relevant data, and information about medical treatment for gender dysphoria and gender transition-related medical care. These groups reported regularly to the Panel and responded to numerous queries for additional information and analysis to support the Panel's review and deliberations. A separate working group tasked with enhancing the lethality of our Armed Forces also provided a briefing to the Panel on their work relating to retention standards.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed information and analyses about gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike past reviews, the Panel's analysis was informed by the Department's own data and experience obtained since the Carter policy took effect.

To fulfill its mandate, the Panel addressed three questions:

- Should the Department of Defense access transgender individuals?
- Should the Department allow transgender individuals to transition gender while serving, and if so, what treatment should be authorized?
- How should the Department address transgender individuals who are currently serving?

After extensive review and deliberation, which included evidence in support of and against the Panel's recommendations, the Panel exercised its professional military judgment and made recommendations. The Department considered those recommendations and the information underlying them, as well as additional information within the Department, and now proposes the following policy consistent with those recommendations.

18

**Recommended Policy**

To maximize military effectiveness and lethality, the Department, after consultation with and the concurrence of the Department of Homeland Security, recommends cancelling the Carter policy and, as explained below, adopting a new policy with respect to the accession and retention of transgender persons.

The Carter policy assumed that transgender persons were generally qualified for service and that their accession and retention would not negatively impact military effectiveness. As noted earlier, Secretary Carter directed the TSRWG, the group charged with evaluating, and making recommendations on, transgender service, to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[50] Where necessary, standards were adjusted or relaxed to accommodate service by transgender persons. The following analysis makes no assumptions but instead applies the relevant standards applicable to everyone to determine the extent to which transgender persons are qualified for military duty.

For the following reasons, the Department concludes that transgender persons should not be disqualified from service solely on account of their transgender status, provided that they, like all other Service members, are willing and able to adhere to all standards, including the standards associated with their biological sex. With respect to the subset of transgender persons who have been diagnosed with gender dysphoria, however, those persons are generally disqualified unless, depending on whether they are accessing or seeking retention, they can demonstrate stability for the prescribed period of time; they do not require, and have not undergone, a change of gender; and they are otherwise willing and able to meet all military standards, including those associated with their biological sex. In order to honor its commitment to current Service members diagnosed with gender dysphoria, those Service members who were diagnosed after the effective date of the Carter policy and before any new policy takes effect will not be subject to the policy recommended here.

Discussion of Standards

The standards most relevant to the issue of service by transgender persons fall into three categories: mental health standards, physical health standards, and sex-based standards. Based on these standards, the Department can assess the extent to which transgender persons are qualified for military service and, in light of that assessment, recommend appropriate policies.

A.    Mental Health Standards

Given the extreme rigors of military service and combat, maintaining high standards of mental health is essential to military effectiveness and lethality. The immense toll that the burden and experience of combat can have on the human psyche cannot be overstated. Therefore, putting individuals into battle, who might be at increased risk of psychological injury, would be reckless, not only for those individuals, but for the Service members who serve beside them as well.

---

[50] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).

19

The Department's experience with the mental health issues arising from our wars in Afghanistan and Iraq, including post-traumatic stress disorder (PTSD), only underscores the importance of maintaining high levels of mental health across the force. PTSD has reached as high as 2.8% of all active duty Service members, and in 2016, the number of active duty Service members with PTSD stood at 1.5%.[51] Of all Service members in the active component, 7.5% have been diagnosed with a mental health condition of some type.[52] The Department is mindful of these existing challenges and must exercise caution when considering changes to its mental health standards.

Most mental health conditions and disorders are automatically disqualifying for accession absent a waiver. For example, persons with a history of bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder (to name a few) are barred from entering into military service, unless a waiver is granted.[53] For a few conditions, however, persons may enter into service without a waiver if they can demonstrate stability for 24 to 36 continuous months preceding accession. Historically, a person is deemed stable if they are without treatment, symptoms, or behavior of a repeated nature that impaired social, school, or work efficiency for an extended period of several months. Such conditions include depressive disorder (stable for 36 continuous months) and anxiety disorder (stable for 24 continuous months).[54] Requiring a period of stability reduces, but does not eliminate, the likelihood that the individual's depression or anxiety will return.

Historically, conditions associated with transgender individuals have been automatically disqualifying absent a waiver. Before the changes directed by Secretary Carter, military mental health standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[55] These standards, however, did not evolve with changing understanding of transgender mental health. Today, transsexualism is no longer considered by most mental health practitioners as a mental health condition. According to the APA, it is not a medical condition for persons to identify with a gender that is different from their biological sex.[56] Put simply, transgender status alone is not a condition.

Gender dysphoria, by contrast, is a mental health condition that can require substantial medical treatment. Many individuals who identify as transgender are diagnosed with gender dysphoria, but "[n]ot all transgender people suffer from gender dysphoria and that distinction," according to the APA, "is important to keep in mind."[57] The DSM-5 defines gender dysphoria as

---

[51] Deployment Health Clinical Center, "Mental Health Disorder Prevalence among Active Duty Service Members in the Military Health System, Fiscal Years 2005-2016" (Jan. 2017).

[52] Id.

[53] DoDI 6130.03 at 47-48.

[54] Id.

[55] Id. at 48.

[56] DSM-5 at 452-53.

[57] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018). Conversely, not all persons with gender dysphoria are transgender. "For example, some men who are disabled in combat, especially if their injury includes genital wounds, may feel that they are no longer men because their bodies do not conform to their concept of manliness. Similarly, a woman who opposes plastic surgery, but who must undergo mastectomy because of breast

20

JA91

a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration," that is manifested in various specified ways.[58] According to the APA, the "condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[59]

Transgender persons with gender dysphoria suffer from high rates of mental health conditions such as anxiety, depression, and substance use disorders.[60] High rates of suicide ideation, attempts, and completion among people who are transgender are also well documented in the medical literature, with lifetime rates of suicide attempts reported to be as high as 41% (compared to 4.6% for the general population).[61] According to a 2015 survey, the rate skyrockets to 57% for transgender individuals without a supportive family.[62] The Department is concerned that the stresses of military life, including basic training, frequent moves, deployment to war zones and austere environments, and the relentless physical demands, will be additional contributors to suicide behavior in people with gender dysphoria. In fact, there is recent evidence that military service can be a contributor to suicidal thoughts.[63]

Preliminary data of Service members with gender dysphoria reflect similar trends. A review of the administrative data indicates that Service members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%).[64]

cancer, may find that she requires reconstructive breast surgery in order to resolve gender dysphoria arising from the incongruence between her body without breasts and her sense of herself as a woman." M. Jocelyn Elders, George R. Brown, Eli Coleman, Thomas Kolditz & Alan Steinman, "Medical Aspects of Transgender Military Service," *Armed Forces & Society*, p. 5 n.22 (Mar. 2014).

[58] DSM-5 at 452.

[59] DSM-5 at 453.

[60] Cecilia Dhejne, Roy Van Vlerken, Gunter Heylens & Jon Arcelus, "Mental health and gender dysphoria: A review of the literature," *International Review of Psychiatry*, Vol. 28, pp. 44-57 (2016); George R. Brown & Kenneth T. Jones, "Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study," *LGBT Health*, Vol. 3, p. 128 (Apr. 2016).

[61] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, p. 2 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf; H.G. Virupaksha, Daliboyina Muralidhar & Jayashree Ramakrishna, "Suicide and Suicide Behavior among Transgender Persons," *Indian Journal of Psychological Medicine*, Vol.38, pp. 505-09 (2016); Claire M. Peterson, Abigail Matthews, Emily Copps-Smith & Lee Ann Conard, "Suicidality, Self-Harm, and Body Dissatisfaction in Transgender Adolescents and Emerging Adults with Gender Dysphoria," *Suicide and Life Threatening Behavior*, Vol. 47, pp. 475-482 (Aug. 2017).

[62] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, pp. 2, 12 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

[63] Raymond P. Tucker, Rylan J. Testa, Mark A.Reger, Tracy L. Simpson, Jillian C. Shipherd, & Keren Lehavot, "Current and Military-Specific Gender Minority Stress Factors and Their Relationship with Suicide Ideation in Transgender Veterans," *Suicide and Life Threatening Behavior* DOI: 10.1111/sltb.12432 (epub ahead of print), pp. 1-10 (2018); Craig J. Bryan, AnnaBelle O. Bryan, Bobbie N. Ray-Sannerud, Neysa Etienne & Chad E. Morrow, "Suicide attempts before joining the military increase risk for suicide attempts and severity of suicidal ideation among military personnel and veterans," *Comprehensive Psychiatry*, Vol. 55, pp. 534-541 (2014).

[64] Data retrieved from Military Health System data repository (Oct. 2017).

21

JA92

Service members with gender dysphoria are also nine times more likely to have mental health encounters than the Service member population as a whole (28.1 average encounters per Service member versus 2.7 average encounters per Service member).[65]  From October 1, 2015 to October 3, 2017, the 994 active duty Service members diagnosed with gender dysphoria accounted for 30,000 mental health visits.[66]

It is widely believed by mental health practitioners that gender dysphoria can be treated.  Under commonly accepted standards of care, treatment for gender dysphoria can include: psychotherapy; social transition—also known as "real life experience"—to allow patients to live and work in their preferred gender without any hormone treatment or surgery; medical transition to align secondary sex characteristics with patients' preferred gender using cross-sex hormone therapy and hair removal; and surgical transition—also known as sex reassignment surgery—to make the physical body—both primary and secondary sex characteristics—resemble as closely as possible patients' preferred gender.[67]  The purpose of these treatment options is to alleviate the distress and impairment of gender dysphoria by seeking to bring patients' physical characteristics into alignment with their gender identity—that is, one's inner sense of one's own gender.[68]

Cross-sex hormone therapy is a common medical treatment associated with gender transition that may be commenced following a diagnosis of gender dysphoria.[69]  Treatment for women transitioning to men involves the administration of testosterone, whereas treatment for men transitioning to women requires the blocking of testosterone and the administration of estrogens.[70]  The Endocrine Society's clinical guidelines recommend laboratory bloodwork every 90 days for the first year of treatment to monitor hormone levels.[71]

As a treatment for gender dysphoria, sex reassignment surgery is "a unique intervention not only in psychiatry but in all of medicine."[72]  Under existing Department guidelines

---

[65] Data retrieved from Military Health System data repository (Oct. 2017).  Study period was Oct. 1, 2015 to July 26, 2017.

[66] Data retrieved from Military Health System data repository (Oct. 2017).

[67] RAND Study at 5-7, Appendices A & C; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 1 (May 15, 2014) ("The full therapeutic approach to [gender dysphoria] consists of 3 elements or phases, typically in the following order:  (1) hormones of the desired gender; (2) real-life experience for 12 months in the desired role; and (3) surgery to change the genitalia and other sex characteristics (e.g., breast reconstruction or mastectomy).  However, not everyone with [gender dysphoria] needs or wants all elements of this triadic approach."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (Oct. 2016) ("The Endocrine Society proposes a sequential approach in transsexual care to optimize mental health and physical outcomes.  Generally, they recommend initiation of psychotherapy, followed by cross-sex hormone treatments, then [sex reassignment surgery].").

[68] RAND Study at 73.

[69] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons:  An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[70] Id. at 3885-3888.

[71] Id.

[72] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011); see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of

22

implementing the Carter policy, men transitioning to women may obtain an orchiectomy (surgical removal of the testicles), a penectomy (surgical removal of the penis), a vaginoplasty (surgical creation of a vagina), a clitoroplasty (surgical creation of a clitoris), and a labiaplasty (surgical creation of the labia). Women transitioning to men may obtain a hysterectomy (surgical removal of the uterus), a mastectomy (surgical removal of the breasts), a metoidioplasty (surgical enlargement of the clitoris), a phalloplasty (surgical creation of a penis), a scrotoplasty (surgical creation of a scrotum) and placement of testicular prostheses, a urethroplasty (surgical enlargement of the urethra), and a vaginectomy (surgical removal of the vagina). In addition, the following cosmetic procedures may be provided at military treatment facilities as well: abdominoplasty, breast augmentation, blepharoplasty (eyelid lift), hair removal, face lift, facial bone reduction, hair transplantation, liposuction, reduction thyroid chondroplasty, rhinoplasty, and voice modification surgery.[73]

The estimated recovery time for each of the surgical procedures, even assuming no complications, can be substantial. For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to eight weeks; an orchiectomy is up to six weeks; and a vaginoplasty is up to three months.[74] When combined with 12 continuous months of hormone therapy, which is required prior to genital surgery,[75] the total time necessary for surgical transition can exceed a year.

Although relatively few people who are transgender undergo genital reassignment surgeries (2% of transgender men and 10% of transgender women), we have to consider that the rate of complications for these surgeries is significant, which could increase a transitioning Service member's unavailability.[76] Even according to the RAND study, 6% to 20% of those receiving vaginoplasty surgery experience complications, meaning that "between three and 11 Service members per year would experience a long-term disability from gender reassignment

---

Gender Dysphoria," p. 2 (May 15, 2014) (noting that gender dysphoria "does not readily fit traditional concepts of medical necessity since research to date has not established anatomical or physiological anomalies associated with [gender dysphoria]"); Hayes Annual Review, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (Apr. 18, 2017).

[73] Memorandum from Defense Health Agency, "Information Memorandum: Interim Defense Health Agency Procedures for Reviewing Requests for Waivers to Allow Supplemental Health Care Program Coverage of Sex Reassignment Surgical Procedures" (Nov. 13, 2017); see also RAND Study at Appendix C.

[74] University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/ trans?page=guidelines-home (last visited Feb. 16, 2018); Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[75] RAND Study at 80; see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

[76] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

23

surgery."[77]  The RAND study further notes that of those receiving phalloplasty surgery, as many as 25%—one in four—will have complications.[78]

The prevailing judgment of mental health practitioners is that gender dysphoria can be treated with the transition-related care described above.  While there are numerous studies of varying quality showing that this treatment can improve health outcomes for individuals with gender dysphoria, the available scientific evidence on the extent to which such treatments fully remedy all of the issues associated with gender dysphoria is unclear.  Nor do any of these studies account for the added stress of military life, deployments, and combat.

As recently as August 2016, the Centers for Medicare and Medicaid Services (CMS) conducted a comprehensive review of the relevant literature, over 500 articles, studies, and reports, to determine if there was "sufficient evidence to conclude that gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[79]  After reviewing the universe of literature regarding sex reassignment surgery, CMS identified 33 studies sufficiently rigorous to merit further review, and of those, "some were positive; others were negative."[80]  "Overall," according to CMS, "the quality and strength of evidence were low due to mostly observational study designs with no comparison groups, subjective endpoints, potential confounding . . . , small sample sizes, lack of validated assessment tools, and considerable [number of study subjects] lost to follow-up."[81]  With respect to whether sex reassignment surgery was "reasonable and necessary" for the treatment of gender dysphoria, CMS concluded that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."[82]

Importantly, CMS identified only six studies as potentially providing "useful information" on the effectiveness of sex reassignment surgery.  According to CRS, "the four best designed and conducted studies that assessed the quality of life before and after surgery using validated (albeit, non-specific) psychometric studies did not demonstrate clinically significant changes or differences in psychometric test results after [sex reassignment surgery]."[83]

---

[77] RAND Study at 40-41.

[78] Id. at 41.

[79] Tamara Jensen, Joseph Chin, James Rollins, Elizabeth Koller, Linda Gousis & Katherine Szarama, "Final Decision Memorandum on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria," Centers for Medicare & Medicaid Services, p. 9 (Aug. 30, 2016) ("CMS Report").

[80] Id. at 62.

[81] Id.

[82] Id. at 65. CMS did not conclude that gender reassignment surgery can never be necessary and reasonable to treat gender dysphoria.  To the contrary, it made clear that Medicare insurers could make their own "determination of whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances." Id. at 66. Nevertheless, CMS did decline to require all Medicare insurers to cover sex reassignment surgeries because it found insufficient scientific evidence to conclude that such surgeries improve health outcomes for persons with gender dysphoria.

[83] Id. at 62.

24

Additional studies found that the "cumulative rates of requests for surgical reassignment reversal or change in legal status" were between 2.2% and 3.3%.[84]

A sixth study, which came out of Sweden, is one of the most robust because it is a "nationwide population-based, long-term follow-up of sex-reassigned transsexual persons."[85] The study found increased mortality and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a healthy control group.[86]  As described by CMS:  "The mortality was primarily due to completed suicides (19.1-fold greater than in [the control group]), but death due to neoplasm and cardiovascular disease was increased 2 to 2.5 times as well.  We note, mortality from this patient population did not become apparent until after 10 years.  The risk for psychiatric hospitalization was 2.8 times greater than in controls even after adjustment for prior psychiatric disease (18%).  The risk for attempted suicide was greater in male-to-female patients regardless of the gender of the control."[87]

According to the Hayes Directory, which conducted a review of 19 peer-reviewed studies on sex reassignment surgery, the "evidence suggests positive benefits," including "decreased [gender dysphoria], depression and anxiety, and increased [quality of life]," but "because of serious limitations," these findings "permit only weak conclusions."[88]  It rated the quality of evidence as "very low" due to the numerous limitations in the studies and concluded that there is

---

[84] Id.

[85] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 6 (Feb. 2011); see also id. ("Strengths of this study include nationwide representativity over more than 30 years, extensive follow-up time, and minimal loss to follow-up. . . . Finally, whereas previous studies either lack a control group or use standardised mortality rates or standarised incidence rates as comparisons, we selected random population controls matched by birth year, and either birth or final sex.").

[86] Id. at 7; see also at 6 ("Mortality from suicide was strikingly high among sex-reassigned persons, also after adjustment for prior psychiatric morbidity.  In line with this, sex-reassigned persons were at increased risk for suicide attempts.  Previous reports suggest that transsexualism is a strong risk factor for suicide, also after sex reassignment, and our long-term findings support the need for continued psychiatric follow-up for persons at risk to prevent this.  Inpatient care for psychiatric disorders was significantly more common among sex-reassigned persons than among matched controls, both before and after sex reassignment.  It is generally accepted that transsexuals have more psychiatric ill-health than the general population prior to the sex reassignment.  It should therefore come as no surprise that studies have found high rates of depression, and low quality of life, also after sex reassignment.  Notably, however, in this study the increased risk for psychiatric hospitalization persisted even after adjusting for psychiatric hospitalization prior to sex reassignment.  This suggests that even though sex reassignment alleviates gender dysphoria, there is a need to identify and treat co-occurring psychiatric morbidity in transsexual persons not only before but also after sex reassignment.").

[87] CMS Report at 62.  It bears noting that the outcomes for mortality and suicide attempts differed "depending on when sex reassignment was performed:  during the period 1973-1988 or 1989-2003."  Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 5 (Feb. 2011).  Even though both mortality and suicide attempts were greater for transsexual persons than the healthy control group across both time periods, this did not reach statistical significance during the 1989-2003 period.  One possible explanation is that mortality rates for transsexual persons did not begin to diverge from the healthy control group until after 10 years of follow-up, in which case the expected increase in mortality would not have been observed for most of the persons receiving sex reassignment surgeries from 1989-2003.  Another possible explanation is that treatment was of a higher quality from 1989-2003 than from 1973-1988.

[88] Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 4 (May 15, 2014).

25

not sufficient "evidence to establish patient selection criteria for [sex reassignment surgery] to treat [gender dysphoria]."[89]

With respect to hormone therapy, the Hayes Directory examined 10 peer-reviewed studies and concluded that a "substantial number of studies of cross-sex hormone therapy each show some positive findings suggesting improvement in well-being after cross-sex hormone therapy."[90] Yet again, it rated the quality of evidence as "very low" and found that the "evidence is insufficient to support patient selection criteria for hormone therapy to treat [gender dysphoria]."[91] Importantly, the Hayes Directory also found: "Hormone therapy and subsequent [sex reassignment surgery] failed to bring overall mortality, suicide rates, or death from illicit drug use in [male-to-female] patients close to rates observed in the general male population. It is possible that mortality is nevertheless reduced by these treatments, but that cannot be determined from the available evidence."[92]

In 2010, Mayo Clinic researchers conducted a comprehensive review of 28 studies on the use of cross-sex hormone therapy in sex reassignment and concluded that there was "very low quality evidence" showing that such therapy "likely improves gender dysphoria, psychological functioning and comorbidities, sexual function and overall quality of life."[93] Not all of the studies showed positive results, but overall, after pooling the data from all of the studies, the researchers showed that 80% of patients reported improvement in gender dysphoria, 78% reported improvement in psychological symptoms, and 80% reported improvement in quality of life, after receiving hormone therapy.[94] Importantly, however, "[s]uicide attempt rates decreased after sex reassignment but stayed higher than the normal population rate."[95]

The authors of the Swedish study discussed above reached similar conclusions: "This study found substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and psychiatric hospitali[z]ations in sex-reassigned transsexual individuals compared to a healthy control population. This highlights that post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up. Even though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons."[96]

Even the RAND study, which the Carter policy is based upon, confirmed that "[t]here have been no randomized controlled trials of the effectiveness of various forms of treatment, and

---

[89] Id. at 3.

[90] Hayes Directory, "Hormone Therapy for the Treatment of Gender Dysphoria," pp. 2, 4 (May 19, 2014).

[91] Id. at 4.

[92] Id. at 3.

[93] Mohammad Hassan Murad, Mohamed B. Elamin, Magaly Zumaeta Garcia, Rebecca J. Mullan, Ayman Murad, Patricia J. Erwin & Victor M. Montori, "Hormonal therapy and sex reassignment: a systematic review and meta-analysis of qualify of life and psychosocial outcomes," *Clinical Endocrinology*, Vol. 72, p. 214 (2010).

[94] Id. at 216.

[95] Id.

[96] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011).

most evidence comes from retrospective studies."[97]  Although noting that "[m]ultiple observational studies have suggested significant and sometimes dramatic reductions in suicidality, suicide attempts, and suicides among transgender patients after receiving transition-related treatment," RAND made clear that "none of these studies were randomized controlled trials (the gold standard for determining treatment efficacy)."[98]  "In the absence of quality randomized trial evidence," RAND concluded, "it is difficult to fully assess the outcomes of treatment for [gender dysphoria]."[99]

Given the scientific uncertainty surrounding the efficacy of transition-related treatments for gender dysphoria, it is imperative that the Department proceed cautiously in setting accession and retention standards for persons with a diagnosis or history of gender dysphoria.

B.     Physical Health Standards

Not only is maintaining high standards of mental health critical to military effectiveness and lethality, maintaining high standards of physical health is as well.  Although technology has done much to ease the physical demands of combat in some military specialties, war very much remains a physically demanding endeavor.  Service members must therefore be physically prepared to endure the rigors and hardships of military service, including potentially combat. They must be able to carry heavy equipment sometimes over long distances; they must be able to handle heavy machinery; they must be able to traverse harsh terrain or survive in ocean waters; they must be able to withstand oppressive heat, bitter cold, rain, sleet, and snow; they must be able to endure in unsanitary conditions, coupled with lack of privacy for basic bodily functions, sometimes with little sleep and sustenance; they must be able to carry their wounded comrades to safety; and they must be able to defend themselves against those who wish to kill them.

Above all, whether they serve on the frontlines or in relative safety in non-combat positions, every Service member is important to mission accomplishment and must be available to perform their duties globally whenever called upon.  The loss of personnel due to illness, disease, injury, or bad health diminishes military effectiveness and lethality.  The Department's physical health standards are therefore designed to minimize the odds that any given Service member will be unable to perform his or her duties in the future because of illness, disease, or injury.  As noted earlier, those who seek to enter military service must be free of contagious diseases; free of medical conditions or physical defects that could require treatment, hospitalization, or eventual separation from service for medical unfitness; medically capable of satisfactorily completing required training; medically adaptable to the military environment; and medically capable of performing duties without aggravation of existing physical defects or medical conditions.[100]  To access recruits with higher rates of anticipated unavailability for deployment thrusts a heavier burden on those who would deploy more often.

---

[97] RAND Study at 7.
[98] Id. at 10 (citing only to a California Department of Insurance report).
[99] Id.
[100] DoDI 6130.03 at 2.

Historically, absent a waiver, the Department has barred from accessing into the military anyone who had undergone chest or genital surgery (e.g., removal of the testicles or uterus) and anyone with a history of major abnormalities or defects of the chest or genitalia, including hermaphroditism and pseudohermaphroditism.[101]  Persons with conditions requiring medications, such as anti-depressants and hormone treatment, were also disqualified from service, unless a waiver was granted.[102]

These standards have long applied uniformly to all persons, regardless of transgender status.  The Carter policy, however, deviates from these uniform standards by exempting, under certain conditions, treatments associated with gender transition, such as sex reassignment surgery and cross-sex hormone therapy.  For example, under the Carter policy, an applicant who has received genital reconstruction surgery may access without a waiver if a period of 18 months has elapsed since the date of the most recent surgery, no functional limitations or complications persist, and no additional surgery is required.  In contrast, an applicant who received similar surgery following a traumatic injury is disqualified from military service without a waiver.[103]  Similarly, under the Carter policy, an applicant who is presently receiving cross-sex hormone therapy post-gender transition may access without a waiver if the applicant has been stable on such hormones for 18 months.  In contrast, an applicant taking synthetic hormones for the treatment of hypothyroidism is disqualified from military service without a waiver.[104]

C.   Sex-Based Standards

Women have made invaluable contributions to the defense of the Nation throughout our history.  These contributions have only grown more significant as the number of women in the Armed Forces has increased and as their roles have expanded.  Today, women account for 17.6% of the force,[105] and now every position, including combat arms positions, is open to them.

The vast majority of military standards make no distinctions between men and women.  Where biological differences between males and females are relevant, however, military standards do differentiate between them.  The Supreme Court has acknowledged the lawfulness of sex-based standards that flow from legitimate biological differences between the sexes.[106]  These sex-based standards ensure fairness, equity, and safety; satisfy reasonable expectations of privacy; reflect common practice in society; and promote core military values of dignity and respect between men and women—all of which promote good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality.

---

[101] Id. at 25-27.
[102] Id. at 46-48.
[103] Id. at 26-27.
[104] Id. at 41.
[105] Defense Manpower Data Center, Active and Reserve Master Files (Dec. 2017).
[106] For example, in *United States v. Virginia*, the Court noted approvingly that "[a]dmitting women to [the Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." 518 U.S. 515, 550-51 n.19 (1996) (citing the statute that requires the same standards for women admitted to the service academies as for the men, "except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals").

For example, anatomical differences between males and females, and the reasonable expectations of privacy that flow from those differences, at least partly account for the laws and regulations that require separate berthing, bathroom, and shower facilities and different drug testing procedures for males and females.[107]  To maintain good order and discipline, Congress has even required by statute that the sleeping and latrine areas provided for "male" recruits be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training and that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits" to ensure "after-hours privacy for recruits during basic training."[108]

In addition, physiological differences between males and females account for the different physical fitness and body fat standards that apply to men and women.[109]  This ensures equity and fairness.  Likewise, those same physiological differences also account for the policies that regulate competition between men and women in military training and sports, such as boxing and combatives.[110]  This ensures protection from injury.

---

[107] See, e.g., Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017); Department of the Air Force, Air Force Instruction 32-6005, "Unaccompanied Housing Management," p. 35 (Jan 29., 2016); Department of the Army, Human Resources Command, AR 600-85, "Substance Abuse Program" (Dec. 28, 2012) ("Observers must . . . [b]e the same gender as the Soldier being observed.").

[108] See 10 U.S.C. § 4319 (Army), 10 U.S.C. § 6931 (Navy), and 10 U.S.C. § 9319 (Air Force) (requiring the sleeping and latrine areas provided for "male" recruits to be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training); 10 U.S.C. § 4320 (Army), 10 U.S.C. § 6932 (Navy), and 10 U.S.C. § 9320 (Air Force) (requiring that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits").

[109] See, e.g., Department of the Army, Army Regulation 600-9, "The Army Body Composition Program," pp. 21-31 (June 28, 2013); Department of the Navy, Office of the Chief of Naval Operations Instruction 6110.1J, "Physical Readiness Program," p. 7 (July 11, 2011); Department of the Air Force, Air Force Instruction 36-2905, "Fitness Program," pp. 86-95, 106-146 (Aug. 27, 2015); Department of the Navy, Marine Corps Order 6100.13, "Marine Corps Physical Fitness Program," (Aug. 1, 2008); Department of the Navy, Marine Corps Order 6110.3A, "Marine Corps Body Composition and Military Appearance Program," (Dec. 15, 2016); see also United States Military Academy, Office of the Commandant of Cadets, "Physical Program Whitebook AY 16-17," p. 13 (specifying that, to graduate, cadets must meet the minimum performance standard of 3:30 for men and 5:29 for women on the Indoor Obstacle Course Test); Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017) ("Performance requirement differences, such as [Army Physical Fitness Test] scoring are based on physiological differences, and apply to the entire Army.").

[110] See, e.g., Headquarters, Department of the Army, TC 3-25.150, "Combatives," p. A-15 (Feb. 2017) ("Due to the physiological difference between the sexes and in order to treat all Soldiers fairly and conduct gender-neutral competitions, female competitors will be given a 15 percent overage at weigh-in."); id. ("In championships at battalion-level and above, competitors are divided into eight weight class brackets. . . . These classes take into account weight and gender."); Major Alex Bedard, Major Robert Peterson & Ray Barone, "Punching Through Barriers:  Female Cadets Integrated into Mandatory Boxing at West Point," *Association of the United States Army* (Nov. 16, 2017), https://www.ausa.org/articles/punching-through-barriers-female-cadets-boxing-west-point (noting that "[m]atching men and women according to weight may not adequately account for gender differences regarding striking force" and that "[w]hile conducting free sparring, cadets must box someone of the same gender"); RAND Study at 57 (noting that, under British military policy, transgender persons "can be excluded from sports that organize around gender to ensure the safety of the individual or other participants"); see also International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_

Uniform and grooming standards, to a certain extent, are also based on anatomical differences between males and females. Even those uniform and grooming standards that are not, strictly speaking, based on physical biology nevertheless flow from longstanding societal expectations regarding differences in attire and grooming for men and women.[111]

Because these sex-based standards are based on legitimate biological differences between males and females, it follows that a person's physical biology should dictate which standards apply. Standards designed for biological males logically apply to biological males, not biological females, and vice versa. When relevant, military practice has long adhered to this straightforward and logical demarcation.

By contrast, the Carter policy deviates from this longstanding practice by making military sex-based standards contingent, not necessarily on the person's biological sex, but on the person's gender marker in DEERS, which can be changed to reflect the person's gender identity.[112] Thus, under the Carter policy, a biological male who identifies as a female (and changes his gender marker to reflect that gender) must be held to the standards and regulations for females, even though those standards and regulations are based on female physical biology, not female gender identity. The same goes for females who identify as males. Gender identity alone, however, is irrelevant to standards that are designed on the basis of biological differences.

Rather than apply only to those transgender individuals who have altered their external biological characteristics to fully match that of their preferred gender, under the Carter policy, persons need not undergo sex reassignment surgery, or even cross-sex hormone therapy, in order to be recognized as, and thus subject to the standards associated with, their preferred gender. A male who identifies as female could remain a biological male in every respect and still must be treated in all respects as a female, including with respect to physical fitness, facilities, and uniform and grooming. This scenario is not farfetched. According to the APA, not "all individuals with gender dysphoria desire a complete gender reassignment. . . . Some are satisfied with no medical or surgical treatment but prefer to dress as the felt gender in public."[113] Currently, of the 424 approved Service member treatment plans, at least 36 do not include cross-

---

consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion; NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.

[111] "The difference between men's and women's grooming policies recognizes the difference between the sexes; sideburns for men, different hairstyles and cosmetics for women. Establishing identical grooming and personal appearance standards for men and women would not be in the Navy's best interest and is not a factor in the assurance of equal opportunity." Department of the Navy, Navy Personnel Command, Navy Personnel Instruction 156651, "Uniform Regulations," Art. 2101.1 (July 7, 2017); see also Department of the Army, Army Regulation 670-1, "Wear and Appearance of Army Uniforms and Insignia," pp. 4-16 (Mar. 31, 2014); Department of the Air Force, Air Force Instruction 26-2903, "Dress and Personal Appearance of Air Force Personnel," pp. 17-27 (Feb. 9, 2017); Department of the Navy, Marine Corps Order P1020.34G, "Marine Corps Uniform Regulations," pp. 1-9 (Mar. 31, 2003).

[112] Department of Defense Instruction 1300.28, *In-service Transition for Service Members Identifying as Transgender*, pp. 3-4 (June 30, 2016).

[113] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018).

sex hormone therapy or sex reassignment surgery.[114]  And it is questionable how many Service members will obtain any type of sex reassignment surgery.  According to a survey of transgender persons, only 25% reported having had some form of transition-related surgery.[115]

The variability and fluidity of gender transition undermine the legitimate purposes that justify different biologically-based, male-female standards.  For example, by allowing a biological male who retains male anatomy to use female berthing, bathroom, and shower facilities, it undermines the reasonable expectations of privacy and dignity of female Service members.  By allowing a biological male to meet the female physical fitness and body fat standards and to compete against females in gender-specific physical training and athletic competition, it undermines fairness (or perceptions of fairness) because males competing as females will likely score higher on the female test than on the male test and possibly compromise safety.  By allowing a biological male to adhere to female uniform and grooming standards, it creates unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity.

These problems could perhaps be alleviated if a person's preferred gender were recognized only after the person underwent a biological transition.  The concept of gender transition is so nebulous, however, that drawing any line—except perhaps at a full sex reassignment surgery—would be arbitrary, not to mention at odds with current medical practice, which allows for a wide range of individualized treatment.  In any event, rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender women.[116]  Only up to 25% of surveyed transgender persons report having had some form of transition-related surgery.[117]  The RAND study estimated that such rates "are typically only around 20 percent, with the exception of chest surgery among female-to-male transgender individuals."[118]  Moreover, of the 424 approved Service member treatment plans available for study, 388 included cross-sex hormone treatment, but only 34 non-genital sex reassignment surgeries and one genital surgery have been completed thus far.  Only 22 Service members have requested a waiver for a genital sex reassignment surgery.[119]

Low rates of full sex reassignment surgery and the otherwise wide variation of transition-related treatment, with all the challenges that entails for privacy, fairness, and safety, weigh in favor of maintaining a bright line based on biological sex—not gender identity or some variation thereof—in determining which sex-based standards apply to a given Service member.  After all, a person's biological sex is generally ascertainable through objective means.  Moreover, this approach will ensure that biologically-based standards will be applied uniformly to all Service members of the same biological sex.  Standards that are clear, coherent, objective, consistent, predictable, and uniformly applied enhance good order, discipline, steady leadership, and unit cohesion, which in turn, ensure military effectiveness and lethality.

---

[114] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).
[115] Id.
[116] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.
[117] Id. at 100.
[118] RAND Study at 21.
[119] Defense Health Agency, Supplemental Health Care Program Data (Feb. 2018).

31

New Transgender Policy

In light of the forgoing standards, all of which are necessary for military effectiveness and lethality, as well as the recommendations of the Panel of Experts, the Department, in consultation with the Department of Homeland Security, recommends the following policy:

A.  Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex. ,

Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are eligible for service, provided that they, like all other persons, satisfy all mental and physical health standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which a transgender person's gender identity is recognized only if the person has a diagnosis or history of gender dysphoria.

Although the precise number is unknown, the Department recognizes that many transgender persons could be disqualified under this policy. And many transgender persons who would not be disqualified may nevertheless be unwilling to adhere to the standards associated with their biological sex. But many have served, and are serving, with great dedication under the standards for their biological sex. As noted earlier, 8,980 Service members reportedly identify as transgender, and yet there are currently only 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016.

B.  Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified.

Except for those who are exempt under this policy, as described below in C.3, and except where waivers or exceptions to policy are otherwise authorized, persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be disqualified from service. In the Department's military judgment, this is a necessary departure from the Carter policy for the following reasons:

1.  *Undermines Readiness.* While transition-related treatments, including real life experience, cross-sex hormone therapy, and sex reassignment surgery, are widely accepted forms of treatment, there is considerable scientific uncertainty concerning whether these treatments fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria. Despite whatever improvements in condition may result from these treatments, there is evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment, as compared to persons without gender dysphoria.[120] The persistence of these problems is a risk for readiness.

---

[120] See *supra* at pp. 24-26.

32

Another readiness risk is the time required for transition-related treatment and the impact on deployability. Although limited and incomplete because many transitioning Service members either began treatment before the Carter policy took effect or did not require sex reassignment surgery, currently available in-service data already show that, cumulatively, transitioning Service members in the Army and Air Force have averaged 167 and 159 days of limited duty, respectively, over a one-year period.[121]

Transition-related treatment that involves cross-sex hormone therapy or sex reassignment surgery could render Service members with gender dysphoria non-deployable for a significant period of time—perhaps even a year—if the theater of operations cannot support the treatment. For example, Endocrine Society guidelines for cross-sex hormone therapy recommend quarterly bloodwork and laboratory monitoring of hormone levels during the first year of treatment.[122] Of the 424 approved Service member treatment plans available for study, almost all of them— 91.5%—include the prescription of cross-sex hormones.[123] The period of potential non-deployability increases for those who undergo sex reassignment surgery. As described earlier, the recovery time for the various sex reassignment procedures is substantial. For non-genital surgeries (assuming no complications), the range of recovery is between two and eight weeks depending on the type of surgery, and for genital surgeries (again assuming no complications), the range is between three and six months before the individual is able to return to full duty.[124] When combined with 12 continuous months of hormone therapy, which is recommended prior to genital surgery,[125] the total time necessary for sex reassignment surgery could exceed a year. If the operational environment does not permit access to a lab for monitoring hormones (and there is certainly debate over how common this would be), then the Service member must be prepared to forego treatment, monitoring, or the deployment. Either outcome carries risks for readiness.

Given the limited data, however, it is difficult to predict with any precision the impact on readiness of allowing gender transition. Moreover, the input received by the Panel of Experts varied considerably. On one hand, some commanders with transgender Service members

---

[121]
  Data reported by the Departments of the Army and Air Force (Oct. 2017).
[122]
  Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).
[123]
  Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017). Although the RAND study observed that British troops who are undergoing hormone therapy are generally able to deploy if the "hormone dose is steady and there are no major side effects," it nevertheless acknowledged that "deployment to all areas may not be possible, depending on the needs associated with any medication (e.g., refrigeration)." RAND Study at 59.
[124]
  For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to 8 weeks; an orchiectomy is up to 6 weeks; and a vaginoplasty is up to three months. See University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/trans?page=guidelines-home (last visited Feb. 16, 2018); see also Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).
[125] RAND Study at 80; see also id. at 7; Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

reported that, from the time of diagnosis to the completion of a transition plan, the transitioning Service members would be non-deployable for two to two-and-a-half years.[126] On the other hand, some commanders, as well as transgender Service members themselves, reported that transition-related treatment is not a burden on unit readiness and could be managed to avoid interfering with deployments, with one commander even reporting that a transgender Service member with gender dysphoria under his command elected to postpone surgery in order to deploy.[127] This conclusion was echoed by some experts in endocrinology who found no harm in stopping or adjusting hormone therapy treatment to accommodate deployment during the first year of hormone use.[128] Of course, postponing treatment, especially during a combat deployment, has risks of its own insofar as the treatment is necessary to mitigate the clinically significant distress and impairment of functioning caused by gender dysphoria. After all, "when Service members deploy and then do not meet medical deployment fitness standards, there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower."[129] In short, the periods of transition-related non-availability and the risks of deploying untreated Service members with gender dysphoria are uncertain, and that alone merits caution.

Moreover, most mental health conditions, as well as the medication used to treat them, limit Service members' ability to deploy. Any DSM-5 psychiatric disorder with residual symptoms, or medication side effects, which impair social or occupational performance, require a waiver for the Service member to deploy.[130] The same is true for mental health conditions that pose a substantial risk for deterioration or recurrence in the deployed environment.[131] In managing mental health conditions while deployed, providers must consider the risk of exacerbation if the individual were exposed to trauma or severe operational stress. These determinations are difficult to make in the absence of evidence on the impact of deployment on individuals with gender dysphoria.[132]

The RAND study acknowledges that the inclusion of individuals with gender dysphoria in the force will have a negative impact on readiness. According to RAND, foreign militaries that allow service by personnel with gender dysphoria have found that it is sometimes necessary to restrict the deployment of transitioning individuals, including those receiving hormone therapy and surgery, to austere environments where their healthcare needs cannot be met.[133] Nevertheless, RAND concluded that the impact on readiness would be minimal—e.g., 0.0015% of available deployable labor-years across the active and reserve components—because of the

---

[126] Minutes, Transgender Review Panel (Oct. 13, 2017).
[127] Id.
[128] Minutes, Transgender Review Panel (Nov. 9, 2017).
[129] Institute for Defense Analyses, "Force Impact of Expanding the Recruitment of Individuals with Auditory Impairment," pp. 60-61 (Apr. 2016).
[130] Modification Thirteen to U.S. Central Command Individual Protection and Individual, Unit Deployment Policy, Tab A, p. 8 (Mar. 2017).
[131] Id.
[132] See generally Memorandum from the Assistant Secretary of Defense for Health Affairs, "Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications," pp. 2-4 (Oct. 7, 2013).
[133] RAND Study at 40.

exceedingly small number of transgender Service members who would seek transition-related treatment.[134] Even then, RAND admitted that the information it cited "must be interpreted with caution" because "much of the current research on transgender prevalence and medical treatment rates relies on self-reported, nonrepresentative samples."[135] Nevertheless, by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers.[136] And yet that is no reason to allow persons with those conditions to serve.

The issue is not whether the military can absorb periods of non-deployability in a small population; rather, it is whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible. As the Department has noted before: "[W]here the operational requirements are growing faster than available resources," it is imperative that the force "be manned with Service members capable of meeting all mission demands. The Services require that every Service member contribute to full mission readiness, regardless of occupation. In other words, the Services require all Service members to be able to engage in core military tasks, including the ability to deploy rapidly, without impediment or encumbrance."[137] Moreover, the Department must be mindful that "an increase in the number of non-deployable military personnel places undue risk and personal burden on Service members qualified and eligible to deploy, and negatively impacts mission readiness."[138] Further, the Department must be attuned to the impact that high numbers of non-deployable military personnel places on families whose Service members deploy more often to backfill or compensate for non-deployable persons.

In sum, the available information indicates that there is inconclusive scientific evidence that the serious problems associated with gender dysphoria can be fully remedied through transition-related treatment and that, even if it could, most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time. By this metric, Service members with gender dysphoria who need transition-related care present a significant challenge for unit readiness.

　　　　　　　　2.　　*Incompatible with Sex-Based Standards.* As discussed in detail earlier, military personnel policy and practice has long maintained a clear line between men and women where their biological differences are relevant with respect to physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards. This line promotes good order and discipline, steady leadership, unit cohesion, and ultimately military

---

[134] Id. at 42.

[135] Id. at 39.

[136] According to the National Institute of Mental Health, 2.8% of U.S. adults experienced bipolar disorder in the past year, and 4.4% have experienced the condition at some time in their lives. National Institute of Mental Health, "Bipolar Disorder" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/bipolar-disorder.shtml. The prevalence of schizophrenia is less than 1%. National Institute of Mental Health, "Schizophrenia" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/schizophrenia.shtml.

[137] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," p. 9 (Apr. 2016).

[138] Id. at 10.

effectiveness and lethality because it ensures fairness, equity, and safety; satisfies reasonable expectations of privacy; reflects common practice in the society from which we recruit; and promotes core military values of dignity and respect between men and women. To exempt Service members from the uniform, biologically-based standards applicable to their biological sex on account of their gender identity would be incompatible with this line and undermine the objectives such standards are designed to serve.

First, a policy that permits a change of gender without requiring any biological changes risks creating unfairness, or perceptions thereof, that could adversely affect unit cohesion and good order and discipline. It could be perceived as discriminatory to apply different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology. For example, it unfairly discriminates against biological males who identify as male and are held to male standards to allow biological males who identify as female to be held to female standards, especially where the transgender female retains many of the biological characteristics and capabilities of a male. It is important to note here that the Carter policy does not require a transgender person to undergo any biological transition in order to be treated in all respects in accordance with the person's preferred gender. Therefore, a biological male who identifies as female could remain a biological male in every respect and still be governed by female standards. Not only would this result in perceived unfairness by biological males who identify as male, it would also result in perceived unfairness by biological females who identify as female. Biological females who may be required to compete against such transgender females in training and athletic competition would potentially be disadvantaged.[139] Even more importantly, in physically violent training and competition, such as boxing and combatives, pitting biological females against biological males who identify as female, and vice versa, could present a serious safety risk as well.[140]

This concern may seem trivial to those unfamiliar with military culture. But vigorous competition, especially physical competition, is central to the military life and is indispensable to the training and preparation of warriors. Nothing encapsulates this more poignantly than the words of General Douglas MacArthur when he was superintendent of the U.S. Military Academy and which are now engraved above the gymnasium at West Point: "Upon the fields of friendly

---

[139] See *supra* note 109. Both the International Olympic Committee (IOC) and the National Collegiate Athletic Association (NCAA) have attempted to mitigate this problem in their policies regarding transgender athletes. For example, the IOC requires athletes who transition from male to female to demonstrate certain suppressed levels of testosterone to minimize any advantage in women's competition. Similarly, the NCAA prohibits an athlete who has transitioned from male to female from competing on a women's team without changing the team status to a mixed gender team. While similar policies could be employed by the Department, it is unrealistic to expect the Department to subject transgender Service members to routine hormone testing prior to biannual fitness testing, athletic competition, or training simply to mitigate real and perceived unfairness or potential safety concerns. See, e.g., International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion, NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/ Transgender_Handbook_2011_Final.pdf.

[140] See *supra* note 109.

36

strife are sown the seeds that, upon other fields, on other days will bear the fruits of victory."[141] Especially in combat units and in training, including the Service academies, ROTC, and other commissioning sources, Service members are graded and judged in significant measure based upon their physical aptitude, which is only fitting given that combat remains a physical endeavor.

Second, a policy that accommodates gender transition without requiring full sex reassignment surgery could also erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline. Given the unique nature of military service, Service members of the same biological sex are often required to live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom. Because of reasonable expectations of privacy, the military has long maintained separate berthing, bathroom, and shower facilities for men and women while in garrison. In the context of recruit training, this separation is even mandated by Congress.[142]

Allowing transgender persons who have not undergone a full sex reassignment, and thus retain at least some of the anatomy of their biological sex, to use the facilities of their identified gender would invade the expectations of privacy that the strict male-female demarcation in berthing, bathroom, and shower facilities is meant to serve. At the same time, requiring transgender persons who have developed, even if only partially, the anatomy of their identified gender to use the facilities of their biological sex could invade the privacy of the transgender person. Without separate facilities for transgender persons or other mitigating accommodations, which may be unpalatable to transgender individuals and logistically impracticable for the Department, the privacy interests of biological males and females and transgender persons could be anticipated to result in irreconcilable situations. Lieutenants, Sergeants, and Petty Officers charged with carrying out their units' assigned combat missions should not be burdened by a change in eligibility requirements disconnected from military life under austere conditions.

The best illustration of this irreconcilability is the report of one commander who was confronted with dueling equal opportunity complaints—one from a transgender female (i.e., a biological male with male genitalia who identified as female) and the other from biological females. The transgender female Service member was granted an exception to policy that allowed the Service member to live as a female, which included giving the Service member access to female shower facilities. This led to an equal opportunity complaint from biological females in the unit who believed that granting a biological male, even one who identified as a female, access to their showers violated their privacy. The transgender Service member responded with an equal opportunity complaint claiming that the command was not sufficiently supportive of the rights of transgender persons.[143]

The collision of interests discussed above are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions. Leaders at all levels

---

[141] Douglas MacArthur, *Respectfully Quoted: A Dictionary of Quotations* (1989), available at http://www.bartleby.com/73/1874.html.

[142] See *supra* note 108.

[143] Minutes, Transgender Review Panel (Oct. 13, 2017). Limited data exists regarding the performance of transgender Service members due to policy restrictions in Department of Defense 1300.28, *In-Service Transition for Transgender Service Members* (Oct. 1, 2016), that prevent the Department from tracking individuals who may identify as transgender as a potentially unwarranted invasion of personal privacy.

37

already face immense challenges in building cohesive military units. Blurring the line that differentiates the standards and policies applicable to men and women will only exacerbate those challenges and divert valuable time and energy from military tasks.

The unique leadership challenges arising from gender transition are evident in the Department's handbook implementing the Carter policy. The handbook provides guidance on various scenarios that commanders may face. One such scenario concerns the use of shower facilities: "A transgender Service member has expressed privacy concerns regarding the open bay shower configuration. Similarly, several other non-transgender Service members have expressed discomfort when showering in these facilities with individuals who have different genitalia." As possible solutions, the handbook offers that the commander could modify the shower facility to provide privacy or, if that is not feasible, adjust the timing of showers. Another scenario involves proper attire during a swim test: "It is the semi-annual swim test and a female to male transgender Service member who has fully transitioned, but did not undergo surgical change, would like to wear a male swimsuit for the test with no shirt or other top coverage." The extent of the handbook's guidance is to advise commanders that "[i]t is within [their] discretion to take measures ensuring good order and discipline," that they should "counsel the individual and address the unit, if additional options (e.g., requiring all personnel to wear shirts) are being considered," and that they should consult the Service Central Coordination Cell, a help line for commanders in need of advice.

These vignettes illustrate the significant effort required of commanders to solve challenging problems posed by the implementation of the current transgender service policies. The potential for discord in the unit during the routine execution of daily activities is substantial and highlights the fundamental incompatibility of the Department's legitimate military interest in uniformity, the privacy interests of all Service members, and the interest of transgender individuals in an appropriate accommodation. Faced with these conflicting interests, commanders are often forced to devote time and resources to resolve issues not present outside of military service. A failure to act quickly can degrade an otherwise highly functioning team, as will failing to seek appropriate counsel and implementing a faulty solution. The appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline.

The RAND study does not meaningfully address how accommodations for gender transition would impact perceptions of fairness and equity, expectations of privacy, and safety during training and athletic competition and how these factors in turn affect unit cohesion. Instead, the RAND study largely dismisses concerns about the impact on unit cohesion by pointing to the experience of four countries that allow transgender service—Australia, Canada, Israel, and the United Kingdom.[144] Although the vast majority of armed forces around the world do not permit or have policies on transgender service, RAND noted that 18 militaries do, but only four have well-developed and publicly available policies.[145] RAND concluded that "the available research revealed no significant effect on cohesion, operational effectiveness, or

---

[144] RAND Study at 45.
[145] Id. at 50.

readiness."[146] It reached this conclusion, however, despite noting reports of resistance in the ranks, which is a strong indication of an adverse effect on unit cohesion.[147] Nevertheless, RAND acknowledged that the available data was "limited" and that the small number of transgender personnel may account for "the limited effect on operational readiness and cohesion."[148]

Perhaps more importantly, however, the RAND study mischaracterizes or overstates the reports upon which it rests its conclusions. For example, the RAND study cites *Gays in Foreign Militaries 2010: A Global Primer* by Nathaniel Frank as support for the conclusions that there is no evidence that transgender service has had an adverse effect on cohesion, operational effectiveness, or readiness in the militaries of Australia and the United Kingdom and that diversity has actually led to increases in readiness and performance.[149] But that particular study has nothing to do with examining the service of transgender persons; rather, it is about the integration of homosexual persons into the military.[150]

With respect to transgender service in the Israeli military, the RAND study points to an unpublished paper by Anne Speckhard and Reuven Paz entitled *Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service*. The RAND study cites this paper for the proposition that "there has been no reported effect on cohesion or readiness" in the Israeli military and "there is no evidence of any impact on operational effectiveness."[151] These sweeping and categorical claims, however, are based only on "six in-depth interviews of experts on the subject both inside and outside the [Israeli Defense Forces (IDF)]: two in the IDF leadership—including the spokesman's office; two transgender individuals who served in the IDF, and two professionals who serve transgender clientele—before, during and after their IDF service."[152] As the RAND report observed, however: "There do appear to be some limitations on the assignment of transgender personnel, particularly in combat units. Because of the austere living conditions in these types of units, necessary accommodations may not be available for Service members in the midst of a gender transition. As a result, transitioning individuals are typically not assigned to combat units."[153] In addition, as the RAND study notes, under the Israeli policy at the time, "assignment of housing, restrooms, and showers is typically linked to the birth gender, which does not change in the military system until after gender reassignment surgery."[154] Therefore, insofar as a Service member's change of gender is not recognized until after sex reassignment

---

[146] Id. at 45.
[147] Id.
[148] Id.
[149] Id.
[150] Nathaniel Frank, "Gays in Foreign Militaries 2010: A Global Primer," p. 6 *The Palm Center* (Feb. 2010), https://www.palmcenter.org/wpcontent/uploads/2017/12/FOREIGNMILITARIESPRIMER2010FINAL.pdf ("This study seeks to answer some of the questions that have been, and will continue to be, raised surrounding the instructive lessons from other nations that have lifted their bans on openly gay service.").
[151] Rand Study at 45.
[152] Anne Speckhard & Reuven Paz, "Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service," p. 3 (2014), http://www.researchgate.net/publication/280093066.
[153] RAND Study at 56.
[154] Id. at 55.

surgery, the Israeli policy—and whatever claims about its impact on cohesion, readiness, and operational effectiveness—are distinguishable from the Carter policy.

Finally, the RAND study cites to a journal article on the Canadian military experience entitled *Gender Identity in the Canadian Forces: A Review of Possible Impacts on Operational Effectiveness* by Alan Okros and Denise Scott. According to RAND, the authors of this article "found no evidence of any effect on unit or overall cohesion."[155] But the article not only fails to support the RAND study's conclusions (not to mention the article's own conclusions), but it confirms the concerns that animate the Department's recommendations. The article acknowledges, for example, the difficulty commanders face in managing the competing interests at play:

> Commanders told us that the new policy fails to provide sufficient guidance as to how to weigh priorities among competing objectives during their subordinates' transition processes. Although they endorsed the need to consult transitioning Service members, they recognized that as commanding officers, they would be called on to balance competing requirements. They saw the primary challenge to involve meeting trans individual's expectations for reasonable accommodation and individual privacy while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness. To do so, they said that they require additional guidance on a range of issues including clothing, communal showers, and shipboard bunking and messing arrangements.[156]

Notwithstanding its optimistic conclusions, the article also documents serious problems with unit cohesion. The authors observe, for instance, that the chain of command "has not fully earned the trust of the transgender personnel," and that even though some transgender Service members do trust the chain of command, others "expressed little confidence in the system," including one who said, "I just don't think it works that well."[157]

In sum, although the foregoing considerations are not susceptible to quantification, undermining the clear sex-differentiated lines with respect to physical fitness; berthing, bathroom, and shower facilities; and uniform and grooming standards, which have served all branches of Service well to date, risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline. The Department acknowledges that there are serious differences of opinion on this subject, even among military professionals, including among some who provided input to the Panel of Experts,[158] but given the vital interests at stake—the survivability of Service members, including

---

[155] Id. at 45.
[156] Alan Okros & Denise Scott, "Gender Identity in the Canadian Forces," *Armed Forces and Society* Vol. 41, p. 8 (2014).
[157] Id. at 9.
[158] While differences of opinion do exist, it bears noting that, according to a Military Times/Syracuse University's Institute for Veterans and Military Families poll, 41% of active duty Service members polled thought that allowing gender transition would hurt their unit's readiness, and only 12% thought it would be beneficial. Overall, 57% had a negative opinion of the Carter policy. Leo Shane III, "Poll: Active-duty troops worry about military's transgender

transgender persons, in combat and the military effectiveness and lethality of our forces—it is prudent to proceed with caution, especially in light of the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health.

        3.    *Imposes Disproportionate Costs.* Transition-related treatment is also proving to be disproportionately costly on a per capita basis, especially in light of the absence of solid scientific support for the efficacy of such treatment. Since implementation of the Carter policy, the medical costs for Service members with gender dysphoria have increased nearly three times—or 300%—compared to Service members without gender dysphoria.[159] And this increase is despite the low number of costly sex reassignment surgeries that have been performed so far.[160] As noted earlier, only 34 non-genital sex reassignment surgeries and one genital surgery have been completed,[161] with an additional 22 Service members requesting a waiver for genital surgery.[162] We can expect the cost disparity to grow as more Service members diagnosed with gender dysphoria avail themselves of surgical treatment. As many as 77% of the 424 Service member treatment plans available for review include requests for transition-related surgery, although it remains to be seen how many will ultimately obtain surgeries.[163] In addition, several commanders reported to the Panel of Experts that transition-related treatment for Service members with gender dysphoria in their units had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care.[164]

        Taken together, the foregoing concerns demonstrate why recognizing and making accommodations for gender transition are not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality. Therefore, it is the Department's professional military judgment that persons who have been diagnosed with, or have a history of, gender dysphoria and require, or have already undergone, a gender transition generally should not be eligible for accession or retention in the Armed Forces absent a waiver.

    C.   <u>Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances.</u>

---

policies," *Military Times* (July 27, 2017) available at https://www.militarytimes.com/news/pentagon-congress/2017/07/27/poll-active-duty-troops-worry-about-militarys-transgender-policies/.

[159] Minutes, Transgender Review Panel (Nov. 2, 2017).

[160] Minutes, Transgender Review Panel (Nov. 2, 2017).

[161] Data retrieved from Military Health System Data Repository (Nov. 2017).

[162] Defense Health Agency Data (as of Feb. 2018).

[163] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).

[164] Minutes, Transgender Review Panel (Oct. 13, 2017); see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1185 (Oct. 2016) ("As previously discussed, a new diagnosis of gender dysphoria and the decision to proceed with gender transition requires frequent evaluations by the [mental health professional] and endocrinologist. However, most [military treatment facilities] lack one or both of these specialty services. Members who are not in proximity to [military treatment facilities] may have significant commutes to reach their required specialty care. Members stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations.").

41

As explained earlier in greater detail, persons with gender dysphoria experience significant distress and impairment in social, occupational, or other important areas of functioning. Gender dysphoria is also accompanied by extremely high rates of suicidal ideation and other comorbidities. Therefore, to ensure unit safety and mission readiness, which is essential to military effectiveness and lethality, persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1.  *Accession of Individuals Diagnosed with Gender Dysphoria.* Given the documented fluctuations in gender identity among children, a history of gender dysphoria should not alone disqualify an applicant seeking to access into the Armed Forces. According to the DSM-5, the persistence of gender dysphoria in biological male children "has ranged from 2.2% to 30%," and the persistence of gender dysphoria in biological female children "has ranged from 12% to 50%."[165] Accordingly, persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability—i.e., absence of gender dysphoria—immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex. The 36-month stability period is the same standard the Department currently applies to persons with a history of depressive disorder. The Carter policy's 18-month stability period for gender dysphoria, by contrast, has no analog with respect to any other mental condition listed in DoDI 6130.03.

2.  *Retention of Service Members Diagnosed with Gender Dysphoria.* Retention standards are typically less stringent than accession standards due to training provided and on-the-job performance data. While accession standards endeavor to predict whether a given applicant will require treatment, hospitalization, or eventual separation from service for medical unfitness, and thus tend to be more cautious, retention standards focus squarely on whether the Service member, despite his or her condition, can continue to do the job. This reflects the Department's desire to retain, as far as possible, the Service members in which it has made substantial investments and to avoid the cost of finding and training a replacement. To use an example outside of the mental health context, high blood pressure does not meet accession standards, even if it can be managed with medication, but it can meet retention standards so long as it can be managed with medication. Regardless, however, once they have completed treatment, Service members must continue to meet the standards that apply to them in order to be retained. Therefore, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[166]

---

[165] DSM-5 at 455.

[166] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

42

3.      *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.*  The Department is mindful of the transgender Service members who were diagnosed with gender dysphoria and either entered or remained in service following the announcement of the Carter policy and the court orders requiring transgender accession and retention.  The reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed. Therefore, transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary treatment, to change their gender marker in DEERS, and to serve in their preferred gender, even after the new policy commences.  This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order.  The Service member must, however, adhere to the procedures set forth in DoDI 1300.28, and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).  While the Department believes that its commitment to these Service members, including the substantial investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption instead is and should be deemed severable from the rest of the policy.

43

## Conclusion

In making these recommendations, the Department is well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues. But as the forgoing analysis demonstrates, the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed. In fact, the RAND study itself repeatedly emphasized the lack of quality data on these issues and qualified its conclusions accordingly. In addition, that study concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs. In its view, however, such harms were negligible in light of the small size of the transgender population. But especially in light of the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect, the Department is not convinced that these risks could be responsibly dismissed or that even negligible harms should be incurred given the Department's grave responsibility to fight and win the Nation's wars in a manner that maximizes the effectiveness, lethality, and survivability of our most precious assets—our Soldiers, Sailors, Airmen, Marines, and Coast Guardsmen.

Accordingly, the Department weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring in developing these recommendations. It is the Department's view that the various balances struck by the recommendations above provide the best solution currently available, especially in light of the significant uncertainty in this area. Although military leadership from the prior administration reached a different conclusion, the Department's professional military judgment is that the risks associated with maintaining the Carter policy—risks that are continuing to be better understood as new data become available—counsel in favor of the recommended approach.

44

## Analysis of Psychological Stability as a Factor in Determining Medical Accession Standards for Transgender Individuals

### Part I: Task and Methodology

In their ongoing efforts to address concerns regarding medical standards for transgender individuals accessing into the U.S. Military, the Accession Medical Standards Working Group tasked the Psychological Health Center of Excellence (PHCoE) and the Accession Medical Standards Analysis and Research Activity (AMSARA) to investigate any relevant data sources that may suggest appropriate periods of psychological stability prior to enlistment or commissioning. Specifically, four questions were posed by Dr. Ciminera and CAPT Bradford on behalf of the AMSWG:

*1. What are the appropriate periods of stability prior to accession into the military for medical (e.g. surgeries, cross-sex hormone use) and psychological conditions associated with gender dysphoria or a gender transition?*

*2. Do our current accession stability period standards for mental health conditions such as depression or anxiety (typically 36 months of stability following treatment) appropriately inform what we should consider appropriate for gender dysphoria or gender transition?*

*3. Does the evidence show that issues such as cross-sex hormone therapy, not a medical condition, should have an equal period of stability as gender dysphoria?*

*4. What would be the next logical steps for further research into this space to inform DoD medical standards?*

To address these core questions, the PHCoE and AMSARA teams crafted a joint approach that includes four phases:

Phase 1: Initial environmental scan of relevant treatment standards, key literature, and international military standards for military accession by transgender individuals.

Phase 2: Analysis of health care data from an identified cohort of individuals diagnosed with gender dysphoria or undergoing gender transition medical procedures in the military health system.

Phase 3: Comprehensive literature review of psychological stability associated with gender dysphoria, gender transition, and hormone replacement therapy.

Phase 4: Analysis of administrative and health care data from a cohort of accessions and separations from transgender disqualifications and waivers.

The current information paper addresses Phases 1 and 2 of this analysis. Phases 3 and 4 will continue as a joint effort between PHCoE and AMSARA throughout Fiscal Year 2021.

**Part II: Literature Review on Psychological Stability in Transgender Individuals**

The *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (Version 7) published by the World Professional Association for Transgender Health (WPATH, 2012) maps out the epidemiology of gender non-conformity, non-medical and medical interventions for gender-related distress, and roles of various providers through various interventions. In considering psychological stability and suitability for military service among transgender individuals, several principles from the WPATH guidelines are relevant:

1. The recommendation to de-pathologize gender non-conformity and recast it as a normal variation of human diversity;
2. Correctly diagnose the "socially-induced" nature of mental health concerns associated with gender non-conformity that comes from widespread prejudice and discrimination rather than gender non-conformity itself;
3. Understand gender dysphoria as distress that can fluctuate in individuals of all gender identities and not necessarily an inherent aspect of gender non-conformity.

The WPATH Standards of Care document also acts as a possible template and helpful comprehensive guide for other institutions. In addition, the principles above are consistent with movement in the International Classification of Diseases (ICD-11) developed by the World Health Organization that renames gender dysphoria as gender incongruence instead and relocates the condition to the sexual health category rather than mental health. They are also consistent with the Department of Defense commitment to diversity and appreciation for the ways various perspectives and abilities maximize our fighting force.

Psychological health issues such as depression, anxiety, suicidality, and non-suicidal self-injury are more prevalent among transgender individuals seeking medical care compared to the general population. Representative and methodologically-sound studies of the transgender population and specifically, of military or Veteran transgender individuals are rare. Overall, transition-related medical interventions positively impact mental health and quality of life.

Elders, Brown, Coleman, Kolditz, and Steinman (2014) summarize and challenge four common notions to justify barring transgender individuals from Service which are actually not supported by research and not internally consistent with other DoD policies and populations. These four notions are (pp. 4-5):

*(1) transgender personnel are too prone to mental illness to serve, (2) cross-sex hormone therapy is too risky for medical personnel to administer and monitor, (3) gender-confirming surgery is too complex and too prone to postoperative complications to permit, and (4) transgender personnel are not medically capable of safely deploying.*

The most notable challenge to these assumptions is falsely equating transgender identity with mental health disorders, which has become a debunked connection broadly in the medical field. In addition, there are a number of other conditions that require hormone treatment which do not bar service or deployment for other groups, including: dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, and renal or voiding dysfunctions. In addition, the authors cite

that 1.4% of all US Service Members report taking prescribed anabolic steroids. The authors conclude that the transgender bar is inconsistent with current medical understanding and relies on assumptions that are either unfounded or inconsistent with other standards for conditions affecting predominately cisgender individuals.

**Core Findings regarding Psychological Stability of Transgender Individuals**

Dhejne et al. (2016) systematically reviewed 47 studies on gender dysphoria among those seeking gender-affirming treatment and concluded that transgender individuals experienced higher rates of psychiatric disorders at study baselines. Mood disorders such depression and anxiety disorders are prevalent among transgender individuals (Dheine et al., 2016; Freitas et al., 2020; McCann & Brown, 2018). While little has been published on the military transgender community, Lindsay et al. (2016) describe mental health prevalence rates for 336 military veterans who served in Iraq and/or Afghanistan and report that 70% of transgender women and 67% of transgender men had depressive disorders. Additionally, 51% of transgender women and 55% of transgender men had anxiety disorders (Lindsay et al., 2016). Swedish civilian transgender individuals actively seeking treatment were approximately 6 times more likely to receive treatment for a mood or anxiety disorder and almost 4 times more likely to use an antidepressant than the general population (Bränström and Pachankis, 2020). The prevalence rates of depression among transgender individuals ranges from 21-60% (Boza & Perry, 2014).

A secondary data analysis of medical records from the Veteran Health Administration (N=32,441), comparing suicide, homicide, and all-cause mortality rates, indicated that transgender Veterans were significantly more likely to complete suicide than the cisgender comparison group and cisgender Veterans were significantly more likely to die from all-cause mortality (Boyer, Youk, Haas, Brown, Shipherd, Kauth, Jasujaa, & Blosnich, 2021). Similar to the Bränstrom and Pachankis (2020) study, suicide completion was still a low-base rate behavior despite significant differences between groups (.8% versus .2% in the cisgender group). Of note, all-cause mortality was higher in the cisgender population in ages 40-64 (19.9% versus 13.6% in the transgender group) and >65 (40.3% versus 25.7% in the transgender group). Marshall et al. (2016) systematically reviewed 31 studies on non-suicidal self-injury, suicidal ideation, and suicide attempts among transgender individuals and reported all to be prevalent across studies. Five of the reviewed studies suggest that non-suicidal self-injury is more prevalent among transgender individuals, specifically among trans men, with one study further clarifying that trans women may be more likely to engage in self-harm behaviors while thoughts of self-harm may be more common among trans men. Twenty-six studies on suicidality were reviewed and researchers concluded that suicidal thoughts and attempts are prevalent among transgender individuals. Across reviewed studies, rates of suicidal ideation within the samples ranged widely from 37% to 81%, with trans men experiencing more prevalent suicidal ideation, and rates of suicide attempts ranged from 18% to 52% of trans participants reporting in their lifetime (Marshall et al., 2016). Rates were consistently higher than the national US average, and those reported by other subgroups in the LGBT community. In one study, transgender individuals within the medical system had consistently higher rates of hospitalization after a suicide attempt over a ten-year period compared to the general population; however, this rate was low for both

groups (.08 versus .01%; Bränström and Pachankis, 2020). Higher rates of suicide attempts for transgender individuals are reportedly correlated with history of incarceration and lower socioeconomic status (McNeill, Ellis, & Eccles, 2017). Studies have indicated that factors indicating higher risk for suicidal ideation include: history of abuse, history of psychotherapy or medication use, history of physical or sexual violence, who were planning to or had already transitioned and were experiencing discrimination, while those who did not plan to transition experienced less risk (McCann & Brown, 2018; McNeill et al., 2017).

*Variation within the Trans Community*

Studies have shown there to be variability of mental health issue prevalence and severity within the trans community but have offered inconsistent findings regarding those differences. Researchers offer conflicting conclusions, particularly regarding the psychological health issues experienced by transmen versus transwomen. Some studies have shown higher psychopathology among trans women, while others have shown no difference (Dhjene et al., 2016). Additionally, some studies show greater risk for suicide attempts among trans men, while at least one study has reported trans women to be at greater risk, and still others have found no difference in risk for suicide attempt (McNeil et al., 2017).

*Minority Stress and Social Risk Factors*

When describing the risk factors for psychological issues in this population, it is important to acknowledge the many social factors that contribute as well. Minority stress plays a role in trans people's lives, because of the psychological damage caused by stigma, discrimination, and transphobia (McCann & Brown, 2018). By acknowledging the impact of minority stress, researchers and clinicians can avoid pathologizing and blaming transgender folks for the higher rates of psychological issues that they experience (Scandurra, Amodeo, & Valerio, 2017). Trans folks experience risk factors related to discrimination by others such as limited access to services such as housing, healthcare, and financial supports that are necessary to meet physical and emotional needs (McCann & Brown, 2018). The effects of discrimination are also seen in the workplace, as it can impact employment status and financial stability, social isolation and exclusion (McCann & Brown, 2018). Physical safety concerns are also reported among the trans community as causing psychological distress and are a realistic threat (McCann & Brown, 2018). Of the documented hate violence against members of the LGBTQ community in 2017, 32% of survivors were transgender (National Coalition of Anti-Violence Programs, 2018). Of the 52 documented hate violence homicides of LGBTQ people in 2017, 52% ($n = 27$) were transgender or gender non-conforming (National Coalition of Anti-Violence Programs, 2018). Further, a majority ($n = 22$) of transgender people who were killed in 2017 were trans women of color (National Coalition of Anti-Violence Programs, 2018).

*Limitations of Current Literature on Psychological Issues*

There are many limitations to the current research on psychological issues experienced by transgender individuals. While studies indicate that mental health issues may remain prevalent among transgender folks, it is difficult to draw generalizable conclusions from older studies, particularly when current medical and psychosocial interventions have progressed a lot over the

past 20 years (Dhjene et al., 2016). Many studies show a sampling bias of transgender people actively seeking transition-related medical interventions or other treatment within a healthcare setting, which could skew the findings towards overrepresenting those with more severe psychopathology, or individuals with greater contact with medical professionals who may diagnose them, and therefore, may not represent the transgender population as a whole (Dhjene et al., 2016). This could also contribute to prevalence rates, as transgender individuals actively engaging in the medical system might have increased opportunities to be diagnosed with mental disorders. There are also issues with generalizability of findings to the trans people in the United States, due to many studies being conducted in Europe, with additional difficulty generalizing findings to those in the military (McCann & Brown, 2018). Study samples often under-represent people of color, neglecting intersectionality and limiting the applicability of findings to individuals experiencing compounded minority stress (McCann & Brown, 2018). Lack of agreement on terms used to describe the transgender community presents an additional challenge to application of findings, as does the lack of attention to gender identity and expression diversity and fluidity (i.e., non-binary, gender non-conforming, gender fluid) within the larger trans community. The methods of traditional quantitative studies often do not have the flexibility that is required to capture and explain the nuances of diverse identities and experiences of this community. When studies do differentiate findings based on smaller subgroups, transwomen appear to be overrepresented across many study samples (McCann & Brown, 2018; Van de Grift et al., 2017).

**Psychological Effects of Transition-Related Medical Interventions**

In general, transition-related medical interventions positively impacted mental health and quality of life. However, there are few studies that measure transition-related medical interventions over time and at specific time-points. In addition, there have only recently been initiatives to standardize outcome measurements for transition-related medical interventions, which have historically made compared groups and outcomes hard due use of non-validated instruments (e.g., Andréasson, Geogas, Elander, & Selvaggi, 2018). We identified three large or cohort-based European studies that provided information on outcomes (Bränström & Pachankis, 2020; Van de Grift, Elaut, Cerwenka, De Cuypere, Richter-Appelt, & Kreukels, 2017; White Hughto, & Reisner, 2016) and one US-based study (Hughto, Gunn, Rood, & Pantalone, 2020).

Of note, many European countries have universal healthcare infrastructure and access for transgender individuals, which may be more transferable to the military healthcare context than the civilian United States system. Bränström and Panchankis (2020) examined healthcare utilization longitudinally from a national Swedish register and found that a sample of 2,679 individuals who received a gender incongruence diagnosis were, at baseline and in general, were more likely to receive treatment for mood or anxiety disorder; however, that gap reduced based on time since last gender-affirming surgery. The likelihood of being treated for mental health treatment reduced by 8% for each year after gender-affirming surgery.  Transgender individuals were equally likely over time to be hospitalized after a suicide attempt (approx. .08% compared to .01% of the general population) and were more likely than the general population to be hospitalized, but the rates were generally low. Van de Grift and colleagues (2017) found that 200

individuals who provided information at baseline upon entering into gender identity clinic and 6 years follow-up who received hormone or surgical intervention reported increased body satisfaction compared to individuals who had received no treatment ($n = 29$). Body satisfaction was not related to gender dysphoria, but was positively related to psychological symptoms. In other words, there was a lot of individual variation, but in general transition-related medical intervention can decrease psychological symptoms and increase body satisfaction. White Hughto, and Reisner (2016) systematically reviewed three studies from gender identity clinics across Italy and Belgium and found that 247 transgender individuals receiving hormone treatment reported significant improvement in psychological functioning (i.e., general mental health symptoms and quality of life) after starting hormone treatment at 3-6 months and 12 months. There was a statistically significant improvement in self-reported quality of life for the transfeminine group ($n = 180$) and a non-significant improvement for the transmasculine group, which may be related to a smaller sample ($n = 67$). Hughto and colleagues (2020) identified that social and medical affirming interventions were inversely related to self-reported mental health symptoms and non-suicidal self-injury in a sample of 288 US-based individuals.

Because of individual variation, relevant variables, and insufficient outcome data, we cannot make conclusions about the specific timing of the positive effects of hormone treatment and/or surgical intervention. However, these positive effects may be experienced even as early as 3-6 months (e.g., White Hughto & Reisner, 2016). Gender dysphoria may become an obsolete diagnosis and may not be related as strongly to overall psychological functioning as body satisfaction (e.g., Van de Grift et al., 2017). Baseline and outcome experiences of transition-related medical interventions are significantly impacted by a variety of mechanisms, included the cultural context, structural barriers to healthcare and other basic needs, and social support (e.g., White Hughto, Reisner, & Pachankis, 2015). Another major limitation is that other non-medical, gender affirming interventions often co-occurred with medical interventions, which can also have a significant positive impact on treatment outcomes (e.g., Hughto et al., 2020). It follows that gender dysphoria as a diagnosis may not be useful as a determinant for overall functioning and focusing on making the environment affirming can itself improve outcomes.

(Page 134 of Total)

USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 134 of 688

**Summary of Studies Examining Psychological Changes following Transition-Related Medical Interventions**

| Study | Sample | Conclusions | Limitations |
|---|---|---|---|
| Bränström & Pachankis, 2020 | Swedish; N=2,679<br><br>Time-points: Baseline, annual through 10+ years | Gender affirming surgery may be more strongly correlated with less mental health care utilization over time | No matched controls<br><br>Only recruited individuals already seeking medical transition |
| Van de Grift, Elaut, Cerwenka, De Cuypere, Richter-Appelt, & Kreukels, 2017 | European; N=201<br>○ 135 transfeminine<br>○ 66 transmasculine<br><br>Time-points: Baseline, + 6 years | At 6 years post-intervention, individuals with and without medical intervention had similar self-reported gender dysphoria to the general population<br><br>Gender dysphoria was not related to body satisfaction and body satisfaction was related positively to mental health symptoms | No matched controls; however, there was a no-treatment comparison group, but was not randomized |
| White Hughto, & Reisner, 2016 | European; N=247<br>○ 180 transfeminine<br>○ 67 transmasculine<br><br>Time-points: baseline, 3-6 months, and 12 months | Hormone treatment was correlated with significantly improved psychological functioning at both follow-up time-points | No control groups<br><br>Mental health treatment provided concurrently with hormone treatment<br><br>Social transition occurred concurrently with hormone treatment |
| Hughto, Gunn, Rood, & Pantalone, 2020 | American; N=288<br>○ 234 trans-masculine gender spectrum<br>○ 54 trans-feminine gender spectrum<br><br>Time-points: Cross-sectional | Effects of non-medical and medical gender affirmation are likely additive with regard to mental health and quality of life | No control groups<br><br>Not longitudinal (i.e., measured over time) |

**Part III: Analysis of Medical Administrative Data on Transgender Service Members**

**Key Findings**

- Applicability of MHS utilization data to questions of accession standards or waiting periods is limited.
- Comparison of matched transgender and depression cohorts suggest that, ***relative to Service Members with depression***,…
    1. …transgender Service Members are more likely to remain on active duty longer following cohort eligibility; AND
    2. …transgender Service Members spend less time in a non-deployable status due to mental health reasons.
- Most transgender Service Members will eventually receive hormone treatments and there appears to be no meaningful difference in deployability (related to mental health concerns) between those with and without a history of such treatment.

**Background**

On 15MAR2021, the Psychological Health Center of Excellence (PHCoE) was tasked by USD(P&R/HA) to support a request for information related to DoD accession policies as they pertain to transgender recruits. In addition to providing a literature review and an analysis of existing policy, PHCoE was directed to determine how transgender service members' healthcare utilization might inform discussions on this matter.

A number of factors limit our ability to apply medical administrative data meaningfully to address the important questions posed around accession waiting periods for transgender recruits. Principal amongst these limitations is that DoD medical databases do not contain information on transgender individuals who apply to join military service but are not ultimately selected. Consequently, data that might speak to these issues are limited to the healthcare utilization of those transgender service members who either met existing accession standards or whose transgender status was only evident following entry into military service. Analysis and interpretation are further limited by the lack of availability of accurate readiness, deployability, and duty limitation data. Finally, it is important to note that members of the transgender community are encouraged (and in many cases required) to maintain contact with mental health services. As such, using administrative data alone to distinguish contacts with mental health service providers that might be duty-limiting from those mental health contacts that are functionally equivalent to wellness visits poses a substantial threat to the validity and interpretability of potential findings.

In light of the limitations mentioned above, and given that available Military Health System (MHS) data do not speak directly to the issue of appropriate accession waiting periods (for any specific circumstance), PHCoE undertook analyses to identify a cohort of transgender service members and describe patterns of healthcare utilization that *might* indicate non-deployability or other duty limitations. These analyses may provide useful context to decision-makers as they consider options related to transgender accessions policy.

## Methods

Analysts identified a cohort of transgender service members based on qualifying diagnoses[1] recorded in either the first or second diagnostic position using either ICD-9 or ICD-10 diagnostic codes[2] between CY2015 and CY2020. This approach to case-finding yielded a cohort of 2,039 individuals over the six-year period. To identify contacts with the mental health system that might be duty-limiting we considered all inpatient admissions and outpatient encounters where the primary reason for the visit/admission (as defined by the diagnostic code recorded in the first diagnostic position) had to do with mental health or substance abuse concerns *other than gender dysphoria or tobacco dependence*. The exclusion of mental health contacts related to gender dysphoria was meant to exclude those encounters that might be considered psychological wellness checks for transgender individuals.

Additionally, analysts identified a matched depression cohort for the purposes of comparison. The two matched cohorts each contained 2,039 individuals and were matched based on age (year), service (Air Force, Army, Marine Corps, Navy), month of entry diagnosis, and component (Active or Reserve). Readiness outcomes were examined for each cohort and compared.

Two sets of ancillary analyses were also carried out. First, since some forms of hormone therapies can render individuals non-deployable, we described hormone therapy use by cohort year with specific attention to routes of administration. We also compared the portion of the transgender cohort who received hormone therapy at some point during the observation period with those who never received hormone treatments and compared both groups on readiness outcomes. Finally, we identified seven transgender Service members for whom gender-dysphoria-related information existed in the medical record prior to accession (i.e., Service Members who were dependent beneficiaries prior to enlisting). Given the extremely small sample size, no conclusions can be drawn that could be generalized to the larger population of transgender recruits. However, since this small group represents the military health system data most applicable to the question of accession standards, the readiness outcomes of these group members are described in a brief case series table.

## Findings

**Table 1: Cohort Entry**

| Cohort Entry Year | % of Cohort |
|---|---|
| 2015 | 6.78% |
| 2016 | 24.39% |
| 2017 | 24.83% |
| 2018 | 17.57% |
| 2019 | 16.25% |
| 2020 | 10.17% |

As noted above, the identified cohort consisted of 2,039 transgender service members of whom roughly 85% were enlisted, about 5% were officers, and around 10% were either in other rank categories or had no recorded rank group. Table 1 shows the distribution by Calendar Year of entry into the cohort across the observation period. 2016 and 2017 mark the years with the largest proportion of Service Members entering the cohort.

---

[1] Transsexualism, Dual Role Transvestism, Gender Identity Disorder Of Childhood, Other Gender Identity Disorders, Gender Identity Disorder, Unspecified, Transvestic Fetishism, Personal History Of Sex Reassignment

[2] 302.3, 302.6, 302.50, 302.51, 302.52, 302.53, 302.85, F64.0, F64.1, F64.2, F64.8, F64.9, F65.1, Z87.890

Since the length of time that service members remain on active duty impacts both their deployability and the level of confidence of our estimates, we first examined how long individuals remained on active duty as observable in the medical benefits eligibility data. For the purpose of this time-to-event analysis, time "zero" for all members was set to the date at which they became identifiable as cohort members in the medical record. Individuals were then followed in the eligibility data and their end-of-service date was set as the month following the last month during which they were listed as being eligible for benefits by virtue of their active duty status. Individuals still on active duty at the time of analysis have no end-of-service dates. On average, members' first documented cohort-qualifying medical encounter occurred about 2.3 years (SD=1.8) after cohort members' earliest MHS enrollment as an Active Duty Service Member.[3] There was no evidence to suggest within-cohort differences in time on Active Duty based on the year in which service members joined the cohort. Based on observed "survival" on active duty, we would expect that slightly more than 50% of transgender service members will leave service by 23 months after receiving their first transgender-related diagnosis within the MHS. How this compares with retention amongst non-transgender service members, however, is now known. The results of this analysis are shown below in Figure 1.

**Figure 1: Time to Termination of Service (Transgender Cohort)**



Given the substantial attrition evident in the cohort, there are many fewer transgender service members with longer service histories available for observation. The most consequential impact of this for our purposes is that our ability to predict longer-term readiness outcomes is even

---

[3] Administrative data related to pre-cohort entry enrollment in the MHS is unreliable. Nearly 20% of identified cohort members were excluded from the calculation of mean time to cohort entry due to missing or obviously erroneous data.

further limited by a rapidly decreasing population under study. As a result, examination of likely non-deployable episodes was limited to the first 24 months following identification as a member of the transgender cohort.

Interestingly, the matched cohort of Service Members with depression were more likely to leave service sooner following cohort entry as compared to the transgender cohort. As presented in Figure 2, below, 50% of the transgender cohort had left service in the first 23 months following gaining cohort eligibility. Amongst the depression cohort, however, 50% had left service within the first 14 months.

**Figure 2: Time to Termination of Service (Transgender vs. Depression Cohorts)**



PHCoE applied CENTCOM standards in considering non-deployability based on mental health concerns amongst the identified cohort of transgender service members. Per available guidance, service members are considered non-deployable to the CENTCOM area of operations for **three months** following the conclusion of outpatient mental health treatment and for **12 months** following an inpatient stay for a mental health concern. Using this definition, around 60% or more of the transgender service member cohort remained deployable throughout the 24 months following cohort eligibility. In general, 10% or fewer of the cohort were non-deployable for reasons related to inpatient mental health stays in the two years following initial diagnosis. Similarly, only about 30% of the cohort would have been non-deployable as a result of outpatient mental health contacts unrelated to gender dysphoria in the 24 months following identification as a cohort member through medical administrative data. Importantly, data were not available from non-transgender service members that could serve as a basis for comparison to indicate if

supposed non-deployability rates amongst the transgender cohort differed from the overall non-deployability rate. Results of this analysis are presented below in Figure 3.

**Figure 3: Estimated Deployability and Non-Deployability amongst Transgender Cohort Members**



Note that Figure 3 also portrays the decreasing proportion of the cohort still in service (the stepped dotted line). As this proportion decreases, certainty around the accuracy of deployability estimates decreases as well.

In order to better contextualize the readiness outcomes of the transgender cohort presented above, analysts examined readiness outcomes amongst the depression cohort. Figure 4, below, shows the proportion of members of each cohort who are still in service as a function of months with cohort-qualifying diagnoses. Figure 4 also presents the proportion of cohort members remaining in service whose deployability we could reasonably expect to be **unrestricted** on the basis of outpatient mental health encounters (non-deployable for 3 months following) or inpatient psychiatric admissions (non-deployable for 12 months following inpatient discharge). As noted above, the transgender cohort stayed in service longer, on average, than did the depression cohort. Interestingly, the transgender cohort also had a greater proportion of members available for deployment than the depression cohort. It is noteworthy that the availability curves approach one another toward the end of the 24-month observation period; this may reflect a selection mechanism wherein individuals with more severe problems had been removed from the population by this point in time. Collectively, this analysis suggests that, within the first 24 months following receipt of a cohort-qualifying diagnosis, members of the transgender cohort are more deployable than members of the matched cohort of service members with depressive disorders.

**Figure 4: Comparison of the Estimated Deployability of the Transgender and Depression Cohorts**



PHCoE also considered transgender service members and hormone therapies since some administration routes impact deployability. Notably, regulations require that transgender service members live for at least 12 months as their preferred gender before initiating hormone therapies. Consequently, we expect that cohort members who were identified more recently (CY2019 or CY2020) would receive hormone therapies at a lower rate. Table 2, below, illustrates the number and proportion of cohort members who have received hormone therapies during the observation period. The table breaks out hormone therapy rates by routes of administration and cohort year. As expected, cohort members identified in CY2019 and CY2020 were less likely to have records of hormone therapy prescriptions. Around 70% of earlier cohorts have received at least one prescription for hormones. Nearly 50% of transgender service members in the 2015-2018 cohorts have received injectable hormones.

**Table 2: Transgender Service Members Receiving Hormone Therapy**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| No Hormone Therapy | 45 (31.7%) | 125 (23.4%) | 167 (31.4%) | 112 (30.1%) | 184 (54.1%) | 162 (75.3%) |
| Capsules Only | 22 (15.5%) | 75 (14.0%) | 68 (12.8%) | 76 (20.4%) | 56 (16.5%) | 26 (12.1%) |
| Injections Only | 28 (19.7%) | 162 (30.3%) | 138 (25.9%) | 87 (23.4%) | 39 (11.5%) | 20 (9.3%) |
| Transdermal Only | 0 (0.0%) | 12 (2.2%) | 16 (3.0%) | 14 (3.8%) | 15 (4.4%) | 1 (0.5%) |
| Capsules and Injections | 20 (14.1%) | 48 (9.0%) | 37 (7.0%) | 17 (4.6%) | 17 (5.0%) | 3 (1.4%) |
| Capsules and Transdermal | 6 (4.2%) | 31 (5.8%) | 33 (6.2%) | 18 (4.8%) | 6 (1.8%) | 1 (0.5%) |
| Injections and Transdermal | 15 (10.6%) | 52 (9.7%) | 54 (10.2%) | 39 (10.5%) | 19 (5.6%) | 2 (0.9%) |
| Capsules, Injections, & Transdermal | 6 (4.2%) | 30 (5.6%) | 19 (3.6%) | 9 (2.4%) | 4 (1.2%) | 0 (0.0%) |

There was no meaningful difference in readiness outcomes between those members of the transgender cohort who received hormone therapy and those who did not. The solid lines in the two graphs in figure 5, below, illustrate the proportions of the transgender cohort receiving and not receiving hormone therapy who have no mental-health-related restrictions on deployability (per CENTCOM standards) at each month following cohort entry. For the most part, there was a 0.6 to 0.7 probability that cohort members in either subgroup would be deployable during the 24-months following cohort entry.

**Figure 5: Deployability Amongst Transgender Cohort Members With and Without Hormone Therapy**



Finally, we identified all members of the transgender cohort who appeared to have pre-accession medical records by virtue of their status as dependent beneficiaries. While 27 individuals were initially identified, data cleaning procedure reduced the total number of cases with pre-accession medical histories that included gender dysphoria to only 7 cases. This number of far too small to make generalizable statements regarding the transgender recruit population as a whole. However, because these 7 cases represent the only data that speak directly to the question of mental healthcare utilization and potential duty limitations amongst transgender service members who were identifiable as such prior to entry into military service, their experience may be illustrative. Table 3 lists each of the seven cases along with the number of months prior to accession since their earliest cohort-qualifying event, the total number of months following accession that they were available for deployment and the total number where they would presumably not have been deployable by virtue of either inpatient or outpatient mental health care.

**Table 3:Case Series Analysis of Transgender Cohort Members with Pre-Accession MHS Contacts**

| | Months Between Initial Gender Dysphoria Dx and Accession | Months Available for Deployment Following Accession | Months Non-Deployable due to Outpatient Mental Health Treatment Following Accession | Months Non-Deployable due to Inpatient Mental Health Treatment Following Accession |
|---|---|---|---|---|
| Case 1 | 123 | 1 | 4 | 0 |
| Case 2 | 56 | 20 | 37 | 13 |
| Case 3 | 17 | 11 | 14 | 13 |
| Case 4 | 32 | 24 | 8 | 13 |
| Case 5 | 20 | 2 | 0 | 0 |
| Case 6 | 43 | 9 | 0 | 0 |
| Case 7 | 53 | 5 | 0 | 0 |

As the table above illustrates, there was considerable variance in the amount of time prior to accession and after initial gender dysphoria diagnosis within the MHS between the selected cases. If one assumes overlapping inpatient and outpatient episodes of non-deployability then one could make the claim that 4 out of 7 cases spent more time deployable than not. It is important to note, however, that four out of the seven had less than one year of post-accession military service during the observation window, further limiting interpretability of these findings.

**Conclusions**

As noted above, the medical administrative data do not speak directly to the question of how long accession waiting periods should be. Instead, these data can be used to identify and follow a cohort of transgender service members and to describe healthcare utilization within the context of readiness and deployability. We estimate that fewer than 40% of the transgender service members identified as part of this study would have been deemed non-deployable due to mental health reasons at some time during the 24 months following initial diagnosis. Members of the transgender cohort were likely to remain in military service longer than were members of a match depression cohort and were less likely to be non-deployable due to their mental health utilization. We also found that, once allowed to begin hormone therapy, upwards of 70% of cohort members have one or more prescription for hormones in the medical record. Importantly, more than 50% of transgender service members in the study had left service in the 24 months following initial diagnosis and this substantially limits our ability to estimate longer-term outcomes related to readiness. Transgender service members with hormone therapy did not appear to differ meaningfully in their deployability from those without hormone therapy.

While these findings may shed some light on transgender service members, their healthcare utilization, and their deployability, data from transgender recruits were not available for analysis. As such, we cannot say with any certainty that the findings described here would apply to a recruit population.

# References

Boza, C., & Perry, K. N. (2014). Gender-related victimization, perceived social support, and predictors of depression among transgender Australians. *International Journal of Transgenderism, 15*(1), 35–52.

Boyer, T.L., Youk, A.O., Haas, A.P., Brown, G.R., Shipherd, J.C., Kauth, M.R., Jasuja, G.K., & Blosnich, J.R. (2021). Suicide, homicide, and all-cause mortality among transgender and cisgender patients in the veterans health administration. *LGBT Health*.

Bränström, R., & Pachankis, J. E. (2020). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. *American Journal of Psychiatry*, *177*(8), 727-734

Dhejne, C., Van Vlerken, R., Heylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry, 28*(1), 44–57.

Hughto, J. M. W., Reisner, S. L., & Pachankis, J. E. (2015). Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. *Social Science & Medicine*, *147*, 222-231.

Elders, M.J., Brown, G.R., Coleman, E., Kolditz, T.A., & Steinman, A.M. (2014). Medical aspects of transgender military service. *Armed Forces & Society*.

Freitas, L. D., Léda, R. G., Bezerra, F. S., & Miranda, S. Â. (2020). Psychiatric disorders in individuals diagnosed with gender dysphoria: A systematic review. *Psychiatry & Clinical Neurosciences, 74*(2), 99–104.

Lindsay, J.A., Meier, C.K., Hudson, S., Walder, A., Martin, L.A., & Kauth, M.R. (2016). Mental health of transgender veterans of the Iraq and Afghanistan conflicts who experienced military sexual trauma. *Journal of Traumatic Stress, 29*, 563-567.

Marshall, E., Claes, L., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2016). Non-suicidal self-injury and suicidality in trans people: A systematic review of the literature. *International Review of Psychiatry, 28*(1), 58–69.

McCann, E., & Brown, M. (2018). Vulnerability and Psychosocial Risk Factors Regarding People who Identify as Transgender. A Systematic Review of the Research Evidence. *Issues in Mental Health Nursing, 39*(1), 3–15**.**

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4*(3), 341–353.

National Coalition of Anti-Violence Programs (NCAVP). (2018). *Lesbian, gay, bisexual, transgender, queer and HIV-affected hate and intimate partner violence in 2017.* NCAVP-HV-IPV-2017-report.pdf

Scandurra, C., Amodeo, A. L., Valerio, P., Bochicchio, V., & Frost, D. M. (2017). Minority Stress, Resilience, and Mental Health: A Study of Italian Transgender People. Journal of Social Issues, 73(3), 563–585.

Van De Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., De Cuypere, G., Richter-Appelt, H., & Kreukels, B. P. (2017). Effects of medical interventions on gender dysphoria and body image: a follow-up study. *Psychosomatic medicine*, *79*(7), 815.

White Hughto, J. M., & Reisner, S. L. (2016). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender health*, *1*(1), 21-31.

World Health Organization. (2019). *International statistical classification of diseases and related health problems* (11th ed.). https://icd.who.int/

World Professional Association for Transgender Health. (2012). *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* [7th Version]. https://www.wpath.org/publications/soc

## Glossary of Relevant Terms

**Binary sex:** The designation of a person at birth as either "male" or "female" based on their based on their anatomy (genitalia and/or reproductive organs) and/or biology (chromosomes and/or hormones).

**Gender or Gender Role:** traditional or stereotypical behaviors often divided into feminine and masculine, as defined by the culture in which they live (e.g. their gender expressions, the careers they pursue, and their duties within a family)

**Gender identity:**  A person's innate, deeply-felt psychological identification as a man, woman, or other gender, which may or may not correspond to the person's external body or assigned sex at birth (i.e., the sex listed on the birth certificate).

**Gender expression:** The external manifestation of a person's gender identity, which may or may not conform to the socially-defined behaviors and external characteristics that are commonly referred to as either masculine or feminine.

**Genderqueer:** An umbrella term that includes all people whose gender varies from the traditional norm, akin to the use of the word "queer" to refer to people whose sexual orientation is not heterosexual only; or (2) to describe a subset of individuals who feel their gender identity is neither female or male.

**Gender nonconformity:** Term that refers to the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex (Institute of Medicine, 2011).

**Bigender, Beyond Binary, Non-Binary, Gender fluid, Androgyne:** gender variations other than the traditional, dichotomous view of male and female.

**Transgender:** An umbrella adjective for people whose gender identity and/or gender expression differs from their assigned sex at birth (i.e., the sex listed on their birth certificates)

**Transwoman:** Noun that generally refers to someone who was identified male at birth but who identifies and portrays her gender as female.

**Transman:** Noun that generally refers to someone who was identified female at birth but who identifies and portrays his gender as male.

**Cisgender:** Adjective referring to individuals whose gender identity and gender expression align with their assigned sex at birth (i.e., the sex listed on their birth certificates)

**Gender incongruence:** A sexual health condition classified by the International Classification of Diseases, eleventh edition (ICD-11) denoting a marked and persistent incongruence between an individual's experienced gender and assigned sex.

**Gender dysphoria:** A mental health diagnosis according to the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-5) that describes a collection of symptoms associated with incongruence between a person's experienced/expressed gender and sex assigned at birth.

**Gender affirming:** Adjective used to refer to behaviors or interventions that affirm a transgender person's gender identity (e.g., a physician using cross-sex hormones for a transgender patient may be called gender affirming, as can the use of a correctly gendered pronoun.)

**Transition:** An individualized process in which transgender people move from living aligned with the sex they were assigned at birth to living aligned with their gender identity. There are three general aspects to transitioning: social (e.g., presentation, relationships, employment, names/pronouns); medical (e.g., hormones, surgery, mental health) and legal (e.g., changing gender marker and name on legal documents and identification). Each person's transition path is unique.

**Gender Affirming Medical Interventions:** Procedures that involve medical providers and typically alter some aspect of physical or biological anatomy or process to better align with gender identity.

**Bottom surgery:** Colloquial phrase to describe gender affirming genital surgery.

**Breast augmentation:** Surgery to enlarge the breasts using breast implants.

**Chest masculinization:** A bilateral mastectomy that removes most of the breast tissue, shapes a contoured male chest, and refines the nipples and areolas.

**Facial feminization surgery:** Includes such procedures as reshaping the nose, and brow or forehead lift; reshaping of the chin, cheek and jaw; Adam's apple reduction; lip augmentation; hairline restoration and earlobe reduction.

**Facial masculinization surgery:** Includes forehead lengthening and augmentation; cheek augmentation, reshaping the nose and chin; jaw augmentation; thyroid cartilage enhancement to construct an Adam's apple.

**Hormone replacement therapy (HRT):** The process in which transgender people choose to take a prescription of synthetic hormones. For transgender women, that may include estrogen as well as testosterone blockers. For transgender men: testosterone (T).

**Metoidioplasty:** A surgical procedure that works with existing genital tissue to form a phallus, or new penis. It can be performed on anyone with significant clitoral growth caused by using testosterone.

**Penile construction/phalloplasty:** The construction of a penis generally includes several procedures that are often performed in tandem. They may include the following: a hysterectomy to remove the uterus, an oophorectomy to remove the ovaries, a vaginectomy to remove the vagina, a phalloplasty to turn a flap of donor skin into a phallus, a scrotectomy to turn the labia majora into a scrotum, a urethroplasty to lengthen and hook up the urethra inside the new phallus, a glansplasty to sculpt the appearance of an uncircumcised penis tip, and a penile implant to allow for erection.

**Top surgery:** Colloquial phrase to describe gender affirming surgery of the chest — either bilateral mastectomy or breast augmentation.

**Vaginal construction/vaginoplasty:** A procedure in which surgeons may remove the penis and testes, if still present, and use tissues from the penis to construction the vagina, clitoris and labia.

# Accession Medical Standards Analysis and Research Activity

## (AMSARA)



## Analysis of Medical Administrative Data on Transgender Service Members

*Phase 4*

7/14/2021

Requested by:
Dr. Paul Ciminera, MD MPH
Program Director, Medical Accessions and Retention Policy, OASD(HA)

Prepared by:
Accession Medical Standards Analysis and Research Activity (AMSARA)
Statistics and Epidemiology Branch (S&E)
Center for Enabling Capabilities (CEC)
Walter Reed Army Institute of Research (WRAIR)

Prepared in response to:
Accession Medical Standards Working Group (AMSWG) task

Distribution Restrictions: not cleared for public release

FCMR-UWE-S

## 1. Purpose

In their ongoing efforts to address concerns regarding medical standards for transgender individuals accessing into the U.S. Military, the Accession Medical Standards Working Group (AMSWG) tasked the Psychological Health Center of Excellence (PHCoE) and the Accession Medical Standards Analysis and Research Activity (AMSARA) to investigate any relevant data sources that may suggest appropriate periods of psychological stability prior to enlistment or commissioning. Specifically, four questions were posed by Dr. Ciminera and CAPT Bradford on behalf of the AMSWG:

*1. What are the appropriate periods of stability prior to accession into the military for medical (e.g. surgeries, cross-sex hormone use) and psychological conditions associated with gender dysphoria or a gender transition?*
*2. Do our current accession stability period standards for mental health conditions such as depression or anxiety (typically 36 months of stability following treatment) appropriately inform what we should consider appropriate for gender dysphoria or gender transition?*
*3. Does the evidence show that issues such as cross-sex hormone therapy, not a medical condition, should have an equal period of stability as gender dysphoria?*
*4. What would be the next logical steps for further research into this space to inform DoD medical standards?*

To address these core questions, the PHCoE and AMSARA teams crafted a joint approach that includes four phases:

Phase 1: Initial environmental scan of relevant treatment standards, key literature, and international military standards for military accession by transgender individuals.
 ✓ Completed and presented at the AMSWG meeting, 1 April 2021

Phase 2: Analysis of health care data from an identified cohort of individuals diagnosed with gender dysphoria or undergoing gender transition medical procedures in the military health system.
 ✓ Completed and presented at the AMSWG meeting, 13 May 2021

Phase 3: Comprehensive literature review of psychological stability associated with gender dysphoria, gender transition, and hormone replacement therapy.
 ✓ Submitted as a separate RAH for AMSWG meeting, 22 July 2021

Phase 4: Analysis of administrative and health care data from a cohort of accessions and separations from transgender disqualifications and waivers.
 ✓ Completed in this document and to be presented at the AMSWG meeting, 22 July 2021

2.  **Key Findings**

- Transgender service members appear similar to the full military applicant pool in terms of the proportion with history of any pre-accession medical disqualification status as well as the distribution of specific medical disqualifications.
- Rates of adverse attrition and existing prior to service (EPTS) discharge among transgender service members were similar to the total force. However, the rates of disability evaluation were estimated to be higher among TG service members.

3.  **Background**

The Accession Medical Standards Analysis and Research Activity (AMSARA) conducted a small complementary analysis with similar cohort identification process to Psychological Health Center of Excellence (PHCoE) to increase the available evidence surrounding transgender service members. These analyses aimed to examine the usability of pre-accession factors and end of service outcomes among transgender service members' as evidence to inform discussions on related to DoD accession policies pertaining to transgender applicants.

4.  **Methods**

Following the PHCoE's cohort identification criteria, eligible for inclusion were service members (Army, Navy, Marine Corps, or Air Force) who had a medical encounter for a qualifying transgender (TG) diagnosis between calendar year 2015-2020.[i] Qualifying diagnoses were identified by the presence of an ICD-9/ICD-10 diagnostic code[ii] in the first or second diagnostic position recorded within a medical encounter either in a military treatment facility (MTF) or outside of the MTF system (purchased care). Only service members with a beneficiary category of active duty or guard/reserve on active duty were included, however due to data limitations, this category was derived from the medical record rather than from the Defense Enrollment Eligibility Reporting System (DEERS), which was utilized by the PHCoE.

To supplement in-service outcomes described in the PHCoE study, AMSARA evaluated pre-accession profiles and end of service outcomes among the identified TG cohort. Military Entrance Processing Station (MEPS) medical screening, accession medical waiver, and accession records were utilized to identify pre-accession medical disqualifications, with an emphasis on transgender or psychiatric-related disqualifications. In addition, AMSARA assessed time in service and end of service outcomes, including non-adverse separations (e.g., expiration of term of service, retirement), adverse attrition (e.g., unqualified for active duty, insufficient retainability), disability discharge, and existing prior to service (EPTS) discharge to: 1) supplement the understanding of the end of service among this cohort gained from the PHCoE analyses; and, 2) provide insight on potential stability periods.

U.S. Military Entrance Processing Command (USMEPCOM) provided data on all enlisted applicants for the Army, Navy, Marine Corps, or Air Force in any component, and data on EPTS discharges.

---

[i] Transsexualism, Dual Role Transvestism, Gender Identity Disorder Of Childhood, Other Gender Identity Disorders, Gender Identity Disorder, Unspecified, Transvestic Fetishism, Personal History Of Sex Reassignment
[ii] 302.3, 302.6, 302.50, 302.51, 302.52, 302.53, 302.85, F64.0, F64.1, F64.2, F64.8, F64.9, F65.1, Z87.890

Accession and separation records were obtained from the Defense Manpower Data Center (DMDC), medical waiver records for enlisted medical waiver requests were received from the various Service Medical Waiver Authorities, and all disability evaluation records were provided by U.S. Army Physical Disability Agency (USPDA), Secretary of the Navy Council of Review Boards (CORB) and Air Force Personnel Center (AFPC). Medical encounter records were queried from the Military Health Systems Data Repository (MDR).

5.    **Findings**

Of the 2,063 service members in the identified cohort, the majority had an accession record in the AMSARA database (94%) and the majority had an application record (94%). Those with a missing accession record could be related to the transactional nature of the data while missing application records is likely due to the service member not applying for enlisted service and therefore not being seen at a Military Entrance Processing Station (MEPS).

A wide range of initial accession years were seen among the cohort (1995-2020), however, 80% initially accessed between fiscal years 2011 and 2020. Among those with an accession record, most initially entered as enlisted (92%) and/or active duty (87%) (Table 1).  In contrast, the DMDC reported that, as of May 2021, 82% of the military were enlisted and 62% were active duty.[4] Among the TG cohort, roughly 35% initially accessed into the Army, while 29% joined the Navy, 24% the Air Force, and 7% accessed into the Marine Corps.  For comparison, according to the DMDC, the distribution of all fiscal year 2019 accessions was approximately 36% for Army, 24% for Navy, and approximately 20% for both the Air Force and Marine Corps.[4]

Approximately 11% of the cohort were medically disqualified at application (Table 1), which is lower than the proportion of medically disqualified applicants among all applicants (17%).[1] The most common disqualifications fell under the Eyes (23%), Learning, Psychiatric, and Behavioral Disorders (19%), Vision (18%), or Miscellaneous Conditions of the Extremities (10%) subsections of the Department of Defense Instruction (DoDI) 6130.03: Medical standards for appointment, enlistment, or induction into the military services[2] (Table 2). This distribution of disqualifications is consistent with the most common disqualifications among all enlisted applicants.[1] The most common disqualifications among the 42 TG service members with history of a Learning, Psychiatric, and Behavioral Disorder pre-accession medical disqualification were attention-deficit hyperactivity disorders (n=24, 57%), unspecified mental disorder (n=9, 21%), and major depressive disorder (n=7, 17%)  (Table 3).

The average time in service to first cohort-qualifying medical encounter was approximately 53 months (± 49 months), although this metric may be skewed due to the large variation of time in service (range of 3 months to 23 years).  The median time to their first cohort-qualifying encounter was 38 months, which is typically nearing the end of a service member's first contract obligation (Table 4).

Nearly half of the cohort were still serving at the end of the study period, however, approximately a quarter were adversely separated either via adverse attrition (12%) or EPTS discharge (0.2%) (Table 1). The most common reason for adverse separation, based on inter-service separation codes (ISC), was unqualified for active duty (34%) (Table 5), which is comparable to the proportion of all adverse

separations among all active duty DoD service members who were separated in FY 2020 (roughly 29%).[4] On average, cohort members were adversely discharged about three years after their first qualifying medical encounter. Only three cohort members were discharged due to EPTS in the first 180 days of service, although EPTS data is known to be incomplete and should be considered an underestimate. Reasons for these EPTS discharges were psychiatric-related, including other specified depressive episodes, adjustment disorder with depressed mood, and unspecified gender identity disorder (Table 6). All three service members were discharged between fiscal year 2017 and 2019 (results not shown) approximately six weeks after their first cohort qualifying encounter.

Nearly 12% of the cohort population was evaluated for disability discharge (Table 1), which is larger than the rate of disability evaluation among all service members (roughly 1-2%). On average, cohort members were evaluated for disability about 20 months after their first qualifying medical encounter (Table 7). Approximately 72% of disability evaluated cohort members were subsequently disability retired with 30% or more DoD benefits. Similarly, the most common disability disposition among disability evaluated Soldiers, Sailors and Airmen is disability retirement with a 30% or higher rating.[3] The most commonly evaluated conditions among cohort members (psychiatric 54%, musculoskeletal 28%, neurological 18%) (Table 8) were comparable to those of all service members evaluated for disability[3]. Major depressive disorder and post-traumatic stress disorder accounted for three quarters of the psychiatric conditions (Table 9); however, PTSD and mood disorders (including major depressive disorder) are often among the most common conditions in the full disability population.[3]

6.    Conclusion

The identified TG cohort present similarly to full applicant pool in terms of pre-accession medical disqualifications. These service members also appear similar to the total force in terms of rates of both adverse attrition and EPTS discharge; however, the proportion of disability discharge is higher. When compared to previous research, TG service members appear to stay in service longer than those who are diagnosed with a psychiatric disorder;[5,6,7] nevertheless, having longer in service time does not equate to deployability. Future research is needed to more thoroughly evaluate in service characteristics including deployment and limited duty.

**References**

1. Washington W, Weber N, Kelley A, et. al (2020). Accession Medical Standards Analysis and Research Activity (AMSARA) 2019 Annual Report. Silver Spring, MD: Walter Reed Army Institute of Research.
2. Department of Defense (DoD). (2018). Department of Defense Instruction (DoDI) 6130.03: Medical standards for appointment, enlistment, or induction into the military services.
3. Washington W, Weber N, Kelley A, et. al (2020). Disability Evaluation System Analysis and Research (DESAR) 2020 Annual Report. Silver Spring, MD: Walter Reed Army Institute of Research.
4. DMDC Reporting System. (n.d.). https://dmdcrs.dmdc.osd.mil/dmdcrs/public/.
5. Garvey Wilson AL, Messer SC, Hoge CW. U.S. military mental health care utilization and attrition prior to the wars in Iraq and Afghanistan. Social Psychiatry and Psychiatric Epidemiology. 2009 Jun;44(6):473-81. doi: 10.1007/s00127-008-0461-7. Epub 2008 Dec 4. PMID: 19057830.
6. Hoge CW, Auchterlonie JL, Milliken CS. Mental Health Problems, Use of Mental Health Services, and Attrition From Military Service After Returning From Deployment to Iraq or Afghanistan. JAMA. 2006;295(9):1023–1032. doi:10.1001/jama.295.9.1023
7. Shawn M.S. Garcia, MC USN, Brian V. Ortman, USAF BSC, Daniel G. Burnett, FS, USAF MC, Mental Health Diagnoses and Attrition in Air Force Recruits, Military Medicine, Volume 180, Issue 4, April 2015, Pages 436–444, https://doi.org/10.7205/MILMED-D-14-00311

**Table 1**: Military Characteristics of the Transgender Cohort at Accession

| | Cohort (N=2,063) | |
|---|---|---|
| **Cohort Entry Calendar Year** | **N** | **%** |
| 2015 | 128 | 6.20% |
| 2016 | 517 | 25.06% |
| 2017 | 523 | 25.35% |
| 2018 | 367 | 17.79% |
| 2019 | 328 | 15.90% |
| 2020 | 200 | 9.69% |
| **First Accession Fiscal Year** | | |
| 1995 | 2 | 0.10% |
| 1996 | 4 | 0.19% |
| 1997 | 3 | 0.15% |
| 1998 | 5 | 0.24% |
| 1999 | 12 | 0.58% |
| 2000 | 12 | 0.58% |
| 2001 | 8 | 0.39% |
| 2002 | 14 | 0.68% |
| 2003 | 22 | 1.07% |
| 2004 | 25 | 1.21% |
| 2005 | 21 | 1.02% |
| 2006 | 29 | 1.41% |
| 2007 | 44 | 2.13% |
| 2008 | 50 | 2.42% |
| 2009 | 61 | 2.96% |
| 2010 | 97 | 4.70% |
| 2011 | 108 | 5.24% |
| 2012 | 135 | 6.54% |
| 2013 | 176 | 8.53% |
| 2014 | 192 | 9.31% |
| 2015 | 245 | 11.88% |
| 2016 | 259 | 12.55% |
| 2017 | 208 | 10.08% |
| 2018 | 138 | 6.69% |
| 2019 | 60 | 2.91% |
| 2020 | 18 | 0.87% |
| No Accession Record | 115 | 5.57% |
| **First Accession Service** | | |
| Army | 714 | 34.61% |
| Navy | 592 | 28.70% |
| Marine Corps | 150 | 7.27% |

| | | |
|---|---|---|
| Air Force | 490 | 23.75% |
| No Accession Record | 115 | 5.57% |
| **First Accession Component** | | |
| Active Duty | 1,789 | 86.72% |
| Reserves | 72 | 3.49% |
| National Guard | 87 | 4.22% |
| No Accession Record | 115 | 5.57% |
| **Rank at First Accession** | | |
| Officer | 58 | 2.81% |
| Enlisted | 1,890 | 91.61% |
| No Accession Record | 115 | 5.57% |
| **Medical Status at Application** | | |
| Qualified | 1,723 | 83.52% |
| Disqualified | 220 | 10.66% |
| No Application Record | 120 | 5.82% |
| **Service Outcome\*** | | |
| Still in Service\*\* | 1,003 | 48.62% |
| Adverse Attrition | 247 | 11.97% |
| EPTS Discharge | 3 | 0.15% |
| Disability Evaluation | 243 | 11.78% |
| Non-Adverse Separation | 540 | 26.18% |

\* Excludes individuals for whom AMSARA found no accession and no separation record

\*\* As of 30 September 2020

**Table 2**: DoDI Subsections among those Transgender Cohort Medically Disqualified at Application

| DoDI Subsection* | Medically Disqualified (N=220) | |
|---|---|---|
| | N | % |
| Head | 0 | 0.00% |
| Eyes | 51 | 23.18% |
| Vision | 39 | 17.73% |
| Ears | 1 | 0.45% |
| Hearing | 0 | 0.00% |
| Nose, Sinuses, Mouth, and Larynx | 1 | 0.45% |
| Dental | 1 | 0.45% |
| Neck | 1 | 0.45% |
| Lungs, Chest Wall, Pleura, and Mediastinum | 14 | 6.36% |
| Heart | 2 | 0.91% |
| Abdominal Organs and Gastrointestinal System | 0 | 0.00% |
| Female Genital System | 12 | 5.45% |
| Male Genital System | 6 | 2.73% |
| Urinary System | 4 | 1.82% |
| Spine and Sacroiliac Joint Conditions | 6 | 2.73% |
| Upper Extremities | 7 | 3.18% |
| Lower Extremities | 16 | 7.27% |
| Miscellaneous Conditions of the Extremities | 22 | 10.00% |
| Vascular System | 1 | 0.45% |
| Skin and Cellular Tissue Conditions | 12 | 5.45% |
| Blood and Blood Forming Conditions | 3 | 1.36% |
| Systemic Conditions | 12 | 5.45% |
| Endocrine and Metabolic Conditions | 5 | 2.27% |
| Rheumatologic Conditions | 3 | 1.36% |
| Neurologic Conditions | 3 | 1.36% |
| Sleep Disorders | 0 | 0.00% |
| Learning, Psychiatric, and Behavioral Disorders | 42 | 19.09% |
| Tumors and Malignancies | 1 | 0.45% |
| Miscellaneous Conditions | 19 | 8.64% |
| Transgender | 1 | 0.45% |

* Includes waiver data, subsections are not mutually exclusive so individuals can be count more than once in the table but only once per subsection. Also, excludes those with a disqualification code that cannot be mapped to the DoDI Subsections.

**Table 3**: Most Common Disqualifications among those Transgender Cohort Medically Disqualified at Application under Learning, Psychiatric, and Behavioral Disorders DoDI Subsection

| Learning, Psychiatric, and Behavioral Disorders Disqualifications* | Medically Disqualified (DoDI Subsection 28) (N=42) | |
|---|---|---|
| | N | % |
| Attention-deficit hyperactivity disorders (F90) | 24 | 57.14% |
| Mental disorder, not otherwise specified (F99) | 9 | 21.43% |
| Major depressive disorder (F32) | 7 | 16.67% |
| Dysthymic disorder (F34.1) | 3 | 7.14% |
| Cannabis abuse (F12.1) | 2 | 4.76% |
| Unspecified mood [affective] disorder (F39) | 2 | 4.76% |
| Other anxiety disorders (F41) | 2 | 4.76% |
| Impulse disorders (F63) | 2 | 4.76% |
| Underweight (R63.6) | 2 | 4.76% |
| Personal history of self-harm (Z91.5) | 2 | 4.76% |
| Specific developmental disorders of speech and language (F80) | 1 | 2.38% |
| Asperger's syndrome (F84.5) | 1 | 2.38% |
| Problems related to lifestyle (Z72) | 1 | 2.38% |

* Disqualifications are not mutually exclusive so individuals can be count more than once in the table but only once per disqualification.

**Table 4**: Months from Accession to Cohort Entry

| Quantile | Cohort with Accession Record (N=1,948) |
|---|---|
| | Months |
| 100% Max | 274 |
| 99% | 228 |
| 95% | 160 |
| 90% | 119 |
| 75% Q3 | 71 |
| 50% Median | 38 |
| 25% Q1 | 17 |
| 10% | 9 |
| 5% | 7 |
| 1% | 3 |
| 0% Min | 0 |
| **Months from Accession to Cohort Entry (mean±SD)*** | 52.96±48.68 |

* Calculated only among those in the TG cohort with an accession record in AMSARA's data.

**Table 5**: End of Service Characteristics among the Transgender Cohort who have Adversely Separated

| ISC Code | Cohort Adversely Separated (N=247) | |
| --- | --- | --- |
| | **N** | **%** |
| Unqualified for Active Duty - Other (1016, 2016) | 83 | 33.60% |
| Drugs (1067) | 31 | 12.55% |
| Commission of a Serious Offense (1084) | 20 | 8.10% |
| Expeditious Discharge/Unsatisfactory Performance (1086) | 17 | 6.88% |
| Discreditable Incidents - Civilian or Military (1065) | 15 | 6.07% |
| Pattern of Minor Disciplinary Infractions (1083) | 13 | 5.26% |
| Other (1099) | 13 | 5.26% |
| Character or Behavior Disorder (1060) | 12 | 4.86% |
| Failure to Meet Minimum Qualifications for Retention (1085) | 11 | 4.45% |
| Alcoholism (1064) | 7 | 2.83% |
| Trainee Discharge/Entry Level Performance and Conduct (1087) | 5 | 2.02% |
| Erroneous Enlistment or Induction (1091) | 4 | 1.62% |
| Good of the Service (in lieu of Court Martial) (1078) | 4 | 1.62% |
| Court Martial (1073) | 3 | 1.21% |
| Unfitness or Unacceptable Conduct (Other) (2081) | 2 | 0.81% |
| Failure of Selection for Promotion (2079) | 2 | 0.81% |
| Fraudulent Entry (1074) | 2 | 0.81% |
| Failure of Course of Instruction (2063) | 1 | 0.40% |
| Secretarial Authority (1090) | 1 | 0.40% |
| Sexual Perversion (1077) | 1 | 0.40% |
| **Months from Cohort Entry to Separation (mean±SD)\*** | 33.33±36.41 | |

\* Calculated only among those in the TG cohort identified as adversely separated.

**Table 6**: Characteristics of Existed Prior to Service Discharge among the Transgender Cohort

| ICD Code | Cohort with an EPTS Record (N=3) | |
| --- | --- | --- |
| | **N** | **%** |
| Other specified depressive episodes (F32.89) | 1 | 33.33% |
| Adjustment disorder with depressed mood (F43.21) | 1 | 33.33% |
| Gender identity disorder, unspecified (F64.9) | 1 | 33.33% |
| **Days from Cohort Entry to Discharge (mean±SD)\*** | 41.67±41.02 | |

\* Calculated only among those in the TG cohort identified as having and EPTS discharge.

**Table 7**: Characteristics of Disability Evaluation among the Transgender Cohort

| Disability Disposition | Cohort with a Disability Record (N=243) | |
|---|---|---|
| | **N** | **%** |
| Retired* | 175 | 72.02% |
| Separated with severance | 46 | 18.93% |
| Separated w/out benefits | 8 | 3.29% |
| Fit | 13 | 5.35% |
| Other | 1 | 0.41% |
| **Percent Rating Categories**** | | |
| <30% | 48 | 21.62% |
| ≥30% (disability retirement) | 174 | 78.38% |
| **# of Conditions Evaluated (mean±SD)*** | 1.45±0.93 | |
| **Months from Cohort Entry to Disability Evaluation (mean±SD)*** | 20.43±13.30 | |

\* Retired category is made up of PDRL, TDRL, retained on TDRL

\*\* Excludes unrated and missing

\*\*\* Calculated only among those in the TG cohort with a disability evaluation record.

**Table 8**: VASRD Categories among the Transgender Cohort with a Disability Evaluation

| VASRD Categories* | Cohort with a Disability Record (N=243) | |
|---|---|---|
| | **N** | **%** |
| Psychiatric | 131 | 53.91% |
| Musculoskeletal | 68 | 27.98% |
| Neurological | 43 | 17.70% |
| Digestive | 6 | 2.47% |
| Genitourinary | 4 | 1.65% |
| Dermatologic | 3 | 1.23% |
| Cardiovascular | 3 | 1.23% |
| Respiratory | 3 | 1.23% |
| Endocrine | 2 | 0.82% |
| Infectious Disease | 2 | 0.82% |
| Eyes and Vision | 1 | 0.41% |
| Hemic/Lymphatic | 1 | 0.41% |

\* VASRD categories are not mutually exclusive so individuals can be count more than once in the table but only once per category.

**Table 9**: VASRD Codes among the Transgender Cohort with a Disability Evaluation within the Psychiatric Category

| VASRD Codes* | Cohort with a Psychiatric VASRD Code (N=131) | |
|---|---|---|
| | N | % |
| Major depressive disorder (9434) | 52 | 39.69% |
| Post-traumatic stress disorder (9411) | 47 | 35.88% |
| Chronic adjustment disorder (9440) | 18 | 13.74% |
| Bipolar disorder (9432) | 12 | 9.16% |
| Generalized anxiety disorder (9400) | 5 | 3.82% |
| Dissociative amnesia; dissociative fugue, dissociative identity disorder (9416) | 1 | 0.76% |
| Panic disorder and/or agoraphobia (9412) | 1 | 0.76% |
| Somatization disorder (9421) | 1 | 0.76% |
| Specific (simple) phobia (9403) | 1 | 0.76% |

\* VASRD codes are not mutually exclusive so individuals can be count more than once in the table but only once per code.

# Analysis of Medical Administrative Data on Transgender Service Members

Accession Medical Standards Analysis and Research Activity (AMSARA)

Medical Standards Analytics and Research (MSAR)

Statistics and Epidemiology Branch

Walter Reed Army Institute of Research





# AMSARA TG Studies

- Study #1
  - January 2018 accession policy change enabled to identify TG population:
    - TG Disqualification: N=24
    - TG Accession: N=1
  - No follow up studies were possible
  - Report presented at the AMSWG meeting, May 2021
- Study #2
  - Complementary administrative data analysis:
    - PHCoE TG cohort N=2,063
      - AD SMs with TG diagnosis from 2015 to 2020
    - Accession characteristics:
      - Data sources: MEPS medical screening, medical waivers and accession records
      - Data points: all medical, TG and psychiatric DQs
    - End of service outcomes:
      - Data sources: loss, disability and EPTS records
      - Data points: non-adverse separations, adverse attrition, disability and EPTS discharges
  - Examined pre-accession factors and end of service outcomes among TG SMs
  - Report presented at the AMSWG meeting, July 2021

**WRAIR**                                              UNCLASSIFIED                                              2

# Results

| | | | |
|---|---|---|---|
| Accession Characteristics | Medical DQ | 11 | 17 |
| | Enlisted | 92 | 82 |
| | Active Duty | 87 | 62 |
| In Service Characteristics | Army | 35 | 36 |
| | Navy | 29 | 24 |
| | Air Force | 24 | 20 |
| | Marine Corps | 7 | 20 |
| End of Service Outcomes | Adverse Attrition | 12 | 12* |
| | Disability Evaluation | 12 | 1.5 |
| | EPTS Discharge | 0.2 | 0.9 |

* Within 3 years of accession

**WRAIR**

UNCLASSIFIED

3

JA150

# Findings: Characteristics

- 80% of TG cohort initially accessed: FY11 - FY20
  - Comparing cohort to all AD
    - Higher % of enlisted (92 vs 82) and AD (87 vs 62)
    - Slightly higher % of Navy and AF, but much lower % of Marines
- Approximately 11% DQ'd at application
  - Slightly lower % of medically DQ'd at application than all AD (11 vs 17)
- Most common DQ's among TG cohort were: Eyes, Psych, Vision
  - Similar when compared to all AD
- Among the TG cohort DQ'd for psych
  - Most common DQ's were ADHD (60%), unspecified mental disorder (20%), and major depressive disorder (17%)
- Median time in service to the first TG encounter: 38 months

**WRAIR**                    UNCLASSIFIED                    4

# Findings: Outcomes

- TG: evaluated for disability ~20 months after their first TG encounter

- TG vs. All SM:
  - Similar adverse attrition and EPTS discharge
  - Higher disability evaluation (12 vs 1-2)
    - Similar % of retired with ≥30% disability (~72)
    - Similar most common evaluated conditions
      - Psychiatric, MSK, neurological
        - TG evaluated for psych disability: MDD and PTSD
        - All SM evaluated for psych disability: PTSD and mood disorders

- TG vs. SMs diagnosed with a psychiatric disorder:
  - Stay in service longer
  - NB: Longer in service time does not equate to deployability

**WRAIR** | UNCLASSIFIED | 5

# Key Findings

- Comparison of TG vs. all SMs:
  - <u>Similar</u>
    - Proportion with history of any pre-accession medical DQ status
    - The distribution of specific medical DQs
    - Rates of adverse attrition
    - EPTS discharge
  - <u>Higher in TG SMs</u>
    - Disability evaluation

**WRAIR**    UNCLASSIFIED    6

**Compilation of Published Materials for Recommendations related to
Transgender Applicants regarding Medical/Psychological Stability**

*Specific questions from Dr. Ciminera and CAPT Bradford:*

*a) What are the appropriate periods of stability prior to accession into the military for medical
(e.g. surgeries, cross-sex hormone use) and psychological conditions associated with gender
dysphoria or a gender transition?*

**Gender Nonconformity, Gender Dysphoria, Stigma and Associated Psychological
Conditions**

"Gender nonconformity refers to the extent to which a person's gender identity, role, or
expression differs from the cultural norms prescribed for people of a particular sex" (Williams,
Patete & Thaller, 2019). Given that there is stigma attached to gender nonconformity in many
societies, it can lead to prejudice and discrimination, resulting in "minority stress" (Meyer,
2003), which is unique, socially based, and chronic, and may make transsexual, transgender, and
gender-nonconforming individuals more vulnerable to developing anxiety and depressive
disorders (Institute of Medicine (US), 2011).

Minority stress plays a role in transgender individuals' lives, because of the psychological
damage caused by stigma, discrimination, and transphobia (McCann & Brown, 2018). By
acknowledging the impact of minority stress, researchers and clinicians can avoid pathologizing
and blaming transgender folks for the higher rates of psychological issues that they experience
(Scandurra, Amodeo, & Valerio, 2017). "Transgender individuals may also experience provider-
generated discrimination in health care facilities, including refusal of service, disrespect, and
abuse, which contribute to depression and low self-esteem" (Smith, 2016). Transgender
individuals experience risk factors related to discrimination by others such as limited access to
services such as housing, healthcare, and financial supports that are necessary to meet physical
and emotional needs (McCann & Brown, 2018). The effects of discrimination are also seen in
the workplace, as it can affect employment status and financial stability, social isolation and
exclusion (McCann & Brown, 2018). Physical safety concerns are also reported among the
transgender community as causing psychological distress and are a realistic threat (McCann &
Brown, 2018). Of the documented hate violence against members of the LGBTQ community in
2017, 32% of survivors were transgender (National Coalition of Anti-Violence Programs, 2018).
Of the 52 documented hate violence homicides of LGBTQ people in 2017, 52% ($n = 27$) were
transgender or gender non-conforming (National Coalition of Anti-Violence Programs, 2018).
Further, a majority ($n = 22$) of transgender people who were killed in 2017 were trans women of
color (National Coalition of Anti-Violence Programs, 2018). Societal and medical barriers along
with discrimination are also associated with increased risks of violence, suicide, suicide attempts,
substance use disorders and sexually transmitted infections, including higher prevalence of HIV
infection (Learmonth, 2018; Williams, Patete & Thaller, 2019). This combination of high
medical needs and barriers to accessing appropriate care may give rise to a self-perpetuating
cycle of risk exposure, stigmatization, prejudice, and eventually poor health outcomes (Williams,
Patete & Thaller, 2019). In their analysis of a large, population-based sample, Gonzales and
Henning-Smith (2017) found that the transgender and gender nonconforming adults were more

1

likely to be uninsured and have unmet health care needs, and were less likely to have routine care, compared to cisgender (non-transgender) women (Gonzales & Henning-Smith, 2017).

In general, transition-related medical interventions positively impact mental health and quality of life. However, few studies measured transition-related medical interventions over time and at specific time intervals. Only recently have there been initiatives to standardize outcome measurements for transition-related medical interventions. Historically, comparisons between groups and outcomes were difficult due to the use of non-validated instruments (e.g., Andréasson, Geogas, Elander, & Selvaggi, 2018). Three large or cohort-based European studies (Bränström & Pachankis, 2020; Van de Grift et al., 2017; White Hughto, & Reisner, 2016) and one US-based study provided information on outcomes (Hughto, Gunn, Rood, & Pantalone, 2020).

Of note, many European countries have universal healthcare infrastructure and access for transgender individuals, which may be more transferable to the military healthcare context than the civilian United States system. Bränström and Panchankis (2020) examined healthcare utilization longitudinally from a national Swedish register and found that a sample of 2,679 individuals who received a gender incongruence diagnosis were, at baseline and in general, were more likely to receive treatment for mood or anxiety disorder; however, the treatment gap reduced based on time since last gender-affirming surgery. The likelihood of being treated for mental health treatment reduced by 8% for each year after gender-affirming surgery. Transgender individuals were equally likely over time to be hospitalized after a suicide attempt (approximately .08% compared to .01% of the general population) and were more likely than the general population to be hospitalized, but the rates were generally low. Gender dysphoria may not be related as strongly to overall psychological functioning as body satisfaction (e.g., Van de Grift et al., 2017). Baseline and outcome experiences of transition-related medical interventions are significantly impacted by a variety of mechanisms, included the cultural context, structural barriers to healthcare and other basic needs, and social support (e.g., White Hughto, Reisner, & Pachankis, 2015). Another major limitation to research on effectiveness is that other non-medical, gender affirming interventions often co-occurred with medical interventions, which can also have a significant positive impact on treatment outcomes (e.g., Hughto et al., 2020). It follows that gender dysphoria as a diagnosis may not be useful as a determinant for overall functioning and focusing on making the environment affirming can itself improve outcomes.

There are a few medical options for gender transition and treatment of gender dysphoria frequently associated with gender nonconformity. "In recent years, puberty suppression by means of gonadotropin-releasing hormone analogs has become accepted in clinical management of adolescents who have gender dysphoria (GD)" (de Vries et al., 2014). "The puberty-suppressing hormones are used in early adolescents and may continue for a few years, at which time a decision is made to either discontinue all hormone therapy or transition to a feminizing/masculinizing hormone regimen" (WPATH, 2012), which may or may not follow by gender reassignment surgical procedures. "Pubertal suppression is considered as a fully reversible intervention and does not inevitably lead to social transition or to sex reassignment" (WPATH, 2012). According to Crall and Jackson (2016), "gender-affirming hormone therapy is a safe and effective way to improve quality of life and mental health outcomes for transgender adolescents. Access to this treatment is limited, with the most vulnerable transgender people

2

experiencing the greatest gaps in care" (Crall & Jackson, 2019). In their review article Mahfouda et al. concluded that the scarce and preliminary available evidence indicates that gender-affirming cross-sex hormones (CSHs) are associated with mental health benefits and improved quality-of-life outcomes in eligible transgender adolescents, but additional studies are needed to improve the quality of the evidence base (Mahfouda et al., 2018).

In 1998, the WPATH (2012) "Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People" guidelines stated that surgical interventions (e.g., vaginoplasty in transgender females, gonadectomy in transgender males) should not be done in patients younger than age 18 years (Mahfouda et al., 2018). However, due to common infertility in those with the disorder of sex development who develop gender dysphoria, physicians are more willing to perform cross-sex hormone treatments and genital surgery before adulthood (DSM-5, p. 456). Mahfouda et al. (2019) listed several preliminary studies that showed benefits of gender-affirming surgery in adolescents, particularly bilateral mastectomy in transgender adolescent males (Marinkovic & Newfield, 2017; Olson-Kennedy et al., 2018), but indicated a scarcity of literature to guide clinical practice for surgical vaginoplasty in transgender adolescent females (Mahfouda et al., 2018). The authors emphasized that the optimal age and developmental stage for initiating cross-sex hormones (CSHs) and performing gender-affirming surgeries remains to be clarified. They recommended that clinical decisions on eligibility should be considered on an individualized basis. This recommendation was informed by Endocrine Society Practice Guidelines (Hembree et al., 2017), the WPATH SoC (Coleman et al, 2012), and other expert consensus including the Australian SoC and Treatment Guidelines for Transgender and Gender Diverse Children and Adolescents (Telfer et al., 2018), until further data become available (Mahfouda et al., 2018).

The WPATH recommends "12 continuous months of living in a gender role that is congruent with their gender identity before meeting criteria for some types of genital surgeries." The recommendation is "based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery". "Social aspects of changing one's gender role are usually challenging— often more so than the physical aspects. Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role" (WPATH, 2012).

"Gender dysphoria refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth along with the associated gender role and/or primary and secondary sex characteristics" (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010; WPATH, 2012). According to the DSM-5, gender dysphoria as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender, but is more specifically defined when used as a diagnostic category:

Gender Dysphoria in Adolescents and Adults (ICD-9: 302.85, ICD-10: F64.1)
    A. A market incongruence between one's experienced/expressed gender and assigned
        gender, of at least 6 months' duration, manifested by at least two of the following:

3

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.
3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender.
5. A strong desire to be treated as the other gender.
6. A strong conviction that one has the typical feelings and reactions of the other gender.

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important area of functioning (DSM-5, pp. 451-453).

According to Kilpatrick's et al. (2019) conclusion after the completion of their study exploring a link between cross sex hormone treatment and a reversal of cerebral patterns associated with gender dysphoria, "gender dysphoria may be associated with specific anatomical features in own-body/self-processing circuits that reverse to the pattern of cisgender controls after cross-sex hormone treatment" (Kilpatrick, 2019).

**Development of Gender Dysphoria**

"Only some gender-nonconforming people experience gender dysphoria at some point in their lives," but the level of distress in a subset of these people "may meet criteria for a formal diagnosis that might be classified as a mental disorder" (WPATH, 2012). "Although not all individuals will experience distress as a result of incongruence, many are distressed if their desired physical interventions by means of hormones and/or surgery are not available" (DSM-5, p. 451). "Such distress may, however, be mitigated by supportive environment and knowledge that biomedical treatments exist to reduce incongruence" (DSM-5, p. 455).

"Gender dysphoria can in large part be alleviated through treatment (Murad et al., 2010). Hence, while transsexual, transgender, and gender-nonconforming people may experience gender dysphoria at some points in their lives, many individuals who receive treatment will find a gender role and expression that is comfortable for them, even if these differ from those associated with their sex assigned at birth, or from prevailing gender norms and expectations" (WPATH, 2012).

The DSM-5 differentiates two broad trajectories for development of gender dysphoria in both adolescent and adult natal males: early onset and late onset. "Early-onset gender dysphoria starts in childhood and continues into adolescence and adulthood; or, there is an intermittent period in which the gender dysphoria desists and these individuals self-identify as gay or homosexual, followed by recurrence of gender dysphoria. Late-onset gender dysphoria occurs around puberty or much later in life. Some of these individuals report having had a desire to be of the other gender in childhood that was not expressed verbally to others. Others do not recall any signs of childhood gender dysphoria. For adolescent males with late-onset gender dysphoria, parents often report surprise because they did not see signs of gender dysphoria during childhood. Expressions of anatomic dysphoria are more common and salient in adolescents and adults once

4

secondary sex characteristics have developed" (DSM-5, pp. 455-456). "Among adult natal males with gender dysphoria the early-onset group seeks out clinical care of hormone treatment and reassignment surgery at an earlier age than does the late-onset group. The late-onset group may have more fluctuations in the degree of gender dysphoria and be more ambivalent about and less likely satisfied after gender reassignment surgery. In both adolescent and adult natal females, the most common course is the early-onset form of gender dysphoria. The late-onset form is much less common in natal females compared with natal males. As in natal males with gender dysphoria, there may have been a period in which the gender dysphoria desisted and these individuals self-identified as lesbian, however, with recurrence of gender dysphoria, clinical consultation is sought, often with the desire for hormone treatment and reassignment surgery. Parents of natal adolescent females with late-onset form also report surprise, as no signs of childhood gender dysphoria were evident. Expressions of anatomic dysphoria are much more common and salient in adolescents and adults than in children" (DSM-5, p. 456).

Functional consequences of gender dysphoria in adolescents and adults are various and as stated in the DSM-5 include preoccupation with cross-gender wishes that often interferes with daily activities. "Relationship difficulties, including sexual relationship problems, are common, and functioning in school or at work may be impaired. Gender dysphoria, along with atypical gender expression, is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds. In addition, these individuals' access to health services and mental health services may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population" (DSM-5, p. 458).

**Prevalence of Gender Dysphoria**

As stated in the DSM-5, the prevalence of gender dysphoria for natal adult males ranges from 0.005% to 0.014%, and for natal females, from 0.002% to 0.003%. "Since not all adults seeking hormone treatment and surgical reassignment attend specialty clinics, these rates are likely modest underestimates. Sex differences in rate of referrals to specialty clinics vary by age group" (DSM-5, p. 454). "In adolescents, the sex ratio is close to parity; in adults, the sex ratio favors natal males, with ratios ranging from 1:1 to 6.1:1" (DSM-5, p. 454). "Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%" (DSM-5, p. 455). DSM-5 concludes that "it is unclear if particular therapeutic approaches to gender dysphoria in children are related to rates of long-term persistence. Extant follow-up samples consisted of children receiving no formal therapeutic intervention or receiving therapeutic interventions of various types, ranging from active efforts to reduce gender dysphoria to a more neutral, "watchful waiting" approach.  It is unclear if children "encouraged" or supported to live socially in the desired gender will show higher rates of persistence, since such children have not yet been followed longitudinally in a systematic manner" (DSM-5, p. 455).

5

## Gender Transition and Gender Dysphoria Treatment

In their small study, Cohen-Kettenis and van Goozen investigated postoperative functioning of the first 22 consecutive adolescent transsexual patients of their gender clinic who underwent sex reassignment surgery. Postoperatively the group was no longer gender-dysphoric; they scored in the normal range with respect to a number of different psychological measures and they were socially functioning quite well. Not a single subject expressed feelings of regret concerning the decision to undergo sex reassignment (Cohen-Kettenis & van Goozen, 1997). Long-standing clinical observations in transgender children and adolescents from the VU University Medical Centre in Amsterdam, the Netherlands, however, found that gender dysphoria did not change, despite extensive therapeutic efforts (Kreukels BP, Cohen-Kettenis, 2011; Mahfouda et al., 2018).

While there is a lack of formal prospective studies on persistence of adolescent gender dysphoria into adulthood, all 70 adolescents diagnosed with gender dysphoria and given puberty-suppressing hormones in the de Vries et al. follow up study continued with actual sex reassignment, beginning with feminizing/masculinizing hormone therapy (de Vries et al., 2010). Many, but not all, adolescents with gender dysphoria have a strong desire to pursue hormone therapy and surgery (WPATH, 2012). "While many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither" (Bockting, Knudson & Goldberg, 2006; Bockting, 2008; Lev, 2004). "Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones." According to Bartolucci's et al. study results of 67 male-to-female and 36 female-to-male gender-dysphoric adults, perception of sexual Quality of Life before genital sex reassignment surgery in about 50% of study subjects was either "poor/dissatisfied" or "very poor/very dissatisfied" with better subjective perception in those receiving hormonal treatment (Bartolucci, 2014).

"It is difficult to determine the effectiveness of hormones alone in the relief of gender dysphoria. Most studies evaluating the effectiveness of masculinizing/feminizing hormone therapy on gender dysphoria have been conducted with patients who have also undergone sex reassignment surgery. Favorable effects of therapies that included both hormones and surgery were reported in a comprehensive review of over 3,000 patients in 79 studies (mostly observational) conducted between 1961 and 1991 (Eldh, Berg, & Gustafsson, 1997; Gijs & Brewaeys, 2007; Murad et al., 2010; Pfäfflin & Junge, 1998). Patients operated on after 1986 did better than those before 1986; this reflects significant improvement in surgical complications (Eldh, Berg, & Gustafsson, 1997). Most patients have reported improved psychosocial outcomes, ranging between 87% for MtF patients and 97% for FtM patients" (Green & Fleming, 1990; WPATH, 2012, Appendix D).

Similar improvements were found in a Swedish study in which "almost all patients were satisfied with sex reassignment at 5 years, and 86% were assessed by clinicians at follow-up as stable or improved in global functioning" (Johansson et al., 2010). Weaknesses of these earlier studies are their retrospective design and use of different criteria to evaluate outcomes. A prospective study conducted in the Netherlands evaluated 325 consecutive adult and adolescent subjects seeking sex reassignment (Smith et al., 2005). Patients who underwent sex reassignment therapy (both hormonal and surgical intervention) showed improvements in their mean gender dysphoria

6

scores, measured by the Utrecht Gender Dysphoria Scale. Scores for body dissatisfaction and psychological function also improved in most categories. Fewer than 2% of patients expressed regret after therapy. Overall, studies have been reporting a steady improvement in outcomes as the field becomes more advanced" (WPATH, 2012, Appendix D).

"Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate gender dysphoria" (WPATH, 2012).

In other words, gender identities and expressions are diverse and treatment for gender dysphoria has become more individualized" (WPATH, 2012), which makes it even harder to estimate one fits all precise stability period. Moreover, an adolescent's shift towards gender conformity can occur, but primarily to please the parents and may not persist or reflect a permanent change in gender dysphoria (Hembree et al., 2009; Steensma et al., 2011).

Gender reassignment therapy can alter external sexual features to resemble those of the desired gender and are broadly classified into two types, female to male (FTM) and male to female (MTF). These therapies include hormonal treatment as well as surgical procedures. The terms for these surgical interventions vary and include gender-affirming surgery (GAS), gender-affirming genital reconstructive surgery (GRS), sex reassignment surgery (SRS) etc. FTM genital reconstructive therapy includes creation of a neophallus, which can be achieved by metoidioplasty or phalloplasty with mastectomy, along with testosterone administration. Facial masculinization surgeries (FMS) comprise of forehead lengthening/augmentation, cheek augmentation, rhinoplasty, chin recontouring, jaw contouring, thyroid cartilage enhancement etc.

MTF gender reassignment surgery includes complete removal of external genitalia with penectomy and orchiectomy, with vaginoplasty, clitoroplasty, labiaplasty, and breast augmentation along with estrogen supplements. Penile inversion vaginoplasty is the gold surgical standard for genital gender-affirming surgery in transgender women. In absence of sufficient penoscrotal skin, due to penoscrotal hypoplasia, circumcision, penile trauma with loss of penile skin quantity and/or quality, or when primary vaginoplasty has failed, intestinal vaginoplasty can be performed. Facial feminization surgeries (FFS) include any combination of scalp advancement, cranioplasty, brow lift, rhinoplasty, upper lip lift, mandibuloplasty, chondrolaryngoplasty, and/or additional cosmetic procedures.

"Since the *Standards of Care* have been in place, there has been a steady increase in patient satisfaction and decrease in dissatisfaction with the outcome of sex reassignment surgery. Studies conducted after 1996 focused on patients who were treated according to the *Standards of Care*. The findings of Rehman and colleagues (1999) and Krege and colleagues (2001) are typical of this body of work; none of the patients in these studies regretted having had surgery, and most reported being satisfied with the cosmetic and functional results of the surgery. Even patients who develop severe surgical complications seldom regret having undergone surgery. Quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2003). The vast majority of follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as

7

subjective wellbeing, cosmesis, and sexual function (De Cuypere et al., 2005; Garaffa, Christopher, & Ralph, 2010; Klein & Gorzalka, 2009), although the specific magnitude of benefit was uncertain". "One troubling report (Newfield et al., 2006) documented lower scores on quality of life (measured with the SF-36) for FtM patients than for the general population. A weakness of that study is that it recruited its 384 participants by a general email rather than a systematic approach, and the degree and type of treatment were not recorded. Study participants who were taking testosterone had typically being doing so for less than 5 years. Reported quality of life was higher for patients who had undergone breast/chest surgery than for those who had not (p<.001). (A similar analysis was not done for genital surgery.) In other work, Kuhn and colleagues (2009) used the King's Health Questionnaire to assess the quality of life of 55 transsexual patients at 15 years after surgery. Scores were compared to those of 20 healthy female control patients who had undergone abdominal/pelvic surgery in the past. Quality of life scores for transsexual patients were the same or better than those of control patients for some subscales (emotions, sleep, incontinence, symptom severity, and role limitation), but worse in other domains (general health, physical limitation, and personal limitation)" (Kuhn et al., 2009; WPATH, 2012 Appendix D).

"For transgender adults who choose to proceed with gender-affirming surgery and meet eligibility criteria, psychological benefits and improvements in quality-of-life outcomes have been documented. Positive findings have been observed with bilateral mastectomy (van de Grift et al., 2016) and genital gender-affirming surgery (Wierckx et al., 2011) in transgender men, and facial feminization procedures (Ainsworth & Spiegel, 2010) and vaginoplasty (Bouman et al., 2016) in transgender women. However, findings from a multicenter European study (Smith, van Goozen & Cohen-Kettenis, 2001) showed that minor regret (n=2) or disappointment (n=6) has been reported (entire sample=136) in transgender adults, although these feelings were predominantly related to postsurgical medical, functional, or aesthetic issues."(Mahfouda et al., 2018)

Bouman et al. (2016) performed a survey study with thirty-one transgender women (median age at time of surgery = 19.1 years, range = 18.3-45.0 with median clinical follow-up of 2.2 years, range = 0.8-7.5) who underwent primary total laparoscopic intestinal vaginoplasty with at least 1 year of clinical follow-up. These relatively young transgender women reported satisfactory functional and esthetic results of the neovagina and a good quality of life, despite low Female Sexual Function Index scores (Bouman et al., 2016).

Gender-affirming surgery in transgender adolescents younger than 18 years are of particular interest given the high prevalence of 18 to 20 years old in the applicants' population. "From the literature, gender affirming surgery that has been done in adolescents includes chest wall masculinization (bilateral mastectomy) in transgender males, and vaginoplasty in transgender females. Transgender adolescent males often describe functional limitations and psychological distress from having breasts (e.g., discomfort from binding breasts, limitations on choice of physical activity and clothing, difficulty in being recognized as male) and present a convincing argument for accessing the top procedure. Breast augmentation is less frequently requested in the transgender female adolescent" (Mahfouda et al., 2018).

8

**Gender Dysphoria following Gender Affirming Surgery**

"Cohen-Kettenis and colleagues (Cohen-Kettenis & van Goozen, 1997) were the first to explore postoperative functioning in transgender adolescents (n=19; 14 transgender males, 5 transgender females; mean age 17·5 years) in 1997. Compared with before surgery, gender dysphoria was markedly reduced when the sample was assessed postoperatively, after a mean of 2.6 years. 40% of transgender males expressed satisfaction with their breast removal, 50% were moderately satisfied, and 10% were dissatisfied with the result. Disappointment about the visibility of the scars was the main reason for dissatisfaction with the breast removal. 80% of transgender males felt comfortable baring their chest. Overall, postsurgical body satisfaction was reported in 60% of transgender males (40% felt neutral), and 100% of transgender females. Transgender female patients in this sample had undergone vaginoplasty; however, young transgender males had been advised to postpone genital surgery because of improvements to surgical methods" (Mahfouda et al., 2018).

"A subsequent prospective follow-up study (Smith, van Goozen & Cohen-Kettenis, 2001) by the same research group evaluated the next consecutive 20 patients (13 transgender male, seven transgender female; mean age 16.6 years) that underwent gender-affirming surgery in adolescence (treatment group) and were assessed again in adulthood (at approximately age 21 years). Posttest scores of anxiety, depression, and hostility in the treatment group were lower than at pre-surgery, but no significant changes were observed with respect to psychological functioning. Post-surgery scores were similar to age-matched peers from the cisgender population."

"In a retrospective observational study (Marinkovic & Newfield, 2017), the psychological and physical effects of chest surgery were examined in a sample of transgender adolescent males (n=14, mean age at surgery 17.2 years). All patients were in the advanced phases of pubertal development at the time of surgery (Tanner Stage V). Depending on breast size, the surgical technique used was either a keyhole approach (n=4; smaller breast volume) or a double incision procedure (n=10). Almost all transgender adolescents had been on testosterone therapy at the time of the surgery. Mean postsurgical aesthetic and comfort satisfaction score, as assessed on a 1–5 Likert scale, was 4.9 (5=highest satisfaction). Before surgery, all but one adolescent had a history of depression or anxiety, or both, and ten adolescents had a history of deliberate self-harm. Postsurgical scores assessing mental health, available for ten of the adolescents, indicated that one patient continued to experience high levels of depression, but almost all patients subjectively reported improvements in symptoms. Postsurgical complications were high, as 36% (n=5) of the sample had adverse scar outcomes" (Mahfouda et al., 2018). "In a study (Van de Grift et al., 2017) exploring surgical satisfaction in transgender people (n=132), eight cases of surgical dissatisfaction were reported, two of which were in transgender adolescents (none <18 years)" (Mahfouda et al., 2018).

"Olson-Kennedy and colleagues (Olson-Kennedy et al., 2018) examined chest dysphoria in transgender male young people who had either undergone surgical chest reconstruction (postsurgical group; n=68, mean age at time of surgery 17.5 years) or had not (non-surgical group; n=68, mean age 17 years). The non-surgical group had significantly higher levels of chest dysphoria than the postsurgical group and were often functionally limited; 47% (n=32) avoided

9

exercise, 60% (n=41) felt intimacy was difficult, and 59% (n=40) felt life had not started because of how they felt towards their chest. One participant from the postsurgical group, older than 18 years at the time of the surgery, reported occasional regret. The data on adolescents are consistent with findings from the transgender adult literature, which showed that chest dysphoria decreased substantially following bilateral mastectomy or chest wall masculinization, or both, and measures of quality of life improved" (Agarwal et al. 2018; Mahfouda et al., 2018).

"A qualitative study (Milrod & Karasic, 2017) investigated attitudes and experiences of US surgeons affiliated with WPATH (n=20) towards vaginoplasty in transgender females younger than 18 years. Although anecdotal and news reports indicate that vaginoplasties have been done in transgender females younger than 18 years (Winter, 2006), published data are almost non-existent. Results from the qualitative study indicated that over half of the respondents had performed vaginoplasty in transgender females younger than 18 years, with the youngest patient aged 15 years. Approximately a third of respondents regarded the WPATH SoC16 minimum eligibility threshold for vaginoplasty as appropriate, whereas the remainder endorsed a case-by-case approach. The most common surgical technique used was one-stage penile inversion vaginoplasty, most often augmented by a full thickness scrotal graft. The technique is not always viable in cases of penoscrotal hypoplasia, which can occur as a consequence of puberty suppression treatment in the early Tanner stages of puberty. In such cases, it is unclear whether alternative surgical methods such as bowel interposition vaginoplasty or use of tissue expanders yield equivalent outcomes. Psychological maturity was perceived as more important than age in adolescent patient selection, particularly in relation to understanding the stressors of undergoing surgery and the expectations of postoperative self-care, including commitment to a dilation schedule to maintain neovaginal patency. Reasons for agreeing to perform vaginoplasty in a minor included: a request for the full transition to be complete before entering work force or college, a potential for a patient outcome to be compromised once at college or work (e.g., busy schedule makes it difficult to adhere to postoperative self-care), support of their families (can ensure the minor adheres to postoperative dilation schedule), patient still living at home (importance of a safe and affirmative environment to recuperate), benefits might outweigh risks in transgender females entering college or very sensitive social roles" (Mahfouda et al., 2018).

Based on such an extensive range in variability of possible approaches to alleviate gender dysphoria and/or other psychosocial aspects of gender nonconformity, it is challenging to determine an appropriate stability period prior to accession into the military without individual consideration of a particular gender nonconformity/transformation path. Moreover, finalizing transition may not completely alleviate dysphoria as the DSM-5 differentiates posttransition gender dysphoria, which could occur in individuals transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one cross-sex medical procedure or treatment regimen – namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender (DSM-5, p. 453).

A precise length of such stability period cannot be derived from the existing literature as it also greatly varies and depends on a combination of multiple factors involving severity of gender dysphoria at the baseline, time of its onset, psychiatric comorbidity, as well as the complexity and length of the gender affirmation approaches that have been completed and/or further

10

planned, or the lack of their availability. According to the DSM-5, "persistence of gender dysphoria is modestly correlated with dimensional measures of severity ascertained at the time of a childhood baseline assessment. In one sample of natal males, lower socioeconomic background was also modestly correlated with persistence" (DSM-5, p. 455).

Another indeterminate factor is an estimation when the transition is complete as there is a possibility of more interventions that would bring a person physical characteristics even closer to their desired gender. Long lasting history of minority stress may create additional vulnerability in trans-gender applicant population and negatively affect their medical readiness and resilience after accession.

The disqualifying aspects of various surgeries and their subsequent stability periods are also determined by the extent of surgical invasiveness, likelihood, timing and severity of complications, along with post-operational length and requirements that are already adequately addressed in the applicable body systems of the DoDI 6130.03 V1. However, given the gender affirmation surgeries' (GAS) complexity along with increasing variability of their techniques and incidence in the past few years, they deserve additional considerations. Thus, AMSARA has expanded the initial literature search to additionally focus on and determine the prevalence and severity of the GAS complications. Some of these surgeries are reported to be highly prevalent and include urethral complications reaching 39% after phalloplasty (Remington et al., 2018: Mahfouda, 2018). Ascha et al. reported 31.5% and 32.8% overall urethral complication rate for radial forearm free flap and anterolateral thigh pedicled flap phalloplasty with 3.4% and 7.8% of respective rate of partial or total neophallus loss (Ascha et al., 2017). "Whilst only a part of the process in gender transitioning, chest reconstruction is important as it is frequently the initial surgical procedure" and enables those with large breasts to more easily live as their self-identified gender. Mastectomy is historically associated with high rates of both complication and revision surgery to include hematoma, infection, seroma, fistula, or partial necrosis of nipple-areola complex reported in third of the patients (Kääriäinen et al., 2016). "The larger the breast, poorer the skin quality, and greater the amount of excess skin, the longer the required incision and resulting scar is for mastectomy of female-to-male patients. Hematoma is the most common reason for acute reoperation and secondary corrections are often needed" (Kääriäinen et al., 2016). More moderately prevalent complications include granulation tissue (26%), intravaginal scarring (20%), and prolonged pain (20%) among those who underwent penile inversion vaginoplasty (Massie et al., 2018) with the incidence of any immediate (<30 days) and delayed (>30 days and <6 months) vaginoplasty postoperative event at 19% and 25% respectively (Ferrando, 2020), and overall neovaginal complication with the rate of 32.5% (Dreher et al., 2018). Severity of the complications range from temporary self-resolving minor issues to those creating major discomfort and/or functional impairment and, therefore, requiring repeated surgeries for various reasons to include reconstructive surgery for complications such as urethral strictures, urethrocutaneous fistulae, vaginal remnant etc. (Geolani et al., 2019). Reoperation rate after mastectomy is 8.8% with hematoma as the most frequent reason (Kääriäinen et al., 2016). A neovaginal reoperation rate was reported at 21.7% for non-esthetic reasons, with the stenosis of the neo-meatus (14.4%) as the most common, according to review and meta-analysis of 125 articles performed by Dreher et al (Dreher et al., 2018). The overall incidence of reoperation/revision was 7.9% (n = 19) with reasons for reoperation included cosmesis (3.8%), neovaginal stenosis (2.1%;), and wound dehiscence (0.8%), with less than 0.5% reoperations for

11

meatal stenosis, hematoma or rectovaginal fistula reported by Levy at al. (2019) for 240 penile-inversion vaginoplasty performed by a single surgeon at a large academic institution. "Patients who developed minor postoperative complications following penile inversion vaginoplasty were more likely to require revision surgery to address functional and aesthetic concerns. Patients responded with high levels of satisfaction following revision procedures, with the majority of patients reporting resolution of genital-related dysphoria."

Bouman et al. (2014) in their review of 21 studies on intestinal vaginoplasty including a total of 894 patients, determined that the prevalence and severity of procedure-related complications were low with main postoperative complication composed of introital stenosis, necessitating surgical correction in 4.1% of sigmoid-derived and 1.2% of ileum-derived vaginoplasties; however, all these studies had a retrospective design and were reported to be of low quality. In their later (2016) study Bouman et al. reported results from 42 transgender women who underwent total laparoscopic sigmoid vaginoplasty as primary vaginal reconstruction with the mean age at the time of surgery: $21.1 \pm 4.7$ and follow-up time: $3.2 \pm 2.1$ years. One patient died as a result of an extended-spectrum beta-lactamase-positive necrotizing fasciitis leading to septic shock, with multi-organ failure. Direct postoperative complications that needed laparoscopic reoperation occurred in three cases and long-term complications needed a secondary correction took place in seven cases. After 1 year, all patients had a functional neovagina so the total laparoscopic sigmoid vaginoplasty was reported to have a similar complication rate as other types of elective laparoscopic colorectal surgery (Bouman et al., 2016).

The complication prevalence and severity are largely depending on the MTF vs FTM types of surgeries, surgical techniques, surgeon experience (decreased after performing 50 surgeries per Ferrando, 2020), prior surgeries etc. "Evidence from the transgender adult literature indicates that phalloplasty has very high complication rates, with one recent retrospective study (n=149) citing urethral complications in approximately a third (n=47) of cases. Given the comparative complexity of phalloplasty over vaginoplasty (penile inversion technique), in future studies, vaginoplasty will probably continue to be associated with a more favorable postsurgical outcome" (Mahfouda et al., 2018).

Surgical complications are reported to be more prevalent after the gender affirming surgeries compared to cisgender surgeries (Remington et al., 2018) and need to be considered in terms of possible impact on military service and wellbeing of prospective Service Members whose health will likely endure multiple challenges in a line of duty.

While GAS are important in the treatment of gender dysphoric patients, a moderate to high complication rate reported in the literature and its postulated impact on success of the military service should be taken under advisement. The variability in techniques and standards in reporting complications makes it difficult to assess accurately the true prevalence and even more so to incorporate it into a risk assessment necessary for establishing a concrete evidence-based stability period before accession.

The mean surgery age reported in studies varies greatly and, depending on the search restrictions, ranges from around 19 through 58 with more studies in 30 to 40 years range. Such a wide age distribution and predominance of adults in their 30th and older is not unexpected. The

12

transgender individuals start on M/F hormones at 16-18 and a year of stability is required before a surgery. Furthermore, the cost of surgical procedures, lack of insurance coverage, possible delay in surgical referrals resulting from insufficient transgender healthcare knowledge among healthcare providers, lack of highly experienced surgeons specializing in GAS, along with reported stigma and discrimination may contribute to pursuing surgeries mostly starting in late twenties. In particular, the transgender individuals experience multiple barriers to accessing care related to medical transition, including a shortage of providers, health insurance programs that categorically exclude the provision of gender-affirming hormones and surgery (Barcelos, 2019) or provide insufficient coverage, which limit comprehensive care (Leinung et al., 2016) along with time-consuming and frustrating process to confirm coverage (Zaliznyak, 2021) or difficulties to secure it (Learmonth et al., 2018). Participants of a small study reported several similar barriers toward receiving GAS: financial (73%), finding a physician (65%), and access to information (63%) (El-Hadi et al, 2018). Survey results from 406 transgender or gender-nonconforming adults who live in Colorado indicate that 40% of respondents report delaying medical care due to cost, inadequate insurance, and/or fear of discrimination (Christian et al., 2018). Moreover, while plastic surgeons are most likely to perform GAS compared to other specialties, the geographic distribution of surgeons, does not match the distribution of patients (Cohen et al, 2020).

The mean age at surgeries in some studies, however, could be skewed to the right by the surgeries in older adults and the median age of surgeries is not always reported. Currently, the prevalence of post GAS applicants might not be expected to be very high given that the predominant age of enlisted military application is close to 20, but the age of GAS could be decreasing in the future.

For practical reasons, a period of stability after surgery is preferable to calculate when it is based on the date of release from the surgical service rather than from the date of surgery since all surgical procedures have different recovery time and rate of complications. However, in retrospect this time point could be more challenging to establish precisely compared with the date of surgery. Some transgender surgeries are somewhat similar to or comparable with cisgender procedures and, therefore, have already been addressed in the relevant sections of the DoDI 6130.03 V1, from which the corresponding established stability periods could be derived. The other surgical interventions are very specific to the transgender and have no precedence in or relevance to the existing post-surgical disqualifications listed in the DoDI. Some of the surgeries also tend to be more invasive, complicated, and require highly skilled and experienced surgeons in these specific procedures. The rapid increase of such surgeries only in the last two decades affords a comparatively shorter time period to perfect and establish adequate surgical techniques with the lowest likelihood of complications and the evidence-based support for their prevention and management. The aforementioned historic uniqueness, individual variability, and unprecedented complexity of some gender affirming surgeries makes it extremely difficult if not impossible to recommend any averaged arbitrary time of post-surgical stability based on the current literature search. While no particular determination of length is being offered for stability period, it seems that individual review of performed surgical procedures, their complexities and complications will provide a much better chance to estimate the risk of future attrition.

13

Johansson et al. (2010) in their five-year follow-up study of Swedish adults with gender identity disorder "evaluated the outcome of sex reassignment as viewed by both clinicians and patients, with an additional focus on the outcome based on sex and subgroups. Of a total of 60 patients approved for sex reassignment, 42 (25 male-to-female [MF] and 17 female-to-male [FM]) transsexuals completed a follow-up assessment after 5 or more years in the process or 2 or more years after completed sex reassignment surgery. Twenty-six (62%) patients had an early onset and 16 (38%) patients had a late onset. At index and follow-up, a semi-structured interview was conducted. At follow-up, 32 patients had completed sex reassignment surgery, five were still in process, and five-following their own decision-had abstained from genital surgery. No one regretted their reassignment. The clinicians rated the global outcome as favorable in 62% of the cases, compared to 95% according to the patients themselves, with no differences between the subgroups. Based on the follow-up interview, more than 90% were stable or improved as regards work situation, partner relations, and sex life, but 5-15% were dissatisfied with the hormonal treatment, results of surgery, total sex reassignment procedure, or their present general health. Most outcome measures were rated positive and substantially equal for MF and FM. Late-onset transsexuals differed from those with early onset in some respects: these were mainly MF (88 vs. 42%), older when applying for sex reassignment (42 vs. 28 years), and non-homosexually oriented (56 vs. 15%). In conclusion, almost all patients were satisfied with the sex reassignment; 86% were assessed by clinicians at follow-up as stable or improved in global functioning" (Johansson et al., 2010).

Also there is no evidence-based theoretical or practical approach that could be offered to determine whether applicants will decide to undergo any/any further gender affirming surgical procedure(s) after their accession. The non-disclosure of such intentions in the applicant pool might likewise become a significant issue for readiness and drive up the health care cost.

18 month time period has been implemented by the Memorandum (OUSD Memo, 2017) effective 1 January 2018 – this specific population has been identified but could not be followed given extremely small prevalence of disqualifications and only one accession (AMSARA TG research report for AMSWG, May 2021).

Elders, Brown, Coleman, Kolditz, and Steinman (2014) summarize and challenge four common notions to justify barring transgender individuals from Service which are actually not supported by research and not internally consistent with other DoD policies and populations. These four notions are (pp. 4-5):

*(1) transgender personnel are too prone to mental illness to serve, (2) cross-sex hormone therapy is too risky for medical personnel to administer and monitor, (3) gender-confirming surgery is too complex and too prone to postoperative complications to permit, and (4) transgender personnel are not medically capable of safely deploying.*

The most notable challenge to these assumptions is falsely equating transgender identity with mental health disorders, which has become a debunked connection broadly in the medical field. In addition, there are a number of other conditions that require hormone treatment which do not bar service or deployment for other groups, including: dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, and renal or voiding dysfunctions. In addition, the authors cite that 1.4% of all US Service Members report taking prescribed anabolic steroids. The authors conclude that the transgender bar is inconsistent with current medical understanding and relies

14

on assumptions that are either unfounded or inconsistent with other standards for conditions affecting predominately cisgender individuals.

Sufficient time of stability in a preferred gender is needed before such major life changes as rigorous military training and demanding service requirement can be successfully physically, psychologically and socially endured.

The limited and varying findings in the literature reviewed here are not sufficient to determine appropriate periods of stability associated with gender dysphoria or gender transition. Studies reported social, economic and medical barriers, prejudice, stigma, discrimination and occasional poor surgical outcomes as potential factors that could contribute to psychological conditions for which transgender or gender non-conforming individuals may be vulnerable. Additionally, stability periods were not elucidated for individuals who choose hormone treatment compared to those who underwent gender-affirming procedures. Other areas needing further study and follow-up include the age of onset of gender dysphoria and how age may or may not be associated with psychological conditions.

Conclusion:

With each individual's experience with transition and gender-affirming treatment being unique, an individualized approach to determining readiness seems appropriate. With the lack of compelling evidence for a stability period before accession into the military, it might be prudent to proceed with a more conservative than 18 months requirement, currently in effect. This approach may help to ascertain a population for an individual review and waiver consideration by Service waiver authorities in order to evaluate and estimate a risk of non-deployability and adverse attrition.

The stability period of 36 months is in alignment with stability periods indicated in DoDI 6130.03 Volume 1: Learning, Psychiatric, and Behavioral Disorders section for existing or comorbid depressive and anxiety disorders, more prevalent in those with gender dysphoria. There is a lack of evidence that gender dysphoria in isolation predicts non-deployability or adverse attrition. Further, as research cited in this document suggest, not all gender non-conforming individuals choose any type of treatment.

*b) Do our current accession stability period standards for mental health conditions such as depression or anxiety (typically 36 months of stability following treatment) appropriately inform what we should consider appropriate for gender dysphoria or gender transition?*

"Mental health concerns, including anxiety disorders (de Vries et al., 2011), and suicidal ideation (Strauss et al., 2017) are much more prevalent in transgender young people than in the cisgender population (people in whom sex assigned at birth corresponds with gender identity). The clinical consensus is that poor mental health is often a consequence of the incongruence between sex assigned at birth and gender identity, and that stigma, bullying, and family non-acceptance are also important contributing factors (Strauss et al., 2017). In transgender adults, gender-affirming cross-sex hormones (CSHs) and surgical interventions have been associated with a substantial reduction in psychological distress and body dysphoria, and improvements in quality of life (Van

15

de Grift et al., 2017; Agarwal et al. 2018; Owen-Smith et al., 2018; Gorin-Lazard et al., 2013).
Only two studies have investigated the potential for gender affirming CSHs to improve mental
health outcomes and alleviate body dysphoria in transgender adolescents. De Vries (2014) and
colleagues assessed gender dysphoria, body satisfaction, and psychological functioning in 55
transgender adolescents at baseline (T0), during puberty suppression (T1), and in adulthood,
following CSH for all at age 16 years, and gender-affirming surgery for some (T2). Compared
with T0 and T1 scores, a substantial decrease was observed in gender dysphoria at T2. Both
transgender males and females also reported significantly less dissatisfaction with primary and
secondary sexual characteristics, less psychopathology, and improved global functioning, with
quality of life similar to age-matched cisgender peers (de Vries et al., 2014). A limitation of the
study was that gender dysphoria and psychological functioning were not assessed during
intervention with CSHs only, which was before surgical intervention in adulthood for many
participants, so it was not possible to disentangle the psychological benefits of CSHs from that of
surgical interventions. Importantly, these participants were originally from a larger cohort
(n=70), whose outcomes following puberty suppression in adolescence were reported previously
(de Vries et al., 2010). The findings of De Vries and colleagues could be overly optimistic
because of the high levels of bias with respect to study participation and study attrition" (Chew et
al., 2018; Mahfouda et al., 2018).

"A study that acknowledged the high rate of problematic weight management behaviours in
transgender adolescents assessed body dissatisfaction and disordered eating in gender non-
conforming youth (n=50) (Guss et al., 2017). Transgender adolescent females and males were
found to have significantly more symptoms of disordered eating than their cisgender peers when
assessed at baseline. However, at 6 months, participants who had commenced gender affirming
CSHs (n=18) had lower levels of body dissatisfaction and less disordered eating behaviours than
those who had not yet received treatment. The data complemented findings from an adult
transgender health service in the UK (n=563) (Jones et al., 2018), where individuals receiving
gender-affirming hormones showed less disordered eating psychopathology than those who had
not yet received treatment" (Mahfouda et al., 2018).

"Collectively, the findings from the very small amount of data available suggest that gender-
affirming hormones are associated with improvements in gender dysphoria or mental health, or
both, in transgender adolescents, which is consistent with the findings in the literature for
transgender adults (Gorin-Lazard et al., 2013). The evidence presented by De Vries and
colleagues for absence of regret and high quality of life is based on a cohort that commenced
CSHs at age 16 years, but clear findings were not obtained as to whether starting CSHs at a
younger age could result in different outcomes" (Mahfouda et al., 2018).

"Two long-term observational studies, both retrospective, compared the mortality and psychiatric
morbidity of transsexual adults to those of general population samples (Asscheman et al., 2011;
Dhejne et al., 2011). An analysis of data from the Swedish National Board of Health and Welfare
information registry found that individuals who had received sex reassignment surgery (191 MtF
and 133 FtM) had significantly higher rates of mortality, suicide, suicidal behavior, and
psychiatric morbidity than those for a non-transsexual control group matched on age, immigrant
status, prior psychiatric morbidity, and birth sex (Dhejne et al., 2011). Similarly, a study in the
Netherlands reported a higher total mortality rate, including incidence of suicide, in both pre- and

16

post-surgery transsexual patients (966 MtF and 365 MtF) than in the general population of that country (Asscheman et al., 2011). Neither of these studies questioned the efficacy of sex reassignment; indeed, both lacked an adequate comparison group of transsexuals who either did not receive treatment or who received treatment other than genital surgery. Moreover, transsexual people in these studies were treated as far back as the 1970s. However, these findings do emphasize the need to have good long-term psychological and psychiatric care available for this population." (WPATH, 2012, Appendix D)

A secondary data analysis of medical records from the Veteran Health Administration (N=32,441), comparing suicide, homicide, and all-cause mortality rates, indicated that transgender Veterans were significantly more likely to complete suicide than the cisgender comparison group and cisgender Veterans were significantly more likely to die from all-cause mortality (Boyer, Youk, Haas, Brown, Shiperd, Kauth, Jasujaa, & Blosnich, 2021). Similar to the Bränstrom and Pachankis (2020) study, suicide completion was still a low-base rate behavior despite significant differences between groups (.8% versus .2% in the cisgender group). Of note, all-cause mortality was higher in the cisgender population in ages 40-64 (19.9% versus 13.6% in the transgender group) and >65 (40.3% versus 25.7% in the transgender group).

The DSM-5 also states that adolescents and adults with gender dysphoria are not only at increased risk for suicidal ideation, suicide attempts, and suicides before gender reassignment, but adjustment after gender reassignment may also vary and suicide risk may persist (DSM-5, p. 454). "Impairment (e.g. school refusal, development of depression, anxiety, and substance abuse) may be a consequence of gender dysphoria" (DSM-5, p. 455).

Of note, New Zealand Defense Force requires one year of stability after completion of gender transition plan before accessing into the military (MS-PER-REC-001: NZDF Recruit Health Standards). The Canadian Armed Forces does not have a specific stabilization requirement and emphasizes the individualization of gender transition plans.

Conclusion:

36 months stability period for gender dysphoria is consistent with other symptomatically similar psychiatric disorders, which can also be present as comorbid. In particular, adolescents with gender dysphoria were reported to have a higher likelihood of coexisting internalizing disorders such as anxiety and depression (DSM-5, p. 459), and/or externalizing disorders such as oppositional defiant disorder (de Vries et al., 2011). While these comorbid psychiatric disorders are associated with decreased medical readiness and increased attrition, they are disqualifying and separately applicable per the DoDI 6130.03 V1. Because individuals labeled with gender dysphoria may also have comorbid psychiatric disorders already covered by DoDI 6130.03 V1, we recommend maintaining the 36-month stability period for symptomatically similar psychiatric disorders in general. This accession policy would cover individuals who suffer from a psychiatric disorder related to gender dysphoria already.

17

*c) Does the evidence show that issues such as cross-sex hormone therapy, not a medical condition, should have an equal period of stability as gender dysphoria?*

"Feminizing/masculinizing hormone therapy—the administration of exogenous endocrine agents to induce feminizing or masculinizing changes—is a medically necessary intervention for many transsexual, transgender, and gender-nonconforming individuals with gender dysphoria (Newfield, 2006; Pfäfflin & Junge, 1998). Some people seek maximum feminization/masculinization, while others experience relief with an androgynous presentation resulting from hormonal minimization of existing secondary sex characteristics" (Factor & Rothblum, 2008; WPATH, 2012).

The WPATH 'Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People' lists the following criteria for feminizing/masculinizing hormone therapy: (1) Persistent, well-documented gender dysphoria; (2) Capacity to make a fully informed decision and to give consent for treatment; (3) Age of majority in a given country (if younger, follow the SOC for children and adolescents); (4) If significant medical or mental concerns are present, they must be reasonably well controlled (WPATH, 2012)

"Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Hormone therapy can provide significant comfort to patients who do not wish to make a social gender role transition or undergo surgery, or who are unable to do so (Meyer III, 2009). Hormone therapy is a recommended criterion for some, but not all, surgical treatments for gender dysphoria" (WPATH, 2012)

The WPATH 'Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People' outlines a few aspects that need to be considered for hormone therapy provided for non-medical condition:
1) Changes caused by hormone therapy: "most physical changes, whether feminizing or masculinizing, occur over the course of two years. The amount of physical change and the exact timeline of effects can be highly variable."
2) Risk of hormone therapy: "All medical interventions carry risks. The likelihood of a serious adverse event is dependent on numerous factors: the medication itself, dose, route of administration, and a patient's clinical characteristics (age, comorbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual patient"
3) Ongoing medical monitoring: "regular physical and laboratory examination to monitor hormone effectiveness and side effects"
4) Regimen: "Clinicians can provide a limited (1-6 month) prescription for hormones while helping patients find a provider who can prescribe long-term hormone therapy. Providers should assess a patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated."

In 1998, WPATH (2012) guidelines stated that "gender-affirming cross sex hormones (CSHs) were accessible for eligible candidates from age 16 years, but these candidates were encouraged

18

to delay the decision until adulthood, but now prescribed to transgender people younger than age 16 years in some centers" (Mahfouda et al., 2018)

**TABLE 2 from WPATH: RISKS ASSOCIATED WITH HORMONE THERAPY.**
**HIGHLIGHTED ITEMS ARE CLINICALLY SIGNIFICANT.**

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | Venous thromboembolic disease[A]<br><br>Gallstones<br><br>Elevated liver enzymes<br><br>Weight gain<br><br>Hypertriglyceridemia | Polycythemia<br><br>Weight gain<br><br>Acne<br><br>Androgenic alopecia (balding)<br><br>Sleep apnea |
| Likely increased risk with presence of additional risk factors[a] | Cardiovascular disease | |
| Possible increased risk | Hypertension<br><br>Hyperprolactinemia or prolactinoma | Elevated liver enzymes<br><br>Hyperlipidemia |
| Possible increased risk with presence of additional risk factors[B] | Type 2 diabetes[a] | Destabilization of certain psychiatric disorders[C]<br><br>Cardiovascular disease<br><br>Hypertension<br><br>Type 2 diabetes |
| No increased risk or inconclusive | Breast cancer | Loss of bone density<br><br>Breast cancer<br><br>Cervical cancer<br><br>Ovarian cancer<br><br>Uterine cancer |

[A] Risk is greater with oral estrogen administration than with transdermal estrogen administration.
[B] Additional risk factors include age.
[C] Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

"Almost all the studies done in transgender adolescents have used longitudinal retrospective methods, in which limitations include loss to follow-up, and sample sizes are often small. Intervention regimens are also heterogeneous and adherence can be inconsistent. Findings are

19

predominantly based on short-term safety profiles, and medium to high levels of bias (through participation, attrition, and outcome measures) have been reported" (Chew et al., 2018).

"Oestrogen and testosterone therapies in transgender adults can exert transient or long-term effects on metabolic variables such as lipid status (Hembree et al., 2017), which is supported by evidence from other studies in adolescent and adult populations that have received hormonal treatments for medical conditions (e.g., testosterone for delayed pubertal development in cisgender males)" (Mahfouda et al., 2018). While gender affirming hormone therapy in transgender men both improves and impairs several surrogate cardiovascular risk markers, very few prospective studies with long follow-up and control group are available. In their small prospective observational study of 20 transgender men Aranda et al. (2019) showed changes in metabolic and inflammatory parameters after 6 and 12 months of hormone therapy follow-up, which could increase cardiovascular risk, together with initial evidence of vascular changes.

"Elevations in haemoglobin and haematocrit have been noted in several populations that receive testosterone therapies, including transgender adult males (Aranda et al., 2016; Jacobeit, Gooren & Schulte, 2007). Several studies in transgender adolescent males have also showed a statistically significant increase in haemoglobin and haematocrit concentrations in response to testosterone therapy (Troutman et al., 2014; Tack et al., 2016; Olson-Kennedy et al., 2018). Importantly, no clinical complications were observed to warrant treatment discontinuation. In their transgender adolescent male sample (n=25, mean age 17.4 years), Tack and colleagues (2016) noted that haemoglobin and haematocrit concentration variables increased, but had stabilized at 6 months" (Tack et al., 2016; Mahfouda et al., 2018).

"In transgender adolescent females that received estradiol (a synthetic form of oestradiol), two separate studies found that haemoglobin and haematocrit had not decreased at either 6 months (n=44, mean age 18 years) (Jarin et al., 2017), or 12 months (n=28, median age 16 years) (Hannema et al., 2017). Conversely, Olson-Kennedy and colleagues (2018) noted a statistically significant decline in haemoglobin concentrations after a 2 year course of estradiol in their sample of transgender adolescent females (n=25, mean age 18 years)" (Olson-Kennedy et al., 2018; Mahfouda et al., 2018).

"A statistically significant decline in mean serum high-density lipoprotein (HDL) concentration has been noted in transgender adolescent males after 6 months of testosterone treatment (Jarin et al., 2017). In a separate study that examined HDL over a 2-year period (in a different sample of transgender adolescent males using testosterone) the mean HDL reduction was clinically significant (Olson-Kennedy et al., 2018). No changes in low-density lipoprotein (LDL) or triglycerides have been documented in the short term for transgender adolescent males (Tack et al., 2016; Jarin et al., 2017), although statistically significant increases in triglyceride concentrations were observed by Olson-Kennedy and colleagues after 2 years of receiving testosterone (Olson-Kennedy et al., 2018). Overall, none of the studies reviewed showed significant changes in mean total cholesterol concentrations (Tack et al., 2016). Elevations in systolic and diastolic blood pressure with testosterone treatment have been observed after 2 years, (Olson-Kennedy et al., 2018) but not 6 months." (Mahfouda et al., 2018)

20

"Studies that have examined safety indices in transgender adults receiving testosterone and oestrogen have mostly been reassuring, with many supporting the short-term safety of treatment, when taken in the context of medical supervision to monitor risks (e.g., polycythaemia in transgender males, venous thromboembolism in transgender females) (Weinand & Safer 2015; Vita et al., 2018). For transgender females, oestrogen therapy alone is insufficient to produce the desired feminizing effects. Spironolactone, an aldosterone antagonist with weak oestrogenic properties, is one of the most commonly used adjuncts to support oestrogen therapy in transgender females. As a potassium-sparing diuretic, spironolactone can cause hyperkalaemia, therefore potassium concentrations **should be monitored every 3 months**. Other adjuncts that can support oestrogen therapy in transgender females include Hannema and colleagues found that alkaline phosphatase decreased in transgender adolescent females receiving estradiol; the decrease occurred in the second and third years of treatment, which the authors surmised was probably due to a reduction in growth velocity (Hannema et al., 2017). The study did not report any changes in other measures of liver or renal function. Although high doses of oestrogens might increase the risk and incidence of venous thromboembolic events in transgender women (Getahun et al., 2018), lifestyle factors such as smoking, and the use of conjugated or synthetic oestrogens (e.g., ethinylestradiol) might contribute to the elevated risk" (Van Kesteren et al., 1997; Toorians et al., 2003). "Longer term evaluations of metabolic and other physical variables are warranted to clarify long-term safety" (Mahfouda et al., 2018).

"Other investigations into the short-term safety of gender-affirming hormones in transgender adolescent females have found statistically significant changes in some variables, including potassium (Olson-Kennedy et al., 2018), alanine transaminase (ALT) (Jarin et al, 2017), prolactin (Olson-Kennedy et al., 2018), and thyroid-stimulating hormone (TSH)(Tack et al., 2016). In transgender adolescent males, statistically significant increases have been observed in concentrations of aspartate transaminase (AST) (Tack et al., 2016; Olson-Kennedy et al., 2018), ALT (Tack et al., 2016; Olson-Kennedy et al., 2018), potassium (Olson-Kennedy et al., 2018) and thyroid function (TSH and free thyroxine)(Tack et al., 2017). Collectively, the consensus among the authors of these studies is that the changes observed in transgender adolescents do not pose a clinical risk, but additional studies are warranted to clarify long-term safety" (Mahfouda et al., 2018).

"In accordance with the Endocrine Society Guidelines (Hembree et al., 2017) monitoring Bone Mass Density (BMD) parameters in transgender adolescents is recommended both prior to and during gender-affirming hormonal treatment" (Mahfouda et al., 2018).

"Transgender adults have an elevated mortality risk compared with the cisgender population, but data suggest that this risk is attributable to extraneous factors, such as suicide, lifestyle factors, and complications related to HIV, rather than hormonal interventions" (Asscheman et al., 2011; Mahfouda et al., 2018).

Van de Grift and colleagues (2017) found that 200 individuals who provided information at baseline upon entering into gender identity clinic and at 6 years follow-up who received hormone or surgical intervention reported increased body satisfaction compared to individuals who had received no treatment ($n = 29$). Body satisfaction was not related to gender dysphoria, but was positively related to psychological symptoms. In other words, there was individual variation, but

21

(Page 187 of Total)

in general, transition-related medical intervention can decrease psychological symptoms and increase body satisfaction. White Hughto, and Reisner (2016) systematically reviewed three studies from gender identity clinics across Italy and Belgium and found that 247 transgender individuals receiving hormone treatment reported significant improvement in psychological functioning (i.e., general mental health symptoms and quality of life) after starting hormone treatment at 3-6 months and 12 months. There was a statistically significant improvement in self-reported quality of life for the transfeminine group ($n = 180$) and a non-significant improvement for the transmasculine group, which may be related to a smaller sample ($n = 67$). Hughto and colleagues (2020) identified that social and medical affirming interventions were inversely related to self-reported mental health symptoms and non-suicidal self-injury in a sample of 288 US-based individuals.

While conclusive research is still in early stages, the positive effects of hormone treatment and/or surgical intervention may be experienced even as early as 3-6 months (e.g., White Hughto & Reisner, 2016).

Conclusion:

As stated in the WPATH, all medical interventions carry risks with the likelihood of a serious adverse event depending on numerous factors: the medication itself, dose, route of administration, and a person's clinical characteristics (age, comorbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual.

Based on the above detailed evidence from the literature, 36 months seems to be a reasonable period of stability to consider before accession to decrease a risk of non-deployability and adverse attrition.

*d) What would be the next logical steps for further research into this space to inform DoD medical standards?*

While the precise research evidence-based answers to all the aforementioned questions are undeniably important for establishing a risk of adverse attrition for these applicants, the impact on the overall military medical readiness might be negligible given the very low historic prevalence of gender dysphoria-related disqualifications reported by AMSARA (AMSARA Annual Report, 2015) and presented at the AMSWG meeting in May of 2021 (AMSARA TG preliminary results). However, the cost of treatment for those individuals may be disproportionally high. The health care utilization by these individuals after their accession have been previously estimated by the PHCoE (2020 study).

Long-term logical steps will include prospective data collection and analyses with periodic progress reports at the AMSWG meetings.

Because transgender Service members seeking transition-related medical services or potential recruits make up such a small portion of the military, it may not make sense to allocate resources

22

to understanding their deficits and deployability as a group and instead flexibly focus on the individual Service member's fitness for duty and individual needs.

- Because having a supportive environment has been recommended for mitigating some of the minority stress experienced by transgender individuals, what is the military doing to ensure the workplace is safe and supportive during and pre-deployment?
- How do various transgender policies impact perceived discrimination and Gen Z perceptions of the military with regard to intent to enlist?
- What is the actual prevalence of transgender and non-conforming Service members (i.e., identifying across the gender spectrum)? Currently we use gender dysphoria as an index, but does not capture non-transitioning Service members.
- How do transgender Service members enhance unit cohesion and military effectiveness?
- What unique traits, skills, and ideas do transgender and gender non-conforming communities bring to the military?

In their review article Mahfouda et al. have concluded that as gender-affirming care in adolescents continues to rapidly evolve, a comprehensive evidence base synthesizing all available data is essential to help guide clinical decision making and inform best practice. The authors have prioritized directions for future research studies (Mahfouda et al., 2018), results of which might be helpful to ascertain once they become available:

- What are the effects of initiating gender-affirming hormones in adolescence on mental health and quality of life in the short and long term?
- To what extent do potential confounding variables, such as psychological support, and experiences of discrimination, influence mental health and quality of life outcomes?
- Are there any effects associated with initiating gender-affirming hormones in transgender adolescents on a cognitive or neural level, either in the short or long term?
- Which factors contribute to compromised bone mineral density values in transgender female adolescents before receiving oestrogen?
- Does starting puberty suppression in early puberty negatively affect peak bone mass accrual and thus increase the risk of osteoporosis in transgender youth later in life? Longitudinal studies are needed to monitor bone health in transgender individuals and develop strategies for the prevention of osteoporosis.
- What is the safety profile of high-dose estradiol preparations in transgender females, often used to limit height?
- What is the long-term safety profile of the different gender-affirming hormonal regimens available?
- Does early initiation of gender-affirming hormones change the metabolic phenotype?
- Does undergoing endogenous puberty first confer a protective effect?
- What effect does early initiation of gender-affirming hormones have on long-term health outcomes?
- For transgender adolescents who receive gender-affirming hormones before 16 years of age, or gender-affirming surgery (chest-wall masculinization in transgender males, vaginoplasty

23

in transgender females) before 18 years of age, how does the rate of regret or disappointment compare with those who have these procedures later?

- For transgender females who have received puberty suppression in early puberty, who might have insufficient penile tissue for penile inversion vaginoplasty, how do other surgical techniques compare?
- For transgender adolescents who wish, and are considered eligible, to have gender-affirming surgery before 18 years of age, how do surgical complication rates compare with those who have surgery in adulthood?
- Since having a supportive environment has been recommended for mitigating some of the minority stress experienced by transgender individuals, what is the military doing to ensure the workplace is safe and supportive during and pre-deployment?

24

# References

Agarwal CA, Scheefer MF, Wright LN, Walzer NK, Rivera A. Quality of life improvement after chest wall masculinization in female-to-male transgender patients: a prospective study using the BREAST-Q and body uneasiness test. J Plast Reconstr Aesthet Surg 2018; 71: 651–57.

Ainsworth TA, Spiegel JH. Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery. Qual Life Res. 2010 Sep;19(7):1019-24. doi: 10.1007/s11136-010-9668-7. Epub 2010 May 12. PMID: 20461468.

Andréasson, M., Georgas, K., Elander, A., & Selvaggi, G. (2018). Patient-reported outcome measures used in gender confirmation surgery: a systematic review. Plastic and Reconstructive Surgery, 141(4), 1026-1039.

Aranda G, Mora M, Hanzu FA, Vera J, Ortega E, Halperin I. Effects of sex steroids on cardiovascular risk profile in transgender men under gender affirming hormone therapy. Endocrinologia, diabetes y nutricion. 2019;66(6):385-92. Epub 2019/02/02. doi: 10.1016/j.endinu.2018.11.004. PubMed PMID: 30704917.

Aranda Velazquez GB, Mora Porta M, Hanzu FA, Vera J, Ortega E, Halperin I. Effects of sex steroids on cardiovascular risk profile in individuals with gender identity disorder with cross-sex hormone treatment. Endocrine Society's 98th Annual Meeting and Expo; Boston, MA; April 1–4, 2016. Poster PP10–2.

Ascha M, Massie JP, Morrison SD, Crane CN, Chen ML. Outcomes of Single Stage Phalloplasty by Pedicled Anterolateral Thigh Flap versus Radial Forearm Free Flap in Gender Confirming Surgery. The Journal of urology. 2018;199(1):206-14. Epub 2017/08/03. doi: 10.1016/j.juro.2017.07.084.

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde, W., van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. European Journal of Endocrinology, 164(4), 635-642.

Barcelos CA. 'Bye-bye boobies': normativity, deservingness and medicalisation in transgender medical crowdfunding. Culture, health & sexuality. 2019;21(12):1394-408. Epub 2019/02/15. doi: 10.1080/13691058.2019.1566971. PubMed PMID: 30762488.

Bartolucci C, Gómez-Gil E, Salamero M, Esteva I, Guillamón A, Zubiaurre L, et al. Sexual quality of life in gender-dysphoric adults before genital sex reassignment surgery. The journal of sexual medicine. 2015;12(1):180-8. Epub 2014/11/18. doi: 10.1111/jsm.12758.

Berry MG, Curtis R, Davies D. Female-to-male transgender chest reconstruction: a large consecutive, single-surgeon experience. Journal of plastic, reconstructive & aesthetic surgery : JPRAS. 2012;65(6):711-9. Epub 2011/12/23. doi: 10.1016/j.bjps.2011.11.053. PubMed PMID: 22189204.

Boas SR, Ascha M, Morrison SD, Massie JP, Nolan IT, Shen JK, et al. Outcomes and Predictors of Revision Labiaplasty and Clitoroplasty after Gender-Affirming Genital Surgery. Plastic and reconstructive surgery. 2019;144(6):1451-61. Epub 2019/11/26. doi: 10.1097/prs.0000000000006282. PubMed PMID: 31764668.

Bockting, W. O. (2008). Psychotherapy and the real-life experience: From gender dichotomy to gender diversity. Sexologies, 17(4), 211-224.

25

Bockting, W. O., Knudson, G., & Goldberg, J. M. (2007). Counseling and mental health care for transgender adults and loved ones. International Journal of Transgenderism, 9(3-4), 35–82.

Bouman MB, van der Sluis WB, van Woudenberg Hamstra LE, Buncamper ME, Kreukels BPC, Meijerink W, et al. Patient-Reported Esthetic and Functional Outcomes of Primary Total Laparoscopic Intestinal Vaginoplasty in Transgender Women With Penoscrotal Hypoplasia. The journal of sexual medicine. 2016;13(9):1438

Bouman MB, van Zeijl MC, Buncamper ME, Meijerink WJ, van Bodegraven AA, Mullender MG. Intestinal vaginoplasty revisited: a review of surgical techniques, complications, and sexual function. J Sex Med. 2014 Jul;11(7):1835-47. doi: 10.1111/jsm.12538. Epub 2014 Apr 4. PMID: 24697986.

Bovin MR, Kwon PO, Cowan DN, Packnett ER, Elmasry H, Feng X, Garvin N, Gary JK, Oetting AA. Accession Medical Standards Analysis & Research Activity, Annual Report 2015.

Boza, C., & Perry, K. N. (2014). Gender-related victimization, perceived social support, and predictors of depression among transgender Australians. International Journal of Transgenderism, 15(1), 35–52.

Bränström, R., & Pachankis, J. E. (2020). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. American Journal of Psychiatry, 177(8), 727-734.

Chew D, Anderson J, Williams K, May T, Pang K. Hormonal treatment in young people with gender dysphoria: a systematic review. Pediatrics 2018; 141: e20173742.

Chou DW, Tejani N, Kleinberger A, Shih C. Initial Facial Feminization Surgery Experience in a Multicenter Integrated Health Care System. Otolaryngology--head and neck surgery : official journal of American Academy of Otolaryngology-Head and Neck Surgery. 2020;163(4):737-42. Epub 2020/05/27.

Christian R, Mellies AA, Bui AG, Lee R, Kattari L, Gray C. Measuring the Health of an Invisible Population: Lessons from the Colorado Transgender Health Survey. Journal of general internal medicine. 2018;33(10):1654-60. Epub 2018/05/16. doi: 10.1007/s11606-018-4450-6. PubMed PMID: 29761263.

Cohen W, Maisner RS, Mansukhani PA, Keith J. Barriers To Finding A Gender Affirming Surgeon. Aesthetic plastic surgery. 2020;44(6):2300-7. Epub 2020/07/23. doi: 10.1007/s00266-020-01883-z. PubMed PMID: 32696165.

Cohen-Kettenis PT, van Goozen SH. Sex reassignment of adolescent transsexuals: a follow-up study. Journal of the American Academy of Child and Adolescent Psychiatry. 1997;36(2):263-71. Epub 1997/02/01. doi: 10.1097/00004583-199702000-00017. PubMed PMID: 9031580.

Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transexual, transgender, and gender-nonconforming people, version 7. Int J Transgend 2012; 13: 165–232.

Crall CS, Jackson RK. Should Psychiatrists Prescribe Gender-Affirming Hormone Therapy to Transgender Adolescents? AMA journal of ethics. 2016;18(11):1086-94. Epub 2016/11/25. doi: 10.1001/journalofethics.2016.18.11.ecas3-1611. PubMed PMID: 27883300.

26

JA180

De Cuypere G, T'Sjoen G, Beerten R, Selvaggi G, De Sutter P, Hoebeke P, Monstrey S, Vansteenwegen A, Rubens R. Sexual and physical health after sex reassignment surgery. Arch Sex Behav. 2005 Dec;34(6):679-90. doi:10.1007/s10508-005-7926-5. PMID: 16362252.

de Vries AL, Doreleijers TA, Steensma TD, Cohen-Kettenis PT. Psychiatric comorbidity in gender dysphoric adolescents. J Child Psychol Psychiatry 2011; 52: 1195–202.

de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics. 2014;134(4):696-704. Epub 2014/09/10. doi: 10.1542/peds.2013-2958. PubMed PMID: 25201798.

de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. J Sex Med. 2011 Aug;8(8):2276-83. doi: 10.1111/j.1743-6109.2010.01943.x. Epub 2010 Jul 14. PMID: 20646177.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langstrom, N., & Landen, M. (2011). Longterm follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. PloS ONE, 6(2), 1-8.

Dhejne, C., Van Vlerken, R., Heylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. International Review of Psychiatry, 28(1), 44–57.

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5, American Psychiatric Association, American Psychiatric Publishing, Washington DC, London, England. ISBN 978-0-89042-555-8

Dreher PC, Edwards D, Hager S, Dennis M, Belkoff A, Mora J, Tarry S, Rumer KL. Complications of the neovagina in male-to-female transgender surgery: A systematic review and meta-analysis with discussion of management. Clin Anat. 2018 Mar;31(2):191-199. doi: 10.1002/ca.23001. Epub 2017 Nov 10.

Dy GW, Granieri MA, Fu BC, Vanni AJ, Voelzke B, Rourke KF, Elliott SP, Nikolavsky D, Zhao LC. Presenting Complications to a Reconstructive Urologist After Masculinizing Genital Reconstructive Surgery. Urology. 2019 Oct;132:202-206. doi: 10.1016/j.urology.2019.04.051. Epub 2019 Jun 20. PMID: 31229518.

Eldh J, Berg A, Gustafsson M. Long-term follow up after sex reassignment surgery. Scand J Plast Reconstr Surg Hand Surg. 1997 Mar;31(1):39-45. doi:10.3109/02844319709010503. PMID: 9075286.

El-Hadi H, Stone J, Temple-Oberle C, Harrop AR. Gender-Affirming Surgery for Transgender Individuals: Perceived Satisfaction and Barriers to Care. Plast Surg (Oakv). 2018;26(4):263-8. Epub 2018/11/20.

Factor, R. J., & Rothblum, E. (2008). Exploring gender identity and community among three groups of transgender individuals in the United States: MtFs, FtMs, and genderqueers. Health Sociology Review, 17(3), 235-253.

Ferrando CA. Adverse events associated with gender affirming vaginoplasty surgery. Am J Obstet Gynecol. 2020 Aug;223(2):267.e1-267.e6. doi: 10.1016/j.ajog.2020.05.033. Epub 2020 May 21. PMID: 32446999.

27

Fisk NM. Editorial: Gender dysphoria syndrome--the conceptualization that liberalizes indications for total gender reorientation and implies a broadly based multi-dimensional rehabilitative regimen. West J Med. 1974 May;120(5):386-91. PMID: 4839483.

Garaffa G, Christopher NA, Ralph DJ. Total phallic reconstruction in female-to-male transsexuals. Eur Urol. 2010 Apr;57(4):715-22. doi:10.1016/j.eururo.2009.05.018. Epub 2009 May 19. PMID: 19477578.

Getahun D, Nash R, Flanders WD, et al. Cross-sex hormones and acute cardiovascular events in transgender persons: a cohort study.Ann Intern Med 2018; 169: 205–13.

Gijs, L., & Brewaeys, A. Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. Annual Review of Sex Research. 2007; 18: 178-224.

Gonzales G, Henning-Smith C. Barriers to Care Among Transgender and Gender Nonconforming Adults. The Milbank quarterly. 2017;95(4):726-48. Epub 2017/12/12. doi: 10.1111/1468-0009.12297. PubMed PMID: 29226450.

Gorin-Lazard A, Baumstarck K, Boyer L, et al. Hormonal therapy is associated with better self-esteem, mood, and quality of life in transexuals. J Nerv Ment Dis 2013; 201: 996–1000.

Green, R., & Fleming, D. Transsexual surgery follow-up: Status in the 1990s. Annual Review of Sex Research, 1990:1(1) 163-174.

Guss CE, Williams DN, Reisner SL, Austin SB, Katz-Wise SL. Disordered weight management behaviors, nonprescription steroid use, and weight perception in transgender youth. J Adolesc Health 2017; 60: 17–22.

Hannema SE, Schagen SE, Cohen-Kettenis PT,Delemarre-van de Waal HA. The efficacy and safety of pubertal induction using 17beta-estradiol in trans girls. J Clin Endocrinol Metab 2017; 102: 2356–63.

Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ 3rd, Spack NP, Tangpricha V, Montori VM; Endocrine Society. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab. 2009 Sep;94(9):3132-54. doi: 10.1210/jc.2009-0345.

Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab 2017; 102: 3869–903.

Hughto, J. M. W., Reisner, S. L., & Pachankis, J. E. (2015). Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. Social Science & Medicine, 147, 222-231.

Hughto, J. M., Gunn, H. A., Rood, B. A., & Pantalone, D. W. (2020). Social and medical gender affirmation experiences are inversely associated with mental health problems in a US non-probability sample of transgender adults. Archives of Sexual Behavior, 49(7), 2635–2647.

Freitas, L. D., Léda, R. G., Bezerra, F. S., & Miranda, S. Â. (2020). Psychiatric disorders in individuals diagnosed with gender dysphoria: A systematic review. Psychiatry & Clinical Neurosciences, 74(2), 99–104.

28

Institute of Medicine (US) Committee on Lesbian, Gay, Bisexual, and Transgender Health Issues and Research Gaps and Opportunities. The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding. Washington (DC): National Academies Press (US); 2011. PMID: 2201

Jacobeit JW, Gooren LJ, Schulte HM. Long-acting intramuscular testosterone undecanoate for treatment of female-to-male transgender individuals. J Sex Med 2007; 4: 1479–84.

Jarin J, Pine-Twaddell E, Trotman G, et al. Cross-sex hormones and metabolic parameters in adolescents with gender dysphoria. Pediatrics 2017; 139: e20163173

Johansson A, Sundbom E, Höjerback T, Bodlund O. A five-year follow-up study of Swedish adults with gender identity disorder. Arch Sex Behav. 2010 Dec;39(6):1429-37. doi: 10.1007/s10508-009-9551-1. Epub 2009 Oct 9. PMID:19816764.

Jones BA, Haycraft E, Bouman WP, Brewin N, Claes L, Arcelus J. Risk factors for eating disorder psychopathology within the treatment seeking transgender population: the role of cross-sex hormone treatment. Eur Eat Disord Rev 2018; 26: 120–28.

Kääriäinen M, Salonen K, Helminen M, Karhunen-Enckell U. Chest-wall contouring surgery in female-to-male transgender patients: A one-center retrospective analysis of applied surgical techniques and results. Scand J Surg. 2017 Mar;106(1):74-79. doi: 10.1177/1457496916645964. Epub 2016 Jun 23.

Kilpatrick LA, Holmberg M, Manzouri A, Savic I. Cross sex hormone treatment is linked with a reversal of cerebral patterns associated with gender dysphoria to the baseline of cisgender controls. The European journal of neuroscience. 2019;50(8):3269-81. Epub 2019/04/17. doi: 10.1111/ejn.14420.

Klein C, Gorzalka BB. Sexual functioning in transsexuals following hormone therapy and genital surgery: a review. J Sex Med. 2009 Nov;6(11):2922-39; quiz 2940-1. doi: 10.1111/j.1743-6109.2009.01370.x. PMID: 20092545.

Knudson, G., De Cuypere, G., & Bockting, W. (2010). Recommendations for revision of the DSM diagnoses of gender identity disorders: Consensus statement of the World Professional Association for Transgender Health. International Journal of Transgenderism, 12(2), 115–118.

Krege S, Bex A, Lümmen G, Rübben H. Male-to-female transsexualism: a technique, results and long-term follow-up in 66 patients. BJU Int. 2001 Sep;88(4):396-402. doi: 10.1046/j.1464-410x.2001.02323.x. PMID: 11564029.

Kreukels BP, Cohen-Kettenis PT. Puberty suppression in gender identity disorder: the Amsterdam experience. Nat Rev Endocrinol 2011; 7: 466–72.

Kuhn A, Bodmer C, Stadlmayr W, Kuhn P, Mueller MD, Birkhäuser M. Quality of life 15 years after sex reassignment surgery for transsexualism. Fertil Steril. 2009 Nov;92(5):1685-1689.e3. doi: 10.1016/j.fertnstert.2008.08.126. Epub 2008 Nov 6. PMID: 18990387.

Lawrence AA. Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. Arch Sex Behav. 2003 Aug;32(4):299-315. doi:10.1023/a:1024086814364. PMID: 12856892.

29

Learmonth C, Viloria R, Lambert C, Goldhammer H, Keuroghlian AS. Barriers to insurance coverage for transgender patients. American journal of obstetrics and gynecology. 2018;219(3):272.e1-.e4. Epub 2018/05/08. doi: 10.1016/j.ajog.2018.04.046. PubMed PMID: 29733842.

Leinung MC, Urizar MF, Patel N, Sood SC. Endocrine treatment of transsexual persons: extensive personal experience. Endocr Pract. 2013;19(4):644-50. Epub 2013/03/21. doi: 10.4158/ep12170.Or. PubMed PMID: 23512380.

Lev, A. I. (2009). The ten tasks of the mental health provider: Recommendation for revision of the World Professional Association for Transgender Health's Standards of Care. International Journal of Transgenderism, 11(2), 74–99.

Levy JA, Edwards DC, Cutruzzula-Dreher P, McGreen BH, Akanda S, Tarry S, Belkoff LH, Rumer KL. Male-to-Female Gender Reassignment Surgery: An Institutional Analysis of Outcomes, Short-term Complications, and Risk Factors for 240 Patients Undergoing Penile-Inversion Vaginoplasty. Urology. 2019 Sep;131:228

Lindsay, J.A., Meier, C.K., Hudson, S., Walder, A., Martin, L.A., & Kauth, M.R. (2016). Mental health of transgender veterans of the Iraq and Afghanistan conflicts who experienced military sexual trauma. Journal of Traumatic Stress, 29, 563-567.

Mahfouda S, Moore JK, Siafarikas A, Hewitt T, Ganti U, Lin A, Zepf FD. Gender-affirming hormones and surgery in transgender children and adolescents. Lancet Diabetes Endocrinol. 2019 Jun;7(6):484-498. doi: 10.1016/S2213-8587(18)30305-X. Epub 2018 Dec 6. PMID: 30528161.

Marinkovic M, Newfield RS. Chest reconstructive surgeries in trans masculine youth: experience from one pediatric center. Int J Transgend 2017; 18: 376–81.

Marshall, E., Claes, L., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2016). Non-suicidal self-injury and suicidality in trans people: A systematic review of the literature. International Review of Psychiatry, 28(1), 58–69.

Massie JP, Morrison SD, Van Maasdam J, Satterwhite T. Predictors of Patient Satisfaction and Postoperative Complications in Penile Inversion Vaginoplasty. Plast Reconstr Surg. 2018 Jun;141(6):911e-921e. doi: 10.1097/PRS.0000000000004427. PMID: 29794711.

McCann, E., & Brown, M. (2018). Vulnerability and Psychosocial Risk Factors Regarding People who Identify as Transgender. A Systematic Review of the Research Evidence. Issues in Mental Health Nursing, 39(1), 3–15.

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. Psychology of Sexual Orientation and Gender Diversity, 4(3), 341–353.

Meyer IH. Prejudice as stress: conceptual and measurement problems. Am J Public Health. 2003 Feb;93(2):262-5. doi: 10.2105/ajph.93.2.262. PMID: 12554580; PMCID: PMC1447727.

Meyer, W. J. III. (2009). World Professional Association for Transgender Health's standards of care requirements of hormone therapy for adults with gender identity disorder. International Journal of Transgenderism,11(2), 127-132.

Milrod C, Karasic DH. Age is just a number: WPATH-affiliated surgeons' experiences and attitudes toward vaginoplasty in transgender females under 18 years of age in the United States. J Sex Med 2017; 14: 624–34.

30

Murad MH, Elamin MB, Garcia MZ, Mullan RJ, Murad A, Erwin PJ, Montori VM. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. Clin Endocrinol (Oxf). 2010 Feb;72(2):214-31. doi: 10.1111/j.1365-2265.2009.03625.x. Epub 2009 May 16.

National Coalition of Anti-Violence Programs (NCAVP). (2018). Lesbian, gay, bisexual, transgender, queer and HIV-affected hate and intimate partner violence in 2017. NCAVP-HV-IPV-2017-report.pdf

Newfield E, Hart S, Dibble S, Kohler L. Female-to-male transgender quality of life. Qual Life Res. 2006 Nov;15(9):1447-57. doi: 10.1007/s11136-006-0002-3. Epub 2006 Jun 7. PMID: 16758113.

Olson-Kennedy J, Okonta V, Clark LF, Belzer M. Physiologic response to gender-affirming hormones among transgender youth. J Adolesc Health 2018; 62: 397–401

Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest reconstruction and chest dysphoria in trans masculine minors and young adults: comparisons of nonsurgical and postsurgical cohorts. JAMA Pediatr 2018; 172: 431–36.

Owen-Smith AA, Gerth J, Sineath RC, et al. Association between gender confirmation treatments and perceived gender congruence, body image satisfaction, and mental health in a cohort of transgender individuals. J Sex Med 2018; 15: 591–600.

Pfäfflin, F., & Junge, A. (1998). Sex reassignment. Thirty years of international follow-up studies after sex reassignment surgery: A comprehensive review, 1961–1991. International Journal of Transgenderism.

Rehman J, Lazer S, Benet AE, Schaefer LC, Melman A. The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. Arch Sex Behav. 1999 Feb;28(1):71-89. doi: 10.1023/a:1018745706354. PMID: 10097806.

Remington AC, Morrison SD, Massie JP, Crowe CS, Shakir A, Wilson SC, Vyas KS, Lee GK, Friedrich JB. Outcomes after Phalloplasty: Do Transgender Patients and Multiple Urethral Procedures Carry a Higher Rate of Complication? Plast Reconstr Surg. 2018 Feb;141(2):220e-229e. doi: 10.1097/PRS.0000000000004061.

Scandurra, C., Amodeo, A. L., Valerio, P., Bochicchio, V., & Frost, D. M. (2017). Minority Stress, Resilience, and Mental Health: A Study of Italian Transgender People. Journal of Social Issues, 73(3), 563–585.

Smith FD. Perioperative Care of the Transgender Patient. Aorn j. 2016;103(2):151-63. Epub 2016/02/07. doi: 10.1016/j.aorn.2015.12.003. PubMed PMID: 26849981.

Smith YL, Van Goozen SH, Kuiper AJ, Cohen-Kettenis PT. Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. Psychol Med. 2005 Jan;35(1):89-99. doi: 10.1017/s0033291704002776. PMID: 15842032.

Steensma TD, Biemond R, de Boer F, Cohen-Kettenis PT. Desisting and persisting gender dysphoria after childhood: a qualitative follow-up study. Clin Child Psychol Psychiatry. 2011 Oct;16(4):499-516. doi: 10.1177/1359104510378303. Epub 2011 Jan 7. PMID: 21216800.

Strauss P, Cook A, Winter S, Watson V, Toussaint DW, Lin A. Trans pathways: the mental health experiences and care pathways of transgender young people. Summary of results. 2017.

31

https://www.telethonkids.org.au/globalassets/media/documents/brain--behaviour/trans-pathwayreport-web2.pdf

Tack LJ, Craen M, Dhondt K, Bossche HV, Laridaen J, Cools M. Consecutive lynestrenol and cross-sex hormone treatment in biological female adolescents with gender dysphoria: a retrospective analysis. Biol Sex Differ 2016; 7: 14.

Tack LJ, Heyse R, Craen M, et al. Consecutive cyproterone acetate and estradiol treatment in late-pubertal transgender female adolescents. J Sex Med 2017; 14: 747–57.

Telfer MM, Tollit MA, Pace CC, Pang KC. Australian standards of care and treatment guidelines for transgender and gender diverse children and adolescents. Med J Aust 2018; 209: 132–36.

Toorians A, Thomassen M, Zweegman S, et al. Venous thrombosis and changes of hemostatic variables during cross-sex hormone treatment in transexual people. J Clin Endocrinol Metab 2003; 88: 5723–29.

Trotman G, Orta L, Oler L, Casey R, Damle L, Gomez-Lobo V. Metabolic profiles in a transgender adolescent population receiving steroid hormone therapy: a pilot study. J Pediatr Adolesc Gynecol 2014; 27: e38.

Undersecretary of Defense, Personnel and Readiness. Medical Standards for Appointment, Enlistment, or Induction of Transgender Applicants into the Military Services. U.S. Department of Defense. MEMORANDUM. 12.08.2017.

van de Grift TC, Kreukels BP, Elfering L, Özer M, Bouman MB, Buncamper ME, Smit JM, Mullender MG. Body Image in Transmen: Multidimensional Measurement and the Effects of Mastectomy. J Sex Med. 2016 Nov;13(11):1778-1786. doi: 10.1016/j.jsxm.2016.09.003. Epub 2016 Sep 22. PMID: 27667355.

Van De Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., De Cuypere, G., Richter-Appelt, H., & Kreukels, B. P. (2017). Effects of medical interventions on gender dysphoria and body image: a follow-up study. Psychosomatic medicine, 79(7), 815.

Van Kesteren PJ, Asscheman H, Megens JA, Gooren LJ. Mortality and morbidity in transexual subjects treated with cross-sex hormones. Clin Endocrinol (Oxf) 1997; 47: 337–43.

Vita R, Settineri S, Liotta M, Benvenga S, Trimarchi F. Changes in hormonal and metabolic parameters in transgender subjects on cross-sex hormone therapy: a cohort study. Maturitas 2018; 107: 92–96.

Weinand JD, Safer JD. Hormone therapy in transgender adults is safe with provider supervision; a review of hormone therapy sequelae for transgender individuals. J Clin Transl Endocrinol 2015; 2: 55–60.

White Hughto, J. M., & Reisner, S. L. (2016). A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. Transgender health, 1(1), 21-31.

Wierckx K, Van Caenegem E, Elaut E, Dedecker D, Van de Peer F, Toye K, Weyers S, Hoebeke P, Monstrey S, De Cuypere G, T'Sjoen G. Quality of life and sexual health after sex reassignment surgery in transsexual men. J Sex Med. 2011 Dec;8(12):3379-88. doi: 10.1111/j.1743-6109.2011.02348.x. Epub 2011 Jun 23.

32

# EXHIBIT X

# LITERATURE REVIEW
## LEVEL OF EVIDENCE FOR GENDER-AFFIRMING TREATMENTS

**ISSUE:**
Health Affairs requested a review of existing research literature on the level of evidence for gender-affirming treatments for gender dysphoria (i.e., behavioral health, hormone therapy, and surgical procedures).

**BACKGROUND:**
Systematic reviews are a rigorous way to compile scientific evidence on health care issues like treatment, diagnosis, or prevention, aiming to minimize bias by assessing the methodological quality and overall strength of the studies. In emerging areas of research like transgender health, systematic reviews face limitations (e.g., lack of available research, methodological differences, evolving treatments, lack of research funding) making it difficult to draw clear conclusions on the strength of the evidence.

The levels of evidence hierarchy range from low (expert opinion, case reports, case series), moderate (cohort studies, case-control studies), and high (meta-analyses, systematic reviews, randomized control trials). Higher levels of hierarchy represent strong research evidence due to rigorous study design. Notably, there are little to no randomized controls trials for transgender health due to ethical concerns and methodological challenges.

A total of 34 studies on transgender health and gender-affirming treatments were included, with 30 peer-reviewed systematic reviews, two independent systematic reviews, one electronic health record review, and one follow-up study.

**DISCUSSION:**

### Behavioral Health

Six systematic reviews were included to review the level of evidence on transgender health and treatment. ***The strength of the evidence on transgender mental health and gender-affirming care is low to moderate.***

Research findings consistently show high rates of mental health disparities and the benefits of gender-affirming care, but are limited by cross-sectional study designs, reliance on self-reported data, lack of standardized assessments, and small sample sizes. Even with low to moderate research evidence, a ***consistent recommendation in the literature is that mental health care should be available before, during, and after transitioning***. The main themes of the systematic reviews on behavioral health include:

<u>Mental Health Disparities are Driven by Discrimination and Minority Stress</u>.
- A meta-synthesis of 42 studies found that 55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime, with higher ideation rates among transfeminine individuals and higher attempt rates among transmasculine individuals.[i]

1

- A systematic review of 165 peer-reviewed articles found that transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals, with mood disorders (1.5x higher), anxiety disorders (3.9x higher), and psychotic disorders (3.8x higher) being the most prevalent. Additionally, the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts. The higher prevalence of mental health disorders was largely driven by minority stress, discrimination, social rejection, lack of access to gender-affirming care, and increased exposure to violence and victimization.[ii]
- The risk of suicide ideation and attempts among transgender individuals increases due to gender identity-related disparities, discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization.[iii]
- A systematic review of 15 quantitative studies found that transgender individuals experience high levels of discrimination, prejudice, and bias, leading to negative mental health outcomes (e.g., psychological distress, substance abuse, eating disorders, reduced relationship quality, ineffective coping, lower self-esteem, and a higher risk of attempted suicide).[iv]
- A systematic review of 47 studies found a strong correlation between minority stress and suicidality in transgender and gender non-conforming (TGNC) adults, but the evidence quality is low, as most studies were cross-sectional, relied on self-reported measures, and lacked standardized assessments, making causality difficult to determine.[v]
- A systematic review and meta-analysis of 85 cross-sectional quantitative studies found that transgender and gender-diverse (TGD) individuals experience significantly higher rates of depression, suicidal ideation, and suicide attempts, largely driven by minority stress factors such as discrimination, social rejection, lack of gender-affirming care, and victimization.[vi]

Effectiveness and Limitations of Affirmative Psychological Interventions.

- A systematic review of 22 studies found that affirmative psychological interventions for transgender and non-binary (TGNB) adults and adolescents show promising improvements in depression, anxiety, suicidality, self-acceptance, coping skills, and minority stress, but evidence quality remains limited due to methodological inconsistencies, small sample sizes, and high risk of bias across studies.[vii]
- Research demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination.[viii]

## Gender-Affirming Hormone Therapy (GAHT):

Twelve systematic reviews were included to review the level of evidence on GAHT. ***The strength of the evidence on the effectiveness of GAHT, for physical and mental health, is generally low to moderate.***

Research findings on GAHT are typically observational, lack randomized controlled trials (RCTs), and have small sample sizes. While literature on GAHT consistently demonstrates improvements in mental health, gender dysphoria, and body composition, its long-term effects on cardiovascular

health and metabolism remain uncertain due to methodological limitations. ***Clinical practice guidelines strongly recommend confirming the diagnosis of gender dysphoria, pre-hormone therapy medical evaluations, monitoring bone health, and an individualized approach to GAHT.***[ix]   The main themes of the systematic reviews on GAHT include:

Cardiovascular, Metabolic, and Bone Density Risks.

- A systematic review of 2 studies – 8 cross-sectional and 4 cohort studies – found that gender-affirming hormone therapy may influence the risk of subclinical atherosclerosis (i.e., plaque builds up inside the arteries) among transgender men, with the evidence being moderate.  However, the effects on cardiovascular health for transgender women may be neutral or even beneficial.[x]
- The systematic review by Connelly et al. (2021) included 14 studies encompassing a total of 1,309 transgender individuals (approximately equal numbers of transgender men and women) treated with GAHT between 1989 and 2019.  Due to methodological limitations, the authors concluded that there is insufficient data to advise the impact of GAHT on blood pressure.[xi]
- The systematic review by Kotamarti et al. (2021) analyzed 27 studies, encompassing 10,428 transgender patients undergoing GAHT.  The findings revealed that transgender women had a higher incidence of venous thromboembolism compared to transgender men, but the strength of the evidence was moderate.[xii]
- While the quality of evidence is low, it is strongly recommended that monitoring of bone mineral density occur during GAHT, especially for transgender individuals at risk of osteoporosis or who have discontinued GAHT after gonadectomy.[xiii]

Psychological Benefits.

- The Endocrine Society's clinical practice guidelines are based on evidence from two systematic reviews, as well as the best available evidence from other published systematic reviews and individual studies.  The guidelines strongly support GAHT for improving psychological well-being and reducing gender dysphoria; however, it acknowledges gaps in long-term safety data, the need for more standardized research, and the lack of high-quality evidence on optimal hormone regimens and monitoring strategies.[xiv]
- One systematic review of seven observational studies, with a total of 552 transgender participants, found that GAHT was associated with improvements in quality of life, depression, and anxiety; but the evidence quality was very low to low.[xv]
- A systematic review by Baker et al. (2021) included 20 studies reported in 22 publications. Findings demonstrated that gender-affirming hormone therapy (GAHT) is associated with improved mental health and quality of life, but the strength of evidence was low due to small sample sizes, high risk of bias in study designs, and confounding factors such as concurrent gender-affirming surgeries.[xvi]
- A systematic review of 46 studies found that GAHT reduces psychological distress and depressive symptoms, but the evidence quality among studies was highly variable.[xvii]
- A systematic review of 38 studies found that GAHT reduces gender dysphoria and improves psychological well-being and quality of life, but the overall evidence quality is low to moderate.[xviii]
- The systematic review by Hughto and Reisner (2016) included three uncontrolled prospective cohort studies with a total of 247 transgender adults. Results found that GAHT

3

was associated with improved psychological functioning and quality of life, but the evidence is low.[xix]

Effectiveness and Limitations of GAHT.

- Endocrine Society's clinical practice guidelines are based on evidence from two systematic reviews, as well as the best available evidence from other published systematic reviews and individual studies. Most evidence levels were low or very low, except for hormone monitoring and cardiovascular risk assessment, which had moderate-quality evidence. The guidelines strongly support GAHT for improving psychological well-being and reducing gender dysphoria; however, it acknowledges gaps in long-term safety data, the need for more standardized research, and the lack of high-quality evidence on optimal hormone regimens and monitoring strategies.[xx]
- One narrative systematic review on four retrospective studies found that antiandrogens (e.g., cyproterone acetate, leuprolide, and spironolactone) effectively suppress testosterone levels in transgender women, but there is insufficient evidence comparing their impact on feminization outcomes like breast development, body fat redistribution, and facial/body hair reduction.[xxi]
- A systematic review found that gender-affirming hormone therapy (GAHT) has mixed effects on sexual function, with testosterone in transgender men generally increasing libido but sometimes reducing genital sensitivity, while estrogen in transgender women often decreases spontaneous erections and libido, though satisfaction improves with gender congruence.[xxii]
- The systematic review by Spanos et al. (2020) included 26 studies and found that GAHT is effective in altering body composition. Testosterone therapy in transgender men increased lean mass, decreased fat mass, and had no significant impact on insulin resistance, while estrogen therapy in transgender women led to decreased lean mass, increased fat mass, and may worsen insulin resistance. However, the overall strength of evidence was moderate to low largely due to a lack of long-term data.[xxiii]

## Gender-Affirming Surgery (GAS)

Fifteen systematic reviews, one follow-up study, and one database study were included to review the level of evidence on GAS. ***The strength of the evidence on the effectiveness of GAS are generally low to moderate.***

The literature review highlights that GAS is associated with high patient satisfaction, reduced gender dysphoria, and improvements in mental health, including decreased anxiety, depression, and suicidality. While complication rates for top surgeries and facial feminization are relatively low, genital surgeries such as phalloplasty and vaginoplasty present higher risks. Despite these challenges, long-term studies show that regret rates are extremely low, with most individuals reporting improved quality of life, body image satisfaction, and overall well-being. ***The research recommends standardized assessment tools, long-term follow-up, and higher-quality research to determine the long-term safety and effectiveness of GAS procedures.*** The main themes of the systematic reviews on GAS include:

4

Patient Satisfaction and Quality of Life.

- A narrative review of current research concluded that GAS decrease rates of gender dysphoria, depression, and suicidality, and significantly improve quality-of-life measures. However, the strength of the evidence is moderate due to inconsistent approaches in measuring post-operative behavioral health impacts.[xxiv]
- The Hayes 2018 and 2020 independent reports[1] on GAS found that while transgender individuals typically experienced high satisfaction, reduced gender dysphoria symptoms and improved body image satisfaction, the overall quality of evidence is low. Across the two reports, findings showed persistent limitations such as small sample sizes, lack of control groups, and short follow-up periods.[xxv, xxvi]
- A systematic review of 79 studies found GAS to be associated with high levels of surgical satisfaction and improved quality of life for transgender individuals at least one-year post-surgery. Additionally, the majority of patients reported reduced gender dysphoria, increased body satisfaction, and overall psychological well-being. However, due to methodological limitations, the evidence strength was low to moderate.[xxvii]
- The systematic reviews by Oles et al. (2022) found that GAS, including chest masculinization, breast augmentation, facial feminization, voice surgery and genitoplasty (vaginoplasty, phalloplasty, metoidioplasty, and oophorectomy/colpectomy), generally had high patient satisfaction rates but the strength of the evidence is moderate.[xxviii, xxix]
- A 40-year follow-up study with 15 participants found that patient satisfaction with GAS remained high, with improved body congruency, reduced gender dysphoria, and persistent mental health benefits, including lower rates of suicidal ideation and depression. Despite high complication rates for some procedures (i.e., phalloplasty and vaginoplasty), none of the participants expressed regret.[xxx]
- A systematic review of 54 studies found reduced suicide attempts, anxiety, depression, and gender dysphoria, as well as higher levels of life satisfaction and happiness. However, the strength of the evidence was moderate due to methodological differences.[xxxi]
- The systematic review by Wernick et al. (2019) included 33 studies and found that GAS (i.e., facial feminization or masculinization, vocal feminization, breast augmentation, mastectomy, chest reconstruction, metoidioplasty, orchiectomy, salpingo-oophorectomy, vaginoplasty, or phalloplasty) often led to significant improvements in quality of life, body image/satisfaction, and overall psychiatric functioning." However, predictive conclusions cannot be drawn due to methodological variability.[xxxii]

Risks and Complications.

- A narrative review of current research concluded that complication rates for gender-affirming mastectomy and breast augmentation are very low, while those for genital surgeries are also reasonably low.[xxxiii]
- The systematic review and meta-analysis by Ding et al. (2023) included 27 studies comprising a total of 3,388 transgender women who underwent penile inversion vaginoplasty. Results found that the risks were low, but notable, for urinary complications (e.g., incontinence, urethral strictures) and emphasized the importance of postoperative follow-up.[xxxiv]

---

[1] The Hayes reports are independently produced and were not located in peer-reviewed journals.

- A systematic review of 21 studies highlighted the increased risk for surgical complications among transgender men undergoing phalloplasty and metoidioplasty, but the strength of the evidence was low to moderate due to the literature consisting of mostly observational or retrospective studies.[xxxv]
- The evidence on the impact of GAS on sexual function is low to moderate quality. Research revealed mixed effects on sexual function, with many transgender individuals reporting improved body image and satisfaction, but also a notable prevalence of sexual dysfunction, including reduced genital sensitivity and orgasmic difficulties, particularly after vaginoplasty and phalloplasty.[xxxvi]
- One study reviewed a database of 4,114 patients who underwent GAS and found that in four years (2015-2019), GAS increased by 400%, with masculinizing procedures being the most common. An overall GAS complication rate was 6%, with bottom surgeries having the highest complication rate at 8%, which was influenced by factors like age and body mass index.[xxxvii]

Surgical Regret.
- A systematic review and meta-analysis of 7,928 transgender individuals found an extremely low prevalence of regret (1%) after GAS, with minor regret being more common. Notably, transfeminine surgeries (e.g., vaginoplasty) had a slightly higher regret rate (1%) compared to transmasculine surgeries (e.g., phalloplasty and mastectomy, <1%), though overall regret rates remained extremely low.[xxxviii]
- Another systematic review of 29 studies found that regret rates for GAS were extremely low (1.94%), but the evidence was limited by retrospective study designs. Vaginoplasty had the highest regret rate (4.0%) among transfeminine individuals, while phalloplasty had a notable regret rate among transmasculine individuals, though lower overall (0.8%).[xxxix]
- A systematic review found regret rates for GAS are significantly lower (<1%) compared to elective surgeries among cisgender individuals (0%-47.1% for breast reconstruction, 5.1%-9.1% for breast augmentation, and 10.82%-33.3% for body contouring).[xl]

**Summary**

While systematic reviews and meta-analyses provide valuable insights, methodological inconsistencies, high risk of bias, and a scarcity of longitudinal, randomized controlled trials weaken the ability to draw definitive causal conclusions. The strength of the evidence reviewed was:
- Low to moderate for mental health treatment among six systematic reviews.
- Low to moderate on GAHT among twelve systematic reviews.
- Low to moderate for GAS among fifteen systematic reviews.

Notably, there is sufficient research evidence that indicates barriers to accessing gender-affirming care and discrimination are key contributors to healthcare disparities and worsened mental health outcomes for transgender individuals. More high-quality, long-term research is needed to strengthen the evidence base and guide best practices in transgender healthcare.

6

[i] Adams N, Hitomi M, Moody C. Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. *Transgender Health.* 2017;2(1):60-75. doi:10.1089/trgh.2016.0036.

[ii] Pinna F, Paribello P, Somaini G, et al. Mental health in transgender individuals: A systematic review. *International Review of Psychiatry.* 2022;34(3-4):292-359. doi:10.1080/09540261.2022.2093629

[iii] Adams N, Hitomi M, Moody C. Varied reports of adult transgender suicidality: Synthesizing and describing the peer-reviewed and gray literature. *Transgender Health.* 2017;2(1):60-75. doi:10.1089/trgh.2016.0036.

[iv] Drabish K, Theeke LA. Health impact of stigma, discrimination, prejudice, and bias experienced by transgender people: a systematic review of quantitative studies. *Issues Ment Health Nurs.* 2022;43(2):111-118. doi:10.1080/01612840.2021.1961330.

[v] Gosling H, Pratt D, Montgomery H, Lea J. The relationship between minority stress factors and suicidal ideation and behaviors amongst transgender and gender non-conforming adults: A systematic review. *Journal of Affective Disorders.* 2022;303:31-51. doi:10.1016/j.jad.2021.12.091

[vi] Pellicane MJ, Ciesla JA. Associations between minority stress, depression, and suicidal ideation and attempts in transgender and gender diverse (TGD) individuals: Systematic review and meta-analysis. *Clinical Psychology Review.* 2022;91:102113. doi:10.1016/j.cpr.2021.102113.

[vii] Expósito-Campos P, Pérez-Fernández JI, Salaberria K. Empirically supported affirmative psychological interventions for transgender and non-binary youth and adults: A systematic review. *Clinical Psychology Review.* 2023;100:102229. doi:10.1016/j.cpr.2022.102229.

[viii] Pellicane MJ, Ciesla JA. Associations between minority stress, depression, and suicidal ideation and attempts in transgender and gender diverse (TGD) individuals: Systematic review and meta-analysis. *Clinical Psychology Review.* 2022;91:102113. doi:10.1016/j.cpr.2021.102113.

[ix] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[x] Allgayer RM, da Silva Borba G, Moraes RS, Ramos RB, Spritzer PM. The effect of gender-affirming hormone therapy on the risk of subclinical atherosclerosis in the transgender population: a systematic review. *Endocr Pract.* 2023;29(6):498-507. doi:10.1016/j.endpr.2023.02.005.

[xi] Connelly PJ, Clark A, Touyz RM, Delles C. Transgender adults, gender-affirming hormone therapy, and blood pressure: A systematic review. *Journal of Hypertension.* 2021;39(2):223-230. doi:10.1097/HJH.0000000000002632

(Page 206 of Total)

[xii] Kotamarti VS, Greige N, Heiman AJ, Patel A, Ricci JA. Risk for venous thromboembolism in transgender patients undergoing cross-sex hormone treatment: a systematic review. *J Sex Med.* 2021;18(7):1280-1291. doi:10.1016/j.jsxm.2021.06.009.

[xiii] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[xiv] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[xv] Rowniak S, Bolt L, Sharifi C. Effect of cross-sex hormones on the quality of life, depression, and anxiety of transgender individuals: A quantitative systematic review. *JBI Database of Systematic Reviews and Implementation Reports.* 2019;17(9):1826–1854. doi:10.11124/JBISRIR-2017-003869

[xvi] Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society.* 2021;5(4):bvab011. doi:10.1210/jendso/bvab011

[xvii] Doyle DM, Lewis TOG, Barreto M. A systematic review of psychosocial functioning changes after gender-affirming hormone therapy among transgender people. *Nature Human Behavior.* 2023;7(8):1320-1331. doi:10.1038/s41562-023-01605-w

[xviii] van Leerdam TR, Zajac JD, Cheung AS. The effect of gender-affirming hormones on gender dysphoria, quality of life, and psychological functioning in transgender individuals: A systematic review. *Transgender Health.* 2023;8(1):6-21. doi:10.1089/trgh.2020.0094

[xix] White Hughto JM, Reisner SL. A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgender Health.* 2016;1(1):21-31. doi:10.1089/trgh.2015.0008

[xx] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903. doi:10.1210/jc.2017-01658.

[xxi] Angus LM, Nolan BJ, Zajac JD, Cheung AS. A systematic review of antiandrogens and feminization in transgender women. *Clinical Endocrinology (Oxf).* 2021;94(5):743-752. doi:10.1111/cen.14329.

[xxii] Mattawanon N, Charoenkwan K, Tangpricha V. Sexual dysfunction in transgender people: A systematic review. *Urologic Clinics North America.* 2021;48(4):437-460. doi:10.1016/j.ucl.2021.06.004

[xxiii] Spanos C, Bretherton I, Zajac JD, Cheung AS. Effects of gender-affirming hormone therapy on insulin resistance and body composition in transgender individuals: A systematic review. *World Journal of Diabetes.* 2020;11(3):66-77. doi:10.4239/wjd.v11.i3.66

[xxiv] Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: what we know, and what we need to know. *Surgery.* 2021;170(1):336-340. doi:10.1016/j.surg.2021.03.032.

8

xxv Hayes, Inc. Sex reassignment surgery for the treatment of gender dysphoria. *Winifred S. Hayes, Inc.* August 1, 2018.

xxvi Hayes, Inc. Sex reassignment surgery for the treatment of gender dysphoria: Annual update. *Winifred S. Hayes, Inc.* September 1, 2020.

xxvii Javier C, Crimston CR, Barlow FK. Surgical satisfaction and quality of life outcomes reported by transgender men and women at least one year post gender-affirming surgery: A systematic literature review. *International Journal of Transgender Health.* 2022;23(3):255-273. doi:10.1080/26895269.2022.2046110.

xxviii Oles N, Darrach H, Landford W, Garza M, Twose C, Park CS, Tran P, Schechter LS, Lau B, Coon D. Gender affirming surgery: a comprehensive, systematic review of all peer-reviewed literature and methods of assessing patient-centered outcomes (part 1: breast/chest, face, and voice). *Ann Surg.* 2022;275(1):e52-e66. doi:10.1097/SLA.0000000000004870.

xxix Oles N, Darrach H, Landford W, et al. Gender-affirming surgery: A comprehensive, systematic review of all peer-reviewed literature and methods of assessing patient-centered outcomes (Part 2: Genital Reconstruction). *Annals of Surgery.* 2022;275(1):e67-e74. doi:10.1097/SLA.0000000000004717.

xxx Park RH, Liu Y-T, Samuel A, et al. Long-term outcomes after gender-affirming surgery: 40-year follow-up study. *Ann Plast Surg.* 2022;89(4):431-436. doi:10.1097/SAP.0000000000003233.

xxxi Swan J, Phillips TM, Sanders T, Mullens AB, Debattista J, Brömdal A. Mental health and quality of life outcomes of gender-affirming surgery: A systematic literature review. *Journal of Gay & Lesbian Mental Health.* 2023;0(0):1-19. doi:10.1080/19359705.2021.2016537

xxxii Wernick JA, Busa S, Matouk K, Nicholson J, Janssen A. A systematic review of the psychological benefits of gender-affirming surgery. *Urologic Clinics North America.* 2019;46(4):475-486. doi:10.1016/j.ucl.2019.07.011.

xxxiii Akhavan AA, Sandhu S, Ndem I, Ogunleye AA. A review of gender affirmation surgery: what we know, and what we need to know. *Surgery.* 2021;170(1):336-340. doi:10.1016/j.surg.2021.03.032.

xxxiv Ding C, Khondker A, Goldenberg MG, et al. Urinary complications after penile inversion vaginoplasty in transgender women: Systematic review and meta-analysis. *Canadian Urological Association Journal.* 2023;17(4):121-128. doi:10.5489/cuaj.8108.

xxxv Hu C-H, Chang C-J, Wang S-W, Chang K-V. A systematic review and meta-analysis of urethral complications and outcomes in transgender men. *Journal of Plastic, Reconstructive & Aesthetic Surgery.* 2022;75(1):10-24. doi:10.1016/j.bjps.2021.08.006.

xxxvi Mattawanon N, Charoenkwan K, Tangpricha V. Sexual dysfunction in transgender people: A systematic review. *Urologic Clinics North America.* 2021;48(4):437-460. doi:10.1016/j.ucl.2021.06.004

xxxvii Scott KB, Thuman J, Jain A, Gregoski M, Herrera F. Gender-affirming surgeries: A national surgical quality improvement project database analyzing demographics, trends, and

9

outcomes. *Annals of Plastic Surgery.* 2022;88(Suppl 5):S501-S507. doi:10.1097/SAP.0000000000003157.

[xxxviii] Bustos VP, Bustos SS, Escandón JM, et al. Regret after gender affirmation surgery: A systematic review and meta-analysis of prevalence. *Plastic and Reconstructive Surgery–Global Open.* 2021;9(12):e3510. doi:10.1097/GOX.0000000000003510.

[xxxix] Ren T, Galenchik-Chan A, Erlichman Z, Krajewski A. Prevalence of regret in gender-affirming surgery: A systematic review. *Annals of Plastic Surgery.* 2024;92(5):597-602. doi:10.1097/SAP.0000000000003895

[xl] Thornton SM, Edalatpour A, Gast KM. A systematic review of patient regret after surgery: A common phenomenon in many specialties but rare within gender-affirmation surgery. *The American Journal of Surgery.* 2024;234:68-73. doi:10.1016/j.amjsurg.2024.04.021

10

# EXHIBIT Z

# PUBLIC AFFAIRS GUIDANCE:
## DEPARTMENT OF DEFENSE IMPLEMENTATION OF EXECUTIVE ORDER PRIORITIZING MILITARY EXCELLENCE AND READINESS

**Background**:

On January 27, 2025, the President signed Executive Order 14183, *Prioritizing Military Excellence and Readiness*. The executive order states that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for Military Service." On February 7, 2025, the Secretary of Defense signed a memorandum that paused all new accessions and medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) to provide additional policy guidance to senior Department of Defense (DoD) leadership on implementation. That guidance was signed on February 26, 2025.

On February 26, 2025, USD(P&R) signed a memorandum that provides supplemental policy guidance and establishes a reporting mechanism to ensure Department compliance. The policy guidance in this memorandum is effective immediately upon signature and supersedes any conflicting policy guidance in Department issuances or other policy guidance and memoranda.

- Accessions: Applicants for military service are disqualified if they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria or have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as a treatment for gender dysphoria or in pursuit of a sex transition.
  - o Applicants for military service may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities.
  - o The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.
- Retention: Service members are disqualified from military service if they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria or have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as a treatment for gender dysphoria or in pursuit of a sex transition.
  - o Service members may be retained and considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria:

CUI//NOT FOR RELEASE

1

CUI//NOT FOR RELEASE

- ▪ The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and
- ▪ The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and
- ▪ The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.
- Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.
- Service members who elect to separate voluntarily in the 30 days following signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy. Those eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.
- Service members separated involuntarily may be provided full involuntary separation pay in accordance with applicable law and Department policy.
- All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.
- Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this memorandum may, if recommended by a DoD health care provider in order to prevent further complications, be continued until separation is complete.

**Public Affairs Posture**: Active.

**Key Audiences**:
- Service members and their families
- Potential recruits and their families
- DoD health care providers
- Congress
- Military and Veteran Support Organizations
- Advocacy Groups

**Topline Messages**:
- Joining the military is open to all persons who can meet the high standards for military service and readiness without special accommodation.

CUI//NOT FOR RELEASE

2

CUI//NOT FOR RELEASE

- Individuals wanting to join the military service, who express a false "gender identity" divergent from an individual's sex distracts from the mission and is inconsistent with the humility and selflessness required of a Service member.
- Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptom consistent with, gender dysphoria is incompatible with military service and are no longer eligible for military service.
- Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria will be processed for separation from military service.
- Separated Service members will receive an honorable characterization of service except where the Service member's record otherwise warrants a lower characterization.

**Talking Points**:
- No funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy.
- All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled.
- Where a standard, requirement, or policy depends on whether the individual is a male or female, such as medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards, all persons will be subject to the standard, requirement, or policy associated with their sex.
- Pronoun usage when referring to Service members must reflect a Service member's sex. In keeping with good order and discipline, salutations, such as addressing a senior officer as "Sir" or "Ma'am", must also reflect an individual's sex.
- Service members being processed for separation in accordance with this policy will be afforded all statutorily required rights and benefits.

**Approved Questions and Answers for Media and Congressional Requests**:

**SECDEF and USD(P&R) Memoranda**
**Q: What did the Secretary of Defense's February 7, 2025 memorandum do?**
**A:** The Secretary of Defense memorandum paused all new accessions and most medical procedures for individuals with a current diagnosis or history of gender dysphoria and directed the USD(P&R) to provide additional policy guidance to the Military Departments on implementation.

CUI//NOT FOR RELEASE

3

CUI//NOT FOR RELEASE

**Q: What did the USD(P&R) February 26, 2025 memorandum do?**
**A:** The USD(P&R) memorandum provides policy guidance addressing issues such as accession, retention, and separation of Service members and applicants for military service who have been diagnosed with gender dysphoria, as well as provides guidance on the implementation of adhering to the standards associated with one's sex.

The policy guidance directs that Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation. It also directs that similarly situated applicants are ineligible for military service.

The memorandum also directs the update of applicable policies addressing accession and retention standards as well as the cancellation of policies and memoranda that addressed Service members serving with a diagnosis of gender dysphoria.

**Definitions**
**Q: How does the Department define gender dysphoria?**
**A:** Gender dysphoria refers to a marked incongruence between one's experienced or expressed gender and assigned gender of at least six months' duration, as manifested by conditions associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Q: How does the Department define "gender identity?"**
**A:** Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'gender identity' as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

**Q: How does the Department define sex?**
**A:** Consistent with Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Department defines 'sex' as "an individual's immutable biological classification as either male or female."

**Applicability**
**Q: Who exactly is impacted by this policy?**
**A:** Any Service member or applicant for military service who has a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service

CUI//NOT FOR RELEASE

4

CUI//NOT FOR RELEASE

member or applicant for military service who has a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition.

**Q: How many Service members are impacted by this policy?**
**A:** We do not have an exact number of active-duty Service members diagnosed with gender dysphoria.

**Q: Is there a breakdown of individuals by service, gender, race, and occupation (MOS)?**
**A:** We do not have that data readily available.

**Q: How will the Department identify Service members who are impacted by this policy?**
**A:** The Department will provide supplemental guidance which will address the identification of Service members diagnosed with gender dysphoria.

<u>Accessions</u>
**Q: If an individual was diagnosed with gender dysphoria as a child, are they disqualified from military service?**
**A:** Yes. However, applicants may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Q: Will offers of admission to Military Service Academies or ROTC programs be rescinded?**
**A:** Yes, offers of admission to a Military Service Academy or the Reserve Officers' Training Corps to individuals disqualified under these policies will be rescinded. Waivers will be considered on a case-by-case basis, provided there is a compelling government interest in accessing the applicant that directly supports warfighting capabilities. The applicant must be willing and able to adhere to all applicable standards, including the standards associated with the applicant's sex.

**Q: Will cadets or midshipmen be required to reimburse the government for their education?**
**A:** No. Absent any other basis for separation or disenrollment, such individuals will not be subject to monetary repayment of educational benefits (i.e., recoupment) nor subject to completion of a military service obligation.

CUI//NOT FOR RELEASE

## Retention

**Q: Will Service members currently serving with a diagnosis of gender dysphoria be allowed to continue to serve?**

**A:** No. Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and any Service members who have a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria, in pursuit of a sex transition, will be processed for administrative separation.

**Q: Will any waivers be permitted?**

**A:** Service members may be considered for a waiver on a case-by-case basis, provided there is a compelling government interest in retaining the Service member that directly supports warfighting capabilities and the Service member concerned meets the following criteria: (1) the Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; (2) the Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and (3) the Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

## Separations

**Q: Will Service members diagnosed with gender dysphoria be honorably discharged?**

**A:** Yes. Characterization of service will be honorable except where the Service member's record otherwise warrants a lower characterization.

**Q: Are Service members separated under this policy eligible for separation pay?**

**A:** Yes. Service members who elect to voluntarily separate within 30 days following the signature of this guidance may be eligible for voluntary separation pay in accordance with applicable law and Department policy. Service members eligible for voluntary separation pay will be paid at a rate that is twice the amount the Service member would have been eligible for in involuntary separation pay.

Service members who choose to be involuntarily separated may be provided full involuntary separation pay in accordance with applicable law and Department policy.

| Common Example | Involuntary Sep. Pay | Voluntary Sep. Pay |
|---|---|---|
| E-5 w/10 YOS | $50,814 | $101,628 |
| O-3 w/7 YOS | $62,612 | $125,224 |

**Q: Will Service members being separated under this policy be afforded a separation board?**

CUI//NOT FOR RELEASE

6

**A:** All enlisted Service members who are involuntarily separated pursuant to this policy will, if desired by the Service member, be afforded an administrative separation board. All officers who are involuntarily separated pursuant to this policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with applicable law.

**Q: Will Service members being separated under this policy be eligible for the Temporary Early Retirement Authority?**
**A:** Yes. Service members with over 18 but less than 20 years of total active-duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with Department policy.

**Q: Will Service member being separated under this policy remain eligible for TRICARE benefits?**
**A:** Yes. Eligible Service members (including active-duty Service members and Reserve or National Guard members when on active duty orders for 30 or more consecutive days) who are processed for separation pursuant to this policy, and their covered dependents, remain eligible for TRICARE for 180 days in accordance with applicable law.

**Q: Are Service members separated under this policy eligible to participate in the Transition Assistance Program?**
**A:** Yes. Service members, whether separated voluntarily or involuntarily are eligible for the Transition Assistance Program.

**Q: Will Service members separated under this policy have to repay any bonuses received prior to their separation?**
**A:** Service members choosing to voluntarily separate will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to applicable law.

The Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated.

**Q: Will the Secretaries of the Military Departments waive any remaining military service obligations?**
**A:** Yes. The Secretaries of the Military Departments will waive any remaining military service obligation for Service members who are separated pursuant to this policy.

**Q: If Service members are required to serve in their sex, will Service members diagnosed with gender dysphoria who have already had sex reassignment surgery be required to serve in their sex?**

CUI//NOT FOR RELEASE

7

CUI//NOT FOR RELEASE

**A:** The Secretaries of the Military Departments may place a Service member being separated under this policy in an administrative absence status until their separation is complete. Service members in this status will be designated as non-deployable.

**Q: Will the records for Service members being separated under this policy be updated to reflect their sex?**
**A:** Yes. All military records, regardless of whether a Service member is being separated under this policy, will reflect the Service member's sex.

**Q: Will the records for Service members being separated under this policy be updated to reflect their name at birth?**
**A:** All military records will reflect the Service member's legal name.

**Medical Providers**
**Q: Will Service members being separated under this policy be allowed to continue hormone therapy?**
**A:** Cross-sex hormone therapy for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria that began prior to the date of this guidance may, if recommended by a DoD health care provider to prevent further complications, be continued until separation is complete.

**Decision-Making**
**Q: The Secretary of Defense has said that the focus needs to be on "lethality, meritocracy, accountability, standards, and readiness." Specifically focusing on 'meritocracy,' will consideration be given to high performing transgender Service members?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

**Q: Transgender Service members have been serving without exception since 2021 and were previously 'grandfathered' under the previous Trump administration policies.  Why are all transgender Service members being targeted for separation now?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, express a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service. Further, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

CUI//NOT FOR RELEASE

8

JA206
FINAL OSDPA 20250228

CUI//NOT FOR RELEASE

**Q: Did the Department consider reinstating the Mattis policy regarding a Service member diagnosed with gender dysphoria and allow them to be grandfathered?**
**A:** While these individuals have volunteered to serve our country and will be treated with dignity and respect, expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.

**Q: Does this policy establish a de facto "Don't Ask, Don't Tell" for Service members diagnosed with gender dysphoria?**
**A:** No. This policy applies to Service members with a current diagnosis or history of or exhibit symptoms consistent with gender dysphoria. A history of cross-sex hormone therapy, sex reassignment, or genital reconstruction surgery as treatment for gender dysphoria in pursuit of a sex transition is disqualifying.

**Q: Will this policy have a negative impact on readiness, recruiting, and retention?**
**A:**
*Readiness:* This policy will remove Service members who are unable to satisfy the rigorous standards required for military service.

*Recruiting:* There is no direct evidence to suggest that recruiting will be impacted by this policy.

*Retention:* There is no direct evidence to suggest that this policy will have an impact on retention beyond the impacted individuals.

**Q: How is this legal? Do these actions violate Service members human rights?**
**A:** These actions are fully consistent with federal law.

**Q: Can you comment on the ongoing litigation?**
**A:** The Department does not comment on ongoing litigation. We respectfully refer you to the Department of Justice.

**References**:
For more information on the Departments actions:
https://www.dcpas.osd.mil/hottopics/executive-orders-and-presidential-memorandums

https://www.defense.gov/Spotlights/Guidance-for-Federal-Personnel-and-Readiness-Policies/

**Resources**:
https://www.whitehouse.gov/presidential-actions/

https://www.whitehouse.gov/fact-sheets/

CUI//NOT FOR RELEASE

9



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
1500 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1500

FEB 2 8 2025

**MANPOWER AND
RESERVE AFFAIRS**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
            COMMANDERS OF THE COMBATANT COMMANDS
            DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Clarifying Guidance on Prioritizing Military Excellence and Readiness

    This memorandum provides clarifying guidance to implement the requirements of the attached Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025.

    While the Secretaries of the Military Departments establish procedures and implement steps to identify Service members as required in the attachment, DoD personnel shall take no action to identify Service members pursuant to the attachment until March 26, 2025, to include the use of medical records, periodic health assessments, ad hoc physical assessments, or any other diagnostic mechanism, unless otherwise directed by an appropriate official in the Office of the Secretary of Defense for Personnel and Readiness.

    Principal Staff Assistants, DoD Component Heads, and their subordinates shall not direct or request that Service members self-identify as having a current diagnosis or history of, or exhibiting symptoms consistent with, gender dysphoria.

    Service members subject to the requirements in the attachment are encouraged to elect to separate voluntarily by March 26, 2025.

    This clarifying guidance does not apply to medical qualification determinations for applicants for military service, including eligibility determinations for individuals preparing to ship to initial entry training.

    This office will provide additional guidance prior to March 26, 2025, concerning identification processes and procedures.

                                            Tim Dill
                                            Performing the Duties of the Assistant
                                            Secretary of Defense for Manpower and
                                            Reserve Affairs

Attachments:
As stated
cc:
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy & Oversight (HSP&O)
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy Surgeon General of the Air Force

2



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
1500 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-1500

MAR 0 4 2025

**MANPOWER AND
RESERVE AFFAIRS**

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
                COMMANDERS OF THE COMBATANT COMMANDS
                DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers

Pursuant to the attached Performing the Duties of the Under Secretary of Defense for Personnel and Readiness Memorandum, "Additional Guidance on Prioritizing Military Excellence and Readiness," February 26, 2025, it is Department policy that the medical, surgical, and mental health constraints on individuals who meet the following criteria are incompatible with military service:

1. Individuals with a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria.

2. Individuals with a history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition.

Service members and applicants for military service disqualified pursuant to the attached memorandum may be considered for a retention or accession waiver on a case-by-case basis where there is a compelling Government interest in either retaining or accessing such individuals that directly supports the Department's warfighting capabilities.

A compelling Government interest that directly supports warfighting capabilities includes special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department, if such experience, training, and education is directly related to the operational needs of the Military Service concerned. The authority to grant a waiver pursuant to this memorandum shall not be further delegated.

To be eligible for such a waiver, the Service member or applicant for military service must meet the following criteria:

1. The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

2. The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

JA210

3. The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

In accordance with the reporting requirement in section 7 of the attachment, the Military Services shall track and report on approved retention waivers for Service members retained and approved accession waivers for all applicants who access into a branch or component of the Military Services.

Tim Dill
Performing the Duties of the Assistant
Secretary of Defense for Manpower and
Reserve Affairs

Attachment:
As stated

cc:
Director, Defense Health Agency
Deputy Assistant Secretary of Defense for Health Services Policy & Oversight (HSP&O)
Deputy Assistant Secretary of Defense for Military Personnel Policy
Deputy Chief of Staff, G-1, U.S. Army
Deputy Commandant for Manpower and Reserve Affairs, U.S. Marine Corps
Chief of Naval Personnel, U.S. Navy
Deputy Chief of Staff for Personnel, U.S. Air Force
Deputy Chief of Space Operations, Personnel
Director for Manpower and Personnel, J1
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force

2

Case 1:25-cv-00240-ACR    Document 72-18    Filed 03/07/25    Page 1 of 6
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 224 of 688
Case 1:25-cv-00240-ACR    Document 13-32    Filed 02/03/25    Page 1 of 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT, ERICA VANDAL, KATE        )
COLE, GORDON HERRERO, DANY                 )
DANRIDGE, JAMIE HASH, KODA NATURE,         )
and CAEL NEARY,                            )
                                           )
            Plaintiffs,                    )
                                           )
v.                                         )
                                           )
DONALD J. TRUMP, in his official capacity as   )
President of the United States; the UNITED     )
STATES OF AMERICA; PETER B. HEGSETH,       )        Civil Action No. 1:25-cv-00240
in his official capacity as Secretary of Defense;  )
MARK AVERILL, in his official capacity as      )
Acting Secretary of the Army; the UNITED       )
STATES DEPARTMENT OF THE ARMY;             )
TERENCE EMMERT, in his official capacity as    )
Acting Secretary of the Navy; the UNITED       )
STATES DEPARTMENT OF THE NAVY;             )
GARY ASHWORTH, in his official capacity as     )
Acting Secretary of the Air Force; the UNITED  )
STATES DEPARTMENT OF THE AIR FORCE;        )
TELITA CROSLAND, in her official capacity as   )
Director of the Defense Health Agency; and the )
DEFENSE HEALTH AGENCY,                     )
                                           )
            Defendants.                     )
_____

## DECLARATION OF NICOLAS TALBOTT

I, Nicolas Talbott, declare as follows:

1. I am a thirty-one-year-old Second Lieutenant in the United States Army Reserve stationed
   in Pennsylvania.  I have been serving the United States honorably for almost a year.  I am
   transgender.

**CURRENT MILITARY ROLE**

2. In my current role as Platoon Leader for the Military Policing Unit, I am responsible for
   leading a platoon of soldiers, overseeing their training, discipline, welfare, and overall

performance during battle assemblies and annual trainings. My duties include mission planning, task assignment, and ensuring that soldiers are executing their tasks and orders effectively.

3. I am scheduled to begin the Military Police Basic Officer Leadership Course in August 2025 to learn how to be a better and more effective leader in this role. Upon completion of this training in December 2025, I will be able to perform duties specific to my Military Policing Unit.

### BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS

4. In March 2024, I took my enlistment oath and began the career I have always dreamed of and worked towards for nearly ten years.

5. I attended basic training from July 2024 to October 2024. I was nominated for and named Honor Graduate at basic combat training by my drill sergeants for stepping up to leadership roles in training and exemplifying the Army's values of leadership, duty, respect, selfless service, honor, integrity, and personal courage.

6. I completed Officer Candidate School in January 2025 and was able to earn my commission as an Officer of the Army Reserve.

### EXPERIENCE AS TRANSGENDER SERVICE MEMBER

7. I have known that I was transgender from a young age, though I did not have the words to describe myself in this way until I was around twelve years old. At the time, I lived in a small town and feared how others would react to me being transgender.

8. When I was sixteen, I found the courage to tell my mother that I was transgender. In March 2011, I received a diagnosis of gender dysphoria from a medical professional. Once I turned eighteen, around 2012, I began hormone replacement therapy.

2

9. The military was always something I had dreamed of pursuing, but I thought that being transgender would prohibit me from ever achieving that dream. I decided to instead attend college and enrolled in Kent State University in 2012.

10. In 2015, while enrolled in a course covering intelligence and counterterrorism studies, I met a professor who encouraged me to pursue my dream of serving in the military despite a policy at the time prohibiting enlistment by transgender individuals. In 2015, the policy changed to permit service by transgender individuals. I graduated from Kent State University with a Bachelor of Arts in Sociology shortly thereafter.

11. In 2016, I found a military recruiter who worked with me to begin the enlistment process. Throughout 2017 and into 2018, my recruiter and I worked to complete all the necessary paperwork for the Military Entrance Processing Station (MEPS). Unfortunately, while I was working to complete and revise my application packet, a new ban on service by transgender individuals was announced.[1] Following this, my recruiter advised that he would no longer be able to process my application to join the military via the MEPS process.

12. The same day, I went to Kent State University to speak with a Reserve Officers' Training Corps (ROTC) recruiter to pursue an alternative path to commission. The ROTC recruiter informed me that ROTC was typically a four-year program, but that I could complete it in three years were I to attend a summer training camp after my first year of enrollment. As I was already planning to pursue a two-year master's program, I decided to enroll in an additional year of undergraduate studies to be eligible for ROTC and join the military through commissioning.

---

[1] I was involved in prior litigation challenging the prior ban. *See generally Stockman v. Trump*, No. 17-CV-01799 (C.D. Cal. Sept. 5, 2017).

3

13. During this time, I was also working as a substitute teacher and taking care of a sick family member.  Although going back to university would require balancing these other obligations with schooling and an additional financial strain in the form of student loans, I was determined to do everything within my power to improve my chances of commissioning.  For example, in addition to commuting an hour and a half each way for non-mandatory physical fitness training, I also volunteered for extra duties to demonstrate my dedication to the program.

14. In 2019, I learned that transgender individuals were going to be prohibited from joining the military.  I asked my ROTC commander to allow me to contract early to avoid this prohibition from affecting me.  Unfortunately, he was unwilling to do so.

15. In 2019, I completed the Spring semester of my ROTC program, but was unable to continue with the program in the fall as I was still prohibited from joining the military based on my transgender status.

16. In July 2020 and July 2021, I had two separate gender transition surgeries.  Fortunately, once my eighteen-month waiting period ended in January 2023, there was a new policy permitting service and enlistment by transgender individuals.  I began the lengthy process of enlistment, including finding a recruiter to work with, completing physical fitness tests, and finalizing the necessary paperwork.

17. In January 2024, I submitted my application and was approved in March 2024.  After years of fighting to realize my dream of military service, I took my enlistment oath and was finally able to start serving my country.

18. Since joining the Army Reserve and completing Officer Candidate School, I have worked with individuals from all walks of life to learn to become soldiers together.  I have been

4

able to participate in, and succeed in, every basic training and Officer Candidate School event. In each military setting I have worked in so far—basic training, Officer Candidate School, and my Reserve unit—I have been open about my transgender status and have felt welcomed by my peers and supervisors.

### IMPACT OF BAN

19. Serving in the United States Armed Forces is not only my career—it is a passion that I have been pursuing and a goal I have been working towards for almost a decade. To be prohibited from continuing to serve, not even a year after achieving my dream and earning my commission, would be a devastating loss for myself and for the United States Army.

20. I would not only lose my source of income, but also access to my health insurance and the numerous other benefits afforded to military members.

21. I plan on transitioning to active duty within the next year, after completing my Basic Officer Leadership Course, because I am eager to be as involved as possible and utilize my education and skillset to the military's benefit. As there is a lengthy approval process as my unit would need to fill the gap I leave behind, I would also be happy to serve my full six-year Reserve term and my two-year Ready Reserve if that were to best suit the Army's needs.

22. I do not want to lose a career that I am capable and willing to devote my life to based on my transgender status rather than my merit. I joined the military to serve my country honorably and with distinction. I plan to continue doing so far as long as I am able.

5

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3 Feb. 2025

Nicolas Talbott

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                 )
                                          )
    Plaintiffs,                      )
                                          )
v.                                        )          Civil Action No. 1:25-cv-00240
                                          )
UNITED STATES OF AMERICA *et al.*,        )
                                          )
    Defendants.                      )
_____   )

## SUPPLEMENTAL DECLARATION OF NICOLAS TALBOTT

I, Nicolas Talbott, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 3, 2025, which was filed on February 3, 2025, in support of the Motion for Preliminary Injunction in this matter. *See* ECF No. 13-32.

2.      I enlisted in the U.S. Army as a man.  In order to enlist, I was required to demonstrate that I had been stable in the male sex for over 18 months.

3.      I currently serve in the U.S. Army as a man. Accordingly, I adhere to male grooming standards, live in men's berthing units, and use men's changing and bathing facilities. Others refer to me as a man, including by using honorifics such as "Sir" when appropriate.

4.      My commander has supported my service and assured me that, from his perspective, my being a transgender man will have no impact on my ability to continue serving.

5.      It is not possible for me to serve in the military as a woman, which I am not. I am a man, look like a man, and have used men's facilities since my transition without incident.

6.      It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

1

7.      If others were required to refer to me by female pronouns or address me by female honorifics such as "Ma'am," it would cause confusion and disruption, and would negatively impact my ability to effectively perform the duties of my job.

8.      I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with women, since I am a man.

9.      If I cannot serve as a man in the military, I will not be able to serve at all.

[remainder of page intentionally left blank]

2

JA219

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 2, 2025

Nicolas Talbott

3

Case 1:25-cv-00240-ACR    Document 72-20    Filed 03/07/25    Page 1 of 6
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 233 of 688

Case 1:25-cv-00240-ACR    Document 13-33    Filed 02/03/25    Page 1 of 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:25-cv-00240 |
| Defendants. | ) ) |

_____

## DECLARATION OF ERICA VANDAL

I, Erica Vandal, declare as follows:

1.  I am a thirty-six-year-old Major in the United States Army stationed in New York.  I have been serving the United States honorably for over thirteen years.  I am transgender.

## CURRENT MILITARY ROLE

2.  I began serving in my current role as Brigade Fire Support Officer (FSO) in August 2024. In this role, I lead, certify, and supervise my brigade's approximately seventy fire support

and targeting officers, warrant officers, non-commissioned officers, and soldiers. I also advise my brigade commander on the employment, integration, and synchronization of all lethal and non-lethal indirect fires and effects, including field artillery, mortars, army attack aviation, and Air Force attack aircrafts. Additionally, I am responsible for planning and incorporating these effects and capabilities into the scheme of maneuver to achieve the Commander's desired end state.

3. Additionally, in connection with my promotion to Major, I was selected to attend the resident Command and General Staff Officer Course where I obtained my second of two master's degrees (in operational studies).

## BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS

4. I attended the United States Military Academy at West Point in New York beginning in 2007 and commissioned into the Army upon my graduation in 2011.

5. During my time at West Point, I signed a Graduate School Option (GRADSO) contract after meeting certain rigorous academic standards. From 2019 to 2020, I attended the University of Colorado, Colorado Springs where I attained my first master's degree (in business administration) paid for by the Army through the GRADSO program.

6. Since joining the military, I have acquired significant training in connection with numerous promotions in rank. I have served as both a Second and First Lieutenant, a Captain, and now in my current rank as a Major, holding a wide array of roles and responsibilities to include Platoon Leader, Battery Commander, fires officer with the United States Forces Korea, and Division Assistant FSO.

7. For each promotion in rank, I underwent months of specialized training, including approximately five months attending the Field Artillery Basic Officer Leader Course, five

2

months at the Field Artillery Captain's Career Course, and ten months at the Command and General Staff Officer's Course.  Additionally, I have attended and graduated from numerous specialty schools, including the Joint Fires Observer course and the Joint Firepower course.

8. In 2018, I deployed to Afghanistan and served as the Battery Commander of an M777 firing battery in support of Operation Freedom's Sentinel.  During this time, my battery split between two posts and was responsible for indirect fires around those posts in support of United States forces and coalition partners.

9. During my thirteen years in the military, I have been honored with a Bronze Star for meritorious achievements while serving as a Battery Commander during my deployment to Afghanistan, a Meritorious Service Medal, a Joint Service Commendation Medal, an Army Commendation Medal, and two Army Achievement Medals.

### EXPERIENCE AS TRANSGENDER SERVICE MEMBER

10. As the daughter of an active duty three-star military general, I grew up on Army bases. The importance of duty and service to country was taught and demonstrated to me, and my two brothers, from birth.

11. I have known I wanted to join the military and follow in my father's footsteps from a young age.  I have also known that I was transgender from an equally young age.  However, growing up within this conservative and masculine environment in which everything I did reflected not only on myself but on my family and my father, I avoided reflecting on my transgender status, repressing and who I was in an attempt to adhere to the expectations placed upon me.  Although ultimately unfounded, this fear of a lack of understanding, acceptance, and support caused me to suppress being transgender for nearly thirty years.

3

12. Around 2019, I knew my transgender status was not something I could continue avoiding and concealing. Due to a fear for my career and the ban on service for transgender service members I paid for a therapist at my own expense to help me reach a conclusion on the best way forward.

13. Around November 2021, I received a gender dysphoria diagnosis from an Army medical professional.

14. While on assignment to the Republic of Korea, I began receiving transgender healthcare in the form of hormone replacement therapy. I informed my immediate chain of command and received nothing but support and acceptance from my command and others who learned I was transgender.

15. Since then, I have been promoted to my current rank of Major, was selected by the Army for schooling related to this promotion, met every standard required of me, and deployed to Romania for about five months as part of mission to deter Russian aggression and assure NATO allies.

16. Around November 2023, I initiated the process to change my gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) and to legally change my name. My fellow service members continued to treat me with respect. I have kept my chain of command up to date about governing regulations and how they might affect me. There has been no negative impact on my work performance, readiness, or ability to be deployed.

17. Being transgender has had no impact on my military readiness—since beginning my transition I have not even taken a sick day, have worked in both the U.S. Indo-Pacific Command (INDOPACOM) and U.S. European Command (EUCOM), served in echelons ranging from battalion to four-star commands, deployed, and participated in numerous field

4

and garrison training events, all while receiving positive recognition, commendations, and evaluations.

**IMPACT OF BAN**

18. Given my strong evaluation reports as a Major, I assess I am on track to be promoted to Lieutenant Colonel in a few years. If I am separated, the Army would lose a strong leader and I would be unable to accomplish this career milestone.

19. Since receiving my commission into the Army, it has been my goal to serve for a minimum of twenty years; ideally attaining the honor and privilege of being selected for battalion command. Not only would a ban deprive me of the ability to continue serving, but, as I would be terminated before serving for twenty years, I would be denied retirement benefits I would otherwise be eligible for, including the loss of my pension in its entirety.

20. In pursuit of my master's degree in business administration, I participated in the GRADSO program. As part of this program, the Army paid for the cost of my education while I remained on active duty. A condition of this program is that I serve until 2026.

21. A ban would also cost me and my family our sole source of income and our health insurance, which we rely on for our medical needs.

22. I am currently in the process of transferring my G.I. Bill to my children. After putting in the request for this transfer, a service member has to continue serving for four years for the transfer to take effect. As I requested this transfer in 2022, my children will not receive it until 2026. If I am prohibited from serving, my children will likely not receive this benefit.

23. Serving in the United States military has been my career for more than thirteen years and, even before then, has always been a part of my life. My father served on active duty for over thirty-six years; my two brothers graduated from the United States Naval Academy

5

and became pilots within the Marine Corps and Navy respectively. Serving in the United States military is not only my career, but also my passion and family tradition. Were I to be prohibited from continuing to serve, I would lose my way of life.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 02 FEB 2025

Erica Vandal

Case 1:25-cv-00240-ACR    Document 72-21    Filed 03/07/25    Page 1 of 3
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 239 of 688
Case 1:25-cv-00240-ACR    Document 48-25    Filed 02/14/25    Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-00240 |
| Defendants. | ) ) | |

**SUPPLEMENTAL DECLARATION OF ERICA VANDAL**

I, Erica Vandal, declare as follows:

1. I write this declaration to supplement the declaration I signed February 2, 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on February 3, 2025. *See* ECF No. 13-33.

2. On December 18, 2024, my nurse case manager and I submitted a revision to my Military Treatment Plan to include surgical interventions that were not authorized on my original plan developed while in Korea.

3. I do not know why, but my brigade did not submit my revision to Service Central Coordination Cell (SCCC) until January 28, 2025.

4. On February 13, a human resources technician for my brigade received an email response from SCCC saying that "…review of transgender actions is suspended pending implementation guidance…any actions submitted on/after 3 January 2025 are being held at the SCCC in the interim." The email further clarified that the reason for halting all transgender healthcare treatments was the February 7, 2025, guidance from defendant Secretary of Defense Hegseth. A true and accurate copy of the email forwarded to me by the human resources technician is attached hereto as **<u>EXHIBIT A</u>**.

5. I want to serve my country on equal terms to my non-transgender peers. This includes receiving equal benefits, including medical benefits. I do not want to have my medically necessary health care taken away from me solely because I am transgender.

6. As a transgender woman, I am required to adhere to all standards applicable to service members identified with an "F" gender marker in the Defense Enrollment Eligibility Reporting System (DEERS). This includes living with women and using women's sleeping, changing and bathing facilities. It includes being referred to as a woman, as well as the use of honorifics such as "Ma'am" where appropriate. If I cannot serve as a woman in the military, I cannot serve as a transgender person at all.

7. It is not possible for me to serve in the military as a man. Having completed my transition, I look like a woman. I have used women's facilities since my transition without incident. It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's bunks, or otherwise access sex-segregated facilities for men.

8. Giving me the "choice" to serve as a man or not serve at all is not a choice. The Executive Order (EO) places me in an impossible position.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 13, 2025

Erica Vandal

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                )
                                         )
    Plaintiffs,                     )
                                         )
v.                                       )        Civil Action No. 1:25-cv-00240
                                         )
UNITED STATES OF AMERICA *et al.*,       )
                                         )
    Defendants.                     )
                                         )

### SECOND SUPPLEMENTAL DECLARATION OF ERICA VANDAL

I, Erica Vandal, declare as follows:

1.    I write this declaration to supplement (a) the declaration I signed on February 2, 2025, which was filed on February 3, 2025, ECF No. 13-33, and (b) the supplemental declaration I signed on February 13, 2025, ECF No. 48-25, which was filed on February 14, 2025, both of which were submitted in support of Plaintiffs' motion for preliminary injunction in this matter.

2.    My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is female.

3.    I serve in the U.S. Army as a woman.

4.    I meet all standards applicable to female service members. I adhere to female grooming standards, live in women's berthing units, and use women's changing and bathing facilities. Others refer to me as a woman, including using honorifics such as "Ma'am."

5.    My command has supported my service and assured me that, from their perspective, my being a transgender woman will have no negative impact on my ability to continue serving.

6.    It is not possible for me to serve in the military as a man, which I am not. I am a woman, look like a woman, and have used women's facilities since my transition without incident.

1

It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.

7.    If others were required to refer to me by male pronouns or address me as "sir," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

8.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with men, since I am a woman.

9.    If I cannot serve as a woman in the military, I cannot serve at all.


[remainder of page intentionally left blank]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 01 , 2025

Erica Vandal

3

JA232

Case 1:25-cv-00240-ACR    Document 72-23    Filed 03/07/25    Page 1 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 245 of 688

Case 1:25-cv-00240-ACR    Document 13-34    Filed 02/03/25    Page 1 of 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY,<br><br>    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:25-cv-00240 |

_____

**<u>DECLARATION OF KATE COLE</u>**

I, Kate Cole, declare as follows:

1. I am a thirty-four-year-old Sergeant First Class in the United States Army stationed in California.  I have been serving the United States honorably for seventeen years.  I am transgender.

### CURRENT MILITARY ROLE

2. In April 2024, I assumed my current role as a Senior Military Science Instructor for the Reserve Officers' Training Corps (ROTC) at the University of California, Los Angeles. In this role, I teach military science to undergraduate students and prepare them for cadet summer training by teaching them military battle drills.

3. For this position, I attended a two-week faculty development where I learned how to be a more effective teacher. My branch manager selected me for this role based on positive evaluations. I also had to pass the Position of Significant Trust and Authority background check.

4. Recently, I placed in the top ten percent of the Army's Order of Merit List for armor Sergeants First Class. This annual evaluation considers each candidate's physical fitness, performance evaluations, and leadership potential. Typically, Sergeants First Class who score in the top fifteen to twenty percent have a high likelihood of promoting to Master Sergeant.

### BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS

5. I enlisted in the Army in 2008 and have served in various capacities during my career.

6. My first assignment was as a driver and dismount in a scout platoon in a Reconnaissance, Surveillance, and Target Acquisition unit with the 82nd Airborne Division station in Fort Bragg, North Carolina. In these roles, helped the unit perform reconnaissance missions.

7. From 2010 to 2012, I was stationed in Germany as a squad-designated marksman. In this role, I operated an M-14 rifle to engage the enemy from a greater distance and provide overwatch to my unit during our reconnaissance missions. During this time, my unit and I

deployed to Afghanistan for twelve months, where I continued to serve as the designated marksman.

8. After serving as a Team Leader in a battalion scout platoon in Texas, for around a year, I returned to Germany from 2013 to 2015 to serve as a Team Leader and Squad Leader. In these roles, I was responsible for overseeing soldiers and their health, welfare, and training. In 2014, my unit and I deployed to Estonia, Latvia, Lithuania, and Poland as part of Operation Atlantic Resolve to provide assurance our NATO allies.

9. Following my second deployment, I was stationed in Fort Polk, Louisiana from 2015 to 2018. During this time, I served as a squad leader at the Joint Readiness Training Center where I evaluated units on their fitness for deployment to combat zones.

10. From 2018 to 2020, I served as a basic training Drill Sergeant in Fort Benning, Georgia, where I helped the Army turn civilians into soldiers.

11. From 2021 to 2024, I served as a Platoon Sergeant in Fort Carson, Colorado where I oversaw thirty-four soldiers and was responsible for their health, welfare, training, and readiness to deploy. During this time, my unit and I deployed to The Republic of Korea for nine months.

12. I have also served as a Sexual Harassment and Assault and Prevention (SHARP) representative from 2016 to 2023. In this role, I advocated for victims of sexual assault or harassment and directed them to the proper healthcare resources. I attended a three-week school to attain my credentials and completed thirty-one credit hours of continuing education hours each year to stay credentialed. Although I am no longer in this position, I remain credentialed.

3

13. During my nearly seventeen years of active duty in the Army, I have been honored with five Army Commendation Medals and seven Army Achievement Medals. Some for cumulative time at duty.

## EXPERIENCE AS A TRANSGENDER SERVICE MEMBER

14. Around 2014, during my deployment to Estonia, I decided to transition and was considering leaving the Army to do since the military did not permit service by transgender individuals at this time. However, I became aware of a study on the impact of military service by transgender individuals and decided to stay to contribute to that study.

15. Around 2016, there was a policy change permitting military service by transgender individuals. Shortly thereafter, I notified my command that I was transgender, officially changed my name, and began the process of changing my gender marker in the Defense Enrollment Eligibility System (DEERS).

16. I also began hormone replacement therapy during this time. My DEERS marker updated in 2017.

17. Although not everyone reacted with overwhelming support, this transition was never an obstacle and most of my peers and supervisors were supportive. I have had several soldiers tell me I changed their views on not only transgender service members but also female service members being in combat arms.

18. I have never missed any training, events, or schools and I have remained deployable. My transition has had no impact at all on me professionally or on my ability to perform effectively in the military.

19. Since transitioning, I have become a better leader and built a more cohesive team because I do not have to hide an aspect of who I am.

4

JA236

## IMPACT OF BAN

20. Serving in the United States Army has been my career and passion since I was seventeen years old. A prohibition on military service by transgender individuals like myself would have an immeasurable impact on my life.

21. Were I to be prohibited from continuing my service, I would lose my income and access to my healthcare, which I rely on for my medical needs.

22. As service members must serve for twenty years before retiring, if I were to be separated from the Army now, after serving seventeen years, I would lose the retirement benefits that I have worked hard for.

23. In March of 2026 I would be eligible to initiate the retirement process. This process flags to the military that a service member is nearing their twenty-year mark for retirement. The military will not assign a service member who has initiated this process a Permanent Change of Station to provide the service member with greater stability.

24. I have dedicated my life to the Army. I have never considered another career and I plan to continue to serve my country honorably until I retire. In addition to the more concrete harms of loss of income and benefits, a ban on service by transgender individuals would make me feel like my service and commitment to the United States is not respected. It would also tarnish my lifetime legacy of service to my country.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 03 Feb 2025

_____
Kate Cole

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                )
                                          )
      Plaintiffs,                     )
                                          )
v.                                        )        Civil Action No. 1:25-cv-00240
                                          )
UNITED STATES OF AMERICA *et al.*,        )
                                          )
      Defendants.                     )
                                          )

## SUPPLEMENTAL DECLARATION OF KATE COLE

I, Kate Cole, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 3, 2025, which was filed on February 3, 2025, ECF No. 13-34, in support of Plaintiffs' motion for preliminary injunction in this matter.

2.      My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is female.

3.      I was diagnosed with gender dysphoria in or about November 2016. I serve in the U.S. Army as a woman.

4.      I meet all standards applicable to female service members. I adhere to female grooming standards, live in women's berthing units, and use women's changing and bathing facilities. Others refer to me as a woman, including using honorifics such as "Ma'am."

5.      My command supports my service and has assured me that, from their perspective, my being a transgender woman will have no negative impact on my ability to continue serving.

6.      It is not possible for me to serve in the military as a man, which I am not. I am a woman, look like a woman, and have used women's facilities since my transition without incident.

1

It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.

7.    If others were required to refer to me by male pronouns or address me as "sir," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

8.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with men, since I am a woman.

9.    If I cannot serve as a woman in the military, I cannot serve at all.


[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March ___, 2025

Kate Cole

3

Case 1:25-cv-00240-ACR     Document 72-25     Filed 03/07/25     Page 1 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 253 of 688

Case 1:25-cv-00240-ACR     Document 13-35     Filed 02/03/25     Page 1 of 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:25-cv-00240<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION OF GORDON HERRERO</u>

I, Gordon Herrero, declare as follows:

1. I am a thirty-four-year-old Captain in the United States Army stationed in California. I have been serving the United States honorably for nine years. I am transgender.

## CURRENT MILITARY ROLE

2. In June 2023, I started my current assignment as an Operations Research Systems Analyst at the Naval Postgraduate School. In this role, I am a student in the Department of Applied Mathematics pursuing a Master of Science degree in applied mathematics.

3. Starting in April 2025, after completion of my degree, the Army has selected me to educate the next generation of military leaders as an Instructor in the Department of Mathematical Sciences at the United States Military Academy at West Point in New York.

**BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS**

4. I commissioned in the Army in 2015 and began active duty service the following year. Since then, I have served in various capacities as Transportation Officer, Logistics Officer, and Operations Research, Systems Analyst.

5. As Transportation Officer, I graduated first in my class at the Army's Transportation Basic Officer Leader Course and served at Fort Liberty, North Carolina. In 2019, I deployed to Poland as the Logistics Officer in Charge for my battalion. While in Poland, I promoted to Captain and was rated second of all Captains in the battalion, despite being the most junior. While in Poland, I also enrolled in a graduate program at the Florida Institute of Technology. I graduated from that program in 2021 with a 4.0 average, earning a Master of Science degree in Operations Research.

6. After my promotion to Captain in 2020, I attended the Combined Logistics Captains Career Course where I was recognized on the Commandant's List and redesignated as a Logistics Officer.

7. In February 2021, I assumed command of the 138th Movement Control Team in The Republic of Korea. In this role, I was responsible for the health, welfare, discipline, training, force protection, morale, and quality of life for United States soldiers, Korean soldiers, and Korean civilians assigned to the unit. I was also responsible for maintaining and further developing the strong partnership with our Korean counterparts.

2

8.  In July 2022, I was hand-selected to serve as a logistics planner in the United Nations Command Headquarters in The Republic of Korea.  In this role, I reviewed and developed plans to effectively integrate and logistically sustain multi-national militaries for the protection of The Republic of Korea.

9.  Throughout my nine years of active-duty service in the Army, I have been honored with a Meritorious Service Medal for my accomplishments as Detachment Commander, a Joint Service Commendation Medal for my contributions to the United Nations Command Headquarters, an Army Commendation Medal with two oak leaf clusters, and an Army Achievement Medal for consistently demonstrating professionalism and dedication to every mission.

## EXPERIENCE AS TRANSGENDER SERVICE MEMBER

10. I was drawn to join the Army Reserve Officers Training Corps (ROTC) while attending Texas Tech University in 2009.  I joined, in part, because I come from a strong family background of military leaders.  My mother was an Army officer, my grandmother a Navy nurse, my father an Army civilian for thirty-six years, my grandfather a Navy test pilot, and my great grandfather served as an Army Air Corps Colonel in the Korean War.  I wanted to make my family proud and prove to myself I had the strength and courage military service requires.

11. Another reason underlying my interest in the military was that, at the time, I was experiencing discomfort in my own skin.  I would later learn that this stemmed from gender dysphoria, but it was not something I was ready to explore at the time.  I thought the military's structured environment would help these feelings subside.  I completed my

3

ROTC program as a Distinguished Military Graduate, earned my bachelor's degree, and commissioned as a female officer.  However, the feelings of discomfort never subsided.

12. In April 2021, I was diagnosed with gender dysphoria, which, per military policy, is a prerequisite to obtaining gender affirming care and changing my gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).

13. In October 2021, my brigade commander approved my transition timeline, and I was cleared to begin hormone replacement therapy.  Because I was a Detachment Commander, I also decided to call my soldiers and civilians in for a conversation, so they could learn about my upcoming transition directly from me, and we could address any concerns together.  When I told them, the team broke out into applause twice and thanked me for taking the time to tell them.

14. At the end of my tour as Detachment Commander, I had chest reconstruction surgery. Upon returning from leave, I reported to the United Nations Command Headquarters, remained fully deployable, and passed a record Army Combat Fitness Test.  My gender marker in DEERS was changed to male in 2023.

15. My transgender status has never impacted my military readiness.  Throughout my transition I remained deployable, and effectively executed every mission the Army gave me.

16. The support of my leaders, peers, and subordinates throughout my transition has not only made our units stronger but has also made me a more effective leader.

**IMPACT OF BAN**

17. Serving in the United States Army is the only career I have ever had—and the only one I have ever wanted.  It is my calling.  If I am prohibited from continuing to serve, I would not only lose my livelihood, but also career I have dedicated my life to.

18. Beyond the personal impact, I would no longer be able to assume my future role as an Instructor at West Point. I am a capable officer, committed to sharing my expertise to educate the next generation of Army leaders. I feel a deep responsibility to model the supportive leadership I have been so fortunate to benefit from throughout my own career.

19. In addition to losing my career and income, I would lose my healthcare which I rely on for my medical needs.

20. Upon graduation from the Naval Postgraduate School in March 2025, I will have an active-duty service obligation. If I am unable to stay on active duty for the required number of years, I may be found financially responsible for repaying the amount of my schooling.

21. I am fully qualified, have exceeded expectations in every billet and wish to continue to serve honorably.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/2/2025

Gordon Herrero

5

Case 1:25-cv-00240-ACR    Document 72-26    Filed 03/07/25    Page 1 of 4
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 258 of 688

Case 1:25-cv-00240-ACR    Document 48-23    Filed 02/14/25    Page 1 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:25-cv-00240 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**SUPPLEMENTAL DECLARATION OF GORDON HERRERO**

I, Gordon Herrero, declare as follows:

1. I write this declaration to supplement the declaration I signed February 2, 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on February 3, 2025. *See* ECF No. 13-35.

2. As outlined in my first declaration, my transgender status has been known to my fellow service members since 2021. Since my gender marker was changed in the Defense Enrollment Eligibility Reporting System (DEERS), I have served as a man in the Army.

3.  As a transgender man, I am required to adhere to all standards applicable to service members identified with an "M" gender marker in DEERS. This includes living with men and using men's sleeping, changing and bathing facilities. It includes being referred to as a man, as well as the use of honorifics such as "Sir" where appropriate. If I cannot serve as a man in the military, I cannot serve at all.

4.  It is not possible for me to serve in the military as a woman. Having completed my transition, I look like a man. I have used men's facilities since my transition without incident. It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's bunks, or otherwise access sex-segregated facilities for women.

5.  Giving me the "choice" to serve as a woman or not serve at all is not a choice. The Executive Order (EO) places me in an impossible position.

6.  My current and future chains of command are overwhelmingly supportive of me. However, they should not need to do any more for me than they do for any other service member. Because my chains of command know me and the value I bring to my service, they have worked hard to keep me. But they should not have to work against the EO to do so.

7.  The EO has impacted my studies as well. I am currently pursuing a Master of Science degree in Applied Mathematics at the Naval Postgraduate School. My motivation for earning this degree is so that I can serve as an Instructor in the Department of Mathematical Sciences at the United States Military Academy (USMA) at West Point in New York. However, the EO has made that future uncertain. It is no longer clear that the time and effort I am currently putting into my studies will lead to that role. At this point, I do not even know if I will be able to remain in the Army long enough to graduate.

8.  This concern has already led me to seek an early graduation and early report date to USMA. As a result of this accelerated timeline, I am now ineligible for an Academic Certificate in Network Science that I would have otherwise earned from my studies.

9.  Moreover, if I am flagged for separation because I am transgender, I will lose the career-making opportunity to teach at USMA.

10. By signing the EO, the president has used his platform to say that I am dishonorable and dishonest. This demeans my service and places barriers that make it harder for me to do my job.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 14, 2025

Gordon Herrero (Feb 14, 2025 09:55 PST)

Gordon Herrero

# Supplemental Herrero Declaration

Final Audit Report                                              2025-02-14

| | |
|---|---|
| Created: | 2025-02-14 |
| By: | Michael Haley (mhaley@glad.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_yO4Ext91Npn8rAMQS7uTtGQNosywxnm |

## "Supplemental Herrero Declaration" History

📄 Document created by Michael Haley (mhaley@glad.org)
2025-02-14 - 5:40:08 PM GMT

📧 Document emailed to gordonherrero@gmail.com for signature
2025-02-14 - 5:40:30 PM GMT

📄 Email viewed by gordonherrero@gmail.com
2025-02-14 - 5:51:32 PM GMT

✍️ Signer gordonherrero@gmail.com entered name at signing as Gordon Herrero
2025-02-14 - 5:54:59 PM GMT

✍️ Document e-signed by Gordon Herrero (gordonherrero@gmail.com)
Signature Date: 2025-02-14 - 5:55:01 PM GMT - Time Source: server

✅ Agreement completed.
2025-02-14 - 5:55:01 PM GMT

**Adobe Acrobat Sign**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,                )
                                          )
    Plaintiffs,        )
                                          )
v.                                        )          Civil Action No. 1:25-cv-00240
                                          )
UNITED STATES OF AMERICA *et al.*,        )
                                          )
    Defendants.        )
                                          )

**SECOND SUPPLEMENTAL DECLARATION OF GORDON HERRERO**

I, Gordon Herrero, declare as follows:

1.    I write this declaration to supplement (a) the declaration I signed on February 2, 2025, which was filed on February 3, 2025, ECF No. 13-35, and (b) the supplemental declaration I signed on February 14, 2025, ECF No. 48-23, which was filed on February 14, 2025, both of which were submitted in support of Plaintiffs' motion for preliminary injunction in this matter.

2.    My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is male.

3.    I serve in the U.S. Army as a man.

4.    I meet all standards applicable to male service members. I adhere to male grooming standards, live in men's berthing units, and use men's changing and bathing facilities. Others refer to me as a man, including using honorifics such as "Sir."

5.    My command has supported my service and assured me that, from their perspective, my being a transgender man will have no negative impact on my ability to continue serving.

6.    It is not possible for me to serve in the military as a woman, which I am not. I am a man, look like a man, and have used men's facilities since my transition without incident. It

1

would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

7.     If others were required, in all circumstances, to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

8.     I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with women, since I am a man.

9.     If I cannot serve as a man in the military, I cannot serve at all.


[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3 , 2025

Gordon Herrero

3

Case 1:25-cv-00240-ACR    Document 72-28    Filed 03/07/25    Page 1 of 8
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 265 of 688
Case 1:25-cv-00240-ACR    Document 13-36    Filed 02/03/25    Page 1 of 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:25-cv-00240

---

## DECLARATION OF DANY DANRIDGE

I, Dany Danridge, declare as follows:

1. I am a thirty-year-old Student Naval Flight Officer in the United States Navy currently enrolled in Flight Training in Pensacola, Florida. I have served honorably for over twelve years in both active duty and reserve capacity, and I am currently ranked Ensign (O-1). I am transgender.

**CURRENT MILITARY ROLE**

2. After serving in active duty in the United States Navy from 2012 to 2020 and the Navy Reserves from 2020 to 2023, I graduated Officer Candidate School ("OCS") and commissioned to active duty in February 2024.

3. In my current role as a Student Naval Flight Officer, I am enrolled in Flight Training at Training Squadron 10 ("VT-10"). I hope to eventually become a naval aviator and serve as a flight officer aboard a Navy aircraft.

4. In my current role, I stand duty as the Assistant Duty Officer. In this position, I am responsible for directing calls, monitoring the flight schedule, updating the weather report, monitoring building security, and reporting directly to the Senior Duty Officer.

5. In addition to these Officer duties, I attend classes five days per week and, when the weather permits, complete flight lessons. I am currently ranked in the top ten percent of my training class.

**BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS**

6. To me, military service has always felt like the family business. My father served for thirty-one years in the Marine Corps. He enlisted right out of high school and then was commissioned as a Warrant Officer. My older brother was commissioned in the Marine Corps right out of college. He is still serving as an O-4 Major in California. Their service inspired me to join the military.

7. As a kid, I loved bringing my father lunch at the base and hanging out with his coworkers in the office. I have vivid memories of running 5ks on base with my father. It feels like everything I have done in my life has involved the military. From as far back as I can

2

remember, I have wanted to serve my country and pursue a challenging and rewarding career in the military. To that end, in high school, I participated in an ROTC program.

8.  Immediately upon graduating from high school in 2012, I enlisted in the Navy. From 2012 to 2020, I served on active duty in the Navy.

9.  After I completed training around 2013, I was assigned to my first duty station at Fleet Readiness Center West in Lemoore, California, which was my home station until 2017. During that time, I advanced to the rank of E-5. I started as a Sailor and, due to my hard work ethic and dedication, I was named Sailor of the Year in 2014.

10. In March 2014, I deployed with the USS Ronald Reagan. During this time, we participated in the Rim of the Pacific exercise, the world's largest international maritime warfare exercise. Also during this time, I became qualified in my assigned primary job as an Electronics Technician. In that role, I provided support to sixteen F/A-18 fleet squadrons, one fleet replacement squadron, one MH-60 search and rescue squadron, two test and evaluation squadrons, six aircraft carriers, and nine repair and return sites.

11. Upon returning from my deployment with the USS Ronald Reagan, I quickly volunteered in August 2014 for deployment with the USS Carl Vinson to the Fifth Fleet for Operation Inherent Resolve—a military campaign against the Islamic State of Iraq and the Levant. For my efforts during that deployment, I was awarded a Global War on Terrorism Service Medal, and a Terrorism Expeditionary Medal.

12. During this deployment, I repaired over ninety weapon and shop replaceable assemblies resulting in 1,695 maintenance hours at an 87% Ready-For-Issue rate. I also cross-trained in another work center to aid in thirty-three component repairs and twenty-five support equipment inspections. There, I was entrusted as the Foreign Object Damage and Electro-

static Discharge Manager.  In that role, in addition to the previous completed work, I exceeded program standards with zero discrepancies over two quality assurance audits and sixteen spot checks throughout the entire deployment.

13. Around the end of 2017, I transferred from Fleet Readiness Center West to Strike Fighter Squadron (VFA) 122, otherwise known as the Flying Eagles.  At this command, I did multiple detachments between 2017 and 2020, including to Naval Air Facility El Centro, Fleet Readiness Center Southeast Detachment Key West, the USS Theodore Roosevelt, and the USS Dwight D. Eisenhower.

14. In 2020, I was honorably discharged so that I could attend college full time.  During that time, I served in the Navy Reserves while I obtained a bachelor's degree in Aeronautics and Sociology from Liberty University.  While in the Reserves, I deployed to Naples, Italy, where I assisted in starting the Transaction Service Center Naples.  For my efforts in starting this new command, I was awarded a Navy and Marine Corps Achievement Medal.

15. After completing my degree, I began attending OCS in October 2023.  I successfully graduated from OCS and commissioned to active duty with the Navy in February 2024.

16. Since joining the military, I have completed a significant amount of practical, academic, and physical training.  The Navy has sent me to over ten different schools and training programs, amounting to a combined total of about four years of training.  Among the many schools and training programs include: Navy boot camp, Avionics Intermediate Repair A school, Consolidated Automated Support System repair school, Collateral Duty Inspector training, Command Fitness Leader school, restricted watch stander training, Officer Candidate School, and Naval Flight Officer training.  After I passed each program, I

returned to my duty stations and performed using the knowledge I had gained.  This benefit led the military to continue investing in me and what I brought to the mission.

**EXPERIENCE AS TRANSGENDER SERVICE MEMBER**

17. When I was a child, I felt like I was different from my peers, although at the time I did not know that those feelings were because I was transgender.  To soothe those feelings, I always worked my hardest and tried to be the best at whatever I was doing because that way, being different would not matter.

18. Having grown up in a military family, I became accustomed to feeling discomfort due to frequent relocation and change.  I attributed a lot of my feelings of being different to this general discomfort.  But when I enlisted in the military in 2012, I found that it was the one place where I could be myself without judgment because we were all striving for the same goal.

19. Around 2017, I started therapy to help manage the difficulty of going through a divorce. During that time, I learned a lot about myself, my work, and my relationships.  After about four months of therapy, I came to understand that I was transgender.

20. That same year, I was diagnosed with gender dysphoria so I could begin receiving transgender healthcare.  Shortly thereafter, I began taking hormones.

21. Around that time, I also disclosed being transgender to my close friends and family, who were mostly supportive.  I did not tell my coworkers because it never came up and I wanted to keep my personal life separate from my professional life.

22. My next step to medically transition was to obtain chest reconstruction surgery.  However, in December 2017 I was getting ready to transfer from Fleet Readiness Center West to Strike Fighter Squadron VFA-122.  Knowing that I was going to be sent to training

(Page 269 of Total)

immediately after checking in, I decided to delay the surgery.  I did not want to impact the needs of the Navy or abdicate my responsibilities.  Ultimately, I delayed the surgery for about a year, until 2019.  Once I did undergo surgery, I returned to work the next day. Though I was not lifting heavy objects, I performed the majority of my duties and actively contributed to my team.

23. In 2019, while on active duty at VFA-122, I changed my gender marker in the Defense Enrollment Eligibility Reporting System ("DEERS") from female to male.

24. My transgender status has had no impact on unit cohesion or the treatment I have received from peers and leaders.  In my time as both a Reservist and on active duty, my transgender status has rarely come up and has never been an issue.  In fact, I received overwhelming support from my unit's Commanding Officer to apply for OCS.  It was with my Commanding Officer's recommendation that I was selected for OCS.  I view my Commanding Officer as a major influence on how and why I am an Officer today.

25. My transgender status has had no impact on my military readiness.  Since beginning to receive transgender healthcare, my evaluation reports have remained positive, I have detached to two carriers, and have deployed to Naples, Italy where I received a Navy and Marine Corps Achievement Medal for my contributions on that deployment.  I successfully conform to male physical fitness standards.  My peers have been supportive, and I have had zero issues.

**IMPACT OF BAN**

26. Serving in the United States Military has been my dream since I was in high school, and it is the only career I have ever known—a career I have served in honorably for over twelve

6

years.  I have dedicated my career to the Navy and take great pride in my work and opportunities for growth.

27. If I were prohibited from continuing to serve, I would be removed from Flight Training and lose out on the hours of time and effort I have dedicated to my studies so far.  I would also lose the opportunity to see that training through and become a naval aviator and serve as a flight officer aboard a Navy aircraft, which has been my dream and goal for a long time.

28. Additionally, I would lose the benefits that I have spent over twelve years earning, including my retirement benefits, health care, and a job and career I truly love.  I fully intend to continue serving at least twenty years, when my retirement benefits fully accrue, if not longer.  I will receive nothing if I am forced to stop serving now.

29. In addition to depriving me of my job, my livelihood, and my eligibility for important retirement benefits, a ban would be a devastating rebuke in the face of my many years of commitment to serving and defending this nation.  I have always performed my duties with honor, courage, and excellence, and my transgender status has never interfered with my work or my readiness.  I have received numerous commendations and awards for my service, and I have earned the respect and trust of my peers and superiors.  To be told that I cannot serve for reasons that have nothing to do with my ability or performance is frustrating, disheartening, and demoralizing.

30. I want to serve in the military because I want to serve my country.  To be denied that opportunity is extremely painful.  I am proud to be a transgender man and a service member, and I do not think those identities are incompatible or contradictory.

7

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 0 5FEB25

Dany Danridge

**8**

JA260

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,             )
                                      )
      Plaintiffs,              )
                                      )
v.                                    )          Civil Action No. 1:25-cv-00240
                                      )
UNITED STATES OF AMERICA *et al.*,    )
                                      )
      Defendants.              )
                                      )
_____       )

**SUPPLEMENTAL DECLARATION OF DANY DANRIDGE**

I, Dany Danridge, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 3, 2025, which was filed on February 3, 2025, ECF No. 13-36, in support of Plaintiffs' motion for preliminary injunction in this matter.

2.      My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is male.

3.      I serve in the U.S. Navy as a man.

4.      I meet all standards applicable to make service members. I adhere to male grooming standards, live in men's berthing units, and use men's changing and bathing facilities. Others refer to me as a man, including using honorifics such as "Sir."

5.      My command supports my service and has assured me that, from their perspective, my being a transgender man will have no negative impact on my ability to continue serving.

6.      It is not possible for me to serve in the military as a woman, which I am not. I am a man, look like a man, and have used men's facilities since my transition without incident. It

1

JA261

would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

7.    If others were required to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

8.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with women, since I am a man.

9.    If I cannot serve as a man in the military, I cannot serve at all.


[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 03, 2025

Dany Danridge

3

Case 1:25-cv-00240-ACR    Document 72-30    Filed 03/07/25    Page 1 of 8
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 276 of 688

Case 1:25-cv-00240-ACR    Document 13-37    Filed 02/03/25    Page 1 of 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT, ERICA VANDAL, KATE ) 
COLE, GORDON HERRERO, DANY ) 
DANRIDGE, JAMIE HASH, KODA NATURE, ) 
and CAEL NEARY, ) 
 ) 
Plaintiffs, ) 
 ) 
v. ) 
 ) 
DONALD J. TRUMP, in his official capacity as ) 
President of the United States; the UNITED ) 
STATES OF AMERICA; PETER B. HEGSETH, )    Civil Action No. 1:25-cv-00240
in his official capacity as Secretary of Defense; ) 
MARK AVERILL, in his official capacity as ) 
Acting Secretary of the Army; the UNITED ) 
STATES DEPARTMENT OF THE ARMY; ) 
TERENCE EMMERT, in his official capacity as ) 
Acting Secretary of the Navy; the UNITED ) 
STATES DEPARTMENT OF THE NAVY; ) 
GARY ASHWORTH, in his official capacity as ) 
Acting Secretary of the Air Force; the UNITED ) 
STATES DEPARTMENT OF THE AIR FORCE; ) 
TELITA CROSLAND, in her official capacity as ) 
Director of the Defense Health Agency; and the ) 
DEFENSE HEALTH AGENCY, ) 
 ) 
Defendants. ) 

---

**<u>DECLARATION OF JAMIE HASH</u>**

I, Jamie Hash, declare as follows:

1. I am a thirty-seven-year-old Senior Master Sergeant in the active-duty United States Air

   Force.  I have completed thirteen years of military service, and I am currently assigned to

   the Pentagon in Washington, D.C., as a Defense Legislative Fellow.  I am transgender.

**CURRENT MILITARY ROLE**

2. After being rated first out of forty-five candidates for selection for Senior Master Sergeant, I was promoted to the rank of Senior Master Sergeant on February 1, 2025.

3. In July 2024, I began serving in my current role as a Defense Legislative Fellow assigned to the Office of the Secretary of the Air Force Directorate of Legislative Liaison and currently attached to the United States Congress. This three-year fellowship is highly competitive, and only selects a handful of enlisted Air Force applicants each year. I was selected as one of only six active-duty Air Force personnel for the program, after undergoing a rigorous application and interview process.

4. In this role, I serve on the personal staff of a congressman as an advisor on matters related to defense and other national security matters. After completing my 12-month tour working with Congress, I will then return to the Department of Air Force for 18 months and utilize my experience to liaise with Congress, coordinate legislative programs, keep Congress informed of issues, and help shape Department of Defense ("DoD") policy to meet national security strategy.

**BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS**

5. I grew up in the Washington, D.C. area, with multiple family members who served in the military and worked for the DoD as civil servants, and many childhood friends whose parents were in the military. I saw the appeal of traveling around the world and being exposed to different people, countries, and cultures, but I was mostly drawn to the military to serve my country and be part of a greater purpose and something bigger than myself.

6. Prior to joining the military, I attended college and had an internship working for the Department of the Army. I began seriously thinking about joining the military in early

adulthood.  In November 2011, when I was twenty-four years old, I enlisted in the active-duty United States Air Force.

7.  During basic training, I was placed in the Aircraft Armament Systems career field, and after graduating basic training with honors (i.e., top ten percent), I attended a four-month technical training course where I graduated top of my class.  Once assigned to my first duty station, I went through many months of on-the-job training to complete upgrade training requirements.  I made Senior Airman Below the Zone, promoted to Staff Sergeant the first time eligible, and eventually became an Aircraft Armament Systems "Craftsman" (i.e., 7-skill level), which means I had many years of experience and was responsible for supervising and training others.

8.  In 2015, I retrained to become a Workforce Planner (i.e., Manpower and Organization), which consisted of a two-month technical training course, which was followed by many months of additional on-the-job training to complete upgrade training requirements.  Since I had become a Non-Commissioned Officer ("NCO") prior to retraining, I attended Airman Leadership School, which is a mandatory two-month professional military education course.

9.  In 2019, I was stationed in Europe and attended the NCO Academy there since I had been promoted to Technical Sergeant my first time eligible, which was another mandatory two-month leadership development course required for promotion.  Prior to relocating back to the United States in 2022, I also promoted to Master Sergeant my first time eligible.  In 2024, I was selected for the rank of Senior Master Sergeant (i.e., "E-8") and as part of that promotion process, attended the mandatory two-month Senior Non-Commissioned Officer ("SNCO") Academy.  I am now on track to be a Workforce Planner "Superintendent" (i.e.,

9-skill level). As a result of my training, experience, and additional education, I have obtained an associate degree in each of my Air Force specialties through the Community College of the Air Force.

10. In addition, I have completed other rigorous educational programs. For example, to gain the necessary qualifications for my current position, the Air Force funds training through the Georgetown Government Affairs Institute where I will obtain a graduate certificate in Legislative Studies. Furthermore, I have obtained a master of science degree in Organizational Performance Improvement utilizing the military's Tuition Assistance Program.

11. During my thirteen years in the Air Force, I have earned numerous awards and honors. These include four Meritorious Service Medals, one Air Force Commendation Medal, two Air Force Achievement Medals, two Air and Space Outstanding Unit Awards, one Humanitarian Service Medal, and one Military Outstanding Volunteer Service Medal. Additionally, I have been awarded Senior Airman Below the Zone, Wing Maintenance Professional of the Year, Group Airman of the Year, Squadron NCO of the Year, Field Operating Agency NCO of the Year, Military Volunteer of the Year, the NCO Academy John Levitow Award (i.e., top graduate), Air Force Operations Directorate SNCO of the Year, Air Force Operations Directorate Lance P. Sijan Leadership SNCO Award, DAF Headquarters ("HQ") Management Engineering Award, DAF HQ Visionary Leadership Award, and SNCO Academy Distinguished Graduate, among others.

## EXPERIENCE AS TRANSGENDER SERVICE MEMBER

12. At a very early age, I could tell who I was on the inside was incongruent with how the world perceived me. However, I realized broad, mainstream society was not accepting of

transgender people and therefore I quickly learned to suppress, hide, and deny who I am. It wasn't until a 2015 deployment to Southwest Asia as part of the joint coalition against the Islamic State of Iraq and Syria ("ISIS") that I achieved a sense of self-actualization and was able to finally accept myself.

13. In 2016, shortly after the DoD adopted a policy permitting transgender individuals to serve in the military, I disclosed being transgender to friends, family, and the military.  My friends and family were very supportive, which I will always be grateful for.  Around that same time, I also disclosed being transgender to my unit leadership who were also very supportive.  My commander at the time was particularly supportive and told me that I was still the same Sergeant Hash who had just won NCO of the quarter.

14. At the end of 2016, I sought and obtained a gender dysphoria diagnosis from a medical professional through the military medical system so I could begin receiving transgender healthcare.  I began hormone replacement therapy shortly thereafter.

15. While I had a few surgical interventions during my transition, most were not covered by the military, either fully or at all.  For example, one civilian doctor provided medical services pro bono while the military only covered the hospital fees such as the hospital stay and the temporary duty costs such as transportation, just as they would for any service member's medically necessary care.  The cumulative time for transition-related health care was less than 12 weeks, which is the length of one parental leave.  The only mental health care I received for being transgender was the initial mental health screening required to obtain the gender dysphoria diagnosis.  The gender dysphoria diagnosis has been removed from my medical record for several years.

16. In early 2017, I changed my gender marker in the Defense Enrollment Eligibility Reporting System ("DEERS") from male to female.

17. Because I was among the first group of service members in the Air Force to identify as transgender following the DoD's 2016 policy change, I was able to help shape the initial Air Force policy implementation regarding transgender service members. This process was challenging yet rewarding. The Air Force has trained staff, and the process became efficient.

18. My transgender status has had no impact on my deployability or readiness. Air Force medical standards previously required each transgender service member to be assigned an assignment limitation code, which restricted locations to which transgender service members could be deployed subject to a waiver process, but medical standards changed around 2020 once there was consensus the standards were overly burdensome and specifically targeted to transgender service members. Since those standards were revised, there have been no limitations on my deployability.

19. Even while that medical policy was in effect, I was able to get stationed overseas without any issue. Since beginning to receive transgender healthcare, I have deployed to HQ Air Forces Africa in Germany with possibility of forward deployment to Africa, completed a three-year overseas tour in Europe, and worked strategic-level Global Force Management in the Pentagon at HQ Air Force. I have been promoted several times, including to my current rank of Senior Master Sergeant—the latter for which I was rated first out of forty-five candidates and only includes 2% of the enlisted force per law (10 U.S.C. § 517).

20. My transgender identity has had no negative impact on unit cohesion or my treatment from peers. In actuality, I found that being vulnerable about my experience to my peers and

subordinates has been beneficial to unit cohesion because it has increased trust, comradery, and made others feel more comfortable confiding in me regarding difficulties they are facing. Prior to transitioning, I had consistently been recognized for superior performance, but when I was able to eventually serve and live authentically, I became an even more effective leader.  My status as transgender has never once been raised as an issue, let alone brought up at all.

### IMPACT OF BAN

21. After facing stigma, anxiety, and uncertainty in 2017 when the Trump Administration announced and pursued a ban on transgender military service, the current ban again threatens my career and the life that I have built, causing me significant distress and hardship, both personally and professionally.

22. Serving in the United States Air Force has been my career and way of life for the past thirteen years.  This ban threatens to end my military career, which I love and cherish, based solely on a characteristic that has nothing to do with my ability to serve effectively. I intend to serve this country for at least seven more years, until I reach retirement eligibility, and would like to continue serving thereafter.  If I were to be separated from service now, I would be deprived of this opportunity, separate prior to the end of my current service commitment, leave a gap in my Air Force specialty which currently offers a reenlistment bonus due to a personnel shortage, and be forced to start over in a different field.

23.  Losing my career brings with it the loss of my financial stability and benefits.  The ban would strip me of my income and my healthcare, which my spouse and I both rely on.  It would also deprive me of my retirement plan, which currently provides me with a pension

(Page 282 of Total)

and other benefits after twenty years of service. If I am forced to separate after thirteen years of honorably serving my country, I will receive nothing.

24. Finally, for the second time, my dignity, service to this nation, and accomplishments are all being denigrated by a ban on military service by transgender individuals. This ban seeks to demean my sacrifices, my achievements, and my contributions as a military service member. The new executive order claims that who I am as a person conflicts with my "commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life," that my truth is a "falsehood," and that being transgender is "not consistent with the humility and selflessness required of a service member." This insults the service and sacrifices of myself and thousands upon thousands of current, past, and future transgender service members and sends a message that I am not valued, not trusted, and not welcome in the military.

25. Even though I am proud to be a transgender service member, it is not my entire identity and has not even been a topic of conversation during my last few assignments. I am proud of who I am, and of what I have done and can do for my country. I am proud to serve alongside other brave and dedicated service members, who judge me by my character and my competence, not by my transgender status.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 02, 2025

Jamie Hash

Case 1:25-cv-00240-ACR   Document 72-31   Filed 03/07/25   Page 1 of 3
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 284 of 688
Case 1:25-cv-00240-ACR   Document 48-22   Filed 02/14/25   Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>Defendants. | Civil Action No. 1:25-cv-00240 |

**SUPPLEMENTAL DECLARATION OF JAMIE HASH**

I, Jamie Hash, declare as follows:

1. I write this declaration to supplement the declaration I signed February 2, 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on February 3, 2025. *See* ECF No. 13-37.

2. As outlined in my first declaration, my transgender status has been known to my fellow service members since 2016. Since my gender marker was changed in the Defense Enrollment Eligibility Reporting System (DEERS), I have served as a woman in the Air Force.

3.  As a transgender woman, I am required to adhere to all standards applicable to service members identified with an "F" gender marker in DEERS. This includes living with women and using women's sleeping, changing and bathing facilities. It includes being referred to as a woman, as well as the use of honorifics such as "Ma'am" where appropriate. If I cannot serve as a woman in the military, I cannot serve at all.

4.  It is not possible for me to serve in the military as a man. Having completed my transition, I look like a woman. I have used women's facilities since my transition without incident. It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's bunks, or otherwise access sex-segregated facilities for men.

5.  Giving me the "choice" to serve as a man or not serve at all is not a choice. The Executive Order (EO) places me in an impossible position.

6.  In addition, the EO makes it impossible for me to be truly effective in my current role. The EO brands me and all transgender service members as dishonest, dishonorable, and undisciplined. This runs completely contrary to the virtues of integrity, service before self, excellence in all I do, honor, and discipline that I have sought to embody in my service every day for the last nearly 14 years. Although my immediate supervisors and peers continue to respect and support me, the order has eroded other people's perceptions of my integrity and worth.

7.  My efforts to craft legislation that improves national security and quality of life for our armed forces are seriously impeded for so long as the nation's Commander-in-Chief has labeled me as promoting a "falsehood" that goes to the core of who I am and stated that I "cannot satisfy the rigorous standards necessary for military service."

8.  After I finish this year working on Capitol Hill, I am scheduled to begin an 18-month utilization tour at either the Office of the Secretary of Defense, or Air Force, for Legislative Affairs. The EO will impact my ability to be effective in that role because I will be forced to work day-in and day-out with the appointees who are charged with implementing the EO.

9.  The EO creates an unnecessary burden for me, requiring me to overcome the presumption that I am disloyal, unequal, and unfit to serve. I want to be judged based on my merit, experience, and contributions, not on the fact that I am transgender. I want to put all of my effort into serving my country, not into rebutting a presidential order that marks me as inferior.

10. Finally, based upon my current rank and my history of promotions, I am on a path to be promoted to Chief Master Sergeant (i.e., E-9) before I complete 20 years of service—this rank is only held for the top 1% of the enlisted forces, which is mandated by law. This EO creates additional hurdles for my career progression solely because I am transgender.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 13, 2025

Jamie Hash

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                )
                                         )
          Plaintiffs,                    )
                                         )
v.                                       )          Civil Action No. 1:25-cv-00240
                                         )
UNITED STATES OF AMERICA *et al.*,       )
                                         )
          Defendants.                    )
_____  )

### SECOND SUPPLEMENTAL DECLARATION OF JAMIE HASH

I, Jamie Hash, declare as follows:

1.      I write this declaration to supplement (a) the declaration I signed on February 2, 2025, which was filed on February 3, 2025, ECF No. 13-37, and (b) the supplemental declaration I signed on February 13, 2025, ECF No. 48-22, which was filed on February 14, 2025, both of which were submitted in support of Plaintiffs' motion for preliminary injunction in this matter.

2.      My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is female.

3.      I serve in the U.S. Air Force as a woman.

4.      I meet all standards applicable to female service members. I adhere to female grooming standards, live in women's berthing units, and use women's changing and bathing facilities. Others refer to me as a woman, including using honorifics such as "Ma'am."

5.      My command has supported my service and assured me that, from their perspective, my being a transgender woman will have no negative impact on my ability to continue serving.

6.      It is not possible for me to serve in the military as a man, which I am not. I am a woman, look like a woman, and have used women's facilities since my transition without incident.

1

JA275

It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.

7.      If others were required to refer to me by male pronouns or address me as "Sir," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

8.      I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with men, since I am a woman.

9.      If I cannot serve as a woman in the military, I cannot serve at all.


[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March  01  , 2025

Jamie Hash

**3**

Case 1:25-cv-00240-ACR     Document 72-33     Filed 03/07/25     Page 1 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 290 of 688

Case 1:25-cv-00240-ACR     Document 13-38     Filed 02/03/25     Page 1 of 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE            )
COLE, GORDON HERRERO, DANY                     )
DANRIDGE, JAMIE HASH, KODA NATURE,             )
and CAEL NEARY,                                )
                                               )
            Plaintiffs,                        )
                                               )
v.                                             )
                                               )
DONALD J. TRUMP, in his official capacity as   )
President of the United States; the UNITED     )
STATES OF AMERICA; PETER B. HEGSETH,           )     Civil Action No. 1:25-cv-00240
in his official capacity as Secretary of Defense; )
MARK AVERILL, in his official capacity as      )
Acting Secretary of the Army; the UNITED       )
STATES DEPARTMENT OF THE ARMY;                 )
TERENCE EMMERT, in his official capacity as    )
Acting Secretary of the Navy; the UNITED       )
STATES DEPARTMENT OF THE NAVY;                 )
GARY ASHWORTH, in his official capacity as     )
Acting Secretary of the Air Force; the UNITED  )
STATES DEPARTMENT OF THE AIR FORCE;            )
TELITA CROSLAND, in her official capacity as   )
Director of the Defense Health Agency; and the )
DEFENSE HEALTH AGENCY,                         )
                                               )
            Defendants.                        )
_____

## DECLARATION OF KODA NATURE

I, Koda Nature, declare as follows:

1. I am twenty-three years old and live in Mesquite, Texas. I have been actively trying to join

   the military since 2020. I am transgender.

## BACKGROUND AND ATTEMPTS TO JOIN THE MILITARY

2. Since I was five years old, I have wanted to join the military. I grew up in a military family.

   My mother served in the Marines, and my late brother and uncles served in various

positions in the Army and Air Force.  I am told that seventeen generations of my family served in the military.  My family's extensive military history has ingrained in me a deep recognition of the pride and honor associated with military service.

3. Despite my strong desire to serve in the military, my mother tried to discourage me from doing so because she was afraid I would experience discrimination because I am transgender.  Nevertheless, my brother encouraged me serve without fear while being the best man I can be.  When my brother passed away in 2008, my desire to serve took on new meaning and strengthened.

4. My goal today is to serve my country honorably in the United States Marine Corps.  I want to serve because I made a promise to my brother that I would serve while being true to myself, and I intend to honor that promise.  And I want to serve so I can prove to myself and others that I am capable of being a Marine, redefining what people believe to be an acceptable and capable member of the Armed Forces in the process.

5. I have been actively trying to join the Marines since I graduated high school in 2020.  While I have waited for the opportunity to enlist, I have started my own freelance graphic design business, which I have run for the past two-and-a-half years.

6. In 2024, I found a recruiter for the Marines who has been working with me to help me enlist.  With the assistance of this recruiter, I began the process of filling out standard enlistment paperwork.  I also made plans with my recruiter to book an appointment to meet with the regional Military Entrance Processing Station ("MEPS") in the coming year.

7. In the meantime, I continued to do physical training sessions with my recruiter and prepared for the initial strength test, which I will need to pass to be accepted into bootcamp.

8.  Recently, on January 23, 2025, my recruiter informed me that he was instructed by military command that he could no longer assist transgender people with enlisting.

**TRANSGENDER STATUS**

9.  I knew that I was transgender before I even knew the word.  Growing up, I played and acted like a boy.  When I was 15, I started dressing like a boy and using my male pronouns. I realized about six months later that there was a term for how I felt in my body— transgender.

10. I medically transitioned in 2020 and have been on hormone therapy since that time.

11. In November 2024, I was diagnosed with gender dysphoria by a medical professional.

**IMPACT OF BAN**

12. I have been dedicated to carrying on my family's legacy and serving my country honorably despite the fluctuations in military policy regarding service by transgender people since I first began seeking to enlist in 2020.  These fluctuations have caused me great uncertainty in my life and career path.

13. When President Biden announced that transgender people would be permitted to serve in the military in 2021, I was excited that I would be able to achieve my dream of serving. Nevertheless, I have faced adversity in trying to enlist due to the stigma towards transgender people, a stigma that has been reinforced by the Trump Administration's repeated bans on service by transgender people.

14. Just when I found a recruiter who was willing to help me and began getting close to completing the necessary steps to enlisting, my recruiter informed me that he can no longer assist me with enlisting because of the ban on military service by transgender people that the Trump Administration would soon be enacting.  Shortly thereafter, President Trump

3

issued an executive order on January 27, 2025, declaring that transgender people would no longer be permitted to serve.

15. Finding out about this ban made me frustrated and angry, because for the second time my existence has been placed up for political debate. I feel that I am being discriminated against and devalued for something that has nothing to do with my ability or performance. And I feel that I am being denied the opportunity to serve my country and follow in my family's footsteps. But most of all, I feel a renewed sense of dedication to fight these arbitrary boundaries so I can serve my country. Despite this Administration's attempts to prevent me from serving, I am determined to one day wear the uniform.

16. I am living in a state of uncertainty because I have not been able to obtain any assurances from my former recruiter or the military about my future ability to enlist and serve. I am very concerned that I will not be permitted to join the military.

17. I will lose many things if the President's ban prevents me from serving or enlisting. First and foremost, I will lose the opportunity to fulfill my lifelong dream and duty of serving in the military. I will lose the chance to be part of a team, a family, and a tradition that I respect and admire. I will lose the chance to contribute to the defense and security of my country and to make a positive difference in the world.

18. I will also lose educational and career opportunities. Because I have been seeking to enlist since I graduated high school, I have foregone pursuing a higher education in the hopes that I would obtain the training and education that the military provides. I wish to use this training and education to better myself and give back to my community. I have also foregone the opportunity to develop other skills or pursue other careers as I have spent the

last four-and-a-half years dedicated to enlisting.  In my mind, there is no other option, and there is no backup plan—I am going to serve.

19. The President's ban has also affected the way I view my place in society.  While I still see myself standing in uniform someday, this ban makes me question whether I will ever be afforded the level of respect and dignity afforded to cisgender service members.

20. I want to serve in the military because I love my country and I want to serve it with honor and pride.  I want to serve in the military because I have the skills, the dedication, and the courage to do so.  I want to serve in the military because it is my dream and my duty.  I do not want to be denied that opportunity because of who I am.

21. If the ban were lifted today, I would immediately continue my efforts to enlist.  Serving in the Marines remains my goal and my dream.  I will not give up this dream and my desire to follow in the footsteps of multiple generations of my family by serving my country.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:  02/03/2025

_Koda Nature_

Koda Nature

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                          )
                                                   )
    Plaintiffs,                 )
                                                   )
v.                                                 )    Civil Action No. 1:25-cv-00240
                                                   )
UNITED STATES OF AMERICA *et al.*,                 )
                                                   )
    Defendants.                 )
_____           )

## SUPPLEMENTAL DECLARATION OF KODA NATURE

I, Koda Nature, declare as follows:

1.    I write this declaration to supplement the declaration I signed on February 3, 2025, which was filed on February 3, 2025, in support of the Motion for Preliminary Injunction in this matter. *See* ECF No. 13-38.

2.    I am a transgender man. I have been on hormone therapy to be and lived as a man for over four years.

3.    I was diagnosed with gender dysphoria in November 2024.

4.    The U.S. Marines determined that I met the enlistment requirement of being stable in the male sex for over 18 months.

5.    As stated in my previous declaration, I wish to enlist in the U.S. Marines.

6.    It would not be possible for me to join the military as a woman, which I am not. I am a man, look like a man, and will be perceived to be a man when I use sex-segregated facilities.

7.    It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

1

8.     If others were required to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

9.     If I cannot join the military as a man, I cannot serve at all.

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March __2__, 2025

*Koda Nature*
_____
Koda Nature

3

Case 1:25-cv-00240-ACR   Document 72-35   Filed 03/07/25   Page 1 of 5
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 298 of 688

Case 1:25-cv-00240-ACR   Document 13-39   Filed 02/03/25   Page 1 of 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | Civil Action No. 1:25-cv-00240 |

## DECLARATION OF CAEL NEARY

I, Cael Neary, declare as follows:

1. I am thirty years old and live with my wife in Appleton, Wisconsin. I have wanted to join
   the military for at least half my life, and I have been actively working with a recruiter to
   enlist. I am transgender.

Case 1:25-cv-00240-ACR    Document 72-35    Filed 03/07/25    Page 2 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 299 of 688

Case 1:25-cv-00240-ACR    Document 13-39    Filed 02/03/25    Page 2 of 5

**BACKGROUND AND ATTEMPTS TO JOIN THE MILITARY**

2. I have always been interested in history and learning about the honorable service of those who have served this Nation since its inception. I first began thinking about serving when I was a teenager in high school, when I was inspired by stories about my family members' military service—particularly that of my grandfather serving in World War II. Since then, I have held a strong sense of patriotism and desire to serve my country.

3. I considered joining the military right after high school, but I decided to first go to college and earn a degree, in part, because transgender people were not then allowed to serve in the military. I earned a degree in fine art, and later another degree in web development. I have since worked in various jobs, including as a as a bakery manager, a freelance muralist and graphic designer, as well as a retail sales specialist. However, none of these jobs fulfilled me and I continued to hold onto my desire to serve my country.

4. After graduating from college in 2017, I decided to take steps towards enlisting and began seeking a recruiter. It was then that I learned that President Trump had issued a ban prohibiting transgender individuals from acceding into the military.

5. Because of this ban, I had to put my plans to enlist on hold. This ban made me feel shocked and angry. I felt that the President was betraying and dismissing thousands of loyal and dedicated service members based on ignorance and prejudice. And I felt that I was being discriminated against and devalued for something that has nothing to do with my ability or performance.

6. Because I was denied the opportunity to serve, I continued working as a bakery manager before going back to school for web development and design. Throughout the duration of the COVID-19 pandemic, I also cared for my partner while she underwent treatment for

2

Case 1:25-cv-00240-ACR     Document 72-35     Filed 03/07/25     Page 3 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 300 of 688

Case 1:25-cv-00240-ACR     Document 13-39     Filed 02/03/25     Page 3 of 5

multiple cancers. Despite these challenges, my desire to serve never subsided. I want to join the military to challenge myself and learn new skills, to uplift those with whom I would serve, and to contribute to the national security and defense of the United States. I want to travel and experience different cultures and places. And I want to be part of something bigger than myself, and to make a difference in the world.

7. After President Biden lifted the Trump Administration's ban and permitted transgender people to serve, and after my partner was sufficiently recovered from her cancer treatments, I revisited my plan to serve in 2024. At the age of thirty, I felt it was now or never.

8. In June 2024, I began speaking with an Air Force Recruiter and, with the assistance of that recruiter, started filling out the standard enlistment paperwork. I attended an appointment with the regional Military Entrance Processing Station (MEPS) in September 2024.

9. I have since decided to switch from the Air Force to the Army, because I felt that it would offer me a broader range of opportunities, as well as a better fit for my personality and goals. With the education, life experience, and perspective I now have at the age of thirty, I believe that I would best be of service to my future fellow service members and to my country as an officer. To that end, I am now pursuing an application to the Army's Officer Candidate School.

**TRANSGENDER STATUS**

10. I realized that I was transgender when I was about fifteen or sixteen years old. Unfortunately, at that time, I did not have strong family support. Nevertheless, I began to socially transition through the latter half of high school and early college years.

3

Case 1:25-cv-00240-ACR    Document 72-35    Filed 03/07/25    Page 4 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 301 of 688

Case 1:25-cv-00240-ACR    Document 13-39    Filed 02/03/25    Page 3 of 5

11. Around 2014, when I was about nineteen years old, I was diagnosed with gender dysphoria and began to medically transition. I began hormone therapy and had chest reconstruction surgery.

12. My transition has been a positive and liberating experience for me. I feel more comfortable and confident in my own skin, and more authentic and honest in my interactions with others. I no longer suffer from gender dysphoria, and I am happier and healthier than ever.

## IMPACT OF BAN

13. Despite the repeated changes in military policy towards transgender people, I remain committed to serving my country honorably. Nevertheless, the repeated bans on service by transgender people, which have been enacted both times I have taken serious steps towards enlisting, have negatively impacted my ability to plan for the future and fulfill the dream I have held since high school.

14. The ban on military service by transgender people has caused me significant distress and hardship, both personally and professionally. If this ban goes into effect, I will be prevented indefinitely from pursuing my chosen career path. I have wanted to join the military for half of my life, and I have put in hours of hard work and training to prepare myself to do so. The ban would deprive me of this opportunity, and force me to settle for a different and less satisfying career path.

15. The ban would also deprive me of the opportunity to obtain the benefits military service provides. I currently earn a modest salary as a senior retail sales specialist. I hope to join the Army and earn a steady salary and receive various allowances and incentives for my service. I also hope to have access to health care, education, housing, and other benefits that would help me and my family live comfortably and securely.

4

16. Finally, the ban threatens to demean my identity, my skills, and my potential to contribute to my country through military service. It sends a message that I am not valued, not trusted, and not welcome in the military. And it exposes me to discrimination, harassment, and violence from those who do not respect or understand me by sending a message, straight from the President himself, that transgender people are less than.

17. I am proud to be a transgender person who wants to serve in the military. I am proud of who I am, and of what I can do and will do for my country. If the ban were lifted today, I would immediately continue my efforts to enlist. Serving in the Army remains my dream.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 02 FEB 24                    _Cael Neary_
                                    Cael Neary

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                    )
                                             )
    Plaintiffs,                   )
                                             )
v.                                           )          Civil Action No. 1:25-cv-00240
                                             )
UNITED STATES OF AMERICA *et al.*,           )
                                             )
    Defendants.                   )
_____        )

### SUPPLEMENTAL DECLARATION OF CAEL NEARY

I, Cael Neary, declare as follows:

1.　　　I write this declaration to supplement the declaration I signed on February 3, 2025, which was filed on February 3, 2025, in support of the Motion for Preliminary Injunction in this matter. *See* ECF No. 13-38.

2.　　　I am a transgender man.

3.　　　I was diagnosed with gender dysphoria in 2014.

4.　　　I transitioned over eight years ago to be and live as a man.

5.　　　I am on hormone therapy to enable me to live as a man.

6.　　　As stated in my previous declaration, I wish to enlist in the U.S. Army.

7.　　　The Army determined that I met the enlistment requirement of being stable in the male sex for over 18 months.

8.　　　It would not be possible for me to join the military as a woman, which I am not. I am a man, look like a man, and will be perceived to be a man when I use sex-segregated facilities.

9.　　　It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

1

10.     If others were required to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

11.     If I cannot join the military as a man, I cannot serve at all.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 1st, 2025

Cael Neary

3

Case 1:25-cv-00240-ACR    Document 72-37    Filed 03/07/25    Page 1 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 306 of 688
Case 1:25-cv-00240-ACR    Document 14-5    Filed 02/04/25    Page 1 of 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY,<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:25-cv-00240-ACR |

---

**DECLARATION OF MIRIAM PERELSON**

I, Miriam Perelson, declare as follows:

1. I am a 28-year-old trainee at the Fort Jackson U.S. Army Base in Columbia, South Carolina. I have been undergoing basic training in preparation to serve the United States since January 13, 2025. I am transgender.

**HISTORY OF ACCESSION**

2. I began pursuing a career in the military mid-2022. I worked with a recruiter to complete all necessary steps to enlist in the U.S. Army. I disclosed my transgender status to my recruiter.

Case 1:25-cv-00240-ACR     Document 72-37     Filed 03/07/25     Page 2 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 307 of 688
Case 1:25-cv-00240-ACR     Document 14-5     Filed 02/04/25     Page 2 of 5

3.  I underwent all required medical and psychological assessments and was deemed fit to serve.

4.  I met all qualifications for enlistment and signed a six-year reserve contract with a two-year inactive ready reserve obligation in March 2024.

5.  I signed my contract to serve for the Military Occupational Specialty (MOS) of 35M, Human intelligence collector, a highly specialized position which requires training to high competency in a foreign language.  I signed for Russian because I have a high degree of competency in the Russian language, having studied Russian Language at university.  I have completed all requirements for a Bachelor of Arts in Russian Language from the University of Colorado, Boulder, and am scheduled to graduate in May 2025.

6.  On January 13, 2025, I began basic training at Fort Jackson with an expected graduation date of March 27, 2025.  I completed reception and began combat training on January 17, 2025.

## THREATENED SEPARATION FROM THE ARMY

7.  In the evening of Friday, January 31, 2025, my Senior Noncommissioned Officer (NCO), First Sergeant Green came to me and told me that I could no longer continue basic training in the female living bays or use female latrines.

8.  The following day, Saturday, February 1, 2025, First Sergeant Green and Captain Swain presented me with a Developmental Counseling Form (Form).  A true and accurate copy of this form is attached to this declaration as **Exhibit 1**.

9.  The Form indicates that its purpose is "to inform [me] of policy changes regarding [my] living accommodations."   Specifically, the form states that, in order to implement "[t]he President's Executive Order entitled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government . . . and subsequent guidance from the

- 2 -

Case 1:25-cv-00240-ACR     Document 72-37     Filed 03/07/25     Page 3 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 308 of 688
Case 1:25-cv-00240-ACR     Document 14-5     Filed 02/04/25     Page 3 of 5

Office of Personnel Management," as of 5:00pm on January 31, 2025, I am required to "reside in male living bays, utilize male latrines, and be partnered with a male battle buddy . . . ."

10. The form required me to initial one of two options: "Yes, I am willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy," or "No, I am not willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy."

11. The Form further states that, if I am not willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy, "the Command will initiate administrative separation from the U.S. Army under Chapter 11 of Army Regulation 635-200."

12. I requested and was provided a brief opportunity to consult with my family and with an Army Chaplain.

13. For the evenings of Friday, January 31, Saturday, February 1, and Sunday, February 2, 2025, I was required to leave the female bay where I had been housed until that point in basic training. For those three nights, I was provided with a cot in an empty classroom to sleep on. I was forbidden from using female latrines and bathing facilities during that time.

14. On both Sunday, February 2, and Monday, February 3, 2025, I spoke with Captain Swain and informed him that I would not select either option or sign the Form. On Monday, February 3, 2025, Captain Swain told me that Command would immediately begin my separation from the U.S. Army.

15. I am currently staying in a private apartment while Command completes the process to administratively separate me from the Army.

(Page 308 of Total)

Case 1:25-cv-00240-ACR     Document 72-37     Filed 03/07/25     Page 4 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 309 of 688
Case 1:25-cv-00240-ACR     Document 14-5     Filed 02/04/25     Page 4 of 5

**IMPACT OF THE BAN**

16. I joined the U.S. Army because I love my country and believed that my knowledge of Russian language and culture would be of great benefit due to the importance of the country of Russia on the world stage.

17. I planned much of my life and career around military service.  I relocated from my home in Colorado to undergo basic training in South Carolina.  I anticipate undergoing an additional year of linguistic training approximately six months of an advanced individual training course before beginning my service as a Human Intelligence Collector.

18. If I am not able to complete my basic training, not only will all of my plans for a career in the Army fall through, but the Army will lose access to the years of language training that I am prepared to put into service for my country.

19. I do not want to lose the opportunity to pursue a patriotic career that I am capable and willing to devote myself to because I am transgender.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 3, 2025

Miriam Rebekah (Feb 3, 2025 20:00 EST)

Miriam Perelson

# Active_150142725_1_Talbott v. Trump - Declaration of Miriam Perelson

**Final Audit Report**                                          2025-02-04

| | |
|---|---|
| Created: | 2025-02-04 |
| By: | Michael Haley (mhaley@glad.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAADizpPEI8uv--m_IjPFrpTPy56RE9W2Mi |

## "Active_150142725_1_Talbott v. Trump - Declaration of Miriam Perelson" History

Document created by Michael Haley (mhaley@glad.org)
2025-02-04 - 0:56:24 AM GMT

Document emailed to Miriam Rebekah (mimperelson@gmail.com) for signature
2025-02-04 - 0:56:55 AM GMT

Email viewed by Miriam Rebekah (mimperelson@gmail.com)
2025-02-04 - 0:58:19 AM GMT

Document e-signed by Miriam Rebekah (mimperelson@gmail.com)
Signature Date: 2025-02-04 - 1:00:01 AM GMT - Time Source: server

Agreement completed.
2025-02-04 - 1:00:01 AM GMT

**Adobe Acrobat Sign**

Case 1:25-cv-00240-ACR    Document 72-38    Filed 03/07/25    Page 1 of 10
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 311 of 688
Case 1:25-cv-00240-ACR    Document 48-24    Filed 02/14/25    Page 1 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,

    Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,

    Defendants.

Civil Action No. 1:25-cv-00240

SUPPLEMENTAL DECLARATION OF MIRIAM PERELSON

I, Miriam Perelson, declare as follows:

1. I am a 28-year-old trainee at the Fort Jackson U.S. Army Base in Columbia, South Carolina. I have been undergoing basic training in preparation to serve the United States since January 13, 2025. I am transgender.

2. As explained in my February 4, 2025, declaration in this matter, *see* ECF No. 14-5, in the evening of Friday, January 31, 2025, I was separated from the female unit I had been training with. I was initially required to sleep on a cot in an empty classroom and to use male latrines and bathing facilities. Later, I was moved to a single-occupancy apartment, still separated from my female unit.

3. On February 6, I was informed by my attorney that DOD had agreed, through counsel, to return me to my female living bay. However, this did not happen. I spent the night of February 6 and February 7 still living apart from my unit.

4. On February 8, I was returned to my female living bay in Delta Company and resumed training as normal with my female unit.

5. On February 10 at approximately 5:00 pm, I was told that I was being transferred to another company. I was given no explanation but was moved to from the Delta Company living bays to the Bravo Company living bays after dinner that night.

6. On February 11 at approximately 11:00 am, I was called into a meeting in the office of Colonel Uthlaut, who informed me that formal complaints of sexual harassment had been filed against me. Among those present were Battalion Command Sergeant Major Byler, Lieutenant Commander Baker, Captain Donovan Swain, Staff Sergeant Rezabala and the command team of the company I had been transferred to. At that meeting, I was informed that a sexual misconduct investigation had been opened into me.

7. Later that afternoon, at around 2:00 pm, Captain Swain presented me with two counseling forms. One informed me that I would be transferred from my current Delta Company to Bravo Company. The other informed me that an investigation into my conduct was being initiated. True and accurate copies of these counseling forms are attached hereto as **EXHIBIT A**.

8. In that meeting, I was not informed of the nature of the harassment I had allegedly committed, nor was I informed of the identities of my accusers.

9. The dates on which the alleged harassment occurred began on the date that the Executive Order was issued. I was not living in the female living bays for eight of the fifteen days when I allegedly harassed someone in Delta Company.

10. On February 13, First Sergeant Donovan of Bravo Company informed me that Captain Swain would be by later to see me with a counseling he had to give me. Captain Swain approached me on the shooting range while I was doing weapons qualification. He presented me with two forms that he did not allow me to keep. One of the forms identified the nature of my alleged harassment as "indecent viewing" and that the alleged location was the Delta Company female bay.

11. Captain Swain told me that Colonel Uthlaut's investigation was closed because he was transferring the case to Military Police Investigators.

12. I have never sexually harassed anyone and do not know what the bases for these allegations is. I have not been told who my accusers are or what "indecent viewing" I allegedly committed.

13. I believe that I am being investigated for no reason other than that I am a transgender woman who lived and shared lavatories and bathing facilities with the other women of Delta Company.

14. I believe that these complaints have been filed against me to harass me and to retaliate against me for asserting my rights to train and serve as a woman.

15. Serving in the military as a woman means meeting all of the standards for women serving. This includes living with women and using women's sleeping, changing and bathing facilities. It includes being referred to as a woman, as well as the use of honorifics such as "Ma'am" where appropriate. If I cannot serve as a woman in the military, I cannot serve at all.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 13, 2025

Miriam Rebekah (Feb 13, 2025 19:10 EST)

Miriam Rebekah Perelson

# EXHIBIT A

## DEVELOPMENTAL COUNSELING FORM
For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

### PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | 5 USC 301, Departmental Regulations, 10 USC 3013, Secretary of the Army |
| **PRINCIPAL PURPOSE:** | These records are created and maintained to manage the member's Army and Army National Guard service effectively, to document historically a member's military service and safeguard the rights of the member and the Army. |
| **NOTE:** | For additional information, see the System of Records Notice A0600-8-104b AHRC, https://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570051/a0600-8-104b-ahrc/ |
| **ROUTINE USE(S):** | There are no specific routine uses anticipated for this form; however, it may be subject to a number of proper and necessary routine uses identified in the system of records notice specified in the purpose statement above. |
| **DISCLOSURE:** | Disclosure is voluntary. |

### PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| PERELSON MIRIAM R | E-3 | 11-Feb-2025 |
| Organization | Name and Title of Counselor | |
| Delta Company, 4th Battalion, 39th INF REG | CPT Swain, Donovan Company Commander | |

### PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** (Leader states the reason for the counseling, e.g. Performance/Professional/Event-Oriented counseling, and include the leader's facts and observations prior to the counseling.)

Approach: [ ] Non Directive    [ ] Combined    [ ] Directive

Type of Counseling: [✓] General Form    [ ] Professional Growth    [ ] Performance    [ ] Event Oriented

Event Oriented - Rehabilitative Transfer

### PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points Discussion:**

Trainee Perelson, due to a formal complaint being filed of alleged sexual harassment while in Delta Company. You have been immediately transfered to Bravo Company 4-39 female bay to continue your stay and training. While in Bravo Company refrain from making or putting yourself in a compromising situation due to the nature of the allegations alleged so far. This move is for your benefit and not meant as punishment, but as a chance to start fresh as the outcomes are being investigated. Failure to remain committed to your goal or cooperate with your current command, drill sergeants and peers could lead to punishment under Article 15, UCMJ, court-martial, or adverse action.

In addition to being counseled on the issues above, he/she received counseling on the following: (1) that behavior for which he/she has been counseled may result in punishment under Article 15, UCMJ, court-martial, or adverse action such as bar of reenlistment, suspension of favorable actions (promotion, retention, schools), or other appropriate administrative sanctions; (2) that if this behavior continues, separation under the provisions of AR 635-200 may be initiated; (3) that if separated prior to ETS, that he/she could receive an honorable, general, or other than honorable discharge for the current term of service, or the term of service would be uncharacterized if less than 180 days had been served on active duty; (4) the basis of each characterization of service, the discharge certificates received for each, and the character of service would become part of a permanent record which may be provided to any Federal agency if they were to apply for other federal employment or security clearance; (5) the possible effects that each type of discharge would have on reenlistment, civilian employment, veteran benefits, and related matters; (6) that a general discharge would cause loss of civil service retirement credit; (7) that other than honorable discharge would result in reduction to the lowest rank, loss of payment of accrued leave, and loss of all benefits administered by the Veterans Administration and other federal and state agencies; (8) that separation prior to ETS may preclude enlistment in any component of the Armed Forces; (9) that separation prior to ETS may cause loss of entitlement to education benefits and money paid into the Army College Fund; (10) that separation prior to ETS may require repayment of any unearned bonus received for enlistment or reenlistment; (11) that it is unlikely that any attempt to have the characterization of service upgraded would be successful; (12) that he/she is encouraged to make every reasonable effort to ensure his/her performance and conduct meet military standards; (13) that he/she will be given a reasonable chance to bring substandard performance and conduct to acceptable military standards. there are agencies to which you may apply to have your characterization of service changed, it is unlikely that such application will be successful.

M P (Soldier's initials)

### OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, MAR 2023**
PREVIOUS EDITIONS ARE OBSOLETE.

APD AEM v1.01ES    Page 1 of 3

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below).*

While this action is being investigated you will:

1. Conduct yourself in a military manner. *MP* int.

2. Cooperate fully with your Drill Sergeants and all other Cadre members. *MP* int.

3. Comply with all lawful orders. *MP* int.

4. Refrain from any conduct or statements which may be detrimental to the motivation and discipline of your fellow soldiers. *MP* int.

5. You will continue to train until further notice. *MP* int.

Failure to comply with this directive will result in punishment under the UCMJ.

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees / disagrees and provides remarks if appropriate.)*

Individual counseled: [X] I agree   [ ] disagree with the information above.

Individual counseled remarks:

I Have not done anything to anyone.

| Signature of Individual Counseled: | DATE (YYYYMMDD): |
|---|---|
| M...  P... | 20250211 |

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

| Signature of Counselor: | Date (YYYYMMDD): |
|---|---|
| | 20250211 |

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

**SIGNATURES**

Note: Both the counselor and the individual counseled should retain a record of the counseling.

DA FORM 4856, MAR 2023                                APD AEM v1.01ES      Page 2 of 3

( This document is considered Controlled Unclassified Information (CUI) when filled. )

## DEVELOPMENTAL COUNSELING FORM
For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

### PRIVACY ACT STATEMENT

**AUTHORITY:** 5 USC 301, Departmental Regulations, 10 USC 3013, Secretary of the Army.

**PRINCIPAL PURPOSE:** These records are created and maintained to manage the member's Army and Army National Guard service effectively, to document historically a member's military service and safeguard the rights of the member and the Army.

**NOTE:** For additional information, see the System of Records Notice A0600-8-1040 AHRC, https://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570331/a0600-8-1040-ahrc/

**ROUTINE USE(S):** There are no specific routine uses anticipated for this form, however, it may be subject to a number of proper and necessary routine uses identified in the system of records notice specified in the purpose statement above.

**DISCLOSURE:** Disclosure is voluntary.

### PART I - ADMINISTRATIVE DATA

| Name (Last, First, MI) | Rank/Grade | Date of Counseling |
|---|---|---|
| PERELSON MIRIAM R. | E-3 | 11-Feb-2025 |

| Organization | Name and Title of Counselor |
|---|---|
| D CO. 4-39INF, 165TH BDE, FORT JACKSON, SC 29207 | CPT SWAIN, DONOVAN L./ COMPANY COMMANDER |

### PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** (Leader states the reason for the counseling, e.g. Performance/Professional/Event Oriented counseling, and include the leader's facts and observations prior to the counseling.)

Approach: ☐ Non Directive  ☐ Combined  ☑ Directive

Type of Counseling: ☑ General Form  ☐ Professional Growth  ☐ Performance  ☐ Event Oriented

Initiation of FLAG
Commanders Investigation of alleged Sexual Harassment

### PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points Discussion:**

Trainee Perelson, you will have a Commanders Investigation flag initiated for allegations of sexual harassments while in D Co 4-39 on or about 27 Jan 2025 to 10 Feb 2025. If this action goes to law enforcement the flag will change to a Law Enforcement Flag "M"
At this time The following will be initiated immediately:
*You will be flagged immediately for Commanders Investigation "L" until the findings and all if any punishment is complete.
General Policy:a. The purpose of a flag is to prevent and/or preclude-
1. Execution of favorable actions to a Soldier who may be in an unlawful status (not in good standing).
2. Movement of a Soldier when it is in the best interest of the Army for the Soldier to remain in his or her current unit or at their current location until cleared of ongoing actions.
3. The effective date of the flag, unless otherwise specified in this regulation, will be the date that the circumstance(s) requiring the flag occurred, not the date the Flag was initiated.

In addition to being counseled on the issues above, he/she received counseling on the following: (1) that behavior for which he/she has been counseled may result in punishment under Article 15, UCMJ, court-martial, or adverse action such as bar of reenlistment, suspension of favorable actions (promotion, retention, schools), or other appropriate administrative sanctions; (2) that if this behavior continues, separation under the provisions of AR 635-200 may be initiated; (3) that if separated prior to ETS, that he/she could receive an honorable, general, or other than honorable discharge for the current term of service, or the term of service would be uncharacterized if less than 180 days had been served on active duty; (4) the basis of each characterization of service, the discharge certificates received for each, and the character of service would become part of a permanent record which may be provided to any Federal agency if they were to apply for either federal employment or security clearance; (5) the possible effects that each type of discharge would have on reenlistment, civilian employment, veteran benefits, and related matters; (6) that a general discharge would cause loss of civil service retirement credit; (7) that other than honorable discharge would result in reduction to the lowest rank, loss of payment of accrued leave, and loss of all benefits administered by the Veterans Administration and other federal and state agencies; (8) that separation prior to ETS may preclude enlistment in any component of the Armed Forces; (9) that separation prior to ETS may cause loss of entitlement to education benefits and money paid into the Army College Fund; (10) that separation prior to ETS may require repayment of any unearned bonus received for enlistment or reenlistment; (11) that it is unlikely that any attempt to have the characterization of service upgraded would be successful; (12) that he/she is encouraged to make every reasonable effort to ensure his/her performance and conduct meet military standards; (13) that he/she will be given a reasonable chance to bring substandard performance and conduct to acceptable military standards.

### OTHER INSTRUCTIONS
This form will be destroyed upon; reassignment (other than rehabilitative transfers), separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

DA FORM 4856, MAR 2023   ( This document is considered Controlled Unclassified Information (CUI) when filled. )   Page 1 of 2
PREVIOUS EDITIONS ARE OBSOLETE.

( This document is considered Controlled Unclassified Information (CUI) when filled. )

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below).*

While this action is being investigated you will:

1. Conduct yourself in a military manner. $MP$ int.

2. Cooperate fully with your Drill Sergeants and all other Cadre members. $MP$ int.

3. Comply with all lawful orders. $MP$ int.

4. Refrain from any conduct or statements which may be detrimental to the motivation and discipline of your fellow soldiers. $MP$ int.

5. You will continue to train until further notice. $MP$ int.

Failure to comply with this directive will result in punishment under the UCMJ,.

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees / disagrees and provides remarks if appropriate.)*
Individual counseled: ☒ I agree  ☐ disagree with the information above.

Individual counseled remarks:

*I have not done anything.*

| Signature of Individual Counseled: | DATE *(YYYMMDD)* |
| --- | --- |
| | 220502 11 |

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

| Signature of Counselor: | Date *(YYYMMDD)* |
| --- | --- |
| | 20250211 |

**PART IV - ASSESSMENT OF THE PLAN OF ACTION**

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

| SIGNATURES | | |
| --- | --- | --- |
| Counselor: | Individual Counseled: | Date of Assessment *(YYYMMDD)*: |

**Note:  Both the counselor and the individual counseled should retain a record of the counseling.**

DA FORM 4856, MAR 2023    ( This document is considered Controlled Unclassified Information (CUI) when filled. )    APD AEM v1.00ES    Page 2 of 2

# Supplemental Perelson Declaration

Final Audit Report                                                2025-02-14

| | |
|---|---|
| Created: | 2025-02-14 |
| By: | Michael Haley (mhaley@glad.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA1X29MrNkOViT9_vQOJFO_n20RK27Z45D |

## "Supplemental Perelson Declaration" History

📄 Document created by Michael Haley (mhaley@glad.org)
2025-02-14 - 0:06:38 AM GMT

📧 Document emailed to Miriam Rebekah (mimperelson@gmail.com) for signature
2025-02-14 - 0:07:28 AM GMT

📄 Email viewed by Miriam Rebekah (mimperelson@gmail.com)
2025-02-14 - 0:07:52 AM GMT

✍️ Document e-signed by Miriam Rebekah (mimperelson@gmail.com)
Signature Date: 2025-02-14 - 0:10:06 AM GMT - Time Source: server

✅ Agreement completed.
2025-02-14 - 0:10:06 AM GMT

🅰️ **Adobe Acrobat Sign**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,            )
                                     )
    Plaintiffs,              )
                                     )
v.                                   )        Civil Action No. 1:25-cv-00240
                                     )
UNITED STATES OF AMERICA *et al.*,   )
                                     )
    Defendants.              )
                                     )

**SECOND SUPPLEMENTAL DECLARATION OF MIRIAM PERELSON**

I, Miriam Perelson, declare as follows:

1.       I write this declaration to supplement (a) the declaration I signed on February 3, 2025, which was filed on February 4, 2025, ECF No. 14-5, and (b) the supplemental declaration I signed on February 13, 2025, ECF No. 48-24, which was filed on February 14, 2025, both of which were submitted in support of Plaintiffs' motion for preliminary injunction in this matter.

2.       I was diagnosed with gender dysphoria in or about October of 2015. I have received transition-related health care to live as a woman and have done so for many years. To join the Army, I was required to prove, as part of the enlistment process, that I was stable in the female sex for over 18 months, which I did.

3.       As outlined in my Supplemental Declaration, on February 10, 2025, I was moved from my original training company, Delta Company, to a new company, Bravo Company, after members of Delta Company made allegations of sexual harassment against me.

4.       On February 18, I was training with Bravo Company on the shooting range. At some point, the women who live in my bay, about one half of the women of Bravo Company, were spoken to separately. I later learned that they were asked whether anyone had sexually harassed

1

them in the showers and told how to report such harassment. Although it is my understanding that my name was not mentioned, I was the only person in that living bay not included in the conversation.

5.    When it was time to return to our living bays, the other women of Bravo Company were loaded onto a bus. My drill sergeant told me that I could not get on the bus with the other members of my company. I was transported back separately.

6.    The other women of Bravo company were brought into a classroom. I was the only member of my company not allowed into the classroom. I was told by another member of Bravo company that the Sexual Assault Response Coordinator (SARC) distributed pieces of paper to all of the women in attendance and asked them to write down any sexual harassment allegations they might have. Although I was, again, not mentioned by name, I was the only person not in the room.

7.    After being transferred from Delta Company to Bravo Company, I was so frightened of having false allegations of sexual harassment filed against me that I avoided using the showers. In the time I was at Bravo Company, I only showered once when all of the other women in the company had left for church.

8.    The day following this request by the SARC for allegations, I was told by my company command team that, because there had been additional allegations against me, orders had come down to them that I would be transferred to another company, Alpha Company.

9.    On February 20, I was transferred to Alpha Company, but I was not permitted to live in the female living bays of Alpha Company. Instead, I am currently housed in a separate, private apartment.

10.    I have never sexually harassed anyone. No allegations of sexual harassment were brought against me until after I joined this lawsuit.

2

11.    My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is female.

12.    I serve in the U.S. Army as a woman.

13.    I meet all standards applicable to female service members. I adhere to female grooming standards, live in women's berthing units, and use women's changing and bathing facilities. Others refer to me as a woman.

14.    It is not possible for me to serve in the military as a man, which I am not. I am a woman, look like a woman, and have used women's facilities since my transition without incident. It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.

15.    If others were required to refer to me by male pronouns or address me as "sir," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

16.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with men, since I am a woman.

17.    If I cannot serve as a woman in the military, I cannot serve at all.


[remainder of page intentionally left blank]

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2025

_____

Miriam Perelson

4

Case 1:25-cv-00240-ACR    Document 72-40    Filed 03/07/25    Page 1 of 4
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 325 of 688
Case 1:25-cv-00240-ACR    Document 48-1    Filed 02/14/25    Page 1 of 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>Defendants. | Civil Action No. 1:25-cv-00240 |

## DECLARATION OF MINERVA BETTIS

I, Minerva Bettis, declare as follows:

1. I am a Major, Rank O-4, in the U.S. Air Force on active duty, stationed at Nellis Air Force Base in Nevada. I serve as an intelligence analyst and weapons officer. I am a transgender woman.

### History of Service

2. I studied at the U.S. Air Force Academy beginning in 2010. I graduated from the Academy and started active duty as an officer in 2014. Throughout my career in the Air Force, I have been an intelligence analyst.

3. Throughout my career, I have been stationed in Alaska, Colorado, South Korea, Qatar, and Nevada. Since graduating from the USAF Weapons School in 2018, I have been a weapons officer. The joint force relies on weapons officers to be instructors, tacticians, and integrators. Since arriving at Nellis Air Force Base two and a half years ago, I have been instructing at the Weapons School. In my current position, I train others how to be weapons officers and Non-Commissioned Officers (NCO) so that they then become instructors in the field.

4. In my time in the service, I have received an Air and Space Achievement Medal, two Air and Space Commendation medals, and a Meritorious Service Medal. I was twice ranked first in Company Grade officer stratifications on my performance reports Throughout my career, I typically ranked in the top third of performers.

5. I received a gender dysphoria diagnosis in August of 2022 and began to medically transition in 2023. I started hormone therapy in January of 2023.

6. My command has consistently been supportive of me and my transition. Although they have not always known how to talk to me about my being transgender, they have always tried to be respectful.

7. Part of my care plan is medically necessary facial feminization surgery (FFS). To me, this surgery is not only about feeling comfortable in my body. I also see it as important to my safety as a transgender woman. Transgender women like me are at risk of being targeted for violence and harassment because we are transgender. I have personally experienced such targeting and harassment. FFS will make it less likely that would-be harassers will perceive me to be a transgender woman and more likely that they will see me as a non-transgender woman. This is not an elective surgery that I think will be nice to have; it is a medically necessary treatment that is vital to my health and safety.

8. It took me nearly two years to get my FFS surgery scheduled. Several times, I had a referral appointment scheduled, but that appointment would be canceled.

9. I was able to get my FFS scheduled for January 13, 2025, at the Naval Medical Center in San Diego. Unfortunately, due to scheduling issues, my appointment needed to be moved to February 11. I asked that my appointment not be moved because I was worried about the potential impact of the incoming administration on my surgery. However, there was no way to keep my original scheduled appointment on January 13.

**Impact of the Ban**

10. On February 5, I received a phone call informing me that the Naval Medical Center was stopping all transition-related surgeries pending further guidance. I was told, in effect, that the hospital was preemptively complying with the Executive Order, even though no Department of Defense guidance on health care had yet been issued.

11. Two days later, defendant Secretary of Defense Hegseth issued his February 7, 2025, Guidance, which stated that "all unscheduled, scheduled, or planned medical procedures

- 2 -

associated with affirming or facilitating a gender transition for Service members are paused."

12. Since then, I have reached out to my providers by phone and text, and have not received any response.

13. With my surgery cancelled, I have had to cancel flights and hotels. But more significantly, I have lost my chance to receive medically necessary surgery that I have waited over two years for.

14. This cancellation places an enormous medical burden on me as well. It devalues my service to this country by denying me medically necessary care solely because I am transgender.

15. I want to serve in the military and be recognized for my skill as an intelligence officer, instructor and leader. I want to receive the same benefits—including medical benefits— that are available to my non-transgender peers.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.


Date: February 13, 2025

Minerva Bettis

(Page 328 of Total)    JA316

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,                    )
                                             )
      Plaintiffs,                           )
                                             )
v.                                           )          Civil Action No. 1:25-cv-00240
                                             )
UNITED STATES OF AMERICA *et al.*,           )
                                             )
      Defendants.                           )
_____   )

**SUPPLEMENTAL DECLARATION OF MINERVA BETTIS**

I, Minerva Bettis, declare as follows:

1.     I write this declaration to supplement the declaration I signed on February 13, 2025, which was filed on February 14, 2025, ECF No. 48-1, in support of Plaintiffs' motion for preliminary injunction in this matter.

2.     I received a diagnosis of gender dysphoria in August 2022.

3.     Since that time, I have been receiving transition-related health care as part of my transition from male to female.

4.     Because my treatment plan is not complete, I am currently serving as a woman under an Exception to Policy (ETP). My gender marker has not yet been updated in DEERS. On March 3, I was informed that, because the US Air Force has rescinded all ETPs, I would be required to adhere to male standards effective immediately. Having lived as a woman and been on hormone therapy for years, it is not possible for me to conform to male standards.

5.     There are no gender-neutral bathrooms in the building where I work. The nearest gender-neutral bathrooms on my base are nearly one mile from my building. With my ETP rescinded, I would be required to use men's bathrooms, which I cannot do, because I am a woman.

1

6.     My command supports my service and has assured me that, from their perspective, my being a transgender woman will have no negative impact on my ability to continue serving.

7.     I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I am currently undergoing gender transition pursuant to my care plan.

8.     If I cannot serve as a woman in the military, I cannot serve at all.

[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 2, 2025

Minerva Bettis

Case 1:25-cv-00240-ACR     Document 72-42     Filed 03/07/25     Page 1 of 3
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 332 of 688
Case 1:25-cv-00240-ACR     Document 48-3     Filed 02/14/25     Page 1 of 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,

        Defendants.

Civil Action No. 1:25-cv-00240

## DECLARATION OF AUDRIE GRAHAM

I, Audrie Graham, declare as follows:

1. I am 27-year-old Petty Officer Third Class, Rank E-4, in the U.S. Navy on active duty at Naval Air Station Oceana, Virginia Beach, Virginia. I have served in the Navy for nearly five years. I am a transgender man.

**History of Service**

2. Prior to enlisting in the Navy, I was a firefighter for approximately five years. In 2020, I lost my job as a firefighter due to the COVID-19 pandemic. I wanted to continue my work

JA320

as a firefighter and thought that by joining the Navy, I could use my skills as a firefighter in service of my country.

3. In the Navy, I was awarded Sailor of the Quarter and once and Sailor of the Week twice.

4. I was diagnosed with gender dysphoria on or about March 24, 2021.

5. As part of my treatment for gender dysphoria, I worked with my providers on a care plan. The plan was ultimately approved in 2023, and I began hormone treatments in or around August of 2023.

6. My treating physicians determined that a double mastectomy was a medically necessary treatment as part of my care plan. After several follow-ups and consultations I received clearance in November 2024 to schedule my appointment for this surgery. It was scheduled for February 5, 2025, at Naval Medical Center in Portsmouth, Virginia.

**Impact of the Ban**

7. On February 5, 2025, my wife and I arrived for my 9:30 am appointment. I changed into a surgical gown and had an IV inserted. I was led to another room to have nerve blockers administered to my chest and shoulders. The surgical team gave me oxygen and hooked me up to equipment to monitor my vital signs. The surgical team then administered a sedative to help with the pain of the nerve blockers.

8. After about 15 minutes, the surgeon came in and began to mark up my chest for the surgery. I was told that the team needed to prepare the operating room, and I would be wheeled in for surgery.

9. For an hour or two, my wife and I were left alone. No one came to talk to us. Finally, our surgeon returned and told us that she had "unfortunate news." She told us that she would not be able to proceed with my surgery because orders had come down under Executive Order 14183, *Prioritizing Military Excellence and Readiness.* She told us that because of this order, Tricare, the military health insurer, would no longer cover my surgery.

10. I had my IV removed and had to change back into my regular clothes and leave the hospital without having received the medically necessary surgery that I had waited over a year for.

11. I want to be able to serve my country on the same terms as any other service member. My treating physicians have all determined that this surgery is medically necessary for my care plan. But I am being denied this care solely because I am transgender.

- 2 -

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 14, 2025

Audrie Graham

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,                    )
                                             )
     Plaintiffs,                            )
                                             )
v.                                           )        Civil Action No. 1:25-cv-00240
                                             )
UNITED STATES OF AMERICA *et al.*,           )
                                             )
     Defendants.                            )
_____             )

**SUPPLEMENTAL DECLARATION OF AUDRIE GRAHAM**

I, Audrie Graham, declare as follows:

1.     I write this declaration to supplement the declaration I signed on February 14, 2025, which was filed on February 14, 2025, ECF No. 48-3, in support of Plaintiffs' motion for preliminary injunction in this matter.

2.     I received a diagnosis of gender dysphoria in March 2021.

3.     Since that time, I have been receiving transition-related health care as part of my transition from female to male.

4.     My command supports my service and has assured me that, from their perspective, my being transgender will have no negative impact on my ability to continue serving.

5.     I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I am currently undergoing gender transition pursuant to my care plan.

6.     If I cannot serve as a man in the military, I cannot serve at all.

[remainder of page intentionally left blank]

1

JA323

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 2, 2025

_____
Audrie Graham

2

Case 1:25-cv-00240-ACR    Document 72-44    Filed 03/07/25    Page 1 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 337 of 688

Case 1:25-cv-00240-ACR    Document 48-16    Filed 02/14/25    Page 1 of 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-00240 |
| Defendants. | ) ) ) | |

## DECLARATION OF ROAN PICKETT

I, Roan Pickett, declare as follows:

1. I am an active duty Staff Sergeant in the US Army stationed in Fort Johnson, Louisiana. I enlisted in the Army on or about October 2012 and currently serve in the Army Criminal Investigations Division. I am a transgender man.

### History of Care

2. In or about November 2016, I received a diagnosis of gender dysphoria and began the process of transitioning in or about February 2017. Part of my treatment plan involved a surgery, which occurred on May 9, 2024.

3. Following that surgery, however, I unfortunately experienced a postoperative complication requiring repair. The repair was scheduled for January 30, 2025, at Cedars Sinai Medical Center in Los Angeles, California.

4. In preparation for this surgery, I received a Defense Travel System (DTS) voucher to cover my travel from Louisiana to Los Angeles. I also received orders for Medical Temporary Duty (Medical TDY) to remain in Los Angeles for a short time following my surgery to recover. Because this was a repair to correct a postoperative complication and not a new treatment, both the DTS and the Medical TDY should have been considered approved in connection with the original surgery.

5. On January 27, 2025, I left Fort Johnson in my personal car to begin the long drive to Los Angeles. I stopped at a friend's house in El Paso, Texas, for the night.

**Impact of the Ban**

6. On January 28, I woke up to a missed call and a text from Mr. Kyle Heinz, the Assistant Special Agent (ASAC) in charge at Fort Johnson, LA, asking me to call him as soon as I could. I returned his call, and he notified me that my DTS voucher was revoked but told me they were still working on getting it approved again. He notified me that I should know that I may or may not get reimbursed for my travel and lodging to California, but I could still go and have my surgery.

7. I did not quite understand but I acknowledged. Due to the current and rapidly changing climate with recent executive orders regarding transgender service members, I did not want to fight about the funding. I just wanted to get this repair done and return to duty. I feared for my career with the potential for a ban on transgender service members, and believed that this could be my only chance in the foreseeable future to get this repair. So, I told him I would continue to drive on to California, even if it was out of my own pocket.

8. That afternoon, around 1:18 pm, I spoke with Department of the Army Criminal Investigative Department (DACID) Behavioral Health Officer, Major Hannah Thomas, LCSW from the Fort Cavazos office, who had been assisting me in coordinating my Medical TDY. I told her what Mr. Heinz had said, and she told me she was working on it. Her tone sounded optimistic. She told me that other Special Agents had been on medical TDY that had been funded by DACID. In the past, she would have to provide the appropriate policies and documentation regarding Medical TDY, and ultimately DACID would fund the Medical TDY IAW existing policy.

9. Later that evening, around 8:00 pm, I was around the middle of Arizona still headed to California when I got another call from Major Hannah Thomas. She told me I would be receiving a call from the Special Agent in Charge (SAC) at the Fort Cavazos office to have a conversation with me that she did not want to have.

10. About 5–10 minutes later, I received a call from SAC Thomas at Fort Cavazos. She stated she was sorry we had to meet this way for the first time as this is not how she would want to meet. She asked me to pull over to talk. So, I pulled into a gas station parking lot. We spoke on the phone for around 35–40 minutes.

- 2 -

11. SAC Thomas stated she had been ordered to give me an order to stop, turn around, and report back to Fort Johnson. She stated that it had came to their attention that my Defense Health Agency (DHA) wavier was expired because I had changed duty stations. She said it had been determined that I needed a new one with my new unit. She did not clarify who had made that determination.

12. I told her I knew that was not accurate information as I had confirmed with DHA several months ago that DHA wavier was still valid for this surgical repair. DHA had notified me that my wavier was valid for 12 months after a procedure for postoperative complications, and I reiterated that the surgery was less than one year ago. I also told her that DHA had notified me that my wavier followed me and that I would not have to redo one when I moved to a new unit. I explained to her that this had nothing to do with gender reassignment surgery, but that this was a repair, and that a new waiver was not required for a repair.

13. She restated that it had come to their attention that I would need a new DHA waiver due to it being expired and because I was at a new unit. She stated that whatever I chose to do, I should know certain actions could have effects.

14. I offered to take personal leave, rather than Medical TDY, but was told that I still needed to return to Fort Johnson without undergoing my surgery.

15. My surgery had been scheduled for 6–7 months, and my chain of command was aware of it. Until I received this series of calls on January 28, at no point had anyone told me that I would need to reschedule my surgery for any duty obligation or other reason.

16. I understood this to mean that I had a choice to obey an order and return to Fort Johnson without the repair or to go on and have my repair but be considered AWOL for having disobeyed a direct order.

17. At that time, TRICARE was still willing to cover my surgery, and my surgeon was still willing to perform it. I was willing to proceed without travel reimbursement, even though I knew that the DHA waiver should still have been valid. But I was being ordered to turn around, return to Fort Johnson, and forgo my surgical repair.

18. This felt like an impossible choice. I had to choose between receiving medically necessary surgery that I knew had been approved or upholding my oath and obeying a direct order.

19. SAC Thomas asked me where I was and how far away I was from Fort Johnson. I told her I was in the middle of Arizona about 1,371 miles away from Fort Johnson. She said, "since you have been driving all night, I suggest you find a hotel and get some sleep and start driving back tomorrow." She asked if it was reasonable for me to report to Fort Johnson on January 31, which was one day after the scheduled surgery.

20. I said, yes it was. I told her that during my almost 12 years of Army service, I have never been in trouble or refused to follow an order. She asked if I was safe, and I said, "yes." She asked if I understood the order, and I said, "yes." She said that I would need to check in with her via text message around 8:00 am the following morning and every four hours to let her know I was continuing back to Fort Johnson.

- 3 -

21. While in Arizona, SAC Thomas received an email from Chief Counsel of DACID, LTC Dan Soeffing, which I was able to obtain, clarifying the order as follows: "The Soldier must return to the place of duty. No surgery." A true and accurate copy of that email is attached to this declaration as **EXHIBIT A**.

22. I understood what my two choices were, although they did not feel like real choices. It felt like whichever I would choose, I would suffer.

23. I leaned into my support network that night. I made a pro and con list, I spoke with my surgeon, and ultimately, I decided I would obey the order and return to Fort Johnson without the medically necessary care. Despite an 8-month waiting list for care, I would work with and hope that Cedars Sinai could reschedule my surgery before my insurance approval expired and hopefully before policy changed.

24. Major Thomas and I spoke again the morning, and I told her I made a choice to obey the direct order and return, hoping for a new surgery date.

25. I have always served honorably and want nothing more than to be treated with the same respect and dignity as any other service member. Being ordered to turn around and not receive this medically necessary care means that I must continue to live with a postoperative surgical complication with no end in sight.

26. I was ordered to turn around not because my care was unnecessary but because it was related to my health care as a transgender person. I want to be recognized for my history of service and achievements as a service member and not treated differently because I am transgender.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 4 -

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 14, 2025

Roan Pickett

Page 342 of 688

Filed: 09/23/2025

Document #2136523

USCA Case #25-5087

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,        )
                                  )
      Plaintiffs,        )
                                    )
v.        )        Civil Action No. 1:25-cv-00240
                                    )
UNITED STATES OF AMERICA *et al.*,        )
                                    )
      Defendants.        )
                                    )

## SUPPLEMENTAL DECLARATION OF ROAN PICKETT

I, Roan Pickett, declare as follows:

1.    I write this declaration to supplement the declaration I signed on February 14, 2025, which was filed on February 14, 2025, in support of the Motion for Preliminary Injunction in this matter. *See* ECF No. 48-16.

2.    I serve in the U.S. Army as a man. Accordingly, I adhere to male grooming standards, live in men's berthing units, and use men's changing and bathing facilities. Others refer to me as a man, including by using honorifics such as "Sir."

3.    My commander has supported my service and assured me that, from his perspective, my being a transgender man will have no impact on my ability to continue serving.

4.    It is not possible for me to serve in the military as a woman, which I am not. I am a man, look like a man, and have used men's facilities since my transition without incident.

5.    It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

1

(Page 342 of Total)

Page 343 of 688

Filed: 09/23/2025

Document #2136523

USCA Case #25-5087

(Page 343 of Total)

6.    If others were required to refer to me by female pronouns or address me by female honorifics such as "Ma'am," it would cause confusion and disruption, and would negatively impact my ability to effectively perform the duties of my job.

7.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with women, since I am a man.

8.    If I cannot serve as a man in the military, I will not be able to serve at all.

[remainder of page intentionally left blank]

2

JA331

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March _3_ , 2025

Roan Pickett

Page 344 of 688

Filed: 09/23/2025

Document #2136523

USCA Case #25-5087

(Page 344 of Total)

3

Case 1:25-cv-00240-ACR    Document 72-46    Filed 03/07/25    Page 1 of 4
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 345 of 688
Case 1:25-cv-00240-ACR    Document 48-18    Filed 02/14/25    Page 1 of 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>Defendants. | Civil Action No. 1:25-cv-00240 |

## DECLARATION OF AMIAH SALE

I, Amiah Sale, declare as follows:

1. I am 38-year-old Master Sergeant, Rank E8, in the U.S. Army on active duty at Fort Riley, Kansas. I have served in the Army for 18 years. I am a transgender woman.

### History of Service

2. I enlisted in the U.S. Army at the age of 20. At the start of my service, I was a radio operator. In the years that followed, I served in a variety of leadership positions ranging from Junior Radio Operator up to Company First Sergeant. I also served as a recruiter for the Army in West Virgina for approximately three years.

3. In my time in the Army, I have been deployed overseas twice: once to Iraq and once to Poland. I am scheduled for a one-year Permanent Change of Station (PCS) to South Korea on March 10, 2025.

4. In my time serving in the Army, I have been awarded two Meritorious Service Medals, seven Army Commendation Medals, and six Army Achievement Medals. I was a distinguished honor graduate from my Army Advanced Leadership course. I am also a member of the Sergeant Audie Murphy Club, a nonprofit organization that recognizes top noncommissioned officers in the U.S. Army.

5. In or about June 2023, I was diagnosed with gender dysphoria by an Army physician.

6. In or about June 2023, I disclosed to my commanding officer that I was transgender and began the process of medically transitioning. I began hormone replacement therapy in or around December 2023. In August of 2024, I completed my transition with the Army and had my gender marker changed to "F" in the Defense Enrollment Eligibility Reporting System (DEERS).

7. In the Fall of 2024, I began the process of seeking an orchiectomy. My care providers, including my primary care manager and endocrinologist agreed that this surgery is medically necessary for me as part of my gender dysphoria treatment.

8. Because this surgery was not available at Fort Riley, I had to schedule it at Madigan Army Medical Center (MAMC) in Tacoma, Washington. I ultimately was able to schedule my surgery for February 21, 2025.

9. I have prepaid for my own transportation to MAMC. I was preapproved to take personal, non-convalescent leave beginning with my surgery date and ending in time for my scheduled PCS to South Korea. Because of the short recovery time for this treatment, and because it would result in no duty-limiting profile, I was able to schedule it so it had no impact on my service schedule.

**Impact of the Ban**

10. On February 10, 2025, less than two weeks before my surgery date, I was told that my surgery was cancelled due to the February 7, 2025, Memorandum from Secretary of Defense Hegseth, which ordered that "[e]ffective immediately, . . . all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused."

11. If my surgery does not proceed on schedule, I will not be able to complete it before I am sent to South Korea for a year. The type of surgery I need cannot be performed at the base where I will be stationed. This sudden cancellation means that for at least a year I will not be able to receive surgery deemed medically necessary by my doctors.

12. I have served in the Army with honor for 18 years. I have made a career of serving this country. I want to be treated the same as any other servicemember who has volunteered to

- 2 -

protect this country. I do not want to be denied medically necessary medical treatment solely because I am transgender.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 13, 2025

Amiah Sale

- 4 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,                    )
                                             )
      Plaintiffs,                      )
                                             )
v.                                           )          Civil Action No. 1:25-cv-00240
                                             )
UNITED STATES OF AMERICA *et al.*,           )
                                             )
      Defendants.                      )
_____     )

**SUPPLEMENTAL DECLARATION OF AMIAH SALE**

I, Amiah Sale, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 13, 2025, which was filed on February 14, 2025, ECF No. 48-18, in support of Plaintiffs' motion for preliminary injunction in this matter.

2.      My gender marker in the Defense Enrollment Eligibility Reporting System (DEERS) is female.

3.      I serve in the U.S. Army as a woman.

4.      I meet all standards applicable to female service members. I adhere to female grooming standards, live in women's berthing units, and use women's changing and bathing facilities. Others refer to me as a woman, including using honorifics such as "Ma'am."

5.      My command has supported my service and assured me that, from their perspective, my being a transgender woman will have no negative impact on my ability to continue serving.

6.      In fact, on December 17, 2024, I was awarded a Meritorious Service Medal. In the Personnel Action Request form that recommended me for that medal, my command specifically noted my accomplishments in serving as a subject matter expert in the care of transgender service

1

JA337

members, as well as the related policies and procedures. A true and accurate copy of this Personnel

Action Request form and my Meritorious Service Medal certificate are attached to this declaration

as **<u>EXHIBIT A</u>**.

7.      It is not possible for me to serve in the military as a man, which I am not. I am a

woman, look like a woman, and have used women's facilities since my transition without incident.

It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's

berthing units, or otherwise access sex-segregated facilities for men.

8.      If others were required to refer to me by male pronouns or address me as "sir," it

would cause confusion and disruption, negatively impacting my ability to effectively perform the

duties of my job.

9.      I am unable to demonstrate that I have never attempted to transition to any sex other

than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am

unable to adhere to the standards associated with men, since I am a woman.

10.      I do not wish to voluntarily separate from the Army. I do not wish to retire early

from the Army. I want to continue to serve my country as a professional soldier. For me, anything

less would be quitting and would go against the Soldier's Creed that I have lived by for the last 18

½ years.

11.      If I cannot serve as a woman in the military, I cannot serve at all.


[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March ____, 2025

Anish Saic



# EXHIBIT A

## PERSONNEL ACTION REQUEST

AUTHORITY: 10 U.S.C. 7013, Secretary of the Army; DA PAM 600-8, Military Human Resources Management Administrative Procedures; this form is subject to the Privacy Act of 1974.

PRINCIPAL PURPOSE(S): To request or record personnel actions for or by Soldiers in accordance with DA PAM 600-8. Notice: Army Personnel System (APS) (July 18, 2019, 84 FR 34373).

For additional information see the System of Records Notice A0600-8-104 AHRC. https://dpcld.defense.gov/Portals/49/Documents/Privacy/SORNs/Army/A006-8-104-AHRC.pdf

ROUTINE USES: The primary administrative tool used for several Human Resources supporting tasks including Changing duty status, Requesting personnel actions (reassignment, training, etc.), Announcing Personnel Actions (local assignment, promotion, etc.). Forms will not be disclosed outside Department of Defense (DoD) and DOD sponsored agencies.

DISCLOSURE: Voluntary, however, failure to impart pertinent information may result in a delay or error in processing the request for personnel action.

### SECTION I - SOLDIER INFORMATION

| NAME (Last, First, MI) | RANK/GRADE/PMOS | UIC | DoD ID |
|---|---|---|---|
| SALE, AMIAH, A | MSG/E8/E25H | WDJVAA | 1293562608 |

### SECTION II - PERSONNEL ACTION INFORMATION

| ACTION | REASON | EFFECTIVE DATE |
|---|---|---|
| Award Recommendation | Permanent Change of Station | 20241029 |
| ELIGIBILITY | STATUS | ORDER NUMBER |
| Eligible | Approved | |
| AWARD TYPE | AWARD NAME | |
| Military Decorations | MSM  MERITORIOUS SVC MDL | |

| APPROVED AWARD | | PROPOSED PRESENTATION DATE |
|---|---|---|
| MSM  MERITORIOUS SVC MDL | | 20250228 |
| PERIOD OF AWARD FROM | | PERIOD OF AWARD TO |
| 20220222 | | 20250310 |

### SECTION III - PAR REMARKS

ACHIEVEMENT #1

MSG Sale distinguished herself while serving as a 1SG for Charlie Company, 601st Aviation Support Battalion. Serving for over 19 months as the 1SG, MSG Sale led her team through 3x WFXs and prepared her team to deploy and serve in EUCOM as the RAF CAB's communication node. Additionally, MSG Sale extended her efforts into the Division, collaborating with the Division G6 and adjacent brigades by building competitive signal lanes and signal qualification tables to validate and prepare commo crews for large-scale combat operations.

ACHIEVEMENT #2

MSG Sale assumed a role as a subject matter expert for transgender care of Soldiers stationed at Fort Riley. Recognizing the installation lacked a transgender care team or a knowledgeable liaison at the hospital, MSG Sale reviewed all DoD treatment policies and processes for Soldiers diagnosed with Gender Dysphoria. MSG Sale's actions enabled command teams across the division to better help Soldiers seeking treatment for Gender Dysphoria and more rapidly return Soldiers to a deployable status thereby increasing readiness within 1ID.

ACHIEVEMENT #3

MSG Sale served as the Barracks Manager for the Combat Aviation Brigade during their most recent rotation to Europe. In this capacity, MSG Sale had a direct influence on the Brigade's unit managers: aiding in the implementation of policy while ensuring safety and upkeep was sustained through garrison maintenance and emergency service partners. Additionally, MSG Sale worked tirelessly with installation barracks management and stakeholder teams to ensure that all work orders were tracked and corrected and quality of life for barracks Soldiers was maintained.

ACHIEVEMENT #4

MSG Sale's distinguished herself during her assignment to Fort Riley through her exemplary service. Her unwavering leadership and communications expertise enhanced communications readiness and generated expert communication Soldiers throughout the brigade. As a trusted leader and subject matter expert, MSG Sale served as part of the communications senior NCO cadre, mentoring and developing the brigade's communication Soldiers while building their individual skills to the highest levels of proficiency.

NARRATIVE

CITATION

EXCEPTIONALLY MERITORIOUS SERVICE WHILE SERVING AS A NETWORK COMMUNICATIONS NON-COMMISSIONED OFFICER FOR HEADQUARTERS AND HEADQUARTERS COMPANY. MASTER SERGEANT SALE'S DEDICATION TO DUTY, LEADERSHIP, AND SELFLESS SERVICE PROVIDED AN EXAMPLE FOR ALL TO EMULATE. HER ACTIONS ARE IN KEEPING WITH THE FINEST TRADITIONS OF MILITARY SERVICE AND REFLECT GREAT CREDIT UPON HER, THE 1ST COMBAT AVIATION BRIGADE, THE 1ST INFANTRY DIVISION, AND THE UNITED STATES ARMY.

### SECTION IV - APPROVALS

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| CPL | FRANCIS, ASHLYN, N | #2 Human Resources | WDJVAA | Recommend:  Approval | 20241202 |

Page 1 of 3
Document ID: 3581188.0

| | | | Specialist | | | | |
|---|---|---|---|---|---|---|---|

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| 1SG | BAILEY, FRANK, W | First Sergeant (1SG) | WDJVAA | Recommend: Approval | 20241203 |

**COMMENTS**

MSG Sale was a phenomenal asset to not only the Archangel and Demon team, but the entirety of Ft. Riley.  Her PCS will be felt for a long time to come.  She is entirely deserving of this award.   Recommend approval.

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| CPT | MOYER, GRANT, A | Commander | WDJVAA | Recommend: Approval | 20241204 |

**COMMENTS**

MSG Sale served with distinction in the CAB and is incredibly deserving of this award!

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| CPL | FRANCIS, ASHLYN, N | #2 Human Resources Specialist | WDJVAA | Recommend: Approval | 20241204 |

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| SGT | WILSON, JAKOBE | #1 Human Resources Sergeant | WDJVAA | Recommend: Approval | 20241205 |

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| SFC | BOSCH, RYAN, J | Senior Human Resources Sergean | WDJVAA | Recommend: Approval | 20241205 |

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| CPT | MONTGOMERY, JAMES, R | Personnel Staff Officer/S1 | WDJVAA | Recommend: Approval | 20241205 |

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| MAJ | WILLETT, ROGER, M | Executive Officer (XO) | WDJVAA | Recommend: Approval | 20241209 |

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| CW5 | ASH, BRAD, B | Command Chief Warrant Officer | WDJVAA | Recommend: Approval | 20241213 |

**COMMENTS**

Recommend Approval. MSG Sales, has demonstrated an incredible dedication to the Army improving her Soldiers and teammates. She has worked out of the BDE improving and supporting division level programs. Recommend Approval

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| CSM | CHRISTENSEN, ROBERT, N | Command Sergeant Major (CSM) | WDJVAA | Recommend: Approval | 20241213 |

**COMMENTS**

Recommend approval. MSG Sale provided exceptional support to Soldiers assigned to the 1st Infantry Division. Her actions improved command understanding and access to care of Soldiers seeking life-changing care.

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| COL | CORRIGAN, CHAD, P | Commander | WDJVAA | Recommend: Approval | 20241213 |

**COMMENTS**

MSG Sale was one of the best 1SGs in the Demon Brigade. After successfully serving as a 1SG, she helped coordinate and develop a transition team care for transgender soldiers after she identified a capability gap which made impact across the installation.

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| SGT | WILSON, JAKOBE | #1 Human Resources Sergeant | WDJVAA | Recommend: Approval | 20241215 |

**COMMENTS**

| RANK | INTERMEDIATE AUTHORITY | POSITION | UIC | RECOMMENDATION | DATE |
|---|---|---|---|---|---|
| SGT | Long, Micah, G | Standard Excess | WAMHA0 | Recommend: Approval | 20241217 |

Page 2 of 3
Document ID: 3581188.0

| COMMENTS | | | | | |
|---|---|---|---|---|---|
| **RANK** | **INTERMEDIATE AUTHORITY** | **POSITION** | **UIC** | **RECOMMENDATION** | **DATE** |
| CPT | HULSE, ASHLEY, M | Human Resources (HR) Officer | WAMHA0 | Recommend: Approval | 20241218 |

| COMMENTS | | | | | |
|---|---|---|---|---|---|
| For review. | | | | | |
| **RANK** | **INTERMEDIATE AUTHORITY** | **POSITION** | **UIC** | **RECOMMENDATION** | **DATE** |
| MAJ | BRIDGEFORD, LOGAN, L | Assistant G1 | WAMHA0 | Recommend: Approval | 20241219 |

| COMMENTS | | | | | |
|---|---|---|---|---|---|
| **RANK** | **INTERMEDIATE AUTHORITY** | **POSITION** | **UIC** | **RECOMMENDATION** | **DATE** |
| MAJ | BENNETT, NATHAN, A | #1 Plans Officer | WAMHT0 | Recommend: Approval | 20241223 |

| COMMENTS | | | | | |
|---|---|---|---|---|---|
| Reviewed. Paper packet routed for V5 approval 23DEC24. SGS. | | | | | |
| **RANK** | **INTERMEDIATE AUTHORITY** | **POSITION** | **UIC** | **RECOMMENDATION** | **DATE** |
| MAJ | BATEY, DANIEL, W | Standard Excess | WAMHT0 | Recommend: Approval | 20250116 |

| COMMENTS | | | | | |
|---|---|---|---|---|---|
| **RANK** | **APPROVAL AUTHORITY** | **POSITION** | **UIC** | **RECOMMENDATION** | **DATE** |
| MG | RONE, MONTE, L | Commander | WAMHT0 | Approved | 20250116 |

| COMMENTS |
|---|
| Outstanding job and thank you for your inspirational leadership! Best of luck to you in your next assignment and remember to stay fit, inspired, disciplined, trained and READY! DUTY FIRST! |

### SECTION V - ENCLOSURES

| ATTACHMENT TYPE | IPERMS DOCUMENT TYPE | DOCUMENT DATE |
|---|---|---|
| Supporting Document | | |



THE UNITED STATES OF AMERICA

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING: THIS IS TO CERTIFY THAT THE PRESIDENT
OF THE UNITED STATES OF AMERICA AUTHORIZED BY EXECUTIVE ORDER, 16 JANUARY 1969 HAS AWARDED

THE MERITORIOUS SERVICE MEDAL

MASTER SERGEANT AMIAH A. SALE
TO        1ST COMBAT AVIATION BRIGADE, 1ST INFANTRY DIVISION

FOR EXCEPTIONALLY MERITORIOUS SERVICE WHILE SERVING AS A NETWORK COMMUNICATIONS NON-
COMMISSIONED OFFICER FOR HEADQUARTERS AND HEADQUARTERS COMPANY. MASTER SERGEANT SALE'S
DEDICATION TO DUTY, LEADERSHIP, AND SELFLESS SERVICE PROVIDED AN EXAMPLE FOR ALL TO
EMULATE. HER ACTIONS ARE IN KEEPING WITH THE FINEST TRADITIONS OF MILITARY SERVICE AND
REFLECT GREAT CREDIT UPON HER, THE 1ST COMBAT AVIATION BRIGADE, THE 1ST INFANTRY DIVISION,
AND THE UNITED STATES ARMY.

22 FEBRUARY 2022 TO 10 MARCH 2025

17 December 2024
1ˢᵗ Infantry Division
Fort Riley, Kansas 66442

MONICA A. RONE
Major General, USA
Commanding

Case 1:25-cv-00240-ACR    Document 72-48    Filed 03/07/25    Page 1 of 4
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 357 of 688
Case 1:25-cv-00240-ACR    Document 48-19    Filed 02/14/25    Page 1 of 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br>Civil Action No. 1:25-cv-00240 |

## DECLARATION OF QUINN TYSON

I, Quinn Tyson, declare as follows:

1. I am Master Sergeant, Rank E7, in the U.S. Space Force, stationed at Shriever Air Force Base in Colorado. I have served in the U.S. Military since February 4, 2014. I am a transgender woman.

### History of Service

2. I first enlisted in the U.S. Army in 2014. I had just graduated with a bachelor's degree from Mississippi State University in mechanical engineering. The Army offered me an

opportunity to serve my country. For eight years, I worked in satellite communications as a satellite controller.

3. On July 28, 2022, my unit was moved from the Army to the newly created U.S. Space Force. I continued my work as a satellite operator there.

4. In my time in the military, I have been awarded five Army Achievement Medals, three Army Commendation Medals, and one Air and Space Force Commendation Medal.

5. In or about December 2022, I received a gender dysphoria diagnosis and began to develop a care plan. I started hormone therapy in February of 2023.

6. As part of my care plan, my treating physician determined that surgery was medically necessary. To schedule the surgery, I needed to first work with a military doctor who specializes in the treatment of gender dysphoria. That doctor referred me to a surgeon with whom I had a consultation about the surgery. I was then able to schedule my surgery for April 24, 2025. The process of getting a date for this surgery involved multiple appointments and approvals, lasting five to six months.

**Impact of the Ban**

7. After defendant Secretary of Defense Hegseth issued his February 7, 2025, Guidance, my scheduled surgery was removed from the hospital calendar. I received no communication explaining why it had been removed—it was simply gone. I contacted my case manager, who also did not know why it had been removed.

8. My case manager later forwarded a February 10 email to me from Maj. David Quackenbush, the Warrior Medicine Flight Commander at the U.S. Air Force Academy (First Quackenbush Email). A true and accurate copy of that email is attached to this declaration as **EXHIBIT A**.

9. The First Quackenbush Email attaches the February 7 Guidance and states that surgeries for transgender care "have been paused."

10. The February 7 Guidance states that "Individuals with gender dysphoria have volunteered to serve our country and will be treated with dignity and respect." I had a medically necessary surgery cancelled without notice or explanation solely because it was a treatment for my gender dysphoria. This is not dignified or respectful treatment. It disrespects the many years I have spent serving my country honorably.

11. I have continued to search for alternative military providers to perform my medically necessary surgery. However, on February 13, my case manager forwarded another email from Maj. David Quackenbush (Second Quackenbush Email). A true and accurate copy of that email is attached to this declaration as **EXHIBIT B**.

12. The Second Quackenbush Email makes clear that, based upon the February 7 Guidance, I will not be able to access medically necessary transition-related care. The Second Quackenbush Email states, among other things, that the Transgender Health Medical

Evaluation Unit (THMEU) is being wound down, and contracts related to the provision of transgender healthcare are being terminated as of February 18.

13. I want to be able to serve my country on the same terms as any other service member. By denying me access to a medically necessary surgery solely because I am transgender, I have been singled out and treated as though my service does not matter. I am stripped of medical benefits that are available to non-transgender service members.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

JA347

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 13, 2025

Quinn Tyson

JA348

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NICOLAS TALBOTT *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00240 |
| | ) | |
| UNITED STATES OF AMERICA *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**SUPPLEMENTAL DECLARATION OF QUINN TYSON**

I, Quinn Tyson, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 13, 2025, which was filed on February 14, 2025, ECF No. 48-19, in support of Plaintiffs' motion for preliminary injunction in this matter.

2.      I received a diagnosis of gender dysphoria in December 2022.

3.      Since that time, I have been receiving transition-related health care as part of my transition from male to female.

4.      Because my treatment plan is not complete, I am currently serving as a woman under an Exception to Policy (ETP). My gender marker has not yet been updated in DEERS. On March 3, I was informed that, because the US Air Force has rescinded all ETPs, I would be required to adhere to male standards effective immediately. Having lived as a woman and been on hormone therapy for years, it is not possible for me to conform to male standards.

5.      My command supports my service and has assured me that, from their perspective, my being a transgender woman will have no negative impact on my ability to continue serving.

1

JA349

6.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I am currently undergoing gender transition pursuant to my care plan.

7.    If I cannot serve as a woman in the military, I cannot serve at all.

[remainder of page intentionally left blank]

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March __4__, 2025

Quinn Tyson

Case 1:25-cv-00240-ACR    Document 72-50    Filed 03/07/25    Page 1 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 365 of 688
Case 1:25-cv-00240-ACR    Document 50    Filed 02/14/25    Page 1 of 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:25-cv-00240

---

**DECLARATION OF GREYSON SHISHKINA**

I, Greyson Shishkina, declare as follows:

1. I am a 19-year-old Navy recruit. I enlisted in the U.S. Navy as of November 22, 2024. I am transgender.

**HISTORY OF ACCESSION**

2. I began pursuing a career in the military in February of 2024. My grandfather served in the U.S. Army, and I always wanted to follow in his footsteps.

3. I had begun a college education studying cybersecurity. But early into my college career, I came to realize that the military would be a better fit for my career goals and passions. I wanted to have a career in health care, and I knew that the military offered many opportunities to study and practice health care professions.

4. Initially, I reached out to the U.S. Air Force. I disclosed to the recruiter that I was transgender. Because of my history with gender dysphoria and anxiety, I underwent additional screening by a military contract psychiatrist. After I applied for a waiver, this psychiatrist cleared me to serve.

5. However, to treat my gender dysphoria, I use injectable testosterone. The Air Force only allows service members to use gel testosterone, not injectable testosterone. However, the Navy allows service members to use injectable testosterone, so the Air Force recruiter referred me to the Navy recruiting center in Grand Ledge, Michigan.

6. In early November 2024, I completed all of the Navy's physical and mental screening and was deemed fit to serve.

7. On November 22, 2024, I signed my enlistment contract and took the Navy oath. I signed on to be a Hospital Corpsman, which is the exact career path I had hoped to pursue.

8. I was given a ship-out date of February 24, 2025.

9. In preparation for my career in the military, I ended my lease for my apartment in May 2024, and moved in with my parents.

10. Once I was given my ship-out date, I quit the assistant manager job I had worked at for two years.

11. Also in preparation for my ship-out date, I withdrew from my college studies. I have completed one year and one semester toward my college degree.

- 2 -

**IMPACT OF THE BAN**

12. In late January or early February 2025, the recruiting chief at my Navy recruitment center called me to say that, because President Trump had signed the Executive Order, *Prioritizing Military Excellence and Readiness*, my ship-out date was postponed to September 23, 2025.  The recruiting chief informed me that this delay was to determine the implementation of the Executive Order, including whether I would be able to serve in the Navy.

13. This eight-month postponement has completely upended my life.  I had expected to ship out on February 24 for nine weeks of boot camp, followed by four months of training in San Antonio to be a Hospital Corpsman.  All of these plans have been taken away from me just a few weeks before they were set to begin.

14. I planned much of my life and career around my military service.  I no longer have a job because I quit my job in preparation for shipping out.  I cannot return to college study for this semester because the semester has already begun.  I no longer have my own place to live because I gave up the lease to my apartment believing that I would be starting a military career.

15. I am unable to plan for the next eight months because I cannot be confident that I will be permitted to ship out on the postponed September 23 ship-out date I have been given.

16. I joined the U.S. Navy because I love my country, I am proud of my grandfather's military service, and I hoped that the military would advance my career in health care.  I want to provide medical treatment for the service members who are serving our country in the military.

17. If I am not able to ship out and complete my basic training, not only will all of my plans for a career in the Navy fall through, but I will also have lost out on many months when I could have been working and studying—opportunities that I have forgone in preparation for military service.

18. I do not want to lose this opportunity to pursue a career that I am passionate about—providing medical care to the service members who put their lives on the line for our country—because I am transgender.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

- 4 -

JA356

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 9, 2025

Greyson Shishkina

(Page 369 of Total)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00240 |
| | ) | |
| UNITED STATES OF AMERICA *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUPPLEMENTAL DECLARATION OF GREYSON SHISHKINA

I, Greyson Shishkina, declare as follows:

1.      I write this declaration to supplement the declaration I signed on February 9, 2025, which was filed on February 14, 2025, in support of the Motion for Preliminary Injunction in this matter. *See* ECF No. 50.

2.      I was diagnosed with gender dysphoria in 2021.

3.      I have transitioned and lived as a man since 2021.

4.      I enlisted in the Navy as man and met all the accession standards to do so. This includes meeting the requirement of being stable in the male sex for over 18 months at the time of enlistment.

5.      It would not be possible for me to join the military as a woman, which I am not. I am a man, look like a man, and will be perceived to be a man when I use sex-segregated facilities.

6.      It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

1

7.      If others were required to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

8.      If I cannot join the military as a man, I cannot serve at all.

2

I declare under penalty of perjury that the foregoing is true and correct.


Dated: March 1, 2025

Greyson Shishkina

Case 1:25-cv-00240-ACR     Document 72-52     Filed 03/07/25     Page 1 of 5
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 373 of 688

Case 1:25-cv-00240-ACR     Document 51     Filed 02/14/25     Page 1 of 5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE          )
COLE, GORDON HERRERO, DANY                   )
DANRIDGE, JAMIE HASH, MIRIAM                 )
PERELSON, KODA NATURE, and CAEL              )
NEARY,                                       )
                                             )
           Plaintiffs,             )
                                             )
v.                                           )
                                             )
DONALD J. TRUMP, in his official capacity as )
President of the United States; the UNITED   )
STATES OF AMERICA; PETER B. HEGSETH,         )     Civil Action No. 1:25-cv-00240
in his official capacity as Secretary of Defense; )
MARK AVERILL, in his official capacity as    )
Acting Secretary of the Army; the UNITED     )
STATES DEPARTMENT OF THE ARMY;               )
TERENCE EMMERT, in his official capacity as  )
Acting Secretary of the Navy; the UNITED     )
STATES DEPARTMENT OF THE NAVY;               )
GARY ASHWORTH, in his official capacity as   )
Acting Secretary of the Air Force; the UNITED )
STATES DEPARTMENT OF THE AIR FORCE;          )
TELITA CROSLAND, in her official capacity as )
Director of the Defense Health Agency; and the )
DEFENSE HEALTH AGENCY,                       )
                                             )
           Defendants.             )
_____      )

## DECLARATION OF CLAYTON McCALLISTER

I, Clayton McCallister, declare as follows:

   1.  I am a 24-year-old Air Force recruit.  On January 22, 2025, I signed my contract and

enlisted to serve in the Pararescue mission of Special Warfare Operator Enlistment (SWOE).  I am

transgender.

## HISTORY OF ACCESSION

2.  I began pursuing a career in the military long before I had spoken to a recruiter.  I graduated in December 2022 with a four-year degree in animal science but had never found a job opportunity that was a good fit for that degree.

3.  I had always wanted to be in the military.  It seemed to me like a career where I could be impactful and be a part of something bigger than myself.  I was attracted to the challenging environment and the camaraderie of the military.

4.  I was attracted to Pararescue work because it is a challenging career with very high fitness standards.  Not many people can meet these standards or want to subject themselves to the harsh conditions it requires.  Pararescuers must be able to attach to any type of military unit to perform rescues under any conditions, whether that involves water rescues, overland rescues, or parachuting out of planes.

5.  I knew that the physical standards for SWOE are very demanding.  Very few people can meet these fitness standards.  For about a year I have been training with a special warfare contractor who specializes in personnel development.  The contractor put on weekly events that included testing and skill development.  I attended nearly all of these training and development sessions in addition to working out two hours per day, between five and seven days per week.

6.  In April, I reached out to a number of recruiters across all branches of the military.  It was important to me to find a recruiter who would support me as a transgender recruit.  My Air Force recruiter has been supportive of my enlistment at every step of the process.

7.  I was cleared by MEPS on July 25, 2024.  Because I had a four-year degree, I attempted to switch to an officer track.  However, I was informed that I would not meet the officer track standards because of my past gender dysphoria.  Although I could have sought a waiver, it was

- 2 -

more important to me to be able to serve.  Since I had already met the standards for enlistment, I returned to that route and was re-approved on January 14, 2025.

8.   Once approved, I signed my contract on January 22, 2025, and was given a ship-out date of March 4, 2025.

9.   My Pararescue training will take approximately two years because I will need to learn how to survive and rescue other service members under such a broad range of conditions.  This training is extremely demanding, and there is an 80% attrition rate.  But I have met the physical and mental standards to undergo this training, and I am committed to seeing it through.

10. On February 5, 2025, I quit the job that I had worked at for one and a half years in preparation for my ship-out date.

**IMPACT OF THE BAN**

11. On February 7, I received a call from a Lieutenant Colonel at Air Force Headquarters.  He informed me that, due to the Executive Order, *Prioritizing Military Excellence and Readiness*, my ship-out date was being placed on an indefinite hold.  I would not be shipping out on March 4 as planned.

12. There are only five SWOE ship-out dates per year, so if I do not ship out in March, it will be approximately an additional three months before I could ship out again at the earliest.

13. This sudden change has upended my life and the lives of my family members.  My wife and I recently adopted our daughter in October 2024.  I was planning to support my family on my military salary.  Now, because I quit my job to prepare to ship out, I have no income to support them.

14. I am unable to plan for the future because I do not know if I will get a future ship out date, or no ship out date at all.

- 3 -

15. I joined the Air Force because I love my country, and I wanted to become one of the people serving in uniform I deeply admire.  I have spent years of hard physical training to meet the demanding fitness standards required of SWOE Pararescuers.  And I have passed the fitness tests multiple times.

16. I want to proudly serve the United States in uniform and to be judged based on the effort I have put into preparing myself for this career and the results that it has produced, not based on the fact that I am transgender.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.


Date: February 9, 2025

Clayton McCallister

**Clayton McCallister**

(Page 377 of Total)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,               )
                                         )
    Plaintiffs,         )
                                         )
v.                                       )     Civil Action No. 1:25-cv-00240
                                         )
UNITED STATES OF AMERICA *et al.*,       )
                                         )
    Defendants.         )
_____ )

### SUPPLEMENTAL DECLARATION OF CLAYTON MCCALLISTER

I, Clayton McCallister, declare as follows:

1.    I write this declaration to supplement the declaration I signed on February 9, 2025, which was filed on February 14, 2025, in support of the Motion for Preliminary Injunction in this matter. *See* ECF No. 51.

2.    I am a transgender man.

3.    I was diagnosed with gender dysphoria in October of 2021.

4.    I have transitioned and lived as a man since December of 2021.

5.    I enlisted in the Air Force as man and met all the accession standards to do so. This includes meeting the requirement of being stable in the male sex for over 18 months at the time of enlistment.

6.    It would not be possible for me to join the military as a woman, which I am not. I am a man, look like a man, and will be perceived to be a man when I use sex-segregated facilities.

7.    It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.

1

8.   If others were required to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

9.   If I cannot join the military as a man, I cannot serve at all.

2

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 1st, 2025

*Clayton McCallister*
Clayton McCallister

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, MINERVA BETTIS, AUDRIE GRAHAM, ROAN PICKETT, AMIAH SALE, QUINN TYSON, MICHELLE BLOOMROSE, SAMUEL AHEARN, CLAYTON McCALLISTER, GREYSON SHISHKINA, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| The UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-00240 |
| Defendants. | ) | |

_____

## DECLARATION OF MICHELLE BLOOMROSE

I, Michelle Bloomrose, declare as follows:

1. I am a 45-year-old Commander in the U.S. Navy currently serving as the Director of JAG Corps Training in the Office of the Judge Advocate General. I have been serving honorably and meritoriously in the Navy for over nineteen years. I am transgender.

## HISTORY OF MILITARY SERVICE

2. I joined the Navy in May of 2004 while I was a second-year law student at Washington and Lee University School of Law. After graduating with my Juris Doctorate and taking the Virginia Bar Exam, I completed Navy Officer Indoctrination School and the Basic Lawyer Course at Naval Justice School by the end of 2005. And, after passing its bar exam, the Virginia State Bar admitted me in October of 2005. I am also a member of the Navy-Marine Corps Court of Criminal Appeals, the U.S. Court of Appeals for the Armed Forces, and the U.S Supreme Court bars.

3. I have deployed to provide legal counsel for combat operations three times. I volunteered to individually augment the Multi-National Force – Iraq during the Iraqi Surge phase of Operation Iraqi Freedom, where I advised on detainee operations from mid-2007 through mid-2008. In 2014, I deployed for nine months at sea as the Command Judge Advocate in the USS George H. W. Bush aircraft carrier in the Mediterranean Sea and Persian Gulf in support of Operations Enduring Freedom, Inherent Resolve, and Active Endeavor. Finally, I embarked the USS Mount Whitney amphibious command ship out of Gaeta, Italy as the chief operational lawyer to the Commander, U.S. Sixth Fleet/Commander, Task Force Six for all fleet/task force exercises and operations she commanded from mid-2019 through mid-2020. Based on my significant quantitative and qualitative operational law experience and my demonstrated proficiency at its practice, the Navy authorized me a subspecialty "S" code in National Security Law.

4. Ashore in the continental United States, I have served as a Trial Counsel (i.e., a U.S. Federal Government Prosecutor) at Naval Submarine Base New London, Staff Judge Advocate to the Commanding Officer of Naval Station Newport, a Special Assistant U.S. Attorney in the District of Rhode Island, the Special Counsel to the Chief Judge of the Department of the Navy and Senior Law Clerk to the Chief Judge of the Navy-Marines Corps Court of Appeals at the Washington Navy Yard, and as a legal Action Officer in the Office of the Judge Advocate General, the Deputy Legal Counsel to the Chief of Naval Personnel, and the senior Legal Counsel to the Deputy Chief of Naval Operations (DCNO) for Installations and Logistics (N4) at the Pentagon.

5. Prior to 2017, my ashore legal practice concentrated on Military Personnel Law. This practice included serving as the Navy JAG Corps subject matter expert on "Don't Ask, Don't Tell" repeal law and policy as well as accepting a "by-name request" to serve on the joint legal working group that advised the Under Secretary of Defense for Personnel and Readiness on devising and implementing the 2016 Carter policy that allowed transgender individuals to serve in the military.

6. In 2017, the Navy selected and funded me to enroll in the Environmental Law post-graduate program at The George Washington University School of Law. Based on my Master of Laws degree and five years of significant quantitative and qualitative environmental law experience and my demonstrated proficiency at its practice, the Navy authorized me a subspecialty "Q" code in Environmental Law. This practice included serving as senior legal advisor to DCNO N4 on the Navy's clean-up of, and liability for, the 20,000 gallon "Red Hill" jet fuel spill in Honolulu that contaminated the drinking water

JA370

of 93,000 Navy installation residents, the lead uniformed legal representative to the National Marine Fisheries Service in consultations seeking to revise the Navy's marine mammal take permits following two U.S. Navy whale strikes and one Royal Australian Navy strike of a mother whale and its calf during exercises off the coast of southern California in the summer of 2021, and the lead legal planner for the joint U.S. Navy/U.K. Royal Navy sinking exercise Atlantic Thunder 22, ensuring compliance with U.S. and U.K. environmental laws and regulations to tow a decommissioned U.S. frigate across the northern Atlantic so that it could be sunk in U.K. waters following a live fire exercise for both nations' surface ships, submarines, and aircraft in order to deliver live ordnance simultaneously on target to simulate a wartime scenario.

7.  In 2023, my career transitioned from active practice to the provision of legal education, training and professional development to future Sea Service legal professionals and support personnel, current Sea Service legal professionals and support personnel, and Sea Service leaders at all levels. First, I served as the Executive Officer of the Naval Justice School. The Naval Justice School's mission is to train all Sea Service (i.e., U.S. Navy, U.S. Marine Corps, and U.S. Coast Guard) judge advocates, and enlisted and civilian legal professionals to deliver quality legal services, promote justice, and enhance Sea Service fleet readiness; and to train Sea Service leaders and legal support personnel to perform their command and staff duties in accordance with United States and international laws. In July of 2024, a Navy JAG Corps Command Screen Oral Board recommended me for command. In September of 2024, I assumed command of the Naval Justice School, the Navy JAG Corps' only major command with ~60 officers, enlisted members, and civilian employees on its staff; and, on any given instructional day, an average of about 250 students enrolled in its courses. I was the Commanding Officer of the Naval Justice School until I recently accepted a billet as Director of JAG Corps Training for the Assistant Judge Advocate General (Education, Training and Professional Development) in the Office of the Judge Advocate General.

8.  As a Navy Commander (pay grade O5), my "promotions" (i.e., superseding executive appointments in the next higher grade) are subject to the advice and consent of the U.S. Senate. After a fiscal year 2025 statutory promotion selection board convened by the Secretary of the Navy selected me for promotion to the grade of Captain (pay grade O6), the President of the United States then nominated me for appointment to that next higher grade in May of 2024. Following the recommendation of the Senate Armed Services Committee, the full Senate confirmed my appointment to the grade of Captain by voice vote in June of 2024. In accordance with the Navy's fiscal year 2025 active-duty officer phasing plan, the tender of my appointment to me is projected to be on September 1, 2025. Pursuant to Navy policy, a Navy officer must decline an appointment to Captain if she will retire before she can complete three years time-in-grade. As a consequence of this policy, I will not be able to accept my appointment to the grade of Captain, unless I am able to serve as a Captain from September 1, 2025 to, at least, September 1, 2028.

9.  My appointment to the grade of Captain comes with a significant pay increase, as well as a greater housing allowance, more substantial retirement pay, and other benefits. I desire to accept my appointment on September 1, 2025 and I desire to complete, at least, three years of active-duty service in the grade of Captain in the Navy. I have no desire to retire

early (or even to retire on October 1, 2025, which is the first date I am legally eligible for regular retirement with 20 years of active-duty service as a commissioned officer.) Being a Navy JAG was, and is, the only job I have ever wanted; it is also the only job I have had since 2004. Becoming a Navy JAG Corps Captain has been my singular career goal since I first had the idea to become a Navy JAG in my junior year of college.

10. During my naval service, I have been awarded five Meritorious Service Medals, one Joint Service Commendation Medal, two Navy and Marine Corps Commendation Medals, and one Navy and Marine Corps Achievement Medal.

## SERVICE AS A TRANSGENDER SERVICE MEMBER

11. In July of 2024, one of my military medical providers diagnosed me with gender dysphoria. In accordance with my duties as a naval officer, I immediately reported this medical diagnosis to my Commanding Officer and simultaneously sought out medical treatment for the diagnosis through the military medical system. In other words, I treated this medical diagnosis like every other medical diagnosis I have received since I commissioned as an officer in the naval service in May of 2004. Then, in November of 2024, I began gender transition medical treatment upon receipt of my Naval Medical Forces Atlantic Transgender Care Team-developed-and-approved gender transition medical treatment plan and my Commanding Officer's endorsement of that plan.

12. In accordance with the recommendations of my military primary care manager and defense contractor psychologist, I began to socially transition while off-duty in August of 2024. Following the approval of the Deputy Judge Advocate General of the Navy and the Chief of Naval Personnel (and in accordance with their guidance), I began socially transitioning on duty in November of 2024.

13. On February 12, 2025, my military primary care manager, defense contractor psychologist and defense health insurance-approved-and-funded civilian endocrinologist opined as a medical care team that I am stable in my female gender. They also determined that my request to change my gender marker in the Defense Enrollment Eligibility Report System (DEERS) was medically advisable. On February 13, 2025, my Commanding Officer determined that I met the established Department of Defense, Department of the Navy, U.S. Navy, and Navy Personnel Command criteria for a gender marker change and so, concurred with my request. On February 14, 2025, Navy Personnel Command approved my gender marker change request and updated that marker (now labeled "sex") in the Navy Standard Integrated Personnel System. My gender (now labeled "sex") marker in DEERS is female.

14. I serve in the U.S. Navy as a woman. I meet all standards applicable to women serving in the Navy. I adhere to grooming and uniform standards for women, use women's changing and restroom facilities, and meet women's physical fitness standards. Seniors, subordinates, and peers refer to me as a woman, including the use of honorifics such as "Ma'am."

JA372

15. It is not possible for me to serve in the Navy as a man, which I am not. I am a woman, look like a woman, follow women's grooming standards, wear women's uniforms, use women's facilities, and meet women's physical fitness standards, and I have done so since my transition without incident. My being a woman has not caused any incident at all involving pronouns, honorifics, facilities, grooming, uniforms, fitness standards, etc. with any service member or civilian employee or government contractor, or with my command, my corps, our client (i.e., the U.S. Navy) and its agents, or their missions, functions and tasks. It would be extraordinarily disruptive for me to adhere to men's grooming standards, wear uniforms that are designed to fit men, use men's restrooms and showers, sleep in men's berthing units, or otherwise access facilities that have been sex-segregated for men. If others were required to refer to me as a man or address me as "Sir," it would cause confusion and disruption, negatively impacting my and my co-workers' ability to effectively perform the duties of our jobs.

16. I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex because I have undergone a legal, social, and medical gender transition in the naval service. As stated above, my military medical care team's opinion is that I am stable in my female gender. Moreover, as also stated above, I am unable to adhere to any Navy standards associated with men, since I am a woman. If I cannot serve as a woman in the Navy, I cannot serve at all.

17. The Office of the Judge Advocate General (OJAG), my command, is overwhelmingly supportive of me. However, OJAG should not need to do any more for me than they do for any other service member under the Judge Advocate General's command. Because OJAG knows me and the value I bring to the Navy JAG Corps, its service members, and to our client and its agents, OJAG senior leadership has worked hard to keep me on active duty. OJAG should not have to work against the EO to do so. My being transgender has never prevented me from serving my Country, my client and its agents, or the Sailors, Marines, Coast Guardsmen, and civilian employees that the Navy entrusted to my command, from keeping my oath to support and protect our Constitution against all enemies, foreign and domestic, or from discharging any of my military duties as lawfully ordered by my superiors.

18. Since the EO was signed, a February 20, 2025, military dermatology appointment that was part of my medical treatment plan was cancelled. The military medical provider I was to see stated that, while it was not her decision, she had been informed a pause was being placed on that part of my gender transition medical treatment. On March 3, 2025, my military speech pathologist-provided vocal therapy that was part of my medical treatment plan was also cancelled. That military medical provider stated to me that her superiors ordered her to cease providing gender-affirming care. My Naval Medical Forces Atlantic Transgender Care Team-developed-and-approved and Commanding Officer-endorsed medical treatment plan is, otherwise, paused.

19. Because my September 1, 2025, acceptance of my Senate-confirmed appointment to the grade of Captain in the Navy is contingent upon my ability to serve until September 1, 2028, the EO not only prevents me from continuing my current service, but it also denies me a career-making promotion to Captain, the capstone grade in the JAG Corps, toward

which I have been striving for nearly 25 years. And, because I will only become eligible for full retirement benefits in the grade of Captain once I complete 23 years of active-duty service (to include 3 year of active-duty service in the grade of Captain), if I am forced to retire or involuntarily separated because of the EO before September 1, 2028, I will be denied retirement benefits in the grade of Captain for the rest of my life.

20. In addition, I use my salary and housing allowance to support my military spouse of 20+ years and our two children. In particular, my housing allowance permits our children to remain in the Rhode Island public school system we chose for them. If I lose these benefits, it will place enormous financial strain on my family and educational strain on my children.

21. By signing the EO, the President, who is also my Commander-in-Chief, has used his platform to say that I am a dishonorable, dishonest and undisciplined person, who lacks humility and integrity, and disrupts the readiness and cohesion of my workplace and co-workers. First, this statement inequitably damages my reputation for honor, honesty, discipline, humility, integrity, leadership, and merit, which I have painstakingly built over my nearly 20 years of naval service. Second, it inequitably stigmatizes me in a way that interferes with my duties. I cannot effectively provide legal advice to my client and its agents, if those agents do not trust me and/or believe I have low moral character. Nor can I effectively direct Navy JAGC training, if those who I am tasked to train do not trust me and/or believe that I have low moral character. Third, my Virginia law license is contingent upon me being a person of honest demeanor and good moral character—trustworthy, diligent, and reliable. Having my reputation damaged without basis or cause by my senior-most commander interferes directly and inequitably with my maintenance of a license to practice my chosen profession of law. Further, it is a condition of my employment with the Navy JAG Corps that I remain a state-licensed attorney "in good standing" with my state licensing authority; with the force of U.S. Presidential authority, the EO has publicly and inequitably called my "in good standing" status with the Virginia State Bar into question.

22. Serving in the U.S. Navy JAG Corps has been my life, career, and passion for nearly twenty years. I have proven over and over again that I can meet the standards for naval service that are applied to me. I do not want to lose, nor do I deserve to lose, the only career I have ever wanted, the achievement of the career goal that I have been pursuing for almost 25 years, or my and my three military dependents' way of life because I am transgender.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

JA374

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 03, 2025

Michelle Bloomrose

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                )
                                         )
        Plaintiffs,                      )
                                         )
v.                                       )        Civil Action No. 1:25-cv-00240
                                         )
UNITED STATES OF AMERICA *et al.*,       )
                                         )
        Defendants.                      )
                                         )

## DECLARATION OF REGAN MORGAN

I, Staff Sergeant (SSG) Regan A. Morgan, declare as follows:

1.      I am a thirty-one-year-old Staff Sergeant in the United States Army. I was born on March 1, 1994, and I enlisted in the Army at age seventeen, on or about March 17, 2011. I am transgender and have been diagnosed with gender dysphoria.

### CURRENT MILITARY ROLE

2.      In May 2021, I assumed my current role in the 5th Special Forces Group (Airborne) ("5th SFG") at Fort Campbell in Kentucky. I am a Special Forces Medical Sergeant with the military occupational specialty (MOS) 18D.

3.      I currently serve in Alpha Company, 2nd Battalion, 5th SFG. I was promoted to Staff Sergeant in November 2020, shortly before joining 5th SFG.

4.      I am presently deployed outside the United States in an active combat zone. I have been on rotation here since on or about January 23, 2025, and was scheduled to remain until approximately August 2025.

### BACKGROUND ON MILITARY SERVICE AND COMMENDATIONS

5.      I completed Basic Training as an 11B (Infantryman) at Fort Benning, Georgia.

1

After my initial training, I served in the Army National Guard from 2011 to 2017 on active-duty orders, primarily performing military funerals, as well as performing my duties as an 11B. Over that period, I conducted as many as 900 military funerals.

6.      I graduated from Rossview High School in Clarksville, Tennessee, in 2012 and attended Middle Tennessee University from 2012 to 2017 to study Criminal Justice. I did not complete my degree due to my ongoing military service.

7.      In 2019, I completed the Special Operations Combat Medics Course at Fort Bragg, North Carolina. I subsequently graduated from the Special Forces Qualification Course (also called "Q" course) in 2020, also at Fort Bragg, earning my Green Beret.

8.      I have continued to enhance my skills by completing the Military Freefall Parachutist Course (2021), Special Forces Advanced Urban Combat Course (2021), and the Special Operations Target Interdiction Course Level 2 (2022).

9.      Over the course of my career, I have held several leadership roles, including:

- **Team Leader** in the National Guard (2015–2016).
- **State Trainer** for the Military Funeral Program (2016–2017).
- **Company Senior Medical Sergeant** for the past two years (2023–2025).

10.      To the best of my recollection and without access to my service record as I am at a remote location with no computer access, I have received multiple awards, ribbons, and commendations, including the Army Commendation Medal, Army Achievement Medal, Army Overseas Service Ribbon, Global War on Terrorism (GWOT) Expeditionary Medal, Global War on Terrorism (GWOT) Service Medal, NCO Professional Development Ribbon (2 awards), The Army Good Conduct Medal (2 awards), Operation Inherent Resolve Campaign Star, among other awards.

2

## EXPERIENCE AS A TRANSGENDER SERVICE MEMBER

11.    I recognized I was transgender at least as early as 2018, during the Special Forces Qualification Course. Although I began having these feelings, I did not fully understand them at the time, and I was surrounded by an all-male environment that made it difficult to voice my experiences. It became clear to me during this experience that I was not like other men.

12.    In 2019, I first sought guidance from Behavioral Health professionals at Fort Campbell for Gender Dysphoria, and in Fall 2020—during the COVID-19 pandemic—I was diagnosed with Gender Dysphoria by a Behavioral Health provider via telephonic consultation.

13.    During 2020 and through 2022 I attended the support group for soldiers with gender dysphoria at behavioral health on Fort Campbell and was able to create a community of other trans service members that allowed me to grow more confident as a leader and soldier.

14.    In Summer 2022, I submitted a packet requesting command approval for transition-related health care to Colonel Brent Lindeman at Fort Campbell. By Fall 2022, I began medically transitioning as approved by Col. Lindeman.

15.    Although I have faced some challenging reactions, I have worked diligently to balance my essential duties with medically necessary care. I have delayed certain surgical procedures, as outlined in my approved treatment plan, specifically to ensure that I remain deployable and available for key assignments as needed by my unit.

16.    Throughout my treatment for gender dysphoria, I have successfully maintained my operational readiness and deployability as a Special Forces Medical Sergeant, my gender dysphoria has not impacted my ability to serve in a combat role and has not interfered with my deployments.

17.    I completed my treatment plan and my DEERS marker has been updated to reflect

3

that I am a woman.

18.    Since starting hormone therapy, I have had no issues performing my duties in combat zones.

19.    In the combat zone I currently serve in, I am still able to receive necessary transition-related medical care. I am able to transport and store my medication, including estradiol and necessary injection supplies, and administer a weekly injection which takes less than ten minutes a week.

20.    Ongoing access to this care has improved my mental health, bolstered my self-confidence, enhanced my effectiveness as a leader on my team, and has in no way impacted my ability to perform my duties.

**IMPACT OF BAN**

17.    In January 2025 President Trump signed Executive Order 14183 effectuating a ban on transgender service members. Following that, my unit became noticeably more hostile toward my presence. Anti-transgender slurs increased, and I was excluded from many essential work conversations that I would otherwise be involved in as a senior medical sergeant.

18.    Since arriving in my current forward operating base and subsequent to the Executive Order, I have been isolated from my fellow teammates by leadership—even to the point of being housed separately—either due to misunderstandings or hostility related to my identity and confusion about the status of the Executive Order.

19.    Despite my scheduled deployment continuing through August 2025, I discovered on or about the morning of March 2, 2025, that a flight had been booked in my name for emergency leave—which I did not request.

20.    I confronted my leadership for answers and was informed by Sergeant Major Klein,

4

my senior enlisted leader in 2nd Battalion, 5th SFG, that I would be placed on emergency leave for five days and then begin "out-processing" out of the Army no later than March 26, 2025. I was told my separation date would be no later than April 26, 2025, effectively forcing me out of the Army.

21.    I was asked to sign a counseling form to this effect. A true and accurate copy of this counseling form is attached to this declaration as **<u>EXHIBIT A</u>**.

22.    I have since been removed from my forward operating base (FOB) in a combat zone and routed through different locations in the Central Command (CENTCOM) area of operations and am awaiting transport to Baltimore, Maryland, and then to Fort Campbell for out-processing from the Army. This decision was made without any request or initiation from me.

23.    Being discharged in this manner would profoundly disrupt my life. I have not completed my civilian degree and have focused primarily on my Army career. I rely on my military income and healthcare, and losing both would cause severe financial and personal hardship.

24.    My unit also stands to lose a highly qualified Special Forces Medic, leaving them with only one medic on the team. Such a reduction severely impacts the readiness and mission capability of our Special Forces unit, who cannot operate without two medics. It would be extremely difficult to replace me without impacting other soldiers' deployment rotations and the overall effectiveness of the team.

25.    I have about six to nine years remaining before reaching retirement eligibility, depending on how my National Guard service is counted. If not for the Executive Order banning transgender service members, I would continue to proudly serve for the rest of my career. Despite the challenges, I find the work immensely rewarding and have built a community among my fellow soldiers.

26.    A ban on transgender service has forced an abrupt and involuntary end to a career I love, tarnishing my record of honorable service and jeopardizing my future. My wish is simply to remain in the Army, continue deploying with my unit, and fulfill my responsibilities to my country and fellow soldiers.

27.    I meet all standards applicable to female service members. I adhere to female grooming standards, live in women's berthing units, and use women's changing and bathing facilities. Others refer to me as a woman, including using honorifics such as "Ma'am."

28.    It is not possible for me to serve in the military as a man, which I am not. I am a woman, look like a woman, and have used women's facilities since my transition without incident. It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.

29.    If others were required to refer to me by male pronouns or address me as "sir," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job.

30.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with men, since I am a woman.

31.    If I cannot serve as a woman in the military, I cannot serve at all.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

6

JA381

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2025

_____
Regan Morgan

7

# EXHIBIT A

( This document is considered Controlled Unclassified Information (CUI) when filled. )

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

## PRIVACY ACT STATEMENT

**AUTHORITY:** 5 USC 301, Departmental Regulations, 10 USC 3013, Secretary of the Army.

**PRINCIPAL PURPOSE:** These records are created and maintained to manage the member's Army and Army National Guard service effectively, to document historically a member's military service, and safeguard the rights of the member and the Army.

**NOTE:** For additional information, see the System of Records Notice A0600-8-104b AHRC, https://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570051/a0600-8-104b-ahrc/.

**ROUTINE USE(S):** There are no specific routine uses anticipated for this form; however, it may be subject to a number of proper and necessary routine uses identified in the system of records notice specified in the purpose statement above.

**DISCLOSURE:** Disclosure is voluntary.

## PART I - ADMINISTRATIVE DATA

| Name *(Last, First, MI)* | Rank/Grade | Date of Counseling |
|---|---|---|
| MORGAN, REGAN, A. | E-6 | 02-Mar-2025 |

| Organization | Name and Title of Counselor |
|---|---|
| A. CO., 5th Special Forces Group (Airborne) | [redacted], Company Commander |

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** *(Leader states the reason for the counseling, e.g. Performance/Professional/Event-Oriented counseling, and include the leader's facts and observations prior to the counseling.)*

Approach: ☐ Non Directive   ☐ Combined   ☑ Directive

Type of Counseling: ☑ General Form   ☐ Professional Growth   ☐ Performance   ☐ Event Oriented

Initiation of Separation based on Under Secretary of Defense for Personnel and Readiness Memo, "Additional Guidance on Prioritizing Military Excellence and Readiness," dated 26FEB25

## PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points Discussion:**

On February 26, 2025 the Office of the Under Secretary of Defense for Personnel and Readiness issued guidance on the continued service of Service members with gender dysphoria, or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria. Per that guidance, individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service, with limited exceptions.

Based on the medical treatment plan you previously provided to the Group Commander, you have been diagnosed with gender dysphoria.

Per this guidance, the initiation of separation procedures must begin within 30 days of the Under Secretary's signed guidance. Alternatively, Service members may elect to separate voluntarily within 30 days of the Under Secretary's signed guidance. The memo also directs the Secretary of the Army to update or publish new regulations, policies, and guidance to implement the provisions of the memo, and to ensure reassignment of all Service members subject to this memo are reassigned from Combatant Commands to their respective military services.

At this time, the Secretary of the Army has not published guidance on implementation of this order. As soon as this command receives guidance, we will inform you of the way forward. Separation will be initiated no later than 27 March 2025, in accordance with this memo and any guidance received from the Secretary of the Army.

## OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

DA FORM 4856, MAR 2023    APD AEM v1.02ES    Page 1 of 2
PREVIOUS EDITIONS ARE OBSOLETE.

( This document is considered Controlled Unclassified Information (CUI) when filled. )

Case 1:25-cv-00240-ACR    Document 72-56    Filed 03/07/25    Page 3 of 3
(This document is considered Controlled Unclassified Information (CUI) when filled.)
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 397 of 688

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below).*

Complete the Following Tasks:

1) Mental Examination
2) Medical Examination
3) CIF turn-in
4) SFL-TAP

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees / disagrees and provides remarks if appropriate.)*

Individual counseled:  [ ] I agree   [✓] disagree with the information above.

Individual counseled remarks:

| Signature of Individual Counseled: | | DATE *(YYYYMMDD)*: |
|---|---|---|
| MORGAN.REGAN.AVA.1027624029 | Digitally signed by MORGAN.REGAN.AVA.1027624029 Date: 2025.03.02 02:51:24 -06'00' | 20250302 |

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*
Provide Service member with Additional Guidance on Prioritizing Military Excellence and Readiness, dtd 26FEB25
Assist Service member with the above plan of action, as required

| Signature of Counselor: | | Date *(YYYYMMDD)*: |
|---|---|---|
| ████████████████ | ████████████ | 20250302 |

## PART IV - ASSESSMENT OF THE PLAN OF ACTION

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

### SIGNATURES

| Counselor: | Individual Counseled: | Date of Assessment *(YYYYMMDD)*: |
|---|---|---|
| | | |

**Note:  Both the counselor and the individual counseled should retain a record of the counseling.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, MINERVA BETTIS, AUDRIE GRAHAM, ROAN PICKETT, AMIAH SALE, QUINN TYSON, MICHELLE BLOOMROSE, SAMUEL AHEARN, CLAYTON McCALLISTER, GREYSON SHISHKINA, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-00240 |
| The UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## DECLARATION OF SAMUEL AHEARN

I, Samuel Ahearn, declare as follows:

1.     I am a 24-year-old candidate at the Officer Candidate School for the U.S. Navy in Newport, Rhode Island. I am transgender.

## HISTORY OF ACCESSION

2.    In 2023, I graduated from Northeastern University in Boston, Massachusetts, with a degree in physics and philosophy. I wanted to join the Navy both to serve my country and for the educational opportunities that are available in the Navy.

3.    Following my graduation, I began the process of acceding to the U.S. Navy.

4.    I received a diagnosis of gender dysphoria in or about July of 2019. I transitioned to live as man 5 years and 7 months ago. I have undergone treatment for my gender dysphoria, including hormone therapy.

5.    In order to accede to the Navy, I was required to demonstrate that I had been stable living as a man for 18 months, which I did.

6.    I completed the application process, was medically cleared by MEPS in August 2024, and began Officer Candidate School in November of 2024. I am training to be an oceanography officer in the Navy.

7.    Throughout this process, my recruiter has known that I am transgender and supported my accession. My physics degree is highly sought after by the navy for oceanography officers.

8.    Throughout my time at Officer Candidate School, it has never been an issue that I am transgender. My commanders and shipmates have been supportive of me.

9.    I completed my training and met all the required standards. I was scheduled to graduate from my program on February 14, 2025. However, because of the EO, Navy command has not allowed me to graduate.

10.    My Executive Officer and Commanding Officer both supported my graduation and sought a waiver to allow me to graduate. However, that waiver request was denied.

11.     Following graduation, I was scheduled to report on March 10 to Virginia Beach for Information Warfare Community School. I was then scheduled for basic oceanography accession training in Mississippi, followed by a duty station in San Diego. As an oceanography officer in San Diego, I would likely be assigned duties associated with meteorology and undersea warfare. However, none of these scheduled assignments can occur until I graduate.

12.     Because I have been denied my graduation, I am currently held in the Talent Management Group. This group is usually reserved for trainees who do not successfully complete their academic work, or who are unable to meet standards due to medical issues. Neither of these applies to me; I have passed all of my coursework and met all standards. I am being retained in the Talent Management Group and denied my graduation solely because I am transgender.

13.     As a transgender man, I am required to adhere to all standards applicable to service members identified with an "M" gender marker in DEERS. This includes berthing with men and using men's changing and bathing facilities. It includes being referred to as a man, as well as the use of honorifics such as "Sir." If I cannot serve as a man in the military, I cannot serve at all.

14.     It would not be possible for me to serve in the Navy as a woman because I am not a woman. I am a man. It would be extraordinarily disruptive for me to use women's restrooms and showers, sleep in women's berthing unites, or otherwise access sex-segregated facilities for women. If others were required to refer to me by female pronouns or address me as "Ma'am," it would cause confusion and disruption, negatively impacting my ability to effectively perform the duties of my job. In short, if I cannot serve as a man, I cannot serve at all.

15.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with women, since I am a man.

16.    Serving in the U.S. Navy has been a goal of mine for many years. I have worked hard and met all applicable standards to ensure that I will be able to serve my country. I do not want to be denied that opportunity because I am transgender.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 3, 2025

Samuel Ahearn

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00240 |
| | ) | |
| UNITED STATES OF AMERICA *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF VERA WOLF

I, Vera Wolf, declare as follows:

1.      I am a 32-year-old Staff Sergeant and weapons specialist in the United States Air Force. I enlisted on or about April 11, 2017. I have served my country honorably for nearly eight years. I am transgender.

2.      I began serving in the Air Force in explosive ordnance disposal. I later served as temporary command support staff, providing IT support to my Commander and her lieutenants and chiefs, before transitioning to my current role as a weapons specialist. In this role, I load ammunition on AC-130 gunships, among other duties.

3.      In my time in the Air Force, I have been deployed overseas twice. I once deployed to Afghanistan between 2018 and 2019. Later, I redeployed to Afghanistan and was part of the final group of service members leaving the country as the U.S. drew down its presence there. I finished that tour in the Middle East in the United Arab Emirates, Kuwait, and Qatar.

4.      In or about November 2019, I received a diagnosis of gender dysphoria. Following that diagnosis, I worked with my Air Force medical providers to develop a treatment plan. I am currently in the process of completing that treatment plan.

1

5.       I have been living and serving as a woman for approximately two years.

6.       I serve in a combat unit that is deployed to the front lines. Although this is a very dangerous and demanding position, throughout my treatment plan, I have never been non-deployable.

7.       To complete my transition, my treatment plan requires two additional surgeries. I was scheduled to have one of those surgeries at the end of March. However, that surgery was cancelled shortly after Defendant Secretary of Defense Hegseth issued his January 28, 2025, memorandum halting medical care for transgender service members.

8.       Because my treatment plan is not complete, I am currently serving as a woman under an Exception to Policy (ETP). My gender marker has not yet been updated in DEERS.

9.       I have received awards including an Air and Space Commendation Medal, an Air and Space Achievement Medal, two Meritorious Service Medals, two Air Force Good Conduct Medals, a Global War on Terrorism Medal.

17.       On March 3, I was informed by my First Sergeant that, because my ETP has been revoked, I will be required to adhere to male standards immediately.

18.       I meet all standards applicable to female service members. I adhere to female grooming standards and use women's restrooms. Others refer to me as a woman.

19.       It is not possible for me to serve in the military as a man, which I am not. I am a woman, look like a woman, and have used women's facilities since my transition without incident. It would be extraordinarily disruptive for me to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.

20.       If others were required to refer to me by male pronouns or address me as "sir," it would cause confusion and disruption, negatively impacting my ability to effectively perform the

2

duties of my job.

21.    I am unable to demonstrate that I have never attempted to transition to any sex other than my birth sex, because I have undergone a gender transition. Moreover, as stated above, I am unable to adhere to the standards associated with men, since I am a woman.

22.    If I cannot serve as a woman in the military, I cannot serve at all.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

JA393

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

Vera Wolf

4

Case 1:25-cv-00240-ACR    Document 72-59    Filed 03/07/25    Page 1 of 15
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 407 of 688

Case 1:25-cv-00240-ACR    Document 13-20    Filed 02/03/25    Page 1 of 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 25-cv-240-ACR |
| Defendants. | ) ) | |

_____

## DECLARATION OF ALEX WAGNER

I, Alex Wagner, declare as follows:

1.  From June 10, 2022, through January 20, 2025, I served as Assistant Secretary of the Air Force for Manpower and Reserve Affairs.  In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness

support for all service members within both the United States Air Force and United States Space Force.

## PROFESSIONAL BACKGROUND

2.   I attended Brown University and obtained undergraduate degrees in Political Science and History in 1999.  After college, I worked as a research analyst and reporter in Washington, D.C. for three years prior to enrolling at Georgetown University Law Center, graduating with a law degree in 2005.

3.   After I graduated law school, I practiced as an attorney at the law firm Preston Gates & Ellis, now K&L Gates.  I have since worked in multiple positions within the Department of Defense ("DoD").  From 2009 to 2011, I was the Special Assistant to the Assistant Secretary of Defense (Global Strategic Affairs).  I then served as the Senior Advisor to the Deputy Assistant Secretary of Defense (Rule of Law and Detainee Policy) from 2011 to 2014.

4.   From 2015 to 2017, I served as Chief of Staff to the Secretary of the Army.  In that capacity, I was deeply involved in shaping the development and implementation of policies that, among other things, enabled transgender Americans to serve in the military.

5.   On June 7th, 2022, I was confirmed by the U.S. Senate and sworn in as Assistant Secretary of the Air Force for Manpower and Reserve Affairs on June 10, 2022.     In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness support for all service members within both the United States Air Force and United States Space Force.

6.   For my work in the DoD, I was awarded the Office of the Secretary of Defense Exceptional Public Service Medal in 2015, the Army's Distinguished Public Service Medal in 2017, and the

2

Department of the Air Force's Decoration for Exceptional Public Service in 2025 (the latter two are the highest awards a civilian can earn).

## THE DEPARTMENT OF THE AIR FORCE

7.  The Department of the Air Force ("DAF") is responsible for organizing, training, and equipping two military services: the United States Air Force and the United States Space Force ("USSF"), the forces, respectively, that defend America's air and space domains.  It is one of three military departments within the DoD.  The DAF, with an annual budget of more than $217.5 billion, employs nearly 700,000 Airmen, Guardians, and civilian employees.  The Air Force, including the Air Force Reserve and Air National Guard, operates over 300 flying squadrons, consisting of eight to 24 aircraft each, worldwide. Air and Space Force bases are located across the United States and span the globe.

8.  The DAF is one of the world's most technologically sophisticated organizations, in many respects dwarfing the technological capabilities of individual companies in the private sector.  Air Force and Space Force personnel train for years to function effectively and develop the leadership skills necessary to advance the critical missions our Nation requires.  Recruitment and retention of capable and qualified Airmen and Guardians is of critical importance to the readiness of the DAF.

## PRIOR DEVELOPMENT OF DOD POLICY

9.  On July 28, 2015, then-Secretary of Defense Ashton B. Carter ordered Brad Carson, in his capacity as Under Secretary of Defense for Personnel and Readiness ("USD P&R"), to convene a working group to formulate policy options for DoD regarding transgender service members (the "Working Group").  Secretary Carter ordered the Working Group to present its recommendations within 180 days.  In the interim, transgender service members were not to be discharged or denied reenlistment or continuation of service for being transgender.

3

10. The Working Group formulated its recommendations by collecting and considering evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members.

11. The Working Group concluded that banning service by transgender persons would require the discharge of highly trained and experienced service members, leaving unexpected vacancies in operational units and requiring the expensive and time-consuming recruitment and training of replacement personnel.

12. The Working Group also concluded that banning service by transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve.

13. In 2016, the RAND Corporation, a federally funded, independent research organization, presented the results of an exhaustive study requested by Mr. Carson. That report was entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report"). The RAND Report found no evidence that allowing transgender people to serve would negatively impact unit cohesion, operational effectiveness, or readiness. RAND Report at 69–70.

14. On June 30, 2016, Secretary of Defense Ashton Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), a true and correct copy of which is attached as Exhibit A.

15. The purpose of DTM 16-005 was to "[e]stablish[ ] policy, assign[ ] responsibilities, and prescribe [ ] procedures for the standards for retention, accession, separation, in-service transition,

and medical coverage for transgender personnel serving in the Military Services." Notably, DTM 16-005 set forth the policy that allowed transgender individuals to serve in the military.

16. Through DTM 16-005, the Secretary of Defense ordered the Secretaries of the Military Departments, including the Army, to identify all DoD, Military Department, and Service issuances in need of revision in light of the DoD change in policy, and to submit proposed revisions to USD P&R.  USD P&R was tasked with drafting revisions to all necessary issuances consistent with DTM 16-005.

17. To begin implementing DTM 16-005 as applied to the Army, on July 1, 2016, I assisted then-Secretary of the Army Eric K. Fanning in the development and issuance of Army Directive 2016-30, entitled *Army Policy on Military Service of Transgender Soldiers*, a true and correct copy of which is attached as Exhibit B.

18. Army Directive 2016-30 was effective immediately and applied to all personnel in the Active Army, U.S. Army Reserve, and Army National Guard.  It stated that "it is Army policy to allow open service by transgender soldiers.  The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline.  Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender.  An otherwise qualified Soldier will not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity."  The Directive required the Assistant Secretary of the Army for Manpower and Reserve Affairs (the "ASA (M&RA)") to establish, no later than July 5, 2016, a Transgender Service Implementation Group to develop policies and procedures for transgender service, as well as a Service Central Coordination Cell ("SCCC"), composed of medical, legal, and military personnel experts, to serve as a resource for commanders' inquiries and requests.  By October 1,

5

2016, the ASA (M&RA) was directed to recommend a policy addressing service of transgender soldiers, including "a process by which transgender soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in [the Defense Enrollment Eligibility Reporting System ("DEERS")]."   In the meantime, the Directive established a process whereby gender marker changes would be handled via Exceptions to Policy ("ETPs") processed by the SCCC and ASA (MR&A), with weekly reports summarizing the ETPs to be provided to the Secretary of the Army, as well as  the Chief of Staff of the Army, then General Mark Milley.

19. On October 7, 2016, I also assisted in Secretary Fanning's issuance of a further directive, Army Directive 2016-35, which "establishe[d] policies and procedures for gender transition in the Army."  A true and correct copy of Army Directive 2016-35 is attached as Exhibit C.

20. Army Directive 2016-35 provided that "a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition."  The Directive provided that gender transition in the Army begins with a diagnosis that gender transition is medically necessary and ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender.  The Directive further stated that for policies and standards that differ according to gender, the Army will recognize a Soldier's gender based on the gender marker that appears in DEERS.  It stated that "the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards" according to the gender marker in DEERS.

**THE AUSTIN POLICY**

21. On January 25, 2021, President Joseph R. Biden rescinded the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason— including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

22. On April 30, 2021, the DoD implemented the EO through the issuance of DoD Instruction ("DoDI") 1300.28, entitled *In-Service Transition for Transgender Service Members* (the "Austin Policy"). The Austin Policy applies to all military departments and sets forth guidance to allow service by qualifying transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and

7

retention is consistent with military service and readiness."  A true and correct copy of DoDI 1300.28 is attached as Exhibit D.

23. To implement the Austin Policy, the then-Acting Secretary of the Air Force issued Department of the Air Force Policy Memorandum 2021-36-01 (the "DAF Policy Memorandum"). As Assistant Secretary of the Air Force for Manpower and Reserve Affairs, my responsibilities included overseeing implementation of the DAF's policy permitting service by qualified transgender Airmen and Guardians.  A true and correct copy of the DAF Policy Memorandum is attached as Exhibit E.

24. The DAF Policy Memorandum states that "[s]ervice in the Air Force and Space Force should be open to all persons who can meet the high standards for military service and readiness" and that "transgender Service members or applicants for accession must be subject to the same standards as all other persons."  For any standard, requirement, or policy that "depends on whether an individual is male or female . . .  all persons will be subject to the standard, requirement, or policy associated with their gender marker in [DEERS]."

25. The DAF Policy Memorandum specifies that personnel will either be accessed or commissioned in accordance with medical standards issued by the DAF and the DoD.

26. The DAF Policy Memorandum also confirms that "[n]o person, sole[ly] based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force."  Additionally, for service members "whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition," the DAF Policy Memorandum states that they "should be treated, for purposes of separation and

retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition."

27. In overseeing the implementation of the Austin Policy and the DAF Policy Memorandum, I was not aware of any negative impact that service by transgender Airmen or Guardians had on the Air Force, the Space Force, or our overall military readiness.

28. The Austin Policy fosters openness and trust among team members, enabling all members of our total force to bring their full selves to their high stakes mission, and thereby engenders stronger unit cohesion.  This unit cohesion forms the basis of our military's ethos and is vital to successfully advancing America's national security interests around the world.  To ensure America's Air and Space Forces are effective in deterring, denying, and — if necessary—defeating our adversaries, the DAF needs to recruit and retain the best talent the American people have available.  As a result, we must be seen as an employer of choice in a highly competitive talent marketplace.

29. Any organization that is perceived by America's youth as discriminatory will be at a competitive disadvantage in this race for talent.  In 2024, PRRI found that an overwhelming majority of Gen Z adults, ranging in age from 18 to 26, support nondiscrimination protections for LGBT people.  (https://www.prri.org/spotlight/young-americans-views-on-lgbtq-rights/).  In addition, the great majority of young adults know LGBT people as classmates, as teammates, as brothers and sisters, and as cousins.  The Austin Policy not only sends a message to LGBT youth and their families that the military is open to everyone who can meet its high standards; it also sends a message to all other youth that it is not an organization that discriminates.  A true and correct copy of the PRRI analysis is attached as Exhibit F.

9

30. Further, the Austin Policy enables our military to retain highly trained and specialized service members that the American taxpayers have invested in financially by providing an opportunity to advance professionally and develop their leadership skills to support our readiness.

31. The military also has an obligation to provide health care to all service members. Gender transition-related health care is medically necessary health care. The Austin Policy fulfills the duty owed to service members to provide necessary care in a non-discriminatory manner to promote a ready force. An individual who seeks transgender health care does not abruptly disappear from the ranks, but rather works with a military medical practitioner to ensure readiness, both personal and unit readiness. This is consistent with the military's general medical policies for any other medically necessary treatment. It is also consistent with new parental leave policies enacted in 2022 which enable the military to retain key talent despite brief interruptions in service.

32. What is patently clear to me is that the Austin Policy has not negatively impacted readiness. During my time as Assistant Secretary, I did not attend a single meeting where concerns about the service of transgender Airmen or Guardians were raised.

33. It is also clear to me that allowing transgender service has had little or no effect on unit cohesion. I am not aware of any complaints regarding unit cohesion resulting from the non-discriminatory policy. To the contrary, in my experience, inclusion of transgender service members into units has been a non-issue. In a 2022 visit to Air Force Basic Military Training (BMT) at Lackland Air Force Base, I discussed the inclusion of transgender trainees with the command team of the 37th Training Wing, responsible for, among other things, providing foundational training for those entering the Air Force, Space Force, Air Force Reserve and Air National Guard—generating 93% of the enlisted corps. The command team reported to me that during their time in command, there had been four transgender trainees and there had been no

10

issues for other trainees or for leadership. To the extent the Austin Policy has had any appreciable impact on unit cohesion, I would assess its impact was either negligible or positive, in that not worrying about hiding one's authentic self improves focus on mission and as a result enables greater trust among team members.

34. Personnel policies that allow transgender service members to be evaluated based on merit rather than transgender status strengthen the military's mission of protecting the United States; they do not jeopardize it. The true power of an All-Volunteer Force that reflects the diversity of the American people is in that it enables those that don't serve to understand it as an extension of their interests. Anyone with a propensity to serve who meets our high entry and retention standards and is courageous enough to pledge that they will support and defend the Constitution, should be able to do so.

## IMPACT OF REVERSING THE AUSTIN POLICY

35. On January 27, 2025, President Trump issued an executive order reversing the Biden Administration's EO and mandating that all transgender people be barred from military service, including those already serving.

36. Such an abrupt reversal of established military personnel policy is both highly unusual and incredibly disruptive.

37. Absent any evidence, the Trump EO claims that the Austin Policy that has been in place since 2021 has had a negative impact on military effectiveness, lethality, and unit cohesion. The Trump EO also claims, without evidence, that transgender people are inherently dishonorable, deceitful, and unfit for military service. These claims are wholly unfounded and refuted by the reality that transgender people are serving honorably, effectively, and often with distinction in our Nation's military while meeting the same performance and medical standards as others. The

11

notion that being transgender reflects negatively on a person's honesty, character, or fitness has no basis in reality, is contradicted every day by the actual contributions of transgender service members, is cruel, and frankly beneath the dignity of the Commander-in-Chief of the United States Armed Forces.

38. Prohibiting transgender individuals from serving in the military is harmful to the military, degrades our recruiting enterprise, undermines unit readiness, and thus is inimical to our national security and the public interest for several reasons.

39. **Loss of Qualified Personnel.**  Prohibiting current transgender service members from accessing or serving in the military will result in the loss of opportunity for otherwise qualified Americans to consider military service, not only for transgender Americans, but for the rest of American youth (and their influencers) who would view the military as an institution that discriminates on bases unrelated to those qualifications to serve.  Indeed, perhaps the greatest value of the law rescinding "Don't Ask, Don't Tell" in 2010, was in realigning in the eyes of the American people the military's practice with its essential ethos: that ability and merit—rather than unjust discrimination—best enable good order and discipline, unit cohesion, and mission accomplishment.

40. For those currently serving, excising transgender service members from their units would undermine readiness and operational effectiveness.  Transgender service members, both officers and enlisted, hold key positions throughout units and well as leadership positions.

41. The loss of qualified personnel as a result of separating transgender service members could be particularly acute at a time of decreased familiarity with military service.  Although the DAF has achieved its 2024 enlisted recruiting goals and is well on its way to meet its increased 2025 goals, the DAF like the other services, is currently facing a reduced pool of American who meet

12

military physical and heath standards.  This reality is further compounded by decreased familiarity with military service and especially strong private-sector economic conditions.  Unlike many private-sector companies, which can fill vacancies by simply tapping an experienced and flexible labor pool, the DAF builds and grows its own skilled specialists and leaders organically, and this typically requires years or decades.

42. **Worldwide Deployability.**  Allowing transgender service members to serve does not create any unique issues relating to deployability.  The DAF relies on force management models, reserve component mobilization, and, in some cases, civilian support to meet mission requirements.  Civilians are particularly well integrated into USSF operations, as approximately half the manpower of the USSF is civilian.  Responding to any deployability issues to the extent that they may arise for some individual transgender service member creates no greater challenges than those recently addressed by, for example, recent expansion of parental leave policies to 12 weeks for both female and male service members, or for the myriad other medical issues that result in short-term periods of non-deployability.  There is nothing about the healthcare needs of transgender individuals that in any way presents any unique issues relating to deployment.

43. **Erosion of Trust in Command.**  The abrupt reversal of policy is also harmful to military readiness because it erodes service members' trust in their command structure and its professionalism.  The military's effectiveness depends on a relationship of mutual trust between leaders and followers.  That trust, and the prompt following of commands, is essential to good order and discipline, unit cohesion, and the ensuing rapid response required to address unexpected crises or challenges.  Following the adoption of the Austin Policy permitting service by transgender persons in 2021, military leaders instructed service members that they should not discriminate

13

against their transgender colleagues.  For that policy to be abruptly reversed will inevitably erode trust in the reliability and integrity of military decision making.

44. This sudden reversal is harmful both to transgender service members and to other formerly disfavored groups that have been recently integrated into the military and into combat roles.  In 2011, the policy prohibiting gay, lesbian, and bisexual people from openly serving in the military was formally repealed.  More recently, DoD also removed remaining barriers for women serving in certain combat specialties.  The sudden reversal of the DoD's recently adopted policy of inclusion sends a message that politics is driving the changes and other policies promoting readiness and equal opportunity may similarly be arbitrarily reversed.

45. **Readiness and Morale.**  The sudden reversal of a policy adopted after substantial deliberation and rigorous data assessment will also have a deleterious effect on morale, as it undermines the confidence of service members that important military policy decisions will be based on rational, deliberate, and merit-based assessments.  Airmen, Guardians, and other service members must believe that the orders and policies they are required to follow are based on the best interests of the force and the Nation, not impulse or a partisan political agenda to punish disfavored groups.  This trust in the rationality and professionalism of our military leadership is also a key factor in recruiting and retaining talented personnel.  The sudden reversal of the Austin Policy is not supported by data nor by lived experience, and as a result, it undermines confidence in the chain of command.

46. The impact to readiness, morale, good order and discipline, unit cohesion, and mission effectiveness engendered by the abrupt reversal of the Austin Policy permitting service by transgender people will have a negative impact not only on transgender service members, but on the joint force as a whole.  Any suggestion that those serving to protect and defend our country

14

JA408

will not have the full support of their entire chain of command will also undermine the DAF's ability to attract and retain highly qualified candidates who can perform at the highest levels necessary to complete the incredibly complex and critical national security missions asked of them, particularly in this new era of great power competition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 3, 2025

_____

Alex Wagner

15

Case 1:25-cv-00240-ACR    Document 72-60    Filed 03/07/25    Page 1 of 7
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 422 of 688

Case 1:25-cv-00240-ACR    Document 13-22    Filed 02/03/25    Page 1 of 7

# EXHIBIT A



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

JUN 3 0 2016

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
                CHAIRMAN OF THE JOINT CHIEFS OF STAFF
                UNDER SECRETARIES OF DEFENSE
                DEPUTY CHIEF MANAGEMENT OFFICER
                CHIEF OF THE NATIONAL GUARD BUREAU
                GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
                DIRECTOR, COST ASSESSMENT AND PROGRAM
                    EVALUATION
                INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
                DIRECTOR, OPERATIONAL TEST AND EVALUATION
                DEPARTMENT OF DEFENSE CHIEF INFORMATION OFFICER
                ASSISTANT SECRETARY OF DEFENSE FOR LEGISLATIVE
                    AFFAIRS
                ASSISTANT TO THE SECRETARY OF DEFENSE FOR PUBLIC
                    AFFAIRS
                DIRECTOR, NET ASSESSMENT
                DIRECTORS OF THE DEFENSE AGENCIES
                DIRECTORS OF THE DOD FIELD ACTIVITIES

SUBJECT:   Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender
           Service Members"

References:   DoD Directive 1020.02E, "Diversity Management and Equal Opportunity in the
              DoD," June 8, 2015
              DoD Directive 1350.2, "Department of Defense Military Equal Opportunity
              (MEO) Program," August 18, 1995
              DoD Instruction 6130.03, "Medical Standards for Appointment, Enlistment, or
              Induction in the Military Services," April 28, 2010, as amended

   Purpose. This DTM:

   • Establishes policy, assigns responsibilities, and prescribes procedures for the
     standards for retention, accession, separation, in-service transition, and
     medical coverage for transgender personnel serving in the Military Services.

   • Except as otherwise noted, this DTM will take effect immediately. It will be
     converted to a new DoDI. This DTM will expire effective June 30, 2017.

   Applicability. This DTM applies to OSD, the Military Departments (including the Coast
Guard at all times, including when it is a Service in the Department of Homeland Security by
agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the

Case 1:25-cv-00240-ACR    Document 12-80    Filed 03/03/25    Page 3 of 7
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 424 of 688

*DTM-16-005*

Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

Policy.

- The defense of the Nation requires a well-trained, all-volunteer force comprised of Active and Reserve Component Service members ready to deploy worldwide on combat and operational missions.

- The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.

- These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity.

Responsibilities

- The Secretaries of the Military Departments will:

  o Take immediate action to identify all DoD, Military Department, and Service issuances, the content of which relate to, or may be affected by, the open service of transgender Service members.

  o Draft revisions to the issuances identified, and, as necessary and appropriate, draft new issuances, consistent with the policies and procedures in this memorandum.

  o Submit to the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) the text of any proposed revisions to existing Military Department and Service regulations, policies, and guidance, and of any proposed new issuance, no later than 30 days in advance of the proposed publication date of each.

- The USD(P&R) will:

  o Take immediate action to identify all DoD, Military Department, and Service issuances, the content of which relate to, or may be affected by, the open service of transgender Service members.

2

*DTM-16-005*

o  Draft revisions to the issuances identified in this memorandum and, as necessary and appropriate, draft new issuances consistent with the policies and procedures in this memorandum.

Procedures.  See Attachment.

Releasability.  **Cleared for public release.**  This DTM is available on the DoD Issuances Website at http://www.dtic.mil/whs/directives.

Attachment:
As stated

cc:
Secretary of Homeland Security
Commandant, United States Coast Guard

*DTM-16-005*

ATTACHMENT

PROCEDURES


1. SEPARATION AND RETENTION

    a.  Effective immediately, no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity.

    b.  Transgender Service members will be subject to the same standards as any other Service member of the same gender; they may be separated, discharged, or denied reenlistment or continuation of service under existing processes and basis, but not due solely to their gender identity or an expressed intent to transition genders.

    c.  A Service member whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition.


2. ACCESSIONS

    a.  Medical standards for accession into the Military Services help to ensure that those entering service are free of medical conditions or physical defects that may require excessive time lost from duty.  Not later than July 1, 2017, the USD(P&R) will update DoD Instruction 6130.03 to reflect the following policies and procedures:

    (1)  A history of gender dysphoria is disqualifying, **unless**, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

    (2)  A history of medical treatment associated with gender transition is disqualifying, **unless**, as certified by a licensed medical provider:

    (a)  the applicant has completed all medical treatment associated with the applicant's gender transition; and

    (b)  the applicant has been stable in the preferred gender for 18 months; and

    (c)  If the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

(3)  A history of sex reassignment or genital reconstruction surgery is disqualifying, **unless**, as certified by a licensed medical provider:

(a)  a period of 18 months has elapsed since the date of the most recent of any such surgery; and

(b)  no functional limitations or complications persist, nor is any additional surgery required.

b.  The Secretaries of the Military Departments and the Commandant, United States Coast Guard, may waive or reduce the 18-month periods, in whole or in part, in individual cases for applicable reasons.

c.  The standards for accession described in this memorandum will be reviewed no later than 24 months from the effective date of this memorandum and may be maintained or changed, as appropriate, to reflect applicable medical standards and clinical practice guidelines, ensure consistency with military readiness, and promote effectiveness in the recruiting and retention policies and procedures of the Armed Forces.

3.  <u>IN-SERVICE TRANSITION</u>

a.  Effective October 1, 2016, DoD will implement a construct by which transgender Service members may transition gender while serving, in accordance with DoDI 1300.28, which I signed today.

b.  Gender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs.

4.  <u>MEDICAL POLICY</u>.  Not later than October 1, 2016, the USD(P&R) will issue further guidance on the provision of necessary medical care and treatment to transgender Service members.  Until the issuance of such guidance, the Military Departments and Services will handle requests from transgender Service members for particular medical care or to transition on a case-by-case basis, following the spirit and intent of this memorandum and DoDI 1300.28.

5.  <u>EQUAL OPPORTUNITY</u>

a.  All Service members are entitled to equal opportunity in an environment free from sexual harassment and unlawful discrimination on the basis of race, color, national origin, religion, sex, or sexual orientation.  It is the Department's position, consistent with the U.S. Attorney General's opinion, that discrimination based on gender identity is a form of sex discrimination.

*DTM-16-005*

b.  The USD(P&R) will revise DoD Directives (DoDDs) 1020.02E," Diversity Management and Equal Opportunity in the DoD," and 1350.2,"Department of Defense Military Equal Opportunity (MEO) Program," to prohibit discrimination on the basis of gender identity and to incorporate such prohibitions in all aspects of the DoD MEO program.  The USD(P&R) will prescribe the period of time within which Military Department and Service issuances implementing the MEO program must be conformed accordingly.

6.  <u>EDUCATION AND TRAINING</u>

a.  The USD(P&R) will expeditiously develop and promulgate education and training materials to provide relevant, useful information for transgender Service members, commanders, the force, and medical professionals regarding DoD policies and procedures on transgender service.  The USD(P&R) will disseminate these training materials to all Military Departments and the Coast Guard not later than October 1, 2016.

b.  Not later than November 1, 2016, each Military Department will issue implementing guidance and a written force training and education plan.  Such plan will detail the Military Department's plan and program for training and educating its assigned force (to include medical professionals), including the standards to which such education and training will be conducted, and the period of time within which it will be completed.

7.  <u>IMPLEMENTATION AND TIMELINE</u>

a.  Not later than October 1, 2016, the USD(P&R) will issue a Commander's Training Handbook, medical guidance, and guidance establishing procedures for changing a Service member's gender marker in DEERS.

b.  In the period between the date of this memorandum and October 1, 2016, the Military Departments and Services will address requests for gender transition from serving transgender Service members on a case-by-case basis, following the spirit and intent of this memorandum and DoDI 1300.28.

Case 1:25-cv-00240-ACR    Document 72-61    Filed 03/07/25    Page 1 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 429 of 688


Case 1:25-cv-00240-ACR    Document 13-23    Filed 02/03/25    Page 1 of 5

# EXHIBIT B



**SECRETARY OF THE ARMY**
**WASHINGTON**

O 1 JUL 2016

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

1. References:

    a.  Department of Defense (DoD) Directive-type Memorandum (DTM) 16-005, Military Service of Transgender Service Members, June 30, 2016.

    b.  DoD Instruction 1300.28 (In-Service Transition for Transgender Service Members), June 30, 2016.

2. Pursuant to references a and b, it is Army policy to allow open service by transgender Soldiers. The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender.  An otherwise qualified Soldier shall not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity.

3. No later than July 5, 2016, the Assistant Secretary of the Army for Manpower and Reserve Affairs (ASA (M&RA)) will do the following.

    a.  Establish a Transgender Service Implementation Group (TSIG) to develop policies and procedures for transgender service.  ASA (M&RA) will Chair the TSIG.  Members of the TSIG will be in the rank/grade of General Officer, Civilian Senior Executive Service, or Command Sergeant Major/Sergeant Major and include representatives from the ASA (M&RA), Deputy Chief of Staff G-1, Deputy Chief of Staff G-3/5/7, Office of General Counsel, Office of the Judge Advocate General, Office of the Chief of Chaplains, the Assistant Chief of Staff for Installation Management, U.S. Army Forces Command, U.S. Army Training and Doctrine Command, Office of the Inspector General, and Office of the Surgeon General.

    b.  Establish and embed a Service Central Coordination Cell (SCCC) as a sub-committee within the TSIG.  The SCCC will be comprised of medical, legal, and military personnel experts.  The SCCC will serve as a resource for commanders, address commanders' inquires, and process requests for exceptions to policy.

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

4.  All commands, organizations, activities, and personnel of the Department of the Army will fully support the ASA (M&RA), as chair of the TSIG, in the execution of the assigned tasks.

5.  Exceptions to Policy (ETP).  At present, the Army does not have codified procedures and policy for gender transition to include completing a gender marker change in the Defense Enrollment Eligibility Reporting System (DEERS).  Until the Army establishes such procedures and policy, the following guidance concerning ETPs will apply:

   a.  For Soldiers whose gender transition is otherwise complete but are awaiting a change to their gender marker, their ETPs shall be processed within ten days after receipt of the ETP by the SCCC and shall be given a presumption in favor of approval. For the purposes of this provision, a Soldier's gender transition is complete when the Soldier has received a diagnosis indicating gender transition is medically necessary from a military medical provider, has completed medically necessary treatment, and has obtained the required documentation supporting a gender change.  The Soldier's chain of command shall provide the SCCC with a recommendation for action on the ETP, and an assessment of an approved ETP on readiness and good order and discipline.

   b.  All other requests for ETPs from Soldiers will include the medical diagnosis from a military medical provider and an approved treatment plan with the expected date of completion.  The chain of command will provide recommendations for action and an assessment of an approved ETP on readiness and good order and discipline.

   c.  All requests will be submitted through the first General Officer in the chain of command.  Commanders shall forward all requests for ETPs related to gender transition (to include application of standards for uniform and grooming, body composition assessment, and physical readiness testing) through the chain of command to the SCCC for a recommendation to the ASA (M&RA), who will make the decision.

   d.  The ASA (M&RA) shall provide a report on a weekly basis to the Chief of Staff and me summarizing the requests for ETPs and the ASA (M&RA)'s decisions.

6. The ASA (M&RA), through the TSIG, is responsible for ensuring completion of the following tasks no later than the prescribed dates:

   a.  Training and educating the force is necessary to sustain readiness.  The Army shall create a force-wide training and education plan no later than November 1, 2016. This training shall be completed across the Army no later than July 1, 2017.

   b.  The Army will continue to provide medically necessary care and treatment to all Soldiers, consistent with applicable laws, policies, and procedures.  No later than 45 days following DoD Under Secretary of Defense for Personnel and Readiness published

2

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

guidance on the provision of medical care to transgender Service members, the Army shall issue guidance to its medical providers to ensure they are prepared to offer or arrange for all medically necessary care for our transgender Soldiers.

c.  No later than October 1, 2016, the ASA (M&RA) will recommend a policy addressing the military service of transgender Soldiers, to include establishing a process by which transgender Soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in DEERS.  In addition, the ASA (M&RA) will identify applicable Army issuances to be updated accordingly.

7.  All Soldiers should be able to perform their duties free from unlawful discrimination. It is Army policy that discrimination based on gender identity is a form of sex discrimination. Army commanders shall promote an environment that is free from gender identity discrimination. No later than October 1, 2016, the Army's issuances implementing the DoD Military Equal Opportunity Program shall be updated to prohibit discrimination on the basis of gender identity and incorporate such prohibitions in all aspects of the Army MEO program.

8.  The provisions of this directive are effective immediately and apply to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States.  This directive shall be rescinded upon publication of revised issuances and updates to governing regulations.

Eric K. Fanning

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
U.S. Army Forces Command
U.S. Army Training and Doctrine Command
U.S. Army Materiel Command
U.S. Army Pacific
U.S. Army Europe
U.S. Army Central
U.S. Army North
U.S. Army South
U.S. Army Africa/Southern European Task Force
U.S. Army Special Operations Command
(CONT)

3

SUBJECT:  Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers)

DISTRIBUTION:  (CONT)

Military Surface Deployment and Distribution Command
U.S. Army Space and Missile Defense Command/Army Strategic Command
U.S. Army Medical Command
U.S. Army Intelligence and Security Command
U.S. Army Criminal Investigative Command
U.S. Army Corps of Engineers
U.S. Army Military District of Washington
U.S. Army Test and Evaluation Command
U.S. Army Installation Management Command
Superintendent, United States Military Academy
Director, U.S. Army Acquisition Support Center
Executive Director, Arlington National Cemetery
Commander, U.S. Army Accessions Support Brigade
Commandant, U.S. Army War College
Commander, Second Army

CF:
Director, Army National Guard
Director of Business Transformation
Commander, Eighth Army
Commander, U.S. Army Cyber Command

4

Case 1:25-cv-00240-ACR     Document 72-62     Filed 03/07/25     Page 1 of 20
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 434 of 688

Case 1:25-cv-00240-ACR     Document 13-24     Filed 02/03/25     Page 1 of 20

# EXHIBIT C

JA422



**SECRETARY OF THE ARMY**
WASHINGTON

0 7 OCT 2016

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

1. References. A complete list of references is at enclosure 1.

2. The Army is open to all who can meet the standards for military service and readiness and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. The Army allows transgender Soldiers to serve openly. Consistent with this policy, the following principles shall apply:

   a. No otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of the Soldier's gender identity.

   b. Army medical providers will diagnose and provide medically necessary care and treatment for transgender Soldiers eligible for military medical care in accordance with the guidance for transgender care issued by the Assistant Secretary of Defense (Health Affairs) and the Army Surgeon General. Consistent with that guidance, a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition.

   c. For policies and standards that apply differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS). Coincident with that gender marker, the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards applied with consideration of the member's gender. For facilities subject to regulation by the Army, a Soldier uses those billeting, bathroom, and shower facilities associated with the Soldier's gender marker in DEERS.

3. This directive establishes policies and procedures for gender transition in the Army. Gender transition in the Army begins when a Soldier receives a diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care) indicating that gender transition is medically necessary. Gender transition ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender.

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

a.  Any Soldier with a diagnosis indicating that gender transition is medically necessary must ensure that his or her chain of command is informed of the diagnosis and projected schedule for medical treatment that is part of the Soldier's medical treatment plan, including an estimated date for a change in the Soldier's gender marker, and must request that the chain of command approve the timing of the medical treatment.  The Soldier must notify his or her chain of command of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

b.  The exact procedures Soldiers, military medical providers, and commanders are to follow in relation to a Soldier's gender transition depend on the Soldier's duty status and eligibility for military medical care.  Procedures for Soldiers on active duty and eligible for military medical care are in enclosure 2.  Procedures for Soldiers serving in the Selected Reserve in the U.S. Army Reserve or Army National Guard, including Individual Mobilization Augmentees, are in enclosure 3.  Procedures for Soldiers serving in the Standby Reserve or Individual Ready Reserve are in enclosure 4.  Procedures for Soldiers serving in the Inactive National Guard are in enclosure 5.

c.  When the Soldier is stable in his or her preferred gender, as determined or confirmed by a military medical provider, the Soldier may request approval of a change to their gender marker in DEERS through the procedures identified in enclosures 2 through 5.  The request for a change in gender marker must be supported by a medical diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care) indicating that gender transition is medically necessary; confirmation from a military medical provider that the Soldier is stable in the preferred gender; and legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

d.  Within 30 days after receiving a request for a change to a Soldier's gender marker and all required documentation (within 60 days for reserve component Soldiers), the applicable approval authority identified in enclosures 2 through 5 will approve a change to the Soldier's gender marker in DEERS to show the Soldier's preferred gender.  The approval will be in writing and state the effective date of the change to the Soldier's gender marker.

e.  The Soldier's gender marker will be changed upon submission of the written approval to the Commander, U.S. Army Human Resources Command.  Human Resources Command will make the change in the Army personnel information systems, which in turn will update the gender marker in DEERS.

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

f.   After the gender marker in DEERS is changed to show a Soldier's preferred gender, the Soldier will be expected to adhere to Army standards applicable to the preferred gender, as described in paragraph 2c.

g.   The change to the gender marker in DEERS does not preclude additional medically necessary care.

4.   Commanders are responsible and accountable for the overall readiness of their command.  Commanders are also responsible for the collective morale, welfare, good order, and discipline of their unit; for the command climate; and for ensuring that all members of the command are treated with dignity and respect.

a.   Commanders should approach a Soldier undergoing gender transition in the same way they would approach a Soldier undergoing any medically necessary treatment.  Commanders will continue to minimize effects to the mission and ensure continued unit readiness.  Commanders will balance the needs of the individual transitioning Soldier and the needs of the command in a manner that is comparable to the actions available to the commander in addressing comparable medical circumstances unrelated to gender transition.  Commanders may consider the following actions:

(1)  Adjusting the date on which the Soldier's gender transition, or any component of the gender transition process, will begin.

(2)  Advising a Soldier of the availability of options for extended leave status or participation in other voluntary absence programs during the gender transition process, in accordance with Army Regulation (AR) 600-8-10 (Leaves and Passes).

(3)  Processing requests for exceptions to policy (ETPs) associated with gender transition in accordance with paragraph 5.

(4)  Establishing or adjusting local policies on the use of billeting, bathroom, and shower facilities subject to regulation by the military during the gender transition process, consistent with paragraphs 4b and 4c.

(5)  Referring the Soldier for a determination of fitness in the disability evaluation system in accordance with DoD Instruction 1332.18 (Disability Evaluation System (DES)) and AR 40-501 (Standards of Medical Fitness).

(6)  Taking other actions, including the initiation of administrative or other proceedings, comparable to actions that could be initiated for other Soldiers whose ability to serve is similarly affected for reasons unrelated to gender transition.

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

    b.  Soldiers must accept living and working conditions that are often austere, primitive, and characterized by little or no privacy.  All Soldiers will use the billeting, bathroom, and shower facilities associated with their gender marker in DEERS. However, commanders have discretion to employ reasonable accommodations to respect the modesty or privacy interests of Soldiers, including discretion to alter billeting assignments or adjust local policies on the use of bathroom and shower facilities, in accordance with Army policy, in the interest of maintaining morale, good order, and discipline and consistent with performance of the mission.  Nevertheless, no commander may order a Soldier on the basis of his or her gender identity or transitioning status to use a billeting, bathroom, or shower facility not required of other Soldiers with the same gender marker.

    c.  Facilities will not be designated, modified, or constructed to make transgender-only areas.  If modifications are made to accommodate the modesty or privacy concerns of a Soldier, they must be made available for all Soldiers to use.  Commanders will accommodate privacy concerns using existing facilities and furnishings where possible and will modify facilities only when other options are ineffective.

    d.  Commanders should remain mindful of the privacy of personal or health-related information concerning the Soldiers in their command.  Personal information regarding transgender Soldiers should be safeguarded to the same extent as comparable information regarding any other Soldier.

    e.  The Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA (M&RA)) has established a Service Central Coordination Cell composed of medical, legal, and military personnel experts to provide advice and assistance to commanders, address their inquiries, and process requests for ETPs in connection with gender transition for decision by the ASA (M&RA).

5.  In general, Soldiers are expected to comport with the standards of their gender marker in DEERS.  In the event that a Soldier undergoing gender transition is unable to meet a particular Army standard as a result of medical treatment or other aspects of the Soldier's gender transition, the Soldier's chain of command, together with the Soldier and/or the military medical provider, should consider options (for example, adjusting the date of a physical fitness test or extended leave options) other than requesting an ETP to depart from Army standards.  If submitted, a request for an ETP to depart from the standards of a Soldier's gender marker in DEERS must be processed according to the procedures outlined in this paragraph and will be evaluated on a case-by-case basis.

    a.  An active duty or Selected Reserve Soldier should submit the ETP request through the Soldier's chain of command.  An Individual Ready Reserve or Standby Reserve Soldier should submit the ETP request to the Commander, Human Resources

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

Command.  An Inactive National Guard Soldier should submit the ETP request to the Director, Army National Guard.

b.  When submitting an ETP request, the Soldier must identify the specific policy for which the Soldier is seeking an exception and explain the reason for the request.  The request must be accompanied by a medical diagnosis from a military medical provider (or a civilian medical provider if the Soldier is ineligible for military medical care), an approved medical treatment plan identifying medically necessary treatment and a projected schedule for such treatment, and an estimated date for completion of the treatment pursuant to the medical treatment plan.

c.  As soon as practicable, but no later than 60 days after receipt of an ETP request, the recipient of the request (as identified in paragraph 5a) must forward the request through the first general officer in the chain of command to the Service Central Coordination Cell or, if disestablished, to the relevant policy proponent in Headquarters, Department of the Army.  Informed, as appropriate, by advice from a military medical provider, the recipient must provide a recommendation for action on the ETP request and an assessment of the expected effects, if any, the ETP will have on mission readiness and the good order and discipline of the unit.  Commanders should include in their assessment a discussion of what other actions not requiring deviation from Army policies they considered or used and why the actions were ineffective or inadequate.

d.  The ASA (M&RA) has withheld the authority to decide requests for ETPs in relation to a Soldier's gender transition.

6.  Effective immediately, the following regulations will be revised in accordance with the language in enclosure 6:  AR 40-501, AR 135-178, AR 600-20, AR 600-85, AR 635-200, and AR 638-2.  The Deputy Chief of Staff (DCS), G-1, the proponent of AR 601-270 and AR 670-1, will review those regulations for consistency with this directive and references a and b and update those regulations as necessary.  In addition, the Army will take the following actions:

a.  Training and educating the force is necessary to sustain readiness.  No later than 1 November 2016, the Army will develop the necessary training and education to ensure that all members of the force understand the core principles of Army policy on the military service of transgender Soldiers.  Training and education via chain teaching across the Army will be completed no later than 1 July 2017.  In addition, by 1 July 2017, the Army will adjust existing blocks of instruction throughout the Army to sustain the training and education of the Army policy concerning transgender military service.

b.  This directive does not alter Army accessions policy.  No later than 1 July 2017, the Under Secretary of Defense (Personnel and Readiness) will update the policies and procedures governing accessions for transgender applicants in DoD Instruction 6130.03

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

(Medical Standards for Appointment, Enlistment, or Induction in the Military Services). No later than 60 days after those policies and procedures are published, the Army will update its accessions policy.

   c.  No later than 1 October 2017, the ASA (M&RA) will provide the Secretary of the Army with an assessment of whether the Service Central Coordination Cell should be continued, disestablished, or become a permanent body.  At that time, the ASA (M&RA) will also reassess whether the ASA (M&RA) should continue to retain approval authority for ETPs associated with gender transition or should delegate the authority to the proponents of the underlying policy.

   d.  No later than 1 October 2018, The Inspector General will provide the Secretary of the Army with a report of inspection on the Army's compliance with reference b and this directive.  This report will be used for assessing and overseeing compliance; identifying compliance deficiencies, if any; initiating timely corrective action, as appropriate; and identifying best practices and lessons learned.

   e.  All Army activities will review local regulations and policies for consistency with this directive and references a and b and update those regulations and policies as necessary.

7.  The provisions of this directive are effective immediately and apply to all personnel in the Active Army, Army National Guard/Army National Guard of the United States, and Army Reserve.  The directive will be rescinded upon publication of revised issuances and updated to governing regulations.  The ASA (M&RA) is the proponent for this policy.  The point of contact is Chief, Accessions Division, DCS, G-1, 703-695-7693, DSN 312-225-7693.

Encls                                           Eric K. Fanning

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
   U.S. Army Forces Command
   U.S. Army Training and Doctrine Command
   U.S. Army Materiel Command
   U.S. Army Europe
   U.S. Army Central
   U.S. Army North
   (CONT)

6
JA428

SUBJECT:  Army Directive 2016-35 (Army Policy on Military Service of Transgender Soldiers)

DISTRIBUTION:  (CONT)
U.S. Army South
U.S. Army Pacific
U.S. Army Africa/Southern European Task Force
U.S. Army Special Operations Command
Military Surface Deployment and Distribution Command
U.S. Army Space and Missile Defense Command/Army Strategic Command
U.S. Army Cyber Command
U.S. Army Medical Command
U.S. Army Intelligence and Security Command
U.S. Army Criminal Investigation Command
U.S. Army Corps of Engineers
U.S. Army Military District of Washington
U.S. Army Test and Evaluation Command
U.S. Army Installation Management Command
Superintendent, United States Military Academy
Director, U.S. Army Acquisition Support Center
Executive Director, Arlington National Cemetery
Commander, U.S. Army Accessions Command
Commander, U.S. Army War College
Commander, Second Army

CF:
Director, Army National Guard
Director of Business Transformation
Commander, Eighth U.S. Army

# REFERENCES

a. Department of Defense (DoD) Directive-type Memorandum (DTM) 16-005 (Military Service of Transgender Service Members), June 30, 2016.

b. DoD Instruction 1300.28 (In-Service Transition for Transgender Service Members), July 1, 2016.

c. DoD Instruction 1332.18 (Disability Evaluation System (DES)), August 5, 2014.

d. DoD Instruction 6130.03 (Medical Standards for Appointment, Enlistment, or Induction in the Military Services), April 28, 2010, Incorporating Change 1, September 13, 2011.

e. Army Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers), 1 July 2016.

f. Army Regulation (AR) 40-501 (Standards of Medical Fitness), 14 December 2007, Including Rapid Action Revision Issued 4 August 2011.

g. AR 135-178 (Enlisted Administrative Separations), 18 March 2014.

h. AR 600-8-10 (Leaves and Passes), 15 February 2006, Including Rapid Action Revision Issued 4 August 2011.

i. AR 600-20 (Army Command Policy), 6 November 2014.

j. AR 600-85 (The Army Substance Abuse Program), 28 December 2012.

k. AR 601-270 (Army Retention Program), 1 April 2016.

l. AR 635-200 (Active Duty Enlisted Administrative Separations), 6 June 2005, Including Rapid Action Revision Issued 6 September 2011.

m. AR 638-2 (Army Mortuary Affairs Program), 23 June 2015.

n. AR 670-1 (Wear and Appearance of Army Uniforms and Insignia), 10 April 2015.

## GENDER TRANSITION FOR ACTIVE DUTY SOLDIERS

1.  The gender transition process for a Soldier serving on active duty and eligible for military medical care begins when the Soldier receives a diagnosis from a military medical provider indicating that gender transition is medically necessary. The Soldier must ensure that his or her brigade-level commander is informed, through command channels, of the diagnosis and projected schedule for medical treatment that is part of the Soldier's medical treatment plan, including an estimated date for a change in the Soldier's gender marker. The Soldier must request that the brigade-level commander approve the timing of the medical treatment. The Soldier must also notify his or her brigade-level commander of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

2.  Upon establishing a diagnosis indicating that gender transition is necessary, the military medical provider is responsible for developing a medical treatment plan and presenting the plan through command channels to the Soldier's brigade-level commander. The provider must advise the brigade-level commander on the medical diagnosis applicable to the Soldier, including the provider's assessment of medically necessary care and treatment, the urgency of the proposed care and treatment, the likely effect of the care and treatment on the individual's readiness and deployability, and the extent of the human and functional support network needed to support the individual.

3.  The Soldier's brigade-level commander is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition and must:

- consider the Soldier's individual facts and circumstances, including the Soldier's medical treatment plan;

- ensure military readiness by minimizing effects to the mission (including deployment, operational, training, and exercise schedules, and critical skills availability); and

- maintain the morale, welfare, good order, and discipline of the unit.

Upon receipt of the Soldier's request, the brigade-level commander will notify the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request. The brigade-level commander will approve the timing of the medical treatment in writing. The timing of the treatment may be adjusted, after consulting with the medical provider, based on unscheduled requirements.

4.  The medical provider, in consultation with the Soldier, must advise the brigade-level commander when the Soldier has completed the medical treatment necessary to achieve stability in the preferred gender and recommend to the brigade-level commander when the Soldier's gender marker should be changed in the Defense

Enrollment Eligibility Reporting System (DEERS).  At that point, the Soldier may request that the brigade-level commander approve a change to the Soldier's gender marker.

  a.  In support of the request, the Soldier must ensure that the brigade-level commander receives:

- a medical diagnosis from a military medical provider indicating that gender transition is medically necessary;

- confirmation from the military medical provider that the Soldier is stable in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

  b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the brigade-level commander will notify the SCCC and consult the SCCC in responding to the request.  The brigade-level commander will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 30 days after receiving all required information from the Soldier, the brigade-level commander will approve the request, including the date when the Soldier's gender marker should be changed in Army personnel information systems, which will initiate the gender marker change in DEERS.

  c.  A Soldier's gender marker will be changed when his or her brigade-level commander submits written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122. Human Resources Command will make the change in Army personnel information systems, which will update the gender marker in DEERS.

## GENDER TRANSITION FOR U.S ARMY RESERVE AND ARMY NATIONAL GUARD SELECTED RESERVE SOLDIERS

1.   The gender transition process for a Soldier serving in the Selected Reserve in the Army Reserve or Army National Guard (ARNG), including Individual Mobilization Augmentees, who is not eligible for military medical care begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis through command channels to his or her brigade-level commander, accompanied by a projected schedule for medical treatment and an estimated date for a change in the Soldier's gender marker, and request that the commander approve the timing of the medical treatment.  The Soldier must also notify the brigade-level commander in the event of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date for the change in the Soldier's gender marker.

2.   The Soldier's brigade-level commander is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition and must:

- consider the Soldier's individual facts and circumstances, including the Soldier's expected medical treatment schedule;

- ensure military readiness by minimizing effects to the mission (including deployment, operational, training, and exercise schedules, and critical skills availability); and

- maintain the morale, welfare, good order, and discipline of the unit.

Upon receipt of the Soldier's request, the brigade-level commander will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving the request, the brigade-level commander will submit the Soldier's request and diagnosis to, as appropriate, U.S. Army Reserve Command's Command Surgeon or the Chief Surgeon, ARNG, who will confirm any civilian medical diagnosis that gender transition is medically necessary.  The brigade-level commander's approval of the timing of medical treatment will be in writing.  The timing of the treatment may be adjusted, after consulting with the medical provider, based on unscheduled requirements.

3.   After the brigade-level commander approves the timing of medical treatment and once the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may request, through command channels, that the brigade-level commander approve a change to the Soldier's gender marker.

   a.   In support of the request, the Soldier must include:

   - the medical diagnosis indicating that gender transition is medically necessary;

- confirmation from a medical provider that the Soldier's medical treatment plan is complete and that the Soldier has achieved stability in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

   b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the brigade-level commander will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the brigade-level commander will submit the Soldier's request to, as appropriate, Reserve Command's Command Surgeon or the Chief Surgeon, ARNG for confirmation of the medical determination that the Soldier has achieved stability in the preferred gender.

   c.  The brigade-level commander will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from the Soldier, the brigade-level commander will approve the request, including the date when the Soldier's gender marker should be changed, and will submit the written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  Human Resources Command will make the change in Army personnel information systems, which will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

**GENDER TRANSITION FOR SOLDIERS SERVING IN THE STANDBY RESERVE OR INDIVIDUAL READY RESERVE**

1.  The gender transition process for a Soldier serving in the Standby Reserve or Individual Ready Reserve begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis to the Commander, Human Resources Command (HRC), accompanied by a projected schedule for medical treatment with an estimated date for a change in the Soldier's gender marker, and request that the Commander, HRC approve the timing of the medical treatment.  The Soldier must also notify the Commander, HRC in the event of any change to the projected schedule for such treatment or the estimated date for the change in the Soldier's gender marker.

2.  Upon receipt of a request, the Commander, HRC is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition.  Factors the Commander, HRC should consider when reviewing the request include the likelihood of the Soldier's return to active service as well as any military necessity that may warrant the mobilization or activation of the Soldier.  Upon receipt of the Soldier's request, the Commander, HRC will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving the timing of any medical treatment, the Commander, HRC will also ensure that the HRC Command Surgeon confirms any civilian medical diagnosis that gender transition is medically necessary.  The timing of the approval will be noted in a memorandum HRC provides to the Soldier.  The Commander, HRC may adjust the timing, after consulting with the medical provider, based on unscheduled requirements.

3.  After the Commander, HRC approves the timing of medical treatment and the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may ask the commander to approve a change to the Soldier's gender marker.

    a.  In support of the request, the Soldier must include:

- the medical diagnosis indicating that gender transition is medically necessary;

- confirmation from a medical provider that the Soldier's medical treatment plan is complete and the Soldier has achieved stability in the preferred gender; and

- legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

    b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the Commander, HRC will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the Commander, HRC will ensure that the HRC

Army Directive 2016-35                                                          Enclosure 4

Command Surgeon confirms the medical diagnosis that the Soldier has achieved stability in the preferred gender.

    c.  The Commander, HRC will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from a Soldier, the Commander, HRC will approve the request, including the effective date of the gender marker change, and change the Soldier's gender marker in Army personnel information systems.  This will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

## GENDER TRANSITION FOR SOLDIERS SERVING IN THE
## INACTIVE NATIONAL GUARD

1.  The gender transition process for a Soldier serving in the Inactive National Guard begins when the Soldier receives a diagnosis from a civilian or military medical provider indicating that gender transition is medically necessary.  The Soldier must submit the diagnosis to the Director, Army National Guard (ARNG), accompanied by a projected schedule for medical treatment and an estimated date for a change in the Soldier's gender marker, and request that the Director, ARNG approve the timing of the medical treatment.  The Soldier must also notify the Director in the event of any change to the projected schedule for the treatment or the estimated date for the change in the Soldier's gender marker.

2.  Upon receipt of a request, the Director, ARNG is responsible for approving the timing, or adjustments to the timing, of medical treatment associated with gender transition.  Factors the Director, ARNG should consider when reviewing the request include the likelihood of the Soldier's return to active status or active duty, as well as any military necessity that may warrant the mobilization or activation of the Soldier.  Upon receipt of the Soldier's request, the Director, ARNG will inform the Service Central Coordination Cell (SCCC) and consult the SCCC in responding to the request.  Before approving any treatment plan, the Director, ARNG will also ensure that the Chief Surgeon, ARNG confirms any civilian medical diagnosis that gender transition is medically necessary.  The Director may adjust the timing of the treatment, after consulting with the medical provider, based on unscheduled requirements.

3.  After the Director, ARNG approves the timing of the medical treatment and after the Soldier's medical provider determines that the Soldier has completed medical treatment necessary to achieve stability in the preferred gender, the Soldier may ask the Director, ARNG to approve a change in the Soldier's gender marker.

   a.  In support of the request, the Soldier must provide:

   - the medical diagnosis indicating that gender transition is medically necessary;

   - confirmation from a medical provider that the Soldier's medical treatment plan is complete and the Soldier has achieved stability in the preferred gender; and

   - legal documentation supporting a gender change, consisting of a certified copy of a State birth certificate, a certified copy of a court order, or a U.S. passport showing the Soldier's preferred gender.

   b.  Upon receipt of the Soldier's request for a change to his or her gender marker, the Director, ARNG will inform the SCCC and consult the SCCC in responding to the request.  Before taking action, the Director will ensure that the Chief Surgeon, ARNG confirms the medical diagnosis that the Soldier has achieved stability in the preferred gender.

Army Directive 2016-35                                          Enclosure 5

c.  The Director, ARNG will return incomplete requests to the Soldier with written notice of the identified deficiencies as soon as practicable, but no later than 30 days after receipt.  Within 60 days after receiving all required information from a Soldier, the Director, ARNG will approve the request, including the effective date of the gender marker change, and submit the written approval to the Commander, U.S. Army Human Resources Command (HRC-PDF), 1600 Spearhead Division Avenue, Fort Knox, Kentucky  40122.  HRC will make the change in Army personnel information systems, which will cause the gender marker in the Defense Enrollment Eligibility Reporting System to change as well.

## PROPOSED REVISIONS TO ARMY REGULATIONS

**AR 40-501 (Standards of Medical Fitness), 14 December 2007:**

*Contents, page iii, line 15 should be revised to read*:

Personality, psychosexual conditions, ~~transsexual, gender identity,~~ exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified • 3–35, page 33

*Paragraph 2-14a(5) should be revised to read*:

(5)  History of major abnormalities or defects of the genitalia such as ~~change of sex (P64.5),~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis (752.7), or dysfunctional residuals from surgical correction of these conditions does not meet the standard.

*Paragraph 2-14d should be revised to read*:

d.  History of major abnormalities or defects of the genitalia, such as ~~a change of sex (P64.5),~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis (752.7), or dysfunctional residuals from surgical correction of these conditions does not meet the standard.

*Paragraph 2-27n should be revised to read*:

n.  Current or history of psychosexual conditions (302), including, but not limited to ~~transsexualism,~~ exhibitionism, transvestism, voyeurism, and other paraphilias, do not meet the standard.

*Paragraph 3-35 should be revised to read*:

**3-35. Personality, psychosexual conditions, ~~transsexual, gender identity,~~ exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders; disorders of impulse control not elsewhere classified**
a.  A history of, or current manifestations of, personality disorders, disorders of impulse control not elsewhere classified, transvestism, voyeurism, other paraphilias, or factitious disorders, psychosexual conditions ~~transsexual, gender identity disorder to include major abnormalities or defects of the genitalia such as change of sex or a current attempt to change sex,~~ hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis or dysfunctional residuals from surgical correction of these conditions render an individual administratively unfit.

**AR 135-178 (Enlisted Administrative Separations), 18 March 2014:**

Lines 25-26 on the Summary of Change should be revised to read:

o Adds transsexualism/gender transformation in accordance with AR 40-501 as a basis for separation. (para 6-7a).

Paragraph 6-7a should be revised to read:

   a. *Criteria.* The separation authority (para 1–10, of this regulation) may approve discharge under this paragraph on the basis of other physical or mental conditions not amounting to disability (AR 635–40) that potentially interfere with assignment to or performance of military duty. Such conditions may include, but are not limited to, chronic airsickness or seasickness, enuresis, sleepwalking, dyslexia, severe nightmares, claustrophobia, personality disorder, transvestism, gender identity disorder or gender dysphoria, and other related conditions in accordance with AR 40–501, paragraph 3–35. Transsexualism/gender transformation in accordance with AR 40–501, and other disorders manifesting disturbances of perception, thinking, emotional control or behavior sufficiently severe that the Soldier's ability to perform military duties effectively is significantly impaired.

**AR 600-20 (Army Command Policy), 6 November 2014**

Replace all references to discrimination based on sex or gender with "sex (including gender identity)."

**AR 600–85 (The Army Substance Abuse Program), 28 December 2012**

Appendix E, paragraph E-4b(2) should be revised to read:

   (2) Optional wide mouth collection cup (for females).

Appendix E, paragraph E-5h should be revised to read:

   h. If the Soldier is female requires use of the optional wide mouth collection cup, the optional wide mouth collection cup will be issued to the Soldier at this time.

Appendix E, paragraph E-5m should be revised to read:

   m. The following procedure applies to female Soldiers who usetilize the wide mouth collection cups:

**AR 635-200 (Active Duty Enlisted Administrative Separations), 6 June 2005**

Paragraph 5-17a should be revised to read:

a.  Commanders specified in paragraph 1–19 may approve separation under this paragraph on the basis of other physical or mental conditions not amounting to disability (AR 635–40) and excluding conditions appropriate for separation processing under paragraph 5–11 or 5–13 that potentially interfere with assignment to or performance of duty.  Such conditions may include, but are not limited to—
   (1)  Chronic airsickness.
   (2)  Chronic seasickness.
   (3)  Enuresis.
   (4)  Sleepwalking.
   (5)  Dyslexia.
   (6)  Severe nightmares.
   (7)  Claustrophobia.
   (8)  ~~Transsexualism/gender transformation in accordance with AR 40-501 paragraph 3-35.~~
   ~~(9)~~ Other disorders manifesting disturbances of perception, thinking, emotional control, or behavior sufficiently severe that the Soldier's ability to effectively perform military duties is significantly impaired.  Soldiers with 24 months or more of active duty service may be separated under this paragraph based on a diagnosis of personality disorder.  For Soldiers who have been deployed to an area designated as an imminent danger pay area, the diagnosis of personality disorder must be corroborated by the MTF Chief of Behavioral Health (or an equivalent official).  The corroborated diagnosis will be forwarded for final review and confirmation by the Director, Proponency of Behavioral Health, Office of the Surgeon General (DASG-HSZ).  Medical review of the personality disorder diagnosis will consider whether PTSD, Traumatic Brain Injury (TBI), and/or other comorbid mental illness may be significant contributing factors to the diagnosis.  If PTSD, TBI, and/or other comorbid mental illness are significant contributing factors to a mental health diagnosis, the Soldier will not be processed for separation under this paragraph, but will be evaluated under the physical disability system in accordance with AR 635-40.


**AR 638–2 (Army Mortuary Affairs Program), 23 June 2015**

Paragraph 2-9b(1) should be revised to read:

(1)  No uniform is authorized; dark suit only or equivalent for females ~~and transgenders~~.

# EXHIBIT D



# DoD Instruction 1300.28

# In-Service Transition for Transgender Service Members

---

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | April 30, 2021 (This issuance supersedes any previously published contradictory guidance). |
| **Change 1 Effective:** | December 20, 2022 |
| **Releasability:** | Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Reissues and Cancels:** | DoD Instruction 1300.28, "Military Service by Transgender Persons and Persons with Gender Dysphoria," September 4, 2020 |
| **Approved by:** | Virginia S. Penrod, Acting Under Secretary of Defense for Personnel and Readiness |
| **Change 1 Approved by:** | Gilbert R. Cisneros, Jr., Under Secretary of Defense for Personnel and Readiness |

---

**Purpose:**  In accordance with the authority in DoD Directive 5124.02, this issuance establishes policy, assigns responsibilities, and prescribes procedures:

- Regarding the process by which Service members may transition gender while serving.

- For changing a Service member's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).

- For medical care for Active Component (AC) and Reserve Component (RC) transgender Service members.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# TABLE OF CONTENTS

SECTION 1:  GENERAL ISSUANCE INFORMATION ................................................................................ 3
  1.1.  Applicability. .............................................................................................................. 3
  1.2.  Policy. ......................................................................................................................... 3
  1.3.  Summary of Change 1. ............................................................................................... 3
SECTION 2:  RESPONSIBILITIES ............................................................................................................ 4
  2.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ................. 4
  2.2.  Assistant Secretary of Defense for Manpower and Reserve Affairs. ....................... 4
  2.3.  Assistant Secretary of Defense for Health Affairs. .................................................. 4
  2.4.  Director, Defense Health Agency (DHA). ................................................................. 4
  2.5.  Secretaries of the Military Departments and Commandant, USCG. ......................... 5
SECTION 3:  GENDER TRANSITION ....................................................................................................... 6
  3.1.  General. ....................................................................................................................... 6
  3.2.  Special Military Considerations. ............................................................................... 7
    a.  Medical. ................................................................................................................. 7
    b.  In-Service Transition. ........................................................................................... 8
    c.  Continuity of Medical Care. ................................................................................. 8
    d.  Living in Self-Identified Gender. ......................................................................... 8
    e.  DEERS. .................................................................................................................. 8
    f.  Military Readiness. ............................................................................................... 8
  3.3.  Roles and Responsibilities. ........................................................................................ 9
    a.  Service Member's Role. ........................................................................................ 9
    b.  Military Medical Provider's Role. ........................................................................ 9
    c.  Commander's Role. ............................................................................................... 10
    d.  Role of the Military Department and the USCG. .................................................. 10
  3.4.  Gender Transition Approval Process. ........................................................................ 12
  3.5.  Considerations Associated with RC personnel. ........................................................ 13
    a.  Gender Transition Approach. ................................................................................ 13
    b.  Diagnosis and Medical Treatment Plans. ............................................................. 13
    c.  Selected Reserve Drilling Member Participation. ................................................ 13
    d.  Delayed Training Program (DTP). ....................................................................... 14
    e.  Split Option Training. ........................................................................................... 14
  3.6.  Considerations Associated with the First Term of Service. ...................................... 14
SECTION 4:  ADDITIONAL POLICY GUIDANCE ....................................................................................... 16
  4.1.  Equal Opportunity. ..................................................................................................... 16
  4.2.  Protection of PII and PHI. .......................................................................................... 16
  4.3.  Personal Privacy Considerations. .............................................................................. 16
  4.4.  Assessment and Oversight of Compliance. ............................................................... 16
GLOSSARY ............................................................................................................................................ 18
  G.1.  Acronyms. ................................................................................................................. 18
  G.2.  Definitions. ................................................................................................................ 19
REFERENCES ......................................................................................................................................... 22

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

a.  This issuance applies to OSD, the Military Departments (including the United States Coast Guard (USCG) at all times, including when it is a Service in the Department of Homeland Security, by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD.

b.  The requirement in Paragraph 2.5.e. of this issuance does not apply to the USCG.

c.  For the purpose of this issuance, the term "Service member" includes cadets and midshipmen in a contracted Reserve Officer Training Corps (ROTC) status and those at the Military Service Academies.  This issuance does not apply to individuals participating in ROTC programs in a non-contracted volunteer status.  Contracted ROTC midshipmen and cadets have limited eligibility for medical benefits and care through a military medical treatment facility (MTF), delineated in DoD Instruction (DoDI) 1215.08.

## 1.2. POLICY.

a.  DoD and the Military Departments will institute policies to provide Service members a process by which they may transition gender while serving.  These policies are based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness.

b.  All Service members must be treated with dignity and respect.  No person, solely on the basis of his or her gender identity, will be:

(1)  Involuntarily separated or discharged from the Military Services;

(2)  Denied reenlistment or continuation of service in the Military Services; or

(3)  Subjected to adverse action or mistreatment.

## 1.3. SUMMARY OF CHANGE 1.

The change to this issuance:

a.  Adds transgender data related guidance pursuant to DoDI 6400.11.

b.  Updates references for accuracy.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 2: RESPONSIBILITIES

## 2.1. UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R):

   a.  Evaluates any proposed new Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with this issuance.

   b.  Issues guidance to the Military Departments, establishing the prerequisites and procedures for changing a Service member's gender marker in DEERS.

## 2.2. ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Manpower and Reserve Affairs coordinates with the Assistant Secretary of Defense for Health Affairs in the management and implementation of this policy, and issues clarifying guidance, as appropriate.

## 2.3. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Health Affairs coordinates with the Assistant Secretary of Defense for Manpower and Reserve Affairs in the management and implementation of health care matters associated with this policy, and issues clarifying guidance, as appropriate.

## 2.4. DIRECTOR, DEFENSE HEALTH AGENCY (DHA).

Under the authority, direction, and control of the USD(P&R), through the Assistant Secretary of Defense for Health Affairs, the Director, DHA:

   a.  Provides or coordinates guidance and oversight, as appropriate, to standardize the provision of medically necessary health care for transgender Service members diagnosed with gender dysphoria, including members for whom gender transition is determined to be medically necessary by a medical provider.

   b.  Oversees the development and use of clinical practice guidelines to support the medical treatment plan and projected schedule for treatment of Service members diagnosed with gender dysphoria.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

c. Oversees the development and use of clinical practice guidelines to support the continuity of care for Service members diagnosed with gender dysphoria.

d. Establishes procedures to require that education and training on transgender health care are conducted in MTFs.

e. Ensures appropriate standards and procedures under the Supplemental Health Care Program for transgender health care services.

## 2.5. SECRETARIES OF THE MILITARY DEPARTMENTS AND COMMANDANT, USCG.

The Secretaries of the Military Departments and the Commandant, USCG:

a. Adhere to all provisions of this issuance.

b. Administer their respective programs, and update existing Military Department regulations, policies, and guidance, or issue new issuances, as appropriate, in accordance with the provisions of this issuance.

c. Maintain a Service central coordination cell (SCCC) to provide multi-disciplinary (e.g., medical, mental health, legal, military personnel management) expert advice and assistance to commanders with regard to service by transgender Service members and gender transition in the military, and to assist commanders in the execution of DoD, Military Department, and Service policies and procedures.

d. Educate their respective AC and RC forces to ensure an adequate understanding within those forces of policies and procedures pertaining to gender transition in the military.

e. Submit to the USD(P&R) the text of any proposed revision to existing Military Department and Service regulations, policies, and guidance, and of any proposed new issuance, at least 15 business days in advance of the proposed publication date. In accordance with Paragraph 1.1.b. of this issuance, this requirement does not apply to the USCG.

f. Provide oversight regarding the implementation of this issuance and any Military Department and Military Service regulations, policies, and guidance related to military service by transgender persons and persons with gender dysphoria, the protection of personally identifiable information (PII), protected health information (PHI), and personal privacy considerations, consistent with current DoD guidance and in accordance with Paragraphs 4.2. and 4.3. of this issuance.

g. Implement processes for the assessment and oversight of compliance with DoD, Military Department, and Service policies and procedures applicable to service by transgender persons, and persons with gender dysphoria, in accordance with Paragraph 4.4. of this issuance.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 3: GENDER TRANSITION

## 3.1. GENERAL.

a. Except where an exception to policy (ETP) has been granted transgender Service members will be subject to the same standards as all other Service members. When a standard, requirement, or policy depends on whether the individual is male or female (e.g., medical fitness for duty; physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all Service members will be subject to the standard, requirement, or policy associated with their gender marker in DEERS.

b. The Military Departments and Services recognize a Service member's gender by the Service member's gender marker in DEERS. Consistent with that gender marker, the Services apply, and the Service member must meet, all standards for uniforms and grooming; body composition assessment (BCA); physical readiness testing (PRT); Military Personnel Drug Abuse Testing Program (MPDATP) participation; and other military standards applied with consideration of the Service member's gender. For facilities subject to regulation by the military, Service members will use those berthing, bathroom, and shower facilities associated with their gender marker in DEERS.

c. Service members with a diagnosis that gender transition is medically necessary will receive associated medical care and treatment from a medical provider. The recommendations from a military medical provider will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment. Medical providers will provide advice to commanders in a manner consistent with processes used for other medical conditions that may limit the Service member's performance of official duties.

d. Any medical care and treatment provided to an individual Service member in the process of gender transition will be provided in the same manner as other medical care and treatment. Nothing in this issuance will be construed to authorize a commander to deny medically necessary treatment to a Service member.

e. Any determination that a transgender Service member is non-deployable at any time will be consistent with established Military Department and Service standards, as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

f. Commanders will assess expected impacts on mission and readiness after consideration of the advice of military medical providers and will address such impacts in accordance with this issuance. In applying the tools described in this issuance, a commander will not accommodate biases against transgender individuals. If a Service member is unable to meet standards or requires an ETP during a period of gender transition, all applicable tools, including the tools described in this issuance, will be available to commanders to minimize impacts to the mission and unit readiness.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

g.  When a cognizant military medical provider determines that a Service member's gender transition is complete, and at a time approved by the commander in consultation with the Service member concerned, the Service member's gender marker will be changed in DEERS and the Service member will be recognized in the self-identified gender.

## 3.2.  SPECIAL MILITARY CONSIDERATIONS.

Gender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness.  Where possible, gender transition should be conducted such that a Service member would meet all applicable standards and be available for duty in the birth gender before a change in the Service member's gender marker in DEERS and would meet all applicable standards and be available for duty in the self-identified gender after the change in gender marker.  However, since every transition is unique, the policies and procedures set forth herein provide flexibility to the Military Departments, Services, and commanders, in addressing transitions that may or may not follow this construct.  These policies and procedures are applicable, in whole or in relevant part, to Service members who intend to begin transition, are beginning transition, who already may have started transition, and who have completed gender transition and are stable in their self-identified gender.

### a.  Medical.

(1)  In accordance with DoDIs 6025.19 and 1215.13, all Service members must maintain their health and fitness, meet individual medical readiness requirements, and report to their chains of command any medical (including mental health) and health issue that may affect their readiness to deploy or fitness to continue serving.

(2)  Each Service member in the AC or in the Selected Reserve will, as a condition of continued participation in military service, report significant health information to their chain of command.  Service members who have or have had a medical condition that may limit their performance of official duties must consult with a military medical provider concerning their diagnosis and proposed treatment, and must notify their commanders.

(3)  When a Service member receives a diagnosis of gender dysphoria from a military medical provider and obtains a medical treatment plan for gender transition, the Service member's notification to the commander must identify all medically necessary care and treatment that is part of the Service member's medical treatment plan.

(a)  If applicable, the Service member's notification to the commander must identify a projected schedule for such treatment and an estimated date for a change in the Service member's gender marker in DEERS.

(b)  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, the Service member must provide notification to the commander identifying the additional care, treatment, and projected schedule for such treatment.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

(c)  Recommendations of a military health care provider will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment.

### b.  In-Service Transition.

Gender transition begins when a Service member receives a diagnosis from a military medical provider indicating that gender transition is medically necessary, and then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan as necessary to achieve stability in the self-identified gender.  It concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in his or her self-identified gender.  Care and treatment may still be received after the gender marker is changed in DEERS as described in Paragraph 3.2.c. of this issuance, but at that point, the Service member must meet all applicable military standards in the self-identified gender.  With regard to facilities subject to regulation by the military, a Service member whose gender marker has been changed in DEERS will use those berthing, bathroom, and shower facilities associated with his or her gender marker in DEERS.

### c.  Continuity of Medical Care.

A military medical provider may determine certain medical care and treatment (e.g., cross-sex hormone therapy) to be medically necessary even after a Service member's gender marker is changed in DEERS.  A gender marker change does not preclude such care and treatment.  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, and that change may impact the Service member's fitness for duty the Service member must provide, medical documentation to the commander identifying the additional care, treatment, and projected schedule for such treatment.

### d.  Living in Self-Identified Gender.

Each Military Department and Service may issue policy regarding the application of real life experience (RLE), including RLE in an on-duty status before gender marker change in DEERS.

### e.  DEERS.

Except when an exception has been granted in accordance with Paragraph 3.2.d. or 3.2.f. of this issuance, a Service member's gender is recognized by the Service member's gender marker in DEERS.  Coincident with that gender marker, the Services apply, and the Service member must meet, all standards for uniforms and grooming; BCA; PRT; MPDATP participation; and other military standards applied with consideration of the Service member's gender.

### f.  Military Readiness.

Unique to military service, the commander is responsible and accountable for the overall readiness of his or her command.  The commander is also responsible for the collective morale, welfare, good order, and discipline of the unit, and establishing a command climate that creates an environment where all members of the command are treated with dignity and respect.  When a commander receives any request from a Service member that entails a period of non-availability for duty (e.g., necessary medical treatment, ordinary leave, emergency leave,

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

temporary duty, other approved absence), the commander must consider the individual need associated with the request and the needs of the command in making a decision on that request.

### 3.3. ROLES AND RESPONSIBILITIES.

#### a. Service Member's Role.

The Service member will:

(1) Secure a medical diagnosis from a military medical provider.

(2) Notify the commander of a diagnosis indicating gender transition is medically necessary. This notification will identify all medically necessary treatment in their medical treatment plan and a projected schedule for such treatment, including an estimated date for a change in the Service member's gender marker in DEERS, pursuant to Paragraph 3.2.a. of this issuance.

(3) Notify the commander of any change to the medical treatment plan, the projected schedule for such treatment, or the estimated date on which the Service member's gender marker will be changed in DEERS.

(4) Notify the commander of any new care determined to be medically necessary after a gender marker change in DEERS that was not previously approved in the medical treatment plan, in accordance with Paragraph 3.2.a.(3) of this issuance, as such care or treatment may affect readiness to deploy or fitness to continue serving.

#### b. Military Medical Provider's Role.

The military medical provider will:

(1) Establish the Service member's medical diagnosis, recommend medically necessary care and treatment, and, in consultation with the Service member, develop a medical treatment plan associated with the Service member's gender transition, pursuant to Paragraph 3.1.a. of this issuance, for submission to the commander.

(2) In accordance with established military medical practices, advise the commander on the medical diagnosis applicable to the Service member, including the provider's assessment of the medically necessary care and treatment, the urgency of the proposed care and treatment, the likely impact of the care and treatment on the individual's readiness and deployability, and the scope of the human and functional support network needed to support the individual.

(3) In consultation with the Service member, formally advise the commander when the Service member's gender transition is complete and recommend to the commander a time at which the Service member's gender marker may be changed in DEERS.

(4) Provide the Service member with medically necessary care and treatment after the Service member's gender marker has been changed in DEERS.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

### c. Commander's Role.

The Service member's commander will:

(1)  Review the Service member's request to transition gender.  Approves the timing and oversees, as appropriate, a transition process that:

(a)  Complies with DoD, Military Department, and Service regulations, policies, and guidance.

(b)  Considers the individual facts and circumstances presented by the Service member.

(c)  Maintains military readiness by minimizing impacts to the mission (including deployment, operational, training and exercise schedules, and critical skills availability), as well as to the morale, welfare, good order, and discipline of the unit.

(d)  Is consistent with the medical treatment plan.

(e)  Incorporates consideration of other factors, as appropriate.

(2)  Coordinate with the military medical provider regarding any medical care or treatment provided to the Service member and any medical issues that arise in the course of a Service member's gender transition.

(3)  Consult, as necessary, with the SCCC about service by transgender Service members and gender transition in the military; the execution of DoD, Military Department, and Military Service policies and procedures; and assessment of the means and timing of any proposed medical care or treatment.

### d. Role of the Military Department and the USCG.

The Military Departments and USCG will:

(1)  Establish policies and procedures in accordance with this issuance, outlining the actions a commander may take to minimize impacts to the mission and ensure continued unit readiness in the event a transitioning individual is unable to meet standards or requires an ETP during a period of gender transition.  Such policies and procedures may address the means and timing of transition, procedures for responding to a request for an ETP before the change of a Service member's gender marker in DEERS, appropriate duty statuses, and tools for addressing any inability to serve throughout the gender transition process.  Any such actions available to the commander will consider and balance the needs of the individual and the needs of the command in a manner comparable to the actions available to the commander in addressing comparable Service members' circumstances unrelated to gender transition.  Such actions may include:

(a)  Adjustments to the date the Service member's gender transition, or any component of the transition process, will begin.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

(b)  Advising the Service member of the availability of options for extended leave status or participation in other voluntary absence programs during the transition process.

(c)  Arrangements for the transfer of the Service member to another organization, command, location, or duty status (e.g., Individual Ready Reserve), as appropriate, during the transition process.

(d)  ETPs associated with changes in the Service member's physical appearance and body composition during gender transition, such as accommodations in the application of standards for uniforms and grooming, BCA, PRT, and MPDATP participation.

(e)  Establishment of, or adjustment to, local policies on the use of berthing, bathroom, and shower facilities subject to regulation by the military during the transition process.

(f)  Referral, as appropriate, for a determination of fitness in the Integrated Disability Evaluation System in accordance with DoDI 1332.18 or the USCG Physical Disability Evaluation System, pursuant to Commandant Instruction M1850.2 (series).

(2)  Establish policies and procedures, consistent with this issuance, whereby a Service member's gender marker will be changed in DEERS based on a determination by the military medical provider that the Service member's gender transition is complete; receipt of written approval from the commander, issued in consultation with the Service member; and documentation indicating gender change provided by the Service member.  Such documentation is limited to:

(a)  A certified true copy of a State birth certificate reflecting the Service member's self-identified gender;

(b)  A certified true copy of a court order reflecting the Service member's self-identified gender; or

(c)  A United States passport reflecting the Service member's self-identified gender.

(3)  When the Service member's gender marker in DEERS is changed:

(a)  Apply uniform standards, grooming standards, BCA standards, PRT standards, MPDATP standards, and other standards applied with consideration of the Service member's gender, applicable to the Service member's gender as reflected in DEERS.

(b)  As to facilities subject to regulation by the military, direct the use of berthing, bathroom, and shower facilities according to the Service member's gender marker as reflected in DEERS.

DoDI 1300.28, April 30, 2021
Change 1, December 20, 2022

## 3.4. GENDER TRANSITION APPROVAL PROCESS.

a.  A Service member on active duty who receives a diagnosis from a military medical provider for which gender transition is medically necessary may, in consultation with the military medical provider, request that the commander approve:

(1)  The timing of medical treatment associated with gender transition;

(2)  An ETP associated with gender transition, pursuant to Paragraphs 3.2.d., 3.2.f., or 3.3.d. of this issuance; or

(3)  A change to the Service member's gender marker in DEERS.

b.  The commander, informed by the recommendations of the military medical provider, the SCCC, and others, as appropriate, will respond to the request within a framework that ensures readiness by minimizing impacts to the mission (including deployment, operational, training, exercise schedules, and critical skills availability), as well as to the morale, welfare, good order, and discipline of the command.

c.  Consistent with applicable law, regulation, and policy, the commander will:

(1)  Comply with the provisions of this issuance and with Military Department and Service regulations, policies, and guidance, and consult with the SCCC.

(2)  Promptly respond to any request for medical care, as identified by the military medical provider, and require such care is provided consistent with applicable regulations.

(3)  Respond to any request for medical treatment or an ETP associated with gender transition as soon as practicable, but not later than 90 calendar days after receiving a request determined to be complete in accordance with the provisions of this issuance and applicable Military Department and Service regulations, policies, and guidance.  The response will be in writing; will include notice of any actions taken by the commander in accordance with applicable regulations, policies, and guidance and the provisions of this issuance; and will be provided to both the Service member and their military medical provider.  The commander will return any request that is determined to be incomplete to the Service member with written notice of the deficiencies identified as soon as practicable, but not later than 30 calendar days after receipt.

(4)  At any time before the change of the Service member's gender marker in DEERS, the commander, in consultation with the Service member and a military health care provider, may modify a previously approved approach to, or an ETP associated with, gender transition.  A determination that modification is necessary and appropriate will be made in accordance with and upon review and consideration of the procedures and factors set forth in Paragraph 3.3.c. of this issuance.  Written notice of such modification will be provided to the Service member pursuant to procedures established by the Military Department or Military Service, and may include options as set forth in Paragraph 3.3.d. of this issuance.

(5)  The commander will approve, in writing, the change of a Service member's gender marker in DEERS, after receipt of the recommendation of the military medical provider that the

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

Service member's gender marker be changed and receipt of the requisite documentation from the Service member. Upon submission of the commander's written approval to the appropriate personnel servicing activity, the change in the Service member's gender marker will be entered in the appropriate Service database, transmitted to the Defense Manpower Data Center, and updated in DEERS.

   d. As authorized by applicable Military Department and Service regulations, policies, and guidance implementing this issuance, a Service member may request review by a senior officer in the chain of command of a subordinate commander's decision with regard to any request pursuant to this issuance and any later modifications to that decision.

   e. A Service member who has completed a gender transition but has not resolved the gender dysphoria should consult with their military medical provider and commander. If a return to their previous gender is medically required, the Service member is to use the procedures outlined in Paragraph 3.4. of this issuance.

## 3.5. CONSIDERATIONS ASSOCIATED WITH RC PERSONNEL.

Excepting only those special considerations set forth in Paragraph 3.5. of this issuance, RC personnel are subject to all policies and procedures applicable to AC Service members as set forth in this issuance and in applicable Military Department and Military Service regulations, policies, and guidance implementing this issuance.

### a. Gender Transition Approach.

   All RC Service members (except Selected Reserve full-time support personnel) identifying as transgender individuals will submit to and coordinate with their chain of command evidence of a medical evaluation that includes a medical treatment plan. Selected Reserve full-time support personnel will follow gender transition approval process set forth in Paragraph 3.4. of this issuance.

### b. Diagnosis and Medical Treatment Plans.

   A diagnosis established by a civilian medical provider will be subject to review and validation by a military medical provider pursuant to applicable Military Department and Military Service regulations, policies, and guidance. A treatment plan established by a civilian medical provider will be subject to review by a military medical provider and the military medical provider will validate any associated duty limitations pursuant to applicable Military Department and Military Service regulations, policies, and guidance.

### c. Selected Reserve Drilling Member Participation.

   To the greatest extent possible, commanders and Service members will address periods of non-availability for any period of military duty, paid or unpaid, during the Service member's gender transition with a view to mitigating unsatisfactory participation. In accordance with DoDI 1215.13, such mitigation strategies may include:

(1)  Rescheduled training;

(2)  Authorized absences; or

(3)  Alternate training.

**d.  Delayed Training Program (DTP).**

Recruiters and commanders must advise DTP personnel of limitations resulting from being non-duty qualified.  As appropriate, Service members in the DTP may be subject to the provisions of Paragraph 3.6. of this issuance.

**e.  Split Option Training.**

When authorized by the Military Department or Military Service concerned, Service members who elect to complete basic and specialty training over two non-consecutive periods may be subject to the provisions of Paragraph 3.6. of this issuance.

## 3.6.  CONSIDERATIONS ASSOCIATED WITH THE FIRST TERM OF SERVICE.

a.  A blanket prohibition on gender transition during a Service member's first term of service is not permissible.  However, the All-Volunteer Force readiness model may be taken into consideration by a commander in evaluating a request for medical care or treatment or an ETP associated with gender transition during a Service member's first term of service.  Any other facts and circumstances related to an individual Service member that impact that model will be considered by the commander as set forth in this issuance and implementing Military Department and Service regulations, policies, and guidance.

b.  The following policies and procedures apply to Service members during the first term of service and will be applied to Service members with a diagnosis indicating that gender transition is medically necessary in the same manner, and to the same extent, as to Service members with other medical conditions that have a comparable impact on the Service member's ability to serve:

(1)  A Service member is subject to separation in an entry-level status during the period of initial training in accordance with DoDI 1332.14, based on a medical condition that impairs the Service member's ability to complete such training.

(2)  An individual participant is subject to placement on medical leave of absence or medical disenrollment from the Reserve Officers' Training Corps in accordance with DoDI 1215.08 or from a Military Service Academy in accordance with DoDI 1322.22, based on a medical condition that impairs the individual's ability to complete such training or to access into the Military Services.

(3)  A Service member is subject to administrative separation for a fraudulent or erroneous enlistment or induction when warranted and in accordance with DoDI 1332.14, based on any deliberate material misrepresentation, omission, or concealment of a fact, including a

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

medical condition, that if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

(4)  If a Service member requests non-urgent medical treatment or an ETP associated with gender transition during the first term of service, including during periods of initial entry training in excess of 180 calendar days, the commander may give the factors set forth in Paragraph 3.6.a. of this issuance significant weight in considering and balancing the individual need associated with the request and the needs of the command, in determining when such treatment, or whether such ETP may commence in accordance with Paragraphs 3.2.d, 3.2.f., and 3.3.d. of this issuance.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# SECTION 4: ADDITIONAL POLICY GUIDANCE

## 4.1. EQUAL OPPORTUNITY.

The DoD and the USCG provide equal opportunity to all Service members in an environment free from harassment and discrimination on the basis of race, color, national origin, religion, sex, gender identity, or sexual orientation, pursuant to DoDI 1350.02.

## 4.2. PROTECTION OF PII AND PHI.

a. The Military Departments and the USCG will:

(1) In cases in which there is a need to collect, use, maintain, or disseminate PII in furtherance of this issuance or Military Department and Military Service regulations, policies, or guidance, protect against unwarranted invasions of personal privacy and the unauthorized disclosure of such PII in accordance with Section 552a of Title 5, United States Code, also known as the Privacy Act of 1974, as amended; DoDI 5400.11; and DoD 5400.11-R.

(2) Maintain such PII so as to protect individuals' rights, consistent with Federal law, regulation, and policy.

b. Disclosure of PHI will be consistent with DoDI 6025.18 and DoDI 6490.08.

## 4.3. PERSONAL PRIVACY CONSIDERATIONS.

A commander may employ reasonable measures to respect the privacy interests of Service members. Commanders are encouraged to consult with the Service member and SCCC when employing such measures.

## 4.4. ASSESSMENT AND OVERSIGHT OF COMPLIANCE.

a. The Secretaries of the Military Departments and the Commandant, USCG will implement processes for the assessment and oversight of compliance with DoD, Military Department, and Military Service policies and procedures applicable to service by transgender persons.

b. Beginning in fiscal year 2022 and at least every 3 years thereafter, the Secretaries of the Military Departments and the Commandant, USCG will direct a special inspection by the Service Inspector General or another appropriate auditing agency to ensure compliance with this issuance and implementing Military Department, Military Service or USCG regulations, policies, and guidance. Such reports will be endorsed and provided by the Secretary concerned to the USD(P&R) within 3 months of completion. The directing official will review the report of inspection for purposes of assessing and overseeing compliance; identifying compliance deficiencies, if any; timely initiating corrective action, as appropriate; and deriving best practices and lessons learned.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

c.  Any questions on gender identity in DoD cross-component assessment of Service members (e.g., surveys, focus groups interviews) must be approved by the USD(P&R) via the Department of Defense Human Resources Activity.  The Secretaries of the Military Departments and the Commandant, USCG will implement processes for the approval of these questions for assessments containing these items administrated solely within their components.  USD(P&R) approval is not required when transgender-related data:

(1)  Is being collected for the limited purpose of survey-based prevention research to inform primary prevention as defined in DoDI 6400.09.

(2)  Collection conforms with DoDI 6400.11, Paragraph 5.3(c)(1)-(5).

(3)  Uses DoD-approved item language in accordance with Paragraph 5.3.d. of DoDI 6400.11.

(4)  Follows policies outlined in DoDIs 8910.01, 1100.13, and 3216.02.

d.  Gender identity is a personal and private matter.  DoD Components, including the Military Departments and Services, require written approval from the USD(P&R) to collect transgender and transgender related data or publicly release such data.  USD(P&R) approval is not required when transgender-related data meets the conditions in Paragraph 4.4.c.  Applicable privacy and human subject procedures should be followed to ensure appropriate safeguards are in place when conducting prevention research.

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---------|---------|
| AC | Active Component |
| BCA | body composition assessment |
| DEERS | Defense Enrollment Eligibility Reporting System |
| DHA | Defense Health Agency |
| DoDI | DoD instruction |
| DSM-5 | American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition |
| DTP | Delayed Training Program |
| ETP | exception to policy |
| HIPAA | Health Insurance Portability and Accountability Act |
| MPDATP | Military Personnel Drug Abuse Testing Program |
| MTF | military medical treatment facility |
| PHI | protected health information |
| PII | personally identifiable information |
| PRT | physical readiness testing |
| RC | Reserve Component |
| RLE | real life experience |
| ROTC | Reserve Officer Training Corps |
| SCCC | Service Central Coordination Cell |
| TRICARE | Military Health Care |
| USCG | United States Coast Guard |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

## G.2. DEFINITIONS.

These terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
| --- | --- |
| **cross-sex hormone therapy** | The use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth. A common medical treatment associated with gender transition. |
| **DTP** | A program established by the Secretary of the Army to provide a personnel accounting category for members of the Army Selected Reserve to be used for categorizing members of the Selected Reserve who have not completed the minimum training required for deployment or who are otherwise not available for deployment. |
| **gender dysphoria** | A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM-5), page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |
| **gender identity** | An individual's internal or personal sense of gender, which may or may not match the individual's biological sex. |
| **gender marker** | Data element in DEERS that identifies a Service member's gender. Service members are expected to adhere to all military standards associated with their gender marker in DEERS and use military berthing, bathroom, and shower facilities in accordance with the DEERS gender marker. |
| **gender transition is complete** | A Service member has completed the medical care identified or approved by a military medical provider in a documented medical treatment plan as necessary to achieve stability in the self-identified gender. |
| **gender transition process** | Gender transition in the military begins when a Service member receives a diagnosis from a military medical provider indicating the Service member's gender transition is medically necessary, and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender. |

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

| TERM | DEFINITION |
|------|------------|
| **human and functional support network** | Support network for a Service member that may be informal (e.g., friends, family, co-workers, social media.) or formal (e.g., medical professionals, counselors, clergy). |
| **medically necessary** | Health-care services or supplies necessary to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine. |
| **mental health provider** | A medical provider who is licensed, credentialed, and experienced in the diagnosis and treatment of mental health conditions and is privileged at a Military MTF (in the direct care system). Private care sector civilian TRICARE authorized mental health providers may be involved in a specific Active Duty Service member's care.  These providers are credentialed through the managed care support contractors. |
| **military medical provider** | Any military, government service, or contract civilian health care professional who, in accordance with regulations of a Military Department or DHA, is credentialed and granted clinical practice privileges to provide health care services within the provider's scope of practice in a Military MTF. |
| **non-urgent medical treatment** | The care required to diagnose and treat problems that are not life or limb threatening or that do not require immediate attention. |
| **PHI** | Individually identifiable health information (as defined in the HIPAA Privacy Rule) that, except as provided in this issuance, is transmitted or maintained by electronic or any other form or medium. PHI excludes individually identifiable health information in employment records held by a DoD covered entity in its role as employer. Information that has been de-identified in accordance with the HIPAA Privacy Rule is not PHI. |
| **PII** | Information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual. Defined in OMB Circular No. A-130. |

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

| TERM | DEFINITION |
|------|------------|
| **RLE** | The phase in the gender transition process during which the individual begins living socially in the gender role consistent with their self-identified gender. RLE may or may not be preceded by the commencement of cross-sex hormone therapy, depending on the medical treatment associated with the individual Service member, cadet, or midshipman's gender transition. The RLE phase is also a necessary precursor to certain medical procedures, including gender transition surgery. RLE generally encompasses dressing in the new gender, as well as using self-identified gender berthing, bathroom, and shower facilities. |
| **SCCC** | Service-level cell of experts created to provide multi-disciplinary (e.g., medical, legal) advice and assistance to commanders regarding service by transgender Service members, cadets, or midshipmen and gender transition in the military. |
| **self-identified gender** | The gender with which an individual identifies. |
| **stable in the self-identified gender** | The absence of clinically significant distress or impairment in social, occupational, or other important areas of functioning associated with a marked incongruence between an individual's experienced or expressed gender and the individual's biological sex. Continuing medical care including, but not limited to, cross-sex hormone therapy may be required to maintain a state of stability. |
| **transgender Service member** | Service member who has received a medical diagnosis indicating that gender transition is medically necessary, including any Service member who intends to begin transition, is undergoing transition, or has completed transition and is stable in the self-identified gender. |
| **transition** | Period of time when individuals change from the gender role associated with their sex assigned at birth to a different gender role. For many people, this involves learning how to live socially in another gender role. For others, this means finding a gender role and expression that are most comfortable for them. Transition may or may not include feminization or masculinization of the body through cross-sex hormone therapy or other medical procedures. The nature and duration of transition are variable and individualized. |

*DoDI 1300.28, April 30, 2021*
*Change 1, December 20, 2022*

# REFERENCES

American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition, May 18, 2013

Commandant Instruction M1850.2D, "Physical Disability Evaluation System," May 19, 2006

DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1100.13, "DoD Surveys," January 15, 2015, as amended

DoD Instruction 1215.08, "Senior Reserve Officers' Training Corps (ROTC) Programs," January 19, 2017, as amended

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy," May 5, 2015

DoD Instruction 1322.22, "Service Academies," September 24, 2015

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System," November 10, 2022

DoD Instruction 1350.02, "DoD Military Equal Opportunity Program," September 4, 2020, as amended

DoD Instruction 3216.02, "Protection of Human Subjects and Adherence to Ethical Standards in DoD-Conducted and -Supported Research," April 15, 2020, as amended

DoD Instruction 5400.11, "DoD Privacy and Civil Liberties Programs," January 29, 2019, as amended

DoD Instruction 6025.18, "Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule Compliance in DoD Health Care Programs," March 13, 2019

DoD Instruction 6025.19, "Individual Medical Readiness Program," July 13, 2022

DoD Instruction 6400.11, "DoD Integrated Primary Prevention Policy for Prevention Workforce and Military Leaders," December 20, 2022

DoD Instruction 6400.09, "DoD Policy on Integrated Primary Prevention of Self-Directed Harm and Prohibited Abuse or Harm," September 11, 2020

DoD Instruction 6490.08, "Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members", August 17, 2011

DoD Instruction 8910.01, "DoD Implementation of the Paperwork Reduction Act," December 5, 2022

Office of Management and Budget Circular No. A-130, "Managing Information as a Strategic Resource," July 28, 2016

United States Code, Title 5, Section 552a (also known as the "Privacy Act of 1974,"), as amended

# EXHIBIT E

Administrative Change to DAFPM 2021-36-01, *Accessions and In-service Transition for Persons Identifying as Transgender*

DAFPM 2021-36-01, is extended and will remain posted on e-publishing and in effect until it is superseded with another PM or PD. It will not otherwise automatically expire on 6 June 2023, but remain in effect until a new or updated PM or PD is accomplished and published to replace it. 6 Dec 2022

DAFPM 2021-36-01 is extended and will remain posted on e-publishing and in effect until it is superseded with another PM or PD. It will not otherwise automatically expire on 30 April 2023, but remain in effect until a new or updated PM or PD is accomplished and published to replace it. 28 April 2022

OPR: SAF/MRR

References to "usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil" are hereby changed to "DAF.Service_Central.Coordination_Cell@us.af.mil." 7 May 2021.



# DEPARTMENT OF THE AIR FORCE
## WASHINGTON, DC

**OFFICE OF THE SECRETARY**

DAFPM2021-36-01
30 April 2021
Extended Date: 28 April 2022

MEMORANDUM FOR DISTRIBUTION C
                              MAJCOMs/FLDCOMs/FOAs/DRUs

SUBJECT: Department of the Air Force Policy Memorandum *Accessions and In-Service Transition for Persons Identifying as Transgender*

        This Department of the Air Force (DAFPM) Policy Memorandum immediately establishes specific Air Force and Space Force policy and provides guidance associated with the accession and in-service transition of Service members identifying as transgender. Compliance with this memorandum is mandatory. To the extent the memorandum's directions are inconsistent with other DAF publications, the information herein prevails, in accordance with Department of the Air Force Instruction 33-360, *Publications and Forms Management.*

        The policy guidance outlined in this memorandum is effective immediately and will be incorporated into Air Force Manual (AFMAN) 36-2905, *Air Force Physical Fitness Program;* Air Force Instruction (AFI) 36-2903, *Dress and Personal Appearance of Air Force Personnel;* AFI 36-3206, *Administrative Discharge Procedures for Commissioned Officers;* AFI 36-3208, *Administrative Separation of Airmen;* AFI 36-3209, *Separation and Retirement Procedures for Air National Guard and Air Force Reserve Members;* AFI 36-3501, *United States Air Force Academy Operations;* AFROTCI 36-2011, *Cadet Operations;* Department of the Air Force Manual 48-123, *Medical Examinations and Standards;* AFI 36-2710, *Equal Opportunity Program* and AFI 32-6000, *Housing Management.*

        There are no releasibility restrictions on this publication. It applies to the Regular Air Force, United States Space Force, Air Force Reserve, and Air National Guard. Ensure all records generated as a result of processes prescribed in this publication adhere to Air Force Instruction 33-322, *Records Management and Information Governance Program,* and are disposed in accordance with the Air Force Records Disposition Schedule, which is located in the Air Force Records Information Management System. This Memorandum becomes void after one year has elapsed from the date of this Memorandum, or upon publishing of a new Policy Directive permanently establishing this policy, whichever is earlier.

                                          JOHN P. ROTH
                                          Acting Secretary of the Air Force

Attachments:
1. Policy Guidance for Transgender Service Members and Members with Gender Dysphoria
2. In-Service Transition
3. References
4. SAMPLE: Exception to Policy (ETP) Request Memorandum

1

**Attachment 1**
**Policy Guidance for Transgender Service Members and Members with Gender Dysphoria**

## 1. SECTION I: Applicability.

This memorandum provides policy and guidance for all Service members serving in the Regular Air Force, the Air Force Reserve, the Air National Guard, and the United States Space Force. This guidance implements the policy in Department of Defense Instruction (DoDI) 1300.28, *In Service Transition for Transgender Service Members* effective April 30, 2021. This guidance also assigns responsibilities, and prescribes procedures regarding the standards for accession, retention, separation, in-service transition, and medical coverage for members and applicants with gender dysphoria, as applicable. Questions regarding this policy may be addressed to the Service Central Coordination Cell (SCCC) at usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil.

For the purpose of this issuance, the term "Service member" includes cadets and midshipmen in a contracted Air Force Reserve Officer Training Corps (AFROTC) status and those at the United States Air Force Academy. This issuance does not apply to individuals participating in AFROTC in a non-contracted volunteer status. Contracted AFROTC cadets have limited eligibility for medical benefits and care through a military medical treatment facility (MTF), delineated in DoD Instruction (DoDI) 1215.08, *Senior Reserve Officers' Training Corps (ROTC) Programs*.

## 2. SECTION II: Policy.

It is DAF policy that:

    a. Service in the Air Force and Space Force should be open to all persons who can meet the high standards for military service and readiness.

    b. All Service members and applicants for accession must be treated with dignity and respect and afforded equal opportunity in an environment free from prohibited discrimination. No person, sole based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force. In today's Air Force and Space Force, people of different backgrounds and views work, live, and fight together on a daily basis. This is possible because they treat each other with dignity and respect. We will continue to respect and serve with others who may have different backgrounds or hold different views.

    c. Except where a provision of policy has granted an exemption, transgender Service members or applicants for accession must be subject to the same standards as all other persons. When a standard, requirement, or policy depends on whether the individual is male or a female (e.g. medical fitness for duty; physical fitness and body fat standards; lodging, bathroom and shower facilities; and uniform and grooming standards), all persons will be subject to the standard, requirement, or policy associated with their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS).

2

d.  Personnel will be accessed or commissioned in accordance with DAFMAN 48-123 and Volume 1 of DODI 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*.

e.  Separation and Retention:

(1)  Service members may not be separated, discharged, or denied reenlistment or continuation of service solely based on gender identity.

(2)  A service member, whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition.

(3)  Service members are subject to separation in an entry-level status during the period of initial training defined as 180 days per DoDI 1332.14, *Enlisted Administrative Separations,* based on a medical condition that impairs the member's ability to complete such training.

(4)  A Service member is subject to administrative separation for a fraudulent or erroneous enlistment or induction when warranted and in accordance with AFI 36-3208, based on any deliberate material misrepresentation, omission, or concealment of a fact, including a medical condition, that if known at the time of enlistment, induction, or entry into a period of military service, might have resulted in rejection.

(5)  Service members who are not wartime mission capable or who are non-deployable for more than 12 consecutive months will be evaluated for referral into the Disability Evaluation System, administrative separation, or retention determination as appropriate, pursuant to DoDI 1332.45, *Retention Determinations for Non-Deployable Service Members* and DAF implementing issuances.

## 3.  SECTION III:  Considerations for Air Force Reserve Officer Training Corps (AFROTC) and United States Air Force Academy (USAFA) Cadets.

a.  In seeking approval for gender transition, contracted AFROTC cadets must coordinate with their detachment commander on how to submit all required civilian medical and mental health documents to Accession Medical Waiver Division (AMWD) for clinical and administrative review for appropriate case disposition. AMWD forwards cases to the Transgender Health Medical Evaluation Unit (THMEU) to validate civilian diagnosis, treatment plan, and to determine the estimated date transition is complete in accordance with associated timeline. In seeking approval for gender transition, USAFA cadets will follow the procedures for regular Active Duty members in Attachment 2.  Except as indicated in this Section, contracted AFROTC cadets will follow the procedures in Attachment 2.

3

b.  An individual participant is subject to placement on medical leave of absence or medical disenrollment from the AFROTC in accordance with DoDI 1215.08 or from USAFA in accordance with DoDI 1322.22, *Service Academies* based on a medical condition that impairs the individual's ability to complete such training or to access into the Military Services.

c.  In a manner consistent with this issuance and with applicable DoD regulations, commanders will address a contracted AFROTC cadet or USAFA cadet's gender transition with a view of mitigating the impact on the cadet's training, scholarships, and eligibility for retention and commissioning. Such mitigation strategies may include:

(1)  AFROTC Cadet:

(a)  Deferring Field Training.

(b)  Placing the cadet in Pursuing Status.

(c)  Requesting waivers to policy or medical standards (including medical qualification for Field Training if appropriate).

(d)  Medical Leave of Absence.

(e)  Changing the Date of Commission, within the same or to a later fiscal year.

(2)  USAFA cadet:

(a)  Requesting waivers to policy or medical standards.

(b)  Medical or excess leave.

d.  Retention:

(1)  Contracted AFROTC or USAFA cadets undergoing commander-approved gender transition.  As with all cadets who experience a medical condition while in the AFROTC Program or USAFA, each situation is unique and will be evaluated based on the individual circumstances.  Individuals are required, however, to meet medical accession standards as a prerequisite to appointment in the Armed Forces."

(a)  Time elapsed since the most recent sex reassignment or genital reconstruction surgery, with no functional limitations or complications and no additional surgery, under DoDI 6130.03 V1, sections 5.13(f)(2) or 5.14(m)(2), or

(b)  Stability on cross-sex hormones or no longer requiring such hormones, under DoDI 6130.03 V1, section 5.24(t), or

4

(c) Stability following gender dysphoria diagnosis, under DoDI 6130.03 V1, section 5.28(t).

(2) A cadet may still be disenrolled for medical disqualification within 180 days after becoming a contracted AFROTC or USAFA cadet.

(3) A cadet may still be disenrolled as otherwise permitted under applicable regulations.

(4) Contracted AFROTC and USAFA cadets must meet accession standards at graduation and prior to commissioning.

## 4.  SECTION IV:  Medical Waivers.

a.  Any accessions applicant who does not meet the medical criteria in DoDI 1300.28 and/or Volume 1 of DoDI 6130.03 may be considered for a medical waiver(s).  Medical waiver requests are routed to the appropriate component's Air Force Medical Waiver Review Authority. (i.e. AD/SG, ANG/SG, AFRC/SG).

## 5.  SECTION V:  Miscellanea.

a.  Medical Policy.

(1)  For Service members who have been diagnosed with gender dysphoria, the DAF will handle requests for medical care and treatment in accordance with DoDI 1300.28, *Individual Medical Readiness (IMR)* and **Attachment 2** to this issuance.

(2)  In accordance with DoDI 1300.28, and DoDI 1215.13, *Ready Reserve Member Participation Policy*, all members in the Active and Reserve Components have a responsibility to maintain their health and fitness, meet individual medical readiness requirements, and report to their chain of command any medical and health issue (including mental health) that may affect their readiness to deploy or fitness to continue serving.

(3)  As a reminder, all Service members, regardless of status and as a condition of continued participation in military service, will report any health information to their chain of command which may limit their performance of official duties, per DoDI 1300.28, para 3.2,a.(2): Each Service member in the AC or in the Selected Reserve will, as a condition of continued participation in military service, report significant health information to their chain of command.  Service members who have or have had a medical condition that may limit their performance of official duties must consult with a military medical provider (or a civilian medical provider validated by a military medical provider) concerning their diagnosis and proposed treatment, and must notify their commanders.

b.  Equal Opportunity. The DAF provides equal opportunity to all Service members in an environment free from harassment and unlawful discrimination on the basis of race, color, national origin, religion, sex, gender identity, or sexual orientation.

c.  Protection of Personally Identifiable Information (PII) and Protected Health Information (PHI).  The DAF will:

> (1)  In accordance with DoDD 5400.11, *DoD Privacy Program*, in cases where there is a need to collect, use, maintain, or disseminate PII in accordance with this memorandum or DAF regulations, policies or guidance, DAF will protect against unwarranted invasions of personal privacy and the unauthorized disclosure of such PII.

> (2)  Maintain such PII and protect individual's rights, consistent with federal law, regulation, and policy.

> (3)  Disclosure of PHI will be consistent with DoD Manual 6025.18, *Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs* and DoDI 6490.08, *Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members.*

d.  Standards. The DAF recognizes a Service member's status as male or female by the member's gender marker in DEERS.

> (1)  The DAF applies all standards that involve consideration of the Service member's status as male or female solely based on the member's gender marker in DEERS such as:

> > (a)  Uniforms and grooming.

> > (b)  Body composition assessment.

> > (c)  Physical readiness testing.

> > (d)  Military Drug Demand Reduction Program (DDRP).

> (2)  As to facilities subject to regulation by the DAF, the Service member will use lodging, bathroom, and shower facilities associated with the member's gender marker in DEERS.

e.  Assessment and Oversight of Compliance.

> (1)  Beginning in fiscal year 2022 and at least every 3 years thereafter, the Air Force Inspector General or another appropriate auditing agency designated by the Secretary of the Air Force (SecAF) will conduct a special inspection to ensure compliance with this issuance and related regulations, policies, and guidance. Such reports will be endorsed and provided by SecAF to the USD(P&R) within three

months of completion, in accordance with DoDI 1300.28. SecAF will review the
report of inspection for purposes of assessing and overseeing compliance;
identifying compliance deficiencies, if any; timely initiating corrective action, as
appropriate; and deriving best practices and lessons learned.

7

**ATTACHMENT 2**

**IN-SERVICE TRANSITION**

This guidance provides unit personnel, supervisors, commanders, and Service members with a diagnosis of gender dysphoria and the medical community a construct by which Service members may transition gender while serving.

**1.  SECTION I:  General considerations for In-Service Transition.**

a.  The DAF recognizes a Service member's gender by the member's gender marker in DEERS. Coincident with that gender marker, the DAF applies, and the member is responsible to meet, all standards for uniforms and grooming, fitness, Military DDRP participation, and other military standards applied with consideration of the member's gender.  Service members will use lodging, bathroom and shower facilities that are subject to regulation by the military in accordance with their gender marker in DEERS unless provided an approved exception to policy (ETP).

b.  Gender transition begins when a Service member receives a diagnosis from a military medical provider (or a civilian medical provider validated by a military medical provider) indicating that gender transition is medically necessary.  The service member then completes the medical care identified or approved by a military mental health or medical provider in a documented treatment plan validated by the THMEU as necessary to achieve stability in the self-identified gender.  Transition concludes when the Service member's gender marker is changed in DEERS and the Service member is recognized in the member's self-identified gender.  Care and treatment may still be received after the gender marker is changed in DEERS, but at that point, the Service member must meet all applicable military standards in the self-identified gender.

c.  Any determination that a transgender Service member or Service member with gender dysphoria is non-deployable at any time will be consistent with established DAF standards, as applied to other Service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

**2. Section II:  Medical Diagnosis and Treatment.**

a.  Any medical care and treatment provided to a transgender Service member or Service member with gender dysphoria will be provided in the same manner as other medical care and treatment. Nothing in this memorandum will be construed to authorize a commander to deny medically necessary treatment to a transgender Service member or Service member with gender dysphoria or authorize elective care not consistent with medical protocols and standards of practice.

b.  When a Service member receives a diagnosis of gender dysphoria from a medical provider, indicating that gender transition is medically necessary for the Service member, it will be confirmed by the Transgender Health Medical Evaluation Unit (THMEU) at Joint Base San Antonio, Lackland. Once the diagnosis is confirmed, the member and military medical provider

(or a civilian medical provider validated by a military medical provider) must notify the unit commander of the diagnosis.

    c.  The THMEU will provide the service member with a medical treatment plan (MTP). Recommendations will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment. Medical advice to commanders will be provided in a manner consistent with processes used for other medical conditions that may limit a Service member's performance of official duties. The THMEU will liaise with base Physical Evaluation Board Liaison Officers (PEBLOs) or ARC/SG to make recommendations regarding profile status for any transitioning members, and update the member's profile in the Aeromedical Services Information Management System (ASIMS) as appropriate.

    d.  An MTP must be developed with input by the patient and the patient's military medical provider (or a civilian medical provider validated by a military medical provider), or by the patient and the THMEU.  All MTPs will be validated by the THMEU prior to start of transition and whenever an update is required. Patients may participate in a medical TDY to the THMEU at Joint Base San Antonio-Lackland for MTP development and validation or updates as needed. When possible, patients should attend a medical TDY to THMEU at least once during the medical transition process, preferably at start of transition.

    e.  When a Service member receives a diagnosis of gender dysphoria from a military medical provider (or a civilian medical provider validated by a military medical provider) and obtains an MTP for gender transition from a military medical provider (or a civilian medical provider validated by a military medical provider), the Service member must notify their commander. The Service member's notification to the commander must identify all medically necessary care and treatment that is part of the Service member's MTP.

        (1)  If applicable, the Service member's notification to the commander must identify a projected schedule for such treatment and an estimated date for a change in the Service member's gender marker in DEERS.

        (2)  If additional care and treatment are required after a gender marker change that was not part of an original treatment plan, the Service member must provide notification to the commander identifying the additional care, treatment, and projected schedule for such treatment.

        (3)  Recommendations of a military medical provider (or a civilian medical provider validated by a military medical provider) will address the severity of the Service member's medical condition and the urgency of any proposed medical treatment.

    f.  Medically necessary care may include real life experiences (RLE). Full-time RLE may be achieved when, as a component of the MTP, a Service member receives an approved ETP for dress and appearance and use of facilities. Full-time RLE is also achieved when a gender marker change is made.

9

JA475

g.  Continued Medical Care. A military medical provider (or a civilian medical provider validated by a military medical provider) in coordination with the THMEU, may determine certain medical care and treatment to be medically necessary even after a Service member's gender marker is changed in DEERS (e.g., cross-sex hormone therapy and/or gender reaffirming surgery). A gender marker change does not preclude such care and treatment. Updates in the treatment plan will be followed by notification to the Service member's unit commander and include treatment timing.  The commander in consultation with the Service member and military medical personnel may approve and/or negotiate impact to the unit mission to reconcile any concerns prior to approval.

h. The THMEU will serve as the POC and consultant to all Military Treatment Facilities (MTFs), RMUs, GMUs, and commanders with any questions relating to medical concerns which may arise as part of a member's gender transition. The THMEU may be contacted at usaf.jbsa.59-mdw.mbx.59-mdw-thmeu-mmdt@mail.mil.

**3. SECTION III:  Transition Approval Process.**

a.  A service member seeking gender transition must follow the procedures in this section.

b.  After the THMEU provides or validates an MTP, the Service member may request that the commander or superior commander concur within 30 calendar days for Active DAF Service members and no later than 90 calendar days for Guard and Reserve:

(1)  The timing of medical treatment associated with gender transition, to include gender-affirming hormones and/or surgeries

(2)  Any ETP associated with gender transition, consistent with guidance in this memorandum; and/or

(3)  A change to the Service member's gender marker in MilPDS to flow to DEERS.

c.  If the commander has concerns with mission impact, the commander will resolve the concerns with the Service member and treating provider within 30 calendar days for Regular DAF Service members and no later than 90 calendar days for Guard and Reserve.

d.  Consistent with applicable law, regulation, and policy, the commander will:

(1)  Comply with the provisions of this issuance, and with DAF regulations, policies and guidance, and consult with the treating provider(s) and the SCCC.

(2)  Promptly respond to any request for medical care, as identified by the medical provider, and ensure that such care is provided consistent with applicable regulations.

10

(3)  Respond to the request for MTP approval within a framework that ensures readiness by minimizing impacts to the mission (including deployment, operational, training, exercise schedules, and critical skills availability), as well as to the morale and welfare and good order and discipline of the command, as informed by the recommendations of the military medical provider, the THMEU, the SCCC, and others as appropriate.

(4)  Consider the All-Volunteer Force readiness model in evaluating a request for medical care or treatment or an ETP associated with gender transition during a Service member's first term of service. Any other facts and circumstances related to an individual Service member that impact that model will be considered by the commander as set forth in this issuance and DoDI 1300.28. If a Service member requests non-urgent medical treatment or an ETP associated with gender transition during the first term of service, including  during periods of initial entry training in excess of 180 calendar days, the commander may give the factors set forth in this paragraph significant weight in considering and balancing the individual need associated with the request and the needs of the command, in determining when such treatment, or whether such ETP may commence.

(5)  30 Calendar days after receipt for Active Duty DAF members and no later than 90 calendar days for Guard and Reserve in writing; include notice of any actions taken by the commander in accordance with applicable regulations, policies and guidance, and the provisions of this issuance; and will be provided to both the Service member and their military medical provider" to "military medical provider (or a civilian medical provider validated by a military medical provider). A request that the commander determines to be incomplete will be returned to the service member, with written notice of the deficiencies identified, as soon as practicable, but not later than 30 calendar days after receipt. However, commanders of part-time AFRC or ANG members must return incomplete requests to the Service member NLT 90 calendar days after receipt.

(6)  At any time prior to the change of the Service member's gender marker in MilPDS to flow to DEERS, and after consultation with the Service member and the THMEU, the commander may request the treating provider(s) and THMEU modify a previously approved approach to, or an ETP associated with gender transition to address mission impact. A determination that modification is necessary and appropriate will be made in accordance with the procedures in this memorandum and upon review and consideration of all other factors prescribed in this memorandum.  Any modification in the treatment plan must not negatively affect the Service member's health nor violate current medical practice standards. Notice of such modification will be provided to the Service member. A Service member may dispute any ETP modification or decision up to the next higher

11

authority, following the same routing process as for new ETP requests. Once an ETP is approved by a Service member's Wing Commander or equivalent superior authority, that approval will be honored following PCS to a new duty station, subject to modification by the gaining Wing/Installation Commander or equivalent in accordance with this paragraph.

(7) Approve, in writing, the request to change a service member's gender marker in MilPDS to flow to DEERS, subsequent to receiving a recommendation from the military medical provider (or upon the recommendation of a civilian provider validated by a military medical provider) and the THMEU indicating that the Service member's gender marker be changed and upon receipt of appropriate legal documentation supporting a gender change. Such documentation consists of either a certified true copy of a state birth certificate reflecting the member's preferred gender, a certified true copy of a court order reflecting the member's preferred gender, or a United States passport reflecting the member's preferred gender. Upon submission of the commander's written approval and required legal documentation to the appropriate personnel servicing activity, the change in the Service member's gender marker will be entered and updated in MilPDS and transmitted to and updated in DEERS, under the authority, direction, and control of the Defense Manpower Data Center (DMDC).

## 4. SECTION IV: Accommodations for Transitioning Service Member.

a. In cases where transitioning Service members may require accommodation in regard to military dress and appearance standards, fitness standards, or to use the designated facilities of their preferred gender, the Service member should submit requests through their unit commander. This may include requests for dress and appearance, fitness or facility exceptions to policy. Upon receiving any request, recommendation, or dispute on a Service member's ETP under this issuance, a commander or director must approve the member's request or forward the disapproval recommendation to the next higher authority within 30 calendar days for Regular DAF Active Duty and no later than 90 calendar days for Guard and Reserve.

b. Fitness.

(1) Service members must adhere to applicable Fitness standards of the gender reflected in DEERS as outlined in AFMAN 36-2905. However, Service members undergoing cross-sex hormone treatment as a component of an MTP, validated and approved by the THMEU, may request an exemption from taking the Fitness Assessment (FA) during their period of transition, prior to a gender marker change in MilPDS to flow to DEERS. Military medical providers may enter profiles for components of the fitness assessment as appropriate.

(3)  For cases in which members have failed the fitness assessment due to treatment for gender dysphoria, a fitness exemption may be requested by the member in accordance with AFI 36-2905. The following are required for fitness assessment exemption consideration:

(a)  A memorandum from the service member requesting the AF exemption, and

(b)  A signed DD Form 2870, *Authorization for Disclosure of Medical or Dental Information*, and

(c)  An MTP signed by the THMEU that shows evidence of:

(i)  A medical diagnosis of gender dysphoria from a military medical provider confirmed by the THMEU (or the diagnosis of a civilian provider validated by a military medical provider and the THMEU), and

(ii)  Confirmation of ongoing cross-sex hormone treatment as part of a gender transition plan, and

(iii)  An estimated gender marker change date that has not yet expired.

(d)  Unit commander, or equivalent, certification that the service member made a full and clear effort to meet the FA standards of their current gender.

(4)  DAF/A1 is the approval authority for exemption requests as outlined in AFI 36-2905. For service members who are transitioning and have an approved MTP, authority to approve fitness exemptions is delegated to the wing commander or equivalent.

(a)  The service member's immediate commander, or equivalent, will recommend approval or disapproval and forward the request through their chain of command to the wing commander for approval. Any disapproval will follow the process below:

(i)  DAF/A1 retains the disapproval authority for such fitness exemptions. Any commander recommending disapproval, after Staff Judge Advocate review, will forward the request to the appropriate MAJCOM, FLDCOM, FOA or DRU A1. The MAJCOM, FLDCOM, FOA, DRU A1 recommends approval or disapproval and forwards the request, to the commander or director

13

for approval or to recommend disapproval. Any MAJCOM, FLDCOM, FOA, DRU commander or director recommending disapproval, after Staff Judge Advocate review, forwards the request to the SCCC to route for DAF/A1 decision

(5) If the fitness exemption is approved, the unit commander, or equivalent, will sign a memo authorizing the exemption. Unit Fitness Program Managers (UFPM) will document the exemption in AFFMS II using the commander's composite exemption. Initial FA exemptions will be for a period of 6 months. To receive a new exemption, the Service member will provide the previously approved FA exemption memo and updated medical documentation showing proof of continued cross-sex hormone treatment to their current unit commander, who may approve or deny any additional 6-month period exemptions.

(a) Upon approval of a fitness exemption, the Installation Commander, or delegate for fitness appeals under AFMAN 36-2905, may approve the removal of failing fitness assessment scores due to gender transition.

(b) Wing Commanders or DAF, MAJCOM, FLDCOM, NAF, FOA and DRU Directors or USSF equivalents receiving a request for fitness exemption will provide a completed, approved request package to the SCCC at usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil.

(6) A service member who receives a fitness exemption will be expected to maintain a healthy lifestyle, participate in unit physical fitness, and work with their unit commander to ensure they are maintaining an active fitness regimen. Members are ultimately responsible for maintaining a healthy lifestyle which incorporates fitness. Unit commanders may use current United States Air Force Fitness Improvement Program options, such as BE WELL online, a Healthy Weight program, or Military OneSource Health Coaching to assist in formally monitoring members' fitness levels. Service members diagnosed with gender dysphoria should provide their unit commander a Fitness Maintenance Plan to ensure they have a verifiable plan to remain physically fit during their gender transition.

(7) The fitness assessment exemption will apply at current and future duty locations but will need to be re-evaluated by the unit commander when the exemption expires.

c. Dress and Appearance

(1) Service members must adhere to applicable dress and appearance standards of the gender reflected in DEERS as outlined in AFI 36-2903. However, altered physical characteristics during gender transition may make dress and appearance standard changes appropriate prior to gender marker changes in MilPDS to flow to DEERS.

14

Therefore, Service members may submit an ETP request for RLE to their commander to adhere to their preferred gender identity dress and appearance standards prior to their official gender marker change in MilPDS, and in turn, DEERS.

(2)  The ETP request package will require the following supporting justification:

(a)  A memorandum from the service member requesting to adhere to the preferred gender's dress and appearance standards, and

(b)  A signed DD Form 2870, and

(c)  An MTP signed by the THMEU that shows:

(i)  Evidence of a medical diagnosis of gender dysphoria from a military medical provider confirmed by the THMEU (or the diagnosis of a civilian provider validated by a military medical provider and the THMEU), and

(ii)  Confirmation that the ETP request is a component of the service member's gender transition plan, and

(iii)  An estimated gender marker change date that has not yet expired, and

(iv)  Unit commander, or equivalent, assessment of dress and appearance that includes information about the service member's professional military image in current and preferred gender's dress and appearance standards, fit and/or function of the uniforms, and potential impact on unit cohesion, good order and discipline (if any).

(3)  DAF/A1 is the approval authority for ETP requests for dress and appearance as outlined in AFI 36-2903, paragraph 12.5. For service members who are transitioning and have an approved MTP, authority to approve dress and appearance ETPs is delegated to the wing commander or equivalent.

(4)  The Service member's immediate commander or equivalent will recommend approval or disapproval and forward the request through their chain of command to the wing commander for approval. Any disapproval will follow the process below:

(a)  DAF/A1 retains the disapproval authority for such ETPs. Any commander recommending disapproval, after Staff Judge Advocate review, will forward the request to the appropriate MAJCOM, FLDCOM, FOA or DRU A1. The MAJCOM, FLDCOM, FOA, DRU A1 recommends approval or disapproval and forwards the request, to the commander or director for approval or to recommend disapproval. After

15

Staff Judge Advocate review, the MAJCOM/FLDCOM/CC recommending disapproval forwards the request to the SCCC to route for DAF/A1 decision.

(5)  Wing Commanders or HAF, MAJCOM, FLDCOM, NAF, FOA and DRU Directors or USSF equivalents receiving a request for a dress and appearance ETP will provide a completed, approved request package to SCCC at usaf.pentagon.saf-mr.mbx.af-central-coordination-cell@mail.mil.

(6)  If approved, the ETP will apply to both the wear of the preferred gender's dress and appearance standards at current and subsequent duty stations, unless modified by the service member's commander. Service members approved for an ETP prior to gender marker change must ensure they carry a copy of their approved ETP on their person until gender marker is changed in MilPDS.  Once the ETP is approved, the member will provide the ETP to the member's medical provider.

(7)  This guidance applies to Air Reserve Technicians (ARTs) who are required to wear the military uniform while performing civilian duties as an ART in accordance with AFI 36-128, *Pay Setting and Allowances*. ARTs must adhere to applicable dress and appearance standards in accordance with AFI 36-2903, *Dress and Personal Appearance of Air Force Personne*l, of the gender reflected in their military personnel record until the ETP request has been approved.

(8)  Service members attached to a unit belonging to another Military Department or a joint or combined environment, will coordinate with their Service Senior Representative (SSR) regarding the dress and appearance requirements applicable to personnel attached to that unit.

d.  Facilities

(1)  A service member undergoing gender transition may request an ETP to use facilities subject to regulation by the military in accordance with their preferred gender prior to a gender marker change in DEERS. The ETP request from the member will require evidence that a military medical provider in coordination with the THMEU (or a civilian medial provider validated by a military medical provider in coordination with the THMEU) has confirmed a diagnosis of gender dysphoria; use of facilities and an ETP for dress and appearance standards are components of the MTP; and after verification the member has received an approved ETP.

(2)  For members who are transitioning and have an approved MTP, authority to approve ETP requests for use of facilities has been delegated by AF/A4 to the installation commander (or relevant approval authority) for approval or disapproval.

16

(3)  Service members may request an ETP for the following facilities:

(a)  Domicile - AFI 32-6000, discusses quarters assignment. Currently, members are assigned to quarters based on the gender reflected in the DEERS, consistent with policy in DoDI 1300.28. Any exceptions should be made consistent with paragraphs (1) and (2) of this section. Until an ETP is approved or gender is updated in DEERS, the member will use the facilities associated with their gender marker in DEERS.

(b)  Bathroom and showers (public) - A service member undergoing gender transition may request a facilities ETP to use facilities subject to regulation by the military in accordance with their preferred gender prior to a gender marker change in DEERS.

(4)  Once the ETP is approved, the member will provide the ETP to the member's medical provider. The member's medical provider will review the document and may include this in the treatment plan to utilize the facilities of the preferred gender. The medical provider will also send a copy of the approved ETP to the THMEU.

(5)  A service member with a locally approved ETP request for use of facilities must also have an approved ETP for dress and appearance prior to using the facilities of their preferred gender.

(6)  Any Air Force installation commander recommending disapproval, after Staff Judge Advocate review, will forward the request to the appropriate MAJCOM, FLDCOM, FOA or DRU A4. The MAJCOM, FLDCOM, FOA, DRU A4 recommends approval or disapproval and forwards the request, to the commander or director for approval or to recommend disapproval. Any MAJCOM, FLDCOM, FOA, DRU commander or director recommending disapproval, after Staff Judge Advocate review, forwards the request to the SCCC to route for AF/A4 decision.

(7)  A Service member whose facilities-use ETP request was disapproved by a non-Air Force/Space Force installation commander (or relevant approval authority) shall follow the policies and procedures related to the facilities of the Service or agency, which is the lead for the installation.

(8)  In executing any accommodation, the unit commander will take into account the physical construction of the facilities as well as the privacy of other members using the facilities in question. The unit commander should consider and balance the needs of the individual and the needs of the command. The installation should explore no-cost facility options. No-cost options may include, but are not limited to, allowing the member to use any family style restroom/shower area, providing additional time for the member to use the privacy of their domicile, or mandating wear of minimal articles of clothing for all.

17

(9)  If a service member has an approved facilities ETP, they should work with their command chain on coordinating appropriate facility usage at any temporary duty, deployed, or permanent change of station (PCS) locations prior to departure. This includes billeting that may require shared living quarters or restrooms. Although many installations have accommodations in place, facilities ETPs, especially in a joint environment, may not have reciprocity.

e.  Deployment and Outside Continental United States (OCONUS) Assignments

(1)  Transgender service members or service members with gender dysphoria selected for deployment, or short-tour overseas assignments, will not be prevented from deploying or reassigned if they are medically qualified and such deployment or reassignment is compatible with the host nation law for the gaining installation. Coordinate any approved exceptions to policy regarding accommodation during transition with the deployed commander to ensure knowledge of transition and any potential accommodations required for the deployed environment. Coordinate any approved exceptions to policy with gaining commander prior to PCS or short-tour assignment.  For OCONUS assignments, coordinate with respective Geographic Combatant Command's International Law Division to ensure that the assignment will be compatible with host- nation laws issues, agreements, and/or responsibilities.

f.  Considerations for ARC Members

(1)  Air Force Reserve Command (AFRC) and Air National Guard (ANG) members on orders for Title 10 Active Duty Operational Support for one year or more or on AGR Title 10 tours will follow the same policies and procedures as Regular DAF Service members. All other AFRC and ANG members will follow the procedures in this section in addition to the provisions in 1.1 through 1.3 above.

(2)  Air Force Reserve Command (AFRC) and Air National Guard (ANG) members (AGRs, ARTs, TRs, traditional Guardsmen, and IMAs) must provide their supporting medical unit (Reserve Medical Unit (RMU), Guard Medical Unit (GMU) or Active Duty Medical Treatment Facility) all civilian medical and mental health documentation for review. The RMU, GMU, or Active Duty Medical Treatment Facility will forward all cases to ARC/SG for review. ARC/SG will forward all cases to the THMEU to validate civilian diagnosis, treatment plan, and to determine the estimated date transition is complete. ARC medical providers do not validate diagnoses or provide treatment plans.

(3)  To the greatest extent possible, commanders and service members will address periods of non-availability for any period of military duty, paid or unpaid, during the member's gender transition with a view of mitigating unsatisfactory

18

participation in accordance with AFMAN 36-2136, DoDI 1215.13 and DoDI 1300.28.  In accordance with DoDI 1215.13, such mitigation strategies may include:

(a)  Rescheduled training;

(b)  Authorized absences; or

(c)  Alternate training.


**5.  SECTION V: Completion of Transition and Post-Transition:**

a.  In consultation with the service member, military medical provider" to "military medical provider (or a civilian medical provider validated by a military medical provider), in coordination with the THMEU will formally advise the commander when the service member's gender transition is complete, and recommend to the commander a time at which the member's gender marker may be changed in MilPDS to flow to DEERS.

b.  THMEU will validate all requests for GMC and make recommendations based on *Diagnostic and Statistical Manual of Mental Disorders, 5TH Edition* (DSM-V) gender dysphoria post-transition criteria to ensure stability in the affirmed gender or completion of the member's MTP. THMEU will provide written documentation to member's commander recommending gender marker change when appropriate

c.  When a Service member has completed transition, they must bring official documentation to their Military Personnel Flight (MPF) to update their gender in MilPDS to flow to DEERS. Official documentation includes authorization from the member's unit commander and a military medical provider's recommendation, validated by the THMEU, to change the member's gender marker. In addition, the member must provide appropriate legal documentation supporting gender change to the MPF. Legal documentation must be either a certified true copy of a state birth certificate reflecting the transgender member's preferred gender, a certified true copy of a court order reflecting the Service member's preferred gender, or a United States passport reflecting the Service member's preferred gender.

d.  An electronic copy of the legal document and a completed AF Form 281, *Notification of Change in Service Member's Official Records*, will be submitted into the member's ARMS record. There will be no direct update in DEERS; the gender marker in MilPDS is what will update DEERS. A new Common Access Card (CAC) will be issued to reflect the updated gender data. ANG Dual Status Technician/ARTs are required to update their gender marker in MilPDS and Defense Civilian Personnel Data System (DCPDS), as there is no integration between the systems (with the exception of data reporting to DEERS from MilPDS and DCPDS).

e.  Post-transition, coincident with the gender marker change, except as noted below, the Air Force and Space Force will apply, and the transgender Service member is responsible to meet, all standards for uniforms and grooming, fitness, DDRP participation, and other military standards

19

applied with consideration of their gender marker in DEERS. Transgender service members will use military lodging, bathrooms and shower facilities associated with their gender marker in DEERS.

f.  Any determination that a transgender service member is non-deployable at any time will be consistent with established DAF standards, as applied to other service members whose deployability is similarly affected in comparable circumstances unrelated to gender transition.

g.  A military medical provider (or a civilian medical provider validated by a military medical provider) may determine certain treatment to be medically necessary, even after a Service member's gender marker is changed in MilPDS to flow to DEERS (e.g. cross-sex hormone therapy or surgical and cosmetic procedures). Surgical interventions after gender marker change will be addressed through an updated MTP, requiring endorsement by the member's commander.

h.  Members who have completed a gender transition and subsequently require a return to previous gender marker will be evaluated by the THMEU and follow procedures for gender transition consistent with this attachment and DODI 1300.28, paragraph 3.4.

(Page 498 of Total)

## ATTACHMENT 3

## REFERENCES

## PART I. GLOSSARY OF REFERENCES AND SUPPORTING INFORMATION

DoDI 1300.28, *In-service transition for transgender service members,* 30 April 2021

DoD Manual 6025.18, *Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs,* 13 March 2019

DoDI 5400.11, *DoD Privacy and Civil Liberties Programs*, 29 January 2019

DoDI 1332.14, *Enlisted Administrative Separations,* 27 January 2014

DoDI 1332.45, *Retention Determinations for Non-Deployable Service Members,* 30 July 2018

DoDI 1322.22, *Service Academies,* 24 September 2015

DoDI 1215.08, *Senior Reserve Officers' Training Corps (ROTC) Programs,* 19 January 2017

DoDI 1215.13, *Ready Reserve Member Participation Policy,* 5 May 2015

DoDI 6025.19, *Individual Medical Readiness (IMR),* 9 June 2014

DoDI 6130.03, Volume 1, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, 6 May 2018

DoDI 6490.08, *Command Notification Requirements to Dispel Stigma in Providing Mental Health Care to Service Members*

DAFI 33-360, *Publications and Forms Management,* 1 December 2015

AFI 36-128, *Pay Setting and Allowances,* 17 May 2019

AFI 32-6000, *Housing Management*, 18 March 2020

AFI 36-2710, *Equal Opportunity Program,* 18 June 2020

AFI 36-2903, *Dress and Personal Appearance of Air Force Personnel*, 7 February 2020

AFMAN 36-2905, *Fitness Program,* 11 December 2020

AFI 36-3206, *Administrative Discharge Procedures for Commissioned Officers,* 9 June 2004

AFI 36-3208, *Administrative Separation of Airmen,* 9 July 2004

AFI 36-3209, *Separation and Retirement Procedures for Air National Guard and Air Force Reserve Members,* 14 April 2005

AF Form 281, *Notification of Change in Service Member's Official Records*

AFI 33-322, *Records Management and Information Governance Program,* 23 March 2020

AFI 36-3212, *Physical Evaluation for Retention Retirement and Separation,* 15 July 2019

AFI 36-3501, *United States Air Force Academy Operations,* 28 December 2018

DAFMAN 48-123, *Medical Examinations and Standards,* 8 December 2020

Health Affairs Memo, *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members*, 29 July 16

DD Form 2870, *Authorization for Disclosure of Medical or Dental Information*

DSM-V, *Diagnostic and Statistical Manual of Mental Disorders, 5TH Edition*

## PART II. ABBREVIATIONS AND ACRONYMS

**AFFMS II**—Air Force Fitness Management System II

**AFI**—Air Force Instruction

**AFMAN-**Air Force Manual

**AFRC**—Air Force Reserve Command

**AFROTC**-Air Force Reserve Officer Training Corp

**AGR**—Active Guard Reserve

**ANG**—Air National Guard

**ARC/SG**-Air Reserve Component/Surgeon General
**ART**—Air Reserve Technician
**CAC**—Common Access Card
**DAF**—Department of the Air Force
**DAFMAN**—Department of the Air Force Manual
**DCPDS**— Defense Civilian Personnel Data System
**DDRP**—Drug Demand Reduction Program
**DEERS**—Defense Enrollment Eligibility Reporting System
**DoDI**—Department of Defense Instruction
**DMDC**—Defense Manpower Data Center
**ETP**—Exception to Policy
**FA**—Fitness Assessment
**FLDCOM**---Field Command
**GMC**—Gender Marker Change
**GMU**—Guard Medical Unit
**MAJCOM**—Major Command
**MilPDS**—Military Personnel Data System
**MPF**—Military Personnel Flight
**MTF**—Military Treatment Facility
**NAF**-Numbered Air Force
**OCONUS**—Outside the Continental United States
**PII**—Personally Identifiable Information
**RLE**—Real Life Experience
**RMU**—Reserve Medical Unit
**SCCC**—Service Central Coordination Cell
**THMEU**—Transgender Health Medical Evaluation Unit
**UFPM**—Unit Fitness Program Manager
**USAFA**—United States Air Force Academy
**USD P&R** – Under Secretary of Defense Personnel & Readiness

## PART III. TERMS

These terms and their definitions are for purpose of this memorandum.

**Biological Sex**—A person's biological status as male or female based on chromosomes, gonads, hormones, and genitals.
**Cross-Sex Hormone Therapy**—The use of feminizing hormones in an individual with a biological sex of male or the use of masculinizing hormones in an individual with a biological sex of female.
**Gender Dysphoria**— A marked incongruence between one's experienced or expressed gender and assigned gender of at least 6 months' duration, as manifested by conditions specified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM-5), page 452, which is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.
**Gender Identity**— An individual's internal or personal sense of gender, which may or may not match the individual's biological sex.
**Gender Marker**— Data element in DEERS that identifies a Service member's gender.
**Gender Transition**— Gender transition in the military begins when a Service member process receives a diagnosis from a military medical provider (or a civilian medical provider validated by a military medical provider indicating the Service member's gender transition is medically necessary,

and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender. This process may involve:

> **Social transition**, also known as "real life experience," that allows the service member to live and work in their preferred gender with or without any cross-sex hormone treatment. This may also include a legal change of gender, including changing gender on a passport, birth certificate, or through a court order; or

> **Medical transition** to align secondary sex characteristics with a service member's preferred gender using any combinations of cross-sex hormone therapy, surgical/cosmetic procedures; or

> **Surgical transition**, also known as sex reassignment surgery, gender affirming surgery, or gender confirmation surgery; to make the physical body, both primary and secondary sex characteristics, resemble as closely as possible the service member's preferred gender.

**Medically Necessary**—Those health-care services or supplies necessary to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine.

**Personally Identifiable Information (PII)**—Information used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, biometric records, home phone numbers, other demographic, personnel, medical, and financial information. PII includes any information that is linked or linkable to a specified individual, alone, or when combined with other personal or identifying information.

**Self-identified gender (Preferred Gender)**—The gender with which an individual identifies.

**Real Life Experience (RLE)**—The phase in gender transition process when the individual begins living in accordance with their gender identity. RLE may or may not be preceded by the start of cross-sex hormone therapy, depending on the individualized MTP for in-service gender transition. Full time continuous RLE, on a daily basis and across all settings of life, is required before any gender transition surgery that affects fertility. If a service member's MTP identifies gender-affirming surgeries, then an ETP or GMC is a required to track the duration of full-time continuous RLE. RLE generally encompasses dressing in the preferred gender, as well as using bathrooms, locker rooms, dormitory areas and showers of the preferred gender.

**Service Central Coordination Cell (SCCC)**—Representatives including, but not limited to: SAF/MR, AF/SG, AF/A1, SF/S1, AF/A3, AF/A4, AFRC, ANG, AF/JA, SAF/GC, and THMEU as subject matter experts who serve as a primary resource for commanders and provide guidance for all inquiries related to service of exempt and non-exempt members with a diagnosis of gender dysphoria.

**Short Term Tour/Short-Tour**—A tour that does not authorize an accompanied tour; or both the accompanied tour is 24 months and the unaccompanied tour is less than 18 months.

**Stable or Stability**—Service member with a diagnosis of gender dysphoria undergoing in-service gender transition are considered clinically stable when, as determined by a military medical provider, significant medical or mental health conditions, if present, are well controlled.

**Transgender Health Medical Evaluation Unit (THMEU)**—Is a centrally located medical unit which is available to service members, MTF providers, and commanders working with transgender service members. Its functions include assuring service members are receiving appropriate treatment in accord with accepted medical practice; service members are evaluated for readiness issues and appropriately profiled; validating all MTPs, surgical requests, and gender marker change requests; and assisting service members, MTF providers, and commanders in DoD and DAF policy and procedures.

**Transgender**—Individuals who identify with a gender that differs from their biological sex.

**ATTACHMENT 4**

**SAMPLE:  Exception to Policy (ETP) Request Memorandum for routing to Squadron Commander, Group Commander, Wing Commander and/or Installation Commander**

(Date)

MEMORANDUM FOR [Grade/Name of Immediate Commander]

FROM: [Grade, Name of Requester]

SUBJECT: Exception to Policy (ETP) to [military dress and appearance standards, use of designated facilities, and/or fitness standards]

       I am a transgender [female/male] Service member in the process of gender transition. Pending my gender marker change in the Defense Enrollment Eligibility Reporting System (DEERS), I request an ETP to allow me to adhere to the requirements of the [insert preferred gender] gender with regard to
       ☒ Dress and appearance (AFI 36-2903, *Dress and Personal Appearance*),
       ☒ Use of lodging, bathroom, and shower facilities that are subject to regulation by the military, Add (AFI 32-6000, *Housing Management)*
       ☒ My current gender Fitness Assessment standards while undergoing cross-sex hormone therapy pending a gender marker change in DEERS (AFMAN 36-2905, *Air Force Physical Fitness Program*).

I have enclosed:

Medical diagnosis and treatment summary from a military medical provider (or a diagnosis made by a civilian provider and validated by a military medical provider) in consultation with the Transgender Health Medical Evaluation Unit that states gender transition is medically necessary.

DD Form 2870, *Authorization for Disclosure of Medical or Dental Information*, with Section II, number 6 filled out to state that my patient information will be released to my Unit Commander (Name, Rank, Duty Title, Unit Name) and servicing Military Personnel Flight (MPF).

Documentation confirming the ETP request is a component of the member's gender transition plan. [Note this applies only if the ETP request is for dress and appearance and/or use of lodging, bathroom, and shower facilities that are subject to regulation by the military].

The point of contact for this memorandum is the undersigned at (insert telephone number and email address).

SERVICE MEMBER SIGNATURE BLOCK

# EXHIBIT F

HOME  >  SPOTLIGHT ANALYSIS  >

# Young Americans' Views on LGBTQ Rights

PRRI Staff, 04.09.2024

Topics:  LGBTQ

## Introduction

Young Americans (ages 18-29) have consistently been more supportive of LGBTQ rights compared with other age groups. The majority of young Americans favor nondiscrimination protections for LGBTQ Americans and allowing same-sex couples to marry legally and oppose allowing businesses to refuse service to LGBTQ Americans if doing so goes against their religious beliefs. However, overall support for LGBTQ rights among 18 to 29-year-olds has seen a decline over the past few years, with the most notable drops among Republicans.

## Support for Nondiscrimination Protections

Three in four young Americans 18 to 29 (75%) favor laws that would protect LGBTQ Americans from discrimination in jobs, public accommodations, and housing. However, there has been a gradual decline from 2020 to 2023, with the most significant drop from 80% in 2022 to 75% in 2023.

Support for nondiscrimination protections among Democrats ages 18 to 29 has shifted little, with around nine in ten favoring LGBTQ nondiscrimination protections from 2020 to 2023. Young independents' support for nondiscrimination protections showed little change from 2020 to 2022 but dropped 5 percentage points from 83% in 2022 to 78% in 2023. Support among Republicans 18 to 29 has seen the most significant declines in the past four years, dropping by nearly 20 percentage points from 72% in 2020 to 53% in 2023.

**FIGURE 1.  Support for Nondiscrimination Protections Among Americans 18-29, by Party Affiliation**

Percent who support:



Source: PRRI, American Values Atlas, 2020-2023.

## Opposition to Religiously Based Service Refusals

In 2023, about two-thirds of Americans ages 18 to 29 (64%) oppose allowing small businesses to refuse providing goods or services to LGBTQ Americans if doing so goes against their religious beliefs. This is about a 5 percentage point decrease from around seven in ten opposing such religiously based service refusals in 2021 (69%) and 2022 (70%) but is similar to the rate of opposition to refusals in 2020 (66%). In 2023, the vast majority of young Democrats (83%) oppose religiously based service refusals compared with 62% of young independents and 38% of young Republicans.

Young Democrats have fluctuated the most among partisan groups. In 2023, 83% of Democrats ages 18 to 29 oppose religiously based service refusals. Even though this percentage decreased from 89% in 2022, it is notably up from 75% in 2020. Sixty-two percent of independents in 2023 also oppose these refusals, a decrease from 68% in 2020. Young Republicans' opposition to religiously based refusals has seen the most dramatic decline, from 49% in 2020 to 38% in 2023.

**FIGURE 2. Opposition to Religiously Based Refusals Among Americans 18-29, by Party Affiliation**

Percent who oppose:



Source: PRRI, American Values Atlas, 2020-2023.

## Support for Same-Sex Marriage

Around seven in ten  Americans ages 18 to 29 (71%) support allowing same-sex couples to marry legally. This percentage has gradually declined from 77% in 2020. More than eight in ten young Democrats (85%) support same-sex marriage compared with three-fourths of young independents (75%) and just under half of young Republicans (49%).

Both young Democrats and young independents have shown little change in their support for allowing same-sex couples to marry legally from 2020 to 2023. However, there has been a substantial decrease in support among young Republicans (25 percentage points). In 2023, under half (49%) of young Republicans support same-sex marriage, compared with 64% in 2020.

**FIGURE 3.  Support for Same-Sex Marriage Among Americans 18-29, by Party Affiliation**

Percent who support:



Source: PRRI, American Values Atlas, 2020-2023.

Although there is still broad support for LGBTQ rights among young Americans, the dramatic decline in support among young Republicans is noteworthy.

**PRRI**

1023 15th Street NW, Floor 9
Washington, DC 20005

**GENERAL INFORMATION**

info@prri.org

(202) 238-9424

**MEDIA INQUIRIES**

press@prri.org

(202) 238-9424

**TERMS OF USE PRIVACY POLICY**

JA496

Case 1:25-cv-00240-ACR    Document 72-66    Filed 03/07/25    Page 1 of 5
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 509 of 688
Case 1:25-cv-00240-ACR    Document 48-27    Filed 02/14/25    Page 1 of 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-00240-ACR |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL DECLARATION OF ALEX WAGNER**

I, Alex Wagner, declare as follows:

1. I write this declaration to supplement the declaration I signed February 3, 2025, and submitted in support of the Motion for Preliminary Injunction in this matter on February 3, 2025. *See* ECF No. 13-20.

2.    The military maintains different medical standards for accession (entry into service) versus retention (continued service).  For accessions, the standards are deliberately and appropriately stringent because the military makes a substantial long-term commitment to each service member it accepts, including comprehensive medical care that may extend throughout their lifetime.

3.    The military must ensure that newly accessed service members can fulfill their initial contract term and potentially serve for many years beyond.  Given the significant financial and resource investment the military makes in training and developing each recruit, it can only accept individuals whose potential service value will equal or exceed the resources invested in them.  This creates a necessarily high bar for medical qualification at accession.

4.    The 18-month stability requirement for transgender individuals seeking to enter military service, as set forth in Volume 1 of DOD Instruction 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction* (May 28, 2024) ("DoDI 6130.03 Vol. 1"), Ex. H to Wardenski Dec., ECF No. 13-11, *see* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1),  is based on the same considerations applied to other treatable medical conditions at accession, reflecting standard military medical policy rather than any unique restriction on transgender service.

5.    In contrast, retention medical standards, as set forth in Volume 2 of DOD Instruction 6130.03, *Medical Standards for Military Service: Retention* (Jun. 6, 2022) ("DoDI 6130.03 Vol. 2"), attached hereto as **Exhibit A**, focus on a service member's ability to perform their duties, deploy when required, and contribute effectively to the military mission.  *See* DoDI 6130.03 Vol. 2 at 1.2. The military recognizes that there are numerous roles and positions within its ranks, and importantly, it has made a commitment to those who have already chosen to serve.

2

6.  This is why DoDI 6130.03 Vol. 2 explicitly requires that every medical condition be evaluated on a case-by-case basis to determine if continued service is appropriate.  *See* DoDI 6130.03 Vol. 2 at 1.2.b(1), 3.2, 3.3.a(1).  The instruction specifically mandates consideration of each service member's ability to safely complete common military tasks at their grade level, their specific duty requirements, and whether they can serve in deployed or garrison conditions.  *See* DoDI 6130.03 Vol. 2 at 3.2.a.

7.  I can't think of any medical condition that bars continued service—rather, the impact of the condition on the individual service member's ability to perform their duties must be evaluated. In my experience, it would be highly unusual, and I cannot think of another example, where a medical condition would result in a categorical bar to retention without such individualized assessment.

8.  For transgender service members, service in the military means serving in a sex different from their sex assigned at birth.  The process for gender transition is detailed in DOD Instruction 1300.28, *In-Service Transition for Transgender Service Members* (Dec. 20, 2022) ("DoDI 1300.28"), Ex. D to Wagner Dec, ECF No. 13-25, which establishes a protocol for transgender service members.  This includes notifying their command, obtaining a medical diagnosis from a military medical provider, developing and completing an approved medical treatment plan for gender transition, and changing their sex designation in the Defense Enrollment Eligibility Reporting System (DEERS).  *See* DoDI 1300.28 at 3.3.

9.  Once a transgender service member has changed their sex marker in DEERS, they live and serve fully in the sex designated on the DEERS marker.  This means they are referred to by the pronouns associated with their DEERS marker, use facilities consistent with their DEERS marker,

3

are assigned berthing consistent with their DEERS marker, and have to meet all of the military standards consistent with their DEERS marker.

10. If a transgender service member were prevented from serving in accordance with their DEERS marker, that individual could not serve in the military as a transgender person.

11. Based on my knowledge, many of the medications that transgender service members may take as part of their medical care are also prescribed to numerous non-transgender service members for various medical conditions, demonstrating that these medications are compatible with military service.

12. As is generally true, there are different criteria for accessions than for retention for transgender service members. For accession into the military, a transgender person must be stable for 18 months following completion of gender transition before they can enter service. *See* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1).

13. However, for retention of currently serving transgender service members, there is no set time period during which a person must be stable following gender transition. Instead, consistent with the case-by-case assessment required by DoDI 6130.03 Vol. 2, the determination of stability and readiness for duty is individualized and based on each service member's specific medical circumstances and needs.

14. In fact, for most transgender service members, there is often no period of non-deployability associated with their gender transition. This reflects the military's recognition that medical needs vary among individuals and that blanket time requirements are neither necessary nor appropriate for retention determinations.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

4

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 14, 2025

Alex Wagner

Case 1:25-cv-00240-ACR    Document 72-67    Filed 03/07/25    Page 1 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 514 of 688

Case 1:25-cv-00240-ACR    Document 48-28    Filed 02/14/25    Page 1 of 41

# EXHIBIT A



# DoD Instruction 6130.03, Volume 2

# Medical Standards for military service: Retention

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | September 4, 2020 |
| **Change 1 Effective** | June 6, 2022 |
| **Releasability:** | Cleared for public release. Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Approved by:** | Matthew P. Donovan, Under Secretary of Defense for Personnel and Readiness |
| **Change 1 Approved by:** | Lloyd J. Austin III, Secretary of Defense |

**Purpose:** This instruction is composed of two volumes, each containing its own purpose. In accordance with the authority in DoD Directive 5124.02:

- This instruction establishes policy, assigns responsibilities, and prescribes procedures for medical standards for the Military Services.

- This volume establishes medical retention standards and the Retention Medical Standards Working Group (RMSWG), under the Medical and Personnel Executive Steering Committee (MEDPERS), to provide policy recommendations related to this instruction.

Case 1:25-cv-00240-ACR    Document 78-27    Filed 03/04/25    Page 3 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 516 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# TABLE OF CONTENTS

SECTION 1: GENERAL ISSUANCE INFORMATION ........................................................................ 4
  1.1.  Applicability. ................................................................................................................. 4
  1.2.  Policy. ............................................................................................................................. 4
  1.3.  Summary of Change 1. ................................................................................................... 5
SECTION 2: RESPONSIBILITIES ................................................................................................. 6
  2.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ...................... 6
  2.2.  Assistant Secretary of Defense For Health Affairs (ASD(HA)). ................................... 6
  2.3.  Deputy Assistant Secretary of Defense for Health Services Policy and Oversight
      (DASD(HSP&O)). ........................................................................................................... 6
  2.4.  Deputy Assistant Secretary of Defense for Military Personnel Policy (DASD(MPP)).... 6
  2.5.  Director, DHA. ................................................................................................................ 7
  2.6.  Secretaries of the Military Departments and Commandant, United States Coast Guard
      (USCG). ........................................................................................................................... 7
SECTION 3: PROCEDURES FOR APPLYING MEDICAL STANDARDS ................................................ 8
  3.1.  Applicability of Retention Medical Standards. .............................................................. 8
  3.2.  Application of Criteria Used to Develop Standards. ...................................................... 8
  3.3.  Implementation. .............................................................................................................. 9
SECTION 4: ACTIVITIES OF THE RMSWG .................................................................................. 11
  4.1.  Purpose of the RMSWG. ................................................................................................ 11
  4.2.  Overall Goals of the RMSWG. ....................................................................................... 11
  4.3.  Co-Chairs of the RMSWG. ............................................................................................. 11
  4.4.  Membership of the RMSWG. .......................................................................................... 11
SECTION 5: DISQUALIFYING CONDITIONS .................................................................................. 12
  5.1.  General. ........................................................................................................................... 12
  5.2.  Head. ............................................................................................................................... 12
  5.3.  Eyes. ................................................................................................................................ 12
  5.4.  Vision. ............................................................................................................................. 13
  5.5.  Ears. ................................................................................................................................. 13
  5.6.  Hearing. ........................................................................................................................... 13
  5.7.  Nose, Sinuses, Mouth, and Larynx. ................................................................................ 14
  5.8.  Dental. ............................................................................................................................. 14
  5.9.  Neck. ............................................................................................................................... 14
  5.10.  Lungs, Chest Wall, Pleura, and Mediastinum................................................................ 14
  5.11.  Heart. ............................................................................................................................. 16
  5.12.  Abdominal Organs and Gastrointestinal System. ......................................................... 18
  5.13.  Female Genital System. ................................................................................................. 20
  5.14.  Male Genital System. ..................................................................................................... 20
  5.15.  Urinary System. ............................................................................................................. 21
  5.16.  Spine and Sacroiliac Joint Conditions. .......................................................................... 22
  5.17.  Upper Extremity Conditions. ......................................................................................... 23
  5.18.  Lower Extremity Conditions. ......................................................................................... 24
  5.19.  Generalized Conditions of the Musculoskeletal System. .............................................. 25
  5.20.  Vascular System. ........................................................................................................... 25

Case 1:25-cv-00240-ACR    Document 78-27    Filed 03/04/25    Page 4 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 517 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

5.21.  Skin and Soft Tissue Conditions. ................................................................. 27
5.22.  Blood and Blood Forming Conditions. ........................................................ 28
5.23.  Systemic Conditions. ................................................................................... 29
5.24.  Endocrine and Metabolic Conditions. .......................................................... 30
5.25.  Rheumatologic Conditions. .......................................................................... 32
5.26.  Neurologic Conditions. ................................................................................ 33
5.27.  Sleep Disorders. ........................................................................................... 34
5.28.  Behavioral Health. ........................................................................................ 35
5.29.  Tumors and Malignancies. ............................................................................ 36
5.30.  Miscellaneous Conditions. ........................................................................... 36
GLOSSARY ..................................................................................................................... 38
G.1.  Acronyms. ..................................................................................................... 38
G.2.  Definitions. .................................................................................................... 38
REFERENCES ................................................................................................................. 40

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 1:  GENERAL ISSUANCE INFORMATION

## 1.1.  APPLICABILITY.

a.  This volume applies to OSD, the Military Departments (including the Coast Guard at all times, including when it is a Service in the Department of Homeland Security by agreement with that Department), the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this volume as the "DoD Components").

b.  Gender dysphoria-related standards in this volume do not apply to Service members considered exempt pursuant to DoDI 1300.28.

## 1.2.  POLICY.

It is DoD policy that:

a.  Service members meet DoD medical standards established in this volume to be retained in the Military Services.

b.  Service members who are unable to successfully complete their assigned duties while deployed, stationed with only operational healthcare unit support, or while in garrison conditions, be referred to:

(1)  The Disability Evaluation System (DES), on a case-by-case basis, in accordance with DoD Instruction (DoDI) 1332.18 and DoDI 1332.45; or

(2)  For conditions not constituting a disability, the responsible Military Department for possible administrative action, in accordance with DoDI 1332.14 or DoDI 1332.30.

c.  DoD medical standards for military retention are consistent with:

(1)  The criteria for DES referral, in accordance with DoDI 1332.18 and other military requirements, as further defined in Paragraph 3.2 of this volume.

(2)  Deployment requirements, as defined in DoDI 6490.07, and a broader definition of deployability, as defined in DoDI 1332.18.

(3)  Retention determinations for certain non-deployable Service members in accordance with DoDI 1332.45.

(4)  Military Health System (MHS) efforts to improve performance, economy, and efficiency.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

d.  Additional, more selective medical standards for military retention may be established by the Secretaries of the Military Departments based on the Service member's office, grade, rank, or rating, as long as such standards are objectively applied and are not inconsistent with applicable laws or DoD policies.

## 1.3.  SUMMARY OF CHANGE 1.

In accordance with the June 6, 2022 Secretary of Defense memorandum, the changes to this issuance update DoD policy with respect to individuals who have been identified as HIV-positive.  Individuals who have been identified as HIV-positive, are asymptomatic, and who have a clinically confirmed undetectable viral load will have no restrictions applied to their deployability or to their ability to commission while a Service member solely on the basis of their HIV-positive status.  Nor will such individuals be discharged or separated solely on the basis of their HIV-positive status.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 2: RESPONSIBILITIES

## 2.1. UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R):

   a.  Eliminates inconsistencies and inequities based on race, sex, or duty location in DoD Component application of these standards.

   b.  Maintains and convenes the chartered MEDPERS, in accordance with Volume 1 of this instruction.

## 2.2.  ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA)).

Under the authority, direction, and control of the USD(P&R), the ASD(HA):

   a.  Reviews, approves, and issues technical modifications to the standards in Section 5 to the DoD Components.

   b.  Reviews implementation of medical standards for military retention throughout the MHS and provides guidance to the Director, Defense Health Agency (DHA) and the Secretaries of the Military Departments.

## 2.3.  DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR HEALTH SERVICES POLICY AND OVERSIGHT (DASD(HSP&O)).

Under the authority, direction, and control of the ASD(HA), the DASD(HSP&O):

   a.  Reviews the standards in Section 5, associated Service-specific regulations, and Service-specific medical standards for retention, in terms of performance, economy, and efficiency throughout the MHS, and provides appropriate policy recommendations to the ASD(HA).

   b.  Coordinates revisions to policies related to this volume with relevant DoD Components.

   c.  Selects a co-chair for the RMSWG and requires records of the RMSWG be maintained and retained, in accordance with all legal requirements.

## 2.4.  DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR MILITARY PERSONNEL POLICY (DASD(MPP)).

Under the authority, direction, and control of the ASD(M&RA), the DASD(MPP):

   a.  Coordinates revisions to policies related to this volume with relevant DoD Components.

b. Selects a co-chair for the RMSWG.

## 2.5.  DIRECTOR, DHA.

Under the authority, direction, and control of the USD(P&R), through the ASD(HA), the Director, DHA:

a.  Publishes DHA procedural instructions necessary to implement this volume.

b.  Uses the planning, programing, budgeting, and execution process to allocate resources necessary for the evaluation of medical conditions, in accordance with this volume and Service-specific medical standards for military retention.

c.  Supports MHS efforts to monitor and improve medical standards for military retention.

d.  Selects a representative for the RMSWG.

## 2.6.  SECRETARIES OF THE MILITARY DEPARTMENTS AND COMMANDANT, UNITED STATES COAST GUARD (USCG).

The Secretaries of the Military Departments and the Commandant, USCG:

a.  Provide guidance necessary to implement this volume and Service-specific retention medical standards, as required, to refer Service members to the:

(1)  DES, in accordance with DoDI 1332.18, DoDI 1332.45, and this volume; or

(2)  For members of the USCG, the USCG Physical DES, pursuant to the Commandant Instruction M1850.2 series.

b.  Select a representative for the RMSWG.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 3:  PROCEDURES FOR APPLYING MEDICAL STANDARDS

## 3.1.  APPLICABILITY OF RETENTION MEDICAL STANDARDS.

The medical standards in Section 5 apply to:

a.  All current Service members, including those:

(1)  Accessed with a medical waiver in accordance with Volume 1 of this instruction and DoDI 1332.18.

(2)  Previously found fit by the DES, in accordance with DoDI 1332.18, when the condition progresses and has become potentially unfitting.

b.  Former Service members being medically evaluated for return to military service when the applicability criteria in Paragraph 4.1 of Volume 1 of this instruction does not apply.

## 3.2.  APPLICATION OF CRITERIA USED TO DEVELOP STANDARDS.

The standards in Section 5 will be applied on a case-by-case basis considering the following criteria:

a.  The affected Service member's ability to safely complete common military tasks at a general duty level.  Tasks may include, but are not limited to:

(1)  Climbing and going down structures such as stairs, a ladder, ladderwells, or a cargo net.

(2)  Wearing personal protective gear.

(3)  Running 100 yards.

(4)  Standing in formation.

(5)  Carrying personal equipment.

(6)  Operating a vehicle.

(7)  Operating an assigned weapons system, to include safe operation of an individual firearm.

(8)  Subsisting on field rations.

(9)  Working in extreme environments or confined spaces.

(10)  Operating for extended work periods.

(11)  Communicating effectively.

b.  Limitations or requirements due to medical condition(s) or objections to recommended medical interventions that:

(1)  Impose unreasonable medical requirements on the Military Services to maintain or protect the Service member.

(2)  Require diagnostic(s), treatment(s), or surveillance for longer than 12 months that is not anticipated to be routinely available in operational locations, unless approved by the Service member's unit commander in accordance with DoDI 1332.45.

(3)  Present an obvious risk to the health or safety of the member, other Service members, or other personnel serving with or accompanying an armed force in the field.

(4)  Are of such a nature or duration that progressive worsening or effects of external stressors are reasonably expected to result in a grave medical outcome or an unacceptable negative impact on mission execution.

(5)  Are incompatible with the physical and psychological demands required for deployment and the Service member's office, grade, rank, or rating.

## 3.3.  IMPLEMENTATION.

a.  The Military Department(s) concerned will:

(1)  Apply the standards in Section 5 on a case-by-case basis.

(2)  Consider which criteria in Paragraph 3.2. apply to the Service member's office, grade, rank, or rating.

(3)  Determine if the Service member should be referred to the DES.

(4)  Perform these evaluations in accordance with Service-specific regulations before or during the medical evaluation board component of the DES process.

b.  Service members will be referred to the DES in accordance with DoDI 1332.18.  The standards listed in Section 5 do not include all of the conditions that may be referred to the DES or that are compensable in accordance with Part 4 of Title 38, Code of Federal Regulations also known as "the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)".  In the event of conflicting guidance or lack of a defined standard in this volume, DoDI 1332.18 will take precedence.

c.  Military Departments may authorize administrative separation processing of Service members with medical conditions and circumstances not constituting a physical disability, in accordance with DoDI 1332.14 or DoDI 1332.30, that interfere with assignment or performance

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

of duty, if the Service member is ineligible for referral to the DES, pursuant to DoDI 1332.18, or the USCG Physical DES, pursuant to the Commandant Instruction M1850.2 series.

d.  Military Department regulations regarding presumption of fitness are considered by medical and administrative personnel when applying the standards in Section 5.

e.  Medical diagnoses and duty limitations will be made in conjunction with referrals or information provided by the appropriate medical specialty, in accordance with this volume and Military Service-specific regulations.

f.  Military Departments will coordinate requirements for clinical evaluations, information technology, and access to medical records with the Director, DHA.

g.  If a Service member fails to consent to medically appropriate treatment for a potentially disqualifying condition, the condition is considered refractory to treatment and may result in the Service member not being eligible for retention.  The Military Department concerned will take appropriate administrative action in accordance with Military Department-specific policies.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# SECTION 4:  ACTIVITIES OF THE RMSWG

## 4.1.  PURPOSE OF THE RMSWG.

The RMSWG—a chartered working group under the MEDPERS—convenes at least twice a year, under the joint guidance of the DASD(HSP&O) and the DASD(MPP), to review and develop policy relevant to this volume.

## 4.2.  OVERALL GOALS OF THE RMSWG.

The RMSWG will:

a.  Review and develop proposed changes to this volume in accordance with DoDI 5025.01.

b.  Draft DoD medical standards for military retention based on DoD mission requirements, available scientific evidence, and expert opinion.

c.  Evaluate DoD Component implementation of the standards in Section 5 of this volume.

d.  Respond to requests from the MEDPERS.

e.  Periodically reassess the goals of the RMSWG.

## 4.3.  CO-CHAIRS OF THE RMSWG.

The DASD(HSP&O) and the DASD(MPP) will each select one representative to co-chair the RMSWG.  The RMSWG co-chairs will:

a.  Draft the RMSWG charter for MEDPERS approval.

b.  Record and retain meeting minutes and other committee records.

c.  Schedule meetings as required.

## 4.4.  MEMBERSHIP OF THE RMSWG.

The RMSWG membership will include medical and personnel representatives from:

a.  Each Military Service.

b.  The Joint Staff.

c.  Other organizations as required in accordance with the RMSWG charter.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# Section 5:  Disqualifying Conditions

## 5.1.  GENERAL.

The medical standards for military retention are classified into general systems in this section. Unless otherwise stipulated, these are the conditions that do not meet the retention standard. These conditions must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.2.  HEAD.

Defects of the skull, face, or mandible to a degree that prevents the member from properly wearing required protective equipment (e.g., military headgear) are not compatible with retention.  The condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.3.  EYES.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

b.  Any chronic disease process or condition of the eye, lids, or visual system that is resistant to treatment and does not meet the vision standards in Paragraph 5.4.

c.  Corneal degeneration, when contact lenses or other special corrective devices (e.g., telescopic lenses, electronic magnifiers) are required to prevent progression or to meet the standards in Paragraph 5.4.

d.  Aphakia, bilateral if not a surgical candidate.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.3.a does not apply.

e.  Binocular diplopia, not correctable by surgery, that is severe, constant, and in a zone less than 20 degrees from the primary position.

f.  Bilateral concentric constriction to less than 40 degrees interfering with the ability to safely perform duty.

g.  Absence of an eye or enucleation.  This condition is not compatible with retention and the Services should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.3.a. does not apply.

Case 1:25-cv-00240-ACR   Document 78-27   Filed 03/07/25   Page 14 of 41
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 527 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

h.  Night blindness requiring assistance to travel at night or resulting in duty limitations due to an inability to perform night missions.

i.  Any chronic eye diseases requiring treatment with systemic immunosuppressant medication.

## 5.4.  VISION.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Vision standards must be met with the unaided eye or clear glasses without specialized optical aids including, but not limited to, telescopic, magnifying, or tinted lenses (excluding sunglasses for routine wear). Color vision standards will be set by the individual DoD Components.

a.  With both eyes open, best corrected for both distant and near vision of at least 20/40.

b.  Any condition that specifically requires contact lenses for correction of vision.

c.  Anisometropia worse than 3.5 diopters (spherical equivalent difference).

d.  Any scotoma large enough to impair duty performance including, but not limited to, permanent hemianopsia.

## 5.5.  EARS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Persistent defect that prevents the proper wearing of required military equipment (e.g., hearing protection).

b.  Ménière's disease and other disorders of balance or sensorium with frequent and severe attacks that interfere with satisfactory performance of duty.

c.  Any conditions of the ear that persist despite appropriate treatment and necessitate frequent and prolonged medical care or hospitalization (e.g., cholesteatoma, chronic otitis infections, and associated secondary changes).

## 5.6.  HEARING.

Hearing loss that prohibits safe performance of duty, with or without hearing aids or other assistive devices is not compatible with retention.  The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

Case 1:25-cv-00240-ACR    Document 78-27    Filed 03/07/25    Page 15 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 528 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.7. NOSE, SINUSES, MOUTH, AND LARYNX.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

   a.  Vocal cord dysfunction characterized by bilateral vocal cord paralysis or dysfunction significant enough to interfere with speech or cause respiratory compromise upon exertion.

   b.  Any persistent condition of the sinuses or nasal cavity that requires ongoing medical care beyond operationally available maintenance medications to maintain sinonasal function.

   c.  Conditions or defects of the mouth, tongue, palate, throat, pharynx, larynx, and nose that interfere with chewing, swallowing, speech, or breathing.

## 5.8. DENTAL.

Diseases and abnormalities of the jaw or associated tissues that prevent normal mastication, speech, or proper wear of required protective equipment are not compatible with retention. The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.9. NECK.

Limited range of motion of the neck that impairs normal function is not compatible with retention. The condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

## 5.10. LUNGS, CHEST WALL, PLEURA, AND MEDIASTINUM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating. Conditions in this paragraph do not meet the standards if the Service member cannot meet Service-specific pulmonary functional assessment (e.g., trial of duty or established standard) or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

   a.  Asthma or airway hyper responsiveness with:

      (1)  Persistent symptoms;

      (2)  Forced expiratory volume in one second (FEV1) persistently below 70 percent despite treatment with inhaled corticosteroids; or

(3) More than once required oral steroid or emergent asthma treatment in the previous 12 months.

b. Chronic obstructive pulmonary disease with:

(1) Persistent symptoms;

(2) FEV1 between 50 percent and 79 percent of predicted FEV1 that cannot pass Service-determined functional assessments;

(3) FEV1 of less than 50 percent of predicted FEV1, despite treatment with inhaled corticosteroids; or

(4) More than one required hospitalization in the previous 12 months.

c. Bronchiectasis, if severe or symptomatic.

d. Thoracic cavity malformation or dysfunction, including pectus excavatum, pectus carinatum, or diaphragmagtic defect, if it is symptomatic or interferes with the wearing of military equipment or the performance of military duty.

e. Chronic or recurrent pulmonary disease or symptoms including, but not limited to:

(1) Pulmonary fibrosis;

(2) Emphysema;

(3) Interstitial lung disease;

(4) Pulmonary sarcoidosis;

(5) Pleurisy; or

(6) Residuals of surgery that prevent satisfactory performance of duty.

f. Recurrent spontaneous pneumothorax, when the underlying defect is not correctable by surgery.

g. Tuberculosis, pulmonary or extra pulmonary, with clinically significant sequelae following treatment, if resistant to treatment or if the condition is of such severity that the individual is not expected to return to full duty despite appropriate treatment.

h. Pulmonary embolism, recurrent or a single episode, if anticoagulation medications, other than aspirin, are clinically indicated for longer than 12 months.

i. Cystic fibrosis.

j. Any condition for which chronic use of supplemental oxygen is indicated.

Case 1:25-cv-00240-ACR   Document 78-27   Filed 03/04/25   Page 17 of 41
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 530 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.11. HEART.

a. When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating. Conditions in this paragraph do not meet the standards if the Service member cannot meet Service-specific cardiac functional assessment (e.g., a Service-defined trial of duty period) or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing due to risk of disease progression or adverse cardiac event.

b. Heart valve disease; including:

(1) Any valve replacement. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions after post-operative recovery (or a period of Limited Duty). Paragraph 5.11.a does not apply.

(2) Moderate or worse valvular insufficiency or regurgitation if a cardiologist determines that the Service member has physical activity or duty restrictions to reduce the risk of disease progression or an adverse cardiac event.

(3) Mild or worse valvular stenosis if a cardiologist determines the Service member has physical activity or duty restrictions to reduce the risk of disease progression or adverse cardiac event.

c. Cardiomyopathy or heart failure; including:

(1) Persistent cardiomyopathy or heart failure related to a potentially reversible condition when a cardiologist determines that the underlying etiology is uncorrectable.

(2) Cardiomyopathy or heart failure, upon diagnosis, when secondary to an underlying permanent condition including, but not limited to: hypertrophic cardiomyopathy, amyloidosis, sarcoidosis, ventricular non-compaction syndrome, and arrhythmogenic right ventricular cardiomyopathy. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.11.a does not apply.

d. Clinical indication or presence of pacemaker or implantable cardioverter-defibrillator. This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis. Paragraph 5.11.a does not apply.

e. Atrial and ventricular arrhythmias, other than isolated Premature Ventricular Contractions and Premature Atrial Contractions, unless successfully ablated (if indicated) and cleared by a cardiologist for unrestricted exercise.

f. Channelopathies reliably diagnosed by a cardiologist that predisposes to sudden cardiac death and syncope including, but not limited to:

(1) Brugada pattern;

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(2)  Acquired or Congenital Long QT syndrome; or

(3)  Catecholiminergic Polymorphic Ventricular Tachycardia.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

g.  Pre-excitation pattern (e.g., Wolff-Parkinson-White pattern) unless it is asymptomatic and associated with low-risk accessory pathway by appropriate diagnostic testing, or successfully treated with ablation.

h.  Conduction disorders associated with potentially fatal or severely symptomatic events including, but not limited to:

(1)  Disorders of sinus arrest;

(2)  Asystole;

(3)  Mobitz type II second-degree atrioventricular block;

(4)  Third-degree atrioventricular block; or

(5)  Sudden cardiac death unless associated with recognizable temporary precipitating conditions (e.g., perioperative period, hypoxia, electrolyte disturbance, drug toxicity, infection, or acute illness).  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.11.a does not apply.

i.  Coronary artery disease; including:

(1)  Acute Coronary Syndrome (ST-elevation myocardial infarction or Non-ST elevation myocardial infarction):

(a)  That required intervention including, but not limited to:

$\underline{1}$.  Percutaneous coronary intervention;

$\underline{2}$.  Coronary artery bypass grafting; or

$\underline{3}$.  Thrombolytic medication.

(b)  For which anti-platelet therapy, other than aspirin, occurs for longer than 12 months.

(2)  Stable coronary disease, unless there is no evidence of ischemia and the Service member can achieve 10 metabolic equivalents while on optimal medical therapy.

j.  Chronic pericardial disease, reliably diagnosed by a cardiologist.

Case 1:25-cv-00240-ACR    Document 78-27    Filed 03/07/25    Page 19 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 532 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

k.  Complex congenital heart disease including, but not limited to: tetrology of Fallot, coarctation of the aorta, and Ebstein's anomaly, unless successfully treated by surgical or percutaneous correction.

l.  Symptomatic or hemodynamically significant anatomic intracardiac shunts including, but not limited to: patent foramen ovale, atrial septal defect, and ventricular septal defect, if persistent despite surgical or percutaneous correction (as indicated).

m.  Recurrent syncope or near syncope (including postural orthostatic tachycardia syndrome) that interferes with duty, if no treatable cause is identified or it persists despite conservative therapy.

n.  Rheumatic heart disease, if sequelae present.

o.  History of spontaneous coronary artery dissection.

p.  Surgery of the heart or pericardium with persistent duty limitations.

## 5.12.  ABDOMINAL ORGANS AND GASTROINTESTINAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if associated with the inability to maintain normal weight or nutrition, require repeated procedures or surgery, or if the condition requires immunomodulating or immunosuppressant medications.

a.  Esophageal stricture, including manifestations of eosinophilic esophagitis, that requires a restricted diet or frequent dilatation.

b.  Persistent esophageal disease (e.g., dysmotility disorders, achalasia, esophagitis, esophageal spasm) that is severe, or results in dysphagia.

c.  Gastritis, if severe, with recurring symptoms not relieved by medication, surgery, or endoscopic intervention.

d.  Non-ulcerative or functional dyspepsia not controlled by medications.

e.  Recurrent gastric or duodenal ulcer, with or without obstruction or perforation confirmed by laboratory, imaging, or endoscopy.

f.  Inflammatory bowel disease including, but not limited to:

(1)  Crohn's disease;

(2)  Ulcerative colitis;

(3)  Ulcerative proctitis;

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(4) Regional enteritis;

(5) Granulomatous enteritis;

(6) Chronic or recurrent indeterminate colitis; or

(7) Microscopic colitis that requires treatment with immune modulator or biologic medications.

g. Chronic proctitis with moderate to severe symptoms of bleeding, painful defecation, tenesmus, or diarrhea.

h. Malabsorption syndromes including those related to:

(1) Celiac sprue;

(2) Pancreatic insufficiency; or

(3) Sequelae of surgery including, but not limited to:

(a) Bariatric surgery;

(b) Colectomy; or

(c) Gastrectomy.

i. Functional gastrointestinal disorders, including but not limited to irritable bowel syndrome.

j. Familial adenomatous polyposis syndrome (e.g., classic or attenuated) or hereditary non-polyposis colon cancer (i.e., Lynch syndrome).

k. Chronic hepatitis with impairment of liver function.

l. Cirrhosis of the liver, portal hypertension, esophageal varices, esophageal bleeding, or other complications of chronic liver disease, resulting from conditions including, but not limited to:

(1) Hemochromatosis.

(2) Alpha-1 anti-trypsin deficiency.

(3) Wilson's disease.

(4) Alcoholic and non-alcoholic fatty liver disease.

m. Chronic gallbladder disease or biliary dyskinesia with frequent abdominal pain or recurrent jaundice.

n.  Chronic liver disease because of trauma or infection, to include amoebic abscess or liver transplant recipient(s).

o.  Chronic or recurrent pancreatitis.

p.  Pancreatectomy or pancreas (whole organ or islet cell) transplant recipient(s).

q.  Pancreaticduodenostomy, pancreaticgastrostomy, or pancreaticojejunostomy, with chronic digestive system dysfunction.

r.  Acquired fecal incontinence or obstruction characterized by intractable constipation or pain on defecation.

s.  Severe symptomatic hernia, including abdominal wall or hiatal.

t.  Total colectomy or any partial colectomy with residual limitations.

u.  Total gastrectomy, or any partial gastroectomy or gastrojejunostomy with residual limitations.

v.  Colostomy, jejunostomy, ileostomy, or gastrostomy, if permanent.

## 5.13.  FEMALE GENITAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Genital trauma or abnormalities that result in urinary incontinence or the need for catheterization.

b.  Chronic pelvic pain, with or without an identifiable diagnosis, such as dysmenorrhea, endometriosis, or ovarian cysts.

c.  Premenstrual dysphoric disorder.

d.  Abnormal uterine bleeding resulting in anemia.

e.  Chronic breast pain, so as to prevent satisfactory wearing of military equipment.

## 5.14.  MALE GENITAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  Absence of both testicles with medically required injectable hormone therapy.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

   b.  Epispadias or hypospadias when accompanied by persistent urinary complications.

   c.  Chronic pelvic pain, with or without an identifiable diagnosis, to include chronic prostatitis, epididymitis, scrotal pain, or orchitis.

   d.  Genital trauma or abnormalities that result in urinary incontinence or the need for catheterization.

## 5.15.  URINARY SYSTEM.

   a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

   b.  Chronic or interstitial cystitis.

   c.  Chronic incontinence, dysfunction, or urinary retention requiring catheterization.

   d.  Cystoplasty, if reconstruction is unsatisfactory or if refractory symptomatic infections persist.

   e.  Ureterointestinal or direct cutaneous urinary diversion.

   f.  Urethral abnormalities, if they:

      (1)  Result in chronic incontinence;

      (2)  Result in the persistent need for catheterization; or

      (3)  Require a urethrostomy, if a satisfactory urethra cannot be restored.

   g.  Ureteral abnormalities, including ureterocystostomy, if both ureters are markedly dilated with irreversible changes, or if they result in:

      (1)  Recurrent obstruction;

      (2)  Kidney infection; or

      (3)  Other chronic kidney dysfunction.

   h.  Kidney transplant recipient(s).  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.15.a. does not apply.

   i.  Chronic or recurrent pyelonephritis with secondary hypertension or hypertensive end-organ damage.

   j.  Kidney abnormalities, including:

(1)  Polycystic kidney disease;

(2)  Horseshoe kidney;

(3)  Hypoplasia of the kidney; or

(4)  Residuals of perirenal abscess when renal function is:

    (a)  Impaired;

    (b)  Associated with secondary hypertension or hypertensive end-organ damage; or

    (c)  The focus of frequent infection.

k.  Hydronephrosis associated with significant systemic effects, renal impairment, secondary hypertension, hypertensive end-organ damage, or frequent infections.

l.  Chronic kidney disease, stage 3A or worse, according to the Kidney Disease Improving Global Outcomes Guidelines Standard, as reliably diagnosed by a nephrologist.  Any level of chronic kidney disease for which chronic immunosuppressant medications (e.g.,  medication for steroid relapsing glomerulonephritis) are required.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.15.a does not apply.

m.  Chronic nephritis or nephrotic syndrome.  Service-specific criteria for proteinuria may apply.

n.  Recurrent calculi that:

(1)  Result in recurring infections;

(2)  Result in obstructive uropathy unresponsive to medical or surgical treatment; or

(3)  Are symptomatic and occur with a frequency that prevents satisfactory performance of duty.

## 5.16.  SPINE AND SACROILIAC JOINT CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

a.  Spondyloarthritis.  Chronic or recurring episodes of axial or peripheral arthritis that may include extra-articular involvement that:

(1)  Causes functional impairment interfering with successful performance of duty supported by objective, subjective, and radiographic findings; or

(2)  Requires medication for control that needs frequent monitoring by a physician due to debilitating or serious side effects including, but not limited to:

    (a)  Ankylosing spondylitis;

    (b)  Reactive arthritis;

    (c)  Psoriatic arthritis; or

    (d)  Arthritis associated with inflammatory bowel disease.

b.  Radicular or non-radicular pain involving the cervical, thoracic, lumbosacral, or coccygeal spine, whether idiopathic or secondary to degenerative disc or joint disease.

c.  Kyphosis:

(1)  Resulting in greater than 50 degrees of curvature, if symptomatic, so as to limit the wearing of military equipment; or

(2)  If recurrently symptomatic, regardless of the degree of curvature.

d.  Scoliosis:

(1)  Resulting in severe deformity—greater than 30 degrees of curvature—if symptomatic, so as to limit the wearing of military equipment; or

(2)  If recurrently symptomatic, regardless of the degree of curvature.

e.  Congenital or surgical fusion or disc replacement.

f.  Vertebral fractures after radiographic evidence of complete healing and experiencing moderate or severe symptoms that result in repeated acute medical visits.

g.  Spina bifida with demonstrable signs and moderate symptoms of root or cord involvement.

h.  Spondylolysis or spondylolisthesis with moderate or severe symptoms resulting in repeated acute medical visits.

## 5.17.  UPPER EXTREMITY CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.  Conditions in this

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Limitation of joint motion.

    b.  Amputation of any part of hand and fingers.

    c.  Intrinsic paralysis or weakness of upper limbs when symptoms are severe and persistent.

### 5.18.  LOWER EXTREMITY CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a.  Limitation of joint motion.

    b.  Foot and ankle conditions that include:

        (1)  Amputation of any part of the foot or toes.

        (2)  Conditions of the foot or toes that prevent the satisfactory performance of required military duty or the wearing of required military footwear, such as:

            (a)  Deformity of the toes;

            (b)  Clubfoot;

            (c)  Rigid pes planus;

            (d)  Recurrent plantar fasciitis; or

            (e)  Symptomatic neuroma.

    c.  Chronic foot, leg, knee, thigh, and hip conditions, such as:

        (1)  Chronic anterior knee pain;

        (2)  Instability after knee ligament reconstruction; or

        (3)  Recurrent stress fracture.

    d.  Coxa vara to such a degree that it results in chronic pain.

## 5.19. GENERALIZED CONDITIONS OF THE MUSCULOSKELETAL SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating. Conditions in this paragraph do not meet retention standards if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

a. Persistent symptoms after any dislocation, subluxation, or instability of the hip, knee, ankle, subtalar joint, foot, shoulder, hand, wrist, or elbow.

b. Osteoarthritis or infectious arthritis with severe symptoms or traumatic arthritis.

c. Malunion, non-union, or hypertrophic ossification with persistent severe deformity or loss of function.

d. Prosthetic replacement of any joints, if there is resultant loss of function or persistent pain.

e. History of neuromuscular paralysis, weakness, contracture, or atrophy that is not completely resolved.

f. Osteopenia, osteoporosis, or osteomalacia resulting in fracture with residual symptoms after therapy.

g. Recurrent episodes of chronic osteomyelitis that:

    (1) Are not responsive to treatment; or

    (2) Involve the bone to a degree that interferes with stability and function.

h. Osteonecrosis, to include avascular necrosis of bone.

i. Chronic tendonitis, tenosynovitis, or tendinopathy.

j. Osteitis deformans (i.e., Paget's disease) that involve single or multiple bones and result in deformities or symptoms that severely interfere with function.

k. Chronic mechanical low back pain.

## 5.20. VASCULAR SYSTEM.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a. Abnormalities of the arteries including, but not limited to, aneurysms, arteriovenous malformations, or arteritis.

b.  Peripheral artery disease including claudication and renal artery stenosis.

c.  Hypertensive cardiovascular disease and hypertensive vascular disease.

 (1)  Essential hypertension that:

  (a)  Is not controlled despite an adequate period of therapy in an ambulatory status;

  (b)  Is associated with end organ damage; or

  (c)  Requires a treatment regimen that is not compatible with an operational environment.

 (2)  Secondary hypertension, unless the underlying cause has been treated with subsequent control of blood pressure.

d.  Persistent peripheral vascular disease.

e.  Venous disease that, despite appropriate treatment, results in:

 (1)  Persistent duty limitations.

 (2)  Limitations in the wearing of the military uniform.

f.  Deep vein thrombosis (recurrent or a single episode), if anticoagulation medications, other than aspirin, are clinically indicated for longer than 12 months.

g.  Surgery of the vascular system with persistent duty limitations.

h.  Thoracic Outlet Syndrome including:

 (1)  Thoracic Outlet Syndrome—either neurogenic, arterial, or venous:

  (a)  With symptoms that are not controlled, despite an adequate period of therapy and surgery;

  (b)  That is associated with end organ damage, or

  (c)  That requires anticoagulation medication other than aspirin.

 (2)  Venous Thoracic Outlet Syndrome that required venous reconstruction with a stent or open surgery.

 (3)  Arterial Thoracic Outlet Syndrome that required arterial reconstruction with a bypass or interposition graft.

i.  Popliteal Entrapment Syndrome:

Case 1:25-cv-00240-ACR    Document 78-27    Filed 03/04/25    Page 28 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 541 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  With symptoms that are not controlled despite an adequate period of therapy and surgery, is associated with end organ damage, or requires anticoagulation medication other than aspirin.

(2)  That required arterial reconstruction with a bypass or interposition graft.

## 5.21.  SKIN AND SOFT TISSUE CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions in this paragraph do not meet standard if the Service member cannot properly wear the required military uniform or equipment.

a.  Skin or soft tissue conditions, such as:

(1)  Severe nodulocystic acne;

(2)  Hidradenitis suppurativa;

(3)  Inflammatory or scarring scalp disorders;

(4)  Bullous dermatoses (including, but not limited to, dermatitis herpetiformis, emphigus, and epidermolysis bullosa);

(5)  Lichen planus; or

(6)  Panniculitis that prevents the proper wearing required military uniform or equipment.

b.  Severe atopic dermatitis that prevents the proper wearing of required military uniform or equipment.

c.  Any dermatitis, including eczematous or exfoliative, that prevents the proper wearing of required military uniform or equipment.

d.  Persistent or recurrent symptomatic cysts, including pilonidal cysts or furunculosis, that prevent the proper wearing of required military uniform or equipment.

e.  Chronic or current lymphedema.

f.  Severe hyperhidrosis.

g.  Scars or keloids that:

(1)  Prevent the proper wearing of required military uniform or equipment; or

(2)  Interfere with the function of an extremity or body area, including by limiting range of motion or causing chronic pain.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

h.  Neurofibromatosis, other than cutaneous neurofibromas.

i.  Psoriasis or parapsoriasis that is uncontrolled or requires:

(1)  Systemic immunomodulating;

(2)  Immunosuppressant medications; or

(3)  Ultraviolet light therapy.

j.  Scleroderma that seriously interferes with the function of an extremity or body area.

k.  Chronic urticaria or angioedema that is not responsive to treatment or requires duty limitations despite appropriate treatment.

l.  Intractable symptomatic plantar keratosis.

m.  Intractable superficial or deep fungal infections.

n.  Malignant neoplasms (refer to Paragraph 5.29 for malignancies):

(1)  Including melanoma, melanoma in situ, and cutaneous lymphoma (mycosis fungoides).

(2)  Not including basal cell and squamous cell carcinomas.

o.  Any photosensitive dermatosis, including, but not limited to:

(1)  Cutaneous lupus erythematosus;

(2)  Dermatomyositis;

(3)  Polymorphous light eruption; or

(4)  Solar urticaria.

p.  Severe or chronic erythema multiforme.

q.  Chronic, non-healing ulcers of the skin.

## 5.22.  BLOOD AND BLOOD FORMING CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Anemia, hereditary or acquired, when:

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  Response to therapy is unsatisfactory; or

(2)  Therapy requires prolonged, intensive, medical supervision or intervention.

b.  Hypercoagulable disease associated with vascular thrombosis when anticoagulation medication of any type (except aspirin) is clinically indicated for longer than 12 months.

c.  Bleeding disorders including, but not limited to:

(1)  Hemophilia or other clinically significant factor deficiencies;

(2)  Thrombocytopenia with persistent platelet count less than 50,000;

(3)  Clinically significant Von Willebrand disease; or

(4)  Platelet function disorders.

d.  Chronic leukopenia:

(1)  If therapy is clinically indicated due to a malignant process; or

(2)  Where therapy is indicated for longer than 12 months.

e.  Primary Polycythemia Vera, Essential Thrombocytosis, or Chronic Myelogenous Leukemia, if therapy beyond aspirin is clinically indicated.

f.  Chronic and clinically significant splenomegaly.

g.  Chronic or recurrent symptomatic hemolytic crisis.


## 5.23.  SYSTEMIC CONDITIONS.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.  Conditions listed in this paragraph do not meet medical retention standards if they require medication for control with frequent monitoring by a medical provider due to potential debilitating or serious side effects.

b.  Disorders involving the immune system, including immunodeficiencies with progressive clinical illness.

(1)  A Service member with laboratory evidence of Human Immunodeficiency Virus infection will be referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses, including evaluation on a case-by-case basis.  Covered personnel will not be discharged or separated solely on the basis of their HIV-positive status.

(2)  Primary immunodeficiencies—including, but not limited to, hypogammaglobulinemia, common variable immune deficiency, or complement deficiency—with objective evidence of function deficiency and severe symptoms that are not controlled with treatment, or when injectable medications are clinically indicated.

c.  Tuberculosis (pulmonary or extra pulmonary) with clinically significant sequelae following treatment, if:

(1)  Resistant to treatment; or

(2)  The condition is of such severity that the individual is not expected to return to full duty despite appropriate treatment.

d.  Severe chronic complications of sexually transmitted diseases including neurosyphilis.

e.  Recurrent anaphylaxis, if:

(1)  Immunotherapy is not sufficient in reducing the risk;

(2)  Avoidance of the trigger results in long-term duty limitations; or

(3)  The individual is not expected to return to duty.

f.  Chronic, severe, urticarial, or histaminergic angioedema.

g.  Hereditary angioedema.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.23.a does not apply.

h.  Recurrent rhabdomyolysis, a single episode of idiopathic rhabdomyolysis, or a single episode of rhabdomyolysis that is associated with underlying metabolic or endocrine abnormalities.

i.  Severe motion sickness.  If due to an underlying disorder, process via the relevant standard.  Otherwise, it may require processing through Service specific separation guidance.

j.  Sarcoidosis, eosinophilic granuloma, or amyloidosis progressive with severe or multiple organ involvement.

k.  Infections (superficial, local, or systemic) that are not responsive to appropriate treatment.

## 5.24.  ENDOCRINE AND METABOLIC CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Adrenal dysfunction, including Addison's disease or Cushing's disease.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

b.  Diabetes mellitus, unless hemoglobin A1c can be maintained at less than eight percent using only lifestyle modifications (e.g., diet and exercise) or with the following medications (alone or in combination):

    (1)  Metformin;

    (2)  Dipeptidyl peptidase 4 inhibitors; or

    (3)  Glucagon-like peptide-1 receptor agonists.

c.  Pituitary dysfunction or mass effect from pituitary tumor.

d.  Diabetes insipidus, after treatment and resolution of an underlying etiology.

e.  Hyperparathyroidism, when residuals or complications are present.

f.  Hypoparathyroidism, when severe, persistent, and difficult to manage.

g.  Goiter, if mass effect.

h.  Persistent, symptomatic, hypothyroidism or hyperthyroidism that is not responsive to therapy.

i.  Persistent metabolic bone disease—including, but not limited to, osteoporosis, Paget's disease, and osteomalacia—if:

    (1)  Associated with pathological fractures; or

    (2)  The condition prevents the wearing of military equipment.

j.  Osteogenesis imperfecta.

k.  Hypogonadism with medically required injectable hormone replacement.

l.  Hypoglycemia when caused by an insulinoma or other hypoglycemia-inducing tumor.

m.  Gout with frequent acute exacerbations or severe bone, joint, or kidney damage.

n.  Endocrine hyperfunctioning syndromes including, but not limited to:

    (1)  Multiple endocrine neoplasia;

    (2)  Pheochromocytoma;

    (3)  Salt-wasting congenital adrenal hyperplasia;

    (4)  Carcinoid syndrome; or

    (5)  Endocrine tumors of the gastrointestinal tract.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

## 5.25. RHEUMATOLOGIC CONDITIONS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating. Conditions listed in this paragraph do not meet medical retention standards if the condition requires geographic limitations to protect the individual from infectious disease risk or due to limited monitoring capabilities, is associated with adverse effects from medication, or if medical clearance cannot be given for safe participation in Service-specific physical fitness testing.

    a. Systemic lupus erythematosus.

    b. Mixed connective tissue disease.

    c. Progressive systemic sclerosis, including:

        (1) Calcinosis;

        (2) Raynaud's phenomenon;

        (3) Esophageal dysmotility;

        (4) Scleroderma; or

        (5) Telangiectasia syndrome.

    d. Rheumatoid arthritis.

    e. Sjögren's syndrome.

    f. Chronic autoimmune vasculitides or autoimmune diseases including, but not limited to:

        (1) Polyarteritis nodosa.

        (2) Behçet's disease.

        (3) Takayasu's arteritis.

        (4) Giant cell arteritis.

        (5) Anti-neutrophil cytoplasmic antibody associated vasculitis.

        (6) IgG-4 disease.

        (7) Henoch-Schonlein Purpura.

    g. Myopathy or polymyositis.

    h. Fibromyalgia or myofascial pain syndrome.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

i.  Connective tissue disorders if associated with cardiac manifestations or limitations from recurrent musculoskeletal dysfunction.

### 5.26.  NEUROLOGIC CONDITIONS.

a.  When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

b.  Cerebrovascular conditions including, but not limited to:

(1)  Subarachnoid or intracerebral hemorrhage;

(2)  Vascular stenosis;

(3)  Stroke;

(4)  Aneurysm;

(5)  Arteriovenous malformation; or

(6)  Recurrent transient ischemic attack unless underlying etiology is identified and definitively treated.

c.  Anomalies of the central nervous system or meninges with persistent sequelae including, but not limited to:

(1)  Pain.

(2)  Significant sensory or motor impairment.

(3)  Severe headaches.

(4)  Seizures.

(5)  Alteration of consciousness, personality, or mental function.

d.  Permanent or progressive cognitive impairment due to Alzheimer's disease or other dementias.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.26.a does not apply.

e.  Neuromuscular disorders and muscular dystrophy including, but not limited to:

(1)  Facioscapulohumeral muscular dystrophy.

(2)  Limb girdle dystrophy.

(3)  Myotonic dystrophy.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

f.  Chronic or recurrent demyelinating processes (e.g., multiple sclerosis, transverse myelitis, or recurrent optic myelitis).

g.  Migraine, tension, or cluster headaches, when manifested by frequent incapacitating attacks.

h.  Traumatic brain injury associated with persistent sequelae including, but not limited to:

   (1)  Pain.

   (2)  Significant sensory, cognitive, or motor impairment.

   (3)  Severe headaches.

   (4)  Seizures.

   (5)  Alteration of consciousness, personality, or mental function.

i.  Peripheral neuropathy or paralytic disorders resulting in permanent functional impairment.

j.  Provoked seizures, if recurrent more than 6 months after the Service member begins treatment and the effects of medication:

   (1)  Prohibit satisfactory performance of duty;

   (2)  Require significant follow-up; or

   (3)  Require modifications to reduce psychological stressors or enhance safety.

k.  Epilepsy.  This condition is not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.  Paragraph 5.26.a does not apply.

l.  Myasthenia gravis, unless only involving extraocular muscles.

m.  Tremor, tic disorders, or dystonia (e.g., Tourette's Syndrome) with significant functional impairment.

n.  Recurrent, neurogenic, or unexplained syncope or near syncope that interferes with duty.

## 5.27.  SLEEP DISORDERS.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

a.  Clinical sleep disorders—including circadian rhythm disorders, insomnia, narcolepsy, cataplexy, or other hypersomnia disorders—that cause sleep disruption resulting in excessive daytime somnolence or other impacts on duty such as:

Case 1:25-cv-00240-ACR    Document 78-27    Filed 03/07/25    Page 36 of 41
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 549 of 688

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

(1)  Mood disturbance;

(2)  Irritability; or

(3)  Chronic use of prescription medication to promote sleep or maintain daytime wakefulness.

b.  Obstructive sleep apnea, of any severity:

(1)  With continued symptoms despite treatment with positive airway pressure machines or oral positional devices; or

(2)  That requires supplemental oxygen or any chronic medication to maintain wakefulness.

c.  Sleep-related movement disorder that causes sleep disruption resulting in excessive daytime somnolence or other impacts on duty, such as:

(1)  Mood disturbance;

(2)  Irritability; or

(3)  Chronic use of prescription medication to promote sleep or maintain daytime wakefulness.

## 5.28.  BEHAVIORAL HEALTH.

The following conditions, defined using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, unless otherwise stated, are not compatible with retention and the Service should initiate appropriate medical and personnel actions upon diagnosis.

a.  Schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, and brief psychotic disorder.  Substance- or medication–induced psychotic disorder and psychotic disorder(s) due to another medical condition should be considered on a case-by-case basis.

b.  Bipolar I disorder.

c.  Other bipolar spectrum disorders—including bipolar II disorder, cyclothymic disorder, substance- or medication–induced bipolar disorder—will be considered on a case-by-case basis if, despite appropriate treatment, they:

(1)  Require persistent duty modifications to reduce psychological stressors or enhance safety; or

(2)  Impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

d.  Other behavioral health conditions, defined using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders—including, but not limited to, anxiety disorders, depressive disorders, or eating or feeding disorders—will be considered on a case-by-case basis if, despite appropriate treatment, they:

(1)  Require persistent duty modifications to reduce psychological stressors or enhance safety; or

(2)  Impair function so as to preclude satisfactory performance of required military duties of the member's office, grade, rank, or rating.

e.  Per Paragraph 3.3, disqualifying behavioral health conditions should either be referred to the DES or processed for administrative separation, based on whichever is appropriate for that condition.

## 5.29.  TUMORS AND MALIGNANCIES.

When considering the conditions listed in this paragraph, the condition must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating.

a.  All malignancies will be evaluated for potential recurrence and need for medical surveillance that could require permanent duty limitations, in accordance with Military Department regulations.

b.  Malignant neoplasms that are not responsive to therapy or have residuals of treatment that limit satisfactory performance of duty.

c.  Benign tumors with mass effect or that interfere with the wearing of military equipment.

## 5.30.  MISCELLANEOUS CONDITIONS.

Conditions listed in this paragraph do not meet medical retention standards if they require medication for control with frequent monitoring by a medical provider due to potential debilitating or serious side effects or geographic limitations to protect the individual from infectious disease risk.

a.  Porphyria.

b.  Cold-related disorders or injuries with sequelae.

c.  Organ or tissue transplantation for which long-term immunosuppressant therapy is clinically indicated.

d.  History of heatstroke or heat injury.

(1)  Three or more episodes of heat exhaustion or heat injury within 24 months.  A single episode of heat injury with severe complications (e.g., compartment syndrome) that affects successful performance of duty or persistent end organ effects.

(2)  Heat stroke, when symptoms fail to resolve or when sequelae pose significant risks for future operations.

e.  Any chronic condition that requires immunomodulating or immunosuppressant medications.

f.  Any chronic pain condition that requires chronic controlled medications listed under Controlled Substance Schedules 2-4, pursuant to Title 21, United States Code.

g.  Chronic complications or effects of surgery that:

(1)  Present a significant risk of infection;

(2)  Result in duty limitations; or

(3)  Require frequent specialty care resulting in an unreasonable requirement on mission execution.

h.  Any persistent condition that requires geographic limitations to the member for assignment, temporary duty, or deployment to protect the individual from infectious disease risk, due to limited monitoring capabilities or other reasons.

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| ASD(HA) | Assistant Secretary of Defense for Health Affairs |
| DASD(HSP&O) | Deputy Assistant Secretary of Defense for Health Services Policy and Oversight |
| DASD(MPP) | Deputy Assistant Secretary of Defense for Military Personnel Policy |
| DES | Disability Evaluation System |
| DHA | Defense Health Agency |
| DoDI | DoD instruction |
| FEV1 | forced expiratory volume in one second |
| MEDPERS | Medical and Personnel Executive Steering Committee |
| MHS | Military Health System |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |
| USCG | United States Coast Guard |
| RMSWG | Retention Medical Standards Working Group |

## G.2. DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purpose of this volume.

| TERM | DEFINITION |
|---|---|
| **covered personnel** | Individuals who have been identified as HIV-positive, are asymptomatic, and who have a clinically confirmed undetectable viral load. |
| **garrison conditions** | Defined in DoDI 6465.03 |
| **heat exhaustion** | A syndrome of hyperthermia (core temperature at time of event usually ≤40ºC or 104ºF) with physical collapse or debilitation occurring during or immediately following exertion in the heat, with no more than minor central nervous system dysfunction (e.g., headache or dizziness). |

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

| TERM | DEFINITION |
|---|---|
| **heat injury** | Heat exhaustion with clinical evidence of organ or muscle damage without sufficient neurological symptoms to be diagnosed as heat stroke. |
| **heat stroke** | A syndrome of hyperthermia (core temperature at time of event usually $\geq 40$ºC or 104ºF), physical collapse or debilitation, and encephalopathy as evidenced by delirium, stupor, or coma, occurring during or immediately following exertion or significant heat exposure.  It can be complicated by organ or tissue damage, systemic inflammatory activation, and disseminated intravascular coagulation. |
| **medical condition** | Any disease or residual of an injury that results in a lessening or weakening of the capacity of the body or its parts to perform normally, according to accepted medical principles. |
| **medically required** | A medically necessary health care treatment or supply for which there is no medically appropriate substitute that can meet operational requirements. |
| **office, grade, rank, or rating** | Defined in DoDI 1332.18. |
| **operational healthcare unit** | Defined in DoD Manual 6025.13. |
| **persistent** | Twelve months, or less if reasonably anticipated to exceed 12 months. |
| **trial of duty** | Service-defined assessment of a Service member's ability to perform the duties of their office, grade, rank, or rating, considering their physical and psychological demands and tasks, medical history, and prognosis. |

*DoDI 6130.03-V2, September 4, 2020*
*Change 1, June 6, 2022*

# REFERENCES

Code of Federal Regulations, Title 38, Part 4 (also known as "the Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)")

Commandant Instruction Ml 850.2 (series), "Physical Disability Evaluation System," May 19, 2006

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1300.28, "Military Service By Transgender Persons And Persons With Gender Dysphoria", September, 4, 2020

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1332.45, "Retention Determinations For Non-Deployable Service Members," July 30, 2018

DoD Instruction 5025.01, "DoD Issuances Program," August 1, 2016, as amended

DoD Instruction 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction" May 5, 2018, as amended

DoD Instruction 6465.03, "Anatomic Gifts and Tissue Donation," June 8, 2016

DoD Instruction 6490.07. "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees," February 5, 2010

DoD Manual 6025.13, "Medical Quality Assurance (MQA) and Clinical Quality Management in the Military Health System (MHS)," October 29, 2013

Kidney Disease: Improving Global Outcomes, "Clinical Practice Guideline for the Evaluation and Management of Chronic Kidney Disease (CKD)," 2012 or current version[1]

Secretary of Defense Memorandum, "Policy Regarding Human Immunodeficiency Virus-Positive Personnel within the Armed Forces," June 6, 2022

United States Code, Title 21

---

[1] Accessible at https://kdigo.org/guidelines/ckd-evaluation-and-management

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)    Civil Action No. 1:25-cv-00240<br>)<br>)<br>)<br>)<br>) |

## SECOND SUPPLEMENTAL DECLARATION OF ALEX WAGNER

I, Alex Wagner, declare as follows:

1.    According to the February 26, 2025, policy providing additional guidance on implementing the transgender military ban announced by President Trump, transgender service members will face dismissal though administrative separation.

2.    Consistent with the purpose and policy of the Order, which is to bar transgender people from military service, the "waiver" in Section 4.3( c) of the Implementing Guidance creates barriers that make it impossible for a transgender person to qualify by excluding anyone who has transitioned or who cannot demonstrate three years of serving in their birth sex without clinically significant distress.

3.    The " waiver" for accession in 4.1(c) also fails to provide transgender applicants with any avenue for service because it similarly requires that an individual must serve in their birth sex—i.e., must suppress or deny their transgender identity.

4.    In my experience, dismissal through administrative separation is typically used for misconduct or failing to meet standards, not for treatable medical conditions where the service member meets the requirements for service, including both job performance and fitness standards.

1

5.      I am not aware of administrative separation ever being used to separate service members with a medical condition which can be successfully managed via treatment, and moreover where, when treated, the medical condition does not interfere with a member's ability to deploy and meet standards.

6.      Normally, when a service member has a medical condition that would limit their ability to serve or deploy, they go through a medical review, not administrative separation.

7.      My understanding is that administrative separation is most often used as disciplinary procedure to effect eventual military discharge. The ordinary path for evaluating impacts from medical conditions is the Disability Evaluation Service (DES) with administrative separation largely reserved for misconduct (including drug abuse) or repeated failure to meet standards, given the significant financial investment the military has already made in the member.

8.      In addition, based on my experience, individual or aggregated costs associated with medication or medical procedures is not a justification for administrative separation. Transgender service members constitute a small fraction of military personnel, and their health care costs represent a de minimis amount of overall health care spending. In fact, non-transgender service members may be prescribed the same medications transgender service members need for gender transition. There is no reason for this group to bear the burden of cost cutting measures when other service members have similar medical needs.

9.      I am aware of congressional testimony that coverage for Viagra for service members in 2023 accounted for $41M of the Department of Defense's budget. These expenditures are important investments and just one of many examples of the full spectrum health care that represents a benefit of service necessary to maintaining an all-volunteer force. I raise this only to note that the relative costs associated with providing essential health care for transgender troops

2

represents a miniscule part of the defense budget for the years they have been permitted to serve.

10.    The rushed and haphazard manner in which this policy has been issued and implemented is highly unusual. Ordinarily, the reversal of an existing policy—especially one adopted after careful study and review—would take place only in response to significant, documented problems with existing policy, after careful consideration and review including an explanation of what led to the problematic outcomes, and would be rolled out in a careful, orderly fashion that provided commanders and members clear guidance.

11.    The process leading to the Order and Implementing Guidance has taken a very different and, in my experience, highly unusual course. The decision to target and purge transgender troops was not based on any documented problem. It was not based on a careful study and review. It has been rolled out on an extremely expedited timeline that puts the affected service members under enormous pressure to make life-altering decisions without adequate time to seek counsel or reflect. It comes with no guidance on how units should adapt, reconfigure, or adjust to the loss of a teammate performing an important role.

12.    The issuance of a series of vague and in some cases conflicting directives undermines confidence in civilian leadership.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

_____
Alex Wagner

4

Case 1:25-cv-00240-ACR    Document 72-69    Filed 03/07/25    Page 1 of 12
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 559 of 688
Case 1:25-cv-00240-ACR    Document 13-28    Filed 02/03/25    Page 1 of 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | Civil Action No. 25-cv-240-ACR |

_____

<u>**DECLARATION OF YVETTE BOURCICOT**</u>

I, Yvette Bourcicot, declare as follows:

1.  I served as the Acting Assistant Secretary of the Army for Manpower and Reserve Affairs from January 18, 2022, to December 23, 2022, and as Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs from December 23, 2022 to January 20, 2025.  In those roles, I managed manpower, personnel, and Reserve Component affairs for the Department of the Army and advised the Secretary of the Army on matters of policy and performance oversight.  As

1

a former Department of Defense official, Department of the Army official, and Air Force veteran, I can attest that personnel policies must be based on merit and objective criteria to promote readiness and unit cohesion.

## PROFESSIONAL BACKGROUND

2.  I attended Princeton University on an Air Force Reserve Officer Training Corps scholarship and obtained an undergraduate degree in English literature in 2000. I later attended Georgetown University Law Center on an Air Force scholarship, earning a Juris Doctor degree in 2008, having focused on public international law and national security law.

3.  From May of 2000 to December of 2010, I served as an officer in the U.S. Air Force in various positions, culminating in my service as a Judge Advocate General (JAG). I later ran my own law practice from March of 2011 to September of 2012, specializing in family law, criminal law, military justice, and administrative law.

4.  From September of 2012 to July of 2014, I served as Special Assistant to the General Counsel of the Army, providing legal advice to the General Counsel, the Secretary of the Army, and Army staff on issues including the Army's response to the Washington Navy Yard shooting, accommodating transgender prisoner populations, updating background check procedures for Army Child Development Center workers, compliance with e-discovery requirements, coordinating an enterprise-wide review of Army Medicine, and reforming the Army Behavioral Health system.

5.  Following this work, I was asked to join a working group in 2015 studying whether and how transgender individuals could serve in the military (the "Working Group") as a subject matter expert. The Working Group brought together representatives from all branches of the military,

2

including the Surgeons General from each branch.  The Working Group also received extensive input from subject matter experts and members of the transgender community.

6.  From July of 2014 to December of 2016, I served as Senior Advisor for International Humanitarian Policy in the Office of the Under Secretary of Defense (Policy) at the Department of Defense.  In December of 2016, I became an Associate Deputy General Counsel in the Office of Legal Counsel, Department of Defense, advising on foreign and international litigation, matters pending before the U.S. Supreme Court, and litigation risk associated with personnel policies.

7.  From February of 2018 to January of 2022, I worked in the private sector, filling a number of policy and communications roles at technology firms, including Facebook, Airbnb, and Match Group.

8.  In January of 2022, I returned to the Department of the Army where I served as Acting Assistant Secretary for Manpower and Reserve Affairs and Principal Deputy Assistant Secretary for Manpower and Reserve Affairs.  I advised the Secretary of the Army on matters including human capital, training, readiness, mobilization, military health policies, force structure, manpower management, equal opportunity, recruiting, marketing, and other critical matters.

## THE ARMY

9.  The United States Army is the largest of the service branches of the United States Armed Forces and performs land-based military operations.  The Department of the Army is one of the three military departments of the DoD.  The Army has an annual budget of more than $185.9 billion.  For fiscal year 2025, the projected end strength for the Active Army is 442,300 soldiers, with an additional 325,000 soldiers in the Army National Guard, and 175,800 in the United States Army Reserve, for a total of 943,100.  The Army's command structure includes four Army

3

Commands, nine Army Service Component Commands, and thirteen Direct Reporting Units, operating across the United States and around the world.

10. The Army's core mission is to fight and win our Nation's wars by providing prompt, sustained land dominance across the full range of military operations and spectrum of conflict in support of combatant commanders.  It does this by executing statutory directives, including organizing, equipping, and training forces for the conduct of prompt and sustained combat operations on land, and by accomplishing missions assigned by the President, Secretary of Defense, and combatant commanders.

11. The Army is the most formidable ground combat force on earth and one of the largest employers in the United States.  The Army's continued excellence in executing its many missions is largely due to deliberate investments in soldier training, equipping, and leader development. Soldiers receive training at the highest level, not only in the classroom, but also through rigorous instruction under intense pressure and realistic battlefield conditions.  Many Army personnel are employed in highly technical roles that require lengthy and expensive specialized training. Particularly in light of these investments in personnel, recruitment and retention of capable and qualified soldiers is crucial to Army readiness.

**THE WORKING GROUP AND DEVELOPMENT OF DOD EQUAL SERVICE POLICY**

12. On July 28, 2015, after consultations with the secretaries of the military departments, Secretary of Defense Ashton Carter directed Brad Carson, Acting Undersecretary of Defense for Personnel and Readiness, to convene a Working Group to study the policy and readiness implications of allowing transgender persons to serve in the armed forces.  Shortly after Brad Carson's directive, I joined the Working Group as a subject matter expert.  Initially, the Working Group was asked to begin with the presumption that transgender individuals could serve unless

4

objective, practical impediments were identified, and to develop an implementation plan that addressed those issues with the goal of maximizing military readiness.

13. The Working Group's process was extremely rigorous.  We considered information and presentations from a variety of sources, including medical and other experts, drawn from both within and outside of the Department of Defense; senior uniformed officers and senior civilian officers from each military department; senior military personnel who supervised transgender service members; and transgender people on active duty.  We also drew specific medical input from Surgeons General from each of the Armed Service branches.

14. One of the many sources that the Working Group relied upon was the RAND Report, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, which the DoD commissioned in 2016.  RAND is a non-profit institution, which seeks to make its research freely and readily available to the public.  Accordingly, the research provided in RAND's publications is held to high-quality peer-review standards for objective analysis.  The RAND Report reviewed all of the relevant scholarly literature and empirical data, including the extensive medical literature, actuarial data, and research and reports from the then- eighteen other countries that permitted service by transgender personnel.  The RAND report found that the military's costs, readiness, and unit cohesion would not be impacted by allowing transgender servicemembers to serve equally in the Armed Forces.  A true and correct copy of the RAND Report is attached as Exhibit A.

15. In consideration of the RAND Report's empirical findings, along with the multitude of opinions from military and civilian personnel, the Working Group concluded that transgender individuals who meet the standards for military service should be permitted to serve.  Accordingly, Secretary of Defense Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), which required the Secretaries of the

Military Departments, including the Army, to implement the Working Group's equal service policy. The Army implemented two Directives: 2016-30 and 2016-35, which applied to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States. Directive 2016-30 disallowed discrimination based on gender identity and stated, "The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect." Meanwhile, Directive 2016-35 provided policies and standards for transgender soldiers to obtain transition-related medical care.

### THE 2021 AUSTIN POLICY

16. On January 25, 2021, President Joseph R. Biden replaced the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." The EO relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender

6

dysphoria—to exclude them from military service or to limit their access to medically necessary care."

17. On April 30, 2021, the DoD implemented this policy through the issuance of DoD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28"), which applies to all military departments. This guidance authorizes "service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

18. To implement DoDI 1300.28, the Secretary of the Army issued Army Directive 2021-22 (Army Service by Transgender Persons and Persons With Gender Dysphoria) (the "Policy Memorandum").

19. Under the policy, a transgender service member who wished to transition during service was required to first make a request to their brigade commander. Those requests were routed through several offices within the Army before coming to Manpower and Reserve Affairs for final review. As Acting Assistant Secretary for Manpower and Reserve Affairs, I reviewed each request and made a recommendation on whether to grant the service member's request. Subsequently, as Principal Deputy Assistant Secretary for Manpower and Reserve Affairs, I was notified of each request. Because the transgender population makes up a very small fraction of total Army military personnel, I only reviewed one or two such requests per quarter. To my best recollection, every request I received met the requirements of the policy, and every requesting service member met the necessary standards for serving, so I never had cause to recommend that a request be denied.

20. The Policy Memorandum states that "[t]he Army is open to all who can meet the standards for military service and readiness. It remains committed to treating all Soldiers with dignity and

7

respect while ensuring good order and discipline, including allowing transgender Soldiers to serve openly . . . ."  For any standard, requirement, or policy that "appl[ies] differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS)."

21. The Policy Memorandum specifies that personnel will either be accessed or commissioned in accordance with medical standards issued by the Department of the Army and the DoD.

22. The Policy Memorandum also confirms that "[n]o otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service, or otherwise subjected to adverse action or treatment, solely on the basis of gender identity."  Additionally, for any "whose fitness for duty or ability to serve is adversely affected by a medical condition or medical treatment related to gender identity or gender transition," the Policy Memorandum states that they "should be treated, for purposes of separation and retention, just as any other Soldier whose fitness for duty or ability to serve is similarly affected by non-gender identity or gender transition reasons."

23. In implementing the Policy Memorandum, I observed no negative impact from permitting transgender service in the Army or on our military capabilities.

24. The Austin Policy fosters trust among team members and advances unit cohesion.  This unit cohesion is vital in protecting America's national security interests around the world.  In order to ensure America's Army is effective, we need to be able to be seen as a top-choice employer in a highly competitive market for talent.  Any organization that American youth perceive as discriminatory will be at a competitive disadvantage in this contest.  The Austin Policy further enables our military to retain highly trained and specialized service members by providing an opportunity to progress and develop leadership and other skills within the military.

8

25. In my positions as Acting Assistant Secretary of the Army for Manpower and Reserve Affairs and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs, I would have been aware of any issues arising from the Austin Policy, and responsible for resolving them.  However, in all of my time serving in these roles I heard no complaints from the field about how the inclusion of transgender service members caused problems for unit readiness or individual deployability.  Although some transgender service members required medical procedures to treat their gender dysphoria that temporarily affected their deployability, this is no different than the myriad medical reasons that any service member might become temporarily non-deployable.

26. I am also unaware of any complaints regarding unit cohesion resulting from permitting transgender people to serve.  Consistent with the military's experience integrating other previously excluded groups into the ranks, unit cohesion hangs on an individual's ability to do the job in front of them, rather than any concerns regarding identity.  Transgender service members have proven themselves able to serve and indeed are serving capably throughout the military.  To the extent their service has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering greater openness and trust among team members.

**RECENT REVERSAL OF POLICY**

27. On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021, executive order permitting equal service by transgender individuals.  On January 27, 2025, President Trump issued an executive order revoking "all policies, directives, and guidance issued pursuant to" the order establishing that equal service policy and directing the Department of Defense "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service.

9

28. Such an abrupt reversal of established military policy is highly unusual, especially without a significant change in the analysis supporting the policy.  As part of the 2015 Working Group, I can attest to the DOD's lengthy review in deciding whether to adopt an equal service policy.  The Working Group's conclusion that transgender individuals should be allowed to serve on equal terms was the result of a rigorous process involving consultation with experts and military personnel.  President Trump's executive order reverses this carefully considered policy and was ordered without any evidence that allowing transgender individuals to serve over the past four years resulted in any negative impact whatsoever.  The executive order claims that permitting transgender individuals to serve harms military effectiveness and lethality and disrupts unit cohesion; however, as the actual experience of transgender service shows, these claims have no evidentiary basis.

29.  Prohibiting transgender individuals from serving in the military is harmful to the military and to the public interest for several reasons.

30. **Erosion of Merit-Based Accession and Retention.**  The 2021 policy required the Army to make accession and retention decisions based upon merit, not based upon a soldier's transgender status.  This policy upheld an important tenet of military service: that anyone who meets the necessary qualifications and raises their hand to serve should be allowed to serve.  The policy required transgender soldiers to meet the same high standards as all other soldiers.  Under the policy, transgender soldiers served with distinction.  The recission of the policy and implementation of the ban on transgender servicemembers means that an individual's ability to serve is not based on standards and merit but solely based on the outcome of a presidential election.

31. Uniformed service entails dedication and sacrifice—long hours, time away from home, and risk of injury or death are all part of that service.  In return, the Nation promises those service

10

members that we will honor their service and respect them.  Summarily dismissing transgender service members without cause breaks the faith they placed in their leaders and the military as an institution.  More broadly, it signals to all service members that their service could also end if they are determined to be members of a politically unpopular group.  This sows division and undermines the unit cohesion that is absolutely essential for fighting forces to be effective.

32. **Detriment to Recruitment.**  The military is competing for, and successfully attracting talent in today's robust job market.   This success is due in large part to policies such as the 2021 Austin Policy.  Research shows that the vast majority of young people in our recruit demographic (17-24 years old) do not want to be associated with institutions that are perceived as discriminatory on the basis of race, sex, sexual orientation, religion, or gender identity.  This sudden reversal of policy will damage the reputation of the military and diminish its attractiveness as a career path among the young people we most need to persuade to join our ranks.

33. **No Detriment to the Military.**  The Austin Policy was implemented following years of thoughtful and careful planning by experts and stakeholders across the military.  It takes into account the medical needs of transgender service members and any associated impacts on their ability to serve.  Because of this careful planning, I am confident that allowing transgender individuals to serve in the military and accommodating their medical needs is no greater a burden on the military than the accommodation of all other service members' medical needs.  The transgender population is so small that the impact of their medical needs on unit readiness is virtually nonexistent.  Moreover, many transgender individuals do not require extensive medical interventions, particularly those who have accessed after an 18-month medical assessment of stability.   Those few transgender service members who require more extensive medical

11

burden on the military than the accommodation of all other service members' medical needs. The transgender population is so small that the impact of their medical needs on unit readiness is virtually nonexistent. Moreover, many transgender individuals do not require extensive medical interventions, particularly those who have accessed after an 18-month medical assessment of stability. Those few transgender service members who require more extensive medical interventions, such as surgeries, are only temporarily unavailable for deployment, similar to any other service member requiring surgery.

## CONCLUSION

34. The Austin Policy was based on years of thoughtful policymaking supported by peer-reviewed scientific research. It has resulted in a stronger, not a weaker military. The sudden reversal of that policy is backed by no research and can be attributable only to animus. It disrespects the transgender service members who have served honorably in the military and threatens to undermine the military's culture, cohesion, and lethality.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3 Feb 25

Yvette Bourcicot

Case 1:25-cv-00240-ACR   Document 72-70   Filed 03/07/25   Page 1 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 571 of 688

Case 1:25-cv-00240-ACR   Document 13-29   Filed 02/03/25   Page 1 of 113

# EXHIBIT A



# Assessing the Implications of Allowing Transgender Personnel to Serve Openly

Agnes Gereben Schaefer, Radha Iyengar,

Srikanth Kadiyala, Jennifer Kavanagh, Charles C. Engel,

Kayla M. Williams, Amii M. Kress

For more information on this publication, visit www.rand.org/t/RR1530

Library of Congress Cataloging-in-Publication Data is available for this publication.

ISBN: 978-0-8330-9436-0

Published by the RAND Corporation, Santa Monica, Calif.

© Copyright 2016 RAND Corporation

RAND® is a registered trademark.

Limited Print and Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law. This representation of RAND intellectual property is provided for noncommercial use only. Unauthorized posting of this publication online is prohibited. Permission is given to duplicate this document for personal use only, as long as it is unaltered and complete. Permission is required from RAND to reproduce, or reuse in another form, any of its research documents for commercial use. For information on reprint and linking permissions, please visit www.rand.org/pubs/permissions.html.

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest.

RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

Support RAND
Make a tax-deductible charitable contribution at
www.rand.org/giving/contribute

www.rand.org

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 12-29   Filed 02/03/25   Page 4 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 574 of 688

# Preface

U.S. Department of Defense (DoD) policies have rendered both the physical and psychological aspects of "transgender conditions" as disqualifying conditions for accession and allow for the administrative discharge of service members who fall into these categories. However, in July 2015, Secretary of Defense Ashton Carter announced that DoD would "create a working group to study the policy and readiness implications of welcoming transgender persons to serve openly." In addition, he directed that "decision authority in all administrative discharges for those diagnosed with gender dysphoria[1] or who identify themselves as transgender be elevated to the Under Secretary of Defense (Personnel and Readiness), who will make determinations on all potential separations" (DoD, 2015b).

It is against this backdrop that DoD is considering allowing transgender personnel to serve openly. To assist in identifying the potential implications of such a change in policy, the Office of the Under Secretary of Defense for Personnel and Readiness asked the RAND National Defense Research Institute to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly. This report documents the findings from that study. This research should be of interest to DoD and military service leadership, members of Congress, and others who are interested in the potential implications of allowing transgender personnel to serve openly in the U.S. armed forces.

This research was sponsored by the Office of the Under Secretary of Defense for Personnel and Readiness and conducted within the Forces and Resources Policy Center of the RAND National Defense Research Institute, a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint

---

[1]  *Gender dysphoria* is "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth" (World Professional Association for Transgender Health, 2011, p. 2).

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR     Document 12-20     Filed 02/03/25     Page 5 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 575 of 688
iv   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community.

For more information on the RAND Forces and Resources Policy Center, see www.rand.org/nsrd/ndri/centers/frp or contact the director (contact information is provided on the web page).

# Contents

**Preface** ................................................................................... iii

**Figures and Tables** .................................................................. vii

**Summary** ................................................................................ ix

**Acknowledgments** ................................................................. xvii

**Abbreviations** ........................................................................ xix

CHAPTER ONE

**Introduction** ........................................................................... 1

Study Approach ........................................................................ 1

Organization of This Report....................................................... 4

CHAPTER TWO

**What Are the Health Care Needs of the Transgender Population?** ......................... 5

Definitions of Key Terms and Concepts ....................................... 5

Health Care Needs of the Transgender Population.......................... 6

Military Health System Capacity and Gender Transition–Related Treatment................. 7

Potential Consequences of Not Providing Necessary Gender Transition–Related Care ...... 9

CHAPTER THREE

**What Is the Estimated Transgender Population in the U.S. Military?**.................... 11

General Population Estimates of Transgender Prevalence ...................... 11

Prevalence-Based Approach to Estimating the Number of Transgender Service Members
in the U.S. Military............................................................. 14

CHAPTER FOUR

**How Many Transgender Service Members Are Likely to Seek Gender
Transition–Related Medical Treatment?**................................... 19

Prevalence-Based Approach to Estimating the Number of Gender Transition–Related
Treatments in the U.S. Military............................................... 20

Utilization-Based Approach to Estimating the Number of Gender Transition–Related
Treatments in the U.S. Military............................................... 22

Summarizing the Estimates..................................................... 30

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 12-29    Filed 02/03/25    Page 7 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 577 of 688

vi    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

CHAPTER FIVE

**What Are the Costs Associated with Extending Health Care Coverage for Gender Transition–Related Treatments?** ...................................................... 33

Private Health Insurance Cost Estimates .......................................................... 33

Sensitivity Analyses ........................................................................................... 35

Summarizing the Estimates .............................................................................. 36

CHAPTER SIX

**What Are the Potential Readiness Implications of Allowing Transgender Service Members to Serve Openly?** ..................................................................... 39

Impact on Ability to Deploy ............................................................................. 39

Impact on Unit Cohesion .................................................................................. 44

Costs of Separation Requirements Related to Transgender Service Members ............... 46

CHAPTER SEVEN

**What Lessons Can Be Learned from Foreign Militaries That Permit Transgender Personnel to Serve Openly?** ...................................................................... 49

Policies on Transgender Personnel in Foreign Militaries ..................................... 50

Effects on Cohesion and Readiness ................................................................... 60

Best Practices from Foreign Militaries .............................................................. 61

Lessons Learned and Issues to Consider for U.S. Military Policy .............................. 62

CHAPTER EIGHT

**Which DoD Policies Would Need to Be Changed if Transgender Service Members Are Allowed to Serve Openly?** ................................................................. 65

Accession Policy ............................................................................................... 66

Retention Policy ............................................................................................... 66

Separation Policy .............................................................................................. 67

Deployment Policy ........................................................................................... 67

CHAPTER NINE

**Conclusion** ..................................................................................................... 69

APPENDIXES

A. **Terminology** ............................................................................................. 73

B. **History of DSM Terminology and Diagnoses** ............................................ 77

C. **Treatments for Gender Dysphoria** ............................................................. 79

D. **Review of Accession, Retention, and Separation Regulations** ..................... 83

**References** ....................................................................................................... 85

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 12-29    Filed 02/03/25    Page 8 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 578 of 688

# Figures and Tables

## Figures

4.1.   Comparison of Annual Estimated Gender Transition–Related Health Care Utilization and Mental Health Care Utilization, Active Component ............ 32
5.1.   Gender Transition–Related Health Care Cost Estimates Compared with Total Health Spending, Active Component ....................................... 37

## Tables

3.1.   DoD Military Force Demographics ................................................. 15
3.2.   Prevalence-Based Estimates of the Number of Transgender Active-Component and Selected Reserve Service Members ..................... 16
4.1.   Estimated Number of Transgender Service Members Who May Seek to Transition per Year ................................................................. 21
4.2.   Lifetime Surgery Preferences Among NTDS Survey Respondents ............ 22
4.3.   Estimated Annual Number of Surgeries and Hormone Therapy Users ........ 23
4.4.   Enrollee Utilization of Gender Transition–Related Benefits in Private Health Insurance Firms .............................................................. 25
4.5.   Utilization Estimates from Applying Private Health Insurance Parameters .... 28
4.6.   Incidence of Penectomies and Bilateral Mastectomies Performed on Transgender Individuals ............................................................ 28
4.7.   Prevalence and Incidence of Gender Identity Disorder Diagnoses in VHA Claims Data .......................................................................... 29
4.8.   Annual Gender Transition–Related Treatment Estimates from All Data Sources ............................................................................... 31
5.1.   Actuarial Estimated Costs of Gender Transition–Related Health Care Coverage from the Literature ...................................................... 34
5.2.   Estimated Annual MHS Costs of Gender Transition–Related Health Care, Active Component .................................................................... 36
6.1.   Gender Transition–Related Readiness Constraints .............................. 41
6.2.   Estimated Number of Nondeployable Man-Years Due to Gender Transition–Related Treatments ................................................... 43

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 12-20   Filed 02/03/25   Page 9 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025   Page 579 of 688

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR     Document 13-20     Filed 03/03/25     Page 10 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 580 of 688

## Summary

The U.S. Department of Defense (DoD) is reviewing its policy on transgender personnel serving openly and receiving gender transition–related treatment during military service. The prospect of transgender personnel serving openly raises a number of policy questions, including those regarding access to gender transition–related health care, the range of transition-related treatments to be provided, the potential costs associated with these treatments, and the impact of gender transition–related health care needs (i.e., surgical, pharmacologic, and psychosocial) on military readiness—specifically, in terms of the deployability of transgender service members. The Office of the Under Secretary of Defense for Personnel and Readiness asked the RAND National Defense Research Institute to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly. This report presents the study findings centered around the following research questions:

- What are the health care needs of the transgender population?
- What is the estimated transgender population in the U.S. military?
- How many transgender service members are likely to seek gender transition–related medical treatment?
- What are the costs associated with extending health care coverage for gender transition–related treatments?
- What are the potential readiness implications of allowing transgender service members to serve openly?
- What lessons can be learned from foreign militaries that permit transgender personnel to serve openly?
- Which DoD policies would need to be changed if transgender service members are allowed to serve openly?

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 11 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 581 of 688
x    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

In the following sections, we summarize the findings associated with each research question.

## What Are the Health Care Needs of the Transgender Population?

For the purposes of this analysis, we use *transgender* as an umbrella term to refer to individuals who identify with a gender different from the sex they were assigned at birth. Under the recently established criteria and terminology in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), the American Psychiatric Association (APA) publication that provides standard language and criteria for classifying mental health conditions, transgender status alone does not constitute a medical condition (APA, 2013). Instead, under the revised diagnostic guidelines, only transgender individuals who experience significant related distress are considered to have a medical condition called *gender dysphoria* (GD). Some combination of psychosocial, pharmacologic (mainly but not exclusively hormonal), or surgical care may be medically necessary for these individuals. Psychotherapy to confirm a diagnosis of GD is a common first step in the process, often followed by hormone therapy and, perhaps, gender reassignment surgery involving secondary or primary sex characteristics. Not all individuals seek all forms of care.

A subset of transgender individuals may choose to *transition*, the term we use to refer to the act of living and working as a gender different from that assigned at birth. For some, the transition may be primarily social, with no accompanying medical treatment; we refer to this as *social transition*. For others, medical treatments, such as hormone therapy and hair removal, are important steps to align their physical body with their target gender. We refer to this as *medical transition*. A subset of those who medically transition may choose to undergo gender reassignment surgery to make their body as congruent as possible with their gender identity. This process of surgical transition is also often referred to as *sex* or *gender reassignment* or *gender confirmation*.

## What Is the Estimated Transgender Population in the U.S. Military?

Estimates of the transgender population in the U.S. military and the analyses presented in this report should be interpreted with caution, as there have been no rigorous epidemiological studies of the size or health care needs of either the transgender population in the United States or the transgender population serving in the military. As a result, much existing research relies on self-reported, nonrepresentative survey samples. We applied a range of prevalence estimates from published research to fiscal year (FY) 2014 personnel numbers to estimate the number of transgender individuals serving in the U.S. military. We estimate that there are between 1,320 and

6,630 transgender personnel serving in the active component (AC) and 830–4,160 in the Selected Reserve (SR). Combining survey evidence from multiple states and adjusting for the male/female distribution in the military gave us a midrange estimate of around 2,450 transgender personnel in the AC and 1,510 in the SR.

### How Many Transgender Service Members Are Likely to Seek Gender Transition–Related Medical Treatment?

We developed two estimates of demand for gender transition–related medical treatments based on private health insurance data and self-reported data from the National Transgender Discrimination Survey (NTDS). Based on our analyses of available private health insurance data on transition-related health care utilization, we expect only a small number of AC service members to access transition-related health care each year. Our estimates based on private health insurance data ranged from 0.022 to 0.0396 annual claimants per 1,000 individuals. Applied to the AC population, these estimates led to a lower-bound estimate of 29 AC service members and an upper-bound estimate of 129 AC service members annually utilizing transition-related health care, out of a total AC force of 1,326,273 in FY 2014.

We also projected health care utilization using the estimated prevalence of transgender service members and self-reported survey data from the NTDS describing the proportion of the transgender population seeking transition-related treatments by age group. Based on these calculations, we estimated, as an upper-bound, 130 total gender transition–related surgeries and 140 service members initiating transition-related hormone therapy (out of a total AC force of 1,326,273 in FY 2014). To put these numbers in perspective, an estimated 278,517 AC service members accessed mental health services in FY 2014. Hence, we expect annual gender transition–related health care to be an extremely small part of the overall health care provided to the AC population.

### What Are the Costs Associated with Extending Health Care Coverage for Gender Transition–Related Treatments?

To determine the budgetary implications of gender transition–related treatment for Military Health System (MHS) health care costs, we again used data from the private health insurance system on the cost of extending coverage for this care to the transgender personnel population. We estimate that AC MHS health care costs will increase by between $2.4 million and $8.4 million annually—an amount that will have little impact on and represents an exceedingly small proportion of AC health care expendi-

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 13 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 583 of 688
xii    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

tures (approximately $6 billion in FY 2014)[1] and overall DoD health care expenditures ($49.3 billion actual expenditures for the FY 2014 Unified Medical Program; Defense Health Agency, 2015, p. 22). These estimates imply small increases in annual health care costs; results that are consistent with the low prevalence of transgender personnel and the low annual utilization estimates that we identified.

### What Are the Potential Readiness Implications of Allowing Transgender Service Members to Serve Openly?

Similarly, when assessing the readiness impact of a policy change, we found that less than 0.0015 percent of the total available labor-years would be affected, based on estimated gender transition–related health care utilization rates.[2] This is because even at upper-bound estimates, less than 0.1 percent of the total force would seek transition-related care that could disrupt their ability to deploy.[3] Existing data also suggest a minimal impact on unit cohesion as a result of allowing transgender personnel to serve openly. However, we caution that these results rely on data from the general civilian population and foreign militaries, as well as previous integration experiences in the military (e.g., gays, lesbians, women), which may not hold for transgender service members.

### What Lessons Can Be Learned from Foreign Militaries That Permit Transgender Personnel to Serve Openly?

There are 18 countries that allow transgender personnel to serve openly in their militaries: Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and the United Kingdom (Polchar et al., 2014). Our analysis focused on the policies of the four countries—Australia, Canada, Israel, and the United Kingdom— with the most well-developed and publicly available policies on transgender military personnel. Several common themes emerged from our analysis of their experiences:

- The service member's gender is usually considered to have shifted to the target gender in areas such as housing, uniforms, identification cards, showers, and restrooms when a service member publicly discloses an intention to live as the target

---

[1]  AC beneficiaries make up less than 15 percent of TRICARE beneficiaries (Defense Health Agency, 2015).

[2]  We define a labor-year as the amount of work done by an individual in a year.

[3]  We note that the ability to deploy is not exactly equivalent to readiness. A service member's readiness could be measured by the ability to participate in required training and exercises, which could be affected by treatments as well. Our estimates include days of inactivity due to medical treatments, which could also apply in these settings.

gender and receives a diagnosis of gender incongruence. However, physical fitness standards typically do not fully shift until the medical transition is complete. In many cases, personnel are considered exempt from physical fitness tests during transition.

- Because the gender transition process is unique for each individual, issues related to physical standards and medical readiness are typically addressed on a case-by-case basis. This flexibility has been important in addressing the needs of transgender personnel.
- The foreign militaries we analyzed permit the use of sick leave for gender transition–related medical issues and cover some, if not all, medical or surgical treatments related to a service member's gender transition.
- In no case was there any evidence of an effect on the operational effectiveness, operational readiness, or cohesion of the force.

The case studies also suggested a number of key best practices:

- Ensure strong leadership support.
- Develop an explicit written policy on all aspects of the gender transition process.
- Provide education and training to the entire force on transgender personnel policy, but integrate this training with other diversity-related training and education.
- Develop and enforce a clear anti-harassment policy that addresses harassment aimed at transgender personnel alongside other forms of harassment.
- Make subject-matter experts and gender advisers serving within military units available to commanders seeking guidance or advice on gender identity issues.
- Identify and communicate the benefits of an inclusive and diverse workforce.

## Which DoD Policies Would Need to Be Changed if Transgender Service Members Are Allowed to Serve Openly?

We reviewed 20 current accession, retention, separation, and deployment regulations across the services and the Office of the Secretary of Defense to assess the impact of changes that may be required to allow transgender individuals to serve openly. We also reviewed 16 other regulations that have been replaced by more recent regulations or that did not mention transgender personnel.[4] Based on the experiences of foreign militaries, we recommend that DoD issue clear and comprehensive policies.

---

[4] These additional policies can are listed in Appendix D of this report.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 15 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 585 of 688
xiv    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

### Accession Policy

We recommend that DoD review and revise the language in accession instructions to match the DSM-5 for conditions related to mental fitness, ensuring the alignment of mental health–related language and facilitating appropriate screening and review processes for disorders that may affect fitness for duty. Similarly, physical fitness standards should specify physical requirements (rather than physical conditions). Finally, physical fitness policies should clarify when the service member's target gender requirements will begin to apply.

### Retention Policy

We recommend that DoD expand and enhance its guidance and directives to clarify retention standards for review during and after medical transition. For example, evidence from Canada and Australia suggests that transgender personnel may need to be held medically exempt from physical fitness testing and requirements (Canadian Armed Forces, 2012; Royal Australian Air Force, 2015). However, after completing medical transition, the service member could be required to meet the standards of the acquired gender.

### Separation Policy

DoD may wish to revise the current separation process based on lessons learned from the repeal of Don't Ask, Don't Tell. The current process relies on administrative decisions outside the purview of the standard medical and physical review process. This limits the documentation and review of discharges, and it could prove burdensome if transgender-related discharges become subject to re-review and redetermination. When medically appropriate, DoD may wish to establish guidance on when such discharge reviews should be handled through the existing medical fitness processes. We also recommend that DoD develop and disseminate clear criteria for assessing whether and how transgender-related conditions may interfere with duty performance.

### Deployment Policy

The degree of austerity will differ across deployment environments, and some locations may be able to meet the health care needs of some transgender individuals. Moreover, recent advancements can minimize the invasiveness of treatments and allow for telemedicine or other forms of remote medical care.

Given this, DoD may wish to adjust some of its processes and deployment restrictions in the context of medical and technological advancements (e.g., minimally invasive treatments, telemedicine). Such reforms could minimize the readiness impact of medical procedures that are common among the transgender population. For example, current regulations specifying that conditions requiring regular laboratory visits that cannot be accommodated in a deployed environment can leave service members ineligible for deployment and would affect all individuals receiving hormone treatments

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 73-29    Filed 03/03/25    Page 16 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 586 of 688

Summary    xv

(Office of the Assistant Secretary of Defense for Health Affairs, 2013, p. 3). These treatments require laboratory monitoring every three months for the first year as hormone levels stabilize (Hembree et al., 2009; Elders et al., 2014). To avoid this cost, DoD would need to either permit more flexible monitoring strategies[5] or provide training to deployed medical personnel.[6]

_____

[5]  Some experts suggest that alternatives, such as telehealth reviews, would address this issue for rural populations with limited access to medical care (see, for example, World Professional Association for Transgender Health, 2011).

[6]  "Independent duty corpsmen, physician assistants, and nurses can supervise hormone treatment initiated by a physician" (Elders et al., 2014).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 17 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 587 of 688

# Acknowledgments

The authors would like to extend thanks to our DoD sponsors who provided valuable feedback on various briefings over the course of this study. Deputy Assistant Secretary of Defense for Military Personnel Policy Anthony Kurta was also extremely helpful in providing oversight of this research effort.

We also benefited from the contributions of our RAND colleagues. Bernard Rostker, Michael Johnson, John Winkler, Lisa Harrington, Kristie Gore, and Sarah Meadows provided helpful formal peer reviews of this report. Michelle McMullen provided administrative support, and Lauren Skrabala provided editorial assistance.

We thank them all, but we retain full responsibility for the objectivity, accuracy, and analytic integrity of the work presented here.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 73-20    Filed 03/03/25    Page 19 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 589 of 688

## Abbreviations

| | |
|---|---|
| AC | active component |
| APA | American Psychiatric Association |
| DoD | U.S. Department of Defense |
| DoDI | U.S. Department of Defense instruction |
| DSM-5 | *Diagnostic and Statistical Manual of Mental Disorders*, fifth ed. |
| FY | fiscal year |
| GD | gender dysphoria |
| IDF | Israel Defense Forces |
| LGBT | lesbian, gay, bisexual, and transgender |
| MHS | Military Health System |
| MTF | military treatment facility |
| NTDS | National Transgender Discrimination Survey |
| SR | Selected Reserve |
| VHA | Veterans Health Administration |
| WPATH | World Professional Association for Transgender Health |

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 22 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 592 of 688

CHAPTER ONE

# Introduction

 U.S. Department of Defense (DoD) policies have rendered both the physical and psychological aspects of "transgender conditions" disqualifying conditions for accession and allowed for the administrative discharge of service members who fall into these categories. However, in July 2015, Secretary of Defense Ashton Carter announced that DoD would "create a working group to study the policy and readiness implications of welcoming transgender persons to serve openly." In addition, he directed that "decision authority in all administrative discharges for those diagnosed with gender dysphoria[1] or who identify themselves as transgender be elevated to the Under Secretary of Defense (Personnel and Readiness), who will make determinations on all potential separations" (DoD, 2015b). It is against this backdrop that DoD is considering allowing transgender service members to serve openly. To assist in identifying the potential implications of such a policy change, the Office of the Under Secretary of Defense for Personnel and Readiness asked the RAND National Defense Research Institute to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly.

## Study Approach

Our study approach centered around the following research questions:

- What are the health care needs of the transgender population?
- What is the estimated transgender population in the U.S. military?

---

[1]  *Gender dysphoria*, or GD, is "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth" (World Professional Association for Transgender Health [WPATH], 2011, p. 2).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 23 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 593 of 688

2    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

- How many transgender service members are likely to seek gender transition–related medical treatment?
- What are the costs associated with extending health care coverage for gender transition–related treatments?
- What are the potential readiness implications of allowing transgender service members to serve openly?
- What lessons can be learned from foreign militaries that permit transgender personnel to serve openly?
- Which DoD policies would need to be changed if transgender service members are allowed to serve openly?

We explain our methodological approaches in detail in each chapter of this report, but, here, we present overviews of the various methodologies that we employed. We began our analysis by defining the term *transgender* and then identifying the health care needs of the transgender population. This entailed an extensive literature review of these health care needs, along with treatment standards and medical options—particularly for those who have been diagnosed with gender dysphoria (GD).

We then undertook a review of existing data to estimate the prevalence and likely utilization rates of the transgender population in the U.S. military. Based on our estimates of the potential utilization of gender transition–related health care services, we estimated the Military Health System (MHS) costs for transgender active-component (AC) service members and reviewed the potential effects on force readiness from allowing these service members to serve openly.

We adopted two distinct but related approaches to estimating health care utilization and readiness impact. The first is what we label the *prevalence-based approach*, in which we estimated the prevalence of transgender personnel in the military and applied information on rates of gender transition and reported preferences for different medical treatments to measure utilization and the implied cost and readiness impact. This approach has the benefit of including those who may seek other forms of accommodation, even if they do not seek medical care. It also provides detailed information on the types of medical treatments likely to be sought, which can improve the accuracy of cost and readiness estimates. However, this approach suffers from a lack of rigorous evidence in terms of the rates at which transgender individuals seek treatment and instead relies on the nonscientific National Transgender Discrimination Survey (NTDS). This approach also relies on prevalence measures from only two states, Massachusetts and California, which may not be directly applicable to military populations.

Using our second approach, which we label the *utilization-based approach*, we estimated the rates of utilization of gender transition–related medical treatment. This approach has the benefit of providing real-world measures of utilization, which may be more accurate and more rigorously collected than survey information. However, it suffers from a lack of large-scale evidence and instead relies on several case studies

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 24 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 594 of 688

Introduction  3

that may not be directly applicable to the U.S. military. Given the caveats described, these approaches provide the best available estimate of the potential number of transgender service members likely to seek medical treatment or require readiness-related accommodations.[2] In both cases, we applied measures of population prevalence and utilization to fiscal year (FY) 2014 DoD force size estimates to provide estimates of prevalence within the U.S. military.

We also reviewed the policies of foreign militaries that allow transgender service members to serve openly. Our primary method supporting the observations presented in this report was an extensive document review that included primarily publicly available policy documents, research articles, and news sources that discussed policies on transgender personnel in these countries. The information about the transgender personnel policies of foreign militaries came directly from the policies of these countries, as well as from research articles describing the policies and their implementation. Findings on the effects of open transgender service on cohesion and readiness drew largely from research articles that specifically examined this question using interviews and an analysis of studies completed by the foreign militaries themselves. Finally, insights on best practices and lessons learned emerged both directly from research articles describing the evolution of policy and experience and indirectly from commonalities in the policies and experiences of our four in-depth case studies. Recommendations provided in this report are based on these best practices and lessons learned, as well as a consideration of the unique characteristics of the U.S. military.

Finally, for our analysis of DoD policies, we reviewed 20 current accession, retention, separation, and deployment regulations across the services and the Office of the Secretary of Defense. We also reviewed 16 other regulations that have been replaced by more recent regulations or that did not mention transgender personnel.[3] Our review focused on transgender-specific DoD instructions (DoDIs) that may contain unnecessarily restrictive conditions and reflect outdated terminology and assessment processes. However, in simply removing these restrictions, DoD could inadvertently affect standards overall. While we focused on reforms to specific instructions and directives, we note that DoD may wish to conduct a more expansive review of personnel policies to ensure that individuals who join and remain in service can perform at the desired level, regardless of gender identity.

### Limitations and Caveats

A critical limitation of such a comprehensive assessment is the lack of rigorous epidemiological studies of the size or health care needs of either the U.S. transgender population or the transgender population serving in the military. Indeed, much of the

---

[2]  We define *accommodations* as adjustments in military rules and policies to allow individuals to live and work in their target gender.

[3]  These additional policies are listed in Appendix D of this report.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 25 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 595 of 688
4    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

existing research on the transgender population relies on self-reported, nonrepresentative survey data, along with unstandardized calculations using results from available studies. Because there are no definitive data on this topic, the information presented here should be interpreted with caution and, therefore, we present the full range of estimates.

## Organization of This Report

The report is organized around our seven research questions. Chapter Two defines what is meant by the term *transgender*, identifies the health care needs of the transgender population, explains the various treatment options for those diagnosed with GD, and examines the capacity of the MHS to provide treatment options to service members diagnosed with GD. Chapter Three estimates the number of transgender service members in the AC and Selected Reserve (SR). Chapter Four estimates how many transgender service members are likely to seek medical treatment. Chapter Five estimates the costs associated with extending health care coverage for gender transition–related treatments. Chapter Six assesses the potential readiness implications of allowing transgender service members to serve openly. Chapter Seven identifies lessons learned from foreign militaries that allow transgender personnel to serve openly. Chapter Eight offers recommendations regarding which DoD accession, retention, separation, and deployment policies would need to be changed if a decision is made to allow transgender service members to serve openly. Chapter Nine summarizes key findings presented in the report and suggests best practices for implementing policy changes.

Appendix A presents definitions of common terms related to gender transition and transgender identity. Appendix B provides a history of the historical nomenclature associated with transgender identity. Appendix C provides details on the psychosocial, pharmacologic, surgical, and other treatments for GD. Appendix D lists the DoD accession, retention, separation, and deployment policies that we reviewed.

CHAPTER TWO

# What Are the Health Care Needs of the Transgender Population?

This report begins by describing the health care needs of the U.S. transgender population overall. To discern the potential impact of changing DoD policies to allow transgender military personnel to serve openly and to ensure appropriate health care for those who seek gender transition–related treatment, it is also important to consider whether the MHS has the capacity to provide this care.

## Definitions of Key Terms and Concepts

A challenge to our efforts to understand the health care needs of the transgender population in general, as well as in the military, is the varied and shifting terminology used in the clinical literature. Consequently, here, we define a range of terms that we will use throughout this review.[1] Consistent with the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), the American Psychiatric Association (APA) publication that provides standard language and criteria for classifying mental health conditions, we use the term *transgender* to refer to "the broad spectrum of individuals who . . . identify with a gender different from their natal gender" (APA, 2013).[2] *Natal gender* or *birth sex*, which is the sex that an individual was assigned at birth and typically correlates with primary sex characteristics (e.g., genitalia).

We refer to the subset of the population whose gender identity does not conform with the expressions and behaviors typically associated with the sex to which they were assigned at birth as *transgender* or *gender nonconforming*. Many identities fall under these umbrella terms, including individuals who identify as androgynous, multigendered, third gender, and two-spirit people. The *gender nonconforming* category also includes individuals who *cross-dress*, which means they wear clothing that is traditionally worn by a gender different from that of their birth sex. The exact definitions of each of these identities vary under the term *gender nonconforming*, and individuals may

---

[1]   A comprehensive list of terms and definitions is provided in Appendix A.

[2]   A brief history of the DSM language and diagnostic criteria for related conditions is presented in Appendix B.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 27 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 597 of 688

6    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

fluidly change, blend, or alter their gender identity over time. For the purposes of this analysis, we use *transgender* as an umbrella term that refers to individuals who identify with a gender different from the sex they were assigned at birth.

Importantly, under the recently established criteria and terminology outlined in DSM-5, transgender status alone does not constitute a medical condition (APA, 2013). Instead, under the revised diagnostic guidelines, only transgender individuals who experience significant related distress are considered to have a medical condition called *gender dysphoria* (GD). Some combination of psychosocial, pharmacologic (mainly but not exclusively hormonal), or surgical care may be medically necessary for these individuals. Psychotherapy to confirm a diagnosis of GD is a common first step in the process, often followed by hormone therapy and, perhaps, by gender reassignment surgery involving secondary or primary sex characteristics. Not all patients seek all forms of care. However, recognized standards of care require documentation of 12 continuous months of hormone therapy and living in the target gender role consistently and in all aspects of life. Unfortunately, the diagnosis is newly established, and data from which to estimate the size of these subgroups are lacking. In the future, however, transgender individuals seeking gender transition–related treatment are likely to require a GD diagnosis as the clinical justification.

Among transgender individuals, a subset may choose to *transition*, the term used to refer to the act of living and working in a gender different from one's sex assigned at birth. For some individuals, this may involve primarily social change but no medical treatment; this is referred to as *social transition*. For others, medical treatments, such as hormone therapy and hair removal, are important steps to align their physical body with their target gender. This is referred to as *medical transition*. A subset of those who medically transition may choose to undergo *gender reassignment surgery* to make their physical body as congruent as possible with their gender identity. This process of *surgical transition* is also often referred to as *sex* or *gender reassignment* or *gender confirmation*.

## Health Care Needs of the Transgender Population

The main types of gender transition–related treatments are psychosocial, pharmacologic (primarily but not exclusively hormonal), and surgical. While one or more of these types of treatments may be necessary for some transgender individuals with GD, the course of treatments varies and must be determined on an individual basis by patients and clinicians. Since little is known about currently serving transgender service members, the following discussion draws primarily from available research on nonmilitary transgender populations.[3]

---

[3]  The 2015 DoD Health Related Behavior Survey of active-duty service members was being fielded concurrently to this research. It marked the first time a U.S. military survey asked questions relating to gender identity.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 28 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 598 of 688

What Are the Health Care Needs of the Transgender Population?    7

**Diagnosis and Treatments for Gender Dysphoria**

Treatments deemed necessary for transgender populations have shifted over time based on research advancements and the accumulation of clinical knowledge. The World Professional Association for Transgender Health (WPATH) regularly publishes revised versions of its *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*; the most current at the time of our research was version 7. The standards are designed to guide the treatment of patients experiencing GD while recognizing that not all expressions of gender nonconformity require treatment (WPATH, 2011, p. 2). Some transgender individuals (again, the proportion is largely unknown) experience significant dysphoria (distress) with the sex and gender they were assigned at birth, and they meet formal DSM-5 diagnostic criteria for GD, as described in Appendix B of this report. For those diagnosed with GD, treatment options include psychotherapy, hormone therapy, surgery, and changes to gender expression and role (i.e., how people present themselves to the world; WPATH, 2011, pp. 9–10). We discuss these treatment options in detail in Appendix C.

Not all patients will prefer or need all or any of these options; however, when clinically indicated, appropriate care can "alleviate gender dysphoria by bringing one's physical characteristics into alignment with one's internal sense of gender" (Herman, 2013b, p. 4). There have been no randomized controlled trials of the effectiveness of various forms of treatment, and most evidence comes from retrospective studies. The widely endorsed consensus-based practice guidelines outlined in the WPATH *Standards of Care* suggest that transition-related mental health care, hormone therapy, and surgery are generally effective and constitute necessary health care for many individuals with GD.[4] The appropriate treatment plan is best determined collaboratively by patients and their health care providers. Optimally, specialized transgender health care will be provided by an interdisciplinary team (WPATH, 2011, p. 26).

## Military Health System Capacity and Gender Transition–Related Treatment

To discern the potential impact of changing DoD policies to allow transgender military personnel to serve openly and to ensure appropriate health care for GD, it is also important to consider whether the MHS has the capacity to provide this care.

---

We anticipate that these survey results will provide additional information regarding how many transgender personnel currently serve in the U.S. military and their health behaviors.

[4]  These standards are endorsed by the American Medical Association, American Psychological Association, American Academy of Family Physicians, National Association of Social Workers, World Professional Association for Transgender Health, and American College of Obstetricians and Gynecologists (see Lambda Legal, 2012). Major insurers, including Aetna and UnitedHealthcare, have incorporated many of these standards of care into their policies (see, for example UnitedHealthcare, 2015).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR     Document 13-29     Filed 03/03/25     Page 29 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 599 of 688

8     Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Psychotherapy, Hormone Therapies, and Gender Transition–Related Surgery**

Both psychotherapy and hormone therapies are available and regularly provided through the military's direct care system, though providers would need some additional continuing education to develop clinical and cultural competence for the proper care of transgender patients. Surgical procedures quite similar to those used for gender transition are already performed within the MHS for other clinical indications.

**Reconstructive Surgery**

Reconstructive breast/chest and genital surgeries are currently performed on patients who have had cancer, been in vehicular and other accidents, or been wounded in combat. The skills and competencies required to perform these procedures on transgender patients are often identical or overlapping. For instance, mastectomies are the same for breast cancer patients and female-to-male transgender patients. Perhaps most importantly, the surgical skills and competencies for some gender transition surgeries also overlap with skills required for the repair of genital injuries sustained in combat, which have increased dramatically among troops deployed to Afghanistan. From 2009 to 2010, the percentage of wounded troops with genitourinary injuries transiting through Landstuhl Regional Medical Center in Germany nearly doubled from 4.8 percent to 9.1 percent—a dramatic increase that led some health providers to call this the "new 'signature wound'" of Operation Enduring Freedom (D. Brown, 2011).[5] There are particular similarities to the procedures recommended to treat those experiencing dismounted complex blast injuries, which typically involve multiple amputations with other injuries, often to the genitals (Wallace, 2012). Providing high-quality surgery to treat the 5 percent of combat wounds that require penile reconstruction requires extensive knowledge and practice in reconstructive techniques (Williams and Jezior, 2013). Assuming the MHS continues to directly provide health services as it has in the past, there are at least two potential implications: First, military surgeons may currently have the competencies required to surgically treat patients with GD, and, second, performing these surgeries on transgender patients may help maintain a vitally important skill required of military surgeons to effectively treat combat injuries during a period in which fewer combat injuries are sustained.

**Cosmetic Surgery**

Recognition of the requirement for reconstructive plastic surgery as a result of the wartime mission drives the existing DoD policy for cosmetic surgery procedures in the MHS; the services have requirements and manpower authorizations for specialists who can perform reconstructive plastic surgery (Office of the Assistant Secretary of Defense

---

[5]   Experimental penis transplants, expected to be performed for the first time within the next year at Johns Hopkins School of Medicine, are being developed in the United States specifically for combat-wounded veterans; however, there may be benefits for transgender patients as well (Welsh, 2015).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 30 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 600 of 688

What Are the Health Care Needs of the Transgender Population?    9

for Health Affairs, 2005, p. 1). Cosmetic/reconstructive surgery skills need to be maintained with practice, and surgeons must also "meet board certification, recertification, and graduate medical education program requirements" (Office of the Assistant Secretary of Defense for Health Affairs, 2005, p. 1).

Current DoD policy draws a distinction between elective cosmetic plastic surgery performed "to improve the patient's appearance or self-esteem" and reconstructive plastic surgery performed on bodily structures that are abnormal due to health conditions to improve function or approximate a normal appearance (Office of the Assistant Secretary of Defense for Health Affairs, 2005, p. 3). While reconstructive surgeries constitute necessary treatment, access to elective cosmetic surgical procedures is subject to added constraints. For example, cosmetic procedures are performed on a space-available basis and restricted to those who will be TRICARE-eligible for at least six months. These procedures also require written permission from the commander of the service member's active-duty unit, and the patient must pay surgical, institutional, and anesthesia fees (Office of the Assistant Secretary of Defense for Health Affairs, 2005, p. 3).[6] DoD recognizes the need for these reconstructive surgery competencies and has crafted a policy to cover plastic surgeries to maintain providers' surgical skills and certification requirements.

## Potential Consequences of Not Providing Necessary Gender Transition–Related Care

The discussion of the health care needs of transgender military personnel is incomplete without considering the potential unintended effects of constraining or limiting gender transition–related treatment. Little question remains that there are transgender personnel currently serving in the AC. Adverse consequences of not providing transition-related health care to transgender personnel could include avoidance of other necessary health care, such as important preventive services, as well as increased rates of mental and substance use disorders, suicide, and reduced productivity.

Research indicates that, "due to discrimination and problematic interactions with health care providers, transgender individuals frequently do not access health care, resulting in short and long-term adverse health outcomes" (Roller, Sedlak, and Draucker, 2015, p. 418).[7] Further, patients denied appropriate health care may turn to other solutions, such as injecting construction-grade silicone into their bodies to alter

---

[6]   Interestingly, according to Elders et al. (2014, p. 19), there is no difference in leave policies related to recovery time between the two.

[7]   For example, among NTDS respondents, 28 percent reported postponing or avoiding treatment when sick or injured, and 33 percent delayed or skipped preventive care due to discrimination or disrespect from health care providers (Grant et al., 2011, p. 76). In one study, transgender respondents had fewer self-reports of good health and were more likely to report limitations on daily activities due to health issues (Kates et al., 2015, p. 5).

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 31 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 601 of 688
10    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

their shape (State of California, 2012, p. 12). There are also potential costs related to mental health care services for individuals who do not receive such care (Herman, 2013b, p. 20). Multiple observational studies have suggested significant and sometimes dramatic reductions in suicidality, suicide attempts, and suicides among transgender patients after receiving transition-related treatment (State of California, 2012, p. 10). A study by Padula, Heru, and Campbell (2015) found that removing exclusions on transgender care "could change the trajectory of health for all transgender persons" at a minimal cost per member per month.[8]

However, we caution that it is not known how well these findings generalize to military personnel. Moreover, while the existing data offer some indication of the needs for and costs of gender transition–related health care, it is important to note that none of these studies were randomized controlled trials (the gold standard for determining treatment efficacy). In the absence of quality randomized trial evidence, it is difficult to fully assess the outcomes of treatment for GD.

--------

[8]  Specifically, they found that insurance provider coverage for transgender-related services resulted in "greater effectiveness, and was cost-effective relative to no health benefits at 5 and 10 years from a willingness-to-pay threshold of $100,000/[quality-adjusted life year]."

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 32 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 602 of 688

CHAPTER THREE

# What Is the Estimated Transgender Population in the U.S. Military?

This chapter provides several estimates of the number of transgender service members in the U.S. military. To date, there have been no systematic studies of the number of transgender individuals in the U.S. general population or in the U.S. military. Current studies rely on clinical samples of health care service utilizers, nonrepresentative samples assembled in ways that are difficult to replicate, and self-reported survey data from a small number of states.

## General Population Estimates of Transgender Prevalence

The transgender prevalence in the U.S. general population is thought to be significantly less than 1 percent (Gates, 2011, p. 6; APA, 2013, p. 454). However, there have been no rigorous epidemiological studies in the general U.S. population that confirm this estimate. Our subsequent estimates must be qualified, therefore, as somewhat speculative; they are based on numerous sources, including health services claims data, representative state-level health surveillance survey data, a convenience (i.e., nonrepresentative) sample recruited by an advocacy network, the experiences of foreign militaries, and selected other data sources.

The Williams Institute at the University of California, Los Angeles, School of Law, calculated that, based on estimates from Massachusetts and California, 0.3 percent of the U.S. population is transgender (Gates, 2011, p. 6). The Massachusetts data were collected between 2007 and 2009 as part of the Massachusetts Behavioral Risk Factor Surveillance System initiative. The survey suggests that 0.5 percent of the population in Massachusetts identifies as "transgender" (95-percent confidence interval: 0.3 to 0.6 percent; Conron et al., 2012). The California data combine information on the percentage of individuals who are transgender from the California Lesbian, Gay, Bisexual, and Transgender (LGBT) Tobacco Survey and the percentage of the overall population that is LGBT from the 2009 California Health Interview Survey. Gates

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 73-29   Filed 03/03/25   Page 33 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 603 of 688

12   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

multiplies these values together to estimate that 0.1 percent of the population of California is transgender.[1]

To develop an estimate of transgender prevalence for the entire United States, Gates (2011) simply averages the Massachusetts and California values, yielding 0.25 percent, then rounds that up to 0.3 percent. This measure is very problematic, however. While survey-based estimates of transgender prevalence are likely to be accurate measures of true state-level transgender prevalence, it is not clear that taking an unweighted average from states with vastly different population sizes is appropriate for estimating national prevalence. For example, a weighted average calculation using the 2009 census population estimates for California and Massachusetts implies a 0.16 percent "national" prevalence estimate, as opposed to the 0.3 percent estimate calculated by Gates (2011)—a nearly 50-percent difference. We used this 0.16 percent weighted average as our combined, national estimate using the California and Massachusetts studies. This estimate was our midrange starting point, though we included both the 0.1 percent (from California) and 0.5 percent (from Massachusetts) as comparison points.

We note that there have been and continue to be other efforts to measure the prevalence of transgender identity in the general population. The two most prominent examples are the meta-analysis conducted by WPATH and a recent effort from the U.S. census. We did not use these estimates due to concerns that they systematically undercounted the prevalence of transgender identity for a variety of reasons detailed in the discussions that follow.

Separately, in 2007, the WPATH reviewed ten studies of prevalence with estimates for transgender individuals presenting for gender transition–related care, ranging from 1:11,900 to 1:45,000 for male-to-female transitions and 1:30,400 to 1:200,000 for female-to-male transitions (WPATH, 2011).[2] The studies cited were largely based on clinical usage. The WPATH authors note that these numbers should be considered "minimum estimates at best":

> The published figures are mostly derived from clinics where patients met criteria for severe gender dysphoria and had access to health care at those clinics. These estimates do not take into account that treatments offered in a particular clinic setting might not be perceived as affordable, useful, or acceptable by all self-identified gender dysphoric individuals in a given area. By counting only those people who

---

[1]   Although Gates (2011) states that 3.2 percent of the LGBT population is transgender, we note that an earlier document (California Department of Health Services, 2004) reporting analyses from the same survey states that 2 percent of this population is transgender. We were not able to obtain the raw data and could not verify which of the two values is correct. We used the 3.2-percent estimate to calculate the California transgender prevalence estimate.

[2]   The studies were Wålinder, 1968; Wålinder, 1971; Hoenig and Kenna, 1974; Eklund, Gooren, and Bezemer, 1988; Tsoi, 1988; Bakker et al., 1993; van Kesteren, Gooren, and Megens, 1996; Weitze and Osburg, 1996; De Cuypere et al., 2007; and Zucker and Lawrence, 2009.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 34 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 604 of 688
What Is the Estimated Transgender Population in the U.S. Military?    13

present at clinics for a specific type of treatment, an unspecified number of gender dysphoric individuals are overlooked. (WPATH, 2011, p. 7)

Additionally, the information is based on utilization rates from the ten studies, mostly conducted in European countries, such as the United Kingdom, the Netherlands, Sweden, Germany, and Belgium. One study was conducted in Singapore. This raises concerns about the applicability of these estimates to the U.S. population due to differences in costs and social tolerance, both of which would likely make health utilization behavior in Europe significantly different from that in the United States. Moreover, the studies were conducted over a 30-year period in which utilization was dramatically increasing, suggesting that the estimates were not stable. This concern is reported in the WPATH report, with the authors noting that the trend (over time) was due to higher rates of individuals seeking care. In one example, the estimated transgender population doubled in just five years in the United Kingdom. If the numbers are increasing over time based on the use of clinics, then an estimate from ten to 15 years ago would likely be very low relative to utilization in those same places today, and again not representative of likely utilization in the United States.[3]

Harris (2015) used information on name and sex changes in Social Security Administration data files to estimate the number of transgender individuals in the U.S. population. Using information on male-to-female and female-to-male name changes, he estimates that there were 89,667 transgender individuals in the United States in 2010. Of this group, 21,833 (24 percent) also changed their sex, according to Social Security records; during some periods in U.S. history, this required documented proof of either initiation or completion of medical transition. Since name changes are not required, prevalence estimated in this manner is likely to be a lower-bound estimate of the true transgender prevalence rate in the United States. Using the 2010 population of adults age 18 and over as the denominator (234,564,071), 89,667 transgender cases implies a lower-bound transgender prevalence rate of 0.038 percent in the United States.

---

[3] According to the WPATH authors,

> The trend appears to be towards higher prevalence rates in the more recent studies, possibly indicating increasing numbers of people seeking clinical care. Support for this interpretation comes from research by Reed and colleagues (2009), who reported a doubling of the numbers of people accessing care at gender clinics in the United Kingdom every five or six years. Similarly, Zucker and colleagues (2008) reported a four- to five-fold increase in child and adolescent referrals to their Toronto, Canada clinic over a 30-year period. (WPATH, 2011, p. 7)

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 13-29   Filed 03/03/25   Page 35 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 605 of 688

14   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

## Prevalence-Based Approach to Estimating the Number of Transgender Service Members in the U.S. Military

Before discussing estimates of prevalence of transgender individuals in the U.S. military, it is important to note that, to our knowledge, no studies have directly measured the prevalence or incidence of transgender individuals currently serving in the active or reserve component.[4] To estimate prevalence in the military, we have constructed estimates using a combination of data sources.[5] One of those sources, the NTDS, provides detailed information on the choices and preferences of transgender individuals but it is not a randomized, representative sample of the military and thus is not generalizable.

We applied measures of population prevalence to DoD force size estimates to estimate prevalence in the U.S. military. We measured force size using information from DoD's 2014 demographics report (DoD, 2014; see Table 3.1). The demographics are separated into AC and SR. For much of the discussion of our medical care analysis, we focus on the AC. We did not include reserve-component service members, retirees, or dependents in the cost analyses because we did not have information on age and sex distribution within these beneficiary categories. Some of these beneficiary categories also have limited eligibility for health care provided through military treatment facilities (MTFs) and may receive their health care through TRICARE coverage in the purchased care setting or through other health insurance plans. For our readiness analysis, we included both the AC and SR because both components may be used for deployments. Although there are ongoing discussions regarding the feasibility of activating the Individual Ready Reserve, we excluded this population because we lacked the detailed information on gender and age needed to conduct our analysis.

Table 3.2 contains estimates of the number of transgender personnel in the AC and SR using the baseline prevalence from existing studies and shows the results of several tests that provide a range of estimates based on different assumptions in the literature. To estimate prevalence in the military, we conducted analyses using five values: (1) a lower-bound estimate of 0.1 percent based on a study in California

---

[4]  G. Brown (1988) found that eight out of 11 evaluated natal males with severe GD had a military background; he explains his findings by positing a "hypermasculine" phase among transgender individuals that coincides with the age of enlistment. Since the sample size in that study was extremely small, we do not consider this good evidence for this theory. Gates and Herman (2014) used estimates from the NTDS, combined with estimates of transgender prevalence (0.3 percent) from Gates (2011) and history of military service in the U.S. population from the American Community Survey, to estimate transgender prevalence in the military. Data from the National College of Health Administration showed that military experience was significantly higher among transgender individuals than among those who did not identify as transgender (9.4 percent versus 2.1 percent; Blosnich, Gordon, and Fine, 2015). However, these data were collected from only 51 institutions, and the response rate for the survey was only 20 percent, which again raises questions regarding the validity of the estimates.

[5]  Our estimates were constructed using Gates (2011), which combined estimates from the Massachusetts Behavioral Risk Factor Social Surveys with the California LGBT Tobacco Survey, and Gates and Herman (2014), which used data from the NTDS, Gates (2011), and the American Community Survey.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 02/03/25    Page 36 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 606 of 688

What Is the Estimated Transgender Population in the U.S. Military?    15

**Table 3.1**
**DoD Military Force Demographics**

| Category | Number | % |
|---|---|---|
| **Active Component** | | |
| Sex | | |
| Female | 200,692 | 15 |
| Male | 1,125,581 | 85 |
| Age | | |
| <25 | 572,293 | 43 |
| 26–30 | 293,698 | 22 |
| 31–35 | 201,137 | 15 |
| 36–40 | 137,653 | 11 |
| 41+ | 121,492 | 9 |
| Total | 1,326,273 | — |
| **Selected Reserve** | | |
| Sex | | |
| Female | 149,759 | 18 |
| Male | 682,233 | 82 |
| Age | | |
| <25 | 285,494 | 34 |
| 26–30 | 156,983 | 19 |
| 31–35 | 124,179 | 15 |
| 36–40 | 86,151 | 10 |
| 41+ | 179,185 | 22 |
| Total | 831,992 | — |

SOURCE: DoD, 2014.

(Conron, 2012); (2) an upper-bound estimate of 0.5 percent based on a study in Massachusetts (Gates, 2011); (3) a population-weighted average of the California and Massachusetts studies, yielding a prevalence estimate of 0.16 percent; (4) an adjustment of this population-weighted approach based on the natal male/female distribution in the military, yielding a prevalence estimate of 0.19 percent; and (5) a doubling of the population-weighted, gender-adjusted value, yielding a prevalence estimate of 0.37 percent.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 37 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 607 of 688

16    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Table 3.2**
**Prevalence-Based Estimates of the Number of Transgender Active-Component and Selected Reserve Service Members**

| Component | Total Force Size (FY 2014) | 0.1%[a] (CA study) | 0.16%[b] (combined, population-weighted CA + MA studies) | 0.19%[c] (gender-adjusted rate) | 0.37%[d] (twice gender-adjusted rate) | 0.5%[e] (MA study) |
|---|---|---|---|---|---|---|
| Active | 1,326,273 | 1,320 | 2,120 | 2,450 | 4,900 | 6,630 |
| Selected Reserve | 831,992 | 830 | 1,330 | 1,510 | 2,930 | 4,160 |

SOURCES: Estimates for force size are based on RAND calculations using FY 2014 data from DoD, 2014.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

Based on the 0.1 percent lower bound, we estimate that there are approximately 1,320 transgender individuals in the AC and approximately 830 in the SR. Using the Massachusetts study (0.5 percent) as an upper bound, we estimate that there are approximately 6,630 transgender service members in the AC and 4,160 in the SR. Because these estimates are based on selected populations in the state and the variation in these populations is significant, we were concerned that they were not representative of broader national numbers, especially as they pertain to the gender mix of the military. Therefore, we adjusted the population-weighted combination of these estimates to account for the male/female distribution in the U.S. military populations. This gender adjustment is critical, as most research indicates that male-to-female transitions are two to three times more common than female-to-male transitions (APA, 2013; Horton, 2008; Gates, 2011; Grant et al., 2011). This assumption of a two to one difference in underlying prevalence across genders applied to the 0.16 percent aggregate estimate implies a natal male-specific prevalence of 0.2 percent and a natal female-specific prevalence of 0.1 percent. Assigning these values to the male/female AC distributions increases the military prevalence estimate from 0.16 percent to 0.19 percent, which implies that there are 2,450 transgender individuals in the AC and 1,510 in the SR.

The estimate of 0.37 percent doubles the gender-adjusted rate based on information provided by the NTDS that 20 percent of the transgender population in its sample reported a history of military service, which is twice the rate of the general population,

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR     Document 13-29     Filed 03/03/25     Page 38 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 608 of 688
What Is the Estimated Transgender Population in the U.S. Military?    17

as reported in the American Community Survey (Grant et al., 2011). We note that this is likely to be an overestimate of the overall transgender population for two reasons. First, given the highly tolerant environment in Massachusetts and California, the prevalence estimates in those two states are likely to overstate the nationwide prevalence.[6] Second, the evidence that transgender individuals are twice as likely to serve in the military is based on extrapolations from a nonrepresentative sample of individuals and not on direct, rigorous study of the transgender military population.

---

[6]  For example, both California and Massachusetts are rated as "top places for LGBT rights" (Keen, 2015).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 73-20    Filed 03/03/25    Page 39 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 609 of 688

CHAPTER FOUR

# How Many Transgender Service Members Are Likely to Seek Gender Transition–Related Medical Treatment?

We adopted two distinct but related approaches to estimate the health care utilization and impact on readiness of allowing transgender personnel to serve openly in the U.S. military. The first is what we label the *prevalence-based approach*, in which we estimated the prevalence of transgender individuals in the military and applied information on rates of gender transition and reported preferences for different medical treatments to measure utilization and the implied cost and readiness impact. This approach has the benefit of including those who may seek other forms of accommodation, even if they do not seek medical care. It also provides detailed information on the types of medical treatments likely to be sought, which can improve the accuracy of cost and readiness estimates. However, this approach suffers from a lack of rigorous evidence in terms of the rates at which transgender individuals seek treatment and instead relies on the nonscientific NTDS. It also relies on prevalence measures from only two states— Massachusetts and California—that may not be directly applicable to military populations.

We refer to our second approach as the *utilization-based approach*, which we used to estimate the rates of utilization of medical treatment. This approach has the benefit of providing real-world measures of utilization based on health insurance claims, which may be more accurate and more rigorously collected than survey information. However, this approach suffers from a lack of large-scale evidence and instead relies on several case studies that may not be directly applicable to the U.S. military. Despite these caveats, these approaches provide the best available estimate of the range in the potential number of transgender service members likely to seek medical treatment or require readiness-related accommodations.[1]

In both cases, we applied measures of population prevalence and utilization to DoD force size demographics to provide estimates of prevalence within the U.S. military. As indicated in the previous chapter, our calculations of population prevalence and health care utilization used FY 2014 data from DoD's 2014 demographics report (DoD, 2014; see Table 3.1 in Chapter Three).

---

[1]   Again, we define *accommodations* as adjustments in military rules and policies to allow individuals to live and work in their target gender.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 41 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 611 of 688

20   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

## Prevalence-Based Approach to Estimating the Number of Gender Transition–Related Treatments in the U.S. Military

To estimate the utilization of gender transition–related health care treatments, we scaled the prevalence of transgender service members identified in Chapter Three by the rates of transition and reported take-up of medical treatments. We based our transition rates on self-reported transitions in the NTDS data. According to the NTDS, 55 percent of transgender individuals reported living and working as their target gender; we refer to this as *social transition*.[2] For others, medical treatments, such as hormone therapy and hair removal, are important steps to align their physical body with their target gender. We refer to this as *medical* or *surgical transition*.[3]

Using the prevalence estimates from Table 3.2 in Chapter Three, we used information from the NTDS on the age of transition for individuals under 25, 26–30, 31–35, 36–40, and over 40 and calibrated our estimates with the age distribution in the military. Fifty-five percent of NTDS respondents reported that they had socially transitioned over their lifetime, and the data indicate that male-to-female transition ages differ from female-to-male transition ages. Nearly 54 percent of female-to-male transitions occurred before the age of 25, compared with only 23 percent of male-to-female transitions.

We focus on social transition because we assess this as most relevant for individuals who may need accommodations as they live and work in a different gender. This was also used as the basis in some foreign militaries, as discussed in Chapter Seven. Table 4.1 presents the estimated number of individuals who may seek to transition each year under each of our prevalence assumptions. We found that a lower bound of 40 AC and 20 SR service members and an upper bound of 190 AC and 110 SR service members will seek to transition each year and may need some sort of accommodations. The population-weighted, gender-adjusted estimate implies a middle range of 65 AC and 40 SR service members who will seek to transition each year.

Next, we combine the estimates of the number of transgender service members with information on the proportion undergoing transition and the age-specific proportion undergoing gender transition–related treatment to generate the number of annual treatments. Surgical preference rates vary by transition type (male-to-female versus female-to-male transition; see Table 4.2). Surgeries are distributed evenly across

---

[2]   We note that an additional 27 percent of those who had not yet socially transitioned wished to transition at some point in the future. Because the timeline and desire for transition are difficult to translate to concrete numbers, we used the estimate of 55 percent of transgender individuals living and working full-time as their target gender as our planning parameter for readiness accommodations.

[3]   In the NTDS sample, 65 percent of transgender individuals had medically transitioned, and 33 percent had surgically transitioned. Note that the rate of medical transitions is higher than the rate of social transitions because some individuals receive hormone treatments but do not live full-time as their target gender.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 42 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 612 of 688

How Many Transgender Service Members Are Likely to Seek Treatment?    21

**Table 4.1**
**Estimated Number of Transgender Service Members Who May Seek to Transition per Year**

| Estimate Source | Active Component (total force: 1,326,273) | Selected Reserve (total force: 831,992) |
|---|:---:|:---:|
| 0.1% (CA study)[a] | 40 | 20 |
| 0.16% (combined, population-weighted CA + MA studies)[b] | 60 | 30 |
| 0.19% (gender-adjusted rate)[c] | 65 | 40 |
| 0.37% (twice gender-adjusted rate)[d] | 130 | 80 |
| 0.5% (MA study)[e] | 190 | 110 |

SOURCES: Estimated proportions of subgroups based on Grant et al., 2011, p. 25. Estimates for the AC and SR are based on RAND calculations using FY 2014 data from DoD, 2014.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

NOTE: The table excludes Individual and Inactive Ready Reserve members because comparable information on their demographics was not available for analysis.

four procedures for male-to-female transitions and primarily over two procedures for female-to-male transitions.

Recall, not all of the individuals seeking to transition would meet the diagnostic criteria for GD, which is a requirement for these surgeries. Moreover, even among individuals who transition in some manner, surgical treatment rates are typically only around 20 percent, with the exception of chest surgery among female-to-male transgender individuals (see Table 4.2).

Table 4.3 shows the estimated annual number of hormone therapy treatments and surgeries in the AC and SR calculated using the same prevalence assumptions described in Chapter Three (see Table 3.2). The surgeries included in the calculations are vaginoplasty, chest surgeries, orchiectomy, hysterectomy, metoidioplasty, and phalloplasty. Note that these estimates constitute the number of treatments, not necessarily the number of individuals. For hormone therapy recipients, the number of treatments and recipients is the same, and these estimates can be treated as counts of individuals. However, the number of individuals is likely smaller for surgical counts because the

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 43 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 613 of 688

22    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Table 4.2**
**Lifetime Surgery Preferences Among NTDS Survey Respondents**

| Procedure | Have Had (%) | Want Someday (%) | Do Not Want (%) |
|---|---|---|---|
| Male-to-female | | | |
|     Augmentation mammoplasty | 21 | 53 | 26 |
|     Orchiectomy | 25 | 61 | 14 |
|     Vaginoplasty | 23 | 64 | 14 |
|     Facial surgery | 17 | Not reported | Not reported |
| Female-to-male | | | |
|     Chest surgery | 43 | 50 | 7 |
|     Hysterectomy | 21 | 58 | 21 |
|     Metoidioplasty | 4 | 53 | 44 |
|     Phalloplasty | 2 | 27 | 72 |

SOURCE: NTDS data (Grant et al., 2011).
NOTE: These estimates are from cross-sectional data; individuals likely received each treatment only once and varied in the age at treatment initiation.

same individual may receive more than one type of surgical treatment.[4] Using the lower-bound estimate from the California study and the upper-bound estimate from the Massachusetts study (see Table 4.3), we estimated that there will be between 45 and 220 hormone treatments and between 40 and 200 transition-related surgeries annually in the AC and SR. The combined population-weighted and gender-adjusted estimate indicates a midrange of 80 hormone treatments and 70 transition-related surgical treatments annually. Although surgical procedures are most likely to be one-time events, hormone therapy treatment rates are likely to be used indefinitely, and the cost and manpower effects will apply until individuals leave the MHS. We did not have information on the length of service conditional on age and therefore could not calculate the total number of service members who would be receiving hormone therapy at any given point in time. We recommend that this line of analysis be explored in the future.

## Utilization-Based Approach to Estimating the Number of Gender Transition–Related Treatments in the U.S. Military

While the prevalence-based approach provides a tractable means to estimate potential utilization of gender transition–related care, there are a number of concerns regard-

---

[4]    For example, a female-to-male transition might include both chest surgery and phalloplasty.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 44 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 614 of 688

How Many Transgender Service Members Are Likely to Seek Treatment?    23

**Table 4.3**
**Estimated Annual Number of Surgeries and Hormone Therapy Users**

| Assumption Regarding Underlying Prevalence | Active Component | | Selected Reserve | |
| --- | --- | --- | --- | --- |
| | Annual Major Surgeries | Annual Hormone Therapy | Annual Major Surgeries | Annual Hormone Therapy |
| 0.1% (CA study)[a] | 25 | 30 | 15 | 15 |
| 0.16% (combined, population-weighted CA + MA studies)[b] | 40 | 45 | 20 | 25 |
| 0.19% (gender-adjusted)[c] | 45 | 50 | 25 | 30 |
| 0.37% (twice gender-adjusted rate)[d] | 90 | 100 | 50 | 55 |
| 0.5% (MA study)[e] | 130 | 140 | 70 | 80 |

SOURCE: RAND analysis.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

NOTE: Hormone therapy is person-level; surgery statistics are counts of surgeries, and one person may have multiple surgeries.

ing the information on which these estimates rely. As stated previously, these concerns include both a reliance on prevalence estimates from just two states and a reliance on data from the NTDS, which were not collected from a random sample. Our utilization estimates were taken primarily from three sources:

- private health insurance utilization data on annual rates of enrollee transgender-related health care utilization in health insurance plans that cover transition-related health care, as reported by Herman (2013b)
- private health clinic data showing estimates of the rates of penectomies and bilateral mastectomies in the U.S. population in 2001, as reported by Horton (2008)[5]

---

[5]  A penectomy is the surgical removal of the penis. A bilateral mastectomy is the surgical removal of both breasts.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 13-29   Filed 03/03/25   Page 45 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 615 of 688

24   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

- Veterans Health Administration (VHA) claims data, which were used to calculate prevalence and incidence rates of gender identity disorder (now referred to as GD in DSM-5) from 2006 to 2013, as reported by Kauth et al. (2014).

Each of these data sources provides information on a different outcome, which makes understanding the results more complicated. However, collectively, the information taken from these three studies provides a broad, useful picture regarding potential gender transition–related health care utilization in the AC population. In the following sections, we review each of these studies in detail, identify key estimates from each, and apply the estimates to the AC population identified in Table 3.2 in Chapter Three.

### Private Health Insurance Utilization Estimates

Herman (2013b) reports on the experiences of 34 employers that provided gender transition–related health care benefits to their employees and dependents via their health insurance plans. This study specifically reports on the annual number of enrollees who accessed "transition-related care." This information is derived from health insurance claims data and thus is dependent on the treatments that were covered by the health insurance companies.[6] The firms surveyed typically covered major gender transition–related surgeries and hormone therapy, but they varied in their coverage of other transition-related treatments, such as vocal cord surgery.[7]

Firms reviewed by Herman (2013b) also typically did not report information on the number of dependents covered but included dependents in their utilization estimates. Data from several sources (e.g., Sonier et al., 2013; Gould, 2012) imply an approximate average one-to-one ratio of employees to dependents in privately insured firms in the United States. Thus, not accounting for the role of dependents in these utilization estimates would overstate utilization by approximately 100 percent.[8] For

---

[6]   If firms do not cover particular treatments, it is not possible to file a claim for reimbursement. If individuals in these firms utilized services that were not covered, thus paying for treatments out of pocket or through some other form of health insurance, these utilization estimates will be biased downward.

[7]   One hundred percent of firms covered major gender transition–related surgeries, including hysterectomy, oophorectomy, metoidioplasty, phalloplasty, urethroplasty, vaginectomy, orchiectomy, vaginoplasty, labiaplasty, and clitoroplasty. Ninety-two percent of firms covered bilateral mastectomy for female-to-male patients, but only 59 percent covered female-to-male chest reconstruction, and only 59 percent covered male-to-female augmentation mammoplasty (breast augmentation). All firms covered hormone therapies, specifically estrogen, progesterone, spironolactone, and testosterone.

[8]   We used two different data sources to determine the typical number of dependents covered by the main policyholder in private health insurance firms in the United States. First, we used information from the Robert Wood Johnson Foundation on the number of people who are covered by employer-sponsored health insurance and are the main policyholders and on the number of people who are covered by employer-sponsored health insurance and are dependents. Using these figures, we estimated a 1-to-0.99 policyholder-to-dependent ratio in employer-sponsored private health insurance. The Economic Policy Institute also reports information on this question using data from the U.S. census Current Population Survey. Using this information, we calculated a policyholder-to-dependent ratio of 1 to 0.94.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 46 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 616 of 688

How Many Transgender Service Members Are Likely to Seek Treatment?    25

firms that did not provide information on dependents, we imputed a one-to-one ratio of employees to dependents to identify the total number of enrolled individuals in a given health plan.

Table 4.4 presents the information from Herman (2013b) on the utilization of gender transition–related care in private health insurance firms. The first column shows available information on the identity of the firm. The second describes the number of firms in each category for which we had utilization estimates. The third contains our estimates regarding the total number of enrollees and dependents from all firms in that category. For confidentiality reasons, some surveyed data sources report only ranges for the number of employees in a firm. Therefore, we used the midpoint of the range to impute the number of employees in a particular firm, then assigned the total number of dependents based on this employee value. For example, we had utilization data from two firms in the "private 1,000–9,999 employees" category. Since we assume the midpoint value for firm size, this implies that there are 5,000 employees in each firm, or 10,000 total employees across the two firms. Assuming a one-to-one employee-to-dependent ratio implies an additional 10,000 covered individuals, resulting in a combined total of 20,000 enrollees.

The estimates presented in Table 4.4 indicate that utilization rates range from an annual low of zero individuals per 1,000 enrollees to an annual high of 0.064 individuals per 1,000 enrollees. To obtain a combined estimate of the different values, we constructed a weighted average using the existing utilization estimates, weighting by the number of covered individuals that generated each of the estimates in Table 4.4. A weighted average of all the estimates results in an overall utilization estimate of 0.0396 individuals per 1,000 enrollees.

**Table 4.4**
**Enrollee Utilization of Gender Transition–Related Benefits in Private Health Insurance Firms**

| Private and Public Firms | Number of Firms | Total Contribution (enrollees + dependents) | Individual Claimants per 1,000 Enrollees |
|---|---|---|---|
| Private, fewer than 1,000 employees | 1 | 1,000 | 0.0000 |
| Private, 1,000–9,999 employees | 2 | 20,000 | 0.0540 |
| Private, 10,000–49,000 employees | 5 | 250,000 | 0.0220 |
| City and County of San Francisco | NA | 80,000 | 0.0640 |
| University of California | NA | 100,000 | 0.0620 |
| Weighted average per 1,000 enrollees | | | 0.0396 |

SOURCE: Data from Herman, 2013b.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 47 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 617 of 688
26    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

We conducted two sets of calculations using these estimates. First, we used the lowest non-zero utilization figure (0.022 claimants per 1,000 enrollees);[9] then, we used the weighted average calculation of 0.0396 per 1,000 enrollees. Applying the 0.022 claimants per 1,000 figure to the AC population of 1,326,273 implies that 29 AC service members would receive gender transition–related care annually. Applying the weighted average estimate of 0.0396 per 1,000 enrollees to the AC population implies that 53 service members would receive gender transition–related care annually.

### Sensitivity Analyses

We also conducted two additional sensitivity analyses to determine the full potential scope of gender transition–related health care utilization in the AC. A key consideration when applying estimates from civilian populations to the military is that the underlying male/female distribution in the AC is different, with 85 percent of the AC population being male (versus approximately 50 percent in the civilian population). Studies suggest that the prevalence of transgender individuals is higher in the male population than in the female population (APA, 2013; Horton, 2008; Gates, 2011; Grant et al., 2011), so applying civilian estimates directly to the AC would underestimate the true utilization rates.

Accurately accounting for this issue required sex-specific utilization estimates that we could then multiply with the male/female AC distribution (85 percent male, 15 percent female). Unfortunately, we could not identify any sex-specific utilization estimates in the available private health insurance data; the aggregate cost and utilization estimates that we were able to identify already included underlying prevalence differences between the sexes. We posited that utilization would be twice as large for male-to-female transitions than for female-to-male transitions based on an assumption of linearity between transgender prevalence, for which we have sex-specific estimates, and total utilization (Horton, 2008).

Combining this assumption about differing utilization rates with the fact that the male/female labor force participation in the civilian population is close to 50 percent male and 50 percent female, we were able to solve for the sex-specific utilization estimates implied by the aggregate lower-bound (0.022) and weighted average (0.0396) values. Solving for the sex-specific utilization estimates in this manner, for the 0.022 aggregate estimate, we estimated a utilization rate of 0.0293 per 1,000 natal male enrollees and a utilization rate of 0.0146 per 1,000 natal female enrollees.[10] Similarly, for the 0.0396 weighted average figure, solving for the natal sex–specific utiliza-

---

9   The unadjusted version of this figure (0.0044 percent) was also used in Belkin (2015) to estimate health care utilization in the military.

10   The equation we solved to calculate the natal male–specific and natal female–specific utilization rates is as follows: $0.5(x) + 0.5(2x) = 0.022$. In this equation, the variable $x$ is the natal female–specific utilization rate, and solving for $x$ results in a value of 0.0146. Since the natal male–specific utilization rate is assumed to be twice the natal female rate, it equals 0.0293.

tion estimates, we identified a utilization rate of 0.0528 per 1,000 natal male enrollees and a utilization rate of 0.0264 per 1,000 natal female enrollees.

Applying these solved sex-specific estimates to the AC male/female distribution (1,125,581, or 85 percent male, versus 200,692, or 15 percent female) increased our initial lower-bound estimate of claimants from 29 to 36 and increased our estimate from applying the weighted average from 53 to 65.

Finally, the sociology and psychology literature speculates that there is a higher transgender prevalence in the military compared with the civilian population (G. Brown, 1988). Gates and Herman (2014) also calculated that transgender prevalence in the military is approximately twice the civilian prevalence (Gates, 2011; Gates and Herman, 2014).[11] Although we believe that the current body of empirical evidence validating this theory is weak, we take it seriously and consider the possible implications for transition-related health care utilization in the military. Assuming that transgender prevalence in the military is twice the transgender prevalence in the civilian population, and, again, assuming a direct relationship between prevalence and utilization, this would inflate our male/female distribution-adjusted estimates of individuals receiving transition-related care annually from 36 to 72, and from 65 to 129 in the AC. Table 4.5, which summarizes the results from applying the private health insurance estimates to the AC population, allows for a comparison of the different estimates.

## Private Health Clinic Estimates

A second source of information regarding gender transition–related health care utilization comes from a survey of surgical clinics conducted by Horton (2008). In 2001, Horton surveyed all major clinics in the United States known to provide transition-related care to determine the number of penectomies and bilateral mastectomies performed on transgender patients. Table 4.6 reports surgery incidence estimates broken out by male-to-female transitions and female-to-male transitions. The third column shows estimates using clinic-reported data only. Horton also developed lower- and upper-bound estimates via assumptions regarding treatment counts for clinics with missing data, and these numbers are reported in the second and fourth columns of Table 4.6.[12] These data were collected in 2001 and coverage of gender transition-related benefits have increased over time, so it is also reasonable to assume that surgical tran-

---

[11] As stated previously, Gates and Herman (2014) used estimates from the NTDS and Gates (2011) for a transgender prevalence of 0.3 percent. That study also used data on history of military service in the U.S. population from the American Community Survey to estimate transgender prevalence in the military. Data from the National College of Health Administration show that military experience was significantly higher among transgender individuals than among those who did not identify as transgender (9.4 percent versus 2.1 percent; Blosnich, Gordon and Fine, 2015). However, data were collected from only 51 institutions, and the response rate for the survey was only 20 percent, which again raises questions regarding the validity of the estimates.

[12] Horton generated upper- and lower-bound estimates by assigning the largest and smallest surgical counts in the data to the clinics with missing values.

**Table 4.5**
**Utilization Estimates from Applying Private Health Insurance Parameters**

| Annual Individual Claimants | Estimate from the Literature | Estimates Using Private Employer Data | | |
|---|---|---|---|---|
| | | Baseline | Sensitivity Analysis 1[a] | Sensitivity Analysis 2[b] |
| Active component, lower-bound estimate | 0.022 claimants per 1,000 individuals | 29 | 36 | 72 |
| Active component, weighted average estimate | 0.0396 claimants per 1,000 individuals | 53 | 65 | 129 |

NOTES: Each cell in the "Estimates Using Private Employer Data" columns represents a unique prediction for utilization in the AC population. In the second column of the table, we describe the estimate from the literature that is applied to the AC population. See the text for details on each of the calculations.

[a] Sensitivity Analysis 1: We calculated a set of estimates that accounted for differences in the male/female distribution between the civilian and AC populations.

[b] Sensitivity Analysis 2: We calculated a set of estimates that accounted for differences in the male/female distribution between the civilian and AC populations and the possibility that transgender prevalence is twice as high in the military population as in the civilian population.

**Table 4.6**
**Incidence of Penectomies and Bilateral Mastectomies Performed on Transgender Individuals**

| Transition Type | Incidence Estimates (%) | | |
|---|---|---|---|
| | Low | Clinic-Reported Data | High |
| Male-to-female | 0.00048 | 0.00053 | 0.00103 |
| Female-to-male | 0.00020 | 0.00030 | 0.00084 |

SOURCE: 2001 data from Horton, 2008.

NOTE: The table includes data on penectomies and bilateral mastectomies only.

sitions have also increased over time. Thus, these utilization rates of penectomies and bilateral mastectomies should be considered lower-bound estimates.

Applying these estimates to the AC male/female distribution results in low, medium, and high annual estimates of 5.8, 6.6, and 13.2 AC service members receiving these two surgeries, respectively. We reiterate here that these estimates are not directly comparable to the private health insurance estimates presented in the previous section because these estimates apply to only two specific procedures, while the private health insurance estimates include any gender transition–related procedures that private health insurance firms cover. One would expect estimates for two specific surgeries from 2001 to be lower than estimates generated from the private health insurance system in the later 2000s. Indeed, they are, but it is more difficult to make other direct

comparisons between these two estimates, given the private health insurance utilization data presented in Herman (2013b).

**Veterans Health Administration Estimates**

In this analysis, we used VHA data to calculate the expected annual incidence of gender identity disorder (the condition now known as GD in the DSM-5) in the AC population. As described previously, those with a gender identity disorder diagnosis are a subset of transgender individuals. Kauth et al. (2014) used VHA health claims data to identify incidence rates of new diagnoses. They also calculated prevalence rates of gender identity disorder in each year using previous yearly incidence rates. Because 2006 was the first year in their data set, the prevalence rate in the first year of their data is equivalent to the incidence rate. In the years after 2006, the prevalence rate is essentially a running total of the incidence rates in the previous years added to the most recent incidence rates.

The data in Table 4.7 imply that the incidence of gender identity disorder increased from 3.5 of 100,000 enrollees in FY 2006 to 6.7 of 100,000 enrollees in FY 2013 among veterans who use VHA health care (Kauth et al., 2014). Before applying these estimates to the AC population, we note two important points with respect to the analyses in Kauth et al. (2014). First, because the prevalence rate is simply a running total of new cases diagnosed since the first year of the study's data (2006), adding years of data prior to 2006 would mechanically increase the prevalence estimates. Thus, Kauth et al.'s prevalence calculations are a lower-bound for the total gender

**Table 4.7**
**Prevalence and Incidence of Gender Identity Disorder Diagnoses in VHA Claims Data**

| Fiscal Year | New Diagnosis Rate (%) | Prevalence (%) |
| --- | --- | --- |
| 2006 | 0.0035 | 0.0035 |
| 2007 | 0.0034 | 0.0068 |
| 2008 | 0.0034 | 0.0098 |
| 2009 | 0.0038 | 0.0131 |
| 2010 | 0.0046 | 0.0172 |
| 2011 | 0.0051 | 0.0217 |
| 2012 | 0.0060 | 0.0270 |
| 2013 | 0.0067 | 0.0329 |

SOURCE: Kauth et al., 2014.

NOTE: The authors calculated new cases diagnosed and total existing cases in a given year based on the entirety of the data since 2006.

identity disorder prevalence rate in this population. Second, estimates based on claims data will likely be lower-bound estimates of incidence and prevalence, since individuals are identified only if they interact with the health care system for reasons related to gender identity disorder. These two caveats should be kept in mind when interpreting the extrapolations here.

Applying estimates from the 2013 data in Table 4.7 to the AC population, one would expect approximately 90 new cases of gender identity disorder each year and that approximately 440 AC service members would be diagnosed with this condition. Although the male/female distribution in the VHA system mirrors that of the AC, veterans who use VHA health care services may have lower socioeconomic and health status than veterans who do not use VHA health care, other military retirees, and AC service members. The VHA population also differs by age and, potentially, by other unmeasured characteristics related to underlying health status. For these varied reasons, these estimates may not be generalizable to the military population overall.

## Summarizing the Estimates

Table 4.8 summarizes the key results after applying the estimates from the various data sets to the AC and SR populations. The largest estimate—270 treatments (surgeries and hormone therapies)—was calculated by combining the upper-bound population-level transgender prevalence estimate from Massachusetts with information from the NTDS data on the age of those receiving common transition-related treatments. When applied to the AC population, estimates from VHA and the private health insurance literature imply that only 30–90 AC service members will receive some type of gender transition–related treatment annually.

To understand the full implications of our estimates regarding the expected annual number of AC service members likely to obtain gender transition–related care, in Figure 4.1 we compare the above utilization estimates with the number of AC service members who self-reported visiting a mental health care provider in a given year (21 percent) and the number of AC service members who visited a mental health care specialist in a given year (7 percent; Hoge et al., 2006; McKibben et al., 2013). We chose this outcome because mental health care among military populations is an important, well-studied topic, and data were readily accessible for us to conduct the comparison. The mental health care utilization estimates represent unique service members accessing health care; thus, they compare most directly to the estimates using the private health insurance data and the NTDS hormone therapy estimates. For clarity's sake, we do not present all of the private health insurance and NTDS hormone therapy estimates in Figure 4.1. We do include the smallest, middle, and largest estimates using the private health insurance data and the largest hormone therapy estimate drawn from the NTDS data.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR     Document 73-20     Filed 03/03/25     Page 52 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 622 of 688

How Many Transgender Service Members Are Likely to Seek Treatment?    31

**Table 4.8**
**Annual Gender Transition–Related Treatment Estimates from All Data Sources**

| Estimate Type | Active Component | | | Selected Reserve | | |
|---|---|---|---|---|---|---|
| | Hormone Treatment | Surgical Treatments | All Treatments | Hormone Treatment | Surgical Treatments | All Treatments |
| **Prevalence-based estimates (using NTDS data)** | | | | | | |
| Annual treatments based on CA study estimate (0.1%) | 30 | 25 | 55 | 15 | 15 | 30 |
| Annual treatments based on combined, population-weighted, gender-adjusted rate (0.19%) | 50 | 45 | 95 | 25 | 30 | 55 |
| Annual treatments based on MA study estimate (0.5%) | 140 | 130 | 270 | 70 | 80 | 150 |
| **Utilization-based estimates** | | | | | | |
| Private health insurance annual individual claimants (0.022 per 1,000) | NA | NA | 29 | NA | NA | 20 |
| Private health insurance annual individual claimants (0.0396 per 1,000) | NA | NA | 53 | NA | NA | 30 |
| VHA-based annual new diagnoses (0.0067%) | 90 | NA | NA | 60 | NA | NA |
| Clinical utilization of penectomies and bilateral chest surgeries (0.0005%) | NA | 10 | NA | NA | 5 | NA |

SOURCE: RAND analysis.

As Figure 4.1 shows, our estimates of the number of AC personnel who will use the gender transition–related health care benefits are overwhelmingly small compared with the number of AC personnel who access mental health treatment. Overall, based on our calculations, we expect annual gender transition–related health care to be an extremely small part of overall health care provided to the AC population.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 73-20    Filed 03/03/25    Page 53 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 623 of 688
32    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Figure 4.1**
**Comparison of Annual Estimated Gender Transition–Related Health Care Utilization and Mental Health Care Utilization, Active Component**



SOURCE: RAND analysis. Utilization rates in the figure are derived from both the prevalence-based and utilization-based approaches presented in Table 4.8.

NOTES: The non–hormone therapy transgender utilization estimates are from the application of estimates from the private health insurance data. The hormone therapy upper-bound transgender utilization estimate is from calculations using the NTDS data.

**RAND** *RR1350-4.1*

JA611

CHAPTER FIVE

# What Are the Costs Associated with Extending Health Care Coverage for Gender Transition–Related Treatments?

In this chapter, we provide estimates for the costs associated with extending health care coverage for gender transition–related treatments. We focused on transgender service members in the AC because they have uniform MHS access. We did not include reserve-component service members in our analyses, but their MHS utilization and the associated cost will be negligible, given their highly limited military health care eligibility. Likewise, we did not include retirees or dependents in the cost analyses because we did not have information on age and sex distribution within these beneficiary categories. Some of these beneficiary categories also have limited eligibility for health care provided through MTFs and may receive their health care through TRICARE coverage in the purchased care setting or through other health insurance plans. Given these unknowns, it was only feasible to estimate the costs of gender transition–related care for AC service members; however, we recommend expanding these analyses in the future to include reserve-component members, as well as all individuals eligible for treatment under TRICARE. For the following analyses, we used demographic characteristics of the 2014 AC population to estimate the cost of providing such services.

## Private Health Insurance Cost Estimates

To determine the potential costs of covering gender transition–related health care for transgender service members, we collected information on private health insurers' experiences with covering this care from two sources (Herman, 2013b; State of California, 2012). These actuarial estimates represent the expected increase in health care costs from covering a new set of treatments or a new group of beneficiaries. If employers decide to provide coverage for a particular treatment, these actuarial estimates are translated into premium increases for covered employees. These estimates should be thought of as the expected costs of extending coverage for gender transition–related care to transgender AC service members. Moreover, we note that the military may already be incurring the cost of some transgender treatments, as some patients and their providers use "omissions and ambiguities" to acquire needed care (Roller, Sedlak, and Draucker, 2015, p. 420). For example, a currently serving female-to-male patient

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 55 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 625 of 688
34    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

who had undergone a hysterectomy reported taking only the testosterone and not the estrogen prescribed as part of hormone therapy with his endocrinologist's knowledge and tacit support, while another was trying to get breast reduction surgery due to back pain rather than GD (Parco, Levy, and Spears, 2015, pp. 235–236).

Table 5.1 presents available data from public employers and private firms on the actuarial costs of covering gender transition–related care. It identifies the particular institution, the number of employees and dependents covered, and the identified premium increases due to expanding benefits.

Data from Table 5.1 show, generally, that the actuarial estimates of providing benefits for gender transition–related care increased total premiums (employee + employer share) by only a small fraction of a percent—and, in the most extreme cases, by only approximately 1 percent. Taking a weighted average of most of the information,[1] we estimated that extending insurance coverage to transgender individuals would increase health care spending by 0.038 percent. Applying this figure to total AC health care spending of $6.27 billion,[2] we find that covering gender transition–related care will increase AC health care spending by approximately $2.4 million (see Table 5.2).

The data in Table 5.1 suggest that the University of California, with 100,000 enrollees in its health plan, is one of the key drivers of the 0.038-percent weighted

**Table 5.1**
**Actuarial Estimated Costs of Gender Transition–Related Health Care Coverage from the Literature**

| Public Employer Data | Actuarially Calculated Premium Increase | Total Contribution (employees + dependents) |
|---|---|---|
| City of Seattle | 0.19% increase in health care budget | 23,090 |
| City of Portland | 0.08% increase in health care budget | 18,000 |
| City of San Francisco | 0% increase in health care budget | 100,000 |
| University of California | 0% increase in health care budget | 100,000 |

| Private Employer Data | Estimate | Total Contribution (employees + dependents) |
|---|---|---|
| 22 firms | Many employers reported no actuarial costs to adding benefit; estimates range from 0 to 0.2% | Mix of firm sizes |
| 2 firms | Approximately 1% increase in premiums | 5,800 |
| 1 firm | Much less than 1% increase in premium | 77,000 |

SOURCE: Estimates are from Herman, 2013b, and State of California, 2012.

---

[1]   We did not use information about the firm with 77,000 enrollees because it is not clear what "much less than 1 percent" implies with respect to the premium increase.

[2]   Pharmaceutical and direct and purchased care inpatient and outpatient data calculated from TRICARE costs in Defense Health Agency, 2015.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 13-29   Filed 03/03/25   Page 56 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 626 of 688
What Are the Costs Associated with Extending Coverage for Treatments?   35

average result. In addition to the actuarial increases, the University of California also reported a realized increase in health care spending of 0.05 percent, so we recalculated the weighted average figure by replacing the 0-percent estimate with the 0.05 percent estimate. This new calculation raised the overall cost estimate from 0.038 percent to 0.054 percent, or from $2.4 million to $3.4 million when applied to the AC. To summarize, our baseline estimates regarding expected gender transition–related health care costs in the AC are between $2.4 million and $3.4 million.

## Sensitivity Analyses

To understand the potential full range of cost effects in the AC population, we conducted two additional sensitivity analyses similar to those described for our utilization ranges in Chapter Four. We used these sensitivity analyses to account for the skewed male/female distribution in the military population and for the possibility that transgender prevalence is higher in the military population. As in the utilization case, we were not able to identify any sex-specific effects on the premium increases. Thus, as in our utilization analysis, we assume that cost estimates are linearly related to prevalence,[3] and cost estimates for male-to-female transitions are twice the cost estimates for female-to-male transitions. Using this relationship, we again calculated natal male– and natal female–specific estimates from the aggregate estimates.

Given the assumption about differing cost effects, we calculated a natal male–specific cost estimate of 0.05 percent and a natal female–specific cost estimate of 0.025 percent for the aggregate premium estimate of 0.038 percent. Applying these sex-specific estimates to the AC male/female distribution increased our initial premium estimate from 0.038 percent to 0.047 percent. A similar calculation can be performed for our realized cost estimate of 0.054 percent. Assuming that gender transition–related health care costs are twice as large for male-to-female transitions as for female-to-male transitions, we calculated a natal male–specific cost effect of 0.072 percent and a natal female–specific cost effect of 0.036 percent. Applying these sex-specific estimates to the AC male/female distribution increased our initial premium estimate from 0.054 percent to 0.067 percent. Applying these newly calculated health care costs to the 2014 AC health care expenditures ($6.27 billion) increased our estimate of costs from the initial range of $2.4–3.4 million to a range of $2.9–4.2 million.

Finally, as noted previously, Gates (2011) and Gates and Herman (2014) calculated that transgender prevalence in the military is approximately twice that in civilian

---

[3]   We also note that built into this linearity assumption and how it is applied in the two sensitivity analyses is the assumption that the cost of male-to-female transitions is the same as the cost of female-to-male transitions. Since there is no sex-specific information in the private health insurance cost data, the validity of the cost per case being equivalent is unknown. Padula, Heru, and Campbell (2015) estimated that a male-to-female surgical case is 33 percent more expensive than a female-to-male surgical case, but these estimates were not based on private employer data, so we did not directly incorporate this result into our calculations.

populations. Assuming that this estimate is valid, and, again, assuming that health care costs are linearly related to underlying prevalence, this would increase the above calculated value of $2.9 million to $5.8 million and the calculated value of $4.2 million to $8.4 million. Table 5.2 summarizes the results from the calculations described in this section.

To better understand the relative importance of our estimates regarding expected AC annual gender transition–related health care spending, we compared our cost estimates to the MHS spending on mental health in 2012 and to total AC health care spending in FY 2014. As Figure 5.1 shows, gender transition–related health care spending is expected to be extremely small compared with MHS spending on mental health (Blakely and Jansen, 2013) and overall AC health care expenditures (Defense Health Agency, 2015).

## Summarizing the Estimates

A direct application of estimates from the private health insurance system implies a baseline spending range between $2.4 million and $3.4 million for AC gender transition–related health care. Sensitivity analyses that attempt to account for the fact that the male/female distribution in the AC population skews more heavily male than the civilian population and that transgender prevalence might be higher in the military increase this initial range to $5.8 million to $8.4 million. The implication is that even in the most extreme scenario that we were able to identify using the private health insurance data, we expect only a 0.13-percent ($8.4 million out of $6.2 billion) increase in AC health care spending.[4]

**Table 5.2**
**Estimated Annual MHS Costs of Gender Transition–Related Health Care, Active Component**

| Analysis Type | Calculations Using Only Actuarial Premium Estimates 0.038% (actuarial) | Calculations Using Actuarial Premiums and Realized Values 0.054% (actuarial + realized) |
|---|---|---|
| Baseline | $2.4 million | $3.4 million |
| Sensitivity analysis 1: Adjusts for the male/female distribution in the AC population | $2.9 million | $4.2 million |
| Sensitivity analysis 2: Adjusts for the male/female distribution in the AC population and the assumption that transgender prevalence is twice as high in the military compared to the civilian population | $5.8 million | $8.4 million |

SOURCE: RAND analysis.

---

[4]  AC beneficiaries make up less than 15 percent of total TRICARE beneficiaries (Defense Health Agency, 2015).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 73-20    Filed 03/03/25    Page 58 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 628 of 688

What Are the Costs Associated with Extending Coverage for Treatments?    37

**Figure 5.1**
**Gender Transition–Related Health Care Cost Estimates Compared with Total Health Spending, Active Component**



SOURCES: RAND analysis; Blakely and Jansen, 2013; Defense Health Agency, 2015. Estimates of premium increased and realized costs are reported in Table 5.1.

NOTES: The lower-bound estimate refers to premium increases only. The middle estimate includes premium increases and realized costs after adjusting for male/female distribution in the military. The upper-bound estimate includes premium increases and realized costs after adjusting for male/female distribution in the military and assuming the prevalence rate of transgender individuals in the military is twice that of civilian populations.

**RAND** *RR1350-5.1*

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 59 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 629 of 688

CHAPTER SIX

# What Are the Potential Readiness Implications of Allowing Transgender Service Members to Serve Openly?

As DoD considers whether to allow transgender personnel to serve openly and to receive transition-related treatment during the course of their military service, it must consider the implications of such a policy change on the service members' ability to deploy and potential reductions in unit cohesion. In prior legal challenges to the transgender military discharge policy, DoD has expressed concern that the medical needs of these service members would affect military readiness and deployability. To address these concerns, this chapter provides estimates of the potential effects on force readiness from a policy change allowing these service members to serve openly.

A critical limitation of such an assessment is that much of the current research on transgender prevalence and medical treatment rates relies on self-reported, nonrepresentative samples. Thus, the information cited here must be interpreted with caution because it may have varying degrees of reliability. In addition, to estimate effects on readiness, we focused on transgender personnel in the AC and SR only. We did not include the Individual Ready Reserve because of the lack of publicly available, detailed demographic information. We used the same approach that applied to our analysis of health care utilization, applying both the prevalence-based and utilization-based approaches to force size. We note that the prevalence-based approach was the only approach that allowed us to estimate the number of transgender service members who may seek to live and work as their target gender. Transition does not necessarily imply the use of medical treatments, and we emphasize that some of these service members may still require accommodations in terms of housing and administrative functions (e.g., military identification cards, restrooms).

## Impact on Ability to Deploy

The most salient and complex issue in allowing transgender personnel to serve openly is how DoD should regulate and manage operational deployment requirements for these personnel in the context of their transition to their target gender.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 61 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 631 of 688
40    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

**Pre-Transition**

If transgender personnel are allowed to serve openly prior to transition, DoD will need to establish policies on when individuals may use the uniforms, physical standards, and facilities (e.g., barracks, restrooms) of their target gender. Additionally, DoD will need to clarify policies related to qualifications for deployment. Current deployment rules suggest that to qualify for deployment, individuals with diagnosed mental health disorders must show a "pattern of stability without significant symptoms or impairment for at least three months prior to deployment."[1] Ensuring appropriate screening will be critical to minimizing any mental health–related readiness issues. Secondary prevention measures prior to deployment, such as screening for GD, may be needed to ensure a pattern of stability and readiness for deployment.

**During Transition**

DoD would also need to determine when transitioning service members would be able to change uniforms and adhere to the physical standards of their target gender, as well as which facilities and identification cards they will use. Other countries have found that, in some cases, it may be necessary to restrict deployment of transitioning individuals to austere environments where their health care needs cannot be met. Deployment restrictions may also be required for individuals seeking medical treatment, including those seeking hormone therapy and surgical treatments.

We detail the constraints associated with transition-related medical treatments in Table 6.1. These constraints typically include a postoperative recovery period that would prevent any work and a period of restricted physical activity that would prevent deployment. The rightmost column of Table 6.1 presents the estimated number of non-deployable days we used to estimate the readiness impact. We note that these estimates do not account for any additional time required to determine medical fitness to deploy. Army guidelines, for example, do not permit deployment within six weeks of surgery. Nevertheless, there may be a significant difference between the estimated availability to deploy and the actual impact on deployability, as it is possible that transgender service members would time their medical treatments to minimize the effect on their eligibility to deploy.[2]

In addition to an expected, short-term inability to deploy during standard postoperative recovery time, some individuals experience postoperative complications that would render them unfit for duty. For instance, among those receiving vagino-

---

[1]  Detailed guidance is provided in a memorandum from the Office of the Assistant Secretary of Defense for Health Affairs, 2013, p. 2.

[2]  See for example, Personnel Policy Guidance Tab A (known as PPG-TAB A) that accompanies the medical guidelines document MOD TWELVE, Section 15.C, which articulates the minimal standards of fitness for deployment to the U.S. Central Command area of responsibility (U.S. Central Command, 2013).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 62 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 632 of 688

What Are the Potential Readiness Implications?    41

plasty surgery, 6–20 percent have complications.[3] This implies that between three and 11 service members per year would experience a long-term disability from gender reassignment surgery. Among those receiving phalloplasty surgery, as many as 25 percent experience some medical complications (Elders et al., 2014).

**Table 6.1**
**Gender Transition–Related Readiness Constraints**

| Transition Type and Treatment | Recovery Time | Leave and Deployment Implications | Estimated Nondeployable Days |
|---|---|---|---|
| **Male-to-Female** | | | |
| Hormone therapy only | Long-term, no recovery required | None (pending accommodations) | N/A |
| Augmentation mammoplasty | 1 week no work, 4–6 weeks restricted physical activity | Up to 14 days medical leave, up to 60 days medical disability | 75 |
| Genital surgery (orchiectomy, vaginoplasty) | 4–6 weeks no work, 8+ weeks restricted physical activity | Up to 45 days medical leave, up to 90 days medical disability | 135 |
| **Female-to-Male** | | | |
| Hormone therapy only | Long-term, no recovery required | None (pending accommodations) | N/A |
| Chest surgery | 1 week no work, 4–6 weeks restricted physical activity | Up to 14 days medical leave, up to 60 days medical disability | 75 |
| Hysterectomy | 2 weeks no work, 4–8 weeks restricted physical activity | Up to 21 days medical leave, up to 90 days medical disability | 111 |
| Genital surgery (metoidioplasty, phalloplasty) | 2–4 weeks no work, 4–6 weeks restricted physical activity | Up to 21 days medical leave, up to 60 days medical disability | 81 |

SOURCES: Treatment times based on RAND research compiled for this study. Estimates of numbers of treatments based on rates in Gates, 2011. Estimated nondeployable days based on RAND calculations using FY 2014 data from DoD, 2014.

NOTES: The total population in the table includes AC and SR personnel. Estimates of treatments are non-unique per person. Individuals may (and likely will) seek multiple treatments simultaneously. As such, deployment days are measured per treatment, not per individual. Estimates of nondeployable days do not include estimated delays generated by Medical Evaluation Board/Physical Evaluation Board review, which may be required depending on service rules.

---

[3]   According to Elders et al. (2014, p. 15), summarizing findings from 15 studies, "2.1 percent of patients had rectal-vaginal fistula, 6.2 percent with vaginal stenosis, 5.3 percent had urethral stenosis, 1.9 percent with clitoral necrosis, and 2.7 percent with vaginal prolapse," and approximately 2.3 percent of patients experienced complications after vaginoplasty.

Taking the estimates for treatment and recovery time, we then applied the standards for leave and restricted physical activity.[4] We applied the recovery times and translated those into nondeployable days separated into medical leave, in which the service member is off the job, and medical disability, in which the service member can be at work but is subject to restricted physical requirements (e.g., no physical training, no heavy lifting). This provided us with the total number of nondeployable days per treatment type. We scaled this estimate by the number of days an individual can be deployed per year. For the AC, we assumed this to be 330 days per year (allowing 30 days of leave plus five days of processing time).[5] For the SR, we assumed 270 days per year (which allows nine months of deployment time). We counted each treatment separately and applied the number of treatments by treatment type shown in Table 6.1.

Note that because individuals may seek multiple treatments, sometimes at the same time, this number is not the same as the total number of individuals who will be nondeployable. Therefore, the estimates presented in Table 6.2 should be considered an upper bound in each category. Moreover, the prevalence-based estimates are significantly larger than the utilization-based estimates as shown in Table 4.8. Using the prevalence-based approach, we found that between eight and 43 of the available 1.2 million labor-years in the AC may be unavailable for deployment.[6] The combined, population-weighted, and gender-adjusted estimate implies that about 16 labor-years from the AC and about 11 labor-years from the SR may be nondeployable. This represents 0.0015 percent of available deployable labor-years across the AC and SR.

These estimates are based on surgical take-up rates ranging from 25 to 130 per year in the AC, with 55–270 total treatments, including hormone treatments. Similarly, the prevalence-based estimates imply 15–80 surgical treatments per year in the SR, with between 30 and 150 total treatments, including hormone therapy.

The utilization-based approach implies many fewer treatments. Although we could not estimate the impact on labor-years because we did not have information on specific treatments, based on usage rates in California, the utilization-based approach implies 30–50 total treatments, including surgeries and hormone therapy. Evidence from the VHA suggests that 90 service members in the AC and 50 in SR are diagnosed with GD in any given year. Such a diagnosis would be a prerequisite for any surgical treatments, suggesting that true utilization rates in the military may be significantly lower than suggested by the prevalence-based approach.

We caution that our labor-year estimates also likely overcount actual nondeployable time because our estimate captures "availability to deploy," rather than the deploy-

---

[4]    For reference, we used the Army Regulation 40-501 (revised 2011), which governs leave and disability, and the Navy Medical Policy 07-009 (2007), which provides guidance on pre-clearance, accommodations for deployment readiness, and additional requirements in the U.S. Central Command area of operations.

[5]    We based this estimate on Army Regulation 600-8-101 (2015).

[6]    We define a labor-year as the amount of work done by an individual in a year.

**Table 6.2**
**Estimated Number of Nondeployable Man-Years Due to Gender Transition–Related Treatments**

| Component | Total Labor-Years Available (FY 2014) | Estimated Number of Nondeployable Labor-Years | | | | |
|---|---|---|---|---|---|---|
| | | 0.1%[a] (CA study) | 0.16%[b] (combined, population-weighted CA + MA studies) | 0.19%[c] (gender-adjusted rate) | 0.37%[d] (twice gender-adjusted rate) | 0.5%[e] (MA study) |
| Active | 1,199,096 | 8.2 | 13.7 | 16.2 | 32.3 | 42.8 |
| Selected Reserve | 615,446 | 5.9 | 9.9 | 10.7 | 21.3 | 29.9 |

SOURCES: Estimates for nondeployable labor-years are based on RAND calculations using FY 2014 data from DoD, 2014.

[a] Based on estimates of prevalence from a California study (Conron, 2012).

[b] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state.

[c] Based on weighted average of studies from California and Massachusetts, weighted by relative population sizes in each state and applied specifically to the male/female distribution in the military components.

[d] Based on estimates of prevalence from NTDS, Gates (2011), and the American Community Survey (Gates and Herman, 2014) and applied specifically to the male/female distribution in the military.

[e] Based on estimates of prevalence from a Massachusetts study (Gates, 2011).

ment impact itself. This difference comes from three key assumptions that we make to calculate these estimates: (1) service members who are seeking treatment will also be deployed; (2) service members who are seeking treatment cannot time those treatments to avoid affecting their deployment eligibility; and (3) service members seek only one treatment at a time rather than having multiple treatments at the same time, which would allow concurrent (rather than sequential) recovery times. Thus, it is likely that a service member's care would have a substantial overall impact on readiness only if that service member worked in an especially unique military occupation, if that occupation was in demand at the time of transition, and if the service member needed to be available for frequent, unpredicted mobilizations.

**Post-Transition**

Having completed medical transition, a service member could resume activity in an operational unit if otherwise qualified. As in other cases in which a service member receives a significant medical treatment, DoD should review and ensure that any longer-term medical care or other accommodations relevant to the transgender service member's specific medical needs are addressed.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 65 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 635 of 688

44    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

## Impact on Unit Cohesion

A key concern in allowing transgender personnel to serve openly is how this may affect unit cohesion—a critical input for unit readiness. The underlying assumption is that if service members discover that a member of their unit is transgender, this could inhibit bonding within the unit, which, in turn, would reduce operational readiness. Similar concerns were raised in debates over whether to allow gay and lesbian personnel to serve openly (Rostker et al., 1993; RAND National Defense Research Institute, 2010), as well as whether to allow women to serve in ground combat positions (Schaefer et al., 2015; Szayna et al., 2015). Evidence from foreign militaries and surveys of the attitudes of service members have indicated that this was not the case for women or for lesbian and gay personnel (Schaefer et al., 2015; Harrell et al., 2007; RAND National Defense Research Institute, 2010). In examining the experiences of foreign militaries, the limited publicly available data we found indicated that there has been no significant effect of openly serving transgender service members on cohesion, operational effectiveness, or readiness. (For a more in-depth discussion of this topic, see Chapter Seven.) However, we do not have direct survey evidence or other data to directly assess the impact on the U.S. military.

### Evidence from the General U.S. Population

According to recent research on the U.S. general population, attitudes toward transgender individuals are significantly more negative than attitudes toward other sexual minorities (Norton and Herek, 2013). However, heterosexual adults' positive attitudes toward and acceptance of transgender individuals are strongly correlated with their attitudes and acceptance of gay, lesbian, and bisexual individuals (Flores, 2015). As such, similar to changes seen in public attitudes toward homosexuality, tolerance and acceptance toward the transgender population could change over time. Additionally, evidence does indicate that direct interactions with transgender individuals significantly reduce negative perceptions and increase acceptance (Flores, 2015), which would suggest that those who have previously interacted with transgender individuals would be more likely to be tolerant and accepting of them in the future. Similar findings have arisen from surveys and focus groups with service members regarding attitudes toward the integration of women into direct combat positions (Szayna et al., 2015) and attitudes toward allowing gay and lesbian service members to serve openly in the U.S. military (RAND National Defense Research Institute, 2010).[7]

---

[7]  A recent article examined the attitudes of military academy, Reserve Officers' Training Corps, and civilian undergraduates in the United States toward transgender people in general, in the workplace, and in the military (see Ender, Rohall, and Matthews, 2016).

JA623

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 66 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 636 of 688

What Are the Potential Readiness Implications?    45

**Evidence from Foreign Militaries**

While there are limited data on the effects of transgender personnel serving openly in foreign militaries, the available research revealed no significant effect on cohesion, operational effectiveness, or readiness. In the case of Australia, there is no evidence and there have been no reports of any effect on cohesion, operational effectiveness, or readiness (Frank, 2010). In the case of Israel, there has also been no reported effect on cohesion or readiness (Speckhard and Paz, 2014). Transgender personnel in these militaries have reported feeling supported and accommodated throughout their gender transition, and there is no evidence of any impact on operational effectiveness (Speckhard and Paz, 2014). In fact, commanders have reported that transgender personnel perform their military duties and contribute effectively to their units (Speckhard and Paz, 2014). Interviews with commanders in the United Kingdom also found no effect on operational effectiveness or readiness (Frank, 2010). Some commanders reported that increases in diversity had led to increases in readiness and performance. Interviews with these same commanders also found no effect on cohesion, though there were some reports of resistance to the policy change within the general military population, which led to a less-than-welcoming environment for transgender personnel. However, this resistance was apparently short-lived (Frank, 2010).

The most extensive research on the potential effects of openly serving transgender personnel on readiness and cohesion has been conducted in Canada. This research involved an extensive review of internal defense reports and memos, an analysis of existing literature, and interviews with military commanders. It found no evidence of any effect on operational effectiveness or readiness. In fact, the researchers heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges (Okros and Scott, 2015). They also found no evidence of any effect on unit or overall cohesion. However, there have been reports of bullying and hostility toward transgender personnel, and some sources have described the environment as somewhat hostile for transgender personnel (Okros and Scott, 2015).

To summarize, our review of the limited available research found no evidence from Australia, Canada, Israel, or the United Kingdom that allowing transgender personnel to serve openly has had any negative effect on operational effectiveness, cohesion, or readiness. However, it is worth noting that the four militaries considered here have had fairly low numbers of openly serving transgender personnel, and this may be a factor in the limited effect on operational readiness and cohesion.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR     Document 13-29     Filed 03/03/25     Page 67 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 637 of 688

46    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

## Costs of Separation Requirements Related to Transgender Service Members

We considered the costs and benefits of providing appropriate care to transgender service members, the requirements for those who would serve openly if the current policy changed, and the costs of continuing the current administrative separation process. We analyzed the costs of separation under several assumptions: (1) some transgender personnel are currently serving but are not able to reveal their transgender status, (2) some individuals who would be desirable recruits could be excluded for reasons only related to their gender identity, and (3) some individuals who are transgender are or have been separated for reasons only related to their gender identity, which imposes separation costs.

Separation and a continued ban on open service (i.e., manpower losses) are the alternatives to meeting the medical needs of transgender individuals. As detailed in Chapter Two, the continued ban on open service may result in worsening mental health status, declining productivity, and other negative outcomes due to lack of treatment for gender identity–related issues. In addition, if DoD actively pursues separation, the process can be tedious, especially now that it requires the approval of the Under Secretary of Defense for Personnel and Readiness. Under current DoD regulations, transgender personnel can be declared administratively unfit for service if their gender identity affects their ability to meet operational or duty requirements. A June 2015 revision to DoD policy requires that a discharge justification be based on inability to meet duty requirements. However, any "administratively unfit" finding prohibits the individual from being medically evaluated for continued service.[8] Absent this process, transgender service members do not have recourse to allow mental health experts or medical professionals to review their case concurrently. This can result in unnecessary and inconsistent approaches to discharging transgender service members. As was the case in enforcing the policy on homosexual conduct, this can involve costly administrative processes and result in the discharge of personnel with valuable skills who are otherwise qualified (U.S. Government Accountability Office, 2011).

Moreover, the total cost in lost days available for deployment is negligible and significantly smaller than the lack of availability due to medical conditions. For example, in 2015 in the Army alone, there were 102,500 nondeployable soldiers, 50,000 of whom were in the AC (Tan, 2015). This accounted for about 14 percent of the AC—personnel who were ineligible to deploy for legal, medical, or administrative reasons.

---

[8] These boards provide an established process and mechanism for evaluating whether a service member with an ailment or diagnosis, such as a mental health diagnosis, could continue military service. The services use the Medical Evaluation Board and Physical Evaluation Board systems to determine whether personnel "with an ailment or diagnosis, such as a mental health diagnosis, can continue . . . military service," based on a thorough review of fitness to serve (DoDI 1332.38, 1996).

Of those, 37,000 could not deploy due to medical conditions.[9] Excluding those who were severely injured and required longer-term care, there were 28,490 service members who had either category 1 (up to 30 days) or category 2 (more than 30 days) restrictions. Assuming those in category 1 cannot deploy for 30 days and those in category 2 cannot deploy for 90 days, we estimate there are currently 5,300 nondeployable labor-years in the Army alone. Thus, we anticipate a minimal impact on readiness from allowing transgender personnel to serve openly.

---

[9]   Rates of injury and nondeployability time as reported in Cox (2015).

JA626

CHAPTER SEVEN

# What Lessons Can Be Learned from Foreign Militaries That Permit Transgender Personnel to Serve Openly?

As the U.S. military considers changes to its transgender personnel policy, revisions to several other policies may be necessary. Policies in need of change would cover a range of personnel, medical, and operational issues affecting individuals and units, including some policies that currently vary by gender. Examples of the latter would include housing assignments, restrooms, uniforms, and physical standards. While these are new questions for the U.S. military, there are other countries that already allow transgender personnel to serve openly in their militaries and have already addressed these policy issues.

We reviewed policies in foreign militaries that allow transgender service members to serve openly. Our primary source for the observations presented in this report was an extensive document review that included primarily publicly available policy documents, research articles, and news sources that discussed policies on transgender personnel in these countries. The information about the policies of foreign militaries came directly from the policies of these countries as well as from research articles describing the policies and their implementation. Our findings on the effects of policy changes on readiness draw largely from research articles that have specifically examined this question using interviews and analyses of studies completed by the militaries themselves. Finally, our insights on best practices and lessons learned emerged both directly from research articles describing the evolution of policy and the experiences of foreign militaries and indirectly from commonalities in the policies and experiences across our four case studies. Recommendations provided in this report are based on these best practices and lessons learned, as well as a consideration of unique characteristics of the U.S. military.

This review and analysis of the policies in foreign militaries can serve as a reference for U.S. decisionmakers as they consider possible policy revisions to support the integration of openly transgender personnel into the U.S. military. We include information on how, when, and why each country changed its policy. We also detail the policies of each country, covering such issues as the medical and administrative

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 71 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 641 of 688
50   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

requirements before gender transition can begin, housing assignments, uniform wear, and physical fitness standards.

## Policies on Transgender Personnel in Foreign Militaries

According to a report by the Hague Center for Security Studies, there are 18 countries that allow transgender personnel to serve openly in their militaries: Australia, Austria, Belgium, Bolivia, Canada, Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, Netherlands, New Zealand, Norway, Spain, Sweden, and the United Kingdom (Polchar et al., 2014). This chapter describes the policies of the four countries—Australia, Canada, Israel, and the United Kingdom—with the most well-developed and publicly available policies on transgender military personnel. It focuses explicitly on policies that describe how these foreign militaries treat transgender personnel and how they address this population's gender transition needs. While the focus of the chapter is on the specific policies integrating openly transgender military personnel in these four foreign militaries, we also provide some information about what happened after the policy change, including bullying and harassment, and summarize best practices and challenges that emerged from our four case studies.[1]

The formal policies on transgender personnel in the four countries address a number of aspects of the gender transition process.[2] Generally, these policies do not explicitly address such issues as the recruitment or retention of transgender personnel, though we provide information on the qualification of transgender personnel to serve when it is available. They do generally address such issues as the requirements for transitioning, housing assignments, restroom use, uniforms, identity cards, and physical standards. They also address whether the transitioning personnel remain with their old units or shift to new ones and how other members of a unit should be informed. Finally, the policies address access to medical care and what is or is not covered by the military health care system.

In addition to addressing these crucial issues, foreign military policies on transgender personnel typically lay out a gender transition plan, which describes the timeline or steps in the transition process. However, it is worth noting that each individual's

---

[1]   We looked for information on the policies of the other 14 countries but were unable to find any publicly available documents in English.

[2]   We note a few interesting points about other countries that we investigated but for which we were unable to find sufficient publicly available information to construct a complete case. The Netherlands was the first country to allow transgender personnel to serve openly in its military, opening its ranks in 1974. New Zealand opened its military to transgender personnel in 1993; although we could not find a written policy, a 2014 report by Hague Center for Strategic Studies referred to New Zealand's as the most friendly military to transgender personnel. The New Zealand Defence Force also has an advocacy group, OverWatch, that provides support to lesbian, gay, bisexual, and transgender personnel (see Polchar et al., 2014).

gender transition is unique. While some choose to undergo hormone therapy or gender reassignment surgery, this is not required for gender transition. As a result, the timelines outlined in the policies are intended to be examples only.

### Australia

In 2010, the Australian Defence Force revoked the defense instruction that prohibited transgender individuals from serving openly, stating that excluding transgender personnel from service was discrimination that could no longer be tolerated (Ross, 2014). The Australian Department of Defence, with the advocacy group Defence Lesbian, Gay, Bisexual, Transgender, and Intersex Information Service, has produced guides to support commanders, transitioning service members, and the units in which transitioning members are serving (Royal Australian Air Force, 2015). The guide outlines five stages in the gender transition process: diagnosis, commencement of treatment, disclosure to commanders and colleagues, the post-transition experience, and, if applicable, gender reassignment surgery (Royal Australian Air Force, 2015). There is no public information on the number of transgender personnel in the Australian military or the costs associated with covering gender transition–related medical care.

A service member's gender transition begins after receiving a medical diagnosis of gender incongruence from a doctor approved by the Australian Defence Force. According to Australian Defence Force policy, once service members receive this diagnosis and present a medical certification form to their commanders, they can begin the "social transition," which policy defines as the time when an individual begins living publicly as the target gender. Under the current policy, after this point, the service member's administrative record is updated to indicate the target gender for the purposes of uniforms, housing, name, identification cards, showers, and restrooms (Royal Australian Air Force, 2015). This means that, after this point, the service member is assigned to housing of the target gender, may use the restrooms of the target gender, has an identification card with the target gender and new name, and can wear the uniform of the target gender.

During the social transition, the service member may undergo hormone therapy. However, neither hormone therapy nor gender reassignment surgery is required for the administrative changes to occur. Importantly, this shift in gender for military administrative purposes may not always match the legal transition (with respect to the Australian government) to the target gender (Royal Australian Air Force, 2015). Finally, when transgender service members choose to transition, they may choose whether to stay with their current unit or transfer to a different one. They may also choose how colleagues are informed of the gender transition—that is, whether they wish to tell colleagues themselves or have a senior leader do so.

Australia's policy also addresses matters related to physical standards and medical readiness. During the transition period, a service member may be downgraded in terms of physical readiness or declared unable to deploy for some time. However, this

determination is decided on a person-by-person basis and is only temporary. According to the guide provided to service members and commanders, most individuals are placed on "MEC [Medical Employment Classification] 3—Rehabilitation" status during their medical transition or if they require four consecutive weeks of sick leave. Others may be able to remain "MEC 2—Employable and Deployable with Restrictions" for the majority of the gender transition period. In most cases, this determination is made by a certification board, though commanders are also given discretion to downgrade transitioning service members or declare them unfit to deploy, contingent on a stated inability to accommodate the service member's needs or a determination that the transitioning service member's presence would undermine the unit's performance. However, there is no public information available on the types of justifications a commander might give in making such a determination.

The deployment status of each individual will vary during the gender transition based on the transition path chosen (for example, whether hormone therapy or surgery is undertaken). Some of these treatments are covered by military health care. In Australia, medical treatments associated with gender transition, including both hormone therapy and gender reassignment surgery, are covered, but treatments considered "cosmetic" might not be (Royal Australian Air Force, 2015). However, it is not clear what is classified as cosmetic or what might be considered medically necessary. Importantly, gender transition–related medical procedures are provided only at certain facilities, so service members who wish to receive these treatments may need to make special requests for specific assignments where their needs can be met. In general, personnel are permitted to take sick leave to facilitate their medical transition (Royal Australian Air Force, 2015).

Transitioning service members' deployment status will also depend on their ability to meet physical fitness standards. During the transition period, a service member may be considered medically exempt from meeting physical fitness standards, with a coinciding readiness classification of nondeployable. Once deemed medically able to complete the test by a medical professional, the service member may be asked to meet the standards of the target gender. However, which gender standards the individual is required to meet and when is determined by the medical officer overseeing the gender transition (Royal Australian Air Force, 2015). Thus, the point at which each transitioning service member is required to meet the target-gender standards varies.

### Canada

In Canada, a 1992 lawsuit from a member of the armed forces resulted in the repeal of a regulation banning gay, lesbian, and transgender individuals from serving openly in the military (Okros and Scott, 2015). In 1998, the Canadian military explicitly recognized gender identity disorder and agreed to cover gender reassignment surgery. In 2010, Canadian military policy was revised to clarify transgender personnel issues, such as name changes, uniforms, fitness standards, identity cards, and records (Okros

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 74 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 644 of 688

What Lessons Can Be Learned from Foreign Militaries?    53

and Scott, 2015). An updated policy, Military Personnel Instruction 01/11, "Management of Transsexual Members," was released in 2012 (Canadian Armed Forces, 2012). It stated, "The CF [Canadian Forces] shall accommodate the needs of CF transsexual members except where the accommodation would: constitute undue hardship; or cause the CF member to not meet, or to not be capable of meeting. . . . Minimum Operational Standards Relating to Universality of Service" (Canadian Armed Forces, 2012, p. 5). Other considerations that can be used to determine whether an accommodation is reasonable include cost and the safety of other service members and the public (Canadian Armed Forces, 2012, p. 5). Data suggest that there are approximately 265 transgender personnel serving openly and that the Canadian military pays for about one gender reassignment surgery per year (Okros and Scott, 2015).

Canada's policy on transgender personnel covers such issues as housing, identification cards, restrooms, physical standards, deployment, medical treatment, and uniforms. The process is similar in most ways to that in Australia, described earlier. In Canada, one of the first steps in the gender transition process is a medical assessment in which the individual is given a diagnosis of gender incongruence and assigned a temporary medical category that defines both employment limitations and accommodations that will be needed to support the service member during gender transition. After receiving this diagnosis, service members are responsible for informing their commanders and are asked to give commanders as much notice as possible before beginning their gender transition. After that, the service member, the service member's manager, and the unit's commanding officer are expected to meet to discuss the service member's gender transition plan and to addresses any necessary accommodations. The policy recommends frequent meetings between the service member and relevant leaders and medical professionals to ensure that the transitioning service member's needs are met. The policy also identifies subject-matter experts, such as chaplains and mental health professionals, who might be available to provide advice (Canadian Armed Forces, 2012).

The policy states that the gender transition plan should address housing, uniforms, deployments, and other administrative considerations. While the timeline will vary for each individual, in most cases, after receiving the diagnosis and informing the commander, the service member is able to begin living openly as the target gender. At this point, the service member is assigned to housing of the target gender, given ID cards with the target gender and new name, given uniforms of the target gender, and permitted to use restrooms of the target gender. However, while the individual is considered a member of the target gender for all administrative purposes within the military at this point, an official name and gender change in the military personnel system requires both medical certificates and legal documentation (Canadian Armed Forces,

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 75 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 645 of 688
54    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

2012).[3] Finally, medals and awards earned by the service member prior to transitioning cannot be transferred to the new name when the service member transitions to the target gender (Okros and Scott, 2015).

While the policy expects accommodations to be made to meet the needs of transgender personnel, it also notes that commanders must strike a balance between meeting the needs and legal rights of transgender personnel and the privacy needs of other service members in restrooms, showers, and housing. It does not, however, provide guidance on how this should be accomplished (Canadian Armed Forces, 2012). The policy also makes clear that incidents of harassment must be dealt with according to the Canadian military's discrimination and harassment policy. Finally, if the transgender service member is assigned to a new unit permanently or temporarily, any required accommodations are to be communicated to the new commanding officer prior to the service member's arrival (Canadian Armed Forces, 2012).

The medical assessment and gender transition plan developed at the start of transition are also used to determine a service member's readiness status and deployability. The policy states that service members can be downgraded temporarily in terms of their readiness, ability to deploy, and eligibility for remote assignments until gender transition is complete (Canadian Armed Forces, 2012). This determination is made primarily by the medical professionals overseeing the service member's gender transition. After the gender transition is complete, the continued need for a reduced medical standard is decided on a case-by-case basis based on the service member's overall health, chronic conditions, and need for access to medical care. After beginning the gender transition, and based on the medical assessment, the service member is considered medically exempt from physical fitness testing and requirements until legally assuming the acquired or target gender (which, as noted earlier, requires provincial recognition). At that point, the fitness standards for the acquired or target gender apply. More specifically, once personnel are removed from the medical exemption list, they have 90 days to meet the new standards (Canadian Armed Forces, 2012).

A reduced medical readiness determination during gender transition is intended primarily to ensure that the service member has uninterrupted access to medical care. Once gender transition is complete, transgender service members and their commanders are responsible for identifying the service member's specific needs and how they will be addressed (Canadian Armed Forces, 2012). Gender reassignment surgery will not, however, automatically result in permanent deployment restrictions. As in Australia, gender reassignment surgery and hormone therapy are covered by military health care. The Canadian military paid for one gender reassignment surgery in 1998 and has paid for one or two surgeries per year since then (Canadian Armed Forces, 2012).

---

[3]  Also note that the requirements for the legal change vary by province but typically involve only a statement that the individual has assumed the target gender and a medical certification from a doctor of a diagnosis of gender incongruence.

### Israel

The Israel Defense Forces (IDF) have allowed transgender personnel to serve openly since 1998 (Speckhard and Paz, 2014).[4] The IDF experience with transgender personnel is somewhat unique because Israel's military is composed largely of conscripts who serve two or three years and then serve in the reserves with extended periods of active service. As a result, a very high percentage of the population spends extended periods of time mixing military and civilian life. From the perspective of this report, this blending of civilian and military life creates unique challenges for transgender personnel, as they cannot be one person in their civilian life and then a different person in their military life. Some transgender individuals receive a discharge or exemption from their military service based on their gender incongruence, but this decision is currently at the discretion of the commander. There is no official IDF policy on transgender personnel, but according to one report, senior members of the IDF are working to draft one (Speckhard and Paz, 2014). In 2014, the IDF announced that it would support transgender individuals throughout the transition process. Under this new policy, transgender teens who have not yet begun to transition to another gender will be enlisted according to their birth sex, but after enlistment, they will be given support and assistance with the gender transition process (Zitun, 2014). As a result, Speckhard and Paz (2014) noted, experiences vary for transgender personnel in the IDF. Some individuals report that once they ask to transition, they are allowed to dress and serve as their target gender. However, it is unclear how generalizable this is.

Typically, IDF administrative records use the gender at that time of enlistment. Since conscription occurs at age 18, and because hormone treatment for gender incongruence cannot legally begin until age 18, the administrative records of most personnel show their birth gender. Under a newly announced policy, personnel enlisted using their birth gender who identify as transgender can immediately receive support and treatment to begin the gender transition (Zitun, 2014). Importantly, however, as of 2014, the military identification card carries the birth gender until a service member undergoes gender reassignment surgery, even if the service member is living publically as the target gender (Speckhard and Paz, 2014). It should be noted that, in Israel, only one hospital can perform gender reassignment surgery, and this surgery cannot be performed until age 21, though some people go abroad for it (Speckhard and Paz, 2014). This creates some complications for housing and other matters, discussed in more detail later. The new policy will also allow transgender recruits to receive support for gender transition after enlistment.

Available evidence suggests that, in the IDF, assignment of housing, restrooms, and showers is typically linked to the birth gender, which does not change in the military system until after gender reassignment surgery. Service members who are undergo-

---

[4]   We do not know the exact date for this change because there was never a formal policy allowing or prohibiting transgender personnel from serving. It was in 1998 that the first openly transgender individual served in the IDF.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 77 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 647 of 688
56    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

ing gender transition are accommodated, however, through the use of ad hoc solutions, including giving transitioning personnel their own showers, housing, or restrooms (Speckhard and Paz, 2014). Once transitioning personnel have completed gender reassignment surgery, they can be assigned to the housing, restrooms, and showers of their acquired gender. It is also worth noting that the majority of noncombat personnel are able to live at home, off base. As a result, the housing issue does not affect a large number of transitioning personnel (Speckhard and Paz, 2014). The issue of uniforms is usually easier to address, and service members are able to wear the uniform of the target gender once they begin their gender transition.

In addition to addressing housing and other administrative matters for conscripts and career soldiers, the IDF must address transitioning reservists. The limited information available suggests that the approach to addressing the needs of this group also varies from person to person. Usually, if reserve members are in the process of transitioning or have transitioned when called to active duty, they are permitted to return to service as their target or acquired gender (following the same administrative policies described earlier). For example, a service member who served in an all-male combat unit and is transitioning to female may be moved to another position. Again, many reservists serve their duty while living at home, so housing is not usually an issue. Restroom and shower assignments are addressed on an ad hoc basis (Speckhard and Paz, 2014). Finally, some personnel who have transitioned or are in the process of transitioning are exempted from their reserve duty. However, this is becoming less common as the IDF strives to accommodate the needs of these personnel rather than exempting them from service (Speckhard and Paz, 2014).

The IDF does not have a formal policy on physical standards for transgender individuals serving their conscription duty, reserve duty, or as professional soldiers. Available information suggests only that transgender personnel can serve in any unit or occupation for which they meet the requirements, with the exception of a few male-only combat units and certain security-related positions (Speckhard and Paz, 2014). Personnel transitioning from female to male are able to serve in male-only combat units only if they can meet the requirements set for other men. Personnel transitioning from male to female cannot serve in male-only combat units once they begin hormone treatment (Speckhard and Paz, 2014).

There do appear to be some limitations on the assignment of transgender personnel, particularly in combat units. Because of austere living conditions in these types of units, necessary accommodations may not be available for service members in the midst of a gender transition. As a result, transitioning individuals are typically not assigned to combat units (Speckhard and Paz, 2014). Transgender personnel are also limited from assignment to certain security-related positions due to concerns about blackmail, based on the assumption that these service members might be open about their gender identity in the military but might not have told others, including family members. Keeping

these types of secrets might make an individual susceptible to blackmail or extortion (Speckhard and Paz, 2014).

In the IDF, medical issues and matters related to the readiness of transgender personnel are addressed on a case-by-case basis, though a more formal policy is being developed. For conscripts, the only treatment that can be provided by the military is hormone therapy because gender reassignment surgery is possible in Israel only after age 21, by which point the conscription duty is usually completed (Speckhard and Paz, 2014). Those who choose to stay in the military full-time after the age of 21, as well as those in the reserve called to back to active service, may receive both hormone therapy and gender reassignment surgery. Those who choose to undergo surgery are permitted to take a period of sick leave for the surgery and recovery, as they can for any other medical treatment or surgery (Speckhard and Paz, 2014). Israel has nationalized health care that typically covers all treatments associated with gender transition, ranging from psychiatric care to pre- and postoperative care, hormone treatment, breast augmentation, and facial feminization. Apart from the approaches used to address physical standards for transitioning individuals (discussed earlier), there are no specific policies governing the readiness classification of transitioning IDF personnel, though some are in development (Zitun, 2014).

## United Kingdom

The United Kingdom lifted the ban on transgender personnel in 2000 following a European Court of Human Rights ruling that the country's policy violated the right to privacy under the European Convention on Human Rights (Frank, 2010). The policy change was implemented with guidance to commanders, as well as a code of social conduct that allowed commanders to address inappropriate behavior toward transgender personnel by appealing to broader principles of tolerance and diversity and to guard operational effectiveness (Yerke and Mitchell, 2013). In 2009, the British Armed Forces released the "Policy for Recruitment and Management of Transsexual Personnel in the Armed Forces" to offer clearer guidance to commanders on how gender transition–related issues should be addressed (Yerke and Mitchell, 2013). While transgender personnel are able to serve openly, under the current policy, they can be excluded from sports that organize around gender to ensure the safety of the individual or other participants. The British Army also provides its official policy on transgender personnel on its website:

> The Army welcomes transgender personnel and ensures that all who apply to join are considered for service subject to meeting the same mental and physical entry standard as any other candidate. If you have completed transition you will be treated as an individual of your acquired gender. Transgender soldiers serve throughout the Army playing their part in the country's security. There is a formal network that operates in the Army to ensure that transgender soldiers can find advice and support with issues that affect their daily lives. (British Army, undated)

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 79 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 649 of 688
58    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

However, the military encourages those who have not yet started their gender transition to complete their transition before joining (UK Ministry of Defence, 2009).

The 2009 UK policy is similar to those in Canada and Australia in terms of the areas covered and approaches to addressing key issues, though the UK policy provides some additional room for individual differences. The policy also includes an extensive discussion of the legal and privacy protections afforded to transgender personnel. These protections are important because they also apply to administrative and medical records in the military system.

The UK policy defines five stages of gender transition: diagnosis, social transition (the individual begins living openly as the target gender), medical treatment/hormone therapy, surgical reassignment, and postoperative transition. However, it also recognizes that the process of gender transition may be different for each person. The policy suggests that each individual work with commanders and service authorities to develop a plan that includes a timeline for transition. The gender transition plan agreed to by the service member and commanders should specify the timing of changes, such as to housing assignments and uniforms. The specific point at which a service member transitions for the purposes of name, uniform, housing, restrooms, and ID cards may vary from person to person. Typically, when service members begin living publicly as the target gender (the social transition) they are reassigned to housing of the target gender, use the restrooms and uniforms of the target gender, and are given an ID card indicating that they are a member of the target gender. Importantly, this shift in gender for administrative purposes does not have to correspond to the point at which an individual transitions gender within the UK legal system, a process that involves a diagnosis of gender incongruence and two years of living as the acquired gender (UK Ministry of Defence, 2009). The policy also notes that it is unlawful to force transgender personnel to use separate toilet or shower facilities or occupy separate housing accommodations from the rest of the force.

The gender transition plan addresses other logistics of the transition. For example, it should specify scheduled time off required for medical procedures, including gender reassignment surgery. In general, medical treatment associated with gender transition is treated like any other medical issue experienced by a service member. However, while hormone replacement therapy is covered by military health care, gender reassignment surgery is not (UK Ministry of Defence, 2009). The policy notes that the timeline and timing of the transition must take into consideration the needs of the service. As a result, at least four weeks notice is typically needed prior to the start of a service member's gender transition. The gender transition plan should also specify whether service members wish to transition in their current post or transfer to a new position and whether they want to tell their colleagues about the gender transition themselves or would like someone else to do this. This decision may depend on the size of the unit. In a small unit, it may be easy to inform fellow service members personally. In a larger organization, it may not be necessary to tell every individual. Commanders of units

with transgender personnel are encouraged to consult members of the Service Equality and Diversity staff about how to approach education and management in matters associated with transgender service members.

The UK policy also addresses medical readiness and physical standards. Transgender personnel are evaluated for medical readiness and deployability on a case-by-case basis following a medical evaluation. During the transition period, specifically during hormone treatment and immediately before and after surgery, service members may receive a reduced Medical Employment Standard, which restricts deployability and sea service (UK Ministry of Defence, 2009). Transitioning service members who continue to meet physical standards throughout this period and are able to perform their jobs may retain normal readiness standards. Usually, those who do not undergo hormone therapy or gender reassignment surgery are able to maintain a fully deployable status throughout their gender transition (UK Ministry of Defence, 2009). Service members who are undergoing hormone therapy are able to deploy, as long as the hormone dose is steady and there are no major side effects. However, deployment to all areas may not be possible, depending on the needs associated with any medication (e.g., refrigeration). Some service members may also be required to have a psychiatric evaluation, but only if they show signs of mental health distress (UK Ministry of Defence, 2009). Individuals who have finished their gender transition and can meet the requirements of their legal gender are considered fully deployable. However, those who remain in a state of reduced readiness for an extended period may have to be discharged (UK Ministry of Defence, 2009). Importantly, the British military encourages individuals who are in the midst of their gender transition and are considering joining the military to wait until the gender transition is complete before joining, as the military may not always be able to provide the support the individual needs during gender transition.

The specific physical standards a transitioning individual must meet during and after the gender transition period are determined on a case-by-case basis. The policy allows that there may be a period of time—especially for individuals transitioning from female to male—during which a service member is not yet able to meet the standards of the target gender. In these cases, medical staff and commanders may assess the individual and determine the appropriate interim standards (UK Ministry of Defence, 2009). Once the gender transition is considered "complete," personnel are required to meet the standards of the target gender (UK Ministry of Defence, 2009). However, the policy recognizes that the point at which the gender transition is complete may vary: It may be complete after hormone therapy or after surgery, or simply after the individual begins living as the target gender. Therefore, the policy continues to allow for some flexibility in physical standards, even for members at the end of their gender transition process (UK Ministry of Defence, 2009). Modified standards may be set by medical staff and commanders, if necessary. Continued failure to meet whatever physical stan-

JA638

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 81 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 651 of 688

60    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

dards are determined to be appropriate (modified or otherwise) can lead to administrative discharge (UK Ministry of Defence, 2009).

The policy also addresses positions that are "gender-restricted" or have unique standards. The United Kingdom still has a number of combat occupations closed to women. Personnel who are transitioning from male to female may not serve in male-only occupations as long as this policy remains in place. Those transitioning from female to male may hold these jobs, assuming that they are able to meet the physical standards (UK Ministry of Defence, 2009). Transgender personnel may hold positions that have unique standards related to the occupation, as long as they can meet the physical and other requirements for the specific position. Finally, according to the policy, service members may request that their medals be transferred to a new name by submitting the request in writing. They are allowed to continue wearing qualifications earned while serving as their birth gender. However, this may indicate their transgender status to others (UK Ministry of Defence, 2009).

## Effects on Cohesion and Readiness

As indicated in Chapter Six, while there is limited research on the effects of transgender personnel serving openly in foreign militaries, the available evidence indicated no significant effect on cohesion, operational effectiveness, or readiness. In the Australian case, there is no evidence and there have been no reports of any effect on cohesion, operational effectiveness, or readiness (Frank, 2010). In the Israeli case, there has also been no reported effect on cohesion or readiness (Speckhard and Paz, 2014). Transgender personnel in these militaries report feeling supported and accommodated throughout their gender transition, and there has been no evidence of any effect on operational effectiveness (Speckhard and Paz, 2014). As noted earlier, commanders report that transgender personnel perform their military duties and contribute to their units effectively (Speckhard and Paz, 2014). Interviews with commanders in the United Kingdom also found no effect on operational effectiveness or readiness (Frank, 2010). Some commanders reported that increases in diversity had led to increases in readiness and performance. Interviews with these same commanders also found no effect on cohesion, though there were some reports of resistance to the policy change within the general military population, which led to a less-than-welcoming environment for transgender personnel. However, this resistance was apparently short-lived (Frank, 2010).

The most extensive research on the potential effects of openly serving transgender personnel on readiness and cohesion has been conducted in Canada. This research involved an extensive review of internal defense reports and memos, an analysis of existing literature, and interviews with military commanders. It found no evidence of any effect on operational effectiveness or readiness. In fact, the researchers

heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges (Okros and Scott, 2015). They also found no evidence of any effect on unit or overall cohesion. However, there have been reports of bullying and hostility toward transgender personnel, and some sources have described the environment as somewhat hostile for transgender personnel (Okros and Scott, 2015).

To summarize, our review of the limited available research found no evidence from Australia, Canada, Israel, or the United Kingdom that allowing transgender personnel to serve openly has had any negative effect on operational effectiveness, cohesion, or readiness. However, it is worth noting that the four militaries considered here have had fairly low numbers of openly serving transgender personnel, and this may be a factor in the limited effect on operational readiness and cohesion.

## Best Practices from Foreign Militaries

Several best practices and lessons learned emerged both directly from research articles describing the evolution of policy and the experiences of foreign militaries and indirectly from commonalities in the policies and experiences across our four case studies. The best practices that extended across all cases include the following:

### The Importance of Leadership
Sources from each of our case-study countries stressed that leadership support was important to executing the policy change. Leaders provided the impetus to draft and implement new policies and were integral to communicating a message of inclusion to the entire force. Supportive leaders were also important in holding accountable those personnel who participated in discrimination (Okros and Scott, 2015; Speckhard and Paz, 2014). Each of the cases underscores the importance of having strong leadership support to back and enforce the policy change, along with clearly written policies that are linked to national policy wherever possible (Frank, 2010). The militaries found that presenting a "business case" for diversity and emphasizing the advantages of an inclusive military, including better retention and recruiting, can help reduce resistance to a policy change (Frank, 2010).

### Awareness Through Broad Diversity Training
The most effective way to educate the force on matters related to transgender personnel is to integrate training on these matters into the diversity and harassment training already given to the entire force. This training addresses all forms of harassment and bullying, including that based on religion, race, and ethnicity (Frank, 2010; Okros and Scott, 2015; Belkin and McNichol, 2000–2001).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 83 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 653 of 688

62    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

In the four cases we reviewed in-depth, we found that targeting only commanders with training and information on what it means to be transgender is not as effective in fostering an inclusive and supportive environment as training that targets the entire force and is integrated into broader forcewide diversity training. The foreign militaries that we examined train not only units with transitioning individuals but also the entire force by including gender identity alongside sexual orientation, religion, ethnicity, and other markers of difference in diversity training and education. However, efforts must be made simultaneously to protect the privacy of transitioning service members. In some cases, telling a unit that a transgender member is arriving before that individual arrives can be counterproductive (Frank, 2010).

### The Importance of an Inclusive Environment

An all-inclusive military environment—not just as it pertains to transgender personnel, sexual orientation, or gender identity, but a culture that embraces diversity—can support the integration of openly serving transgender personnel. In this context, gender identity is just one marker of diversity.[5]

### Ensuring Availability of Subject-Matter Experts to Advise Commanders

Most of the four countries we examined in-depth also make subject-matter experts (e.g., chaplains, psychiatrists) and gender advisers (individuals who have special training in gender awareness and gender mainstreaming in the military context) available to commanders tasked with the integration of transgender personnel. Gender advisers were originally intended to deal primarily with issues associated with integrating women into male-dominated military environments, but they could also help with other gender-related matters, including transgender personnel policy. They serve directly within military units and are a readily available resource to commanders. Adopting a similar practice of integrating advisers with expertise in the area of transgender personnel policy and gender transition-related matters might also support the integration of transgender service members in the U.S. military.

## Lessons Learned and Issues to Consider for U.S. Military Policy

Based on these best practices and the broader experiences of four foreign militaries, there are some key lessons to be learned and possible issues to consider when crafting U.S. military transgender personnel policy. First, in each of the four foreign militaries, there were some reports of resistance, bullying, and harassment of transgender personnel who made their gender transition public. This harassment ranged from exclusion to more aggressive behavior. In most cases, this behavior was relatively limited; however,

---

[5]  Remarks by a Canadian subject-matter expert in a phone discussion with RAND researchers, November 2015.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 84 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 654 of 688

What Lessons Can Be Learned from Foreign Militaries?    63

in some cases, it did contribute to a hostile work environment for transgender personnel and had the effect of discouraging these personnel from being open about their gender transition or gender identity (Okros and Scott, 2015; Frank, 2010). Although the foreign militaries we examined tended to adopt a policy of no tolerance for this type of harassment, some bullying behavior may have gone unreported (Okros and Scott, 2015; Frank, 2010). In the case of Canada, the issue of restrooms for transgender personnel is an ongoing topic of discussion, and restrooms have been a common site of harassment and discrimination (Okros and Scott, 2015).

A second lesson learned is related to problems caused by the lack of an explicit, clearly written policy. For instance, in the IDF, without a clear policy, some transitioning individuals are placed in difficult and uncomfortable situations. For example, in some cases, personnel who have been permitted to begin hormone therapy cannot be housed with members of their target gender or grow their hair and fingernails (in the case of individuals transitioning from male to female). Others have been isolated, assigned to separate housing, or asked to use separate restrooms (Speckhard and Paz, 2014). Recognizing these challenges, IDF leadership is working to design a clear and explicit policy. In the Israeli case, transgender individuals were allowed to serve openly before a formal policy was written. Only when it was faced with questions about the integration of transgender personnel did the IDF begin to create a formal policy.[6] In Canada, a similar policy gap arose when transgender personnel were allowed to serve openly following a national policy revision that ended discrimination based on sexual orientation or gender. However, the focus at that point was on gay and lesbian service members, and no formal policy was created to address transgender personnel explicitly. When matters related to the medical care of transgender personnel arose, Canadian defense leaders developed a policy that just addressed this narrow, pressing issue, and did not develop policies to address the other matters (e.g., housing, restrooms, name changes). Commanders complained that the original policy was too vague and lacked sufficient details. A new, revised policy was written in 2012, and commanders have responded with positive feedback.[7] The lack of a clear, written policy has also been an issue in Australia.

A third and final issue that has come up in at least two of the countries we surveyed is that of awards and medals. In the UK case, medals and awards received prior to gender transition can be transferred to the service member's post-transition name (UK Ministry of Defence, 2009). In the Canadian case, this is not possible, and the awards remain associated only with the original name. This is a cause for concern among transgender personnel in the Canadian military, but Canadian officials have responded that they cannot rewrite history (Okros and Scott, 2015). This is a policy area that the United States should consider alongside other administrative policies.

---

[6] Remarks by a Canadian subject-matter expert in a phone discussion with RAND researchers, November 2015.

[7] Remarks by a Canadian subject-matter expert in a phone discussion with RAND researchers, November 2015.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 86 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 656 of 688

CHAPTER EIGHT

# Which DoD Policies Would Need to Be Changed if Transgender Service Members Are Allowed to Serve Openly?

This chapter reviews DoD accession, retention, separation, and deployment policies and provides an assessment of the impact of changes required to allow transgender personnel to serve openly. For our analysis of DoD policies, we reviewed 20 current accession, retention, separation, and deployment regulations across the services and the Office of the Secretary of Defense. We also reviewed 16 other regulations that have been replaced by more recent regulations or did not mention transgender policies.[1] DoDI 6130.03 establishes medical standards for entry into military service, including a list of disqualifying physical and mental conditions, some of which are transgender-related.[2] Current DoD policy also authorizes, but no longer requires, the discharge of transgender personnel for reasons related to both medical conditions that generate disabilities, as well as mental health concerns.[3] However, a July 2015 directive from the Office of the Secretary of Defense elevated decisions to administratively separate transgender service members to the Office of the Under Secretary of Defense for Personnel and Readiness (DoD, 2015b).

Note that our review focused on transgender-specific DoD instructions that may contain unnecessarily restrictive conditions and reflect outdated terminology and assessment processes. However, in simply removing these restrictions, DoD could inadvertently affect overall standards. While we focus on reforms to specific instruc-

---

[1] These additional policies are listed in Appendix D.

[2] The instruction specifies conditions that disqualify accessions, including "current or history of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias"; "history of major abnormalities or defects of the genitalia including but not limited to change of sex, hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis"; and "history of major abnormalities or defects of the genitalia such as change of sex, hermaphroditism, pseudohermaphroditism, or pure gonadal dysgenesis" (DoDI 6130.03, 2011, enclosure 4).

[3] "Sexual gender and identity disorders" are specified as medical conditions that may generate disabilities under DoDI 1332.38, enclosure 5 (2006). Mental health conditions are specified in DoDI 1332.14 (2014) and DoDI 1332.30 (2013) for enlisted and officers, respectively. DoDI 1332.18, issued on August 5, 2014, updated these guidelines and established general criteria for referral for disability evaluation and defers to service-specific standards for retention. However, a recent review of this revision suggests that service-specific regulations may still disqualify transgender personnel, and the new guidance may not overrule those service policies (Pollock and Minter, 2014).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 87 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 657 of 688

66    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

tions and directives, we note that DoD may wish to conduct a more expansive review of personnel policies to ensure that individuals who join and remain in service can perform at the desired level, regardless of gender identity.

## Accession Policy

The language pertaining to transgender individuals in accession instructions does not match that used in DSM-5.[4] This results in restrictions in DoD policy that do not match current medical understanding of gender identity issues and thus may be misapplied or difficult to interpret in the context of current medical treatments and diagnoses. Under current guidelines, otherwise qualified individuals could be excluded for conditions that are unlikely to affect their military service, and individuals with true restrictions may be more difficult to screen for and identify. Modernizing the terminology to match current psychological and medical understanding of gender identity would help ensure that existing procedures do not inadvertently exclude otherwise qualified individuals who might want to join the military. We recommend that DoD review and revise the language to match the DSM-5 for conditions related to mental fitness so that mental health screening language matches current disorders and facilitates appropriate screening and review processes for disorders that may affect fitness for duty. Similarly, physical fitness standards should specify physical requirements, rather than physical conditions. Finally, the physical fitness language should clarify when in the transition process the service member's target gender requirements will begin to apply.

## Retention Policy

We recommend that DoD expand and enhance its guidance and directives to clarify and adjust, where necessary, standards for retention of service members during and after gender transition. Evidence from Canada and Australia suggests that transgender personnel may need to be held medically exempt from physical fitness testing and requirements during transition (Canadian Armed Forces, 2012; Royal Australian Air Force, 2015). However, after completing transition, the service member could be required to meet the standards of the acquired gender. The determination of when the service member is "medically ready" to complete the physical fitness test occurs on a case-by-case basis and is typically made by the unit commander.

---

[4]  Two key changes are that the term *transsexualism* has been replaced, and *gender dysphoria* is no longer in the chapter "Sexual Desire Disorders, Sexual Dysfunctions, and Paraphilias" but, rather, has its own chapter (Milhiser, 2014).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 88 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 658 of 688
Which DoD Policies Would Need to Be Changed?    67

## Separation Policy

DoD may wish to revise the current separation process based on lessons learned from the repeal of Don't Ask, Don't Tell. The current process relies on administrative decisions outside the purview of the standard medical and physical review process. This limits the available documentation and opportunities for review, and it could prove burdensome if transgender-related discharges become subject to re-review. When medically appropriate, DoD may wish to establish guidance on when and how such discharge reviews should be handled. We also recommend that DoD develop and disseminate clear criteria for assessing whether transgender-related conditions may interfere with duty performance.

## Deployment Policy

Deployment conditions vary significantly based on the unique environment of each deployment, with some deployed environments able to accommodate transgender individuals, even those who are undergoing medical treatments. Moreover, recent medical advancements can minimize the invasiveness of treatments and allow for telemedicine or other forms of remote medical care. Given medical and technological advances, DoD may wish to adjust some of its processes and deployment restrictions to minimize the impact on readiness. For example, current regulations specify that conditions requiring regular laboratory visits make service members ineligible for deployment, including all service members who are receiving hormone treatments,[5] since such treatments require laboratory monitoring every three months for the first year as hormone levels stabilize (Hembree et al., 2009; Elders et al., 2014). Such a change would require DoD to either permit more flexible monitoring strategies[6] or provide training to deployed medical personnel.[7] Similarly, the use of refrigerated medications is a disqualifying condition for deployment,[8] even though nearly all hormone therapies are available in other formats that do not require refrigeration.

---

[5]  Current regulations state that "medications that require laboratory monitoring or special assessment of a type or frequency that is not available or feasible in a deployed environment" disqualify an individual from deployment (Office of the Assistant Secretary of Defense for Health Affairs, 2013, p. 3).

[6]  Some experts suggest that alternatives, such as telehealth reviews, would address this issue for rural populations with limited access to medical care (see, for example, WPATH, 2011).

[7]  "Independent duty corpsmen, physician assistants, and nurses can supervise hormone treatment initiated by a physician" (Elders et al., 2014).

[8]  The memo issued by the Office of the Assistant Secretary of Defense for Health Affairs states, "Medications that disqualify an individual for deployment include . . . [m]edications that have special storage considerations, such as refrigeration (does not include those medications maintained at medical facilities for inpatient or emergency use)" (Office of the Assistant Secretary of Defense for Health Affairs 2013, p. 3).

CHAPTER NINE

# Conclusion

By many measures, there are currently serving U.S. military personnel who are transgender. Overall, our study found that the number of U.S. transgender service members who are likely to seek transition-related care is so small that a change in policy will likely have a marginal impact on health care costs and the readiness of the force. We estimate, based on state-level surveys of transgender prevalence, that between 1,320 and 6,630 transgender personnel may be serving in the AC, and 830–4,160 may be serving in the SR. Estimates based on studies from multiple states, weighted for population and the gender distribution in the military, imply that there are around 2,450 transgender service members in the AC and 1,510 in the SR.[1]

However, only a small proportion of these service members will seek gender transition–related treatment each year. Employing utilization and cost data from the private health insurance system, we estimated the potential impact of providing this care to openly serving transgender personnel on AC health care utilization and costs. Directly applying private health insurance utilization rates to the AC military population indicated that a very small number of service members will access gender transition–related care annually. Our estimates based on private health insurance data ranged from a lower-bound estimate of 29 AC service members to an upper-bound estimate of 129 annually using care, including those seeking both surgical and other medical treatments.

Using estimates from two states and adjusting for the male/female AC distribution, we also estimate a total of 45 gender transition–related surgeries, with 50 service members initiating transition-related hormone therapy annually in the AC.[2] We estimate 30 gender transition-related surgeries and 25 service members initiating hormone therapy treatments in the SR. These are likely to be upper-bound estimates, given the nonrepresentative sample selection procedures used in the NTDS. Furthermore, the best prevalence estimates that we were able to identify were from two of the more transgender-tolerant states in the country, and the empirical evidence that trans-

---

[1]   Estimates are based on FY 2014 AC and SR personnel numbers.

[2]   For hormone therapy recipients, the number of treatments and recipients is the same, and these estimates can be treated as counts of individuals.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 12-29    Filed 03/03/25    Page 91 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 661 of 688
70    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

gender prevalence is higher in the military than in the general population is weak. As a point of comparison, we also compared these estimated values to mental health utilization in the AC population overall. Using data from McKibben et al. (2013), we calculated that approximately 278,517 AC service members accessed mental health care treatment in 2014, the implication being that health care for the transgender population will be a very small part of the total health care provided to AC service members across the MHS.

With respect to health care costs, actuarial estimates from the private health insurance sector indicate that covering gender transition–related care for transgender employees increased premiums by less than 1 percent. Taking a weighted average of the identified firm-level data, we estimate that covering transgender-related care for service members will increase the U.S. military's AC health care spending by only 0.038–0.054 percent. Using these baseline estimates, we estimate that MHS health care costs will increase by between $2.4 million and $8.4 million. These numbers represent only a small proportion of FY 2014 AC health care expenditures ($6.27 billion) and the FY 2014 Unified Medical Program budget ($49.3 billion). This is consistent with our estimate of relatively low AC rates of gender transition–related health care utilization in the MHS.

Similarly, when considering the impact on readiness, we found that using either the prevalence-based approach or the utilization-based approach yielded an estimate of less than 0.0015 percent of total labor-years likely to be affected by a change in policy. This is much smaller than the current lost labor-years due to medical care in the Army alone.

Even if transgender personnel serve in the military at twice the rate of their prevalence in the general population and we use the upper-bound rates of health care utilization, the total proportion of the force that is transgender and would seek treatment would be less than 0.1 percent, with fewer than 130 AC surgical cases per year even at the highest utilization rates. Given this, true usage rates from civilian case studies imply only 30 treatments in the AC, suggesting that the total number of individuals seeking treatment may be substantially smaller than 0.1 percent of the total force. Thus, we estimate the impact on readiness to be negligible.

We conclude with some general recommendations and insights based on the experiences of foreign militaries that permit transgender individuals to serve openly—specifically, Australia, Canada, Israel, and the United Kingdom. Our case studies provide some guidance that policymakers should consider as they develop policies to govern the employment of transgender personnel in the U.S. military. These cases also suggested a number of key implementation practices if a decision is made to allow transgender service members to serve openly:

- Ensure strong leadership support.
- Develop an explicit written policy on all aspects of the gender transition process.

- Provide education and training to the rest of the force on transgender personnel policy, but integrate this training with other diversity-related training and education.
- Develop and enforce a clear anti-harassment policy that addresses harassment aimed at transgender personnel alongside other forces of harassment.
- Make subject-matter experts and gender advisers serving within military units available to commanders seeking guidance or advice on gender transition-related issues.
- Identify and communicate the benefits of an inclusive and diverse workforce.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 73-20    Filed 03/03/25    Page 93 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 663 of 688

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-20    Filed 03/03/25    Page 94 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 664 of 688

APPENDIX A

# Terminology

*Augmentation mammoplasty:* breast augmentation involving implants or lipofilling

*Buccal administration:* placement of medication between the gums and cheek

*Chest surgery:* surgery to create a contoured, male-looking chest

*Clitoroplasty:* surgical creation/restoration of a clitoris

*Cross-dresser:* someone who dresses in the clothes of the other gender, not always on a full-time basis

*Female-to-male:* those assigned female sex at birth who identify as male; transgender men; transmen

*Gender:* an individual's gender identity, which is influenced by societal norms and expectations; public, lived role as male or female

*Gender assignment:* initial assignment at birth as male or female; yields "natal gender" (APA, 2013, p. 451)

*Gender atypical:* behaviors not typical for one's gender "in a given society and historical era" (APA, 2013, p. 451)

*Gender identity:* "one's inner sense of one's own gender, which may or may not match the sex assigned at birth" (Office of Personnel Management, 2015, p. 2)

*Gender dysphoria:* "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)" (WPATH, 2011, p. 2).

*Gender nonconformity:* "the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex" (WPATH, 2011, p. 5, citing Institute of Medicine definition)

*Gender transition–related surgery/gender-confirming surgery/sex reassignment surgery:* surgery to mitigate distress associated with gender dysphoria by aligning sex characteristics with gender identity

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 13-29    Filed 03/03/25    Page 95 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 665 of 688
74    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

*Genderqueer:* those who "define their gender outside the construct of male or female, such as having no gender, being androgynous, or having elements of multiple genders" (Roller, Sedlak, and Draucker, 2015, p. 417)

*Gluteal augmentation:* buttocks augmentation involving implants or lipofilling

*Hormone therapy:* "the administration of exogenous endocrine agents to induce feminizing or masculinizing changes" (WPATH, 2011, p. 33)

*Hysterectomy:* surgery to remove the uterus

*Intersex:* "a general term used for a variety of conditions in which a person is born with a reproductive or sexual anatomy that doesn't seem to fit the typical definitions of female or male" (Intersex Society of North America, undated)

*Labiaplasty:* plastic surgery for altering or creating the labia

*Lipofilling:* injection of fat rather than artificial implants

*Male-to-female:* those assigned male sex at birth who identify as female; transgender females; transwomen

*Mastectomy:* surgical removal of one or both breasts

*Metoidioplasty:* surgically relocating a clitoris that has been enlarged by hormone therapy to a more forward position that more closely resembles that of a penis; average length is 1.5–2 inches

*Oophorectomy:* surgical removal of one or both ovaries

*Orchiectomy:* surgical removal of one or both testicles

*Ovariectomy:* surgical removal of one or both ovaries

*Parenteral administration:* intravenous injection (into a vein) or intramuscular infusion (into muscle) of medication

*Penectomy:* surgical removal of the penis

*Phalloplasty:* surgical creation/reconstruction of a penis using one of a variety of techniques including free or pedicled (attached) flap (see Rashid and Tamimy, 2013)

*Primary sex characteristics:* physical characteristics/sex organs directly involved in reproduction

*Salpingo-oophorectomy:* removal of the ovaries and fallopian tubes

*Scrotoplasty:* surgical creation/reconstruction of testicles; in transmen, native labia tissue is used; testicular implants can be used

*Secondary sex characteristics:* physical characteristics that appear at puberty and vary by sex but are not directly involved in reproduction (e.g., breasts)

JA653

*Sex:* a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals (intersex is a rare exception)

*Sexual orientation:* sexual identity in relation to the gender to which someone is attracted: heterosexual, homosexual, or bisexual

*Thyroid chondroplasty:* removal or reduction of the Adam's apple

*Transdermal administration:* delivery of medication across the skin with patches

*Transgender:* "an umbrella term used for individuals who have sexual identity or gender expression that differs from their assigned sex at birth" (Roller, Sedlak, and Draucker, 2015, p. 417)

*Transsexual:* someone whose gender identity is inconsistent with their assigned sex and who desires to permanently transition their physical characteristics to match their inner sense of their own gender

*Urethroplasty:* surgical reconstruction or fabrication of the urethra.

*Vaginectomy (colpectomy):* surgical removal of all or part of the vagina

*Vaginoplasty:* surgical creation/reconstruction of a vagina

*Vulvoplasty:* surgical creation/reconstruction of the vulva

JA654

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR     Document 13-20     Filed 03/03/25     Page 98 of 113
USCA Case #25-5087     Document #2136523     Filed: 09/23/2025     Page 668 of 688

APPENDIX B

# History of DSM Terminology and Diagnoses

A brief historical understanding of the evolving diagnostic nomenclature pertaining to transgender status is important to discussions of related health care. DSM-III (APA, 1980) first contained the diagnosis of transsexualism. DSM-III-R (APA, 1987) introduced gender identity disorder, non-transsexual type. In DSM-IV (APA, 1994), these two diagnoses were merged and called *gender identity disorder*. Gender identity disorder, together with the paraphilias (disorders of extreme, dangerous, or abnormal sexual desire, including transvestic fetishism, sometimes referred to as cross-dressing), constituted the DSM-IV section "Sexual and Gender Identity Disorders."

With DSM-5 (APA, 2013) came the migration from *gender identity disorder* to *gender dysphoria*. The clinical significance of the shift in DSM-5 was great: For the first time, without accompanying symptoms of distress, transgender individuals were no longer considered to have a diagnosable mental disorder. The historical parallel with homosexuality is hard to miss: In 1980, DSM-III similarly normalized the DSM-II diagnosis of homosexuality, moving instead to ego-dystonic homosexuality, a diagnosis reserved only for gay persons who felt related distress. In the next DSM iteration, DSM-III-R, all reference to homosexuality as a diagnostic term was removed. In the aftermath of depathologizing gender nonconformity, a similar move relating to transgender status appears to be underway.

As noted in this report, there is a consensus among clinicians and their professional organizations that transition-related treatment with hormones or surgery constitutes necessary health care, though there is a divide over whether it serves as "a strategy to diminish the serious suffering" of the patient or "a method to assist people in finding self-actualization" (Gijs and Brewaeys, 2007, p. 184). The conclusion that transition-related surgery "is an effective treatment for gender identity disorder in adults" is based primarily on retrospective studies of satisfaction rather than randomized controlled trials or prospective studies (Gijs and Brewaeys, 2007, p. 199). The prevalence of postoperative regret is very low, though "little empirical research has been done" on related risk and protective factors (Gijs and Brewaeys, 2007, pp. 201, 204). Overall, surgery is considered "the most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals," but rigorous controlled-outcome studies evaluating its

effectiveness should be conducted despite feasibility and ethical challenges (Gijs and Brewaeys, 2007, pp. 215–216; Buchholz, 2015, p. 1786).

---

**DSM-5 Diagnostic Criteria: Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)**

A.   A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
   1.   A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
   2.   A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
   3.   A strong desire for the primary and/or secondary sex characteristics of the other gender.
   4.   A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
   5.   A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
   6.   A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
B.   The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

APPENDIX C

# Treatments for Gender Dysphoria

In this appendix, we provide additional details about psychosocial, pharmacologic, surgical, and other treatments for gender dysphoria (GD).

## Psychotherapy

The emphasis of psychotherapy for this population today is on "affirming a unique transgender identity," rather than focusing on gender transition (Institute of Medicine, 2011, p. 52). Mental health professionals can also help patients presenting with GD navigate the process of coming out to family, friends, and peers; treat comorbid mental health conditions;[1] weigh options related to gender identity, gender expression, and transition-related treatment interventions; and conduct assessments, make referrals, and guide preparation for and provide support through the transition-related treatment process (WPATH, 2011, pp. 22–26). Referral from a mental health professional is necessary under the standards of care for those seeking breast/chest or genital surgeries, and the latter also requires confirmation from an independent mental health provider (WPATH, 2011, p. 27). Mental health providers may also serve an important role on behalf of their patients by providing education and advocacy within the community and supporting changes to identity documents (WPATH, 2011, p. 31).

Of note, treatment aimed at changing one's gender identity to align with the sex assigned at birth has proven unsuccessful and is no longer considered ethical care; mental health providers who are unwilling or unable to provide appropriate care should refer patients to a provider who is (WPATH, 2011, p. 32).

## Hormone Therapy

Hormone therapy is necessary for many individuals with GD (WPATH, 2011, p. 33). It has two major goals: (1) reduce naturally occurring hormones to minimize secondary sex characteristics and (2) maximize desired feminization/masculinization using the principles and medications used for hormone replacement in non-transgender patients who do not produce enough hormones, such as women who have had hyster-

---

[1]   Co-occurring mental health conditions could range from anxiety and depression, which are common among the transgender population, to more severe and rare illnesses, such as schizophrenia or bipolar disorder.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 12-20    Filed 02/03/25    Page 101 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 671 of 688

80   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

ectomies or men with low testosterone (WPATH, 2011, p. 33; Hembree et al., 2009). As with most medications, there are risks, which may increase in the presence of some health conditions or behaviors (such as smoking); these should be evaluated and managed (Hembree et al., 2009).

For those transitioning from female to male, hormone therapy should lead to "deepened voice, clitoral enlargement (variable, 3–8 cm), growth in facial and body hair, cessation of menses, atrophy of breast tissue, increased libido, and increased percentage of body fat." For those transitioning from male to female, hormone therapy should lead to "breast growth (variable), decreased libido and erections, decreased testicular size, and increased percentage of body fat" (WPATH, 2011, p. 36). The timeline for these and other physical changes varies by individual; expected onset is within months, and maximum expected effect (such as body fat and muscle mass changes) is generally achieved in three or more years. Feminizing hormone therapy typically involves both estrogen and antiandrogens.[2] Masculinizing hormone therapy consists primarily of testosterone, which is available in oral, transdermal, parenteral (intravenous/intramuscular), buccal (cheek), and implantable administrations; brief use of progestin can help stop menstrual periods early in treatment (WPATH, 2011, p. 49). Detailed clinical practice guidelines are available from the Endocrine Society (Hembree et al., 2009).

### Gender Transition–Related Surgery

As noted, gender transition–related surgery (also called sex reassignment surgery or gender-confirming surgery) is necessary for some transgender patients. Under the standards of care, mental health professionals must refer patients for surgery; in addition, criteria for both breast/chest and genital surgery include persistent and well-documented GD, the capacity to make informed decisions and to consent, and for other mental or general health concerns to be reasonably well controlled if present (WPATH, 2011, p. 59). Hormone therapy is not a prerequisite for breast/chest (also called "top") surgery, though it is recommended for 12–24 months for male-to-female patients to achieve optimal results (Hembree et al., 2009).

For genital (also called "bottom") surgery, 12 continuous months of hormone therapy are required prior to oophorectomy or orchiectomy (surgical removal of ovaries or testicles), unless contraindicated; health record documentation of "12 continuous months of living in a gender role that is congruent with their gender identity . . . consistently, on a day-to-day basis and across all settings of life" is also required for metoidioplasty (surgical relocation of an enlarged clitoris), phalloplasty (surgical creation of a penis), or vaginoplasty (surgical creation of a vagina; WPATH, 2011,

---

[2]   Transdermal rather than oral estrogen is recommended. Common antiandrogens include spironolactone (an antihypertensive agent that requires electrolyte monitoring); cyproterone acetate (not approved in the United States); GnRH agonists, such as gosrelin, buserelin, or triptorelin (available as injectables or implants); and 5-alpha reductase inhibitors, such as finasteride and dutasteride (WPATH, 2011, p. 48).

pp. 60–61). Mastectomy is often the only surgery undertaken by the female-to-male population; for those who do undergo genital surgery, phalloplasty is relatively uncommon, as it often requires multiple procedures and has frequent complications (WPATH, 2011, pp. 63–64). Surgeons should work closely with patients and other care providers, if needed, to ensure that the advantages, disadvantages, and risks of various treatments and procedures are well understood.

**Other Treatments**

Aside from breast/chest and genital surgery, other surgical interventions may include liposuction, lipofilling, and various aesthetic procedures. For male-to-female patients, these may include "facial feminization surgery, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), [and] hair reconstruction"; female-to-male patients may seek pectoral implants (WPATH, 2011, pp. 57–58). There is ongoing debate regarding whether these and other transition-related treatments are "medically necessary" (and therefore covered by insurance). For example, in some circumstances, facial hair removal for male-to-female patients may constitute necessary transition-related treatment: One study found that those who have undergone the procedure were "less likely to experience harassment in public spaces," and harassment can "have a negative impact on the success of a person's treatment for gender dysphoria" (Herman, 2013b, p. 19). In addition, voice and communication therapy to develop vocal characteristics and nonverbal communication patterns congruent with gender identity may prevent "vocal misuse and long-term vocal damage" (WPATH, 2011, pp. 52–54).

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 72-20    Filed 02/03/25    Page 103 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 673 of 688

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR   Document 72-20   Filed 03/03/25   Page 104 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 674 of 688

APPENDIX D

# Review of Accession, Retention, and Separation Regulations

| Directive | Date | Department |
|---|---|---|
| Air Force Instruction 36-2002, *Regular Air Force and Special Category Accessions* | 4/7/1999, revised 6/2/2014 | Air Force |
| Air Force Instruction Guidance Memorandum AFI48-123_AFGM2015-01, "Guidance Memorandum: AFI 48-123, *Medical Examinations and Standards*" | 8/27/2015 | Air Force |
| Air Force Instruction Guidance Memorandum 48-123_AFGM4, "Air Force Guidance Memorandum to AFI 48-123, *Medical Examinations and Standards*" | 1/29/2013 | Air Force |
| Air Force Recruiting Service Instruction 36-2001, *Recruiting Procedures for the Air Force* | 8/1/2012 | Air Force |
| Air Force Instruction 41-210, *TRICARE Operations and Patient Administration Functions* | 6/6/2012 | Air Force |
| U.S. Army Recruiting Command, *Pocket Recruiter Guide* | 7/1/2013 | Army |
| Army Regulation 635-40, *Physical Evaluation for Retention, Retirement, or Separation* | 3/20/2012 | Army |
| Army Regulation 601-280, *Army Retention Program* | 9/15/2011 | Army |
| Army Regulation 40-501, *Standards of Medical Fitness* | 8/4/2011 | Army |
| Army Regulation 40-66, *Medical Record Administration and Healthcare Documentation* | 1/4/2010 | Army |
| Army Regulation 635-200, *Active Duty Enlisted Administrative Separations* | 9/6/2011 | Army |
| Army Regulation 601-210, *Active and Reserve Components Enlistment Program* | 3/12/2013 | Army |
| DoDI 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* | 4/28/2010, revised 9/13/11 | DoD |
| DoDI 1332.18, *Disability Evaluation System (DES)* | 8/5/2014 | DoD |
| Office of the Under Secretary of Defense for Personnel and Readiness, *Disability Evaluation System (DES) Pilot Operations Manual* | 12/2008 | DoD |

| Directive | Date | Department |
|---|---|---|
| Marine Corps Order 1040.31, *Enlisted Retention and Career Development Program* | 9/8/2010 | Marine Corps |
| Marine Corps Order 6110.3, *Marine Corps Body Composition and Military Appearance Program* | 8/8/2008 | Marine Corps |
| Marine Administrative Message 064/11, "Amplification to Testing Accession Standards for the Purpose of Application to Marine Office Commissioning Programs" | 1/26/2011 | Marine Corps |
| Navy Military Personnel Manual 1306-964, "Recruiting Duty" | 5/9/2014 | Navy |
| Navy Medicine Manual P-117, *Manual of the Medical Department*, Chapter 15, Article 15-31, "Waivers of Physical Standards" | 5/3/2012 | Navy and Marine Corps |

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 72-20    Filed 02/03/25    Page 106 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 676 of 688

# References

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, 3rd ed., Arlington, Va., 1980.

———, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)*, 3rd ed., revised, Arlington, Va., 1987.

———, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 4th ed., revised, Arlington, Va., 1994.

———, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, 5th ed., Arlington, Va., 2013a.

———, "Gender Dysphoria," fact sheet, 2013b. As of January 5, 2016: http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf

APA—*See* American Psychiatric Association.

Army Regulation 40-501, *Standards of Medical Fitness*, December 14, 2007, revised August 4, 2011.

Army Regulation 600-8-101, *Personnel Processing (In-, Out-, Soldier Readiness, and Deployment Cycle)*, February 19, 2015.

Bakker, A., P. J. van Kesteren, L. J. Gooren, and P. D. Bezemer, "The Prevalence of Transsexualism in the Netherlands," *Acta Psychiatrica Scandinavica*, Vol. 87, No. 4, April 1993, pp. 237–238.

Belkin, Aaron, "Caring for Our Transgender Troops—The Negligible Cost of Transition-Related Care," *New England Journal of Medicine*, Vol. 373, No. 12, September 17, 2015, pp. 1089–1092.

Belkin, Aaron, and Jason McNichol, "Homosexual Personnel Policy in the Canadian Forces: Did Lifting the Gay Ban Undermine Military Performance?" *International Journal*, Vol. 56, No. 1, Winter 2000–2001, pp. 73–88.

Blakely, Katherine, and Don J. Jansen, *Post-Traumatic Stress Disorder and Other Mental Health Problems in the Military: Oversight Issues for Congress*, Washington, D.C.: Congressional Research Service, August 8, 2013.

Blosnich, John R., Adam J. Gordon, and Michael J. Fine, "Associations of Sexual and Gender Minority Status with Health Indicators, Health Risk Factors, and Social Stressors in a National Sample of Young Adults with Military Experience," *Annals of Epidemiology*, Vol. 25, No. 9, September 2015, pp. 661–667.

British Army, "Diversity," web page, undated. As of January 4, 2016: http://www.army.mod.UK/join/38473.aspx

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR    Document 72-20    Filed 02/03/25    Page 107 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 677 of 688
86    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

Brown, David, "Amputations and Genital Injuries Increase Sharply Among Soldiers in Afghanistan," *Washington Post*, May 4, 2011. As of January 5, 2016:
https://www.washingtonpost.com/national/amputations-and-genital-injuries-increase-sharply-among-soldiers-in-afghanistan/2011/02/25/ABX0TqN_story.html

Brown, George R., "Transsexuals in the Military: Flight into Hypermasculinity," *Archives of Sexual Behavior*, Vol. 17, No. 6, December 1988, pp. 527–537.

Buchholz, Laura, "Transgender Care Moves into the Mainstream," *Journal of the American Medical Association*, Vol. 314, No. 17, November 3, 2015, pp. 1785–1787.

California Department of Health Services, *California Lesbian, Gay, Bisexual, and Transgender Tobacco Survey 2004*, San Francisco, Calif., 2004.

Canadian Armed Forces, Military Personnel Instruction 01/11, "Management of Transsexual Members," 2012.

Conron, Keith, Gunner Scott, Grace Sterling Stowell, and Stewart J. Landers, "Transgender Health in Massachusetts: Results from a Household Probability Sample of Results," *American Journal of Public Health*, Vol. 102, No. 1, January 2012, pp. 118–122.

Cox, Matthew, "Army Has 50,000 Active Soldiers Who Can't Deploy, Top NCO Says," *Military.com*, November 25, 2015. As of March 16, 2016:
http://www.military.com/daily-news/2015/11/25/army-has-50000-active-soldiers-who-cant-deploy-top-nco-says.html

De Cuypere, G., M. Van Hemelrijck, A. Michel, B. Carael, G. Heylens, R. Rubens, P. Hoebeke, and S. Monstrey, "Prevalence and Demography of Transsexualism in Belgium," *European Psychiatry*, Vol. 22, No. 3, 2007, pp. 137–141.

Defense Health Agency, TRICARE Management Activity, *Evaluation of the TRICARE Program: Access, Cost, and Quality, Fiscal Year 2015*, 2015. As of January 5, 2016:
http://www.health.mil/Military-Health-Topics/Access-Cost-Quality-and-Safety/Health-Care-Program-Evaluation/Annual-Evaluation-of-the-TRICARE-Program

DoD—*See* U.S. Department of Defense.

Eklund, P. L., L. J. Gooren, and P. D. Bezemer, "Prevalence of Transsexualism in the Netherlands," *British Journal of Psychiatry*, Vol. 152, No. 5, May 1988, pp. 638–640.

Elders, Joycelyn, Alan M. Steinman, George R. Brown, Eli Coleman, and Thomas A. Kolditz, *Report of the Transgender Military Service Commission*, Santa Barbara, Calif.: Palm Center, March 2014.

Ender, Morten G., David E. Rohall, and Michael D. Matthews, "Cadet and Civilian Undergraduate Attitudes Toward Transgender People: A Research Note," *Armed Forces and Society*, Vol. 42, No. 2, April 2016, pp. 427–435.

Flores, Andrew R., "Attitudes Toward Transgender Rights: Perceived Knowledge and Secondary Interpersonal Contact," *Politics, Groups, and Identities*, Vol. 3, No. 3, 2015.

Frank, Nathaniel, *Gays in Foreign Militaries 2010: A Global Primer*, Santa Barbara, Calif.: Palm Center, 2010.

Gates, Gary J., *How Many People Are Lesbian, Gay, Bisexual, and Transgender?* Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, April 2011.

Gates, Gary J., and Jody L. Herman, "Transgender Military Service in the United States," Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, May 2014.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 72-20    Filed 02/03/25    Page 108 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 678 of 688

References   87

Gijs, Luk, and Anne Brewaeys, "Surgical Treatment of Gender Dysphoria in Adults and Adolescents: Recent Developments, Effectiveness, and Challenges," *Annual Review of Sex Research*, Vol. 18, No. 1, 2007, pp. 178–224.

Gould, Elise, *A Decade of Declines in Employer-Sponsored Health Insurance Coverage*, Washington, D.C.: Economic Policy Institute, February 2012. As of January 5, 2016: http://www.epi.org/publication/bp337-employer-sponsored-health-insurance

Grant, Jaime M., Lisa A. Mottet, and Justin Tanis, with Jack Harrison, Jody L. Herman, and Mara Keisling, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Washington, D.C.: National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011.

Harrell, Margaret C., Laura Werber, Peter Schirmer, Bryan W. Hallmark, Jennifer Kavanagh, Daniel Gershwin, and Paul S. Steinberg, *Assessing the Assignment Policy for Army Women*, Santa Monica, Calif.: RAND Corporation, MG-590-1-OSD, 2007. As of March 17, 2016: http://www.rand.org/pubs/monographs/MG590-1.html

Harris, Benjamin Cerf, *Likely Transgender Individuals in the U.S. Federal Administrative Records and the 2010 Census*, Washington, D.C.: U.S. Census Bureau, May 4, 2015.

Hembree, Wylie C., Peggy Cohen-Kettenis, Henriette A. Delemarre–van de Waal, Louis J. Gooren, Walter J. Meyer III, Norman P. Spack, Vin Tangpricha, and Victor M. Montori, "Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline," *Journal of Clinical Endocrinology and Metabolism*, Vol. 94, No. 9, September 2009, pp. 3132–3154.

Herman, Jody L., *The Cost of Employment and Housing Discrimination Against Transgender Residents of New York*, Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, April 2013a.

———, *Costs and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans: Findings from a Survey of Employers*, Los Angeles, Calif.: Williams Institute, University of California, Los Angeles, School of Law, September 2013b.

Hoenig, J., and J. C. Kenna, "The Prevalence of Transsexualism in England and Wales," *British Journal of Psychiatry*, Vol. 124, No. 579, 1974, pp. 181–190.

Hoge, Charles W., Jennifer Auchterlonie, and Charles S. Millike, "Mental Health Problems, Use of Mental Health Services, and Attrition from Military Service After Returning from Deployment to Iraq or Afghanistan," *Journal of the American Medical Association*, Vol. 295, No. 9, March 1, 2006, pp. 1023–1032.

Horton, Mary Ann, "The Incidence and Prevalence of SRS Among US Residents," paper presented at the Out and Equal Workplace Summit, September 12, 2008. As of January 5, 2016: http://www.tgender.net/taw/thb/THBPrevalence-OE2008.pdf

Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*, Washington, D.C.: National Academies Press, 2011.

Intersex Society of North America, "What Is Intersex?" web page, undated. As of January 5, 2016: http://www.isna.org/faq/what_is_intersex

Kates, Jen, Usha Ranji, Adara Beamesderfer, Alina Salganicoff, and Lindsey Dawson, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, Menlo Park, Calif.: Henry J. Kaiser Family Foundation, July 2015.

Kauth, Michael R., Jillian C. Shipherd, Jan Lindsay, John R. Blosnich, George R. Brown, and Kenneth T. Jones, "Access to Care for Transgender Veterans in the Veterans Health Administration: 2006–2013," *American Journal of Public Health*, Vol. 104, No. S4, September 2014, pp. S532–S534.

Date visited: November 2, 2016

Case 1:25-cv-00240-ACR    Document 12-20    Filed 02/03/25    Page 109 of 113
USCA Case #25-5087    Document #2136523    Filed: 09/23/2025    Page 679 of 688
88    Assessing the Implications of Allowing Transgender Personnel to Serve Openly

Keen, Lisa, "Mass. Ranks Sixth for LGBT-Friendly Laws, Study Says," *Boston Globe*, May 28, 2015. As of March 17, 2016: https://www.bostonglobe.com/news/politics/2015/05/27/mass-ranks-sixth-for-lgbt-friendly-laws-study-says/sBX5TpZdNeusUo7Iuqs2qN/story.html

Lambda Legal, "Professional Organization Statements Supporting Transgender People in Health Care," last updated June 8, 2012. As of January 4, 2016: http://www.lambdalegal.org/sites/default/files/publications/downloads/fs_professional-org-statements-supporting-trans-health_1.pdf

McKibben, Jodi B. A., Carol S. Fullerton, Christine L. Gray, Ronald C. Kessler, Murray B. Stein, and Robert J. Ursano, "Mental Health Service Utilization in the U.S. Army," *Psychiatric Services*, Vol. 64, No. 4, April 2013, pp. 347–353.

Milhiser, Mark R., "Transgender Service: The Next Social Domino for the Army," *Military Law Review*, Vol. 220, Summer 2014, pp. 191–217.

Navy Medical Policy 07-009, *Deployment Medical Readiness*, April 6, 2007.

Norton, Aaron T., and Gregory M. Herek, "Heterosexuals' Attitudes Toward Transgender People: Findings from a National Probability Sample of U.S. Adults," *Sex Roles*, Vol. 68, No. 11, June 2013, pp. 738–753.

Office of the Assistant Secretary of Defense for Health Affairs, "Policy for Cosmetic Surgery Procedures in the Military Health System," Health Affairs Policy 05-020, October 25, 2005.

———, "Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications," memorandum, October 7, 2013.

Office of Personnel Management, *Addressing Sexual Orientation and Gender Identity Discrimination in Federal Civilian Employment*, Washington, D.C., June 2015.

Okros, Alan, and Denise Scott, "Gender Identity in the Canadian Forces," *Armed Forces and Society*, Vol. 41, No. 2, April 2015, pp. 243–256.

Padula, William V., Shiona Heru, and Jonathan D. Campbell, "Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis," *Journal of General Internal Medicine*, October 19, 2015.

Parco, James E., David A. Levy, and Sarah R. Spears, "Transgender Military Personnel in the Post-DADT Repeal Era: A Phenomenological Study," *Armed Forces and Society*, Vol. 41, No. 2, 2015, pp. 221–242.

Polchar, Joshua, Tim Sweijs, Phillip Marten, and Jan Gladega, *LGBT Military Personnel: A Strategic Vision for Inclusion*, The Hague, Netherlands: The Hague Centre for Strategic Studies, 2014.

Pollock, Gale S., and Shannon Minter, *Report of the Planning Commission on Transgender Military Service*, Santa Barbara, Calif.: Palm Center, August 2014.

RAND National Defense Research Institute, *Sexual Orientation and U.S. Military Personnel Policy: An Update of RAND's 1993 Study*, Santa Monica, Calif.: RAND Corporation, MG-1056-OSD, 2010. As of March 17, 2016: http://www.rand.org/pubs/monographs/MG1056.html

Rashid, Mamoon, and Muhammad Sarmad Tamimy, "Phalloplasty: The Dream and the Reality," *Indian Journal of Plastic Surgery*, Vol. 46, No. 2, May 2013, pp. 283–293.

Reed, Bernard, Stephenne Rhodes, Pietà Schofiled, and Kevan Wylie, *Gender Variance in the UK: Prevalence, Incidence, Growth and Geographic Distribution*, Surrey, UK: Gender Identity Research and Education Society, June 2009.

Roller, Cyndi Gale, Carol Sedlak, and Claire Burke Draucker, "Navigating the System: How Transgender Individuals Engage in Health Care Services," *Journal of Nursing Scholarship*, Vol. 47, No. 5, September 2015, pp. 417–424.

Ross, Allison, "The Invisible Army: Why the Military Needs to Rescind its Ban on Transgender Service Members," *Southern California Interdisciplinary Law Journal*, Vol. 23, No. 1, 2014, pp. 185–216.

Rostker, Bernard D., Scott A. Harris, James P. Kahan, Erik J. Frinking, C. Neil Fulcher, Lawrence M. Hanser, Paul Koegel, John D. Winkler, Brent A. Boultinghouse, Joanna Heilbrunn, Janet Lever, Robert J. MacCoun, Peter Tiemeyer, Gail L. Zellman, Sandra H. Berry, Jennifer Hawes-Dawson, Samantha Ravich, Steven L. Schlossman, Timothy Haggarty, Tanjam Jacobson, Ancella Livers, Sherie Mershon, Andrew Cornell, Mark A. Schuster, David E. Kanouse, Raynard Kington, Mark Litwin, Conrad Peter Schmidt, Carl H. Builder, Peter Jacobson, Stephen A. Saltzburg, Roger Allen Brown, William Fedorochko, Marilyn Fisher Freemon, John F. Peterson, and James A. Dewar, *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment*, Santa Monica, Calif.: RAND Corporation, MR-323-OSD, 1993. As of March 17, 2016:
http://www.rand.org/pubs/monograph_reports/MR323.html

Royal Australian Air Force, *Air Force Diversity Handbook: Transitioning Gender in Air Force*, July 2015.

Schaefer, Agnes Gereben, Jennie W. Wenger, Jennifer Kavanagh, Jonathan P. Wong, Gillian S. Oak, Thomas E. Trail, and Todd Nichols, *Implications of Integrating Women into the Marine Corps Infantry*, Santa Monica, Calif.: RAND Corporation, RR-1103-USMC, 2015. As of March 17, 2016:
http://www.rand.org/pubs/research_reports/RR1103.html

Sonier, Julie, Brett Fried, Caroline Au-Yeung, and Breanna Auringer, *State-Level Trends in Employer-Sponsored Health Insurance, A State-by-State Analysis*, Minneapolis, Minn.: State Health Access Data Center and Robert Wood Johnson Foundation, April 2013.

Speckhard, Anne, and Reuven Paz, "Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service," unpublished research paper, 2014. As of January 4, 2016:
http://www.researchgate.net/publication/280093066

State of California, Department of Insurance, "Economic Impact Assessment: Gender Nondiscrimination in Health Insurance," Regulation File Number: REG-2011-00023, April 13, 2012. As of January 5, 2016:
http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf

Szayna, Thomas S., Eric V. Larson, Angela O'Mahony, Sean Robson, Agnes Gereben Schaefer, Miriam Matthews, J. Michael Polich, Lynsay Ayer, Derek Eaton, William Marcellino, Lisa Miyashiro, Marek Posard, James Syme, Zev Winkelman, Cameron Wright, Megan Zander-Cotugno, and William Welser, *Considerations for Integrating Women into Closed Occupations in the U.S. Special Operations Forces*, Santa Monica, Calif.: RAND Corporation, RR-1058-USSOCOM, 2015. As of March 17, 2016:
http://www.rand.org/pubs/research_reports/RR1058.html

Tan, Michelle, "SMA Calls for Bonus Money for Soldiers on Deployment, at NTC," *Army Times*, November 1, 2015. As of March 16, 2016:
http://www.armytimes.com/story/military/benefits/pay/allowances/2015/11/01/sma-calls-bonus-money-soldiers-deployment-ntc/74821828

Tsoi, W. F., "The Prevalence of Transsexualism in Singapore," *Acta Psychiatrica Scandinavica*, Vol. 78, No. 4, 1988, pp. 501–504.

Date visited: November 2, 2016
Case 1:25-cv-00240-ACR   Document 72-20   Filed 02/03/25   Page 111 of 113
USCA Case #25-5087   Document #2136523   Filed: 09/23/2025   Page 681 of 688
90   Assessing the Implications of Allowing Transgender Personnel to Serve Openly

UK Ministry of Defence, "Policy for the Recruitment and Management of Transsexual Personnel in the Armed Forces," January 2009.

UnitedHealthcare, "Gender Dysphoria (Gender Identity Disorder) Treatment," Coverage Determination Guideline CDG.011.05, effective October 1, 2015. As of January 5, 2016: https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/Medical%20Policies/Medical%20Policies/Gender_Identity_Disorder_CD.pdf

U.S. Central Command, "PPG-TAB A: Amplification of the Minimal Standards of Fitness for Deployment to the CENTCOM AOR; to Accompany MOD ELEVEN to USCENTCOM Individual Protection and Individual/Unit Deployment Policy," December 2, 2013. As of March 17, 2016:
http://www.tam.usace.army.mil/Portals/53/docs/UDC/medical-disqualifiers.pdf

U.S. Department of Defense, *2014 Demographics: Profile of the Military Community*, Washington, D.C., 2014. As of January 5, 2016:
http://download.militaryonesource.mil/12038/MOS/Reports/2014-Demographics-Report.pdf

———, "DoD Announces Recruiting and Retention Numbers for Fiscal 2015, Through November 2014," press release, No. NR-001-15, January 6, 2015a. As of January 4, 2016:
http://www.defense.gov/News/News-Releases/News-Release-View/Article/605335

———, "Statement by Secretary of Defense Ash Carter on DoD Transgender Policy," press release, No. NR-272-15, July 15, 2015b. As of March 16, 2016:
http://www.defense.gov/News/News-Releases/News-Release-View/Article/612778

U.S. Department of Defense Instruction 1332.14, *Enlisted Administrative Separations*, January 27, 2014, incorporating change 1, December 4, 2014.

U.S. Department of Defense Instruction 1332.18, *Disability Evaluation System (DES)*, August 5, 2014.

U.S. Department of Defense Instruction 1332.30, *Separation of Regular and Reserve Commissioned Officers*, November 25, 2013.

U.S. Department of Defense Instruction 1332.38, *Physical Disability Evaluation*, November 14, 1996, incorporating change 1, July 10, 2006.

U.S. Department of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, April 28, 2010, incorporating change 1, September 13, 2011.

U.S. Government Accountability Office, *Personnel and Cost Data Associated with Implementing DOD's Homosexual Conduct Policy*, Washington, D.C., GAO-11-170. January 2011.

Van Kesteren, Paul J., Louis J. Gooren, and Jos A. Megens, "An Epidemiological and Demographic Study of Transsexuals in the Netherlands," *Archives of Sexual Behavior*, Vol. 25, No. 6, 1996, pp. 589–600.

Wålinder, Jan, "Transsexualism: Definition, Prevalence and Sex Distribution," *Acta Psychiatrica Scandinavica*, Vol. 43, No. S203, August 1968, pp. 255–257.

———, "Incidence and Sex Ratio of Transsexualism in Sweden," *British Journal of Psychiatry*, Vol. 119, No. 549, 1971, pp. 195–196.

Wallace, Duncan, "Trends in Traumatic Limb Amputation in Allied Forces in Iraq and Afghanistan," *Journal of Military and Veterans' Health*, Vol. 20, No. 2, April 2012.

Weitze, Cordula, and Susanne Osburg, "Transsexualism in Germany: Empirical Data on Epidemiology and Application of the German Transsexuals' Act During Its First Ten Years," *Archives of Sexual Behavior*, Vol. 25, No. 4, 1996, pp. 409–425.

Welsh, Ashley, "First U.S. Penis Transplants Planned to Help Wounded Vets," CBS News, December 7, 2015. As of January 5, 2016:
http://www.cbsnews.com/news/first-penis-transplants-planned-in-u-s-to-help-wounded-vets

Williams, Molly, and James Jezior, "Management of Combat-Related Urological Trauma in the Modern Era," *Nature Reviews Urology*, Vol. 10, No. 9, September 2013, pp. 504–512.

World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, version 7, Elgin, Ill., 2011.

WPATH—*See* World Professional Association for Transgender Health.

Yerke, Adam F., and Valory Mitchell, "Transgender People in the Military: Don't Ask? Don't Tell? Don't Enlist!" *Journal of Homosexuality*, Vol. 60, Nos. 2–3, 2013, pp. 436–457.

Zitun, Yoav, "IDF to Support Transgender Recruits Throughout the Sex Change Process," *YNET News*, December 26, 2014. As of January 4, 2016:
http://www.ynetnews.com/articles/0,7340,L-4608141,00.html

Zucker, Kenneth J., Susan J. Bradley, Allison Owen-Anderson, Sarah J. Kibblewhite, and James M. Cantor, "Is Gender Identity Disorder in Adolescents Coming out of the Closet?" *Journal of Sex and Marital Therapy*, Vol. 34, No. 4, June 2008, pp. 287–290.

Zucker, Kenneth J., and Anne A. Lawrence, "Epidemiology of Gender Identity Disorder: Recommendations for the Standards of Care of the World Professional Association for Transgender Health," *International Journal of Transgenderism*, Vol. 11, No. 1, 2009, pp. 8–18.

JA670

Current U.S. Department of Defense (DoD) policy bans transgender personnel from serving openly in the military. DoD has begun considering changes to this policy, but the prospect raises questions regarding access to gender transition–related health care, the range of transition-related treatments that DoD will need to provide, the potential costs associated with these treatments, and the impact of these health care needs on force readiness and the deployability of transgender service members. A RAND study identified the health care needs of the transgender population and transgender service members in particular. It also examined the costs of covering transition-related treatments, assessed the potential readiness implications of a policy change, and reviewed the experiences of foreign militaries that permit transgender service members to serve openly.



NATIONAL DEFENSE RESEARCH INSTITUTE

**www.rand.org**

$22.50

ISBN-10 0-8330-9436-X
ISBN-13 978-0-8330-9436-0



52250

RR-1530-OSD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,                )
                                       )
      Plaintiffs,                        )
                                         )
v.                                       )     Civil Action No. 1:25-cv-00240
                                         )
UNITED STATES OF AMERICA *et al.*,       )
                                         )
      Defendants.                        )
_____  )

### SUPPLEMENTAL DECLARATION OF YVETTE BOURCICOT

I, Yvette Bourcicot, declare as follows:

1.      I have reviewed the February 26 memorandum implementing the executive order banning transgender people from serving in the military. It is apparent from my review that this memo is designed to make accession of transgender people virtually impossible and to entirely purge currently serving transgender personnel from the armed forces. It is also clear that the interest that the policy serves is entrenching invidious discrimination against a minority group, and not military readiness.

2.      I have reviewed the waiver provisions in sections 4.1. (accessions) and 4.3. (retention) in the February 26 memorandum.

3.      The accessions waiver provision in 4.1. is designed to exclude anyone who is transgender from being able to obtain a waiver. The vast majority of accessions candidates are entry-level and presenting themselves to be trained as warfighters. Therefore, they would be unable to support the claim required by section 4.1.c. that "there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities."

4.      Moreover, the policy is designed to exacerbate a candidate's gender dysphoria. Per

1

section 4.1.c., the waiver requires a transgender person to serve in their birth sex. To the extent any transgender person could obtain a waiver for accessions under 4.1.c, they would be required to suppresses who they are as a transgender person. In my experience, such a person will experience distress directly stemming from their attempt to serve in their birth sex despite having a gender identity different than their birth sex. This would make them susceptible to administrative separation as set forth in section 4.3.

5.    Lastly, given the defendants' well-publicized animus towards transgender service members, it is extraordinarily unlikely that even if an accessions candidate were able to meet the onerous burdens imposed by the policy, that an approval authority would risk the personal and professional consequences of signing such a waiver. As a result, section 4.1 is effectively a ban on accessions for transgender people.

6.    Similarly, section 4.3 is an effective ban on retention of transgender service members, no matter how honorable their service or essential their duties. The waiver provisions are a barrier for anyone with a gender dysphoria diagnosis who is receiving supportive treatment.

7.    A transgender service member is only eligible to be considered for a waiver if they meet all of the following conditions: 1) they have been stable for 36 consecutive months in their birth sex without distress, 2) they have never attempted to transition their sex to align with their gender identity, and 3) they are willing to serve in their birth sex going forward. Given the previous policy which encouraged service members to work with their commands and medical providers to resolve their dysphoria with supportive treatment, no one can meet that standard. People who meet the first waiver condition are definitionally not transgender. Anyone stable in their birth sex for 36 consecutive months does not have gender dysphoria and is not covered by this policy. The second condition is equally problematic -- it is unlikely that anyone who received a gender dysphoria

2

diagnosis under the previous policy "never attempted" to experience inhabiting their gender identity. And the third requirement that a transgender service member must serve in their birth sex as a condition of a waiver is indeed no waiver – a waiver indicates the service will accept the service member's condition, rather than willfully ignoring and exacerbating it.

8.    To the final point, the discussion above regarding accessions recruits' requirement to serve in their birth sex applies to retention cases as well. If a person has an accurate gender dysphoria diagnosis, they cannot live in their birth sex without experiencing the distressing symptoms of gender dysphoria. Treatment for gender dysphoria includes providing a transgender person the opportunity to express themselves consistent with their gender identity and not in their birth sex. Accordingly, there is no retention waiver that requires a transgender person to live in their birth sex that would not specifically contradict their treatment plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

Yvette Bourcicot

4

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.


*s/ Amanda L. Mundell*
Amanda L. Mundell