United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-5087** **September Term, 2026**

**1:25-cv-00240-ACR**

**Filed On:** November 17, 2026

Nicolas Talbott, et al.,

Appellees

v.

United States of America, et al.,

Appellants

**BEFORE:** Wilkins* and Walker**, Circuit Judges; and Rogers, Senior Circuit Judge

**O R D E R**

Upon consideration of appellants' motion to stay issuance of the mandate pending the filing and disposition of a petition for a writ of certiorari, the response thereto, the reply, and the notices, it is

**ORDERED** that the motion be denied. The Clerk is directed to issue the mandate forthwith.

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY: /s/
Daniel J. Reidy
Deputy Clerk

*A statement by Circuit Judge Wilkins is attached.
**Circuit Judge Walker would grant this motion.

WILKINS, *Circuit Judge*: In *Talbott v. United States*, 176 F.4th 720 (D.C. Cir. 2026), this Panel reviewed a Department of Defense policy ("Hegseth Policy") that disqualifies from military service people who express what the Department believes is a "false gender identity." *Id.* at 726. We held that this Policy likely violates equal protection because it is not rationally related to any legitimate government interest. On the equities, I found that an injunction against the Policy's accession standards—unlike its retention standards—may cause irreparable harm to the government. So I voted with Judge Rogers to affirm the District Court's injunction against the expulsion of currently serving Plaintiffs, while Judge Walker and I voted to vacate the injunction as to the Plaintiffs seeking accession into the military.

The government now asks that we stay our mandate pending the disposition of its petition for a writ of certiorari. That requires the government to establish both that its petition would "present a substantial question" and "that there is good cause for a stay." Fed. R. App. P. 41(d)(1). We determine good cause "against the court's long-standing principles governing stays pending appeal," which requires the movant to establish "irreparabl[e] harm absent a stay." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 129 F.4th 869, 871 (D.C. Cir. 2025).

Because the government has failed to meet that burden, I vote to deny a stay. In its motion, the government has not alleged any irreparable harm that will result from retention of the currently serving Plaintiffs—decorated servicemembers who have "served honorably" while meeting "all military standards during their service." *Talbott*, 176 F.4th at 748. Instead of contesting these facts, the government generically asserts that our mandate requires the military to "implement a policy" that it believes "poses 'substantial risks' to an effective national defense." Gov't Mtn. for Stay at 9. But the Department has never specified—before the District Court, on appeal, or now in its motion to stay—*what* national security

"risks" will follow from retaining the serving Plaintiffs. *See Talbott*, 176 F.4th at 748–49. Yet that is all our mandate requires.

The Supreme Court's stay in *United States v. Shilling*, 145 S. Ct. 2695 (2025), does not disturb this understanding of the equities. *Shilling* involved a universal injunction that barred enforcement of the Hegseth Policy on retention *and* accession. By contrast, this Panel has affirmed the District Court's injunction only as to the retention of specified plaintiffs. The equities in this appeal therefore "differ" in at least one key "respect" from *Shilling*. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Further, our injunction differs in scope. There, the injunction blocked the Hegseth Policy in its entirety; here, this injunction has been narrowed to cover only a limited group of currently serving Plaintiffs.

To the extent the government suggests that *any* injunction against the Executive Branch imposes irreparable harm, I am also unpersuaded. Such a "broad and seemingly novel proposition" is untethered to both this Court's and the Supreme Court's long-standing practice. *Miot v. Trump*, No. 26-5050, 2026 WL 659420, at *4 (D.C. Cir. Mar. 6, 2026) (per curiam). As we have repeatedly said, irreparable injury must be both "certain and great," "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted); *see Nken v. Holder*, 556 U.S. 418, 434–35 (2009). The Supreme Court has accordingly pointed to concrete injuries—not abstract executive interests—when the government has shown irreparable harm justifying a stay. *See, e.g.*, *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, No. 26A203, 2026 WL 2564318, at *3 (U.S. Aug. 31, 2026) (citing declarations attesting that enjoined ballroom's height and mass was "crucial" to "security" of below-ground installation); *cf. Murthy v. Missouri,* 144 S. Ct. 7, 8–10 (2023)

(Alito, J., dissenting) (noting government must make a "clear showing" of "imminent" irreparable harm under the "settled test for granting a stay"). Likewise, the Supreme Court has found that the equities weighed *against* the government even when it asserted that an injunction intruded on executive powers. *See, e.g.*, Application for Stay at 38, *Dep't of Educ. v. Louisiana*, No. 24A78 (U.S. July 22, 2024) (arguing that injunction preventing "Department from fulfilling its statutory mandate" inflicted irreparable harm); *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (finding government failed to show that "the equities favor a stay"); *cf.* Application for Stay at 35, *Trump v. Kingdom*, No. 26A416 (U.S. Sept. 28, 2026) (arguing that an injunction "prevent[ing] the application of the Executive's chosen policy" caused irreparable harm); *Trump v. Kingdom*, No. 26A416, 2026 WL 3147418, at *1 (U.S. Oct. 21, 2026) (denying stay).[1] So it cannot be that a mere assertion of executive prerogative suffices to show irreparable harm.

The equities therefore cut against the government. And there is also no "good cause" for a stay based on an intervening change in the merits. After our opinions in *Talbott* were published, the Supreme Court released its decision in *West Virginia v. B.P.J.,* holding that, under the Equal Protection Clause, schools may restrict "eligibility for women's and girls' sports based on biological sex." 146 S. Ct. 2356, 2367 (2026). The government suggests that this decision "casts doubt on this Court's analysis," Gov't Mtn. for Stay at 8, but I do not agree.

---

[1] As Justice Jackson has pointed out, other examples abound. *Noem v. Doe*, 145 S. Ct. 1524, 1528 (2025) (Jackson, J., dissenting) (listing Supreme Court's "repeated[]" denial of stay requests when the government asserted irreparable harm based on a "substantial interest in carrying out the President's policies").

The government first points to *B.P.J.*'s description of intermediate scrutiny. There, the Supreme Court recognized that, under intermediate scrutiny, the "validity" of a policy is judged "by the relation it bears to the general problem" rather than "by the extent to which it furthers the Government's interest in an individual case." *B.P.J.,* 146 S. Ct. at 2376 (citation omitted). So "long as the relationship is sufficient as a general matter," the Supreme Court also wrote, the government is not constitutionally required to grant "individualized exemptions." *Id.* at 2377. The government suggests that our analysis is inconsistent with these principles, pointing to our emphasis on the Hegseth Policy's exclusion of servicemembers with only a remote history of gender dysphoria. Gov't Mtn. for Stay at 8.

But the government misunderstands both *B.P.J.* and this Panel's holdings. In *B.P.J.*, the Supreme Court reviewed a classification—the explicitly sex-based division of sports—that the challengers conceded was valid as to "most biological males." *Id.* at 2375. As a result, the question in *B.P.J.* was whether that *generally valid* sex-based classification was constitutional *as applied to* transgender girls who had taken puberty blockers. *Id.* That is very different from the question in this case: whether the Hegseth Policy's classifications are *valid to begin with*. On that sort of facial challenge, this Court appropriately looked to the Policy's scope and operation to determine the true basis for the classification: gender dysphoria, as the government suggested, or gender identity? *See United States v. Skrmetti*, 605 U.S. 495, 514 (2025) (recognizing that "a State may not circumvent" equal protection scrutiny "by writing in abstract terms"). And we found that, because of the Policy's sweeping breadth—and its failure to treat gender dysphoria similarly to other mental-health conditions—that it classifies based on gender identity, not gender dysphoria. *See Talbott*, 176 F.4th at 742 (finding

that, under the Hegseth Policy, "having the correct gender identity is all that matters"); *id.* at 752 (Rogers, J., concurring in part and dissenting in part) (finding that the Hegseth Policy "appears designed to target a group of disfavored people, not to address a particular medical condition").

Consider, for instance, the Policy's categorical bar on waivers for anyone who has "attempted to" transition. J.A. 210. Under the plain language of that provision, even a "compelling Government interest in . . . retaining" a servicemember "that directly supports the Department's warfighting capabilities" is not enough to prevent their expulsion, so long as that servicemember has *ever* "attempted to transition," J.A. 210—such as a "biological woman wearing slacks and a tie." *Talbott*, 176 F.4th at 736. And indeed, the government conceded below that this language sweeps so broadly as to include attempts to socially transition; when invited by the District Court to say otherwise, the government declined to offer any alternative interpretation. Defendants' Notice to Court at 1, *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Mar. 17, 2025), ECF No. 86; *Talbott*, 176 F.4th at 736 n.8. Given that settled record, we found that the Policy necessarily classifies based on gender identity because it discriminates based on the clothes someone once wore or the pronouns they once used. *See Skrmetti*, 605 U.S. at 516 (suggesting a requirement that children wear "sex-consistent clothing" could constitute sex stereotyping).

Properly understood, then, the Panel's holding does not turn on the Hegseth Policy's application to any particular plaintiff. *Cf. B.P.J.,* 146 S. Ct. at 2376. Rather, we looked at how the Policy works—which necessarily involves its many applications—in order to discern *how it classifies*. *See Skrmetti*, 605 U.S. at 512 (considering "the application of SB1" to determine the relevant classification). Having done that, we

next asked whether those classifications were rationally related to the "overall problem the government seeks to correct." *B.P.J.*, 146 S. Ct. at 2376 (citation omitted). And at that juncture, the Policy flunked rational-basis review. The government had no explanation of how a classification targeting "false gender identity" (rather than gender dysphoria) connects to the overall problem identified: "rigorous standards for military services." *Talbott*, 176 F.4th at 742. All the Department offered were the "foundational premises of the Hegseth Policy"—that people with a "false gender identity" are "unfit for the military." *Id.* at 745. But such "stereotyping" is not a legitimate government interest. *Skrmetti*, 605 U.S. at 516. To the contrary, unsupported generalizations are "strong evidence of a law having the purpose and effect of disapproval of" a "class" of people. *Talbott*, 176 F.4th at 746 (quoting *United States v. Windsor*, 570 U.S. 744, 770 (2013)); *id.* at 754 (Rogers, J., concurring in part and dissenting in part) (finding that features of the Hegseth Policy "are inexplicable by anything other than animus").

In fact, by holding open the possibility of heightened scrutiny for transgender classifications, *B.P.J.* buttresses these conclusions. As *B.P.J.* noted, "if a school had a co-ed sports team but prohibited all transgender individuals from participating on the team, that would be a distinct transgender classification." *B.P.J.*, 146 S. Ct. 2378. That is the Hegseth Policy in a nutshell. Through classifications targeting so-called false gender identity, the Department has effectively "prohibited all transgender individuals from participating" in the military. *Id.* While this Panel did not apply heightened scrutiny on such a basis, *B.P.J.* keeps this doctrinal path open, which—if taken—would render the Hegseth Policy's unreasoned classifications doubly insufficient.

***

For these reasons, I vote to deny the government's motion to stay the mandate.